**No. 20-17490**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PANGEA LEGAL SERVICES, et al.
Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.
Defendants-Appellants.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA

## APPELLANTS' EXCERPTS OF RECORD

## VOL. 2 OF 12

JOHN V. COGHLAN
*Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice
Civil Division
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
PATRICK GLEN
CHRISTINA P. GREER
*Senior Litigation Counsel*
CRAIG NEWELL
*Trial Attorney*

Naomi Igra, SBN 269095
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Sirine Shebaya (*pro hac vice* pending)
sirine@nipnlg.org
NATIONAL IMMIGRATION PROJECT OF
THE NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue NW, Suite 200
Washington, D.C. 20007
Telephone: +1 202 656 4788

Sabrineh Ardalan (*pro hac vice* pending)
sardalan@law.harvard.edu
HARVARD LAW SCHOOL
HARVARD IMMIGRATION AND REFUGEE
CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone: +1 617 384 7504

Leila Kang (*pro hac vice* pending)
leila@immdefense.org
IMMIGRANT DEFENSE PROJECT
40 W. 39th Street, Fifth Floor
New York, NY 10018
Telephone: +1 646 762 8428

*Attorneys for Plaintiffs*                    (Additional counsel listed on signature page)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| PANGEA LEGAL SERVICES, *et al.*, | Case No. 3:20-cv-7721 |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE** |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY *et al.*, | Assigned to Hon. |
| Defendants. | Date:<br>Time:<br>Courtroom: |

ER-0052

1

## **TABLE OF CONTENTS**

I.   INTRODUCTION ......................................................................................................1

II.  BACKGROUND .....................................................................................................2

    A.   The INA's asylum provisions. ......................................................................2

    B.   The proposed Rule. .......................................................................................3

    C.   The final Rule. ..............................................................................................4

III. LEGAL STANDARD ..............................................................................................5

IV.  ARGUMENT ...........................................................................................................5

    A.   Plaintiffs are likely to succeed on the merits. ..............................................5

        1.   The Rule conflicts with the governing INA provisions. .....................5

            a.   The Rule's new categorical asylum bars are not "consistent with" Congress's carefully drawn regime. ....................5

            b.   The Rule's treatment of conviction vacaturs or modifications is inconsistent with the statute. ....................13

        2.   Some of the Rule's categorical bars are unconstitutionally vague. ..................15

        3.   The Rule is arbitrary and capricious. .................................................16

            a.   The Rule does not articulate a satisfactory explanation. ......................16

            b.   The rule fails to consider important aspects of the problem. ...............17

        4.   The Rule is procedurally invalid. ......................................................21

            a.   The Rule was adopted without sufficient opportunity for public comment. ...........................21

            b.   The Rule does not properly analyze its impacts on federalism. ..........22

            c.   The Rule does not comply with the Regulatory Flexibility Act. .........23

    B.   The Rule will irreparably harm Plaintiffs and the people they serve. .........24

    C.   The equities and the public interest favor injunctive relief. .........................25

    D.   The Court should enjoin the Rule's national implementation. .....................25

V.   CONCLUSION .......................................................................................................25

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CAS NO. 3:20-cv-7721

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adams v. Commonwealth*,
    46 S.W.3d 572 (Ky. Ct. App. 2000) ...................................................................... 7

*Alim v. Gonzales*,
    446 F.3d 1239 (11th Cir. 2006) ........................................................................... 14

*Alphonsus v. Holder*,
    705 F.3d 1031 (9th Cir. 2013) ........................................................................... 6, 7

*Am. Fed. of Labor v. Chertoff*,
    552 F. Supp. 2d 999 (N.D. Cal. 2007) ................................................................ 23

*Am. Min. Congress v. EPA*,
    965 F.2d 759 (9th Cir. 1992) .............................................................................. 18

*Barapind v. Reno*,
    225 F.3d 1100 (9th Cir. 2000) .............................................................................. 3

*Cal. ex rel. Becerra v. Dep't of Interior*,
    381 F. Supp. 3d 1153 (N.D. Cal. 2019) .............................................................. 21

*Cal. PUC v. FERC*,
    879 F.3d 966 (9th Cir. 2018) .............................................................................. 16

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) .............................................................................. 22

*Delgado v. Holder*,
    648 F.3d 1095 (9th Cir. 2011) (en banc) ............................................................ 10

*Doe #1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) ............................................................................ 25

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) (*EBSC I*) ........................................................... 9, 25

*E. Bay Sanctuary Covenant v. Trump*,
    950 F.3d 1242 (9th Cir. 2020) (*EBSC II*) ..................................................*passim*

*E. Bay Sanctuary Covenant v. Barr*,
    964 F.3d 832 (9th Cir. 2020) (*EBSC III*) ...................................................*passim*

*Guerrero v. Whitaker*,
    908 F.3d 541, 544 (9th Cir. 2018) ............................................................ 6, 7, 15

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

*Idaho Farm Bureau Fed'n v. Babitt*,
  58 F.3d 1392 (9th Cir. 1995) .................................................................. 21

*In re L-S-*,
  22 I. & N. Dec. 645 (BIA 1999) ............................................................... 9

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) ................................................................................ 13

*Johnson v. United States*,
  135 S. Ct. 2551 (2015) ............................................................................ 15

*Kolender v. Lawson*,
  461 U.S. 352 (1983) ................................................................................ 16

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) .................................................................... 25

*M.R. v. Dreyfus*,
  735 F.3d 1058 (9th Cir. 2011) .................................................................. 5

*Matthews v. State*,
  296 So. 3d 887 (Ala. Crim. App. 2019) ................................................... 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ........................................................................... 16, 18

*N.C. Growers' Ass'n v. UFW*,
  702 F.3d 755 (4th Cir. 2012) .................................................................. 21

*NAM v. Dep't of Def.*,
  138 S. Ct. 617 (2018) .............................................................................. 11

*Padilla v. Kentucky*,
  559 U.S. 356 (2010) ................................................................................ 14

*Portland Cement Ass'n v. EPA*,
  665 F.3d 177 (D.C. Cir. 2011) .......................................................... 19, 21

*Matter of Pula*,
  19 I. & N. Dec. 467 (BIA 1987) ........................................................ 16, 17

*R-S-C v. Sessions*,
  869 F.3d 1176 (10th Cir. 2017) ................................................................ 7

*Ramirez-Castro v. INS*,
  287 F.3d 1172 (9th Cir. 2002) ................................................................ 14

*San Francisco v. USCIS*,
  408 F. Supp. 3d 1057 (N.D. Cal. 2019) ................................................... 5

ER-0055

iii

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018)..................................................................................................15

*Solid Waste Agency of N. Cook. Cnty. v. U.S. Army Corps of Eng'rs*,
  531 U.S. 159 (2001)....................................................................................................15

*Specialty Equip. Market Ass'n v. Ruckelshaus*,
  720 F.2d 124 (D.C. Cir. 1983)...................................................................................18

*State v. Hittle*,
  257 Neb. 344 (Neb. 1999)...........................................................................................7

*United States v. Davis*,
  139 S. Ct. 2319 (2019)................................................................................................15

*Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.*,
  435 U.S. 519 (1978)....................................................................................................21

*Waits v. State*,
  56 S.W.3d 894 (Tex. App. 2001).................................................................................8

**Statutes**

5 U.S.C. §§ 603–604.............................................................................................................23

    § 604(a)(6)..........................................................................................................23

    § 705....................................................................................................................5

    § 706(2)................................................................................................................5

8 U.S.C. § 1101(a)(42)(A)......................................................................................................3

    § 1101(a)(43)(B)................................................................................................8

    § 1101(a)(43)(B), (F), (K), (U)........................................................................12

    § 1101(a)(43)(N).........................................................................................6, 9

    § 1101(a)(43)(O)...............................................................................................10

    § 1158(a)(1).........................................................................................................9

    § 1158(b)(1)(A)..................................................................................................3

    § 1158(b)(2)(A).............................................................................................1, 6

    § 1158(b)(2)(A)(i)–(vi).....................................................................................3

    § 1158(b)(2)(A)(ii)............................................................................................6

    § 1158(b)(2)(A)(ii), (b)(2)(B)(i)......................................................................11

    § 1158(b)(2)(A)(vi)..........................................................................................6

    § 1158(b)(2)(B)(i).............................................................................................6

    § 1158(b)(2)(B)(ii).......................................................................................4, 13

§ 1158(b)(2)(C) ............................................................................ 6, 7

§ 1227(a)(7)(A) ............................................................................ 11

§ 1231(b)(3) .................................................................................. 4

§ 1252(a)(2)(A)(iii) ................................................................. 19, 20

§ 1324(a) ................................................................................... 3, 9

§ 1324(a)(1)(A), (a)(2) ................................................................. 9

§ 1326 ..................................................................................... 3, 10

§ 1326(a) ...................................................................................... 9

16 U.S.C. § 3373(d)(1) ..................................................................... 8

18 U.S.C. § 521(c) ......................................................................... 12

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ...................... 3

Ariz. Rev. Stat. § 13-1604(A)(2), (B)(1)(a) ...................................... 8

Fla. Stat. § 784.048(1)(d), (2) ........................................................ 12

Md. Code, Alco. Bev. § 6-307 ........................................................... 8

Md. Crim. L. § 3-804(a)(l) ................................................................ 8

§ 7-203 ............................................................. 8

Nev. Rev. Stat. 453.411(1), (3)(a) .................................................... 8

**Regulatory Materials**

8 C.F.R. § 208.16(e) ........................................................................ 4

*Procedures for Asylum and Bars to Asylum Eligibility*,
    84 Fed. Reg. 69640 (Dec. 19, 2020) ............................................ *passim*

*Procedures for Asylum and Bars to Asylum Eligibility*,
    85 Fed. Reg. 67202 (Oct. 21, 2020) ............................................. *passim*

*Asylum Application, Interview, and Employment Authorization for Applicants*,
    84 Fed. Reg. 62396 (Nov. 14, 2019) ................................................ 19

*Asylum Application, Interview, and Employment Authorization for Applicants*,
    85 Fed. Reg. 38532 (June 26, 2020) ................................................. 19

*U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain
    Other Immigration Benefit Request Requirements*,
    85 Fed. Reg. 4243 (Jan. 24, 2020) .................................................. 21

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

*Procedures for Asylum and Withholding of Removal, Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 36264 (June 15, 2020)..............................................................19

**Legislative and Executive Materials**

H.R. Conf. Rep. 96-781, at 17–18 (1980)...............................................................................3

H.R. Rep. No. 96-608 (1979).............................................................................................3, 6

*Exec. Order No. 13132*, 64 Fed. Reg. 43,255 (Aug. 10, 1999) ..........................................23

*Exec. Order No. 13563*, 76 Fed. Reg. 3,821 (Jan. 21, 2011) .............................................21

*Exec. Order No. 12866*, 58 Fed. Reg. 190 (Sept. 30, 1993) ..............................................21

**Other Authorities**

Immig. Legal Res. Ctr., *Deportation by any Means Necessary: How Immigration Officials are Labeling Immigrant Youth as Gang Members* (2018), https://bit.ly/31TBNSD ...........................................................................................................12

U.S. Comm'n on Int'l Relig. Freedom, *Serious Flaws in U.S. Treatment of Asylum Seekers in Expedited Removal: Children Especially Harmed* (Aug. 2, 2016), https://bit.ly/2Jeaigc .............................................................................................................20

UNHCR, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* (July 2007), http://www.unhcr.org/enus/576d237f7.pdf ...............8

UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* (1979), https://www.unhcr.org/4d93528a9.pdf ...................................................................7

HARVEY SILVERGLATE, THREE FELONIES A DAY (2011)....................................................8

# I.    INTRODUCTION

The Departments of Justice and Homeland Security have—without proper procedure or reasoned decision-making—issued a Rule that conflicts directly with the statutory asylum regime.  The Rule would impose several new categorical bars to asylum eligibility based on convictions for—or mere suspicion of—generally minor criminal offenses.  A second misdemeanor conviction for marijuana possession; a misdemeanor conviction for using a fake ID; a misdemeanor vandalism conviction for graffiti that the government has "reason to believe" is a gang sign; literally *any* felony, from driving with a suspended license to unlawfully exporting fish—all would now bar people from asylum in the United States, even if they could show a well-founded fear of persecution in their home countries.  The Rule also empowers asylum adjudicators to second-guess judges' reasons for vacating or modifying criminal convictions, and it removes regulations governing automatic reconsideration of discretionary asylum denials.  If allowed to take effect, these unprecedented changes will force countless people to return to countries where they will likely be beaten, tortured, or even killed.

The Rule violates the APA because it conflicts with the Immigration and Nationality Act (INA).  Consistent with the international obligations that undergird our asylum system, Congress in the INA made only narrow categories of people ineligible for asylum based on their conduct:  Those who have persecuted others, who have committed a "serious nonpolitical crime" abroad or been convicted of a "particularly serious crime," who are a "danger to the security of the United States," or who have engaged in terrorist activity.  8 U.S.C. § 1158(b)(2)(A).  These bars all address people "who pose a threat to society."  *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 846 (9th Cir. 2020) (*EBSC III*).  And any additional regulatory bars must be "consistent with" this "core principle."  *Id*. at 848 (quoting 8 U.S.C. § 1158(b)(2)(C)).  The Rule's new bars flunk that test.  They address conduct that does not come close to the level Congress specified, and they are not remotely tailored to address dangerousness.  And apart from conclusory and unsupported assertions, Defendants do not really try to show otherwise.  Instead, they declare that these bars exclude people who show "a disregard for the societal values of the United States" and thus "should not be rewarded with asylum."  85 Fed. Reg. at 67225, 67242.  But that is not the statutory principle.  Nor is it the humanitarian commitment we made to refugees and other nations.  The Rule thus conflicts with Congress's carefully drawn asylum regime.

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CAS NO. 3:20-cv-7721

The Rule is unlawful for other reasons, too. The INA provides no support for the presumption that state court orders vacating convictions to cure constitutional or substantive errors can be ignored because they actually have other purposes. And some of the Rule's bars are so vague that they violate due process. The Rule is also arbitrary and capricious: It departs from longstanding agency precedent without adequate explanation and fails to offer substantial evidence to support its conclusions or to consider important aspects of the issues presented. What is more, the Rule is procedurally invalid. Defendants provided just 30 days, spanning the 2019 end-of-year holidays, to comment on this major overhaul of the asylum system, which was also part of an improperly staggered rulemaking process. Nor does the Rule conduct the federalism or regulatory-flexibility analyses that federal law required.

Unless this Court stops the Rule from taking effect on November 20, it will cause immediate, irreparable harm. Under the Rule, Plaintiffs—nonprofits that help low-income immigrants seek asylum and provide resources and training to others who help asylum-seekers—will be forced to "divert resources away from [their] core programs to address the new policy." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020) (*EBSC II*). They will have to devote significant resources to analyzing and interpreting the Rule, creating new informational materials and resources, and re-training thousands of people. The Rule's changes will also make it more difficult (or impossible) for legal assistants and law students to perform tasks like client intake. And it will cause "ongoing harms to [Plaintiffs'] organizational missions," *EBSC III*, 964 F.3d at 854, by increasing the time spent on each asylum seeker's case. Plaintiffs will thus "provid[e] fewer services to fewer individuals," frustrating their missions. *Id*. For the same reasons, the Rule "directly threatens their standard caseload, and consequently, their caseload[] dependent funding." *Id*. These harms are all irreparable.

The public interest and equities also favor relief. There is a strong interest in preventing the wrongful removal and possible deaths of asylum-seekers, and in ensuring that the government follows the law. The Court should enjoin or stay the Rule's effectiveness before November 20.

## II. BACKGROUND

### A. The INA's asylum provisions.

The U.S. asylum system is founded on the 1951 Convention Relating to the Status of Refugees (Refugee Convention) and the 1967 U.N. Protocol Relating to the Status of Refugees (1967 Protocol),

by way of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. "In enacting the Refugee Act, Congress sought to bring United States refugee law into conformity with the" 1967 Protocol, which in turn "incorporates the substantive provisions" of the Refugee Convention. *Barapind v. Reno*, 225 F.3d 1100, 1106 (9th Cir. 2000). The Refugee Act amended the INA to include a formal process for people fearing persecution to apply for asylum, thus codifying our long tradition of "welcoming the oppressed of other nations." H.R. Conf. Rep. 96-608, at 17 (1979).

Today, a person may seek asylum in the United States "because of persecution or a well-founded fear of persecution" on a protected ground. 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). Among other criteria, a person must not (i) have participated in the persecution of others; (ii) have "been convicted by a final judgment of a particularly serious crime," thus "constitut[ing] a danger to the community of the United States"; (iii) have committed a "serious nonpolitical crime outside the United States"; (iv) be "a danger to the security of the United States"; (v) have engaged in terrorist activity or been part of a terrorist group; or (vi) have "firmly resettled in another country." *See id.* § 1158(b)(2)(A)(i)–(vi). Congress codified these provisions "so that U.S. statutory law clearly reflects our legal obligations under international agreements." *See* H.R. Rep. No. 96-608, at 18 (1979).

**B.      The proposed Rule.**

Defendants proposed the Rule on December 19, 2019, just before the year-end holidays. *See* 84 Fed. Reg. 69640. The proposal included several new categorical bars to asylum eligibility:

(i)      any felony conviction under federal, state, or local law;

(ii)     any conviction for specified misdemeanor offenses, including any drug-related offense (except first-time marijuana possession), any offense involving possession or use of a false identification document, or unlawfully receiving public benefits.

(iii)    any conviction for "smuggling or harboring" non-citizens under 8 U.S.C. § 1324(a);

(iv)    any conviction for illegal reentry under 8 U.S.C. § 1326;

(v)     any conviction for a DUI offense that resulted in serious bodily injury or death, or for any second or subsequent DUI offense, even if no one was injured;

(vi)    any conviction for various family- or child-related offenses like stalking or child neglect, or any situation where there are "serious reasons for believing" the person engaged in "acts of battery or extreme cruelty" in a domestic relationship, even without a conviction; and

3

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

(vii) any conviction for an offense the asylum adjudicator "knows *or has reason to be-lieve* was committed in support, promotion, or furtherance of the activity of a crim-inal street gang."

84 Fed. Reg. at 69659–60 (emphasis added). As authority for these new bars, the proposal invoked 8 U.S.C. § 1158(b)(2)(B)(ii), which allows the Attorney General to designate "offenses that will be con-sidered" particularly serious crimes, and § 1158(b)(2)(C), which allows the Attorney General to "es-tablish additional limitations and conditions, consistent with this section, under which [a noncitizen] shall be ineligible for asylum." *See* 84 Fed. Reg. at 69643–44.

The proposed Rule also presumed that criminal convictions remain effective (and thus trigger the asylum bars) despite any vacatur, expungement, or modification, if (a) the vacatur or modification order was entered after removal proceedings began or (b) the applicant moved for the order more than a year after conviction or sentencing—even if the order was made to correct constitutional or substan-tive legal defects. *See id.* at 69654–55. It placed the burden on the asylum-seeker to establish that any vacatur or modification to the underlying conviction or sentence was not made for rehabilitative or "immigration purposes," and it empowered asylum adjudicators to consider evidence beyond the face of the court order to determine the ruling state judge's "purposes." *See id.*

Finally, Defendants proposed to eliminate 8 C.F.R. § 208.16(e), which provides for automatic review of a discretionary denial of asylum where an asylum-seeker is denied asylum but granted with-holding of removal under 8 U.S.C. § 1231(b)(3), and bona fide refugees are thus precluded from reu-niting with their spouses and minor children. *See id.* at 69656–57.

Defendants gave the public just 30 days to comment on these major changes, ending January 21, 2020. *Id.* at 69640. This already-brief period spanned Christmas Eve, Christmas Day, New Year's Day, Hanukkah, Kwanzaa, and the birthday of Martin Luther King, Jr. The comment period thus included just 15 business days. Even so, Defendants ignored requests to extend it.

## C. The final Rule.

The final Rule—published on October 21, with an effective date of November 20—is essen-tially unchanged from the proposal. Defendants merely replaced the "serious reasons for believing" standard in the new suspicion-of-domestic-violence bar with "knows or has reason to believe." *See*

85 Fed. Reg. at 67255.  Otherwise, they made only technical changes to the regulatory text.  And they largely brushed aside comments opposing the rule, declaring that many issues commenters raised "are outside the scope of this rulemaking."  *E.g.*, *id.* at 67226.  They also backpedaled on the authority for the Rule's new eligibility bars; while the proposal said most of the bars were supported by the Attorney General's power to designate new "particularly serious crimes," the final Rule disclaims that authority, even as it continues to argue that the new bars are "similar" to particularly serious crimes.  *Id.* at 67207.

## III.   LEGAL STANDARD

To obtain a temporary restraining order, a preliminary injunction, or a stay under 5 U.S.C. § 705, plaintiffs must show that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm" absent relief, (3) "the balance of equities tips in [their] favor," and (4) relief "is in the public interest."  *San Francisco v. USCIS*, 408 F. Supp. 3d 1057, 1078 (N.D. Cal. 2019).  Also, "serious questions going to the merits" and "a hardship balance that tips sharply toward the plaintiff can support" injunctive relief.  *Id.*; *M.R. v. Dreyfus*, 735 F.3d 1058, 1059 (9th Cir. 2011).

## IV.   ARGUMENT

### A.   Plaintiffs are likely to succeed on the merits.

The APA requires a reviewing court to "hold unlawful and set aside agency action" that is "arbitrary, capricious," "not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."  5 U.S.C. § 706(2).  The Rule is invalid on all of these grounds.

#### 1.   The Rule conflicts with the governing INA provisions.

"Federal courts are 'the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.'"  *EBSC II*, 950 F.3d at 1272.  That is the case here, as the INA's text, structure, and history show.

##### a.   The Rule's new categorical asylum bars are not "consistent with" Congress's carefully drawn regime.

The Rule's new asylum bars, based on broad categories of criminal convictions or suspected conduct, conflict with the INA.  The final Rule asserts that these unprecedented measures are a valid exercise of the Attorney General's authority to "establish additional limitations and conditions" on

ER-0063

asylum eligibility. *E.g.*, 85 Fed. Reg. at 67236. But any such limitations must be "consistent with this section." 8 U.S.C. § 1158(b)(2)(C). The "words 'consistent with'" thus "limit[ ] the scope of that authority." *EBSC III*, 964 F.3d at 848. In fact, "Congress went out of its way to insert the 'consistent with' language," underscoring "the importance Congress attached to the constraints on the Attorney General's discretion to prescribe criteria for asylum eligibility." *Id.* at 849. Thus, any "additional limitations and conditions under § 1158(b)(2)(C) must be consistent with the core principle of" § 1158(b)'s statutory eligibility bars. *Id.* at 848.

That core principle is protecting "the safety of those already in the United States," *EBSC II*, 950 F.3d at 1275, by excluding people "who pose a threat to society," *EBSC III*, 964 F.3d at 846. The statutory eligibility bars apply if the asylum applicant (i) persecuted others, (ii) was convicted of "a particularly serious crime" and thus "constitutes a danger to the community of the United States"; (iii) "committed a serious nonpolitical crime outside the United States"; (iv) is "a danger to the security of the United States"; or (v) has engaged in terrorist activity.[1] 8 U.S.C. § 1158(b)(2)(A). Categorical exclusion is thus reserved for the most serious offenses: Terrorists, "war crim[inals]," and people who are explicitly "a danger" to domestic or national security are ineligible. *See* H.R. Rep. No. 96-608, at 10, 18. Consistent with that principle, a U.S. criminal conviction bars eligibility only if it is "particularly serious" and makes the applicant "a danger." 8 U.S.C. § 1158(b)(2)(A)(ii). And in this context, "*a 'serious' crime must be a capital crime or a very grave punishable act*." *Alphonsus v. Holder*, 705 F.3d 1031, 1038 (9th Cir. 2013) (quoting *Matter of Frentescu*, 18 I. & N. Dec. 244, 246 (BIA 1982), in turn quoting UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* (1979)), *abrogated on other grounds*, *Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018).[2]

This high standard is unsurprising. These INA provisions implement Article 33(2) of the Refugee Convention, which renders ineligible "a refugee whom there are reasonable grounds for regarding as a danger to the security of the country" or "who, having been convicted by a final judgment of

---

[1] The exception is § 1158(b)(2)(A)(vi)'s bar for people "firmly resettled" in other countries, who "do not need" asylum. *EBSC III*, 964 F.3d at 846–47. The Rule does not invoke § 1158(b)(2)(A)(vi).

[2] Congress also provided that a noncitizen "who has been convicted of an aggravated felony shall be considered to have been convicted of a particularly serious crime." 8 U.S.C. § 1158(b)(2)(B)(i); *see id.* § 1101(a)(43) (listing aggravated felonies).

a particularly serious crime, constitutes a danger to the community of that country."  This provision—a narrow exception to Article 33(1)'s commitment not to return people to persecution—is aimed at crimes showing "a complete or near complete lack of social and moral inhibitions," like "blowing up [ ] a passenger airplane in order to collect life insurance," or "wanton killing in a public place."  *Al-phonsus*, 705 F.3d at 1037 n.6.  A "common crime (or crimes) of a less serious nature" do not warrant the harsh penalty of asylum ineligibility.  *See UNHCR Handbook* ¶ 151.  And "Congress imbued these international commitments with the force of law when it enacted the Refugee Act."  *R-S-C v. Sessions*, 869 F.3d 1176, 1178 (10th Cir. 2017).  In turn, "the categorical bars on eligibility in the INA are interpreted with lenience toward migrants to avoid infringing on [these] commitments."  *EBSC II*, 950 F.3d at 1275.

As the Rule concedes, any new regulatory bar must be "consistent" with these standards.  8 U.S.C. § 1158(b)(2)(C); 85 Fed. Reg. at 67236.  So, for example, the Ninth Circuit recently held that a categorical bar based on "method of entry" was "inconsistent with the INA" because "a migrant's method of entry" does not "per se create a danger to the United States, serve as a useful proxy for terrorist activity, or suggest the persecution of another."  *EBSC II*, 950 F.3d at 1261, 1276.  So too here.  The Rule's new eligibility bars are not "a useful proxy" for dangerousness and do not involve "particularly serious" or "very grave" criminal acts.  Instead, they would arbitrarily deny eligibility to countless bona fide refugees, contrary to our basic international and statutory commitments.

**Any felony.**  The Rule reaches "[a]ny felony under Federal, State, tribal, or local law," 85 Fed. Reg. at 67258, meaning "any crime defined as a felony by the relevant jurisdiction" or "punishable by more than one year of imprisonment," *id*. at 67260.  But Congress made only certain specified felonies an eligibility bar.  *Supra* p. 6 n.2.  And many felonies do not "per se create a danger" to others, *EBSC II*, 950 F.3d at 1276, and do not approach the seriousness Congress required.

In some states, "driving under a suspended license" can be a felony.  *E.g.*, *State v. Hittle*, 257 Neb. 344, 355 (Neb. 1999); *Adams v. Commonwealth*, 46 S.W.3d 572, 574 (Ky. Ct. App. 2000); *cf. Guerrero*, 908 F.3d at 545 (noting that "a minor traffic infraction is not 'particularly serious'").  In Maryland, selling alcohol to a visibly intoxicated person, Md. Code, Alco. Bev. § 6-307, using a tele-

phone to make a single anonymous call to annoy or embarrass, Md. Crim. L. § 3-804(a)(l), and temporarily using someone else's car without their consent, *id.* § 7-203, are all punishable by more than a year's imprisonment. In Arizona, "recklessly . . . [d]efacing" a school building—something countless teenaged pranksters have done—is a felony. Ariz. Rev. Stat. § 13-1604(A)(2), (B)(1)(a). Federal law, too, includes many felonies that involve no danger. *See generally* HARVEY SILVERGLATE, THREE FELONIES A DAY (2011). For example, knowingly and unlawfully "export[ing] any fish or wildlife" is punishable by up to five years' imprisonment. 16 U.S.C. § 3373(d)(1). None of these offenses approach the seriousness required to categorically deny asylum eligibility.

What is more, some states punish simple drug possession or use as a felony. *E.g.*, *Waits v. State*, 56 S.W.3d 894, 895 (Tex. App. 2001) ("possession of less than one gram of cocaine"); Nev. Rev. Stat. 453.411(1), (3)(a) (using any amount of certain controlled substances); *Matthews v. State*, 296 So. 3d 887, 889 (Ala. Crim. App. 2019) ("unlawful possession of a controlled substance"). The Rule thus sweeps in many minor drug offenses. That result clashes with Congress's choice to make only drug *trafficking* an aggravated felony, 8 U.S.C. § 1101(a)(43)(B), and ignores that drug "possession for personal use . . . would not meet the threshold of seriousness" under the Refugee Convention.[3] A categorical bar reaching *any* felony conflicts with both the "core principle" of the statutory eligibility bars, *see EBSC III*, 964 F.3d at 848, and with Congress's inclusion of only certain, specified felonies.

**Misdemeanors**. The Rule's misdemeanor bar is equally improper. This bar would reach anyone with a misdemeanor conviction for "[p]ossession . . . of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana." 85 Fed. Reg. at 67260. Thus, a second misdemeanor conviction for marijuana possession—or a first conviction for possessing *any* amount of any other drug—would make someone ineligible for asylum. So would a first misdemeanor conviction for possessing "controlled-substance paraphernalia," *id.*, for example, any "object that can be used to unlawfully inject or smoke a controlled substance," Judicial Council of Cal., Crim. Jury Instr. No. 2410. Again, that result clashes with the statutory principle, Congress's treatment of drug offenses, and our treaty obligations.

---

[3] *See* UNHCR, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 10 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

The misdemeanor bar would also reach "possession or use of an identification document, authentication feature, or false identification document without lawful authority." 85 Fed. Reg. at 67260. So a 20-year-old convicted of using a fake ID to enter a bar, or an asylum-seeker using a false SSN to get a job to feed her family (because other recent rules make work permits harder to get), would be barred from asylum. And the bar would reach any misdemeanor conviction for "receipt of . . . public benefits" from any governmental entity "without lawful authority." *See id*. These offenses involve no danger to anyone and do not approach the "grave" seriousness required to deny asylum eligibility.

**Immigration offenses.** The Rule's bar for immigration-related convictions under 8 U.S.C. §§ 1324(a)(1)(A), (a)(2), and 1326 likewise clashes with Congress's design. *See* 85 Fed. Reg. at 67259. As relevant, § 1324 addresses "[b]ringing in and harboring" certain noncitizens who are not authorized to enter the country. 8 U.S.C. § 1324(a)(1)(A), (a)(2). These provisions would cover, for example, an asylum-seeker who entered the country unlawfully and brought her own spouse, child, or parent to safety in the process. Barring eligibility on that basis is not consistent with the statute. The Board of Immigration Appeals itself has recognized that such an offense can be "motivated by love, charity, or kindness, or by religious principles." *In re L-S-*, 22 I. & N. Dec. 645, 655 (BIA 1999). This bar also ignores Congress's careful drafting: A violation of § 1324(a)(1)(A) or (a)(2) is an aggravated felony *unless* the noncitizen "committed the offense for the purpose of assisting, abetting, or aiding only the [noncitizen's] spouse, child, or parent (and no other individual) to violate a provision of this chapter." 8 U.S.C. § 1101(a)(43)(N). But the Rule contains no similar carve-out, and thus denies asylum eligibility based on violations that Congress specifically exempted. That is improper.

Section 1326(a) addresses illegal reentry. *See* 8 U.S.C. § 1326(a). But as already noted, a rule "categorically denying refugees an opportunity to seek asylum only because of their method of entry" is "inconsistent with the INA." *See EBSC II*, 950 F.3d at 1261, 1276; 8 U.S.C. § 1158(a)(1). Such a rule is also "inconsistent with the treaty obligations that the United States has assumed and that Congress has enforced" by statute. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 773 (9th Cir. 2018) (*EBSC I*). And Defendants again ignore Congress's choices. A violation of § 1326 is an aggravated felony that bars eligibility—but *only* when "committed by [a noncitizen] who was previously deported" for another aggravated felony. 8 U.S.C. § 1101(a)(43)(O). By treating *every* conviction

1 under § 1326 as a bar to asylum, Defendants overstep Congress's boundary. And their rationale is

2 faulty. They say this bar ensures "the orderly and lawful admission of aliens into the United States."

3 85 Fed. Reg. at 67222. But that is not the principle of § 1158(b)'s eligibility bars.

4       **Driving under the influence**. The DUI bars fare no better. *See* 85 Fed. Reg. at 67259. They

5 apply to any conviction for driving under the influence of "alcohol or drugs," whether "misdemeanor

6 or felony," that either (i) "was a cause of serious bodily injury or death of another person" or (ii) was

7 "a second or subsequent offense." *Id*. So even a second DUI misdemeanor would qualify—no matter

8 the circumstances, no matter how long the gap between the two convictions, and even if no one was

9 hurt. But DUI is not akin to the "particularly serious crimes" the Refugee Act contemplates or the

10 aggravated-felony definition. "Driving under the influence has little in common with these sorts of

11 crimes." *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (Reinhardt, J., concurring).

12 "It has not been specially targeted through federal legislation, nor is it mentioned elsewhere in the

13 immigration laws, nor does it involve violence." *Id*. Indeed, "American voters would be unlikely to

14 elect a president or vice president who had committed a particularly serious crime, yet they had no

15 difficulty in recently electing to each office a candidate with a DUI record." *Id*.

16       **Family-related offenses**. The family-related-offense bars also clash with the statute. *See* 85

17 Fed. Reg. at 67259–60. These bars again sweep in conduct that does not approach the "particularly

18 serious" level Congress deemed necessary to deny asylum eligibility. For example, denying asylum

19 eligibility based on "child neglect," *id*. at 67259—and thus ensuring that the child is either permanently

20 separated from the parent or is returned to her home country to face possible persecution too—is per-

21 verse. Child neglect is tragic, but it does not suggest that the asylum-seeker is *dangerous*; there are

22 countless reasons why a person with limited means who fled persecution elsewhere might be accused

23 of neglecting a child. Such conduct is nothing like the criminal offenses that bar eligibility by statute.

24       Likewise, the bar related to domestic "battery or extreme cruelty" is improper. To start, this

25 bar "does not necessarily require a criminal conviction or criminal conduct." 85 Fed. Reg. at 67256

26 n.44. It instead applies if the adjudicator merely "has *reason to believe*" that the asylum-seeker "en-

27 gaged" in such acts. *Id*. at 67260 (emphasis added). That is inconsistent with Congress's approach.

28 Neither of the statutory eligibility bars based on criminal conduct in the United States apply based on

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

mere "reason to believe"—both require a final "convict[ion]." *See* 8 U.S.C. § 1158(b)(2)(A)(ii), (b)(2)(B)(i). And Defendants "are required to give effect to Congress' express inclusions and exclusions, not disregard them." *NAM v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018).

But even if the "reason to believe" standard were proper, this bar sweeps too broadly. Domestic-violence incidents often result in the arrest of both the primary abuser and the survivor. These "cross-arrests" do not always yield clear determinations of victim and perpetrator. *See* 85 Fed. Reg. at 67228. Yet an arrest or a police report from such an incident could easily supply "reason to believe" that the victim "engaged . . . in acts of battery" against a "current or former spouse." *See id.* at 67260. The Rule would thus require asylum adjudicators to bar domestic-violence victims from asylum. The Rule's incorporation of the narrow exception for "victims of domestic violence" in 8 U.S.C. § 1227(a)(7)(A) does not solve this problem, *contra id.* at 67230, including because it involves a complex waiver process that applicants must know to undertake, and the waiver applies to a narrower set of offenses than the Rule does. In any event, Defendants do not and cannot contend that all domestic-violence offenses make the perpetrator a danger to the community or to national security. Instead, they argue that "such conduct must not be tolerated in the United States." 85 Fed. Reg. at 67229. Everyone can agree on that—but whether conduct should be "tolerated" is not the statutory principle.

The Rule also applies to "a crime that *involves conduct amounting to* a crime of stalking . . . or that *involves conduct amounting to* a domestic assault or battery offense." 85 Fed. Reg. at 67259 (emphasis added). As with the "reason to believe" standard, allowing asylum adjudicators to bar applicants based on unadjudicated conduct in the United States clashes with Congress's statutory approach, which nowhere incorporates such a malleable concept. In any event, the underlying conduct described here also does not rise to the level of the statutory eligibility bars. For example, many states' stalking laws can be violated by "cyberstalking," *i.e.*, maliciously engaging "in a course of conduct" through "electronic communication, directed at a specific person . . . causing substantial emotional distress to that person and serving no legitimate purpose." *E.g.*, Fla. Stat. § 784.048(1)(d), (2). That is not the kind of serious criminal violation required to bar asylum.

**Suspected gang offenses.** Finally, the "criminal street gang" bar is improper. This bar reaches anyone convicted of *any* offense that the adjudicator "knows or has reason to believe was committed

in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined" in federal, state, or local law.  85 Fed. Reg. at 67259.  So, for example, a misdemeanor vandalism conviction for graffiti would render someone ineligible for asylum if there were "reason to believe" the graffiti "promot[ed]" a gang.  *Id.*  Likewise, committing a petty crime while wearing a certain color or style of clothing that the government associates with a gang could exclude someone from asylum.[4] The applicant need not actually be a member of a gang or participate in any of the criminal conduct that makes it a "criminal street gang."

Contrary to the Rule's conclusory assertion, this sort of conduct is not remotely "similar" to the serious, dangerous acts Congress addressed by statute.  85 Fed. Reg. at 67225.  Indeed, all of the "series of offenses" that a group of people must commit to be a "criminal street gang" under federal law, *see* 18 U.S.C. § 521(c), are already aggravated felonies, *see* 8 U.S.C. § 1101(a)(43)(B), (F), (K), (U).  So if Defendants are concerned about "extortion threats, murders, kidnappings, and sexual as- saults by organized criminal groups," 85 Fed. Reg. at 67205, they can rest easy—Congress has acted. But the Rule's street-gang bar is vastly overinclusive and thus is not tailored to address dangerousness. And the street-gang bar's "reason to believe" standard is also inconsistent with the statute:  None of the statutory bars turn on offenses for which there is mere "reason to believe" some connection with some other kind of criminal conduct or group.  In fact, as used in the street-gang bar, this standard is so vague it violates due process, as explained below.  *Infra* § IV.A.2.

*     *     *

In sum, the Rule sweeps in offenses (or conduct) that do not rise to the level Congress deemed necessary to bar asylum.  The new bars include many crimes that in no way suggest a danger to others or to the community.  Indeed, Defendants themselves describe the Rule as barring people who demon- strate "disregard" for "societal values."  85 Fed. Reg. at 67242.  But that is a radically different and broader view of ineligibility than Congress adopted—or our international obligations allow.  Defend- ants also err by declaring that people covered by the Rule's new bars "should not be rewarded with asylum."  *Id*. at 67225.  Asylum is not a reward; it is a humanitarian commitment.  And Congress has

---

[4] *See* Immig. Legal Res. Ctr., *Deportation by any Means Necessary: How Immigration Officials are Labeling Immigrant Youth as Gang Members* 10–14 (2018), https://bit.ly/31TBNSD.

decided, consistent with our international obligations, that domestic criminal conduct must be *particularly serious* before it justifies consigning someone to persecution.

Indeed, Defendants effectively admit they cannot shoehorn the Rule's new bars into those Congress prescribed. The proposed Rule said the new bars were authorized in part by the Attorney General's power under § 1158(b)(2)(B)(ii) to "designate" particularly serious crimes. 84 Fed. Reg. at 69643. But the final Rule disclaims this authority, declaring that it "does not actually designate" any particularly serious crimes and instead relying solely on the power to set "additional limitations and conditions." 85 Fed. Reg. at 67207. This retreat confirms the Rule's true purpose: Defendants are trying exclude people from asylum based on domestic criminal convictions (or allegations) that do not meet the threshold Congress adopted "to conform . . . our asylum law to the United Nations Protocol to which the United States [is] bound." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987).

Nor do Defendants succeed in arguing that they need not "tailor the bar[s] to precisely identify serious conduct, [or] evaluate severity of conduct," 85 Fed. Reg. at 67227, because their power to set "additional limitations and conditions" supposedly "does not require that the offenses meet a threshold of dangerousness or seriousness," *id*. at 67224. As already explained—and as the Ninth Circuit has held—§ 1158(b)(2)(C) requires that any regulatory limitations be "consistent with the core principle of" the statutory bars. *EBSC III*, 964 F.3d at 848. And again, the core statutory principle, consistent with the underlying treaty obligations, is to exclude people "who pose a threat to society." *Id.* at 846. Because the Rule's new bars fall far short of that threshold, they are unlawful. And if any doubt remains, the Court should construe § 1158(b) "with lenience toward migrants," both to "avoid infringing" on our international commitments not to return people to persecution, *EBSC II*, 950 F.3d at 1275, and to respect the "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of" noncitizens, *Cardoza-Fonseca*, 480 U.S. at 449.

> **b.** **The Rule's treatment of conviction vacaturs or modifications is inconsistent with the statute.**

The Rule also adopts a novel presumption: A criminal conviction still triggers asylum ineligibility even if vacated, expunged, or modified—and even if the vacatur was *to correct constitutional or substantive defects*—so long as (1) the vacatur or modification order was entered after removal

proceedings began, or (2) the asylum-seeker moved for the order more than a year after conviction or sentencing.  85 Fed. Reg. at 67259–60.  The asylum-seeker must try to rebut this presumption by showing that any modification was not made for (i) rehabilitative reasons or (ii) "for purposes of ame-liorating the immigration consequences."  *Id.*  Nothing in the INA allows this bizarre regime.

The BIA previously held that if "vacatur occurs because there was a legal defect in the under-lying proceeding (*i.e.*, a violation of a constitutional or statutory right), then there is no longer a con-viction for purposes of the INA."  *See Alim v. Gonzales*, 446 F.3d 1239, 1249–50 (11th Cir. 2006); *Ramirez-Castro v. INS*, 287 F.3d 1172, 1174 (9th Cir. 2002).  But the Rule goes further.  It presumes that a state court order vacating a conviction *expressly because the conviction was unconstitutional* is a nullity, and thus the conviction remains valid.  That view cannot be squared with the INA or with basic due process or federalism principles.  Treating as valid a conviction vacated to correct a consti-tutional error is "so foreign, so antithetical, to the long-standing principles underlying our criminal justice system and our notions of due process that we would expect Congress to have spoken very clearly if it intended to effect such results."  *Alim*, 446 F.3d at 1249.  Yet the INA says no such thing.

Take this example.  A noncitizen pleads guilty because he is advised—wrongly—that doing so will not affect his immigration status.  This violates the Sixth Amendment, *see Padilla v. Kentucky*, 559 U.S. 356, 359 (2010), but he does not realize it until more than a year later, or (as is common) until removal proceedings begin.  He then obtains an order vacating his conviction for the express reason that it violated his Sixth Amendment rights.  Even so, the Rule presumes that his conviction remains valid and bars him from asylum—and puts the burden on him to prove otherwise.  Even worse, the Rule empowers the asylum adjudicator "to look beyond the face of" the court order, and even beyond the court record, to divine its true "purposes."  85 Fed. Reg. at 67260.  So, for example, if the non-citizen's vacatur motion notes that he will be deported unless his unconstitutional conviction is vacated, the asylum adjudicator can decide that the order was entered "for purposes of ameliorating [ ] immigration consequences" and ignore it—even if the state judge said no such thing.

Congress authorized none of this.  That silence forecloses the rule, both because of the "long-standing principles" *Alim* noted, 446 F.3d at 1249, and because the Supreme Court requires a "clear indication" of congressional intent to uphold an "administrative interpretation [that] alters the federal-

14

state framework by permitting federal encroachment upon a traditional state power," *see Solid Waste Agency of N. Cook. Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001). It is hard to imagine a more obvious agency encroachment than (a) presuming the invalidity of a state order entered on constitutional grounds and (b) authorizing a federal employee to ignore a state court order because he doesn't believe the state judge's express reasons for ruling. This Rule provision is unlawful.

### 2. Some of the Rule's categorical bars are unconstitutionally vague.

Some of the Rule's bars also "contravene the 'first essential of due process'" because they fail to "give people 'of common intelligence' fair notice of what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). This vagueness doctrine "guards against arbitrary or discriminatory law enforcement." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (plurality).[5]

First, as described above, the street-gang bar applies to any conviction the adjudicator "knows *or has reason to believe* was committed *in support, promotion, or furtherance* of" gang activity. 85 Fed. Reg. at 67259 (emphasis added). The Rule says the "reason to believe" language is "used elsewhere in the INA," *id.* at 67239, and that it allows "all reliable evidence," which is "not a new standard in immigration proceedings," *id.* at 67225. But the vagueness problem here arises from the combination of the already-malleable "reason to believe" standard with the "support, promotion, or furtherance" language. As the Supreme Court has explained, "combining" two "indetermin[ate]" standards that might be constitutional on their own can result in unconstitutional vagueness. *Johnson v. United States*, 135 S. Ct. 2551, 2558 (2015). That is the case here. The phrase "support, promotion, or furtherance" appears nowhere in any federal law or rule. And while the Rule insists that this language "conveys sufficiently definite warning as to the proscribed conduct," it does not even attempt an explanation, instead "leav[ing] the determination . . . to adjudicators in the first instance." 85 Fed. Reg.

---

[5] The Rule says its bars "do not implicate due process" because "aliens have no cognizable due process interest in the discretionary benefit of asylum." 85 Fed. Reg. at 67237. But while asylum itself is discretionary, asylum *eligibility* is not. And the Supreme Court and the Ninth Circuit have both applied the "most exacting vagueness standard" in immigration cases, *see Dimaya*, 138 S. Ct. at 1213, including in considering "particularly serious crimes," *Guerrero*, 908 F.3d at 544.

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

1    at 67225.  In combination with the "reason to believe" standard, this is precisely the sort of "'stand-

2    ardless sweep'" that improperly allows the government and adjudicators "to pursue their personal

3    predilections" and indulge improper biases.  *See Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

4         Second, as noted, the domestic-offense bar applies to "a crime that involves conduct amounting

5    to a crime of stalking . . . or that involves conduct amounting to a domestic assault or battery of-

6    fense[.]" 85 Fed. Reg. at 67258.  The "involves conduct amounting to" standard exists nowhere else

7    in U.S. immigration law.  And again, the Rule makes no effort to explain it, saying only that "the

8    underlying conduct of the crime may be considered and the immigration judge is not limited to facts

9    found by the criminal court or provided in the underlying record of conviction." *Id.* at 67259.  It is

10   not even clear what version of the "crime" adjudicators will measure "conduct" against—a federal

11   version, the version of the state of conviction, the version of the state of residence, or some generic or

12   ordinary-case version.  This, too, is the kind of indeterminate standard that fails due process scrutiny.

13            **3.    The Rule is arbitrary and capricious.**

14                *a.    The Rule does not articulate a satisfactory explanation.*

15        An agency "must examine the relevant data and articulate a satisfactory explanation for its

16   action," including a "rational connection between the facts found and the choice made." *Motor Vehicle*

17   *Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).  It cannot "offer[ ] an explana-

18   tion for its decision that runs counter to the evidence." *Id*.  And it must adequately explain any "de-

19   parture" from prior policy or precedent.  *Cal. PUC v. FERC*, 879 F.3d 966, 978 (9th Cir. 2018).

20        Before the Rule, committing a crime outside the statutory eligibility bars was simply part of

21   "the totality of the circumstances" that "should be examined in determining whether a favorable exer-

22   cise of discretion is warranted," and not a basis "to deny relief in [ ] all cases." *Matter of Pula*, 19 I.

23   & N. Dec. 467, 473 (BIA 1987).  The Rule departs dramatically from that regime by denying eligibility

24   based on all manner of crimes (or conduct).  And it declares that adjudicators should not "readjudicate

25   an alien's criminal culpability"; conviction is now dispositive.  85 Fed. Reg. at 67220.  To justify this

26   sweeping change, Defendants assert that "defer[ring] to" the original prosecution and conviction will

27   "promote adjudicative efficiency." *Id*.  That explanation is insufficient, for two reasons.

28

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

First, it simply fails to grapple with the good reasons the government previously did not deny eligibility based on crimes outside the statutory bars: "[I]n light of the unusually harsh consequences which may befall an alien who has established a well-founded fear of persecution[,] *the danger of persecution should generally outweigh all but the most egregious of adverse factors.*" *Pula*, 19 I. & N. Dec. at 474 (emphasis added). The Rule turns that regime on its head, and never explains why this prior reasoning no longer holds. Nor does it explain why this new approach is supposedly consistent with the international obligations codified in the INA. Agencies can change policy, but "the incumbent administration's view of wise policy," 85 Fed. Reg. at 67207, is not a sufficient explanation for doing so. The supposed seriousness of the new criminal bars is not enough either. Those crimes are no more serious today than they have been for the past three decades, during which the agency recognized that such offenses could and often should be "outweigh[ed]" by the "danger of persecution." *Pula*, 19 I. & N. Dec. at 474. In any event, apart from conclusory assertions, the Rule offers nothing to sub-stantiate Defendants' view that these offenses are indeed serious or dangerous.

Second, the Rule's efficiency rationale is faulty on its face. While "rule-based approaches" can "promote more efficient administration than wholly discretionary, case-by-case determinations," 85 Fed. Reg. at 67246, several of the Rule's bars are vague, subjective, and fact-intensive. In partic-ular, the street-gang bar, the suspicion-of-domestic-violence bar, and the vacatur-presumption provi-sion all create new, unpredictable and fact-intensive inquiries—with extremely high stakes. Before, if an asylum-seeker was accused of a misdemeanor that supposedly had a gang connection, the adju-dicator could simply take all the facts into account in reaching a discretionary asylum determination. Now, everything turns on whether the offense "promoted" gang activity, and the asylum-seeker will have life-and-death reasons to try to prove it did not. Likewise, the vacatur presumption now requires adjudicators to look behind a facially valid and complete state court order to determine what "purpose" the judge really had. None of this is efficient or predictable. The Rule is thus arbitrary and capricious.

### b.  *The rule fails to consider important aspects of the problem.*

An agency also acts arbitrarily and capriciously when it "entirely fail[s] to consider an im-portant aspect of the problem." *State Farm*, 463 U.S. at 43. That happened here, for two reasons.

17

1        1.     An agency must "respond to 'significant' comments, *i.e.*, those which raise relevant

2  points and which, if adopted, would require a change in the agency's proposed rule." *Am. Min. Con-*

3  *gress v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992). But Defendants brushed aside many commenters'

4  concerns with a series of non-sequiturs and conclusory assertions.

5        To start, the final Rule "decline[s] to respond" to comments explaining that the new bars are

6  inconsistent with the "particularly serious crime" bar because (contrary to the proposed Rule) the final

7  Rule does not "actually designate" particularly serious crimes. 85 Fed. Reg. at 67238; *id.* at 67207.

8  But the final Rule repeatedly argues that its new bars are permissible in part because they are "similar

9  to 'particularly serious crimes.'" *E.g.*, *id.* at 67207. Defendants cannot justify the new bars as "simi-

10  lar" while refusing to engage with comments explaining that they are not, in fact, similar.

11        The Rule likewise declares many other topics "outside the scope," including whether current

12  administrative practices prevent asylum-seekers from lawfully presenting themselves at the border—

13  which is directly relevant to barring eligibility based on manner of entry. 85 Fed. Reg. at 67222. Also

14  supposedly "outside the scope" are comments and data showing the Rule "will exacerbate harms

15  caused by racially disparate policing practices or that the result of this rule will disproportionately

16  affect people of color," *id.* at 67226, "barriers" that prevent domestic-violence victims from seeking

17  waivers that would prevent the Rule's bars from applying to them, *id.* at 67230, "how the rule might

18  affect working conditions of aliens," *id.* at 67233, "issues involving evidence gathering" under the

19  Rule's vacatur presumption, *id.* at 67239, "humanitarian concerns for asylum seekers," *id.* at 67243,

20  "services for children who have experienced trauma," *id.* at 67244, the "complex 'web' of asylum

21  laws and regulations," *id.*, "dangerous conditions in Mexico, the effects of the [migrant protection

22  protocol], and the third-country transit bar," *id.* at 67245, "access to healthcare, food, and housing,"

23  *id.* at 67246, "increased likelihood of convictions for minor offenses for certain vulnerable groups,"

24  *id.* at 67247, and "representation in immigration proceedings or during asylum adjudications," *id.* at

25  67249. On most of these points, Defendants just "reiterate[d] their statutory authority to limit and

26  condition asylum eligibility." *E.g.*, *id.* at 67239. That is no answer. Even if Defendants had the

27  authority to issue these bars, they must also consider and address comments explaining that doing so

28  is bad policy and will harm people. *See Specialty Equip. Market Ass'n v. Ruckelshaus*, 720 F.2d 124,

18

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

131 (D.C. Cir. 1983) (agency "acted arbitrarily and capriciously by failing to address adequately the practical effect of its regulations"). They failed to do so.

2. Defendants did not consider problems that arise from the Rule's interaction with other rules, and thus violated the principle that "an agency's right hand" must "take account of what its left hand is doing." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011). From November 2019 to June 2020, the government proposed three rules limiting noncitizens' ability to apply for asylum and related benefits based on criminal convictions or allegations, including this Rule.[6] The other two rulemakings extended this Rule's eligibility bars to apply to employment authorization documents (EADs), credible fear interviews (CFIs), and reasonable fear interviews (RFIs).[7] The rules doing so were released after the comment period on this Rule closed, but before the final Rule was issued. When this Rule was proposed in December 2019, the agencies were still accepting comments to the proposed EAD rule published a month earlier, which contained an overlapping-but-distinct set of criminal bars making asylum applicants ineligible for employment authorization. 84 Fed. Reg. at 62390. But the final EAD rule, issued in June 2020, dispensed with the separate set of criminal bars and incorporated this Rule's bars in full, *see* 85 Fed. Reg. 38532, 38537 (June 26, 2020), even though the final Rule had not yet been issued. Also in June 2020, Defendants published a proposed rule comprehensively limiting asylum eligibility and expanding the Rule's criminal bars to initial CFI and RFI screening processes that had only previously been used to flag *potential* eligibility bars for later consideration. *See id.* at 36284. This process both violated the APA's notice-and-comment requirements, as explained below, and prevented Defendants from considering two important issues.

*First*, belatedly incorporating the Rule's criminal bars into the final EAD rule prevented the agency from considering concerns about non-specialists applying the bars and thus wrongfully denying employment authorization—leaving asylum seekers without any means of legally supporting

---

[6] *See Asylum Application, Interview, and Employment Authorization for Applicants*, 84 Fed. Reg. 62374 (Nov. 14, 2019) (EAD proposal), *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 36264 (June 15, 2020) (proposed asylum rule).

[7] CFI screenings are conducted by asylum officers to determine if a noncitizen subject to expedited removal can demonstrate "a significant possibility" of establishing asylum eligibility. RFI screenings are conducted in the same fashion, but the applicable standard is "reasonable possibility." Noncitizens denied the opportunity to seek asylum after a negative CFI or RFI determination may seek review by an Immigration Judge, from which no statutory appeal is possible. 8 U.S.C. § 1252(a)(2)(A)(iii).

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

themselves and their families while they await a decision.  Government employees adjudicate EAD applications remotely and do not receive specialized training relevant to applying the Rule's bars.  The final EAD rule seemed to recognize that errors would result, saying that DHS "does not view this alignment" with the criminal bars "as . . . legally obligating DHS to adopt the interpretations or procedures used by" asylum adjudicators "to determine when and if an alien's conduct bars his or her eligibility for asylum," and leaving open the possibility that an asylum adjudicator may disagree with a determination in the EAD context about whether the Rule's bars apply.  85 Fed. Reg. at 38572.  That kind of error would have serious consequences.  Erroneously denying work authorization (which is not appealable) could force asylum-seekers to obtain false ID papers to feed themselves and their families—which bars asylum under the Rule.  Defendants should have considered these issues.

*Second*, the proposed incorporation of the Rule's criminal bars into the CFI and RFI screening processes prevented consideration of important due process concerns.  The CFI and RFI processes are limited in scope and provide only limited appellate rights.  8 U.S.C. § 1252(a)(2)(A)(iii).  Applying the Rule's bars in CFI and RFI proceedings would result in summary asylum denials, without full and fair hearings or access to meaningful judicial review.  Currently, no mandatory bars apply at this stage.  But if the proposed asylum rule is adopted (incorporating this Rule), the officers conducting these screenings will deny anyone they deem covered by these criminal bars the opportunity to seek asylum.  The Rule's bars are problematic enough without shoehorning the extensive factual and credibility evaluations they require into the flawed and truncated CFI and RFI processes.[8]  Defendants should have considered these issues before the Rule became final.

Moreover, in the broader asylum rule proposed in June, the agencies justified extending the Rule's eligibility bars to CFI and RFI screenings because "it is pointless and inefficient to adjudicate claims for relief in [removal proceedings] when it is determined that [a noncitizen] is subject to one or more of the mandatory bars to asylum . . . at the screening stage."  85 Fed. Reg. at 36272.  In other words, months after the comment period on this Rule closed, Defendants declared that the central issues commenters debated would be mooted or dramatically altered by the incorporation of the Rule's

---

[8] *See* U.S. Comm'n on Int'l Relig. Freedom, *Serious Flaws in U.S. Treatment of Asylum Seekers in Expedited Removal: Children Especially Harmed* (Aug. 2, 2016), https://bit.ly/2Jeaigc.

bars into the CFI and RFI screenings. Agencies cannot ignore the "collateral impact[s]" of "interdependent" rules in this way. *See Portland Cement*, 665 F.3d at 185, 187 (invalidating a rulemaking whose effect the agency altered in a subsequent rulemaking before the final rule issued).

### 4. The Rule is procedurally invalid.

#### a. The Rule was adopted without sufficient opportunity for public comment.

1. Agencies must "provide for meaningful public participation in the rule-making process." *Idaho Farm Bureau Fed'n v. Babitt*, 58 F.3d 1392, 1404 (9th Cir. 1995). The government has consistently recognized that "a meaningful opportunity to comment" requires "a comment period of not less than 60 days." *See, e.g.*, *Exec. Order No. 12866*, 58 Fed. Reg. 51735 (Sept. 30, 1993); *Exec. Order No. 13563*, 76 Fed. Reg. 3821 (Jan. 18, 2011). The "usual" period is 90 days. *See Cal. ex rel. Becerra v. Dep't of Interior*, 381 F. Supp. 3d 1153, 1176 (N.D. Cal. 2019).

Defendants provided just 30 days. And that 30-day window spanned several year-end holidays, and thus included only 15 business days. As a result, Defendants received just 581 comments on this major rule—a small fraction of the number received on proposed asylum rules with 60-day comment periods. *E.g.*, 84 Fed. Reg. 62,374 (3,200 comments on the EAD proposal); *cf. N.C. Growers' Ass'n v. UFW*, 702 F.3d 755, 770 (4th Cir. 2012) (the contrast between 800 comments in a 10-day window and 11,000 comments in a 60-day window showed the 10-day window was too short). What is more, Defendants refused multiple requests to extend the 30-day period, despite extending other rulemakings over the same time period. *E.g.*, 85 Fed. Reg. 4243 (Jan. 24, 2020) (comment period ending December 16 was extended to December 30 and then to February 10).

This too-short comment period violated the APA. *Becerra* held that the Interior Department's "failure to provide a meaningful opportunity to comment [was] underscored by the brevity of the [30-day] comment period." 381 F. Supp. 3d at 1176. That reasoning applies even more strongly here, both because the comment period here spanned the holidays and because of the vital subject matter. The rule in *Becerra* addressed payments under oil-and-gas leases, *id.* at 1158, while this Rule concerns eligibility for the life-saving protection of asylum. "Matters of great import . . . should naturally be accorded more elaborate public procedures." *Vt. Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435

1    U.S. 519, 545 (1978).  Yet here, the agencies shortchanged the public in commenting on sweeping

2    provisions governing matters of life and death.  Adding insult to injury, Defendants concede that the

3    proposed Rule "resulted in confusion regarding which authority the Departments relied on in promul-

4    gating this rule."  85 Fed. Reg. at 67207.  So Defendants did not explain themselves clearly and then

5    provided too short a time to respond.  The Rule thus violates the APA and is invalid.

6           2.     Defendants also failed to fairly apprise the public of the Rule's impact on matters be-

7    yond pure asylum eligibility.  As explained above, this is one of three interrelated rules issued or

8    proposed over the past year; the other two incorporate the Rule's bars into the EAD, CFI, and RFI

9    processes.  These staggered rulemakings formed a puzzle.  The full picture, depicting just how drasti-

10   cally asylum-seekers were impacted, only became visible months after the comment period on this

11   Rule closed.  This piecemeal process prevented the public from ever commenting on the eligibility

12   bars' full impact.  *Cf. California v. Azar*, 911 F.3d 558, 580 (9th Cir. 2018) (rejecting the government's

13   argument that a comment period was unnecessary because the public had an opportunity to respond to

14   similar prior rulemakings).  And these new applications of the Rule's eligibility bars are not a "logical

15   outgrowth" of the proposed Rule.  *See id*.  The EAD, CFI, and RFI processes offer much more limited

16   procedural protections than an asylum interview or hearing, and have not before been used to evaluate

17   the effect of criminal convictions or alleged criminal conduct on applications for relief.  The proposed

18   Rule did not address, or even hint at, this use of the proposed bars.  The public was thus unable to

19   comment on the full extent and impact of the resulting regulatory regime.  For example, the final Rule

20   dismisses commenters' objections that asylum adjudicators are unsuited to make "reliability determi-

21   nations of evidence already made by judicial courts," concluding that "adjudicators are well experi-

22   enced at separating reliable from unreliable evidence, . . . and this rule neither inhibits their ability to

23   do so nor changes the process for assessing evidence."  85 Fed. Reg. at 67238.  But commenters had

24   no chance to address, and no reason to anticipate, how these bars would be applied in very different

25   procedural settings by different personnel.

26                        **b.     The Rule does not properly analyze its impacts on federalism.**

27          An agency must include a federalism certification in any final rule that will have "substantial

28   direct effects on the States, on the relationship between the national government and the States, or on

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

the distribution of power and responsibilities among the various levels of government." *Exec. Order No. 13132*, § 1(a), 64 Fed. Reg. 43,255 (Aug. 4, 1999). If the rule triggers federalism concerns, the agency must also consult with state and local officials about its potential impact and publish a federalism summary impact statement in the rule. Here, the Rule raises significant federalism concerns by presuming that state court orders vacating convictions to cure constitutional or substantive defects are invalid based purely on their timing. Yet the Rule does not include a federalism impact statement or certification. Instead, it simply states that it "does not have sufficient federalism implications[.]" 85 Fed. Reg. at 67257. The Rule therefore violates the federalism certification requirements.

### c. The Rule does not comply with the Regulatory Flexibility Act.

The Regulatory Flexibility Act requires agencies to analyze their rules' effects on "small entities," 5 U.S.C. §§ 603–604, including small nonprofits, *id.* § 601(4). In particular, an agency must describe "the steps the agency has taken to minimize the significant economic impact on small entities" and "the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." *Id.* § 604(a)(6). Defendants did not do so.

The proposed Rule declares, and the final Rule simply repeats, that "this rule will not have a significant economic impact" on small entities because "only individuals are eligible to apply for asylum," so the rule does "not regulate 'small entities.'" 85 Fed. Reg. at 67255. But the RFA is not limited to rules that "regulate" small entities, *see* 5 U.S.C. § 604(a)(6), and Defendants ignore the Rule's impacts on immigration service providers like Plaintiffs. The Rule will require Plaintiffs to divert resources and staff and expend substantial sums of money on training, and will limit the overall number of clients Plaintiffs are able to service. *See infra* § IV.B. This kind of impact—making small entities' operations more expensive or burdensome—is what the RFA requires agencies to consider. *See Am. Fed. of Labor v. Chertoff*, 552 F. Supp. 2d 999, 1013 (N.D. Cal. 2007) (finding "serious questions whether DHS violated the RFA by refusing to conduct a final flexibility analysis" where the rule effectively "mandates costly compliance" measures, including "paying for the training of in-house counsel" and "dedicating . . . staff" to new tasks). The Rule is procedurally invalid.

B. **The Rule will irreparably harm Plaintiffs and the people they serve.**

The Rule is scheduled to take effect on November 20, 2020. Plaintiffs are already suffering irreparable harm because they have been forced to "divert resources away from [their] core programs to address the new policy." *EBSC II*, 950 F.3d at 1280. Unless the Rule is enjoined, Plaintiffs will be compelled to devote even greater resources to analyzing and interpreting the Rule, creating new materials and resources, and retraining thousands of practitioners, who not only represent clients but also advise other attorneys in affiliate groups. (Ex. A ¶¶ 17–19; Ex. B ¶¶ 21–23; C ¶¶ 16–24, 27; Ex. D ¶ 15–22.) The Rule requires highly fact-intensive and subjective inquiries, including whether an offense was committed in furtherance of gang activity, or why a prior conviction was vacated or modified. These complexities will require additional training for the new criminal law expertise required (Ex. A ¶¶ 13, 18; Ex. C ¶ 20–21, 24; Ex. D ¶¶ 13, 24) and make it difficult or impossible for legal assistants and law students to perform tasks like intake (Ex. D ¶¶ 23–25; *see* Ex. C ¶ 20). Indeed, the Rule "has already prompted [Plaintiffs] to change their core missions," *EBSC II*, 950 F.3d at 1280, by requiring them to divert resources in response (Ex. B ¶¶ 22–23; Ex. C ¶¶ 17–20).

The Rule will also cause "ongoing harms to [Plaintiffs'] organizational missions," *EBSC III*, 964 F.3d at 854, to support and provide legal services to as many low income and vulnerable noncitizens as possible (Ex. A ¶¶ 4–5, 12; Ex. B ¶¶ 11, 16; Ex. C ¶¶ 4–5, 15, 30; Ex. D ¶¶ 8–11, 29). The Rule's new eligibility bars and complexities will increase the time spent on each case, including at intake and briefing, and in obtaining records of prior convictions. (Ex. A ¶¶ 12–18; Ex. B ¶¶ 12–14; Ex. C ¶ 25; Ex. D ¶¶ 13–22.) The Rule will also prevent people from applying for asylum as a family unit if a parent is ineligible under a new bar. (Ex. A ¶ 16; Ex. B ¶ 17–18; Ex. C ¶ 26.) The cumulative effect is that Plaintiffs would "provid[e] fewer services to fewer individuals," frustrating their missions. *EBSC III*, 964 F.3d at 854.

And the Rule will harm Plaintiffs' funding. All Plaintiffs rely in part on grants and donations related to their ability to achieve certain numerical targets, such as total clients served or applications filed. (Ex. A ¶¶ 20–22; Ex. B ¶ 24; Ex. C ¶¶ 28–29; Ex. D ¶¶ 27–28.) By shrinking the pool of eligible applicants and reducing Plaintiffs' capacity, the Rule "directly threatens their standard caseload, and consequently, their caseload[] dependent funding." *EBSC III*, 964 F.3d at 854.

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

**C.      The equities and the public interest favor injunctive relief.**

Finally, the equities and the public interest favor relief.  "Relevant equitable factors include the value of complying with the APA, the public interest in preventing the deaths and wrongful removal of asylum-seekers, preserving congressional intent, and promoting the efficient administration of our immigration laws . . . ."  *EBSC II*, 950 F.3d at 1280.  These interests all weigh in Plaintiffs' favor.  Most obviously, "the public has an interest in 'ensuring that we do not deliver [refugees] into the hands of their persecutors,' and 'preventing [refugees] from being wrongfully removed, particularly to countries where they are likely to face substantial harm.'"  *Id*. at 1281 (citation omitted); *see EBSC III*, 964 F.3d at 854 (district court properly "found that there was a public interest in not returning refugees to their persecutors or to a country where they would be endangered").  Further, "maintaining the *status quo*" serves the important interest in "a stable immigration system."  *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020).  Allowing the rule to take effect will also harm immigrant communities and public safety.  *E.g.*, Ex. E at 2–6 (N.Y.C. Comment Letter).  And "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

**D.      The Court should enjoin the Rule's national implementation.**

The Court should enjoin the Rule's implementation nationally.  "In immigration matters," the Ninth Circuit has "consistently recognized the authority of district courts to enjoin unlawful policies on a universal basis."  *EBSC I*, 932 F.3d at 779.  "Such relief is commonplace in APA cases, promotes uniformity in immigration enforcement, and is necessary to provide the plaintiffs here with complete redress."  *Id*.  Together, Plaintiffs work with asylum applicants across the nation.  Indeed, Plaintiff CLINIC has affiliates in 48 states and the District of Columbia.  (Ex. D ¶ 5.)  Nationwide relief is warranted.

**V.      CONCLUSION**

The Court should enjoin or stay the Rule's national implementation before November 20.

November 3, 2020

Respectfully submitted,

/s/ *Naomi Igra*
Naomi Igra, SBN 269095
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Sirine Shebaya (*pro hac vice* pending)
sirine@nipnlg.org
Cristina Velez*
cristina@nipnlg.org (*pro hac vice* pending)
NATIONAL IMMIGRATION PROJECT OF
THE NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue NW, Suite 200
Washington, D.C. 20007
Telephone: +1 202 656 4788
*Not admitted in D.C.; working remotely from
and barred in New York*

Tobias S. Loss-Eaton (*pro hac vice* pending)
tlosseaton@sidley.com
Chike B. Croslin (*pro hac vice* pending)
ccroslin@sidley.com
Alice A. Wang (*pro hac vice* pending)
alice.wang@sidley.com
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Telephone: +1 202 736 8000

Sabrineh Ardalan (*pro hac vice* pending)
sardalan@law.harvard.edu
Philip L. Torrey (*pro hac vice* pending)
ptorrey@law.harvard.edu
Sameer Ahmed, SBN 319609
sahmed@law.harvard.edu
HARVARD LAW SCHOOL
HARVARD IMMIGRATION AND REFUGEE
CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone: +1 617 384 7504

Jack W. Pirozzolo (*pro hac vice* pending)
jpirozzolo@sidley.com
Kenyon C. Hall (*pro hac vice* pending)
kenyon.hall@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
Telephone: +1 617 223 0300

Leila Kang (*pro hac vice* pending)
leila@immdefense.org
Nabilah Siddiquee (*pro hac vice* pending)
nabilah@immdefense.org
IMMIGRANT DEFENSE PROJECT
40 W. 39th Street, Fifth Floor
New York, NY 10018
Telephone: +1 646 762 8428

*Attorneys for Plaintiffs*

MEM. OF P. & A. ISO PLS.' EX PARTE MOTION FOR TRO & OSC – CASE NO. 3:20-cv-7721

1    Naomi A. Igra, SBN 269095                   Sirine Shebaya (*pro hac vice* forthcoming)
     naomi.igra@sidley.com                        sirine@nipnlg.org
2    SIDLEY AUSTIN LLP                            NATIONAL IMMIGRATION PROJECT OF
     555 California Street, Suite 2000            THE NATIONAL LAWYERS GUILD
3    San Francisco, CA 94104                      2201 Wisconsin Avenue N.W., Suite 200
     Telephone:  +1 415 772 1200                  Washington, D.C. 20007
4    Facsimile:  +1 415 772 7400                  Telephone:  +1 202 656 4788
                                                  Facsimile:  +1 617 227 5495
5    Sabrineh Ardalan (*pro hac vice* forthcoming)
     sardalan@law.harvard.edu                     Leila Kang (*pro hac vice* forthcoming)
6    Philip L. Torrey (*pro hac vice* forthcoming) leila@immdefense.org
     ptorrey@law.harvard.edu                      IMMIGRANT DEFENSE PROJECT
7    HARVARD LAW SCHOOL                           40 W. 39th Street, Fifth Floor
     HARVARD IMMIGRATION AND REFUGEE              New York, NY 10018
8    CLINICAL PROGRAM                             Telephone:  +1 646 762 8428
     6 Everett Street, WCC 3103
9    Cambridge, MA 02138
     Telephone:  +1 617 384 7504
10   Facsimile:  +1 617 495 8595

11

12   *Attorneys for Plaintiffs*
     (Additional counsel listed on signature page)

13                        UNITED STATES DISTRICT COURT

14                      NORTHERN DISTRICT OF CALIFORNIA

15                                 SAN FRANCISCO

16   PANGEA LEGAL SERVICES; DOLORES            Case No. _____
     STREET COMMUNITY SERVICES, INC.;
17   CATHOLIC LEGAL IMMIGRATION NET-           Hon. _____
     WORK, INC.; and CAPITAL AREA IMMI-
18   GRANTS' RIGHTS COALITION,

19              Plaintiffs,

20        v.                                   **COMPLAINT FOR DECLARATORY AND
                                               INJUNCTIVE RELIEF AND
21   U.S. DEPARTMENT OF HOMELAND               ADMINISTRATIVE PROCEDURE ACT
     SECURITY;                                 CASE**
22   CHAD F. WOLF, *under the title of Acting
     Secretary of Homeland Security*;          **DEMAND FOR JURY TRIAL**
23   KENNETH T. CUCCINELLI, *under the title of
     Senior Official Performing the Duties of the
24   Deputy Secretary for the Department of
     Homeland Security;*
25   U.S. CITIZENSHIP AND IMMIGRATION
     SERVICES;
26   U.S. IMMIGRATION AND CUSTOMS
     ENFORCEMENT;
27

28

COMPLAINT

TONY H. PHAM, *under the title of Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement*;
U.S. CUSTOMS AND BORDER PROTECTION;
MARK A. MORGAN, *under the title of Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection*;
U.S. DEPARTMENT OF JUSTICE;
WILLIAM P. BARR, *under the title of U.S. Attorney General*;
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; and
JAMES MCHENRY, *under the title of Director of the Executive Office for Immigration Review*,

Defendants.

COMPLAINT

**INTRODUCTION**

1.      This action challenges a final rule issued by the Departments of Justice and Homeland Security (the "Rule").  *See* Procedures for Asylum and Bars to Asylum Eligibility, 85 Fed. Reg. 67202 (Oct. 21, 2020).  The Rule imposes several vague and sweeping new bars to asylum eligibility, frustrates the purpose of state criminal dispositions, and strips asylum-seekers of protections set forth in the Immigration and Nationality Act ("INA").  These changes will dramatically curtail the availability of asylum to people fleeing persecution, in contravention of the INA's plain language and the United States' international commitments.  The Rule will thus have a devastating impact on asylum-seekers and immigration legal services providers—including Plaintiffs and the communities they serve.

2.      The toll the Rule will take is best illustrated by the stories of real clients represented by Plaintiffs.  For example, Dolores Street Community Services, Inc.'s ("DSCS") client, Bryan*, has been a lawful permanent resident for many years.[1]  Bryan suffers from psychotic disorder and related substance abuse issues; as a result of these mental health challenges, he was arrested multiple times and sustained several convictions that threatened his lawful permanent resident status.  Bryan was placed in removal proceedings, where he sought asylum, among other forms of relief.  With DSCS's help, Bryan has been able to access—for the first time—substance abuse and mental health treatment.  DSCS has also helped Bryan vacate some of his prior convictions, because he did not understand the nature or immigration consequences of the proceedings at the time.  Under current law, these vacaturs carry legal weight even though they were obtained after Bryan was placed in removal proceedings, as they should:  Bryan's constitutional rights were violated at the time of his criminal cases, and he should not now suffer immigration consequences as a result of those unlawful convictions.  The Rule, however, would severely prejudice respondents like Bryan by requiring him to demonstrate these illegalities yet again in immigration court.

3.      At least six aspects of the Rule are unlawful.  *First*, the Rule would create several new categorical bars to asylum eligibility that conflict with the INA's text and structure and the United

---

[1] This name has been changed to protect the client's safety and preserve confidentiality.

1
COMPLAINT

States' international treaty obligations, which Congress has directly incorporated into U.S. law. These bars would categorically exclude from asylum eligibility any person with:

- any conviction for bringing in or harboring certain aliens under 8 U.S.C. § 1324(a)—even if the asylum-seeker was just bringing their own spouse, child, or parent to safety;

- any conviction for illegal reentry under 8 U.S.C. § 1326;

- any conviction for an offense the adjudicator knows or has some unspecified "*reason to believe* was committed in support, promotion, or furtherance of the activity of a criminal street gang*";

- any conviction for an offense involving driving while intoxicated or impaired that results in serious bodily injury or death, or any second offense for driving while impaired, even if there is no injury to any person or property;

- any felony conviction under federal, state, or local law;

- any conviction under several newly defined categories of misdemeanor offenses, including any controlled substance-related offense except for a first-time marijuana simple possession offense, any offense involving possession or use of a false identification document, and any offense involving the receipt of public benefits without lawful authority;

- any conviction for an offense involving domestic violence; and

-  any *accusation* of battery or extreme cruelty involving a domestic relationship, even if it does not result in a conviction.

    4.    The Rule asserts that these new categorical bars are proper exercises of the Attorney General's power to "establish additional limitations and conditions, *consistent with this section*, under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C) (emphasis added). But the Rule's new bars are *not* "consistent with" the statutory eligibility scheme, which is narrowly drawn to exclude people "who pose a threat to society." *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 846 (9th Cir. 2020). The Rule sweeps in everything from a second misdemeanor conviction for marijuana possession, to a misdemeanor conviction for using a fake ID to enter a bar, to unlawfully exporting fish—a federal felony. The Rule's bars thus bear no resemblance to those Congress wrote into the statute, which in turn reflect our international treaty obligations. The Rule also ignores Congress's

1  careful drafting, for example by treating *every* illegal reentry conviction under § 1326 as a categorical

2  bar, even though Congress specified that such a conviction bars asylum eligibility *only* when "com-

3  mitted by an alien who was previously deported" based on an aggravated-felony conviction.  8 U.S.C.

4  § 1101(a)(43)(O).  The Rule's categorical bars thus exceed Defendants' authority and conflict with

5  the governing statute.

6       5.    *Second*, the Rule adopts a novel presumption:  a criminal conviction still triggers asy-

7  lum ineligibility even if vacated, expunged, or modified—and even if the vacatur or modification was

8  *to correct constitutional or substantive defects*—so long as (i) the vacatur or modification order was

9  entered after removal proceedings began, or (ii) the applicant moved for the order more than a year

10  after conviction or sentencing.  85 Fed. Reg. at 67259–60 (to be codified at 8 C.F.R. §§ 208.13(c)(7)–

11  (8), 1208.13(c)(7)–(8)).  The asylum-seeker must try to rebut this presumption by showing that any

12  modification was not made (i) for rehabilitative reasons or (ii) "for purposes of ameliorating the im-

13  migration consequences."  *Id*.  But Congress nowhere authorized Defendants to disregard state court

14  orders curing constitutional errors based purely on their assumptions about judges' subjective reasons

15  for ruling.  This aspect of the Rule thus clashes with the text of the INA and with basic federalism

16  principles.

17       6.    *Third*, the Rule violates the Administrative Procedure Act ("APA") in at least three

18  respects.  First, the Rule departs dramatically from decades of consistent agency precedent without

19  adequate explanation.  For example, the Rule discards the agency's longstanding practice of treating

20  criminal convictions (or conduct) beyond the statutory eligibility bars as merely part of "the totality

21  of the circumstances" that "should be examined in determining whether a favorable exercise of dis-

22  cretion is warranted," and not a basis "to deny relief in [ ] all cases."  *Matter of Pula*, 19 I. & N. Dec.

23  467, 473 (BIA 1987).  Yet the Rule fails to explain why the agencies' good reasons for that approach

24  no longer hold true.  This unexplained departure is a textbook example of arbitrary and capricious

25  rulemaking.  Second, in issuing the Rule, Defendants entirely failed to consider important aspects of

26  the problem, repeatedly dismissing comments and data about the Rule's harmful effects as "outside

27  the scope of [the] rulemaking."  *See, e.g.*, 85 Fed. Reg. at 67226.  Third, Defendants did not provide

28  sufficient opportunity for public comment.  They provided just 30 days, spanning the 2019 end-of-

year holidays, to comment on this major overhaul of the asylum system. That is not long enough for the public to digest and comment on a sweeping proposal with such significant impacts. The Rule was also part of an improperly staggered rulemaking process, which prevented the public from seeing and commenting on the whole picture at once.

7. *Fourth*, the Rule is procedurally invalid for another three reasons. First, Defendant Chad Wolf—who purported to issue the proposed and final Rule in conjunction with Defendant William Barr—unlawfully assumed the role of Acting Secretary of Homeland Security in violation of the Appointments Clause of the U.S. Constitution, the Homeland Security Act of 2002 ("HSA"), and the Federal Vacancies Reform Act of 1998 ("FVRA"). Wolf thus lacked the authority to propose or issue the Rule. Second, the Rule violates the Regulatory Flexibility Act ("RFA"), which requires federal agencies to analyze the effects of their rules on "small entities." 5 U.S.C. §§ 603–604. Here, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") failed to do so, stating only that the Rule "will not have a significant economic impact on a substantial number of small entities" because "[o]nly individuals, rather than entities, are eligible to apply for asylum." 85 Fed. Reg. at 67255. This conclusory statement entirely fails to acknowledge the impact the Rule will have on immigration legal services providers like Plaintiffs. Third, the Rule fails to comply with the federalism certification requirement set forth in Executive Order 13132, notwithstanding the significant federalism concerns the Rule raises. *See* 64 Fed. Reg. 43255 §1(a) (Aug. 4, 1999).

8. *Fifth*, the Rule is unconstitutionally vague, in violation of the Due Process Clause, because it fails to "give ordinary people fair warning about what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). For example, the Rule bars asylum based on a conviction of *any* offense the adjudicator "has reason to believe" was committed "in support, promotion, or furtherance" of the activity of a criminal street gang. 85 Fed. Reg. at 67258–59 (to be codified at 8 C.F.R. §§ 208.13(c)(6)(ii), 1208.13(c)(6)(ii)). The Rule does not describe what behaviors, associations, or statuses might meet this standard. Nor does it provide any guidance on the types of offenses or circumstances that may trigger such an inquiry, or the sorts of evidence that might be considered. These vague standards fail to provide fair notice and invite arbitrary and discriminatory enforcement.

4

9.      *Sixth*, the Rule violates the equal protection component of the Fifth Amendment because it was motivated by discriminatory animus toward certain racial and ethnic groups and people of certain national origins.  The discriminatory intent underlying this Rule is evinced by two primary factors.  First, the Rule will disproportionately harm non-white immigrants relative to their counterparts from predominantly white countries—a concern that Defendants acknowledged, but did not seek to mitigate or resolve, in issuing the Rule.  Second, the Rule was promulgated in the context of years of repeated, racist statements by members of the Trump Administration casting non-white immigrants as dangerous criminals, including statements made in the days and weeks immediately surrounding the publication of the proposed Rule in December 2019 and the final Rule in October 2020.

10.      In short, the Rule is inconsistent with the INA; is arbitrary, capricious, and procedurally invalid under the APA, the HSA, the FVRA, and the RFA; and violates (i) the Appointments Clause and (ii) the Fifth Amendment's Due Process Clause, including its equal protection component.  It also conflicts with the international law obligations that Congress directly incorporated into U.S. law and on which our asylum system is founded.  The Rule thus threatens to send bona fide asylum-seekers to countries where they will likely face violence, torture, and even death.  The Court should hold the Rule unlawful, set it aside, and enjoin its enforcement.

## JURISDICTION AND VENUE

11.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution and federal statutes, including the INA, 8 U.S.C. § 1101 *et seq.*, and the APA, 5 U.S.C. § 551 *et seq.*  This Court also has subject matter jurisdiction under 5 U.S.C. § 702.  Additionally, the Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

12.      Defendants' promulgation of the final Rule in the Federal Register on October 21, 2020 constitutes final agency action and is therefore subject to judicial review.  5 U.S.C. §§ 704, 706.

13.      Plaintiffs have standing to challenge the Rule under 5 U.S.C. § 702 because they have been and will be injured by the Rule's operation.  Plaintiffs are also within the zone of interest of the INA, which establishes asylum eligibility requirements.  *See, e.g.*, *E. Bay Sanctuary Covenant v.*

*Trump*, 950 F.3d 1242, 1270 (9th Cir. 2020); *La Clinica de la Raza v. Trump*, No. 19-cv-04980-PJH, 2020 WL 4569462, at *9–11 (N.D. Cal. Aug. 7, 2020).

14.     Venue is proper in this District because Defendants are officers or employees of the United States or agencies thereof acting in their official capacity or under color of legal authority, or are federal agencies of the United States. 28 U.S.C. § 1391(e)(1). Venue is also proper because both Pangea Legal Services and DSCS have their principal place of business in San Francisco, California. Consequently, both reside in this judicial district under 28 U.S.C. § 1391(c)(2).

## PARTIES

15.     Plaintiff Pangea Legal Services ("Pangea") is a non-profit organization based in California's Bay Area with offices in San Francisco and San Jose. Pangea's mission is to stand with immigrant communities and to provide services through direct legal representation. Pangea serves the immigrant community in the Bay Area by providing direct legal services, including filing both affirmative and defensive asylum applications, engaging in policy advocacy, and providing educational programs aimed at legal empowerment. The publication and impending effective date of the Rule has required Pangea to divert resources from its core activities to address the impact of the Rule on the communities it serves.

16.     Plaintiff DSCS is a non-profit organization based in San Francisco, California, that provides a variety of services to low-income and immigrant communities in San Francisco, including through its Deportation Defense & Legal Advocacy Program. DSCS's mission is to cultivate collective power among low-income and migrant communities to create a more just society. DSCS serves San Francisco's immigrant community in part by providing direct legal services—including filing both affirmative and defensive asylum applications—and by partnering with other organizations to carry out local and national advocacy. The publication and impending effective date of the Rule has required DSCS to divert resources from its core activities to address the impact of the Rule on the communities it serves.

17.     Plaintiff Catholic Legal Immigration Network, Inc. ("CLINIC") promotes the dignity and protects the rights of immigrants in partnership with its network organizations. CLINIC implements its mission by providing substantive legal and program management training and support for

organizations within its network, including organizations engaged in completing affirmative and de-
fensive applications for asylum; providing direct representation and legal orientation to asylum-seek-
ers; and engaging in advocacy and providing advocacy support to network organizations at state, local,
and national levels. CLINIC is the largest charitable legal immigration network in the United States,
with almost 400 nonprofit organizations spanning 48 states, including the state of California. Many
of its affiliates appear on the List of Pro Bono Legal Service Providers maintained by the Executive
Office for Immigration Review ("EOIR") as required by 8 C.F.R. § 1003.61. CLINIC maintains an
office with three staff members in Oakland, California, and has staff in a dozen states around the
country. The publication and impending effective date of the Rule has required CLINIC to divert
resources from its core activities to address the impact of the Rule on the communities it serves.

18.     Plaintiff Capital Area Immigrants' Rights Coalition ("CAIR Coalition") is a non-profit
organization serving the Washington, D.C. region. It appears on the List of Pro Bono Legal Service
Providers maintained by the EOIR as required by 8 C.F.R. § 1003.61. CAIR Coalition's mission is to
ensure equal justice for all immigrant adults and children at risk of detention and deportation in the
Washington, D.C. region and beyond. CAIR Coalition implements its mission by providing direct
legal representation to children and adults in immigration proceedings, including representing unac-
companied alien children ("UACs") in interviews before the Asylum Office; conducting educational
programming, including know your rights presentations and training of attorneys to defend immi-
grants; and engaging in impact litigation and advocacy on key policy issues. The publication and
impending effective date of the Rule has required CAIR Coalition to divert resources from its core
activities to address the impact of the Rule on the communities it serves.

19.     Defendant DHS is a cabinet-level department that enforces the immigration laws of the
United States.

20.     Defendant Chad F. Wolf is purportedly the Acting Secretary of DHS. He is being sued
in his official capacity. In this capacity, he directs each of the component agencies within DHS, in-
cluding United States Immigration and Customs Enforcement ("ICE"), United States Citizenship and
Immigration Services ("USCIS"), and United States Customs and Border Protection ("CBP"). The

Secretary of DHS is responsible for the administration and enforcement of immigration laws under 8 U.S.C. § 1103(a).

21.     Defendant Kenneth T. Cuccinelli is the Senior Official Performing the Duties of the Deputy Secretary for DHS.  He is being sued in his official capacity.

22.     Defendant USCIS is the agency within DHS responsible for adjudicating affirmatively filed asylum applications and conducting credible and reasonable fear interviews.

23.     Defendant ICE is the agency within DHS responsible for carrying out removal orders and overseeing immigration enforcement and detention.

24.     Defendant Tony H. Pham is the Senior Official Performing the Duties of the Director of ICE.  He is being sued in his official capacity.

25.     Defendant CBP is the agency within DHS responsible for the initial processing and detention of noncitizens who are apprehended at or near the border and placed in expedited removal or reinstatement of removal proceedings.

26.     Defendant Mark A. Morgan is the Senior Official Performing the Duties of the Commissioner of CBP.  He is being sued in his official capacity.

27.     Defendant DOJ is a cabinet-level department of the federal government.

28.     Defendant William P. Barr is the U.S. Attorney General.  He is being sued in his official capacity.  Under 8 U.S.C. § 1103(g), the Attorney General is responsible for the administration of immigration law.

29.     Defendant EOIR is a sub-agency of DOJ responsible for adjudicating administrative claims concerning federal immigration laws, including asylum applications filed in immigration court.

30.     Defendant James McHenry is the Director of EOIR.  He is being sued in his official capacity.

## **GENERAL ALLEGATIONS**

### I.     **Background on the INA**

31.     Federal law affords several humanitarian protections for non-citizens who fear persecution and violence in their home countries.  Congress incorporated international humanitarian principles into U.S. law through the INA, which ensures that asylum and related protections are accessible

1    to asylum-seekers who fear returning to their home country because of the persecution, torture, or

2    other harm they would endure.

3        32.    The U.S. asylum system was founded on its international obligations under the 1951

4    Convention Relating to the Status of Refugees ("Refugee Convention") and the 1967 United Nations

5    Protocol Relating to the Status of Refugees ("1967 Protocol").  Opened for signature in 1951, the

6    Refugee Convention was designed to avoid the horrors experienced by refugees during World War II.

7    The 1967 Protocol, which the United States ratified in 1968, expanded the Convention's protections,

8    allowing them to be applied universally.

9        33.    Congress incorporated the 1967 Protocol into U.S. law with the Refugee Act of 1980,

10   Pub. L. No. 96-212, 94 Stat. 102.  The Refugee Act amended the INA to include a formal process for

11   people fearing persecution in their home country to apply for asylum.  *Id.* § 101(a) (codified at 8 U.S.C.

12   § 1521 Note).

13       34.    The Refugee Act thus codified the United States' longstanding tradition of "welcoming

14   the oppressed of other nations."  H.R. Rep. No. 96-781, at 17–18 (1980) (Conf. Rep.).  Congress

15   deliberately sought to bring the United States into compliance with its international obligations under

16   the 1967 Protocol and the Refugee Convention.  *See* H.R. Rep. No. 96-608, at 17 (1979) (noting that

17   proposed asylum and withholding provisions were designed to "conform[] United States statutory law

18   to our obligations under Article 33 [of the Refugee Convention]"); S. Rep. No. 96-256, at 4 (1979)

19   (same).  "Congress imbued these international commitments with the force of law when it enacted the

20   Refugee Act . . ." *R-S-C- v. Sessions*, 869 F.3d 1176, 1178 (10th Cir. 2017); *see also INS v. Cardoza-*

21   *Fonseca*, 480 U.S. 421, 436–37 (1987) (explaining that Congress enacted the Refugee Act of 1980 "to

22   bring United States refugee law into conformance with the [1967 Protocol]").

23       35.    Today, asylum may be granted to a person who has suffered persecution or who has a

24   "well-founded fear of persecution" on account of one of five enumerated protected grounds:  "race,

25   religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C.

26   § 1158(b)(1)(B); *id.* § 1101(a)(42)(A).  Among other requirements, to be eligible for asylum, a person

27   must not fall within any mandatory bars to asylum.  Specifically, they must not (i) have participated

28   in the persecution of others; (ii) have been convicted of a "particularly serious crime" that makes them

1    a danger to the United States; (iii) have committed a "serious nonpolitical crime outside the United

2    States"; (iv) represent a danger to the security of the United States; (v) have engaged in "terrorist

3    activity"; or (vi) have resettled in a third country prior to arriving in the United States.  *See id.* §

4    1158(b)(2)(A)(i)–(vi).

5    **II.    Criminal Bars to Asylum Eligibility under the INA**

6         36.    The INA specifies two crime-related bars to asylum eligibility:  (i) the particularly se-

7    rious crime ("PSC") bar, and (ii) the serious nonpolitical crime bar.  *See id.* § 1158(b)(2)(A)(ii) (PSC

8    bar); *id.* § 1158(b)(2)(A)(iii) (serious nonpolitical crime bar).  Both bars have specific definitions and

9    scopes of application.

10        37.    Like most of the asylum provisions in the INA, the PSC bar closely mirrors the lan-

11   guage of the same bar in the Refugee Convention.  The Refugee Convention's bar was designed to be

12   narrow, so as not to preclude a bona fide refugee from protection unless they had been convicted of a

13   very serious criminal offense and thus posed a danger to the community.  The INA PSC bar thus

14   requires a conviction for a "*particularly* serious crime" that renders the applicant "a danger to the

15   community of the United States."  *Id.* § 1158(b)(2)(A)(ii) (emphasis added).

16        38.    The United Nations High Commissioner for Refugees (UNHCR) has noted that, to be

17   considered a serious crime, an offense must generally be a "capital crime or a very grave punishable

18   act," such as murder, arson, rape, or armed robbery.  UNHCR, *Handbook on Procedures and Criteria*

19   *for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the*

20   *Status of Refugees*, U.N. Doc. HCR/4/IP/Eng/REV. ¶¶ 154–155 (1979, reissued 2019) ("*UNHCR*

21   *Handbook*").  The danger to the community must be both serious and posed by the asylum-seeker

22   themselves.  Convention Relating to the Status of Refugees art. 33(2), Apr. 22, 1954, 189 U.N.T.S.

23   150.

24        39.    Under the Refugee Convention, adjudicators determining whether an offense is a PSC

25   must conduct an individualized analysis, considering the nature of the act, the actual harm inflicted,

26   how the offense is prosecuted, and whether most jurisdictions would consider the act a serious crime.

27   UNHCR, *Criminal Justice and Immigration Bill:  Briefing for the House of Commons at Second Read-*

28   *ing* ¶ 10 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf.  Adjudicators must also consider

COMPLAINT

mitigating or extenuating factors in their determinations. UNHCR, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004* 4 (2004).

40. Adjudicators in the United States similarly apply a fact-specific analysis to determine whether an offense is a PSC under the INA (except for aggravated felonies, *see* 8 U.S.C. § 1158(b)(2)(B)(i)). This analysis considers, among other things, the nature of the offense, the criminal sentence imposed, and whether the offense itself indicates that the person is likely to be a danger to the community. *See Matter of Frentescu*, 18 I. & N. Dec. 244, 247 (BIA 1982), *superseded on other grounds by statute*, Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, *as recognized in Matter of N-A-M-*, 24 I. & N. Dec. 336, 339 (BIA 2007).

41. Moreover, the INA PSC bar requires a "convict[ion] by a final judgment" of a PSC. 8 U.S.C. § 1158(b)(2)(A)(ii). Accusations of criminal activity, or reasonable suspicion of criminal activity, do not trigger the PSC bar.

42. The "serious nonpolitical crime" bar requires a showing that "there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." *Id.* § 1158(b)(2)(A)(iii). This provision also corresponds to an exclusion clause in the 1951 Refugee Convention: Article 1F(b) provides that the Convention does not apply to "any person with respect to whom there are serious reasons for considering that . . . [h]e has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee." Convention Relating to the Status of Refugees art. 1F(b).

43. This treaty provision serves a dual purpose: (i) "to protect the community of a receiving country from the danger of admitting a refugee who has committed a serious common crime," and (ii) "to render due justice to a refugee who has committed a common crime (or crimes) of a less serious nature or has committed a political offence." UNHCR Handbook ¶ 151. Under the treaty, reconciliation of these twin purposes demands an individualized analysis that accounts for all factors relating to "the nature of the offence presumed to have been committed"—including all aggravating or mitigating circumstances—balanced against "the degree of persecution feared," such that "[i]f a person

1  has well-founded fear of very severe persecution . . . a crime must be very grave in order to exclude

2  him." *Id.* ¶¶ 155–157.

3      44.    Adjudicators in the United States similarly apply an individualized, fact-specific anal-

4  ysis in determining whether an offense qualifies as a serious nonpolitical crime. That analysis requires

5  judges to assess in each case whether the "political aspect of his offense may not fairly be said to

6  predominate over its criminal character." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 429–30 (1999); *see*

7  *also McMullen v. INS*, 788 F.2d 591, 596 (9th Cir. 1986) (noting that "a balancing approach including

8  consideration of the offense's 'proportionality' to its objective and its degree of atrocity makes good

9  sense"), *overruled on other grounds by Barapind v. Enomoto*, 400 F.3d 744 (9th Cir. 2000).

10  ## III.   The Rule

11      ### A.   The Rulemaking Process

12      45.    Defendants DOJ and DHS jointly published the proposed Rule in the Federal Register

13  on December 19, 2019. *See* Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg.

14  69640 (Dec. 19, 2019). The Rule proposed parallel amendments to the immigration regulations ad-

15  ministered by DHS (8 C.F.R. pt. 208) and those administered by EOIR, a sub-agency of DOJ (8 C.F.R.

16  pt. 1208). Defendants' stated purposes in issuing the proposed Rule were to (i) amend regulations

17  governing the bars to asylum eligibility; (ii) clarify the effect of criminal convictions; and (iii) remove

18  regulations governing the automatic reconsideration of discretionary denials of asylum. *Id.* at 69640.

19      46.    Although the RFA requires federal agencies to analyze the effects of their rules on

20  "small entities," the proposed Rule disposed of this requirement by stating that "[the] rule will not

21  have a significant economic impact on a substantial number of small entities" because "[o]nly indi-

22  viduals, rather than entities, are eligible to apply for asylum." *Id.* at 69657.

23      47.    Defendants gave the public just 30 days to comment on the proposed Rule, ending

24  January 21, 2020. This already-brief period included multiple federal and religious holidays, including

25  Hanukkah, Christmas Eve, Christmas Day, New Year's Day, and the Birthday of Martin Luther King,

26  Jr., leaving just 15 business days for comment. Even so, Defendants ignored requests to extend the

27  comment period.

12
COMPLAINT

48. On October 21, 2020, the final Rule was published in the Federal Register. *See* Procedures for Asylum and Bars to Asylum Eligibility, 85 Fed. Reg. 67202 (Oct. 21, 2020). Despite 581 comments on the proposed Rule, most of which opposed it—including 78 comments from organizations such as legal advocacy groups, non-profit organizations, and religious organizations, *all* of which opposed it—the final Rule is nearly identical to the proposed text published ten months earlier.

49. The proposed Rule cited two purported sources of authority for the new bars to asylum eligibility: 8 U.S.C. § 1158(b)(2)(B)(ii), which allows the Attorney General to "designate by regulation offenses that will be considered" particularly serious crimes that trigger the PSC bar, and § 1158(b)(2)(C), which allows the Attorney General to "establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum." The final Rule reflects that commenters raised numerous concerns about the invocation of the PSC bar:

> In general, commenters alleged that the [notice of proposed rulemaking] was untethered to the approach set out by Congress regarding particularly serious crimes and that if Congress had sought to sweepingly bar individuals from asylum eligibility based on their conduct or felony convictions, as outlined in the [notice of proposed rulemaking], it would have done so in the Act. Commenters stated that adding seven new categories of barred conduct rendered the language of section 208(b)(2) of the Act (8 U.S.C. 1158(b)(2)) essentially meaningless and drained the term "particularly serious crime" of any sensible meaning because the Departments were effectively considering all offenses, regardless of seriousness, as falling under the particularly serious crime bar to asylum.

85 Fed. Reg. at 67206. Rather than revising the scope of the Rule to address these concerns, Defendants simply disclaimed reliance on the Attorney General's power to designate PSCs in the final Rule. Although the final Rule repeatedly draws analogies to the PSC bar, stating that the new bars are "similar to" PSCs, Defendants dismissed commenters' concerns by stating that the rule "does not designate any offenses . . . as specific particularly serious crimes," rather, it "sets out seven new 'additional limitations' . . . on asylum eligibility." *Id.* at 67207.

50. On many other issues raised by commenters—including issues that go to the heart of the Rule—Defendants failed to provide a meaningful response, stating that various comments and concerns were "beyond the scope of" the rulemaking. Supposedly "outside the scope" were comments and data showing the Rule "will exacerbate harms caused by racially disparate policing practices or that the result of this rule will disproportionately affect people of color," *id.* at 67226, "barriers" that

prevent domestic violence victims from seeking waivers that would prevent the Rule's bars from ap-plying to them, *id*. at 67230, "how the rule might affect working conditions of aliens," *id*. at 67233, "issues involving evidence gathering" under the Rule's vacatur presumption, *id*. at 67239, "humani-tarian concerns for asylum seekers," *id*. at 67243, "treatment, support, and services for children who have experienced trauma," *id*. at 67244, the "complex 'web' of asylum laws and regulations," *id*., "dangerous conditions in Mexico, the effects of the ['migrant protection protocol'], and the third-country transit bar," *id*. at 67245, "access to healthcare, food, and housing," *id*. at 67246, "increased likelihood of convictions for minor offenses for certain vulnerable groups," *id*. at 67247, and "repre-sentation in immigration proceedings or during asylum adjudications," *id*. at 67249.  On most of these points, Defendants just "reiterate[d] their statutory authority to limit and condition asylum eligibility." *Id*. at 67239.

51.     Moreover, like the proposed Rule, the final Rule did not analyze the effects of the Rule on "small entities" as required by the RFA.  Rather, the final Rule concluded without analysis that "[the] rule will not have a significant economic impact on a substantial number of small entities" because "[o]nly individuals, rather than entities, are eligible to apply for asylum."  *Id.* at 67255.

52.     The Rule is currently scheduled to take effect on November 20, 2020.

**B.     Additional Categorical Bars to Asylum Eligibility**

53.     Although the Attorney General may impose additional "limitations and conditions" on asylum eligibility, those limitations must be "consistent with" the INA's asylum provisions.  *See* 8 U.S.C. § 1158(b)(2)(C).  None of the Rule's new asylum eligibility bars pass this test.

54.     The Rule purports to establish several new categorical bars to asylum eligibility, re-gardless of the circumstances of the crime, the punishment imposed, or whether the offense indicates dangerousness to the community—in direct contravention of Congress's intent in establishing asylum protection.  While the Rule asserts similarities between these new bars and the PSC bar, *see* 85 Fed. Reg. at 67216 & n. 16, the new bars are not tailored to address the touchstone of the statutory eligibility bars, including the PSC bar:  dangerousness to the community or the nation.  The Rule thus attempts to add new criminal bars that ignore the boundaries Congress articulated in the statute.

14

55.     The Rule radically expands the list of offenses triggering a categorical bar to asylum eligibility to include:

- any conviction for bringing in or harboring certain aliens under 8 U.S.C. § 1324(a);

- any conviction for illegal reentry under 8 U.S.C. § 1326;

- any conviction for an offense the asylum officer knows or has some unspecified "*reason to believe* was committed in support, promotion, or furtherance of the activity of a criminal street gang";

- any conviction for an offense involving driving while intoxicated or impaired that results in serious bodily injury or death, or any second offense for driving while impaired, even if no injury results;

- any felony conviction under federal, state, or local law;

- any conviction under several newly defined categories of misdemeanor offenses, including any controlled substance-related offense except for a first-time marijuana possession offense, any offense involving possession or use of a false identification document, or any offense involving the receipt of public benefits without lawful authority;

- any conviction for an offense involving domestic violence; and

- any *accusation* of battery or extreme cruelty involving a domestic relationship, even if it does not result in a conviction.

56.     These new bars are inconsistent with the INA's asylum provisions because they (i) involve offenses (or alleged conduct) far less serious, and less dangerous, than Congress deemed necessary to deny asylum eligibility; (ii) allow people to be barred from asylum eligibility based on mere accusation or suspicion of misconduct; and (iii) seek to impose *categorical* eligibility bars, with no individualized analysis (for example, to determine whether the asylum-seeker constitutes a danger to the community).

57.     Nor can this inconsistency be remedied by vague references to the Attorney General's authority to "designate by regulation offenses that will be considered" PSCs.  8 U.S.C. § 1158(b)(2)(B)(ii).  The PSC bar applies only where the person (i) is "convicted by final judgment" (ii) of a "*particularly* serious crime" and (iii) "constitutes a danger to the community of the United

ER-0101   15

COMPLAINT

States." 8 U.S.C. § 1158(b)(2)(A)(ii). The Rule's categorical bars involve crimes that are not serious, let alone *particularly* serious; they are largely unrelated to whether the asylum-seeker poses a danger to the community; and some of them apply even absent a conviction.

58. Some of these new categorical bars also fail to provide fair notice of what convictions—or what suspicions, based on which materials—will trigger them. For example, the Rule says that an asylum-seeker is barred if they are convicted of *any* crime the adjudicator "knows or has reason to believe" was committed in "support, promotion, or furtherance" of the activity of a criminal street gang. The Rule does not explain these nebulous standards or otherwise cabin adjudicators' discretion in a way that would provide fair notice to asylum-seekers or stave off discriminatory or arbitrary enforcement.

## C. Change in the Effect of Vacated, Modified, and Expunged Criminal Convictions

59. The Rule presumes that criminal convictions remain effective (and thus trigger the asylum bars) despite any vacatur, expungement, or modification, if (i) the vacatur or modification order was entered after removal proceedings began or (ii) the applicant moved for the order more than a year after conviction or sentencing, even if the modification was made to correct constitutional or legal defects. 85 Fed. Reg. at 67259–60 (to be codified at 8 C.F.R. §§ 208.13(c)(7)–(8), 1208.13(c)(7)–(8)). The Rule places the burden on the asylum-seeker to establish that any modification to their underlying criminal conviction or sentence was not made for rehabilitative purposes or "for purposes of ameliorating the immigration consequences of the [underlying] conviction or sentence." *Id.* Moreover, the Rule empowers immigration adjudicators to consider evidence beyond the face of the court order itself to determine the ruling state judge's "purposes." *Id.* at 67259–60 (to be codified at 8 C.F.R. §§ 208.13(c)(9), 1208.13(c)(9)).

60. This portion of the Rule does not reflect a permissible interpretation of the INA. Treating as valid a conviction vacated to correct a constitutional error is "so foreign, so antithetical, to the long-standing principles underlying our criminal justice system and our notions of due process that we would expect Congress to have spoken very clearly if it intended to effect such results." *Alim v. Gonzales*, 446 F.3d 1239, 1249 (11th Cir. 2006). Yet Congress nowhere authorized defendants to do

so.  Nor does the INA contain the clear statement that courts require before they allow federal agencies to upset the federal–state balance.  Indeed, this novel regime may violate the Full Faith and Credit Act, 28 U.S.C. § 1738, and the underlying constitutional guarantees thereof, U.S. Const. art. IV, § 1.

**D.    Elimination of Automatic Review of Discretionary Denials of Asylum**

61.    Finally, the Rule eliminates 8 C.F.R. §§ 208.16(e) and 1208.16(e), which provide for automatic review of a discretionary denial of asylum where an asylum-seeker is denied asylum but granted withholding of removal under 8 U.S.C. § 1231(b)(3), and the refugee is thereby precluded from reuniting with their spouse and/or children and from obtaining permanent residence or citizenship.

62.    If asylum is granted to an applicant, they may petition to have their spouse and/or minor children admitted as derivative asylees.  8 U.S.C. § 1158(b)(3).  Recipients of withholding of removal are not able to do the same.  *Id.*; *see also id.* § 1231.  As a result of the Rule, an asylum applicant who is denied asylum solely in the exercise of discretion, but who is then granted withholding of removal, will not receive automatic review of that decision, even if it results in the inability to petition for their spouse and/or minor children.

63.    Defendants have failed to offer any satisfactory justification for this fundamental change in policy.  The Rule relies primarily on unsubstantiated assertions that §§ 208.16(e) and 1208.16(e) are "inefficient, unclear, and unnecessary," 85 Fed. Reg. 67251; however, instead of adding detail or clarifying language to resolve any such confusion, Defendants have eliminated these regulatory provisions entirely.  In so doing, Defendants have not articulated any explanation for the provisions' alleged inefficiency.  Nor have they articulated a basis for depriving applicants who are not granted asylum solely in the exercise of discretion but who later win withholding of removal the opportunity to achieve family unity.  Family unity has been a cornerstone of U.S. immigration policy for decades, and this change would prevent spouses and children from finding safety in the United States.

**IV.    Defendant Chad Wolf Lacked Authority to Propose or Issue the Rule**

64.    The Rule was jointly issued by DHS and DOJ and sets forth parallel provisions to amend 8 C.F.R. pt. 208, which operationalizes immigration laws administered by DHS (including

1   those that govern affirmative asylum applications), and 8 C.F.R. pt. 1208, which operationalizes im-

2   migration laws administered by the EOIR, a sub-agency of DOJ.

3       65.   Insofar as the Rule relies on authority from DHS—including to implement amend-

4   ments to 8 C.F.R. pt. 208—the Rule was not validly issued because Defendant Chad Wolf lacked

5   authority under the Appointments Clause of the U.S. Constitution, the HSA, and/or the FVRA to pro-

6   pose or issue the Rule.

7       66.   On August 14, 2020, the U.S. Government Accountability Office ("GAO") issued a

8   decision stating that the "incorrect official assumed the title of Acting Secretary" when former DHS

9   Secretary Kirstjen Nielsen resigned in April 2019 and that "subsequent amendments to the order of

10  succession made by [Kevin McAleenan] were invalid and officials who assumed their positions under

11  such amendments, including Chad Wolf and Kenneth Cuccinelli, were named by reference to an in-

12  valid order of succession."  GAO, *Decision in the Matter of Department of Homeland Security—Le-*

13  *gality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing*

14  *the Duties of Deputy Secretary of Homeland Security* 1 (Aug. 14, 2020), https://www.gao.gov/as-

15  sets/710/708830.pdf ("GAO Decision").

16      67.   While the GAO decision focused primarily on the validity of Wolf's appointment pur-

17  suant to the HSA, Wolf's claim to the role of Acting Secretary fares no better under the FVRA.  The

18  FVRA states that a person serving as an acting officer may serve in the office "for no longer than 210

19  days *beginning on the date the vacancy occurs*," except under narrow circumstances.  5 U.S.C. §

20  3346(a)(1) (emphasis added).

21      68.   The relevant vacancy occurred, at the latest, by  April 10, 2019, the purported effective

22  date of former DHS Secretary Kirstjen Nielsen's resignation.

23      69.   Kevin McAleenan resigned, and Wolf purported to assume the role of Acting Secretary

24  of DHS, on November 13, 2019—217 days after April 10, 2019, and thus beyond the 210-day period

25  set forth in the FVRA.  Accordingly, Wolf's assumption of the role of Acting Secretary was not lawful

26  pursuant to the FVRA.

27

28

70.    On December 19, 2019, DOJ and DHS jointly released the proposed Rule.  *See* 84 Fed. Reg. 69640.  Wolf signed the proposal, notwithstanding that—as the GAO Decision explained—he lacked the authority to do so.

71.    On October 21, 2020, the Departments jointly released the final Rule.  Defendant Wolf signed the final Rule under his purported authority as Acting Secretary of DHS.  Specifically, Wolf, "having reviewed and approved" the Rule, "delegated the authority to electronically sign" the Rule to Chad R. Mizelle (the Senior Official Performing the Duties of the General Counsel for DHS).

72.    Because Defendant Wolf is not validly serving as Acting Secretary of DHS, he could not lawfully exercise the authority of that office, including by proposing or issuing the Rule.  To the extent the Rule relies on authority from DHS, including to amend the procedures for asylum and withholding of removal set forth at 8 C.F.R. pt. 208, the Rule must be set aside.

## V.    <u>The Rule Is Motivated by Racial Animus</u>

73.    Additionally, the Rule is motivated by racial, ethnic, and national origin-based animus. As a threshold matter, the Rule reflects that DHS and DOJ received a number of comments expressing concern about the ways in which it would disproportionately harm non-white immigrants.  *See, e.g.*, 85 Fed. Reg. at 67223 (describing comments about the disparate racial impact that a bar based on allegations that an offense was committed in "furtherance of criminal street gang activity" may have). The Departments did not refute these comments, did not meaningfully engage with them, and did not revise the Rule to address these concerns.  Rather, the Rule includes only a hollow assertion that "[t]o the extent that the rule disproportionally affects any group referenced by the commenters, any such impact is beyond the scope of this rule, as this rule was not drafted with discriminatory intent toward any group, and the provisions of the rule apply equally to all applicants for asylum."  *Id.* at 67226. This statement is belied by countless racist, xenophobic comments made by members of the Trump Administration and by the outsized impact that the Rule will have—and that DHS and DOJ were made aware the Rule will have—on non-white immigrants.

74.    Statements by President Trump and others lay bare the Trump Administration's discriminatory motives against non-white, non-European immigrants, especially those accused or convicted of criminal conduct.  The statements below are just a few examples; there are many more.

75.     President Trump launched his 2016 campaign by raising the specter of violence from supposedly criminal immigrants.  When he announced his presidential bid, he infamously said: "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with [*sic*] us.  They're bringing drugs.  They're bring-ing crime.  They're rapists.  And some, I assume, are good people."  *Donald Trump Announces a Presidential Bid*, Wash. Post (June 16, 2015), https://www.washingtonpost.com/news/post-poli-tics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/.   Three days later, he re-peated a variation of the same statement on Twitter, writing, "Druggies, drug dealers, rapists and kill-ers are coming across the southern border.  When will the U.S. get smart and stop this travesty?"  President Donald Trump (@realDonaldTrump), Twitter (June 19, 2015, 10:22 PM), https://twit-ter.com/realdonaldtrump/status/612083064945180672.

76.     President Trump has continued to make similar remarks throughout his presidency.  For example, in 2018, reports circulated that a group of several thousand asylum-seekers were approaching the U.S.-Mexico border seeking refuge.  President Trump tweeted about the event repeatedly over the next several weeks, writing:

- "I am watching the Democrat Party led . . . assault on our country by Guatemala, Honduras and El Salvador, whose leaders are doing little to stop this large flow of people, INCLUDING MANY CRIMINALS, from entering Mexico to U.S....."  President Donald Trump (@real-DonaldTrump), Twitter (Oct. 18, 2018, 7:25 AM), https://twitter.com/realdonaldtrump/sta-tus/1052883467430694912.

- "Sadly, it looks like Mexico's Police and Military are unable to stop the Caravan heading to the Southern Border of the United States.  Criminals and unknown Middle Easterners are mixed in.  I have alerted Border Patrol and Military that this is a National Emergy [*sic*].  Must change laws!"  President Donald Trump (@realDonaldTrump), Twitter (Oct. 22, 2018, 8:37 AM), https://twitter.com/realdonaldtrump/status/1054351078328885248.

- "There are a lot of CRIMINALS in the Caravan.  We will stop them.  Catch and Detain!  Judicial Activism, by people who know nothing about security and the safety of our citizens,

is putting our country in great danger. Not good!" President Donald Trump (@real-DonaldTrump), Twitter (Nov. 21, 2018, 4:42 PM), https://twitter.com/realdonaldtrump/status/1065359825654169600.

77.     Around the same time, President Trump aired a midterm campaign ad that featured footage of an undocumented Mexican immigrant, Luis Bracamontes, bragging about his murder of two police officers in California. It juxtaposed footage of Bracamontes with images of the so-called "migrant caravan" moving toward the United States border—even though Bracamontes had nothing to do with the caravan—and stated: "Dangerous illegal criminals like cop-killer Luis Bracamontes don't care about our laws." Michael M. Grynbaum & Niraj Chokshi, *Even Fox News Stops Running Trump Caravan Ad Criticized as Racist*, N.Y. Times (Nov. 5, 2018), https://www.nytimes.com/2018/11/05/us/politics/nbc-caravan-advertisement.html.

78.     President Trump's attempts to paint immigrants (particularly those from Central America) as gang members and dangerous people continued into the weeks surrounding the publication of the proposed Rule in 2019. Less than two weeks before the proposed Rule was published in the Federal Register, President Trump posted a tweet reading in part, "Without the horror show that is the Radical Left . . . the Border would be closed to the evil of Drugs, Gangs and all other problems!" President Donald Trump (@realDonaldTrump), Twitter (Dec. 6, 2019, 11:00 AM), https://twitter.com/realdonaldtrump/status/1202981139155210241. The day after the proposed Rule was published, President Trump took to Twitter to share a link to an article about a number of purported gang-related arrests in New York, writing, "We are getting MS-13 gang members, and many other people that shouldn't be here, out of our Country!" President Donald Trump (@realDonaldTrump), Twitter (Dec. 20, 2019, 5:41 PM), https://twitter.com/realDonaldTrump/status/1208155412962447360.

79.     Similarly, during a presidential debate held on October 22, 2020—the day after the final Rule was published—President Trump described noncitizen children separated from their parents at the U.S. border as having been brought to the United States "through cartels and through coyotes and through gangs." ABC News, *Biden and Trump Discuss Their Views on Immigration Policy*, YouTube (Oct. 22, 2020), https://www.youtube.com/watch?v=DZ9vIzVZjS4. In criticizing "catch

1 and release" (the practice of allowing asylum-seekers to await their immigration hearings in the com-

2 munity rather than detaining them), President Trump further stated, "Catch and release is a disaster.

3 A murderer would come in, a rapist would come in, a very bad person would come in . . . we [would]

4 have to release them into *our* country." *Id.* (emphasis added).

5       80. These comments are part of a broader pattern of racist and xenophobic remarks made

6 by members of the Trump Administration. For example, in 2017, at the height of litigation surround-

7 ing the Administration's travel bans, President Trump tweeted, "That's right, we need a TRAVEL

8 BAN for certain DANGEROUS countries, not some politically correct term that won't help us protect

9 our people!" President Donald Trump (@realDonaldTrump), Twitter (June 5, 2017, 9:20 PM),

10 https://twitter.com/realdonaldtrump/status/871899511525961728. A few months later, he tweeted

11 again, "The travel ban into the United States should be far larger, tougher and more specific – but

12 stupidly, that would not be politically correct!" President Donald Trump (@realDonaldTrump), Twit-

13 ter (Sept. 15, 2017, 6:54 AM), https://twitter.com/realdonaldtrump/status/908645126146265090.

14       81. Around January 2018, President Trump met with lawmakers to discuss protections for

15 immigrants from Haiti, El Salvador, and African countries. According to those present at the meeting,

16 the President asked, "Why are we having all these people from shithole countries come here?" Josh

17 Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, Wash. Post (Jan. 12,

18 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-

19 shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-

20 31ac729add94_story.html. He also suggested that the United States should allow more people from

21 countries like Norway instead. Alan Fram & Jonathan Lemire, *Trump: Why Allow Immigrants from*

22 *'Shithole Countries'?*, AP News (Jan. 12, 2018), https://ap-

23 news.com/fdda2ff0b877416c8ae1c1a77a3cc425/Trump:-Why-allow-immigrants-from-'shithole-

24 countries'.

25       82. Similarly, Defendant Kenneth Cuccinelli has made a number of troubling comments

26 about immigrants and their families. During a radio interview in 2012, Cuccinelli criticized Washing-

27 ton, D.C.'s pest control policy, stating that "it is worse than our immigration policy," and noting, "You

28 can't break up rat families. Or raccoons, and all the rest, and you can't even kill 'em." Nick Wing,

1    *Ken Cuccinelli Once Compared Immigration Policy to Pest Control, Exterminating Rats*, Huffington

2    Post (July 26, 2013), https://www.huffpost.com/entry/ken-cuccinelli-immigration-

3    rats_n_3658064?guccounter=1.

4         83.    More recently, in August 2019, Cuccinelli was asked whether he agreed that the words

5    of Emma Lazarus appearing on the Statue of Liberty, "Give me your tired, your poor," are part of the

6    American ethos.  Devan Cole & Caroline Kelly, *Cuccinelli Rewrites Statue of Liberty Poem to Make*

7    *Case for Limiting Immigration*, CNN (Aug. 13, 2019), https://www.cnn.com/2019/08/13/politics/ken-

8    cuccinelli-statue-of-liberty/index.html.  He responded, "They certainly are:  'Give me your tired and

9    your poor who can stand on their own two feet and who will not become a public charge.'"  *Id.*  He

10   later noted that Lazarus's poem "was referring back to people coming from Europe."  *Id.*

11        84.    The Trump Administration has repeatedly used racist rhetoric to cast non-white immi-

12   grants as dangerous and to curb their entry into the United States.  These statements leave no doubt

13   about the racial, ethnic, and national origin-based animus driving the new Rule, which will dramati-

14   cally expand bars to asylum eligibility for people convicted—or simply *accused*—of various relatively

15   minor offenses.  The Rule will cause significant harm to non-white immigrants.

16        85.    It is well documented that current law enforcement policies harm immigrants of color.

17   For example, as a result of racially biased policing practices, Black people are disproportionately likely

18   to be arrested, convicted, and imprisoned in the United States.  *See* NYU Law Immigrant Rights Clinic,

19   *The State of Black Immigrants Part II:  Black Immigrants in the Mass Criminalization System* at 15,

20   https://www.immigrationresearch.org/system/files/sobi-fullreport-jan22.pdf (last visited Nov. 1,

21   2020) (noting in part, "These disparities exist even when crime rates are the same; for example, alt-

22   hough Blacks and whites use marijuana at roughly equal rates, Black people are 3.7 times more likely

23   than whites to be arrested for marijuana possession.").

24        86.    The harm caused by racial bias in policing is further compounded by the immigration

25   consequences that often accompany arrests and convictions.  *See, e.g.*, Elizabeth Aranda & Elizabeth

26   Vaquera, *Racism, the Immigration Enforcement Regime, and the Implications for Racial Inequality in*

27   *the Lives of Undocumented Young Adults*, Soc. of Race and Ethnicity 88 (2015) ("[W]ith the exception

28   of Salvadorans, Latino and black immigrants are disproportionately represented among those being

apprehended, detained, and deported from the country when compared with their shares of the undocumented population"); *see also* Refugee and Immigrant Ctr. for Educ. and Legal Servs., *Black Immigrant Lives Are Under Attack*, https://www.raicestexas.org/2020/07/22/black-immigrant-lives-are-under-attack/ (last visited Nov. 1, 2020) ("While 7% of non-citizens in the U.S. are Black, they make up a full 20% of those facing deportation on criminal grounds[.]").

87.     The specific nature of several of the newly imposed bars to asylum eligibility is likely to augment these harms.  For example, the use of convictions for bringing in or harboring certain aliens as a bar to asylum eligibility will be particularly harmful to people entering the country through the Southwest border of the United States.  In fiscal year 2019, 3,487 convictions for "alien smuggling" offenses were reported to the United States Sentencing Commission.  *See* U.S. Sentencing Comm'n, *Quick Facts: Alien Smuggling Offenses* (2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Alien_Smuggling_FY19.pdf.  A staggering 94% of those convictions were brought in districts along the Southwest border.  *Id.*  Data from CBP reflects that in the same year, nearly 88% of single adults apprehended at the Southwest border—i.e., the population of people statistically most likely to be convicted for smuggling or harboring illegal aliens—came from the same four countries:  El Salvador, Guatemala, Honduras, and Mexico.  *See* U.S. Customs and Border Prot., *U.S. Border Patrol Southwest Border Apprehensions by Sector:  Fiscal Year 2019* (Nov. 14, 2019), https://www.cbp.gov/newsroom/stats/sw-border-migration/usbp-sw-border-apprehensions-fy2019.

88.     Similarly, barring asylum where a person is convicted of a crime that the adjudicator knows or "has reason to believe" was committed in furtherance of gang activity—an extremely low standard—will harm asylum-seekers from communities of color.[2]  *See* 85 Fed. Reg. at 67258–59 (to be codified at 8 C.F.R. §§ 208.13(c)(6)(ii), 1208.13(c)(6)(ii)).  For example, the Boston Regional Intelligence Center ("BRIC") maintains a "Gang Assessment Database" that tracks suspected gang members.  *See* Bos. Police Dep't, *Rule 335 – Gang Assessment Database* (Mar. 23, 2017),

[2] This harm will only be exacerbated by the Executive Order on Combating Race and Sex Stereotyping issued by President Trump on September 22, 2020.  The Executive Order prohibits, in part, training on implicit bias for certain federal employees, characterizing such training—perplexingly—as "promot[ing] race or sex stereotyping or scapegoating."  As a result of the interplay between the Rule and this Executive Order, adjudicators will now be empowered to make a subjective determination about whether an offense was committed in furtherance of gang activity without the benefit of any training on the impacts of implicit bias on such determinations.

https://bpdnews.com/rules-and-procedures. People are added to the BRIC Gang Assessment Database based on a highly flawed point system, pursuant to which law enforcement officers assign people a "score" based on various purported markers for gang involvement. *Id.* at 2 (describing the "10 Point Verification System"). The point system allows law enforcement officers to assign points to a person even where there is no allegation that the person has engaged in criminal activity. For example, a person may receive points against them based on nicknames, attire, "drawings," tattoos, or "[w]alking, eating, recreating, communicating, or otherwise associating with" a purported gang member—even if that person is a friend, neighbor, or family member. *Id.* at 3, 5–6. Data from the Boston Police Department reflects that 66% of the people tracked in the BRIC Gang Assessment Database are Black, 24% are Latino, and just 2% are white, notwithstanding that Black and Latino residents make up 25% and 20% of the Boston population, respectively. Phillip Marcelo, *Inside The Boston Police Gang Database*, WGBH (July 30, 2019), https://www.wgbh.org/news/local-news/2019/07/30/inside-the-boston-police-gang-database.

89. Moreover, available data suggest that empowering immigration adjudicators to determine whether there is "reason to believe" that a crime was gang-related is likely to result in harm to people from communities of color, who are often labeled by police as gang-involved even when they are not. Government audits of gang databases have routinely found significant error rates. *See, e.g.*, Cal. State Auditor, The CalGang Criminal Intelligence System 2 (Aug. 2016), https://www.auditor.ca.gov/pdfs/reports/2015-130.pdf (finding that 23% of the CalGang designations reviewed lacked adequate support); City of Chi. Office of Inspector Gen., Review of the Chicago Police Department's "Gang Database" 2 (Apr. 2019), https://igchicago.org/wp-content/uploads/2019/04/OIG-CPD-Gang-Database-Review.pdf (finding that over 15,000 people designated as gang members in Chicago's gang database "had no specific gang membership listed and no reason provided for why the individual was listed as a gang member").

90. By way of additional example, in April 2016, officers in New York arrested 120 people in the Bronx (the "Bronx 120") in what was then-described as the "largest gang takedown in New York City history." Babe Howell & Priscilla Bustamante, CUNY Sch. Of Law, *Report on the Bronx*

COMPLAINT

*120 Mass "Gang" Prosecution* 4 (Apr. 2019), https://bronx120.report/.  Notwithstanding this charac-
terization, approximately half of those arrested were not ultimately alleged to be gang members in the
indictment.  *Id.* at 9.  88% of those arrested were Black, and not one was identified as white.  *Id.* at 13.
The outcome of the Bronx 120 incident is emblematic of both the impact that a bar to asylum eligibility
based on purported gang activity will have on non-white immigrants and the unreliable nature of sub-
jective determinations of whether conduct is gang-related.

91.      The Rule does not articulate a standard to be applied in determining whether an offense
was committed in furtherance of gang activity, nor even criteria for what should prompt such an in-
quiry.  Under the Rule, a conviction for something minor, like disorderly conduct, could lead to de-
portation of a young person to a country where they face persecution when paired with even minimal
evidence or a mere allegation of gang involvement.  This outcome is manifestly unjust and exemplifies
the harm the Rule will cause asylum-seekers from low-income communities and communities of color.

## VI.    The Rule's Harm to Plaintiffs

92.      Plaintiffs are non-profit organizations that provide direct representation to, and advo-
cate on behalf of, immigrant communities, and provide training and educational programming to im-
migration practitioners and/or immigrant communities.  The significant changes the Rule will im-
pose—including by creating several new categorical bars to asylum eligibility and eroding protections
set forth in the INA—will harm Plaintiffs in a number of ways.

### A.    The Rule Frustrates Plaintiffs' Missions

93.      Each of the Plaintiffs shares a mission to support and provide legal services to as many
low income and vulnerable noncitizens as possible, including to asylum-seekers.  For example,
CLINIC operates the nation's largest network of nonprofit legal immigration services programs as part
of its mission to embrace the Gospel value of welcoming the stranger by promoting the dignity and
protecting the rights of immigrants.  The Rule frustrates Plaintiffs' missions by establishing a number
of new barriers to asylum eligibility that will make it far more difficult for Plaintiffs to serve their
clients—many of whom the Rule will render ineligible for asylum.

94.      For CLINIC (and the nearly 400 affiliated immigration programs in its network), the
Rule will impede its core aims of "welcoming the stranger" and protecting the rights of immigrants by

1  categorically excluding many from asylum eligibility, leaving CLINIC and its affiliates without a

2  means of securing a pathway to permanent residency for many of the people it serves.

3        95.    Moreover, the Rule allows immigration adjudicators to undertake a number of subjec-

4  tive inquiries, including determining whether an offense was committed in furtherance of the activity

5  of a criminal street gang, whether a person engaged in battery or extreme cruelty involving a domestic

6  relationship (even if it did not result in a conviction), and the purposes for which a prior conviction

7  was vacated or modified.  These changes will increase the proportion of resource-intensive cases aris-

8  ing within the communities Plaintiffs serve, necessarily reducing the number of asylum-seekers Plain-

9  tiffs are able to assist and causing ripple effects felt throughout Plaintiffs' organizations.

10        96.    For example, in 2019 alone, CAIR Coalition was able to provide 4,090 individual con-

11  sultations for adults and children in detention to ascertain their asylum options, spending 4,000 hours

12  conducting jail visits.  As a result of the sweeping impact of the new Rule, each consultation is likely

13  to take significantly more time—indeed, CAIR Coalition estimates that the number of adults its staff

14  could prepare during each jail visit will be reduced by a third.

15        97.    Similarly, the number of intake interviews CAIR Coalition has traditionally been able

16  to provide is driven in part by its ability to rely on appropriately supervised legal assistants and law

17  student volunteers to conduct such interviews.  Given the increased complexity resulting from the new

18  Rule (including the need to assess the applicability of a number of new categorical bars to asylum

19  eligibility and the impact of any prior convictions an asylum-seeker may have), CAIR Coalition an-

20  ticipates that it will no longer be able to staff client intake interviews with legal assistant or law student

21  volunteers.  The new need to staff such interviews with CAIR Coalition staff members and volunteer

22  lawyers will (i) significantly reduce the overall amount of intake interviews CAIR Coalition is able to

23  conduct and (ii) reduce CAIR Coalition's capacity to assist as many clients as possible in other aspects

24  of the asylum process, including in trial-stage proceedings.

25        98.    The Rule will significantly reduce the amount of cases in which Plaintiffs can support

26  and represent asylum-seekers going forward, as their attorneys will need to expend an increased

27  amount of time and resources on each client's case to establish eligibility under the Rule (including,

28  among other things, the time and resources required to obtain and assess criminal conviction and arrest

records, prepare for and put on a "mini-trial" in immigration court regarding whether there is a "reason to believe" an offense was committed in furtherance of gang activity or is a domestic violence offense, and engage expert witnesses). The Plaintiffs will also need to expend an increased amount of time and resources on the cases of applicants who are barred from asylum by the Rule and bear the burden to meet a higher standard under withholding of removal than asylum.

99. The ability of the Plaintiffs to take on new clients will also be harmed by the Rule's impact on family members of the asylum-seekers the Plaintiffs serve, many of whom are parents who fled their home countries with their young children. If a parent who flees to the United States is subject to one of the Rule's new eligibility bars, and thereby forced to seek withholding of removal, they will no longer be able to ensure that their child or spouse can also obtain protection in the United States, regardless of whether the parent is granted withholding of removal. The de facto decoupling of family cases contemplated by the new Rule will likely result in increased family separation, as family members who no longer qualify for asylum are removed, but will also have a significant impact on the Plaintiffs, who will be faced with an increased number of cases where they must assist each family member in seeking asylum as a principal, rather than being able to rely on derivative status, at the same time as they face a decrease in the number of resources they have available.

100. The resulting reduction in the number of people Plaintiffs are able to support will frustrate their missions, including by directly conflicting with CAIR Coalition's mission to expand access to counsel within the population it serves.

**B.  The Rule Diverts Resources from Plaintiffs' Core Programs**

101. The Rule is also causing and will continue to cause Plaintiffs to divert resources from their core programs. Before the effective date of the Rule, each Plaintiff will need to expend significant resources—including by diverting resources from its core programs—to analyze and interpret the Rule, create new informational materials and resources to address the Rule, and provide training to its staff and, in the case of CLINIC, its large network of affiliates, almost half of whom provide asylum representation. For example, CAIR Coalition will need to update its client database and intake process to add questions and responses relevant to the new Rule's asylum eligibility bars, a process that will

take days of staff member time and require deferring previously planned updates due to cost and timing reasons.

102. Additionally, several of the Plaintiffs provide training and support to other practitioners and/or directly to immigrant communities, which will require them to expend substantial resources in the near term on tasks such as drafting client alerts, designing and hosting webinars, and updating any website content concerning asylum eligibility. For example, Pangea provides Know Your Rights presentations to hundreds of immigrants each year, and DSCS conducts advocacy work for ICE detainees and assists undocumented youth with DACA registrations. In 2020, Pangea piloted a program that provides in-depth assistance to *pro se* asylum applicants that has already served ten clients, while CAIR Coalition hosted 182 workshops for *pro se* asylum-seekers and provided *pro se* assistance to 241 individuals in 2019 alone. To continue offering these programs, Pangea, CAIR Coalition, and DSCS will need to analyze the new Rule, revise their training materials, and create new curricula promptly. They will also need to spend more staff time on each workshop to explain the complexities of the rule to *pro se* asylum-seekers.

103. Likewise, all Plaintiffs anticipate needing to rework their existing training materials to ensure their staff understand the Rule's new eligibility and processing framework requirements, and especially on the complexities of criminal law, which will take a tremendous amount of time and workforce effort that the Plaintiffs cannot afford to spare.

104. Moreover, because CLINIC is the hub of the largest network of immigration legal services providers in the nation, its affiliate programs will look to it to provide real-time guidance regarding the new Rule, including through in-depth articles and news alerts and multi-platform social media announcements. Among other tools, CLINIC provides its affiliates with access to the "Ask-the-Experts" portal on its website, which allows attorneys and accredited representatives at its affiliates to submit inquiries regarding individual immigration matters. In order to ensure that it is adequately prepared to field questions from affiliate legal staff about the impact of the Rule on asylum-seeking clients, CLINIC will need to devote substantial resources to training its legal staff. If a submitted question is broadly applicable, CLINIC staff may also spend additional weeks developing trainings or written resources designed to answer it. Indeed, due to the substantial number of questions CLINIC

1    has already received from its affiliates regarding the intersection of criminal law and immigration law,

2    CLINIC hired a consulting attorney who specializes in this area to respond specifically to such inquir-

3    ies.  Because the attorney charges CLINIC an hourly rate, CLINIC expects to realize a negative impact

4    to its budget, especially given the number of queries the organization will continue to receive regarding

5    the implications of the new Rule alone.

6         105.    Each of the tasks and expenses necessary to respond to the new Rule—including those

7    described above—requires Plaintiffs to divert their finite resources from other aspects of the programs

8    they provide.  As a result of the Rule, Plaintiffs anticipate the need to make changes including reallo-

9    cating staffing, devoting less time to advocacy projects and community initiatives, and taking on fewer

10   cases.

11        **C.    The Rule Jeopardizes Plaintiffs' Funding**

12        106.    The Rule will also jeopardize Plaintiffs' funding.  Plaintiffs rely in part on grants from

13   sources such as states, counties, and foundations.  Such grants are often conditioned on Plaintiffs'

14   ability to achieve certain targets, such as a total number of clients served or asylum applications filed

15   each year.  In 2020, grants of this nature constituted approximately 65% of Pangea's budget and ap-

16   proximately 95% of the budget for DSCS's Deportation Defense & Legal Advocacy Project.  CAIR

17   Coalition, too, receives funding from grants and foundations tied to the number of adults CAIR Coa-

18   lition is able to represent each year.  Because the Rule will necessarily reduce the number of Plaintiffs'

19   clients eligible for asylum, and will require Plaintiffs to spend significantly more time on each client's

20   case, Plaintiffs are unlikely to be able to comply with existing funding requirements—and thus expect

21   to lose a substantial amount of their funding once this Rule goes into effect.

22        107.    Similarly, CAIR Coalition has established pro bono partnerships with a number of law

23   firms with which it places asylum cases.  In addition to providing pro bono legal services, many of

24   these law firms donate money to CAIR Coalition, often in exchange for opportunities to provide direct

25   assistance with and staffing of asylum matters.  Currently, law firm donations of this kind account for

26   close to 5% of CAIR Coalition's annual budget.  Under the new Rule, fewer of CAIR Coalition's

27   clients will be eligible for asylum, as a result of which it will necessarily have fewer asylum cases to

28   place with partner law firms.  CAIR Coalition expects that this shift could result in a decrease in the

amount of law firm donations it receives.  CLINIC expects to see a similar decrease in law firm dona-tions in connection with the impact the Rule may have on its BIA Pro Bono Project, through which CLINIC matches vulnerable immigrants with pro bono counsel to defend their cases before the Board of Immigration Appeals ("BIA").

108.    Even under the best of circumstances, the loss of a significant source of funding could have devastating impacts for the Plaintiffs.  With respect to the new Rule, the harm caused by the loss of funding will be further exacerbated by the concomitant increase in demands on Plaintiffs' resources.

**D.    The Rule Harms the Populations Plaintiffs Serve**

109.    In addition to the harmful outcomes described above, if permitted to take effect, the Rule will cause serious harm to the populations Plaintiffs serve.

110.    To start, the harm caused by the Rule will be exacerbated by the manner in which it intersects with other rules recently issued by DHS.  For example:  the Rule will impose a categorical bar against asylum-seekers convicted of "possession or use of an identification document, authentica-tion feature, or false identification document without lawful authority." 85 Fed. Reg. at 67258–60 (to be codified at 8 C.F.R. §§ 208.13(c)(6)(vi), 1208.13(c)(6)(vi)).  However, this Rule follows close be-hind a separate rule entitled Asylum Application, Interview, and Employment Authorization for Ap-plicants, published on June 26, 2020, which prohibits asylum-seekers from applying for work author-ization until at least one year after submission of an asylum application.  *See* 85 Fed. Reg. 38532, 38626 (June 26, 2020) ("EAD Rule").  At the same time, asylum-seekers are generally not eligible to receive federal public benefits until they are granted asylum.  *Id.* at 38566.  As a result of the EAD Rule, asylum-seekers will be unable to work *or* to receive federal public benefits for a prolonged period of time, which may drive some to seek and/or use false identification out of necessity.  This harm will be further exacerbated by the ongoing unemployment and health impacts of the coronavirus pandemic.  Under the Rule, even people seeking false identification as a means of survival (due to the impacts of the EAD Rule) may be barred from asylum eligibility as a result.

111.    Moreover, the Rule will summarily exclude many people from asylum eligibility in violation of U.S. asylum laws, decades of asylum jurisprudence, and international treaty obligations.  As a direct result of the Rule, thousands of people fleeing persecution, violence, and even death in

their countries of origin will be ineligible for the life-saving relief asylum is meant to provide, in direct contravention of the Refugee Convention and the Refugee Act of 1980. The Rule will also impact their family members, who will be rendered ineligible for derivative asylum and family reunification. Moreover, the Rule will leave thousands ineligible for adjustment of status based on asylum, as a result of which—even if they are permitted to remain in the United States—they will no longer have a pathway to citizenship.

112. The Rule will disproportionately impact the most vulnerable people who are fleeing persecution and seeking asylum. Asylum-seekers are often impacted by the trauma of persecution, ranging from torture, rape, and severe bodily injury to death threats, pervasive discrimination, imprisonment, and subjugation of their beliefs and identities. These populations have also often suffered the additional traumas of witnessing the persecution of family members and friends; harrowing journeys from their countries of origin to the United States; and even facing additional discrimination and hardship once they arrive here.

113. The trauma refugees and asylum-seekers have faced frequently manifests as mental illness, and studies suggest that more than one out of every three asylum-seekers struggles with depression, anxiety, and/or post-traumatic stress disorder. Giulia Turrini et al., *Common Mental Disorders in Asylum Seekers and Refugees: Umbrella Review of Prevalence and Intervention Studies*, 11 Int'l J. Mental Health Sys. 51 (Aug. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/. In many cases, the behavior that serves as the basis for criminal convictions is a direct result of these traumatic experiences. For example, asylum-seekers, and even asylum-seeking unaccompanied children, often have little or no access to mental health care and may turn to self-medication through drugs or alcohol.[3] This behavior, in turn, places them at high risk for substance-related convictions; *e.g.*, convictions for drug possession or driving under the influence. Under the new Rule, any such conviction could bar someone from eligibility for asylum, even if it were a one-time offense and the applicant demonstrated extensive evidence of rehabilitation. The Rule eliminates

---

[3] Moreover, many may refrain from seeking help due to concerns about the applicability of the Inadmissibility on Public Charge Grounds Rule (the "Public Charge Rule"). *See* 84 Fed. Reg. 41292 (Aug. 14, 2019). Under the Public Charge Rule, a person may be rendered inadmissible to the United States if they are "likely at any time to become a public charge." *Id.* at 41294; *see also* 8 U.S.C. § 1182(a)(4).

1   immigration adjudicators' discretion to consider the underlying circumstances of these types of of-

2   fenses and thus to treat these asylum-seekers with the compassion that trauma-related addiction issues

3   deserve.

4         114.    The Rule's categorical bar against asylum-seekers convicted or accused of acts of do-

5   mestic violence will similarly impact the most vulnerable applicants.  While plaintiffs unequivocally

6   condemn domestic violence in all of its forms, the Rule as drafted fails to account for the complex

7   dynamics of such violence and its treatment under criminal law—a failure that puts even survivors of

8   domestic violence at risk.  For example, in many states, any incident involving intimate partners, or

9   parents and children, is treated as a domestic violence case from the outset, regardless of circumstance.

10  *See* Kari Hong & Philip L. Torrey, *What* Matter of Soram *Got Wrong:  "Child Abuse" Crimes that*

11  *May Trigger Deportation Are Constantly Evolving and Even Target Good Parents*, Harv. Civ. Rts.

12  Civ. L. Rev. (Oct. 15, 2019) ("In 1999, Minnesota enacted legislation requiring a child's exposure and

13  proximity to domestic violence to be 'a statutorily specified form of reportable child abuse and ne-

14  glect.' . . . 'Parents, primarily mothers, who themselves were victims of domestic violence thus be-

15  came the subjects of neglect reports based on their alleged failure to protect their children from expo-

16  sure to the violence.'").  Additionally, instances of domestic violence often result in the arrest of *both*

17  the victim and the perpetrator, and victims may face criminal charges for harming perpetrators in self-

18  defense.  Even if these charges are eventually dropped, the sweeping language of the Rule could render

19  these people ineligible for asylum simply as a result of having been charged in the first instance.

20        115.    As the Rule reflects, commenters noted that this portion of the Rule could be particu-

21  larly harmful for populations with overlapping vulnerabilities, such as members of the LGBTQ com-

22  munity (who are prone to experience inaction by law enforcement in response to domestic violence

23  and may be more likely to have both partners arrested) and people with limited English proficiency,

24  who may be unable to describe the abuse to police officers.  85 Fed. Reg. at 67228.  Critically, the

25  Rule permits immigration adjudicators to determine that a person is ineligible for asylum if the adju-

26  dicator "knows or has reason to believe" that the applicant engaged in battery or extreme cruelty in-

27  volving a domestic relationship even if the alleged conduct did not result in a conviction.  *Id*. at 67258–

28  60.  The Rule does not articulate a standard to be applied in making such determinations, nor even

ER-0119   33

COMPLAINT

criteria for what should prompt such an inquiry.  The end result is that any asylum-seeker arrested for any offense, whether convicted or not, could be subject to a nebulous, subjective inquiry—without fair notice as to what such an inquiry may entail—and could be barred from asylum eligibility as a result. The exceptionally far reach of this portion of the Rule harms asylum-seekers by leaving them vulnerable to assessments of their culpability by an immigration adjudicator without the same level of due process protection they would receive in court.  Moreover, such assessments may involve the adjudicator's consideration of alleged conduct that is years old and that never resulted in a conviction.

116.    Although the Rule purportedly provides an exception from the domestic violence bar for survivors who "have been battered or subjected to extreme cruelty and aliens who were not the primary perpetrators of violence in the relationship," *id.* at 67230, this weak exemption does not mitigate the damage done by the Rule.  Even for those who may seek to avail themselves of this exception, the reality is that many abusers isolate, intimidate, and control their victims in ways that will make it very difficult for survivors to produce evidence of being "battered or subjected to extreme cruelty" such that they can successfully rely upon the exception.

117.    Similarly, using convictions for "harboring certain aliens" as a bar to asylum eligibility disproportionately targets the most vulnerable.  When asylum-seekers flee, their family members are often also in danger and being persecuted; thus, asylum-seekers may help their relatives seek safety in the United States as well.  Under the new Rule, asylum-seekers will be rendered ineligible for asylum if they assist loved ones in dire circumstances.  For example, parents who are trying to help their minor children escape life-threatening situations—something virtually every parent would feel compelled to do—will be barred from asylum eligibility.   *Id.* at 67258–59 (to be codified at 8 C.F.R. §§ 208.13(c)(6)(i), 1208.13(c)(6)(i)).

118.    The Rule's provision on conviction and sentence vacaturs and modifications will also lead to the expulsion of countless people.  The Rule will bar many people who no longer have convictions at all by creating a temporally-based presumption that orders vacating, expunging, or modifying criminal convictions were entered "for the purpose of ameliorating immigration consequences" if the relevant order was entered (i) after the initiation of removal proceedings or (ii) more than one year after the date of the original order of conviction or sentencing.  *Id.* at 67259–60 (to be codified at 8

C.F.R. §§ 208.13(c)(7)–(8), 1208.13(c)(7)–(8)).  The Rule will thus preclude from asylum eligibility countless people who have appropriately had their sentences modified because of their rehabilitation and/or their efforts to overcome addiction or escape from domestic violence or gang pressure—people who have turned their lives around and who do not pose any danger to their community.

119.    This provision will also impact those immigrants whose convictions and sentences are procedurally or substantively defective, but who only realized that fact (i) more than one year after they were convicted or sentenced and/or (ii) at the time of their immigration proceedings, or those who lack the legal resources and evidence to ensure that the change to their criminal record conforms to this contorted interpretation of the law.  As with other provisions of the Rule, this provision will dis-proportionately impact the most vulnerable asylum-seekers:  those who are low income, who speak the least English, or who have limited education and resources.  Moreover, the Rule will unlawfully deny essential protection to asylum-seekers by refusing to give full faith and credit to valid criminal court decisions and allowing an adjudicator to "look beyond the face of" any such court order to de-termine the purpose for which it was issued.  *Id*. at 67259–60.

120.    The Rule's rescission of automatic review of discretionary asylum denials under 8 C.F.R. §§ 208.16(e) and § 1208.16(e) will also have a devastating impact on the families of asylum-seekers.  People will face the impossible choice of either abandoning their spouse and children or risking return to a country where their lives or freedom would be threatened in order to reunite.  Those spouses and children may also face persecution themselves.  This provision—like all the others set forth in the Rule—will thus leave more vulnerable people unprotected, particularly if those spouses and children lack the resources or are otherwise unable to travel to the United States and apply for asylum independently.  The Rule contravenes the principles of family cohesion and unification that underpin United States immigration law, that have been part of our country's tradition since its found-ing, and that were first codified more than fifty years ago in 1965 and later expanded in 1980.  *See* Immigration and Nationality Act of 1965, Pub. L. No. 89-236, 79 Stat. 911; *see also* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.

121.    Jointly, the three provisions of this Rule will upend the United States' entire regime for asylum protection.  It will place thousands of bona fide refugees in peril of persecution, bodily harm,

and even death.  The Rule violates our country's obligations under international and domestic law and runs counter to our country's proud history and tradition of providing refuge for the oppressed.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**The Rule is not in accordance with law, or is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under the INA and the APA**

122.    Plaintiffs incorporate and reallege the allegations above.

123.    The APA requires a court to set aside agency action that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)–(C).

124.    The Rule's new categorical eligibility bars exceed the Attorney General's authority to set further conditions and limitations on asylum eligibility and conflict with the text, structure, and history of the INA's asylum provisions.  The only domestic crimes that render a refugee ineligible for asylum under Section 1158 are "particularly serious crimes"—that is, those crimes that (i) correspond to an actual conviction, rather than suspicions or accusations; (ii) are "*particularly* serious"; and (iii) reflect a danger to the community.  *See* 8 U.S.C. § 1158(b)(2)(A)(ii) (emphasis added).  Likewise, the other statutory eligibility bars (apart from the firm-resettlement bar, which is irrelevant here) involve serious conduct that renders someone a danger to others or to the nation.

125.    The Rule's new categorical bars, by contrast, sweep in offenses that are not serious— let alone particularly serious—and do not suggest a danger to others or to the community.  Some of them are also triggered by mere "reason to believe" that domestic criminal conduct occurred or had certain characteristics, a dynamic found nowhere in the asylum statute.  The bars are thus not "consistent with" the statutory scheme, as required by the sole provision on which the Rule relies for its authority.  *Id*. § 1158(b)(2)(C).  For the same reasons, they conflict with the governing statutory language.

126.    The Rule also conflicts with Section 1158 because categorical bars to asylum eligibility are inconsistent with the Refugee Convention, as incorporated by the INA.  "Where fairly possible, a United States statute is to be construed as not to conflict with international law or with an international

agreement with the U.S." *Serra v. Lappin*, 600 F.3d 1191, 1198 (9th Cir. 2010) (alteration omitted) (quoting *Munoz v. Ashcroft*, 339 F.3d 950, 958 (9th Cir. 2003)).  The Refugee Convention—relevant portions of which are incorporated into the INA—requires an individualized analysis of whether a particular crime disqualifies an asylum applicant, no matter which of the criminal bars is at issue.  The government's proposed categorical bars simply ignore that requirement, and raise concerns about compliance with the United States' non-refoulement obligation.  The bars are accordingly in conflict with the INA and the treaty obligations it effectuates.

127.     The Rule's presumption that criminal convictions vacated to cure substantive or constitutional errors remain valid based purely on when they were vacated has no basis in the INA, conflicts with basic due process principles, and fails to give full faith and credit to state court rulings.

### SECOND CLAIM FOR RELIEF

### The Rule is arbitrary, capricious, or an abuse of discretion under the APA

128.     Plaintiffs incorporate and reallege the allegations above.

129.     Under the APA, an agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

130.     The agency's broad shift away from individualized, multi-factor asylum determinations and toward categorical bars—in violation of the Refugee Convention—represents a dramatic and unexplained break.  In *Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987), the BIA concluded that asylum determinations call for an examination of "the totality of the circumstances" in which no one factor "should be considered in such a way that the practical effect is to deny relief in virtually all cases," *id.* at 473, and "the danger of persecution should generally outweigh all but the most egregious of adverse factors," *id.* at 474; *see also In re Kasinga*, 21 I. & N. Dec. 357, 367–68 (BIA 1996) (applying *Matter of Pula* and holding same); *Hussam F. v. Sessions*, 897 F.3d 707, 718–19 (6th Cir. 2018) (per curiam) (summarizing BIA precedent and concluding that "failure to disclose that . . . passport was not obtained in the usual manner" could not "be reasonably termed the 'most egregious' of adverse factors").  Nevertheless, the agency has departed from this precedent by determining that the conditions that are the subject of each of its categorical bars are the only factors of importance in any circumstance in which

one of those conditions is satisfied. The agency explanation does not account for the sudden unimportance of the expressed considerations that drove its prior policy for decades, does not provide a reasoned explanation for disregarding such policy, does not meaningfully discuss the consequences of this shift on populations relevant to Congress's statutory purpose, and does not adequately explain what statutorily grounded objectives would be achieved by the shift. The agency's failure to consider these and other significant factors renders the Rule arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–27 (2016).

131. The Rule is also arbitrary and capricious because DHS and DOJ have failed to "examine[ ] [the] relevant data" in issuing it. *Genuine Parts Co. v. EPA*, 890 F.3d 304, 311–12 (D.C. Cir. 2018) (alterations in original) (quoting *Carus Chem. Co. v. EPA*, 395 F.3d 434, 441 (D.C. Cir. 2005)). The agencies do not fully consider the effects of the Rule on asylum-seekers, as they fail to give any kind of estimate of the additional number or percentage of asylum-seekers who would be barred from asylum based on the mandatory bars and their serious reliance interests in the agencies' prior position.[4] *See Encino Motorcars*, 136 S. Ct. at 2125–27. DHS and DOJ instead unhelpfully note that "[t]he [proposed] expansion of the mandatory bars for asylum would likely result in fewer asylum grants annually" and allege that they are unable to provide any estimates of "the expected decrease" "because asylum applications are inherently fact-specific, and because there may be multiple bases for denying an asylum application." 85 Fed. Reg. at 67256. The Departments further admit that "the full extent of the impacts [of the Rule] . . . is unclear." *Id.* at 67257.

132. The Rule also fails to offer any substantial evidence or reasoned explanation to support how its provisions will serve the stated purposes of more predictable results and judicial efficiency. *See* 85 Fed. Reg. at 67209 (asserting that the Rule will "create a more streamlined and predictable approach that will increase efficiency in immigration adjudications" (citing 84 Fed. Reg. at 69647)). In the absence of evidence to the contrary, it is difficult to see how proposing a categorical bar based

---

[4] *See* 84 Fed. Reg. at 69658. DHS and DOJ provide an estimate of the number of cases that will be impacted by a section of the proposed Rule that removes the provisions at 8 CFR §§ 208.16(e), 1208.16(e) regarding reconsideration of discretionary denials of asylum but do not provide any estimate for the number of cases affected by these other changes. *See also* 85 Fed. Reg. at 67256–57 (noting the absence of data).

on circumstances described in unreliable documents—including police reports, rap sheets, and proba-tion reports—rather than actual convictions could avoid creating additional burdens for the already overwhelmed immigration court system by tasking adjudicators with additional, highly nuanced, re-source-intensive assessments. The agency's failure to provide any evidence or explanation addressing how efficiency would be improved by a requirement for adjudicators to engage in mini-trials on the applicability of categorical criminal bars is arbitrary and capricious. *See Moncrieffe v. Holder*, 133 S.Ct. 1678, 1690 (2013) (describing how the avoidance of "minitrials" "promotes judicial and admin-istrative efficiency").

133. The Rule fails to offer any substantial evidence or reasoned explanation to support its conclusions relating to the "seriousness" or "dangerousness" of the offenses (or conduct) that are the subject of its automatic bars. For instance, the Rule's reliance on criminal history, recidivism, and their connection to "dangerousness" in general establishes nothing about the danger to the community associated with the specific offense of illegal reentry. *See* 84 Fed. Reg. at 69648; 85 Fed. Reg. at 67243. The same is true of the Rule's reliance on decade-old, non-targeted studies to support its bar on offenses involving criminal street gangs. 84 Fed. Reg. at 69649–50; 85 Fed. Reg. at 67225. This absence of substantial evidence or reasoned explanation renders the rule arbitrary and capricious.

134. Finally, the Rule also entirely fails to consider numerous important aspects of the prob-lem. The Rule repeatedly states that material and foreseeable impacts associated with its novel con-straints on asylum eligibility were "outside the scope of the rulemaking"—including the effect of the rule on the asylum system itself. *See* 85 Fed. Reg. 67244–45. The agency's failure to acknowledge and consider these matters renders the rule arbitrary and capricious.

**THIRD CLAIM FOR RELIEF**

**Defendants failed to provide adequate notice and opportunity to comment under the**

**APA**

135. Plaintiffs incorporate and reallege the allegations above.

136. The APA requires a court to hold unlawful and set aside agency action that is arbitrary, capricious, or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

137.     The APA also requires an agency proposing a new rule to provide public notice and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(c).

138.     The 30-day notice-and-comment period provided was inadequate in light of the proposed rule's evident complexity and potential for far-reaching impact.  The Rule was also part of an improperly staggered rulemaking process, which prevented the public from understanding and commenting on the final regulatory regime.  Further, the Agency did not respond adequately to public comments, repeatedly declaring that foreseeable impacts of the Rule—including "humanitarian concerns for asylum seekers" facing deportation to countries in which they face persecution—were "outside of the scope of this rulemaking."  85 Fed. Reg. at 67243.  The Rule is therefore invalid.

## FOURTH CLAIM FOR RELIEF

**Defendant Wolf lacked the authority to issue the Rule under the Appointments Clause of the U.S. Constitution, the Homeland Security Act, and the Federal Vacancies Reform Act**

139.     Plaintiffs incorporate and reallege the allegations above.

140.     The Secretary of Homeland Security is a principal officer of the United States whose appointment requires Presidential nomination and Senate confirmation.  *See* 6 U.S.C. § 112(a)(1); *see also* U.S. Const. art. II, § 2, cl. 2.

141.     Defendant Chad Wolf purports to serve as the Acting Secretary of DHS; however, he has not been confirmed by the Senate to hold that office and has no valid legal claim to the role.

142.     The HSA mandates that, in the event of the "absence, disability, or vacancy in office" of the DHS Secretary, the Deputy DHS Secretary is first in the order of succession, followed by the Under Secretary for Management.  6 U.S.C. § 113(g)(1).  After the Deputy Secretary and the Under Secretary for Management, the HSA allows the Secretary to "designate such other officers of the Department in further order of succession to serve as acting secretary."  *Id.* § 113(g)(2).

143.     Although Wolf's predecessor, Kevin McAleenan, attempted to invoke § 113(g)(2) to amend the order of succession on November 8, 2019, the GAO has since issued a decision concluding that the "incorrect official assumed the title of Acting Secretary at [the time of former Secretary Nielsen's resignation]" and that "subsequent amendments to the order of succession made by [McAleenan]

1 were invalid and officials who assumed their positions under such amendments, including Chad Wolf

2 and Kenneth Cuccinelli, were named by reference to an invalid order of succession." *See* GAO Deci-

3 sion 1.  The GAO's interpretation is correct.

4      144.    Wolf's claim to the role of Acting Secretary fares no better under the FVRA.  The

5 FVRA states that a person serving as an acting officer may serve in the office "for no longer than 210

6 days *beginning on the date the vacancy occurs*," except under narrow circumstances.  5 U.S.C. §

7 3346(a)(1) (emphasis added).

8      145.    The relevant vacancy occurred, at the latest, by April 10, 2019, the purported effective

9 date of former Secretary Kirstjen Nielsen's resignation.

10      146.    Wolf purported to assume the role of Acting Secretary of DHS on November 13, 2019,

11 after the 210-day period set forth in the FVRA had passed.  Both the proposed and final Rule were

12 also issued well beyond the statutory time limit.

13      147.    Because Defendant Wolf is performing the functions and duties of the Secretary of

14 DHS without having been confirmed by the Senate, in reliance on invalid orders of succession, and

15 far past the 210-day period set forth in the FVRA, he did not have valid authority to issue the Rule

16 under the Appointments Clause of the U.S. Constitution, the HSA, and/or the FVRA.

17      148.    The Rule, to the extent it relies on authority from DHS and/or Defendant Wolf, is thus

18 invalid and should not be permitted to take effect.

19 **FIFTH CLAIM FOR RELIEF**

20 **The Rule violates the Regulatory Flexibility Act**

21      149.    Plaintiffs incorporate and reallege the allegations above.

22      150.    The RFA requires federal administrative agencies to analyze the effects on "small en-

23 tities" of rules they promulgate, and to publish initial and final versions of those analyses.  *See* 5 U.S.C.

24 §§ 603–604.

25      151.    Under the RFA, the court may set aside, stay, or grant other relief for agency action in

26 violation of the RFA, *id.* §§ 601, 604, 605(b), 608(b), and 610.  *Id.* 5 U.S.C. § 611.

27      152.    The Rule is a "rule" within the meaning of the RFA.  *Id.* § 601(2).

28

COMPLAINT

153.    The RFA defines "small entities" to include small businesses, small nonprofit organizations, and small governmental jurisdictions.  *Id.* § 601(6).  Each of the Plaintiffs is a "small entity" within the meaning of the RFA and is directly affected by the Rule, which, among other things, will require them to devote substantial resources to addressing the new restrictions on asylum eligibility imposed by the Rule and will jeopardize their funding.

154.    DOJ and DHS's regulatory flexibility analysis does not comply with the RFA because DOJ and DHS concluded that the Rule will not have a significant impact on small entities.  In lieu of an adequate explanation, the Rule simply asserts that "[o]nly individuals, rather than entities, are eligible to apply for asylum," a statement that wholly ignores the impact of the Rule on Plaintiffs and other organizations that serve asylum-seekers.  85 Fed. Reg. at 67255.

155.    The RFA requires DOJ and DHS to describe and estimate the number of small entities that would be affected by the Rule.  5 U.S.C. § 604(a)(4).  DOJ and DHS did not do so and refused to include small nonprofit organizations affected by the Rule.  85 Fed. Reg. at 67255.

156.    The RFA requires DOJ and DHS to describe "the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the [Rule] and why each one of the other significant alternatives to the [Rule] considered by the agency which affect the impact on small entities was rejected."  5 U.S.C. § 604(a)(6).  Again, DOJ and DHS failed to describe any such steps and failed to consider the "stated objectives of applicable statutes," *id.*, including the INA, the Refugee Act, and the HSA. 85 Fed. Reg. at 67255.

157.    As a result of the foregoing, the Rule's regulatory flexibility analysis does not comply with the RFA.

158.    The Rule's regulatory flexibility analysis is also arbitrary and capricious because it does not reflect reasoned decision-making and fails to support its conclusions with substantial evidence.

159.    The Rule is therefore unlawful and must be set aside.  *See* 5 U.S.C. § 611; *id.* § 706.

**SIXTH CLAIM FOR RELIEF**

**The Rule violates the Fifth Amendment's Due Process Clause**

160.   Plaintiffs incorporate and reallege the allegations above.

161.   The Due Process Clause of the Fifth Amendment prohibits laws and regulations that fail to "give ordinary people fair warning about what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). The requirement of fair notice applies in civil contexts just as in criminal. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212–13 (2018) (plurality opinion). Given the "grave nature of deportation," the "most exacting vagueness standard" applies in the immigration context." *Id*. at 1213.

162.   The Rule is unconstitutionally vague. It fails to provide fair notice of the conduct that may result in a bar to asylum eligibility and invites arbitrary enforcement by immigration adjudicators.

163.   For example, the Rule suggests that an asylum-seeker may be barred from eligibility if they are convicted of *any* crime the adjudicator "knows or has reason to believe" was committed in support, promotion, or furtherance of the activity of a criminal street gang. 85 Fed. Reg. at 67258–59 (to be codified at 8 C.F.R. §§ 208.13(c)(6)(ii), 1208.13(c)(6)(ii)). The Rule provides no description of what behaviors, associations, or statuses could lead an adjudicator to find that an asylum-seeker was involved in gang activity or that their conduct was in furtherance of the activity of a criminal street gang. Nor does it provide any guidance on the types of offenses or circumstances that may trigger such an inquiry, or any limitation on the evidence to which an adjudicator may look to make such a determination.

164.   Similarly, the Rule allows adjudicators to determine whether a conviction amounts to a domestic violence offense (for purposes of triggering an asylum eligibility bar) and, even where the asylum-seeker has *not* been convicted, allows the adjudicator to determine that an asylum-seeker is barred from eligibility if the adjudicator "knows or has reason to believe" that the person engaged in battery or extreme cruelty involving a domestic relationship. *Id*. at 67258–60 (to be codified at 8 C.F.R. §§ 208.13(c)(6)(vii), 1208.13(c)(6)(vii)). The Rule again provides no guidance for this assessment, including when such an assessment is appropriate; what factors should be considered in determining whether conduct amounts to domestic violence; and what standard should be applied.

**SEVENTH CLAIM FOR RELIEF**

ER-0129   43

**The Rule violates the Fifth Amendment's Equal Protection Component**

165.    Plaintiffs incorporate and reallege the allegations above.

166.    The equal protection component of the Fifth Amendment prohibits Defendants from denying equal protection of laws to persons residing in the United States.  Official actions that reflect a racially discriminatory intent or purpose thus violate the Fifth Amendment's equal protection component.  *See Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954), *supplemented sub. nom. Brown v. Bd. of Educ.*, 349 U.S. 294 (1955); *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).  Even facially neutral policies and practices are unconstitutional if they reflect racial animus or discrimination.  *Id.* at 266.

167.    In the instant case, Defendants violated the Fifth Amendment because they acted with a discriminatory purpose based on race, ethnicity, and national origin in issuing the Rule.  The Rule thus violates the guarantee of equal protection under the Fifth Amendment.

168.    Defendants' discriminatory intent in promulgating this Rule is evinced by, among other things, the Rule's impact on non-white immigrants and DHS and DOJ's complete dismissal of and failure to contend with this disproportionate impact as falling "beyond the scope of [the] rule."  85 Fed. Reg. at 67226.

169.    Moreover, the Rule was promulgated following years of repeated comments by President Trump and others within the Trump Administration reflecting racial, ethnic, and national origin-based animus, including referring to immigrants as "rapists," "druggies," and "killers" and comparing immigrants to rats and other pests.

170.    Defendants have failed to articulate a compelling governmental interest justifying the promulgation of the Rule, and they have not tailored the Rule to address any legitimate interest.

171.    Plaintiffs and the communities they serve will suffer severe harm as a result of the implementation of the Rule.

## JURY DEMAND

172.    Plaintiffs demand a jury trial on all counts triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

A.     Hold unlawful and set aside the Rule under 5 U.S.C. § 706(2);

B.     Declare the Rule arbitrary, capricious, an abuse of discretion, otherwise not in accord-ance with law, and without observance of procedure as required by law, in violation of the APA, INA, and RFA;

C.     Declare the Rule invalid for being co-issued by Defendant Chad Wolf, who lacked the authority to do so pursuant to the Appointments Clause of the United States Constitution, the HSA, and the FVRA;

D.     Declare the Rule unconstitutional for violating the Due Process and Equal Protection guarantees of the Fifth Amendment of the United States Constitution;

E.     Enter a preliminary and permanent nationwide injunction, without bond, enjoining De-fendants, their officials, agents, employees, and assigns from implementing or enforcing the Rule;

F.     Stay the implementation or enforcement of the Rule;

G.     Award Plaintiffs reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

H.     Grant any other and further relief this Court may deem just and proper.

Respectfully submitted,

DATE:  November 2, 2020          _/s/ Naomi A. Igra_
Sirine Shebaya (*pro hac vice* forthcoming)     Naomi A. Igra, SBN 269095
sirine@nipnlg.org                naomi.igra@sidley.com
Cristina Velez*                  SIDLEY AUSTIN LLP
*Not admitted in DC; working remotely from     555 California Street, Suite 2000
and barred in New York           San Francisco, CA 94104
cristina@nipnlg.org (*pro hac vice* forthcoming)     Telephone:  +1 415 772 1200
NATIONAL IMMIGRATION PROJECT OF     Facsimile:  +1 415 772 7400
THE NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue N.W., Suite 200     Tobias S. Loss-Eaton
Washington, D.C. 20007           (*pro hac vice* forthcoming)
Telephone:  +1 202 656 4788      tlosseaton@sidley.com
Facsimile:  +1 617 227 5495      Chike B. Croslin (*pro hac vice* forthcoming)
                                 ccroslin@sidley.com
Sabrineh Ardalan (*pro hac vice* forthcoming)     Alice A. Wang (*pro hac vice* forthcoming)
sardalan@law.harvard.edu         alice.wang@sidley.com
Philip L. Torrey (*pro hac vice* forthcoming)     SIDLEY AUSTIN LLP
ptorrey@law.harvard.edu          1501 K Street, N.W.
Sameer Ahmed, SBN 319609         Washington, D.C. 20005
sahmed@law.harvard.edu           Telephone:  +1 202 736 8000
HARVARD LAW SCHOOL               Facsimile:  +1 202 736 8711
HARVARD IMMIGRATION AND REFUGEE

COMPLAINT

CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone:  +1 617 384 7504
Facsimile:  +1 617 495 8595

Leila Kang (*pro hac vice* forthcoming)
leila@immdefense.org
Nabilah Siddiquee (*pro hac vice* forthcoming)
nabilah@immdefense.org
IMMIGRANT DEFENSE PROJECT
40 W. 39th Street, Fifth Floor
New York, NY 10018
Telephone:  +1 646 762 8428

*Attorneys for Plaintiffs*

Jack W. Pirozzolo (*pro hac vice* forthcoming)
jpirozzolo@sidley.com
Kenyon C. Hall (*pro hac vice* forthcoming)
kenyon.hall@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
Telephone:  +1 617 223 0300
Facsimile:  +1 617 223 0301

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

See Attachment 1

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See Attachment 2

## DEFENDANTS

See Attachment 1

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

|   |   |   |   |
|---|---|---|---|
| 1 | U.S. Government Plaintiff | 3 | Federal Question *(U.S. Government Not a Party)* |
| ☒ 2 | U.S. Government Defendant | 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                             *and One Box for Defendant)*

|   | PTF | DEF |   | PTF | DEF |
|---|-----|-----|---|-----|-----|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 480 Consumer Credit |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | **IMMIGRATION** | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | 462 Naturalization Application | 862 Black Lung (923) | 490 Cable/Sat TV |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 864 SSID Title XVI | 890 Other Statutory Actions |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 891 Agricultural Acts |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | ☒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | 2 Removed from State Court | 3 Remanded from Appellate Court | 4 Reinstated or Reopened | 5 Transferred from Another District *(specify)* | 6 Multidistrict Litigation–Transfer | 8 Multidistrict Litigation–Direct File |

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. § 702

Brief description of cause:
Violation of Administrative Procedure Act, Regulatory Flexibility Act, Fifth Amendment (Equal Protection and Due Process), Appointments Clause of the U.S. Constitution, the Homeland Security Act, and the Federal Vacancies Reform Act

## VII.  REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   No

## VIII.  RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE

DOCKET NUMBER

## IX.  DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

**(Place an "X" in One Box Only)**   ☒ SAN FRANCISCO/OAKLAND       SAN JOSE       EUREKA-MCKINLEYVILLE

DATE  11/02/2020        SIGNATURE OF ATTORNEY OF RECORD   /s/ Naomi A. Igra

ER-0133

**ATTACHMENT 1**

| Plaintiffs | Defendants |
|---|---|
| PANGEA LEGAL SERVICES;<br><br>DOLORES STREET COMMUNITY SERVICES, INC.;<br><br>CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; and<br><br>CAPITAL AREA IMMIGRANTS' RIGHTS COALITION | U.S. DEPARTMENT OF HOMELAND SECURITY;<br><br>CHAD F. WOLF, under the title of Acting Secretary of Homeland Security;<br><br>KENNETH T. CUCCINELLI, under the title of Senior Official Performing the Duties of the Deputy Secretary for the Department of Homeland Security;<br><br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES;<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;<br><br>TONY H. PHAM, under the title of Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement;<br><br>U.S. CUSTOMS AND BORDER PROTECTION;<br><br>MARK A. MORGAN, under the title of Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection;<br><br>U.S. DEPARTMENT OF JUSTICE;<br><br>WILLIAM P. BARR, under the title of U.S. Attorney General;<br><br>EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; and<br><br>JAMES MCHENRY, under the title of Director of the Executive Office for Immigration Review |

## ATTACHMENT 2

Sirine Shebaya (*pro hac vice* forthcoming)
sirine@nipnlg.org
Cristina Velez*
*Not admitted in DC; working remotely from and barred in New York
cristina@nipnlg.org (*pro hac vice* forthcoming)
NATIONAL IMMIGRATION PROJECT OF THE NATIONAL LAWYERS GUILD
2201 Wisconsin Avenue N.W., Suite 200
Washington, D.C. 20007
Telephone: +1 202 656 4788
Facsimile: +1 617 227 5495

Sabrineh Ardalan (*pro hac vice* forthcoming)
sardalan@law.harvard.edu
Philip L. Torrey (*pro hac vice* forthcoming)
ptorrey@law.harvard.edu
Sameer Ahmed, SBN 319609
sahmed@law.harvard.edu
HARVARD LAW SCHOOL
HARVARD IMMIGRATION AND REFUGEE CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone: +1 617 384 7504
Facsimile: +1 617 495 8595

Leila Kang (*pro hac vice* forthcoming)
leila@immdefense.org
Nabilah Siddiquee (*pro hac vice* forthcoming)
nabilah@immdefense.org
IMMIGRANT DEFENSE PROJECT
40 W. 39th Street, Fifth Floor
New York, NY 10018
Telephone: +1 646 762 8428

Naomi A. Igra, SBN 269095
naomi.igra@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Tobias S. Loss-Eaton
(*pro hac vice* forthcoming)
tlosseaton@sidley.com
Chike B. Croslin (*pro hac vice* forthcoming)
ccroslin@sidley.com
Alice A. Wang (*pro hac vice* forthcoming)
alice.wang@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

Jack W. Pirozzolo (*pro hac vice* forthcoming)
jpirozzolo@sidley.com
Kenyon C. Hall (*pro hac vice* forthcoming)
kenyon.hall@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
Telephone: +1 617 223 0300
Facsimile: +1 617 223 0301

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 208**

**RIN 1615–AC41**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Part 1208**

**[EOIR Docket No. 18–0002; A.G. Order No. 4873–2020]**

**RIN 1125–AA87**

**Procedures for Asylum and Bars to Asylum Eligibility**

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Final rule.

**SUMMARY:** On December 19, 2019, the Department of Justice ("DOJ") and the Department of Homeland Security ("DHS") (collectively, "the Departments") published a notice of proposed rulemaking ("NPRM") that would amend their respective regulations governing the bars to asylum eligibility. The Departments also proposed to clarify the effect of criminal convictions and to remove their respective regulations governing the automatic reconsideration of discretionary denials of asylum applications. This final rule ("final rule" or "rule") responds to comments received and adopts the provisions of the NPRM with technical corrections to ensure clarity and internal consistency.

**DATES:** This rule is effective on November 20, 2020.

**FOR FURTHER INFORMATION CONTACT:**

Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 1800, Falls Church, VA 22041, telephone (703) 305–0289 (not a toll-free call).

Maureen Dunn, Chief, Division of Humanitarian Affairs, Office of Policy and Strategy, U.S. Citizenship and Immigration Services ("USCIS"), DHS, 20 Massachusetts Avenue NW, Washington, DC 20529–2140; telephone (202) 272–8377 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**I. Summary of the Proposed Rule**

On December 19, 2019, the Departments published an NPRM that would amend their respective regulations governing the bars to asylum eligibility, clarify the effect of criminal convictions, and remove their respective regulations governing the automatic reconsideration of discretionary denials of asylum applications. Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640 (Dec. 19, 2019).

*A. Authority and Legal Framework*

The Departments published the proposed rule pursuant to their respective authorities regarding the adjudication of asylum applications. 84 FR at 69641–42, 69644–45.

Regarding the DOJ, the Attorney General, through himself and the Executive Office for Immigration Review ("EOIR"), has authority over immigration adjudications. *See* 6 U.S.C. 521; section 103(g) of the Immigration and Nationality Act ("INA" or "the Act") (8 U.S.C. 1103(g)). Immigration judges in DOJ adjudicate defensive asylum applications filed during removal proceedings[1] and affirmative asylum applications referred to the immigration courts by USCIS within DHS. INA 101(b)(4) (8 U.S.C. 1101(b)(4)); 8 CFR 1003.10(b), 1208.2. The Board of Immigration Appeals ("BIA" or "the Board") hears appeals from immigration judges' decisions, including decisions related to the relief of asylum. 8 CFR 1003.1.

The immigration laws further provide the Attorney General with authority regarding immigration adjudications and determinations. For example, the Attorney General's determination with respect to all questions of law is "controlling." INA 103(a)(1) (8 U.S.C. 1103(a)(1)). The Attorney General possesses a general authority to "establish such regulations * * * as the Attorney General determines to be necessary for carrying out" his authorities under the INA. INA 103(g)(2) (8 U.S.C. 1103(g)(2)). In addition, the INA authorizes the Attorney General to (1) "by regulation establish additional limitations and conditions, consistent with [INA 208 (8 U.S.C. 1158)], under which an alien shall be ineligible for asylum under," INA 208(b)(1) (8 U.S.C. 1158(b)(1)); and (2) "provide by regulation for * * * conditions or limitations on the consideration of an application for asylum not inconsistent with the Act." INA 208(b)(2)(C) and (d)(5)(B) (8 U.S.C. 1158(b)(2)(C) and (d)(5)(B)).

Regarding the Department of Homeland Security, the Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, transferred many functions related to the execution of Federal immigration law to the newly created DHS. The HSA charges the Secretary of Homeland Security ("the Secretary") "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," INA 103(a)(1) (8 U.S.C. 1103(a)(1)), and grants the Secretary the power to take all actions "necessary for carrying out" the provisions of the immigration and nationality laws, INA 103(a)(3) (8 U.S.C. 1103(a)(3)). The HSA also transferred to USCIS responsibility for affirmative asylum applications, *i.e.*, applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). If an alien is not in removal proceedings, USCIS asylum officers determine in the first instance whether an alien's asylum application should be granted. *See* 8 CFR 208.2.

*B. Provisions of the Proposed Rule*

The NPRM proposed to amend 8 CFR 208.13 and 1208.13 by adding new paragraphs (c)(6)–(9) and amending 8 CFR 208.16 and 1208.16 by removing and reserving paragraphs (e) in each section.

1. Bars to Asylum Eligibility

Pursuant to the authorities outlined above, the Departments proposed to revise 8 CFR 208.13 and 1208.13 in each section to add paragraphs (c)(6) to add the following bars on eligibility for asylum for the following aliens:

• Aliens who have been convicted of an offense arising under INA 274(a)(1)(A) or (a)(2) or INA 276 (8 U.S.C. 1324(a)(1)(A) or (a)(2) or 1326) (convictions related to alien harboring, alien smuggling, and illegal reentry). *See* 8 CFR 208.13(c)(6)(i) and 1208.13(c)(6)(i) (proposed); 84 FR at 69647–49.

• Aliens who have been convicted of a Federal, State, tribal, or local crime that the Attorney General or Secretary knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined under the law of the jurisdiction where the conviction occurred or as in 18 U.S.C. 521(a). *See* 8 CFR 208.13(c)(6)(ii) and 1208.13(c)(6)(ii) (proposed); 84 FR at 69649–50.

• Aliens who have been convicted of an offense for driving while intoxicated or impaired as those terms are defined under the law of the jurisdiction where

---

[1] One exception is that asylum officers in DHS have initial jurisdiction to adjudicate asylum applications filed by unaccompanied alien children ("UAC") in removal proceedings. INA 208(b)(3)(C) (8 U.S.C. 1158(b)(3)(C)); *see also* 6 U.S.C. 279(g)(2) (UAC defined).

the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person. *See* 8 CFR 208.13(c)(6)(iii) and 1208.13(c)(6)(iii) (proposed); 84 FR at 69650–51.

• Aliens who have been convicted of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the law of the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law. *See* 8 CFR 208.13(c)(6)(iv)(A) and 1208.13(c)(6)(iv)(A) (proposed); 84 FR at 69650–51.[2]

• Aliens who have been convicted of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by (a) the person's current or former spouse, (b) an alien with whom the person shares a child in common, (c) an alien who is cohabitating with or who has cohabitated with the person as a spouse, (d) an alien similarly situated to a

---

[2] When determining whether an alien's offense qualifies under this provision, the NPRM further provided that the adjudicator would not be required to find the initial conviction as a predicate offense. 8 CFR 208.13(c)(6)(iv)(B), 1208.13(c)(6)(iv)(B) (proposed). Further, the NPRM provided that the adjudicator would be permitted to consider the underlying conduct of the crime and would not be limited to those facts found by the criminal court or otherwise contained in the record of conviction. 8 CFR 208.13(c)(6)(iv)(B), 1208.13(c)(6)(iv)(B) (proposed). Instead, the adjudicator would be required only to make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the law of the jurisdiction where the convictions occurred. 8 CFR 208.13(c)(6)(iv)(B), 1208.13(c)(6)(iv)(B).

spouse of the person under the domestic or family violence laws of the jurisdiction, or (e) any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government. *See* 8 CFR 208.13(c)(6)(v)(A), 1208.13(c)(6)(v)(A) (proposed); 84 FR at 69651–53. The NPRM also provided that an alien's conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act (8 U.S.C. 1227(a)(2)(E)(i)–(ii)) would not disqualify him or her from asylum under this provision if a determination was made that the alien satisfies the criteria in section 237(a)(7)(A) of the Act (8 U.S.C. 1227(a)(7)(A)). *See* 8 CFR 208.13(c)(6)(v)(C), 1208.13(c)(6)(v)(C) (proposed); 84 FR at 69651–53.

• Aliens who have been convicted of any felony under Federal, State, tribal, or local law. *See* 8 CFR 208.13(c)(6)(vi)(A), 1208.13(c)(6)(vi)(A) (proposed); 84 FR at 69645–47.

• Aliens who have been convicted of any misdemeanor offense under Federal, State, tribal, or local law that involves (1) possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry; (2) the receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or (3) possession or trafficking of a controlled substance or controlled substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana. *See* 8 CFR 208.13(c)(6)(vi)(B), 1208.13(c)(6)(vi)(B) (proposed); 84 FR at 69653–54.

• Aliens for whom there are serious reasons to believe have engaged in acts of battery or extreme cruelty, as defined in 8 CFR 204.2(c)(1)(vi), upon a person and committed by the same list of aliens as set forth above regarding domestic-violence convictions. *See* 8 CFR 208.13(c)(6)(vii)(A)–(E), 1208.13(c)(6)(vii)(A)–(E) (proposed); 84

FR at 69651–53. The NPRM further provided that an alien's offense would not disqualify him or her from asylum under this provision for crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) and (ii) of the Act if a determination was made that the alien satisfies the criteria in section 237(a)(7)(A) of the Act (8 U.S.C. 1227(a)(7)(A)) (8 U.S.C. 1227(a)(2)(E)(i)–(ii)). *See* 8 CFR 208.13(c)(6)(vii)(F), 1208.13(c)(6)(vii)(F) (proposed); 84 FR at 69651–53.

*2. Additional Instruction and Definitions for Analyzing the New Bars to Eligibility*

The Departments proposed to revise 8 CFR 208.13 and 1208.13 by adding paragraphs (c)(7) through (9), which would have provided relevant definitions and other procedural instructions for the implementation of the proposed bars to eligibility discussed above.

First, this proposed revision would have defined the terms ''felony'' (''any crime defined as a felony by the relevant jurisdiction * * * of conviction, or any crime punishable by more than one year of imprisonment'') and ''misdemeanor'' (''any crime defined as a misdemeanor by the relevant jurisdiction * * * of conviction, or any crime not punishable by more than one year of imprisonment''). 8 CFR 208.13(c)(7)(i)–(ii), 1208.13(c)(7)(i)–(ii) (proposed); 84 FR at 69646, 69653.

The proposed rule further would have provided instructions that whether an activity would constitute a basis for removability is irrelevant to determining whether the activity would make an alien ineligible for asylum and that all criminal convictions referenced in the proposed bars to eligibility would include inchoate offenses. 8 CFR 208.13(c)(7)(iii)–(iv), 1208.13(c)(7)(iii)–(iv) (proposed).

Regarding convictions that have been modified, vacated, clarified, or otherwise altered, the proposed rule would have instructed that such modifications, vacaturs, clarifications, or alterations do not have any effect on the alien's eligibility for asylum unless the court issuing the order had jurisdiction and authority to do so, and the court did not do so for rehabilitative purposes or to alleviate possible immigration-related consequences of the conviction. 8 CFR 208.13(c)(7)(v), 1208.13(c)(7)(v) (proposed); 84 FR at 69654–56. The rule would have further provided that the modification, vacatur, clarification, or other alteration is presumed to be for the purpose of ameliorating the immigration

**67204** **Federal Register** / Vol. 85, No. 204 / Wednesday, October 21, 2020 / Rules and Regulations

consequences of a conviction if it was entered subsequent to the initiation of removal proceedings or if the alien moved for the order more than one year following the original order of conviction or sentencing. 8 CFR 208.13(c)(8), 1208.13(c)(8) (proposed); 84 FR at 69654–56. Finally, the proposed rule would have specifically allowed the asylum officer or immigration judge to "look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence" to determine what effect such order should be given under proposed 8 CFR 208.13(c)(7)(v) and 1208.13(c)(7)(v). 8 CFR 208.13(c)(9),1208.13(c)(9) (proposed); 84 FR at 69654–56.

### 3. Reconsideration of Discretionary Denials

Lastly, the proposed rule would have removed and reserved 8 CFR 208.16(e) and 1208.16(e), which provide for the automatic review of a discretionary denial of an alien's asylum application if the alien is subsequently granted withholding of removal. 84 FR at 69656–57.

## II. Public Comments on the Proposed Rule

### A. Summary of Public Comments

The comment period for the NPRM closed on January 21, 2020, with 581 comments received.[3] Individual commenters submitted 503 comments, and 78 comments were submitted by organizations, including non-government organizations, legal advocacy groups, non-profit organizations, religious organizations, congressional committees, and groups of members of Congress. Most individual commenters opposed the NPRM. All organizations opposed the NPRM.

### B. Comments Expressing Support for the Proposed Rule

*Comment:* One commenter supported the final rule to ensure that individuals who qualify for asylum are granted that status only when merited in the exercise of discretion and to provide a uniform and fair standard to prevent criminal aliens from "gaining a foothold in the United States."

One commenter stated that the NPRM was an appropriate exercise of discretionary authority. The commenter

stated that asylum is an extraordinary benefit that offers a path to lawful permanent residence and United States citizenship and, thus, should be discretionary. The commenter stated that asylees are protected from removal, authorized to work in the United States, and may travel under certain circumstances, and that asylees' spouses and children are eligible for derivative status in the United States. The commenter stated that the United States asylum system is generous, asserting that, in fiscal year 2018, 38,687 individuals were granted asylum, including 25,439 affirmative grants and 13,248 defensive grants. The commenter stated that this was the highest number of grants since fiscal year 2002.

The commenter cited the BIA: "The ultimate consideration when balancing factors in the exercise of discretion is to determine whether a grant of relief, or in this case protection, appears to be in the best interest of the United States." *Matter of D–A–C–*, 27 I&N Dec. 575, 578 (BIA 2019) (citing *Matter of C–V–T–*, 22 I&N Dec. 7, 11 (BIA 1998) and *Matter of Mendez*, 21 I&N Dec. 296, 305 (BIA 1996)). The commenter stated that criminal aliens, as described in the NPRM, should not be granted the benefit of asylum because their admission would not be in the best interest of the United States.

The commenter emphasized that the NPRM would not bar individuals from all forms of fear-based protection and that individuals who were barred from asylum under the NPRM could still apply for withholding of removal under the INA or protection under the regulations issued pursuant to the legislation implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT" and "CAT regulations").[4] The commenter opined that the NPRM would improve the integrity of the asylum system.

The commenter stated that the crimes and conduct listed in the NPRM should constitute a "conclusive determination that an applicant does not merit asylum in the exercise of discretion." The commenter stated that the NPRM would ensure fair and uniform application of the immigration laws because aliens who have been convicted of similar crimes would not receive different

outcomes depending on their adjudicator.

The commenter stated that the NPRM was authorized by the Act, which the commenter stated provides for regulations establishing additional conditions or limitations on asylum. The commenter stated that the NPRM was consistent with existing limitations on asylum eligibility in the statute because several statutory provisions exclude individuals from asylum eligibility on the basis of criminal conduct or other conduct indicating that the applicant does not merit asylum. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (particularly serious crime); INA 208(b)(2)(A)(iii) (8 U.S.C. 1158(b)(2)(A)(iii)) (serious nonpolitical crime outside the United States); INA 208(b)(2)(B)(i) (8 U.S.C. 1158(b)(2)(B)(i)) (conviction for aggravated felony); INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)) (offenses designated as particularly serious crimes or serious nonpolitical crimes by regulation); INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) (alien engaged in persecution of another on account of a protected ground); INA 208(b)(2)(A)(iv) (8 U.S.C. 1158(b)(2)(A)(iv)) (reasonable grounds to regard alien as a danger to the security of the United States); INA 208(b)(2)(A)(v) (8 U.S.C. 1158(b)(2)(A)(v)) (alien presents national security concerns or engaged in terrorist activity).

The commenter supported the NPRM's proposed limitation on asylum eligibility for those who have been convicted of a felony, stating that felonies are categorized as such because they present more serious criminal conduct, which has a higher social cost. The commenter asserted that a felony conviction should be such a heavily weighted negative factor that it should conclusively establish that an alien does not merit asylum. The commenter supported defining a crime by the maximum possible sentence, as opposed to the actual sentence imposed, because of the variability of sentences that can be imposed on individuals who commit the same crime yet appear before different judges or are charged in different jurisdictions. The commenter asserted that immigration consequences should not vary based on the jurisdiction or a judge's "individual personality" and instead should be standardized in the interest of fairness, uniformity, and efficiency.

Commenters also supported the NPRM's proposed limitation on eligibility for individuals convicted of alien harboring in violation of section 274(a)(1)(A) of the Act (8 U.S.C. 1324(a)(1)(A)). Specifically, the

---

[3] The Departments reviewed all 581 comments submitted in response to the rule; however, the Departments did not post 5 of the comments to regulations.gov for public inspection. Of these comments, three were duplicates of another comment written by the same commenter, and two were written in Spanish. Accordingly, the Departments posted 576 comments.

[4] Adopted and opened for signature Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) (implemented in the immigration context in principal part at 8 CFR 208.16(c) through 208.18 and 8 CFR 1208.16(c) through 1208.18). *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Public Law 105–277, div. G, sec. 2242, 112 Stat. 2681, 2631–822 (8 U.S.C. 1231 note).

commenters stated that smuggling involves a business where people are routinely treated not as human beings, but as chattel. The commenters stated that individuals who participate in smuggling, or who place others into the hands of smugglers, should not be eligible for asylum because the conduct required for such a conviction demonstrates contempt for U.S. immigration law and a disregard for the value of human life. Commenters similarly supported the NPRM's proposed limitation on eligibility for asylum for aliens who have been convicted of illegal reentry in violation of section 276 of the Act (8 U.S.C. 1326). Commenters stated that such individuals have demonstrated contempt for U.S immigration law and should not be granted asylum. Commenters stated that a conviction under section 276 of the Act (8 U.S.C. 1326) requires that an alien repeatedly violated the immigration laws because such a conviction requires that the alien illegally reentered after a prior removal and intentionally chose not to present himself or herself at a port of entry. The commenters stated that whether or not the final rule includes the felony bar to asylum, it should incorporate a mandatory bar for those convicted of illegal reentry.

Commenters also expressed support for the NPRM's proposed limitation on asylum eligibility for individuals who have committed criminal acts on behalf of or in furtherance of a criminal street gang. The commenters stated that such activity is an indicator of ongoing danger to the community. The commenters noted that, although widespread criminal activity is not a sufficient legal basis to receive asylum protection, adjudicators routinely hear testimony about the harm suffered by people subjected to extortion threats, murders, kidnappings, and sexual assaults by organized criminal groups. The commenters stated that the United States immigration system should not award a discretionary benefit to those who would destabilize communities at home and abroad through violence.

Commenters supported the NPRM's approach authorizing adjudicators to determine—on the basis of sufficient evidence—whether a particular criminal act was committed "in support, promotion, or furtherance of a criminal street gang." Specifically, the commenters stated that the range of crimes committed by street gangs is broad and that not all gang members are convicted of a gang participation offense even when they commit a crime on behalf of the gang. The commenters noted that such a determination would

not be based on "mere suspicion" but would only occur where the adjudicator knows or has reason to believe that the crime was committed in furtherance of gang activity on the basis of competent evidence. The commenters stated that "[g]ang violence is a scourge on our communities, and those who further the goals of criminal street gangs should not be put on a path to citizenship."

Commenters expressed support for the NPRM's proposed limitation on asylum eligibility where an individual has been convicted of multiple driving-under-the-influence ("DUI") offenses or a single offense resulting in death or serious bodily injury. The commenters stated that drunk and impaired driving is a dangerous activity that kills more than 10,000 people in the United States each year and injures many more. The commenters stated that individuals with recidivist DUI records, or who have already caused injury or death, should not be rewarded with asylum. The commenters expressed support for the NPRM's proposed limitation on asylum eligibility for individuals who have been convicted of certain misdemeanors. The commenters encouraged the Departments to consider including misdemeanor offenses involving sexual abuse or offenses reflecting a danger to children, asserting that such offenses are indicative of an ongoing danger to the community.

The commenters expressed support for the NPRM's approach to treating vacated, expunged, or modified convictions and sentences. The commenter stated that the approach is consistent with the Attorney General's decision in *Matter of Thomas and Thompson*, 27 I&N Dec. 674 (A.G. 2019). The commenters also stated that such an approach would be appropriate in the interests of uniform application of the law across jurisdictions by helping to ensure that aliens convicted of the same or similar conduct receive the same consequence with respect to asylum eligibility.

The commenters expressed support for the NPRM's proposed removal of 8 CFR 208.16(e) and 1208.16(e), stating that these provisions are unnecessary. Specifically, the commenters stated that the current regulations require an adjudicator who denies an asylum application in the exercise of discretion to revisit and reconsider that denial by weighing factors that would already have been considered in the original discretionary analysis. The commenters stated that there should not be a presumption that the adjudicator did not properly weigh discretionary factors in the first instance. The commenters stated that, as noted by the NPRM, such

a requirement is inefficient, requiring additional adjudicatory resources to re-evaluate a decision that was only just decided by the same adjudicator. The commenters also stated that an alien already has opportunities to seek review of that discretionary decision through motions or an appeal.

Other commenters expressed general support for the NPRM. Some commenters stated that such a rule would make America safer. One commenter stated that further restrictions on asylum were necessary because individuals who have no basis to remain in the United States "routinely ask to use political asylum as a last ditch effort to remain." At least one commenter stated that the NPRM would not adversely affect "innocent asylum seeker[s] truly escaping political persecution." Other commenters stated that all applications for relief should require at least a minimum of good character and behavior. One commenter stated that the NPRM "is a direct result of state and local governments working to nullify undocumented criminal activity by dropping charges, expunging records or pardoning crimes, including serious crimes like armed robbery * * * sex assault, domestic abuse, wire fraud, identity theft etc."

One commenter expressed support for the NPRM's proposed limitation on asylum eligibility for individuals who are convicted of offenses related to controlled substances, stating that the United States must bar those who engage in drug trafficking into the United States. Another commenter expressed support for the proposed limitations on asylum eligibility for individuals who are convicted of domestic violence offenses or who engage in identity theft, stating that such individuals should not have the opportunity to be lawfully present in the United States.

*Response:* The Departments note the commenters' support for the rule. The Departments have taken the commenters' recommendations under advisement.

*C. Comments Expressing Opposition to the Proposed Rule*

1. General Opposition

*Comment:* Many commenters expressed general opposition to the NPRM. Some provided no reasoning, simply stating, "I oppose this proposed rule" with varying degrees of severity. Many commenters also asked the Departments to withdraw the NPRM. Others, as explained in the following sections, provided specific points of

opposition or their reasoning underlying their opposition.

*Response:* The Departments are unable to provide a detailed response to comments that express only general opposition without providing reasoning for their opposition. The following sections of this final rule provide the Departments' responses to comments that offered specific points of opposition or reasoning underlying their opposition.

2. Violation of Law

a. Violation of Domestic Law

Commenters asserted that the proposed rule violated United States law in three main ways: First, it violated law regarding particularly serious crimes; second, it improperly disposed of the categorical approach to determine immigration consequences of criminal offenses; and third, it violated law regarding the validity of convictions for immigration purposes. Overall, commenters were concerned that the NPRM's provisions contradicting case law would result in the "wrongful exclusion" of immigrants from asylum eligibility.

i. Law Regarding "Particularly Serious Crime" Bar

*Comment:* Commenters opposed the NPRM, stating that it violates domestic law and contravenes existing case law from the BIA, the circuit courts of appeals, and the Supreme Court of the United States regarding the particularly serious crime bar to asylum for multiple reasons. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)). In general, commenters alleged that the NPRM was untethered to the approach set out by Congress regarding particularly serious crimes and that if Congress had sought to sweepingly bar individuals from asylum eligibility based on their conduct or felony convictions, as outlined in the NPRM, it would have done so in the Act. Commenters stated that adding seven new categories of barred conduct rendered the language of section 208(b)(2) of the Act (8 U.S.C. 1158(b)(2)) essentially meaningless and drained the term "particularly serious crime" of any sensible meaning because the Departments were effectively considering all offenses, regardless of seriousness, as falling under the particularly serious crime bar to asylum. One organization asserted that this violated the Supreme Court's requirements for statutory interpretation, citing *Corley* v. *United States,* 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons[ ] [is] that a statute should be construed so

that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (alterations and quotation marks omitted)).

At the same time, commenters also asserted that the additional crimes to be considered particularly serious by the proposed rule have been repeatedly recognized as not particularly serious. For example, commenters cited *Matter of Pula,* 19 I&N Dec. 467, 474 (BIA 1987), and noted the BIA's conclusion that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Paraphrasing *Delgado* v. *Holder,* 648 F.3d 1095, 1110 (9th Cir. 2010) (Reinhardt, J., concurring in part and concurring in the judgment), commenters stated that, outside of the aggravated felony context, "it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, 'run-of-the-mill' offenses do not constitute particularly serious crimes."

Commenters asserted that low-level offenses like misdemeanor DUI with no injury or simple possession of a controlled substance cannot constitute a particularly serious crime. In support of this proposition, commenters cited *Mellouli* v. *Lynch,* 575 U.S. 798 (2015) (possession of drug paraphernalia was not a controlled substances offense); *Carachuri-Rosendo* v. *Holder,* 560 U.S. 563 (2010) (subsequent marijuana possession offense is not an aggravated felony); and *Leocal* v. *Ashcroft,* 543 U.S. 1 (2004) (conviction for DUI was not an aggravated felony crime of violence). Commenters asserted that if the Departments wished to abrogate the Supreme Court's interpretation of the statute, they should do so by passing new legislation, not by proposing what the commenters consider to be unlawful rules.

Moreover, commenters asserted that the "essential key to determining whether a crime is particularly serious * * * is whether the nature of the crime is one which indicates that the alien poses a danger to the community." *Matter of G–G–S–,* 26 I&N Dec. 339 (BIA 2014) (quotation marks omitted). Commenters argued that despite this analytical requirement, the proposed rule arbitrarily re-categorizes many offenses as particularly serious without consideration of whether the nature of the crime indicates that the alien poses a danger to the community. Commenters expressed additional concern that this categorization removes all discretion

from the adjudicator to determine whether an individual's circumstances merit such a harsh penalty.

Commenters further asserted that, because Congress made commission of a "particularly serious crime" a bar to asylum but did not make commission of other categories of crimes such a bar, Congress intended to preclude that result. Commenters alleged that the NPRM violated the canon of construction articulated in *United States* v. *Vonn,* 535 U.S. 55, 65 (2002), *expressio unius est exclusio alterius,* which means that "expressing one item of a commonly associated group or series excludes another left unmentioned," because it attempted to create additional categories of crime bars to asylum eligibility in a manner inconsistent with the statute and congressional intent. Commenters analogized these NPRM provisions to another rule that had categorically barred "arriving aliens" from applying for adjustment of status in removal proceedings. *See* 8 CFR 245.1(c)(8) (1997). The Federal courts of appeals were split over whether that now-rescinded rule circumvented the Act and congressional intent because adjustment of status was ordinarily a discretionary determination.[5]

Commenters further alleged that the NPRM unlawfully categorically exempted a wide range of offenses from a positive discretionary adjudication of asylum. Commenters acknowledged that the Attorney General can provide for "additional limitations and conditions" on asylum applications consistent with the asylum statute by designating offenses as per se particularly serious, *see* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), but commenters emphasized that crimes that are not particularly serious are still subject to a discretionary determination. Commenters stated that Congress did not intend to authorize the Attorney General to categorically bar "large swaths of asylum seekers from protection." Commenters alleged that the Departments purposefully wrote the NPRM in this way (designating the bars as both particularly serious crimes and categorical exceptions to positive

---

[5] *Compare Scheerer* v. *U.S. Att'y Gen.,* 445 F.3d 1311, 1321–22 (11th Cir. 2006) (holding that the regulation was unlawful); *Bona* v. *Gonzales,* 425 F.3d 663, 668–71 (9th Cir. 2005) (same); *Zheng* v. *Gonzales,* 422 F.3d 98, 116–20 (3d Cir. 2005) (same), *and Succar* v. *Ashcroft,* 394 F.3d 8, 29 (1st Cir. 2005) (same), *with Akhtar* v. *Gonzales,* 450 F.3d 587, 593–95 (5th Cir. 2006) (upholding validity of the regulation), *rehearing en banc granted and remanded on other grounds,* 461 F.3d 584 (2006) (en banc), *and Mouelle* v. *Gonzales,* 416 F.3d 923, 928–30 (8th Cir. 2005) (same), *vacated on other grounds,* 126 S. Ct. 2964 (2006).

discretionary adjudication) to "insulate the Proposed Rules from review."

*Response:* The Departments disagree with comments asserting that the rule violates domestic law. Commenters asserted that Congress did not intend for the Attorney General to categorically bar "large swaths of asylum seekers from protection." However, Congress, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), vested the Attorney General with broad authority to establish conditions or limitations on asylum. Public Law 104–208, div. C, 110 Stat. 3009, 3009–546.

At that time, Congress created three categories of aliens who are barred from applying for asylum and adopted six other mandatory bars to asylum eligibility. IIRIRA, sec. 604(a), 110 Stat. at 3009–690 through 3009–694 (codified at INA 208(a)(2)(A)–(C), (b)(2)(A)(i)–(vi) (8 U.S.C. 1158(a)(2)(A)–(C), (b)(2)(A)(i)–(vi))). Congress further expressly authorized the Attorney General to expand upon two bars to asylum eligibility—the bars for "particularly serious crimes" and "serious nonpolitical crimes." INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)). Congress also vested the Attorney General with the ability to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B) (8 U.S.C. 1158(d)(5)(B)).

Significantly, "[t]his delegation of authority means that Congress was prepared to accept administrative dilution of the asylum guarantee in § 1158(a)(1)," as "the statute clearly empowers" the Attorney General and the Secretary to "adopt[ ] further limitations" on eligibility to apply for or receive asylum. *R–S–C* v. *Sessions,* 869 F.3d 1176, 1187 & n.9 (10th Cir. 2017). In authorizing "additional limitations and conditions" by regulation, the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be. The Act instructs only that additional limitations on eligibility are to be established "by regulation," and must be "consistent with" the rest of section 208 of the Act (8 U.S.C. 1158). INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)); *see also* INA 208(d)(5)(B) (8 U.S.C. 1158(d)(5)(B)).

Moreover, a long-held principle of administrative law is that an agency, within its congressionally delegated policymaking responsibilities, may "properly rely upon the incumbent administration's view of wise policy to

inform its judgments." *Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 865 (1984). Accordingly, an agency may make policy choices that Congress either inadvertently or intentionally left to be resolved by the agency charged with administration of the statute, given the current realities faced by the agency. *See id.* at 865–66. Through the publication of the NPRM, the Departments have properly exercised this congressionally delegated authority. Such policymaking is well within the confines of permissible agency action. Additionally, despite commenters' assertions that the Departments should pursue these changes through legislative channels, the Departments, as part of the Executive Branch, do not pursue legislative changes but instead rely on regulatory authority to interpret and enforce legislation as enacted by Congress.

As explained in the NPRM, Congress granted the Attorney General and the Secretary broad authority to determine additional "limitations and conditions" on asylum. For example, the Attorney General and the Secretary have authority to impose procedural requirements for asylum seekers and to designate by regulation additional crimes that could be considered particularly serious crimes or serious nonpolitical crimes. *See* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)); *see also* INA 208(2)(5)(B) (8 U.S.C. 1158(d)(5)(B)).

Based on the comments received, the Departments realize that the preamble to the NPRM resulted in confusion regarding which authority the Departments relied on in promulgating this rule. Specifically, commenters raised concerns regarding the Departments' reliance on section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) in support of some of the new bars to asylum eligibility. In response to these concerns and confusion, the Departments emphasize that, as in the proposed rule, the regulatory text itself does not designate any offenses covered in 8 CFR 208.13(c)(6) or 1208.13(c)(6) as specific particularly serious crimes.[6] Instead, this rule, like the proposed rule, sets out seven new "additional limitations," consistent with the Departments' authority at INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) to establish "additional limitations and conditions" on asylum

eligibility. *See* 8 CFR 208.13(c)(6), 1208.13(c)(6).

This reliance on the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) is consistent with the proposed rule. There, although the Departments cited the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as particularly serious crimes, the Departments also cited the authority at section 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) in support of each category of bars included in the rule. *See generally* 84 FR at 69645–54. The references throughout the preamble in the NPRM to the Attorney General's and the Secretary's authorities to designate additional particularly serious crimes accordingly highlighted one of two alternative bases for the inclusion of most of the new bars to asylum eligibility and sought to elucidate the serious nature of these crimes and the Departments' reasoning for including these offenses in the new provisions. In other words, although the Departments are not specifically designating any categories of offenses as "particularly serious crimes," the authority of the Attorney General and the Secretary to deny eligibility to aliens convicted of such offenses helps demonstrate that the new bars are "consistent with" the INA because the offenses to which the new bars apply—similar to "particularly serious crimes"—indicate that the aliens who commit them may be dangerous to the community of the United States or otherwise may not merit eligibility for asylum. As a result, the Departments need not address in detail commenters' concerns about whether discrete categories of offenses should constitute "particularly serious crimes" because (1) the new rule does not actually designate any specific offense as such crimes; and (2) section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)), as already discussed and as recognized by the Departments, independently authorizes the Attorney General and the Secretary to establish additional limitations and conditions on asylum eligibility.

Commenters asserted that Congress intended for the only criminal bars to asylum to be those contemplated by the particularly serious crime and serious nonpolitical crime bars. The Departments, however, disagree. Although the INA explicitly permits the Attorney General and the Secretary to designate additional crimes as particularly serious crimes or serious nonpolitical crimes, this does not mean that any time the Attorney General and the Secretary decide to limit eligibility for asylum based on criminal activity,

---

[6] The Departments do not intend, however, to imply that an immigration adjudicator could not or should not find those offenses to be particularly serious crimes in the context of adjudicating individual asylum applications on a case-by-case basis.

the limit must be based on either a particularly serious crime or a serious nonpolitical crime. Rather, the Attorney General and the Secretary may choose to designate certain criminal activity as a limitation or condition on asylum eligibility separate and apart from the scope of crimes considered particularly serious. These additional limitations must simply be established by regulation and must be consistent with the rest of section 208 of the Act (8 U.S.C. 1158).

Nothing in the Act suggests that Congress intended for the particularly serious crime bar at section 208(b)(2)(A)(ii) of the Act (8 U.S.C. 1158(b)(2)(A)(ii)) or the serious nonpolitical crime bar at section 208(b)(2)(A)(iii) of the Act (8 U.S.C. 1158(b)(2)(A)(iii)) to be the sole bars to asylum based on criminal activity. The Departments disagree with comments suggesting that existing exceptions to asylum eligibility occupy the entire field of existing exceptions. The Attorney General and the Secretary have the authority to impose additional limitations on asylum eligibility that are otherwise consistent with the limitations contained section 208(b)(2) of the Act (8 U.S.C. 1158(b)(2)). Those existing limitations on eligibility include limitations on eligibility because of criminal conduct. *See, e.g.,* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime)) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Deciding to impose additional limitations on asylum eligibility that are also based on criminal conduct, as the Departments are doing in this rulemaking, is accordingly consistent with the statute. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).

Of note, in *Trump* v. *Hawaii,* the Supreme Court determined that the INA's provisions regarding the entry of aliens "did not implicitly foreclose the Executive from imposing tighter restrictions," even in circumstances in which those restrictions concerned a subject "similar" to the one that Congress "already touch[ed] on in the INA." 138 S. Ct. 2392, 2411–12 (2018). Thus, by the same reasoning, Congress's statutory command that certain aliens are ineligible for asylum based on a conviction for a particularly serious crime or serious nonpolitical crime does not deprive the Attorney General and Secretary of authority, by regulation, to deny asylum eligibility for certain other aliens whose circumstances may—in a general sense—be "similar."

Commenters' references to the proposed rule revising 8 CFR 245.1(c)(8) (1997) (limitations on eligibility for adjustment of status) and subsequent case law striking down that proposed rule are inapposite. The First Circuit explained that the adjustment of status statute grants the Attorney General discretion to grant applications, but that this authority does not extend to grant the Attorney General authority to define eligibility for that relief. *Succar,* 394 F.3d at 10. However, unlike the adjustment of status statute, INA 245(a) (8 U.S.C. 1255(a)), the asylum statute explicitly grants the Attorney General authority to define additional limitations on eligibility for relief that are "consistent with this section." [7] INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). This express grant of authority contradicts any implied limitation on the Attorney General's authority that might otherwise be inferred from Congress's delineation of certain statutory bars.

ii. Law Regarding the Categorical Approach

*Comment:* Commenters asserted that the proposed rule violated the Supreme Court's longstanding categorical approach. Commenters stated that "federal courts have repeatedly embraced the 'categorical approach' to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court." Additionally, commenters noted that the Supreme Court has "long deemed undesirable" a "*post hoc* investigation into the facts of the predicate offenses." *Moncrieffe* v. *Holder,* 569 U.S. 184, 200 (2013). Commenters argued that the proposed rule directly contravenes this directive to avoid post hoc investigations.

---

[7] Moreover, at least two Federal courts of appeals rejected the reasoning in *Succar. See supra* note 5; *see also Lopez* v. *Davis,* 531 U.S. 230, 243–44 (2001) ("We also reject [the] argument * * * that the agency must not make categorical exclusions, but may rely only on case-by-case assessments. Even if a statutory scheme requires individualized determinations, which this scheme does not, the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority. The approach pressed by [the petitioner]—case-by-case decisionmaking in thousands of cases each year— could invite favoritism, disunity, and inconsistency. The [agency] is not required continually to revisit issues that may be established fairly and efficiently in a single rulemaking proceeding." (citations, footnote, and quotation marks omitted)); *Fook Hong Mak* v. *INS,* 435 F.2d 728, 730 (2d Cir. 1970) ("We are unable to understand why there should be any general principle forbidding an administrator, vested with discretionary power, to determine by appropriate rulemaking that he will not use it in favor of a particular class on a case-by-case basis * * *.").

Commenters emphasized that the categorical approach promotes fairness and due process, as well as judicial and administrative efficiency by avoiding "pseudo-criminal trials." Citing *Moncrieffe,* commenters noted concern that if an immigration adjudicator were required to determine the nature and amount of remuneration involved in, for example, a marijuana-related conviction, the "overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary." *Id.* at 201. Commenters noted that this would result in a disparity of outcomes based on the presiding immigration judge and would further burden the immigration court system. Moreover, commenters noted that the Supreme Court has repeatedly applied the categorical approach and found that its virtues outweigh its shortcomings. Citing *Mathis* v. *United States,* 136 S. Ct. 2243, 2252–53 (2016), commenters noted that the Supreme Court articulated basic reasons for adhering to the elements-only inquiry of the categorical approach, including "serious Sixth Amendment concerns" and "unfairness to defendants" created by alternative approaches.

Commenters asserted that the Departments' concern regarding the unpredictable results of the categorical approach is misleading because immigration adjudicators may already utilize a facts-based analysis to determine whether an offense is a "particularly serious crime" that would bar asylum. Commenters further alleged that the Departments recognized that this was a red herring by noting that the BIA has rectified some anomalies by determining that certain crimes, although not aggravated felonies, nonetheless constitute particularly serious crimes. *See* 84 FR at 69646.

Commenters further noted that, even if an offense does not rise to the level of a particularly serious crime, immigration adjudicators may deny asylum as a matter of discretion. In addition, commenters averred that for gang-related and domestic violence offenses, the proposed rule undermined criminal judgments and violated due process because the proposed rule disregarded the established framework for determining whether a conviction is an aggravated felony. Rather than looking to the elements of the offense, as currently required by the categorical approach, commenters noted that the proposed rule required adjudicators to consider "gang-related" or "domestic violence" conduct that may not have been one of the required elements for a

ER-0142

conviction and therefore not objected to by the asylum applicant or his or her attorney during the criminal proceeding.

*Response:* The Departments first note that the traditional elements-to-elements categorical approach extolled by the commenters and as set out in *Mathis* by the Supreme Court is an interpretive tool frequently applied by the courts to determine the immigration-related or penal consequences of criminal convictions. *Cf. Mathis,* 136 S. Ct. at 2248 ("To determine whether a prior conviction is for generic burglary (or other listed crime) courts apply what is known as the categorical approach * * *."). However, this traditional categorical approach is not the only analytical tool blessed by the Supreme Court, and the exact analysis depends on the language of the statute at issue. For example, in *Nijhawan* v. *Holder,* 557 U.S. 29, 38 (2009), the Court held that the aggravated felony statute at section 101(a)(43) of the Act (8 U.S.C. 1101(a)(43)) "contains some language that refers to generic crimes and some language that almost certainly refers to the specific circumstances in which a crime was committed." Based on the language of section 101(a)(43)(M)(i) of the Act (8 U.S.C. 1101(a)(43)(M)(i)), the Supreme Court held that the INA required a "circumstance-specific" analysis to determine whether an aggravated felony conviction for a fraud or deceit offense involved $10,000 or more under INA 101(a)(43)(M)(i) (8 U.S.C. 1101(a)(43)(M)(i)). *Id.* at 40. And in *Mathis* itself, the Supreme Court observed that the categorical approach is not the only permissible approach: Again relying on the language as written in a statute by Congress, the Supreme Court explained that "Congress well knows how to instruct sentencing judges to look into the facts of prior crimes: In other statutes, using different language, it has done just that." *Mathis,* 136 S. Ct. at 2252 (noting the determination in *Nijhawan* that a circumstance-specific approach applies when called for by Congress).

Nevertheless, the Departments did not purport to end the use of the traditional categorical approach for determining asylum eligibility through the proposed rule. Instead, the Departments explained that the use of the categorical approach has created inconsistent adjudications and created inefficiencies through the required complexities of the analysis in immigration adjudications. *See* 84 FR at 69646–47. The Departments' concerns with the categorical approach are in line with those of an increasing number of Federal judges and others who are required to work within its confines. *See, e.g., Lopez-Aguilar* v. *Barr,* 948

F.3d 1143, 1149 (9th Cir. 2020) (Graber, J., concurring) ("I write separately to add my voice to the substantial chorus of federal judges pleading for the Supreme Court or Congress to rescue us from the morass of the categorical approach. * * * The categorical approach requires us to perform absurd legal gymnastics, and it produces absurd results."); *see also Lowe* v. *United States,* 920 F.3d 414, 420 (6th Cir. 2019) (Thapar, J., concurring) ("[I]n the categorical-approach world, we cannot call rape what it is. * * * [I]t is time for Congress to revisit the categorical approach so we do not have to live in a fictional world where we call a violent rape non-violent.").

As a result, the Departments proposed, for example, that an alien who has been convicted of "[a]ny felony under Federal, State, tribal, or local law" would be ineligible for asylum. *See* 8 CFR 208.13(c)(6)(vi)(A), 1208.13(c)(6)(vi)(A) (proposed). This provision would not require an adjudicator to conduct a categorical analysis and compare the elements of the alien's statute of conviction with a generic offense. As explained in the NPRM, the Departments believe this will create a more streamlined and predictable approach that will increase efficiency in immigration adjudications. 84 FR at 69647. It will also increase predictability because it will be clear and straightforward which offenses will bar an individual from asylum.

The Attorney General and the Secretary have the authority to place additional limitations on eligibility for asylum, provided that they are consistent with the rest of section 208 of the Act (8 U.S.C. 1158). INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). There is no obligation that any criminal-based limitation implemented pursuant to this authority must correspond with a particular generic offense to which an adjudicator would compare the elements of the alien's offense using the categorical approach, particularly when not every criminal provision implemented by Congress itself requires such an analysis. *See Nijhawan,* 557 U.S. at 36; *see also United States* v. *Keene,* 955 F.3d 391, 393 (4th Cir. 2020) (holding that Congress did not intend for the violent crimes in aid of racketeering activity statute (18 U.S.C. 1959) to require a categorical analysis because "the statutory language * * * requires only that a defendant's *conduct,* presently before the court, constitute one of the enumerated federal offenses as well as the charged state crime" (emphasis in original)). Additionally, prior case law interpreting and applying the categorical approach

to determine whether a crime is particularly serious does not apply where, like here, the Departments are designating additional limitations on eligibility for asylum under the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)).[8]

Finally, the Departments expect immigration adjudicators to determine whether an alien is barred from asylum eligibility under the other provisions of the proposed rule due to the alien's conviction or conduct in keeping with case law. For example, in order to determine whether an alien's misdemeanor conviction is a conviction for an offense "involving * * * the possession or trafficking of a controlled substance or controlled substance paraphernalia," the adjudicator would be required to review the specific elements of the underlying offense as required by the categorical approach. On the other hand, the inquiry into whether conduct is related to street-gang activity or domestic violence as promulgated by the rule is similar to statutory provisions that already require an inquiry into conduct-based allegations that may bar asylum but that do not require a categorical approach analysis. *See* INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) (bar to asylum based on persecution of others); INA 240A(b)(2)(A) (8 U.S.C. 1229b(b)(2)(A)) (immigration benefits for aliens who are battered or subjected to extreme cruelty).

### iii. Law Regarding the Validity of Convictions

*Comment:* Commenters also asserted that the proposed rule's establishment of criteria for determining whether a conviction or sentence is valid for immigration purposes exceeded the Act's statutory grant of authority, violated case law, and violated the Constitution. Broadly speaking,

---

[8] The proposed rule preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as particularly serious crimes and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the inclusion of the new categories of bars in the proposed rule. *See* 84 FR at 69645–54. The regulatory text, however, does not actually designate any additional offenses as "particularly serious crimes." The text instead aligns with section 208(b)(2)(C) by setting out "[a]dditional limitations on asylum eligibility." *See id.* at 65659. Section 208(b)(2)(B)(ii) remains relevant to the current rule in that the new bars are "consistent with" the INA partly because they deny eligibility as a result of crimes or conduct that share certain characteristics with "particularly serious crimes," but the Departments clarify that they are promulgating this rule under section 208(b)(2)(C). Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

commenters asserted that the NPRM is contrary to the intent of Congress because it attempts to "rewrite immigration law." First, commenters asserted that the proposed rule violated the full faith and credit owed to State court decisions. Second, commenters asserted that the Departments misread and misinterpreted applicable case law in justifying the presumption against the validity of post-conviction relief. Third, commenters expressed concern with the rebuttable presumption against the validity of post-conviction relief in certain circumstances created by the proposed rule.

Commenters expressed opposition to the NPRM's rebuttable presumption that an order vacating a conviction or modifying, clarifying, or otherwise altering a sentence are for the purpose of ameliorating the conviction's immigration consequences in certain circumstances, *see* 8 CFR 208.13(c)(8), 1208.13(c)(8) (proposed), because they alleged that it could violate principles of federalism under the Constitution's Full Faith and Credit Clause, U.S. Const. art. IV, sec. 1, as codified by the Full Faith and Credit Act, 28 U.S.C. 1738. Commenters asserted that the proposed rule abandoned the presumption of regularity that should accompany State court orders. By precluding an adjudicator from considering a post-conviction order entered to cure substantive or procedural constitutional deficiencies, adjudicators are effectively given permission to second-guess State court decisions, which would undermine the authority of and attribute improper motives to State and Federal tribunals. Commenters alleged that, in this way, immigration judges would become fact-finders who look beyond State court records. Further, one commenter contended that the NPRM undermined local authority to "evaluate the impact and consequences certain conduct should have on its residents by adding broad misdemeanor offenses as a bar to asylum relief," which the commenter asserted would interfere with a local authority's "sovereign prerogative to shape its law enforcement policies to best account for its complex social and political realities."

Commenters averred that the Departments cited "a misleading quote" from *Matter of F–*, 8 I&N Dec. 251, 253 (BIA 1959), which would allow asylum adjudicators to look beyond the face of the State court order. *See* 84 FR at 69656. Commenters asserted that the Departments failed to read *Matter of F-* in its entirety and that, if they had, they would have noted that the BIA instead offered support in favor of presuming the validity of a State court order unless

there is a reason to doubt it. *Matter of F–*, 8 I&N Dec. at 253 ("Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself.").

Additionally, commenters stated the proposed rule violates circuit courts of appeals case law holding that the BIA may not consider outside motives. Commenters cited *Pickering* v. *Gonzales,* 465 F.3d 263, 267–70 (6th Cir. 2006), which held that the BIA was limited to reviewing the authority of the court issuing a vacatur and was not permitted to review outside motives, such as avoiding negative immigration consequences. Commenters also cited *Reyes-Torres* v. *Holder,* 645 F.3d 1073, 1077–78 (9th Cir. 2011), and noted that the court held that the respondent's motive was not relevant to the immigration court's inquiry into whether the decision vacating his conviction was valid. Finally, commenters cited *Rodriguez* v. *U.S. Attorney General,* 844 F.3d 392, 397 (3d Cir. 2006), which held that the immigration judge may rely only on "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction." Commenters asserted that, in direct contravention of these cases, the proposed rule grants "vague and indefinite authority to look beyond a facially valid vacatur," which violates asylum seekers' rights to a full and fair proceeding.

Commenters also asserted that the Departments improperly extended the decision in *Matter of Thomas and Thompson,* 27 I&N Dec. 674, to all forms of post-conviction relief. By extending this decision, commenters stated that the proposed rule imposes an ultra vires and unnecessary burden on asylum seekers. Commenters first asserted that the Attorney General's decision in *Matter of Thomas and Thompson* had no justification in the text or history of the Act. Specifically, commenters stated that the Act does not limit the authority of immigration judges by requiring them to consider only State court sentence modifications that are based on substantive or procedural defects in the underlying criminal proceedings. Rather, commenters asserted, the Act requires a "convict[ion] by a final judgment." Commenters argued that, because a vacated judgment is neither "final" nor a "judgment," it would have

no effect on immigration proceedings. Commenters argued therefore that the Act does not permit immigration judges to treat a vacated judgment as valid and effective based on when, how, or why it was vacated. Moreover, commenters asserted that "[c]ourt orders are presumptively valid, not the other way around."

Commenters asserted that the BIA, in *Matter of Cota-Vargas,* 23 I&N Dec. 849, 852 (BIA 2005), *overruled by Matter of Thomas and Thompson,* 27 I&N Dec. 674, relied on the text of the Act and the legislative history behind Congress's definition of "conviction" and "sentence" in section 101(a)(48) of the Act (8 U.S.C. 1101(a)(48)) to hold that proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Commenters argued that, as a result, neither the text of the Act nor the legislative history supports the conclusion reached in *Matter of Thomas and Thompson,* and hence that the decision should not be extended to the proposed rule. Commenters stated that the same is true of orders modifying, clarifying, or altering a judgment or sentence, as recognized by the BIA in *Matter of Cota-Vargas,* 23 I&N Dec. at 852. Specifically, commenters quoted *Matter of Cota-Vargas* in noting that the NPRM's approach to "sentence modifications has no discernible basis in the language of the Act."

Commenters also objected to the two situations in which the rebuttable presumption against the validity of an order modifying, clarifying, or altering a judgment or sentence arises: When a court enters a judgment or sentencing order after the asylum seeker is already in removal proceedings; or when the asylum seeker moves the court to modify, clarify, or alter a judgment or sentencing order more than one year after it was entered. Commenters cited the holding in *Padilla* v. *Kentucky,* 559 U.S. 356, 374 (2010), that noncitizen defendants have a Sixth Amendment right to be competently advised of immigration consequences before agreeing to a guilty plea. Commenters alleged that the presumption is unlawful under *Padilla* because it holds asylum applicants whose rights were violated under *Padilla* to a different standard. Commenters similarly asserted that the presumption would prejudice asylum seekers who have not had an opportunity to seek review of their criminal proceedings until applying for asylum. Commenters stated that asylum applicants would be forced to rebut the presumption that an order, entered after the asylum seeker was

placed in removal proceedings or requested more than one year after the date of conviction or sentence was entered, is invalid. In this way, commenters alleged, the NPRM would "compound the harm to immigrants who * * * have been denied constitutionally compliant process in the United States criminal legal system."

One commenter asserted that some orders changing a sentence or conviction are entered after removal proceedings began because the alien had not received the constitutionally required advice regarding immigration consequences stemming from his or her criminal convictions. Other commenters explained that because criminal defendants oftentimes lack legal representation in post-conviction proceedings, they may have lacked knowledge of their constitutional rights or resources to challenge their convictions or related issues. Commenters also explained that asylum applicants may not have had reason to suspect defects in their criminal proceedings until they applied for asylum and met with an attorney. Commenters asserted that the NPRM would also harm those people if they realized those defects more than one year after their convictions were entered.

Another commenter explained that "state and federal sentencing courts should have more discretion to ameliorate the consequences of criminal convictions for a non-citizen's immigration proceedings. Collateral sanctions imposed on persons convicted of crimes—such as ineligibility to apply for relief from removal and other immigration consequences—should be subject to waiver, modification, or another form of relief if the sanctions are inappropriate or unfair in a particular case."

*Response:* The Attorney General and the Secretary are granted general authority to "establish such regulations [as each determines to be] necessary for carrying out" their authorities under the INA. INA 103(a)(1), (a)(3), and (g)(2) (8 U.S.C. 1103(a)(1), (a)(3), and (g)(2)); *see also Tamenut* v. *Mukasey,* 521 F.3d 1000, 1004 (8th Cir. 2008) (en banc) (per curiam) (describing INA 103(g)(2) (8 U.S.C. 1103(g)(2)) as "a general grant of regulatory authority"); *cf. Narenji* v. *Civiletti,* 617 F.2d 745, 747 (DC Cir. 1979) ("The [INA] need not specifically authorize each and every action taken by the Attorney General, so long as his action is reasonably related to the duties imposed upon him."). As stated above, the Attorney General and the Secretary also have the congressionally provided

authority to place additional limitations and conditions on eligibility for asylum, provided that they are consistent with section 208 of the Act (8 U.S.C. 1158). INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). Prescribing the effect to be given to vacated, expunged, or modified convictions or sentences is an ancillary aspect of prescribing additional limitations or conditions on asylum eligibility.

As explained in the NPRM, the rule codifies the principle set forth in *Matter of Thomas and Thompson,* 27 I&N Dec. at 680, that, if the underlying reasons for the vacatur, expungement, or modification were for "rehabilitation or immigration hardship," the conviction remains effective for immigration purposes. *See* 84 FR at 69655. Even before *Matter of Thomas and Thompson* was decided, courts of appeals repeatedly accepted the result reached in that case. *See id.; see also Saleh* v. *Gonzales,* 495 F.3d 17, 24 (2d Cir. 2007); *Pinho* v. *Gonzales,* 432 F.3d 193, 215 (3d Cir. 2005). Therefore, the Departments reject commenters' assertions that the rule improperly relies on or extends *Matter of Thomas and Thompson.*[9] In addition, the Departments note that agencies may decide whether to announce reinterpretations of a statute through rulemaking or through adjudication. *Matter of Thomas and Thompson,* 27 I&N Dec. at 688 (citing, *inter alia, NLRB* v. *Bell Aerospace Co.,* 416 U.S. 267, 294 (1974)). In *Matter of Thomas and Thompson,* the Attorney General elected to address prior BIA precedent regarding the validity of modifications, clarifications, or other alterations through administrative adjudication. *Id.* at 689. That the Attorney General declined to consider additional issues on this topic through the administrative adjudication does not foreclose him from later promulgating additional interpretations or reinterpretations of the Act through rulemaking, as is being

done in this final rule. *See Bell Aerospace Co.,* 416 U.S. at 294.

The Departments also reject commenters' claims that the approach set forth by the rule violates the Full Faith and Credit Clause, U.S. Const. art. IV, sec. 1, or the Full Faith and Credit Act, 28 U.S.C. 1738. The Full Faith and Credit provisions of 28 U.S.C. 1738 apply to courts and not administrative agencies. *See NLRB* v. *Yellow Freight Sys., Inc.,* 930 F.2d 316, 320 (3d Cir. 1991) (federal administrative agencies are not bound by section 1738 because they are not "courts"); *see also Am. Airlines* v. *Dep't. of Transp.,* 202 F.3d 788, 799 (5th Cir. 2000) (28 U.S.C. 1738 did not apply to the Department of Transportation because it is "an agency, not a 'court'").

Moreover, as explained by the Second Circuit, and as reiterated by the Attorney General in *Matter of Thomas and Thompson,* when an immigration judge reviews a State conviction for an offense, the immigration judge is merely comparing the State conviction to the Federal definition of an offense under the Act. *Saleh,* 495 F.3d at 26 ("[T]he BIA is simply interpreting how to apply Saleh's vacated State conviction for receiving stolen property to the INA and is not refusing to recognize or relitigating the validity of Saleh's California state conviction."); *Matter of Thomas and Thompson,* 27 I&N Dec. at 688 ("[T]he immigration judge in such a case simply determines the effect of that order for the purposes of federal immigration law."). As a result, because the State court order remains effective and unchallenged for all other purposes, there is no intrusion on State law and no violation of the principles of federalism and comity. *Matter of Thomas and Thompson,* 27 I&N Dec. at 688.

The Departments reject commenters' assertions that the NPRM improperly quotes *Matter of F–,* 8 I&N Dec. 251. The NPRM cites *Matter of F-* only to support the proposition that the alien must establish that a court issuing an order vacating or expunging a conviction or modifying a sentence had jurisdiction and authority to do so. 84 FR at 69656. No law compels the Departments to accept State court orders entered without jurisdiction, and there is no sound public policy reason for doing so. Further, adopting such a policy would also potentially raise difficulties for the faithful and consistent administration of the immigration laws, as the Departments could be required to accept a State court judgment declaring an alien to be a United States citizen, even though a State court cannot confer or establish United States citizenship. Both

---

[9] To the extent the commenters disagree with the substance of the Attorney General's decision in *Matter of Thomas and Thompson,* the Departments note that this rulemaking is not the mechanism for expressing such criticisms. The Attorney General has the authority to review administrative determinations in immigration proceedings, which includes the power to refer cases for review. INA 103(a)(1), (g) (8 U.S.C. 1103(a)(1), (g)); 8 CFR 1003.1(h)(1); *see also Xian Tong Dong* v. *Holder,* 696 F.3d 121, 124 (1st Cir. 2012) (the Attorney General is authorized to direct the BIA to refer cases to him for review and, given this authority, his decisions are entitled to *Chevron* deference). When the Attorney General certifies a case to himself, he has broad discretion to review the issues before him. *See Matter of J–F–F–,* 23 I&N Dec. 912, 913 (A.G. 2006).

*Matter of F-* and the regulatory language simply restate the longstanding proposition that adjudicators in the Departments are not bound by judgments rendered by courts without jurisdiction, and even the full language noted by commenters from *Matter of F-* adheres to that proposition. *Matter of F-,* 8 I&N Dec. at 253 (explaining that, although "familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court," the "presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself").

Commenters' statements that the Departments' interpretation of "conviction" runs contrary to Congress's intent in defining the term are similarly misplaced. As explained by the Attorney General, in enacting section 101(a)(48) of the Act (8 U.S.C. 1101(a)(48)), Congress made clear that immigration consequences should flow from the original determination of guilt. *Matter of Thomas and Thompson,* 27 I&N Dec. at 682 (describing subsequent case law analyzing Congress's intent in enacting a definition for conviction). To the extent that commenters relied on *Matter of Cota-Vargas,* 23 I&N Dec. 849, the Attorney General expressly overruled that decision and explained that Congress did intend to clarify the definition of "conviction" for immigration purposes. *Matter of Thomas and Thompson,* 27 I&N Dec. at 679, 682.

Regarding commenters' concerns about the creation of a rebuttable presumption against the validity of an order modifying, clarifying, or altering a judgment or sentence, the Departments reiterate that this is merely a presumption. Individuals will be able to overcome the presumption by providing evidence that the modification, clarification, or vacatur was sought for genuine substantive or procedural reasons. As noted in the NPRM, the purpose of this presumption is to promote finality in immigration proceedings by encouraging individuals to pursue legitimate concerns regarding the validity of prior convictions. 84 FR at 69656.

The Departments disagree that creating a rebuttable presumption is unlawful under *Padilla* v. *Kentucky,* 559 U.S. 356. In *Padilla,* the Supreme Court held that noncitizen defendants have a Sixth Amendment right to be competently advised of immigration consequences before agreeing to a guilty plea. *Id.* at 374. The rule does not affect this right, and noncitizen defendants continue to retain this right in criminal proceedings. Moreover, if a noncitizen

defendant is not properly apprised of the immigration consequences of a guilty plea, that individual continues to have the right to pursue the necessary action to address that error through the criminal justice system. Similarly, an individual whose Sixth Amendment rights were determined to have been violated in contravention of *Padilla* would be able to present this evidence in immigration proceedings and, if the evidence is sufficient, overcome the presumption that the individual was seeking a modification, clarification, or vacatur for immigration purposes.

Regarding commenters' assertions that State and Federal sentencing courts should have more discretion to ameliorate the consequences of criminal convictions for a non-citizen's immigration proceedings, the Departments disagree. Administration and enforcement of the nation's immigration laws as written by Congress are entirely within the purview of the Executive Branch, specifically the Attorney General and the Secretary. *See* INA 103 (8 U.S.C. 1103). The Attorney General and the Secretary are granted discretion and authority to determine the manner in which to administer and enforce the immigration laws. *Id.* At the same time, this rule will not have any bearing on how States or other jurisdictions implement their criminal justice system because, as explained, any post-conviction relief remains valid for all other purposes.

b. Violation of International Law

*Comment:* Numerous commenters alleged that the proposed rule violates the United States' obligations to protect refugees and asylum seekers under international law, including obligations flowing from the Protocol relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223 ("the Protocol" or "the 1967 Protocol"), which incorporates Articles 2 to 34 of the 1951 Convention relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6233, 6259–76 ("the Refugee Convention"). Commenters stated that, by virtue of signing the Protocol, the United States is bound to create refugee laws that comply with the Protocol. Commenters asserted that the current laws, regulations, and processes governing asylum adjudications are already exceedingly harsh and are not compliant with international obligations. Commenters claimed that, rather than working to better align the United States with international obligations, the proposed rule's new categorical bars to asylum violate both the language and spirit of the Refugee Convention.

Commenters speculated that the proposed rule will violate the principle of non-refoulement, as described in Article 33(1) of the Refugee Convention, which requires that "[n]o contracting state shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Commenters noted that, in considering non-refoulement, the United States is obligated to ensure a heightened consideration to children. Commenters also claimed that the exception to refugee protection contained in Article 33(2) of the Refugee Convention [10] does not affect non-refoulement obligations. Commenters also outlined the United States' obligations to protect migrants, irrespective of migration status, as outlined in the Universal Declaration of Human Rights and other human rights instruments. Commenters stated that to comply with these protection obligations, the United States must respond to the protection needs of migrants, with a particular duty of care for migrants in vulnerable situations.

Commenters also asserted that the proposed rule violates the United States' obligations under customary international law. These commenters cited Article III of the U.S. Constitution and *Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 729 (2004), in asserting that customary international law is recognized as and must be applied as U.S. law. Commenters stated that, unlike treaty law, customary international law cannot be derogated by later legislation and remains in full force at all times. Commenters claimed that even good faith efforts by States to change a rule are violations of customary international law until the rule has been changed by a consensus of States through *opinio juris* and state practice. Despite this summary of customary international law, these commenters did not specify how the proposed rule violates customary international law.

Other commenters averred that the proposed rule violates international law by expanding the definition of a "particularly serious crime" beyond the parameters of the term as defined by the United Nations High Commissioner for

---

[10] Article 33(2) of the Refugee Conviction provides: "The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."

Refugees ("UNHCR") by rendering nearly all criminal convictions bars to asylum. Commenters recognized that Article 33(2) of the Refugee Convention allows states to exclude or expel individuals from refugee protection if they have been "convicted by a final judgment of a particularly serious crime" and "constitute[] a danger to the community of that country." However, commenters asserted that this clause is intended only for "extreme cases," in which the particularly serious crime is a "capital crime or a very grave punishable act.'' Commenters cited UNHCR's statement that the crime "must belong to the gravest category" and that the individual must "become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum.'' Again citing UNHCR, commenters further asserted that this exception does not include less extreme crimes such as "petty theft or the possession for personal use of illicit narcotic substances.''

Commenters also expressed concern that the proposed rule's categorical bars do not allow for an individualized analysis as to whether an individual who has been convicted of a particularly serious crime also presents a danger to the community. Commenters noted that, in the proposed rule, the Departments cited the need for increased efficiency as a justification for creating these additional bars. However, commenters responded that an individualized determination is exactly what is required by the Refugee Convention. Specifically, commenters claimed that the Departments ignored UNHCR guidelines,[11] which require not only a conviction for a particularly serious crime but also a determination that the individual constitutes a danger to the community of the country of refuge. Commenters averred that a conviction, without more, does not make an individual a present or future danger to the community. Commenters accordingly asserted that the Refugee Convention's "particularly serious crime" bar should apply only after a determination that an individual was convicted of a particularly serious crime and a separate assessment demonstrates that he or she is a present or future danger.

In addition, commenters alleged that the Act, in combination with subsequent agency interpretations, have

already expanded the term "particularly serious crime'' far beyond its contemplated definition by creating the categorical "particularly serious crime'' bar that incorporates the aggravated felony definition. Similarly, commenters stated that adjudicators already have overly broad discretion to deny asylum based on alleged criminal conduct. These commenters claimed that the proposed rule would cause the United States to further depart from its international obligations by creating additional bars without consideration of other factors, such as dangerousness. Commenters alleged that, in justifying the proposed rule, the Departments improperly cited the "serious non-political crime'' bar that applies only to conduct that occurred outside the United States.

In addition to these alleged violations of international law, commenters also asserted that the Departments' emphasis on the discretionary nature of asylum violates U.S. treaty obligations, congressional intent, and case law. Commenters noted that, although a refugee seeking protection in the United States does not always have a claim to mandatory protection, Congress's intent, in enacting the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 ("the Refugee Act''), was to expand the availability of refugee protection and bring the United States into compliance with its obligations under the 1967 Protocol. Commenters alleged that the proposed rule does the opposite by providing seven categorical bars to asylum and, as a result, violates the spirit and intent of the Refugee Act.

Commenters alleged that the Departments' reliance on the Attorney General's discretion to enact the proposed changes is ultra vires because the Attorney General, even in his discretion, may not violate domestic law, international treaties, or fundamental human rights. Specifically, commenters averred that the Attorney General's discretion is limited by the criteria in sections 208(b) and (d) of the Act (8 U.S.C. 1158(b) and (d)) as well as the legislative history regarding these sections, which, according to the commenters, clearly incorporate international law and legal norms. Commenters stated, moreover, that where the United States is a party to a treaty, any decision to abrogate the treaty must be clearly expressed by Congress.

One commenter expressed concern with the Departments' interpretation and reliance on Article 34 of the Refugee Convention, which provides that parties "shall as far as possible facilitate the assimilation and

naturalization of refugees.'' This commenter criticized the Departments' analysis regarding the availability of alternative relief for individuals barred from asylum under the proposed rule. Specifically, the commenter noted that, although Article 34 requires the United States only to make efforts to naturalize refugees, not to naturalize all refugees, this does not mean that the United States then has the discretion to limit access to the asylum system in the first place.

*Response:* As explained in the NPRM, this rule is consistent with the United States' obligations as a party to the 1967 Protocol, which incorporates Articles 2 through 34 of the 1951 Refugee Convention.[12] This rule is also consistent with U.S. obligations under Article 3 of the CAT, as implemented in the immigration regulations pursuant to the implementing legislation.

As an initial matter, the rule affects eligibility for asylum but does not place any additional limitations on statutory withholding of removal or protection under the CAT regulations. The United States implemented the non-refoulement provision of Article 33(1) of the Refugee Convention through the withholding of removal provision at section 241(b)(3) of the Act (8 U.S.C. 1231(b)(3)), and the non-refoulement provision of Article 3 of the CAT through the CAT regulations, rather than through the asylum provisions at section 208 of the Act (8 U.S.C. 1158). *See INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 429, 440–41 (1987); *Matter of C–T–L–,* 25 I&N Dec. 341 (BIA 2010) (applying section 241(b)(3)); *see also* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA''), Public Law 105–277, div. G, sec. 2242, 112 Stat. 2681, 2631–822; 8 CFR 208.16 through 208.18; 1208.16 through 1208.18. The Supreme Court has explained that asylum "does not correspond to Article 33 of the Convention, but instead corresponds to Article 34,'' which provides that contracting States "'shall as far as possible facilitate the assimilation and naturalization of refugees.' '' *Cardoza-Fonseca,* 480 U.S. at 441. Article 34 "is

---

[11] Commenters cited paragraph 154 the UNHCR Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees.

[12] The Departments also note that neither of these treaties is self-executing, and that they are therefore not directly enforceable in U.S. law except to the extent that they have been implemented by domestic legislation. *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.''); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (CAT "was not self-executing''); *see also INS* v. *Stevic,* 467 U.S. 407, 428 n.22 (1984) ("Article 34 merely called on nations to facilitate the admission of refugees to the extent possible; the language of Article 34 was precatory and not self-executing.'').

precatory; it does not require the implementing authority actually to grant asylum to all those who are eligible.'' *Id.*

Because the rule does not affect statutory withholding of removal or CAT protection, the proposed rule is consistent with the non-refoulement provisions of the 1951 Refugee Convention, the 1967 Protocol, and the CAT. *See Matter of R–S–C–,* 869 F.3d at 1188 & n.11 (explaining that ''the Refugee Convention's non-refoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution— is given full effect by the Attorney General's withholding-only rule''); *Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016); *Maldonado* v. *Lynch,* 786 F.3d 1155, 1162 (9th Cir. 2015) (explaining that Article 3 of the CAT, which sets out the non-refoulement obligations of parties, was implemented in the United States by FARRA and its implementing regulations).

The rule does not affect the withholding of removal process or standards. INA 241(b)(3) (8 U.S.C. 1231(b)(3)); 8 CFR 208.16, 1208.16. An alien who can demonstrate that he or she would more likely than not face persecution on account of a protected ground or torture may qualify for statutory withholding of removal or CAT protection. Therefore, because individuals who may be barred from asylum by the rule remain eligible to seek statutory withholding of removal and CAT protection, the rule does not violate the principle of non-refoulement. *Cf. Garcia* v. *Sessions,* 856 F.3d 27, 40 (1st Cir. 2017) (discussing the distinction between asylum and withholding of removal and explaining that ''withholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood'').

Commenters asserted, without support, that the United States must respond to the needs of migrants to comply with the 1948 Universal Declaration of Human Rights. *See* Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 (1948) (''UDHR''). The UDHR is a non-binding human rights instrument, not an international agreement, and thus it does not impose legal obligations on the United States. *Alvarez-Machain,* 542 U.S. at 728, 734–35 (citing John P. Humphrey, The U.N. Charter and the Universal Declaration of Human Rights, in The International Protection of Human Rights 39, 50 (Evan Luard ed., 1967) (quoting Eleanor Roosevelt as

stating that the Declaration is '''a statement of principles * * * setting up a common standard of achievement for all peoples and all nations' and 'not a treaty or international agreement * * * impos[ing] legal obligations.' '')). In any case, although the UDHR proclaims the right of ''[e]veryone'' to ''seek and to enjoy'' asylum, UDHR Art. 14(1), it does not purport to state specific standards for establishing asylum eligibility, and it certainly cannot be read to impose an obligation on the United States to grant asylum to ''everyone,'' *see id.,* or to prevent the Attorney General and the Secretary from exercising their discretion granted by the INA, consistent with U.S. obligations under international law as implemented in domestic law. *See* UNHCR, *Advisory Opinion on the Extraterritorial Application of Non-Refoulement Obligations Under the 1951 Convention Relating to the Status of Refugees and its 1967 Protocol* 3 (Jan. 26, 2007), *https://www.unhcr.org/4d9486929.pdf* (''The principle of *non-refoulement* as provided for in Article 33(1) of the 1951 Convention does not, as such, entail a right of the individual to be granted asylum in a particular State.''). The United States' overall response to the needs of migrants extends beyond the scope of this rulemaking.

To the extent that commenters made blanket assertions that the rule violates customary international law or other international documents and statements of principles, the commenters ignore the fact that the rule leaves the requirements for an ultimate grant of statutory withholding of removal or CAT withholding or deferral of removal unchanged.

As explained in additional detail in section II.C.2.a.i of this preamble, the rule did not designate additional particularly serious crimes in the regulatory text. Because the Departments have the independent authority for these changes under INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)), the Departments need not further respond to comments regarding the current ''particularly serious crime'' bar, as those comments extend beyond the scope of this rulemaking. Nevertheless, commenters' assertions that the proposed rule improperly and unlawfully expands the definition of ''particularly serious crime'' beyond the definition provided by UNHCR are misguided. UNHCR's interpretations of or recommendations regarding the Refugee Convention and the Protocol, such as set forth in the UNHCR Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967

Protocol Relating to the Status of Refugees (Geneva 1992) (reissued Feb. 2019), are ''not binding on the Attorney General, the BIA, or United States courts.'' *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 427 (1999). ''Indeed, the Handbook itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol * * * is incumbent upon the Contracting State in whose territory the refugee finds himself.' '' *Id.* at 427–28. To the extent such guidance ''may be a useful interpretative aid,'' *id.* at 427, it would apply to statutory withholding of removal—which is the protection that implements Article 33 of the Convention—and which, as discussed above, this rule does not affect.

Commenters also relied on the advisory opinion UNHCR Handbook to assert that an adjudicator must make an individualized assessment as to whether an asylum applicant presents or will present a danger to the community. Again, as noted above, the Departments clarify in section II.C.2.a.i that the rule did not designate additional particularly serious crimes in the regulatory text. Regardless, the Departments have longstanding authority under U.S. law to create asylum-related conditions without an individualized consideration of present or future danger to the community.[13] For example, in 2000, Attorney General Janet Reno limited asylum eligibility pursuant to the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) based on ''a fundamental change in circumstances'' or the ability of an alien to reasonably relocate within the alien's country of nationality or last habitual residence, even where that alien had established he or she had suffered past persecution. *See* Asylum Procedures, 65 FR 76121, 76133–36 (Dec. 6, 2000) (adding 8 CFR 208.13(b)(1)(i)–(iii)). As outlined in the NPRM, the Attorney General and Congress have previously established several mandatory bars to asylum eligibility. 84 FR at 69641. The Departments note that the adjudicator must still make an individualized determination as to whether a given offense falls into the category of conduct

---

[13] In addition, even if this rulemaking did enact regulatory provisions requiring an interpretation of particularly serious crimes, U.S. law has long held that, once an alien is found to have been convicted of a particularly serious crime, there is no need for a separate determination whether he or she is a danger to the community. *See Matter of N–A–M–,* 24 I&N Dec. 336, 343 (BIA 2007), *aff'd, N–A–M–* v. *Holder,* 587 F.3d 1052 (10th Cir. 2009), *cert. denied,* 562 U.S. 1141 (2011); *Matter of Q–T–M–T–,* 21 I&N Dec. 639, 646–47 (BIA 1996); *Matter of K–,* 20 I&N Dec. 418, 423–24 (BIA 1991); *Matter of Carballe,* 19 I&N Dec. 357, 360 (BIA 1986).

contemplated by an individual bar. *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly serious crime bar), *abrogated on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009). In addition, as explained above, the UNHCR Handbook is not binding on the Attorney General, the BIA, or United States courts, although it ''may be a useful interpretative aid.'' *Aguirre-Aguirre,* 526 U.S. at 427.

The Departments disagree with commenters' assertions that, by relying on the discretionary nature of asylum, the rule violates U.S. treaty obligations, congressional intent, and case law. As explained above, because the rule does not alter eligibility for withholding of removal or CAT protection, the rule does not violate U.S. treaty obligations and ensures continued compliance with U.S. non-refoulement obligations. Additionally, Congress's intent in enacting the Refugee Act was ''a desire to revise and regularize the procedures governing the admission of refugees into the United States.'' *Stevic,* 467 U.S. at 425. Rather than expanding the availability of refugee protection, as asserted by commenters, the Refugee Act's definition of refugee does ''not create a new and expanded means of entry, but instead regularizes and formalizes the policies and practices that have been followed in recent years.'' *Id.* at 426 (quoting H.R. Rep. No. 96–608, at 10 (1979)). Moreover, case law supports the Attorney General's authority under U.S. law to limit asylum. *See Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding regulatory implementation of the firm resettlement bar); *see also Komarenko,* 35 F.3d at 436 (upholding regulatory implementation of the ''particularly serious crime'' bar).

Regarding the Attorney General's and the Secretary's discretion to enact the rule, the Departments disagree that the rule is ultra vires because, as explained above, Congress has granted the Attorney General and the Secretary the authority to limit eligibility for asylum. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). Moreover, the rule does not violate applicable obligations under domestic law or international treaties for the reasons discussed above.

3. Concerns With Categorical Bars

In addition to comments generally opposing the seven bars proposed by the NPRM, commenters also raised concerns related to specific bars.

a. Felonies

*Comment:* Commenters opposed the proposed limitation on asylum

eligibility for individuals who have been convicted of any felony under Federal, State, tribal, or local law. *See* 8 CFR 208.13(c)(6)(vi)(A), 1208.13(c)(6)(vi)(A) (proposed). Commenters generally stated that the proposed limitation was overbroad and that the Departments failed to support their stated position that offenses carrying potential sentences of more than one year correlate to recidivism and dangerousness. Commenters asserted that the proposed limitation would ''sweep in'' minor conduct, including some State misdemeanors.

Commenters also opposed the Departments' proposed definition of the term ''felony,'' *see* 8 CFR 208.13(c)(7)(i), 1208.13(c)(7)(i) (proposed), as any crime defined as a felony by the relevant jurisdiction of conviction, or any crime punishable by more than one year imprisonment. Commenters objected to both portions of the proposed definition.

Specifically, commenters opposed the definition's reliance on the maximum possible sentence of an offense over the actual sentence imposed. Commenters opposed the Departments' reasoning for that determination. *See* 84 FR at 69646 (''[T]he sentence actually imposed often depends on factors such as offender characteristics that may operate to reduce a sentence but do not diminish the gravity of the crime.'' (alteration and quotation marks omitted)). Commenters stated that imposing a sentence requires careful consideration of numerous factors, including any mitigating circumstances, and that the proposed definition dismissed careful sentencing considerations by prosecutors and criminal sentencing courts, which are charged with considering public safety. Commenters stated that the actual sentence imposed is a more faithful and accurate measure of whether an individual's conduct was ''particularly serious'' and that not every offense that would be a felony under the proposed definition is or should be considered a ''particularly serious crime.'' Commenters also stated that not every alien convicted of a crime that is punishable by more than one year of imprisonment is a danger to the community who should be barred from asylum eligibility.

Commenters also opposed the proposal that the definition of felony include any offense that is labeled as a felony in its respective jurisdiction, regardless of the maximum term of imprisonment or other factors. Commenters stated that, with certain types of offenses, the difference between misdemeanors and felonies does not necessarily involve aggravated conduct

or heightened risk to the public but rather factual elements, such as the alleged dollar value of a stolen good. Accordingly, commenters stated, it would be inappropriate to categorically bar eligibility for asylum on this basis.

Commenters asserted that a categorical bar against all felonies, as defined by the NPRM, would result in drastic inconsistencies and unfair results and would undermine the Departments' stated goal of uniformity and consistency. Commenters stated that the proposed definition would improperly treat a broad range of offenses as equally severe. Additionally, commenters stated, a broad range of criminal conduct encompassing varying degrees of severity or dangerousness could be charged under the same disqualifying offense.

At the same time, commenters suggested that identical conduct in different States (or other jurisdictions) would have different consequences on eligibility for asylum, depending on whether the jurisdiction labeled the crime as a felony or set a maximum penalty of over one year of imprisonment. As an example, one commenter asserted that felony theft threshold amounts among the States vary considerably, ranging from $200 to $2,500 or more, but noted that the proposed rule would treat these varying offenses equally under the proposed definition. The commenter stated that the definition was overbroad and did not exercise the ''special caution'' that should be taken with asylum cases given the high stakes involved. Other commenters stated that the desire for consistency should not be elevated over ''legitimate concerns of fairness and accurate assessments of dangerousness.''

One commenter opined that the proposed limitation would ignore the federalist nature of the U.S. criminal justice system, where each State has its own criminal code and makes individual determinations about which conduct should be criminalized, and how.

Commenters stated that the ''harsh inequities'' created by the rule would dissuade aliens who are fleeing persecution to plead guilty to misdemeanor charges that could carry a one-year sentence, even if the plea agreement would not include any incarceration, which could in turn have a host of unintended collateral consequences in the criminal justice system. Numerous commenters offered specific examples of State laws that they asserted would improperly be considered disqualifying offenses under the proposed limitation and accompanying definition. For example,

commenters stated that some States, such as Massachusetts, define misdemeanors, which may carry a sentence of one year or more in a "house of correction," much more broadly than many other States. Commenters also listed statutes from New York,[14] Maryland,[15] and several other States that they believed should not qualify as a basis for limiting eligibility to asylum.

*Response:* The Departments disagree with commenters' opposition to the inclusion of any felony conviction as a bar to asylum eligibility and to the corresponding proposed definition of "felony" for the purposes of determining whether the bar applies. As an initial matter, to the extent commenters expressed concern that the inclusion of any felony is an inaccurate measure of whether an individual's conduct was "particularly serious" or that not every offense that would be a felony under the proposed definition is or should be considered a "particularly serious crime," the Departments need not address these concerns in detail because this rule, like the proposed rule, designates these offenses as additional limitations on asylum eligibility pursuant to INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[16] *See* 8 CFR 208.13(c)(6), 1208.13(c)(6).

As explained above, the Departments reiterate the explanation in the NPRM that the inclusion of any felony conviction as a bar to asylum eligibility is intended to avoid inconsistencies, inefficiencies, and anomalous results that often follow from the application of the categorical approach. 84 FR at 69645–46. In addition, the felony limitation on eligibility for asylum is consistent with other losses of benefits for felony convictions. *See* 84 FR at 69647 (explaining that treating a felony conviction as disqualifying for purposes of obtaining the discretionary benefit of asylum would be consistent with the disabilities arising from felony convictions in other contexts and would reflect the "serious social costs of such crimes").

The Departments disagree with commenters' concerns that the felony limitation and related definition of "felony" would result in drastic inconsistencies and unfair results, undermining the stated purpose of the rule. As described in the NPRM, the existing reliance on the categorical approach to determine the immigration consequences of convictions has far too often resulted in seemingly inconsistent or anomalous results. 84 FR at 69645–46.[17] The rule will significantly help to curtail inconsistencies and confusion over what offenses may be disqualifying for purposes of asylum, as all aliens who have been convicted of the same level of offense will receive the same treatment during asylum proceedings.

The Departments understand that the States have different criminal codes with different definitions of crimes, levels of offense, and other differences. With respect to commenters' federalism concerns, Congress has plenary authority over aliens, and that authority has been delegated the Departments. *See Zadvydas* v. *Davis,* 533 U.S. 678, 695

(2001) (citing *INS* v. *Chadha,* 462 U.S. 919, 941–42 (1983), for the proposition that Congress must choose "a constitutionally permissible means of implementing" that power); INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Additionally, as stated in the NPRM and above in section II.C.2.A.ii, the categorical approach is overly complex, leads to inconsistent treatment of aliens who have been convicted of serious criminal offenses, and presents a strain on judicial and administrative resources. Although some aliens who have been convicted of serious criminal offenses are appropriately barred from discretionary benefits under the Act, such as asylum, others are not. *See, e.g., Lowe,* 920 F.3d at 420 (Thapar, J., concurring) ("[I]n the categorical-approach world, we cannot call rape what it is. * * * [I]t is time for Congress to revisit the categorical approach so we do not have to live in a fictional world where we call a violent rape non-violent."). This rule will provide certainty by establishing a bright-line rule that is both easy to understand and will apply uniformly to all applicants who have been convicted of felonies, which the Departments believe to be significant offenses. Aliens are being given advance notice through the NPRM, which was published on December 19, 2019, 84 FR at 69646, and by this publication of the final rule, that any felony conviction will be a bar to eligibility for the discretionary benefit of asylum. *Cf.* 8 CFR 208.3(c)(6)(vi)(A), 8 CFR 1208.3(c)(6)(vi)(A) (proposed) (barring aliens who have been convicted of felonies "on or after [the effective date"]).

The Departments disagree that the proposed definition of "felony" implicates federalism concerns by defining the term "felony," as it is to be used in this context, differently from States' (or other jurisdictions') definitions of felonies. In fact, the Departments believe that the felony definition is consistent with principles of federalism by primarily deferring to each State's choice of what offenses to define as felonies. Similarly, the alternative definition capturing any crime punishable by more than one year of imprisonment is consistent with the Federal definition and many States' definitions of "felony." *See, e.g.,* 18 U.S.C. 3559 (defining "felonies" as offenses with a maximum term of imprisonment of more than one year); 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) (surveying State laws). Congress has delegated to the Departments, not the States or other jurisdictions, the authority to set additional limitations on eligibility for

---

[14] *See* N.Y.P.L. 145.05. (criminalizing the causing of $250 worth of property damage); N.Y.P.L. 275.34 (criminalizing the recording of a movie in a theater two times); N.Y.P.L. 220.06 (criminalizing simple possession of more than half an ounce of a narcotic).

[15] *See* MD. CODE, ALCO. BEV. 6–307; MD. CODE, ALCO. BEV. 6–402 (criminalizing the sale of alcohol to a visibly intoxicated person with a sentence of up to two years); MD. CODE, CRIM. LAW 3–804 (criminalizing the use of a telephone to make a single anonymous phone call to annoy or embarrass another person with a sentence of up to three years); MD. CODE, CRIM. LAW 4–101 (criminalizing the simple possession of a "dangerous weapon," including a utility knife, on one's person, with a sentence of up to three years); MD. CODE, CRIM. LAW 6–105 (criminalizing the burning of property under $1,000 with a sentence of up to 18 months); MD. CODE, CRIM. LAW 6–205 (criminalizing the unauthorized entry into a dwelling with a sentence of up to three years); MD. CODE, CRIM. LAW 7–203 (criminalizing the temporary use of another person's vehicle without his or her consent (*i.e.,* "joyriding") with a sentence of up to four years); MD. CODE, TAX–GEN. 13–1015 (criminalizing the import, sale or transportation of unstamped cigarettes within the state of Maryland with a sentence of up to two years).

[16] The proposed rule's preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as particularly serious crimes and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the designation of all felonies as bars to asylum eligibility. *Compare* 84 FR at 69645 (explaining that the Attorney General and the Secretary could reasonably exercise their discretion to "classify felony offenses as particularly serious crimes for purposes of 8 U.S.C.

1158(b)(2)(B)(ii)"), *with id.* at 69647 (explaining that, in addition to their authority under section 208(b)(2)(C), "the Attorney General and the Secretary" further propose relying on their respective authorities under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), to make all felony convictions disqualifying for purposes of asylum eligibility"). The regulatory text, however, does not actually designate any additional offenses as "particularly serious crimes." Instead, the discussion of particularly serious crimes helps illustrate how issuing the new bars pursuant to section 208(b)(2)(C) is "consistent with" the rest of the INA because the new bars—similar to the "particularly serious crime" bar—exclude from eligibility those aliens whose conduct demonstrates that they are dangerous to the United States or otherwise do not merit eligibility for asylum. Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

[17] Further discussion of the problems with the categorical approach is set out above in section II.C.2.a.ii.

asylum, and the Departments have reasonably determined that the offenses encompassed within the definition should be disqualifying offenses. This rule will not have any direct bearing on how States or other jurisdictions implement their criminal justice system.

With respect to commenters' concerns that the rule will affect how and when aliens enter into plea deals for criminal offenses, such pleadings take place during criminal proceedings, not immigration proceedings. Although asylum adjudications may rely on the information derived from criminal proceedings, the Departments believe that any effects that the rule might have outside of the immigration context are beyond the context of this rulemaking. *Cf. San Francisco* v. *USCIS,* 944 F.3d 773, 804 (9th Cir. 2019) ("Any effects [of a DHS rule] on [healthcare] entities are indirect and well beyond DHS's charge and expertise."). Additionally, the Departments believe that this rule would actually provide more clarity in the pleading process because the rule sets forth straightforward guidelines about what offenses would and would not be disqualifying offenses for purposes of asylum. In turn, criminal defense attorneys will be better able to advise their clients on the predictable immigration consequences of a conviction. *Cf. Padilla,* 559 U.S. at 357 ("There will, however, undoubtedly be numerous situations in which the deportation consequences of a plea are unclear. In those cases, a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry adverse immigration consequences. But when the deportation consequence is truly clear, as it was here, the duty to give correct advice is equally clear.").

Second, regarding the commenters' concerns with the definition for the term "felony," *see* 8 CFR 208.13(c)(7)(i), 1208.13(c)(7)(i) (proposed), the Departments disagree that the definition should look to the actual sentence imposed instead of the maximum possible sentence. As noted in the NPRM, consideration of an offense's maximum possible sentence is generally consistent with the way other Federal laws define felonies. *See* 84 FR at 69646; *see also, e.g.,* 5 U.S.C. 7313(b) ("For the purposes of this section, 'felony' means any offense for which imprisonment is authorized for a term exceeding one year."); *cf.* U.S.S.G. 2L1.2 cmt. n.2 ("'Felony' means any Federal, state, or local offense punishable by imprisonment for a term exceeding one year."). The Model Penal Code and most States likewise define a felony as a crime with a possible sentence in

"excess of one year." Model Penal Code § 1.04(2); *see also* 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) (surveying State laws).

In addition, as recognized by the commenters, sentencing courts and prosecutors consider a number of factors when imposing a sentence, many of which have no bearing on the seriousness of the crime committed. Specifically, in *Matter of N-A-M-,* 24 I&N Dec. 336 (BIA 2007), the BIA explained that the sentence imposed might be based on conduct "subsequent and unrelated to the commission of the offense, such as cooperation with law enforcement authorities," or "offender characteristics." *Id.* at 343 (determining that the respondent had been convicted of a particularly serious crime even where no term of imprisonment was imposed); *see also Holloway* v. *Att'y Gen. U.S.,* 948 F.3d 164, 175 (3d Cir. 2020) ("[T]he maximum penalty that may be imposed often reveals how the legislature views an offense. Put succinctly, the maximum possible punishment is certainly probative of a misdemeanor's seriousness." (footnote and internal quotation marks omitted)). Such considerations are necessarily unrelated to the seriousness of the actual crime, and the sentence imposed is "not the most accurate or salient factor to consider in determining the seriousness of an offense." *Matter of N-A-M-,* 24 I&N Dec. at 343; *see also Holloway,* 948 F.3d at 175 n.12 (stating that the penalty imposed may be more reflective of how a sentencing judge viewed an offender than the offense itself).

The Departments therefore reject recommendations to consider the sentence imposed when determining whether a conviction is a felony, as opposed to the NPRM's proposal to consider the maximum possible sentence associated with a given offense. The Departments are persuaded by the reasoning of the U.S. Court of Appeals for the Third Circuit, which recognized that, in cases where the analysis centers around an offense, and not the offender (as in the "particularly serious crime" analysis), "the maximum punishment is a more appropriate data point because it provides insight into how a state legislature views a crime—not how a sentencing judge views an individual." *Holloway,* 948 F.3d at 175 n.12. Thus, the Departments continue to believe that lengthier maximum sentences are associated with more serious offenses that appropriately should have consequences when determining asylum eligibility. 84 FR at 69646.

Furthermore, as noted above, the Departments are acting within their designated authority pursuant to section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) (authority to establish additional limitations and conditions on eligibility for asylum) to designate felonies, as defined in the rule, as disqualifying offenses for purposes of asylum eligibility. *See* section II.C.2.a.i. Assuming, arguendo, that the commenters are correct that felonies as defined by the final rule do not necessarily reflect an alien's dangerousness, the Departments' authority to set forth additional limitations and conditions on asylum eligibility under this provision requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158). *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."). Unlike the designation of particularly serious crimes, there is no requirement that the aliens subject to these additional conditions or limitations first meet a particular dangerousness threshold. *Compare id., with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). Instead, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the Secretary to establish a wide range of conditions on asylum eligibility, and the designation of felonies as defined in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars on eligibility demonstrates the intent to allow the Attorney General and Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Indeed, by expressly including "serious nonpolitical crimes" as a statutory basis for ineligibility, Congress indicated that "particularly serious crimes" need not be the only crime-based bar on asylum

eligibility. And by further excluding from eligibility aliens who engage in certain harmful conduct, regardless of whether those aliens pose a danger to the United States, *see* INA 208(b)(2)(A)(i) (persecutor bar) (8 U.S.C. 1158(b)(2)(A)(i)), Congress indicated that "dangerousness" need not be the only criterion by which eligibility for asylum is to be determined.

b. Alien Smuggling or Harboring

*Comment:* Commenters raised several concerns with respect to the NPRM's proposed bar to asylum eligibility for aliens convicted of harboring or smuggling offenses under sections 274(a)(1)(A) and (a)(2) of the Act (8 U.S.C. 1324(a)(1)(A), (a)(2)). *See* 8 CFR 208.13(c)(6)(i), 1208.13(c)(6)(i) (proposed).

First, commenters asserted that the NPRM improperly broadened the existing statutory bar to asylum for many individuals who have been convicted of alien smuggling or harboring under sections 274(a)(1)(A) and (a)(2) of the Act (8 U.S.C. 1324(a)(1)(A), (a)(2)). Specifically, commenters noted that such convictions already constitute aggravated felonies under the Act that would bar an alien from eligibility for asylum,[18] "except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent (and no other individual)." *See* INA 101(a)(43)(N) (8 U.S.C. 1101(a)(43)(N)). Commenters opposed the NPRM, asserting that it improperly proposed removing the limited exception to this bar and imposing a blanket bar against anybody convicted of such an offense. Commenters asserted that adjudicators should have the discretion to decide whether individuals convicted of such offenses, who are not already statutorily precluded because their convictions are not considered aggravated felonies, should be barred from asylum.

Commenters also asserted that the proposed limitation undermined congressional intent. Specifically, commenters stated that Congress intended to make asylum available to those present in the United States, without regard to how they entered, and would not have intended to bar from asylum first-time offenders who were convicted for helping their family

members escape persecution. *See* INA 208(a)(1) (8 U.S.C. 1158(a)(1)) (providing that an alien "who arrives in the United States (whether or not at a designated port of arrival * * *)" may apply for asylum in accordance with the rest of the section). Commenters stated that this congressional intent is demonstrated by the fact that Congress did not consider such offenses to be aggravated felonies and thus, in turn, particularly serious crimes that would bar asylum eligibility.

Commenters also asserted that the proposed limitation undermined UNHCR's recognition that aliens must sometimes commit crimes "as a means of, or concomitant with, escape from the country where persecution was feared," and that the fear of persecution should be considered a mitigating factor when considering such convictions. However, the commenters did not elaborate on how this assertion pertains to aliens who commit crimes concomitant with another person's escape from a country where persecution may be feared.

Commenters asserted that the Departments failed to properly explain how all smuggling and harboring convictions under section 274 of the Act (8 U.S.C. 1324) reflected a danger to the community that should result in a categorical bar to asylum.

Numerous commenters stated that they opposed the proposed limitation because it unfairly penalized asylum seekers for helping their family members, such as minor children and spouses, to come to the United States for any reason, including to escape from persecutors, traffickers, or abusers. Commenters stated that the proposed bar would force family members to choose between their loved ones remaining in danger in their countries of origin and themselves or their family being barred from asylum and returned to their persecutors. At least one commenter stated that the Departments illogically concluded that the hazard posed to a child or spouse being smuggled is greater than the harm the same child or spouse would face in the country of origin.

At least one commenter suggested that children in particular would be harmed by the proposed bar because children are often derivatives on their parents' asylum application and may have nobody else to care for them in the United States if their parents are deported. Commenters also stated that asylum seekers often travel to the United States in family units and that some types of persecution are "familial by nature, culture, and law." Commenters suggested that the proposed limitation would undermine

the sanctity of the family and eliminate family reunification options, which would result in permanent separation of families.

Commenters asserted that survivors of domestic violence who are forced to flee to the United States without their children should not be barred from asylum for trying to later reunite the family.

Commenters also objected to the Departments' assertion that families could present themselves at the United States border, stating that this may not be possible due to recently implemented policies and regulations. Some commenters asserted that the proposed bar "is particularly insidious" in light of documents [19] that they claimed revealed efforts to utilize smuggling prosecutions against parents and caregivers as part of a strategy to deter families from seeking asylum in the United States and that the NPRM proposed an expansion of those efforts.

At least one commenter stated that the proposed bar, in addition to the above-described policies, would harm good Samaritans who provide humanitarian aid to migrants traversing deserts with harsh conditions. At least one commenter expressed concerns that existing prohibitions against harboring, which include "transportation," could be applied to punish those who engage in routine conduct like driving someone to work or to a doctor's appointment. *See* INA 274(a)(1)(A)(iii) (8 U.S.C. 1324(a)(1)(A)(iii)) (establishing criminal penalties for an individual who "conceals, harbors, or shields from detection [or attempts to do so], [an] alien in any place, including * * * any means of transportation").

Commenters also generally asserted that the proposed limitation would multiply the harms that asylum seekers face in coming to the United States.

*Response:* The Departments disagree with comments suggesting that the additional limitation on eligibility for asylum for aliens who have been convicted of bringing in or harboring certain aliens pursuant to sections 274(a)(1)(A), (2) of the Act (8 U.S.C. 1324(a)(1)(A), (2)) is inappropriate or unlawful.

The Departments reject commenters' concerns that the additional limitation is an unlawful expansion of existing bars to asylum eligibility set forth at

---

[18] A conviction for an aggravated felony is automatically considered a conviction for a particularly serious crime that would bar an alien from asylum eligibility under section 208(b)(2)(A)(ii) of the Act (8 U.S.C. 1158(b)(2)(A)(ii)). INA 208(b)(2)(B)(i) (8 U.S.C. 1158(b)(2)(B)(i)).

[19] Commenters cited Ryan Devereaux, *Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers,* The Intercept (Apr. 29, 2019), *https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/* (describing how, in May 2017, DHS allegedly set out to target parents and family members of unaccompanied minors for prosecution).

section 101(a)(43)(N) of the Act (8 U.S.C. 1101(a)(43)(N)). It is within the Departments' delegated authority to set forth additional limitations on asylum eligibility. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). In other words, the Departments may expand upon the existing grounds for ineligibility and the disqualifying offenses, even when those or similar grounds have already been assigned immigration consequences, and the Departments have done so in this rulemaking. *Cf. Hawaii*, 138 S. Ct. 2411–12 (holding that Congress "did not implicitly foreclose * * * tighter restrictions," even in circumstances in which those restrictions concerned a subject "similar" to the one that Congress "already touch[ed] on in the INA").

The Departments disagree with commenters that adjudicators should have the discretion to determine whether aliens who have been convicted of offenses under sections 274(a)(1)(A), (2) of the Act (8 U.S.C. 1324(a)(1)(A), (2)) should be eligible for asylum. Convictions for such offenses are serious and harmful. As noted in the NPRM, even first-time alien smuggling offenses display a serious disregard for U.S. immigration law and pose a potential hazard to smuggled family members, which often include a vulnerable child or spouse. 84 FR at 69648. And as also noted in the NPRM, the Act already bars most individuals who have been convicted of this offense from asylum eligibility, thus demonstrating congressional recognition of the seriousness of such offenses. *Id.* at 69647. Accordingly, the Departments have concluded that no aliens who have been convicted of such offenses should merit the discretionary benefit of asylum.

The Departments disagree with commenters that an additional limitation on eligibility for aliens who have been convicted of alien smuggling or harboring offenses contravenes the "whether or not at a designated port of arrival" language in the asylum statute at section 208(a)(1) of the Act (8 U.S.C. 1158(a)(1)). The Departments stress that this additional limitation has no bearing on the asylum applicant's manner of entry; rather it involves the asylum applicant's conduct with respect to unlawful entry of others. Thus, the Departments do not further address these comments.

Comments concerning statements or guidance from UNHCR are misplaced. UNHCR's interpretations of or recommendations regarding the Refugee Convention and Refugee Protocol "may be a useful interpretative aid," but they are "not binding on the Attorney General, the BIA, or United States courts." *Aguirre-Aguirre*, 526 U.S. at 427. Indeed, as noted already, "the Handbook itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol * * * is incumbent upon the Contracting State in whose territory the refugee finds himself.'" *Id.* at 427–28.

The Departments disagree with commenters who stated that the Departments failed to explain how all smuggling and harboring convictions reflected a danger to the community that should result in a categorical bar to asylum.[20] The Departments believe that they adequately explained their reasoning in the NPRM that such offenses place others, including children, in potentially hazardous situations that could result in injury or death, and that they reflect a flagrant disregard for immigration laws. As a result, those people who commit these offenses present a danger to the community. 84 FR at 69648.

Additionally, as stated above, the Departments have designated such alien smuggling or harboring offenses as discrete bases for ineligibility pursuant to the authority provided by section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) (authority to establish additional limitations and conditions on eligibility for asylum). Assuming, arguendo, that commenters are correct that the offenses designated by the rule do not accurately reflect an alien's dangerousness, the Departments' authority to set forth additional limitations and conditions on asylum eligibility under this provision requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158). *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."). Unlike the designation of particularly serious crimes, there is no requirement that the aliens subject to the conditions or limitations meet a threshold of dangerousness. *Compare id., with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by

regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). Instead, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) confers broad discretion on the Attorney General and the Secretary to establish a wide range of conditions on asylum eligibility, and the designation of the alien smuggling and harboring offenses included in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars to asylum eligibility demonstrates the intent to allow the Attorney General and Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). And, as explained previously, Congress's inclusion of statutory bars on eligibility for aliens who engage in certain harmful conduct or commit certain types of crimes that are not "particularly serious," *see* INA 208(b)(2)(A)(i), (iii) (8 U.S.C. 1158(b)(2)(A)(i), (iii)), demonstrates that the "dangerousness" associated with the conduct is not the sole criterion by which the Departments may consider whether an alien should be eligible for asylum.

The Departments disagree that this rule would undermine family values or particularly harm children. The Departments believe that the rule helps families and children by discouraging the dangerous practices of alien smuggling and harboring. The Departments disagree with commenters' assertions that current administrative policies or practices prevent families from presenting themselves at the border. In any event, commenters' concerns referencing such policies or practices are outside the scope of this rulemaking.

Finally, regarding commenters' concerns for good Samaritans, the Departments note again that the bar requires a conviction for it to apply in a particular case. As a result, an individual who leaves provisions or other assistance for individuals traversing the harsh terrain at the southern border would not be ineligible for asylum under this bar unless he or she is in fact prosecuted and convicted. As with the other bars, the Departments understand that the individual circumstances surrounding each offense will vary and that some cases may involve mitigating circumstances, but

---

[20] In addition, the Departments note that some commenters agreed with the Departments' determination regarding the dangerousness of these offenses. For example, one organization stated that "the conduct required for such a conviction demonstrates contempt for U.S. immigration law and a disregard for the value of human life."

the Departments find that in the context of asylum eligibility, adjudicators should not look behind a conviction to readjudicate an alien's criminal culpability. Although the individual circumstances behind an alien's prosecution may vary, the Departments have concluded that, to promote adjudicative efficiency, it is appropriate to provide a clear standard that defers to the original prosecutor's determination to pursue a conviction of the alien for his or her conduct, as well as the criminal court's existing determination of a reasonable doubt that the alien engaged in the conduct.

c. Illegal Reentry

*Comment:* Commenters specified several reasons for opposing the NPRM's proposed limitation on eligibility for asylum for aliens convicted of illegal reentry under section 276 of the Act (8 U.S.C. 1326). *See* 8 CFR 208.13(c)(6)(i), 1208.13(c)(6)(i) (proposed). Under section 276(a) of the Act (8 U.S.C. 1326(a)), aliens who unlawfully reenter the United States after having been previously removed are subject to fines and to a term of imprisonment of two years or less. Section 276(b) of the Act (8 U.S.C. 1326(b)) describes certain aliens, such as those who have been removed after commission of an aggravated felony, who face significantly higher penalties for unlawfully reentering the United States after previously having been removed and authorizes sentences of imprisonment up to 20 years as possible penalties.

Some commenters asserted that the Departments improperly concluded that aliens who have been convicted of such offenses are per se dangers to the community, as recidivist offenders of the law, because the NPRM did not consider whether an alien's prior offenses were serious. *See* 84 FR at 69648.

Commenters asserted that the proposed limitation would violate Article 31(1) of the Refugee Convention, which generally prohibits imposing penalties based on a refugee's manner of entry or presence in the country. Commenters stated that this is a critical principle of the Convention because "it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge." Commenters stated that the NPRM did not sufficiently explain how the proposed limitation was consistent with the Convention.

Commenters also asserted that the proposed limitation undermined congressional intent and was not consistent with other provisions in the Act. Specifically, commenters stated that Congress, in accordance with international treaty obligations, has "clearly supported the right to claim asylum anywhere on the U.S. border or at a land, sea, or air port of entry" for almost 40 years. The commenters cited the Refugee Act, where, they stated, Congress authorized asylum claims by any foreign national "physically present in the United States or at a land border or port of entry." The commenters stated that Congress later expressly reaffirmed this position in enacting section 208(a)(1) of the Act (8 U.S.C. 1158(a)(1)), which states that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival * * *)" may apply for asylum. Commenters believed that this provision "reflected Congress's ongoing intent to comply with international law, as well as its recognition that allowing an applicant for refugee status to assert a claim for asylum at any point along a land border is a necessary component of essential refugee protections."

Commenters also asserted that the proposed limitation was inconsistent with the Act because it would treat all immigration violations as just as serious as those violations that should fall under the particularly serious crime bar, thus rendering meaningless the limiting language of "particularly serious crimes" in the statute. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)).

Commenters asserted that the proposed limitation was inconsistent with any of the other bars previously recognized by the BIA or the circuit courts because the crime of illegal reentry under section 276 of the Act (8 U.S.C. 1326) has no element of danger or violence to others and has no victim.

Commenters stated that the BIA and the circuit courts have also recognized that an alien's manner of entry should have little effect on eligibility for asylum. *See, e.g., Hussam F.* v. *Sessions,* 897 F.3d 707, 718 (6th Cir. 2018) (holding that it was an abuse of discretion to deny asylum as a matter of discretion when the only negative factor was the alien's "intentional failure to disclose that his passport was obtained in a non-traditional manner"); *Zuh* v. *Mukasey,* 547 F.3d 504, 511 n.4 (4th Cir. 2008) ("When an alien uses fraudulent documents to escape imminent capture or further persecution, courts and [immigration judges] may give this

factor little to no weight."); *Huang* v. *INS,* 436 F.3d 89, 100 (2d Cir. 2006) ("As with peripheral embellishments, if illegal manner of flight and entry were enough independently to support a denial of asylum, we can readily take notice, from the facts in numerous asylum cases that come before us, that virtually no persecuted refugee would obtain asylum. It follows that Wu's manner of entry, on the facts in this record, could not bear the weight given to it by the [immigration judge]."); *Mamouzian* v. *Ashcroft,* 390 F.3d 1129, 1138 (9th Cir. 2004) ("[I]n order to secure entry to the United States and to escape their persecutors, genuine refugees may lie to immigration officials and use false documentation."); *Matter of Pula,* 19 I&N Dec. at 473–74 (holding that the circumvention of the immigration laws is one factor for consideration).

Commenters stated that asylum seekers are often motivated to illegally reenter the United States after having been deported to seek protection from harm rather than for criminal purposes, and that individuals who legitimately fear returning to their countries of origin have been criminally prosecuted under section 276 of the Act (8 U.S.C. 1326). Commenters were concerned that the proposed bar would further criminalize vulnerable individuals fleeing persecution and would result in denial of meritorious claims for asylum. Commenters opined that such individuals should not be barred from asylum.

Commenters stated that the Departments did not take into consideration that trafficking victims may have reentered the United States without authorization "either because they were smuggled in by [a] trafficker, or because they were removed by the U.S., and then returned to find safety."

Commenters stated that "racial and ethnic disparity in the number of sentenced offenders is even more pronounced in the context of illegal reentry" and that "latinx immigrants are disproportionately impacted by over-prosecution of illegal reentry offenses and harsh sentencing of illegal reentry convictions."

Some commenters described anecdotes of "clients who have had to enter the United States without inspection due to cartel kidnappings, fears of being separated at the border, or misinformation by coyotes." One commenter stated that juveniles who were apprehended at the border and placed in Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR") custody might request to return to their country

of origin due to "detention fatigue." The commenter stated that, upon return, these juveniles might face the same or new persecution, forcing them to flee once again.

One commenter stated that this proposed limitation was unnecessary because many convictions under section 276 of the Act (8 U.S.C. 1326) already qualify as aggravated felonies. INA 101(a)(43)(O) (8 U.S.C. 1101(a)(43)(O)) (providing that "an offense described in section 1325(a) [illegal entry] or 1326 of this title [illegal reentry] committed by an alien who was previously deported on the basis of an [aggravated felony as defined by section 101(a)(43) of the Act (8 U.S.C. 1101(a)(43))]" is an aggravated felony). Additionally, commenters stated that the proposed limitation was unnecessary because individuals who are convicted under section 276 of the Act (8 U.S.C. 1326) are also subject to reinstatement of a prior order of removal under section 241(a)(5) of the Act (8 U.S.C. 1231(a)(5)), and, thus, are barred from applying for asylum if the prior order is reinstated. *See* INA 241(a)(5) (8 U.S.C. 1231(a)(5)) (stating that an alien whose "prior order of removal is reinstated * * * is not eligible and may not apply" for any relief under the INA); 8 CFR 1208.31(e), (g)(2), 1241.8(e). The commenters suggested that the Departments inappropriately expanded the bar to categorically exclude anyone convicted of illegal reentry.

Some commenters stated that the proposed limitation was improper because underlying removal orders that are the basis for an illegal reentry conviction are often incorrectly issued and do not withstand legal scrutiny.

Commenters expressed concern that individuals who attempt illegal reentry into the United States to flee persecution may have been previously removed from the United States without being aware of their right to apply for asylum. Commenters opined that such individuals "would not have knowingly abandoned their right." Commenters also stated that some individuals may have been prevented from seeking asylum during prior entries.

Commenters asserted that asylum seekers who illegally reenter could have been incorrectly found to lack a credible fear in prior credible fear interviews. Some commenters stated that asylum seekers with legitimate claims may have been previously removed because they were unable to establish eligibility for relief without adequate access to legal representation. Some commenters asserted that there are credible reports that DHS officers do not comply with requirements to inform individuals subject to expedited removal of their

rights or to refer those with a fear of return to asylum officers for credible fear screenings, even when requested, and that DHS officers have engaged in harassment or the spread of misinformation that interferes with individuals' abilities to pursue asylum. One commenter stated that there is a higher risk that credible fear interviews may result in erroneous denial because border patrol officers, not asylum officers, have been conducting asylum interviews. Commenters proposed that the illegal reentry bar to asylum eligibility would "essentially punish asylum seekers for the failure of DHS officers to follow the agency's own rules.'' Commenters stated that preserving discretion, rather than implementing a categorical bar, would ensure that meritorious asylum claims are heard and correct previous errors.

Some commenters stated that the Departments did not take into account that illegal reentry "may be the only possible option" for asylum applicants. Commenters asserted that "current U.S. violations of international and domestic law regarding access to territory" further intensified this proposition. Commenters stated that they believed that a number of the Executive Branch's administrative policies—such as (1) "metering" at the border; (2) the Migrant Protection Protocols ("MPP"), *see* DHS, *Policy Guidance for Implementation of the Migrant Protection Protocols* (Jan. 25, 2019), *https://www.dhs.gov/sites/ default/files/publications/19_0129_ OPA_migrant-protection-protocols- policy-guidance.pdf;* (3) the "third- country transit ban," *see* Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019); and (4) international asylum cooperative agreements, *see* Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 FR 63994 (Nov. 19, 2019)—drive asylum seekers to enter illegally rather than wait to present themselves at a port of entry, which in turn subjects them to the illegal reentry bar. Commenters suggested that, given these policies, the Departments incorrectly asserted that aliens who have previously been removed from the United States may present themselves at a port of entry. *See* 84 FR at 69648. One commenter suggested that many individuals who are driven to enter the United States unlawfully due to these policies do so with the intention of turning themselves in to U.S. Border Patrol authorities. Commenters also raised concerns that the proposed limitation would "condemn to persecution those who are

simply trying to enter the [United States] to reunite with their family and community." Commenters were also concerned that individuals with convictions under section 276 of the Act (8 U.S.C. 1326) would be punished twice for the same crime by also being barred from asylum.

Some commenters stated that the NPRM unfairly punished individuals who have fled persecution multiple times or who have faced persecution arising after they had been removed, resulting in multiple unlawful entries. Commenters stated that refugee protection principles upon which asylum law is based require newly arising claims to be examined. Commenters specifically stated that, in proposing the illegal reentry bar, the Departments did not consider that immigrant survivors of violence who are removed to their countries of nationality may face violent retaliation and possibly death at the hands of their abusers or perpetrators and may flee the same perpetrators of domestic and sexual violence multiple times. Commenters asserted that a discretionary assessment was necessary to ensure that meritorious claims are heard.

*Response:* The Departments disagree with commenters who oppose the rule's additional limitation on asylum eligibility for those who have been convicted of illegal reentry under section 276 of the Act (8 U.S.C. 1326). The Departments have appropriately exercised their delegated authority to impose additional limitations on asylum eligibility per section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)).

First, the Departments clarify that this rule, like the proposed rule, designates these offenses as additional limitations on asylum eligibility pursuant to INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[21] *See* 8 CFR 208.13(c)(6), 1208.13(c)(6). Regardless of commenters' concerns regarding the dangerousness of these crimes, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) offers a discrete basis

---

[21] Although the Departments at times cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as a particularly serious crime and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the designation of a subset of the included bars in the proposed rule, *see* 84 FR at 69645–54, the references to the authority to designate additional particularly serious crimes highlighted an alternative basis for the inclusion of most of the new bars to asylum eligibility and sought to elucidate the serious nature of these crimes and the Departments' reasoning for including these offenses in the new provisions. Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

under which the Departments may designate these offenses as bases for ineligibility. Although the "particularly serious crime" designation would justify the conclusion that an alien is dangerous, *see* section 208(b)(2)(A)(ii) of the Act (8 U.S.C. 1158(b)(2)(a)(ii)) ("the alien, having been convicted by final judgment of a particularly serious crime, constitutes a danger to the community of the United States"), the Attorney General's and the Secretary's authorities to set forth additional limitations and conditions on asylum eligibility under section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) require only that such limitations or conditions be "consistent with [section 208 of the Act (8 U.S.C. 1158)]." Thus, even assuming, arguendo, that the offenses designated by the final rule do not necessarily reflect an alien's dangerousness, the Attorney General and the Secretary retain the authority to promulgate the new bar. Accordingly, the Departments are unpersuaded by commenters' concerns regarding whether these offenses may not pose a danger to the community because such a finding is not required under section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)).

With respect to commenters who expressed concern that the proposed limitation would violate Article 31 of the Refugee Convention, as well as undermine congressional intent and established case law, the Departments note that the rule's limitations on eligibility for asylum are consistent with Article 31 of the Refugee Convention. Courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to receive asylum does not constitute a prohibited "penalty" under Article 31(1) of the Refugee Convention.[22] *Cazun,* 856 F.3d at 257 & n.16; *Mejia,* 866 F.3d at 588.

The proposed rule is also consistent with Article 34 of the Refugee Convention, concerning assimilation of refugees, as implemented by section 208 of the INA, 8 U.S.C. 1158. Section 208 of the INA reflects that Article 34 is

precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See Cardoza-Fonseca,* 480 U.S. at 441; *Garcia,* 856 F.3d at 42; *Cazun,* 856 F.3d at 257 & n.16; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *R–S–C,* 869 F.3d at 1188; *Ramirez-Mejia,* 813 F.3d at 241. As noted above, Congress has long recognized the precatory nature of Article 34 by imposing various statutory exceptions and by authorizing the creation of new bars to asylum eligibility through regulation. Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for withholding must also be granted asylum. *Garcia,* 856 F.3d at 42; *R–S–C,* 869 F.3d at 1188. Additionally, as noted above, the United States implemented the non-refoulement obligation of Article 33(1) of the Refugee Convention through the withholding-of-removal provision at section 241(b)(3) of the Act (8 U.S.C. 1231(b)(3)), and the non-refoulement obligation of the CAT under the CAT regulations, rather than through the asylum provisions at section 208 of the Act (8 U.S.C. 1158). *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41. Individuals who may be barred from asylum by the rule remain eligible to seek withholding of removal and protection under CAT in accordance with non-refoulement obligations.

Additionally, as noted in the NPRM, the statutory bar on applying for asylum and other forms of relief when an order of removal is reinstated has been upheld by every circuit to consider the question. 84 FR at 69648; *see Garcia* v. *Sessions,* 873 F.3d 553, 557 (7th Cir. 2017), *cert. denied,* 138 S. Ct. 2648 (2018); *R–S–C,* 869 F.3d at 1189; *Mejia,* 866 F.3d at 587; *Garcia,* 856 F.3d at 30; *Cazun,* 856 F.3d at 260; *Perez-Guzman* v. *Lynch,* 835 F.3d 1066, 1082 (9th Cir. 2016); *Jimenez-Morales* v. *U.S. Att'y Gen.,* 821 F.3d 1307, 1310 (11th Cir. 2016); *Ramirez-Mejia* v. *Lynch,* 794 F.3d 485, 489–90 (5th Cir. 2015); *Herrera-Molina* v. *Holder,* 597 F.3d 128, 137–38 (2d Cir. 2010). This reflects a broad understanding that individuals who repeatedly enter the United States unlawfully should not be eligible for the discretionary benefit of asylum and that limiting such eligibility does not conflict with section 208(a) of the Act (8 U.S.C. 1158(a)).

The Departments disagree with commenters' assertions that current administrative practices prevent asylum seekers from lawfully presenting themselves at the border. In any event, commenters' concerns referencing such policies or practices are outside the scope of this rulemaking.

With respect to commenters' concerns that the rule should not apply to those who unlawfully reentered the United States because of their desire to be reunited with family members living in the United States or to individuals who have been victims of trafficking or smuggling, the Departments believe that evaluations of mitigating factors or criminal culpability based on motives are more appropriately reserved for criminal proceedings. As stated in the NPRM, the Departments believe it is reasonable to limit eligibility for asylum to exclude aliens convicted of illegal reentry because this type of offense demonstrates that an alien has repeatedly flouted the immigration laws. *See* 84 FR at 69648. The Departments have a legitimate interest in maintaining the orderly and lawful admission of aliens into the United States. Aliens convicted of illegal reentry have engaged in conduct that undermines that goal.

In response to commenters who suggested that the rule would result in denial of meritorious claims, the Departments note that those with a legitimate fear of persecution or torture may still apply for statutory withholding of removal or CAT withholding and deferral, forms of protection that this final rule does not affect. Additionally, these commenters misapprehend the purpose of this rulemaking. Awarding the discretionary benefit of asylum to individuals described in this rule would, among other things, encourage lawless behavior and subject the United States and its communities to the dangers associated with the crimes or conduct in which such persons have engaged. The Departments have appropriately exercised their authority to impose additional limitations on asylum eligibility to bar such individuals from that relief. Accordingly, those persons do not have meritorious asylum claims. By definition, if an applicant is ineligible for the discretionary benefit of asylum because of this rule, or any other statutory or regulatory limitation, he or she does not have a meritorious claim for asylum.

The Departments disagree with commenters' concerns that individuals with convictions under section 276 of the INA (8 U.S.C. 1326) would be punished twice for the same crime by

---

[22] The Ninth Circuit recently indicated—erroneously, in the view of the Departments—that removal can be considered a "penalty" under Article 31(1) of the Refugee Convention. *E. Bay Sanctuary Covenant* v. *Trump,* 950 F.3d 1242, 1276 (9th Cir. 2020). In doing so, however, the Ninth Circuit cited the Supreme Court's decision in *Padilla,* 559 U.S. at 364, which discussed immigration penalties in terms of criminal proceedings, not Article 31(1) of the Refugee Convention. Further, the Ninth Circuit noted its observation solely in the context of limiting asylum eligibility based on manner of entry, and the court did not reach other asylum restrictions such as this rule.

ER-0156

being barred from asylum. The Departments emphasize that immigration proceedings are civil in nature, and thus denial of relief from removal is not a punishment, particularly with respect to a discretionary benefit such as asylum. *Cf. Mejia,* 866 F.3d at 588 ("We therefore perceive no basis for concluding that depriving aliens, upon illegal re-entry, additional opportunities to apply for discretionary relief constitutes a 'penalty.'"). In addition, commenters' logic would have far-reaching implications that would undermine the entire statutory scheme that imposes any immigration consequences on account of an alien's criminal convictions, including eligibility for forms of relief or removability from the United States, *see, e.g.,* INA 212(a)(2) (8 U.S.C. 1182(a)(2)) (criminal grounds of inadmissibility); 237(a)(2) (8 U.S.C. 1227(a)(2)) (criminal grounds of deportability), but there has never been any reason to question the framework in such a manner, *see, e.g., Nijhawan,* 557 U.S. at 36 (analyzing whether convictions for certain crimes constituted aggravated felonies for purposes of the INA without questioning whether immigration penalties could be imposed for those convictions).

d. Criminal Street Gang Activity

*Comment:* Several commenters opposed the imposition of a bar to asylum eligibility based on the furtherance of criminal street gang activity.

As an initial matter, commenters noted that, under the current asylum system, a conviction for an offense categorized as a gang-related crime would bar an individual from asylum in most cases. However, commenters expressed concern that the NPRM extends culpability for gang-related crime beyond offenses categorized as gang-related crimes and would also bar individuals from asylum if an adjudicator "knows or has reason to believe the crime was committed in furtherance of criminal street gang activity." Commenters asserted that the standard for this bar is so broad that individuals not associated with gangs could be included in this category and barred from asylum.

At the same time, commenters argued that the proposed rule does not sufficiently detail how an individual qualifies as a street gang member or how an activity is to be categorized as gang-related. As a result, commenters expressed concern that the proposed rule granted immigration adjudicators too much latitude to determine whether

a crime fits into the vague category of supporting, promoting, or furthering the activity of a criminal street gang. Commenters were concerned that information in databases of gang-related crimes or factors such as where the criminal activity occurred may lead to improper categorization of gang-related activity. Commenters were similarly concerned that the bar does not account for the circumstances of the offense, such as whether coercion or threats forced the asylum applicant to undertake the criminal activity. Commenters asserted that immigration adjudicators should, at a minimum, be permitted to consider such factors as coercion or duress prior to granting or denying asylum.

Commenters asserted that the "reason to believe" standard is ultra vires and unconscionably limits asylum eligibility for those most in need of protection. Commenters asserted that the "reason to believe" standard grandly expands the number of convictions for which an eligibility analysis is required and would "sweep[] in even petty offenses that would otherwise not trigger immigration consequences." Commenters asserted, moreover, that the "reason to believe" standard for determining whether there is a sufficient link between the underlying conviction and the gang-related activity is "overly broad and alarmingly vague."

Additionally, commenters argued that the "reason to believe" standard places the adjudicator in the role of a second prosecutor and requires the adjudicator to decide, without the benefit of a criminal trial and attendant due process of law, whether a crime could have been potentially gang-related. At the same time, commenters stated that immigration adjudicators, who are not criminologists, sociologists, or criminal law experts, would be required to analyze past misdemeanor convictions to determine whether there is a link to gang activity, regardless of whether the individual was also charged or convicted of a street gang offense.

Commenters cited concerns regarding the admission of "all reliable evidence" to determine whether there was "reason to believe" that the conduct implicated gang-related matters. They averred that this phrase was potentially limitless and that its scope required both parties to present fulsome arguments regarding an offense's possible gang connections. Moreover, commenters asserted that the proposed rule fails to articulate what type of evidence or non-adjudicated conduct may be considered by an adjudicator when determining whether a bar to asylum applies.

In addition, commenters expressed concern that permitting adjudicators to rely on "all reliable evidence" will result in immigration adjudicators relying on any type of evidence, including police reports, unsubstantiated or subsequently recanted hearsay statements, and discredited methods of gang identification, such as gang databases. Commenters asserted that this will result in a compounded disparate racial impact based on over-inclusion of young people of color in those gang databases. Commenters asserted that gang databases are "notoriously inaccurate, outdated, and infected by racial bias." Additionally, commenters stated that gang databases are unregulated and that an individual may be included in a database simply based on "living in a building or even neighborhood where there are gang members, wearing certain colors or articles of clothing, or speaking to people law enforcement believe to be gang members."

One commenter referenced a decision of the Supreme Judicial Court of Massachusetts holding that the information in gang databases is hearsay, not independently admissible, and raises serious Confrontation Clause concerns. *Commonwealth* v. *Wardsworth,* 124 NE3d 662, 678–79 & nn.24–25 (Mass. 2019). That commenter also asserted that, despite the concern expressed by the Supreme Judicial Court of Massachusetts regarding the use of gang databases, immigration judges continue to regularly rely on such reports. By relying on such unreliable evidence, commenters averred, the proposed rule will exacerbate due process violations already occurring as a result of unsubstantiated gang ties.

Commenters further noted that, because these databases disparately affect young people of color, relying on these databases would multiply the harm already caused by racially disparate policing and racially disparate rates of guilty pleas to minor offenses. Commenters claimed that asylum seekers of color are subject to racially disparate policing, which results in racially disparate rates of guilty pleas to minor offense, and which also results in this population being erroneously entered and overrepresented in gang databases. In support of the inaccuracy of these databases, one commenter cited concerns that police departments falsify gang affiliations of youth encountered by police officers. As a result, commenters asserted, the proposed rule would "invite extended inquiry into the character of young men of color" who

may otherwise have meritorious asylum claims and who are already subject to racially suspect policing practices.

Commenters noted that police reports are inherently unreliable in the absence of the protections offered by the Confrontation Clause of the Sixth Amendment and the Federal Rules of Evidence, neither of which apply in immigration court. Regarding the unreliability of evidence, one commenter provided an example where neither the police officers nor the alleged victims were required to testify. Without this testimony, the commenter alleged, the immigration adjudicator would be unable to determine whether a victim had a motive to lie to the police, whether the victim later recanted his or her statements, or whether the police officer misunderstood some critical fact. Moreover, commenters asserted that, although immigration adjudicators would be unable to rely on uncorroborated allegations such as those contained in arrest reports, adjudicators could nevertheless shield denials based on such information by relying on discretion.

Commenters stated that the proposed rule would exacerbate due process violations that already occur as a result of unsubstantiated information about gang ties. Commenters claimed that asylum applicants are already subjected to wrongful denials of asylum based on allegations of gang activity made by DHS. Commenters alleged that DHS relies on unreliable foreign databases and "fusion" intelligence-gathering centers outside of the United States. For example, one commenter alleged that information regarding gang affiliations gathered from the fusion intelligence-gathering center in El Salvador has already been used against asylum seekers, despite having been found to be inaccurate. At the same time, commenters asserted that immigration adjudicators routinely premise enforcement, detention, and discretionary denials of relief on purported gang membership and often grant deference to gang allegations made by Immigration and Customs Enforcement ("ICE") personnel. Commenters asserted that the already expanded use of gang databases to apprehend and remove foreign nationals has been widely criticized as an overbroad, unreliable, and often biased measure of gang membership and involvement.

Additionally, commenters expressed disagreement with the Departments' position that all gang-related offenses could be considered as particularly serious crimes. Commenters criticized the Departments' reliance on statistics

from up to 16 years ago to demonstrate that gang members commit violent crimes and drug crimes. Commenters disagreed with the Departments' conclusion that all crimes that may be construed as connected to gang activity are particularly serious. Commenters asserted instead that it is illogical to argue that, because gang members may commit some violent crimes and drug crimes, all crimes committed by anyone remotely connected with a gang are particularly serious.

Commenters also asserted that the proposed rule will result in asylum seekers who live in economically distressed areas but who have a minor criminal conviction, for example for a property crime, being excluded from protection. Commenters asserted that including even minor crimes construed as gang-related in the "particularly serious crime" bar and preventing those individuals from accessing asylum is "disingenuous at best, and tinged with racial animus at worst." Commenters asserted that this bar would perpetuate racial bias within the immigration court system.

Commenters asserted that the gang-related-crimes bar should not be introduced at all due to the complex nature of gang ties and the frequency with which individuals are mislabeled as being part of a gang. These commenters argued that the risk of erroneously barring legitimate asylum seekers from eligibility is too high. Another commenter noted that it was "particularly cruel" to create a bar related to gang offenses "in the wake of this Administration's refusal to countenance gang violence as a ground to asylum." Moreover, commenters asserted that the INA and existing regulations already permit immigration adjudicators to deny asylum as a matter of discretion. Adding this new bar based on gang-related activity, according to these commenters, risks excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

Commenters noted that previous attempts to expand the grounds of removal and inadmissibility to include gang membership failed to pass both houses of Congress. One commenter noted concern that an individual could be erroneously convicted of a gang-related crime because of the widespread nature of gang activity in Central America. This commenter also expressed concern that, because gangs in Central America may act with impunity and "often control a corrupt judiciary," an individual could be erroneously convicted of a crime for

refusing to acquiesce to a gang's demands.

*Response:* As explained further in section II.C.2.a.i, the bar based on activity related to criminal street gangs is enacted pursuant to the Attorney General's and the Secretary's designated authorities to establish additional limitations and conditions on asylum. INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[23] This authority requires such conditions and limitations to be consistent with section 208 of the Act (8 U.S.C. 1158) and does not require that the offenses meet a threshold of dangerousness or seriousness. *Compare* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)"), *with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)) *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered a "danger to the community of the United States" by virtue of "having been convicted by a final judgment of a particularly serious crime"). Although the Departments have determined that the included offenses involving criminal street gangs represent dangerous offenses and that the offenders represent particular dangers to society, *see* 84 FR at 69649–50, the Departments would nevertheless be acting within the authority of section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) if commenters are correct that some offenses included are not connected to dangerousness. Section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the Secretary to establish a wide range of conditions on asylum eligibility, and the designation of criminal street gang-

---

[23] The proposed rule preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as a particularly serious crime and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the designation of gang-related crimes as bars to asylum eligibility. *Compare* 84 FR at 69650 ("Regardless, criminal street gangs-related offenses—whether felonies or misdemeanors—could reasonably be designated as 'particularly serious crimes' pursuant to 8 U.S.C. 1158(b)(2)(B)(ii)."), *with id.* ("Moreover, even if 8 U.S.C. 1158(b)(2)(B)(ii) did not authorize the proposed bar, the Attorney General and the Secretary would propose designating criminal gang-related offenses as disqualifying under 8 U.S.C. 1158(b)(2)(C)."). Nevertheless, the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) aligns with the regulatory text and was used to support all of the categories of bars set out in the rule.

related offenses as defined in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars to asylum eligibility demonstrates the intent to allow the Attorney General and the Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Moreover, Congress has expressly excluded from eligibility certain aliens who engage in conduct or commit crimes of a certain character or gravity, regardless of whether those aliens are "dangerous" to the United States, and regardless of whether those crimes have been formally designated as "particularly serious." *See* INA 208(b)(2)(A)(i), (iii) (8 U.S.C. 1158(b)(2)(A)(i), (iii)). The Departments have concluded that criminal street gang-related offenses are sufficiently similar to such conduct and crimes that aliens who commit such offenses should not be rewarded with asylum and the many benefits that asylum confers.

Further, the Departments disagree with comments asserting the criminal street gang-related offenses are not necessarily indicative of a danger to the United States. *See* 84 FR at 69650. Specifically, the Departments believe that such offenses are strong indicators of recidivism and ongoing, organized criminality. *Id.* Based on the data and research articulated in the NPRM, the Departments believe that individuals who enter the United States and are then convicted of a crime related to criminal street gang activity present an ongoing danger to the community and should therefore be ineligible for asylum. Significantly, the Departments reject commenters' assertions that the Departments relied on data that was over 16 years old. Although one of the reports relied upon in the NPRM was published in 2004, additional studies and information were cited ranging from 2010 to 2015. *See* 84 FR at 69650. Additionally, the White House recently issued a fact sheet observing that "[a]pproximately 38 percent of all murders in Suffolk County, New York, between January 2016 and June 2017" were linked to a single criminal gang— MS–13—alone. The White House, *Protecting American Communities from the Violence of MS–13* (Feb. 6, 2020), *https://www.whitehouse.gov/briefings-statements/protecting-american-communities-violence-ms-13/; see also*

Alan Feuer, *MS–13 Gang: 96 Charged in Sweeping Crackdown on Long Island,* N.Y. Times (Dec. 20, 2019), *https://www.nytimes.com/2019/12/20/nyregion/ms-13-long-island.html;* Proc. No. 9928, 84 FR 49187, 49187 (Sept. 13, 2019) (explaining that the DOJ is working with law enforcement in El Salvador, Guatemala, and Honduras to "help coordinate the fight against MS–13, the 18th Street Gang, and other dangerous criminal organizations that try to enter the United States in an effort to ravage our communities," and that this partnership "targets gangs at the source and works to ensure that these criminals never reach our borders"); *id.* (observing that, in 2017 and 2018, ICE officers "made 266,000 arrests of aliens with criminal records, including those charged or convicted of 100,000 assaults, nearly 30,000 sex crimes, and 4,000 violent killings"). These more recent examples demonstrate the continued threat posed by gang-related crime.

The Departments disagree with commenters' assertions that the rule fails to sufficiently detail how an individual qualifies as a street gang member or how an activity is to be categorized as a gang-related event. As an initial matter, the rule does not purport to categorize individuals as street gang members. Rather, the inquiry is limited into whether an adjudicator knows or has reason to believe that a prior conviction for a Federal, State, tribal, or local crime was committed in support, promotion, or furtherance of criminal street gang activity. 84 FR at 69649. This rule defines "criminal street gang" by referencing how that term is defined in the convicting jurisdiction or, alternatively, as the term is defined in 18 U.S.C. 521(a). The Departments believe that the language of the Federal statute conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices, as do the definitions in the convicting jurisdictions. This rule leaves the determination of whether a crime was in fact committed "in furtherance" of gang-related activity to adjudicators in the first instance. As noted in the NPRM, to the extent that this type of inquiry may lead to concerns regarding inconsistent application of the bar, the Departments reiterate that the BIA is capable of ensuring a uniform approach. *See* 8 CFR 1003.1(e)(6)(i).

In response to commenters who suggested that the rule would result in denial of meritorious claims, the Departments note that those with legitimate fear of persecution or torture may still apply for statutory

withholding of removal or protection under the CAT regulations, as discussed in section II.C.5. In addition, and as explained previously, these commenters misapprehend the purpose of this rulemaking. The Departments have concluded that persons subject to the new bars do not warrant asylum because awarding the discretionary benefit of asylum to such individuals would encourage lawless behavior, subject the United States to certain dangers, and otherwise undermine the policies underlying the statutory framework for asylum. These persons accordingly do not have meritorious asylum claims. And, because nothing in the INA precludes the imposition of these new bars, the fact that these persons' claims might otherwise be meritorious is irrelevant.

Regarding commenters' concerns with the "reason to believe" standard articulated in the rule, the Departments note that this standard is used elsewhere in the INA. For example, when considering admissibility, immigration judges consider whether there is reason to believe that the individual "is or has been an illicit trafficker in any controlled substance." INA 212(a)(2)(C) (8 U.S.C. 1182(a)(2)(C)). In accordance with this provision, courts have upheld findings of inadmissibility in the absence of a conviction. *See Cuevas* v. *Holder,* 737 F.3d 972, 975 (5th Cir. 2013) (holding "that an alien can be inadmissible under [INA 212(a)(2)(C) (8 U.S.C. 1182(a)(2)(C))] even when not convicted of a crime"); *Garces* v. *U.S. Att'y Gen.,* 611 F.3d 1337, 1345 (11th Cir. 2010) (stating that section 1182(a)(2)(C) of the Act (8 U.S.C. 1182(a)(2)(C)) renders an alien inadmissible based on a "reason to believe" standard, which does not require a conviction); *Lopez–Umanzor* v. *Gonzales,* 405 F.3d 1049, 1053 (9th Cir. 2005) ("Section 1182(a)(2)(C) does not require a conviction, but only a 'reason to believe' that the alien is or has been involved in drug trafficking."). The bar on criminal street gang-related activity is narrower in scope than the inadmissibility charge based on illicit trafficking in that the bar in this rule still requires a conviction. As such, the Departments believe that the "reason to believe" standard is appropriately applied to the final rule.

Similarly, the "all reliable evidence" standard is not a new standard in immigration proceedings. Immigration judges routinely consider any relevant evidence provided in removal hearings by either party. 8 CFR 1240.1(c). Additionally, the BIA held, in the context of evaluating whether a crime constitutes a particularly serious crime,

that, once the elements of the offense are examined and found to potentially bring the offense within the ambit of a particularly serious crime, the adjudicator may consider all reliable information in making a "particularly serious crime" determination, including but not limited to the record of conviction and sentencing information. *Matter of N–A–M–,* 24 I&N Dec. at 337–38. The Ninth Circuit has held that the BIA's interpretation in *Matter of N-A-M-* is reasonable. *Anaya-Ortiz* v. *Holder,* 594 F.3d 673, 678 (9th Cir. 2010). Additionally, various circuit courts have applied the "all reliable information" standard articulated in *Matter of N-A-M-* in considering whether crimes are particularly serious. *See, e.g., Luziga* v. *Att'y Gen. U.S.,* 937 F.3d 244, 253 (3d Cir. 2019); *Marambo* v. *Barr,* 932 F.3d 650, 655 (8th Cir. 2019).

The Departments disagree with commenters' concerns about adjudicators' reliance on arrest reports and uncorroborated information. As an initial point, most asylum claims are based significantly on hearsay evidence that is uncorroborated by non-hearsay evidence. Such evidence, however, does not necessarily make an asylum claim unreliable or insusceptible to proper adjudication. Adjudicators assessing asylum applications are well versed in separating reliable from unreliable information, assigning appropriate evidentiary weight to the evidence submitted by the applicant and DHS, and determining whether corroborative evidence needs to be provided. *See* INA 208(b)(1)(B) (8 U.S.C. 1158(b)(1)(B)). Moreover, this rule does not provide adjudicators with unfettered discretion; instead, adjudicators must consider such evidence in the context of making a criminal street gang determination under the "reason to believe" standard. An asylum officer's assessment of eligibility necessarily must explain the consideration of the evidence of record as it applies to the evaluation of bars to asylum and the burden of proof, and it must also explain the exercise of discretion. Similarly, immigration judges are already charged with considering material and relevant evidence. 8 CFR 1240.1(c). To make this determination, immigration judges consider whether evidence is "probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna* v. *Ashcroft,* 325 F.3d 396, 405 (3d Cir. 2003) (quoting *Bustos-Torres* v. *INS,* 898 F.2d 1053, 1055 (5th Cir. 1990)). Nothing in this rule undermines or withdraws from this standard. Moreover, the Departments would not purport to

impinge on an adjudicator's evidentiary determination or direct the result of such a determination. If aliens have concerns about the reliability of any evidence, aliens may challenge the reliability of that evidence as part of their arguments to the adjudicator. As a result, the Departments have concluded that concerns regarding the reliability of gang databases or other evidence are more properly addressed in front of the immigration judge or asylum officer in individual cases.

The Departments disagree with comments that adjudicators should have the discretion to determine whether factors such as coercion or duress affected an individual's involvement in criminal street gang-related activity. The Departments believe that criminal street gang-related activity is serious and harmful in all circumstances. As stated in the NPRM, "[c]riminal gangs of all types * * * are a significant threat to the security and safety of the American public." 84 FR at 69650. Accordingly, the Departments have concluded that aliens who have been convicted of such offenses do not merit the discretionary benefit of asylum, even if their gang involvement was potentially the result of coercion or some other unique circumstance. In addition, the Departments believe that considerations regarding criminal culpability for criminal street gang-related offenses would be best addressed during the individual's underlying criminal proceedings.

Commenters' assertions that the rule will exacerbate harms caused by racially disparate policing practices or that the result of this rule will disproportionately affect people of color are outside the scope of this rulemaking. *Cf. San Francisco,* 944 F.3d at 803–04 ("Any effects [of the public charge rule] on [healthcare] entities are indirect and well beyond DHS's charge and expertise."). The rulemaking does not address actual or alleged injustices of the criminal justice system, as referenced by the commenters. Moreover, the rule was not racially motivated, nor did racial animus or a legacy of bias play any role in the publication of the rule. Rather, this final rule is being published to categorically preclude from asylum eligibility certain aliens with various criminal convictions because the Departments determined that individuals engaging in criminal activity that is related to criminal street gangs present a sufficient danger to the United States to warrant exclusion from the discretionary benefit of asylum. To the extent that the rule disproportionately affects any group referenced by the commenters, any such

impact is beyond the scope of this rule, as this rule was not drafted with discriminatory intent towards any group, and the provisions of the rule apply equally to all applicants for asylum.

e. Driving Under the Influence of an Intoxicant

*Comment:* Commenters opposed the proposed categorical bar to asylum based on a DUI conviction. Commenters stated that the proposed categorical bars encompass crimes with a wide range of severity, and commenters asserted that DUI does not rise to a comparable level of severity as a particularly serious crime warranting its promulgation as a categorical bar to asylum. Other commenters similarly stated that, because DUI does not involve conduct that is necessarily dangerous on its own, the offense is not serious enough to support a categorical bar to asylum. Commenters provided examples of allegedly low-level convictions for DUI, based on examples such as a court concluding that, when "the key is in the ignition and the engine is running, a person 'operates' a vehicle, even if that person is sleeping or unconscious," *State* v. *Barac,* 558 SW3d 126, 130 (Mo. Ct. App. 2018), or when a person operates a vehicle while under the influence but no injury to another person results. Accordingly, commenters asserted that DUI is not necessarily serious or sufficiently dangerous to warrant a categorical bar. One commenter summarized the concern by stating that offenses related to DUI are "excessively overbroad in the convictions and conduct covered[] and are not tailored to identify conduct that is 'serious' or identify individuals who pose a danger to the community."

Commenters also asserted that creating a blanket categorical bar to asylum based on a DUI conviction would eliminate the opportunity for adjudicators to consider the facts before them in exercising discretion. Commenters stated that adjudicators should consider the severity of the DUI offense given relevant facts, such as the applicant's criminal history, the underlying cause of the applicant's criminal record involving DUI, the applicant's efforts towards rehabilitation, the length of time passed since the conviction, the applicant's potential danger to the community, and the applicant's risk of persecution if returned to his or her home country.

Commenters noted that multiple DUI convictions are not an absolute bar to cancellation of removal under INA 240A(b) (8 U.S.C. 1229b(b)) and cited the Attorney General's opinion that

ER-0160

such offenses were inconclusive of an individual's character, thus allowing individuals to rebut the presumption with evidence of good character and rehabilitation. *Matter of Castillo-Perez,* 27 I&N Dec. 664 (A.G. 2019). Commenters stated that, "if individuals seeking discretionary cancellation of removal are afforded the opportunity to show that they merit permanent residence in spite of their prior convictions for driving under the influence, it is nonsensical to promulgate a rule denying asylum seekers that same opportunity."

Finally, commenters noted that low-income people and people of color are more likely to be pulled over and charged with DUI. These commenters alleged that the proposed rule accordingly exacerbates the unjust criminal justice system by including these provisions as a bar to asylum eligibility.

*Response:* The Departments disagree that DUI does not warrant a categorical bar to asylum eligibility.

Although commenters provided limited examples of times where an individual convicted of a DUI offense fortunately may not have caused actual harm to others, these sorts of DUI convictions alone would not render an alien ineligible for asylum under this rule. The final rule bars aliens with DUI convictions from asylum eligibility under two grounds in 8 CFR 208.13(c)(6)(iii), (c)(6)(iv) and 1208.18(c)(6)(iii), (c)(6)(iv). First, under 8 CFR 208.13(c)(6)(iii) and 1208.13(c)(6)(iii), a single DUI offense would only be disqualifying if it "was a cause of serious bodily injury or death of another person." Second, under 8 CFR 208.13(c)(6)(iv)(A) and 1208.13(c)(6)(iv)(A), any second or subsequent DUI offense would be disqualifying. Accordingly, a single conviction that does not cause bodily injury or death to another would not be a bar to asylum, but would continue to be considered by adjudicators in determining whether an alien should receive asylum as a matter of discretion.

The Departments maintain that DUI convictions, particularly those covered by this rule (based on actions that cause serious bodily injury or death or that indicate recidivism, along with the risk of harm from such recurrent dangerous behavior), constitute serious, dangerous activity that threatens community safety. First, the Departments reiterate that DUI laws exist, in part, to protect unknowing persons from the dangerous people who "choose to willingly disregard common knowledge that their criminal acts endanger others." 84 FR at 69651. Second, the Supreme Court and

other Federal courts have repeatedly echoed the gravity of such acts. *See Begay* v. *United States,* 553 U.S. 137, 141 (2008) ("Drunk driving is an extremely dangerous crime."), *abrogated on other grounds by Johnson* v. *United States,* 576 U.S. 591 (2015); *United States* v. *DeSantiago-Gonzalez,* 207 F.3d 261, 264 (5th Cir. 2000) ("[T]he very nature of the crime * * * presents a 'serious risk of physical injury' to others[.]"); *Marmolejo-Campos* v. *Holder,* 558 F.3d 903, 913 (9th Cir. 2009) ("[T]he dangers of drunk driving are well established * * * ."); *see also Holloway,* 948 F.3d at 173–74 ("A crime that presents a potential for danger and risk of harm to self and others is 'serious.' * * * 'There is no question that drunk driving is a serious and potentially deadly crime * * * . The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases.'" (quoting *Virginia* v. *Harris,* 558 U.S. 978, 979–80 (2009) (Roberts, C.J., dissenting from denial of writ of certiorari))).

It is well within the Departments' authority to condition asylum eligibility based on a DUI conviction. The INA authorizes the Attorney General and the Secretary to establish by regulation additional limitations and conditions on asylum eligibility, INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)), and Federal courts have upheld BIA discretionary denials of asylum based on DUI convictions, even in circumstances where a DUI conviction does not constitute a particularly serious crime. *See, e.g., Kouljinski* v. *Keisler,* 505 F.3d 534, 543 (6th Cir. 2007). For the reasons above, DUI is a serious crime that represents a blatant disregard for the laws and societal values of the United States; accordingly, the final rule limits asylum eligibility by considering a DUI conviction to be a categorical bar to asylum.

For these reasons, the Departments decline to tailor the bar to precisely identify serious conduct, evaluate severity of conduct, identify individuals who pose a danger to communities, or provide discretion to adjudicators, as suggested by commenters. The Departments will no longer afford discretion to adjudicators considering DUI convictions in the circumstances defined by this rule; elimination of such discretion is, again, well within the Departments' authority. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)).

Regarding DUI convictions in the context of cancellation of removal under INA 240A(b) (8 U.S.C. 1229b(b)), the Departments note that cancellation of

removal is separate from asylum, and this rule contemplates asylum only. *See* 84 FR at 69640 (stating that the Departments propose to amend their respective regulations governing the bars to "asylum eligibility"). Although both forms of relief may eventually lead to lawful permanent resident status in the United States, cancellation of removal generally applies to a different class of aliens, and its conditions and requirements are different from asylum relief.[24] *Compare* INA 240A(b) (8 U.S.C. 1229b(b)), *with* INA 208 (8 U.S.C. 1158)). Cancellation of removal requires "good moral character," which asylum relief neither requires nor mentions. Thus, references to DUI convictions and their relative effect on the good moral character requirement for cancellation of removal are irrelevant to asylum eligibility. Commenters conflate two separate forms of relief from removal intended for separate populations with separate eligibility provisions.

Likewise, the Attorney General's statement in *Matter of Castillo-Perez,* 27 I&N Dec. at 671—that multiple DUI convictions were not necessarily conclusive evidence of an individual's character—was made in regards to eligibility for cancellation of removal, not asylum.[25] Accordingly, that case has no bearing on this rulemaking.

---

[24] Generally, cancellation of removal is a discretionary form of relief in which the Attorney General may cancel removal and adjust status to lawful permanent residence ("LPR") of an otherwise inadmissible or deportable alien who has been physically present in the United States for a continuous period of not less than 10 years preceding the date of the application; has been a person of good moral character during such period; has not been convicted of an offense under INA 212(a)(2), 237(a)(2), or 237(a)(3) (8 U.S.C. 1182(a)(2), 1226(a)(2), or 1226(a)(3)); and establishes that removal would result in exceptional and extremely unusual hardship to the applicant's U.S. citizen or LPR spouse, parent, or child. *See* INA 240A(b) (8 U.S.C. 1229b(b)). In contrast, asylum is a discretionary benefit that precludes an alien from removal, creates a pathway to LPR status and citizenship, and affords various ancillary benefits such as work authorization, opportunity for certain family members to obtain derivative asylee and LPR status, and authorization, in some cases, to receive certain financial assistance from the government. *See* INA 208 (8 U.S.C. 1158). Asylum eligibility includes the following factors: The alien must be physically present or arrive in the United States, the alien must meet the definition of "refugee" under INA 101(a)(42)(A) (8 U.S.C. 1101(a)(42)(A)), and the alien must otherwise be eligible for asylum in that no statutory bars or limitations apply. *See* INA 208(a)(1) (8 U.S.C. 1158(a)(1)), INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)), INA 208(b)(2) (8 U.S.C. 1158(b)(2)) and 8 CFR 1240.8(d); *see also* 84 FR at 69642.

[25] Nevertheless, the Attorney General in the context of discussing eligibility for cancellation of removal as a matter of discretion made clear that "[m]ultiple DUI convictions are a serious blemish on a person's record and reflect disregard for the safety of others and for the law." *Castillo-Perez,* 27 I&N Dec. at 670. This reasoning as to the
Continued

In sum, the rulemaking categorically bars asylum eligibility for those with one or more DUI convictions in order to protect communities from the dangers of driving under the influence. *See* 84 FR at 69650–51; *see also* 84 FR at 69640. It does not consider other factors of apparent concern to commenters, such as financial status, race, or nationality. The rulemaking also does not address actual or alleged injustices of the criminal justice system, as referenced by the commenters. Such considerations are outside the scope of this rulemaking.

### f. Battery or Domestic Violence

*Comment:* Commenters opposed the proposed bar to asylum based on domestic assault or battery, stalking, or child abuse. Broadly, commenters opposed a bar to asylum based on "mere allegations of conduct without any adjudication of guilt" for several reasons. First, commenters stated that a bar based on conduct, not convictions, violates INA 208(b)(2)(A) (8 U.S.C. 1158(b)(2)(A)), which bars noncitizens who, "having been convicted by a final judgment of a particularly serious crime, constitute[ ] a danger to the community of the United States." In accordance with the plain text and judicial interpretation of this section of the Act, commenters asserted, the statute prohibits application of the "particularly serious crime" bar based only on non-adjudicated facts, thereby precluding separation of "the seriousness determination from the conviction." Accordingly, commenters stated that the proposed application of the "particularly serious crime" bar based on conduct involving domestic assault or battery directly contradicts the statute, which requires a final judgment of conviction. Commenters also alleged that the proposed rule violates the Supreme Court's holding that "conviction" refers to the "crime as generally committed," rather than the actual conduct. *See Sessions* v. *Dimaya,* 138 S. Ct. 1204, 1217 (2018); *see also Delgado,* 648 F.3d at 1109 n.1 (Reinhardt, J., concurring in part and concurring in the judgment). One commenter asserted that the statute "only bars asylum seekers for alleged conduct in exceptional circumstances like potential terrorist activity or persecution of others. * * * [C]onduct-based asylum bars should be used only in very limited circumstances, and in this case should not be expanded."

Relatedly, commenters raised constitutional concerns. Commenters cited constitutional principles that "individuals have a right to defend themselves against criminal charges and are presumed innocent until proven guilty. Individuals should not be excluded from asylum eligibility based on allegations of criminal misconduct that have not been proven in a court of law." Accordingly, commenters opposed the NPRM because it "deprives the individual the opportunity to challenge the alleged behavior and does away with the presumption of innocence." More specifically, a commenter claimed that, under the NPRM, an incident and subsequent arrest related to domestic assault or battery would trigger an inquiry into the alien's conduct, thereby undermining the criminal justice system and constitutional due process protections for criminal defendants who may not have access to counsel. The commenter alleged that, regardless of whether the alien was convicted of the offense, the alien may still be barred from asylum relief following an adjudicator's independent inquiry into the incident.

Commenters also stated that a bar based on conduct alone, especially in the context of domestic assault or battery, could disproportionately penalize innocent individuals and victims, and subsequently their spouses and children, who may be denied immigration status or be left with an abuser. First, commenters explained that specific barriers—including discrimination, community ostracism, community or religious norms, or lack of eligibility for certain services—deter aliens from even initially contacting law enforcement. Second, if law enforcement was involved, commenters expressed concern about cross arrests in which both the perpetrator of abuse and the victim are arrested but no clear determinations of fault are made. Commenters stated that "authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances." Further, commenters alleged that "identifying the primary aggressor is not always consistently nor correctly conducted," especially if survivors acted in self-defense. Commenters also expressed concern that survivors of domestic assault or battery are oftentimes vulnerable, with the result that a bar based on conduct alone could affect populations with overlapping

vulnerabilities. For example, commenters specifically referenced lesbian, gay, bisexual, transgender, and queer or questioning ("LGBTQ") survivors, who are already allegedly prone to experience inaction by law enforcement in response to domestic violence, and limited English proficiency individuals, who may be unable to fully describe the abuse to police officers, prompting officers to then use the offenses' perpetrators for interpretation.

One commenter expressed concern that the NPRM establishes a lower standard by which admission may be denied because other forms of admission require an actual conviction or factual admission to form the basis of denial. Accordingly, the commenter stated that similarly situated persons would be treated inconsistently based upon the mechanism for admission that they choose. This commenter also asserted that U nonimmigrant status and Violence Against Women Act of 1994, Public Law 103–322, 108 Stat. 1902 ("VAWA") relief are insufficient alternative forms of relief because they generally require acknowledgement from a local authority, negating the need for a fact-finding hearing. Presumably then, most individuals affected by the NPRM would be ineligible for these alternative forms of relief. In addition, the commenter noted that granting those benefits is entirely different from making an asylum applicant overcome an asylum bar.

Commenters also identified unintended consequences of the proposed rule, explaining that individuals may act maliciously. One commenter suggested that individuals may file for baseless temporary restraining orders or protective orders to try to block domestic violence victims' applications for employment authorization documents following an asylum application. Another commenter speculated that abusers may falsely accuse or frame survivors of domestic violence to terrorize or control them. One commenter asserted that survivors may be hesitant to report abuse or request a restraining order if it could negatively impact the immigration status of the perpetrator, especially in situations where they share a child. Another commenter stated that it would "undoubtedly embolden[ ] perpetrators more and len[d] more strength to otherwise weak accusations."

Some commenters generally stated that the NPRM too broadly categorized domestic violence offenses as particularly serious crimes. Relatedly, another commenter stated that the bar is too vague and requires adjudicators to

seriousness of DUI offenses supports the type of categorical bar at issue here and does not conflict with the Departments' determination that DUI offenses should categorically bar asylum eligibility.

ER-0162

become experts in domestic criminal law jurisdictions of every State to determine whether, for example, conduct "amounts to" domestic assault or battery, stalking, or child abuse. Further, the commenter noted that the NPRM's definition of battery and extreme cruelty is different from the various States' criminal laws, which creates inconsistent application. That commenter also alleged that the proposed exceptions for individuals who have been battered or subjected to extreme cruelty are "insufficient, vague, and place[d] a high burden on victims." Another commenter asserted that it is "unclear how 'serious' will be defined, and whether and how detrimental and potentially false information provided by abusers will be considered in decision-making." One commenter suggested that "the presentation of evidence under oath by adverse parties is a more appropriate forum for adjudications as to whether or not domestic violence took place, and will likely lead to fewer determinations that will cruelly strip immigrant survivors of their right to seek asylum." Another commenter asserted that the NPRM does not include a framework or limits to guide an adjudicator's inquiry, especially in the context of false accusations. For these reasons, commenters opposed the NPRM because it allegedly would cause inconsistent and unjust results.

Some commenters claimed that the proposed bar is unnecessary because the current bars for those with domestic violence convictions or aggravated felony convictions allow for "the denial of asylum protection for these types of crimes when appropriate," whereas the proposed bar denies asylum protection for vulnerable individuals. Accordingly, commenters believed that "immigration judges should retain discretion in these situations and be permitted to grant relief in situations where the asylum seeker is not at fault."

Many commenters alleged that the proposed bar conflicts with VAWA. One commenter alleged that the NPRM "distorts language contained in VAWA * * * in order to create barriers for asylum seekers." Commenters stated that VAWA gives discretion to adjudicators "based on a number of factors and circumstances." Accordingly, commenters stated that the proposed "blunt approach" conflicts with VAWA and lacks "evidence-based justification for treating asylum seekers differently." Commenters were also concerned with the lack of "analogous protections in the asylum context to protect a survivor from the devastating

effects of a vindictive abuser's unfounded allegations."

Commenters also disagreed with the proposed approach towards the burden of proof as compared to VAWA. Because of the "vastly different interests at stake," commenters stated that VAWA's low burden of proof is necessary for several reasons: More harm results from erroneously denying relief than erroneously granting relief, a lower standard maximizes the self-petitioner's confidentiality and safety, certain evidence may be inaccessible to a victim because the abuser blocked access, and no liberty interests are implicated for alleged perpetrators. By contrast, commenters asserted, a "rigorous burden of proof is appropriate when potentially barring applicants from asylum," as the NPRM did, because "[t]he consequences of invoking the bar are dire, with the applicant's life and safety hanging in the balance."

Commenters also disagreed that the exception for asylum applicants who demonstrate eligibility for a waiver under INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)) sufficiently protects survivors deemed not to be the primary aggressors. Commenters noted that survivors may be unaware of their eligibility for a waiver, unaware that such a waiver exists, or too fearful to apply.

Commenters also claimed that the waiver application process turns an otherwise non-adversarial inquiry into a "multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency." Commenters also questioned whether adjudicators could conduct such an inquiry and correctly apply the exception because they are removed from the immediate circumstances surrounding an incident. Accordingly, commenters alleged that the waiver fails to adequately protect survivors and, in some cases, inflicts harm.

*Response:* First, commenters are incorrect that the rule's conditioning of asylum eligibility on conduct violated INA 208(b)(2)(A) (8 U.S.C. 1158(b)(2)(A)) because that section requires a final judgment of conviction. As discussed above, this rule, like the proposed rule, designates the listed offenses as additional limitations on asylum eligibility pursuant to INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)).[26] *See* 8 CFR 208.13(c)(6),

1208.13(c)(6). This section provides authority to the Attorney General and the Secretary to condition or limit asylum eligibility, consistent with the statute, but does not require any sort of conviction. Accordingly, the bar is consistent with the plain text of that section, and the Supreme Court cases cited by commenters are not specifically relevant.

The Departments disagree with the comment that conduct-based bars should be used only in "very limited circumstances," not including domestic assault or battery, stalking, or child abuse. As explained in the NPRM, the Departments believe that domestic violence is "particularly reprehensible because the perpetrator takes advantage of an 'especially vulnerable' victim." 84 FR at 69652 (quoting *Carillo* v. *Holder,* 781 F.3d 1155, 1159 (9th Cir. 2015)). Accordingly, the Departments emphasize that such conduct must not be tolerated in the United States, and the discretionary benefit of asylum, along with the numerous ancillary benefits that follow, will not be granted to aliens who engage in such acts. *See id.* Further, the statute already contemplates conduct-based bars in sections 208(b)(2)(A)(i), (iii)–(iv) of the Act (8 U.S.C. 1158(b)(2)(A)(i), (iii)–(iv)),[27] and the Departments believe it is

---

[26] The proposed rule preamble cited both the authority at section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii)) to designate offenses as a

particularly serious crime and the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) to establish additional limitations on asylum eligibility in support of the inclusion of these domestic violence-related bars at 8 CFR 208.13(c)(6)(v), (vii), 1208.13(c)(6)(v), (vii). *See* 84 FR at 69651–53. However, as stated in the proposed rule, the authority at section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) provides underlying authority for all these provisions. 84 FR at 69652 (noting that, even if all of the proposed domestic violence offenses would not qualify as particularly serious crimes, convictions for such offenses—as well as engaging in conduct involving domestic violence that does not result in a conviction— "should be a basis for ineligibility for asylum under section 208(b)(2)(C) of the INA"). The Departments acknowledge that the proposed rule stated that the Attorney General and the Secretary were, in part, "[r]elying on the authority under section 208(b)(2)(B)(ii) of the INA." *Id.* at 69651. But the regulatory text of the new bar does not actually designate any additional offense as "particularly serious." The Departments thus clarify that the current bars are an exercise of the authority granted by section 208(b)(2)(C), and that the discussion of the "particularly serious crime" bar merely helps illustrate how the new bars are "consistent with" the statutory asylum scheme. Further discussion of the interaction of the rule with the "particularly serious crime" bar is set out above in section II.C.2.a.i.

[27] These provisions provide as follows: (1) INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) ("the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion"); (2) INA 208(b)(2)(A)(iii) (8 U.S.C. 1158(b)(2)(A)(iii)) ("there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the
Continued

appropriate to also enforce an asylum bar based on conduct involving domestic battery or extreme cruelty.

The rule does not violate the constitutional rights of aliens, nor does it offend constitutional principles referenced by the commenters. First, commenters incorrectly equated denial of a discretionary benefit to "criminal charges." The Departments will not bring "criminal charges" against aliens in this context; rather, the Departments will deny asylum based on certain convictions and conduct, in some limited instances, as stated in the NPRM and authorized by statute. *See* 84 FR at 69640.

The Departments disagree that the rule undermines the criminal justice system and constitutional due process protections in either the civil or criminal context. As an initial matter, aliens have no liberty interest in the discretionary benefit of asylum. *See Yuen Jin* v. *Mukasey,* 538 F.3d 143, 156–57 (2d Cir. 2008); *see also Ticoalu* v. *Gonzales,* 472 F.3d 8, 11 (1st Cir. 2006) (citing *DaCosta* v. *Gonzales,* 449 F.3d 45, 49–50 (1st Cir. 2006)); *cf. Hernandez* v. *Sessions,* 884 F.3d 107, 112 (2d Cir. 2018) (stating, in the context of duress waivers to the material support bar, that "aliens have no constitutionally-protected 'liberty or property interest' in such a discretionary grant of relief for which they are otherwise statutorily ineligible"); *Obleshchenko* v. *Ashcroft,* 392 F.3d 970, 971 (8th Cir. 2004) (finding that there is no right to effective assistance of counsel with regard to an asylum claim because an alien does not have a liberty interest in a statutorily created, discretionary form of relief, but distinguishing withholding of removal). In other words, "[t]here is no constitutional right to asylum per se." *Mudric* v. *Mukasey,* 469 F.3d 94, 98 (3d Cir. 2006). Further, although aliens may choose to be represented by counsel, the government is not required to appoint counsel. INA 292 (8 U.S.C. 1362).

Second, the Departments reiterate that Congress authorized the Attorney General and the Secretary to, by regulation, limit and condition asylum eligibility under INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). The Departments exercise such authority in promulgating the provisions of the rule, 84 FR at 69652, that allow adjudicators to inquire into allegations of conduct to determine whether the conduct constitutes battery

United States prior to the arrival of the alien in the United States"); and (3) INA 208(b)(2)(A)(iv) (8 U.S.C. 1158(b)(2)(A)(iv)) ("there are reasonable grounds for regarding the alien as a danger to the security of the United States").

or extreme cruelty barring asylum, similar to current statutory provisions requiring inquiry into other conduct-based allegations that may bar asylum. *See* INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)); *see also Meng* v. *Holder,* 770 F.3d 1071, 1076 (2d Cir. 2014) (considering evidence in the record to determine whether it supported the agency finding that an alien's conduct amounted to persecution, thus triggering the persecutor bar under INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i))). A similar inquiry is also conducted under INA 240A(b)(2)(A) (8 U.S.C. 1229b(b)(2)(A)) to determine immigration benefits for aliens who are battered or subjected to extreme cruelty. Hence, promulgating an additional conduct-based bar to asylum eligibility, even without a conviction, is consistent with and therefore not necessarily precluded by the INA.

The Departments disagree that the rule disproportionately penalizes innocent individuals, victims, and their spouses or children. First, the Departments emphasize the exceptions for aliens who have been battered or subjected to extreme cruelty and aliens who were not the primary perpetrators of violence in the relationship. *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). This exception protects qualified innocent individuals and their spouses or children from asylum ineligibility by providing that individuals whose crimes or conduct were based on "grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act [8 U.S.C. 1227(a)(2)(E)(i)–(ii)]" would nevertheless not be rendered ineligible for asylum if such individuals "would be described in section 237(a)(7)(A) of the Act [8 U.S.C. 1227(a)(7)(A)]." *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). Section 237(a)(7)(A) of the Act (8 U.S.C. 1227(a)(7)(A)), in turn, describes individuals who: (1) Were battered or subject to extreme cruelty; (2) were not the primary perpetrator of violence in the relationship; and (3) whose convictions were predicated upon conduct where the individual acted in self-defense, violated a protection order intended to protect that individual, or where the crime either did not result in serious bodily injury or was connected to the individual having been battered or subjected to extreme cruelty.

The Departments disagree with commenters' concerns that the provided exceptions are insufficient. To the extent that the commenters are concerned that individuals might not be able to avail themselves of the exception

because of a lack of awareness of the waiver or their eligibility for it, such concerns are unfounded. Just as aliens are currently informed of eligibility and other asylum requirements through the Act and regulations; the instructions to the I–589 application and the form itself; representatives or other legal assistance projects; or other sources, aliens will similarly be informed of the existence of this exception. The Departments encourage individuals to contact law enforcement if they experience domestic violence; however, potential resolutions to the sort of specific barriers referenced by the commenters are outside the scope of this rulemaking. It is the Departments' aim, however, that the exception to the bar would reduce such barriers.

In regard to commenters' concerns about cross arrests with no definite determinations made, the Departments note that the adjudicatory inquiry into whether acts constitute battery or extreme cruelty is in no way novel. *See, e.g.,* INA 240A(b)(2)(A) (8 U.S.C. 1229b(b)(2)(A)) (providing for similar adjudicatory inquiry in the context of cancellation of removal). The Departments are confident in adjudicators' continued ability to conduct such inquiries, which include properly applying exceptions for innocent individuals. The Departments acknowledge that survivors are oftentimes vulnerable individuals. The bar and related exception are specifically promulgated to ensure that aliens with convictions for or who engage in conduct involving domestic assault or battery are ineligible for asylum, thereby reducing subsequent effects on vulnerable individuals.

The Departments may predicate asylum eligibility based on certain convictions or conduct under the statutory authority that allows them to limit or condition asylum eligibility. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Aliens may apply for immigration benefits for which they are eligible, and the INA affords various ancillary benefits in accordance with the specific relief granted. In other words, aliens are generally free to apply (or not to apply) for benefits, and then the relevant provisions of the statute are consistently applied. *See* 8 CFR 208.1(a)(1), 1208.1(a)(1). Accordingly, aliens may be "similarly situated," as phrased by the commenters, but whether "similarly situated" aliens choose to apply for the same benefits under the INA is not a decision for the Departments to make.

The Departments emphasize that the sufficiency of alternative forms of protection or relief, such as U

nonimmigrant status and VAWA relief referenced by the commenters, varies in accordance with the unique facts in each case. For example, although some aliens may be unable to obtain the necessary law enforcement certification, many others are able to successfully meet all the necessary requirements. *See* 8 CFR 214.14. The Departments, however, reiterate that the new bar for convictions or conduct involving domestic assault or battery, stalking, or child abuse, contains an exception that is intended to ensure that innocent victims of violence are not rendered ineligible for asylum relief. *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). This exception demonstrates both the Departments' concern for domestic violence victims and their consideration of how best to address those victims' circumstances, and the Departments have concluded that—especially in light of countervailing considerations such as the need to protect the United States from the harms associated with domestic abusers—this exception is sufficient.

The Departments acknowledge the commenters' concerns regarding unintended consequences stemming from the rule. The Departments, however, reiterate that mere allegations alone would not automatically bar asylum eligibility. Rather, an adjudicator will consider the alleged conduct and make a determination on whether it amounts to battery or extreme cruelty, thereby triggering the bar to asylum eligibility. *See* 8 CFR 208.13(c)(6)(vii),1208.13(c)(6)(vii) (proposed); *see also* 84 FR at 69652. Similar considerations are currently utilized in other immigration contexts, including other asylum provisions (INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) and removability (INA 237(a)(1)(E) (8 U.S.C. 1227(a)(1)(E)). In conjunction with the exception at 8 CFR 208.13(c)(6)(v)(C), (vii)(F) and 1208.13(c)(6)(v)(C), (vii)(F) (proposed), the Departments believe this inquiry is properly used in this context as well.

Commenters' allegations that the bar is too vague or broad to cover only offenses that constitute "particularly serious crimes" are irrelevant because, although the Departments possess statutory authority under section 208(b)(2)(B)(ii) of the Act (8 U.S.C. 1158(b)(2)(B)(ii) to designate a "particularly serious crime," the Departments are also authorized to establish additional limitations or conditions on asylum. INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). The only requirement is that these limitations or conditions must be

consistent with section 208 of the Act (8 U.S.C. 1158). Nothing in section 208 of the Act (8 U.S.C. 1158) conflicts with this rule.

The Departments also disagree with commenters who alleged that the rule requires adjudicators to have expertise in all State jurisdictions. The rule requires adjudicators to engage in a fact-based inquiry, and that inquiry accounts for the differences in State law regarding criminal convictions for offenses related to domestic violence. *See* 84 FR at 69652. Further, even if adjudicators must interpret and apply law from various jurisdictions, the Departments are confident that adjudicators will properly do so, as they currently do in other immigration contexts. *See, e.g.,* INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i)) (other asylum provisions); INA 237(a)(1)(E) (8 U.S.C. 1227(a)(1)(E)) (removability).

The Departments disagree that the exception is "insufficient" or "vague" or "place[s] a high burden on victims." The exception directly references and adapts the statutory requirements in INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)). In the interest of consistency and protection afforded to victims since its enactment, the exceptions to this categorical bar align with those enacted by Congress.

The Departments decline to evaluate the commenters' various examples. A proper inquiry is fact-based in nature; absent the entirety of facts for each unique case, various examples cannot be adequately addressed. The BIA has deemed some domestic violence offenses as "particularly serious crimes." *See* 84 FR at 69652 (providing such examples of BIA decisions). As explained in the proposed rule, that case-by-case approach fails to include all of the offenses enumerated in the rule, and it does not include conduct related to domestic violence. *Id.* Accordingly, the Departments believe this rule-based approach is preferable because it will facilitate fair and just adjudicatory results.

In addition, the Departments disagree with commenters that the bar is unnecessary. The Departments believe the bar and its exception establish important protections for vulnerable individuals, including those not at fault, and clarify the Departments' views on such reprehensible conduct. *See id.*

The rule does not conflict with or distort language in VAWA. The rule is solely applicable to eligibility for the discretionary benefit of asylum. The rule does not expound upon or specifically supplement VAWA. Rather, the rule adds categorical bars to asylum eligibility, clarifies the effect of certain

criminal convictions—and, in one instance, abusive conduct that may not necessarily involve a criminal conviction—on asylum eligibility, and eliminates automatic reconsideration of discretionary denials of asylum. *See generally* 84 FR at 69640. The rule excludes from a grant of asylum and its many ancillary benefits aliens who have been convicted of certain offenses or engaged in certain conduct. Contrary to the commenters' remarks, the rule is not intended to exclude survivors of domestic violence; in fact, the preamble to the rule, 84 FR at 69652, provided an extensive explanation of the Departments' opposition to domestic violence, including an overview of various legislative and regulatory actions that seek to protect victims and to convey strong opposition to domestic violence. Moreover, the rule is fully consonant with other regulations, *see, e.g.,* 8 CFR 204.2(c)(1)(i)(E), designed to ensure that those who commit acts of domestic violence, even if they are not convicted, do not distort or undermine the immigration laws of the United States. Accordingly, although VAWA and the rule may not use the same approach, both are instrumental in the government's efforts to protect victims from domestic violence in the United States.

In that vein, the rule provides protection to victims of domestic violence by way of the exceptions to the bar in 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed). The rule also conveys the Departments' opposition to domestic violence by denying asylum eligibility to aliens convicted of or who have engaged in such conduct so that abusers may not stay in the United States. *See* 84 FR at 69652.

Addressing commenters' concerns that the "life and safety" of aliens were "hanging in the balance," the Departments reiterate the alternative forms of relief or protection that may be available to applicants who are ineligible for asylum under the rulemaking—applicants may still apply for statutory withholding of removal or CAT protection. *See* 84 FR at 69642. Accordingly, the Departments disagree that a "vigorous burden of proof" is necessary in this context. On the contrary, asylum is a discretionary benefit in which the alien bears the burden of proof to demonstrate eligibility under the conditions and limitations Congress authorized the Departments to establish. *See* INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)).

To clarify the exception in 8 CFR 208.13(c)(6)(v)(C), (vii)(F) and 1208.13(c)(6)(v)(C), (vii)(F) (proposed),

**67232** **Federal Register** / Vol. 85, No. 204 / Wednesday, October 21, 2020 / Rules and Regulations

applicants need not be granted a waiver under INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)) to qualify for the exception. Rather, applicants must only satisfy one of the following criteria contained in the Act to the satisfaction of an adjudicator: (1) The applicant was acting in self-defense; (2) the applicant was found to have violated a protection order intended to protect the applicant; or (3) the applicant committed, was arrested for, was convicted of, or pled guilty to committing a crime that did not result in serious bodily injury and where there was a connection between the crime and the applicant's having been battered or subjected to extreme cruelty. 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F) (proposed); *see also* 84 FR at 69653. Together, the proposed rule and this final rule serve, in part, as notice to the public that such provisions exist— including the exception for applicants who are themselves victims. *See* 84 FR at 69640 (stating that this section of the **Federal Register** contains notices to the public of the proposed issuance of rules and regulations). Accordingly, just like other immigration benefits and relevant exceptions, aliens are on notice upon publication in the **Federal Register**.

Finally, the exceptions provided by 8 CFR 208.13(c)(6)(v)(C), (vii)(F) and 1208.13(c)(6)(v)(C), (vii)(F) do not create an adversarial process. These provisions mirror the text of the statute except that aliens only need to satisfy the criteria, not be actually granted an exception. In this way, the exceptions as stated in the rule are arguably less stringent than the statutory exception. Further, the Departments remain confident that adjudicators will continue to properly apply the exceptions, regardless of commenters' concerns of how far removed adjudicators may be from the immediate circumstances of the conduct at issue. The exceptions are not intended to mitigate harm already suffered by survivors; rather, it is the Departments' hope that the exceptions ensure that the conduct of applicants who are actually victims of domestic violence does not bar their asylum eligibility. Accordingly, the Departments strongly disagree that the exceptions will inflict harm on survivors, as commenters alleged.

g. Document Fraud Misdemeanors

*Comment:* Numerous commenters opposed implementing a categorical limitation on eligibility for asylum for individuals convicted of Federal, State, tribal, or local misdemeanor offenses related to document fraud, stating that it would result in denial of meritorious asylum claims. *See* 8 CFR

208.13(c)(6)(vi)(B)(1), 1208.13(c)(6)(vi)(B)(1) (proposed). Commenters stated that some asylum applicants have necessarily and justifiably used false documents to escape persecution. Commenters stated that the NPRM ignored common circumstances related to convictions involving document fraud, such as when individuals flee their countries of origin with no belongings and "must rely on informal networks to navigate their new circumstances." Some commenters suggested that applicants' use of fraudulent documents in entering the United States can be linked to their financial means but did not offer further detail on that position. Commenters stated that it was "arbitrary and irrational" for the Departments to suggest that such conduct would render somebody unfit to remain in the United States or a threat to public safety.

Commenters also suggested that the proposed limitation contravened long-standing case law establishing that violations of the law arising from an asylum applicants' manner of flight should be just one of many factors to be considered in the exercise of discretion. *Matter of Pula,* 19 I&N Dec. at 474. Some commenters objected to the proposed limitation because it allegedly did not provide a sufficient exception for those who have unknowingly engaged in such conduct, such as those who have unknowingly obtained false documents from bad actors like unscrupulous notarios. Other commenters opposed the proposed limitation because it did not provide a sufficient exception for those who must use false documentation to flee persecution.

Some commenters recognized the NPRM's proposed exception to this limitation on asylum eligibility.[28] Commenters opined that the proposed exception was not sufficient, given the consequences for those who do not fit within the exception. Commenters stated that asylum seekers who obtain false documents when passing through a third country or who may be unable to prove that they fall within an

exception would be adversely affected by the proposed limitation.

Some commenters stated that the proposed exception was unrealistic given circumstances that could prevent asylum seekers from immediately claiming a fear of persecution, such as mistrust of government officials, language barriers, or trauma-induced barriers.

At least one commenter noted that traffickers routinely provide victims with false documents for crossing borders and that trafficking victims may be unable to explain the circumstances of their documentation to law enforcement. The commenter also noted that traffickers regularly confiscate, hide, or destroy their victims' documents to exert control over their victims and that trafficking victims often lack documentation. The commenter opined that trafficking victims were thus particularly vulnerable to bad actors who falsely claim that they can prepare legal documentation.

Commenters stated that the NPRM did not properly consider that some asylum seekers would be required to, or inadvertently, use false documents in the United States while their proceedings were pending, for example, in order to drive or work. Commenters suggested that continued availability of asylum protection to low-wage immigrant workers could encourage them to "step out of the shadows" when faced with workplace exploitation, dangers, and discrimination. By contrast, commenters stated, a categorical limitation would further incentivize some employers to hire and exploit undocumented workers where employers use aliens' immigration status against them and force asylum seekers "deeper into the dangerous informal economy." At least one commenter stated that DHS recently made it harder for asylum seekers with pending applications to survive without using fraudulent documents by proposing a rule that would extend the waiting period for asylum seekers to apply for work authorization from 180 days to one year.

At least one commenter suggested that the proposed limitation related to document-fraud offenses undermined an important policy objective to encourage truthful testimony by asylum seekers.

At least one commenter stated that there was a discrepancy between the Departments' reasoning that the use of fraudulent documents "so strongly undermines government integrity that it would be inappropriate to allow an individual convicted of such an offense

[28] *See* 8 CFR 208.13(c)(6)(vi)(B)(1) and 1208.13(c)(6)(vi)(B)(1), which provide that a misdemeanor offense related to document fraud would bar eligibility for asylum unless the alien can establish (1) that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, (2) that the document related to the alien's eligibility to enter the United States, (3) that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and (4) that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry.

**Federal Register** / Vol. 85, No. 204 / Wednesday, October 21, 2020 / Rules and Regulations **67233**

to obtain the discretionary benefit of asylum'' and possible availability of adjustment of status for a document-fraud-related conviction if the conviction qualified as a petty offense or if the individual obtained a waiver of inadmissibility.

*Response:* The Departments have considered all comments and recommendations submitted regarding the bar to asylum eligibility for aliens with misdemeanor document fraud convictions. Despite commenters' concerns, the Departments continue to believe this exception is consistent with distinctions regarding certain document-related offenses as recognized by the BIA, *Matter of Pula,* 19 I&N Dec. at 474–75; existing statutes, *see* INA 274C(a)(6) and (d)(7) (8 U.S.C. 1324c(a)(6) and (d)(7)); and existing regulations, *see* 8 CFR 270.2(j) and 1270.2(j), as noted in the NPRM. *See* 84 FR at 69653; *cf. Matter of Kasinga,* 21 I&N Dec. 357, 368 (BIA 1996) (concluding that possession of a fraudulent passport was not a significant adverse factor where the applicant "did not attempt to use the false passport to enter" the United States, but instead "told the immigration inspector the truth"). The Departments will not amend the bar as laid out in the proposed rule and will continue to rely on the justifications provided in the NPRM. *See* 84 FR at 69653.[29]

Further, offenses related to fraudulent documents that carry a potential sentence of at least one year are already aggravated felonies, and thus are disqualifying offenses for purposes of asylum. INA 101(a)(43)(P) (8 U.S.C. 1101(a)(43)(P)). Courts have recognized that proper identity documents are essential to the functioning of immigration proceedings. *See Noriega-Perez* v. *United States,* 179 F.3d 1166, 1173–74 (9th Cir. 1999). Furthermore, in passing the REAL ID Act of 2005, Public Law 109–13, 119 Stat. 231, Congress acknowledged the critical role that identity documents play in protecting national security and public safety.

Regarding the commenters' concerns for aliens who may use fraudulent documents as a means to flee persecution or other harms, the Departments reiterate the exception for this bar in the rule for aliens who can establish (1) that the conviction resulted

[29] The Departments also reject some comments as wholly unfounded. For example, there is no logical or factual indication that the rule, combined with a criminal conviction for document fraud necessary for the bar to apply, would subsequently cause an alien to commit another crime—*i.e.,* perjury—by testifying untruthfully while in immigration proceedings.

from circumstances showing that the document was presented before boarding a common carrier, (2) that the document related to the alien's eligibility to enter the United States, (3) that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and (4) that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry. 8 CFR 208.13(c)(6)(vi)(B)(1), 1208.13(c)(6)(vi)(B)(1).

The Departments agree with commenters that there are certain, limited circumstances under which an individual with a legitimate asylum claim might need to utilize fraudulent documents during his or her flight to the United States, and the Departments provided this exception to the bar to account for such circumstances. The Departments believe that the exception, as proposed in the NPRM, is sufficient to allow individuals who may have committed document-fraud offenses directly related to their legitimate claims of fear to apply for asylum. The Departments believe that this exception, which is consistent with the exception in INA 274C(d)(7), 8 U.S.C. 1324c(d)(7), allowing the Attorney General to waive civil money penalties for document fraud to an alien granted asylum or statutory withholding of removal, strikes the appropriate balance between recognizing the seriousness of document-fraud-related offenses, including the threat they pose to a functioning asylum system, and the very limited instances where a conviction for such an offense should not bar an applicant from eligibility for asylum.

The Departments disagree with concerns that aliens with viable asylum claims might not be able to either immediately disclose their fear of return at a port-of-entry or prove that they fall within an exception to the bar. DHS has, by regulation, established procedures for determining whether individuals who present themselves at the border have a credible fear of persecution or torture, 8 CFR 208.30, and officers who conduct the interviews are required by regulation to undergo "special training in international human rights law, non-adversarial interview techniques, and other relevant national and international refugee laws and principles," 8 CFR 208.1(b). Asylum officers are required to determine that the alien is able to participate effectively in his or her interview before proceeding, 8 CFR 208.30(d)(1), (5), and verify that the alien has received information about the credible fear process, 8 CFR

208.30(d)(2). The alien may consult with others prior to his or her interview. 8 CFR 208.30(d)(4). Such regulations are intended to recognize and accommodate the sensitive nature of fear-based claims and to foster an environment in which aliens may express their claims to an immigration officer.

The Departments disagree with the commenters that this bar to asylum is inconsistent with case law, particularly *Matter of Pula. See* 19 I&N Dec. at 474–75. The Departments first note that *Matter of Pula* pertains to how adjudicators should weigh discretionary factors in asylum applications. *Id.* This rule, by contrast, sets forth additional limitations on eligibility for asylum, which are separate from the discretionary determination. Additionally, *Matter of Pula* stated that whether a fraudulent document offense should preclude a favorable finding of discretion depends on "the seriousness of the fraud." *Id.* at 474. The Departments in this rule are clarifying that the disqualifying offenses, which as provided by the rule must have resulted in a misdemeanor conviction, are serious enough to preclude eligibility for asylum, and have provided an exception for those situations that the Departments have determined should not preclude eligibility.

The Departments further reject some comments as unjustified within the context of a law-abiding society. For example, criticizing the rule because it may discourage participation in criminal activity—*e.g.,* driving without a license—or other activity in violation of the law—*e.g.,* working without employment authorization—is tantamount to saying the Departments should encourage and reward unlawful behavior. The Departments decline to adopt such suggestions. More specifically, the Departments reject commenters' suggestions that the additional limitation should not apply to document-fraud-related offenses that stem from fraudulent driver's licenses or employment authorization. The Departments' position on this matter is both reasonable and justified. As explained in the NPRM, such offenses are serious, "pos[ing] * * * a significant affront to government integrity" and are particularly pernicious in the context of immigration law, where the use of fraudulent documents, "especially involving the appropriation of someone else's identity, * * * strongly undermines government integrity." 84 FR at 69653. Commenters' concerns about how the rule might affect working conditions of aliens are beyond the scope of this rulemaking.

Congress has delegated its authority to the Departments to propose additional, *i.e.,* broader, limitations on the existing bars to asylum eligibility, so long as the additional limitations are consistent with the Act. INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). The Departments are acting pursuant to their authority to create additional limitations on asylum eligibility and are not designating additional offenses as particularly serious crimes pursuant to INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), as discussed above. Accordingly, the Departments do not address commenters' concerns that the disqualifying offenses are not or should not be particularly serious crimes.

The Departments disagree with commenters' assertions that the rule would unfairly affect trafficking victims because traffickers force them to use fraudulent documents when they are crossing the border. The Departments recognize the serious nature of such circumstances, but they believe that considerations regarding criminal culpability for document-fraud-related offenses would be best addressed during criminal proceedings.

Finally, regarding commenters' points about the effect of document-fraud-related convictions in the context of adjustment of status under INA 245(a) (8 U.S.C. 1255(a)), the Departments note that adjustment of status is separate from asylum, and the rule contemplates asylum only. *See* 84 FR at 69640 (stating that the Departments propose to amend their respective regulations governing the bars to "asylum" eligibility). The adjustment of status conditions and consequent benefits are different from asylum. *See Mahmood* v. *Sessions,* 849 F.3d 187, 195 (4th Cir. 2017) (observing that, although "strong policies underlie" both asylum and adjustment of status, "[t]hese policies serve different purposes"). *Compare* INA 209(b) (8 U.S.C. 1159(b)) *and* 245(a) (8 U.S.C. 1255(a)), *with* INA 208 (8 U.S.C. 1158)). The Departments do note, however, that, because adjustment of status is a discretionary form of relief, an alien's document-fraud-related conviction that would bar the alien from asylum eligibility under this rule could also separately be the basis for a denial of adjustment of status. *See, e.g., Matter of Hashmi,* 24 I&N Dec. 785, 790 (BIA 2009) (instructing immigration judges to consider "whether the respondent's application for adjustment merits a favorable exercise of discretion" when considering whether to continue proceedings).

### h. Unlawful Public Benefits Misdemeanors

*Comment:* Commenters opposed the NPRM's proposed limitation on asylum eligibility based on convictions for misdemeanor offenses involving the "unlawful receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority." *See* 8 CFR 208.13(c)(6)(vi)(B)(2), 1208.13(c)(6)(vi)(B)(2). Commenters stated that this proposed limitation would disproportionately impact low-income individuals and people of color. Commenters stated that complex evaluations involving assets, income, household composition, and changing circumstances, such as employment or housing, could easily result in overpayments and miscalculations of benefits by both case workers for recipients and recipients themselves. Commenters asserted that these calculations could be especially confusing and difficult for low-income persons who may have literacy challenges, low education levels, or limited English proficiency.

One commenter stated that this proposed limitation was overbroad because there is no requirement that any convictions related to the unlawful receipt of public benefits be linked to fraud or require intentionality.

Commenters asserted that unlawful receipt of public benefits is not a "particularly serious crime." The commenters stated that the proposed limitation fails to differentiate between dangerous offenses and those committed out of desperation and observed that such offenses do not involve an element of intentional or threatened use of force. One commenter stated that the Departments' assertions that such offenses burden taxpayers and drain resources from lawful beneficiaries was not sufficient to render these offenses "particularly serious crimes." Specifically, the commenter stated that this was inconsistent with the intent of the Act and the 1967 Protocol, as well as BIA precedent, citing the following: United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.1.A.S. No. 6577, 606 U.N.T.S. 268 ("The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."); *Delgado,* 648 F.3d at 1110 (Reinhardt, J., concurring in part and concurring in the judgment) ("The agency's past precedential decisions also help to illuminate the definition of a 'particularly serious crime.' Crimes that the Attorney General has determined to be 'particularly serious' as a categorical matter, regardless of the circumstances of an individual conviction, include felony menacing (by threatening with a deadly weapon), armed robbery, and burglary of a dwelling (during which the offender is armed with a deadly weapon or causes injury to another). Common to these crimes is the intentional use or threatened use of force, the implication being that the perpetrator is a violent person." (footnotes omitted)).

Commenters stated that the Departments greatly overstated the scope of this issue and failed to support their assertions that such crimes are of an "inherently pernicious nature." *See* 84 FR at 69653. Commenters stated that, by contrast, "data demonstrates that the incidents of these types of fraud crimes are minimal. For example, the incidence of fraud in the Supplemental Nutrition Assistance Program is estimated at 1.5% for all incidents of fraud, including individuals of all citizenship categories and including both fraud committed by agencies, retailers/shops and individuals." *See* Randy Alison Aussenberg, Cong. Research Serv., R45147, *Errors and Fraud in the Supplemental Nutrition Assistance Program (SNAP)* (2018), *https://fas.org/ sgp/crs/misc/R45147.pdf.*

*Response:* The Departments have considered all of the comments received, and have chosen not to make any changes to the NPRM's regulatory language establishing an additional limitation on asylum eligibility for individuals who have been convicted of an offense related to public benefits. *See* 8 CFR 208.13(c)(6)(vi)(B)(2), 1208.13(c)(6)(vi)(B)(2).

The Departments disagree with commenters who believe that the rule would unfairly impact low-income individuals. By contrast, the rule is designed to limit asylum eligibility for those who criminally take advantage of benefits designed to assist low-income individuals. The Departments recognize commenters' concerns that individuals might be unaware of the complex systems that might result in miscalculation and overpayment of benefits; however, the Departments believe that it would be more appropriate for criminal culpability for such offenses to be determined during criminal proceedings.

In response to comments that such offenses are not particularly serious crimes, the Departments again note that the Departments' authority to set forth additional limitations and conditions on asylum eligibility requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158) and does not require that the offenses be particularly serious crimes or involve any calculation of dangerousness. *Compare* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."), *with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). As discussed in the NPRM, limiting asylum eligibility for those who have been convicted of such offenses, which are of an "inherently pernicious nature," is consistent with previous Government actions to prioritize enforcement of the immigration laws against such offenders. 84 FR at 69653.

Regardless of the relative frequency of public benefits fraud, the Departments have concluded that convictions for such crimes, however often they occur, should be disqualifying for eligibility for the discretionary benefit of asylum. For example, the Departments are encouraged by the data cited by commenters indicating that the rate of fraud in certain programs may be low, but low rates of fraud do not support countenancing the abuse of public benefits by the remainder of the programs' participants.

i. Controlled Substance Possession or Trafficking Misdemeanors [30]

*Comment:* Commenters also opposed designation of misdemeanor possession or trafficking of a controlled

[30] In addition to the comments regarding the bar to asylum discussed in this section, multiple commenters shared their opinion that marijuana should be legalized, without reference to a particular provision of the proposed rule. The Departments note that broad questions of national drug policy, including the legalization of marijuana at the national or State level, are outside the scope of this rulemaking. Marijuana remains a controlled substance, with the resulting penalties that may flow from its possession, trafficking, or other activities involving it. *See* 21 CFR 1308.11 (Schedule I controlled substances).

substance or controlled-substance paraphernalia as categorical bars to asylum eligibility. *See* 8 CFR 208.13(c)(6)(vi)(B)(3), 1208.13(c)(6)(vi)(B)(3) (proposed). Commenters asserted that the proposed limitation would be unnecessary, overbroad, and racially discriminatory.

Commenters remarked that the proposed limitation was overbroad with respect to the convictions and conduct covered and was not tailored to bar only those who have engaged in "serious" conduct or otherwise posed a danger to the community. Commenters also stated that the proposed limitation was overbroad because it did not account for jurisdictions that had decriminalized certain drugs, like cannabis.

Commenters said that, given the stakes at issue in asylum claims, protection should not be predicated on an applicant's abstinence from drugs. Commenters also stated that this proposed limitation was particularly inappropriate "at a time of such inconsistency in federal laws surrounding drug legalization." Commenters generally expressed concern about the Federal government's perpetuation of the "war on drugs."

Commenters stated that the proposed limitation would not make anybody safer but rather result in the denial of bona fide asylum claims. Commenters stated that the proposed limitation would "go beyond any common sense meaning" of the term "particularly serious crime." Commenters were particularly concerned with the implications of this proposed limitation because it would eliminate the opportunity for applicants to present mitigating circumstances that, commenters stated, are commonly associated with such convictions, such as addiction, self-medication, and any subsequent treatment or rehabilitation. Commenters asserted that the proposed limitation would improperly expand bars to asylum eligibility based on laws where enforcement decisions are "heavily tainted" by racial profiling.

Commenters also expressed concern that the proposed limitation would unfairly punish asylum seekers who might be vulnerable to struggles with addiction as a coping mechanism after facing significant trauma, particularly in light of obstacles to accessing medical or psychological treatment. Commenters stated that the proposed limitation eliminated any possibility of a treatment- and compassion-based approach to addiction. Commenters stated that the Departments' position on this matter was at odds with national trends to "move toward a harm reduction approach to combating drug

and alcohol addiction." Some commenters noted that treatment of misdemeanor offenses relating to controlled substances, particularly with respect to offenses involving possession of marijuana or prescription drugs, was "wildly disproportionate to the severity of these offenses." One commenter asserted that these offenses do not have an element of violence or dangerousness and stated that the "only victims are the offenders themselves."

One commenter remarked that the Departments relied on "misleading evidence that does not create a link between dangerousness" and the disqualifying offense. The commenter stated that widespread opioid abuse is "rooted in over-prescription by healthcare providers based on the assurances of pharmaceutical companies" and does not serve as a relevant justification for the additional limitation.

One commenter stated that courts and statutes, including the Supreme Court, have treated varying simple possession drug offenses differently. For example, the commenter read the Supreme Court's decision in *Lopez* v. *Gonzales,* 549 U.S. 47 (2006), to mean that simple possession of a controlled substance is not a "drug trafficking crime unless it would be treated as a felony if prosecuted under federal law." The commenter also remarked that a single incident of simple possession of any controlled substance except for Flunitrazepam is not treated as a felony and is thus not considered an aggravated felony, *see* 21 U.S.C. 844; and that some second convictions for possession have been recognized as drug trafficking aggravated felonies, but not all, *see Carachuri-Rosendo* v. *Holder,* 560 U.S. 563, 566 (2010); *Berhe* v. *Gonzales,* 464 F.3d 74, 85–86 (1st Cir. 2006). The commenter asserted that the nuanced and varying assessments related to such offenses suggest "they do not merit blanket treatment of the same severity."

Some commenters objected to existing aggravated felony bars with respect to drug-related offenses in addition to the proposed limitation. Commenters stated that immigration judges should continue to be able to exercise discretion over those controlled-substance-related offenses that are not already subject to an existing bar to asylum. Commenters also generally objected to criminalizing possession of drugs for personal use, given the medical value and current inconsistent treatment among states, but no analysis was provided connecting these comments to the NPRM, specifically.

*Response:* The Departments have considered all comments and recommendations submitted regarding the NPRM. The final rule does not alter the regulatory language set forth in the NPRM with respect to the limitation on misdemeanor offenses involving possession or trafficking of a controlled substance or controlled-substance paraphernalia. *See* 8 CFR 208.13(c)(6)(vi)(B)(3), 1208.13(c)(6)(vi)(B)(3).

Consistent with the INA's approach toward controlled substance offenses, for example in the removability context under INA 237(a)(2)(B)(i) (8 U.S.C. 1227(a)(2)(B)(i)), this rule does not penalize a single offense of marijuana possession for personal use of 30 grams or less. *See* 84 FR at 69654. However, as discussed in the NPRM, the Departments have determined that possessors and traffickers of controlled substances "pose a direct threat to the public health and safety interests of the United States." *Id.* Accordingly, the Departments made a policy decision to protect against such threats by barring asylum to such possessors and traffickers, and Federal courts have agreed with such treatment in the past. *See Ayala-Chavez* v. *U.S. INS,* 944 F.2d 638, 641 (9th Cir. 1991) ("[T]he immigration laws clearly reflect strong Congressional policy against lenient treatment of drug offenders." (quoting *Blackwood* v. *INS,* 803 F.2d 1165, 1167 (11th Cir. 1988))).

The Departments note that aliens barred from asylum eligibility as a result of this provision may still be eligible for withholding of removal under the Act or CAT protection, provisions that would preclude return to a country where they experienced or fear torture or persecution. *See* 84 FR at 69642.

The Departments disagree with comments suggesting that the bar is overbroad and not appropriately tailored only to aliens who have engaged in serious conduct or pose a danger to the community. Similarly, the Departments strongly disagree with commenters who asserted that this additional limitation will not make communities safer. Despite commenters' arguments, the Departments reiterate that controlled substance offenses represent significant and dangerous offenses that are damaging to society as a whole. *See Matter of Y–L–,* 23 I&N Dec. 270, 275 (A.G. 2002) (noting that "[t]he harmful effect to society from drug offenses has consistently been recognized by Congress in the clear distinctions and disparate statutory treatment it has drawn between drug offenses and other crimes"). The illicit use of controlled substances imposes

substantial costs on society from loss of life, familial disruption, the costs of treatment or incarceration, lost economic productivity, and more. *Id.* at 275–76 (citing *Matter of U–M–,* 20 I&N Dec. 327, 330–31 (BIA 1991) ("This unfortunate situation has reached epidemic proportions and it tears the very fabric of American society.")); 84 FR at 69654; *see also* Office of Nat'l Drug Control Policy, *National Drug Control Strategy* 11 (Feb. 2020), *https:// www.whitehouse.gov/wp-content/ uploads/2020/02/2020-NDCS.pdf* (explaining, in support of the national drug control strategy, the devastating effects of drug use and the necessity for treatment that includes "continuing services and support structures over an extended period of time"). Increased controlled substance prevalence is often correlated with increased rates of violent crime and other criminal activities. *See* 84 FR at 69650 (explaining that perpetrators of crimes such as drug trafficking are "displaying a disregard for basic societal structures in preference of criminal activities that place other members of the community * * * in danger").

Even assuming, arguendo, the commenters are correct that such offenses do not reflect an alien's dangerousness to the same extent as those offenses that are formally designated "particularly serious crimes," the Departments' authority to set forth additional limitations and conditions on asylum eligibility under section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C)) requires only that such conditions and limitations be consistent with section 208 of the Act (8 U.S.C. 1158). *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)) ("The Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum under paragraph (1)."). Unlike the designation of particularly serious crimes, there is no requirement that the aliens subject to these additional conditions or limitations first meet a particular level of dangerousness. *Compare id., with* INA 208(b)(2)(B)(ii) (8 U.S.C. 1158(b)(2)(B)(ii)), *and* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)) (providing that "[t]he Attorney General may designate by regulation offenses" for which an alien would be considered "a danger to the community of the United States" by virtue of having been convicted of a "particularly serious crime"). Instead, section 208(b)(2)(C) of the Act (8 U.S.C. 1158(b)(2)(C) confers broad discretion on the Attorney General and the

Secretary to establish a wide range of conditions on asylum eligibility, and the designation of certain drug-related offenses as defined in the rule as an additional limitation on asylum eligibility is consistent with the rest of the statutory scheme. For example, Congress's inclusion of other crime-based bars to asylum eligibility demonstrates the intent to allow the Attorney General and Secretary to exercise the congressionally provided authority to designate additional types of criminal offenses or related behavior as bars to asylum eligibility. *See* INA 208(b)(2)(A)(ii), (iii) (particularly serious crime and serious nonpolitical crime) (8 U.S.C. 1158(b)(2)(A)(ii), (iii)). Further, as discussed at length in the NPRM, this additional limitation on asylum eligibility is consistent with the Act's treatment of controlled-substance offenses as offenses that may render aliens removable from or inadmissible to the United States. 84 FR at 69654.

### 4. Due Process and Fairness Considerations

*Comment:* The Departments received numerous comments asserting that the rule violates basic notions of fairness and due process. One commenter asserted that anything that makes the asylum process harder, which the NPRM does according to the commenter, is a denial of due process. Commenters claimed that the Departments' true goal in promulgating these rules is to reduce the protections offered by existing asylum laws and to erode "any semblance of due process and justice for those seeking safety and refuge in this country."

In addition to general objections regarding due process, commenters asserted various constitutional problems with the proposed rule. Citing *United States* v. *Davis,* 139 S. Ct. 2319, 2323 (2019), commenters specified that due process requires laws and regulations to "give ordinary people fair warning about what the law demands of them." These commenters argued that the proposed rule fails to give affected individuals fair notice of which offenses will bar asylum. Commenters also noted that equal protection principles require the government to treat similarly situated people in the same manner but averred that the proposed rule, as applied, would result in similarly situated applicants being treated differently.

Commenters stated that requiring immigration adjudicators to deny a legal benefit, even a discretionary one, based on alleged and uncharged conduct is a clear violation of the presumption of innocence, which the commenters

argued is a fundamental tenet of our democracy.

Commenters alleged that immigration proceedings are not the proper venue for the sort of evidentiary considerations required by the rule. Commenters argued that asylum applicants will not have the opportunity to be confronted by evidence or to contest such evidence in a criminal court. These commenters noted that criminal courts afford defendants additional due process protections not found in immigration court, such as the right to counsel, the right to discovery of the evidence that will be presented, and robust evidentiary rules protecting against the use of unreliable evidence.

Similarly, commenters alleged that, due to the "lack of robust evidentiary rules in immigration proceedings," many applicants would be unable to rebut negative evidence submitted against them, even if the evidence submitted is false. One commenter claimed, without more, that there is a high likelihood that such evidence is false. Commenters were concerned that unreliable evidence would be submitted in support of the application of the additional bars. Alternatively, commenters stated that immigration adjudicators might rely on evidence where a judicial court had already evaluated reliability and not credited the evidence based on a lack of reliability. In addition, commenters were concerned that the rule authorizes adjudicators to seek out unreliable evidence obtained in violation of due process to determine whether an applicant's conduct triggers the particularly serious crime bar.

Commenters were concerned that requiring applicants to disprove allegations of gang-related activity or domestic violence would result in re-litigation of convictions or litigation of conduct that fell outside the scope of prior convictions. Similarly, commenters were concerned that the rule violates due process because it requires adjudicators to consider an applicant's conduct, separate and apart from any criminal court decision, that may trigger a categorical bar to asylum. One commenter asserted that "people seeking asylum should have the right to be considered innocent until proven guilty, and should not be denied asylum based on an accusation." Moreover, commenters alleged that this consideration extends to whether a vacated or modified conviction or sentence still constitutes a conviction or sentence triggering the bar to asylum.

Commenters alleged that adjudicators might improperly rely on uncorroborated allegations in arrest reports and shield the ensuing decision from judicial review by claiming discretion. Commenters stated that the rule lacks safeguards to prevent such erroneous decisions.

Commenters expressed concern that asylum applicants, especially detained applicants, would struggle to find evidence related to events that may have occurred years prior to the asylum application. One organization noted that the rule would be particularly challenging for detained respondents because they often lack representation and would be required to rebut circumstantial allegations with limited access to witnesses and evidence.

The Departments also received numerous comments stating that asylum hearings, which typically last three or fewer hours, provide insufficient time to permit both parties to present full arguments on these complex issues, as effectively required by the rule, thereby resulting in due process violations.

One commenter raised due process and constitutional concerns if the rule fails to provide proper notice to the alien. In that case, commenters alleged that the Sixth Amendment right to "be accurately apprised by defense counsel of the immigration consequences of his guilty plea to criminal charges" applies but that the rule fails to account for those consequences.

*Response:* The rule does not violate notions of fairness or due process. As an initial matter, asylum is a discretionary benefit, as demonstrated by the text of the statute, which states the Departments "may" grant asylum, INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)), and which provides authority to the Attorney General and the Secretary to limit and condition, by regulation, asylum eligibility under INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Courts have found that aliens have no cognizable due process interest in the discretionary benefit of asylum. *See Yuen Jin,* 538 F.3d at 156–57; *Ticoalu,* 472 F.3d at 11 (citing *DaCosta,* 449 F.3d at 49–50). In other words, "[t]here is no constitutional right to asylum per se." *Mudric,* 469 F.3d at 98. Thus, how the Departments choose to exercise their authority to limit or condition asylum eligibility and an adjudicator's consideration of an applicant's conduct in relation to asylum eligibility do not implicate due process concerns.

The rule does not "reduce the protections offered by the asylum laws." In fact, the rule makes no changes to asylum benefits at all; rather, it changes who is eligible for such benefits. *See* 84 FR at 69640. Further, the rule is not intended to "erode" due process and justice for aliens seeking protection; instead, the rule revises asylum eligibility by adding categorical bars to asylum eligibility, clarifying the effect of certain criminal convictions and conduct on asylum eligibility, and removing automatic reconsideration of discretionary denials of asylum. *See* 84 FR at 69640. Although some of these changes may affect aliens seeking protection in the United States, these effects do not constitute a deprivation of due process or justice, and alternative forms of protection—withholding of removal under the Act along with withholding of removal or deferral of removal under the CAT regulations—remain available for qualifying aliens. *See* 84 FR at 69642.

Regarding commenters' concerns that the rule does not sufficiently provide notice to aliens regarding which offenses would bar asylum eligibility, the Departments first note that the publication of the NPRM and this final rule serves, in part, as notice to the public regarding which offenses bar asylum eligibility. *See* 5 U.S.C. 552. Courts have held that an agency's informal rulemaking pursuant to 5 U.S.C. 553 constitutes sufficient notice to the public if it "fairly apprise[s] interested persons of the 'subjects and issues' involved in the rulemaking[.]" *Air Transport Ass'n of America* v. *FAA,* 169 F.3d 1, 6 (D.C. Cir. 1999) (quoting *Small Refiner Lead Phase-Down Task Force* v. *EPA,* 705 F.2d 506, 547 (D.C. Cir. 1983)).

To the extent that commenters argued that the rule is insufficiently clear with regards to the substance of what offenses are disqualifying,[31] the Departments disagree. This rule clearly establishes which offenses bar asylum by listing such offenses in detail in the regulatory text at 8 CFR 208.13(c)(6)–(9) and 1208.13(c)(6)–(9). Unlike other statutory provisions that have been found unconstitutionally vague,[32] this rule clearly establishes grounds for mandatory denial of request for asylum. 8 CFR 208.13(c)(6)–(9), 1208.13(c)(6)–(9). The regulatory text adds paragraph (c)(7) to specifically define terms used

---

[31] *Cf. Dimaya,* 138 S. Ct. at 1225 ("Perhaps the most basic of due process's customary protections is the demand of fair notice.").

[32] For example, the Court in *Dimaya,* 138 S. Ct. at 1222–23, held that the Federal criminal code provision at issue was unconstitutionally vague in part because it failed to provide definitions for or explain such terms as "ordinary case" and "violent." On the other hand, the term "crime involving moral turpitude" has continuously been upheld as not unconstitutionally vague, despite repeated judicial criticism. *See, e.g., Islas-Veloz* v. *Whitaker,* 914 F.3d 1249, 1250 (9th Cir. 2019) ("the phrase 'crime involving moral turpitude' [is] not unconstitutionally vague").

**67238** **Federal Register** / Vol. 85, No. 204 / Wednesday, October 21, 2020 / Rules and Regulations

in 8 CFR 208.13 and 1208.13, and the regulatory text otherwise references applicable definitions for terms not found in paragraph (c)(7). *See, e.g.,* 8 CFR 1208.13(c)(6)(iv)(A) (defining driving while intoxicated or impaired "as those terms are defined under the jurisdiction where the conviction occurred"). Further, just as the INA contains various criminal grounds for ineligibility without specified elements, *see generally* INA 101(a)(43) (8 U.S.C. 1101(a)(43)), here, the Departments have provided a detailed list of particular criminal offenses or related activities that would render an alien ineligible for asylum. Accordingly, despite the commenter's argument that the regulatory text fails to give "fair warning" of which offenses would bar asylum eligibility, the regulatory text is sufficiently clear to provide the public with the requisite notice. *See Davis,* 139 S. Ct. at 2323.

The Departments acknowledge the commenters' general equal protection concerns; however, without more detailed comments providing for the specific concerns of commenters, the Departments are unable to provide a complete response to these comments. The Departments note, however, that categorical bars to asylum apply equally to all asylum applicants and do not classify applicants on the basis of any protected characteristic, such as race or religion.

Immigration proceedings are civil in nature; thus constitutional protections for criminal defendants, including evidentiary rules, do not apply. *See INS* v. *Lopez-Mendoza,* 468 U.S. 1032, 1038 (1984); *Dallo* v. *INS,* 765 F.2d 581, 586 (6th Cir. 1985); *Baliza* v. *INS,* 709 F.2d 1231, 1233 (9th Cir. 1983); *Longoria-Castaneda* v. *INS,* 548 F.2d 233 (8th Cir. 1977). In addition, any determinations regarding evidence or other related procedural issues by a criminal court do not automatically apply in a subsequent immigration proceeding or asylum interview. The Departments emphasize that the NRPM did not propose and the final rule does not enact any changes to the immigration court or asylum interview rules of procedure or evidentiary consideration processes. Accordingly, adjudicators will continue to receive and consider "material and relevant evidence," and it is the adjudicator who determines what evidence so qualifies. 8 CFR 1240.1(c). Immigration adjudicators regularly consider and receive evidence regarding criminal offenses or conduct in the context of immigration adjudications, including asylum applications, where such evidence has been frequently considered as part of the "particularly

serious crime" determination or as part of the ultimate discretionary decision. *Cf. Matter of Jean,* 23 I&N Dec. 373, 385 (A.G. 2002) (holding that aliens convicted of violent or dangerous offenses generally do not merit asylum as a matter of discretion).

Many of the commenters' concerns rely on circumstances that are purely speculative or that are only indirectly implicated by the rule. For example, commenters' concerns regarding an alien's hypothetical inability to confront evidence require first that concerning evidence is at issue, that such evidence is false, and finally that the alien is unable (for reasons unspecified by commenters) to rebut such evidence. Likewise, commenters' concerns regarding evidence supporting the bars rest on the premise that such specific evidence is submitted in the future, that such evidence has not been tested, and that such evidence is thus unreliable. Regarding these concerns, the Departments are unable to comment on speculative examples.

In regard to commenters' concerns about the reliability determinations of evidence already made by judicial courts, the regulations require that immigration judges consider material and relevant evidence. *See* 8 CFR 1240.1(c). Immigration judges consider whether evidence is "probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna,* 325 F.3d at 405 (quoting *Bustos-Torres,* 898 F.2d at 1055). The rule does not undermine or revise that standard; thus, commenters' concerns are unwarranted.

In general, commenters' concerns are no different than existing concerns regarding the reliability of evidence submitted by aliens in asylum cases, which is generally rooted in hearsay, frequently cannot be confronted or rebutted, and is typically uncorroborated except by other hearsay evidence. *See, e.g., Angov* v. *Lynch,* 788 F.3d 893, 901 (9th Cir. 2015) ("The specific facts supporting a petitioner's asylum claim—when, where, why and by whom he was allegedly persecuted—are peculiarly within the petitioner's grasp. By definition, they will have happened at some time in the past—often many years ago—in a foreign country. In order for [DHS] to present evidence 'refuting or in any way contradicting' petitioner's testimony, it would have to conduct a costly and often fruitless investigation abroad, trying to prove a negative—that the incidents petitioner alleges did not happen." (quoting *Abovian* v. *INS,* 257 F.3d 971, 976 (9th Cir. 2001) (Kozinski, J., dissenting from denial of petition for

rehearing en banc))); *Mitondo* v. *Mukasey,* 523 F.3d 784, 788 (7th Cir. 2008) ("Most claims of persecution can be neither confirmed nor refuted by documentary evidence. Even when it is certain that a particular incident occurred, there may be doubt about whether a given alien was among the victims. Then the alien's oral narration must stand or fall on its own terms. Yet many aliens, who want to remain in the United States for economic or social reasons unrelated to persecution, try to deceive immigration officials."). Asylum adjudicators are well experienced at separating reliable from unreliable evidence, regardless of its provenance, and this rule neither inhibits their ability to do so nor changes the process for assessing evidence.

Further, as discussed in the preamble to the proposed rule, the rule contemplates the consideration of all "reliable" evidence and authorizes adjudicators to assess all "reliable" evidence. 84 FR at 69649 and 69652. The rule does not encourage adjudicators to "seek out unreliable evidence," as commenters alleged. Accordingly, the Departments disagree with commenters that adjudicators will improperly rely on information in arrest reports that the adjudicators have determined is unreliable, and the Departments further disagree that adjudicators would seek to protect such decisions by claiming discretion.

As explained in section II.C.2.a.i, the rule establishes limits and conditions on asylum eligibility; it does not add offenses to the "particularly serious crime" bar. *See* 8 CFR 208.13(c)(6), 1208.13(c)(6) (both using prefatory language that reads "[a]dditional limitations on eligibility for asylum"). To the extent that commenters' concerns relate specifically to the "particularly serious crime" bar, the Departments decline to respond because those concerns are outside the scope of this rulemaking.

Regarding commenters' concerns that the domestic violence and gang-related bars to asylum eligibility would violate due process due to the requirement that the adjudication re-litigate the offense or consider conduct separate and apart from a criminal conviction, the Departments first note that there has never been a prohibition on the consideration of conduct when determining the immigration consequences of an offense or action.[33]

---

[33] To the extent the issues raised by commenters relate to the domestic violence provision of the rule that is not based on a criminal conviction, the Departments note that regulations have considered

Further, the consideration of conduct in this manner matches certain bars to admissibility or bases of deportability under the INA. *See, e.g.,* INA 212(a)(2)(C)(i) (8 U.S.C. 1182(a)(2)(C)(i)) (instructing that an alien who the relevant official "knows or has reason to believe * * * is or has been an illicit trafficker in any controlled substance" is inadmissible); INA 212(a)(2)(H) (8 U.S.C. 1182(a)(2)(H)) (instructing that an alien who the relevant official "knows or has reason to believe is or has been * * * a trafficker in severe forms of trafficking in persons" is inadmissible); INA 237(a)(2)(F) (8 U.S.C. 1227(a)(2)(F)) (instructing that an alien described in section 212(a)(2)(H) of the Act (8 U.S.C. 1182(a)(2)(H)) is deportable); *see also, e.g., Lopez-Molina* v. *Ashcroft,* 368 F.3d 1206, 1207–08 & n.1 (9th Cir. 2004) (explaining that the immigration judge found the respondent removable due to a reason to believe he was a controlled substance trafficker on account of a prior arrest report and information surrounding his conviction for misprision of a felony). In addition, the consideration of the alien's conduct in these circumstances is consistent with the consideration of conduct when reviewing a circumstance-specific ground of removability or deportability. *See Nijhawan,* 55 U.S. at 38.

Further, as discussed above, the rule does not violate due process because asylum is a discretionary benefit that does not implicate a liberty interest. *See Yuen Jin,* 538 F.3d at 156–57 (collecting cases); *Ticoalu,* 472 F.3d at 11 (citing *DaCosta,* 449 F.3d at 49–50); *cf. Hernandez,* 884 F.3d at 112 (stating, in the context of duress waivers to the material support bar, that "aliens have no constitutionally-protected 'liberty or property interest' in such a discretionary grant of relief for which they are otherwise statutorily ineligible"); *Obleshchenko,* 392 F.3d at 971 (finding that an alien has no right to effective assistance of counsel with regard to an asylum claim because there is no liberty interest in a statutorily created, discretionary form of relief, but distinguishing withholding of removal). In addition, aliens may provide argument and evidence that they are not subject to an asylum bar. *See* 8 CFR 1240.8(d) (providing that the alien bears the burden of proof to show that a basis for mandatory denial does not apply); *see also* 84 FR at 69642.

Finally, commenters' Sixth Amendment concerns, including the

presumption that a person is "innocent until proven guilty" are inapposite. The protections afforded by that amendment apply to criminal defendants, and asylum applicants in immigration proceedings are not criminal defendants. *See, e.g., Ambati* v. *Reno,* 233 F.3d 1054, 1061 (7th Cir. 2000) ("Deportation hearings are civil proceedings, and asylum-seekers, therefore, have no Sixth Amendment right to counsel."); *Lavoie* v. *Immigration and Naturalization Service,* 418 F.2d 732, 734 (9th Cir. 1969) ("[D]eportation proceedings are civil and not criminal, in nature, and [] the rules * * * requiring the presence of counsel during interrogation, and other Sixth Amendment safeguards, are not applicable to such proceedings."); *Lyon* v. *U.S. Immigr. and Customs Enf't,* 171 F. Supp. 3d 961, 975 (N.D. Cal 2016) ("[T]he Ninth Circuit has never so held, and the Court is reluctant to so interpret the INA absent any indication that Congress intended to import full Sixth Amendment standards into the INA.").

The Departments maintain that they have correctly concluded that convictions pursuant to expunged or vacated orders or modified sentences remain effective for immigration purposes if the underlying reason for expungement, vacatur, or modification was for "rehabilitation or immigration hardship." *Matter of Thomas and Thompson,* 27 I&N Dec. at 680; *see also* 84 FR at 69655. Courts also support this principle, stating that it is "entirely consistent with Congress's intent * * * [to] focus[] on the original attachment of guilt (which only a vacatur based on some procedural or substantive defect would call into question)" and to "impose[] uniformity on the enforcement of immigration laws." *Saleh,* 495 F.3d at 24.

Next, contrary to commenters' concerns, this rule does not violate principles such as being "innocent until proven guilty." Convictions and sentences are not re-litigated during immigration proceedings. Rather, convictions and sentences at issue in immigration proceedings have already been determined in a separate hearing, consistent with due process, and "[l]ater alterations to that sentence that do not correct legal defects[] do not change the underlying gravity of the alien's action." *Matter of Thomas and Thompson,* 27 I&N Dec. at 683. Congress determined that immigration consequences should attach to an alien's original conviction and sentencing, pursuant to section 101(a)(48) of the Act (8 U.S.C. 1101(a)(48)). *See id.* Thus, the Departments do not deprive an alien of due process or presume guilt when an

alien's conviction or sentence, if expunged, vacated or modified for rehabilitation or immigration purposes, remains effective for immigration proceedings, including asylum adjudications, because such an expungement, vacatur, or modification does not call into question whether the underlying criminal proceedings themselves complied with due process.

The Departments once again reiterate their statutory authority to limit and condition asylum eligibility consistent with the statute. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). In accordance with that authority, the Departments promulgated the NPRM and believe that the provisions of this final rule are sufficient without commenters' recommended safeguards.

Finally, issues involving evidence gathering are beyond the scope of this rulemaking. For issues regarding representation, *see* section II.C.6.h. The Departments disagree that hearings lack sufficient time for both parties to present arguments. *See* Office of the Chief Immigration Judge, *Immigration Court Practice Manual,* 68–69 (Mar. 17, 2020), *https://www.justice.gov/eoir/page/file/1258536/download* (noting that, at a master calendar hearing, a respondent should be prepared "to estimate (in hours) the amount of time needed to present the case at the individual calendar hearing"). Moreover, if parties believe additional time is needed, the regulations provide a mechanism for them to seek additional time through a motion for continuance. *See* 8 CFR 1003.29.

## 5. Insufficient Alternative Protection From Removal

*Comment:* The Departments received numerous comments alleging that withholding of removal under the Act and protection under the CAT regulations are insufficient alternative forms of protection for individuals barred from asylum pursuant to the proposed rule. Overall, commenters believed that refugees "should not be required to settle for these lesser forms of relief." Commenters averred that the availability of these forms of protection does not justify the serious harm caused by the proposed rule's "overly harsh and broad limits on asylum." Specifically, statutory withholding of removal and protection under the CAT regulations are much narrower in scope and duration than asylum and require applicants to establish a higher burden of proof. One commenter noted that, even if an applicant was able to meet the higher burden of proof for statutory withholding of removal or protection

under the CAT regulations, the individual would not then be accorded the benefits required by the Refugee Convention.

Commenters cited a number of limitations imposed on recipients of these forms of protection to demonstrate why they are insufficient alternatives to asylum. For example, commenters expressed concern regarding the prohibition on international travel for recipients of statutory withholding of removal and CAT protection. Commenters noted that, unlike recipients of asylum, these individuals are not provided travel documents. At the same time, because these individuals have been ordered removed but that removal has been withheld or deferred, any international travel would be considered a "self-deportation," foreclosing any future return to the United States. Commenters stated that this conflicts with the Refugee Convention, which requires that contracting states issue travel documents for international travel to refugees lawfully staying in their territory.

Commenters also claimed the proposed rule contravenes the Refugee Convention by failing to ensure "that the unity of the refugee's family is maintained particularly in cases where the head of the family has fulfilled the necessary conditions for admission to a particular country." Commenters alleged that individuals who are granted statutory withholding of removal or protection under the CAT regulations would be unable to reunite with family in the United States because these forms of relief do not allow the recipient to petition for derivative beneficiaries. Due to this, commenters stated that the proposed rule instituted another formal policy of family separation that permanently separate spouses and children from their family members.

Commenters also stated that the proposed rule would lead to additional forms of family separation because spouses and minor children who traveled with the primary asylum seeker would still need to establish individual eligibility for statutory withholding of removal or protection under the CAT regulations because there is no derivative application available in such circumstances. Also, commenters expressed concern that, without the ability to petition for additional family members, the proposed rule would force family members who remain in danger abroad to make the journey to the United States alone, likely endangering children who might be forced to make the journey as unaccompanied minors.

As another example of the lesser benefits of statutory withholding of removal and protection under the CAT regulations, commenters noted that recipients of withholding of removal must apply annually for work authorization. Commenters explained that individuals not only have to pay for these work authorization applications, but also face delays in adjudication of work authorization applications, which often results in the loss of legal authorization to work.

Similarly, commenters noted that recipients of statutory withholding of removal or protection under the CAT regulations may lose access to Federal public benefits, including "supplemental security income, food stamps, Medicaid, and cash assistance." Commenters expressed concern that, although recipients of withholding of removal may be eligible for a period of seven years to receive Federal means-tested public benefits, after seven years, the presumption is that the alien would have adjusted status. However, because recipients of withholding of removal are not provided a pathway to lawful permanent residency, commenters expressed concern that vulnerable individuals such as those who are disabled or elderly would be at risk of losing those public benefits.

Commenters also noted that recipients of statutory withholding of removal and protection under the CAT regulations remain in a tenuous position because they are not granted lawful status to remain in the United States indefinitely. Commenters averred that this contravenes the Refugee Convention by failing to "as far as possible facilitate the assimilation and naturalization of refugees." Recipients of statutory withholding of removal or protection under the CAT regulations may have their status terminated at any time based on a change in the conditions of their home country. Commenters explained that, because these individuals have no access to permanent residence or citizenship, they may be required to check in with immigration officials periodically. Commenters claimed that, at these check-ins, individuals may be required to undergo removal to a third country to which the individual has no connection.

Because of the constant prospect of deportation or removal, commenters stated that recipients of withholding or CAT protection are in a constant state of uncertainty. This uncertainty, commenters alleged, is particularly harmful to asylum seekers who have experienced severe human rights abuses. Commenters argued that certainty of a safe place to live forever is one of the most important aspects of the treaties establishing the refugee system. Commenters claimed that uncertainty and limbo discourage recipients from establishing connections to the United States, which in turn generates community instability. Commenters alleged that a lack of community stability will result in increased criminal activity as individuals are less incentivized to invest in the community or keep the community safe. Additionally, this uncertainty may reduce the incentive for individuals to invest in their community by, for example, opening businesses, hiring others, or paying taxes.

Commenters were concerned that increasing the population of people who are ineligible to receive asylum may create a cohort of individuals who will later need a "legislative fix" to adjust their status and grant them full rights as citizens.

Finally, commenters noted that both statutory withholding of removal and protection under the CAT regulations require a higher burden of proof than asylum. Commenters explained that asylum requires only that the applicant demonstrate at least a 10 percent chance of being persecuted if removed. Withholding of removal, either under the Act or under the CAT regulations, however, requires the applicant to demonstrate that it is more likely than not that he or she would be persecuted or tortured if returned—*i.e.,* he or she must show a more than fifty percent chance of being persecuted or tortured if removed. Commenters noted that, because of this higher burden of proof, an applicant may have a valid and strong asylum claim but be unable to meet the burden for statutory withholding of removal or protection under the CAT regulations. As a result, commenters alleged that an individual may be returned to a country where he or she would face persecution or even death.

Commenters averred that the Departments failed to provide an assessment of how many individuals subject to the new categorical bars could meet the higher burdens required for statutory withholding of removal and protection under the CAT regulations.

*Response:* The Departments maintain that statutory withholding of removal under the Act and protection under the CAT regulations are sufficient alternatives for individuals who are barred from asylum by one of the new bars. As stated, asylum is a discretionary form of relief subject to regulation and limitations by the Attorney General and the Secretary. *See*

ER-0174

INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)). Significantly, the United States implemented the non-refoulement provisions of Article 33(1) of the Refugee Convention and Article 3 of the CAT through the withholding of removal provision at section 241(b)(3) of the Act (8 U.S.C. 1231(b)(3)), and the CAT regulations, rather than through the asylum provisions at section 208 of the Act (8 U.S.C. 1158). *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41; *see also* 8 CFR 208.16 through 208.1; 1208.16 through 1208.18.

As recognized by commenters, asylum recipients are granted additional benefits not granted to recipients of statutory withholding of removal or CAT protection. Although the Attorney General and the Secretary are authorized to place limitations on those who receive asylum, it is Congress that delineates the attendant benefits to receiving relief or protection under the INA. *See, e.g.,* INA 208(c)(1)(A), (C) (8 U.S.C. 1158(c)(1)(A), (C)) (asylees cannot be removed and can travel abroad without prior consent); INA 208(b)(3) (8 U.S.C. 1158(b)(3)) (allowing derivative asylum for asylee's spouse and unmarried children); INA 209(b) (8 U.S.C. 1159(b)) (allowing the Attorney General or the Secretary to adjust the status of an asylee to that of a lawful permanent resident). Commenters identified various benefits that would be denied to individuals who receive statutory withholding of removal or protection under the CAT regulations as opposed to asylum. Congress chose not to provide the identified immigration benefits to recipients of statutory withholding of removal under the Act or protection under the CAT regulations. Congress, of course, may always revisit its decision; however, that is not the proper role of the Executive Branch.

Moreover, the United States is not required under U.S. law to provide the benefits identified by commenters to all individuals who seek asylum. For example, the valuable benefit of permanent legal status is not required under the United States' international treaty obligations.

In addition, recipients of statutory withholding of removal are eligible for numerous public benefits. Specifically, recipients of statutory withholding are eligible for Supplemental Security Income ("SSI"), the Supplemental Nutrition Assistance Program ("SNAP," also known as food stamps), and Medicaid for the first seven years after their applications are granted,[34] and for

Temporary Assistance to Needy Families ("TANF") during the first five years after their applications are granted.[35] Although asylees are eligible for additional benefits administered by HHS and ORR, the Departments believe that it is reasonable to exercise their discretion under U.S. law to limit these benefits to asylum recipients who do not have or who have not been found to have engaged in the sort of conduct identified in the bars to asylum eligibility being implemented in this rule because doing so incentivizes lawful behavior.

Commenters' assertions that statutory withholding of removal and protection under the CAT regulations essentially trap individuals in the United States is misplaced. Although an individual who has been granted these forms of protection is not guaranteed return to the United States if he or she leaves the country, these forms of protection do not prevent individuals from traveling outside the United States. *See Cazun,* 856 F.3d at 257 n.16.

To the extent commenters raised concerns that recipients of statutory withholding and CAT protection must apply annually for work authorization, the United States is permitted to place restrictions on work authorization. As required by Article 17 of the Refugee Convention, the United States must accord refugees "the most favourable treatment accorded to nationals of a foreign country in the same circumstances." Individuals who have received a grant of withholding of removal or protection under the CAT regulations are not in the same position as an individual who has been granted lawful permanent resident status. Rather, these individuals have been ordered removed and had their removal withheld or deferred pursuant to a grant of withholding of removal or protection under the CAT regulations. The United States has opted to grant these individuals work authorization, despite their lack of permanent lawful status. However, because these individuals are not accorded permanent lawful status, the United States has determined that they must submit a yearly renewal for that work authorization.

Significantly, although the burden of proof to establish statutory withholding of removal or protection under the CAT regulations is higher than to establish asylum, this burden remains in compliance with the Protocol and Refugee Convention, which require that

"[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion," and Article 3 of the CAT, which similarly requires that "[n]o State Party shall expel, return * * * or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." As explained by the Supreme Court with respect to statutory withholding of removal, the use of the term "would" be threatened as opposed to "might" or "could" indicates that a likelihood of persecution is required. *Stevic,* 467 U.S. at 422. Citing congressional intent to bring the laws of the United States into compliance with the Protocol, the Court concluded that Congress intended withholding of removal to require a higher burden of proof and that the higher burden complied with Article 33 of the Refugee Convention. *Id.* at 425–30. Similarly, the "burden of proof for an alien seeking CAT protection is higher than the burden for showing eligibility for asylum." *Lapaix* v. *U.S. Att'y Gen.,* 605 F.3d 1138, 1145 (11th Cir. 2010). As with statutory withholding of removal and the risk of persecution, the burden of proof for CAT protection and the risk of torture is "more likely than not." *Compare* 8 CFR 1208.16(b)(2) (statutory withholding), *with* 1208.16(c)(2) (CAT protection).[36]

In response to commenters who asserted that the Departments failed to provide an assessment of how many individuals subject to the new categorical bars could meet the higher burdens required for statutory withholding of removal and protection under the CAT regulations, the Departments note that such an assessment would not be feasible. The Departments do not maintain data on the number of asylum applicants with criminal convictions or, more specifically, with criminal convictions or pertinent criminal conduct that would be subject to the bars added by this rule. Without this data, the

---

[34] 8 U.S.C. 1612(a)(1), (a)(2)(A)(iii), (a)(3) (SSI & SNAP); 8 U.S.C. 1612(b)(1), (b)(2)(A)(i)(III), (b)(3)(C) (Medicaid).

[35] 8 U.S.C. 1612(b)(1), (b)(2)(A)(ii)(III), (b)(3)(A)–(B) (TANF and Social Services Block Grant); 8 U.S.C. 1622(a), (b)(1)(C); 8 U.S.C. 1621(c) (state public assistance).

[36] The burden associated with the CAT regulations is consistent with congressional intent. As the Third Circuit has noted, the U.S. Senate gave its advice and consent to ratification of the CAT subject to several reservations, understandings, and declarations, including that the "United States understands the phrase 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.' " *Auguste,* 395 F.3d at 132.

Departments cannot reliably estimate the population affected by this rule. In addition, even with these statistics, it is impossible to accurately predict in advance whether immigration judges would grant these individuals statutory withholding of removal or protection under the CAT regulations due to the fact-bound nature of such claims, the various factors that must be established for each claim (*e.g.*, credibility), independent nuances regarding the claim, evidence submitted, and myriad other factors.

6. Policy Concerns

a. Unfair, Cruel Effects on Asylum Seekers

*Comment:* Commenters opposed the rule because, among many reasons, they alleged that it imposes unfair, cruel effects on aliens who would otherwise be eligible for asylum. Commenters alleged that the rule constitutes an "unnecessary, harsh, and unlawful gutting of [ ] asylum protections." Commenters also alleged that the rule disadvantages asylum seekers because, in comparison to other forms of relief, no waiver of inadmissibility is available to waive misdemeanor convictions, rendering asylum "disproportionately and counterintuitively more difficult to obtain for some of the most vulnerable people." Many commenters were also concerned that the rule denies protection to people who most need it and whom the asylum system was designed to protect. For those people, commenters stated, asylum is their "only pathway to safety and protection."

Many commenters expressed opposition to the rule by claiming that the rule will exclude bona fide refugees from asylum eligibility. Relatedly, commenters also opposed the rule because they alleged that it prevents aliens from presenting meritorious, legitimate claims. Overall, most commenters asserted that the consequence of asylum ineligibility was "disproportionately harsh." In support, commenters provided various examples of offenses that would, in their view, unjustly render an alien ineligible for asylum under the rule: An alien in Florida who stole $301 worth of groceries; an alien with two convictions for DUI, regardless of whether the alien seeks treatment for alcohol addiction or the circumstances of the convictions; an alien defensively seeking asylum who has been convicted of a document fraud offense related to his or her immigration status; or a mother convicted for bringing her own child across the southern border seeking safety.

Commenters alleged that aliens seeking asylum are typically fleeing persecution or death, so ineligibility based on such minor infractions constitutes "punishment that clearly does not fit the crime." As stated by one commenter, "Congress designed our current laws to provide a safe haven for asylum seekers and their immediate family members who are still in danger abroad. If an asylum claim is denied, those individuals may be killed, tortured, or subjected to grave harm after being deported."

Commenters also opposed the rule by claiming that it bars asylum for aliens "simply accused" of engaging in battery or extreme cruelty; commenters believed it to be unfair that the rule could bar asylum based on conduct without a conviction.[37] Commenters opposed barring asylum relief based on "mere allegations" without any "adjudication of guilt." One commenter stated that the rule exceeds the scope of the Act because, the commenter claimed, the INA allows asylum bars to be based only on convictions for particularly serious crimes.

Many commenters expressed opposition to a wide range of issues related to asylum seekers. One commenter expressed concern with the treatment of immigrants, stating that mistreatment "increases blood pressure, diabetes, and risks for acute crises like heart attacks[,] which harm immigrant communities and negatively impact our healthcare system." Another commenter expressed opposition to the United States' allocation of resources, stating that the redirection of tax cuts and expanded military budgets could help to assist asylum seekers. Others more broadly expressed general opposition to family separation without relating that concern to this rule.

*Response:* The Departments disagree that the rule "guts" asylum protections or that the rule affects otherwise eligible asylum applicants in an unfair or otherwise cruel manner. First, as discussed elsewhere, asylum is a discretionary form of relief. *See* INA 208(b)(1)(A) (8 U.S.C. 1158(b)(1)(A)). Accordingly, aliens who apply for asylum must establish that they are statutorily eligible for asylum and merit a favorable exercise of discretion. *See id.;* INA 240(c)(4)(A) (8 U.S.C. 8 U.S.C. 1229a(c)(4)(A)); *see also Matter of A–B–,* 27 I&N Dec. 316, 345 n.12 (A.G. 2018), *abrogated on other grounds by Grace* v. *Whitaker,* 344 F. Supp. 3d 96, 140

(D.D.C. 2018), *aff'd in part, Grace* v. *Barr,* 965 F.3d 883 (D.C. Cir. 2020). Over time, Congress, the Attorney General, and the Secretary have established various categories of aliens who are barred from asylum and have established additional limitations and conditions on asylum eligibility in keeping with the Departments' congressionally provided authority. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)); *see also* 84 FR at 69641.

Rather than "gut" asylum protections, the rule narrows asylum eligibility by adding categorical bars for aliens who have engaged in certain criminal conduct that the Departments have determined constitutes a disregard for the societal values of the United States; clarifies the effect of criminal convictions on asylum eligibility; and removes reconsideration of discretionary denials of asylum. *See* 84 FR at 69640. The Departments establish these changes as additional limitations and conditions on asylum eligibility, pursuant to their statutory authority in sections 208(b)(2)(C) and (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)).

Further, the Departments promulgate this rule to streamline determinations for asylum eligibility so that those who qualify for and demonstrate that they warrant a favorable exercise of discretion might be granted asylum and enjoy its ancillary benefits in a more timely fashion. Given the rule's clarified conditions and limitations on asylum eligibility, the Departments anticipate more timely adjudications for two reasons. First, non-meritorious claims will more quickly be resolved because the rule eliminates the current system of case-by-case adjudications and application of the categorical approach with respect to aggravated felonies, thereby freeing up time and resources that can be subsequently allocated towards adjudication of meritorious asylum claims. Second, the Departments believe that, because fewer people would be eligible for asylum, fewer applications may be filed overall, thereby reducing the total number of asylum applications requiring adjudication. As a result, the Departments could allocate their time and resources to asylum applications that are more likely to be meritorious. In this way, the rule does not eliminate protection for those who need it most or the benefits available to asylees; instead, it may actually allow for those people to more quickly receive protection.

In response to commenters who claim that the rule prevents aliens from seeking asylum who otherwise have meritorious claims, the Departments

---

[37] Further discussions of comments specifically regarding allegations of gang-related activity and domestic violence are contained in sections II.C.3.d and II.C.3.f, respectively.

Case 3:20-cv-07721-SI Document 58-26 Filed 11/09/20 Page 43 of 300
Case 3:20-cv-07721-SI Document 118-26 Filed 11/03/20 Page 43 of 600

**Federal Register**/Vol. 85, No. 204/Wednesday, October 21, 2020/Rules and Regulations 67243

emphasize that the rule changes asylum eligibility. Accordingly, despite commenters' assertions, an alien who is ineligible under the provisions of this rule would not, in fact, have a meritorious claim.

The Departments do not believe that the examples of misdemeanors that commenters provided in response to the request for public feedback about whether the proposed rule was over-inclusive warrant altering the scope of the proposed rule. Regarding certain referenced examples, the Departments strongly disagree that the rule employs too harsh a consequence or that the "punishment does not fit the crime." The bars articulated in this rule indicate the Departments' refusal to harbor individuals who have committed conduct that the Departments have determined is undesirable. This is not a punishment. For example, the Departments strongly oppose driving under the influence and disagree that two DUI convictions, regardless of the circumstances or harm caused to others, do not warrant ineligibility for asylum. As previously stated, driving under the influence represents a blatant disregard for the laws of the United States. Further, the Departments disagree that document fraud does not warrant ineligibility for asylum, as it undermines the integrity of our national security and the rule of law. Overall, the Departments disagree that such examples demonstrate that revision of the rule is warranted.

The Departments further disagree that the rule disadvantages asylum seekers by failing to provide a waiver of inadmissibility for misdemeanor convictions. No such waiver is required by statute in the asylum eligibility context. Further, the Departments reiterate that alternative forms of relief or protection may still be available for aliens who are ineligible for asylum under the rule. *See* 84 FR at 69658 (explaining that an alien will still be eligible to apply for statutory withholding of removal or protection under regulations implementing U.S. obligations under Article 3 of the CAT); *see also* INA 241(b)(3) (8 U.S.C. 1231(b)(3)); 8 CFR 208.16 through 208.18; 1208.16 through 1208.18; *cf. Negusie* v. *Holder,* 555 U.S. 511, 527–28 (2009) (Scalia, J. and Alito, J., concurring) (noting that, if asylum is denied under the persecutor bar to an alien who was subject to coercion, that alien "might anyway be entitled to protection under the Convention Against Torture"). Accordingly, aliens who are ineligible for asylum under the rule will not "automatically" be returned to countries where they fear

persecution or torture, contrary to commenters' assertions.

The Departments emphasize that the rule changes the asylum eligibility regulations, but it does not affect the regulatory provisions for refugee processing under 8 CFR parts 207, 209, 1207, and 1209. Further, it does not categorically exclude "bona fide refugees" from the United States.

The INA does not preclude conduct-based bars. In fact, the statute already contemplates conduct-based bars in sections 208(b)(2)(A)(i), (iii)–(v) of the Act (8 U.S.C. 1158(b)(2)(A)(i), (iii)–(v)). Thus, commenters' concerns that the rule exceeds the scope of the statute are unwarranted, and the Departments choose, pursuant to statutory authority, to condition and limit asylum eligibility using conduct-based bars.

Relating to commenters' general humanitarian concerns for asylum seekers, such concerns are outside of the scope of this rulemaking, and the Departments decline to address them. Whether the current statutory framework appropriately addresses all aspects of the problems faced by aliens seeking asylum is a matter for Congress; here, the Departments merely exercise their authority under the discretion afforded to them by the existing statutes.

**b. Incorrect Assumptions Regarding Criminal Convictions**

*Comment:* Commenters alleged that the Departments promulgated the proposed rule based on incorrect assumptions regarding criminal convictions. Generally, commenters asserted that a conviction, without more, is both an unreliable predictor of future danger and an unreliable indicator of past criminal conduct. As an example, commenters stated that an alien may plead guilty to certain crimes to avoid the threat of a more severe sentence.

Commenters also asserted that not every noncitizen convicted of a crime punishable by more than one year in prison constitutes a danger to the community, which relates to the more general proposition advanced by commenters that the length of a sentence does not necessarily correlate with the consequential nature of the crime. One commenter mentioned that innocence and biased enforcement concerns underlie convictions and that there is a "growing understanding domestically that a criminal conviction is a poor metric for assessing current public safety risk." Another commenter disagreed with the Departments' use of "public safety" as a justified reason for restricting liberty—in this case, liberty of asylum seekers.

Commenters claimed that the Departments provided no evidence underlying these assumptions. Further, commenters alleged that the proposed rule is arbitrary and capricious in violation of the Administrative Procedure Act ("APA") because of these faulty assumptions.

*Response:* The Departments disagree that this rule was based on incorrect assumptions. The Departments have concluded that convictions with longer sentences tend to be associated with more consequential crimes and that offenders who commit such crimes are generally more likely to be dangerous to the community, and less deserving of the benefit of asylum, than offenders who commit crimes punishable by shorter sentences. *See* 84 FR at 69646. This determination is supported throughout the nation's criminal law framework. For example, for sentencing for Federal crimes, criminal history serves as a "proxy" for the need to protect the public from the defendant's future crimes. *See United States* v. *Hayes,* 762 F.3d 1300, 1314 n.8 (11th Cir. 2008); *see also* U.S. Sentencing Guidelines Manual § 4A1.2 cmt. Background (U.S. Sentencing Comm'n 2018). Further, in numerous Federal statutes and the Model Penal Code, crimes with a possible sentence exceeding one year constitute "felonies" regardless of the assumptions and implications referenced by the commenters. *See, e.g.,* 84 FR at 69646 (providing 5 U.S.C. 7313(b); Model Penal Code § 1.04(2); and 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) as exemplary authorities that define "felony," in part, by considering whether the sentence may exceed one year). Accordingly, and pursuant to their statutory authority, the Departments have determined that similarly conditioning asylum eligibility on criminal convictions with possible sentences of more than one year is proper and reasonable because such convictions are general indicators of social harm and conduct that the Departments have deemed undesirable.

Regarding commenters' claims that the proposed rule is arbitrary and capricious because it is based on faulty assumptions, the Departments respond in section II.D.1, which addresses comments related to the APA and other regulatory requirements.

**c. Disregards Criminal Activity Linked to Trauma**

*Comment:* Many commenters expressed opposition to the rule by alleging that it disregards the reality that criminal activity is oftentimes linked to trauma experienced by asylum seekers

in their countries of origin or on their journey to safety. Citing statistics and evidence regarding the vulnerability of asylum seekers and the high likelihood that they have experienced various forms of trauma related to the circumstances from which they are trying to escape and a lack of affordable healthcare, commenters asserted that asylum seekers are at a higher risk of self-medicating with drugs or alcohol, which in turn would increase the likelihood for asylum seekers to be involved in the criminal justice system and, as a result of the rule, ineligible for asylum. Commenters stated that aliens with substance use disorders, drug-related convictions, and other related addictions should be provided with "treatment and compassion" and not barred from asylum eligibility. A commenter stated that the rule renders aliens who have experienced persecution and subsequent trauma "at greater risk of being returned to a country where they will only be further tortured and harmed."

Commenters claimed that denying aliens who have experienced such trauma the opportunity to present countervailing factors regarding their subsequent or associated criminal activity was "simply cruel." Commenters alleged that the rule ignores the fact that these aliens likely struggle with post-traumatic stress disorder, other untreated mental health problems such as anxiety or depression, substance use disorders or addictions, self-medication, poverty, and over-policing. Accordingly, commenters stated that the rule would "further marginalize asylum seekers already struggling with trauma and discrimination" and exclude "those convicted of offenses that are coincident to their flight from persecution."

Some commenters emphasized the trauma experienced by children prior to arriving in the United States and in ORR custody. Those commenters also emphasized that many children are then convicted and tried as adults for crimes stemming from that trauma, which, under the NPRM, would bar them from asylum. The commenters stated that such children, if given appropriate treatment, support, and services, are able to recover rather than remain in the juvenile or criminal justice systems. Accordingly, commenters disagreed with the NPRM's approach of categorically barring such individuals and preventing them from presenting context and mitigating evidence for their crimes.

*Response:* The Departments acknowledge the trauma aliens may face but note that aliens barred from asylum

eligibility may still be eligible for alternative measures of protection precluding their return to a country where they experienced torture or persecution resulting in trauma. *See* 84 FR at 69642. The Departments, however, disagree that the possibility of personal trauma or other strife is sufficient to overcome the dangerousness or harms to society posed by the offenders subject to the sorts of bars to asylum implemented by the rule because, as discussed in the proposed rule, possessors and traffickers of controlled substances "pose a direct threat to the public health and safety interests of the United States." 84 FR at 69654; *accord Ayala-Chavez,* 944 F.2d at 641 ("[T]he immigration laws clearly reflect strong Congressional policy against lenient treatment of drug offenders." (quoting *Blackwood,* 803 F.2d at 1167)). Also, commenters' suggestions regarding treatment, support, and services for children who have experienced trauma are outside the scope of this rulemaking.

Finally, the Departments note that, consistent with the INA's approach to controlled substance offenses, for example in the removability context under INA 237(a)(2)(B)(i) (8 U.S.C. 1227(a)(2)(B)(i)), the rule does not penalize a single offense of marijuana possession for personal use of 30 grams or less. *See* 84 FR at 69654. The Departments have concluded that allowing this limited exception to application of the new bar appropriately balances the competing policy objectives of protecting the United States from the harms associated with drug trafficking and possession, on the one hand, and the goal of not imposing unduly harsh penalties on persons subject to the new bars, on the other.

d. Problems With Existing Asylum System

*Comment:* Commenters opposed the NPRM because they alleged that the current overall asylum system is too harsh. Specifically, commenters stated that the current bars to asylum are too harsh and overly broad, given that all serious crimes are already considered as part of the discretionary analysis and that asylum seekers are already heavily vetted and scrutinized. Accordingly, commenters stated that the asylum restrictions should be narrowed rather than expanded.

Specifically, commenters asserted that the current "harsh system" places a high evidentiary burden on applicants to establish eligibility and disregards the danger they may face if they are sent

back to their countries.[38] Commenters claimed that conditions in Mexico, where many asylum seekers are sent, are dangerous, and that asylum seekers are killed or experience other harms. In addition, commenters referenced numerous other barriers to asylum—the complex "web" of laws and regulations that asylum seekers must navigate, sometimes from jail or without counsel, and other recent policies such as the MPP, *see* DHS, *Policy Guidance for Implementation for the Migrant Protection Protocols* (Jan. 25, 2019), *https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-guidance.pdf,* and the "third-country transit bar," *see* Asylum Eligibility and Procedural Modifications, 84 FR 33829 (July 16, 2019).

Further, commenters asserted that the current criminal bars to asylum eligibility are too broad, emphasizing, for example, that the term "aggravated felony," which is a "particularly serious crime" that renders the applicant ineligible for asylum, has come to encompass "hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses and misdemeanors * * *. A single one of these past offenses eliminates an individual's eligibility for asylum, with no regard to the danger that person will face if sent back to their country."

Commenters also explained that immigration judges currently have full discretion to deny asylum to any alien who is not categorically barred from relief but who has been convicted of criminal conduct. Accordingly, commenters asserted that the existing system is sufficient to ensure that relief is denied to those who may be dangerous to a community, while at the same time providing latitude for adjudicators to consider unique challenges that asylum seekers face resulting from the harm they have faced. In light of these facts, commenters opposed adding more bars and encouraged the Departments to instead narrow the bars.

*Response:* Commenters' concerns regarding the entire asylum system, including the asserted complex "web" of asylum laws and regulations, are outside the scope of this rulemaking. The rule adds categorical bars to asylum

---

[38] Commenters also mentioned numerous other alleged barriers to asylum unrelated to the NPRM, including the required time between an application's submission and the attached photo's taking, English-only application forms, and additional concerns. The Departments acknowledge the general concerns with the asylum system, but because these concerns do not relate to particular provisions of the NPRM, the Departments do not address them further.

eligibility; clarifies the effect of criminal convictions and, in one instance, criminal conduct, on asylum eligibility; and removes automatic reconsideration of discretionary denials of asylum. *See* 84 FR at 69640. The Departments do not otherwise propose to amend the asylum system established by Congress and implemented by the Departments through rulemaking and policy over the years.

The Departments note here, and the proposed rule acknowledged, in part, *see, e.g.,* 84 FR at 69645–46, that, although immigration judge discretion, BIA review, and scrutiny of asylum applicants could achieve results similar to some of the proposed provisions, the rule streamlines the system to increase efficiency. By eliminating the current system of case-by-case adjudications and application of the categorical approach with respect to aggravated felonies, the Departments anticipate that adjudication of asylum claims will be a much quicker process. In addition, the Departments believe that, given the clarified conditions and limitations on asylum eligibility, fewer non-meritorious or frivolous asylum claims may be filed overall, with the result that the Departments' adjudication resources would be allocated, from the beginning, to claims that are more likely to have merit. Overall, the Departments maintain that a rule-based approach to accomplish that goal is preferable. *See* 84 FR at 69646.

The Departments reiterate that asylum is a discretionary benefit; the Departments work in coordination to establish requirements, limits, and conditions, which may include evidentiary burdens. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Contrary to the commenters' assertions that the rule disregards the dangers faced by aliens, the rule noted alternative forms of protection for which aliens may apply, even if they are subject to an asylum bar. *See* 84 FR at 69642. Nevertheless, many commenters' concerns referencing allegedly dangerous conditions in Mexico, the effects of the MPP, and the third-country transit bar are also outside the scope of this rulemaking.

The Departments disagree with commenters' assertions that the asylum bars should be narrowed. Given efficiency interests, the Departments posit that expanded categorical bars will streamline the asylum system, with the result that asylum benefits may be granted more quickly to eligible aliens.

## e. Inefficiencies in Immigration Proceedings

*Comment:* Commenters opposed the rule because they alleged that various provisions would result in inefficiencies and exacerbate an already inefficient, backlogged, and under-staffed immigration system.

First, commenters stated that requiring adjudicators to make "complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, conduct," would lead to inefficiencies. Many commenters stated that the rule effectively requires adjudicators to "engage in mini-trials into issues already adjudicated by the criminal law system based on evidence that may not have been properly tested for its veracity in the criminal process," thereby decreasing efficiency. Further, commenters stated that adjudicators will have to "conduct a separate factual inquiry into the basis for a criminal conviction or allegations of criminal conduct to determine whether the individual is eligible for asylum," instead of relying on adjudications from the criminal legal system.

Other commenters stated that the rule is especially inefficient in the case of family members' asylum eligibility. Commenters alleged that, under the proposed rule, family members' claims will be adjudicated separately and potentially before different adjudicators. Given that family members' claims are oftentimes interrelated and children are less able to sufficiently explain asylum claims, commenters concluded that the rule, especially as it relates to family claims, further increases inefficiencies in the system.

Commenters also stated that these ramifications directly contradict one of the rule's stated justifications of increased efficiency and alleged that the rule increased the time and expense necessary to process asylum claims. One commenter alleged that this will decrease the ability of asylum seekers to access healthcare, food, and housing. That commenter also averred that asylum seekers will likely have to request to reschedule interviews, which will introduce further delay, because the rule's filing deadlines restrict applicants' ability to provide supplementary evidence. Further, commenters alleged that the Departments failed to provide information or research to explain how the rule would increase efficiencies in the system.

Many commenters asserted that the rule will require a highly nuanced, resource-intensive inquiry that will prolong asylum proceedings and "invariably lead to erroneous determinations" or disparate results, with the consequence that appeals will increase and consume further Departmental resources.

*Response:* The Departments disagree with the commenters' assertions regarding inefficiencies.

First, adjudicators currently conduct a factual inquiry similar to the inquiry contemplated by the new bars in other immigration contexts. *See* 84 FR at 69652 (providing, as examples, the removability context in INA 237(a)(1)(E) (8 U.S.C. 1227(a)(1)(E)) and consideration of the persecutor bar in INA 208(b)(2)(A)(i) (8 U.S.C. 1158(b)(2)(A)(i))). Thus, adjudicators are adequately trained and equipped to conduct such analyses.

Second, the Departments emphasize that this rule is just one tool for increasing efficiencies in the immigration adjudications process and for correcting what the Departments view as problematic rules regarding asylum eligibility. This rule is not intended to correct all inefficiencies or to be a complete panacea, and DOJ has implemented numerous initiatives recently to address inefficiencies where appropriate. *See, e.g.,* EOIR, *Policy Memorandum 20–07: Case Management and Docketing Practices* (Jan. 31, 2020), *https://www.justice.gov/eoir/page/file/1242501/download* (implementing efficient docketing practices); EOIR, *Policy Memorandum 19–11: "No Dark Courtrooms"* (Mar. 31, 2019), *https://www.justice.gov/eoir/file/1149286/download* (providing policies to reduce and minimize the impact of unused courtrooms and docket times to address the caseload and backlog); EOIR, *Policy Memorandum 19–05: Guidance Regarding the Adjudication of Asylum Applications Consistent with INA § 208(d)(5)(A)(iii)* (Nov. 19, 2018), *https://www.justice.gov/eoir/page/file/1112581/download* (providing policy guidance to effectuate the statutory directive to complete asylum adjudications within 180 days of filing, absent extraordinary circumstances); *see also* DOJ, *Memorandum for the Executive Office for Immigration Review: Renewing Our Commitment to the Timely and Efficient Adjudication of Immigration Cases to Serve the National Interest* (Dec. 5, 2017), *https://www.justice.gov/opa/press-release/file/1015996/download* (reiterating EOIR's commitment to efficient adjudication).

Although the Departments agree that the current system for adjudicating asylum applications frequently fails to meet the statutory deadline of completing such cases within 180 days

absent exceptional circumstances, INA 208(d)(5)(A)(iii) (8 U.S.C. 1158(d)(5)(A)(iii)) the Departments believe this rulemaking will improve efficiency. The Departments direct commenters to the proposed rule at 84 FR at 69645–46 for an extensive explanation of inefficiencies addressed through this rulemaking, which provides adequate "information and research" describing how the rule will increase efficiencies. Notably, courts have often recognized that rule-based approaches promote more efficient administration than wholly discretionary, case-by-case determinations. *See Lopez* v. *Davis,* 531 U.S. 230, 244 (2001) (observing that "a single rulemaking proceeding" may allow an agency to more "fairly and efficiently" address an issue than would "case-by-case decisionmaking" (quotation marks omitted)); *Marin-Rodriguez* v. *Holder,* 612 F.3d 591, 593 (7th Cir. 2010) ("An agency may exercise discretion categorically, by regulation, and is not limited to making discretionary decisions one case at a time under open-ended standards."); *cf. Baylor Cty. Hosp. Dist.* v. *Price,* 850 F.3d 257, 263 (5th Cir. 2017) ("DHHS opted for a bright-line rule after considering its lack of agency resources to make case-by-case judgments" because "the statutory text had to be articulated properly and in an administratively efficient way."). The Departments acknowledge the backlog in asylum applications, *see* EOIR, *Adjudication Statistics: Total Asylum Applications* (July 14, 2020), *https://www.justice.gov/ eoir/page/file/1106366/download,* and the Departments, as a matter of policy, choose to address this backlog and resulting inefficiencies in part through this rulemaking.

The backlogged asylum system presents challenges; however, the Departments disagree with commenters regarding how best to address the backlog. The Departments disagree that the rule will prolong proceedings and lead to erroneous determinations, thus allegedly prompting more appeals. On the contrary, the Departments have concluded that the rule will increase efficiencies by eliminating the current system of case-by-case adjudications and application of the categorical approach with respect to aggravated felonies as they apply to asylum adjudications. *See* 84 FR at 69646–47. The Departments have determined that this rule-based approach is preferable, partly because, given the specific context of asylum eligibility, it will result in consistent treatment of asylum

seekers with respect to criminal convictions. *See id.*

Finally, concerns regarding access to healthcare, food, and housing, are outside the scope of this rulemaking.

### f. Disparate Impact on Certain Persons

*Comment:* Many commenters opposed the rule because they claimed it will harm or disparately affect asylum applicants whom commenters deem the most vulnerable people in society. Commenters explained that, although asylum seekers and refugees are generally vulnerable, the rule further implicates other vulnerable groups, such as LGBTQ individuals; victims of trafficking; communities of color, especially youth, and other minority ethnic groups; individuals who have experienced trauma, coercion, abuse, or assault; people with mental illness, especially those lacking adequate mental health services, such as children in ORR custody; people struggling with addictions and related convictions, regardless of whether they have sought treatment; parents who cross the border with children to seek safety; individuals convicted of document fraud who unknowingly use fraudulent documents or unscrupulous services to procure immigration documents; victims of domestic or intimate violence; people from Central America and the "Global South"; and low-income people. Commenters were concerned that the rule categorically bars these populations without consideration of mitigating factors, thereby potentially resulting in the return of such people to countries and communities where they initially experienced discrimination, bias, trauma, and violence. In a related vein, commenters were concerned that these populations are more prone to be convicted of minor offenses that will, under the rule, preclude them from asylum relief. For example, one commenter speculated that a trafficking victim who leaves a child alone at home while on a brief trip to a store could be convicted of "endangering the welfare of a child" and then barred from asylum.

Commenters especially emphasized concerns regarding the effect of the rule on two groups: LGBTQ individuals, especially transgender women; and trafficking victims.[39] Regarding LGBTQ individuals, multiple commenters asserted that the rule constitutes a

"unique threat" because those individuals have likely faced:

a high degree of violence and disenfranchisement from economic and political life in their home countries. * * * Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave[s] many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices.

One commenter explained that some LGBTQ individuals are charged with a variety of crimes in connection with their private, consensual conduct because of differences in discriminatory laws regarding this population around the world.

For trafficking victims, commenters explained that the rule bars them from asylum when they are only involuntarily part of a trafficking scheme and will likely face subsequent retaliation and other harms from their traffickers. Commenters were especially concerned that the rule denies asylum benefits to people who desperately need and will greatly benefit from them. Further, commenters asserted that alternative forms of relief are oftentimes insufficient for trafficking victims. For example, commenters explained that trafficking victims who have been removed are not eligible for T nonimmigrant status. Similarly, commenters explained that trafficking victims who are forced by their traffickers to commit other crimes may then be ineligible for other forms of relief under certain crime bars. Commenters also explained that trafficking victims typically receive intervention and other support services only after coming into contact with law enforcement; thus, this rule would preclude them from such resources.

Commenters explained that, not only are these people more prone to experiencing harms if they are barred from asylum, but also these people are more prone to initially experience harms that subsequently result in their involvement in the criminal justice system, which would, under this rule, bar them from asylum. For these reasons, commenters opposed the rule.

*Response:* To the extent that commenters ask the Departments to establish unique protections for these referenced groups, such protections are outside the scope of this particular rulemaking. Congress has chosen to provide special protections for certain groups, such as unaccompanied alien children, and Congress could choose to

---

[39] Commenters also expressed concerns for communities of color. These concerns, however, are addressed in section II.C.3.d because commenters' concerns on this point were primarily connected to concerns regarding the gang-related offenses included in the rule.

ER-0180

similarly extend protections to LGBTQ persons or other groups. Without such congressional action, however, the Departments are merely implementing the statutory framework as it currently exists. Further, to the extent that the commenters posit that the noted groups are more prone to engage in criminal conduct implicated by the rule—*e.g.,* fraud, DUI, human smuggling, gang activity, drug-related crimes—the Departments have no evidence that such groups are more likely to commit such crimes than any other groups of asylum applicants, and commenters did not provide evidence that would suggest otherwise. Thus, the Departments reject the assertion that the rule would have a disparate impact on discrete groups, absent evidence such groups are more likely to engage in criminal behavior addressed by the rule.

The rule includes several provisions that act, in part, to preclude returning vulnerable persons, including LGBTQ individuals and trafficking victims, to countries where they may have experienced or fear, as referenced by the commenters, discrimination, bias, trauma, and violence. As an initial matter, regardless of asylum eligibility, vulnerable persons may be eligible for statutory withholding of removal and protection under the CAT regulations. *See* 84 FR at 69642. Next, the rule includes an exception to the bar based on domestic assault or battery, stalking, or child abuse. *See* 8 CFR 208.13(c)(6)(v)(C), (vii)(F), 1208.13(c)(6)(v)(C), (vii)(F). The exception mirrors the provisions in the statute at INA 237(a)(7)(A) (8 U.S.C. 1227(a)(7)(A)) (removability context), but has one significant difference. In the removability context, applicants claiming this exception must satisfy the statutory criteria and be granted a discretionary waiver. Under the rule, however, applicants claiming the exception must only satisfy the criteria; no waiver is required. *See* 84 FR at 69653. This exception exists so that proper considerations can be taken of the vulnerability of domestic violence victims. The Departments believe this exception strikes the proper balance between providing protections for domestic violence victims while advancing the goals of reducing the incidence of domestic violence and protecting the United States from the sorts of conduct that would subject offenders to the new bars.

Commenters' concerns regarding vulnerable individuals' increased likelihood of convictions for minor offenses for certain vulnerable groups relate to the larger criminal justice system and accordingly fall outside the scope of this rulemaking. *See* section II.C.6.k for further discussion. Moreover, as noted above, the Departments have no evidence—and commenters provided none—that the groups identified by commenters are more prone to engage in criminal conduct implicated by the rule that would increase the likelihood of a conviction for, *e.g.,* fraud, DUI, human smuggling, gang activity, or drug-related crimes.

Next, this rule expands asylum ineligibility based on offenses committed in the United States, not abroad. *See* 84 FR at 69647 n.5. Thus, the rule does not expand asylum ineligibility for trafficking victims forced to commit crimes abroad or LGBTQ individuals whose private, consensual acts are criminalized abroad. Indeed, case law has long recognized that some criminal prosecutions abroad, if pretextual, can, for example, form the basis of a protection claim. *See, e.g., Fisher* v. *INS,* 79 F.3d 955, 962 (9th Cir. 1996) (noting "two exceptions to the general rule that prosecution does not amount to persecution—disproportionately severe punishment and pretextual prosecution"); *Matter of S–P–,* 21 I&N Dec. 486, 492 (BIA 1996) (noting that "prosecution for an offense may be a pretext for punishing an individual" on account of a protected ground). The rule does not alter such case law.

### g. Adjudicator Discretion

*Comment:* Many commenters opposed the rule out of concern that it strips adjudicators of discretion. First, commenters stated that it is crucial that adjudicators consider countervailing factors "to determine whether the circumstances merit such a harsh penalty." Another commenter explained that "[d]iscretion allows an adjudicator to consider a person's entire experience, including those factors that led to criminal behavior as well as the steps towards rehabilitation that individuals have taken." Commenters claimed that effective use of discretion is crucial in these circumstances: "The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community." Thus, commenters alleged that the rule's removal of that discretion is punitive and unnecessary. One commenter stated that the purpose of the NPRM seems to be to remove all discretion from adjudicators to consider each case on a case-by-case basis. Another commenter underscored the importance of adjudicators retaining discretion to make individualized determinations because Congress established asylum as a discretionary form of relief.

One commenter alleged that the rule diminishes due process protections, stating that, "by preventing the use of discretion in such cases[,] the proposed rules have a chilling effect on due process. Ensuring adjudicators have discretion to grant asylum under such circumstances allows asylum seekers to have a fair day in court and guards against further injustice resulting from errors that might have occurred in the criminal legal system."

Commenters also alleged that the proposed rule incorrectly raises the burden of proof to establish that a favorable grant of discretion is warranted so that it is equivalent to the burden required to establish a well-founded fear of persecution. These commenters averred that this is problematic in the face of contrary case law that requires a more cautious, restrained view of the Attorney General's and the Secretary's discretion and that cautions against permitting the Departments unchecked power and unrestrained discretion in making asylum determinations. Commenters first cited *Matter of Pula,* 19 I&N Dec. at 474, arguing that it encouraged a restrained view of discretion because the Board asserted that "the danger of persecution should generally outweigh all but the most egregious of adverse factors." Commenters averred that the Supreme Court cautioned against unlimited discretion in *Moncrieffe,* 569 U.S. at 200–01, by holding that the government must follow the categorical approach. Similarly, commenters cited *Delgado,* 648 F.3d at 1097, to support this proposition because the Ninth Circuit "first assert[ed] its jurisdiction to review the Attorney General's discretionary authority" and overruled an earlier decision that the jurisdiction-stripping provision at 8 U.S.C. 1252 barred the court's judicial review.

On the other hand, in the context of convictions or conduct related to domestic violence, battery, or extreme cruelty, commenters also opposed the amount of discretion afforded to adjudicators because the rule allegedly provides no clear guidance for the adjudicator's inquiry, analysis, and resulting determination. For example, commenters asserted that it is unclear what constitutes "reliable evidence" under the rule. Commenters were concerned that this would result in inconsistent decisions or diminished due process. Further, commenters were also concerned because determinations under the rule would be discretionary

and therefore non-appealable in most cases.

*Response:* Congress has authorized the Attorney General and the Secretary to, by regulation, limit and condition asylum eligibility consistent with the statute. INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Through this rule, the Departments exercise such authority by establishing categorical bars to asylum that constitute such limits and conditions. The Departments disagree that adjudicators must be afforded discretion to consider mitigating factors in determining asylum eligibility in all circumstances. Given the challenges faced by the agencies and the operative functioning of current categorical bars, *see* INA 208(b)(2)(A) (8 U.S.C. 1158(b)(2)(A)), the Departments add the new categorical bars, in part, to improve the efficient processing of asylum claims. The regulatory changes are not punitive or intended to revoke all discretion from adjudicators, as commenters alleged; rather, the Departments promulgate this rule to facilitate and streamline processing of asylum claims. *See e.g.,* 84 FR at 69646–47, 69657.

The rule does not diminish due process. As discussed above, the discretionary benefit of asylum is not a liberty or property interest subject to due process protections. *See Yuen Jin,* 538 F.3d at 156–57; *Ticoalu,* 472 F.3d at 11 (citing *DaCosta,* 449 F.3d at 49–50). In other words, "[t]here is no constitutional right to asylum per se." *Mudric,* 469 F.3d at 98. The Departments disagree that affording discretion to adjudicators in lieu of promulgating the additional bars is a preferable way to process asylum applications. Moreover, nothing in this rule prevents individuals from appealing the immigration judge's determination. *See* 8 CFR 1003.38 (appeals with the BIA). Further, as explained in section II.C.6.k, resolving errors in the criminal justice system is beyond the scope of this rulemaking.

The Departments reiterate their authority to limit and condition asylum eligibility consistent with the statute. *See* INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)). Accordingly, the Departments may promulgate bars that govern determinations regarding asylum eligibility. In light of this authority, the Departments also disagree with commenters that the rule provides adjudicators with insufficient guidance for the sound exercise of their judgment in determining eligibility for asylum. For example, the proposed rule provides clarity surrounding determinations whether a conviction is a felony by applying the relevant jurisdiction's

definition; also, it provides detailed guidance on vacated or expunged convictions, and modified convictions and sentences. 84 FR at 69646, 69654–55. Immigration judges and asylum officers currently exercise discretion to determine whether an asylum seeker merits relief for a wide range of reasons, many of which are not similarly set out or defined in the Act or by regulation. *See, e.g., Matter of A–B–,* 27 I&N Dec. 316 at 345 n.12 (outlining factors for consideration in discretionary asylum determinations). The Departments accordingly do not believe that the new bars require immigration judges or asylum officers to exercise significantly more discretion than those judges or officers already do.

Further, the Departments note that providing more exacting guidance, as some commenters suggested, would impede the very nature of legal discretion, as demonstrated by its definition: "[f]reedom in the exercise of judgment," or "the power of free decision-making." Black's Law Dictionary (11th ed. 2019); *see also* "Discretion," Merriam-Webster, *https://www.merriam-webster.com/dictionary/discretion* (last updated Feb. 15, 2020) (defining "discretion" as the "power of free decision or latitude of choice within certain legal bounds"). Doing so would thus aggravate the problems that some commenters perceived in the rule's alleged lack of sufficient flexibility.

Next, nothing in the final rule changes the standard of proof as regards an individual's ability to demonstrate that he or she warrants a positive grant of discretion. As an initial matter, citing a standard of proof for discretion is a misnomer. Rather, the determination of whether an alien warrants a discretionary grant of asylum is an analysis that requires reviewing the circumstances of the case. In determining whether the alien warrants a discretionary grant of asylum, the immigration judge considers a number of factors and considerations. *See Matter of Pula,* 19 I&N Dec. at 473–74 (outlining how adjudicators should weigh discretionary factors in applications for asylum). By contrast, the final rule sets forth additional limitations on eligibility for asylum, which are separate from the discretionary determination. As a result, the final rule does not create a standard of proof for establishing that an alien warrants a discretionary grant of asylum.

Similarly, the Departments disagree with commenters' assertions that the final rule violates Supreme Court and court of appeals precedent regarding the

amount of discretion granted to the Attorney General and the Secretary. As explained, Congress, in IIRIRA, vested the Attorney General with broad authority to establish conditions or limitations on asylum. *See* 110 Stat. at 3009–692. Congress also vested the Attorney General with the authority to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B) (8 U.S.C. 1158(d)(5)(B)). This broad authority is not undercut by the cases cited by commenters. Neither *Moncrieffe* nor *Delgado* presumes to limit the Attorney General's discretion to place limits on asylum. Rather, *Moncrieffe* addressed whether a conviction for possession of a small amount of marijuana with intent to distribute qualified as an aggravated felony. 569 U.S. at 206. Similarly, the *Delgado* court held that it had authority to review certain discretionary determinations made by the Attorney General when not explicitly identified in the INA. 648 F.3d at 1100. However, this inquiry was based on statutory interpretation to determine whether the court had jurisdiction to review a BIA decision. Apart from disagreeing with the Department's legal arguments on appeal, neither of these two decisions purported, even in dicta, to place additional limitations on the Attorney General's ability to consider whether to grant asylum as a matter of discretion.

h. Issues With Representation

*Comment:* Commenters opposed the NPRM because they alleged that it made the asylum system more arduous for asylum seekers, especially children, to navigate alone. One commenter claimed that 86 percent of detainees lack access to counsel. Overall, commenters were concerned that the rule's changes disadvantage asylum seekers by making it more difficult for them to proceed without representation and for organizations, in turn, to provide representation and assistance to aliens.

Commenters pointed out that asylum seekers lack the benefit of appointed counsel, which is especially significant for pro se aliens affected by the rule, particularly in regard to gathering evidence and developing responses to refute the "extremely broad grounds" for the denial of asylum.

Commenters also alleged that it will be more difficult for organizations to represent and assist aliens in accordance with the rule's provisions. Commenters stated that backlogs at USCIS are detrimental to organizations and the aliens they represent because

aliens may wait years for a decision on their applications, while organizations have limited resources to assist immigrants and must seek to prioritize spending for emergency situations.

Commenters also stated that the system is already complicated; further complicating it with additional barriers will require much time, funding, and effort by immigration advocates. Finally, commenters stated that an asserted "lack of predictability" in application of the rule would "create a substantial burden on immigration legal services providers, who [would] be unable to advise their clients as to their asylum eligibility, a long-term and stable form of protection from persecution."

*Response:* The commenters' particular concerns regarding representation in immigration proceedings or during asylum adjudications are outside the scope of this rulemaking. The rule does not involve securing or facilitating representation, and Congress has already directed that aliens have a right to counsel in removal proceedings but at no expense to the government. INA 292 (8 U.S.C. 1362). Moreover, 87 percent of asylum applicants in pending asylum cases have representation, and there is nothing in the rule that would cause a reduction in that representation rate. *See* EOIR, *Adjudication Statistics: Representation Rate* (Apr. 15, 2020), *https://www.justice.gov/eoir/page/file/1062991/download.*

In addition, the Departments continue to maintain resources designed to assist aliens in proceedings find representation or otherwise help themselves in their proceedings. *See* EOIR, *Find Legal Representation, https://www.justice.gov/eoir/find-legal-representation* (last updated Nov. 29, 2016). Further, the Office of Legal Access Programs within EOIR works to increase access to information and raise the level of representation for individuals in immigration proceedings. *See* EOIR, *Office of Legal Access Programs, https://www.justice.gov/eoir/office-of-legal-access-programs* (last updated Feb. 19, 2020).

In regard to commenters' concerns regarding the backlog at USCIS, the rule facilitates a more streamlined approach by eliminating inefficiencies. *See, e.g.,* 84 FR at 69647, 69656–57. For example, the rule's established definition for "felony" will create greater uniformity by accounting for "possible variations in how different jurisdictions may label the same offense" and avoid anomalies in the asylum context "that arise from the definition of 'aggravated felonies.'" *Id.* at 69647. Significantly, that definition eliminates the need for adjudicators and courts alike to engage

in the categorical approach for aggravated felonies. *See id.* These improvements to the asylum system will increase predictability, therefore rendering representation less complicated and potentially requiring less funding by immigration advocates.

The Departments emphasize that the rule does not create an entirely new system. As with any other change to the regulations, the Departments anticipate that immigration advocates and organizations will adjust and adapt their strategies to continue to provide effective representation for their selected clients.

i. Against American Ideals

*Comment:* Commenters opposed the rule because they alleged that it conflicts with American ideals. Commenters remarked that the rule conflicts with the United States' tradition and moral obligation of providing a "haven for persons fleeing oppression" and a "beacon of hope" for vulnerable people, and that it violates principles that people should have freedom and equal rights under the law "regardless of skin color or birthplace." Many commenters characterized these concerns as humanitarian, religious, and American ideals of showing compassion, fairness, and respect for human rights. Another commenter claimed that the rule "eviscerated the spirit and overall purpose of the U.S. asylum system by categorically refusing protection to large groups of vulnerable people who are neither a danger to the public nor a threat to U.S. national security interests, and who have no other safe and reasonable option for protection."

Other commenters expressed opposition by claiming that the rule would diminish the United States' role as a world leader, hurt the country's international reputation, and undermine foreign policy interests abroad. One commenter stated that the rule would diminish the "country's historical role as a defender of human rights."

*Response:* The rule does not conflict with American traditions or moral obligations related to caring for vulnerable people. On the contrary, the rule streamlines the asylum system to improve the consistency and predictability of the adjudication of claims, thereby enabling applicants who qualify for asylum eligibility to swiftly access the benefits that follow a grant of asylum. Those benefits include, among many, preclusion from removal, a path to lawful permanent resident status and citizenship, work authorization, the possibility of derivative lawful status for certain family members, and access to

certain financial assistance from the Federal government. *See R–S–C,* 869 F.3d at 1180; INA 208(c)(1)(A), (C) (8 U.S.C. 1158(c)(1)(A), (C)); INA 208(c)(1)(B), (d)(2) (8 U.S.C. 1158(c)(1)(B), (d)(2)); *see also* 84 FR at 69641. The availability of these benefits demonstrates American ideals of compassion realized through the asylum system.

Aliens with certain criminal convictions demonstrate a disregard for the societal values of the United States and may constitute a danger to the community or threaten national security. The Departments have concluded that limiting asylum eligibility for these aliens furthers American ideals of the rule of law and a commitment to public safety. Although such aliens are not eligible for asylum under the rule, they may still be eligible for withholding of removal under the Act (INA 241(b)(3) (8 U.S.C. 1231(b)(3)); 8 CFR 1208.16(b)), or protection under the CAT regulations (8 CFR 1208.16(c)). These forms of protection limit removal to a country where the alien is more likely than not to be persecuted based on protected grounds or tortured, thereby affording protection to aliens, even if they are ineligible for asylum.

The Departments do not agree that the rule diminishes the United States' international reputation for caring for the less fortunate. On the contrary, the Departments believe the rule strengthens the United States' ability to care for those who truly deserve the discretionary benefit of asylum and may take full advantage of the numerous benefits that follow.

j. Bad Motives

*Comment:* Commenters opposed the NPRM because they alleged that the Departments published it with racist motives. Commenters stated that the rule was published "out of animus to asylum seekers and [with] a desire to undermine the asylum system through an end-run around Congress" because the rule would "necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors." One commenter specifically stated the rule was based upon a "dark legacy" of bias against Latin American countries and violated the Equal Protection Clause of the Fourteenth Amendment.

One commenter stated that "the [A]dministration has targeted low-income, immigrant communities of color to further their white supremacist

agenda of maintaining a white majority in the United States.'' Other commenters alleged that DHS and ICE have relied on racist policing techniques to identify gang activity, which rarely result in criminal convictions.

Commenters also opposed the rule because they alleged that it is an attempt to ''drastically limit asylum eligibility,'' ''exclude refugees from stability and security,'' and make the United States more ''hostile'' towards immigrants. In other words, commenters alleged that the rule ''represent[ed] a thinly veiled attempt to prevent otherwise eligible asylum seekers from lawfully seeking refuge in the United States.'' Commenters referenced public documents allegedly revealing the Administration's efforts to utilize smuggling prosecutions against parents and caregivers as part of its overall strategy to deter families from seeking asylum. Commenters were concerned that the rule threatens to ''magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.''

*Response:* The rule is not racially motivated, nor did racial animus or a ''legacy of bias'' play a role in the rule. Rather, the rule categorically precludes from asylum eligibility certain aliens based on the aliens' various criminal convictions and, in one limited instance, criminal conduct, because the Departments believe that the current case-by-case adjudicatory approach yields inconsistent results that are both ineffective to protect communities from danger and inefficient in regard to overall case processing. *See* 84 FR at 69640.

To the extent that the rule disproportionately affects any group referenced by the commenters, the rule was not intentionally drafted to discriminate against any group. The provisions of the rule apply equally to all asylum applicants without regard to any applicant's ethnic or national background, or any other personal characteristics separate and apart from the criminal or conduct history laid out in the rule. Accordingly, the rule does not violate the Equal Protection Clause of the Fourteenth Amendment. *See Washington* v. *Davis,* 426 U.S. 229, 242 (1976) (''[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial

discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.'' (citation omitted)); *cf. United States* v. *Smith,* 818 F.2d 687, 691 (9th Cir. 1987) (''We begin our review of this challenge by holding that persons convicted of crimes are not a suspect class.'').

As explained in the proposed rule, Congress expressly authorized the Attorney General and the Secretary to establish conditions or limitations for the consideration of asylum applications under INA 208(b)(2)(C), (d)(5)(B) (8 U.S.C. 1158(b)(2)(C), (d)(5)(B)) that are not inconsistent with the statute. *See* 84 FR at 69643. The Departments promulgate this final rule in accordance with those statutory sections, and in doing so, have promulgated a rule that is equally applicable to all races. The Departments strongly disavow any allegation of white supremacy.

The Departments reiterate that the rule does not encourage or facilitate hostility towards immigrants. Instead, the rule categorically precludes from asylum eligibility certain aliens based on criminal convictions, and, in one limited instance, criminal conduct, because the Departments believe the current case-by-case adjudicatory approach yields inconsistent results that are both ineffective to protect the American public from danger and inefficient in regard to overall case processing. The rule retains the current general statutory asylum system, *see* 84 FR at 69640, with the result that applicants for asylum must prove that they are (1) statutorily eligible for asylum, and (2) merit a favorable exercise of discretion. INA 208(b)(1)(A), 240(c)(4)(A) (8 U.S.C. 1158(b)(1)(A) 1229a(c)(4)(A)); *see also Matter of A–B–,* 27 I&N Dec. at 345 n.12. That framework continues to be equally applicable to persons of all races.

The rule does not affect regulatory provisions regarding refugee processing under 8 CFR parts 207, 209, 1207, and 1209, and it does not categorically exclude refugees from the United States or facilitate hostility towards immigrants. The Departments disavow allegations that the government used smuggling prosecutions against parents and caregivers specifically to deter families from seeking asylum. Rather, the Departments anticipate that the rule will better facilitate efficient processing of asylum applications by introducing a more streamlined approach, thus helping families who qualify for asylum

and demonstrate their applications merit a favorable decision.

k. Problems With the Criminal Justice System

*Comment:* Commenters opposed the proposed rule because they alleged that it implicates a criminal justice system that suffers from structural challenges such as racial profiling, unjust outcomes, barriers to equal justice, and incentives to plead guilty, especially in the context of misdemeanors.

Related to commenters' concerns regarding racism in the NPRM,[40] commenters explained their concern that the NPRM imports racial disparities prevalent in the criminal justice system into the immigration system, stating, ''[a]sylum seekers of color, like all communities of color in the United States, are already disproportionately targeted and punished by the criminal justice system.'' Particularly, commenters stated that both undocumented and documented non-white immigrants are arrested, convicted of drug crimes, given longer sentences, and deported more frequently than their white counterparts. Further, commenters stated that LGBTQ aliens are more prone to experiencing violence from police.

One commenter opposed the NPRM, stating that it would exacerbate problems in our criminal justice system, such as increased incarceration, deportations, and racial profiling, which would, in turn, exacerbate health concerns for individuals and communities.

*Response:* The final rule amends the Departments' respective regulations governing bars to asylum eligibility. The rule clarifies the effect of criminal convictions and, in one instance, criminal conduct, in the asylum context and removes regulations governing automatic reconsideration of discretionary denials of asylum applications. *See* 84 FR at 69640. Accordingly, commenters' concerns regarding structural challenges to the criminal justice system are outside the scope of this rulemaking. The rule does not seek or intend to address actual or alleged injustices of the criminal justice system as a whole, as referenced by the commenters, including racial profiling, disparities based on race and sexual orientation, unjust outcomes, barriers to equal justice, incentives to plead guilty, and health concerns following alleged increases in incarceration, deportations, and racial profiling.

---

[40] *See* section II.C.6.j for further discussion.

l. Automatic Review of Discretionary Denials

*Comment:* Many commenters expressed strong opposition to the rule because it eliminates automatic review of discretionary denials. Commenters were concerned that language barriers and lack of financial resources may prevent applicants with meritorious claims from adequately presenting their cases. According to commenters, "[m]aintaining reconsiderations of discretionary denials of asylum is therefore absolutely critical to ensuring that immigrant survivors who are eligible for asylum have another opportunity to defend and prove their right to obtain asylum protections."

*Response:* The Departments disagree that reconsideration of discretionary denials of asylum is necessary and find that commenters' concerns regarding removal of these provisions are unwarranted. First, the current regulations providing for automatic reconsideration of discretionary denials at 8 CFR 208.16(e) and 1208.16(e) are inefficient, unclear, and unnecessary. *See* 84 FR at 69656. Federal courts have expressed similar sentiment as they approach related litigation. *See Shantu* v. *Lynch,* 654 F. App'x 608, 613–14 (4th Cir. 2016) (discussing unresolved anomalies of the regulations regarding reconsideration of discretionary denials); *see also* 84 FR at 69656–57.

Further, there are currently multiple avenues through which an asylum applicant may challenge a discretionary denial, with the result that removing the regulations providing for reconsideration (8 CFR 208.16(e) and 1208.16(e)) does not effectively render asylum eligibility determinations final. *See* 84 FR at 69657. First, under 8 CFR 1003.23(b)(1), an immigration judge may reconsider a decision upon his or her own motion.[41] Second, also under 8 CFR 1003.23(b)(1), an alien may file a motion to reconsider with the immigration judge. Third, under 8 CFR 1003.38, an alien may file an appeal with the BIA. The Departments have concluded that these alternatives sufficiently preserve the alien's ability to obtain review of the immigration judge's discretionary asylum decision, while removing the confusing,

inefficient, and unnecessary automatic review provisions at 8 CFR 208.16(e) and 1208.16(e).

7. Recommendations

*Comment:* Commenters provided numerous recommendations to the Departments.

First, several commenters suggested that the Departments provide annual bias training to all immigration judges and prosecutors.

Next, two commenters recommended that the sentencing guidelines as provided in the Washington Adult Sentencing Guidelines Manual be incorporated into the NPRM to provide clarity and guidance to immigration judges.

Another commenter asserted that international human rights law obligations required the Departments to

(1) put in place and allocate resources to the identification and assessment of protection needs; and (2) establish mechanisms for entry and stay of migrants who are considered to have protection needs prohibiting their return under international human rights law, including non-refoulement, as well as the rights to health, family life, best interests of the child, and torture rehabilitation.

A commenter suggested the Departments should incorporate recent innovative criminal justice reforms. For example, the commenter pointed to special drug trafficking courts that "recognize the need for discretion in the determination of criminal culpability" and suggested that the Departments should create specialized asylum eligibility courts.

Another commenter emphasized the effects of climate change, claiming that the United States should be "creating new categories of asylum given the predictions on climate change migrants and the latest UN human rights ruling declaring governments cannot deport people back to countries if their lives are in danger due to climate change."

One commenter recommended that the Departments continue to hire more immigration judges and asylum officers and to retain discretion with immigration adjudicators to make determinations on a case-by-case basis rather than expand the categorical bars.

Some commenters emphasized the general need for comprehensive, compassionate immigration reform. One commenter specifically urged the Departments to support the New Way Forward Act, which, according to the commenter, "rolls back harmful immigration laws [because] it proposes immigration reform measures that dismantle abuses of our system and our asylum seeking community."

Some commenters urged the Departments to take a more "welcoming" approach, citing the positive effects of diversity and economic advantages.

Another commenter, despite opposing the NPRM, provided several recommendations regarding the domestic violence crime bar and primary perpetrator exception should the Departments publish the rule as final. First, the commenter recommended that all immigration adjudicators should receive specialized training developed with input from stakeholders regarding domestic violence and the unique vulnerabilities faced by immigrants. Second, the commenter recommended that an automatic supervisory review should follow any determination that an applicant does not meet an exception to an asylum bar. Third, the commenter recommended that adjudicators should be required to provide written explanations of (1) the factual findings, weighed against the evidence, if a determination is made that an applicant does not meet an exception to the asylum bar and (2) their initial decisions to apply the bar, including what "'serious reasons' existed for believing that the applicant engaged in acts of domestic violence or extreme cruelty." Fourth, when applicants do not meet the exception, the commenter recommended that adjudicators identify what evidence, if any, was provided by the alleged primary perpetrator, how it was weighed, and what the adjudicator did to determine whether it was false or fabricated. Fifth, the commenter requested that agencies regularly engage with stakeholders to assess the impact of the bar and the exception on survivors.

Several commenters urged the Departments to dedicate their efforts to ensuring that individuals fleeing violence would be granted full asylum protections. One commenter suggested that the bars to asylum be narrowed by eliminating the bar related to convictions in other countries.

Some commenters suggested that families, especially children, be allowed to apply for asylum together, rather than require each person to file a separate application.

*Response:* The Departments note the commenters' recommendations.

Some commenters' suggestions involved issues or topics outside the scope of the rule, such as the suggestions that immigration judges should be provided certain types of training or to allow for additional flexibilities for family-based versus individual asylum applications. The

---

[41] On August 26, 2020, the Department of Justice proposed restricting the ability of an immigration judge to reconsider a decision upon his or her own motion. Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 FR 52491, 52504–06 (Aug. 26, 2020). That rule has not yet been finalized, but even if the proposal is adopted in the final rule, asylum applicants would still remain able to file a motion to reconsider or an appeal in order to challenge an immigration judge's discretionary denial in these circumstances.

Departments may consider these recommendations in the event of additional rulemakings, but do not take any further action in response to these out-of-scope suggestions at this point.

Other commenters' suggestions involved topics outside the authority of the Departments, such as suggestions that there should be new asylum-related protections due to concerns surrounding climate change or that legislative changes to the immigration laws should be enacted. If Congress enacts these or other changes to the immigration laws, the Departments' regulations will reflect such changes in future rules. However, this rule is designed to implement the immigration laws currently in force.

Regarding the remaining suggestions related to the provisions of this rule, the Departments decline to adopt the recommendations or make changes to the proposed rule except as set out below in section III. Overall, the Departments find that the commenters' recommendations would frustrate the rule's purpose by slowing and prolonging the adjudicatory process, thereby undermining the goal of more efficiently processing asylum claims. Further, the Departments have determined, as discussed above, that the included offenses are significant offenses that warrant rendering aliens described by the rule ineligible for asylum.

For example, the Departments decline to adopt one commenter's requests to automatically require supervisory review of an asylum officer's decision to apply a bar, or to require the asylum officer or immigration judge to issue a written decision explaining the application of the bars. The Departments believe that the existing processes for issuing decisions and providing review of asylum determinations give sufficient protections to applicants. *See, e.g.,* 8 CFR 208.14(c)(1) (explaining that, for a removable alien, when an asylum officer cannot grant an asylum application, the officer shall refer the application for adjudication in removal proceedings by an immigration judge); 8 CFR 1003.3(a)(1) (providing for appeals of immigration judge decisions to the BIA); 8 CFR 1003.37(a) (explaining that a "decision of the Immigration Judge may be rendered orally or in writing," and that, if the decision is oral, it shall be "stated by the Immigration Judge in the presence of the parties" and a memorandum "summarizing the oral decision shall be served on the parties"). Requiring additional steps beyond these long-standing processes would only create inefficiencies that this rule seeks to avoid. For example,

this rule removes the automatic review of a discretionary denial of asylum specifically because "mandating that the decision maker reevaluate the very issue just decided is an inefficient practice that * * * grants insufficient deference to the original fact finding and exercise of discretion." 84 FR at 69657.

The Departments also decline to incorporate a commenter's suggestion to include the Washington Adult Sentencing Guidelines Manual into the rule, as the Departments believe the rule provides sufficient guidance to adjudicators without adding a specific state's criminal law manual, which would only add confusion to the immigration adjudication process.

*D. Comments Regarding Regulatory Requirements*

1. Administrative Procedure Act

*Comment:* Commenters raised concerns that this rule violated the APA's requirements, as set forth in 5 U.S.C. 553(b) through (d). First, commenters stated that the 30-day comment period was not sufficient for such a significant rule and that, at a minimum, the comment period should have been 60 days. Commenters cited the complexity of the legal and policy issues raised by the rule, the impact of the rule on asylum-seekers, and the potential implications of the rule regarding the United States' compliance with international and domestic asylum law. In support, commenters referenced Executive Orders 12866 and 13563, both of which recommend a "meaningful opportunity to comment" with a comment period of not less than 60 days "in most cases." They also noted that the comment period for this rule ran through the winter holiday season, with multiple Federal holidays.

Commenters also stated that the rule was arbitrary and capricious under the APA because the Departments did not provide sufficient evidence to support such significant changes. For example, commenters noted the lack of statistics regarding the number of asylum seekers that would be affected by the rule and expressed concerned that the Departments were relying on conclusory statements in support of the rule.

Commenters further stated that the reasons given for the rule were insufficient and, therefore, arbitrary and capricious. For example, commenters took issue with the Departments' explanation that the additional categories of criminal bars were necessary to address the "inefficient" and "unpredictable" case-by-case adjudication process. Instead, commenters stated that the case-by-case

process ensured that the adjudicator takes into account all of the relevant factors in making a determination.

Commenters had specific concerns with the rule's provision that all felony convictions constitute a particularly serious crime. Commenters stated that the rule provided no evidence to support the provision, and that a criminal record in and of itself does not reliably predict future dangerousness. Further, the provision does not address persons who accept plea deals to avoid lengthy potential sentences; who have rehabilitated since the conviction; or who have committed a crime that does not involve a danger to the community or circumstances when a Federal, State, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence.

Commenters stated that the rule was arbitrary and capricious because it is inconsistent with the statute, *see* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)), which requires a separate showing from the particularly serious crime determination that the alien constitutes a danger to the community.

Commenters also raised concerns with the "reason to believe" standard for gang-related crime determinations. The commenters asserted that the standard relied on ineffective, inaccurate, and discriminatory practices and was therefore arbitrary and capricious.

*Response:* The Departments believe the 30-day comment period was sufficient to allow for a meaningful public input, as evidenced by the significant number of public comments received, including almost 80 detailed comments from interested organizations. The APA does not require a specific comment period length. *See* 5 U.S.C. 553(b)–(c). Similarly, although Executive Orders 12866 and 13563 recommend a comment period of at least 60 days, such a period is not required. Federal courts have presumed 30 days to be a reasonable comment period length. For example, the D.C. Circuit recently stated that, "[w]hen substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n* v. *Fed. Commc'ns Comm'n,* 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citing *Petry* v. *Block,* 737 F.2d 1193, 1201 (D.C. Cir. 1984)). Litigation has mainly focused on the reasonableness of comment periods shorter than 30 days, often in the face of exigent circumstances, and the Departments are unaware of any case

law holding that a 30-day comment period was insufficient. *See, e.g., N. Carolina Growers' Ass'n, Inc.* v. *United Farm Workers,* 702 F.3d 755, 770 (4th Cir. 2012) (analyzing the sufficiency of a 10-day comment period); *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 629–30 (D.C. Cir. 1996) (15-day comment period); *Northwest Airlines, Inc.* v. *Goldschmidt,* 645 F.2d 1309, 1321 (8th Cir. 1981) (7-day comment period).

The Departments also believe that the 30-day comment period was preferable to a longer comment period since this rule involves public safety concerns. *Cf. Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (noting that the Federal Aviation Administration had good cause to not engage in notice-and-comment rulemaking because the rule was needed to protect public safety as demonstrated by numerous then-recent helicopter crashes). By proceeding with a 30-day comment period rather than a 60-day period, the Departments are able to more quickly finalize and implement this rule, which prevents persons with certain criminal histories, such as domestic violence or gang-related crimes, from receiving asylum and potentially residing or prolonging their presence in the United States on that basis during the pendency of the asylum process.

Regarding commenters' APA concerns about the statistical analysis in this rule, the Departments reiterate that they are unable to provide precise data on the number of persons affected by the rule because the Departments do not maintain data on the number of asylum applicants with criminal convictions or, more specifically, with criminal convictions and pertinent criminal conduct, that would be subject to the bars added by this rule. An attempt to quantify the population affected would risk providing the public with inaccurate data that at best would be unhelpful. As a general matter, the rule will likely result in fewer asylum grants annually, but the Departments do not believe that further analysis—in the absence of any reliable data—is warranted. *See Stilwell* v. *Office of Thrift Supervision,* 569 F.3d 514, 519 (D.C. Cir. 2009) ("The APA imposes no general obligation on agencies to produce empirical evidence. Rather, an agency has to justify its rule with a reasoned explanation."); *see also id.* (upholding an agency's decision to rely on its "long experience" and "considered judgment," rather than statistical analyses, in promulgating a rule).

Likewise, the Departments disagree with commenters that the NPRM did not

sufficiently explain the reasons for adding additional per se criminal bars. As explained in the NPRM, immigration judges and the BIA have had difficulty applying the "particularly serious crime" bar and, therefore, the Departments believe additional standalone criminal bars will provide a clear and efficient process for adjudicating asylum applications involving criminal convictions. *See* 84 FR at 69646. The Attorney General and the Secretary have not issued regulations identifying additional categories of convictions that qualify as particularly serious crimes, which has in turn resulted in adjudicators and the courts analyzing on a case-by-case basis whether individual criminal statutes qualify as particularly serious crimes. However, this statute-by-statute determination has not provided adjudicators with sufficient guidance in making "particularly serious crime" determinations due to the individualized nature of the BIA's determinations. *See id.* By adding these standalone criminal bars, the rule helps ensure that immigration adjudicators will be able to apply clear standards outside of applying the particularly serious crime bar. In regards to commenters' concerns about the blanket felony conviction bar, the Departments chose to include a bar for all felony convictions because it provides a clear standard to apply in adjudicating the effect to be given to criminal offenses as part of asylum determinations.

Adjudicators will be able to efficiently determine the effect of criminal convictions without resort to complex legal determinations as to the immigration effects of a specific criminal statute. The Departments are aware that the particular personal circumstances and facts of each case are unique; however, the Departments believe that the clarity and consistency of a per se rule outweigh any benefits of a case-by-case approach.

Further, adding a bar to asylum eligibility for all felony convictions recognizes the significance of felony convictions. For example, Congress recognized the relationship between felonies and the seriousness of criminal offenses when it explicitly defined "aggravated felony" to include numerous offenses requiring a term of imprisonment of at least one year. *See* INA 101(a)(43)(F), (G), (J), (P), (R), (S) (8 U.S.C. 1101(a)(43)(F), (G), (J), (P), (R), (S)). Similarly, Congress focused on the importance of felonies in the Armed Career Criminal Act, a sentencing enhancement statute for persons who have been convicted of three violent felonies, which requires the predicate

offenses to be punishable by imprisonment for terms exceeding one year. *See* 18 U.S.C. 924(e)(2)(B).

The Departments also disagree that the use of the "reason to believe" standard for gang-related crime determinations is arbitrary and capricious. The "reason to believe" standard is used in multiple subsections of section 212 of the Act (8 U.S.C. 1182) in making inadmissibility determinations, and the Federal circuit courts have had no issues reviewing immigration judges' "reason to believe" inadmissibility determinations. *See, e.g., Chavez-Reyes* v. *Holder,* 741 F.3d 1, 3–4 (9th Cir. 2014) (reviewing "reason to believe" determination for substantial evidence); *Lopez-Molina,* 368 F.3d at 1211 (same). There is no reason that the Departments cannot apply this same standard when determining whether a criminal conviction involves gang activity.

In addition, the Departments disagree with commenters that the use of the "reason to believe" standard would enable adjudicators to rely on inaccurate, ineffective, or discriminatory evidence when making determinations regarding gang-related crimes. As discussed above, immigration judges are already charged with considering material and relevant evidence. 8 CFR 1240.1(c). To make this determination, immigration judges consider whether evidence is "probative and whether its use is fundamentally fair so as not to deprive the alien of due process of law." *Ezeagwuna,* 325 F.3d at 405 (quoting *Bustos-Torres,* 898 F.2d at 1055). Nothing in the rule undermines or withdraws from this standard. If an alien believes that an adjudicator has relied on inaccurate, ineffective, or discriminatory evidence in making this determination, such decision would be subject to further review.

Finally, the Departments clarify that this rule creates additional standalone criminal bars to asylum and does not alter the definitions of the "particularly serious crime" bar. As a result, this rule does not create any inconsistencies with the "particularly serious crime" bar statutory language regarding dangerousness, which, the Departments note, does not require a separate finding of dangerousness. *See* INA 208(b)(2)(A)(ii) (8 U.S.C. 1158(b)(2)(A)(ii)); *see also, e.g., Matter of R–A–M–,* 25 I&N Dec. 657, 662 (BIA 2012) (explaining that, for purposes of the "particularly serious crime" bar, "it is not necessary to make a separate determination whether the alien is a danger to the community").

2. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)

*Comment:* Commenters raised concerns that the Departments' cost-benefit analysis presented no evidence that potential benefits from the rule exceed the potential costs. For example, commenters explained that the Departments' primary stated reason for adopting new categorical bars was that the exercise of discretion has created inefficiency and inconsistency. However, commenters stated that the Departments' cost-benefit estimates failed to account for new assessments regarding numerous questions of law and fact that the rule would require. Accordingly, commenters argued that the Departments' cost-benefit analysis was unreliable.

Further, commenters stated that the agencies did not comply with Executive Orders 12866, 13563, and 13771, which require agencies to quantify potential costs to the fullest extent possible. Commenters explained that the Departments noted that the rule would likely result in fewer asylum grants annually but failed to quantify or evaluate the impact of the decrease and did not provide any evidence or indication that an attempt was made at quantifying this impact. Commenters explained that the Departments are required to use the best methods available to estimate regulatory costs and benefits, even if those estimates cannot be precise. Commenters also noted that the Departments did not attempt to provide a high and low estimate for the rule's potential impacts despite such an estimation being common practice in rulemaking.

Commenters noted that public comments on this rule and other recent asylum-related rulemakings provided the Departments with data regarding the impacts of asylum denials. Commenters gave examples of potential costs that the Departments failed to consider, including, for example, costs from the differences in benefits for individuals who may obtain only lesser protection in the form of statutory withholding of removal or protection under the CAT regulations; costs from the detention and deportation of individuals who would otherwise have meritorious asylum claims; economic and non-economic costs to asylum-seekers' families; costs to businesses that currently employ or are patronized by asylum-seekers; costs from the torture and killings of deported asylum-seekers;

and intangible costs from the diminution of respect for U.S. treaty obligations and diminution of respect for human life and the safety of asylum-seekers, among others. As a result, commenters stated that the Departments did not support their conclusion that "the expected costs of this proposed rule are likely to be de minimis."

*Response:* The Departments disagree that the rule will create additional adjudicatory burdens that will outweigh the rule's benefits. The purpose of the rule is to limit asylum eligibility for persons with certain criminal convictions, which in turn will lessen the burdens on the overtaxed asylum system. There are currently more than one million pending cases at the immigration courts, with significant year over year increases, despite a near doubling of the number of immigration judges over the past decade and the completion of historic numbers of cases. *See* EOIR, *Adjudication Statistics: Pending Cases* (July 14, 2020), *https://www.justice.gov/eoir/page/file/1242166/download;* EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* (June 2020), *https://www.justice.gov/eoir/page/file/1242156/download;* EOIR, *Adjudication Statistics: New Cases and Total Completions* (July 14, 2020), *https://www.justice.gov/eoir/page/file/1060841/download*). Of these pending cases, over 575,000 include an asylum application.

These new bars will help achieve the goal of alleviating the burden on the immigration system while retaining the existing framework for asylum adjudications. As stated in the NPRM, this rule does not change the role of an immigration judge or asylum officer in adjudicating asylum applications; immigration judges and asylum officers currently consider an applicant's criminal history to determine the associated immigration consequences, if any, and whether the applicant warrants asylum as a matter of discretion. *See* 84 FR at 69657–58. These additional bars will be considered under that existing framework and, therefore, the Departments do not anticipate additional costs to the adjudication process.

In addition, the Departments believe the rule complies with the cost-benefit analysis required by Executive Orders 12866, 13563, and 13771. Executive Order 12866 requires the Departments to quantify costs "to the fullest extent that these can be usefully estimated." *See* E.O. 12866, 58 FR 51735, 51735, sec. 1(a) (Sept. 30, 1993). As explained in the NPRM, the Departments do not maintain data on the number of asylum applicants with criminal convictions or,

more specifically, with criminal convictions and pertinent criminal conduct, that would be subject to the bars added by this rule. Without this data, the Departments cannot reliably estimate the population effected by this rule, outside of identifying the group likely affected by the rule: Asylum applicants with criminal convictions and pertinent criminal conduct, barred under this rule, and asylum applicants denied asylum solely as a matter of discretion that will no longer receive automatic review of such decisions.

Based on this identified population, commenters provided a number of potential ancillary costs to the likely increase in asylum denials under these additional bars, which the Departments have reviewed. As explained in the NPRM, a main effect of the likely increase in asylum denials is a potential increase in grants of statutory withholding of removal or protection under the CAT regulations. 84 FR at 69658. These forms of protection do not provide the same benefits as asylum, including the ability to gain permanent status in the United States, obtain derivative status for family members, or travel outside the country. Such non-monetary costs are difficult to quantify, but the Departments believe that the similarly difficult-to-quantify benefits associated with the rule—such as a reduction in the risks associated with dangerous aliens and an increase in adjudicative efficiency—outweigh these costs.

Commenters also cited other potential costs, such as the effects that the bars could have on businesses employing or patronized by asylum applicants. However, such projections were general, tenuous, and unsupported by data, and the Departments are unaware of any reliable data parsing business income attributable to individuals affected by this rule—*i.e.,* asylum applicants who have been convicted of or engaged in certain types of criminal behavior—as opposed to non-criminal asylum applicants, asylees, refugees, aliens granted statutory withholding of removal or protection under the CAT, or other groups of aliens in general. Moreover, because aliens may still obtain work authorization if granted withholding of removal or protection under the CAT, 8 CFR 274a.12(a)(10), this rule would not necessarily foreclose employment or patronage opportunities for aliens subject to its parameters. Finally, even if there were identifiable economic costs for these aliens, the Departments believe that the benefits associated with limiting asylum eligibility based on certain criminal conduct would outweigh them because

ER-0188

of (1) the rule's likely impact in improving adjudicatory efficiency, and (2) the intangible benefits associated with promotion of the rule of law. *See* E.O. 12866, 58 FR at 51734 (directing agencies to account for "qualitative" benefits that are "difficult to quantify," but which are "essential to consider"). The Departments further disagree with commenters' assertions that these bars will have a negative intangible cost on the United States' interests or international standing, as Congress expressly conferred on the Attorney General and the Secretary the authority to provide these additional asylum limitations, which—as explained in the NPRM—are consistent with U.S. treaty obligations. *See* INA 208(b)(2)(C) (8 U.S.C. 1158(b)(2)(C)); 84 FR at 69644.

## III. Provisions of the Final Rule

The Departments have considered and responded to the comments received in response to the NPRM. In accordance with the authorities discussed above in section I.A, the Departments are now issuing this final rule to finalize the NPRM. The final rule adopts the provisions of the NPRM as final, with the following minor edits for clarity, for the reasons discussed above in section II in response to the comments received.[42]

### A. 8 CFR 208.13(c)(6)(ii)

As drafted in the NPRM, 8 CFR 208.13(c)(6)(ii) would have included a reference to "the Secretary:" "The alien has been convicted [of a crime] that the Secretary knows or has reason to believe * * * ." For internal consistency within 8 CFR 208.13(c)(6)(ii) and for specificity, the Departments are replacing this reference to "the Secretary" with "the asylum officer," the officials in DHS who adjudicate asylum applications.

### B. 8 CFR 1208.13(c)(6)(ii)

Regulations in chapter V of 8 CFR govern proceedings before EOIR and not before DHS. The Departments, however, mistakenly listed both the Attorney General and the Secretary in 8 CFR 1208.13(c)(6)(ii) as drafted in the NPRM: "The alien has been convicted [of a crime] that the Attorney General or Secretary knows or has reason to believe * * * ." This final rule removes the reference to the Secretary so that 8 CFR 208.13(c)(6)(ii), governing DHS, references the Secretary, and 8 CFR 1208.13(c)(6)(ii) references only officials within DOJ. It further changes "Attorney

General" to "immigration judge" for internal consistency within the rest of 8 CFR 1208.13.

### C. 8 CFR 1208.13(c)(6)(v)(B)

This rule amends the cross-reference in 8 CFR 1208.13(c)(6)(v)(B) so that it reads "under paragraph (c)(6)(v)(A)" instead of "under paragraph (c)(6)(v)" as published in the NPRM. This change provides clarity and matches the same cross-reference in 8 CFR 208.13(c)(6)(v)(B)–(C) and 8 CFR 1208.13(c)(6)(v)(C).

In addition, this rule changes "adjudicator" to "immigration judge" for specificity and clarity. This matches the specific reference to "asylum officer," who is the relevant adjudicating entity for DHS, in 8 CFR 208.13(c)(6)(v)(B).

### D. 8 CFR 1208.13(c)(7)(v)

As with the change discussed above to 8 CFR 1208.13(c)(6)(v)(B), this rule corrects the reference to the "asylum officer" to read "immigration judge" in 8 CFR 1208.13(c)(7)(v). The immigration judge is the relevant adjudicator for DOJ's regulations.

### E. 8 CFR 1208.13(c)(9)

As with the change discussed above regarding 8 CFR 1208.13(c)(6)(v)(B), this rule removes "or other adjudicator" from the proposed text for 8 CFR 1208.13(c)(9). This change provides clarity because the immigration judge is the relevant adjudicator for DOJ's regulations and matches the specific reference to only an "asylum officer" in 8 CFR 208.13(c)(9).

### F. 8 CFR 208.13(c)(6)(vii) and 8 CFR 1208.13(c)(6)(vii)

This rule amends the same language in both 8 CFR 208.13(c)(6)(vii) and 8 CFR 1208.13(c)(6)(vii) so that the provisions instruct that an alien will be barred from asylum if the immigration judge or asylum officer "knows or has reason to believe" that the alien has engaged in on or after the effective date in certain acts of battery or extreme cruelty. Previously, these provisions provided "[t]here are serious reasons for believing" the alien has engaged in such conduct. In other words, the Departments have replaced the "serious reasons for believing" standard in proposed 8 CFR 208.13(c)(6)(vii) and proposed 1208.13(c)(6)(vii) with a "knows or has reason to believe" standard.

This change is intended to prevent confusion and ensure the rule's consistency, both within the new provisions it adds to 8 CFR and with the INA more generally. As discussed

above, the "reason to believe" standard is used in multiple subsections of section 212 of the Act (8 U.S.C. 1182) in making inadmissibility determinations. *See, e.g.,* INA 212(a)(2)(C)(i) (8 U.S.C. 1182(a)(2)(C)(i)) (providing that an alien who "the consular officer or the Attorney General knows or has reason to believe" is an illicit trafficker of controlled substances is inadmissible). The Federal circuit courts have had no issues reviewing immigration judges' "reason to believe" inadmissibility determinations. *See, e.g., Chavez-Reyes,* 741 F.3d at 3–4 (reviewing "reason to believe" determination for substantial evidence); *Lopez-Molina,* 368 F.3d at 1211 (same). Further, without this change, the rule may have created additional unintended questions regarding what sort of reasons to believe are sufficient to qualify as "serious" reasons. Although the Departments are modifying the language in the final rule to reduce the likelihood of confusion, they reiterate that the language in 8 CFR 208.13(c)(6)(vii) and 8 CFR 1208.13(c)(6)(vii) is intended to be analogous to similar provisions in 8 CFR 204.2.

## IV. Regulatory Requirements

### A. Regulatory Flexibility Act

The Departments have reviewed this proposed rule in accordance with the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*) and have determined that this rule will not have a significant economic impact on a substantial number of small entities. The rule would not regulate "small entities" as that term is defined in 5 U.S.C. 601(6). Only individuals, rather than entities, are eligible to apply for asylum, and only individuals are eligible to apply for asylum or are otherwise placed in immigration proceedings.

### B. Administrative Procedure Act

This final rule is being published with a 30-day effective date as required by the Administrative Procedure Act. 5 U.S.C. 553(d).

### C. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995. *See* 2 U.S.C. 1532(a).

---

[42] In addition, the final rule makes clarifying grammatical edits to the punctuation of the proposed rule, such as by replacing semicolons with periods where relevant.

**67256**     **Federal Register** / Vol. 85, No. 204 / Wednesday, October 21, 2020 / Rules and Regulations

## D. Congressional Review Act

The Office of Information and Regulatory Affairs has determined that this rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804(2). This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

## E. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)

The Office of Information and Regulatory Affairs, Office of Management and Budget ("OMB"), has designated this rule a "significant regulatory action" under section 3(f)(4) of Executive Order 12866, but not an economically significant regulatory action. Accordingly, the rule has been submitted to OMB for review. The Departments certify that this rule has been drafted in accordance with the principles of Executive Order 12866, section 1(b); Executive Order 13563; and Executive Order 13771.

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of using the best available methods to quantify costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Similarly, Executive Order 13771 requires agencies to manage both the public and private costs of regulatory actions.

Because this final rule does not make substantive changes from the NPRM that would impact the rule's expected costs and benefits, the Departments have performed the same analysis as set out in the NPRM. 84 FR at 69657–59.

This rule provides seven additional mandatory bars to eligibility for asylum pursuant to the Attorney General's and the Secretary's authorities under sections 208(b)(2)(C) and 208(d)(5) of the INA (8 U.S.C. 1182(b)(2)(C) and

1182(d)(5)).[43] This rule adds bars on eligibility for aliens who commit certain offenses in the United States after entering the country. Those bars would apply to aliens who are convicted of, or engage in criminal conduct, as appropriate, with respect to: (1) A felony under Federal, State, tribal, or local law; (2) an offense under section 274(a)(1)(A) or (a)(2) of the Act (8 U.S.C. 1324(a)(1)(A) or 1324(a)(2)) (Alien Smuggling or Harboring); (3) an offense under section 276 of the Act (8 U.S.C. 1326) (Illegal Reentry); (4) a Federal, State, tribal, or local crime involving criminal street gang activity; (5) certain Federal, State, tribal, or local offenses concerning the operation of a motor vehicle while under the influence of an intoxicant; (6) a Federal, State, tribal, or local domestic violence offense; and (7) certain misdemeanors under Federal, State, tribal, or local law for offenses related to false identification; the unlawful receipt of public benefits from a Federal, State, tribal, or local entity; or the possession or trafficking of a controlled substance or controlled-substance paraphernalia.

The seven bars are in addition to the existing mandatory bars relating to the persecution of others, convictions for particularly serious crimes, commission of serious nonpolitical crimes, security threats, terrorist activity, and firm resettlement in another country that are currently contained in its implementing regulations. See INA 208(b)(2) (8 U.S.C. 1158(b)(2)); 8 CFR 208.13, 1208.13. Under the current statutory and regulatory framework, asylum officers and immigration judges consider the applicability of mandatory bars to the relief of asylum in every proceeding involving an alien who has submitted a Form I–589 application for asylum. Although this rule expands the mandatory bars to asylum, it does not change the nature or scope of the role of an immigration judge or an asylum officer during proceedings for consideration of asylum applications. Immigration judges and asylum officers are already trained to consider both an alien's previous conduct and criminal record to determine whether any immigration consequences result, and this rule does not propose any adjudications that are more challenging than those that are already conducted. For example, immigration judges already consider the documentation of an alien's criminal record that is filed by

the alien, the alien's representative, or the DHS representative in order to determine whether one of the mandatory bars applies and whether the alien warrants asylum as a matter of discretion. Because the new bars all relate to an alien's criminal convictions or other criminal conduct, adjudicators will conduct the same analysis to determine the applicability of the bars proposed by the rule.[44] The Departments do not expect the additional mandatory bars to increase the adjudication time for immigration court proceedings involving asylum applications.

The expansion of the mandatory bars for asylum would likely result in fewer asylum grants annually;[45] however, because asylum applications are inherently fact-specific, and because there may be multiple bases for denying an asylum application, neither DOJ nor DHS can quantify precisely the expected decrease. An alien who would be barred from asylum as a result of the rule may still be eligible to apply for the protection of withholding of removal under section 241(b)(3) of the INA (8 U.S.C. 1231(b)(3)) or withholding of removal or deferral of removal under regulations implementing U.S. obligations under Article 3 of the CAT. See INA 241(b)(3) (8 U.S.C. 1231(b)(3));

---

[43] As discussed further below, this rule will not otherwise impact the ability of an alien who is denied asylum to receive the protection of withholding of removal under the Act or withholding of removal or deferral of removal under the CAT.

[44] The Departments note that one of the new bars, regarding whether the alien has "engaged" in certain acts of battery or extreme cruelty, does not necessarily require a criminal conviction or criminal conduct. The Departments believe that a criminal arrest or conviction is the most likely evidence to be filed with the immigration court related to this bar, but even in cases where no such evidence is available, the analysis by immigration judges related to this bar is an expansion from the current analysis immigration judges employ in determining whether conduct rises to level of "extreme cruelty" under 8 CFR 204.2(c)(1)(vi) in other contexts during removal proceedings. See, e.g., Bedoya-Melendez v. U.S. Atty. Gen., 680 F.3d 1321, 1326–28 (11th Cir. 2012) (demonstrating that, although there is a circuit split as to whether the "extreme cruelty" analysis is discretionary, all circuits look to conduct and not convictions in conducting the "extreme cruelty" analysis); Stepanovic v. Filip, 554 F.3d 673, 680 (7th Cir. 2009) (explaining that, in analyzing whether conduct rises to the level of "extreme cruelty," the immigration judge "must determine the facts of a particular case, make a judgment call as to whether those facts constitute cruelty, and, if so, whether the cruelty rises to such a level that it can rightly be described as extreme"). In addition, adjudicators have experience reviewing questions of an alien's conduct in other contexts during the course of removal proceedings. See INA 212(a)(2)(C) (8 U.S.C. 1182(a)(2)(C)) (providing that an alien is inadmissible if "the Attorney General knows or has reason to believe" that the alien is an illicit trafficker of a controlled substance, regardless of whether the alien has a controlled substance-related conviction).

[45] In Fiscal Year ("FY") 2018, DOJ's immigration courts granted over 13,000 applications for asylum. See EOIR, Adjudication Statistics: Asylum Decision Rates, (July 14, 2020), https://www.justice.gov/eoir/page/file/1248491/download.

8 CFR 208.16 through 208.18; 1208.16 through 1208.18. For those aliens barred from asylum under this rule who would otherwise be positively adjudicated for asylum, it is possible they would qualify for withholding (provided a bar to withholding did not apply separate and apart from this rule) or deferral of removal.[46] To the extent this rule has any impacts, they would almost exclusively fall on that population.[47]

The full extent of the impacts on this population is unclear and would depend on the specific circumstances and personal characteristics of each alien, and neither DHS nor DOJ collects such data at such a level of granularity. Both asylum applicants and those who receive withholding of removal or protection under CAT may obtain work authorization in the United States. Although asylees may apply for lawful permanent resident status and later citizenship, they are not required to do so, and some do not. Further, although asylees may bring certain family members to the United States, not all asylees have family members or family members who wish to leave their home countries. Moreover, family members of aliens granted withholding of removal may have valid asylum claims in their own right, which would provide them with a potential path to the United States as well. The only clear impact is that aliens granted withholding of removal generally may not travel outside the United States without executing their underlying order of removal and, thus, may not be allowed to return to the United States; however, even in that situation—depending on the destination of their travel—they may have a prima facie case for another grant of withholding of removal should they attempt to reenter. In short, there is no precise quantification available for the impact, if any, of this rule beyond the general notion that it will likely result in fewer grants of asylum on the whole.

Applications for withholding of removal typically require a similar amount of in-court time to complete as an asylum application due to a similar nucleus of facts. 8 CFR 1208.3(b) (an

asylum application is deemed to be an application for withholding of removal). In addition, this rule does not affect the eligibility of applicants for the employment authorization documents available to recipients of those protections and during the pendency of the consideration of the application in accordance with the current regulations and agency procedures. *See* 8 CFR 274a.12(c)(8), (c)(18), 208.7, 1208.7.

This rule removes the provision at 8 CFR 208.16(e) and 1208.16(e) regarding automatic reconsideration of discretionary denials of asylum. This change has no impact on DHS adjudicative operations because DHS does not adjudicate withholding requests. DOJ estimates that immigration judges nationwide must apply 8 CFR 1208.16(e) in approximately 800 cases per year on average.[48] The removal of the requirement to reconsider a discretionary denial will increase immigration court efficiencies and reduce any cost from the increased adjudication time by no longer requiring a second review of the same application by the same immigration judge. This impact, however, would likely be minor because of the small number of affected cases, and because affected aliens have other means to seek reconsideration of a discretionary denial of asylum. Accordingly, DOJ has concluded that removal of paragraphs 8 CFR 208.16(e) and 1208.16(e) would not increase the costs of EOIR's operations, and would, if anything, result in a small increase in efficiency. Removal of 8 CFR 208.16(e) and 1208.16(e) may have a marginal cost for aliens in immigration court proceedings by removing one avenue for an alien who would otherwise be denied asylum as a matter of discretion to be granted that relief. However, of the average of 800 aliens situated as such each year during the last 10 years, an average of fewer than 150, or 0.4 percent, of the average 38,000 total asylum completions[49] each year filed an appeal in their case, so the affected population is very small, and the overall impact would be nominal at most.[50]

Moreover, such aliens would retain the ability to file a motion to reconsider in such a situation and, thus, would not actually lose the opportunity for reconsideration of a discretionary denial.

For the reasons explained above, the expected costs of this rule are likely to be *de minimis*. This rule is accordingly exempt from Executive Order 13771. *See* OMB, *Guidance Implementing Executive Order 13771, titled "Reducing Regulation and Controlling Regulatory Costs"* (2017), *https://www.whitehouse .gov/sites/whitehouse.gov/files/omb/ memoranda/2017/M-17-21-OMB.pdf.*

### F. Executive Order 13132 (Federalism)

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### G. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### H. Paperwork Reduction Act

This rule does not propose new or revisions to existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. 3501 *et seq.,* and its implementing regulations, 5 CFR part 1320.

### I. Signature

The Acting Secretary of Homeland Security, Chad F. Wolf, having reviewed and approved this document, has delegated the authority to electronically sign this document to Chad R. Mizelle, who is the Senior Official Performing the Duties of the General Counsel for DHS, for purposes of publication in the **Federal Register**.

### List of Subjects

#### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

#### 8 CFR Part 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

---

[46] Because asylum applications may be denied for multiple reasons and because the proposed bars do not have exact analogues in existing immigration law, there is no precise data on how many otherwise grantable asylum applications would be denied using these bars and, thus, there is no way to calculate precisely how many aliens would be granted withholding. Further, because the immigration judge would have to adjudicate the application in either case, there is no cost to DOJ.

[47] In FY 2018, DOJ's immigration courts completed 45,923 cases with an application for asylum on file. For the first three quarters of FY 2018, 622 applicants were denied asylum but granted withholding.

[48] This approximation is based on the number of initial case completions with an asylum application on file that had a denial of asylum but a grant of withholding during FYs 2009 through the third quarter of 2018.

[49] Thirty-eight thousand is the average of completions of cases with an asylum application on file from FY 2008 through FY 2018. Completions consist of both initial case completions and subsequent case completions.

[50] Because each case may have multiple bases for appeal and appeal bases are not tracked to specific levels of granularity, it is not possible to quantify precisely how many appeals were successful on this particular issue.

## DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble and pursuant to the authority vested in the Acting Secretary of Homeland Security, part 208 of title 8 of the Code of Federal Regulations is amended as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as fol1ows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229, 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.13 by adding paragraphs (c)(6) through (9) to read as follows:

### § 208.13  Establishing asylum eligibility.

\*  \*  \*  \*  \*

(c) \* \* \*

(6) *Additional limitations on eligibility for asylum.* For applications filed on or after November 20, 2020, an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the asylum officer knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined either under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the asylum officer to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The asylum officer need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs).

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

(*1*) An alien who is a current or former spouse of the person;

(*2*) An alien with whom the person shares a child in common;

(*3*) An alien who is cohabiting with or has cohabited with the person as a spouse;

(*4*) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(*5*) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the asylum officer is not limited to facts found by the criminal court or provided in the underlying record of conviction.

(C) An alien who was convicted of offenses described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving:

(*1*) The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

(*2*) The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

(*3*) Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

(vii) The asylum officer knows or has reason to believe that the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) An alien who is a current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local

government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)–(ii) of the Act.

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or conviction also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the asylum officer determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

(9) An asylum officer is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine

whether such order should be given any effect under this section.

**§ 208.16   [Amended]**

■ 3. Amend § 208.16 by removing and reserving paragraph (e).

**Department of Justice**

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR part 1208 as follows:

**PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 4. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229; Pub. L. 115–218.

■ 5. Amend § 1208.13 by adding paragraphs (c)(6) through (9) to read as follows:

**§ 1208.13   Establishing asylum eligibility.**

\*     \*     \*     \*     \*

(c) \* \* \*

(6) *Additional limitations on eligibility for asylum.* For applications filed on or after November 20, 2020, an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the immigration judge knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined either under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or

drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the immigration judge to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The immigration judge need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs).

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse, child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

(*1*) An alien who is a current or former spouse of the person;

(*2*) An alien with whom the person shares a child in common;

(*3*) An alien who is cohabiting with or has cohabited with the person as a spouse;

(*4*) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(*5*) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the immigration judge is not limited to facts found by the criminal court or

provided in the underlying record of conviction.

(C) An alien who was convicted of offenses described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving:

(*1*) The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

(*2*) The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

(*3*) Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

(vii) The immigration judge knows or has reason to believe that the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in

8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) An alien who is a current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)–(ii) of the Act.

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or conviction also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the

offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the immigration judge determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

(9) An immigration judge is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine whether such order should be given any effect under this section.

## § 1208.16 [Amended]

■ 6. Amend § 1208.16 by removing and reserving paragraph (e).

Approved:

**Chad R. Mizelle,**

*Senior Official Performing the Duties of the General Counsel, U.S. Department of Homeland Security.*

Approved:

Dated: October 14, 2020.

**William P. Barr,**

*Attorney General.*

[FR Doc. 2020–23159 Filed 10–20–20; 8:45 am]

**BILLING CODE 4410–30–P 9111–97–P**



# NATIONAL DRUG CONTROL STRATEGY

*A Report by the*
**Office of National Drug Control Policy**

**FEBRUARY 2020**

ER-0195

AR.07731

NATIONAL DRUG CONTROL STRATEGY

# TABLE OF CONTENTS

Preface

Introduction ................................................................................................................................... 1

Strategic Outcome and Assumptions ........................................................................................... 4

Strategy Implementation .............................................................................................................. 5

Prevention ..................................................................................................................................... 6

Treatment and Recovery ............................................................................................................. 11

Reducing the Availability of Illicit Drugs in the United States .................................................. 17

Goals and Budget Projections .................................................................................................... 24

Appendix 1: List of Supporting Planning Documents ............................................................... 28

Appendix 2: ONDCP's Role in Facilitating the Achievement of the Strategic Goals and
the Existing Coordination Mechanisms Necessary for Achieving the Strategic Goals .......... 29

Appendix 3: Mission Statement and List of National Drug Control Program Agencies
and Role in Achieving Strategic Goals ...................................................................................... 31

Appendix 4: Role of Key Stakeholders and Partners in the Strategy ...................................... 33

Appendix 5: National Drug Control Strategy Research and Data Collection Plan ................. 37

ER-0196



Despite the challenges communities continue to face related to the negative consequences of the trafficking and use of illicit drugs and the continued availability of illicit drugs across the Nation, over the past year we have seen significant progress in strengthening communities across the Nation to address this evolving crisis. The Trump Administration remains focused on making continued progress in its second *National Drug Control Strategy* dedicated to reversing the adverse impacts of addiction so we may continue to save American lives and set our Nation on a path to being stronger, healthier, and drug-free.

This Strategy focuses Federal government efforts along three complementary lines of effort. First, we must continue to prevent initiates to drug use through education and evidence-based prevention programs. Second, we must continue to reduce barriers to treatment services so that access to long-term recovery is available for those suffering from substance use disorder. And finally, we must continue our work to drastically reduce the availability of these drugs in the United States through law enforcement and cooperation with international partners to eliminate the negative effects that drug trafficking has on the safety of our communities and the well-being of our citizens.

Drug misuse and abuse continues to endanger too many communities, ruin too many families, and takes the lives of too many of our fellow Americans. Drug addiction is causing rises in the number of children in foster care, job insecurity, and transportation safety issues. While this Strategy reflects the President's top priority to address the current opioid crisis and reduce the number of Americans dying from these dangerous drugs, it also sets us on the path to develop further the capability, knowledge, and infrastructure to respond quickly to the evolving nature of our Nation's drug threats. It reflects our understanding of the complex interplay between the availability of drugs in the U.S. market and their use, anticipates changes in the drug environment in both the public health and law enforcement domains, and allows us to adapt our actions and make lasting progress against this historic national security, law enforcement, and public health challenge.

Most importantly, it demands our full effort and a relentless focus on delivering results. The American People should expect nothing less.

James W. Carroll
Director of National Drug Control Policy

AR.07733

*"Our Administration remains committed to protecting American families and communities from the dangers of substance use. Working together we will lead our Nation to become a stronger, healthier, and drug-free society."*

—PRESIDENT DONALD J. TRUMP

# INTRODUCTION

During the past year we have indeed made some progress in preventing drug use, reducing barriers to treatment leading to long-term recovery, and reducing the availability of drugs in our communities and our homes. The Trump Administration has made life-saving gains through the synchronized approach laid out in the final report of The *President's Commission on Combating Drug Addiction and Opioid Abuse* in 2017, President Trump's *Initiative to Stop Opioid Abuse and Reduce Drug Supply and Demand* in 2018, and the Administration's 2019 *National Drug Control Strategy*. Nevertheless, far too many Americans continue to lose their lives to drug use, and drugs remain all too available throughout our Nation. While some advances have been made in our daily work to address the country's unprecedented drug crisis, we remain far from achieving the President's vision of being a healthier and drug-free society.

We must continue the hard work of individuals and organizations at all levels of government and civil society in an effort to resolve the crisis and to save American lives. It is well-understood that the crisis has evolved over several decades and has steadily worsened with time. Every state and county, and every socioeconomic group in our country, continues to be affected by the negative consequences of illicit drug use. However, as in the past year, our long-term success can only be achieved by our collective commitment to save lives and establish lasting solutions to this historic problem. The partnership of our law enforcement and public health professionals, working side-by-side, and inspired by the strength and wisdom of families who have lost loved ones to the scourge of drug use, continue to make a significant difference. This *National Drug Control Strategy*, the Trump Administration's second, affirms the President's priorities for addressing the challenge of drug trafficking and use, now and in coming years. It also provides the strategic direction necessary for the Federal government to prevent initiates to drug use through education and evidence-based prevention, provide treatment for those suffering from the disease of addiction so they can reach long-term recovery, and reduce the availability of these dangerous drugs in every American community.

The President's top priority remains, as he articulated in his first strategy, to address, head on, the current opioid crisis and reduce the number of Americans dying from these dangerous drugs. In 2017, there were more than 70,200 drug overdose deaths in the United States.[1] More than 47,500 of these deaths involved an opioid, and more than half of these deaths involved a synthetic opioid such as illicit fentanyl or one of its analogues. From 2014 to 2017, the number of deaths attributed to synthetic

---

[1] These are the latest available statistics of annual mortality due to drug overdoses in the United States. The 2018 statistics are expected to be issued by the Center for Disease Control and Prevention (CDC) in early 2020.

AR.07734

opioids like fentanyl and its analogues increased 413 percent, and these synthetic opioids are now involved in more deaths than any other drug such as prescription opioids, heroin, or cocaine. The infectious disease consequences of the opioid epidemic is also of grave concern. Since 2010, the United States has seen hepatitis C infection increase more than three-fold. Progress made in HIV resulting from injection drug use has stalled. Moreover, methamphetamine availability and use shows signs of renewed growth. According to the most recent available data, 10,333 Americans died in 2017 from a drug overdose involving methamphetamine and other psychostimulants with abuse potential, and half of these deaths also involved a prescription or illicit opioid, with a quarter involving a synthetic opioid such as fentanyl.

As he has since the beginning of his Administration, the President has marshalled every available resource throughout the Federal government to address America's crisis of drug abuse and addiction[2], requesting over $34.6 billion in his Fiscal Year 2020 Drug Control Budget to help states, communities, and law enforcement respond to the drug crisis and curb drug trafficking through several existing and new initiatives. The Trump Administration's whole-of-government approach reflected in these resources and articulated in this *Strategy* is focused on achieving a singular and overarching purpose: to prevent Americans from dying of a drug overdose.

While confronting today's drug crisis to arrest its growth and reduce its effects, we must also redouble our efforts to develop the capability, knowledge, and infrastructure to respond to the evolving nature of the drug threat. Over the past year we have seen the drug crisis transform in every dimension. A much larger variety of new and highly potent synthetic opioids and other synthetic drugs are being rapidly developed and shipped into the United States at an increasing rate. New marketing and sales techniques are making their detection and interdiction more challenging than ever. The historically low price for some synthetic drugs like methamphetamine is putting them within the economic reach of even more potential users, leading to an increasing trend of polydrug use across America. We have even seen an evolution in the manner in which drugs are taken into the body, including a startling and dangerous increase in concentrated marijuana-type drugs being ingested through vaping devices.

We must also confront the increasing availability and use of cocaine in the United States. The cultivation of coca and production of cocaine in Colombia, the source of the vast majority of the cocaine in the U.S. market, remains at record highs even in light of a slight leveling in 2018. Cocaine use in the United States continues to rise again after many years of decline. The National Survey of Drug Use and Health (NSDUH) shows that in 2018 there were 1.9 million people aged 12 and above who were past-month users of cocaine and 874,000 new cocaine initiates, averaging approximately 2,400 individuals per day. Moreover, the suspension of aerial eradication programs in Colombia that began in 2015 led to even greater yield from coca plants, resulting in increased production and purity levels that continues to bring negative consequences. From 2016 to 2017, overdose deaths in which cocaine was the primary

[2]The Diagnostic and Statistical Manual of Mental Disorders (DSM-5) contains descriptions and symptoms of all medical disorders classified by the American Psychiatric Association, including substance use disorder. The *Strategy* and ONDCP uses the word "addiction" to describe compulsive drug seeking despite negative consequences. ONDCP's use of the term addiction is consistent with the DSM definition of substance use disorder but acknowledges that addiction is not a specific diagnosis in the DSM-5.

AR.07735

contributing drug increased 34 percent.

The fundamental motivation of drug traffickers remains unchanged. They continue to attempt to secure ever-greater profits by expanding their customer base through the introduction of novel substances that create new user experiences, reducing production overhead, and mitigating risks to their supply chains by continually finding new methods of concealment and routes into the United States. The exponential growth in the availability and use of synthetic drugs in the United States continues to show us the face of drug use and trafficking for the foreseeable future. Drug trafficking organizations can avoid the costly process of harvesting illicit crops and producing plant-based drugs by the much cheaper and faster process of chemical synthesis. Potent synthetic drugs are smuggled across our borders in small quantities that can be more easily concealed than bulkier plant-based drugs. They are also purchased cheaply on the dark web using cryptocurrencies that provide anonymity, and shipped into the United States through international mail or as express consignment shipments. The combination of low production cost, the anonymity of the dark web and cryptocurrencies, and drugs with higher potency than their plant-based counterparts creates a favorable risk-reward structure that drug traffickers are now embracing to an even greater degree than ever before.

Given the current drug crisis facing America, and the President's priorities, this *Strategy* continues its strong bias toward action. The three lines of effort and associated nine goals contained in the *Strategy* were determined by drawing upon the collective expertise at the Federal, State, local and Tribal levels by key stakeholders in the governmental, academic, civic, law enforcement, and public health communities. Their deep understanding of America's drug crisis was fundamental to determining the *Strategy's* nine goals and has allowed us to better understand the complex interplay between the availability of drugs in the U.S. market and their use, anticipating changes in the drug environment in both the public health and law enforcement domains, and adapting our actions to seize the initiative to make lasting progress against this historic challenge. Specifically, Goals 1, 2, 4, 5, and 6, which are associated with the line of effort to prevent initiates to drug use, were selected based on our consultations with public health experts whose research and clinical experience determined that addiction is a disease that must be prevented from the start, and prevention is most effective when it is carried out over the long-term with repeated evidenced-based interventions. Similarly, Goals 1 and 3, which relate to the treatment and recovery line of effort, were selected based on our consultations with public health experts who understand that addiction is a chronic disease that should be treated like any other medical condition. This evidence, based on research and clinical expertise of our stakeholders, informed our decision to establish these goals. Finally, those goals related to addressing the availability of illicit drugs, Goals 1, 7, 8, and 9 were the result of consultations with Federal, State and local and Tribal government and law enforcement organizations. These consultations clearly demonstrated that almost all illicit drugs are produced outside the United States and then trafficked across the borders or via international mail or express consignment carriers. This evidence informed our selection of the goals that will aggressively reduce the availability of illicit drugs in American communities.

The global drug trafficking environment is vast, dynamic, and adaptable, but it is not without

AR.07736

vulnerabilities. It is only through a unified effort in which the Federal government works with, and in support of, creative and resourceful individuals and organizations across the country and within the nations of our international partners, that we can address this complex national security, law enforcement, and public health problem.

# STRATEGIC OUTCOME AND ASSUMPTIONS

This *Strategy* focuses on achieving one overarching strategic outcome:

> *Building a stronger, healthier, drug-free society today and in the years to come by drastically reducing the number of Americans losing their lives to drug addiction in today's crisis, and preparing now to dominate the drug environment of the future. This will be done by preventing initiates to drug use, providing treatment services leading to long-term recovery for those suffering from addiction, and aggressively reducing the availability of illicit drugs in America's communities.*

This *Strategy* consists of three interconnected lines of effort designed to achieve the President's strategic outcome of building and fostering a stronger, healthier, and drug-free society: prevention; treatment and recovery; and reducing the availability of drugs in America. The single and most important criterion of success is saving American lives, and achieving that outcome requires the Federal government to work with partners at the State, local, and Tribal levels; the healthcare sector; industry; foreign partners; and every concerned American citizen to advance our Nation's efforts to promote and maintain healthy lifestyles, and help build and grow safe communities free from the scourge of drug use and addiction.

This *Strategy* makes several key assumptions:

- Deliberate, sustained, and well-coordinated evidence-based prevention and education efforts will, over time, reduce the number of Americans who initiate illicit drug use.

- Better prescribing practices and the promotion of alternatives to prescription drugs that hold a high potential for addiction and misuse will have a positive effect on reducing the number of initiates to illicit drug use.

- Increasing the availability, access, and quality of evidence-based treatment and recovery services for substance use disorder, particularly in rural, tribal and other underserved communities, will lead to a greater number of Americans achieving sustained recovery.

- Reducing the availability of illicit drugs in the United States by disrupting the illicit drug supply chain will relieve pressure on our public health efforts, allowing our historic effort to prevent drug use and increase the availability of treatment to take hold, and increasing the potential sustainable success over time.

- Aggressive and versatile drug trafficking organizations will respond to sustained pressure

4

placed upon them by disruption, dismantlement, interdiction efforts, and judicial/prosecutorial efforts, and will adapt their production and trafficking methods to minimize risk and maximize profit.

This *Strategy* acknowledges several key challenges:

- Drug trafficking and transnational criminal organizations are highly adaptable.

- The path to substance use disorder is multifaceted and extremely individualized. Consequently, prevention, treatment, and recovery support services must also be multifaceted and individualized to maximize effectiveness.

- Synthetic drugs are easily modified, and rapid modifications in synthetic drug types and structures make their early detection a challenge.

# *STRATEGY* IMPLEMENTATION

The three fundamental lines of effort that form the heart of this *Strategy*—prevention, treatment and recovery, and reducing availability—are complementary and mutually supporting. Reducing the size of the illicit drug using population involves **preventing** initiates to illicit drug use through education and evidence-based prevention programs. Providing effective **treatment services leading to long-term recovery** for those suffering from substance use disorder, often using medication-assisted treatment (MAT) combined with therapy, moves people out of the active user population and puts them on the path to recovery. By reducing the number of individuals who use illicit drugs through prevention and treatment, we can diminish the market forces pulling illicit drugs across our borders and into our communities. Simultaneously, we must drastically reduce the **availability** of these drugs in the United States. Increased availability expands the opportunity for individuals to initiate drug use, and the path from first use to chronic use can be brutally short, particularly for potent and highly addictive drugs like methamphetamine and opioids. By reducing availability we not only lessen the negative ancillary effects of drug trafficking that impact the safety of our communities and the well-being of our citizens, we also relieve the pressure on the public health domain in its prevention and treatment efforts.

This *Strategy* does not enumerate every activity that the Federal government and key stakeholders must execute in order to achieve the President's strategic outcome. Rather, it articulates the President's drug control priorities and sets the strategic direction for the Administration to prevent Americans, especially our future generations, from falling into the cycle of drug use and addiction; to provide Americans who suffer from substance use disorders with world class treatment and recovery services; and to protect America's citizens from the negative effects of drug trafficking and use. It also provides Federal drug control departments and agencies the strategic guidance they need to develop their own drug control plans and strategies and ensures programming and resource decisions about Federal drug control budget dollars are allocated in a manner consistent with the Administration's priorities.

NATIONAL DRUG CONTROL STRATEGY

# PREVENTION

Preventing drug use before it starts is a fundamental tenet of a comprehensive approach to drug control. The science of prevention has evolved and significantly improved, and decades of research show that prevention is most effective when it is carried out over the long-term with repeated evidence-based interventions. Early detection of those most at risk united with education programs and community support mechanisms can alter the trajectory of young people's lives by increasing protective factors while reducing risk factors. Studies show that addiction is a disease that can be prevented and treated through sound public health interventions.

Early recognition and addressing risky substance use can help interrupt the trajectory toward more chronic substance use disorders and opportunities to screen for risky behavior should be widespread. Many medical organizations have developed evidence-based screening tools and recommend screening for drug use and prescription drug misuse for adolescents, as well as adults. All health systems should be using screening tools as part of routine health care. Given the high prevalence of co-occurring mental and substance use disorders, we must ensure adoption of comprehensive screening and integrated treatment for both. There is a significant relationship between mental health and substance use disorders at all ages, and it is common for persons to use substances in an attempt to self-medicate the symptoms of mental illness. Substance use can mask or exacerbate symptoms of mental illness and both disorders share common risk and protective factors that should be assessed and addressed together where possible, and treated when indicated. Facilities and professionals serving persons with either disorder should have the skill and operational capacity to provide integrated treatment that addresses behavioral and physical health, family, and environmental problems in addition to substance use. Additionally, treatment providers should recognize the different prevention and treatment considerations for children and young adults, and provide age appropriate care. Because the developing brain continues growth until at least age 25, children and young adults are more susceptible to addiction. Children and young adults also require age appropriate and relevant substance use prevention which integrates elements of sociocultural environment, social norms, trauma informed approaches, and resiliency-building interventions to help them make healthy lifestyle choices.

Individuals who have experienced a high number of traumatic or challenging experiences in childhood are at a significantly elevated risk for developing substance use disorder, and therefore need increased access to prevention education and intervention. Adverse Childhood Experiences (ACEs) describes the exposure of a person under the age of 18 to trauma, abuse, household challenges and neglect. As the number of ACEs increases, the likelihood of engaging in risky health behaviors including alcohol and drug use also increases. Research from the National Center for Chronic Disease Prevention and Health Promotion has shown that there is a correlation between having a higher ACE score and the number of prescriptions or classes of illicit drugs used by an individual, even long after the initial exposure to the childhood trauma. While significant challenges early in life, and a high ACE score, do not determine that a child will have poor life outcomes, they nonetheless present an increased need for protective factors to prevent drug misuse. Young people who are identified as being particularly vulnerable to

6

AR.07739

addiction have an increased potential for positive outcomes if they have access to supportive adults, exposure to evaluated drug prevention education, opportunities for academic and extracurricular engagement, and clear boundaries related to conduct and drug use.

Evidence continues to demonstrate that combining multiple evidence-based approaches in a comprehensive prevention program is more effective than a single activity alone. Moreover, these early investments pay large dividends in substantially reducing treatment and criminal justice costs, saving taxpayer dollars while reducing the number of young people whose lives are tragically affected by early substance misuse.

Finally, while the opioid crisis in America has mobilized awareness, action, and resources to reduce overdose fatalities, we cannot ignore the larger landscape of substance use and substance use disorders. Poly-substance use has become much more common as individuals make economic decisions about the drugs they use. It is important that we take the opportunity to leverage the momentum of our national response to the opioid crisis, and apply it to preventing the first use of all drugs using the decades of scientific evidence on effective primary prevention to launch and fully support effective prevention in homes, schools, the workplace, and communities.

## Strengthening the Capacity of State, Local, and Tribal Communities to Identify and Prevent Substance Misuse

Family, friends, and local communities are the first line of defense in preventing substance use and misuse. In addition, positive adult involvement in children's lives reduces the likelihood of drug use. Given the strong relationship between excessive alcohol use and binge drinking, and the misuse of prescription opioids and other illicit drugs, this Strategy emphasizes the need to implement effective community-based strategies to reduce misuse of legal substances, along with those to reduce the initiation of illicit drug use. Parents and primary caregivers must understand that they can make the most significant difference in the child's attitudes and values regarding the use of drugs. Religious and faith-based organizations are also an integral part of the community response to substance misuse, and clergy and faith-based organizations have been critical allies at keeping youth away from drugs and providing successful support when youth have turned to drug use. This *Strategy* supports and reinforces the positive resources that family, friends, and the community can bring to bear on this crisis at both the prevention and the treatment and recovery levels. Parents and families are historically under-represented in prevention programs despite the fact that family-based programs play a vital role in delaying the onset and use of alcohol and other drugs. This is true for school outreach programs as well. Finally, to build effective grassroots solutions, local leaders need greater access to data about drug use and drug-related deaths in their communities, as well as information on the demographic factors that may be driving those trends. Our rural communities have a particular need for comprehensive information about the many Federal funding resources available to combat addiction and to build capacity to assist a community in responding to the crisis. Federal grant-making agencies should continue to assist these rural communities in knowing what to apply for and the process for applying for these resources.

AR.07740

## Enhancing Research and the Development of Evidence–Based Prevention Programs

The National Academies of Sciences, Engineering, and Medicine outline three categories of prevention intervention: universal, selective, and indicated. Advancing our ability to prevent drug use before it starts will require, among other things, more widespread adoption and use of evidence-based methods to identify at-risk individuals using strategies that allow for screening, brief intervention, and referral to treatment. This is especially important for adolescents and young adults, from the middle school years through college age. In addition, we must work with stakeholders to increase opportunities to educate and inform child welfare professionals and healthcare providers about the early signs of substance misuse and identify resources to support pregnant and parenting women, children of parents with substance use disorders or addiction, and children born with neonatal abstinence syndrome (NAS). We must engage the research sector and prevention community to build evidence on interventions that address the Nation's ever-changing addiction crisis in diverse communities and conditions.

## Continuing to Strengthen ONDCP's Drug Free Communities Support Program

The Office of National Drug Control Policy's (ONDCP's) Drug-Free Communities (DFC) Support Program, created by the Drug-Free Communities Act of 1997, undergirds the Administration's focus on preventing and reducing youth substance use at the community level. The DFC Program provides grants to community coalitions to strengthen the infrastructure among local partners to create and sustain a reduction in local youth substance use. Since the DFC Program's inception, findings from evaluations of the DFC Program demonstrate that DFC-funded community coalitions have reduced youth substance use. According to the DFC's 2018 National Cross-Site Evaluation Report, on average DFC-funded communities saw significant reductions in middle school and high school aged youth. For example, past 30-day alcohol use decreased by 19 percent, past 30-day tobacco use decreased by 31 percent, past 30-day marijuana use decreased by 7 percent, and past 30-day prescription drug use decreased by 24 percent among high school students in DFC-funded communities. The DFC Program, through the National Coalition Institute (NCI), will provide training to ensure DFC-funded community coalitions have the resources, tools and skillset they need to develop, strengthen, and sustain the prevention infrastructure within their communities and among their local partners to effectively prevent and reduce youth alcohol, tobacco, marijuana, vaping, and prescription drug misuse.

## Addressing Safe Prescribing Practices

Safe prescribing practices are essential in primary prevention by decreasing the risk of drug addiction in patients who take opioids and controlled medications. Safe prescribing is also important for patients using medications at high dosages or with central nervous system depressants that in combination can lead to drug interactions, including overdose. Finally, safe prescribing also includes prevention of using medications for non-medical purposes.

Significant effort has gone into the development of evidence-based guidelines for the use of

NATIONAL DRUG CONTROL STRATEGY

medications and non-pharmacological therapies for the treatment of acute or chronic pain. These guidelines include recommendations for the dosing and duration of use of opioid analgesics, the use of lower risk opioid and non-opioid medications, and the development of innovative pain therapies that avoid potentially addictive medications. Another key area of concern is the practice of co-prescribing opioids and benzodiazepines or other drugs that increase the risk of opioid overdose or fatal respiratory depression. Overdose data shows that more than 30 percent of overdoses involving opioids also involve benzodiazepines. While opioid and other controlled substance prescribing practices continue to improve, continued monitoring, evaluation, and improvement, along with the enhanced ability to track prescribing across providers and states through the integration of Prescription Drug Monitoring Programs (PDMPs) and Electronic Health Records (EHRs) are essential to promoting safe and responsible prescribing, while also assuring appropriate pain care.

Prescribing naloxone can be life saving for patients on high dose opioids, along with those who use illicit drugs or are otherwise at risk for an accidental overdose. In 2018, the CDC reported that only one naloxone prescription was dispensed for every 69 high-dose opioid prescriptions, despite the fact that the number of naloxone prescriptions has doubled from 2017 to 2018. In 2017, unintentional overdoses involving prescribed medications other than illicit fentanyl were more than twice as common as in 1999. The medical community has responded by limiting opioid prescriptions both in terms of the total number of pills prescribed and the total morphine milligram equivalent (MME) of the prescriptions dispensed.  The total year-to-date billions of MMEs dispensed as of September 2018 decreased 16 percent over the prior year.

While we have made significant gains in reducing cases of unsafe or inappropriate prescribing, we must remain aware that patients with acute and especially chronic pain and who rely upon opioid medications to live comfortable and productive lives legitimately require access to opioid medications. Moreover, providers who know and understand their patients are in the best position to administer opioid medications at the correct dosage in a safe and responsible manner. Some patients do require long term pain management that includes opioids and others may be able to work with their clinicians to appropriately taper or discontinue opioid medications. Patients may also require ongoing treatment for any co-occurring behavioral health conditions such as depression. In some cases, specialty referral to a pain management or substance use disorder specialist may be necessary. While treatment guidelines are important and beneficial, the doctor-patient relationship is the foundation of quality medical care and must be tailored to meet the individual patient's needs.

## Expanding the Use of Prescription Drug Monitoring Programs

A PDMP is a proven means to increase accountability in opioid prescribing practices by providing information that allows for the coordination of multiple medications, as well as to prevent adverse drug interactions. However, PDMP use faces challenges nationwide. In some states PDMP checking is optional, and many providers report difficulty using their PDMP because it is not integrated with EHRs which interrupts providers' workflow and creates practical barriers to their use. In those cases where states' integration services are available, the service can be costly. Providers also cite a lack

AR.07742

NATIONAL DRUG CONTROL STRATEGY

of interstate data-sharing and concerns about patient confidentiality as reasons not to fully use the PDMP. Currently, two PDMP data sharing hubs exist and many states share data freely across state lines. However, remaining technical, legal, and procedural barriers remain and have thus far prevented the full development and execution of a nationwide PDMP capability. Expanding the use of PDMPs is a fundamental element of the *President's Initiative to Stop Opioid Abuse*, our *Strategy*, and ensuring the safe, legal, and responsible prescribing of opioids for those who need them. Expanding the use of PDMPs across the country means each state is choosing the system(s) it wants based on cost, needs, or whatever else they determine are important factors; ensuring that all systems communicate with each other and are integrated within provider workflows so they can be useful to providers; and the creation of a federated group of state PDMPs all able to seamlessly share data needed to connect with one another across the country. We will continue to work with our key stakeholders to build on existing research regarding barriers to nation-wide PDMP implementation, and drive PDMP integration and data sharing, including efforts that address any legal and interoperability challenges. We will also pursue incentives for states to make checking PDMPs mandatory for all providers, such as the Centers for Medicare and Medicaid Services' new incentive that offers five bonus points to prescribers who query the PDMP under the Medicare Merit Based Incentive Payment System.

## Expanding Drug Take–Back across the Country

The Drug Enforcement Administration's (DEA) twice-yearly Take-Back Day serves as an opportunity for citizens to dispose of unused and unneeded prescription drugs and a chance to support community drug prevention efforts. This past year, amidst an outbreak of vaping-related lung illness, the DEA has included the Take-Back of vaping products in addition to unused prescriptions for the first time. Although year-round take-back programs are expanding, including some by retail drug stores, the DEA program remains an important element to raise public awareness about the need to reduce unused medications available for potential diversion and misuse. Expanding the number of registered collectors, including hospitals and law enforcement centers, would allow states and municipalities to reduce their reliance on the Federal government for collection, disposal, and transportation. It should be noted that the number of authorized collectors has climbed from almost 6,000 in January 2019 to over 8,850 in December 2019, an increase of 40 percent. The DEA and other Federal partners should work to engage State, local, and Tribal governments to raise awareness of the importance of disposing unused medications, expand the number of permanent disposal sites across the country, and increase the opportunity for their citizens to do so safely and easily. In addition, at-home disposal options should be more widely available, particularly in rural and tribal communities where prescribing rates are historically high, take-back options are limited, and transportation may be a barrier to accessing existing disposal locations.

## Conclusion

Decades of research and data demonstrate addiction is a preventable disease. Today, we continue to face a compelling need to invest in a comprehensive approach to preventing drug misuse that emphasizes concrete and lasting policy change at the Federal, State, Tribal, and community levels.

NATIONAL DRUG CONTROL STRATEGY

The Administration will continue to focus its efforts and work across the government to empower communities, youth, parents, caregivers, and families to come together to create sustainable programs, policies, and practices to combat drug abuse. We know that every dollar we invest in evidence-based substance use prevention programs has the potential to save much more in health care and criminal justice system costs and enhance the overall quality of life for communities and their citizens.

# TREATMENT AND RECOVERY

Addiction is a chronic medical condition that affects the brain by causing distinct cognitive, behavioral, and physiological changes. There is a need to improve the availability of treatment while concurrently enhancing the quality of that treatment. Research shows that treatment is most effective when it addresses addiction as a chronic condition requiring continuing services and support structures over an extended period of time. This can include ongoing outpatient services including MAT programs, intensive initial services such as detoxification, hospitalizations, and residential treatment, followed by continued care and recovery support in the community. Expanding treatment availability also requires accessibility for older adults and people with disabilities, including ensuring treatment centers are physically accessible. Every individual needs an assessment and individualized treatment plan to address their needs as they relate to opioid and other substance use disorders.

Unfortunately, most people who need treatment do not seek it. According to the NSDUH, in 2018 an estimated 21.2 million Americans aged 12 or older needed treatment for a substance use disorder, but only 3.7 million received any kind of treatment and only 2.4 million received that treatment at a specialty facility—a disparity known as the "treatment gap." In some cases treatment capacity is simply not available, and in others people do not fully acknowledge their need for treatment. Therefore, in addition to expanding treatment capacity, we need to engage with those people who need treatment but, for whatever reason, are not seeking it. Furthermore, according to the 2018 NSDUH, 62 percent of the 7.4 million working age adults who had illicit substance use disorder were employed either full-time (45 percent) or part-time (17 percent). The perception that one must "hit rock bottom" to need treatment is not accurate, and we must work to raise awareness of early intervention.

As a Nation, we must encourage people who need treatment to seek it, create greater access to treatment, and ensure there is adequate capacity and quality to accommodate the need. The Administration prioritizes several distinct initiatives to achieve these goals. First, we must expand a proactive response to overdoses to ensure that the patient can enter into a treatment program designed to meet his or her individual needs. Second, we need to use evidence-based approaches to treatment and make MAT the standard of care for opioid addiction. This means increasing the number of physicians providing high-quality, evidence-based MAT for opioid use disorders and increasing the availability of MAT for incarcerated individuals and people living in rural and tribal communities. Expanding treatment infrastructure will enable us to increase the initial treatment for the vast majority of people who require treatment but are unable or unwilling to obtain it. Third, we need to ensure that health insurance plans provide substance use disorder benefits in parity with medical/surgical

11

AR.07744

benefits and implement the SUPPORT Act which reduces reimbursement barriers, to encourage people who need treatment to make the positive decision to pursue it. Finally, the use of drug courts and diversion programs will foster entrance into treatment programs, steering people away from the cycle of destructive and self-defeating behaviors that is the hallmark of the disease of addiction.

People in long-term recovery demonstrate that recovery is possible and share the message that addiction is a disease and not the result of a personal or family failing. In doing so, they help lift the stigma, misunderstanding, and shame that prevent too many Americans from seeking help for substance use disorders. Often, these factors can close off opportunities for those in recovery who seek to become healthy and fully rejoin and contribute to their communities. Implementation of recovery-supportive and drug-free workplace policies is another important component to improve both the health of individuals and communities, as well as economic outcomes for affected workers. The Administration recognizes the toll that misunderstandings and stigma can take on people, families, and communities struggling with addiction, and is taking steps to address them.

Addressing these and other challenges will require a comprehensive multi-year strategy to educate the public and policymakers, reduce stigma and misunderstanding of addiction, better integrate substance misuse screening and treatment into mainstream health care, build and stabilize the addiction treatment workforce, increase access to treatment, and foster more effective approaches to care for people with substance use disorders.

# PROVIDING TREATMENT

## Improving the Response to and Monitoring of Overdose

Naloxone is an opioid antagonist medication that can rapidly reverse an opioid overdose. However, access to naloxone varies throughout the country. Most states have protocols to expand access to naloxone, such as allowing pharmacists to dispense naloxone under a standing physician's order. The U.S. Food and Drug Administration (FDA) is working to facilitate the development of nonprescription naloxone by creating and testing appropriate consumer-friendly Drug Facts labels. However, even simple rescue breathing can keep a person alive until the naloxone arrives and can be administered. We will begin to increase public awareness of the importance of rescue breathing as a critical life-saving measure in the event of an opioid overdose when naloxone is not immediately available. Moreover, we must do more to ensure that the reversal of a potentially fatal overdose is not just another event in a long and protracted struggle with an addiction to dangerous drugs, but rather the first important step toward effective treatment and sustained recovery.

## Enhancing Evidence–Based Addiction Treatment

Treatment models that demonstrate the best outcomes incorporate behavioral, psychosocial, and pharmacological elements, and are tailored to the specific circumstance of the individual. The ability to provide evidence-based treatment for those who need it depends on skilled and well-trained providers who are appropriately credentialed and licensed. This must include a complete assessment

AR.07745

NATIONAL DRUG CONTROL STRATEGY

for substance use disorders by a qualified medical professional; access to addiction treatment such as MAT as a deliberate choice made by a qualified professional in consultation with the patient for a substance use disorder; access to relevant psychosocial treatments such as therapy and relapse prevention; and, the treatment of co-occurring medical and mental health disorders. We must help health providers reduce and treat incidents of NAS by promoting responsible drug prescribing for pregnant women, promoting uniform screening and diagnostic tools, and providing women and their babies with evidence-backed pre- and postnatal treatment. Health providers and other stakeholders should also promote effective gender-relevant models for substance use disorder treatment for pregnant and parenting women. Children and young adults have unique prevention and treatment considerations, and the treatment gap for youth and young adults ages 12-17 is greater than the general public. We need a concerted effort to engage clinicians, school staff, employers, families, caregivers, juvenile justice professionals, community leaders, and health plans and issuers to ensure youth receive treatment that is developmentally appropriate, readily available, and adequately covered by insurance plans.

## Eliminating Barriers to Treatment Availability

Individuals with substance use disorders, including opioid addiction, should have access to evidence-based treatment. According to the Bureau of Justice Statistics and the Substance Abuse and Mental Health Services Administration (SAMHSA), this is particularly true for people in the criminal justice system where nearly 60 percent of people in state prisons and two-thirds of people in jail met the criteria for drug dependence or misuse. Fewer than half of the privately funded substance use disorder treatment facilities offer MAT, and only a third of patients with opioid use disorders have access to those treatments. This is especially true in rural areas where the compelling need for access to treatment far exceeds its availability. The Administration will work across the Federal government to remove barriers to substance use disorder treatments, including those obstacles to FDA-approved MAT, counseling, certain inpatient/residential treatment, and other treatment modalities. All primary care providers employed by the Federal government should screen for alcohol and drug use disorders and, if the patient requests it, provide substance use treatment or a referral for such treatment.

## Leveraging Drug Courts and Diversion Programs

Providing individuals arrested for non-violent drug-related offenses the opportunity to participate in a drug court program or outpatient treatment while under supervision is increasingly becoming the practice throughout the country. From 2009 to 2014 the number of drug courts in the United States increased by 24 percent, reaching 3,057, and today there are more than 3,100 drug courts across the United States, half of which are adult treatment drug courts according to the Department of Justice. Recently, some pioneering police departments began diverting individuals addicted to drugs directly to treatment in lieu of arrest. Many communities are adopting pre-arrest diversion programs where individuals with a substance use disorder are offered treatment in lieu of arrest and deflection models, where those struggling with addiction can walk into a participating police station 24 hours a day for police-assisted rapid treatment entry. The Administration supports these innovative programs and will

AR.07746

NATIONAL DRUG CONTROL STRATEGY

continue support for State, Tribal, and local drug courts to provide offenders struggling with addiction access to evidence-based treatment as an alternative to or in conjunction with incarceration, or as a condition of supervised release.

## Building the Addiction Treatment Workforce

Additional efforts must be made to build an addiction medicine infrastructure and expand the addiction profession and peer recovery support services workforces. Medical providers and patients may not have access to a network of treatment and recovery providers and services, and the actual availability of services when needed continues to be a challenge. Federal partners, medical institutions and educational systems must improve recruitment efforts to build and broaden addiction medicine expertise. The entire medical community is encouraged to engage in expanding addiction medicine knowledge. The current climate requires expansion of addiction medicine specialists in psychiatry and general medicine. Beyond the addiction medicine experts, all medical specialists are encouraged to learn about the treatment of addiction. The addiction treatment workforce covers a broad spectrum of professionals from peer counselors and peer support specialists, to addiction counselors, social workers, nurses, nurse providers, physician assistants, psychiatrists, and physicians of all specialties. We will work to grow and enhance all levels of the professional, mid-level and paraprofessional addiction workforces.

## Improving Efficiency in Surveillance and Infrastructure

Current public health infrastructure and its monitoring systems must improve to enable real-time information and epidemiological surveillance. Efforts must be made to understand infrastructure and monitoring capabilities to improve existing systems. Modernizing public health data systems includes having a trained workforce that can manage modernized systems and develop and improve the criteria and indicators necessary for identifying new or evolving classes of illicit drugs. A part of this process is to examine the capabilities and capacities around local toxicology testing, including the recommended minimum detection levels for screening and confirmatory testing of drugs, the role of coroners and medical examiners, and how issues with infrastructure impact data collection. The Federal government, in collaboration with States and localities, should explore ways to better measure and track treatment services and recovery housing availability against demand and need on the local, state, and national levels.

# SUPPORTING RECOVERY

## Utilizing Recovery Support Organizations

The sense of community and the establishment of a safe place to live are essential ingredients for all people who are breaking the grip of addiction and making the journey of recovery. Healthcare professionals, substance use disorder treatment providers, and government agencies need to utilize persons in recovery as a resource. People with lived experience offer an intimate understanding of the nature of addiction, the negative feelings associated with this disease, challenges to be met, and

AR.07747

NATIONAL DRUG CONTROL STRATEGY

whose very presence exemplifies hope for a new life to those still suffering.

Recovery-oriented services include Peer Recovery Support Services (PRSS), Recovery Community Organizations (RCOs), Collegiate Recovery Programs (CRPs) and other supportive community-based organizations. In rural areas where distance to service is a challenge, these recovery support services can be provided through mobile or teleservices. Peer Recovery Support Services provide essential services including help with navigating difficult social and family relationships, and offering employment-related advice. These PRSSs often provide a bridge to other communal support systems (mutual aid, faith groups, alcohol and drug-free social and recreational activities) and to other more formal systems such as child welfare offices, healthcare providers, treatment professionals, housing assistance programs, and job training. Recovery Community Organizations provide recovery-oriented education, community outreach, and peer-based recovery services among other invaluable contributions.

To further increase the development of RCOs and enhance their valuable services, Federal agencies should consider uniform standards for recovery support services. These PRSS standards will seek to augment care similar to SAMHSA's Recovery House Guidelines, the National Association of Recovery Residence's (NARR) standards, the Association of Recovery Organizations (ARCO), the Council on Accreditation of Peer Recovery Support Services (CAPRSS), the Oxford House, and other professional organizations with a mission to improve the quality of recovery support services.

Furthermore, while the number of CRPs on the campuses of large public universities, private higher education institutions, and community colleges has increased rapidly over the past decade, they are still the exception rather than the rule. Every higher education campus in America could potentially benefit from some type of CRP. Adolescent recovery support services are especially scarce and of tremendous value to youth, given the importance of peer networks to their social development. Recovery high schools and alternative peer group models hold great promise for meeting the needs of youth, either in active recovery or in encouraging youth to seek it, and we must encourage their increased use across the Nation.

For many individuals seeking recovery, a safe, drug and alcohol-free living environment that encourages recovery is vital to their growth and development. Access to quality recovery housing helps people overcome the challenges associated with substance use disorders.

## Improving Opportunities for Employment for Those in Recovery

Americans in stable recovery from addiction deserve fair consideration for any job for which they are qualified. Today, millions of Americans from all walks of life are in recovery. Many of these individuals have barriers to employment, such as past misdemeanor or felony drug-related criminal convictions that can impede or prevent them from securing employment for which they are fully qualified. In addition to the obstacles created by a past criminal conviction, those in recovery can face additional hardship in finding employment as a result of laws that prohibit the hiring of individuals with a past conviction. These legal restrictions can create additional difficulties for those seeking to fully rejoin the

15

AR.07748

community and sustain a life in recovery. The Administration will work across the Federal government and the private sector to increase hiring opportunities for those in recovery, including for those with past criminal convictions. This will include providing the best information to employers on the overall benefits of bringing these individuals back into our workforce, developing best practices to increase their employment prospects, and increasing the availability of workforce training, transportation, and safe housing that enables those in recovery to take their place in the American workforce.

## Expanding the Scientific Understanding of Peer Recovery Support Services

While much is known about the process of addiction and about interventions to help address it, less is known about the recovery process and its various trajectories, components, and stages. A better understanding of the recovery process will help in the design and targeting of both clinical and recovery support service interventions that are stage- and trajectory-specific. Continued research is needed to design and target clinical and recovery support interventions and strategies for long-term recovery. However, while the positive anecdotal evidence of the near-term effectiveness of recovery support service models is strong, empirical and rigorous research is required on their long-term effectiveness, the characteristics of those who benefit most from them, and peer recovery support services' role within and impact on broader systems and communities.

Even though evidence suggests that recovery support service models are efficacious in lessening the consequences associated with active addiction, more rigorous research is required to develop a deeper and broader understanding of how these services can best be utilized to mitigate relapses, save lives, and reach a segment of the population who are in need of services. To date much is known about the process of addiction, including specific interventions and treatment models, but less is known about the recovery process and its various trajectories, components, and stages. A better understanding of the recovery process will help practitioners design interventions that can be more effective in meeting people in all stages of active use and recovery. In other words, more research is needed to design and target clinical and recovery support interventions to assist all people in achieving long-term recovery.

## Reducing Stigma and Making Recovery Possible

Americans in recovery are a vital part of every community in the United States, and they seek the same things other Americans want and need—a good job, a safe place to live, a strong social support network, such as a faith community, and the companionship of neighbors and friends. Many people who go through recovery lack a supportive network and the necessary resources to be successful such as safe housing, transportation, or childcare. These hurdles can impede employment and healing, which can lead to potential relapse. For long-term recovery to work we must create mutually-supportive communities where individuals improve their physical, mental, spiritual, and social well-being and gain skills and resources to sustain their recovery. The millions of Americans in long-term recovery from addiction demonstrate that recovery is possible, and they share the message that while addiction is a chronic disease, it can be effectively addressed with evidence-based treatment. By sharing their

stories, individuals in recovery help lift the stigma, misunderstanding, and shame that prevent too many Americans from seeking help for substance use disorders. While stigma knows no geographical boundaries, this can be a particular challenge in rural and tribal communities that are often closely knit. By promoting, supporting, and celebrating recovery, we can reduce stigma and offer hope and encouragement to those struggling with addiction. Many people in recovery have also dedicated their lives to helping others affected by substance misuse as recovery coaches and counselors, a critically important and growing component of the addiction service workforce. The Administration will continue in its efforts to better educate the public, healthcare professionals, and policymakers on the science of addiction and the promise of recovery, and how stigma, poor language choice, and misunderstanding can undermine efforts to reduce drug use and its consequences.

## Conclusion

Untreated substance use disorder can result in violence, crime, and risky behavior that jeopardizes the health and safety of individuals, families, and communities. The moment a person is ready and willing to enter treatment can be fleeting and infrequent. In addition to matching the individual with the most appropriate care model, efforts to expand treatment must include the capability to act quickly on the demand for treatment whenever and wherever the opportunity is presented. Anytime someone seeking help for addiction calls a treatment center, doctor's office, hospital, health clinic, or other medical facility, that person should immediately be referred to some level of assistance. Even if a treatment slot is not immediately available, recovery coaches, peer counseling groups, and families who have learned about addiction can provide help until the right treatment opportunity becomes available. It is in everyone's best interest—affected individuals, their families, and the Nation—for high-quality, evidence-based drug treatment to become more easily accessible. The current opioid crisis highlights the urgent need to encourage those who need treatment to seek it, rapidly increase treatment admissions for opioid addiction, improve treatment retention, and increase the number of individuals who successfully achieve sustained recovery. It is also essential to eliminate the stigma, misunderstanding, and legal and regulatory barriers that delay or prevent treatment access and impede recovery. In addition to saving lives and helping people in recovery achieve their full potential, these changes will help ensure that the significant public investment in treatment pays off in terms of long-term recovery.

# REDUCING THE AVAILABILITY OF ILLICIT DRUGS IN THE UNITED STATES

Almost all of the illicit drugs causing American deaths are produced outside the United States and trafficked across the Nation's borders and through the international mail and express consignment carriers. Large and established Drug Trafficking Organizations (DTOs), the Transnational Criminal Organizations (TCOs) responsible for producing and shipping the drugs into the United States, threaten the health and safety of our communities by exposing our citizens to substances such as illicit fentanyl, non-fentanyl synthetic opioids, heroin, cocaine, and methamphetamine, which kill tens of thousands

17

NATIONAL DRUG CONTROL STRATEGY

of Americans each year. The increased use of illicit drugs burdens the U.S. health care system and leads to lost productivity and civil engagement. Moreover, drug trafficking sustains a vast domestic and international criminal enterprise that enables corruption, undermines governance, has a destabilizing effect on our partner nations, and funds a range of illicit activities. Law enforcement agencies at all levels—Federal, state, local, and tribal—have achieved considerable success in combating drug trafficking and use, yet traffickers continue to refine their methods and adopt new techniques for delivering potent illicit drugs to our communities. Responding to the aggressive trafficking and distribution techniques of DTOs is an urgent national security and law enforcement priority.

The non-medical use of prescription drugs presents another dimension of the availability problem. Many active drug users report obtaining prescription drugs from friends, family members, and in some cases, healthcare providers. The overprescribing of prescription drugs, the diversion of prescription drugs for non-medical use, and the lack of accountability or oversight in prescribing practices increase the availability of prescription drugs in America's homes and workplaces, making it far too easy for them to fall into the wrong hands. Moreover, drug dealers exploit the demand for prescription medicines and traffic in counterfeit pills containing illicit fentanyl, or one of its analogues. These drugs are difficult to distinguish from legitimate prescription medicines, and because they are most often milled and pressed in variable formulations in clandestine locations, it increases the chance for accidental overdose.

## Disrupting, Dismantling, and Defeating Drug Traffickers and Their Supply Chains

While DTOs often are involved in poly-drug trafficking and other criminal activity, the unprecedented rise in deaths from the opioid crisis demands that we prioritize U.S. government efforts on the individuals and groups involved in the smuggling and sale of the most deadly drugs such as synthetic opioids and heroin. As these organizations continue to modify their techniques and operations in an attempt to reduce risk and maximize profit, we must anticipate and then respond to changes in the drug trafficking environment, identify and exploit vulnerabilities in the illicit drug supply chain, and seize the initiative from drug traffickers in order to disrupt their activities and dismantle the infrastructure they use to sustain their illicit enterprise. Along with aggressive actions to prevent the further expansion of these criminal enterprises in our country, we must also work with foreign partners to attack criminal networks, principally those in the Western Hemisphere, whose drug trafficking and associated criminality directly impact migration and border security issues affecting the United States.

## Working with International Partners

The U.S. Government will focus its diplomatic efforts to encourage partner nations to produce results that match the growing threat from illicit drugs. Consistent with the National Security Strategy, we will prioritize assistance with partners who are aligned with U.S. interests, are showing results, and building the capacity to address these threats independent of U.S. assistance programs. This will require partners' renewed commitment to disrupt the illicit supply chain through the interdiction and

18

seizure of the illicit drug supply, illicit funds, and weapons; eradicate poppy and coca plants; find and dismantle the labs used for all illicit drug processing; develop and sustain robust law enforcement and justice systems; maintain the rule of law and ferret out corruption; and arrest and prosecute drug traffickers operating within their own land borders, territorial waters, and airspace. These efforts are not only important in their own right but will complement, and be informed by, a strong domestic public health response to the crisis aimed at reducing the use of these drugs in the United States. We will continue to work bilaterally with the primary drug producing and trafficking countries most affecting the United States, emphasizing our shared responsibility for today's drug problems and the strong desire for tangible progress in the years to come. Regional relationships will be an important part of our international approach, allowing us to share information and harmonize our drug policies in the face of a constantly changing threat. Moreover, we will take full advantage of the strong multilateral framework that exists to address the global drug problem, particularly in terms of supporting the three international drug control conventions and providing leadership in the processes for internationally scheduling, controlling, and monitoring illicit drugs and their precursor chemicals.

## Combating Illicit Internet Drug Sales

Over the past three years, illicit drug sales on both the clear and the dark web have further expanded the illicit drug market, allowing individuals to purchase dangerous drugs directly from their manufacturers or individual intermediaries instead of through established trafficking organizations, and have them shipped directly to their homes. We must continue to disrupt the ability of drug traffickers to exploit the anonymity, distance, and financial transaction reliability provided through internet sales by degrading the implicit trust between buyer and seller required for illicit on-line transactions. We must use existing authorities to their maximum effect to target drug traffickers and their enablers by employing both passive and active measures to disrupt and exploit illicit drug related activities operating on both clear and dark webs. Contesting drug marketplaces in the cyber domain and disrupting the use of cryptocurrencies for illicit drug sales requires a coordinated and well-resourced framework of relationships, laws and regulations, procedures, and capabilities. This will allow us to identify and target the network of actors involved, and prosecute those who use the open or dark webs to market, sell, and purchase illicit drugs. Utilizing our full range of authorities and cyberspace capabilities in a sustained effort against the internet drug market, will erode this implicit trust and disrupt illicit operations on the clear and dark webs over time.

## Focusing Federal Government Effort against Illicit Drug Delivery through the Mail and Express Consignment Networks

We must complement our efforts against internet drug sales with a sustained effort to disrupt the flow of illicit drugs shipped through the international mail and express consignment environments. This requires maximizing the policy and regulations, international relationships, facility infrastructure, and technology required to aggressively target, detect, and intercept illicit drugs transported through the international mail and express consignment environments both internationally and domestically. We must work with our international partners to develop the ability to share Advance Electronic Data

for all international shipments, in accordance with the President's *Initiative to Stop Opioid Abuse*, and continuously refine targeting algorithms to identify and interdict international shipments before they depart the source country and at U.S. Ports of Entry. We must help critical partner countries develop the ability to detect and intercept illicit drugs in their domestic mail and express consignment systems before those drugs depart for the United States and enter the U.S. mail or commercial carrier system. We must continue our extensive work with private sector partners which is critical to disrupting the manufacturing, marketing, sale, and shipment of drugs through the nation's commercial infrastructure. Finally, we must develop next generation technology and screening capabilities to increase our ability to detect illicit drugs once they enter the mail and express consignment systems within the country, and improve testing capability to determine the precise type and source of illicit drugs seized. This investment in science, technology, resources, and international relationships is necessary to determine the type, source region, production location, and route traveled for all illicit drugs seized by the United States and its international partners.

## Interdicting the Flow of Drugs across the Physical Borders and into the United States

Along with the challenge of drug trafficking via internet sales and mail and express consignment delivery, drugs continue to flow across our land borders and through the maritime and air routes. Stopping these flows must continue to be a part of our comprehensive interdiction efforts. This work includes enhancing the border's physical security infrastructure, especially along our southern border. The historically high levels of cocaine production in Colombia, along with heroin, methamphetamine, and illicit fentanyl production in Mexico, combined with the vast number of routes and conveyances into the United States, make the challenge of combating drug trafficking across our physical borders no less daunting than it has been for the past several decades. Federal agencies should expand efforts in the detection and monitoring of the air and maritime approaches to the United States; the detection of illicit drugs and precursor chemicals shipped in commercial containers; and interdiction of plant-based drugs such as heroin, cocaine, and marijuana, as well as synthetic drugs and their precursor chemicals, along the Nation's land borders. Moreover, increasing cooperation and effort from foreign partners who can contribute vital information on trafficking patterns and assets to seize drugs bound for the United States, will complement U.S. efforts.

## Disrupting and Dismantling the Illicit Drug Production Infrastructure

The United States and Mexico have expanded cooperation to address the common threat of illicit opioids, and both governments agree that reducing the supply of heroin, methamphetamine, and illicit fentanyl is a shared responsibility. Mexico has increased its efforts to eradicate poppy fields more effectively, destroy clandestine laboratories, and interdict heroin and other drugs before they reach the U.S. border. The U.S. Government's partnership with Mexican law enforcement officers, analysts, chemists, and military personnel to identify and safely dismantle clandestine drug laboratories that produce heroin, methamphetamine, and illicit fentanyl has increased Mexico's capability in addressing the dangers synthetic drugs present to law enforcement.

NATIONAL DRUG CONTROL STRATEGY

We must work with partners to address expanding coca cultivation and cocaine production in Colombia and the broader Andean region in a comprehensive manner. Key elements of cooperation with proven partners such as Colombia and Peru include increasing all forms of illicit crop eradication, alternative development and economic opportunities, interdiction, investigation and prosecution, judicial support, and public health cooperation, all of which must be long-term and sustainable. Since coca fields differ in their level of productivity, this approach will be most successful if we focus in areas of high-yield coca cultivation. Unfortunately, these areas generally have limited government services and lingering security concerns, and will require concerted effort over several years to turn the rising tide of cocaine production.

Within the United States, marijuana cultivation on public lands, and within National Forest System lands in particular, is a significant issue. Cultivation activities not only sustain the illicit marijuana trade but also produce large volumes of hazardous materials that pose a significant risk to the public and the environment. Wildlife, soil, and vegetation are often contaminated by the various hazardous substances involved in the cultivation process. Personnel conducting enforcement, cleanup, and regulatory activities, as well as the public, are at considerable health risk from exposure to these chemicals. Continued firm action is required against the exploitation of the Nation's public lands through increased detection, disruption, reclamation, and prosecutions.

The majority of illicit synthetic drugs available in the United States are manufactured abroad. New illicit synthetic drugs and the precursor chemicals used to make them originate predominantly in China, although most of the methamphetamine available in the United States is manufactured in Mexico and the rising production of illicit fentanyl in Mexico has become an increasing concern. Increased collaboration with Mexico, China, and other partners on shared drug priorities can help disrupt drug trafficking networks, along with the corrupt or compromised systems that support them, and reduce the availability of dangerous synthetic drugs in the United States. The United States will continue bilateral exchanges with China, Mexico, Colombia, and other source and transit countries to reduce production and trafficking of synthetic drugs destined for markets in the United States and support collaboration with international partners impacted by drugs from the very same sources.

## Leveraging the Full Capabilities of Multi-Agency, Multi-Jurisdictional Task Force Programs

Transnational drug trafficking organizations, by definition, operate across national, state, and local boundaries to produce, transport, and distribute dangerous and addictive drugs. In order to protect their criminal enterprise, drug trafficking organizations also commit violent crimes, threaten and corrupt public officials, traffic weapons, and launder their criminal proceeds. Accordingly, no single government, or government organization, alone can defeat these threats. Our best strategy to dismantle and disrupt criminal organizations is to employ the coordinated efforts of multi-agency, multi-jurisdiction task forces. Such task forces are best organized to work with international partners and to take coordinated action on shared investigative information and intelligence.

21

AR.07754

ONDCP oversees the High Intensity Drug Trafficking Areas (HIDTA) Program which provides assistance to law enforcement agencies operating in areas determined to be critical drug-trafficking regions of the United States. HIDTAs provide an umbrella to coordinate Federal, state, local, and tribal drug law enforcement agencies' investigations, and act as neutral centers to manage, de-conflict, analyze, provide intelligence support to, and execute drug enforcement activities in their respective regions. With the last year's inclusion of Alaska, the first new HIDTA in 17 years, the 29 regional HIDTAs now include designated areas in all 50 states, Puerto Rico, the U.S. Virgin Islands, and the District of Columbia. The regional HIDTAs bring together more than 21,000 Federal, state, local, and tribal personnel from 500 agencies through 800 enforcement, intelligence, and training initiatives, all designed to disrupt illicit drug trafficking and dismantle criminal and drug trafficking organizations. The Administration will ensure strong support for counterdrug enforcement, including by supporting Federal participation in multi-jurisdictional task forces and enhancing support for information sharing at all levels. This will ensure that national data systems receive input from state, local, and tribal agencies, and that these agencies, in turn, have access to data compiled by Federal agencies that can prove vital to their own investigations.

## Interrupting the Financial Activities of Drug Traffickers

Illicit drugs enter the United States from global suppliers as the result of a long and complex process involving manufacture, concealment, movement, purchase, and delivery. The illicit drugs may change hands several times during the process, and this often necessitates the transfer of money, either as payment for services or for delivery of the final product. Traditionally, street-level sales of illegal drugs are conducted with cash, creating immediately liquid assets that are almost impossible to track. As technology and money laundering methods have adapted over the years to circumvent Anti-Money Laundering regulations, drug traffickers have initiated many new techniques to enable the traditional method of hard currency transactions. Although some of these methods create additional investigative evidence, emerging technologies continue to outpace banking regulations and consistently provide drug traffickers the means to launder large amounts of their illicit proceeds.

Most of the revenue generated from illegal drug sales in the United States is maintained at the retail level of drug distribution. However, illicit proceeds that flow back to international sources of drug supply are most often used to finance other illegal activities or the next cycle of illegal drugs flowing into our communities, posing a continual threat to the country. These funds also corrupt and weaken the government infrastructure of source and transit countries, limiting those governments' ability to combat TCOs, escalating violence, and threatening the stability of the governments we partner with to counter illicit activity. We will combat this threat and target the drug proceeds that motivate criminal activity by attacking TCOs' financial capital; preventing the circulation, transfer, and concealment of their illicit proceeds; and, ultimately decreasing their wealth and their incentive to function.

## Enhancing Law Enforcement Capacity

Success in reducing the availability of illicit drugs in our country requires continuing to strengthen

the capacity and tools to fully understand, and relentlessly respond to, the increased drug threat we face. As our National Security Strategy states, this capacity building includes national-level strategic intelligence and planning capabilities to improve the ability of departments and agencies to work together to combat TCOs, particularly those who traffic drugs at home and abroad. We must improve our capability to dismantle TCOs as a whole through greater coordination and focus, directly benefiting our counterdrug efforts. Improved strategic planning must be informed by better strategic intelligence on transnational organized crime and global criminal networks, fusing law enforcement and Intelligence Community information and intelligence to create the most complete picture available of criminal networks. We must use that information to identify and exploit vulnerabilities in drug trafficking networks, using the full range of law enforcement capabilities including criminal prosecutions, financial disruption tools such as asset forfeiture proceedings, and security operations to remove the profits from crime. Moreover, we must maintain pressure on these organizations over time and prevent them from regenerating their capabilities. We must also emphasize both actions that lead to prosecutions—to reduce networks' ability to operate, through the investigation, arrest, and prosecution of critical personnel —and those that lead to the long-term disruption of network operations such as the seizures of illicit drugs, precursor chemicals, illicit funds, and weapons.

Our conventional focus on targeting high-level individuals within the hierarchy of well-organized and sophisticated DTOs must evolve toward identifying and targeting vulnerable critical components of more fluid and dynamic organizations such as financial facilitators, corrupt officials, and key transporters, to affect a significant disruption of DTO activities, targeting key nodes to attack the entire network through its enablers. Degrading and defeating criminal networks that have become more resilient because they are decentralized, redundant in capabilities and capacities, and compartmentalized, requires identifying the key nodes enabling DTO operations and simultaneously targeting them for maximum effectiveness over time. Agile interagency and international coordination will allow for better detection of changes in the trafficking supply chain, which will support intelligence-driven operations against identified vulnerabilities, from drug production to delivery to the end user.

## Conclusion

The increased availability and use of illicit drugs is taking far too many American lives and destroying American families. It burdens the U.S. health care system and leads to lost productivity and civil engagement here at home, and global drug trafficking sustains a vast domestic and international criminal enterprise that enables corruption and destabilizes partner nations abroad. America's drug crisis has created a complex national security, law enforcement, and public health challenge for the Nation, and this challenge will remain with us for the foreseeable future. We must leverage the full capabilities of the U.S. intelligence and law enforcement communities, our military, domestic law enforcement and criminal justice capabilities, and sustained engagements with the governments of key partner nations and international organizations to stop the flow of these drugs across our borders and into our communities, and use that capability to posture ourselves for an ever-evolving drug trafficking environment. Our actions will continue disrupting the evolving illicit supply chain, decreasing the

AR.07756

volume of drugs being sold over the internet; decreasing the cultivation of illicit crops like poppy and coca as well as the volume of illicit drugs being produced for export to the United States; increasing the amount of illicit drugs seized before entering the United States; increasing the amount of forfeited assets; increasing the number of convictions for drug-related crimes; and increasing the pace of review of, and imposition of international controls on, emerging dangerous substances.

Achieving the President's outcome of reducing the number of Americans losing their lives to drug addiction in today's crisis, and preparing now to dominate the drug environment of the future, requires deliberate actions focused on clear priorities and tangible outcomes to reduce the availability of drugs in our Nation. However, lasting success requires those actions to complement, and be informed by, a strong domestic public health response to reduce the use of these drugs in the United States which makes possible enormous profits for drug traffickers and fuels the illicit drug market. Bold and decisive national security, law enforcement, and public health efforts are needed to lift the Nation from the shadow of drug use and move toward the President's goal of a stronger, healthier, and drug-free society today and in the years to come.

# GOALS AND BUDGET PROJECTIONS

While this *Strategy* focuses on aggregate progress toward a strategic outcome rather than enumerating all of the tasks and activities that organizations at the Federal, State, local and Tribal levels must undertake in order to stem the tide of America's drug crisis, it is nonetheless important to establish objectives that align to the *Strategy's* nine goals for achieving the overarching strategic outcome of saving American lives and building a healthier, drug-free society. This not only ensures the necessary policies, priorities, and objectives of drug control agencies and interagency partners are adequately aligned and resourced to advance the President's drug control priorities, but also serves to identify those areas where a refinement of the *Strategy* may be necessary to close an identified gap, or areas where a shift in specific agency focus or resources can attain greater effects in achieving the President's overarching strategic objective.

## Goals for Reducing Illicit Drug Use, Objectives, and Targets for Measuring Progress

This *Strategy's* three lines of effort: preventing drug use before it starts, providing treatment leading to long-term recovery for those suffering from substance use disorder, and reducing the availability of drugs in the United States, will be advanced by the accomplishment of the nine goals listed below. Each goal directly supports the three lines of effort and contains one or more quantifiable and measurable objectives. The *Strategy*, with its three lines of effort, describes in detail how the aggregate progress across the interagency directly contributes to the achievement of the nine goals. Assessing the sustained progress toward achieving those objectives, and realizing the related goals, is enabled by annual targets that will be continually assessed over a five year period.[3]

---

[3]The accompanying *Performance and Reporting System* contains each of the annual targets for each Objective and a detailed description of how each was determined.

NATIONAL DRUG CONTROL STRATEGY

A description of how each goal and its supporting objective(s) was determined, including the data, research, or other information used to inform the determination to establish them, is discussed in the *National Drug Control Strategy: Performance Reporting System*. The baseline for all objectives is 2017, the first year of the Administration, except for three objectives for which the earliest data is for either 2018 or 2019. Development of the goals and objectives was an iterative process conducted by review of the latest research and data and consultation with subject matter experts within ONDCP and from the relevant National Drug Control Program Agencies.

- Goal 1: The number of Americans dying from a drug overdose is significantly reduced within five years.

  o Objective 1: Overdose deaths are reduced by reaching annual targets in percentage reductions each year, and by a total of 15 percent by 2022.

- Goal 2: Educate the public, especially adolescents, about drug use, specifically opioids.

  o Objective 1: Reduce the rate of past year use of any illicit drug among youth each year, and by 15 percent by 2022.

  o Objective 2: Reduce the rate of past year use of opioids among youth each year, and by 15 percent by 2022.

- Goal 3: Evidence-based addiction treatment, including MAT for opioid addiction, is more accessible nationwide.

  o Objective 1: Increase the percentage of specialty treatment facilities providing Medication-Assisted Treatment for opioid use disorder every year, so that 100 percent do so by 2022.

  o Objective 2: Increase the percentage of Federal health care workers certified to administer, prescribe, and dispense buprenorphine for opioid use disorder every year, and to 10 percent by 2022.

- Goal 4: Increase mandatory prescriber education and continuing training on best practices and current clinical guidelines.

  o Objective 1: Increase the percentage of Federal prescribers that have completed continuing education on best practices and current clinical guidelines in prescribing opioid medications every year, and by 50 percent by 2022.

- Goal 5: Reduce nationwide opioid prescription fills.

  o Objective 1: By increasing education and adherence to proper prescribing practices for effective pain management, reduce nationwide opioid prescription fills every year, and by 33 percent by 2020 and maintain that reduction in 2021 and 2022.

25

AR.07758

NATIONAL DRUG CONTROL STRATEGY

- Goal 6: Increase Prescription Drug Monitoring Program interoperability and usage across the country.

    o Objective 1: Increase the number of states integrating electronic health records with their Prescription Drug Monitoring Programs every year, and to 30 by 2022.

- Goal 7: Significantly reduce the availability of illicit drugs in the United States by preventing their production outside the United States.

    o Objective 1: Reduce potential production of cocaine (pure metric tons) in Colombia every year, and by 42 percent by 2022.

    o Objective 2: Reduce potential production of heroin (pure metric tons) in Mexico every year, and by 25 percent by 2022.

- Goal 8: Significantly reduce the availability of illicit drugs in the United States by disrupting their sale on the internet, and stopping their flow into the country through the mail and express courier environments, and across our borders.

    o Objective 1: Increase the amount of cocaine removals (in metric tons) in the transit zone every year, and by 10 percent by 2022.

    o Objective 2: Increase the amount of seizures (in metric tons or kilograms) at the U.S. southern border every year, and by 10 percent by 2022 for each of the following drugs: cocaine, fentanyl, heroin, and methamphetamines.

    o Objective 3: Increase the number of online drug vendor investigations every year, and by 20 percent by 2022.

- Goal 9: Illicit drugs are less available in the United States as reflected in increased price and decreased purity as measured by price per pure gram.

    o Objective 1: Increase the average price per pure gram of cocaine every year, and reach $250 by 2022.

    o Objective 2: Increase the average price per pure gram of heroin every year, and reach $1,400 by 2022.

    o Objective 3: Increase the average price per pure gram of methamphetamine to $120 by 2022.

    o Objective 4: Increase the cost of illicit fentanyl (purity not known) charged by dealers per kilogram to customers every year, and by 10 percent to $3,300 by 2022.

ER-0223

AR.07759

NATIONAL DRUG CONTROL STRATEGY

## Projections for National Drug Control Program and Budget Priorities

The 2019 *Strategy* set policy goals and objectives for the Nation, along with associated performance measures and targets to achieve those goals and objectives. ONDCP considers the *Strategy's* projections for policy priorities to be the budget priorities because they indicate to the National Drug Control Program Agencies what the Administration's long-term priorities are, and those agencies are expected to provide resources for those priorities over the course of the Administration. ONDCP's funding guidance also establishes the budget priorities—for the current and future years—for National Drug Control Program agencies to meet the performance targets and achieve the policy goals and objectives of the *Strategy*.

## Budget and Performance Summary

The *FY2020 Budget and Performance Summary*, published in May 2019, can be found at:

https://www.whitehouse.gov/wp-content/uploads/2019/05/FY-2020-Budget-and-Performance.pdf

ONDCP will release the *National Drug Control Strategy: FY 2021 Budget and Performance Summary* (*Budget Summary*) after the President's proposed budget is released in early 2020. The *Budget Summary* contains information on the President's FY 2021 drug control budget, as well as the enacted and actual funding levels for FY 2020 and FY 2019, by National Drug Control Program Agency (NDCPA) and subordinate elements, as well as historical funding levels by function. Appendices contain information on the resources to support the National Drug Control Strategy Border Strategies and the National Treatment Plan. In addition, the *Budget Summary* provides a description of each agency's mission, program descriptions, and significant changes in the FY 2021 request compared to the FY 2020 enacted or continuing resolution amount. The *FY 2021 Budget Summary* also contains details of each agency's program performance metrics and a section on the assessment of the contribution of each NDCPA to achieving the goals and objectives of the *Strategy.*

AR.07760

# Appendix 1: List of Supporting Planning Documents

The *National Drug Control Strategy* has six supporting plans or documents that address specific requirements necessary for achieving the *Strategy's* overarching strategic outcome and the nine goals, objectives, and targets used to assess performance. Taken together, the base *Strategy* and its six supporting plans and documents compose the Administration's *National Drug Control Strategy*:

- *National Drug Control Strategy: National Treatment Plan*—articulates how the Federal Departments and Agencies and their key stakeholders at the State, local, Tribal, and private sectors of society will expand treatment for substance use disorders.

- *National Drug Control Strategy: Southwest Border Counternarcotic Strategy*—articulates the Government's strategy for preventing the illegal trafficking of drugs across the international border between the United States and Mexico, including through ports of entry and between ports of entry on the border.

- *National Drug Control Strategy: Northern Border Counternarcotic Strategy*—articulates the Government's strategy for preventing the illegal trafficking of drugs across the international border between the United States and Canada, including through ports of entry and between ports of entry on the border.

- *National Drug Control Strategy: Budget and Performance Summary Report*—presents the details of the President's resource requirements to implement the Strategy and to inform Congress and the public about the total amount proposed to be spent on all supply reduction, demand reduction, State, local, and tribal affairs, including any drug law enforcement, and other drug control activities by the Federal Government. There are 16 Federal Departments and Agencies that have been designated by the ONDCP Director as Drug Control Program Agencies. Budget detail is provided at the program, project, and activity levels (the level at which the Office of Management and Budget and the agencies request funding and Congress appropriates it). The report also provides detail on agency-level performance metrics to enable assessment of progress toward achieving programmatic objectives.

- *National Drug Control Strategy: Performance Reporting System*—describes the Strategy's goals, objectives, and annual targets established for reducing drug use, availability, and the consequences of drug use.

- *National Drug Control Strategy: Data Supplement*—provides the data that enables an assessment of current drug use and availability, impact of illicit drug use, and treatment availability. The more than 150 data tables provide national, state, local, and international data on drug use; attitudes and perceptions toward drug use; drug- induced morbidity and mortality; drug treatment; drug-related crime, including drugged driving; drug price and purity; cultivation and/or the production of drugs; and drug eradication and seizures.

# Appendix 2: ONDCP's Role in Facilitating the Achievement of the Strategic Goals and the Coordination Mechanisms Necessary for Achieving the Strategic Goals

**ONDCP's Role:** Established by the Anti-Drug Abuse Act of 1988, and reauthorized by the *SUPPORT for Patients and Communities Act* (Public Law 115-271), ONDCP leads, coordinates, and oversees the implementation of the national drug control policy, including this *Strategy*. There are numerous facilitation mechanisms that the Director of the National Drug Control Policy uses to achieve the nine goals and objectives of this *Strategy*, the most important of which are the two National Coordination Groups within ONDCP and the specific functional coordinators discussed below. In addition, the Director, in conjunction with ONDCP's Office of Performance and Budget, conducts a yearly evaluation of the effectiveness of this *Strategy* in light of the activities and accomplishments of the National Drug Control Program Agencies.

## Existing Coordination Mechanisms:

**National Cocaine Coordination Group (NCCG):** Responsible for guiding and synchronizing interagency efforts to reduce the availability of cocaine. The NCCG identifies gaps and redundancies in Federal government's efforts to address the cocaine problem set and works to solve them in order to achieve its goal of reducing the number of fatal overdoses. The NCCG works with the National Security Council (NSC), Domestic Policy Council (DPC), and other White House elements, as appropriate, on issues involving counternarcotics, Colombia, Peru, transnational organized crime, and the implementation of the 2019 *National Drug Control Strategy*.

**National Opioids and Synthetics Coordination Group (NOSCG):** The focal point for guiding and synchronizing interagency efforts to reduce the availability of all illicit or illegally trafficked opioids, plant-based and synthetic, as well as psychostimulants such as methamphetamine. To achieve its primary measure of effectiveness, reducing the number of fatal overdoses, the NOSCG identifies gaps and redundancies in the Federal government's efforts to address the opioid and synthetics problem set and works to close them.

To do so, the NOSCG coordinates widely across the interagency and with partners in the private sector and the state-level and below, starting with ten engagements per month in direct support of the implementation of its Heroin Availability Reduction Plan. These engagements include a weekly TS-SCI video teleconference (VTC) with all Intelligence Community partners; a monthly VTC with US Embassy Mexico to align and coordinate counternarcotics and security activities and issues; a monthly VTC with US Embassy Beijing to coordinate and align policy issues related to synthetic opioids; a monthly Federal law enforcement Secure VTC to share information on emerging trends; a monthly nationwide webinar with 20 partner states in all four US census regions that brings together law enforcement and public health officials to share trends, best practices, and lessons learned; and a monthly teleconference to allow forensic scientists, medical examiners, coroners, intelligence analysts, and members of the law enforcement community to share trend data and information on newly identified substances seized by

29

U.S. Customs and Border Protection (CBP).

The NOSCG also co-chairs or supports NSC-led sub-policy coordinating committees, policy coordinating committees, and deputies committee meetings as appropriate on issues involving counternarcotics, Mexico, China, illicit finance, transnational organized crime, and special interest topics such as the Community Response to Drug Overdose and the safe handling of illicit fentanyl for first responders. Along with the DPC, the NOSCG co-chairs meetings on public health-related topics such as prescription drug monitoring programs, safe prescribing, naloxone availability and use, and increasing the availability of MAT for opioid use disorder. The NOSCG also organizes, leads, or participates in White House stakeholder events on specific topics for private sector partners such as private sector cooperation on stemming the flow of synthetic opioids and counterfeit prescription drugs into the United States, and overdose response and Naloxone availability in colleges and universities. Finally, the NOSCG supports both the NSC and DPC to co-chair meetings on implementation of the 2019 *Strategy*, providing subject matter and policy expertise on those strategy objectives related to opioids, illicit opioids, synthetic drugs, dark web drug sales, and illicit finance.

**Demand Reduction Coordinator and Public Health, Education and Treatment Task Force (PHET):** The Demand Reduction Coordinator leads ONDCP's Public Health, Education, and Treatment Task Force which establishes the ONDCP response to the Nation's addiction crisis, and provides strategic guidance to lead the interagency effort to plan, coordinate, and manage the public health responsibilities of the President's *Strategy*. The task force portfolio includes primary drug prevention, public education on the consequences of drug use, removing barriers to access effective addiction treatment including medication assisted therapies, criminal justice diversion programs, and establishing recovery support programs. Collaboration and coordination with other Federal agencies, State, local and Tribal health officials, and health policy-related interest groups is key to the development and implementation of these demand reduction functions.

**United States Interdiction Coordinator (USIC):** Responsible for establishing the Federal government's interdiction strategy and assessing the sufficiency of assets committed to illicit drug interdiction. To accomplish this, the USIC staff works across four primary lines of effort: border strategy development, information sharing, interdiction capability and capacity development and support, and interagency coordination. The USIC publishes the Administration's *National Interdiction Command Control Plan* (NICCP) and multiple border strategies in support of the of the President's *Strategy*. To develop and implement these availability reduction functions, the USIC collaborates with White House peers, international partners, Federal, State, local, and Tribal law enforcement officials, and the HIDTAs.

**State, Local, and Tribal Affairs Coordinator (SLTAC):** Coordinates drug control efforts between Federal agencies and State, local, and Tribal governments. The SLTAC meets with State, local, and Tribal governments to hear their concerns and coordinate their drug control efforts with the drug control efforts of the Federal agencies. This helps to ensure cooperation and information sharing, and to avoid duplication between Federal efforts and State, local, and Tribal efforts. The SLTAC also ensures that State, local, and Tribal governments commit to and take steps to achieve the *Strategy's* goals.

**Emerging Drug Threats Coordinator:** Chairs the Emerging Threats Committee that is responsible for recommending to the Director the criteria for declaring or terminating an emerging or evolving drug threat in the United States, monitoring, discussing, and identifying an evolving and emerging drug threat in the United States, and recommending to the Director when such a declaration or termination needs to be made. In the case of a declaration, the Chairperson and the Committee are responsible for developing, coordinating, and overseeing the execution of a Response Plan to address the drug threat as outlined in 21 USC §1708: Emerging Threats Committee, plan, and media campaign.

**Performance Budget Coordinator:** Responsible for ensuring the Director has sufficient information necessary to analyze the performance of each National Drug Control program Agency, the impact Federal funding has had on the goals in the *Strategy*, and the likely contributions to the goals of the Strategy based on funding levels of each National Drug Control Program Agency, to make an independent assessment of the budget request of each agency; and advising the Director on agency budgets, performance measures and targets, and additional data and research needed to make informed policy decisions.

# Appendix 3: Mission Statement and List of National Drug Control Program Agencies and How They Help Achieve the Strategic Goals

The National Drug Control Program's mission is to develop policies and to coordinate, promote, and implement initiatives that result in a stronger, healthier, drug-free society today and in the years to come. This mission is implemented through a series of congressionally mandated activities set forth in the agency's authorizing legislation, as well as through strategic initiatives aimed at preventing the initiation of illicit drug use, providing treatment services leading to long-term recovery for those suffering from addiction, and aggressively reducing the availability of illicit drugs in American communities.

The National Drug Control Program Agencies are the Departments of Agriculture, Defense, Education, Health and Human Services, Homeland Security, Housing and Urban Development, Interior, Justice, Labor, State, Transportation, Treasury, and Veterans Affairs, the Federal Judiciary, the Office of National Drug Control Policy, the United States Postal Inspection Service, and the Court Services and Offender Supervision Agency for the District of Columbia.

ONDCP has a performance evaluation plan for the nine goals of the *Strategy* that includes performance measures for each National Drug Control Program Agency, to the extent practicable, sets performance targets for those measures, and presents an estimate of the Federal funding needed to achieve performance targets and objectives. The *Strategy* establishes the long-range goals for reducing illicit drug use and the consequences of illicit drug use. The performance measures and targets that support the policy objectives of the *Strategy* are described in the *National Drug Control Strategy: Performance Reporting System* (PRS). ONDCP collaborates with National Drug Control Program Agencies to align their activities that support implementing the *Strategy's* policy objectives to the PRS performance targets. ONDCP also collaborates with agencies to establish agency-specific performance measures and targets to assist ONDCP and the agencies in evaluating their contributions to achieving *Strategy* goals. This agency-specific performance data is presented in the Performance section of the *National Drug Control Strategy: Budget and Performance Summary (Budget Summary)*. The budget request for the agency, also presented in the *Budget Summary*, describes the resources needed to meet the agency's performance targets, and ensures their contribution to achieving the performance goals and objectives of the *Strategy*. ONDCP's construct for performance evaluation planning allows it to assess the government's effectiveness in achieving policy objectives by aligning agency funding and performance to the strategic goals and policy priorities of the *Strategy*.

For a more in-depth description of the role of each NDCPA, their related programs, assets and activities to achieve Strategy goals, please refer to the FY 2020 *Budget and Performance Summary* that was published in May 2019, and to the FY 2021 *Budget and Performance Summary* that will be published after the President's proposed Budget is released.

## Appendix 4: Role of Key Stakeholders and Partners in the *Strategy*

ONDCP, established by the Anti-Drug Abuse Act of 1988, and reauthorized by the *SUPPORT for Patients and Communities Act* (Public Law 115-271), is required to consult a wide array of experts, key stakeholders, and officials while developing the President's *National Drug Control Strategy*. It requires the ONDCP Director to work with the heads of the National Drug Control Program agencies; ONDCP's internal coordinators; the Interdiction Committee and the Emerging Threats Committee; appropriate Congressional Committees; State, local and Tribal officials; private citizens and organizations with experience and expertise in demand and supply reduction; and appropriate representatives of foreign governments. ONDCP met this requirement by soliciting the views of the following individuals and organizations during the development of the National Drug Control Strategy as detailed below.

*Consultation with National Drug-Control Program Agencies (21 USC § 1705(b)(4)(A)(i))*

ONDCP works closely with agencies that have been charged to oversee drug prevention, treatment and recovery, and availability reduction. Input was solicited from fifteen Federal Departments, Independent Agencies, and the Federal Judiciary. ONDCP works regularly throughout the interagency (including the NSC and the DPC) to ensure the effective coordination of drug programs. These agencies, based on their unique mission, roles, functions, will play key roles in achieving all nine goals contained in the strategy

*Consultation with ONDCP coordinators (21 USC § 1705(b)(4)(A)(ii))*

The various coordinators within ONDCP (the Performance Budget Coordinator, the Interdiction Coordinator, the Emerging and Continuing Threats Coordinator, the State, Local, and Tribal Affairs Coordinator, and the Demand Reduction Coordinator) are each an integral part of the development of the Administration's policy and budget priorities in the areas of prevention, treatment and recovery, and reducing the availability of illicit drugs. Each coordinator contributed to the development of the *Strategy* and will play key roles in achieving the nine goals.

*Consultation with Interdiction and Emerging Threats committees (21 USC § 1705(b)(4)(A)(iii))*

ONDCP serves a leadership role on both the Interdiction Committee (TIC) and the Emerging Threats Committee, and engaged both groups to gather their views on the *Strategy*. The TIC works to enhance and expand cooperation and coordination with all agencies engaged across the operational spectrum of supply reduction and interdiction. Similarly, the new Emerging Threats Committee has established the criteria for declaring or terminating an evolving or emerging drug threat, and it is monitoring the landscape to identify such threats in the United States. Both Committees' perspectives were essential when considering both the public health and public safety aspects of the *Strategy*. The Interdiction Committee will have a significant role in achieving Goals 1, 7, 8, and 9 of the *Strategy*. The Emerging Threats Committee has members from the Prevention, Treatment and Recovery, and the Interdiction (law enforcement) communities, they will play key roles across the three lines of effort and with each of the nine goals.

NATIONAL DRUG CONTROL STRATEGY

*Consultation with appropriate Congressional committees (21 USC § 1705(b)(4)(A)(iv))*

The Administration works closely with the Congress in the development, implementation, oversight, and funding of the *National Drug Control Strategy*. ONDCP requested input from over 250 members of the House and Senate who sit on the House Oversight and Reform, Judiciary, Energy and Commerce, and Appropriations Committees, as well as the Senate Drug Caucus, Judiciary, Health, Education, Labor and Pensions and Appropriations Committees. Their input, as well as the continued interaction between Administration and Congress, was critical to the development of this *Strategy*.

*Consultation with State, local, and Tribal officials (21 USC § 1705(b)(4)(A)(v))*

ONDCP meets, interacts and consults regularly with State, local and Tribal officials when implementing the *Strategy*. Governors from all states and territories, regional commissions, Tribal leaders, local prevention experts, and public health and public safety officials (including those at the HIDTAs) were asked to provide input in the areas of prevention, treatment, and availability reduction. These views are important because they offer insight into local drug policy issues as well as potential solutions. These communities draw from key stakeholders in the Prevention, Treatment and Recovery, and Reducing the Availability of Illicit Drugs arenas, so they will have an important role in achieving all nine goals.

*Consultation with private citizens and organizations (21 USC § 1705(b)(4)(A)(vi and vii))*

ONDCP solicited input from a comprehensive array of nonprofit organizations, governmental associations, medical associations, health plans and issuers, drug policy stakeholders, community anti-drug coalitions, professional associations, research and educational institutions, and faith-based organizations representing the interest of both the supply-side and demand reduction communities. These citizens and organizations span all three lines of effort and will, therefore, have significant responsibility for achieving all nine objectives.

*Consultation with foreign governments (21 USC § 1705(b)(4)(A)(viii))*

ONDCP and the interagency works regularly with the international community to confront transnational criminal organizations, reduce illicit production, and protect citizens and democratic institutions from corruption or subversion. ONDCP requested input from both a number of partner nations as well as global and regional organizations including the United Nations Office on Drugs and Crime and the International Narcotics Control Board. Foreign governments are involved in preventing initiates to drug use, providing treatment services to move people into long-term recovery, and for interdicting the flow of drug into their countries and around the globe. This strategy will rely on the expertise and capabilities of our foreign partners across the three lines of effort and the related nine goals.

*Review of Stakeholders' Drug Control Activities and Their Role in Achieving the Strategic Goals (21 USC § 1705(c)(1)(E) and (F)(ii))*

ONDCP routinely examines how international, state, local, tribal, and the private sectors' activities align with the strategy to facilitate a coordinated and effective drug control system at all levels of government.

NATIONAL DRUG CONTROL STRATEGY

We do that through the strategy consultation process, in the annual performance review of the strategy, and in ongoing community outreach. The *Strategy* is not intended to enumerate every activity the Federal government and key stakeholder must execute in order to achieve our common vision, but it articulates a common way forward for stakeholders in academic, civic, government, law enforcement, and public health communities at the Federal, state, local, and tribal level to take collective action to address the crisis challenging communities across America. It is only through a united and unified effort in which the Federal government works with, and in support of, creative and resourceful individuals and organizations across the country and with our international partners, that we can address this complex national security, law enforcement, and public health problem.

Regarding stakeholders' consultation, as noted in the introduction of the *Strategy*, ONDCP relied heavily on the expertise of the stakeholders discussed above during the consultation and development phases of the *Strategy*. Their input was decisive in determining the nine goals as well as the underlying activities we must accomplish in order to achieve the strategic outcome of building a stronger, healthier, drug-free society and reducing the number of Americans losing their lives to drug addiction. More information regarding how stakeholder input helped to inform the strategy's goals can be found in the *Performance Reporting System*.

Stakeholders and their activities are also important in implementing the goals of the *Strategy*. The following bullets outlines major groups of stakeholders and include a sampling of their current activities and their role in facilitating the achievement of the *Strategy's* goals:

- Prevention Organizations: Prevention organizations engage in a variety of activities and programs to prevent people, especially young people, from initiating drug use. Some focus on education in schools, while others are more broadly community-based. These prevention organizations will play an important role in implementing the prevention line of effort and *Strategy* Goals 1, 2, and 5. For example, the stakeholders can help achieve the strategic goals through early recognition and addressing risky substance use which can help interrupt the trajectory towards more chronic substance use disorders. They would also do so through increasing the quantity and quality of prevention education, and in particular by making such prevention programs evidence-based.

- Public Health, Treatment, and Recovery Organizations: Public health, treatment and recovery organizations provide drug treatment to those with addictions, ensure sustainable recovery for those in recovery from addictions, and address broader public health concerns such as conditions associated with drug use. These public health, treatment, and recovery organizations will play an important role in implementing the treatment and recovery line of effort and *Strategy* Goals 1, 3, 4, and 5. For example, they would do so through increasing the quantity and quality of addiction treatment and recovery programs, and in particular by making such treatment and recovery programs evidence-based. Once an individual is in recovery, stakeholders can help achieve the strategic goals by creating mutually-supportive communities where the individual can improve their physical, mental, spiritual, and social well-being and gains skills and resources

35

AR.07768

to sustain their recovery.

- Law Enforcement Organizations: Law enforcement organizations stop drug trafficking through targeting drug trafficking organizations and reducing availability of drugs, and can assist with public health efforts through the criminal justice system as well. These law enforcement organizations will play an important role in implementing the Availability Reduction line of effort and *Strategy* Goals 1, 8, and 9. For example, these are numerous activities conducted by National Drug Control Program Agencies that enhance and coordinate domestic law enforcement efforts leading to reduced drug-related violence and property crime as well as substance use and availability. Law enforcement action would result in the further disruption of the evolving illicit drug supply chain and increase the amount of drugs seized before entering the United States.

- State, Local and Tribal Governments: State, local, and tribal governments play roles on both the public health and law enforcement aspects of the Strategy, and they are key partners of ONDCP and Federal agencies in all aspects of drug control. They often organize and fund various public health, prevention, and treatment efforts for drugs. They also run state, local, and tribal law enforcement agencies, which is where the majority of national drug prosecutions occur. State, local and tribal governments will play an important role in implementing all of the *Strategy's* lines of effort and goals. It is only through a unified effort in which the Federal government works with, and in support of, the creative and resourceful individuals at the State, Local, and Tribal level of government that we can successfully address this complex national security, law enforcement, and public health problem.

- International Organizations and Foreign Governments: International organizations and foreign governments play a role in working with U.S. agencies and law enforcement in particular to reduce source country production of drugs and interdict traffickers. International organizations and foreign governments will play an important role in implementing primarily the Availability Reduction line of effort and *Strategy* Goals 1, 7, and 9. For example, National Drug Control Program agencies conduct activities to reduce illicit drug availability by assisting our international partners in managing the consequences of drug production; trafficking; consumption in their own societies, including training and equipping security forces; raising awareness of science-based practices and programs to prevent, treat and recover from substance use disorder; and supporting economic development programs primarily intended to reduce the production and trafficking of illicit drugs. By taking advantage of the strong multilateral framework that exists to address the global drug problem, particularly in terms of supporting the three drug control conventions and providing leadership in the processes for internationally scheduling, controlling, and monitoring illicit drugs and their precursor chemicals, we will continue to advance the strategic goals.

# Appendix 5: *National Drug Control Strategy* Research and Data Collection Plan

**Scope & Criteria for Policy Questions:** While there are a range of data collection and research activities germane to the implementation of the *National Drug Control Strategy*, this data research plan focuses its policy questions on the identification and analysis of emerging or increasing trends that may require significant shifts in strategy, approach, or resource allocation to identify if we are postured to deal with these drug trends. This initial plan does not provide programmatic details outlining our progress.

As per the requirements of 21 U.S.C. § 1705(c)(1)(M), this plan also:

- Identifies data required to answer each question;

- Explains how data will be collected, analyzed and applied;

- Describes data collection and analysis challenges, such as data availability, data timeliness and integrity, and data sharing constraints; and,

- Details the steps ONDCP and drug control agencies will take to implement the plan.

**Research Plan Policy Question (RPPQ) 1:**

- **Question:** What new or emerging drugs or significant shifts in U.S. illicit drug use patterns may require changes in law enforcement or public health strategies, resource allocation or national strategy or priorities?

  o Do these trends include significant shifts in primary drug of choice, prevalence, route of administration, forms of poly drug use, overdose, use-related co-morbidities and mortality, or other consequences?

  o Are there trends that require an emergency or alternative response at the national, regional, state, or local levels?

  This information would give senior policymakers the latest illicit drug use patterns, including emerging drugs to enable early detection and a rapid public health and public safety response to, ultimately, reduce morbidity and mortality.

- **Data or Datasets:** Current data systems such as the National Survey on Drug Use and Health (NSDUH), the Healthcare Cost and Utilization Project (HCUP), and the National Emergency Medical Services Information System (NEMSIS) provide information on the latest illicit drug use trends for the most commonly used substances.

  NSDUH surveys a statistical sample of Americans living in households about their **alcohol** and other drug use and their mental health status, but does not collect adequate information on the use of emerging drugs. Administrative hospital billing records from HCUP can provide data on inpatient stays and emergency department visits related to non-fatal drug overdoses, based on

37

AR.07770

physician diagnoses and International Classification of Diseases, 10 Revision, Clinical Modification (ICD-10-CM) codes, but may not be corroborated with toxicology testing. NEMSIS provides data from Emergency Medical Service patient records resulting from an emergency 911 call, including non-fatal drug overdoses, however a toxicological test result is usually not included in the record. Postmortem testing can currently measure new or changing patterns of drug use.

- **Methods or Analytical Approach:** The U.S. Government can monitor emerging drugs by testing individuals at high risk—such as probationers, emergency-room patients, and the drug treatment population—for their drug use to get a better warning of new drugs of abuse. To achieve this testing, the US Government should establish a sentinel warning system—a system that actively monitors high-risk drug using populations—that conducts urinalysis tests on a broad panel of substances beyond those most commonly encountered. For example, the Community Drug Early Warning System (CDEWS) study was a pilot for such a sentinel system. CDEWS retested previously collected urine samples from populations very likely to use drugs. Results revealed that these high-risk populations commonly used multiple drugs that would not be detected using a traditional toxicology panel. Finally, systematic monitoring of online drug fora like Bluelight, Reddit, and Erowid via an artificial intelligence data mining interface may shed light on the substances current drug users are seeking out and purchasing.

- **Challenges or Deficiencies:** Existing data systems, such as NSDUH, HCUP, or NEMSIS are constrained by their design to report on drugs that are already commonly used and provide little or no insight into emerging drugs or use patterns. While postmortem testing can currently measure new or changing patterns of drug use, variations in local toxicological forensic testing and delays in national standardization and reporting limit its use as an early detection capability. Enhanced frontline surveillance systems could be further developed to identify emerging national and local drugs and trends, subject to the availability of funding.

**RPPQ 2:**

- **Question:** Are significant shifts occurring in the domestic illicit production of synthetic drugs and other emerging substances?

  This information will provide senior policymakers an understanding of the latest domestic drug production threat.

- **Data or Datasets:** The National Seizure System (NSS) collects domestic data on illicit drug and laboratory seizures.

- **Methods or Analytical Approach:** The DEA's Signature Programs, which determines the likely source country of a small sample of heroin and cocaine seizures, could potentially help identify domestic production. CBP palynologists have successfully used pollen testing to identify the geographic origin of seized fentanyl and related substances. Analysis of pollen and other residual organic matter have enabled palynologists to identify provinces in China where fentanyl has been

packaged, and shows promise for better identifying the source country of synthetic drugs. This method could be further tested to determine if it could be applied to domestic pollen to determine if a drug was produced in the United States. The U.S. Government also monitors domestic laboratory seizures of illicit synthetic drugs as an indicator of domestic production. For example, estimated levels of domestic methamphetamine production are assumed to be low because numbers of domestic laboratory seizures are few. Forensic analysis—the collection, analysis, and reporting of information critical to investigations by law enforcement—can also provide insight into domestic production trends.

- **Challenges or Deficiencies:** While the U.S. Government has some domestic production statistics, real-time surveillance of domestic production is limited. Also, due to the United States' negligible drug production, it is not among the countries for whom a source signature has been established. Source country signature analysis is not possible for synthetic drugs in the same fashion as plant-based drugs, like heroin and cocaine. DEA's labs and signature programs could test a greater proportion of seized drug material for content, purity, and source country signature. CBP's palynology department could be expanded to geo-locate the packaging source location of a greater proportion of seized synthetic drugs. In tandem, consistent law enforcement resources need to be applied toward regular monitoring for and detection of domestic clandestine drug labs.

**RPPQ 3:**

- **Question:** Are criminal actors exploiting new vectors (e.g., transshipment locations, methods of smuggling) for U.S. bound illicit substances?

  Senior policymakers need this information to ensure activities are prioritized toward the greatest concealment threats.

- **Data or Datasets**: Existing law enforcement seizure databases can provide some insight into current vectors of illicit substances. However, information about drug trafficking trends and common concealment methods are typically derived from targeted and time-limited intelligence gathering and law enforcement operations. For example, the El Paso Intelligence Center (EPIC) provides tactical intelligence to Federal, state, and local law enforcement agencies on a national scale—at times identifying new concealment methods in its intelligence reports.

- **Methods or Analytical Approach:** Policymaker understanding of the drug trafficking and use environment is essentially based upon three things; an in-depth understanding of the environment as it is, valid and necessary assumptions about how it will change over time, and a collective understanding about how actions can be taken to shape that environment in order to achieve the strategy's long-term goal, in this case to reduce the number of Americans dying from drug use. To do this policymakers rely upon a large body of reporting and datasets that each have unique capabilities and limitations. Law enforcement seizure data provides insight into the types of drugs seized during law enforcement operations within the United States, their value, and their purity. Seizure data from ports of entry identify the volume and variety of drugs seized as traffickers attempt

to bring them into the United States. Chemical signature and profiling data tells us the geographic origin of plant-based drugs or the chemical composition of synthetic drugs, and crop estimate data provides the magnitude of plant-based drug production in other countries that produce drugs for the US market. Similarly, public health data provides us insight in the size, behaviors, preferences, and usage patterns among the drug using population, as well as longitudinal trends in drug us across the country over time. Moreover, public health information is used to identify many of the consequences of drug use for individuals, families, and communities. Although each of these individual data sources have known limitations, taken together they can provide the most complete available understanding of drug availability and use in the United States. More importantly, they allow policymakers to identify changes in that environment to identify whether or not the strategy's assumptions remain valid, and to see if there are gaps in our Federal government capability that need to be filled through regulatory, legislative, or resource changes.

- **Challenges or Deficiencies:** Whether law enforcement agencies activities are normative, generalizable, or scalable is difficult to judge absent consolidated law enforcement databases establishing baseline trends. Policymakers also have difficulty judging what front-end resources (e.g., detection technologies, person-power, screening levels) are most impactful against these new event types. Considerable ongoing interagency collaboration would be required to establish incoming and outgoing vector baseline thresholds, the operational and process requirements and maintenance of a consolidated data system, and the most effective use of detection technologies. Significant and efforts in technology, law enforcement operational capacity, big database architecture, and randomized data collection and analysis would be required to improve detection capabilities for new and under-resourced vectors, develop a consolidated data system that is useful both operationally and for policymakers, and establish baselines for specific locations and concealment methods.

**RPPQ 4:**

- **Question:** How well does substance use disorder treatment capacity (e.g., opioid treatment programs, residential treatment facilities, office-based opioid treatment, and outpatient specialty treatment) respond to new or emerging shifts in drug use within the United States?

    o  Is a shift in resource allocation required to better respond to needs?

    Senior policymakers need this information to determine if there is sufficient treatment support and to ensure that resources are appropriately targeted as domestic drug use shifts.

- **Data or Datasets**: Current surveys such as the NSDUH and the Monitoring the Future (MTF) provide information on the latest illicit drug use trends for the most commonly used substances for adults and youth. The Treatment Episode Data Set (TEDS) provides demographic and substance use characteristics of admissions to treatment for abuse of alcohol or drugs, while the National Survey of Substance Abuse Treatment Services (N-SSATS) collects data on the location, scope, and characteristics of substance abuse treatment facilities throughout the United States.

NATIONAL DRUG CONTROL STRATEGY

- **Methods or Analytical Approach:** Compare use and treatment admission data at the state, regional, and local levels to available treatment capacity to identify potential discrepancies between treatment availability and need.

- **Challenges or Deficiencies:** There is no data source that provides real-time available treatment capacity that can be cross-referenced against drug trends in demand.

**Director's Next Steps:**

The Director will establish an Interagency Drug Research Group composed of individuals from the National Drug Control Program Agencies chaired by ONDCP to effectuate the data collection plan and help explore data needs from future policy questions related to the *National Drug Control Strategy*.

AR.07774



# Errors and Fraud in the Supplemental Nutrition Assistance Program (SNAP)

**Randy Alison Aussenberg**
Specialist in Nutrition Assistance Policy

Updated September 28, 2018

Congressional Research Service

7-5700

www.crs.gov

R45147

**CRS REPORT**
Prepared for Members and
Committees of Congress

ER-0239

AR.07912

# Summary

The Supplemental Nutrition Assistance Program (SNAP) is the nation's largest domestic food assistance program, serving over 42.1 million recipients in an average month at a federal cost of over $68 billion in FY2017. SNAP is jointly administered by state agencies, which handle most recipient functions, and the federal government—specifically, the U.S. Department of Agriculture's Food and Nutrition Service (USDA-FNS)—which supports and oversees the states and handles most retailer functions. In a program with diverse stakeholders, detecting, preventing, and addressing errors and fraud is complex. SNAP has typically been reauthorized in a farm bill approximately every five years; this occurred most recently in 2014 (P.L. 113-79). Policymakers have long been interested in reducing fraud and improving payment accuracy in the program. Provisions related to these goals have been included in past farm bill reauthorizations and may be considered for the next farm bill, expected in 2018.

There are four main types of inaccuracy and misconduct in SNAP:

- *Trafficking SNAP benefits* is the illicit sale of SNAP benefits, which can involve both retailers and recipients.

- *Retailer application fraud* generally involves an illicit attempt by a store owner to participate in SNAP when the store or owner is not eligible.

- *Errors and fraud by households applying for SNAP benefits* can result in improper payments. Errors are unintentional, while fraud is the intentional violation of program rules.

- *Errors and fraud by state agencies*—agency errors can result in inadvertent improper payments; the discussion of agency fraud largely focuses on certain states' Quality Control (QC) misconduct.

Certain key ideas are fundamental to any discussion of SNAP errors and fraud:

- Errors are not the same as fraud. Fraud is intentional activity that breaks federal and/or state laws, while errors can be the result of unintentional mistakes. Certain acts, such as trafficking SNAP benefits, are always considered fraud; other acts, such as duplicate enrollment, may be the result of either error or fraud depending on the circumstances of the case.

- SNAP fraud is relatively rare, according to available data and reports.

- There is no single measure that reflects all the forms of fraud in SNAP. There are some frequently cited measures that capture some parts of the issue, and there are relevant data from federal and state agencies' enforcement efforts.

The most frequently cited measure of fraud is the national retailer trafficking rate, which estimated that 1.5% of SNAP benefits redeemed from FY2012-FY2014 were trafficked. While the national retailer trafficking rate (which is issued roughly every three years) estimates the extent of retailer trafficking, there is not a standard recipient trafficking rate, nor is there an overall recipient fraud rate.

USDA-FNS is responsible for identifying stores engaged in retailer trafficking—using transaction data analysis, undercover investigations, and other tools—and imposing penalties on store owners who commit violations. Retailers found to have trafficked may be subject to permanent disqualification from participation in SNAP, fines, and other penalties. USDA-FNS also works to identify fraud by retailers applying to accept SNAP benefits. Retailers found to have falsified their applications may be subject to denial, permanent disqualification, and other penalties.

While retailer trafficking and retailer application fraud are primarily pursued by a single federal entity (USDA-FNS), recipient violations (i.e., recipient trafficking and recipient application fraud) are pursued by 53 different state agencies. Recipients found to have trafficked may be required to repay the amount trafficked and may be subject to disqualification from receiving SNAP benefits and other penalties. State agencies' efforts to reduce and punish recipient fraud vary, which is evident, for instance, in state-submitted data on recipient disqualification activities.

The national payment error rate (NPER) is the most-cited measure of nationwide payment accuracy. Using USDA-FNS's Quality Control (QC) system, the NPER estimates states' accuracy in determining eligibility and benefit amounts. The NPER has limitations, though; for instance, it only reflects errors above a threshold amount ($38 in FY2017). After publishing a FY2014 NPER, USDA Office of the Inspector General (OIG ) and USDA-FNS identified data quality issues that prevented the publication of an NPER in FY2015 and FY2016, but USDA-FNS published a NPER for FY2017 in June 2018. For FY2017, it was estimated that 6.30% of SNAP benefit issuance was improper—including a 5.19% overpayment rate and a 1.11% underpayment rate. Regardless of the cause of an overpayment, SNAP agencies are required to work toward recovering excess benefits from households that were overpaid (this is referred to as "establishing a claim against a household"). Applying these rates to benefits issued in FY2017 (over $63.6 billion), an estimated $3.30 billion in benefits were overpaid, and about $710 million in benefits were underpaid.

Overpayments and underpayments to households can be the result of recipient errors, recipient fraud, or agency errors during the certification process. State agencies rely on household-provided information in applications, but also employ a range of data matches—some required by federal law, some optional that vary by state—to promote accuracy and double-check information. According to the USDA-FNS FY2016 State Activity Report, of states' established claims for overpayment, approximately 62% of overpayment claim dollars were for recipient errors, about 28% were for agency errors, and about 11% were due to recipient fraud.

In addition to inadvertent agency errors, state agencies and their agents have been involved in isolated instances of fraud. Beyond cases of fraud conducted by state agency employees for personal gain, in FY2017 the Department of Justice obtained False Claim Act settlements from three state agencies accused of falsifying their Quality Control data and unlawfully obtaining federal bonuses. Investigations into this matter, conducted by the USDA-OIG, are ongoing.

Across all types of fraud, oversight entities such as the Government Accountability Office and USDA-OIG have identified issues and strategies relevant to combating errors and fraud in SNAP. USDA-FNS has also proposed related regulatory changes that were not finalized. On the retailer side, issues identified focus on opportunities to prevent and more promptly punish trafficking. On the recipient side, issues identified include the nonexistence of a recipient fraud rate, states' varied levels of anti-fraud efforts (which may be better incentivized), and improvements to data matching in the application process. During the 115th Congress, Members voted on farm bill proposals that contained some changes to SNAP program integrity policy; these proposals are summarized in CRS Report R45275, *The House and Senate 2018 Farm Bills (H.R. 2): A Side-by-Side Comparison with Current Law.*

Changes that might strengthen payment accuracy and punishments against fraud can be in tension with other policy objectives such as preserving recipient access to the program, and may have unintended consequences such as incurring costs greater than their savings. Balancing program objectives such as these are considerations for policymakers in this area.

# Contents

Introduction ........................................................................................................................................... 1

Types of Errors and Fraud ..................................................................................................................... 2

Trafficking: Retailer and Recipient ............................................................................................... 3
Retailer Application Fraud ............................................................................................................. 3
Errors and Fraud in Benefit Issuance to Households ..................................................................... 4
Recipient Errors ....................................................................................................................... 4
Recipient Application Fraud ..................................................................................................... 4
Agency Errors ........................................................................................................................... 5
Fraud Conducted by State Agencies or Their Agents .................................................................... 5
State Agency Employee Fraud .................................................................................................. 5
State Agency Fraud ................................................................................................................... 5

Extent of Errors and Fraud .................................................................................................................... 5

Extent of Retailer Trafficking ........................................................................................................ 5
Extent of Retailer Application Fraud ............................................................................................. 7
Extent of Errors and Fraud in Benefit Issuance to Households ..................................................... 8
National Payment Error Rate ................................................................................................... 8
Differentiating Between Recipient Fraud, Recipient Errors, and Agency Errors ................... 10

Detection and Correction of Errors and Fraud ................................................................................... 13

Retailer Fraud ............................................................................................................................... 14
Detection of Retailer Trafficking ........................................................................................... 14
Correction of Retailer Trafficking.......................................................................................... 15
Detection of Retailer Application Fraud ................................................................................. 17
Correction of Retailer Application Fraud................................................................................ 17
Errors in Benefit Issuance to Households ..................................................................................... 17
Detection of Recipient Errors—Data Matching...................................................................... 17
Detection of Agency Errors .................................................................................................... 21
Correction of Recipient and Agency Errors—Claims............................................................. 21
Recipient Fraud ............................................................................................................................. 22
Detection of Recipient Fraud .................................................................................................. 22
Correction of Recipient Fraud ................................................................................................ 23
State Agency Employee Fraud Detection and Correction............................................................. 25

State Agency Fraud: SNAP Quality Control ....................................................................................... 25

Quality Control: Incentives and Penalties Overview .................................................................... 25
State Agency Misreporting and Falsification of Quality Control Data ......................................... 27

Combating Errors and Fraud: Issues and Strategies............................................................................ 29

Retailer Trafficking ....................................................................................................................... 29
Certain Store Owners Remain Active in SNAP Despite Permanent
Disqualification for Trafficking ......................................................................................... 29
Strengthening Monetary Penalties against Trafficking Retailers..................................... 30
Changes in EBT Transaction Processing since 2014 .............................................................. 31
Enhancing Retailer Stocking Standards .................................................................................. 32
Suspending "Flagrant" Retailer Traffickers ........................................................................... 33
Increasing Requirements for High-Risk Stores ...................................................................... 33
Recipient Trafficking..................................................................................................................... 34
Requiring Recipient Photographs on EBT Cards.................................................................... 34
State Agency Reporting on Recipient Fraud............................................................................ 35

Enhancing Federal Financial Incentives for State Agencies to Fight Fraud ..................... 36
Federal Oversight of State Agencies—Management Evaluations (MEs) ......................... 36
Delayed State Agency Notification of Retailer Trafficking Cases .................................... 37
Difference in Burden of Proof for Retailer Trafficking versus
    Recipient Trafficking ............................................................................................... 37
Best Practices for Fighting Recipient Fraud—the SNAP Fraud Framework ................... 38
Retailer Application Fraud ..................................................................................................... 38
Verification and Use of Retailer Submitted Social Security Numbers (SSNs) ................ 38
Other Verification of Retailer Submitted Information ..................................................... 39
Mandating Background Checks on High-Risk Retailer Applications .............................. 39
Additional Retailer Application Vulnerabilities Identified in 2012 and 2013
    USDA-FNS Proposed Rules ...................................................................................... 40
Recipient Application Errors and Fraud ................................................................................. 41
Establish Federal Incentives to Conduct Pre-certification Investigations ....................... 41
Difficulties in Collecting Amounts Overpaid to or Trafficked by Recipients ................. 41
Duplicate Enrollment and the National Accuracy Clearinghouse (NAC) ...................... 42
Considerations for Data Matching .................................................................................. 44
State Agency Errors and Fraud .............................................................................................. 45
Modifying State Involvement in the Quality Control System .......................................... 45

# Figures

Figure 1. Authorization and Trafficking at Convenience Stores, 2006-2014 ................................. 7
Figure 2. Claims Establishment by Type, FY2007-FY2016 ......................................................... 13
Figure 3. Data Matching in SNAP Certification ........................................................................... 18
Figure 4. Per Capita Recipient Disqualifications in States ............................................................ 24
Figure 5. Claims Established and Claims Collected as Shares of Estimated Dollars
    Overissued, FY2005-FY2014 ................................................................................................. 42

# Tables

Table 1. National Payment Error Rate, FY2011-FY2014, FY2017 ............................................... 10
Table 2. Bonuses Awarded to States for High Payment Accuracy, FY2014 ................................. 26
Table 3. Penalties Repaid by States for Low Payment Accuracy, FY2005-FY2014 ..................... 27

Table B-1. Inactive USDA-FNS Rulemaking Actions Related to SNAP Integrity ...................... 48
Table D-1. Convenience Stores as a Percentage of All Stores in SNAP ...................................... 52
Table D-2. Trafficking Rates in Convenience Stores Compared to the
    National Trafficking Rates ....................................................................................................... 52
Table D-3. Convenience Store Redemptions and Trafficking as a Percentage of
    All Redemptions and Trafficking ............................................................................................ 53
Table E-1. State Payment Error Rates, FY2010 to FY2014 ........................................................ 54
Table E-2. State Bonuses and Liabilities, FY2010 to FY2014 .................................................... 56

# Appendixes

Appendix A. Glossary of Abbreviations......................................................................... 46
Appendix B. "Inactive" USDA-FNS Rules................................................................... 48
Appendix C. Optional Income Data Matches............................................................... 50
Appendix D. Trends in Retailer Trafficking and Convenience Store Participation in
 SNAP.......................................................................................................................... 52
Appendix E. Payment Error Rate Information ............................................................. 54

# Contacts

Author Contact Information ........................................................................................... 58

# Introduction

The Supplemental Nutrition Assistance Program (SNAP) is the nation's largest domestic food assistance program, serving about 42.2 million recipients in an average month at a federal cost of over $68 billion in FY2017.[1] It is jointly administered by the federal government and the states and provides means-tested benefits to recipients who are deemed eligible. These benefits may be used only for eligible foods at any of the approximately 260,000 authorized retailers, which range from independent corner stores to national chain supermarkets.[2] In a program that operates with so many different stakeholders, detecting, preventing, and addressing errors and fraud is a complex undertaking. Among the complexities are the monitoring of retailer acceptance and recipient use of benefits, the accuracy of information provided by applicant households, and states' performance administering the program. Many governmental entities—federal and state agencies, including both human services and law enforcement—play a role in efforts to detect, prevent, and punish fraudulent SNAP activities and to reduce inadvertent errors.

SNAP has typically been reauthorized in a farm bill approximately every five years; this occurred most recently in 2014 (P.L. 113-79).[3] Policymakers have long been interested in reducing fraud and improving accuracy in the program, and provisions related to these goals are frequently included in farm bills. In preparation for the next farm bill, up for reauthorization in September 2018, policymakers have again begun to discuss error and fraud in the program.[4] The Trump Administration has also announced related policy changes.[5] At the same time, some policymakers defend the program against criticism of its integrity.[6]

To help policymakers navigate this complex set of policy issues, this report seeks to define terms related to errors and fraud; identify problems and describe what is known of their extent; summarize current policy and practice; and share recommendations, proposals, and pilots that have come up in recent years. The report answers several questions around four main types of inaccuracy and misconduct: (1) trafficking SNAP benefits (by retailers and by recipients); (2) retailer application fraud; (3) errors and fraud in SNAP household applications; and (4) errors and fraud committed by state agencies (including a discussion of states' recent Quality Control (QC) misconduct). The report then discusses challenges to combating errors and fraud—across the four areas—and potential strategies for addressing those challenges.

---

[1] Average monthly participation data and total program cost for FY2017 are from the U.S. Department of Agriculture Food and Nutrition Service (USDA-FNS) administrative data.

[2] For basic information on SNAP eligibility rules, benefit calculation, and benefit redemption, see CRS Report R42505, *Supplemental Nutrition Assistance Program (SNAP): A Primer on Eligibility and Benefits*, by Randy Alison Aussenberg.

[3] For background, see CRS In Focus IF10663, *Farm Bill Primer: SNAP and Other Nutrition Title Programs*, by Randy Alison Aussenberg.

[4] See Chairman K. Michael Conaway, *Past, Present, and Future of SNAP: Hearing Series Findings: 114th Congress*, House Committee on Agriculture, December 7, 2016, pp. 38-48, https://agriculture.house.gov/UploadedFiles/ SNAP_Report_2016.pdf.

[5] For information regarding these policy changes, see, for example: December 5, 2017, USDA press release, https://www.usda.gov/media/press-releases/2017/12/05/usda-promises-new-snap-flexibilities-promote-self-sufficiency; and December 8, 2017, USDA press release: https://www.usda.gov/media/press-releases/2017/12/08/usda-clears-arizona-test-snap-fraud-prevention-improvement.

[6] See, for example, Representative Jim McGovern, "U.S. Rep. McGovern's 18th End Hunger Now Speech: Fraud, Waste, Abuse," press release, July 17, 2013, https://mcgovern.house.gov/news/documentsingle.aspx?DocumentID= 396547.

ER-0245

AR.07918

Certain key ideas that are fundamental to discussion of SNAP errors and fraud are explored further in the report:

- Errors are not the same as fraud. Fraud is intentional activity that breaks federal and/or state laws, but there are also ways that program stakeholders—particularly recipients and states—may inadvertently err, which could affect benefit amounts. Certain acts, such as trafficking, are always considered fraud, but other acts, such as duplicate enrollment, may be the result of either error or fraud depending on the circumstances of the case.

- SNAP fraud is relatively rare, according to available data and reports. While this report discusses illegal or inaccurate activities in SNAP, they represent a relatively small fraction of SNAP activity overall.

- There is no single data point that reflects all the forms of fraud in SNAP. The most frequently cited measure of fraud is a national estimate of retailer trafficking, which is a significant, but not the only, type of fraud in the program.

- While retailer trafficking and retailer application fraud are pursued primarily by a single federal entity, recipient violations are pursued by 53 different state agencies. This leads to disparate approaches and disparate reporting.[7]

- The national payment error rate (NPER) is the most-often cited measure of nationwide SNAP payment accuracy, but it has limitations. For example, it only reflects errors above an error tolerance threshold.

Policies to reduce fraud and increase accuracy can be in tension with other policy objectives, and may have unintended consequences. Policies that make retailer authorization more onerous, for instance, have the potential to decrease participants' access to SNAP-authorized stores. Making eligibility determinations more complex for recipients can impede recipients' access to the program and could strain states' eligibility determination operations. Implementing better data collection and accountability systems could require more staff and could incur more costs than it reduces.

This report provides a foundation for discussing error and fraud in SNAP and for evaluating policy proposals. It does not make independent CRS findings, but rather synthesizes the many available resources on error and fraud in SNAP. It relies, in particular, on reports and data from the United States Department of Agriculture's Food and Nutrition Service (USDA-FNS) as well as the published audits of the USDA's Office of the Inspector General (USDA-OIG) and the Government Accountability Office (GAO). For a list of abbreviations used in this report, see **Appendix A**.

# Types of Errors and Fraud

This section defines each of the types of intentional fraud and unintentional errors committed by recipients, retailers, and state agencies, including retailer trafficking (fraud), recipient trafficking (fraud), retailer application fraud, recipient application fraud, recipient errors, agency errors, state agency employee fraud, and state agency fraud.

---

[7] 50 states, the District of Columbia, Guam, and the U.S. Virgin Islands administer SNAP.

## Trafficking: Retailer and Recipient

USDA-FNS is responsible for administering the retailer side of SNAP and for pursuing retailer fraud; while states are responsible for administering the recipient side of SNAP (with federal oversight) and for pursuing recipient fraud.[8] "Trafficking" usually means the direct exchange of SNAP benefits (formerly known as food stamps) for cash, which is illegal, and both retailers and recipients can engage in this form of fraud.[9] Although SNAP benefits have a dollar value, they are not the same as cash because they can only be spent on eligible food for household consumption at authorized stores equipped with Electronic Benefit Transfer (EBT) point of sale (POS) machines.[10] Trafficking can also include the exchange of SNAP benefits for controlled substances, firearms, ammunition, or explosives.[11] Additionally, trafficking includes indirect exchanges, such as obtaining cash refunds for products purchased with SNAP benefits or reselling products purchased with SNAP benefits. Trafficking SNAP benefits includes recipient trafficking and retailer trafficking. Retailer trafficking of SNAP benefits usually occurs when a SNAP recipient sells their benefits for cash, often at a loss, to an owner or employee of a store participating in SNAP.[12] Recipient trafficking usually coincides with retailer trafficking, but it may take other forms (e.g., if a recipient were to sell their benefits, or food purchased with benefits, to another individual). Trafficking is one of the most serious forms of SNAP fraud, and although it does not increase costs to the federal government (as overpayments do), it does divert federal funds from their intended purpose.

## Retailer Application Fraud

Retailers misrepresenting themselves or circumventing disqualification in the application process can be a source of fraud. To obtain SNAP authorization, applicant retailers must meet certain requirements, including stocking[13] and business integrity standards.[14] When a retailer initially applies to receive authorization to participate in SNAP or applies for reauthorization to continue SNAP participation,[15] the store owner must submit personal and business information and documentation to USDA-FNS in order to verify eligibility for SNAP participation. If a retailer

---

[8] Sections 9, 12, and 15 of the Food and Nutrition Act of 2008 (FNA) outline the requirement that USDA-FNS administer SNAP on the retailer side; Section 11 outlines the requirement that states administer SNAP on the recipient side.

[9] For the full definition of trafficking, see 7 C.F.R. §271.2.

[10] Stores authorized to participate in SNAP are required to ensure that SNAP benefits are accepted as payment only for eligible food. Many, but not all, stores ensure compliance by programming their point of sale systems to recognize the SNAP eligibility of products at the checkout counter, thereby preventing the use of SNAP benefits to pay for ineligible products.

[11] Controlled substances as defined at 21 U.S.C. §802.

[12] For example, a recipient swipes their SNAP EBT card for a $20 purchase transaction, but rather than receiving $20 of eligible food, the recipient obtains $10 in cash from the store owner. The total amount of the transaction ($20) is deposited into the store owner's bank account. In this example, both the recipient and retailer are engaged in trafficking SNAP benefits.

[13] SNAP stocking standards may be met with either a range of different staple foods on hand or documentation reflecting more than 50% of store sales in staple foods. For more information, see CRS Report R42505, *Supplemental Nutrition Assistance Program (SNAP): A Primer on Eligibility and Benefits*, by Randy Alison Aussenberg.

[14] SNAP business integrity standards require that store owners do *not* have a history of certain convictions, civil judgments, and violations. Section 9(a)(1)(D) of the FNA (codified at 7 U.S.C. §2018(a)(1)(D) and implemented at 7 C.F.R §278.1(b)(3)).

[15] Stores participating in SNAP must apply for reauthorization on a regular basis. Depending on risk level and other factors, stores are reconsidered on reauthorization cycles that vary from one to five years.

deliberately submits false or misleading information of a substantive nature in order to receive SNAP authorization despite their ineligibility, then they have committed falsification—retailer application fraud.[16] Another kind of retailer application fraud involves a store owner attempting to circumvent disqualification from SNAP by engaging in a purported sale or transfer of ownership of their store to a spouse or relative; after which the new purported owner applies to participate in SNAP, claiming that the former disqualified owners are no longer associated with the store. This practice is often referred to as "straw ownership," and USDA-FNS does not consider such sales or transfers of ownership to be bona fide.[17] Such actions by the disqualified retailer are considered circumvention—retailer application fraud.[18] Retailer application fraud does not increase costs to the federal government (as overpayments can), but it does enable retailers who may be more likely to engage in trafficking to enter the program.

## Errors and Fraud in Benefit Issuance to Households

In addition to retailer trafficking and retailer application fraud, errors and fraud can arise in determining eligibility and benefit amounts for recipients.

### Recipient Errors

When a household initially applies to receive or recertifies to continue receiving SNAP benefits, the applicant household must submit personal information and documentation to their state agency for eligibility determination, and for benefit calculation if found to be eligible. During this application process, an applicant may misunderstand SNAP rules, make a miscalculation, otherwise unintentionally provide incorrect information, or accidentally omit certain information. If this error results in an overpayment to the household and there is no proof that this error was *intentional*, then this error is designated as an inadvertent household error (IHE).[19]

### Recipient Application Fraud

If an applicant is found to have intentionally submitted false or misleading information during the initial application or recertification process that leads to an incorrect eligibility or allotment determination (resulting in an overpayment), then that applicant has committed an intentional program violation (IPV)—recipient application fraud.[20]

---

[16] Examples of falsification include providing USDA-FNS with a fake Social Security Number (SSN) for a store owner, untruthfully attesting that a store owner had never been convicted of a crime, or providing forged records indicating an inventory of foodstuffs not stocked at the store.

[17] A "straw owner" is an individual who legally owns property, or has the legal appearance of owning property, on behalf of another individual, sometimes for a fee. Typically, such arrangements are conducted solely to hide the identity of the effective owner.

[18] U.S. Department of Agriculture, Office of the Inspector General, *FNS: Controls for Authorizing Supplemental Nutrition Assistance Program Retailers*, Audit Report 27601-0001-31, July 2013, pp. 3-4, https://www.usda.gov/oig/webdocs/27601-0001-31.pdf (hereinafter cited as "July 2013 USDA-OIG report").

[19] Inadvertent household errors are sometimes referred to as unintentional program violations (UPVs).

[20] This is also referred to as "eligibility fraud" although recipient application fraud can involve recipients falsifying information pertaining to eligibility as well as income. See Section 6(b) of the FNA (codified at 7 U.S.C. §2015(b) and implemented at 7 C.F.R. §273.16).

### Agency Errors

SNAP overpayments or underpayments that are *not* the result of recipient actions (i.e., not the result of recipient errors or recipient fraud) are generally the result of agency errors (AEs).[21] Agency errors include overpayments or underpayments caused by the action of, or failure to take action by, any representative of a state agency.

## Fraud Conducted by State Agencies or Their Agents

"State agency employee fraud" and "state agency fraud" are not terms defined in statute, regulation, or agency guidance. As used in this report, "state agency employee fraud" and "state agency fraud" include forms of fraud often referred to as "insider threats"—a threat to SNAP integrity that comes from within entities that administer SNAP (i.e., state agencies).

### State Agency Employee Fraud

State agency employee fraud is any intentional effort by state employees to illegally generate and benefit from SNAP overpayments. State agency employee fraud usually involves eligibility workers who abuse their positions and access to the SNAP certification process in order to unlawfully generate SNAP accounts that materially benefit individuals not entitled to such benefits.

### State Agency Fraud

State agency fraud is any intentional effort by state officials to mislead USDA-FNS or other federal authorities in order to illegally obtain federal funds or avoid federal monetary penalties. State agency fraud cases are very infrequent and generally center on a state's falsification of program-related data. Of interest to policymakers, the state agency fraud case examined in this report, first identified in 2017, deals with multiple states' falsification of Quality Control (QC) data in order to obtain monetary bonuses and avoid monetary penalties, with some actions dating back to 2008.[22] (For more information, see "State Agency Fraud: SNAP Quality Control.")

# Extent of Errors and Fraud

## Extent of Retailer Trafficking

USDA-FNS publishes an annual report that summarizes their annual administrative activities pertaining to retailers participating in SNAP,[23] including detailed retailer data on participation and redemptions, retailer applications and authorizations, investigations and sanctions, and administrative review. According to this Retailer Management Report, in FY2016 there were 260,115 retailers participating in SNAP, and USDA-FNS permanently disqualified 1,842 stores for retailer trafficking (less than 1% of all stores).[24]

Roughly every three years, USDA-FNS publishes a study estimating the extent of retailer trafficking in SNAP over about three years of SNAP redemption data. The retailer trafficking studies referenced in this report were issued in 2017 (covering 2012-2014), 2013

---

**National Retailer Trafficking Rate[25]**

The most recent trafficking study (analyzing 2012-2014 data) estimated that 1.50% of all SNAP benefits redeemed were trafficked (sold for cash or exchanged illegally) at stores. This is up from an estimated 1.34% in the 2009-2011 study. This only reflects one type of fraud—retailer trafficking.

---

(covering 2009-2011), and 2011 (covering 2006-2008).[26] By examining a representative sample, these studies determined two national rates that reflect the prevalence of retailer trafficking. The *national retailer trafficking rate* represents the proportion of SNAP redemptions at stores that were estimated to have been trafficked. The *national store violation rate* represents the proportion of authorized stores that were estimated to have engaged in trafficking.

The national retailer trafficking rate is the most-cited measure of fraud in SNAP, although it does not capture all types of fraud (i.e., it represents only retailer trafficking). According to the September 2017 USDA-FNS Retailer Trafficking Study, the national retailer trafficking rate for 2012-2014 was 1.50%, up from 1.34% in the 2009-2011 study.[27] This means that, during this period, USDA-FNS estimates that 1.50% of all SNAP benefits redeemed were trafficked at participating stores. This constitutes about $1.1 billion in estimated benefits trafficked each year at stores during this period.[28] Additionally, this study estimated that the national store violation rate for this period was 11.82%, up from 10.47% in the 2009-2011 study.[29] This means that, during this period, USDA-FNS estimates that 11.82% of all SNAP-authorized retailers engaged in retailer trafficking at least once.

The September 2017 USDA-FNS Retailer Trafficking Study found that the increase in retailer trafficking was due to increased program participation by smaller stores, which have a higher rate of retailer trafficking. While stores enter and leave the program from year to year, the overall growth in SNAP-authorized stores over the last 10 years (FY2007-FY2016) was about 93,000, and about 63% of this growth came from convenience stores in the program (see **Table D-1** in **Appendix D**).[30] As of FY2016, convenience stores constitute about 46% of all stores in the program, up from 36% in FY2007.[31] According to the September 2017 USDA-FNS Retailer Trafficking Study, covering 2012-2014, convenience stores account for about 5% of total SNAP redemptions, but about 57% of retailer trafficking (see **Table D-3** in **Appendix D**).[32] Also

---

[21] Agency errors are sometimes called "administrative errors."

[22] U.S. Department of Justice (DOJ), "Wisconsin Department of Health Services Agrees to Pay Nearly $7 Million to Resolve Alleged False Claims for SNAP Funds," press release, April 12, 2017, https://www.justice.gov/opa/pr/wisconsin-department-health-services-agrees-pay-nearly-7-million-resolve-alleged-false-claims.

[23] Retailer Management Reports are available at https://www.fns.usda.gov/snap-retailer-data.

[24] This comes to about 0.71% of total stores participating in the program in FY2016. This CRS calculation is based on data provided in an email from SNAP, USDA-FNS, October 25, 2017.

[25] Joseph Willey, Nicole B. Fettig, and Malcolm Hale, *The Extent of Trafficking in the Supplemental Nutrition Assistance Program: 2012–2014*, prepared by WRMA, Inc. for the U.S. Department of Agriculture, Food and Nutrition Service, September 2017, pp. ii-9, https://www.fns.usda.gov/snap/extent-trafficking-supplemental-nutrition-assistance-program-2012%E2%80%932014 (hereinafter cited as "September 2017 USDA-FNS Retailer Trafficking Study").

[26] These three studies can be found online at https://www.fns.usda.gov/report-finder.

[27] September 2017 USDA-FNS Retailer Trafficking Study, pp. ii-9.

[28] SNAP benefit redemptions in FY2012, FY2013, and FY2014 were about $75 billion, $76 billion, and $70 billion, respectively.

[29] September 2017 USDA-FNS Retailer Trafficking Study, p. 17.

[30] This CRS calculation is based on data provided in an email from SNAP, USDA-FNS, January 5, 2018. USDA-FNS categorizes retailers into "store types" (e.g., "convenience store") according to definitions in an internal agency document. Store types are largely defined by volumes of sales, size, and other business characteristics.

[31] This CRS calculation based on data provided in an email from SNAP, USDA-FNS, January 5, 2018, and from U.S. Department of Agriculture, Food and Nutrition Service, *2016 Retailer Management Year End Summary Report*, December 2016, p. 1, https://fns-prod.azureedge.net/sites/default/files/snap/2016-SNAP-Retailer-Management-Year-End-Summary.pdf (hereinafter cited as "December 2016 USDA-FNS Retailer Management Report").

[32] This CRS calculation based on data from September 2017 USDA-FNS Retailer Trafficking Study, p. 9.

*Errors and Fraud in the Supplemental Nutrition Assistance Program (SNAP)*

according to this study, about 18% of all SNAP benefits used at authorized convenience stores are trafficked by these stores (i.e., the convenience store trafficking rate), and about 19% of all authorized convenience stores are engaged in trafficking (i.e., the convenience store violation rate).[33] These rates are significantly higher than the national rates for all stores (see **Table D-2** in **Appendix D**). The increase in SNAP participation by smaller stores appears to correlate to an overall increase in retailer trafficking, according to USDA-FNS.[34] **Figure 1** displays some of these data from the three most recent trafficking studies.

**Figure 1. Authorization and Trafficking at Convenience Stores, 2006-2014**



**Source:** The three USDA-FNS retailer trafficking studies referenced can be found online using https://www.fns.usda.gov/report-finder.

## Extent of Retailer Application Fraud

There is no standard measure of retailer application fraud. However, USDA-FNS does report annually on actions taken against business integrity violations, and a retailer engaged in application fraud (including falsification and circumvention) is generally considered to be in violation of business integrity standards.

In FY2016, USDA-FNS sanctioned 126 stores for business integrity violations. This number includes sanctions not related to retailer application fraud and amounts to less than 1 store sanctioned for every 2,064 stores participating in the program.[35] During the same period, USDA-FNS permanently disqualified about 15 times as many stores for retailer trafficking.[36]

---

[33] September 2017 USDA-FNS Retailer Trafficking Study, p. 9.

[34] September 2017 USDA-FNS Retailer Trafficking Study, pp. iii-14.

[35] This business integrity sanction total includes stores sanctioned for past convictions as well as retailer application fraud (i.e., circumvention and falsification). Total FY2016 business integrity sanctions include 25 time-limited denials, 5 time-limited withdrawals, 56 permanent denials, 37 permanent withdrawals, and 3 permanent disqualifications; December 2016 USDA-FNS Retailer Management Report, p. 5, and email from SNAP, USDA-FNS, October 25, 2017.

[36] Total FY2016 permanent disqualifications for retailer trafficking were 1,842. CRS calculations in this paragraph use data from the December 2016 USDA-FNS Retailer Management Report, pp. 1-8, and email from SNAP, USDA-FNS, October 25, 2017.

# Extent of Errors and Fraud in Benefit Issuance to Households

## National Payment Error Rate

The SNAP Quality Control (QC) system measures improper payments in SNAP. This system was first established by the Food Stamp Act of 1977.[37] Under the QC system, every state agency conducts a monthly review of a sample of its households, comparing the amounts of overpayments and underpayments to total issuance.[38] From this review, state agencies calculate their state payment error rate (SPER). USDA-FNS conducts annual reviews of a sample of each state's reviews to validate state findings and determine national rates—developing the national payment error rate (NPER).

The NPER is the most-often cited measure of payment accuracy in SNAP.[39] Unlike the national retailer trafficking rate, the NPER is *not* a measure of fraud. The NPER reflects improper payments, but not the *cause* of these overpayments and underpayments. The NPER estimates all overpayments and underpayments resulting from recipient errors, recipient application fraud, and agency error.[40] Per current federal law, only overpayments and underpayments of $38 or more (inflation-adjusted annually) in the sample month are counted when calculating the payment error rate—this is called the Quality Control threshold.[41] Additionally, the NPER combines both the overpayment rate and the underpayment rate, so it does not reflect only excess expenditures. For example, in FY2017, the NPER was 6.30%—which included a 5.19% overpayment rate and a 1.11% underpayment rate.[42]

In discussions regarding SNAP payment accuracy, the NPER is sometimes misunderstood to be a measure of the federal dollars lost to fraud and waste in the program. The NPER instead reflects the extent of inaccurate payments that exceed the Quality Control threshold in a given year. Regardless of the cause of an overpayment, SNAP agencies are required to work towards recovering excess benefits from households that were overpaid. Recovery of overpayments involves, first, the establishment (or determination) of a claim against a household, and, second, the actual collection of that claim. Applying the FY2017 NPER to total benefit issuance, in FY2017 an estimated $3.3 billion in benefits were overpaid, an estimated $710 million in benefits

---

[37] Section 16 of the 1977 FSA originally established the SNAP QC system; Section 4418-4420 of the Farm Security and Rural Investment Act of 2002 (the 2002 Farm Bill) and Sections 4019-4021 of the 2014 Farm Bill modified Section 16 of the FNA (codified at 7 U.S.C. §2025 and implemented at 7 C.F.R. §275).

[38] This statistical sample includes households receiving benefits, as well as households denied, suspended, or terminated from receiving benefits in the sample month.

[39] USDA uses the NPER to measure the payment accuracy of SNAP issuance per the requirements of the Improper Payments and Elimination and Recovery Act of 2010 (P.L. 111-204); see https://paymentaccuracy.gov/program/supplemental-nutrition-assistance-program/. Also see CRS Report R43694, *Improper Payments in High Priority Programs: In Brief*, by Garrett Hatch.

[40] For information regarding the determination of payment error rates, see 7 C.F.R. §275.23(b) & (c).

[41] When SNAP agencies detect overpayments and underpayments of less than $38 (inflation adjusted annually), they still must follow SNAP rules and correct these errors. The Quality Control threshold, also known as the error tolerance threshold, is only important in the calculation of the payment error rate. The current Quality Control threshold was most recently set by Section 4019 of the 2014 Farm Bill which modified Section 16(c)(1)(A) of the FNA (codified at 7 U.S.C. §2025(c)(1)(A) and implemented at 7 C.F.R. §275.12(f)(2)). This threshold has been adjusted by statute and regulation over the years (set at $5 in FY1980, $25 in FY2000, $50 in FY2009, $25 in FY2010, $50 in FY2012, $37 in FY2014, and most recently $38 in FY2015).

[42] The NPER is sometimes called the "combined payment error rate" or the "national performance measure", and the NPER is sometimes called the "national payment accuracy rate" when inverted (i.e., 93.70% in FY2017).

were underpaid.[43] In FY2016, the most recent year available, states established over $684 million in claims to recover overpayments.[44]

### Context for Comparing FY2017 NPER to Prior Years

Recent years' NPERs are listed in **Table 1**, showing rates from FY2011-FY2014 and then skipping to FY2017. SNAP national payment error rates were not released by USDA-FNS in FY2015 or FY2016, due to data quality concerns.

In 2014, USDA found data quality issues in 42 of 53 state agencies' Quality Control data reporting. These data quality issues are not, in and of themselves, proof of wrongdoing. In some cases, states had not followed protocol, while in other cases states had been found to have deliberately covered up errors (fraudulent actions). (A more detailed discussion of Quality Control as well as these audits and investigations can be found in "State Agency Fraud: SNAP Quality Control"). USDA-FNS suspended error reporting for FY2015 and FY2016, and also used this time to examine and improve state quality control procedures.[45]

In June 2018, USDA-FNS published FY2017 state and national error rates (NPER). USDA-FNS's accompanying materials describe that this NPER was determined "under new controls to prevent any recurrence of statistical bias in the QC system," which includes "a new management evaluation process to examine state quality control procedures on a regular basis."[46] The agency also described that the FY2017 rate stems from "a modernized review process, which includes updated guidance, revisions to [the relevant FNS handbook], extensive training for State and Federal staff, and modifications to State procedures to ensure consistency with Federal guidelines."[47]

As displayed (**Table 1**) and discussed earlier, the FY2017 NPER of 6.30% is a substantial increase from the FY2014 of 3.66%. USDA-FNS states the FY2017 rate "is higher than the previous rate ... but it is more accurate."[48] However, changes to data collection and related oversight since FY2014 make it difficult to reliably compare FY2017 rates to earlier years, as it is possible that earlier years include systemic under-reporting.

---

[43] CRS calculation using USDA-FNS SNAP summary data for FY2017. This data is typically published in USDA-FNS QC annual reports; the FY2017 report has not been published as of the date of this report.

[44] In FY2016, 884,301 claims were established with a total value of $684,187,891, and $402,007,206 in claims were collected. Claims are established only when an overpayment is detected by the state agency. Claims are not always established or collected in the year that the overpayment occurred, and there exists large variability between levels of state claim establishment and collection activity. FY2016 SAR, pp. 32, 34.

[45] See, e.g., U.S. Department of Agriculture, Food and Nutrition Service , *Fiscal Year (FY) 2016 Supplemental Nutrition Assistance Program (SNAP) Payment Error Rate*, June 29, 2017, https://fns-prod.azureedge.net/sites/default/files/snap/FY2016-Payment-Error-Rate-Memo.pdf.

[46] USDA-FNS, "Fact Sheet: SNAP Payment Error Rate," June 2018, https://www.fns.usda.gov/sites/default/files/snap/QC-FactSheet-2018.pdf.

[47] USDA-FNS, "Quality Control," https://www.fns.usda.gov/snap/quality-control, accessed September 24, 2018.

[48] USDA-FNS, "Fact Sheet: SNAP Payment Error Rate," June 2018, https://www.fns.usda.gov/sites/default/files/snap/QC-FactSheet-2018.pdf.

**Table 1. National Payment Error Rate, FY2011-FY2014, FY2017**

|  | FY2011 | FY2012 | FY2013 | FY2014 | FY2017[a] |
|---|---|---|---|---|---|
| Overpayment | 2.99% | 2.77% | 2.61% | 2.96% | 5.19% |
| Underpayment | 0.81% | 0.65% | 0.60% | 0.69% | 1.11% |
| *NPER* | *3.80%* | *3.42%* | *3.20%* | *3.66%* | *6.30%* |

**Source:** USDA-FNS QC Annual Reports from the respective fiscal years.

**Note:** Overpayment and underpayment rates may not total to listed NPER due to rounding.

a.  Per USDA-FNS, the agency developed new controls for FY2017 data collection that were not in place in FY2014.

## Differentiating Between Recipient Fraud, Recipient Errors, and Agency Errors

The SNAP overpayment rate (component of the national payment error rate) estimates the extent of all SNAP overpayments, including overpayments resulting from recipient errors, recipient fraud, and agency errors (estimated to total about $3.3 billion overpaid in FY2017). The NPER does *not*, however, differentiate between the relative extents of each of these types of errors and fraud (i.e., the NPER cannot tell us what percentage of this $3.3 billion is due to, for example, agency errors). There is currently no single standard measurement that individually quantifies the extent of recipient errors, recipient fraud, or agency errors. State agencies are, however, responsible for administering the recipient side of SNAP, and every year states report data on these activities which USDA-FNS publishes in the SNAP State Activity Report (SAR).[49] This report includes detailed data on state-level program operations including benefit issuance, participation, administrative (i.e., non-benefits) costs, recipient disqualification, and claims.

When a recipient error, an act of recipient fraud, or an agency error results in an overpayment to a household (and that overpayment is detected by the state agency), the household is generally required by the state agency to repay the overpaid amount (i.e., a claim is established). Data on the establishment of claims resulting from recipient errors, recipient fraud, and agency errors is provided in the state report (subdivided by type). The extent of claims establishment, therefore, can serve as a proxy for the extent of these types of errors and fraud. In addition, when a recipient commits fraud (and that act of fraud is detected and proven by the state agency), that recipient is generally punished with disqualification from SNAP. The extent of recipient disqualifications, therefore, can serve as a proxy for the extent of recipient fraud.

Before examining these claims and disqualification data, however, it is important to understand the limitations of this approach. Claims are not established in all instances of overpayments resulting from recipient errors, recipient fraud, or agency errors. For example, claims may not be established when overpayment amounts fall below state agencies' claims thresholds[50] or when overpayments are not detected by state agencies. Likewise, not all acts of recipient fraud are detected, proven, and punished with disqualification. Also, these claims establishment and disqualifications data are not based on representative samples and, therefore, these data may not fully reflect the prevalence of recipient errors, recipient fraud, or agency errors in the SNAP

---

[49] State Activity Reports are available at https://www.fns.usda.gov/pd/snap-state-activity-reports.

[50] Per SNAP regulation at 7 C.F.R. §273.18(e)(2), the "claims threshold" is the minimum dollar value of overpayments that *must* be collected by states. States *may* establish claims on amounts below this threshold. The claims threshold applies to overpayments regardless of cause (i.e., recipient error, recipient fraud, or agency error). Since 2000 the claims threshold has been set at $125.

caseload. Despite these shortcomings, these claims and disqualification data are the only available measures which reflect, albeit imperfectly, the extent of recipient errors, recipient fraud, or agency errors in SNAP. The following calculations of the extent of these types of errors and fraud are based on SNAP State Activity Report FY2016 data including the following: total issuance of $66,539,351,219; average monthly participation of 21,777,938 households; an average monthly participation of 44,219,363 persons; total claims established of 884,301; and total claims dollars established of $684,197,891.[51]

## Recipient Fraud

Unlike retailer trafficking, which is handled by one federal entity (USDA-FNS), recipient fraud is detected and punished by 53 different SNAP agencies (50 states, DC, Guam and the U.S. Virgin Islands) and, as noted in the September 2012 USDA-OIG report, "FNS cannot estimate a recipient fraud rate because it has not established how States should compile, track, and report fraud in a uniform manner."[52] This lack of standardization is a reason why a national recipient fraud rate does not exist.[53] Both recipient trafficking and recipient application fraud are included in these figures.

According to the FY2016 SNAP State Activity Report

- for every 10,000 households participating in SNAP, about 14 contained a recipient who was investigated and determined to have committed fraud that resulted in an overpayment that the state agency required the household to repay (30,274 claims established);

- for every $10,000 in benefits issued to households participating in SNAP, about $11 were determined by state agencies to have been overpaid due to recipient fraud and were required to be repaid by the overpaid household ($73,403,758 in fraud claims established);

- about 3% of the total number of claims established were established due to recipient fraud;

- about 11% of the total claims dollars established were established due to recipient fraud;

- for every 10,000 recipients participating in SNAP, about 13 were disqualified from the program for violating SNAP rules (e.g., committing fraud; 55,930 disqualified);

---

[51] U.S. Department of Agriculture, Food and Nutrition Service, *State Activity Report Fiscal Year 2016*, September 2016, pp. 5-36, https://fns-prod.azureedge.net/sites/default/files/snap/FY16-State-Activity-Report.pdf (hereinafter cited as "FY2016 SAR")**.**

[52] U.S. Department of Agriculture, Office of the Inspector General, *Analysis of FNS' Supplemental Nutrition Assistance Program Fraud Prevention and Detection Efforts*, Audit Report 27002-001-13, September 2012, p. 2, https://www.usda.gov/oig/webdocs/27002-0011-13.pdf (hereinafter cited as "September 2012 USDA-OIG report").

[53] USDA-FNS has considered developing a level of standardization sufficient to calculate a recipient fraud rate, but in May 2014 the agency determined that it was not possible without significant investment and oversight. Email from SNAP, USDA-FNS, November 24, 2017.

- about 1.5% of disqualification entries made into the USDA-FNS electronic Disqualified Recipient System (eDRS)[54] in FY2016 were permanent disqualifications;[55] and

- for every $10,000 in benefits issued to households participating in SNAP, about $21 were determined by state agencies to have been lost (overpaid due to recipient application fraud or trafficked) to recipient fraud associated with disqualified recipients ($136,475,242 in program loss associated with disqualified recipients).[56]

## *Recipient Errors*

According to the FY2016 SNAP State Activity Report

- for every 10,000 households participating in SNAP, about 181 were overpaid due to a recipient error and the state agency required the household to repay the overpaid amount (394,883 recipient error claims established);

- for every $10,000 in benefits issued to households participating in SNAP, about $63 were determined by state agencies to have been overpaid due to recipient errors and were required to be repaid by the overpaid household ($421,934,288 in recipient error claims established);

- about 45% of the total number of claims established were established due to recipient errors;

- about 62% of the total claims dollars established were established due to recipient errors;

- about 65% of FY2016 claims were established by four states;[57]

- about 55% of FY2016 claims amounts were established by these four states; and

- these four states accounted for about 30% of SNAP participants.

## *Agency Errors*

According to the FY2016 SNAP State Activity Report

- for every 10,000 households participating in SNAP, about 47 were overpaid due to agency errors, and the state agency required the household to repay the overpaid amount (459,144 agency error claims established);

- for every $10,000 in benefits issued to households participating in SNAP, about $28 were determined by state agencies to have been overpaid due to agency errors and were required to be repaid by the overpaid household ($188,859,846 in agency error claims established);

---

[54] The USDA-FNS-eDRS compiles information regarding recipients disqualified by SNAP state agencies.

[55] Email from SNAP, USDA-FNS, January 3, 2018.

[56] Per the FY2016 SAR, p. 32, "Some states establish all non-agency error claims as household error claims initially and then transfer the claim from household error to fraud after the prosecution or [administrative disqualification hearing] ADH. Therefore, the sum of the fraud associated with disqualifications is a better measure of the ultimate amount of fraud claims than the newly established amount."

[57] These states are California, Illinois, Texas, and Florida.

- about 52% of the total number of claims established were established due to agency errors;
- about 28% of the total claims dollars established were established due to agency errors;
- about 80% of the total number of agency error claims established were established by California;[58]
- about 64% of the total agency error claims dollars established were established by California; and
- California accounted for about 10% of SNAP participants.

Although the total volume of claims established has increased over time, the majority of claims established have been the result of recipient errors, with agency errors being second most common, and recipient fraud claims being least common—as illustrated by **Figure 2**.

**Figure 2. Claims Establishment by Type, FY2007-FY2016**



**Source:** Created by CRS using data from SNAP State Activity Reports FY2007-FY2016.

# Detection and Correction of Errors and Fraud

State and federal efforts to detect and correct errors, as well as efforts to detect and deter fraud, are detailed in this section.

---

[58] The claim threshold for agency errors in California is $35 for current households and $125 for inactive households. See http://www.cdss.ca.gov/shd/res/htm/FoodStampIndex.htm.

# Retailer Fraud

USDA-FNS is responsible for administering the retailer side of SNAP and for pursuing retailer fraud.[59] USDA-OIG, in collaboration with the Federal Bureau of Investigations (FBI), U.S. Secret Service, and other federal, state, and local law enforcement entities, is responsible for pursuing criminal charges against retailers found to be engaging in retailer trafficking.

## Detection of Retailer Trafficking

Retailer trafficking can be detected through a variety of means, including the following:

**Analysis of EBT Transaction Data**—Whenever a SNAP EBT card is swiped, the transaction data is captured and analyzed by USDA-FNS for suspicious patterns. USDA-FNS use these data to develop a case against a retailer when the transactions indicate retailer trafficking is occurring at their store. In FY2016, USDA-FNS reviewed the transactions of nearly 9% of participating stores.[60] Over 80% of retailer trafficking detected by USDA-FNS are found primarily through EBT transaction analysis.[61]

**Undercover Investigations**—USDA-FNS performs undercover investigation of stores suspected of violating SNAP rules (e.g., trafficking), and in FY2016, USDA-FNS investigated over 1% of participating stores.[62]

**State Law Enforcement Bureau (SLEB) Agreements**—Some state agencies enter into state law enforcement bureau (SLEB) agreements with law enforcement entities in their jurisdictions in order to further their efforts to detect trafficking. These agreements are typically focused on recipient trafficking, but they can have implications for retailer trafficking.

**Tips and Referrals**—USDA-FNS receives tips, complaints, and referrals, which can lead to cases of retailer trafficking. These referrals come from SNAP retailers, SNAP recipients, members of the public, state agencies, SLEBs, USDA-OIG, or other law enforcement entities. USDA-OIG operates a website and hotline for members of the public to report instances of fraud.[63] In FY2016, USDA-OIG referred 4,320 complaints to USDA-FNS.[64]

---

[59] Sections 9, 12, and 15 of the FNA outline the requirement that USDA-FNS administer SNAP on the retailer side.

[60] This CRS calculation is based on data from the December 2016 USDA-FNS Retailer Management Report, p. 1.

[61] This CRS calculation is based on data from the December 2016 USDA-FNS Retailer Management Report, p. 8 and an email from SNAP, USDA-FNS, October 25, 2017. In FY2016 1,842 stores were permanently disqualified for trafficking SNAP benefits, and USDA-FNS undercover investigations identified retailer trafficking in 288 instances. The remaining stores were EBT cases, sometimes referred to as paper cases.

[62] About 20% of these investigations resulted in findings of trafficking. This CRS calculation is based on data from the December 2016 USDA-FNS Retailer Management Report, p. 8.

[63] USDA-OIG hotline information available at https://www.usda.gov/oig/hotline.php.

[64] U.S. Department of Agriculture, Office of the Inspector General, *Semiannual Report to Congress: Second Half, April 1, 2016-September 30, 2016*, Number 76, November 2016, p. 54, https://www.usda.gov/oig/webdocs/ sarc2016_2nd_half_508.pdf (hereinafter cited as "USDA-OIG SARC 2nd Half FY2016"); U.S. Department of Agriculture, Office of the Inspector General, *Semiannual Report to Congress: First Half, October 1, 2015-March 31, 2016*, Number 75, May 2016, p. 57, https://www.usda.gov/oig/webdocs/sarc2016_1st_half.pdf (hereinafter cited as "USDA-OIG SARC 1st Half FY2016").

## Correction of Retailer Trafficking

If a store is found to have committed trafficking, then all of the owners of the store may be subject to penalties.[65] Major penalties associated with retailer trafficking include the following:

**Disqualification**—If USDA-FNS finds that a SNAP-authorized retailer violated *any* SNAP rules, then that retailer may be subject to a period of disqualification from program participation.[66] Trafficking SNAP benefits is considered one of the most severe violations of SNAP rules, and a retailer found by USDA-FNS to have trafficked SNAP benefits (regardless of the amount) is generally subject to a permanent disqualification (PDQ) from program participation.[67]

**Reciprocal WIC Disqualification**—Stores that are disqualified for violations of the rules of SNAP are disqualified for an equal (but not necessarily concurrent) period of time from participation in the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC).[68] Likewise, stores disqualified from WIC are disqualified from SNAP for an equal (but not necessarily concurrent) period of time. PDQs, such as PDQs for trafficking, are also reciprocal between the programs.

**Restitution of Benefits Trafficked (Claims)**—When a retailer accepts or redeems SNAP benefits in violation of the Food and Nutrition Act of 2008 (FNA), such as engaging in retailer trafficking of SNAP benefits, that retailer may be compelled to repay the amount that they illegally redeemed. This is called a claim and is considered a federal debt. USDA-FNS has the authority to collect such claims by offsetting against a store's SNAP redemptions as well as a store's bond or letter of credit (LOC),[69] where applicable.[70]

> ### Rights of Retailers Accused of Fraud
> Following a completed trafficking investigation, the agency sends a retailer a "charge letter" detailing the charges, and explaining the retailer's right to request administrative review. If requested, an independent subdivision of USDA-FNS considers the validity of the charges anew and issues a Final Agency Determination that sustains, reverses, or modifies the charges and explains the retailer's right to request judicial review. The retailer may choose to file a complaint against USDA-FNS in the court of jurisdiction after receiving a Final Agency Determination.

**Public Disclosure of Disqualified Retailers**—USDA-FNS has the authority to publicly disclose the store and owner name for disqualified retailers.[71] A December 2016 USDA-FNS Final Rule asserted USDA-FNS's intent to disclose this information in order to deter retailer trafficking.[72]

---

[65] In community property states, the spouses of owners are automatically considered owners themselves and are also subject to all applicable penalties. As of March 2018, Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington, and Wisconsin are community property states.

[66] Disqualifications can be for a term or permanent. Term disqualification can vary in length from 6 months to 10 years, depending on the nature of the violation. Disqualification for trafficking is generally permanent. Section 12 of the FNA (codified at 7 U.S.C. §2021 and implemented at 7 C.F.R. §278.6).

[67] Section 12(b)(3)(B) of the FNA (codified at 7 U.S.C. §2021(b)(3)(B) and implemented at 7 C.F.R. §278.6(e)(1)(i)).

[68] Section 12(g) of the FNA (codified at 7 U.S.C. §2021(g) and implemented at 7 C.F.R §278.6(e)(8)). For more information on WIC, see CRS Report R44115, *A Primer on WIC: The Special Supplemental Nutrition Program for Women, Infants, and Children*, by Randy Alison Aussenberg.

[69] In certain circumstances USDA-FNS may require a retailer to provide a form of financial collateral (i.e., a collateral bond or an irrevocable letter of credit) as a condition of SNAP authorization.

[70] Section 15(e) of the FNA (codified at 7 U.S.C. §2024(e) and clarified at 7 C.F.R. §278.7).

[71] Section 9(c) of the FNA (codified at 7 U.S.C. §2018(c) and implemented at 7 C.F.R. §278.1(q)(5).

[72] U.S. Department of Agriculture, Food and Nutrition Service, "Enhancing Retailer Standards in the Supplemental

**Transfer of Ownership Civil Money Penalty (TOCMP)**—If a retailer under a period of disqualification sells or transfers ownership of their store, then USDA-FNS is to assess that disqualified retailer a "transfer of ownership civil money penalty" (TOCMP).[73] This means that retailers permanently disqualified from SNAP for committing retailer trafficking are to be assessed this penalty *whenever* they sell or transfer ownership of their stores (regardless of how much time has passed since the disqualification occurred). In FY2016, USDA-FNS assessed 257 such penalties with a mean value of $29,284.[74]

**Exclusion from the General Service Administration's System for Award Management (GSA-SAM)**—This GSA system tracks individuals and entities that do business with the federal government. An individual or entity excluded from this system is prohibited from doing business with the federal government for the duration of the exclusion.[75] All of the owners of a store permanently disqualified from SNAP participation for trafficking benefits are permanently listed as exclusions in GSA-SAM. As of September 2017, 10,307 permanently disqualified retailers have been listed by USDA-FNS in GSA-SAM as exclusions due to SNAP and WIC violations.[76] This type of exclusion can have collateral consequences for the excluded party.[77]

**Criminal Charges and Penalties**—Retailers engaged in trafficking may be criminally charged and penalized with fines up to $250,000 and imprisonment up to 20 years.[78] In addition, other adverse monetary penalties (e.g., asset forfeitures, recoveries, collections, and restitutions) may be assessed against those convicted. USDA-OIG, in collaboration with federal, state, and local law enforcement entities, pursues charges against retailers who traffic SNAP benefits. USDA-OIG usually criminally pursues only retailers who traffic in high dollar amounts of benefits and/or retailers who also engaged in other criminal activity. In some cases, state law enforcement bureaus may pursue criminal charges against individuals engaged in retailer trafficking under state or local statutes. In FY2016, USDA-OIG opened 208 SNAP fraud investigations, and obtained 600 indictments, 510 convictions, and $95.3 million in monetary penalties.[79]

Nutrition Assistance Program (SNAP)," 81 *Federal Register* 90675, December 15, 2016 (hereinafter cited as "December 2016 Final Rule"). For more information about this final rule, see CRS Report R44650, *Updated Standards for SNAP-Authorized Retailers*, by Randy Alison Aussenberg.

[73] Section 12(e)(1) of the FNA (codified at 7 U.S.C. §2021(e) and implemented at 7 C.F.R. §278.6(f)(2)).

[74] Email from SNAP, USDA-FNS, October 17, 2017.

[75] For more information on GSA-SAM, see CRS Report RL34753, *Procurement Debarment and Suspension of Government Contractors: Legal Overview*, coordinated by Kathleen Ann Ruane (available to congressional clients upon request to CRS).

[76] U.S. Department of Agriculture, Office of the Inspector General, *Implementation of Suspension and Debarment Tools in the U.S. Department of Agriculture*, 50016-0001-23, September 2017, p. 5, https://www.usda.gov/oig/webdocs/50016-0001-23.pdf (hereinafter cited as "September 2017 USDA-OIG report").

[77] This GSA system is available to the public, and this system is frequently used by employers, banks, universities, professional associations, and other institutions when checking the background of candidates or applicants. A GSA-SAM exclusion is often regarded by such institutions as a derogatory mark and may result in a wide range of adverse actions against the individual subject to the exclusion (e.g., denial of a mortgage loan, revocation of professional credentials, or non-selection for employment).

[78] This penalty is applicable to any party that knowingly misuses SNAP benefits equal to or greater than $5,000 in value (a felony). For felony violations involving benefits valued equal to or greater than $100 and less than $5,000, the penalties are a fine up to $10,000 and imprisonment up to five years. For misdemeanor violations involving benefits valued at less than $100, the penalties are a fine up to $1,000 and imprisonment up to one year. Section 15(b) of the FNA (codified at 7 U.S.C. §2024(b)(1)).

[79] Email from USDA-OIG, January 11, 2018.

ER-0260

AR.07933

## Detection of Retailer Application Fraud

USDA-FNS reviews all information and materials submitted by applicant retailers in order to identify suspicious items and documentation that may indicate retailer application fraud. Where such suspicions arise, USDA-FNS may require additional supporting documentation from the applicant retailer and may contact other federal, state, or local government entities (e.g., entities that administer business licensure, taxation, or trade) to verify questionable items.[80]

## Correction of Retailer Application Fraud

**Denial of Application**—If USDA-FNS finds during the application process that a retailer fails to meet requirements such as stocking and business integrity standards, then the retailer's application is to be denied. If USDA-FNS determines that an applicant retailer has falsified the application, then that retailer's application is to be denied—the period of denial ranges from three years to permanent depending on the severity and nature of the falsification.[81] A retailer denied authorization to participate in SNAP is not generally subject to any penalties other than denial.[82]

**Permanent or Term Disqualification**—Retailers who knowingly engage in falsification of substantive matters (e.g., falsification of ownership or eligibility information) may be subject to a permanent disqualification from program participation. Retailers who engage in falsification of a lesser nature (e.g., falsification of store information such as store name or address) are generally subject to a term disqualification of three years. Retailers that are permanently disqualified for falsification may be subject to all of the penalties associated with permanent disqualification (as discussed previously in the context of retailer trafficking penalties), including reciprocal WIC disqualification, claims, public disclosure, TOCMP, GSA-SAM exclusion, and criminal charges and penalties where appropriate.[83]

# Errors in Benefit Issuance to Households

SNAP certification is the process of evaluating an application, determining if an applicant is eligible to receive SNAP benefits, and the appropriate size of the benefit allotment if the applicant is found to be eligible. This is one of the primary responsibilities of state agencies (with federal oversight). Errors (i.e., recipient errors and agency errors) that occur during this process can result in underissuance or overissuance of SNAP benefits.

## Detection of Recipient Errors—Data Matching

The primary sources for information needed to make certification determinations are generally the applicants themselves, but the eligibility worker may also utilize collateral contact with other entities when necessary.[84] In addition, an eligibility worker may perform additional checks using federal, state, local, or private data systems in order to verify information provided by

---

[80] Section 9(c) of the FNA (codified at 7 U.S.C. §2018(c) and implemented at 7 C.F.R. §278.1(b)).

[81] See 7 C.F.R. 278.1(k)(3)-(4), 278.6(e)(1),(3).

[82] According to 7 C.F.R. §278.1(o), a retailer applicant's submission of false information may subject the store and its owners to civil or criminal action, but no such penalties are currently pursued against retailers denied for falsification.

[83] Email from SNAP, USDA-FNS, January 5, 2018.

[84] For example, an eligibility worker may contact an applicant's landlord in order to confirm residency and shelter costs.

applicants.[85] A visual overview of data matching in the certification process is presented in **Figure 3**.

**Figure 3. Data Matching in SNAP Certification**



**Source:** Prepared by the Congressional Research Service (CRS).

**Notes:** Certification, as illustrated in this graphic, includes five main steps: (1) a household initially applies to receive or recertifies to continue receiving SNAP benefits; (2) a SNAP eligibility worker evaluates the household's application for completion and verifies submitted information (including through interviews with the applicant); (3) a range of data matching systems (both mandatory and optional) is used to confirm eligibility and income information reported by the applicant; (4) when needed, the SNAP staff follows up to verify data; and (5) SNAP staff ultimately makes a SNAP eligibility determination and, if appropriate, designates the benefit allotment amount.

In FY2016, about 62% of overpayment dollars identified through the claims establishment process (i.e., after overpayments have already occurred) were due to inadvertent household errors made by recipients when applying for benefits.[86] With a caseload of about 22 million households, recipient errors (sometimes stemming from simple misunderstanding of federal SNAP regulations) can add up quickly and create a serious payment accuracy problem for states. Although the upfront cost and effort required of a state agency to implement a data match as part of the SNAP certification process can be considerable, data matches using federal, state, local, or private systems can allow agencies to quickly identify recipient errors that could affect applicants' eligibility or benefit amount. Over the years, policymakers have been interested in data matching systems to reduce overpayments.

### *Mandatory Data Matches*

The following six data matches have been statutorily mandated as part of the SNAP certification process:

**U.S Department of Health and Human Services, Administration for Children and Families, National Directory of New Hires (HHS-ACF-NDNH) New Hire File**—This system is used to verify household employment information.[87] The 2014 Farm Bill mandated state use of the New

---

[85] For more information regarding verification requirements, see 7 C.F.R. §273.2(f)

[86] This is addressed more fully in the "Extent of Errors and Fraud in Benefit Issuance to Households" section of this report.

[87] Matches made from this file are not considered verified upon receipt, so additional steps are necessary to confirm

AR.07935

Hire File and this requirement was implemented in a January 2016 USDA-FNS Interim Final Rule.[88]

**Social Security Administration, Prisoner Verification System (SSA-PVS)**—This system is used to verify if household members are incarcerated.[89] The Balanced Budget Act of 1997 mandated that all SNAP agencies match against the SSA's Prisoner Verification System.[90]

**Social Security Administration, Death Master File (SSA-DMF)**—This system is used to verify if household members are deceased.[91] In 1998, P.L. 105-379 mandated that all SNAP agencies match against the SSA-DMF.[92]

**USDA-FNS Electronic Disqualified Recipient System (USDA-FNS-eDRS)**—This system is used to verify if household members are disqualified from SNAP.[93]

**U.S. Department of Homeland Security U.S. Citizenship and Immigration Services Systematic Alien Verification for Entitlements (DHS-USCIS-SAVE)**—This system is used to verify household members immigration status.[94] The 2014 Farm Bill mandated that SNAP agencies utilize an immigration status verification system[95] as a part of the certification process;[96] a December 2016 USDA-FNS notice of proposed rulemaking (NPRM) regarding the requirement to utilize this data match was published, but the rule has not yet been finalized.[97]

---

matches. According to USDA-FNS, as of September 2017, 47 SNAP agencies were utilizing NDNH (per telephone call, SNAP, USDA-FNS, January 5, 2018) and in a survey of SNAP agencies from an October 2016 GAO report, only 14 of the 39 agencies utilizing it at the time considered it moderately or extremely useful (U.S. Government Accountability Office, *Supplemental Nutrition Assistance Program: More Information on Promising Practices Could Enhance States' Use of Data Matching for Eligibility*, GAO-17-111, October 2016, p. 16, https://www.gao.gov/assets/690/680535.pdf (hereinafter cited as "October 2016 GAO report").

[88] Section 4013 of the 2014 Farm Bill modified Section 11(e)(24) of the FNA (codified at 7 U.S.C. §2020(e)(24) and implemented at 7 C.F.R. §272.16) and U.S. Department of Agriculture, Food and Nutrition Service, "SNAP Requirement for National Directory of New Hires Employment Verification and Annual Program Activity Reporting," 81 *Federal Register* 4519, January 26, 2016.

[89] Matches made from this system are not considered verified upon receipt, so additional steps are necessary to confirm matches.

[90] Section 1003 of P.L. 105-33 modified Section 11(r) of the FNA (codified at 7 U.S.C. §2020(q) and (e)(18) and implemented at 7 C.F.R. §272.13). This requirement was implemented initially in a USDA-FNS directive in February 2000 and finally in U.S. Department of Agriculture, Food and Nutrition Service, "Supplemental Nutrition Assistance Program: Disqualified Recipient Reporting and Computer Matching Requirements," 77 *Federal Register* 48045, August 13, 2012 (hereinafter cited as "August 2012 USDA-FNS Final Rule").

[91] This system is also referred to as the Deceased Matching System (DMS). Matches made from this system are not considered verified upon receipt, so additional steps are necessary to confirm matches.

[92] Section 1 of P.L. 105-379 modified Section 11(r) of the FNA (codified at U.S.C. §2020(r) and clarified at 7 C.F.R. §272.14). This requirement was implemented initially in a USDA-FNS directive in February 2000 and finally in the August 2012 USDA-FNS Final Rule.

[93] Matches made from this system are not considered verified upon receipt, so additional steps are necessary to confirm matches. The use of the USDA-FNS-eDRS is mandated by SNAP regulations at 7 C.F.R. §273.16(i).

[94] Matches made from this system are considered verified upon receipt. As of January 2018, every state is using this system (Email from SNAP, USDA-FNS, January 2, 2018).

[95] Section 4015 of the 2014 Farm Bill modified Section 11(p) of the FNA (codified at 7 U.S.C. §2020(p)) to specify that SNAP agencies must use the immigration status verification system established under §1137 of the Social Security Act (42 U.S.C. §1320b-7). This system is DHS-USCIS-SAVE.

[96] Section 4015 of the 2014 Farm Bill modified Section 11(p) of the FNA (codified at 7 U.S.C. §2020).

[97] U.S. Department of Agriculture, Food and Nutrition Service, "Supplemental Nutrition Assistance Program: Student Eligibility, Convicted Felons, Lottery and Gambling, and State Verification Provisions of the Agricultural Act of 2014," 81 *Federal Register* 86614, December 1, 2016 (hereinafter cited as "December 2016 Proposed Rule").

**Income and Eligibility Verification System (IEVS)**—SNAP agencies are required to verify the income and eligibility of all applicants during the SNAP certification process. They generally fulfill this requirement through the use of an income and eligibility verification system (IEVS). An IEVS is not a single data match, but rather a state system that may use multiple federal, state, and local data sources to confirm the accuracy of eligibility and income information provided by the applicant and to locate pertinent information that may have been omitted by the applicant.[98] The specific data matches used in an IEVS, however, will vary from state to state.[99] The 2014 Farm Bill made states' use of IEVS mandatory in accordance with standards set by the Secretary of Agriculture. This policy is pending implementation, as USDA-FNS published an NPRM in December 2016, but a final rule has not yet been published.[100]

## *Optional Data Matches*

States also use optional data matches and incorporate these into their processes. Several key eligibility data examples, such as income and program disqualifications, are discussed below:[101]

**Income matches**—A household's income and related SNAP deductions are basic determinants of eligibility and an applicant's benefit allotment. As a result, in addition to the mandatory matches discussed above, most states utilize several optional federal and state data matches to verify earned and unearned income. For examples of optional income matches, see **Appendix C**.

**SNAP disqualification matches**—In addition to the mandatory USDA-FNS-eDRS match, states maintain their own internal databases of recipients disqualified within the state, and a match from such state databases indicates that a member of an applicant household is ineligible.[102]

**Other data matches**—In addition, state agencies use data sources to assess a number of other aspects of a household's application or recertification. For instance, state criminal justice or correctional agency system matches and state department of health vital information system or burial assistance program matches can ensure that a household does not include incarcerated or deceased members. Likewise, state department of children's services or foster care matches can ensure that a household does not include children that have been removed. Such state matches to verify that household size is correct are generally considered verified upon receipt. Matches against state and federal crime databases can ensure that individuals subject to crime-related restrictions are correctly excluded in eligibility determination.[103] Data matches between SNAP and other public benefit programs can also help a state agency ensure that states are accurately implementing their comparable disqualification policies.[104] These data matches are discussed in more detail in the October 2016 GAO report.[105]

---

[98] See §1137 of the Social Security Act for IEVS federal requirements.

[99] The definition of IEVS can be found in 7 C.F.R. §§271.2 and 272.8.

[100] Section 2015 of the 2014 Farm Bill modified Section 11(p) of the FNA (codified at 7 U.S.C. §2020). December 2016 Proposed Rule.

[101] For more information regarding SNAP eligibility, see CRS Report R42505, *Supplemental Nutrition Assistance Program (SNAP): A Primer on Eligibility and Benefits*, by Randy Alison Aussenberg.

[102] Matches made from these systems are generally considered verified upon receipt.

[103] For more information, see CRS Report R42394, *Drug Testing and Crime-Related Restrictions in TANF, SNAP, and Housing Assistance*, by Maggie McCarty et al.

[104] Section 6(i) of the FNA (codified at 7 U.S.C. §2015(i) and implemented at 7 C.F.R. §273.11(k)).

[105] See https://www.gao.gov/assets/690/680535.pdf.

## Detection of Agency Errors

State agencies are responsible for preventing, detecting, and correcting agency errors.[106] Agency errors are generally the product of human error, so training and supervision of eligibility workers is the primary means of mitigating them (e.g., something as simple as an eligibility worker transposing two digits during data entry). Agency errors can be detected by ongoing, independent process improvements (e.g., quality control or quality assurance), supervisory case review, eligibility workers, and recipients. Agency errors may also result from state system technical glitches, so states may detect these errors through system audits and mitigate them through system improvements.

## Correction of Recipient and Agency Errors—Claims

If a household receives an overpayment, and that overpayment is detected by the state agency, then the agency generally establishes a claim against the household, requiring the adult members of the household to repay the amount that was overpaid. Claims are considered federal debt and must be repaid by the adult members of overpaid households regardless of the cause of the overpayment (i.e., recipient error, recipient fraud, or agency error) except in the case of a major systems failure.[107] Agencies must also correct underpayments that they identify. State agencies may elect *not* to establish claims on low dollar overpayments when such overpayments fall below the agency's claims threshold, explained below.

---

**Claims Threshold**

The "claims threshold" is the minimum dollar value of overpayments that *must* be collected by state agencies. Agencies *may* establish claims on amounts below this threshold.[108] This threshold applies to overpayments regardless of cause (i.e., recipient error, recipient fraud, or agency error). Since 1983, this threshold was set at $35, but in 2000 it was raised to $125.[109] This threshold does not apply to any overpayments discovered during the Quality Control (QC) process, and claims must be established on all such amounts (regardless of dollar value). Generally, this threshold does *not* apply to households currently participating in the program, as it is easier to collect claims from actively participating households using allotment reduction (i.e., a portion of the household's monthly SNAP benefits are withheld until the claim amount is repaid). States may, however, establish their own cost-effectiveness plans. Under such a plan, if approved by USDA-FNS, a state may modify this threshold for one or more types of overpayments and may create a threshold limit for claims on households currently participating in the program.

---

Claims are not always established in the year that the overpayment occurs and claims are not always collected in the year that they are established. State agencies are entitled to retain 35% of the amount they collect on recipient fraud claims and certain recipient error claims, 20% of the

---

[106] Section 13 of the FNA (codified at 7 U.S.C. §2022 and implemented at 7 C.F.R. §273.18).

[107] In the case of a state agency's major systemic error "overissued benefits to a substantial number of households," USDA "may prohibit the State agency from collecting these overissuances from some or all households" and "shall establish a claim against the State agency equal to the value of the overissuance caused by the systemic error." Section 13(b)(5) of the FNA (codified at 7 U.S.C. §2022(b)(5)). In 2011, USDA-FNS published a proposed rule to implement this statutory provision; as of the date of this report, this rulemaking action is inactive (see **Table B-1** in **Appendix B**). As an example of USDA applying this statutory authority, in 2012, USDA established a claim of nearly $5 million against Maine for certain overissuances. (Eric Russell, *Feds order Maine to pay for food-stamp error*, The Portland Press Herald, September 27, 2012, https://www.pressherald.com/2012/09/27/maine-food-stamp-overpayment-recipeints-usda-reimbursment-letter-mary-mayhew/).

[108] See 7 C.F.R. §273.18(e)(2).

[109] U.S. Department of Agriculture, Food and Nutrition Service, "Food Stamp Program: Recipient Claim Establishment and Collection Standards; Final Rule," 65 *Federal Register* 41751, July 6, 2000.

AR.07938

amount they collect on all other recipient error claims, and none of the amount they collect on agency error claims.

# Recipient Fraud

## Detection of Recipient Fraud

State agencies are responsible for administering the recipient side of SNAP (with federal oversight) and for pursuing recipient fraud.[110] State agencies must, furthermore, establish and operate a SNAP recipient fraud investigation unit.[111] These units detect and punish recipient trafficking, as well as other forms of recipient fraud. USDA-FNS supports state agencies in this capacity by providing technical assistance and setting policy. USDA-OIG, in collaboration with other federal and state law enforcement entities, sometimes criminally pursues recipients who traffic SNAP benefits when such recipients traffic in high dollar amounts of benefits and/or such recipients also engage in other criminal activity. Recipient fraud, like retailer fraud, can be detected through a variety of means, including the following:

**Analysis of EBT Transaction Data**—Once USDA-FNS has completed the process of administratively penalizing a *retailer* for retailer trafficking, and the retailer has exhausted their appeal rights,[112] then USDA-FNS provides the retailer trafficking case to the appropriate state agency including EBT card numbers which can be used to identify SNAP *recipients* who may be trafficking.

**Social Media**—State agencies use automated tools and manual monitoring to detect postings on social media and online commerce websites by individuals attempting to traffic SNAP benefits.

**Undercover Investigations**—As is done with retailer trafficking cases, state agencies perform undercover investigations to detect recipient trafficking and recipient application fraud.

**Multiple Card Replacement**—Recipients who frequently request replacement EBT cards are flagged for review as potentially involved in trafficking benefits, because they would request replacements after selling their cards.[113] This recipient trafficking detection mechanism was established by an April 2014 USDA-FNS Final Rule.[114] In December 2017 USDA-FNS granted a waiver for one state to contact recipients who request a replacement card more than two times in a 12-month period, as opposed to the current regulations' standard of four requests in a 12-month period.[115]

**State Law Enforcement Bureau (SLEB) Agreements**—Some state agencies enter into state law enforcement bureau (SLEB) agreements with law enforcement entities in their jurisdictions in order to further their efforts to detect recipient trafficking and recipient application fraud. There are advantages to such arrangements for state agencies; for example, under SLEB agreements, the agency could be notified whenever an individual is arrested in possession of multiple EBT cards,

---

[110] Section 11 of FNA outlines the requirement that states administer SNAP on the recipient side.

[111] Section 11(e)(20) of the FNA (codified at 7 U.S.C. §2020(e)(20)).

[112] Section 14 of the FNA (codified at 7 U.S.C. §2023).

[113] Section 7(h)(8) of the FNA (codified at 7 U.S.C. 2016(h)(8) and implemented at 7 C.F.R. §274.6(b)(6)).

[114] U.S. Department of Agriculture, Food and Nutrition Service, "Supplemental Nutrition Assistance Program: Trafficking Controls and Fraud Investigations," 79 *Federal Register* 22766, April 23, 2014 (hereinafter cited as "April 2014 USDA-FNS Final Rule").

[115] USDA Office of Communications, "USDA Clears Arizona to Test SNAP Fraud Prevention Improvement," press release, December 8, 2017, https://content.govdelivery.com/accounts/USDAOC/bulletins/1cad357.

ER-0266

AR.07939

allowing the agency to flag the recipients associated with those EBT cards for potential recipient trafficking.

**Tips and Referrals**—As is done in detecting retailer trafficking, agencies use tips and referrals to detect recipient trafficking and recipient application fraud.

**Data Matching and Other Verification**—As is done in detecting recipient errors when applying for SNAP benefits, the data matching and certification process may also provide information useful in detecting recipient application fraud.

## Correction of Recipient Fraud

Whenever a SNAP recipient is found to have committed fraud, that individual is subject to individual penalties, such as disqualification. The other members of the SNAP household will not automatically be subject to such penalties, but the adult members of the household will generally be obligated to repay the amount established by the state agency as a claim for overpayment or trafficking. Major penalties associated with recipient fraud include the following:

---

### Rights of Recipients Accused of Fraud

When a state agency determines that a recipient has committed fraud, the agency provides notice of adverse action to the recipient, which outlines the charges. This notice explains the recipient's right to request a fair hearing (fair hearings may be requested by any recipient aggrieved by a SNAP agency action, not just recipients accused of fraud).[116] After a hearing, the recipient is notified of the decision reached and of the recipient's right to request an appeal or rehearing with the state agency. After a rehearing or appeal, the recipient is notified of the decision reached and the recipient's right to request judicial review. Until this process has been exhausted, recipients continue to receive SNAP benefits. Advocates argue that some states' anti-fraud efforts are overly aggressive and deny recipients' access to SNAP when a recipient error, not fraud, may be to blame for an overpayment.[117]

---

**Disqualification**—Trafficking and recipient application fraud are types of intentional program violations, and a SNAP recipient found to have committed fraud is generally subject to a period of program disqualification varying from one year to permanent.[118] **Figure 4** below compares the number of FY2016 SNAP recipient disqualifications to the monthly average number of participating recipients in the state in FY2016. Performing investigations and proving that recipients have committed intentional program violations (in order to disqualify them from SNAP) can require a considerable amount of state agency resources. This chart illustrates the

---

[116] SAR data indicates significant variability between the number of fair hearings held and the percentage of state decisions upheld/reversed from state to state. One state, Pennsylvania, accounted for about 36% of the fair hearings held in FY2016 although this state had an average of only 4% of the monthly recipients participating in that year. CRS calculation based on data from the FY2016 SAR, pp. 5, 20, 50.

[117] Bill Lueders, "Wisconsin FoodShare fraud crackdown questioned," Wisconsin Center for Investigative Journalism, May 3, 2015, https://www.wisconsinwatch.org/2015/05/wisconsin-foodshare-fraud-crackdown-questioned/. When charging a recipient with an intentional program violation, state agencies often encourage recipients to sign administrative disqualification hearing waivers. Signing such a document waives a recipient's rights to a fair hearing. This type of waiver accounted for about 44% of SNAP disqualifications in FY2016. Many recipients, advocates posit, are also unaware of their appeal rights and that participants often win on appeal. According to the FY2016 State Activity Report (pp. 20-25), state decisions were reversed in about 63% of fair hearings (this includes fair hearings held as result of any adverse state action, not just hearings held as a result of disqualification actions).

[118] Penalties for fraud generally include a one-year disqualification for the recipient's first violation, a two-year disqualification for the recipient's second violation, and a permanent disqualification for the recipient's third violation; however, recipients that traffic $500 or more in benefits are permanently disqualified upon the first violation. Section 6(b) of the FNA (codified at 7 U.S.C. §2015(b)).

extent to which agencies have prioritized this aspect of SNAP administration relative to their SNAP caseload.

### Figure 4. Per Capita Recipient Disqualifications in States

Comparing levels of state agency disqualification action



**Source:** Prepared by the Congressional Research Service (CRS) using data from the FY2016 State Activity Report, pp. 29-37.

**Restitution of Benefits Defrauded (Claims)**—A SNAP household must generally repay benefits amounts that are overpaid due to recipient application fraud or are trafficked.[119]

**Comparable Disqualification**—If a SNAP recipient is disqualified from any federal, state, or local means-tested public assistance program, then the state agency *may* impose the same period of disqualification on the individual under SNAP.[120] This comparable disqualification is mandatory for the Food Distribution Program on Indian Reservations (FDPIR).

**Criminal Charges and Penalties**—Generally, if criminal charges are pursued against recipients who traffic benefits or commit recipient application fraud, it is the states that will pursue and prosecute. State fraud laws vary in their penalties for recipient fraud.[121] Additionally, as stated in a

---

[119] Section 13 of the FNA (codified at 7 U.S.C. §2022 and implemented at 7 C.F.R. §273.18).

[120] Section 4211 of the 2008 Farm Bill modified Section 6(i) of the FNA (codified at 7 U.S.C. §2018(i) and implemented at 7 C.F.R. §273.11(k)).

[121] These criminal penalties may include fines, imprisonment, probation, community service, etc. For example, under Oklahoma law, recipient trafficking is punishable by fines up to $5,000 and/or imprisonment up to two years (OK Statute Title 56 Chapter 7 §243); under Mississippi law, recipient trafficking is punishable by fines up to $10,000

GAO report from August 2014, each state exercises its discretion differently with respect to filing criminal charges in cases of recipient fraud.[122] As with retailer trafficking, USDA-OIG sometimes pursues criminal charges in collaboration with federal and state law enforcement entities against recipients engaged in SNAP fraud.

## State Agency Employee Fraud Detection and Correction

U.S. Department of Agriculture, Office of the Inspector General (USDA-OIG), in conjunction with local, state, and other federal law enforcement entities, investigates cases of state agency employee fraud and penalizes state agency employees engaged in it. Criminal penalties for state agency employee fraud vary from state to state, and individuals who commit state agency employee fraud may be prosecuted for other crimes (e.g., identity theft) that occurred during the commission of the state agency employee fraud. Penalties for this type of criminal fraud vary but may include imprisonment, probation, and/or monetary restitutions.

# State Agency Fraud: SNAP Quality Control

SNAP has long had policies and procedures in place for measuring improper payments—largely, the program's Quality Control (QC) system. QC is currently the basis for levying financial penalties from low-performing states and providing financial performance incentives for the higher-performing and most improved states. In June 2018, following concerns that there had been misreporting of errors, USDA-FNS released a FY2017 NPER under new quality control procedures. This section reviews QC and these developments.

## Quality Control: Incentives and Penalties Overview

This section discusses false claims by state agencies with regard to Quality Control (QC) data and state payment error rates (SPERs). As discussed earlier in this report, since 1977, the SNAP Quality Control system has measured improper payments in SNAP, comparing the amounts of overpayments and underpayments that exceed the error tolerance threshold ($38 adjusted annually for inflation)[123] to total benefits issuance. The Quality Control process starts with state agency analyses that determine state payment error rates, which are then reviewed by USDA-FNS to develop the SNAP national payment error rate (NPER). After conducting this annual Quality

---

and/or imprisonment up to three years (MS Code Title 97 Chapter 19 §71). Most of the state laws' penalties for recipients are more lenient than the penalties enumerated at Section 15(b) of the FNA (codified at 7 U.S.C. §2024(b)(1)).

[122] U.S. Government Accountability Office, *Supplemental Nutrition Assistance Program: Enhanced Detection Tools and Reporting Could Improve Efforts to Combat Recipient Fraud*, GAO-14-641, August 2014, pp. 15-16, https://www.gao.gov/products/GAO-14-641 (hereinafter cited as "August 2014 GAO report"). For example, this report stated that the minimum amount of recipient fraud that would result in the filing of criminal charges was $100 in Tennessee, while it was $5,000 in Texas. In addition, according to this report certain prosecutors and jurisdictions refused to prosecute recipient trafficking cases entirely due to limited resources and caseloads replete with more serious criminal cases.

[123] When agencies detect overpayments and underpayments under the threshold, they still must follow SNAP rules and correct these errors. This current Quality Control threshold was most recently set by Section 4019 of the 2014 Farm Bill which modified Section 16(c)(1)(A) of the FNA (codified at 7 U.S.C. §2025(c)(1)(A) and implemented at 7 C.F.R. §275.12(f)(2)).

Control review, USDA-FNS awards bonuses to high-performing state agencies and assigns penalties to low-performing state agencies.[124]

USDA-FNS annually awards high-performance bonuses to up to 10 states with the lowest or most improved state payment error rates. High-performance bonuses must be used by states to improve their administration of SNAP.[125] The total annual amount awarded for SPER high-performance bonuses is $24 million.[126] The bonuses awarded in FY2014 are summarized in **Table 2**. Awards for FY2017 have not yet been announced, as of the date of this report.

### Table 2. Bonuses Awarded to States for High Payment Accuracy, FY2014

Amount of bonuses in thousands

| State | AK | FL | KS | MS | RI | SC | TN | TX | VT | WA |
|---|---|---|---|---|---|---|---|---|---|---|
| **Bonus** | $247 | $7,742 | $628 | $1,302 | $502* | $1,672 | $2,687 | $6,497 | $293* | $2,428 |

**Source:** USDA-FNS, https://fns-prod.azureedge.net/sites/default/files/snap/2014-chart-awards.pdf.

**Note:** Bonus amounts marked with an asterisk "*" are for the most-improved state payment error rates.

State sanctions—known as "liabilities"—are used to punish states that have comparatively high payment error rates. If there is a 95% probability that a state makes payment errors 5% more frequently than the national average, then that state has "exceeded the liability level". If a state exceeds the liability level for two years in a row, then it is assessed a penalty—known as a "liability amount".[127] Liability amounts are assessed for only that portion of the state payment error rate that is above 6% (e.g., a state that exceeds the liability level with a state payment error rate of 5.99% would be assessed a $0 liability amount).[128] Once assessed, states have the option to pay the liability amount in full or enter into a settlement agreement with USDA-FNS.[129]

From FY2005 to FY2014, 42 of 53 state agencies have exceeded the liability level at least once, but only 9 state agencies have ever been compelled to actually repay an at-risk penalty amount to

---

[124] See Section 16(d) of FNA (codified at 7 U.S.C. §2025(d) and implemented at 7 C.F.R. §275.24).

[125] Section 4021 of the 2014 Farm Bill modified Section 16(d) of the FNA (codified at 7 U.S.C. §2025(d) and implemented at 7 C.F.R. §275(a)(8)). Consistent with the 2014 statutory change, this regulation limits the use of high-performance bonuses to SNAP administration. In terms of related proposals, the House-passed farm bill in the 113th Congress would have eliminated the performance bonuses (H.R. 2642), and the FY2019 President's Budget (FY2019 USDA-FNS Budget Justification, http://www.obpa.usda.gov/32fns2019notes.pdf, p. "32-87") also proposed elimination (estimating a savings of $480 million over FY2019-2028).

[126] Section 4420(a) of the 2002 Farm Bill modified Section 16(d)(2)(B)(ii) of the FNA (codified at 7 U.S.C. §2025(d)(1)(ii) and implemented at 7 C.F.R. §275.24(b)(1)).

[127] USDA-FNS determinations of error rates must be within 95% statistical probability. As a result, sometimes smaller states report exceeding the liability level, but are not assessed a liability as such a statistical determination cannot be made. Email from SNAP, USDA-FNS, December 28, 2017.

[128] Section 16(c)(1)(C) of the FNA (codified at 7 U.S.C. §2025(c)(1)(C) and implemented at 7 C.F.R. §275.23(d)(2)). Once assessed, generally half of liability amounts must be invested by the state in improving SNAP administration (without a federal match) and the other half are designated as "at-risk" for repayment to USDA-FNS. At-risk funds must be repaid to USDA-FNS if the state exceeds the liability level again the following year. This means that states have three years in which to improve their program administration before they are ever required to pay a penalty to USDA-FNS. See also 7 C.F.R. §275.234(e).

[129] Under such a settlement, half of the liability amount must be invested by the state into improving SNAP administration (without federal match) and the other half are designated "at-risk" for repayment to USDA-FNS. At-risk funds must be repaid to USDA-FNS if the state exceeds a 6% error rate again the following year. This means that states have three years in which to improve their program administration before they are required to pay a penalty to USDA-FNS.

USDA-FNS.[130] This is because most states improve their state payment error rates within one or two years and avoid being required to make a payment to USDA-FNS. Over these 10 years, these 9 states repaid about $1.5 million to USDA-FNS (see **Table 3**).[131]

### Table 3. Penalties Repaid by States for Low Payment Accuracy, FY2005-FY2014

Liability amounts (penalty) are in thousands, and year is fiscal year liability amount was established

| State | DC | ME | AZ | MD | WV | VT | GU | NV | RI | VT | GU | **TOTAL** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Penalty** | $189 | $387 | $220 | $212 | $77 | $171 | $76 | $3 | $152 | $68 | $38a | **$1,514** |
| **Year** | 2006 | 2007 | 2010 | 2010 | 2011 | 2011 | 2012 | 2012 | 2012 | 2012 | 2013 | **2005-2014** |

**Source:** Email from SNAP, USDA-FNS, January 19, 2018.

a. Amount due for repayment has not yet been paid as of the date of this report.

## State Agency Misreporting and Falsification of Quality Control Data

State agencies perform Quality Control reviews to determine state payment error rates and then submit these rates to USDA-FNS for its annual review; and agencies may be awarded or sanctioned according to these rates. This combination of positive and negative reinforcement is intended to incentivize high payment accuracy among states. USDA-FNS oversees state agencies through the management evaluation process and the Quality Control system, in addition to other federal oversight mechanisms.[132]

USDA-OIG performs regular audits of and investigations into state agency compliance with a range of SNAP rules. Through this oversight, USDA-OIG and USDA-FNS identified concerns in state-reported Quality Control data. In order to examine this issue, USDA-OIG began a series of audits in March 2013, which culminated in a September 2015 USDA-OIG report.[133] USDA-OIG looked at eight states and determined that all eight state agencies had deliberately weakened the integrity of the Quality Control process with the aid of hired consultants.[134] USDA-FNS responded in the September 2015 USDA-OIG report that USDA-OIG drew its conclusions on the basis of unconfirmed information, misunderstandings of SNAP policy, and insufficient statistical analysis. As a result, USDA-FNS contends that the concerns identified over these eight states' QC efforts were largely the result of administrative issues rather than fraud.[135]

According to 2017 U.S. Department of Justice (DOJ) findings, at least three state agencies (Virginia, Wisconsin, and Alaska) engaged in state agency fraud related to Quality Control data falsification since at least 2008. These three state agencies, with the help of their third-party

---

[130] Email from SNAP, USDA-FNS, January 19, 2018.

[131] This is compared to about $17.6 billion in benefits overissued by states, based on USDA-FNS QC Reports, FY2005-FY2014.

[132] Management evaluations are periodic reviews of state agency operations by USDA-FNS focusing on specific areas of compliance with program rules. More information regarding SNAP management evaluations is available at https://www.fns.usda.gov/snap/snap-program-improvement.

[133] U.S. Department of Agriculture, Office of the Inspector General, *FNS Quality Control Process for SNAP Error Rate*, 27601-0002-41, September 2015, https://www.usda.gov/oig/webdocs/27601-0002-41.pdf (hereinafter cited as "September 2015 USDA-OIG report").

[134] Ibid., p. 4.

[135] Ibid., pp. 56-58.

ER-0271

AR.07944

consultants, were found to have mitigated errors,[136] fraudulently improving their state payment error rates.[137] USDA-FNS and USDA-OIG testified on this subject in two hearings, one before the Senate Committee on Agriculture, Nutrition, and Forestry in August 2017 and one before the House Committee on Agriculture in July 2016.[138] Entities, including state agencies, found to have defrauded federal programs are required to repay funds obtained through fraud, plus interest, under the False Claims Act (31 U.S.C. §3729). As of the date of this report, these three state agencies have admitted to the DOJ that they engaged in falsifying QC data and violating the False Claims Act in their administration of SNAP.[139] As part of their settlements with DOJ, the Virginia state agency agreed to pay $7,150,436,[140] the Wisconsin state agency agreed to pay $6,991,905,[141] and the Alaska state agency agreed to pay $2,489,999.[142] These $16.6 million in payments represent the share of the high-performance bonuses awarded to these states for low state payment error rates while they were engaged in fraudulent practices, plus interest.

For FY2015, USDA-FNS determined that data quality issues existed for 79% of state agencies; however, such issues are not in and of themselves proof of fraud.[143] All three states that settled with DOJ had hired the same Quality Control consultant firm. As of the date of this report, the USDA-OIG investigation into this state agency fraud is still ongoing and Mississippi is known to be under investigation for Quality Control fraud.[144] In her comments at the August 2017 Senate Agriculture Committee Hearing, Ann M. Coffey, Assistant Inspector General of Investigations at USDA-OIG, stated that a "significant number" of states were still under investigation and that the scale of this state fraud was "unique."[145]

---

[136] For example, if a household in the Quality Control sample was overpaid by $50 due to an agency error (AE), the state agency employee conducting the Quality Control review would look for ways to offset this error (e.g., by adding new household or medical expenses) in order to bring the total overpayment below the Quality Control threshold, rather than simply reporting the error as required. September 2015 USDA-OIG report, p. 5.

[137] Wisconsin, for example, reduced its state payment error rate from 7.38% in FY2008 to 2.02% in FY2011, a 73% decline, during the period it worked with consultants and committed state agency fraud.

[138] Senate Committee on Agriculture, Nutrition, and Forestry, *Nutrition Programs: Perspectives for the 2018 Farm Bill*, 115th Cong., 1st sess., August 13, 2017, https://www.agriculture.senate.gov/hearings/nutrition-programs-perspectives-for-the-2018-farm-bill (hereinafter cited as "August 2017 Senate Agriculture Committee Hearing"). House Committee on Agriculture, *Past, Present, and Future of SNAP: Evaluating Error Rates and Anti-Fraud Measures to Enhance Program Integrity*, 114th Cong., 1st sess., July 6, 2016. https://agriculture.house.gov/news/documentsingle.aspx?DocumentID=3472.

[139] For more information regarding the False Claims Act, see CRS Report R40785, *Qui Tam: The False Claims Act and Related Federal Statutes*, by Charles Doyle.

[140] U.S. Department of Justice, "Virginia Department of Social Services Agrees to Pay $7.1 Million to Resolve Alleged False Claims for SNAP Funds," press release, April 10, 2017, https://www.justice.gov/opa/pr/virginia-department-social-services-agrees-pay-71-million-resolve-alleged-false-claims-snap.

[141] U.S. Department of Justice (DOJ), "Wisconsin Department of Health Services Agrees to Pay Nearly $7 Million to Resolve Alleged False Claims for SNAP Funds," press release, April 12, 2017, https://www.justice.gov/opa/pr/wisconsin-department-health-services-agrees-pay-nearly-7-million-resolve-alleged-false-claims.

[142] U.S. Department of Justice, "Alaska Department of Health and Social Services to Pay Nearly $2.5 Million to Resolve Alleged False Claims for SNAP Funds," press release, August 18, 2017, https://www.justice.gov/opa/pr/alaska-department-health-and-social-services-pay-nearly-25-million-resolve-alleged-false.

[143] This CRS calculation is based on data provided by the USDA-FNS QC Statement; QC data for only 11 of the 53 state agencies could be validated for FY2015. The remaining 42 state agencies had serious data quality issues in their QC samples. See https://www.fns.usda.gov/snap/quality-control.

[144] See https://www.clarionledger.com/story/news/2017/11/29/doj-investigates-mississippi-department-human-services-over-food-stamps-consultant/901927001/.

[145] August 2017 Senate Agriculture Committee Hearing.

# Combating Errors and Fraud: Issues and Strategies

Over time, USDA-FNS, SNAP state agencies, USDA-OIG, GAO, and other stakeholders have identified issues that may complicate or impede the detection and correction of errors and fraud in SNAP. These kinds of issues can stem from shortcomings or gaps in existing regulation and law, as well as complexities in the fundamental design of the program itself. In addition, stakeholders have proposed strategies to address these kinds of issues and further curb errors and fraud in SNAP. These include, for example, proposed rulemaking actions, proposed statutory changes, and state pilots. Changes that strengthen payment accuracy and punishments against fraud can be in tension with other policy objectives, such as preserving recipient access to the program, and may have unintended consequences such as incurring costs greater than their savings. Balancing program objectives such as these is always a consideration for policymakers in this area.

---

**Recent Developments**

In the second session of the 115th Congress, Members voted on related policies in farm bill proposals considered in the House and Senate. See CRS Report R45275, *The House and Senate 2018 Farm Bills (H.R. 2): A Side-by-Side Comparison with Current Law* for a summary of the policies passed in versions of H.R. 2. The House and Senate each passed bills that contained policies related to errors and fraud, but the bills differ in their precise contents.

---

## Retailer Trafficking

### Certain Store Owners Remain Active in SNAP Despite Permanent Disqualification for Trafficking

According to SNAP rules, if a store is permanently disqualified from participating in SNAP and later that store's owner applies to participate in SNAP at a new store, then USDA-FNS will deny the new store's application. Due to a longstanding USDA-FNS policy, however, store owners who own multiple stores that participate in SNAP have been able to remain in the program with some of their stores despite a permanent disqualification at another of their stores.[146] This USDA-FNS policy, identified and examined in the July 2013 USDA-OIG report, was intended to prevent the elimination of whole chains of stores from the program as a result of violations at one store.[147] However, the policy has been applied beyond chain stores, and USDA-OIG identified it as a weakness in efforts to combat trafficking. In the July 2013 report, USDA-OIG identified 586 store owners who remained in SNAP due to this policy despite their association with a permanently disqualified store; 66 of these owners were found to have obtained SNAP authorization at new stores.[148]

In the July 2013 report, USDA-OIG proposed that USDA-FNS make a change to SNAP regulations and USDA-FNS policy to allow for the permanent disqualification or denial of *all*

---

[146] For example, an individual owns three stores (Store A, B, and C) that are authorized to participate in SNAP. Store B is permanently disqualified from participating in SNAP due to a USDA-FNS finding that the store engaged in retailer trafficking. Store A and Store C will continue to participate in SNAP irrespective of the permanent disqualification of Store B. Additionally, when the store owner applies for SNAP authorization for a new store location, Store D, USDA-FNS will generally process that new application irrespective of the past trafficking violations that took place at Store B.

[147] July 2013 USDA-OIG report, p. 9.

[148] Ibid., pp. 2-19.

current or future stores, respectively, associated with an owner of a store that is permanently disqualified for retailer trafficking unless the retailer can meet certain criteria.[149]

USDA-FNS responded to USDA-OIG with an alternative policy that would impose collateral requirements for these owners. (Under current law, collateral bonds or letters of credit are required as a condition of participation in SNAP for stores that have been subjected to a term disqualification.[150] These are held as collateral against the retailer committing future violations.) USDA-FNS suggested requiring a bond or letter of credit for all authorized stores associated with a permanently disqualified owner and for new stores when such stores have an owner associated with a store permanently disqualified for trafficking.[151] USDA-OIG indicated that it considered this USDA-FNS alternative to its disqualification recommendations inadequate, noting "[w]e believe that continuing to allow known traffickers to participate in SNAP will undermine program integrity."[152]

As of the date of this report, none of these proposed policy changes have been implemented.[153]

## Strengthening Monetary Penalties against Trafficking Retailers

An estimated $1.1 billion in SNAP benefits were trafficked annually at stores,[154] but in FY2016, USDA-FNS fined trafficking retailers only about $7.5 million.[155] Monetary penalties can discourage retailers from engaging in trafficking and also help recoup federal funds lost to fraud. For these reasons, changes to SNAP rules have been proposed to augment the monetary penalties assessed against trafficking retailers.

**Increasing Transfer of Ownership Civil Money Penalties**—The 2008 Farm Bill modified the FNA to increase civil monetary penalties against retailers that break SNAP rules to a maximum of $100,000 per violation.[156] If a retailer that has been permanently disqualified for trafficking SNAP benefits subsequently sells or transfers ownership of a store, then USDA-FNS assesses that retailer a "transfer of ownership civil money penalty" (TOCMP).[157] This is currently the primary financial penalty assessed by USDA-FNS against retailers found to have engaged in trafficking.

In August 2012, USDA-FNS published a notice of proposed rulemaking (NPRM) to implement the 2008 Farm Bill change.[158] This notice stated that existing limits used by USDA-FNS were

---

[149] Relevant criteria are outlined in SNAP regulations at 7 C.F.R. §278.6(i).

[150] The value of these bonds or letters of credit is equal to 10% of the SNAP business conducted by the store in the previous 12-month period. Section 12(d) of the FNA (codified 7 U.S.C. §2021(d) and implemented at 7 C.F.R. §278.1(b)(4)).

[151] Under this change, if a retailer owned three stores (Store A, B, and C) and Store B was permanently disqualified for trafficking, the retailer would be required to submit a bond or letter of credit for Store A and Store C, in addition to a bond or letter of credit for any future store applying for participation in SNAP.

[152] July 2013 USDA-OIG report, p. 21.

[153] July 2013 USDA-OIG report, pp. 20-22.

[154] This figure represents estimated retailer trafficking annually from 2012 to 2014 per the September 2017 USDA-FNS Retailer Trafficking Study, pp. ii-iii.

[155] This CRS calculation is based on information provided via email from SNAP, USDA-FNS, October 17, 2017.

[156] Section 4132 of the Food, Conservation, and Energy Act of 2008 (the 2008 Farm Bill, P.L. 110-246) modified Section 12(a)(1)(B) and (c)(1) of the FNA (codified at 7 U.S.C. §2021(a)(1)(B) and (c)(1) and implemented at 7 C.F.R. §3.91(b)(3)(i)).

[157] Section 12(e)(1) of the FNA (codified at 7 U.S.C. §2021(e) and implemented at 7 C.F.R. §278.6(f)(2)).

[158] U.S. Department of Agriculture, Food and Nutrition Service, "Supplemental Nutrition Assistance Program: Farm Bill of 2008 Retailer Sanctions," 77 *Federal Register* 4848461, August 14, 2012 (hereinafter cited as "August 2012

$11,000 per violation and $59,000 per investigation, and that this rulemaking action would increase these limits to up to $100,000 per violation per the intent of Congress expressed in the 2008 Farm Bill.[159] As of the date of this report, this rulemaking action is inactive (see **Table B-1** in **Appendix B**). Because this change in the limits on TOCMPs has not been implemented, USDA-FNS continues to assess TOCMPs according to the limits in place before the passage of the 2008 Farm Bill (i.e., $11,000 per violation and $59,000 per investigation). In FY2016, the mean value of TOCMPs assessed by USDA-FNS was $29,284, about half of the limit per investigation.[160] Implementation of these changes in the maximum limits on TOCMPs could represent a nearly tenfold increase in the penalty amounts for permanently disqualified retailers engaged in a high volume of SNAP business, potentially increasing the penalties' deterrent effect.[161]

**Creating Additional Civil Money Penalties**—Currently, USDA-FNS only fines a limited share of trafficking retailers. Firms permanently disqualified for trafficking are subject to a TOCMP when USDA-FNS becomes aware that the permanently disqualified store owner has sold a store, but USDA-FNS can only become aware of such a sale when, and if, the new store owner applies for SNAP authorization. For every retailer assessed a TOCMP in FY2016, more than seven retailers were permanently disqualified for trafficking.[162] Ultimately this means that the overwhelming majority of store owners found by USDA-FNS to have committed and materially benefited from retailer trafficking are subject to no monetary penalty at all.

USDA-FNS proposed to create a new kind of monetary penalty, the trafficking civil penalty (TCP), in the August 2012 USDA-FNS NPRM.[163] Under this proposal, a retailer permanently disqualified for trafficking would be subject to this new kind of fine, the size of which would be based on the retailer's volume of fraud, as it is for a TOCMP.[164] Establishing this new fine would provide an immediate monetary penalty at the time of permanent disqualification to further deter retailers from engaging in trafficking activity and recoup misappropriated federal funds. As of the date of this report, this rulemaking action is inactive (see **Table B-1** in **Appendix B**) and USDA-FNS is not assessing this new kind of fine.

## Changes in EBT Transaction Processing since 2014

Prior to September 2014, about half of all SNAP-authorized retailers (including many smaller independent retailers) used free EBT-only point of sale (POS) devices provided by their state's EBT host processors.[165] Transaction data for purchases made at these free EBT-only POS devices

---

USDA-FNS NPRM").

[159] Ibid., p. 48466.

[160] Email from SNAP, USDA-FNS, October 17, 2017.

[161] For example, if a store that redeemed an average of $4,000 in SNAP benefits per month is permanently disqualified for six retailer trafficking violations, then it would be assessed a TOCMP at the maximum of $59,000 under current regulations. Such a store would be assessed a TOCMP of $576,000 under this proposal. This CRS calculation is based on information provided in the August 2012 USDA-FNS NPRM and regulations at 7 C.F.R. §278.6(g).

[162] This CRS calculation is based on data from the December 2016 USDA-FNS Retailer Management Report, pp. 1-8.

[163] The Food Stamp Act of 1977 granted USDA-FNS the authority to either disqualify a firm for program violations or impose a civil money penalty, but not both. This authority was broadened by the 2008 FNA to allow USDA-FNS to simultaneously apply both kinds of penalties (i.e., disqualification *and* civil money penalty) to retailers in violation.

[164] For example, if a store that redeemed an average of $4,000 in SNAP benefits per month is permanently disqualified for six retailer trafficking violations, then it would be immediately assessed a fine in the amount of $288,000. This CRS calculation is based on information provided in the August 2012 USDA-FNS NPRM.

[165] EBT host processors are larger companies, such as Fidelity National Information Services (FIS), Solutran, and

went directly to EBT host processors and then to USDA-FNS. USDA-FNS uses this transaction data to detect retailer trafficking activity.

The 2014 Farm Bill modified the FNA to require that all nonexempt retailers pay for their own EBT equipment and services.[166] Since this change, most stores now work with third-party companies that provide POS equipment and services for a fee. The introduction of these unregulated intermediary entities has complicated USDA-FNS's efforts to detect retailer trafficking,[167] and has also facilitated new forms of fraud. For example, in 2017, an account executive for a third party processor was sentenced to prison, to be followed by supervised release, and was ordered to pay restitution for his role in illegally providing 50 unauthorized stores with active SNAP EBT point-of-sale devices which were used to redeem about $6.5 million in benefits (at least eight of these stores were found to engaged in retailer trafficking).[168]

## Enhancing Retailer Stocking Standards

Since 1994, retailers applying to participate in the program have been required to meet stocking standards which mandate a minimum of 12 food items.[169] In an October 2006 GAO report on trafficking, these minimal stocking requirements were identified as a factor potentially contributing to retailer trafficking, as the standards may make it easier for small, fraud-prone retailers that do not primarily sell food to enter the program.[170] In addition, the September 2017 USDA-FNS Retailer Trafficking Study identified a correlation between an increase in small stores (e.g., convenience stores) in the program and an increase in retailer trafficking (for more information, see **Appendix D**). As a result, increasing stocking standards has been proposed as a strategy to curb retailer trafficking. The 2014 Farm Bill modified the FNA to enhance retailer stocking standards for participating stores.[171] The December 2016 USDA-FNS Final Rule implemented these changes and included several other provisions that would have significantly increased stocking standards for retailers; however, Section 765 of the Consolidated

---

Conduent, that contract with individual states or groups of states to provide EBT services such as routing transactions and printing cards. These EBT host processors are subject to service contracts that reflect the statutory and regulatory requirements of the EBT system and are overseen by USDA-FNS.

[166] Section 4002(b)(1) of the Agricultural Act of 2014 (the 2014 Farm Bill, P.L. 113-79) modified Section 7(f)(2)(A) of the FNA (codified at 7 U.S.C. §2016(f)(2)(A)). A small number of SNAP-authorized retailers were exempt from this change, including military commissaries, nonprofit food purchasing cooperative ventures, group living arrangements, direct-marketing farmers, farmers' markets, and others. See also agency guidance, *Supplemental Nutrition Assistance Program Provisions of the Agricultural Act of 2014 - Implementing Memorandum*, U.S. Department of Agriculture, Food and Nutrition Service , March 21, 2014, pp. 1-3, https://fns-prod.azureedge.net/sites/default/files/SNAP%20Provisions%20of%20the%20Agricultural%20Act%20of%202014%20-%20Implementing%20Memo.pdf.

[167] These entities include independent sales organizations (ISOs) and third-party processors (TPPs). An ISO generally works directly with a retailer by providing EBT equipment and helping to set up the retailer's connection to a TPP. A TPP generally provides transaction services between a retailer and an EBT host processor. TPPs and ISOs have no contractual relationship with states and are not overseen by USDA-FNS.

[168] USDA-OIG SARC 1st Half FY2017, pp. 29-30.

[169] Section 201 of the Food Stamp Program Improvements Act of 1994 (P.L. 103-225) modified Section 3(o)(1) of the FNA (codified at 7 U.S.C. §2018(a)(1) and implemented in 7 C.F.R. §271.2 and §278.1(b)(1)). See also U.S. Department of Agriculture, Food and Nutrition Service, "Food Stamp Program: Revisions to the Retail Food Store Definition and Program Authorization Guidance," 66 *Federal Register* 2795, January 12, 2001.

[170] U.S. Government Accountability Office, Food Stamp Trafficking: FNS Could Enhance Program Integrity by Better Targeting Stores Likely to Traffic and Increasing Penalties, GAO-07-53, October 2006, p. 5, http://www.gao.gov/assets/260/252570.pdf.

[171] Section 4002(a)(1) and (2) of the 2014 Farm Bill P.L. 113-79 modified Section 3(o)(1)(A) of the FNA (codified at 7 U.S.C. §2012(o)(1)(A)).

Appropriations Act of 2017 (2017 Omnibus, P.L. 115-31) prevented full implementation of this rule.[172] On January 17, 2018, USDA-FNS began implementing the remaining provisions of the December 2016 USDA-FNS Final Rule. Current implementation requires a modest increase to the number of items stocked (from 12 to 36 food items) but not as much as would have been required by the final rule before the 2017 Omnibus (84 food items).

## Suspending "Flagrant" Retailer Traffickers

Some retailers have been found to have delayed the disqualification process for their stores, enabling them to continue trafficking. Between the USDA-FNS official notification of trafficking charges and the permanent disqualification for trafficking, there are a number of administrative steps.[173] Until final implementation of a permanent disqualification, the retailer may continue to participate in the program, accepting and redeeming SNAP benefits. According to USDA-FNS, some charged retailers exploit the delay created by these administrative steps in order to continue (or even accelerate) their trafficking of SNAP benefits, sometimes remaining in the program for months.[174] The 2008 Farm Bill modified the FNA to require USDA-FNS to utilize the EBT system to immediately suspend the payment of redeemed SNAP benefits to stores determined to be engaged in this "flagrant" retailer trafficking.[175] A February 2013 USDA-FNS NPRM included a provision to implement this 2008 Farm Bill requirement, but, as of the date of this report, this rulemaking action is inactive (see **Table B-1** in **Appendix B**).

## Increasing Requirements for High-Risk Stores

When a store applies for authorization to participate in SNAP, USDA-FNS internally assigns that store a risk status (i.e., high, medium, or low) based on retailer trafficking data for the location and area.[176] If a new store applies at a physical address associated with past retailer trafficking, that new store is more likely to be considered "high risk." In a July 2013 report, USDA-OIG noted that certain high-risk store locations evidence a pattern of retailer trafficking that continues under new ownership.[177] USDA-OIG recommended requiring a bond or letter of credit as a precondition of SNAP authorization at high-risk store locations, which would require statutory changes.

---

[172] For more information on this rulemaking, see CRS Report R44650, *Updated Standards for SNAP-Authorized Retailers*, by Randy Alison Aussenberg.

[173] These administrative steps include providing USDA-FNS with additional information, requesting agency administrative review, and filing Freedom of Information Act (FOIA) requests that must be fulfilled before final implementation of a permanent disqualification for trafficking may occur.

[174] U.S. Department of Agriculture, Food and Nutrition Service, "Supplemental Nutrition Assistance Program: Suspension of SNAP Benefit Payments of Retailers," 78 *Federal Register* 12245, February 22, 2013 (hereinafter cited as "February 2013 USDA-FNS NPRM").

[175] Section 4132 of the 2008 Farm Bill modified Section 12(h) of the FNA (codified at 7 U.S.C. §2021(h)).

[176] Stores with higher-risk statuses may be subjected by USDA-FNS to more rigorous authorization processes, including enhanced documentation requirements and more frequent inspections.

[177] July 2013 USDA-OIG report, p. 16.

# Recipient Trafficking

## Requiring Recipient Photographs on EBT Cards

While some have argued that placing recipient photographs on EBT cards would reduce trafficking, specifically the sale of cards between recipients and unauthorized use of cards at authorized stores, there are operational and access challenges to this strategy. Since 1996, state agencies have had the option to require photographs of one or more SNAP household members on the household's EBT card(s).[178] This state option is known as "photo EBT."

Like SNAP benefits, EBT cards are issued to households, not to individuals. Also, households may appoint authorized representatives (outside of the household) to use their EBT cards to shop on the households' behalf.[179] As a result, a photo EBT card might only bear the image of the head of a household despite the fact that all members of the household can use the card. Similarly, an authorized representative may use a card that does not have the representative's picture on it. Retailers therefore cannot legally deny a SNAP transaction just because the user does not match the photo on the card. Additionally, some advocates point out that photo EBT has shown some adverse effects on recipient access.[180]

A number of states have considered or implemented photo EBT since 1996. States' evaluations of photo EBT have generally concluded that the option has or would have little to no effect on recipient trafficking.[181] Though evidence of reduced trafficking is lacking, two states, Maine and Massachusetts, currently implement photo EBT. Maine contended that it "[strengthens] the integrity of our public assistance programs."[182]

The implementation of photo EBT in a state requires both upfront and ongoing costs to the state and federal government. Upfront costs generally exceed ongoing costs, and ongoing costs generally increase over time. State estimates and actual expenditures on the cost of photo EBT vary widely. As an example, in 2000, Missouri enacted a state law mandating photo EBT, and the Office of the Missouri State Auditor evaluated the option in August 2001.[183] This audit determined that in the first year of implementation, photo EBT effected no fraud reduction, cost $1,801,858 ($947,280 federal costs and $854,578 state costs), and should be discontinued.[184] In 2001, Missouri discontinued its use of photo EBT.

---

[178] Section 825(a)(9) of Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) modified Section 7(h)(9) of the FNA (codified at 7 U.S.C. §2016(h)(9) and implemented at 7 C.F.R. §274.8(b)(5)).

[179] For example, a household containing homebound senior citizens may give their EBT card and PIN to a neighbor and authorize them to shop on the household's behalf.

[180] See, for example, a summary of Massachusetts client advocate experiences and concerns included in an Urban Institute issue brief published in March 2015, "Assessing the Merits of Photo EBT Cards in the Supplemental Nutrition Assistance Program."

[181] This includes state reports such as those conducted by Missouri in August 2001 (https://catalog.loc.gov/vwebv/ search?searchCode=LCCN&searchArg=2002435093&searchType=1&permalink=y), Rhode Island in September 2013 (https://lisaopdycke.files.wordpress.com/2014/03/ebt-feasibility-in-ri1.pdf), Pennsylvania in November 2012 (http://lbfc.legis.state.pa.us/Resources/Documents/Reports/450.pdf), and Massachusetts in April 2012 (http://archives.lib.state.ma.us/bitstream/handle/2452/213365/ocn885253047.pdf?sequence=1&isAllowed=y).

[182] Maine Department of Health and Human Services Commissioner Mary Mayhew, Department of Health and Human Services, Maine, "DHHS to Begin Putting Photos on Maine EBT Cards," press release, April 17, 2014, http://www.maine.gov/dhhs/archivednews_autosearch.shtml?id=618847.

[183] See Section 208.182, RSMo 2000.

[184] Office of Missouri State Auditor, *Audit of Department of Social Services Electronic Benefit Security Card and Electronic Benefit Transfer Benefit Delivery System*, Report No. 2001-58, August 2001, p. 8, https://catalog.loc.gov/

In reviewing 14 states that have considered photo EBT implementation since 2001, upfront costs range from about $1.6 million in New Hampshire (2016) to about $25.1 million in North Carolina (2011).[185] Estimates of ongoing annual costs vary across an even wider range, from approximately $65,000 in Virginia (2017) to $8.4 million in Arizona (2016).[186]

## State Agency Reporting on Recipient Fraud

There is currently no single standard measurement of recipient fraud (neither recipient trafficking nor recipient application fraud). In the absence of a national recipient trafficking rate, it is difficult to observe trends and evaluate the effectiveness of enforcement strategies. Both GAO[187] and USDA-OIG[188] have commented on the significance of this shortcoming and recommended changes to allow for the creation of a national recipient trafficking rate akin to the national retailer trafficking rate. Based on USDA-FNS analysis, however, GAO found it is infeasible to create a uniform methodology for states to calculate a national recipient trafficking rate without statutory changes to require and enable USDA-FNS and state agencies to assign sufficient resources to this issue.[189] USDA-FNS echoed these feasibility concerns in a May 2014 evaluation.[190]

Additional authority and resources to develop a recipient trafficking rate might allow USDA-FNS to do some or all of the following:

- conduct and publish a study of recipient trafficking of SNAP benefits using currently existing data, including a national recipient trafficking rate;

- determine and document what changes must be made to current regulations, forms, policies, and practices to standardize state agency reporting and calculation of recipient trafficking, including at minimum the definition of

---

vwebv/search?searchCode=LCCN&searchArg=2002435093&searchType=1&permalink=y.

[185] The cost estimate for New Hampshire in 2016 estimated an upfront cost of $1,554,634 and ongoing costs of about $887,507 a year. The cost estimate for North Carolina in 2011 estimated an upfront cost of $25,050,000 and ongoing costs of $2,450,000 a year. Department of Health and Human Services, New Hampshire, Fiscal Note: Senate Bill 529, January 28, 2016, https://legiscan.com/NH/text/SB529/id/1318275; General Assembly of North Carolina, Legislative Fiscal Note: House Bill 734, July 1, 2012, pp. 2-3, https://www.ncleg.net/Sessions/2011/FiscalNotes/House/PDF/HFN0734v1.pdf.

[186] The cost estimate for Virginia in 2017 estimated ongoing costs at approximately $65,000 per year and an upfront cost of $1,836,935 (this estimate only included costs directly associated with card production and excluded other ongoing photo EBT implementation costs); Joint Legislative Audit and Review Commission, 2017 General Assembly Session, Fiscal Impact Review: House Bill 2208, February 6, 2017, p. 3, https://lis.virginia.gov/cgi-bin/legp604.exe?171+oth+HB2208J110+PDF. The cost estimate for Arizona in 2016 estimated ongoing costs of $8.4 million per year and an upfront cost of $12 million; Joint Legislative Budget Committee of Arizona, Fiscal Note: House Bill 2596, February 17, 2016, p. 1, https://www.azleg.gov/legtext/52leg/2r/fiscal/hb2596.docx.pdf.

[187] Government Accountability Office, *Supplemental Nutrition Assistance Program: Enhanced Detection Tools and Reporting to Combat Recipient Fraud Are in Development*, GAO-16-719T, May 2016, pp. 4-15, https://www.gao.gov/assets/680/677779.pdf (hereinafter cited as "June 2016 GAO report").

[188] September 2012 USDA-OIG report, p. 21.

[189] June 2016 GAO report, p. 4-5.

[190] As of May 2014, USDA-FNS evaluated the feasibility of calculating a national recipient trafficking rate and determined that it would be necessary for USDA-FNS to create a system similar in nature to the SNAP Quality Control system in order to calculate a recipient fraud rate. This system would, like the SNAP QC system, require statutory authority and extensive regulations to standardize terminology, definitions, timelines, methodologies, data reporting, and data formatting. The system would also require a significant investment of state and federal resources to establish and operate. As no such authority or resources currently exist, USDA-FNS found that establishing the rate was infeasible. Email from SNAP, USDA-FNS, November 24, 2017.

relevant terms (e.g., definition of "investigation"), the annual timeframes, and the data sources for compilation of recipient trafficking data; and

- implement the identified changes necessary to reliably and accurately document the national recipient trafficking rate.

## Enhancing Federal Financial Incentives for State Agencies to Fight Fraud

USDA-FNS provides financial incentives to state agencies to reward high performance.[191] These bonuses reward states with low error rates but do not reward states that effectively detect and penalize recipient trafficking. In April 2014, USDA-FNS published a Request for Information (RFI) soliciting comment on ways to modify performance bonuses for state agencies, including creating bonuses related to activities targeting recipient trafficking.[192] The July 2016 GAO report also found that USDA-FNS does not sufficiently incentivize state agencies to pursue recipient trafficking cases. The report stated, "to help address the increased caseloads and the resources needed to conduct investigations, we recommended that USDA explore ways that federal financial incentives could be used to better support cost-effective anti-fraud strategies. At this time, FNS has decided not to pursue bonus awards for anti-fraud and program integrity activities."[193] Establishing a standard to measure performance for these bonuses would likely require the establishment of a national recipient trafficking rate as discussed earlier in this section.

Additionally, as stated earlier, state agencies establish and collect claims against recipients who traffic SNAP benefits. If a state agency collects on a claim resulting from fraud, such as recipient trafficking, the state agency is entitled to retain 35% of the amount collected.[194] The August 2014 GAO report suggested that increasing this retention rate and restricting the use of retained funds to state agency anti-fraud activities could significantly enhance efforts to combat recipient trafficking, noting that the strategy "may result in a net savings for SNAP if increased collections in payment recoveries outweigh the increased amount states receive in retentions."[195] Implementation of this strategy may require statutory change.

## Federal Oversight of State Agencies—Management Evaluations (MEs)

USDA-FNS oversees state agency administration of SNAP, and one of the primary tools used in this federal oversight is the management evaluation (ME). USDA-FNS conducts annual management evaluations on high priority areas and triennial reviews on lower priority areas.[196] If a state agency is found to be out of compliance with SNAP rules, then a corrective action plan (CAP) will be developed and USDA-FNS will work with the state agency to improve

---

[191] Section 16(d) of the FNA (codified at 7 U.S.C. §2025(d) and implemented at 7 C.F.R. §275.24).

[192] U.S. Department of Agriculture, Food and Nutrition Service, "Request for Information: Supplemental Nutrition Assistance Program (SNAP) High Performance Bonuses," 79 *Federal Register* 22788, April 23, 2014.

[193] July 2016 GAO report, p. 29.

[194] Section 16(a) of the FNA (codified at 7 U.S.C. §2025(a) and implemented at 7 C.F.R. §273.18(k)(1)).

[195] August 2014 GAO report, pp. 15-34.

[196] See 7 C.F.R. §275.3(a). In FY2017, for example, management evaluations included the administration of policies and programs related to Able-bodied Adults without Dependents (ABAWD), SNAP Employment and Training (E&T), Program Access Review (PAR), and photo EBT. U.S. Department of Agriculture, Food and Nutrition Service, *Supplemental Nutrition Assistance Program - Fiscal Year 2017 National Target Areas for Management Evaluations*, June 2018, pp. 1-2, https://fns-prod.azureedge.net/sites/default/files/snap/ SNAP%20FY17%20National%20Target%20Areas%20for%20Management%20Evaluations%20%282%29.pdf.

compliance. A January 2012 USDA-OIG report noted that USDA-FNS did not utilize management evaluations to assess the effectiveness of state agencies' efforts to detect and penalize recipient trafficking.[197] In response, USDA-FNS created a "recipient integrity" management evaluation in FY2012 which it currently uses to evaluate state agencies every three years.[198]

## Delayed State Agency Notification of Retailer Trafficking Cases

State agencies are responsible for investigating recipient trafficking, and USDA-FNS is responsible for investigating retailer trafficking. A large share of trafficking, however, results from collusion between recipients and retailers. If a state agency is made aware that a store in its jurisdiction is engaged in retailer trafficking, it can place the store under surveillance and build cases against recipients engaged in trafficking at that location.[199] Usually, however, state agencies have no such opportunity. USDA-FNS provides retailer trafficking cases to state agencies only after completing the agency administrative and appeal process. By the time the state agency is made aware of a retailer trafficking case, the store has ceased accepting SNAP and has often closed. At that point, meaningful surveillance of the store cannot be performed and EBT transaction data cannot be corroborated with other forms of hard evidence. It is important to note, however, that providing state agencies with advance notification regarding ongoing USDA-FNS investigations of retailers may jeopardize these investigations.[200]

## Difference in Burden of Proof for Retailer Trafficking versus Recipient Trafficking

Retailer and recipient trafficking proceedings have different burdens of proof; therefore, governments will not necessarily prevail in both cases with the same evidence. Accepting SNAP benefits as a form of payment is not an entitlement for retailers. To disqualify a SNAP retailer for a violation of SNAP rules, USDA-FNS must only meet a lower-level burden of proof—the "preponderance of the evidence" standard.[201] Receiving SNAP benefits is an entitlement for eligible individuals. To disqualify a SNAP recipient for fraud, a state agency must meet a higher-level burden of proof—the "clear and convincing evidence" standard.[202] This means that evidence

---

[197] U.S. Department of Agriculture, Office of the Inspector General, *State Fraud Detection Efforts for the Supplement Nutrition Assistance Program*, Audit Report 27703-0002-HY, January 2012, p. 2, https://www.usda.gov/oig/webdocs/27703-0002-HY.pdf.

[198] For more information about these management evaluations, see https://www.fns.usda.gov/snap/snap-program-improvement.

[199] Surveillance helps identify the SNAP recipients who frequent the store and, paired with EBT transaction data, can provide evidence of recipient trafficking. If, for example, a SNAP recipient enters a trafficking store, swipes his/her EBT card for a large transaction amount, and then leaves the store without bags of groceries, it is extremely likely that the recipient is engaged in trafficking.

[200] Email from SNAP, USDA-FNS, January 5, 2018.

[201] Under the preponderance standard, if more than 50% of the evidence favors a party, then that party prevails. In the context of a retailer administratively sanctioned by USDA-FNS for trafficking, the retailer must satisfy the preponderance standard to prove that the USDA-FNS administrative sanction was invalid. If the retailer is unable to meet this burden of proof, then the court will sustain USDA-FNS's administrative sanction. See USDA-FNS Final Agency Decisions at https://www.fns.usda.gov/snap/retailer-sanctions-final-agency-decisions-fads.

[202] The clear and convincing standard is met if the plaintiff/prosecutor proves that their position is substantially more likely than not to be true (i.e., if more than 70-75% of the evidence favors the plaintiff/prosecutor, then the plaintiff/prosecutor will win the case). The applicability of this burden of proof for SNAP recipients is established in regulation at 7 C.F.R. §273.16(e)(6).

deemed sufficient to prove retailer trafficking may not be sufficient to prove recipient trafficking. Indeed, over 84% of the USDA-FNS retailer trafficking cases that resulted in a permanent disqualification in FY2016 relied primarily on an analysis of suspicious transaction patterns based on Anti-fraud Locator using EBT Retailer Transactions (ALERT) system data.[203] These EBT transaction data, on their own, are not generally considered sufficient grounds for the disqualification of SNAP recipients. For this reason, state agencies often have difficulty disqualifying recipients whose EBT cards were used in transactions flagged as trafficking by ALERT transaction data analysis, absent other evidence of recipient trafficking.

### Best Practices for Fighting Recipient Fraud—the SNAP Fraud Framework

Grants to states for integrity activities, established by Section 4029 of the 2014 Farm Bill, were awarded in FY2014 and FY2015 but not in FY2016 or FY2017.[204] USDA-FNS is currently developing a "SNAP Fraud Framework," which combines best practices for fraud prevention gathered by USDA-FNS over several years from federal, state, and private partners. USDA-FNS plans to launch the SNAP Fraud Framework in FY2018 and to offer states grant opportunities using this funding to implement the framework.[205]

## Retailer Application Fraud

USDA-FNS is responsible for reviewing the applications submitted by retailers and ensuring that retailers authorized to participate in SNAP meet all eligibility requirements. Included in these applications are store owners' personal information, including but not limited to owners' Social Security Numbers (SSNs), but USDA-FNS is statutorily limited in how it can use these SSNs.

---

**Restrictions on the Use of Retailers' Social Security Numbers (SSNs)**

When a retailer applies to participate in SNAP, they must provide to USDA-FNS the SSNs of all owners of the applicant store. Per the Social Security Act, USDA-FNS may only legally use these SSNs for one purpose: "the establishment and maintenance of a list of the names and social security account numbers of such individuals for use in determining those applicants who have been previously sanctioned or convicted under section 12 or 15 [of the FNA]."[206] Due to this restriction, USDA-FNS is unable to use these SSNs to perform background checks or match with federal databases.

---

### Verification and Use of Retailer Submitted Social Security Numbers (SSNs)

During the application process, retailers provide USDA-FNS with the SSNs of all store owners. USDA-OIG compared these retailer-submitted SSNs to the Social Security Administration's Death Master File to identify store owners using SSNs that matched the SSNs of deceased individuals. In a January 2017 USDA-OIG report, 3,394 stores were found to have at least one owner using an SSA-DMF matched SSN, and 346 of these stores were found to have all owners

---

[203] CRS calculation based on data from December 2016 USDA-FNS Retailer Management Report, p. 8.

[204] For state activities under this grant, see, for example, U.S. Department of Agriculture, Food and Nutrition Service, *FY 2015 SNAP Recipient Integrity Information Technology Grant Summaries*, October 2015. https://www.fns.usda.gov/snap/fy2015-snap-recipient-integrity-information-technology-grant-summaries.

[205] U.S. Department of Agriculture, Office of Budget and Program Analysis , *2019 USDA Budget Explanatory Notes: Food and Nutrition Service* , pp. 32-91, https://www.obpa.usda.gov/32fns2019notes.pdf.

[206] Section 205(c)(2)(C)(iii)(I) of the Social Security Act (codified at 42 U.S.C. §405(c)(2)(C)(iii)(I) and implemented at 7 C.F.R. §278.1(q)(3)).

using SSA-DMF matched SSNs.[207] USDA-OIG recommended that USDA-FNS follow up with these 3,394 retailers and implement a new workflow process to check retailer-submitted SSNs on an ongoing basis. In the agency response to the report, USDA-FNS addressed these 3,394 identified retailers, but also identified the statutory barrier to this proposed change, stating: "FNS recognizes the value in conducting a DMF match on an on-going basis. As such, should FNS be granted future authority to use SSN for matching purposes, FNS will match to the SSA DMF using SSN on an on-going basis."[208] As of the date of this report, USDA-FNS does not verify retailer-submitted SSNs or match against the SSA-DMF due to this statutory restriction.[209] Implementation of this change would require modification to the Social Security Act.

## Other Verification of Retailer Submitted Information

In the July 2013 report, USDA-OIG recommended that USDA-FNS use other methods to verify applicant retailer information such as memoranda of understanding (MOUs) with state licensing agencies. USDA-FNS proposed instead to test the use of data brokers to complement existing techniques used to verify retailer applicant information.[210] In 2014, USDA-FNS conducted four pilots testing the use of data brokers and determined that it had low return on investment, in part due to USDA-FNS's inability to utilize applicant retailers' SSNs in data matches.[211]

## Mandating Background Checks on High-Risk Retailer Applications

Store owners who have been convicted of certain crimes will be denied authorization to participate in SNAP for lack of business integrity if they declare the past conviction when applying. However, USDA-FNS is not currently able to verify the information provided by the retailer if he/she chooses to falsify the application and conceal past criminal convictions. A September 2008 USDA-OIG report[212] suggested that USDA-FNS utilize the Interstate Identification Index (III) of the National Crime Information Center (NCIC) to perform background checks on retailers applying to participate in SNAP.[213] The July 2013 USDA-OIG report repeated this recommendation, finding three owners who failed to disclose past criminal convictions on their application for SNAP authorization out of a sample of 212 owners (all three were later permanently disqualified for retailer trafficking).[214] In response, USDA-FNS agreed to

---

[207] U.S. Department of Agriculture, Office of the Inspector General, *Detecting Potential SNAP Trafficking Using Data Analysis*, Report 27901-0002-13, January 2017, https://www.usda.gov/oig/webdocs/27901-0002-13.pdf, pp. 3-8.

[208] January 2017 USDA-OIG report, p. 6.

[209] Section 205(c)(2)(C)(iii)(I) of the Social Security Act (codified at 42 U.S.C. §405(c)(2)(C)(iii)(I) and implemented at 7 C.F.R. §278.1(q)(3)).

[210] A data broker, or information broker, collects information on individuals from private and public records and provides access to this information to customers for a fee.

[211] Email from SNAP, USDA-FNS, January 5, 2017.

[212] U.S. Department of Agriculture, Office of the Inspector General, *Audit Report: Food Stamp Program Retailer Authorization and Store Visits*, Report No. 27601-15-AT, September 2008, pp. 6-8, https://www.usda.gov/oig/webdocs/27601-15-At.pdf.

[213] The III, or "triple-I", is a national database of individuals' criminal histories which can be used for individual criminal background checks. The III database is accessible through the system used to access the DOJ-FBI-NCIC and maintained by the FBI. The NCIC is the country's central repository for a range of criminal information, facilitating information flow between federal, state, and local law enforcement agencies. USDA-FNS, and other non-criminal justice agencies, do not have access to the NCIC, but can obtain NCIC data when authorized by statute and approved by the U.S. Department of Justice (DOJ). Although individuals may obtain their own NCIC records, agencies like USDA cannot compel individuals to submit their own NCIC records without statutory authority and DOJ approval.

[214] September 2008 USDA-OIG report, pp. 4-8.

initiate a proposed rulemaking action to require retailer applicants and currently authorized retailers deemed "high risk"[215] to provide USDA-FNS with a self-initiated background check.[216] However, USDA-FNS does not currently have the statutory authority to compel retailer applicants to submit background checks. As of the date of this report, this rulemaking action is "inactive" (see **Table B-1** in Appendix B).

## Additional Retailer Application Vulnerabilities Identified in 2012 and 2013 USDA-FNS Proposed Rules

The August 2012 and February 2013 USDA-FNS NPRMs contained four provisions addressing shortcomings in existing retailer application regulations. These proposed rules are currently "inactive" (see **Table B-1** in **Appendix B**). Proposed changes included the following:

**Retailers failing to report changes in ownership**—Currently, authorized retailers are required to report any changes in the ownership of their stores, but there is currently no penalty for noncompliance. To deter retailer noncompliance, USDA-FNS proposed to subject to a six-month disqualification any retailer that failed to report ownership changes to USDA-FNS within 10 days of the change.[217]

**Disqualified SNAP recipients applying to become SNAP-authorized retailers**—Under current SNAP rules, USDA-FNS may not deny the application of a retailer who was permanently disqualified from SNAP as a recipient for fraud on business integrity grounds. USDA-FNS proposed to add recipient fraud to the definition of business integrity standards, "because a person, who violates program rules as a recipient, lacks the necessary business integrity and responsibility expected of a store owner who must train employees and oversee operations to ensure that SNAP EBT transactions are conducted in accordance with Department rules."[218] Data matches with the USDA-FNS electronic Disqualified Recipient System (eDRS) are needed to determine whether individuals are disqualified from receiving SNAP benefits, and such matches rely on the use of individuals' SSNs; therefore, USDA-FNS would have difficulty implementing this provision due to statutory restrictions on allowable uses of applicant retailers' SSNs.[219]

**Illegal retailer-to-retailer transfers of SNAP authorization**—Authorized retailers are prohibited from transferring the SNAP authorization of their stores to a new owner in the event of a sale, and retailers are prohibited from accepting SNAP benefits without first applying for and obtaining SNAP authorization. Under current regulations, if a retailer sells the authorization and a retailer buyer uses it, USDA-FNS penalizes the buyer but not the seller.[220] To address illegal collusion on the part of the seller and curtail unauthorized SNAP redemptions, USDA-FNS

---

[215] When a store applies for authorization to participate in SNAP, USDA-FNS internally assigns that store a risk status (i.e., high, medium, or low) based on retailer trafficking data for the location and area. Stores with higher-risk statuses may be subjected by USDA-FNS to more rigorous authorization processes, including enhanced documentation requirements and more frequent inspections.

[216] July 2013 USDA-OIG report, pp. 10-14.

[217] February 2013 USDA-FNS NPRM, pp. 12249-12250.

[218] August 2012 USDA-FNS NPRM, p. 48464.

[219] Section 205(c)(2)(C)(iii)(I) of the Social Security Act (codified at 42 U.S.C. §405(c)(2)(C)(iii)(I) and implemented at 7 C.F.R. §278.1(q)(3)).

[220] The fine for unauthorized acceptance of SNAP benefits is $1,000 for each violation plus an amount equal to three times the face value of the illegally accepted SNAP benefits. Section 12(f) of the FNA (codified at 7 U.S.C. §2021(f) and clarified at 7 C.F.R. §278.6(m)).

proposed to subject the seller to two penalties: permanent SNAP retailer ineligibility (for all current and future stores) and a fine equal to that of the buyer (under current regulations).[221]

**Retailers' failure to pay fines, claims, or fiscal penalties**—Current SNAP regulations allow USDA-FNS, on the basis of business integrity, to deny or withdraw the authorization of retailers who fail to pay *certain* fiscal claims or fines.[222] USDA-FNS proposed to allow the agency to deny or withdraw the authorization of retailers who fail to pay *any* fine, claim, or fiscal penalty assessed against them under 7 C.F.R. §278 when such debts become delinquent.[223]

# Recipient Application Errors and Fraud

## Establish Federal Incentives to Conduct Pre-certification Investigations

In the June 2016 GAO report, GAO recommended that federal financial incentives should be restructured to encourage effective pre-certification investigations "because some investigative agencies were not rewarded for cost-effective, anti-fraud efforts that could prevent ineligible people from receiving benefits."[224] As this report noted, "when fraud by a recipient is discovered, the state may generally retain 35 percent of the recovered overpayment, but when a state detects potential fraud by an applicant and denies the application, there are no payments to recover."[225] According to FY2016 State Activity Report data,[226] about half of the state agencies dedicated minimal resources to pre-certification investigations.[227] The five state agencies that engaged in the most extensive pre-certification investigation activity represented 96% of these investigations despite serving only 32% of all SNAP participants in FY2016.[228] Together, the five states reported about $369 million in prevented improper federal expenditure through these efforts.[229] With incentives, it is possible that more states would dedicate resources to conducting pre-certification investigations to find error and fraud on a regular basis.

## Difficulties in Collecting Amounts Overpaid to or Trafficked by Recipients

As one might expect, it is challenging to recover overpayments from poor and near-poor households.[230] Establishing and collecting claims is the primary way that overpayments are recovered; and, while state agencies have improved the rate of claims establishment since

---

[221] February 2013 USDA-FNS NPRM.

[222] Section 9(a)(1)(D) of the FNA (codified at 7 U.S.C. §2018(a)(1)(D) and implemented 7 C.F.R. §278.1(k)(7)).

[223] February 2013 USDA-FNS NPRM.

[224] June 2016 GAO report, p. 9.

[225] Ibid., pp. 9-10.

[226] The following CRS calculations are based on state data from the FY2016 SAR, pp. 5-36. Calculations are based on total FY2016 issuance of $66,539,351,219 and average monthly participation of 44,219,363 persons.

[227] Of the 53 states that administer SNAP (including the District of Columbia, Guam, and the U.S. Virgin Islands), 19 states did not initiate pre-certification investigations in FY2016 (Alabama, Georgia, Guam, Hawaii, Idaho, Illinois, Louisiana, Maine, Massachusetts, Mississippi, Missouri, Montana, New Mexico, Oklahoma, Oregon, South Carolina, Tennessee, Texas, and Wyoming) and 7 states initiated fewer than 100 pre-certification investigations in FY2016 (Colorado, the District of Columbia, Maryland, Nebraska, North Dakota, South Dakota, and Vermont).

[228] These five states are California, Florida, Michigan, New York, and Pennsylvania.

[229] FY2016 SAR, pp. 23-37.

[230] About 41% of claims are collected through the Treasury Offset Program (TOP) and about 39% of claims are collected through recoupment (i.e., partial reduction of an active SNAP household's monthly benefit to gradually collect overpayments). The remaining collections are conducted through other methods. This CRS calculation is based on FY2016 SAR, p. 35.

FY2005, states' efforts to actually collect on these claims have not likewise improved. From FY2005 to FY2014:

- the total annual dollar value of claims established has increased from about 20% to about 28% of the total annual dollar value of estimated overpayments; this improvement indicates increased claims establishment activity by state agencies.

- the total annual dollar value of claims collected has remained around 16% of the total annual dollar value of estimated overpayments; this reflects persistent difficulties in claim collection.

**Figure 5** reflects these trends.

**Figure 5. Claims Established and Claims Collected as Shares of Estimated Dollars Overissued, FY2005-FY2014**



**Sources:** CRS graphic made using data from SNAP State Activity Reports and Annual Quality Control Reports.

**Notes:** Claims are not always established in the same year as the overpayment or trafficking occurs, and claims are not always collected in the same year that they were established. Totals for claims establishment and claims collection are actual amounts established and collected, while total overpayments are estimates calculated using the SNAP Quality Control review system.

This was a finding in the August 2014 GAO report and, furthermore, "[s]tates' difficulty collecting overpayments compounds their concerns about having adequate resources for investigations because some states use recovered overpayments for this purpose."[231] The GAO report did not provide strategies for how states might address this concern.

## Duplicate Enrollment and the National Accuracy Clearinghouse (NAC)

Individuals are not allowed to apply for or receive benefits from more than one state agency at a time. It is important to note, however, that duplicate enrollment may be indicative of either an

---

[231] August 2014 GAO report, p. 16.

error or fraud depending on the circumstances of the case. Duplicate enrollment (or "dual participation") results in a 10-year disqualification from SNAP if it is due to intentional fraud.[232]

Some state agencies detect duplicate enrollment through exchanging enrollment data with neighboring states. As of the October 2016 GAO report, Massachusetts and New York, for example, had such an arrangement.[233]

The National Accuracy Clearinghouse (NAC) is a significant effort to detect and prevent duplicate enrollment. The NAC was funded as a pilot by the U.S. Office of Management and Budget (OMB) Partnership for Program Integrity and Innovation from April 2013 until May 2015. The NAC gathers and analyzes SNAP state enrollment data from five participating states.[234] Since the conclusion of the pilot in May 2015, these five states have continued NAC operations. In practice, the NAC is another data match performed during certification. NAC matches are not considered verified upon receipt, so additional steps are necessary to confirm matches.[235]

An evaluation of NAC published in October 2015[236] documented several elements of NAC's performance, outcomes, and costs, including the following:[237]

- In May 2014, prior to implementation, 10,076 instances of duplicate enrollment across the five states were identified. One year later, in May 2015, duplicate enrollment in these five states had been reduced by almost 50% (5,464 instances identified).

- Using NAC is estimated to have prevented about $548,336 in monthly overpayments during the pilot year,[238] with monthly state agency work effort costs totaling $81,913 (resulting in about $6.69 in monthly overpayments prevented for every $1.00 spent monthly).[239]

- In the first year, using NAC produced an estimated annualized savings of $5,597,076 (less the $669,331 spent on one-time startup costs).

- Nationalizing NAC has been estimated to result in $114,072,753 in annual savings.

---

[232] Sections 6(j) and 11(e)(18) of the FNA (codified at 7 U.S.C. §2015(j) and §2020(e)(18)(A) and implemented at 7 C.F.R. §273.16(b)(5)).

[233] October 2016 GAO report, p. 22.

[234] These five states are Florida, Georgia, Alabama, Louisiana, and Mississippi.

[235] The most common outcome of this process is preventing *accidental* dual participation, a recipient error, when a household failed to report that it moved to a different state. For example, an applicant household resides in Mississippi and is deemed eligible for and receives SNAP in Mississippi. Halfway through the year, the household moves to Louisiana and applies for SNAP benefits there. When a match is detected through NAC, the ultimate result would be the closure of the household's SNAP case in Mississippi followed by certification in Louisiana.

[236] PCG Human Services, *National Accuracy Clearinghouse (NAC) Evaluation*, Final Report, October 2015, pp. 22-38, https://risk.lexisnexis.com/-/media/files/government/report/ b7de1d11976a4bdd82a039a8f272265busdareportonnac2016117614-pdf.pdf (hereinafter cited as "NAC October 2015 report"). PCG completed this evaluation under a contract with Mississippi Department of Human Resources. The following CRS calculations are based on data from this NAC October 2015 report.

[237] The following are CRS calculations based on data from the NAC October 2015 report.

[238] Total overpayments in FY2014 in these five states are estimated at about $200 million. This CRS calculation is based on data from the FY2014 QC report, p. 11.

[239] This estimate is based on a comparison of duplicate enrollment levels in these five states prior to implementation (September 2013 to May 2014) with levels in the last four months of the pilot (February 2015 to May 2015).

- Costs of setting up and utilizing NAC for the first year came to about $1,652,287 for all five participating states.[240] USDA-FNS provides federal matching funds for states' program administration costs, including costs of NAC participation.

During the 115th Congress, the House passed an emergency supplemental appropriations bill, which included a provision that would have required the expansion of NAC to all states (Section 3003 of H.R. 4667; however, this provision was not included in the emergency supplemental appropriations which became law (Bipartisan Budget Act of 2018, P.L. 115-123).[241]

## Considerations for Data Matching

As discussed earlier, states are required to conduct certain data matches to verify household application information, and many opt to include additional data sources. There are arguments for and against expanding states' use of additional data matches. While verifying household data to high-fidelity sources seems compelling, the use of matching to less authoritative data can require additional employee hours and might introduce the errors it seeks to prevent.

Implementing new data matches may require large upfront investments and ongoing costs to state agencies. Non-verified upon receipt data matches may necessitate additional manual follow-up, which can create even more cost and delay. As a result, state agencies prefer to use verified upon receipt data matches whenever possible. However, only one of the six federally required databases is considered verified upon receipt. In comments published in response to USDA-FNS rulemaking implementing the statutorily mandated data matches, some states pointed out that the implementation of these data matches is burdensome on state agencies while providing minimal cost avoidance due to the rarity of matches and the effort needed to verify them.[242] A range of anecdotal evidence also points to the limited return on investment for the non-verified upon receipt of federally mandated data matches.[243] In a 2017 series of USDA-OIG audits of five states' compliance with federal requirements for state agencies, USDA-OIG found that all five were improperly handling a mandatory SSA-PVS data match.[244] At least one state explicitly stated that it elected not to perform the mandatory match due to perceived low return on investment.[245]

---

[240] NAC October 2015 report, p. 22. Generally, USDA-FNS pays 50% of state agencies' costs for program administration.

[241] The FY2019 President's Budget also proposes to require all states to participate in NAC, estimating that this policy change would save $1.1 billion over 10 years (FY2019-FY2028). FY2019 USDA-FNS Budget Justification, http://www.obpa.usda.gov/32fns2019notes.pdf, p. "32-87."

[242] With respect to the mandating of the SSA-PVS for example, the New York state agency noted that it piloted use of the system prior to the December 2006 USDA-FNS NPRM and concluded that less than 1% of matches were useful, while the Iowa state agency noted that it implemented use of the system in June 2000 and, as of March 2007, had never had a single confirmed match through it.

[243] According to the October 2016 GAO report, p.19, 41 of the 51 state agencies surveyed (50 states plus D.C.) identified the work hours needed to verify data matches as moderately or extremely challenging, and 35 of the 51 surveyed identified the untimeliness of data matches as moderately or extremely challenging.

[244] This audit series focused on compliance with regulations at 7 C.F.R. §272. States audited include Washington, South Carolina, Pennsylvania, Nebraska, and Georgia.

[245] For Washington, USDA-OIG noted, "During our testing, WA DSHS [the state agency] acknowledged that the State agency does not perform matches against SSA's PVS at application and recertification. This occurred because WA DSHS believes the data from SSA's PVS is neither current nor reliable and instead uses data from the State's [Department of Corrections] DOC database to identify individuals who are incarcerated, which the State believes is more reliable." U.S. Department of Agriculture, Office of the Inspector General, *Washington's Compliance with SNAP Requirements for Participating State Agencies (7 CFR, Part 272)*, Audit Report 27601-0012-10, September 2017, p.

Some optional data matches are widely used and considered worthwhile by state agencies, while other verified upon receipt and useful non-verified upon receipt data matches are arguably underutilized. Although not federally mandated, SSA benefit program databases were utilized and considered useful by all state agencies surveyed in the October 2016 GAO report, because these data matches provide verified upon receipt data on unearned income. Matches with state systems that provide verified upon receipt data on eligibility and income were used by many, but not all, state agencies.[246] In some cases, statutory obstacles prevent using existing federal data sources, such as the Centers for Medicare and Medicaid Services (CMS) federal data services hub (the Hub), which consolidates various sources of earned and unearned income data matching.[247] Some state agencies were concerned that the same data match services are being paid for twice, once for SNAP and once for Medicaid, often for the same beneficiaries.[248] In 2017, certain states have piloted data sharing agreements to utilize these federal data services hubs for SNAP.[249]

Earned income may be especially difficult to verify through data matching, and the costs associated with these matches may be prohibitive.[250] Currently, state agencies contract individually with The Work Number, but USDA-FNS has proposed negotiating a single contract that would make the service available for all state agencies at a greatly reduced cost per match.[251] According to the October 2016 GAO report, USDA-FNS has not done enough to encourage state agencies to adopt best practices in data matching. This includes explaining technical improvements such as unifying data sources into a centralized portal (data brokering) and publicizing the methods and successes of pilot projects like NAC.

## State Agency Errors and Fraud

### Modifying State Involvement in the Quality Control System

The September 2015 USDA-OIG report stated that the primary vulnerability of the QC system was its "two-tier" structure.[252] USDA-OIG argued that because a state calculates its own SPER, it has the means to manipulate the outcome of the QC process, and because a state stands to benefit from a low SPER, it has the motive to commit this fraud. USDA-OIG recommended the adoption of a "one-tier" QC process conducted exclusively by USDA-FNS. USDA-FNS noted that a one-tier QC system could create additional federal cost.

---

11, https://www.usda.gov/oig/webdocs/27601-0012-10.pdf.

[246] This can include data matches of income (such as child support payments and unemployment insurance benefits) and eligibility (such as state department of corrections records of incarceration and state department of health records of death)—all of which are generally considered verified upon receipt. October 2016 GAO report, pp. 10-20.

[247] The Patient Protection and Affordable Care Act (ACA), the Privacy Act of 1974, the Fair Credit Reporting Act, and other statutes, as well as the current terms of certain CMS contracts with private databases, were all cited as preventing the full utilization of CMS's the Hub and other data sources for SNAP certification determinations. October 2016 GAO report, pp. 23-27.

[248] October 2016 GAO report, p. 24

[249] U.S. Government Accountability Office, *Federal Low-Income Programs: Eligibility and Benefits Differ for Selected Programs Due to Complex and Varied Rules*, GAO-17-558, June 2017, p. 38, https://www.gao.gov/assets/690/685551.pdf.

[250] According to the October 2016 GAO report, p. 27, costs associated with data matches, especially private data match services like The Work Number, limited state agency usage of systems that they considered effective in preventing overpayments, with 34 of the 42 respondents identifying upfront costs and 30 of the 42 respondents identifying ongoing costs as challenging.

[251] October 2016 GAO report, pp. 27-33.

[252] September 2015 USDA-OIG report, p. 10.

# Appendix A. Glossary of Abbreviations

| | |
|---|---|
| **ACF** | Administration for Children and Families (HHS) |
| **AE** | agency error |
| **ALERT** | Anti-Fraud Locator using EBT Retailer Transactions (USDA-FNS) |
| **APT** | Application Processing Timeliness (USDA-FNS-SNAP) |
| **AR** | administrative review |
| **CAP** | corrective action plan |
| **CAPER** | Case and Procedural Error Rate (USDA-FNS-SNAP) |
| **CMS** | Centers for Medicare & Medicaid Services (HHS) |
| **DHS** | U.S. Department of Homeland Security |
| **DMF** | Death Master File (see DMS) |
| **DMS** | Deceased Matching System (see DMF) |
| **DOJ** | U.S. Department of Justice |
| **EBT** | Electronic Benefit Transfer |
| **eDRS** | electronic Disqualified Recipient System (USDA-FNS-SNAP) |
| **FAD** | final agency determination |
| **FBI** | Federal Bureau of Investigations (DOJ) |
| **FDPIR** | Food Distribution Program on Indian Reservations (USDA-FNS) |
| **FNA** | Food and Nutrition Act of 2008 |
| **FNS** | Food and Nutrition Service (USDA) |
| **GAO** | Government Accountability Office |
| **GSA** | General Services Administration |
| **HHS** | U.S. Department of Health and Human Services |
| **IEVS** | Income and Eligibility Verification System |
| **IHE** | inadvertent household error |
| **III** | Interstate Identification Index (DOJ-FBI) |
| **IPV** | intentional program violation |
| **JR** | judicial review |
| **LOC** | letter of credit |
| **ME** | management evaluation |
| **NAC** | National Accuracy Clearinghouse (USDA-FNS-SNAP) |
| **NCIC** | National Crime Information Center (DOJ-FBI) |
| **NDNH** | National Directory of New Hires (HHS-ACF) |
| **NPER** | National Payment Error Rate (USDA-FNS-SNAP) |
| **NPRM** | notice of proposed rulemaking |
| **OASDI** | Old-Age, Survivors, and Disability Insurance (SSA) |
| **OIG** | Office of the Inspector General |
| **OMB** | Office of Management and Budget |
| **OPM** | Office of Personnel Management |
| **PARIS** | Public Assistance Reporting Information System (HHS-ACF) |
| **PDQ** | permanent disqualification |
| **POS** | point of sale |
| **PVS** | Prisoner Verification System (SSA) |
| **QC** | Quality Control |
| **RIN** | Regulatory Identification Number |

ER-0290

AR.07963

| | |
|---|---|
| **SA** | state agency |
| **SAM** | System for Award Management (GSA) |
| **SAR** | State Activity Report (USDA-FNS-SNAP) |
| **SARC** | Semiannual Report to Congress (USDA-OIG) |
| **SAVE** | Systematic Alien Verification for Entitlements (DHS-USCIS) |
| **SLEB** | state law enforcement bureau |
| **SNAP** | Supplemental Nutrition Assistance Program (USDA-FNS) |
| **SPER** | State Payment Error Rate (USDA-FNS-SNAP) |
| **SSA** | Social Security Administration |
| **SSI** | Supplemental Security Income (SSA) |
| **SSN** | Social Security Number (SSA) |
| **TANF** | Temporary Assistance for Needy Families (HHS) |
| **TCP** | Trafficking Civil Penalty |
| **TOCMP** | Transfer of Ownership Civil Money Penalty |
| **TPP** | third-party processor |
| **UA** | Unified Agenda |
| **UIB** | unemployment insurance benefits |
| **UPV** | unintentional program violation (see IHE) |
| **USCIS** | U.S. Citizenship and Immigration Services (DHS) |
| **USDA** | U.S. Department of Agriculture |
| **VA** | U.S. Department of Veteran Affairs |
| **VUR** | verified upon receipt |
| **WIC** | Special Supplemental Nutrition Program for Women, Infants, and Children |

# Appendix B. "Inactive" USDA-FNS Rules

In the last 10 years, the U.S. Department of Agriculture Food and Nutrition Service (USDA-FNS) had started to draft new rules in response to direction in federal law and USDA Office of the Inspector General (USDA-OIG) audit findings, and at their own initiative. Currently, none of the regulatory initiatives discussed in this appendix have been completed. Before USDA-FNS's actions were suspended, they were in various stages of the regulatory process, which occurs as follows:

In order to codify a federal regulation in the Code of Federal Regulations (C.F.R.), the following steps must generally be completed:

- a regulatory work plan must be submitted to the Office of Management and Budget (OMB) and OMB must assign the rulemaking action a Regulatory Identification Number (RIN), adding the RIN to OMB's Unified Agenda (UA);[253]

- a notice of proposed rulemaking (NPRM) generally must be published by the rulemaking agency in the *Federal Register* (FR) with a comment period open to the public; and

- the rulemaking agency must consider the comments, make necessary changes to the rulemaking action, and then publish the final rule in the FR.

Along with other rulemaking actions, USDA rules had been in a "pending" status and had not been made available to the public.[254] The Trump Administration made these rules public in July 2017 and termed them "inactive."[255]

**Table B-1. Inactive USDA-FNS Rulemaking Actions Related to SNAP Integrity**

| RIN | Full Title | First in UA | Proposed | Cited in Report as |
|---|---|---|---|---|
| 0584-AE22[a] | Supplemental Nutrition Assistance Program: Suspension of SNAP Benefit Payments to Retailers | 2012 | 02/22/2013 78 FR 12245 | February 2013 USDA-FNS NPRM |
| 0584-AD88[b] | Supplemental Nutrition Assistance Program: Farm Bill of 2008 Retailer Sanctions | Spring 2009 | 08/14/2012 77 FR 48461 | August 2012 USDA-FNS NPRM |
| 0584-AE37[c] | Modernizing Supplemental Nutrition Assistance Program (SNAP) Benefit Redemption Systems | Spring 2015 | n/a | USDA-FNS Benefit Redemption Modernization Rule |
| 0584-AE46[c] | Supplemental Nutrition Assistance Program: Definition of "Benefit" as it Pertains to Retail Owners | Fall 2016 | n/a | USDA-FNS Definition of Benefit Rule |

---

[253] The UA is a government-wide publication of upcoming regulations and is generally published twice each year on https://www.reginfo.gov.

[254] The "pending" list included rules that were not actively being worked on by the agencies.

[255] See CRS Report R45032, *The Trump Administration and the Unified Agenda of Federal Regulatory and Deregulatory Actions*, by Maeve P. Carey and Kathryn A. Francis.

ER-0292

AR.07965

| RIN | Full Title | First in UA | Proposed | Cited in Report as |
|---|---|---|---|---|
| 0584-AE47[c] | Supplemental Nutrition Assistance Program: National Crime Information Center Background Check Requirement for Retailer Authorization and Reauthorization | Fall 2016 | n/a | USDA-FNS Background Check Rule |
| 0584-AD98 | Supplemental Nutrition Assistance Program: Major System Failures | Fall 2009 | 08/18/2011 76 FR 51274 | n/a |

**Source:** Follow the FR links to view the proposed rules. The full inactive list is available online at https://www.reginfo.gov/public/jsp/eAgenda/InactiveRINs_2017_Agenda_Update.pdf.

a.  See https://www.federalregister.gov/documents/2013/02/22/2013-04037/supplemental-nutrition-assistance-program-suspension-of-snap-benefit-payments-to-retailers. For the history of this RIN, see https://www.reginfo.gov/public/do/eAgendaViewRule?RIN=0584-AE22.

b.  For the history of this RIN, see https://www.reginfo.gov/public/do/eAgendaViewRule?RIN=0584-AD88; https://www.federalregister.gov/documents/2012/08/14/2012-19773/supplemental-nutrition-assistance-program-farm-bill-of-2008-retailer-sanctions.

c.  This RIN appears on the OMB inactive list; see https://www.reginfo.gov/public/jsp/eAgenda/InactiveRINs_2017_Agenda_Update.pdf.

# Appendix C. Optional Income Data Matches

Data matching is used during the SNAP certification process to help make SNAP eligibility determinations and, if appropriate, designate the benefit allotment amounts for applicant households. In addition to the mandatory data matches discussed earlier in this report, states have many additional federal, state, and local data sources that they might use to verify household income data. This appendix lists some additional data matches that are discussed in related audit reports and state-specific policy manuals. Their verified upon receipt status varies.

## Optional Federal Income Data Matches[256]

- Social Security Administration (SSA) Benefit Programs Databases[257]—State agencies can match with SSA databases to verify an applicant's unearned income from these SSA programs.[258] These are verified upon receipt data matches. They are conducted and considered moderately or extremely useful by 51 of the 51 state agencies surveyed (50 states plus D.C.) in October 2016.

- SSA Beneficiary Earnings Exchange Record (BEER)—State agencies can match with SSA-BEER to verify income based on Internal Revenue Service (IRS) earnings and tax data. This is a non-verified upon receipt data match. It is conducted by 24 of the 51 state agencies and considered moderately or extremely useful by only 10 of those using it.

- U.S. Department of Health and Human Services Administration for Children and Families (HHS-ACF) Public Assistance Reporting Information System (PARIS)[259]—State agencies can match with HHS-ACF-PARIS to verify an applicant's earned and unearned income from public assistance and federal employment or retirement. These are non-verified upon receipt data matches. The HHS-ACF-PARIS Interstate Match File is conducted by 40 of the 51 state agencies and considered moderately or extremely useful by 31 of those using it. The HHS-ACF-PARIS Federal/VA File matches are conducted by 31 of the 51 state agencies and considered moderately or extremely useful by 20 of those using them.

- The Work Number—State agencies can match with this commercial verification service operated by Equifax, Inc. (for a fee) to obtain payroll information from participating retailers (covering about 35%-40% of working population) to verify an applicant's earned income. This is a non-verified upon receipt data match. It is used by 45 of the 51 state agencies and considered moderately or extremely useful by 43 of those using it.

---

[256] All survey numbers are from the October 2016 GAO report, cited elsewhere in this report, https://www.gao.gov/assets/690/680535.pdf.

[257] SSA benefit programs covered include Old Age, Survivors, and Disability Insurance (OASDI), Retirement Survivors and Disability Insurance (RSDI), and Supplemental Security Income (SSI).

[258] SSA databases for these programs that are used include the State On-Line Query (SOLQ), State Verification and Exchange System (SVES), Beneficiary and Earnings Data Exchange (BENDEX), and State Data Exchange (SDX).

[259] The HHS-ACF-PARIS Interstate Match File compiles public assistance beneficiary information from states, HHS-ACF-PARIS Veterans Affairs (VA) File includes VA beneficiary information, and the HHS-ACF-PARIS Federal File includes military and federal employees' and retirees' wage and retirement information gathered from Department of Defense (DOD) and Office of Personnel Management (OPM).

- HHS-ACF National Directory of New Hires (NDNH) Unemployment Insurance and Quarterly Wage Files—These data matches are distinct from the mandatory HHS-ACF-NDNH New Hire File match. The Unemployment Insurance File compiles information from state workforce agencies regarding unearned income, and the Quarterly Wage File compiles information from state workforce agencies regarding earned income. These are non-verified upon receipt data matches. The former is used by 9 of the 51 state agencies and the latter by 4 of the 51.

## Optional State Income Data Matches[260]

- State Unemployment Insurance Benefits (UIB) Database—State agencies can match with state workforce agencies that administer UIB to verify applicants' unearned income. This is generally a verified upon receipt data match. It is conducted by 49 of the 51 state agencies surveyed in October 2016 and considered moderately or extremely useful by 48 of those using it.

- Child Support Payments Database—State agencies can match with state human or social services agencies that administer and enforce child support payments to verify applicants' unearned income. This is generally a verified upon receipt data match. It is conducted by 47 of the 51 state agencies and considered moderately or extremely useful by 46 of those using it.

- State Wage Information Collection Agency (SWICA) Database—State agencies can match with SWICAs that gather quarterly wage and new hire data from employers to verify applicants' earned income. This is the state equivalent of the HHS-ACF-NDNH. These are non-verified upon receipt data matches. The former is conducted by 45 of the 51 state agencies and considered moderately or extremely useful by 31 of those using it; the latter is conducted by 36 of the 51 state agencies and considered moderately or extremely useful by 23 of those using it.

- State Day Care License Database—State agencies can match with state human or social services agencies that license day care workers and facilities to verify applicants' earned income. This is generally a verified upon receipt data match. It is conducted by 11 of the 51 state agencies.

- State Taxpayer Database—State agencies can match with state taxation agencies to verify applicants' unearned and earned income. This is generally a verified upon receipt data match. It is conducted by 7 of the 51 state agencies.

- Database of Income Verified by Other State Programs—State agencies can match with state human or social services agencies that administer other means-tested programs[261] to verify applicants' unearned and earned income. This is generally a verified upon receipt data match. It is conducted by 42 of the 51 state agencies and considered moderately or extremely useful by 38 of those using it.

---

[260] All survey numbers are from the October 2016 GAO report.

[261] These include TANF, old age pensions, aid to the disabled, state SSI supplement, etc.

ER-0295

AR.07968

# Appendix D. Trends in Retailer Trafficking and Convenience Store Participation in SNAP

The following three tables include CRS calculations based on data from U.S. Department of Agriculture Food and Nutrition Service (USDA-FNS) Retailer Management Reports, the last three Retailer Trafficking Studies, and other agency sources. **Table D-1** compares the growth in total stores participating in SNAP with the growth of convenience stores ("c-stores") participating in the program. From FY2007 to FY2016, convenience stores have grown from about 36% of all stores in the program to about 46%.

**Table D-1. Convenience Stores as a Percentage of All Stores in SNAP**

| Year | C-Stores | Change in C-Stores | All Stores | Change in All Stores | C-Stores as a Percentage of All Stores |
|------|----------|--------------------|------------|----------------------|----------------------------------------|
| FY2007 | 58,669 | — | 162,672 | — | 36.07% |
| FY2008 | 61,968 | +5.62% | 172,094 | +5.79% | 36.01% |
| FY2009 | 66,809 | +7.81% | 190,334 | +10.60% | 35.10% |
| FY2010 | 78,754 | +17.88% | 212,834 | +11.82% | 37.00% |
| FY2011 | 87,857 | +11.56% | 227,190 | +6.75% | 38.67% |
| FY2012 | 96,769 | +10.14% | 242,325 | +6.66% | 39.93% |
| FY2013 | 101,059 | +4.43% | 248,666 | +2.62% | 40.64% |
| FY2014 | 105,742 | +4.63% | 256,670 | +3.22% | 41.20% |
| FY2015 | 106,531 | +0.75% | 254,593 | -0.81% | 41.84% |
| FY2016 | 117,591 | +10.38% | 255,931 | +0.53% | 45.95% |

**Source:** USDA-FNS data from annual Retailer Management Reports, https://www.fns.usda.gov/snap-retailer-data; and email from SNAP, USDA-FNS, January 5, 2018.

The *national retailer trafficking rate* represents the proportion of SNAP benefits redeemed that were trafficked at stores, and the *national store violation rate* represents the proportion of authorized stores that were estimated to have engaged in trafficking. **Table D-2** compares these two rates for all stores with these rates for convenience stores. Across the nine years examined in the three studies, the convenience store retailer trafficking rates have been more than 1000% of the national retailer trafficking rates, and the convenience store violation rates have been more than 150% of the national store violation rates.

**Table D-2. Trafficking Rates in Convenience Stores Compared to the National Trafficking Rates**

| Report Years | National Retailer Trafficking Rate | C-Store Retailer Trafficking Rate | National Store Violation Rate | C-Store Violation Rate |
|--------------|-----------------------------------|-----------------------------------|-------------------------------|------------------------|
| 2006-2008 | 1.03% | 12.93% | 8.25% | 15.52% |
| 2009-2011 | 1.34% | 14.07% | 10.47% | 17.68% |
| 2012-2014 | 1.50% | 17.67% | 11.82% | 19.42% |

**Source:** USDA-FNS data from Retailer Trafficking Studies, https://www.fns.usda.gov/report-finder.

**Table D-3** displays data regarding the convenience store share of total redemptions and data regarding the estimated convenience store share of total trafficking. Across the nine years examined in these three studies, convenience stores' shares of redemptions have not exceeded 5% of total redemptions and convenience store shares of trafficking have averaged more than half of total trafficking.

**Table D-3. Convenience Store Redemptions and Trafficking as a Percentage of All Redemptions and Trafficking**

| Report Years | C-Store Redemptions as % of Total Redemptions | C-Store Trafficking as % of Total Trafficking |
|---|---|---|
| 2006-2008 | 4.05% | 50.91% |
| 2009-2011 | 4.38% | 45.80% |
| 2012-2014 | 4.84% | 57.24% |

**Source:** USDA-FNS data from Retailer Trafficking Studies, https://www.fns.usda.gov/report-finder.

ER-0297

# Appendix E. Payment Error Rate Information

This appendix provides a state-by-state summary of payment-error related data from FY2010-FY2014, including state payment error rates (SPERs), high-performance bonuses, and liabilities for low performance. **Table E-1** shows the states' annual rates and whether the state received an award or a sanction, while **Table E-2** displays the amounts of awards and sanctions. Using Alabama as an example, according to the first table the state received a bonus in FY2012 based on a 1.85% SPER, and according to the second table that award amount was approximately $1.9 million.

## Table E-1. State Payment Error Rates, FY2010 to FY2014

| State | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 |
|---|---|---|---|---|---|
| Alabama | 3.75% | 5.10% | 1.85% (+) | 1.70% | 2.03% |
| Alaska | **2.15% (+)** | **0.76% (+)** | **1.07% (+)** | **1.27% (+)** | 0.89% (+) |
| Arizona | 6.69% (-)‡ | 6.34% (-)‡ | 5.60% (-) | 5.48% (-) | 5.18% (-) |
| Arkansas | 5.64% | 5.79% (-) | 4.76% (-) | 4.34% | 5.58% |
| California | 4.81% | 4.58% | 3.98% | 3.63% | 5.13% |
| Colorado | 3.18% | 4.45% | 4.55% | 5.59% (-) | 4.26% |
| Connecticut | 7.66% ‡ | 6.46% (-)‡ | 5.99% (-) | 7.13% (-)‡ | 5.84% (-) |
| District of Columbia | 4.47% | 3.03% | 3.91% | 6.87% (-)‡ | 7.38% (-)‡ |
| Delaware | 1.52% (+) | 2.53% (+) | 3.41% | 3.53% | 2.78% |
| Florida | 0.78% (+) | 0.87% (+) | 0.77% (+) | 0.81% (+) | 0.42% (+) |
| Georgia | 1.99% (+) | 2.71% | 3.18% | 5.11% | 6.49% (-) |
| Guam | 5.42% | 6.25% (-)‡ | 7.33% (-)‡ | 6.65% (-)‡ | 7.08% (-)‡ |
| Hawaii | 3.04% | 3.37% | 4.84% | 4.39% | 4.13% |
| Idaho | 3.32% | 2.52% (+) | 2.49% | 1.86% | 2.74% |
| Illinois | 1.70% (+) | 3.15% | 1.74% (+) | 4.27% | 5.27% |
| Indiana | 2.60% (+)* | 3.29% | 3.02% | 3.72% | 4.76% |
| Iowa | 3.36% | 3.97% | 3.43% | 4.12% | 4.60% |
| Kansas | 4.79% | 5.00% | 5.45% | 3.99% | 0.75% (+) |
| Kentucky | 4.09% | 4.50% | 4.93% | 5.78% (-) | 6.00% (-) |
| Louisiana | 5.03% | 3.97% | 1.45% (+) | 1.44% (+) | 1.55% |
| Maine | 3.49% | 3.28% | 2.16% | 2.48% | 2.52% |
| Maryland | 7.68% (-)‡ | 6.06% (-)‡ | 3.40% (+)* | 2.12% | 3.41% |
| Massachusetts | 5.90% | 4.40% (+)* | 4.03% | 2.87% | 5.09% |
| Michigan | 3.31% | 3.12% | 3.55% | 2.70% | 2.99% |
| Minnesota | 4.76% | 5.02% | 5.07% | 4.08% | 6.87% ‡ |
| Mississippi | 1.92% (+) | 2.83% | 2.10% | 1.48% (+) | 1.16% (+) |
| Missouri | 5.65% (-) | 5.88% (-) | 7.18% (-)‡ | 1.62% (+)* | 1.50% |
| Montana | 4.12% | 3.10% | 2.71% | 6.00% | 7.25% (-)‡ |

| State | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 |
|---|---|---|---|---|---|
| Nebraska | 3.52% | 4.50% | 3.19% | 2.87% | 2.98% |
| Nevada | 6.57% ‡ | 6.29% (-)‡ | 6.01% (-)‡ | 5.51% (-) | 7.61% (-)‡ |
| New Hampshire | 5.31% | 4.82% | 5.09% | 3.82% | 4.72% |
| New Jersey | 4.62% | 4.33% | 3.49% | 1.32% (+) | 1.43% |
| New Mexico | 4.50% | 4.35% | 3.73% | 4.55% | 6.22% (-)‡ |
| New York | *5.51%* | 4.32% | 5.09% | 4.79% (-) | 5.23% (-) |
| North Carolina | 2.70% | 2.65% (+) | 2.32% | 4.75% | 4.98% (-) |
| North Dakota | 4.38% | 4.34% | 2.94% | 2.30% | 1.73% |
| Ohio | 3.31% | 3.40% | 3.39% | 4.12% | 4.67% |
| Oklahoma | 4.22% | 3.94% | 4.94% | 3.99% | 5.58% |
| Oregon | 4.88% | 3.99% | 4.66% | 4.17% | 5.11% |
| Pennsylvania | 3.93% | 3.30% | 3.08% | 3.56% | 4.27% |
| Rhode Island | 5.98% | 7.89% (-)‡ | 7.36% (-)‡ | 8.25% (-)‡ | 5.97% (-/+)* |
| South Carolina | *5.14%* | 3.14% (+)* | 1.59% (+) | 1.75% | 1.09% (+) |
| South Dakota | 1.31% (+) | 1.59% (+) | 1.37% (+) | 0.99% (+) | 1.26% |
| Tennessee | 4.39% | *5.46%* | 3.25% | 1.32% (+) | 1.08% (+) |
| Texas | 2.13% (+) | 3.48% | 3.63% | 1.44% (+) | 0.63% (+) |
| Utah | 4.33% | 4.19% | 2.39% | 2.11% | 2.79% |
| Vermont | 6.59% ‡ | 8.53% (-)‡ | 6.96% (-)‡ | 9.66% (-)‡ | 2.76% (+)* |
| Virgin Islands | 3.10% | 4.77% | 4.20% | 3.58% | 3.18% |
| Virginia | *5.87%* | **3.41% (+)*** | **1.76% (+)** | **0.44% (+)** | 4.73% |
| Washington | 3.30% | 3.81% | 2.49% | 1.71% | 0.77% (+) |
| West Virginia | 7.14%‡ | 6.31% (-)‡ | 7.06% (-)‡ | 5.24% (-) | 4.90% |
| Wisconsin | **1.97% (+)** | **2.02% (+)** | 2.07% (+) | 2.40% | 2.55% |
| Wyoming | 4.76% | 9.63% ‡ | 7.18% (-)‡ | 4.99% (-/+)* | 5.19% |
| NPER | 3.81% | 3.80% | 3.42% | 3.20% | 3.66% |

**Source:** USDA-FNS data, https://www.fns.usda.gov/pd/snap-quality-control-annual-reports.

**Notes:**

(+) represents years in which states were awarded a high-performance bonus for the years' best state payment error rates (SPERs).

* represents years in which states were awarded a high-performance bonus for the years' most improved SPERs.

(-) represents years in which states were assessed liabilities for SPERS that exceed Quality Control standards.

(+/-) represents years in which states were awarded a high-performance bonus for most improved payment error rate, but still incurred a liability.

‡ represents years in which states' SPERs exceeded the liability threshold of 6%.

Italicized figures represent years in which states' SPERs exceeded the liability level (105% of the national payment error rate).

Bold figures represent years in which states' SPERs were fraudulently misreported (according to U.S. Department of Justice (DOJ) settlement documents, as these SPERs are associated with DOJ False Claims Act cases).

**Table E-2. State Bonuses and Liabilities, FY2010 to FY2014**

In thousands of dollars

| State | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 |
|---|---|---|---|---|---|
| Alabama | – | – | +$1,898 | – | – |
| Alaska | **+$233** | **+$290** | **+$266** | **+$236** | +$247 |
| Arizona | -$1,096 | -$561 | -$0 | -$0 | -$0 |
| Arkansas | LLE | -$0 | -$0 | – | LLE |
| California | – | – | – | – | – |
| Colorado | – | – | LLE | -$0 | – |
| Connecticut | LLE | -$298 | -$0 | -$800 | -$0 |
| District of Columbia | – | – | – | LLE | -$307 |
| Delaware | +$321 | +$435 | – | – | – |
| Florida | +$6,084 | +$9,088 | +$8,072 | +$7,015 | +$7,742 |
| Georgia | +$3,077 | – | – | LLE | -$1,386 |
| Guam | LLE | -$26 | -$151 | -$77 | -$117 |
| Hawaii | – | – | – | LLE | – |
| Idaho | – | +$622 | – | – | – |
| Illinois | +$3,484 | – | +$4,092 | – | LLE |
| Indiana | +$1,619* | – | – | – | – |
| Iowa | – | – | – | – | – |
| Kansas | LLE | – | LLE | – | +$628 |
| Kentucky | – | – | LLE | -$0 | -$0 |
| Louisiana | LLE | – | +$1,946 | +$1,614 | – |
| Maine | – | – | – | – | – |
| Maryland | -$1,475 | -$62 | +$1,674* | – | – |
| Massachusetts | LLE | +$2,522* | – | – | LLE |
| Michigan | – | – | – | – | – |
| Minnesota | – | – | LLE | – | LLE |
| Mississippi | +$1,182 | – | – | +$1,185 | +$1,302 |
| Missouri | -$0 | -$0 | -$1,725 | +$1,656* | – |
| Montana | – | – | – | LLE | -$220 |
| Nebraska | – | – | – | – | – |
| Nevada | LLE | -$144 | -$5 | -$0 | -$870 |
| New Hampshire | – | – | LLE | – | – |
| New Jersey | – | – | – | +$1,638 | – |
| New Mexico | – | – | – | LLE | -$138 |
| New York | LLE | – | LLE | -$0 | -$0 |
| North Carolina | – | +$4,079 | – | LLE | -$0 |

ER-0300

| State | FY2010 | FY2011 | FY2012 | FY2013 | FY2014 |
|---|---|---|---|---|---|
| North Dakota | – | – | – | – | – |
| Ohio | – | – | – | – | – |
| Oklahoma | – | – | LLE | – | LLE |
| Oregon | – | – | LLE | – | – |
| Pennsylvania | – | – | – | – | – |
| Rhode Island | LLE | -$519 | -$394 | -$683 | -$0 / +$502* |
| South Carolina | LLE | +$2,218* | +$1,892 | | +$1,672 |
| South Dakota | +$275 | +$336 | +$297 | +$261 | – |
| Tennessee | – | LLE | – | +$2,456 | +$2,687 |
| Texas | +$6,243 | – | – | +$6,056 | +$6,497 |
| Utah | – | – | – | – | – |
| Vermont | LLE | -$341 | -$136 | -$549 | +$293* |
| Virgin Islands | – | – | – | – | – |
| Virginia | LLE | **+$2,304*** | **+$2,021** | **+$1,724** | – |
| Washington | – | – | – | – | +$2,428 |
| West Virginia | LLE | -$154 | -$530 | -$0 | – |
| Wisconsin | **+$1,484** | **+$2,106** | +$1,842 | – | – |
| Wyoming | – | LLE | -$61 | -$0 / +$158* | – |

**Source:** SNAP Quality Control Annual Reports FY2010 to FY2014; https://www.fns.usda.gov/pd/snap-quality-control-annual-reports.

**Notes:**

+$ represents high-performance bonuses awarded to states for the years' best state payment error rates (SPERs).

* represents years in which states were awarded a high-performance bonus for the years' most improved SPERs.

-$ represents liability amounts assessed against states for SPERS that exceed QC standards; if a state exceeded the liability level for two consecutive years but did not exceed the liability threshold of 6%, they were assessed a $0 liability (value noted as "-$0").

-$/+$ represents years in which states were awarded a high-performance bonus for most improved payment error rate, but still incurred a liability.

LLE (liability level exceeded) represents the first year that the liability level was exceeded by a state.

Bold figures represent years in which states' SPERs were fraudulently misreported (according to U.S. Department of Justice (DOJ) settlement documents, as these SPERs are associated with DOJ False Claims Act cases).

ER-0301

AR.07974

## Author Contact Information

Randy Alison Aussenberg
Specialist in Nutrition Assistance Policy
raussenberg@crs.loc.gov, 7-8641

## Acknowledgments

Daniel R. Cline, formerly a Research Associate with CRS, researched and authored the original version of this report. Jameson A. Carter, a Research Assistant in CRS's Domestic Social Policy division, assisted with this report's data and figures.

# Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers

*Ryan Devereauxryan.devereaux@theintercept.com@rdevro*

<u>In the first months</u> of Donald Trump's presidency, senior administration and U.S. Immigration and Customs Enforcement officials embarked on an ambitious plan to deal with undocumented children crossing the border alone. Reasoning that most of the kids made their way into the U.S. only after their parents or family members paid a smuggler to facilitate the journey, the officials decided to cut the migration off at its source: by arresting the parents and family members.

By late April, top officials in the Trump government were [already hinting](#) at the emerging strategy in public appearances. Meanwhile, behind the scenes, ICE was drafting a detailed plan laying out how it would work. The end result was a document that, nearly two years later, offers new insight into an enforcement initiative that was the precursor to one of the darkest episodes of the Trump administration: the forced separation of thousands of migrant children from their parents on the U.S. border with Mexico.



[Read Our Complete Coverage](#)[The War on Immigrants](#)

Included among hundreds of pages of documents produced by ICE's Homeland Security Investigations, or HSI, and shared with The Intercept, the release of ICE's six-page "[concept of operations](#)" was the result of litigation the American Immigration Council — in collaboration with the Florence Immigrant and Refugee Rights Project, the National Immigrant Justice Center, Kids in Need of Defense, Women's Refugee Commission, and Wilmer Cutler Pickering Hale and Dorr LLP — is engaged in to secure the release of materials detailing the creation, implementation, and fallout of family separation.

The now-released May 5, 2017 plan details the creation of a "90- to 120-day operation" targeting criminal organizations involved in the smuggling of unaccompanied children, "with an emphasis on the identification, investigation, and arrest of human smuggling facilitators, including, but not limited to, parents and family members." Noting that the number of unaccompanied children coming

AR.07992

into the country decreased from a high in 2014, the plan nonetheless justified itself on the assertion that smuggling organizations "have yet to be held accountable."

"Since parents and sponsors have not been held accountable for their role, there is no deterrent for complying with U.S. immigration laws," the plan said, adding that "approximately 90 percent" of unaccompanied minors "are eventually turned over to a family member."

The initiative would be a collaboration between HSI, ICE's powerful investigative wing, and Enforcement and Removal Operations, the side of ICE responsible for deportations. The plan additionally called for coordination with the Department of Justice and the Department of Health and Human Services, as well as multiphase strategies to deal with Congress and the press.

On the ground, the initiative involved interviewing unaccompanied children to determine whether their mothers or fathers, or other family members, could be arrested. Once arrest operations were set in motion, ICE would grant itself the authority to take into custody any deportable immigrants encountered along the way (what ICE refers to as "collateral arrests").

In theory, the entire process — from the moment the child was first encountered to the time their family members were identified, surveilled, interviewed, and arrested — would take no more than 72 hours. ICE would gather several "metrics" as it pressed forward with the initiative, including the number of criminal, administrative, and collateral arrests made, and the value of any assets seized in the operations. The number of cases the DOJ declined to prosecute would also be tracked, as would the number of "gang members/affiliates" taken into custody.

ICE put an additional emphasis on tracking the effect the initiative would have on deterring migrants from making the journey north by monitoring "intelligence and open-source reporting identifying the changes in the alien's perception of the ability to enter and remain in the United States illegally."



ER-0305

AR.07994

From left, U.S. Border Patrol Acting Chief Carla Provost, Immigration and Customs Enforcement Executive Associate Director of Enforcement and Removal Operations Matthew Albence, commander of the U.S. Public Health Service Commissioned Corps Commander Jonathan White, and U.S. Justice Department Executive Office for Immigration Review Director James McHenry are sworn in before testifying to the Senate Judiciary Committee on July 31, 2018.

Photo: Chip Somodevilla/Getty Images

## A "Surge Initiative"

By June 2017, the operation was underway. In a June 12 email, an HSI "Intelligence Research Specialist" described the initiative as a "high" priority coming from headquarters. The specialist noted that the initiative was unfolding in three phases.

During phase one, HSI investigators would determine the final destination of a migrant child in government custody, identify their parents or guardians, then "develop target folders of the parents/guardians." During phase two, HSI agents would perform so-called knock and talk visits to the family's home and "determine the identities of the parents/guardians." The parents or guardians would be interviewed during phase three of the initiative, and "[i]f determined that the parents/guardians did pay smugglers to smuggle their children through the border, then HSI agents will develop warrants of prosecution."

With the initiative designed to last no more than a few months, its eventual end came as a disappointment to some senior administration officials.

In a December 2017 memo later leaked to Sen. Jeff Merkley's office by a government whistleblower, a central architect of the Trump administration's most hard-line immigration policies named Gene Hamilton offered comments on a range of policy proposals to respond to the "surge of illegal immigration" at the border. Hamilton's first comment, included in the margins of the memo, referenced "one option that isn't listed here, but should be: prosecuting those in the United States who conspire or otherwise facilitate the illegal entry into the United States." He pointed to a "fairly good initiative over the summer" that "got close to zero press."

"Not enough cases were accepted for criminal prosecution," Hamilton wrote. "We need a concerted six-month campaign — involving coordination between DHS, DOJ, and HHS. The whole of government needs to take a zero tolerance policy to the smuggling of minors into the United States (all aliens, of course, but especially minors)."

While the campaign to hunt down the parents of children fleeing some the most violent countries in the world did not generate the positive coverage Hamilton hoped for, it did attract attention. The same month that Hamilton lamented the end of the initiative, a coalition of immigrant rights organizations sent a letter to the heads of the Department of Homeland Security's top oversight offices; they criticized a "surge initiative" in immigration enforcement targeting relatives of unaccompanied minors as an unconstitutional effort in which law enforcement was "using children as bait." By the end of the summer, NPR confirmed, the initiative had resulted in more than 400 arrests.

The Trump administration's efforts to deter undocumented families from coming to

AR.07995

11/8/2020, 8:06 PM

the U.S. by criminally prosecuting them did not end with the summer 2017 initiative. In the memo Hamilton marked up in December 2017, the prospect of separating arriving families — by requiring that all parents be criminally processed — was addressed explicitly. "[T]he increase in prosecutions would be reported by the media and it would have a substantial deterrent effect," the memo said.

Five months later, in April 2018, the heads of three of the administration's top immigration enforcement agencies recommended a policy of "zero tolerance" to former DHS Secretary Kirstjen Nielsen, acknowledging that the policy would lead to the separation of families.

One of those officials, Kevin McAleenan, is now acting director of DHS and scheduled to testify before Congress this week. The recommendation McAleenan provided — co-signed by the heads of ICE and U.S. Citizenship and Immigration Services — was included in a memo later obtained by Open the Government and Project on Government Oversight through a freedom of information request. On the same day the memo was sent, newly released emails now show HSI officials scrambling to find cases that would justify family separation to provide Nielsen ahead of an appearance before lawmakers.

"In preparation for S1's hearing next week, I want to develop a good narrative (supported by facts and cases), on the separating issues," the secretary's chief of staff wrote at the time. "We need to think strategically of the arguments from the other side and position S1 accordingly."

A year after family separation dominated the headlines, a pattern is emerging of primary source documents obtained through hard-fought freedom of information litigation detailing just how deliberate the policy of family separation was in its creation. Emily Creighton, deputy legal director at the American Immigration Council, said there's a value in seeing actual government records that cannot be overstated. "I think primary source documents are increasingly important to the American public," Creighton told The Intercept. "We've become skeptics of public statements that are made by public officials, for good reason, particularly in this context."

Creighton explained that the documents her organization and its legal collaborators are now beginning to receive started with freedom of information requests filed before "zero tolerance" — the policy that required family separation — even became official. Immigrant rights stakeholders like AIC "have been unearthing documents that contradict the government's public position," Creighton said. "These government documents are what help tell the whole story."

ICE did not respond to a request for comment.

As The Intercept reported Monday, in a story detailing how a private intelligence company working with DHS monitored more than 600 protests against family separation, the government has identified hundreds of thousands of documents responsive to the requests AIC and its partners have made. Getting access to those materials, however, has not been easy. "Their search capacities are limited," Creighton said of the government agencies involved. "We have to work with them to find a way to get to a place where we're actually receiving documents, and it's been a real struggle in this case."

"We live in a time when we are really rightly skeptical about how the government is

ER-0307

AR.07996

messaging policies and lying to the public to explain appalling policies like family separation," Creighton went on to say. "We have to continually remind ourselves that we have laws like the Freedom of Information Act that allow access to government documents that protect our right to know."

**Update: Monday, April 29, 2019**

*After publication, ICE provided the following statement:*

> *ICE aims to disrupt and dismantle end-to-end the illicit pathways used by transnational criminal organizations and human smuggling facilitators. As such, ICE conducted a surge initiative focused on the identification and arrest of individuals involved in illicit human smuggling operations, to include sponsors who have paid criminal organizations to smuggle children into the United States. The risks associated with smuggling children into the U.S. present a constant humanitarian threat. The sponsors who have placed children directly into harm's way by entrusting them to violent criminal organizations will be held accountable for their role in these conspiracies.*

> *The numbers as of August 21, 2017 when the domestic enforcement phase of the initiative concluded:*

> - *443 administrative arrests*
> - *35 criminal arrests*
> - *38 prosecutions accepted on charges including alien smuggling and re-entry of removed aliens.*

> *After the domestic enforcement phase of the initiative, the focus moved internationally to disrupting the transnational criminal organizations involved in human smuggling.*

ER-0308

AR.07997



**FACT SHEETS**

# Protecting American Communities from the Violence of MS-13

— **IMMIGRATION**   |   Issued on: **February 6, 2018**



❝

# Together, we're going to restore safety to our streets and peace to our communities, and we're going to destroy the vile criminal cartel, MS-13, and many other gangs❞

*President Donald J. Trump*

**A THREAT TO AMERICAN COMMUNITIES: MS-13 has brought violence, fear, and suffering to communities across the country.**

- MS-13, short for Mara Salvatrucha, is a violent transnational gang primarily composed of immigrants or descendants of immigrants from El Salvador.

ER-0309

AR.08032

- MS-13's motto is "mata, viola, controla" which means "kill, rape, control."

  - They commit shocking acts of violence to instill fear, like machete attacks, execution-style murders, gang rape, and human trafficking

- MS-13 has more than 30,000 members worldwide, including more than 10,000 in the United States.

  - The violent gang recruits middle- and high-school students, primarily immigrants, and uses fear of retribution to keep their recruits from leaving

- The gang is known to regularly conduct activities in at least 40 states and the District of Columbia.

  - MS-13 primarily generates income through extortion, prostitution, membership dues, and illicit trafficking.

- As revealed by recent investigations, MS-13 gang leaders are known to send representatives across the United States border to take control of local MS-13 "cliques," local units, and connect the local members to gang leaders abroad.

  - MS-13 gang leaders have directed American MS-13 cliques to become more violent in order to control territory.

- In recent years, MS-13 has taken advantage of the large flow of foreign nationals from Central America and Mexico into the U.S. by hiding in these populations.

- MS-13 has preyed on American communities, committing horrendous acts of violence.

  - Approximately 38 percent of all murders in Suffolk County, New York, between January 2016 and June 2017, were linked to MS-13.

**COMBATING MS-13: President Trump's Administration has undertaken serious efforts to bring the violent criminals of MS-13 to justice.**

- President Trump spoke on the threat posed by MS-13 in his remarks on the State of

ER-0310

AR.08033

the Union and described the bravery of our Nation's law enforcement officers who continue to combat this violent gang.

- Attorney General Jeff Sessions designated MS-13 as a priority for the Department of Justice (DOJ)'s Organized Crime Drug Enforcement Task Forces in October 2017.

- Under President Trump, DOJ has worked with partners in Central America resulting in the filing of criminal charges against more than 4,000 members of MS-13.

- ICE Homeland Security Investigations (HSI) made 4,818 criminal arrests related to gang activity in FY 2017, as well as 892 administrative arrests that resulted from gang investigations.

  - HSI arrested 796 MS-13 gang members and associates in FY 2017, an 83 percent increase from FY 2016.

- In FY 2017, U.S. Border Patrol Agents arrested 536 gang-affiliated illegal aliens, of whom 228, more than 40 percent, were affiliated with MS-13.

**SECURING OUR BORDERS: President Donald J. Trump has released an immigration framework which includes border security measures vital to preventing the entry of criminal aliens like MS-13 members into the United States.**

- President Trump has proposed an immigration framework that includes the tools and resources required to secure our borders and close legal loopholes exploited by cartels and criminals.

- The President has made clear that, as a part of our efforts to curb illegal immigration, we must ensure criminal aliens, gang members, violent offenders, and aggravated felons are detained and quickly removed from the United States.

ER-0311

AR.08034

# PUBLIC SUBMISSION

**As of:** 11/10/20 1:04 PM
**Received:** January 04, 2020
**Status:** Deferred
**Tracking No.** 1k4-9e9f-f8vx
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-DRAFT-0023
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Alegria Martinez
**Address:**
  4901 24th ave nw
  Rochester,  MN,  55901
**Email:** alvarez8092960575@gmail.com
**Phone:** 5073191213
**Organization:** Otra oportunidades para seguir con vida

---

## General Comment

El asilo no debe tener ninguna barrera ya que est figura del asilo busca proteger a las personas para que siga con con vida si ese derecho se restringe es como si condenaramos a muerte a los solicitantes de asilo que vienen huyendo a la muerte de pases que no valoran la vida ni tampoco respetan la dignidad de las personas sin el hecho de decir que ellos son ciudadanos de su pas de origen es decir se entiende que una persona debe poseer los mismos derechos que quienes los persiguen y lo quieren matar todo parece que nacer pobre es una condena de muerte

A los millonarios nadie lo persigue ni el estado ni grupos armados los millonarios viven su vida muy bien y hacen lo que le da la gana

Para que una persona que viene a Estados Unidos a pedir asilo esas personas si se le da la oportunidad de residir legalmente lo valorarn y harn todo por conservar su estatus como la nica oportunidad de vida que ellos tienen

Y como en todo puede aparecer alguien que solicite asilo y no se comporte como estados unidos quisiera entonce a esa personas es que se le debe aplicar todo peso de la ley y expulsarlo

Pero no apliquen una regla que afecte a todos y por favor busque la estadsticas de las personas que le han otorgado asilo y miren su historial tanto criminal como moral y su buen carcter y vern que esos aislados se comportan excentemente y agradecen infinitamente esta gran oportunidad

AR.08356

# PUBLIC SUBMISSION

**As of:** 11/10/20 1:11 PM
**Received:** January 11, 2020
**Status:** DoNotPost
**Tracking No.** 1k4-9edk-7f1f
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-DRAFT-0047
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Jay Martin Steinman
**Address:**
  1202 Hampshire Street
  Apt 13
  San Francisco, CA, 94110
**Email:** jaysteinman@hotmail.com

---

## General Comment

I wish to register my strong opposition to the proposed rule. It creates new limits to asylum which tread a path that Congress declined to take. The United States has a duty under treaty and domestic law to maintain a functioning asylum system; the proposed rule is just the latest in a series of measures to destroy that system from within. I have worked with asylum seekers for over ten years, and have known a good many with compelling asylum cases which would have been thrown out if the proposed rule were in effect. As it is, adjudicators are able to weigh any criminal history against other factors, and make a balanced determination whether asylum is warranted. The proposed rule would take away that discretion for a whole new class of cases, forcing them to be dismissed out of hand. I have seen the process up close, and know the importance of letting those claims be heard, argued, and considered. I urge the government to rescind the proposed rule.

Please see the attached letter for my full comments.

---

## Attachments

Regulations_comment_Proposed_rule_84 _FR_69640

AR.08357

# PUBLIC SUBMISSION

**As of:** 11/10/20 1:11 PM
**Received:** January 14, 2020
**Status:** Deferred
**Tracking No.** 1k4-9efw-ujuu
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-DRAFT-0074
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Guillermina Castellanos
**Address:**
 gcastellanos@dscs.org
 San Francisco, CA, 94110
**Phone:** 415 4107139

## General Comment

El president Trump no debe de jugar con la vida de las personas que piden asilo porque su vida esta en riesgo. El asilo es un derecho para salvar la vidas humanas.

AR.08358

# PUBLIC SUBMISSION

**As of:** 11/10/20 1:12 PM
**Received:** January 15, 2020
**Status:** DoNotPost
**Tracking No.** 1k4-9egk-1yet
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-DRAFT-0166
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Ravahn Samati

## General Comment

To Whom it May Concern:

I am writing n response to the above-referenced Proposed Rules to express my/our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights. But the Trump administration is gutting asylum again with an unrelenting series of attacks.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact Ravahn Samati, ravahn.samati@gmail.com to provide further information.

Sincerely,

Ravahn
Activist and Organizer
White men for Racial and Gender Justice, Educators for Democratic Schools

AR.08359

# PUBLIC SUBMISSION

**As of:** 11/10/20 1:12 PM
**Received:** January 17, 2020
**Status:** DoNotPost
**Tracking No.** 1k4-9ehz-vlqa
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-DRAFT-0295
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Samuel Warren

---

## General Comment

I am strongly opposed to this rule change. I am a seventh-generation American citizen who strongly believes that we must open our doors to those fleeing violence and persecution abroad. My community has been enriched immeasurably by immigrants and the families they have established here, and our country should do everything in its power to welcome asylees.

AR.08360

Case: 20-17490, 01/19/2021, ID: 11968426, DktEntry: 9-3, Page 267 of 300


# PUBLIC SUBMISSION

<table>
<tr><td><strong>As of:</strong> January 22, 2020</td></tr>
<tr><td><strong>Received:</strong> December 19, 2019</td></tr>
<tr><td><strong>Status:</strong> Posted</td></tr>
<tr><td><strong>Posted:</strong> December 23, 2019</td></tr>
<tr><td><strong>Tracking No.</strong> 1k3-9dys-znks</td></tr>
<tr><td><strong>Comments Due:</strong> January 21, 2020</td></tr>
<tr><td><strong>Submission Type:</strong> Web</td></tr>
</table>

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0002
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Ray Anonymous

## General Comment

I've smoked a lot of weed with Republicans and Democrats, all of them white people. We get our weed from Theory Wellness in Massachusetts and party in New York. Your laws mean nothing and criminalizing a plant is stupid and wasteful. Stop spending my American taxpayer money to fight a war on cannabis that I only want safe legal access to.

ER-0317


AR.08361

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 20, 2019
**Status:** Posted
**Posted:** December 23, 2019
**Tracking No.** 1k3-9dz2-d0yp
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0003
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Ray Anonymous

---

## General Comment

From Michigan:
According to the ballot proposal approved by voters in 2018, the first $20 million in tax revenues in the first two years of recreational marijuana sales goes to research on the benefits of marijuana to treat ailments such as post-traumatic stress disorder REGARDLESS OF RACE OR NATIONALITY.

Cannabis use works for people with PTSD.

AR.08362

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 20, 2019
**Status:** Posted
**Posted:** December 23, 2019
**Tracking No.** 1k3-9dz1-3nv8
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0004
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Charles Lynch

---

## General Comment

More than half the entire nation including Celebrities, Politicians, Stock Brokers and State Officials all profiting off of a Schedule I Drug in Felonious violation of Federal Law (21 U.S.C. 812) Celebrities operating Continuing Criminal Enterprises branding distribution of marijuana (21 U.S.C. 848) #whoopigoldberg #willienelson #jimmybuffet #genesimmons #ziggymarley #jimbelushi #joemontana; Stock Brokers selling stocks of companies that conspire to distribute marijuana (21 U.S.C. 846) #etrade #nasdaq #tilray #nyse #aurora #canopygrowth; Politicians join the conspiracy as Executive Board members of Marijuana companies (21 U.S.C. 846) #johnboehner #howarddean #michaelsteele #antoniovillaraigosa #garyjohnson and State Officials collect taxes off the sales of a Schedule I Drug #gavinnewsom #jerrybrown #loriajax #jaredpolis #johnhickenlooper all in violation of Federal Drug Laws (21 U.S.C. 841 ) and the Patriot Act at RICO (18 U.S.C. 1961) and Death Penalty levels (18 U.S.C. 359(b)(1)) US Government employees should be required to disclose portfolios and held accountable for any schedule I holdings or dealings.
Meanwhile Millions of Americans continue to suffer the consequences of Schedule I Prohibition at the hands of law enforcement including defamation, prosecution, incarceration, disenfranchisement, forfeiture and the loss of basic civil liberties #scarmazzo #gloor #lynch #sandusky Additionally Free Federal Public Defenders say Federal Prosecutors are in Felonious Violation of Consolidated Appropriations Act 2019 Division C Section 537 by Continuing the 12 year 51 million Taxpayer dollar Federal Medical Marijuana Prosecution of Medical Cannabis Pioneer Charles Lynch for operating a Little ole Medical Marijuana Dispensary in California. Help end the 12 year Federal Medical Marijuana Prosecution of Charles Lynch Free Lance Gloor, Arron Sandusky and Luke Scarmazzo End World War Weed America Home of the Brave but fears a plant. Be Brave America Deschedulize #yourstruly
#usavslynch

#todayisday 4648

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 20, 2019
**Status:** Posted
**Posted:** December 23, 2019
**Tracking No.** 1k3-9dz9-z1p2
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0005
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

I absolutely oppose to this proposed rule.

AR.08364

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 20, 2019
**Status:** Posted
**Posted:** December 23, 2019
**Tracking No.** 1k3-9dz9-2luh
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0006
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Grace Kennedy
**Address:**
   1755 The Exchange, Suite 355
   Suite 355
   Marietta, GA, 30068
**Email:** gkennedy@kennedyimmigrationfirm.com
**Phone:** 4049935358
**Organization:** 1978

---

## General Comment

Women fleeing extreme violence should not be barred from asylum because they save their children.

AR.08365

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 20, 2019
**Status:** Posted
**Posted:** December 23, 2019
**Tracking No.** 1k3-9dz4-gxwl
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0007
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Teresa Pedrizco

## General Comment

I oppose to this proposed rule.

AR.08366

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 27, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9e3l-pvkd
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0008
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Xuan Luo

---

## General Comment

I am concerned about the new bar to asylum for convictions of offenses for alien smuggling under INA 274(a)(1)(A). As described in section III.A.2 of the proposed rule, convictions under this section are mostly already a bar to asylum for being an aggravated felony, except for a first offense for the purpose of assisting the alien's spouse, child, or parent. As described in section III.A.2, the proposed rule makes the bar to asylum cover this exception too: "The proposed rule would broaden this bar so that first-time offenders who engage in illegal smuggling or harboring to aid certain family members, in violation of section 1324(a)(1)(A) or (2), are deemed to have committed particularly serious crimes." I am concerned about the expansion of the bar to asylum to cover this exception.

When a family group consisting of adults and children enter the US illegally together, the adults are generally considered to be guilty of having brought the children to the US illegally under INA 274(a)(1)(A)(i). The US government can prosecute and convict the adults for this offense, and that would make them ineligible for asylum under this proposed rule. Yet this ineligibility for asylum arguably arises primarily from the fact that they are adults in a family group including children entering together, and the manner of the group's entry being illegal. This seems contrary to the spirit of 8 USC 1158(a)(1) (part of the Refugee Act of 1980), which says an alien "who arrives in the United States (whether or not at a designated port of arrival [...])" may apply for asylum, as well as the spirit Article 31(1) of the 1951 Refugee Convention (as applied to the US through the 1967 Refugee Protocol), which says contracting states shall not impose penalties on refugees "on account of their illegal entry".

You could argue that, in this example, technically the adults are not being made ineligible for asylum due to their own illegal entry, but rather due to their assistance to the children in their family to enter the US illegally, but in my opinion that is a distinction without a practical difference, because adults are generally deemed to be assisting children when entering together. Asylum seekers often travel in family groups involving adults and children, and if the Refugee Act and the Refugee Convention envision that asylum seekers should be able to obtain asylum despite illegal entry, then I would argue that they also envision that when asylum seekers travel in a family group involving adults and children, all members of that group should be able to obtain asylum, if otherwise eligible,

AR.08367

despite their illegal entry together.

AR.08368

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 27, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9e3l-7uea
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0009
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** louie dixon

## General Comment

deport them period

AR.08369

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 26, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9e5p-g6wr
**Comments Due:** January 21, 2020
**Submission Type:** Paper

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0010
Comment on EOIR Docket 18-0002

## Submitter Information

**Name:** Linda S. Cornelius
**Address:**
   7505 New Hampshire Ave
   Suite 308
   Takoma Park,  MD,  20912
**Email:** Linda@Cornelius.legal
**Phone:** 301-439-0011

## General Comment

See Attached

## Attachments

Comment on EOIR Docket 18-0002

ER-0326

AR.08370

**LAW OFFICE OF LINDA CORNELIUS**

**7505 New Hampshire Avenue**

**Suite 308**

**Takoma Park MD 20912**

**301-439-0011**

Linda@Cornelius.legal

Attn: Lauren Alder Reid

Assistant Director, Office of Policy

Executive Office for Immigration Review,

5107 Leesburg Pike, Suite 2616,

Falls Church, VA 22041.

RE: EOIR Docket No. 18–0002                                        December 23, 2019

To Whom it May Concern;

This letter is a comment on portions of the rules proposed 12-19-2019 which would create several new bars to asylum. I am an attorney who has previously worked in Legal Services offices in several states, and I am now practicing immigration law.

Asylum under existing law is granted not only to individuals, but to their families. The existing law and regulations specifically permit those who are granted asylum to include in their claim their spouses and children.

We need to be mindful that any bar or restriction or limit imposed on the right to claim asylum not only prevents the claimant, (who by definition has been already found to have been the subject of past persecution or to be in danger of future persecution), from finding safety, but also prevents their spouse and children from finding safety as derivative beneficiaries.

The recent decision of the Attorney General, that family members of a persecuted individual are generally no longer eligible for individual asylum claims based on their membership in the family of a persecuted individual, **Matter of L-E-A- 27 I&N Dec. 581 (A.G. 2019)**, makes it imperative that the rights of the derivative beneficiaries of asylum seekers be preserved intact and undiminished. Since that decision has reduced substantially the possibility of family members to qualify for asylum individually, it is important to preserve their rights to asylum as derivative beneficiaries

Many of the bars proposed on 12-19-2019 are based on what are essentially misdemeanors, or minor felonies. It was not the intention of the Congress when they passed the asylum law to limit the benefits to only those who had perfect records. And it was certainly not their intention to prevent derivative beneficiaries, the spouses and minor children of asylum seekers, from getting asylum because the family member who suffered persecution has made a single unwise mis-step or engaged in a single bad act in the United States.

The five current bars based in behavior, rather than firm resettlement in a third country, all focus on serious crimes creating serious danger. The proposed bars would ban from asylum entire family of a persecuted individual if that

ER-0327                                                              AR.08371

individual had engaged in minor bad behavior. Behavior which could block asylum for an entire household includes: A single drunk driving conviction, even if the individual has taken remedial actions such as alcohol abuse treatment;

Loitering or trespassing together with a gang member; possessing marijuana, even if authorized by local law for medical or individual use purposes; possessing rolling papers for marijuana in certain jurisdictions; and similar misdemeanors that are not generally considered of extreme danger to society.

A sense of proportion is lacking if we bar otherwise eligible families from asylum, (which can be a matter of life or death), in order to reprimand a parent who has acted badly, but in a way that usually is punished with a brief jail term, or probation.

Particularly egregious is the proposed section 7. B. Public Benefit Offenses.

Anyone who has worked representing individuals who receive public benefits knows that many times people receive the wrong amounts or wrong kinds of public benefits, not only through greed or recklessness about following the laws, but because the programs are convoluted and so difficult to understand and apply correctly that the case workers administering them more often than not calculate the benefits incorrectly or enroll individuals in the wrong programs or enroll them under the wrong sections of programs. When I worked in Cook County, with a legal services program, we found that 100% of the food program benefits received by our clients were calculated incorrectly by the county.

In addition, we need also to recall that most of the persons applying for asylum are unfamiliar with our public benefit programs, unable to read the materials in English, and sometimes unable to read at all in any language, and therefor much more at risk than native born citizens of inadvertently receiving public benefits that they are not eligible for.

People can be convicted of fraud in the area of public benefits for minor errors. For example, for incorrectly reporting small amounts of income, which then results in their family receiving the wrong amount of benefits. I recall a young father who was hired to paint his grandmother's kitchen, and failed to report less than $100 in income, thereby receiving too much in food benefits for his twin infant children. He was convicted for that offense. His conviction, under this proposed set of rules, would bar his wife, his two children, and himself from asylum.

The proposed rules are setting up bars to asylum based on minor and petty offenses. There is no evident need to add additional bars to asylum. The asylum rules, as written and now existing, provide a fair and just framework for determining who will receive this life-saving benefit. The proposed changes will endanger countless innocent family members of people who may have made only a single, non-serious, mistake.


Sincerely,

Linda S. Cornelius

Attorney at law

AR.08372

Law Office of Linda Cornelius
7505 New Hampshire Ave. #308
Takoma Park, MD 20912



RECEIVED #3

DEC 26 2019

THIS PARCEL HAS BEEN X-RAYED

Attn: Lauren Alder Reid
 Assistant Director, Office of Policy
Executive Office for Immigration Review,
5107 Leesburg Pike, Suite 2616,
 Falls Church, VA 22041.

22041-326499

ER-0329

AR.08373

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 24, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9e1p-nq1f
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0011
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Robert Lindstrom
**Address:**
  2017 Wisteria Road
  Rockford,  IL,  61107
**Email:** Rbrtlindstrom@gmail.com
**Phone:** 8155409843

## General Comment

This is easy, Cannabis should not be on Schedule 1 because it has known medical value.
Go to medicalcannabis.com Or go to Pubmed and search for cannabis research to find scores of studies to prove that this is true. Finally, www.cannabisinternational.org It starts with information on the US Governments patent on the medical use of cannabis as a neuroprotectant. Please, do the right thing!

AR.08374

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 28, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9e4e-7c42
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0012
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

We need to change the laws with regards to Medical Marijuana and not ruin lives over a plant that help so many people have found beneficial for so many illnesses. This has to change

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 19, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9dyq-b8y4
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0013
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous
**Address:** United States,

---

## General Comment

Any increase in restrictions on asylum are a step in the right direction.

As a practicing attorney, I regularly see clients who have no basis for immigration, and who routinely ask to use political asylum as a last ditch effort to remain. Procedurally, this kind of nonsense fills up court dockets and delays the removal of aliens who have zero basis for immigration.

Many people argue that the asylum seeker just needs a safe haven, but they do not realize that asylum leads to LPR status. I have clients that have been granted asylum, granted permanent residency, naturalized, and then turn around and go right back to the country they claim they fled from. This is nothing short of stupidity on the part of the United States. It seems obvious that anyone who would return to the country they claim they had to leave should have their case re-examined for fraud; and the fraud should be prima facie where the asylee travels to the country their asylum case was based on.

Regarding the DUI, yes, absolutely this should be a bar. Allow me to explain why. On its face, DUI may not seem that bad, just a little too much to drink. But the reality is, most people convicted of a DUI are not first time offenders. My personal experience with many DUI offenders reveals a multitude of other behavioral problems coexisting with the drinking. Further, the DUI convictions often come after multiple alcohol incidents. In other words, by the time someone is finally convicted of DUI, they have committed many previous incidents of driving while intoxicated and just had not been caught. Or, put another way, they were just lucky that no one else was involved in the other incidents of drinking.

Regarding convictions, especially for border violations and family violence, of course they should be barred from asylum, and any other benefit that leads to LPR status.

Regarding reconsiderations, yes, end that practice. It consumes resources far beyond the value of the practice.

ER-0332

AR.08376

I have chosen not to provide contact information because doing so makes all my information public.

You should give serious consideration to protecting the identity of people who comment. There is much much more that I could tell you, but not if my name is exposed to existing clients.

AR.08377

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 22, 2019
**Status:** Posted
**Posted:** December 30, 2019
**Tracking No.** 1k3-9e05-xcoe
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0014
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

Dear people of the Executive Office for immigration review,
I stand in favor of making sure that the opioid epidemic that used marijuana as a gateway drug does not also continue to be ignored. My brothers untimely death may have been partially from the judgement impairment that comes with using marijuana (hairpin turns and 60 miles an hour and no seat belt in a Jeep.) The double incentive that combines sex/labor/child labor are alive and well in Ohio. At the Trillium egg farm in Marion Ohio it is PROVEN that Health and Human Services PLACED Guatemalan children into slavery. They were not allowed to go to school, they were physically abused. They were threatened. You can see the pictures in the Marion Star newspaper. You can see the hearings. What does this have to do with marijuana, this reduces the profitability of slave trading. In Franklin county Ohio Massage parlor women were never allowed to leave and slept on massage tables. This is a fact. Women and children are also used for the loopholes in immigration laws. Catch - release - ENSLAVE. I had a friend who had detectives staking out a massage parlor watching it from inside at her work. THE LIFE OF A SLAVE AVERAGES ONLY 17 years. THE DEMAND IS HIGH. A police chief APPROACHEDour womens church leader and told here to tell everyone to keep the children very close to them. ABC AND CBS do not care about exploited children-DO YOU!? Why do I care? Well, state route 23 goes right through Ohio. Stare route 23 goes from almost the Mexican border to Toledo Ohio-close to Canada. According to the B. R. A. V. E. Coalition Ohio is the number one human trafficking (slave) state in the Spring and Summer. Whether that is still the case, I do know that that NARCAN IS now available because it is often mixed with anesthesia drugs. We have dead people who thought marijuana and heroin were safe. JEFFERY EPSTEINS coworkers are NOT IN JAIL. Stop the guilty from exploiting the innocent. How can we convince the world WE ARE NOT A SLAVE NATION unless we take steps to make sure we do not allow those who would Traffick during/ children anesthesia drugs deadly in salt size portions into our nation. The we have those who will not protect the enslaved. Somehow, we forget what the consequences are for nations that do not uphold laws. We are enabling the bait and switch enslavement whether it is drug abuse or child slave/sex slave/labor slavery. The blind eye approach is killing people.

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 30, 2019
**Status:** Posted
**Posted:** December 31, 2019
**Tracking No.** 1k3-9e5x-sej9
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0015
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Carolyn Anonymous

## General Comment

I am in favor of proposed changes to asylum procedures and eligibility.

AR.08379

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** December 31, 2019
**Status:** Posted
**Posted:** January 02, 2020
**Tracking No.** 1k3-9e6i-gjn4
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0016
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Lauren Dikos-Roche
**Address:**
   120 w 1100 n #6
   Logan,  UT,
**Email:** L.a.dikos@aggiemail.usu.edu
**Phone:** 8158614896

## General Comment

The proposed bars to asylum eligibility are nothing but a way to eliminate persons from seeking asylum from dangerous places. By allowing these bars to eligibility ie; claiming that certain felonies prior to seeking asylum would promote more crime is nothing but a tactic to limit persons from entering the US. The list of "felonies" needs to be more clear and better thought out instead of implying that every asylum seeker is a criminal. Fleeing from violence and seeking asylum are legitimate reasons for people to want asylum in the first place. By adding these bars shows the discriminatory intent to sow fear among the American people and further claims of criminal intent are nothing but a way to deter people who are in danger in their home countries. Asylum seekers see the United States as a safe haven from the fears and violence from their original countries. Instead of demonizing and criminalizing these people we should welcome them with open arms and provide them with the security they need.

AR.08380

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 22, 2020 |
| **Received:** January 01, 2020 |
| **Status:** Posted |
| **Posted:** January 02, 2020 |
| **Tracking No.** 1k4-9e72-xjph |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0017
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** W L Clark
**Address:**
   PO Box 2694
   La Mesa, CA, 91943
**Email:** wleeclark8@gmail.com
**Phone:** 619-755-6048

---

## General Comment

After reading the proposed changes, I support this revised rule. Does the USA need more criminals? Obviously not! Kudos to Attorney General Barr for working to make America safer from foreign criminal street gang members and convicted felons.

AR.08381

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 01, 2020
**Status:** Posted
**Posted:** January 02, 2020
**Tracking No.** 1k4-9e75-8h78
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0018
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous
**Address:**
    MD,

## General Comment

I think these policy changes are sufficient in addressing the immigration issues facing this country

AR.08382

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 22, 2020 |
| **Received:** January 01, 2020 |
| **Status:** Posted |
| **Posted:** January 02, 2020 |
| **Tracking No.** 1k4-9e75-9k50 |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** API |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0019
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Joel Watters

---

## General Comment

You're trying to include people who've gotten a D.U.I as a bar? On its face it's prejudiced against poor people. The obvious reasoning is a poor person will never get the same rights as someone who is not. That's reality, and so is the fact that a lot of these immigrants are in the poor person category by default.

You're lumping marijuana in there? I don't even do that and I find it hilarious that you would try to add that in.

You're also trying to include "engaged in acts of battery or extreme cruelty in a domestic context, even if no conviction resulted". That one is funny for two reasons:

First and foremost is your laughably ignorant "even if no conviction resulted".

Secondly, have any of you ever been involved in anything like that? I have, I(the man) was the abused for a long while, only to have it turned around on me by the system. I never got to say one word in court(I was told by a lawyer they'd not take me because it'd be an instant lose...no matter what proof I had had), never got to show MY proof that I still have years later(minus some videos I took of myself, she'd found those and trashed them). Screwed enough I ended up just leaving my home state and will never go back to a place that will do that to someone.

So, in closing: you and your corrupt system can go bleep yourselves.

AR.08383

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 01, 2020
**Status:** Posted
**Posted:** January 02, 2020
**Tracking No.** 1k4-9e7d-b5ym
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0020
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I 100% support this rule change. Criminals should not be able to get asylum in this great nation. This tightening of regulations is a direct result of state and local governments working to nullify undocumented criminal activity by dropping chargers, expunging records or pardoning. Including for serious crimes like armed robbery(Gov Colorado), sex assault, domestic abuse, wire fraud, identity theft etc. If you commit crimes in your home country and then commit crimes when you are in the United States or Criminally re-enter after you have gone through the immigration courts and have been removed YOU SHOULD NOT BE REWARDED with entry into this great nation. Adults who human smuggle children or adults should not only lose their right to entry but they should be imprisoned.

AR.08384

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 22, 2020 |
| **Received:** January 01, 2020 |
| **Status:** Posted |
| **Posted:** January 02, 2020 |
| **Tracking No.** 1k4-9e7f-slf5 |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0021
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I totally support barring those who have abused the American citizen by committing crimes from being awarded asylum.
People who are domestic abusers, sexual abusers, drunk drivers, people who steal things or identities. People who human smuggle or criminally re-enter should in no way be REWARDED with the greatest gift anyone in the world can get THE OPPORTUNITY TO BE LEGALLY PRESENT IN THE USA.

This rule does nothing to the INNOCENT asylum seeker truly escaping political unrest or natural disaster.

I support the changes as written.

AR.08385

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 04, 2020
**Status:** Posted
**Posted:** January 06, 2020
**Tracking No.** 1k4-9e96-a5l3
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0022
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anonymous Anonymous

## General Comment

How can this proposal be even a question? Should be already in the books! Should have been a rule approved and enforced already!
I live many miles away from the border & seeing someone driving wreckedssly & drunk it's becoming the norm. Curiously though, it's always a non white, non African American, non Asian, non middle eastern, non Indian. Sadly, it's most of the time Hispanic. And before you get infuriated thinking this comment it's racist understand that I'M HISPANIC.
I'm in COMPLETELY AGREEMENT with a new rule requesting good moral character from ALL applicants. If we, legal residents and Naturalized US citizen must present ourselves as deserving & worthy, why an asylum applicant would get to walk free?
PLEASE enforce this proposal as rule like starting TODAY.

AR.08386

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 04, 2020
**Status:** Posted
**Posted:** January 06, 2020
**Tracking No.** 1k4-9e9b-l05c
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0023
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Stpephen Gaertner
**Address:**
   3720 Sedona pl
   Apex,  NC,  27539
**Email:** gaertnersaw@hotmail.com
**Phone:** 9199246802

---

## General Comment

I approve of this regulation. I don't want people in the USA that have a complete disregard for our laws and norms...

AR.08387

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 05, 2020
**Status:** Posted
**Posted:** January 06, 2020
**Tracking No.** 1k4-9ea2-scz1
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0024
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Kate Gessert

## General Comment

I am strongly opposed to the categories of Alien Smuggling, Illegal Reentry, and Fraudulent Documents being included as grounds to deny asylum. In many cases, these actions cause harm to no one and are actions immigrants are forced into as a result of a broken immigration system. The U.S. needs to enact comprehensive, compassionate immigration reform, rather than persecuting individuals.

AR.08388

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 06, 2020
**Status:** Posted
**Posted:** January 06, 2020
**Tracking No.** 1k4-9ea5-pm7y
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0025
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Frank J Lugo

---

## General Comment

A person pending asylum with minor crimes in his or her history should be able to enjoy a second chance to retract their behavior. could be sent to a court to defend the circumstances that led him to do so. Mention that our Lord Jesus Christ did not condemn the sinner but gave him the opportunity to redeem his actions and make them a better person. People can change if they give it a chance not to condemn them to be deported so that in their countries they are not victims of hatred and fear from which they fled

In the Bible it says that he who is forgiven much loves much. These people would be the most grateful to this wonderful country that they can give you that opportunity. Let's not be ordinary human beings and continue judging people by their past. God bless this great country and its rulers

AR.08389

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 06, 2020
**Status:** Posted
**Posted:** January 07, 2020
**Tracking No.** 1k4-9eag-uksf
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0026
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I'm in SUPPORT of this regulation.
The US is a very generous country & many have been taking advantage of it.
We taxpayers are already seeing the disastrous consequences of foreigners who disregard the law. Enough already!
Even immigration lawyers are ill advising their clients. Everybody is taking advantage of the system!

AR.08390

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 07, 2020
**Status:** Posted
**Posted:** January 08, 2020
**Tracking No.** 1k4-9ebc-u465
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0027
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Naomi Metz

## General Comment

I oppose this! The processes/laws in place are sufficient (or already too restrictive) and the proposed rules would unfairly and unnecessarily restrict access to asylum for so many people. Plus, they do not comport with our international treaty obligations nor with our domestic laws.

AR.08391

# PUBLIC SUBMISSION

**As of:** January 22, 2020
**Received:** January 07, 2020
**Status:** Posted
**Posted:** January 08, 2020
**Tracking No.** 1k4-9ebb-4s20
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0028
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Aubra Fletcher

---

## General Comment

I oppose the Proposed Rules for the reasons stated in the attached letter. Asylum-seekers are already thoroughly vetted and must already navigate a complicated system of laws and procedures, including multiple legal bars to obtaining status. The Proposed Rules will wreak havoc on our legal system, on our credibility as a nation, and in the lives of people fleeing brutal persecution.

---

## Attachments

Comments re proposed new asylum bars - 1-7-20

# LAW OFFICE OF AUBRA FLETCHER

~ P.O. Box 189402, Sacramento, CA 95818 ~ 510-499-5264 ~ aubrafletcherlaw.com ~
aubra@aubrafletcherlaw.com

January 7, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

*Submitted via www.regulations.gov*

> **Re:    84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019;
> RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed
> Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**

To Whom it May Concern:

I am writing in response to the above-referenced Proposed Rules to express my strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

I am an immigration attorney who specializes in asylum law. I have spent more than a decade working with asylum-seekers from all over the world.

For the reasons detailed in the comments that follow, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Please see below, and please do not hesitate to contact me to provide further information.

Sincerely,

Aubra Fletcher

AR.08393

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

Taken together, the proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. I submit these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. I urge that the Proposed Rules be rescinded in their entirety.

I.   **The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility**

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980. That Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.

Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger. Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees and others fleeing the Holocaust. Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad. For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail. The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds. Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path. There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.

AR.08394