## No. 20-17490

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PANGEA LEGAL SERVICES, et al.
Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.
Defendants-Appellants.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## APPELLANTS' EXCERPTS OF RECORD

## VOL. 5 OF 12

JOHN V. COGHLAN
*Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice
Civil Division
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
PATRICK GLEN
CHRISTINA P. GREER
*Senior Litigation Counsel*
CRAIG NEWELL
*Trial Attorney*

from asylum due to involvement in the criminal legal system, and 3) rescind a provision in the current regulation regarding reconsideration of discretionary denials of asylum. Immigrant survivors of violence already face numerous barriers to applying for asylum, and these proposed changes will only serve to create more barriers and prevent immigrant survivors from obtaining the asylum protections they desperately need. Rather than restricting access to protection, the administration should continue to expand opportunities for vulnerable immigrant survivors to access safety and protection.

## II.     The Proposed Rule Violates U.S. Obligations Under Both Domestic and International Law.

The United States has long served as a beacon of hope for immigrant survivors of domestic and sexual violence and other gender-based persecution. As a party to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the U.S. developed section 208 of the Immigration and Nationality Act ("INA") to extend asylum protections to non-citizens fleeing persecution. For over forty years, the United States has continued to uphold its commitment to helping and protecting those who are fleeing persecution, including gender-based persecution. However, by carving out categorical bars from asylum protection and grossly expanding the serious crime bar beyond the Convention's definition of "capital crime or a very grave punishable act," the proposed rule violates our nation's treaty obligations under the Refugee Convention and the INA to provide asylum seekers with fair access to asylum protections. These increased and arbitrary hurdles to protection are wholly incongruent with the letter and spirit of the commitment the United States made in the Refugee Convention and the INA to protect vulnerable refugees fleeing persecution.

## III.     The Proposed Rule Will Unfairly Prevent Many Vulnerable Immigrant Survivors from Obtaining Asylum.

The proposed rule seeks to add seven new criminal bars to asylum eligibility.[21] These new bars are sweeping in scope, and several will render ineligible many vulnerable immigrant survivors who are in desperate need of protection and who would otherwise be eligible for asylum protections.

### A.  The Categorical Bar for an Offense of "Smuggling or Harboring" Will Harm and Fracture Immigrant Survivors and Their Families.

The proposed rule expands the "smuggling and harboring" asylum eligibility bar to include immigrants who are convicted of assisting their spouse, children, or parents fleeing persecution

---

[21]  Individuals would be ineligible to seek asylum if they are convicted of 1) a felony offense; 2) "smuggling or harboring" under 8 U.S.C. § 1324(a); 3) illegal reentry under 8 U.S.C. § 1326; 4) an offense involving "criminal street gangs"; 5) a second offense of driving while intoxicated or impaired; 6) conviction or *accusation of conduct* of acts of battery or extreme cruelty in the domestic context; 7) certain newly defined misdemeanor offenses.

AR.08993

to come to the U.S. Under this proposal, efforts to bring children to safety will disturbingly be considered "particularly serious crimes" and classified as aggravated felonies.

In many cases, the risk of domestic violence, sexual assault, and/or human trafficking in survivors' countries of origin remain unabated. Survivors who have fled and subsequently seek to protect and be reunited with their children or other family members that they have been forced to leave behind may face criminal prosecution and conviction for smuggling or harboring. However, survivors who have seized their last possible chance of protecting their children by helping them flee to the U.S. should not be deprived of the ability to obtain humanitarian protections, lest they be removed and made vulnerable to experiencing even more violence and abuse.

### B. The Bar for Illegal Reentry Lacks Credible Justification and Criminalizes Immigrant Survivors Desperately Fleeing Violence.

The proposed rule seeks to bar all applicants convicted of illegal reentry from being eligible for asylum. This proposal wholly ignores the reality that immigrant survivors of violence who are sent back to their countries of nationality are at risk of violent retaliation from their abusers or perpetrators, and may even face death. In addition, because of inadequate access to legal representation, survivors may be unable to establish their eligibility for legal protections in the United States, resulting in their removal. Because the risk of domestic violence, sexual assault, and/or human trafficking in their countries of origin is continuous and ongoing, victims subsequently attempt to reenter the U.S. to protect themselves and their children. Other victims of domestic and sexual violence and trafficking may be deported because their abusers or traffickers isolate them, or prevent them from obtaining lawful immigration status. They are deported, with some victims having to leave their children behind in the custody of their abusers or traffickers.

Restricting asylum eligibility to exclude immigrant survivors who are convicted of illegal reentry when they are fleeing from violence multiple times is morally reprehensible. By denying these survivors the ability to seek asylum, the proposed rule will be denying protection to among those who need it most.

### C. The Bar for Conviction or an Allegation of Conduct of Battery or Extreme Cruelty Harms Survivors.

The proposed rule seeks to make ineligible for asylum all applicants who have been convicted of domestic assault or battery, stalking, or child abuse in the domestic context. Furthermore, the proposed rule alarmingly takes this one step further so that individuals who are alleged to have engaged in battery and extreme cruelty are also barred. This proposed rule creates the *only* crime-related bar for which a conviction is not required. DHS and DOJ paint this proposal as a

AR.08994

way to protect survivors; however, it will cause immense harm to immigrant survivors of violence.

There are many cases in which survivors, not their abusers, are arrested and prosecuted for domestic violence related offenses.  Immigrant survivors who have limited English proficiency (LEP) may not be able to fully describe the situation and the abuse they experienced to police officers. In many situations, police officers may then turn to the *perpetrators* to interpret. Many survivors are arrested in dual arrests because the police use perpetrators as interpreters.[22] In other instances, survivors are arrested and face charges for domestic violence arising from acts of self-defense[23] or because abusive partners or perpetrators manipulate the legal system by filing false claims of abuse. Service providers report that it is common to see abusers make false allegations to police and the courts to have immigrant survivors arrested. The proposed rule's lack of requirement of a conviction increases that likelihood, given the lack of completion of a fact-finding.

Although there is a proposed waiver for survivors who are deemed to not be the primary aggressor, the waiver is insufficient to mitigate the harm that many survivors will experience. Not only will victim-defendants be swept in, but survivors and their families will be harmed in instances where the allegedly abusive family member has not engaged in a pattern of coercive, controlling behavior, or has demonstrated rehabilitation and accountability and plays an important contribution to the health and well-being to the family.

As a result of the sweeping scope of the proposed rule's complete bars to those with domestic violence and battery and extreme cruelty allegations, many victims in immigrant communities will very likely be deterred from seek legal system help from abuse. Because immigrant survivors of domestic violence and sexual assault also face systemic barriers to their safety that are not generated by their abusers, such as economic barriers, community and religious norms, discrimination, and lack of eligibility for services,[24]  they may simply decline to reach out for help for the abuse if the choice is between contacting law enforcement, and impoverishment, lack of housing, or community ostracism.

---

[22] Casa de Esperanza: National Latin@ Network. Wrongful Arrests and Convictions of Immigrant Victims of Domestic Violence: Stories from the Field. Retrieved from
https://www.nationallatinonetwork.org/images/files/Quote_Sheet_for_Hill_Visits_-_Service_Providers.pdf.
[23] For examples outside the context of immigrant survivors, see, Flock, E., (2020, Jan. 20) How Far Can Women Go to Protect Themselves?, *The New Yorker,* found at: https://www.newyorker.com/magazine/2020/01/20/how-far-can-abused-women-go-to-protect-themselves
[24] E.g.,  Bui, H. N. (2003). Help-seeking behavior among abused immigrant women. *Violence Against Women, 9*(2), 207-239. Kasturirangan, A., Krishnan, S., and Riger, S., (2004) The Impact of Culture and Minority Status on Women's Experience of Domestic Violence, *Trauma Violence & Abuse* 5, 318-332.

AR.08995

### D. The Eligibility Bar for Misdemeanor Document Fraud Ignores Migration-related Circumstances.

One of the offenses that would render an immigrant ineligible for asylum is the use of fraudulent documents. This bar will sharpen the tools of control and coercion used by abusers, as well as punish immigrant survivors who have themselves fallen victim to fraud. Abusers often hide or destroy survivors' documents in order to exert dominance and prevent survivors from being able to leave the relationship. Most survivors of violence have experienced financial abuse, where the abuser is taking or controlling the money that they have earned, or the abuser has limited their access to financial resources and forced survivors to depend on them for housing, food, health care, and other basic needs. Survivors who escape from abusive relationships therefore risk falling into poverty and homelessness. As such, survivors may be compelled to resort to any measure to obtain documentation so that they can work and sustain themselves and their children. Access to economic resources is absolutely critical in supporting the safety of survivors who are fleeing domestic violence, sexual assault, and human trafficking. Barring immigrant survivors from asylum for taking measures to ensure that they could feed, clothe, and house themselves and their children is cruel and will only serve to render them even more vulnerable to exploitation.

### IV. The Proposed Rule Creates Inconsistency in Adjudications and Provides Immigration Adjudicators with an Unprecedented Amount of Authority.

The proposed rule aims to permit immigration adjudicators to determine whether a conviction or conduct related to domestic violence or battery and extreme cruelty would render an immigrant ineligible for asylum. First, the definition of battery and extreme cruelty in particular differs from state-law domestic violence criminal definitions, creating inconsistency in determining who is covered by the asylum bar. While such language is appropriate in providing protection for those seeking it, it is highly inappropriate in the context of barring individuals seeking protection against persecution.

In addition, in order to properly and accurately assess domestic violence, battery, or extreme cruelty, one must have experience and in-depth knowledge of the intricacies of abuser-survivor relationships and dynamics; the nuances of the tactics abusers and perpetrators use to control, intimidate, and manipulate survivors; understanding of the ongoing pattern of behavior in abusive relationships; specific vulnerabilities of immigrants to being victimized; and many other important analyses of the domestic nature of abusive conduct. Without ongoing, consistent, and practical training, it is likely that many deciding eligibility in these matters will be able to fairly adjudicate these complex decisions. As such, the presentation of evidence under oath by adverse parties is a more appropriate forum for adjudications as to whether or not domestic violence took place, and will likely lead to fewer determinations that will cruelly strip immigrant survivors of their right to seek asylum.

AR.08996

The proposed rule also seeks to provide immigration adjudicators with the authority to determine whether a vacated, expunged, or modified conviction or sentence should be recognized in determining whether an immigrant is eligible for asylum. This proposed change undermines the authority of state courts that have experience and expertise and allows immigration adjudicators to essentially question and disbelieve the decisions of court judges. Providing immigration adjudicators with this broad and overextending authority will compromise the ability for immigrant survivors to have a fair and full proceeding.

## V.   Alternative Forms of Relief Are Insufficient to Protecting Immigrant Survivors of Violence

The proposed rule offers that immigrants who become ineligible for asylum under the seven new bars of asylum ineligibility could still qualify for other forms of protection, namely withholding of removal or protection under the Torture Convention (CAT). However, these forms of relief require a higher burden of proof than asylum, meaning that many asylum seekers excluded from eligibility under the proposed rule will face deportation back to harm if they cannot meet this higher burden.

Furthermore, the protections afforded by CAT and by statutory withholding of removal are limited in scope and duration. Withholding of removal and CAT protection do not provide a path to lawful permanent residence and do not allow for freedom of travel or for family reunification, with detrimental consequences for other family members fleeing domestic and sexual violence and trafficking. Limiting protections for immigrant survivors to withholding of removal and CAT will leave them in a continued state of limbo and unable to truly build a safe and secure life for themselves and their children.

## VI.  Removing Reconsiderations of Discretionary Denials of Asylum Will Deprive Immigrant Survivors of the Opportunity to Seek Safety Despite Having Viable Claims of Asylum.

The proposed rule seeks to remove automatic review of a discretionary denial of an asylum seeker's application in the event that the immigrant is denied asylum solely in the exercise of discretion. Rescinding the review of discretionary denials will be extremely harmful to immigrant survivors of violence. Many immigrant survivors are limited English proficient or lack the financial resources to retain an attorney. The immigration legal system is incredibly complex and difficult to navigate, and many immigrant survivors with viable claims for asylum find their cases denied due to these barriers. Even if the survivor is granted withholding of removal or protection under CAT, as detailed in the section above, these alternative forms of protection do not allow for the same level of relief and benefits as asylum protection. Maintaining reconsiderations of discretionary denials of asylum is therefore absolutely critical to ensuring that immigrant survivors who are eligible for asylum have another opportunity to defend and prove their right to obtain asylum protections and remain in the U.S.

AR.08997

**VII.     Conclusion**

For the foregoing reasons, the Asian Pacific Institute on Gender-Based Violence urges the DOJ and DHS to rescind the proposed rule, which violates our nation's laws and moral obligations and cruelly prevents many survivors of domestic violence, sexual assault, and human trafficking who are fleeing persecution from obtaining the asylum protections they need and deserve. We instead urge DOJ and DHS to promote policies that account for the dire reality that traumatized refugees face and seek to maximize their safety throughout the asylum process.

Thank you for the opportunity to submit comments on the Joint Notice of Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility. Please contact me if you have any questions or concerns relating to these comments. Thank you.

Respectfully submitted,

ASIAN PACIFIC INSTITUTE ON GENDER-BASED VIOLENCE

GRACE HUANG                                              YEIN PYO
Policy Director                                              Program Assistant
ghuang@api-gbv.org

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9eki-xivh
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0375
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Grace Meng
**Organization:** Human Rights Watch

## General Comment

I am writing on behalf of Human Rights Watch to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Our reasons for opposing these comments are detailed in our full comment and relevant Human Rights Watch reports, which are attached. The Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing persecution are granted full and fair access to asylum protections in the United States.

## Attachments

HRW Forced Apart report

HRW asylum bar comment FINAL

HRW Turning Migrants Into Criminals

HRW A Price Too High

AR.08999



**HUMAN RIGHTS WATCH**

**JULY 2007**                                                    **VOLUME 19, NO. 3(G)**

# Forced Apart

## Families Separated and Immigrants Harmed by United States Deportation Policy

**Acknowledgements** ........................................................................................... 1

**I. Summary** ..................................................................................................... 3

**II. Recommendations** .................................................................................... 8
    To the President of the United States .................................................... 8
    To the United States Congress .............................................................. 8
    To the Department of Homeland Security ............................................. 9
    To the Bureau of Population, Refugees and Migration .......................... 9
    To the United States Citizenship and Immigration Services .................. 9
    To Criminal Defense Attorneys ............................................................. 9

**III. Deportation Law Based on Criminal Convictions Before 1996** ......................... 10
    Early History of the Deportation Power ................................................. 10
    Crimes of Moral Turpitude and Aggravated Felonies ............................ 11

**IV. Deportation Law Based on Criminal Convictions After 1996** ........................... 16
    Specific Crimes Rendering Non-Citizens Deportable ............................ 18
        Aggravated Felonies .................................................................... 18
        Crimes of Moral Turpitude ........................................................... 22
        Definitions Include Relatively Minor Crimes ................................ 23
    Elimination of Defenses to Deportation ................................................ 25
        Elimination of 212(c) Waiver of Deportation ................................ 25
        Limits on Withholding: Returns to Persecution ............................ 30
    Retroactive Effects ............................................................................... 31
    Congressional Regrets .......................................................................... 34

**V. National Statistics on Deportation for Crimes** ............................................... 38

AR.09000

**VI. US Deportation Policy Violates Human Rights** ................................................................ **45**

The Right to Raise Defenses to Deportation ................................................................ 45

Proportionality ................................................................................................................ 52

Family Unity .................................................................................................................... 57

    Children's Rights ...................................................................................................... 67

Ties to a Country ............................................................................................................ 70

    Length of Legal Residence ...................................................................................... 72

    Legal Residence in the United States Since Childhood .......................................... 73

    Military Service ........................................................................................................ 75

    Training and Employment ....................................................................................... 77

Protection from Return to Persecution for Refugees .................................................. 78

**VII. Conclusion: The Need for a Legislative Solution** ........................................................ **82**

**Appendix: A History of Human Rights Watch's FOIA Request for Deportation Data** ............ **84**

AR.09001

# Acknowledgements

We would like to thank all of the immigrants, their children, spouses, parents, siblings, attorneys, social workers, and friends who generously and courageously shared their experiences with us for this report. We would also like to thank the immigration attorneys, criminal attorneys, immigrants' rights advocates and organizations, judges, legislators, and government officials who shared their expertise with us for this report.

Alison Parker, senior researcher in the US Program of Human Rights Watch researched and wrote this report. The full report was edited by Jamie Fellner, director of the US Program at Human Rights Watch; Lois Whitman, director of the Children's Rights Division; Bill Frelick, director of the Refugee Policy Program; Dinah PoKempner, general counsel; and Ian Gorvin, consultant in the Program Office. Also at Human Rights Watch, Ashoka Mukpo and Keramet Reiter, US Program Associates, provided invaluable research and production assistance. Layout and production were coordinated by Andrea Holley and Ashoka Mukpo.

For their contributions to our research, we would especially like to acknowledge the following people and organizations. In Arizona: the Florence Project (Ashley Kaper and Victoria Lopez); in Chicago: the Cambodian Association of Illinois (Nil Samorn), Centro Sin Fronteras (Emma Lozano), Coalition of Asian African European and Latino Immigrants of Illinois (Dale Asis), Centro Romero (Daisy Fuñez), Illinois Coalition for Immigrant and Refugee Rights (Joshua Hoyt and Fred Tsao), Latinos Progresandos (Luis Guitierrez, Laura Pichardo), Midwest Immigrant and Human Rights Council (Oscar Chacon, Mary Meg McCarthy, Sara Rose Weinman), Lisa Palumbo, Esq.; in Florida: the Florida Immigrant Advocacy Center; in Los Angeles: Siu Ming Cheer, Esq., Coalition for Humane Immigrant Rights of Los Angeles, Homies Unidos (Silvia Beltran, Rocio Santacruz, Will Colely), Khmer Girls in Action; in Massachusetts: Dan Kanstroom; in San Francisco: ACLU Immigrants' Rights Project (Cecilia Wang, Esq.), and the law firm of Van Der Hout, Brigagliano & Nightingale, LLP; in New York: the ACLU Immigrants' Rights Project (Judy Rabinovitz), Families for Freedom (Aarti Shahani and Subash Kateel), and the Immigrant Defense Project of the New York State Defenders Association.

The following individuals also contributed to this report: Joshua Franco (Chapter VI); pro bono counsel Paul Kemnitzer and Lauren Aronson Teitelbaum of Sidley and Austin (figure 7); Gloria Borges, Lin Chan, and Jayashri Srikantiah of the Stanford Immigrants Rights Clinic (Chapter VI); John Schaefer (Chapter V), Human Rights Watch associate Lee Anne

Hasselbacher; and interns Hanna Bauman, Pat Tomaino, and Karin Orr, who each performed a myriad of tasks in contribution to this report.

For assistance with our still-pending Freedom of Information Act request, we would like to thank Leslie Platt Zolov, counsel to Human Rights Watch; and Ethan Strell and Catherine Sheehy, of the law firm of Carter, Ledyard & Milburn LLP, for their pro bono counsel.

Human Rights Watch would also like to thank Peter Lewis, The Joyce Foundation, and the Open Society Institute, all of whom generously support our work in the United States. Finally, we would like to extend a very special thanks to the JEHT Foundation. Without JEHT's support, this report would not have been written.

ER-0962                                              AR.09003

# I. Summary

Antonio Cerami came to the United States with his family when he was 12 years old. He entered the country as a lawful permanent resident. In 1984, Antonio met Cristina, who is a US citizen, and they were married in 1992. Antonio became stepfather to her four children, and the couple had a son of their own. A unionized dockworker in Chicago, Antonio also worked part-time in the evenings and weekends to provide financial support to his family. The couple purchased a home in the Chicago suburbs and sent their children to local public schools. Cristina told a Human Rights Watch researcher,



"I stayed home until our son was about three years old. Antonio worked two jobs to take care of us. Then, I also got a job in an office and everything was good …. We were fine, we were just a normal—not a rich—family, but very comfortable, right? I went to work, he went to work, we hardly ever saw each other because we worked for 10 hours. But we had a plain old normal life. We moved to a [new suburb] after a few years because … there were better schools and we wanted a home where [each of our] kids could have his own room."[1]



Then, in 2003, Antonio decided to take his young son and wife on a three-week trip to Italy for a niece's wedding. Upon their return to O'Hare airport, Antonio was taken into custody in connection with a conviction he had received 19 years earlier, for attempting with an accomplice to rob a pizza parlor. Antonio had been sentenced to six years in prison, and released after three years for good behavior. He had complied with all conditions of his parole by reporting once a month to a parole officer.

© 2005 private

Antonio was ordered deported back to Italy. Cristina explained what happened when she was called to testify at the immigration court:

When I begged the judge not to take Tony away, the judge said, "You have a job, you can work." Well what happened to America and family unity? What happened to that? Does that not mean anything? No child left behind? Mr. Bush? We pay taxes. My husband paid taxes. He was here for 30 years

---

[1] Human Rights Watch interview with Cerami family, Chicago, Illinois, February 5, 2006.

　　　　AR.09004

> [before his deportation] …. My daughter, you should have seen the way she
> was crying … when I saw her face in court, that was a nightmare. He was her
> dad. He raised her since she was five years old …. My whole family was there.
> We're decent people. It was a very traumatic experience for my whole family,
> but mostly for my kids.[2]

Cristina's youngest son had to undergo counseling after his father was deported. She explained, "He's a good boy, but he started using drugs." The loss of Antonio's income and expensive legal fees took their toll on the family. Cristina lost the house in the suburbs. Her oldest daughter moved in with her boyfriend's family and, Cristina explained,

> My daughter had problems. I had problems. I cried every day. Right now we
> don't really have a home. We're living with friends and family. John lives with
> a friend, Jessica lives with another friend, Danny's with his uncle and Angela
> lives with another friend. They have really split us up.[3]

Unfortunately, the Ceramis are not alone. Hundreds of thousands of families throughout the United States are being forced apart by punitive and inflexible US deportation policies. Regularly, legal immigrants who have lived in the country for decades with family members who are citizens or lawful permanent residents are being deported from the United States.

Contrary to popular belief, US deportation policy did not become more severe after the terrorist attacks on September 11; instead, drastic changes made in 1996 have been at work for more than a decade, devastating communities across the nation. Also, contrary to popular belief, these policies do not target only undocumented immigrants—they apply to long-term lawful permanent residents (or green card holders) as well. When these members of the community of the United States are deported, their absence is felt because shops close, entrepreneurs lose their business partners, tax revenues are lost, and, most tragically, US citizen and lawful permanent resident children and spouses are forced to confront life without their fathers, mothers, children, husbands, or wives.

Deportation is a necessary part of every country's enforcement of its immigration laws. To be sure, the non-citizens featured in this report are being deported for a reason—they have violated the criminal laws of the United States, making them subject to deportation after

---

[2] Ibid.

[3] Ibid.

FORCED APART

4

they have finished serving their criminal sentences. However, many immigrants being deported from the United States are a far cry from the worst and most violent offenders. Non-citizens have been forced into permanent exile for non-violent misdemeanor offenses, even if they served a short sentence with a perfect record of good conduct. As shown in the case of Mr. Cerami, the 1996 laws have also had sweeping retroactive effects: a criminal offense committed in the 1980s that did not trigger deportation at that time can now render a non-citizen deportable, even if the non-citizen served a prison sentence, successfully completed all terms of probation, and has since lived, worked, and raised a family in the community without ever running into trouble with the law again.

Not only have deportation laws become more punitive—increasing the types of crimes that can permanently sever an immigrant's ties to the United States—but there are fewer ways for immigrants to appeal for leniency. Hearings that used to happen in which a judge would consider immigrants' ties to the United States, most especially their family relationships, were stopped in 1996 for those convicted of a long list of crimes. There are no exceptions available, no matter how long an individual has lived in the United States and no matter how much his spouse and children depend on him for their livelihood and emotional support.

A retired immigration judge shared the frustration he felt when he was unable to prevent deportation because of the strict requirements of the changed laws:

> My 30-year career with the Department of Justice has been exciting and stimulating. Each case I hear is a life story. I have been able to grant refuge to persons who have a genuine fear of persecution. I have been able to unite or re-unite families. On the other hand, in many cases I have had to deal with the frustration of not being able to grant relief to someone because of the precise requirements of the statute, even though on a personal level he appears to be worthy of some immigration benefit.[4]

In the United States between 1997 and 2005 (the most recent year for which data are publicly available), 672,593 non-citizens have been deported for criminal offenses.[5] The Department of Homeland Security (DHS) has only recently disclosed general statistics on the criminal convictions that formed the basis for removal orders. In 2005, 64.6 percent of the

---

[4] James P. Vandello, "Perspective of an Immigration Judge," *Denver University Law Review*, vol. 80 (2003), p. 775.

[5] Immigration and Naturalization Service, "Enforcement Operations, Aliens Removed by Criminal Status and Region and Selected Country of Nationality," *Statistical Yearbook 1997*, Table 65 (FY 1997), p. 185; Department of Homeland Security, *Yearbook of Immigration Statistics 2005*, Table 41 and Table 42 (FY 1998-2005), http://www.dhs.gov/ximgtn/statistics/publications/YrBk05En.shtm (accessed May 31, 2007).

immigrants deported were removed for non-violent offenses like drug convictions, illegal entry, and larceny; 20.9 percent were removed for violent offenses; and 14.7 percent were removed for "other" crimes.

Unfortunately, we have no idea whether and how many of those 672,593 non-citizens were lawful permanent residents or otherwise in the country with legal permission, and how many were undocumented. There are also no hard data on their family relationships. However, based on the 2000 US Census, we estimate that approximately 1.6 million spouses and children living in the United States were separated from their parent, husband, or wife because of these deportations.

Human rights law recognizes that the privilege of living in any country as a non-citizen may be conditional upon obeying that country's laws. However, a country like the United States cannot withdraw that privilege without protecting the human rights of the immigrants it previously allowed to enter. Unfortunately, that is precisely what US immigration law fails to do—it gives no opportunity to immigration judges to balance the individual's crime against his or her family relationships, length of time in the US, military service, economic ties to the US, likelihood of persecution, or lack of connections to the country of origin.

Without being able to raise these issues in their immigration hearings, people's rights to have these factors taken into account are violated. In this respect, the United States is far out of step with international human rights standards and the practices of other nations, particularly nations that it considers to be its peers. For example, of all the governments in western Europe, the United States joins only Luxembourg in not weighing family ties or providing for some proportionality analysis in all of its deportation proceedings.

In this report, Human Rights Watch charts the various devastating ways in which changes to immigration laws passed 10 years ago have impacted America's families. We reiterate a theme that US President George W. Bush has repeatedly recognized, including in an April 9, 2007 statement about proposed comprehensive immigration reform legislation: "[F]amily values d[o] not stop at the Rio Grande River."[6]

Human Rights Watch calls on the President and Congress, as a part of comprehensive immigration reform or other legislation, to hold true to those words. The United States

---

[6] The White House, "President Bush Discusses Comprehensive Immigration Reform in Yuma, Arizona," US Border Patrol, Yuma Station Headquarters, Yuma, Arizona, April 9, 2007, http://www.whitehouse.gov/news/releases/2007/04/20070409-12.html (accessed May 30, 2007).

AR.09007

should reinstate hearings that would allow immigrants facing deportation the chance to ask a judge to allow them to remain in the United States when their crimes are relatively minor and their connections (including their family ties) to the United States are strong. We ask Congress to take a second look at the kinds of crimes that render people deportable, in order to prevent permanent and mandatory banishment from the United States for relatively minor non-violent crimes like theft or drug possession. Providing for proportionality in deportation and protecting family unity are essential to a just and fair immigration policy, and this cannot be accomplished without amending US immigration law to allow for relatively simple balancing hearings.

# II. Recommendations

## To the President of the United States

- Encourage Congress to amend immigration laws to ensure that all non-citizens have access to a hearing before an impartial adjudicator, weighing the non-citizen's interest in remaining in the United States against the US interest in deporting the individual.

## To the United States Congress

- Amend immigration laws to provide access to a balancing hearing before an impartial adjudicator in which an individual non-citizen's interest in remaining in the United States is weighed against the US interest in deporting the individual.
  - In the reinstated balancing hearings, ensure that the following are weighed in favor of the non-citizen remaining in the United States:
    - Family relationships in the United States,
    - Hardship family members will experience as a result of deportation,
    - The best interests of any children in the family,
    - Legal presence in the United States,
    - Length of time in the United States,
    - Period of time after the conviction during which the non-citizen has remained conviction-free (evidence of rehabilitation),
    - Investment in the community of the United States through business enterprises, military service, property ownership, and/or tax payments,
    - Lack of connection to the country of origin.
- Amend immigration laws so that only non-citizens who have committed serious, violent crimes (not misdemeanor crimes), for which the non-citizen has served an actual prison term (not probation or drug treatment sentences) are subject to deportation.
- Amend immigration laws to ensure that individuals whose lives or freedom would be threatened if returned are provided protection from return to persecution unless they have been convicted of a particularly serious crime and are dangerous to the community of the United States within the meaning of the 1951 Refugee Convention.
- Amend immigration laws to ensure that offenses that did not trigger deportation at the time they were committed are not used to deport immigrants now.

ER-0968                                                                    AR.09009

- Amend immigration laws to allow state and federal criminal judges to sentence non-citizens convicted of crimes with a judicial recommendation against deportation ("JRAD").

## To the Department of Homeland Security

- Publish statistics annually that reveal what criminal convictions form the basis for all removals from the United States on criminal grounds, the immigration status (lawful permanent resident, asylee, etc.) of all persons removed on criminal grounds, and whether non-citizens removed have family relationships with US citizens or lawful permanent residents.

## To the Bureau of Population, Refugees and Migration

- Ensure that individuals who enter the United States through refugee resettlement programs ("refugees") receive information in a language they understand about the naturalization process for themselves and their children.
- After the five-year waiting period, conduct follow up through social service agencies with refugees and their children to ensure that they receive support and advice in a language they understand so that they may naturalize.

## To the United States Citizenship and Immigration Services

- Ensure that individuals who are granted asylum ("asylees") receive information in a language they understand about the naturalization process for themselves and their children.
- After the five-year waiting period, conduct follow up through social service agencies with asylees and their children to ensure that they receive support and advice in a language they understand so that they may naturalize.

## To Criminal Defense Attorneys

- Advise clients on the immigration consequences of criminal convictions or other criminal dispositions such as guilty pleas, court-mandated drug treatment, or probation.

# III. Deportation Law Based on Criminal Convictions Before 1996

## Early History of the Deportation Power

In 1996, Congress adopted the most sweeping immigration law changes in the history of the United States, focusing in particular on deporting non-citizens with criminal convictions. In the 50 years leading up to these historic amendments, Congress had already made incremental changes to US immigration law. This chapter traces the most significant of these earlier changes, setting the stage for Congress's broad overhaul in 1996.

All governments enact immigration laws to control the flow of people across their borders. The United States is no exception, and has a long history of regulating which non-citizens can enter and live in the country, for how long, and for what reasons. Early laws mostly controlled entry to the country, and were less concerned with deportation.[7] For example, a general immigration law passed in 1875 excluded prostitutes and alien convicts from entering the United States, and the 1882 Immigration Act denied entry to "convicts (except those convicted of political offences), lunatics, idiots, and persons likely to become public charges."[8] An 1891 law refused entry to prospective immigrants who had a "dangerous contagious disease" or were polygamists, and a 1917 law established a literacy requirement for admission to the country.

However, deportation also has a long history in the United States. As early as 1798, the newly established US Congress passed the Alien Enemies Act and the Alien Friends Act, which empowered the president to expel any non-citizen he deemed dangerous.[9] Other changes passed in 1882 made it illegal for Chinese laborers to enter or to *remain* in the United States.[10] In 1952 the McCarran-Walter Act established the basic structure of US immigration law today, setting up deportation procedures, creating an admissions system with quotas based on nationality, as well as detailed exclusions based on political grounds. Other major changes to US immigration laws have occurred in 1965, 1980, 1986, 1988, 1990, and 1996.

---

[7] Throughout this report, we use the term "deportation" and "removal" interchangeably to refer to a government's policy to remove a non-citizen from its territory. We note that the terms had different meanings under earlier versions of US immigration law, and that now all such governmental actions are referred to in US law as "removals." Nevertheless, for ease of reading and simplicity we use the more commonly understood term "deportation" wherever possible.

[8] Immigration Act, 1882.

[9] 50 U.S.C. Sections 21-23, 1798.

[10] An Act to Execute Certain Treaty Stipulations Relating to Chinese, Section 1 and Section 2, 1882.

AR.09011

Throughout the history of the United States, many different kinds of non-citizens have been made subject to deportation after criminal convictions. People with lawful permanent resident status (or green card holders), including those who have lived lawfully in the US for decades, are subject to deportation. So are other legal immigrants—refugees, students, businesspeople, and those who have permission to remain because their country of nationality is in the midst of war or a humanitarian disaster. Of course, undocumented non-citizens are also subject to deportation regardless of whether they have committed a crime.

A primary principle of US immigration law is that US citizens can never be denied entry into the US; neither can they ever be forcibly deported from the US. By contrast, non-citizens, even those who have lived in the country legally for decades, are always vulnerable to deportation, especially if they have been convicted of a crime.

## Crimes of Moral Turpitude and Aggravated Felonies

Created as a category in 1891, "crimes of moral turpitude" have long been a type of criminal conviction that could render non-citizens subject to deportation. The term "moral turpitude" is undefined in immigration law, and this lack of clarity has left courts to draw their own conclusions as to what crimes fit the definition over time. Courts have generally found that a "moral turpitude" offense must involve immoral or fraudulent intent[11] as an element of the offense.[12] Weapons offenses involve moral turpitude when committed with a malicious intent, but not when committed "passively."[13] Attempts and conspiracies to commit crimes and being an accessory to a crime involve moral turpitude if the primary or substantive offense does.[14]

Broadly speaking, from 1952 until 1996, non-citizens were subject to deportation for crimes of moral turpitude committed within five years after the date of entry and with a sentence of

---

[11] Charles Gordon et al., *Immigration Law and Procedure* (New York: Matthew Bender, revised edition, 1999), Sections 71.05[1][d][i] and 71.05[1][d][iii].

[12] Commentators divide "crimes involving moral turpitude" into four major categories: (1) crimes against the person; (2) crimes against property; (3) sex crimes and crimes involving family relationships; and (4) crimes of fraud against the government or its authority. Brian C. Harms, "Redefining 'Crimes of Moral Turpitude': A Proposal to Congress," *Georgetown Immigration Law Journal*, vol. 15 (Winter 2001), p. 259.

[13] See, for example, *Andreacchi v. Curran*, 38 F.2d 498 (S.D.N.Y. 1926); *Ex parte Saraceno*, 182 F. 955 (S.D.N.Y. 1910); *In re S*, Immigration & Nationality Laws Administrative Decisions, vol. 8, decision 344 (B.I.A. 1959) (carrying a concealed weapon is a crime of moral turpitude when local statute specifies that carrying a concealed deadly weapon allows presumption that person carrying weapon had intent to use it against another person).

[14] Annotation, "What Constitutes 'Crime Involving Moral Turpitude' Within Meaning of Sections 212(a)(9) and 241(a)(4) of Immigration and Nationality Act (8 USCS Sections 1182(a)(9), 1251(a)(4)), and Similar Predecessor Statutes Providing for Exclusion or Deportation of Aliens Convicted of Such Crime," *American Law Reports Federal*, vol. 23 (1975), p. 487 (citing *Jordan v. DeGeorge*, 341 U.S. 223 (1951)).

AR.09012

at least one year.[15] Non-citizens were also subject to deportation for violating a controlled substance law[16] or for unlawful possession of an automatic weapon.[17]

With the passage of the Anti-Drug Abuse Act (ADA) in 1988, Congress added to the types of crimes that could render someone deportable and began limiting the procedures available to non-citizens who wished to challenge their deportation. The ADA added a new category of crimes for which non-citizens were subject to deportation, called "aggravated felonies." This category included murder as well as many of the crimes previously categorized as crimes of moral turpitude, including drug and firearms offenses.[18]

Virtually every subsequent change to US immigration law has included an expansion of the aggravated felony definition. The Immigration Act of 1990 expanded the category to include crimes of violence for which the term of imprisonment that the court may impose is at least five years, as well as money laundering and trafficking in any controlled substance.[19] The Immigration and Technical Corrections Act of 1994 added additional weapons offenses, some theft and burglary offenses, prostitution, tax evasion, and certain categories of fraud as aggravated felonies.[20]

Throughout the history of immigration law in the United States until the present day, deportation ensues only after the non-citizen involved has served his or her criminal sentence. Upon release from criminal incarceration or upon payment of the necessary fines, the non-citizen is put into deportation procedures. Up until 1988, non-citizens could be deported from the United States only after a hearing before an immigration judge in which the non-citizen could raise one of several bases (see discussion below) for canceling[21] their deportation orders. If the immigration judge found that the non-citizen failed to meet any of these bases for cancellation, the order of deportation became final. Thereafter, the non-citizen was deported unless he or she chose to appeal the immigration judge's decision to

---

[15] 8 U.S.C. Section 1251(a)(4)(1952).

[16] 8 U.S.C. Section 1251(a)(11)(1952).

[17] 8 U.S.C. Section 1251(a)(14)(1952).

[18] Anti-Drug Abuse Act, 1988, Section 7344(a).

[19] Public Law No. 101-649, 104 Stat. 4978, 1990.

[20] Public Law No. 103-416, 108 Stat. 4305, 1994.

[21] Although the various defenses to deportation have a variety of technical names in immigration law (cancellation, withholding, waiver, suspension), we use the term "cancellation" simply to mean any decision by an immigration authority or judge to prevent the deportation of a non-citizen from the United States.

AR.09013

the Board of Immigration Appeals (BIA), an administrative court. Once the BIA reached its decision, the non-citizen could appeal to an independent federal court within six months.

From the 1950s until the 1990s, non-citizens could raise one of several possible bases for canceling their deportation from the United States. These were:

- **A Judicial Recommendation against Deportation.** US immigration law used to allow non-citizens to ask their criminal court judge to issue a binding recommendation that, despite conviction of a crime of moral turpitude, the conviction must not trigger deportation.[22] This basis for stopping deportation was eliminated by Congress in 1990.
- **Suspension of Deportation.** A non-legal permanent resident of good moral character who had lived in the US for a minimum of seven years could ask an immigration judge to suspend his or her deportation after demonstrating that deportation would cause him or her extreme hardship.[23]
- **Waiver of Deportation (212(h)).**[24] Non-citizens who were the spouses, parents, or children of a US citizen or legal permanent resident, upon evidencing that they would suffer extreme hardship, could ask the immigration judge to waive deportation based on a crime of moral turpitude or possession of 30 grams or less of marijuana.[25]
- **Waiver of Deportation (212(c)).** Non-citizens who were legal permanent residents and had lived in the United States lawfully for at least seven years could ask the immigration judge to waive deportation based on a series of factors such as family ties within the United States, duration of residence in the United States (particularly when residence began at a young age), hardship to family if deportation occurred, service in US armed forces, history of stable employment, and other evidence attesting to the non-citizen's good character. Adverse factors included the seriousness of the crime, and whether the individual had a record of immigration or additional criminal offenses.[26]

---

[22] 8 U.S.C. Section 1251(b), 1986.

[23] 8 U.S.C. Section 1254(a)(1), (2), 1986.

[24] Throughout this report, in the text we use the more commonly understood citations to the Immigration and Nationality Act ("Section 212(h)"), and in the footnotes we cite to the codification of these sections in the United States Code ("8 U.S.C. Section 1182(h)").

[25] 8 U.S.C. Section 1182(h), 1990.

[26] 8 U.S.C. Section 1182(c), 1990.

AR.09014

- **Withholding.** Non-citizens could ask the immigration judge to withhold their deportation if their life or freedom would be threatened in the country of proposed return on the basis of their race, religion, nationality, membership in a particular social group, or political opinion. Non-citizens with a criminal record could not request withholding if they had been convicted of a "particularly serious crime," a term that was interpreted by courts until 1990, at which time Congress decided that aggravated felonies constituted "particularly serious crimes," and therefore prevented non-citizens with aggravated felony convictions from applying for withholding.[27]

With the passage of the Immigration Act of 1990 and the Immigration and Nationality Technical Corrections Act of 1994, immigration law remained in this configuration until the major changes passed by Congress in 1996.

### Case Study: Why Not Become a Citizen?[28]

Given the very harsh effects of deportation, it is natural to wonder why immigrants do not become citizens; which is the only surefire way to effectively avoid deportation. Human Rights Watch posed this question to many of the individuals and families we interviewed, and we received many credible answers.

For example, Pierre B., originally from the Philippines, lived in the United States from his early childhood as a lawful permanent resident. He was deported from the United States for a criminal conviction. In a telephone interview with a Human Rights Watch researcher, Pierre B's mother, Beth B., explained that she purposefully kept her son from becoming a US citizen since dual citizenship was not an option at the time, and she did not want him to lose his rights to inherit his father's property in the Philippines.

Other immigrants claimed it was ignorance (including the ignorance inherent in youth) that kept them from taking the necessary legal steps to become citizens. Juan F., originally from Guatemala, came to the United States with his mother when he was four years old. He lived in the United States for 19 years, during which time, he said, "my mistake was to not listen to my mom. She told me, 'go become a citizen. . .' In reality, it's my fault."

---

[27] 8 U.S.C. Section 1253(h), 1990.

[28] This text box is based on a Human Rights Watch telephone interview with Beth B., mother of Pierre B. (both pseudonyms), Scottsdale, Arizona, May 2006; a Human Rights Watch interview with Maria F. and Juan F. (both pseudonyms), Los Angeles, California, April 7, 2006; and *Chan v. Gantner*, 464 F.3d 289 (2d Cir. 2006).

AR.09015

Many other immigrants never understood that their status as "lawful permanent residents" was, contrary to the ordinary meaning of the phrase, *not* permanent (see case study "I am Legally Here," below).

Immigrants also fail to apply for citizenship because there is no point in doing so. Individuals who try to naturalize *after* a criminal conviction often fail to meet the "good moral character" requirement in naturalization law. For example, Kai Tung Chan, originally from China, entered the United States on December 20, 1975, with a visitor's visa issued by the United States Consulate in Hong Kong. In June 1985 Chan married a United States citizen, and in October of that year Chan was granted lawful permanent resident status.

In 1993, Chan pled guilty to one count of conspiracy to smuggle aliens, and was sentenced to five years of probation and fined $5,000. Soon thereafter, immigration authorities charged Chan with deportability, but because Chan had accepted responsibility for his offense and because his deportation would cause his family hardship, the immigration judge granted him a waiver of deportation under the previous immigration laws (Section 212(c)). Thereafter, Chan completed his probation and paid the fine without incident.

By 2002, Chan had lived in the US for a decade without committing another offense. On March 20 of that year, he decided to submit an application to become a US citizen through naturalization. On his application, Chan acknowledged his past conviction for conspiracy to smuggle aliens. Chan took and passed the naturalization exam. However, his application for naturalization was denied due to his inability to establish good moral character. The decision to deny his application was affirmed by the court of appeals.

## IV. Deportation Law Based on Criminal Convictions After 1996

Three events—the 1993 World Trade Center bombing,[29] the initial popularity of anti-immigrant legislation in California in 1994 (Proposition 187),[30] and the 1995 Oklahoma City bombing[31]—prompted Congress to restructure United States immigration law in 1996.

The legislative changes were adopted in a rushed atmosphere. During its consideration of the first of the two bills passed, the Antiterrorism and Effective Death Penalty Act (AEDPA), Congress was pressed for time because it sought to adopt legislation prior to April 1996, which was the first anniversary of the Oklahoma City bombing;[32] and in the case of the second bill, the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) (hereinafter both laws are referred to generally as the "1996 laws"), Congress wanted to pass immigration legislation that emphasized enforcement prior to the run-up to the 1998 national elections.[33]

Although commentators since have focused on the fact that the two bills were adopted very quickly,[34] official debate contains few expressions of concern about Congress's haste. One notable exception is Senator Robert Graham of Florida, who said that Congress was "not in

---

[29] John Dillon, "Surge in Immigration to US Raises Public Anxiety, Spurs A Showdown in Congress," *Christian Science Monitor*, December 17, 1993; Anthony Lewis, "Abroad at Home: Warning, Hysteria Ahead," *The New York Times*, October 25, 1993; Robert McFadden, "Immigration Hurts City, New Yorkers Say in Poll," *The New York Times*, October 18, 1993; William Schneider, "Americans Turn against Immigration," *The National Journal*, July 24, 1993; Michael Tackett and Nicholas Horrock, "Terrorism Prompting Immigration Review," *Chicago Tribune*, July 13, 1993.

[30] Human Rights Watch telephone interview with University of Virginia Professor David Martin, former general counsel of US Immigration and Naturalization Service from 1995-98, Charlottesville, Virginia, December 1, 2006.

[31] Gerald F. Seib & John Harwood, "Oklahoma City Terror Bombing May Intensify Hard-Line Views on Crime and Immigration," *Wall Street Journal*, April 21, 1995; Howie Carr, "Bomb begs the question: Do we need immigrants?" *The Boston Herald*, April 21, 1995; Fred LeBrun, "A Time to Turn Down the Radio," *The Times Union* (Albany), April 23, 1995; Tamara Kerrill, "Arab Americans Here Suffer Slings of Suspicion," *Chicago Sun-Times*, April 23, 1995; Editorial, "Don't Bash Immigrants," *The Boston Herald*, April 22, 1995; Mary Abowd, "Arab-Americans Suffer Hatred After Bombing," *Chicago Sun-Times*, May 13, 1995; Peter Brimelow, "Immigration Pendulum has Swung too Far, Now Threatens America's Future," *The Augusta Chronicle* (Georgia), June 1, 1995; Joe Fitzgerald, "Those of Us who Cherish Sanctity of Life Deplore Actions of Madmen like Salvi," *The Boston Herald*, December 28, 1995 (noting that "Nine months ago, local airwaves were used to whip up hatred of 'towelheads' and 'immigrant scum' in the hours following the Oklahoma City bombing, then the accused bombers turned out to be as All-American as the cast from 'Happy Days.'").

[32] Human Rights Watch telephone interview with University of Virginia Professor David Martin, December 1, 2006. Of course, a US-born United States citizen was convicted for committing the Oklahoma City bombing.

[33] Ibid. Martin emphasized that the "theme of enforcement" was very strong among politicians at the time.

[34] John H. Blume, "AEDPA: The 'Hype' and the 'Bite,'" *Cornell Law Review*, vol. 91 (1996), p. 259 (noting that "the use of new statutory language combined with the speed with which Congress enacted AEDPA left the Supreme Court, and lower federal courts, with little guidance regarding Congress's intent.").

as advanced a position as we should be" when considering the legislative changes contained in IIRIRA. He cautioned,

> [I]t was also essentially a closed process. Not only were many of the members of the conference committee not given the opportunity to participate, at the conclusion of the conference they were not even allowed to offer amendments to try to modify provisions which were found to be objectionable. So we have a product today which has not had the kind of thoughtful dialog and debate which we associate with a conference report which is presented to the US Senate for final consideration.[35]

Senator Graham also questioned Congress's narrow focus on an eventually defeated provision that would have granted states the ability to deny public education to undocumented children. Graham said the provision was "so inflammatory that it tended to focus total attention on this legislation on that single provision …. Therefore, we are now focusing for the first time on the totality of this legislation."[36]

The rushed consideration of legislative changes in 1996 was also fueled by a perceived connection between terrorists and non-citizens convicted of crimes. In their statements, members of Congress continually made such connections explicitly or implicitly to non-citizens involved in crime, no matter how petty the offense or how distinguishable from terrorism.[37]

Representative Bill McCollum said that the

> [C]riminal alien provisions in this bill [AEDPA] … are also important to the terrorist issue, because oftentimes we find that terrorists or would-be terrorists are criminal aliens and we are not deporting them in a proper fashion …. The sooner we get them out of the country, the better procedures we have for that, the less likely we are to have that element in this country

---

[35] "Conference Report to Accompany Illegal Immigration Reform and Immigrant Responsibility Act of 1996," Congressional Record, vol. 142, Section 11514, 104th Congress, 2nd Session, September 27, 1996 (Mr. Graham).

[36] Ibid.

[37] In the post-September 11 United States, conflations between non-citizens convicted of crimes and terrorists abound. For example, President George W. Bush said on April 9, 2007, "that way our Border Patrol can chase the criminals and the drug runners, potential terrorists, and not have to try to chase people who are coming here to do work Americans are not doing." The White House, "President Bush Discusses Comprehensive Immigration Reform in Yuma, Arizona," US Border Patrol, Yuma Station Headquarters, Yuma, Arizona, April 9, 2007, http://www.whitehouse.gov/news/releases/2007/04/20070409-12.html (accessed May 30, 2007).

　　　　AR.09018

either create the actual acts of terrorism or directing them in some manner. We need to kick these people out of the country....[38]

Similarly, Representative Lamar Smith said that the 1996 laws

Ensure[] that the forgotten Americans—the citizens who obey the law, pay their taxes, and seek to raise their children in safety—will be protected from the criminals and terrorists who want to prey on them.[39]

However, Representative Patsy Mink of Hawaii questioned her colleagues' conflation of terrorists and non-citizens with criminal convictions:

This bill increases the number of criminal activities that legal aliens can be deported for. Most of the additional offenses are not required to be linked to terrorism .... I am deeply concerned that these provisions expand authorization for deportation of aliens without any association with crimes of violence or terrorism.[40]

President Bill Clinton made a similar comment when signing AEDPA into law. He said, "This bill also makes a number of major, ill-advised changes in our immigration laws having nothing to do with fighting terrorism. These provisions eliminate most remedial relief for long-term legal residents...."[41]

## Specific Crimes Rendering Non-Citizens Deportable

### Aggravated Felonies

The 1996 laws added new crimes to the aggravated felony ground of deportation. First, Congress added 17 additional types of crimes to the category when it passed AEDPA in April 1996.[42]  In September 1996, shortly before Congress adjourned to campaign, it passed IIRIRA, which added four more types of crimes to the aggravated felony definition and lowered

---

[38] Congressional Record, vol. 142, H 2247, H2259-H2260, 104th Congress, 2nd Session, March 14, 1996 (Mr. McCollum).

[39] Congressional Record, vol. 142, H 3605, 3617, 104th Congress, 2nd Session, April 18, 1996 (Mr. Smith).

[40] "Conference Report on S. 735, Antiterrorism and Effective Death Penalty Act of 1996," Congressional Record, vol. 142, no. 55, 104th Congress, 2nd Session, page E645, April 18, 1996 (Ms. Mink).

[41] William J. Clinton, "Statement on Signing the Antiterrorism and Effective Death Penalty Act of 1996," *Weekly Compilation of Presidential Documents*, vol. 32 (April 24, 1996), p. 720.

[42] Antiterrorism and Effective Death Penalty Act (AEDPA) Section 440(e), amending INA Section 101(a)(43), 1996.

AR.09019

certain threshold requirements. For example, before IIRIRA, theft offenses and crimes of violence were aggravated felonies only if the term of imprisonment was five years or more; IIRIRA reduced the term of imprisonment provision to a one-year threshold.[43]

Therefore, since 1996, aggravated felonies include the following broad categories of crime:

- any crime of violence (including crimes involving a substantial risk of the use of physical force) for which the term of imprisonment is at least one year;
- any crime of theft (including the receipt of stolen property) or burglary for which the term of imprisonment is at least one year; and
- illegal trafficking in drugs, firearms, or destructive devices.

The following specific crimes are also listed as aggravated felonies:

- murder;
- rape;
- sexual abuse of a minor;
- illicit trafficking in a controlled substance, including a federal drug trafficking offense;
- illicit trafficking in a firearm, explosive, or destructive device;
- federal money laundering or engaging in monetary transactions in property derived from specific unlawful activity, if the amount of the funds exceeded $10,000;
- any of various federal firearms or explosives offenses;
- any of various federal offenses relating to a demand for, or receipt of, ransom;
- any of various federal offenses relating to child pornography;
- a federal racketeering offense;
- a federal gambling offense (including the transmission of wagering information in commerce, if the offense is a second or subsequent offense) that is punishable by imprisonment of at least one year;
- a federal offense relating to the prostitution business;
- a federal offense relating to peonage, slavery, involuntary servitude, or trafficking in persons;
- any of various offenses relating to espionage, protecting undercover agents, classified information, sabotage, or treason;
- fraud, deceit, or federal tax evasion, if the offense involves more than $10,000;

---

[43] Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Section 321(a)(3), 1996.

AR.09020

- alien smuggling, other than a first offense involving the alien's spouse, child, or parent;
- illegal entry or re-entry of an alien previously deported on account of committing an aggravated felony;
- an offense relating to falsely making, forging, counterfeiting, mutilating, or altering a passport or immigration document if (1) the term of imprisonment is at least one year and (2) the offense is not a first offense relating to the alien's spouse, parent, or child;
- failure to appear for service of a sentence, if the underlying offense is punishable by imprisonment of at least five years;
- an offense relating to commercial bribery, counterfeiting, forgery, or trafficking in vehicles with altered identification numbers, for which the term of imprisonment is at least one year;
- an offense relating to obstruction of justice, perjury or subornation of perjury, or bribery of a witness, for which the term of imprisonment is at least one year;
- an offense relating to a failure to appear before a court pursuant to a court order to answer to or dispose of a charge of a felony for which a sentence of two years' imprisonment or more may be imposed; and
- an attempt or conspiracy to commit one of the foregoing offenses.

While some of the above examples of aggravated felonies would seem to be severe offenses for which deportation is an appropriate punishment, in practice it is not always clear cut.  For example, Ramon H. (a pseudonym) is originally from Mexico. He married a United States citizen, Pamela H., (a pseudonym) in 1990. In February 1993, Ramon pled guilty to lewd or lacscivious acts with a minor.  After his plea, he completed his probation, according to his probation officer, "in an exemplary fashion."[44] He applied to adjust his status to that of a lawful permanent resident through his US citizen wife in 1996, but in 2001 DHS informed him that he was deportable for his criminal conviction, and he was placed in removal proceedings in August 2004.

The circumstances of Ramon's crime were later described by his niece Kelda in a sworn affidavit that she submitted during his deportation hearing. Kelda explained that during a family gathering, Ramon patted her "lightly on the butt … for no apparent reason."[45] Kelda

---

[44] Letter from Dick Tschinkel, Los Angeles County Probation Department, October 15, 2004 (on file with Human Rights Watch).

[45] Affidavit of Kelda O. (pseudonym), submitted in opposition to Ramon's deportation, October 15, 2004 (on file with Human Rights Watch).

AR.09021

mentioned the incident to a friend at school, who in turn told a teacher, and the school called the police, resulting in Ramon's conviction and order of deportation.

Some minor drug crimes are considered aggravated felonies. For example, 24-year-old Mario Pacheco entered the United States with his mother in 1981 when he was two months old. He lived in Chicago with his parents as a lawful permanent resident for 20 years, where he attended public schools. Mario obtained his general equivalency diploma (GED) and went to work right away.

At the age of 19, in 2001, Mario was convicted for possession of 2.5 grams of marijuana with intent to distribute, which is a misdemeanor offense under Illinois law, but is also considered an aggravated felony under immigration law. The drugs were discovered in Mario's car after he was stopped for a broken taillight. Mario explained that he was hanging out with the wrong crowd at the time, that he often drove friends in his car, and that the drugs belonged to one of his friends. He was sentenced to one year of "supervision"—a sentence that is less severe than probation.

At this writing, Mario was still trying to appeal his deportation, but his prospects did not look good. Mario works about 60 hours a week in the shipping department at a large warehouse and is the father of three US citizen children, ages two to six.[46]  Mario's parents also spoke with a Human Rights Watch researcher.[47] They both are lawful permanent residents: his mother has worked at the same company for more than 20 years and has a graduate degree in business, which she obtained by attending courses at night while working full time. His mother spoke about how stressful her son's impending deportation was for her and the family: "If you do something very bad, then I'm not saying anything about that. But he's being punished for something he did when he was a teenager. He didn't even go to jail."[48]

Ricardo S. was also facing separation from his US citizen wife and two children because of an aggravated felony drug conviction. He was ordered deported because of a conviction for possession with intent to distribute a small amount of heroin, for which he was advised by a defense attorney to plead guilty. In return for his guilty plea, he received no jail time but was ordered to pay a fine of $500 and serve two years probation, which he completed without incident. Ricardo S. had no other criminal convictions and worked in construction in the Chicago area. His conviction was brought to the attention of the immigration authorities

---

[46] Human Rights Watch interview with Mario Pacheco, Chicago, Illinois, February 2, 2006.

[47] Human Rights Watch interview with Pacheco family, Chicago, Illinois, February 2, 2006.

[48] Stacie Williams, "One Strike, You're Out," *The Chicago Reporter*, July/August 2005.

because he and his US citizen wife, who were married in 2001, applied to adjust Ricardo S.'s status to that of a lawful permanent resident. Looking back on his one conviction, Ricardo S. said,

> I feel bad about it because of my family. If I was by myself, without my wife or any children, it would have been a lot different. But I feel real bad for them …. Maybe if they would have caught me with a ton of drugs [I could understand them wanting to deport me], or if I ever murdered somebody. But it was the only one …. I wish that [when I applied for my green card] they would have just told me I didn't qualify. I have kids who are citizens and a wife who is a citizen but I wish they would have just let me continue working to support my family….[49]

Deportation under almost any circumstances limits a non-citizen's ability to return, even temporarily, to the United States. Non-citizens previously removed are barred from re-entry for five or 10 years, depending on the circumstances of their removal. For non-citizens with aggravated felony convictions, this bar to re-entry is permanent, unless they can obtain permission to enter from the Attorney General, which is rarely granted.[50] Thus, for families separated due to offenses classified as aggravated felonies, deportation permanently splits the family in two. Spouses and children are often either US citizens or lawful permanent residents, and cannot relocate to the deportee's country of origin. In addition to the strong connections to the United States that these family members often have, parents of school-age children emphasize that the United States is the only home their children have ever known, that their children often do not speak any language other than English, and that their children are being educated in US schools as reasons for not being able to join their deported spouse permanently.

### Crimes of Moral Turpitude

Immigrants are deportable if they are convicted of a "crime involving moral turpitude" within five or in some cases 10 years after they enter the United States and their crime carries a sentence of one year or longer.[51]  A non-citizen is also deportable if he or she is convicted of two or more crimes of moral turpitude at any time after admission.[52]  In 1996 Congress did

---

[49] Human Rights Watch interview with Ricardo S. (pseudonym), Chicago, Illinois, February 3, 2006.

[50] 8 U.S.C. Section 1182(a)(9)(A), 1996.

[51] 8 U.S.C. Section 1227(a)(2)(A)(i)(I) and (II), 1996.

[52] 8 U.S.C. Section 1227(a)(2)(A)(ii), 1996.

AR.09023

not change the crimes considered to meet the definition of "moral turpitude." However, it did make it more difficult for non-citizens with convictions for crimes of moral turpitude to defend against deportation, primarily because Congress made the standards more rigorous and the determination of who merited cancellation of removal entirely up to the discretion of the immigration judge.

Under the Immigration and Nationality Act (INA) Section 240A(a), non-citizens convicted of moral turpitude crimes can apply for "cancellation of removal":

> The Attorney General may cancel removal in the case of an alien who is inadmissible or deportable for the United States if the alien:
>
> (1) has been an alien lawfully admitted for permanent residence for not less than 5 years;
> (2) has resided in the United States continuously for 7 years after having been admitted in any status;
> (3) has not been convicted of an aggravated felony.[53]

For example, Mark Ferguson, a native of the United Kingdom who had lived in the United States lawfully as a green card holder since the age of three, was convicted of two or more crimes of moral turpitude for "mooning" (showing his nude buttocks to) women. Ferguson testified that in the past he had mooned a woman about once every six months, but was under psychiatric treatment for the practice, and under treatment had not re-offended for two years. He submitted expert testimony that he was not sexually aroused by the practice, had an "unusually low" chance of re-offending, and that he had strong family connections to the United States, including because he was a primary caregiver for his deceased sister's children. The Board of Immigration Appeals found that although he was statutorily eligible for cancellation of removal under INA Section 240A, cancellation of Ferguson's removal would not be in the best interests of the United States. On appeal, the court found that it had no power to review that discretionary decision.[54]

## Definitions Include Relatively Minor Crimes

In 1996, listeners to Congressional debate were left with the impression that only the most violent non-citizen offenders would be subject to deportation once the 1996 laws were

[53] 8 U.S.C. Section 240A(a), 1996.

[54] *Ferguson v. Attorney General of the United States*, 2007 U.S. App. LEXIS 3100 (3d Circuit, February 9, 2007).

passed. Senator Alan Simpson of Wyoming chose two from the long list of more minor crimes that would require deportation in the new legislation, noting that "domestic violence and stalking are made deportable offenses."[55]

Similarly, focusing on felonies (and ignoring the many misdemeanor crimes that would also trigger deportation under the proposed legislation), Senator Spencer Abraham of Michigan said, "By conservative estimates, almost half a million felons are living in this country illegally. These aliens have been convicted of murder, rape, drug trafficking, potentially such crimes as espionage, sabotage, treason and/or a number of other serious crimes...."[56]

Even after the new laws were in place for a year, there remained some confusion among legislators responsible for the bills' passage as to what kinds of crimes actually triggered deportation. In an article published in the *Washington Post* in 1998, Congressman Lamar Smith of Texas denied that shoplifting could render someone deportable and characterized this assertion as "a view peddled in the media by immigration lawyers."[57] But, in fact, shoplifting is a deportable offense.

Congresswoman Patsy Mink of Hawaii and Senator Edward Kennedy of Massachusetts were among the few legislators who raised concerns about the minor crimes that would result in deportation under the new laws. Summing up her views on this issue, Representative Mink said,

> [I]t is wrong to place upon legal immigrants a higher penalty for crimes which in themselves are not related to terroristic actions. Deportation should be reserved for only the most heinous of crimes rendering the person unfit to remain in the country.[58]

Similarly, Senator Kennedy said,

> It applies to all criminal aliens, regardless of the gravity of their offense .... whether they are murderers or petty shoplifters. An immigrant with an

---

[55] Congressional Record, vol. 142, no. 137, 104th Congress, 2nd Session, September 28, 1996 (Mr. Simpson).

[56] "Conference Report on S. 735, Antiterrorism and Effective Death Penalty Act of 1996," Congressional Record, vol. 142, no. 55, 104th Congress, 2nd Session, page E645, April 18, 1996 (Mr. Abraham).

[57] Lamar Smith, "Immigration Facts," *Washington Post*, February 16, 1998.

[58] "Conference Report on S. 735, Antiterrorism and Effective Death Penalty Act of 1996," Congressional Record, vol. 142, no. 55, 104th Congress, 2nd Session, page E645, April 18, 1996 (Ms. Mink).

FORCED APART                                    24

American citizen wife and children sentenced to 1-year probation for minor tax evasion and fraud would be subject to this procedure. And under this provision, he would be treated the same as ax murderers and drug lords.[59]

## Elimination of Defenses to Deportation

As noted above, prior to 1996, there were several grounds that non-citizens could raise in order to cancel their deportation from the United States: a judicial recommendation against deportation (JRAD); suspension of deportation; 212(h) waiver of deportation; 212(c) waiver of deportation; and withholding. The JRAD was eliminated in 1990. In 1996 Congress eliminated 212(c) waivers and replaced suspension of deportation with cancellation of removal, instituting instead a much narrower waiver under 240A(a) for legal permanent residents (described above). Congress further decided to limit immigrants with criminal convictions' ability to apply for 212(h) waivers and withholding.

### Elimination of 212(c) Waiver of Deportation

The continuing expansion of the aggravated felony definition, culminating in the 1996 laws, has meant that increasing numbers of non-citizens find themselves barred from raising defenses to deportation in their immigration hearings. The very limited relief that does remain in immigration law at this writing, in the Immigration and Nationality Act (INA) Sections 240A and 212(h), is not available to those convicted of aggravated felonies.[60]

Congress chose to eliminate hearings under former INA Section 212(c) with the passage of the 1996 laws. The hearings had allowed seven-year lawful permanent residents who committed crimes to seek discretionary relief from deportation from an immigration judge by showing negative factors were outweighed by positive factors.[61] Negative factors in a 212(c) application included: the nature and underlying circumstances of the reason for deportation; the presence of additional significant violations of the immigration laws; the existence of a criminal record and, if so, its nature, recency, and seriousness; and the presence of other

---

[59] Congressional Record, vol. 141, S 7803, 104th Congress, 2nd Session, (Mr. Kennedy).

[60] IIRIRA, Pub. L. No. 104-208, Section 348, 110 Stat. 3009-628 (2005).

[61] Section 212(c) provided, "Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General …. The first sentence of this subsection shall not apply to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years." INA 212(c), 8 U.S.C. 1182(c), 1994 (repealed 1996 by AEDPA Section 440(d)).

evidence indicative of a respondent's bad character or undesirability as a permanent resident of the United States.[62]

Favorable 212(c) factors included: family ties within the United States; residence of long duration in the country (particularly when the inception of residence occurred while the respondent was of young age); evidence of hardship to the respondent and family if deportation occurs; service in the US Armed Forces; a history of employment; the existence of property or business ties; evidence of value and service to the community; proof of a genuine rehabilitation if a criminal record exists; and other evidence attesting to a respondent's good character (for example, affidavits from family, friends, and responsible community representatives).[63]

Throughout the 1996 legislative debate, Congress never considered these factors in detail, and never analyzed the utility or importance of retaining a hearing in which some or all of them were weighed. Instead, Congress took a wholesale approach and eradicated the hearings altogether.

Legislative discussion on this issue lacked nuance, especially because legislators tended to lump all non-citizens convicted of crimes into one category—neglecting the fact that the legislation under consideration would include legal residents with minor offenses and affect US citizen family members. As a result, Congress chose to eliminate 212(c) across the board.

Congress was motivated by its belief that 212(c) relief was abused, leading to unnecessary delays in deportation. A colloquy between Senator Orrin Hatch of Utah and Senator Abraham revealed a concern on the part of both senators that immigration judges were granting

---

[62] *Matter of Marin*, Board of Immigration Appeals, Immigration & Nationality Laws Administrative Decisions, vol. 16, decision 581, August 4, 1978. *Matter of Marin* cites to the following cases in support of the use of these factors: *Matter of Carrasco*, Interim Decision 2579 (BIA 1977), aff'd on other grounds; *Carrasco-Favela v. INS*, 563 F.2d 1220 (5 Cir. 1977); *Matter of Edwards*, Immigration & Nationality Laws Administrative Decisions, vol. 10, decision 506 (BIA 1963, 1964); *Matter of M---*, Immigration & Nationality Laws Administrative Decisions, vol. 3, decision 1804 (BIA 1949) (involving the seventh proviso to section 3 of the Immigration Act of 1917); *Matter of V---*, Immigration & Nationality Laws Administrative Decisions, vol. 1, decision 293 (BIA 1942) (seventh proviso); *Matter of G---*, Immigration & Nationality Laws Administrative Decisions, vol. 1, decision 8 (BIA 1940; A.G. 1940) (seventh proviso).

[63] *Matter of Marin*, Immigration & Nationality Laws Administrative Decisions, vol. 16, decision 581, (BIA 1978). *Matter of Marin* cites to the following cases in support of the use of these factors: *Matter of Edwards* (see above); *Matter of G--- A---*, Immigration & Nationality Laws Administrative Decisions, vol. 7, decision 274 (BIA 1956); *Matter of F---*, Immigration & Nationality Laws Administrative Decisions, vol. 6, decision 537 (BIA 1955); *Matter of S---*, Immigration & Nationality Laws Administrative Decisions, vol. 6, decision 392 (BIA 1954; A.G. 1955); *Matter of M---*, Immigration & Nationality Laws Administrative Decisions, vol. 5, decision 598 (BIA 1954); *Matter of G--- Y--- G---*, Immigration & Nationality Laws Administrative Decisions, vol. 4, decision 211 (BIA 1950; Act'g A.G. 1951) (seventh proviso); *Matter of M---*, Immigration & Nationality Laws Administrative Decisions, vol. 3, decision 1804 (BIA 1949) (seventh proviso); *Matter of V---/---*, Immigration & Nationality Laws Administrative Decisions, vol. 3, decision 571 (BIA 1949) (seventh proviso); Matter *of V---*, (see above); *Matter of G---*, (see above).

discretionary relief under 212(c) too frequently. Senator Abraham highlighted his concern by stating, "for the past 8 years, however, 212(c) relief has been granted to more than half of all who apply, the vast majority of whom are criminal aliens, amounting to thousands of criminal aliens per year."[64]

By contrast, Immigration and Naturalization Service (INS) officials, who on a daily basis saw the important role that the hearings played, were distressed to see the elimination of the 212(c) provision:

> Key officials in the Department of Justice were keenly aware … that the "criminal alien" slogan, for all its power on the campaign trail, embraces a vast spectrum of human character and behavior. Some such criminals are truly dangerous, but a large fraction of this class made single mistakes or had shown genuine rehabilitation and remorse. In the view of those officials, most such deportable aliens should at least be eligible for consideration of release during proceedings and for a discretionary waiver of deportation altogether, as had earlier been possible under INA § 212(c).[65]

An immigration judge interviewed by a Human Rights Watch researcher for this report said,

> It is true that judges often granted 212(c) relief, but that was because immigration judges often saw deserving cases. Congress did not accept that fact, and so took judicial discretion away. Instead, what they created was a statute with so many legal interpretation questions that litigation did not decrease at all after 1996.[66]

Drawing a connection between slow deportation rates and the judicial review that non-citizens used to request once they received an order of deportation, Representative Henry Hyde of Illinois spoke in favor of what he called AEDPA's "criminal alien deportation improvements …. they can get deported with expedition rather than go through another and another and another hearing."[67]

---

[64] Congressional Record, vol. 142, S 12294, 104th Congress, 2nd Session (Mr. Abraham).

[65] David A. Martin, "Graduated Application of Constitutional Protections for Aliens: The Real Meaning of *Zadvydas v. Davis,*" *The Supreme Court Review,* vol. 47 (2001), p. 92.

[66] Human Rights Watch interview with an immigration judge who requested anonymity, October 26, 2006.

[67] "Conference Report on S. 735, Antiterrorism and Effective Death Penalty Act of 1996," Congressional Record, vol. 142, no. 55, 104th Congress, 2nd Session, page E645, April 18, 1996 (Mr. Hyde).

In fact, according to the Department of Justice, on average, 12,043 cases were appealed by immigrants from the administrative level to the Board of Immigration Appeals in the seven years prior to April 1, 1997 (the date the 1996 laws took effect).[68] In the seven years after the laws took effect (up through April 1, 2004), on average, 22,629 cases were appealed each year.[69]

Although many members of Congress clearly thought the elimination of 212(c) was a good thing, Senator Kennedy did not. He argued against the bill's "one size fits all approach" that eliminated hearings balancing non-citizens' interests in remaining in the country against the government's interest in deportation:

> [T]his amendment virtually eliminates the Attorney General's flexibility to grant discretionary relief from deportation for long-time permanent residents convicted of lesser crimes …. [T]his discretionary relief would be denied to permanent residents for carrying a concealed firearm, drug abuse or addiction, in which no conviction would even be required, any drug offense involving more than 30 grams of marijuana, and other such crimes. They could live here productively for 30 years and have an American citizen wife and children. But for them, it is one strike and you are out.[70]

---

[68] Statistics provided by US Department of Justice, Executive Office for Immigration Review, October 31, 2006 (on file with Human Rights Watch).

[69] Ibid.

[70] Congressional Record, vol. 141, S 7803, 104th Congress, 1st Session, June 7, 1995 (Mr. Kennedy).

ER-0988

AR.09029

**Case Study: Deportation in Europe: the Boultif Test[71]**

The 47 member countries in the Council of Europe (COE) have adopted the European Convention for the Protection of Human Rights and Fundamental Freedoms (the "European Convention" or ECHR), which places them under the jurisdiction of the European Court of Human Rights (ECtHR). Any person alleging a rights violation under the European Convention within a Council nation can take their case to the ECtHR, whose decisions are legally binding upon Council member nations. Article 8 of the European Convention covers an individual's right to family life and provides:

1. Everyone has the right to respect for his private and family life, his home and his correspondence.
2. There shall be no interference by a public authority with the exercise of this right except such as is in accordance with the law and is necessary in a democratic society in the interests of national security, public safety or the economic well-being of the country, for the prevention of disorder or crime, for the protection of health or morals, or for the protection of the rights and freedoms of others.

The right to be free from government interference with family life has been successfully asserted by non-citizens facing deportation because of criminal convictions. In several COE nations, non-citizens have challenged deportation by proving that it would unjustifiably interfere with their right to family life or because the deportation procedures they were subject to gave inadequate attention to their Article 8 rights.

The ECtHR's approach to these questions was established in 2001 by the *Boultif v. Switzerland* case. The case involved an Algerian citizen who moved to Switzerland in 1992 and married a Swiss woman a few months later. He was soon convicted of weapons possession and then, in 1994, of physically assaulting and robbing a man in Zurich, for which he received a two-year sentence. Shortly after he started his sentence, Swiss authorities refused to renew his residence permit and the Swiss Federal Court held that his deportation did not violate Article 8 of the European Convention, since it was a valid exercise of state power in the interests of public order and security.

---

[71] This text box is based on analysis of the European Court of Human Rights case, *Boultif v. Switzerland*, (App. 54273/00) Judgment of 2 August 2001; EHRR 497. The case was based on the European Convention for the Protection of Human Rights and Fundamental Freedoms (ECHR), which was adopted under the auspices of the Council of Europe on November 4, 1950 for the purpose of protecting human rights and fundamental freedoms in Europe. The ECHR binds the 47 present members of the Council, which are as follows: Albania, Andorra, Armenia, Austria, Azerbaijan, Belgium, Bosnia and Herzegovina, Bulgaria, Croatia, Cyprus, Czech Republic, Denmark, Estonia, Finland, France, Georgia, Germany, Greece, Hungary, Iceland, Ireland, Italy, Latvia, Liechtenstein, Lithuania, Luxembourg, Macedonia, Malta, Moldova, Monaco, Montenegro, Netherlands, Norway, Poland, Portugal, Romania, Russia, San Marino, Serbia, Slovakia, Slovenia, Spain, Sweden, Switzerland, Turkey, Ukraine, and the United Kingdom.

The ECtHR rejected Switzerland's judgment. In so doing, the court determined "guiding principles" for this type of case, establishing a four-step framework. In the first three steps, the court determines whether there has been interference with family life, and if so, if it fits with the factors allowing for such interference in Article 8(2) (such as national security or public safety). The fourth and final step asks whether the interference is "necessary in a democratic society," and weighs eight factors:

(1) The nature and seriousness of the offense,
(2) The length of the applicant's stay in the expelling country,
(3) The length of time elapsed since the offense and the applicant's behavior during that time,
(4) The nationalities of the parties concerned,
(5) The applicant's family situation (length and "effectiveness" of the marriage),
(6) Whether the spouse knew about the offense at the time of entering into the marriage,
(7) Whether there are children, and their ages, and
(8) The potential difficulties family members would face in relocating to the applicant's home country.

In Mr. Boultif's case, the court found in his favor mostly by focusing on the potential hardship to his wife in relocating to Algeria and by considering whether he continued to pose a danger to the public. The court noted not only Mr. Boultif's good behavior since committing his crime, but the fact that he had originally received a relatively light criminal sentence. This, in the court's view, undercut the idea that he posed a danger. Based largely on these two factors, the court found that the harm Mr. Boultif would suffer from deportation would be disproportionate to Switzerland's stated goals in expelling him.

## Limits on Withholding: Returns to Persecution

During its adoption of the 1996 laws, Congress appears to have paid very little attention to the fact that the expansion of the aggravated felony definition would allow immigration authorities to deport refugees to persecution (*refoulement*), even if their crimes did not fit the "particularly serious crime" definition as required under the UN Convention relating to the Status of Refugees, which the United States is bound by through its ratification of the UN Protocol relating to the Status of Refugees in 1967.

The 1996 changes to US immigration law mean that the United States no longer meets its treaty obligations to protect from refoulement refugees who meet the Refugee Convention's criteria for protection. IIRIRA made it impossible for any immigrant convicted of an aggravated felony with a five-year sentence to obtain protection from return to persecution. This means, for example, that drug offenders with sentences of five years or more can be sent to persecution by US immigration authorities. By contrast, under international

AR.09031

standards, only refugees who have been convicted of a "particularly serious crime" *and* who "constitute a danger to the community" of the United States can be returned to places where they would be persecuted.[72]

There are only two scant references to this in the legislative history for the 1996 immigration laws. Senator Kennedy said, "[r]efugees could also be deported to the hands of their persecutors for relatively small offenses";[73] and the UN agency responsible for refugee protection, the United Nations High Commissioner for Refugees (UNHCR), wrote to the Senate Judiciary Committee to raise its concerns that "the particularly serious crime" exclusion ground should only be invoked in "extreme cases" and only after a balancing test has been applied, weighing the degree of persecution feared against the seriousness of the offense committed.[74]

## Retroactive Effects

Congress also decided to make the 1996 laws retroactive. The laws render someone deportable for crimes committed at any point prior to the change in law, including crimes that were not deportable offenses at the time of their commission.

Despite this sweeping change, there is little in the legislative history to show that Congress considered the likely outcomes. Former INS General Counsel David Martin recalled that Senator Kennedy and his staff tried to draw attention to sympathetic cases of immigrant families that would suffer drastic effects under the retroactive application of the laws. Kennedy had meetings with Senator Jon Kyl of Arizona and Senator Abrahams to try to "walk through some of the retroactivity scenarios," but "there wasn't much response. I really don't think there was anyone in Congress who anticipated what would happen and even when

---

[72] Although there is some debate as to whether the treaty requires both the "particularly serious crime" and the "danger to the community" prongs to be established, the weight of international authority suggests that both must be satisfied before the bar can be applied. Kathleen Keller, "A Comparative and International Law Perspective on the United States (Non) Compliance with its Duty of Non-Refoulement," *Yale Human Rights and Development Law Journal*, vol. 2 (1999), p. 183.

[73] Congressional Record, vol. 141 S 7803, 104th Congress, 1st Session, June 7, 1995 (Mr. Kennedy).

[74] Letter to Honorable Orrin Hatch, Chairman, Senate Judiciary Committee, from United Nations High Commissioner for Refugees, Branch Office for the United States of America, September 20, 1996. Another authority on this issue wrote, "The offence in question and the perceived threat to the community would need to be extremely grave if danger to the life of the refugee were to be disregarded, although a less serious offence and a lesser threat might justify the return of an individual likely to face only some harassment or discrimination." Guy Goodwin-Gill, *The Refugee in International Law* (Oxford, UK: Oxford University Press, 1996), p. 140.

they were presented with sympathetic facts, they just didn't want to appear soft on immigration, so they left the retroactivity in."[75]

Martin said that the idea originally came from his office, although he ultimately came to oppose the way that Congress dealt with retroactivity:

> We proposed the retroactivity because we saw it as a way to clean up the previous aggravated felony provisions from the 1988, 1991, and 1994 laws. These different definitions and effective dates were a nightmare for INS to administer, so we wanted the new definition to clean all that up, and be fully retroactive.[76]

Even though INS wanted the new definition to be retroactive, it expected to be able to continue to exercise discretion to allow compelling cases to remain in the country, particularly those cases in which the immigrant had lived in the United States for a long time and had family ties. In other words, the INS expected 212(c) hearings to remain available. According to Martin,

> The key point is that this was at a time when 212(c) was available …. If we had known that [Congress] would ultimately exclude all those people from 212(c) relief, I'm sure we wouldn't have taken that stance [in support of retroactivity].[77]

---

[75] Human Rights Watch interview with University of Virginia Professor David Martin, former general counsel of US Immigration and Naturalization Service from 1995-98, Charlottesville, Virginia, December 1, 2006.

[76] Ibid.

[77] Ibid.

ER-0992                                                    AR.09033

**Case Study: 212(c) Hearings: The St. Cyr Precedent**

Due to the Supreme Court case, *U.S. v. St. Cyr*, 533 U.S. 289 (2001), a small sub-group of non-citizens who entered guilty pleas prior to 1996 on the understanding that they would have had access to 212(c) waivers are now allowed to apply for those waivers.

One such case is that of Ricardo Etienne, who moved to the United States at the age of 11 in 1986, and attended middle and high school in Stamford, Connecticut. His mother, brother, and sister all live in the United States. He is engaged to Marjorie Roc and the couple has three children. Prior to his incarceration and deportation, Etienne supported his family by earning $8 an hour at a series of full-time jobs. During his incarceration prior to deportation, he completed a series of drug rehabilitation programs. Etienne was not allowed a 212(c) hearing and was therefore deported to Haiti. With their main breadwinner deported, Ms. Roc and Etienne's children could no longer afford the apartment in which they had been living and moved to public housing, which was located in an unsafe neighborhood, according to Ms. Roc. They also could not afford to travel to Haiti to see Etienne.

Etienne's case was reconsidered under *St. Cyr v. INS*, and the reviewing court found that the favorable factors—family ties, substantial rehabilitation, and work history—outweighed Etienne's criminal history and that "there is a reasonable probability that … [Etienne] would have been granted Section 212(c) relief." *United States of America v. Ricardo Etienne*, 2005 U.S. Dist. LEXIS 976, p. 25 (D. Conn, January 14, 2005).

Other cases decided under the St. Cyr precedent have stopped the deportation of non-citizens with strong ties to the United States. In *Matter of Dominos Dias Goncalves,* No. A34 744 205, Immigration Reporter, vol. 26 (MB) B1-117 (BIA November 25, 2002), the court prevented deportation, noting "While it is indeed lengthy, the respondent's criminal record includes several arrests for minor offenses which were committed when the respondent was a minor from an abusive and troubled background. Given the strength of the positive factors in this case, including the evidence of the respondent's strong ties in the United States and of his significant rehabilitation, we conclude that the positive factors surpass the cumulative weight of the respondent's criminal record and his substance-abuse history."

These immigrants are "lucky" to fit within the St. Cyr precedent, and therefore had the ability to access the 212(c) waiver. Hundreds of thousands of other immigrants who did not plead guilty in their cases, and whose convictions came after 1996, have not had this same chance.

AR.09034

## Congressional Regrets

After watching the effects over the years, several members of Congress have expressed regrets about having changed US immigration law so drastically in 1996. Representative Bob Filner of California characterized what Congress did in 1996 in the following way:

> [In] the Immigration Law of 1996 …. people were defined as felons in a new way. They were picked up off the streets in the middle of the night, deported without any due process—and these were legal people, here legally, but may have committed some crime, even shoplifting 20 or 30 years ago.[78]

Some US legislators have sought ways to lessen the blow dealt by the 1996 laws to non-citizens with close family and other ties to the United States. Although several bills have been introduced over the ensuing decade, only one, H.R. 5062, made it out of congressional committee in the US House of Representatives and was introduced in the US Senate—only to die there without being referred to a Senate committee. All of the other reform bills have failed to receive the full attention or consideration of Congress, since they never made it out of the committee process.[79] Therefore, despite some clear signals that Congress regrets its actions in 1996, it has never had the opportunity to carefully consider what was done 10 years ago, including whether some aspects of the laws should be amended to bring them better into line with notions of justice and fair play.

On October 1, 1999, Representative Bill McCollum of Florida, once a proponent of the 1996 laws, introduced the Fairness for Permanent Residents Act, which would have allowed the Attorney General to prevent the deportation of lawful permanent residents who were convicted of certain aggravated felonies, in particular those whose crimes were not serious violent felonies. The bill focused primarily on giving some permanent residents relief from the harsh application of the new definition of aggravated felon. Family ties were not considered. When introducing this bill, McCollum stated,

---

[78] "House Democrats Hold News Conference on Justice Department Policies," Press Statement from Congressman Bob Filner, Washington, D.C., June 5, 2003.

[79] This is true for each of the bills described in this report: H.R. 5035 was referred to the House Committee on the Judiciary on March 28, 2006, and no further action was taken; H.R. 213 was referred to the House Subcommittee on Immigration on February 2, 2007, and no further action was taken; H.R. 4966 was referred to the House Subcommittee on Immigration on August 15, 2000, and no further action was taken; S. 3120 was referred to the Senate Committee on the Judiciary on September 27, 2000, and no further action was taken; S. 173 was referred to the Senate Subcommittee on Immigration on March 24, 1999, and no further action was taken; and S. 871 was referred to the Committee on the Judiciary on April 22, 1999, and no further action was taken.

> [I]n 1996, Congress made several modifications to our country's immigration code that have had a harsh and unintended impact on many people living in the United States. These individuals, permanent resident aliens, have the legal right to reside in the country and apply for US citizenship. They serve in the military, own businesses and made valuable contributions to society…. Our bill returns balance to our existing laws by allowing people with compelling or unusual circumstances to argue their cases for reconsideration. The legislation does not automatically waive the deportation order, it simply grants a permanent resident alien the right to have the Attorney General review the merits of his case.[80]

In July 2000, Representative Henry Hyde, who was then chair of the House Judiciary Committee, brought together Representatives McCollum, Barney Frank of Massachusetts, and other interested legislators. Their discussions resulted in H.R. 5062, sponsored by McCollum and co-sponsored by 10 additional Representatives.[81] H.R. 5062 was subsequently passed by the House on September 19, 2000. The bill offered amendments limiting the retroactive application of the new aggravated felony definition to pre-1996 crimes, and gave non-citizens with pre-1996 convictions access to cancellation of removal.

Upon unanimous passage of the bill, Representative Filner addressed the House to "honor [his] colleagues for taking a step forward and unanimously passing H.R. 5062, an important step toward restoring fairness to families split apart by 1996 legislation that was billed in this House as immigration reform."[82] Senate passage of the bill seemed certain, and White House Chief of Staff John Podesta wrote to Senator Hatch of the Senate Judiciary Committee to voice the Clinton administration's support for reforms. However, the Senate became embroiled in a battle over visas allocated to skilled professional workers and no subsequent action was taken on the bill, inaction that was attributed to the 2000 elections.[83]

Representative John Conyers of Michigan sponsored a very comprehensive reform bill, entitled the "Restoration of Fairness in Immigration Law Act of 2000," but known more

---

[80] Statement by Hon. Bill McCollum to the House of Representatives, October 4, 1999.

[81] H.R. 5062 was co-sponsored by Representatives Andrews (New Jersey); Diaz-Balart (Florida); Frank (Massachusetts); Kennedy (Rhode Island); Rogan (California); Bilbray (California); Filner (California); Frost (Texas); Ose (California); Ros-Lehtinen (Florida).

[82] "Stop Splintering Families, Start Applying American Fairness and Justice," Press Statement from Congressman Bob Filner, September 28, 2000.

[83] Carol Leslie Wolchock, "Legislative Efforts to Restore Immigrant Rights," *Human Rights Magazine*, American Bar Association, Winter 2001.

colloquially as the "Fix '96" bill, which was introduced on July 26, 2000, and was co-sponsored by 47 additional representatives.[84] Conyers reintroduced the bill in March 2002, together with members from the Congressional Hispanic, Black, and Asian Pacific Caucuses. The bill would have, among many other provisions, improved access to judicial review for non-citizens facing deportation; redefined crimes of moral turpitude, aggravated felonies, and the definition of conviction to limit deportation to the most serious crimes; and it would have allowed judges to exercise discretion in favor of certain non-citizens facing removal whose deportation would result in extreme hardship to their US citizen or legally present family members. The bill was referred to the House Subcommittee on Immigration and Claims, but made no further progress in Congress. When he reintroduced the bill in March 2002, Conyers said that the bill "restores fairness to the immigration process by making sure that each person has a chance to have their case heard by a fair and impartial decision maker. No one here is looking to give immigrants a free ride, just a fair chance."[85]

In the Senate, Senator Kennedy sponsored a bill, S. 3120, introduced on September 27, 2000, and co-sponsored by seven additional Senators,[86] which made the statement that current immigration laws "punish legal residents out of proportion to their crimes," and revised several punitive aspects of the laws, including by eliminating the retroactive effects, eliminating several minor crimes (including aggravated felonies punishable by a sentence of more than five years) from eligibility as deportable offenses, and affording more deportable non-citizens access to cancellation of removal.[87]

Other attempts at reform included a bill sponsored by Senator Daniel Patrick Moynihan of New York, S. 173, introduced to the Senate on January 19, 1999, which would have made non-citizens convicted of an aggravated felony with a sentence of less than five years eligible for cancellation of removal.[88] Senator Patrick Leahy of Vermont introduced a bill on April 22, 1999, which would have lessened the impact of deportation policy on US military veterans, including by making them eligible for cancellation of removal, irrespective of any criminal convictions.[89] Even as recently as January 2007, a bill sponsored by Representative

---

[84] Restoration of Fairness in Immigration Law Act of 2000, H.R. 4966, July 26, 2000.

[85] "Conyers re-Introduces the Omnibus 'Fix '96' Immigration Bill," Press Statement from Congressman John Conyers, Jr., March 7, 2002.

[86] The bill was co-sponsored by Senators Dodd (Connecticut); Feingold (Wisconsin); Kerry (Massachusetts); Wellstone (Minnesota); Durbin (Illinois); Graham (Florida); and Leahy (Vermont).

[87] Immigrant Fairness Restoration Act of 2000, S. 3120.

[88] To amend the Immigration and Nationality Act to revise amendments made by the Illegal Immigration Reform and Immigrant Responsibility Act, S. 173, Section 1(a), January 19, 1999.

[89] Fairness to Immigrant Veterans Act of 1999, S. 871, April 22, 1999, Section 3.

José Serrano of New York was introduced that would provide discretionary authority to immigration judges to allow non-citizen parents of US citizen children to remain in the United States and avoid deportation when such deportation is determined to be against the best interests of the child.[90] Despite these many efforts, at this writing not one of these proposed reforms has received the full and detailed attention of Congress, and none has passed.

---

[90] Discretionary Authority with Respect to Removal of Parents of Citizen Children, H.R. 213, January 4, 2007 (previously introduced as H.R. 5035 on March 28, 2006).

ER-0997

AR.09038

# V. National Statistics on Deportation for Crimes

The history of the 1996 immigration laws tells a story of unintended consequences—
Congress seems to have passed laws that treated some immigrants more harshly than
lawmakers anticipated. Regardless of what Congress intended, the effects of the 1996
laws—particularly on families in the United States—have been widespread and devastating.

Aggregate statistics released annually by immigration authorities reveal that since 1997
(when the 1996 laws went into effect), a total of 672,593 immigrants have been deported for
criminal convictions. Figure 1 shows that the annual number of deportees has risen most
years and predictably jumped the most (61 percent) between 1996, before the new laws took
effect, and 1998, when they had been in place for a full calendar year. Each year
subsequently, with the exception of 2002 and 2005, the numbers have risen steadily.

**Figure 1**



Deportations from the US on Criminal Grounds 1996 - 2005

Source: For FY 1996 and FY 1997, Immigration and Naturalization Service, "Enforcement Operations, Aliens Removed by
Criminal Status and Region and Selected Country of Nationality," *Statistical Yearbook 1997,* Table 65, p. 185. For all
subsequent years, Department of Homeland Security, *Yearbook of Immigration Statistics 2005*, Table 41 and Table 42
http://www.dhs.gov/ximgtn/statistics/publications/YrBk05En.shtm (accessed July 2, 2007). According to ICE, Tables 41 and
42 should be added to calculate the total number of non-citizens removed on criminal grounds. Human Rights Watch
telephone interview with Elizabeth M. Grieco, Ph.D., Office of Immigration Statistics, Department of Homeland Security,
Washington, D.C., March 1, 2007.

AR.09039

Large numbers of these non-citizens deported for crimes receive their deportation orders after appearing in immigration proceedings without an attorney, often speaking with the help of whatever interpretation services the court normally uses. Figure 2 shows that in 2005, 65 percent of immigrants represented themselves in their deportation hearings before the immigration court.

**Figure 2**



Source: Karin Brulliard, "Battling Deportation Often a Solitary Journey," *The Washington Post*, January 8, 2007 (citing Department of Justice, Executive Office for Immigration Review).

Non-citizens deported for criminal offenses come from the same countries and regions of the world as all immigrants living in the United States. Therefore, the bulk of those deported—or 93 percent—are sent to countries in North and Central America and the Caribbean, as shown in figure 3. Mexico receives by far the largest number of immigrants deported for criminal convictions, shown in figure 4.

Figure 3



Source: For FY 1996 and FY 1997, Immigration and Naturalization Service, "Enforcement Operations, Aliens Removed by Criminal Status and Region and Selected Country of Nationality," *Statistical Yearbook 1997,* Table 65, p. 185. For all subsequent years, Department of Homeland Security, *Yearbook of Immigration Statistics 2005,* Table 41 and Table 42 http://www.dhs.gov/ximgtn/statistics/publications/YrBk05En.shtm (accessed July 2, 2007).

Figure 4



Source: For FY 1996 and FY 1997, Immigration and Naturalization Service, "Enforcement Operations, Aliens Removed by Criminal Status and Region and Selected Country of Nationality," *Statistical Yearbook 1997,* Table 65, p. 185. For all subsequent years, Department of Homeland Security, *Yearbook of Immigration Statistics 2005,* Table 41 and Table 42 http://www.dhs.gov/ximgtn/statistics/publications/YrBk05En.shtm (accessed July 2, 2007).

The Immigration and Customs Enforcement (ICE) agency within the Department of Homeland Security only recently has made data available about the criminal convictions that form the basis for deportations from the United States. For reasons that are unclear, in its regular press updates the agency always touts its deportations of violent criminals, but keeps vague the other categories of immigrants deported. The secrecy surrounding the criminal convictions forming the basis for deportations has been remarked upon by many attorneys, academics, and statistical researchers. In fact, Syracuse University, which maintains a special immigration data analysis unit, recently observed,

> Despite the interest in aggravated felonies, very little is currently known about how often aggravated felony provisions are in fact used. The government publishes no statistics on the number of individuals it has sought to deport, or actually deported, on aggravated felony grounds. A literature search has not turned up any other sources with relevant statistics.[91]

In its regular press releases, instead of simply disclosing all of the offenses that form the basis for deportations, ICE prefers to highlight the worst, most violent offenses. In one press statement, announcing the deportation of 562 "criminal aliens," ICE chose to highlight presumably three deportees who were removed for "aggravated assault," "drug trafficking," and "lewd and lascivious acts on a child." Details on criminal convictions for the 559 additional immigrants deported were not provided. The same release quotes Marc Moore, San Antonio ICE field office director for detention and removal operations:

> Our citizens may sleep better knowing that these dangerous criminals no longer pose a threat to our communities. ICE will continue to work to aggressively remove those who have no legal right to remain in the United States, especially those who terrorize our communities.[92]

In another press advisory, ICE announced its deportation of "144 criminals," highlighting three non-citizens who were deported for sex offenses or stalking, and referring to "other individuals" who were deported for "crimes such as homicide, heroin and cocaine

---

[91] Transactional Records Access Clearinghouse, Immigration Report, "How Often Is The Aggravated Felony Statute Used?" Syracuse University, 2006, http://trac.syr.edu/immigration/reports/158/ (accessed March 1, 2007).

[92] "ICE Removed More Than 3,000 Criminal Aliens, Status Violators from South Texas During June," Office of the Press Secretary, Immigration and Customs Enforcement Public Affairs, July 11, 2005, www.ice.gov/pi/news/newsreleases/articles/050711santonio.htm (accessed May 30, 2007).

smuggling, fraud, weapons offenses, sexual assault, prostitution, and extortion."[93] In yet another release, ICE chose to highlight the deportations of two men: a Brazilian who was convicted for assault with a deadly weapon, domestic assault and unlawful possession of a firearm; and a Jamaican who was deported for "unnatural acts upon a child; providing obscene materials to minors; assault and battery; breaking and entering; larceny; and possession of a controlled substance." But the agency failed to describe the crimes of the 756 other immigrants deported during the same ICE operation.[94]

As figure 5 reveals, newly public data on the underlying convictions for deportations in fiscal year 2005, which were released by ICE at the end of 2006, show that 64.6 percent of immigrants were deported for non-violent offenses, including non-violent theft offenses; 20.9 percent were deported for offenses involving violence against people; and 14.7 percent were deported for "other" crimes, unreported by ICE. Figure 6 breaks down these numbers into more specific offenses for 2005, showing that drug crimes, immigration offenses, assault (non-sexual), and "other" crimes are the top four most common criminal convictions, totaling 81 percent of all deportations on criminal grounds in that year.

**Figure 5**



Source: Mary Dougherty, Denise Wilson, and Amy Wu, Department of Homeland Security, Office of Immigration Statistics, *Immigration Enforcement Actions: 2005*, Table 4, November 2006, p. 5.

---

[93] "Philadelphia ICE Deports 144 Criminals, Office of the Press Secretary, Immigration and Customs Enforcement Public Affairs", June 22, 2005, www.ice.gov/pi/news/newsreleases/articles/050622philadelphia.htm (accessed May 30, 2007).

[94] "ICE Removes 758 Criminal Aliens from 5-State Area During July," Office of the Press Secretary, Immigration and Customs Enforcement Public Affairs, August 15, 2006, www.ice.gov/pi/news/newsreleases/articles/060815neworleans.htm (accessed May 30, 2007).

Figure 6



Source: Mary Dougherty, Denise Wilson, and Amy Wu, Department of Homeland Security, Office of Immigration Statistics, *Immigration Enforcement Actions: 2005*, Table 4, November 2006, p. 5.

Applying these percentages from 2005 to the aggregate number of persons deported since 1997 allows us to estimate that 434,495, or nearly half a million people, were non-violent offenders deported from the United States in the 10 years since the 1996 laws went into effect. In addition, we can estimate that 140,572 people were deported during that same decade for violent offenses.

These broad estimates fail to answer important additional questions. When Human Rights Watch commenced research for this report, we filed a Freedom of Information Act (FOIA) request with ICE to answer basic questions about the legal status of those deported for crimes (how many were green card holders and how many were undocumented), the nature and seriousness of the criminal convictions forming the basis for deportations (e.g. how many convicted of shoplifting, how many of homicide) and the family relationships of those deported (how many had US citizen or lawfully present spouses and children). Human Rights Watch delayed publication of this report for one year while we waited to receive a response to our FOIA request.[95] Unfortunately, as detailed in the Appendix, we have not received the

---

[95] On the eve of publication of this report, on June 19, 2007, Human Rights Watch received correspondence in response to our administrative appeal in which ICE claimed it could provide records responsive to three of the five types of information we had requested: the country of origin of each non-citizen deported on criminal grounds from 1997 to the present, their immigration status, and the crime forming the basis for the deportation. Contrary to the provisions of FOIA regarding payments for information, ICE has assessed fees without responding to our application for a fee waiver as an organization that publicizes information "in the public interest" about the "operation or activities of the [US] government." We have appealed this finding of the agency.

AR.09044

information requested. Worse, the history of ICE's response to our repeated requests suggests at best a lack of commitment to transparency and the goals behind the FOIA legislation; at worst it suggests deliberate stonewalling.

If ICE had responded to our FOIA request, we would have been able to fill in at least some of the blanks left by the publicly available data. That data, for example, do not reveal how many of the 672,593 non-citizens deported for crimes were lawfully present in the country and how many were undocumented. The data also provides the public with little basis for judging the fairness of the deportations in light of the crimes for which the deported immigrants were convicted because criminal categories used by ICE are so broad as to be almost meaningless. The broad category of "sex offenses" may include acts like consensual underage sex (prosecuted as statutory rape), as well as violent rape. The category of "drugs" no doubt includes high-level drug traffickers as well as immigrants deported for simple possession of small amounts of narcotics.

Although Human Rights Watch cannot make reliable estimates of the legal status of the deported immigrants nor the offenses triggering their deportations, we can make reasonable estimates of how many spouses and children were left behind as a result of these deportations. The 2000 US Census found that the 6.3 million households with a foreign-born non-citizen householder[96] in the United States had an average household size of 3.44 persons.[97] If that average household size holds true for the foreign-born non-citizens being deported from the United States for criminal offenses (that is, deportee plus 2.44 relatives in each household), then we can estimate that at least 1.6 million family members, including husbands, wives, sons and daughters, have been separated from loved ones by deportations since 1997.

We can also estimate that many of these relatives are US citizens and lawful permanent residents. The 2000 US Census found that US citizens represented 33 percent of all members of foreign-born households. This means that since the harsh immigration laws were passed in 1996, an estimated 1.6 million spouses and children, of whom approximately 540,000 were US citizens by birth or naturalization, lost a loved one to deportation. (We have found no way of reliably estimating the numbers of lawful permanent residents within the families of deported immigrants.)

---

[96] A "householder" is "usually the household member or one of the household members in whose name the housing unit is owned or rented." US Census Bureau, *Profile of the Foreign Born Population in the United States: 2000*, December 2001, p. 430.

[97] Ibid., p. 4; US Census Bureau, "Table FB1-Profile of Selected Demographic and Social Characteristics for the Non-U.S. Citizen Population," *Census 2000 Special Tabulations* (STP-159), 2000. See also US Census Bureau, Immigration Statistics Staff, Population Division, "American Community Survey," 2003 (revealing that 50 percent of the non-US citizen population was married with their spouse present, and 8 percent were married with their spouse absent).

AR.09045

## VI. US Deportation Policy Violates Human Rights

Since the beginning of the nation state, control over immigration has been understood as an essential power of government. In recent history, governments have allowed limits on their immigration power, recognizing that it may only be exercised in ways that do not violate fundamental human rights.[98] Therefore, while international law does support every state's right to set deportation criteria and procedures, it does not allow unfettered discretion to deport all non-citizens in all circumstances.

When Congress changed deportation law in 1996 it broke with international human rights standards in ways never before attempted in the United States. Four important human rights are violated by US deportation policies as applied to immigrants with criminal convictions: the right to raise defenses to deportation, the principle of proportionality, the right to family unity, and the right to protection from return to persecution. In this chapter, we describe these human rights standards and highlight examples of people who were ordered deported in contravention of these norms.

## The Right to Raise Defenses to Deportation

A primary purpose of human rights law is to define rights protecting the individual against the coercive powers of the state. Deportation, which removes an immigrant from the community with which he or she has built close and enduring ties, is an example of a coercive state power. However, the recognized legitimate interests of states in deporting certain non-citizens, combined with the relative ease by which deportation can be accomplished, have caused government officials and the public at large to lose sight of just how serious and coercive the state's decision to deport really can be.

---

[98] UN Human Rights Committee, General Comment 15 ("It is in principle a matter for the State to decide who it will admit to its territory. However, in certain circumstances an alien may enjoy the protection of the Covenant even in relation to entry or residence, for example, when considerations of non-discrimination, prohibition of inhuman treatment and respect for family life arise"); Inter-American Commission on Human Rights – Report No. 49/99 Case 11.610, *Loren Laroye Riebe Star, Jorge Alberto Barón Guttlein and Rodolfo Izal Elorz v. Mexico*, April 13, 1999, Section 30 (recognizing state authority to control immigration but stressing that this power is limited by the American Convention on Human Rights' guarantees); Gerald P. Heckman, "Securing Procedural Safeguards for Asylum Seekers in Canadian Law: An Expanding Role for International Human Rights Law?" *International Journal of Refugee Law*, vol. 15 no. 2 (2003), p. 214 ("[o]nce widely accepted as a nearly unfettered discretion derived from state sovereignty, the power of states to control the entry and residence of aliens on their territories is increasingly understood to be circumscribed by domestic law and customary and conventional international law."); *Boughanemi v. France* (App. 22070/93), Judgment of 24 April 1996 (recognizing that a state's right to control immigration is "well-established international law," but that it must be tempered by Article 8's protection of family life).

Deported individuals lose their ability to live with close family members in a country that they may reasonably view as "home." They are deprived of raising their children or living in the same country as their parents, they lose friends and communities, and their ability to work may be restricted as well. In their countries of nationality, people deported from the United States for criminal convictions are often stigmatized and have difficulty finding jobs and establishing or reestablishing family and community connections. Most are barred, either permanently or for decades, from ever re-entering the United States, even for a short visit.

A governmental decision to deprive a person of connection to the place he or she considers home raises serious human rights concerns, requiring at a minimum that the decision to deport be carefully considered, with all relevant impacts and potential rights violations weighed by an independent decision maker. Unfortunately, the US fails to do this on a daily basis.

Instead, the United States takes a "one size fits all" approach to deportation. When non-citizens are facing deportation for criminal convictions, immigration judges can do little more than run conveyer belt deportation hearings in which they rubber stamp the removal orders issued by Immigration and Customs Enforcement. Many non-citizens are legally blocked from raising the closeness of their family relationships or other ties to the United States as well as the likelihood that they may be returned to persecution. Without an ability to raise these equities, deportation hearings provided for immigrants with criminal convictions are devoid of justice, and they violate international standards.

The International Covenant on Civil and Political Rights (ICCPR), which the United States ratified in 1992,[99] states in Article 13 (to which the United States has entered no reservations, understandings or declarations),

> An Alien lawfully in the territory of a State Party to the present covenant may be expelled therefrom only in pursuance of a decision reached in accordance with law and shall, except where compelling reasons of national security otherwise require, *be allowed to submit the reasons against his expulsion* and to have his case reviewed by, and be represented for the purpose before, the competent authority or a person or persons especially designated by the competent authority.[100]

---

[99] International Covenant on Civil and Political Rights (ICCPR), adopted December 16, 1966, G.A. Res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force March 23, 1976, ratified by the United States on June 8, 1992, http://www.ohchr.org/english/countries/ratification/4.htm (accessed May 30, 2007).

[100] ICCPR, art. 13 (emphasis added).

AR.09047

The UN Human Rights Committee, which monitors state compliance with the ICCPR, has interpreted the phrase "lawfully in the territory" to include non-citizens who wish to challenge the validity of the deportation order against them. In addition, the Human Rights Committee has made this clarifying statement: "if the legality of an alien's entry or stay is in dispute, any decision on this point leading to his expulsion or deportation ought to be taken in accordance with article 13 ….  An alien must be given full facilities for pursuing his remedy against expulsion so that this right will in all the circumstances of his case be an effective one."[101]

Similarly, Article 8(1) of the American Convention on Human Rights, which the United States signed in 1977,[102] states,

> Every person has the right to a hearing, with due guarantees and within a reasonable time, by a competent, independent, and impartial tribunal, previously established by law … for the determination of his rights and obligations of a civil, labor, fiscal, or any other nature.[103]

Applying this standard, the Inter-American Commission on Human Rights has stated that deportation proceedings require "as broad as possible" an interpretation of due process requirements and include the right to a meaningful defense and to be represented by an attorney.[104]

While the ability to raise defenses to deportation is provided for in these human rights treaties, not every possible argument against deportation is important enough to call into question the legitimacy of a hearing that denies such arguments' consideration. For example, a non-citizen who for reasons of personal predilection prefers the economic opportunities and climate in one country to another could not legitimately challenge his hearing under human rights law if he was prevented from making this argument as a defense to deportation.

However, some defenses implicate very important and fundamental rights that non-citizens should be able to raise in their deportation hearings in the United States, including the

---

[101] UN Human Rights Committee, General Comment 15, paras 9 and 10.

[102] American Convention on Human Rights "Pact of San Jose, Costa Rica," General Information on the Treaty, http://www.oas.org/juridico/english/Sigs/b-32.html (accessed May 30, 2007).

[103] American Convention, art. 8(1).

[104] Inter American Commission on Human Rights, Report No. 49/99 Case 11.610, *Loren Laroye Riebe Star, Jorge Alberto Barón Guttlein and Rodolfo Izal Elorz v. Mexico*, April 13, 1999, Section 70-1.

AR.09048

rights to family unity, ties to a country, proportionality, and the likelihood of return to persecution upon return.  Without a hearing that allows for the weighing of these concerns, the right to raise defenses to deportation is undermined.

Several categories of immigrants facing deportation for crimes in the United States are barred from having hearings in which their human rights can be weighed.[105] First, there is no mechanism by which immigration courts weigh whether deportation itself is a proportionate penalty imposed for the crimes a non-citizen has committed. Second, immigrants convicted of offenses categorized as aggravated felonies are barred from raising their family relationships or longstanding ties to the United States in a deportation hearing. Third, other non-citizens convicted of crimes cannot raise these issues if they do not fit the very narrow categories contained in the two remaining waivers of deportation (Sections 212(h) and 240A(a)). Fourth, many refugees convicted of aggravated felonies are barred from having their risk of persecution weighed by the courts.

The US policy of blocking certain categories of immigrants convicted of crimes from raising defenses to deportation during their deportation hearings violates international human rights standards. Europe has consistently allowed immigrants to raise these issues during deportation. If deportation infringes on a right protected in the European Convention of Human Rights, such as the right to family life under Article 8, a non-citizen is entitled to "an effective remedy before a national authority" under Article 13.[106]  This remedy must provide some basic procedural protections as well as be conducted by an authority with sufficient power to rule on the question of whether the infringement of the right is so severe as to render the deportation unlawful.[107] In addition, in *Stewart v. Canada*[108] and *Canepa v.*

---

[105] Non-citizens convicted of aggravated felonies who are not lawful permanent residents, or who have lawful permanent resident status conditionally, are subject to accelerated removal procedures without a hearing before an immigration judge. Under such procedures, the law explicitly states that "an alien convicted of an aggravated felony shall be conclusively presumed to be deportable from the United States." 8 U.S.C. Section 1228. Where cases are reviewed by immigration judges or the Board of Immigration Appeals, serious concerns exist that the quality of such review has "fallen below the minimum standards of legal justice." *Benslimane v. Gonzales*, 430 F.3d 828, 830 (7th Cir. 2005).  Review of detention and removal decisions is now possible only through a writ of habeas corpus in the Court of Appeals, and it is unclear as yet whether such review will be construed to include the right to challenge the underlying removal decision itself. Hiroshi Motomura, "Immigration Law and Federal Court Jurisdiction Through the Lens of Habeas Corpus," *Bender's Immigration Bulletin*, vol. 11-10, p. 2 (2006). In addition, all categories of aggravated felons (including lawful permanent residents) facing deportation have no right to raise the fact that they will be separated from family members if the deportation is carried out. This lack of a hearing violates basic standards in international human rights law.

[106] European Court of Human Rights, *Al-Nashif and Others v. Bulgaria* (App. 50963/99), Judgment of June 6, 2002.

[107] Ibid., Section 137.

[108] *Stewart v. Canada*, Communication No. 538/1993, U.N. Doc. CCPR/C/58/D/538/1993 (1996).

AR.09049

*Canada*,[109] the Human Rights Committee has determined that hearings weighing family ties should take place prior to deportation.

Given the strength of these standards, many other constitutional democracies require deportation hearings to weigh such defenses to deportation in their domestic practices. In fact, in contrast to the United States, the laws and practices of 61 governments around the world researched by Human Rights Watch offer non-citizens an opportunity to raise family unity concerns, proportionality, ties to a particular country, and/or other human rights standards prior to deportation.

**Figure 7: Human Rights Protections in the Deportation Laws of 61 Countries and Territories**

| | Must weigh family ties as Party to ECHR | As a matter of domestic law (DL): must weigh family ties prior to deportation | DL: Must weigh proportionality prior to deportation | DL: Must weigh ties to a country prior to deportation | DL: Must give due process prior to deportation | DL: Must consider human rights prior to deportation |
|---|---|---|---|---|---|---|
| Albania | X | X | | | | |
| Andorra | X | | | | | |
| Argentina | | X | | X | X | |
| Armenia | X | | | | X | |
| Australia | | | X | X | | |
| Austria | X | X | | | | |
| Azerbaijan | X | | | | | |
| Belgium | X | | | | X | |
| Bosnia & Herzegovina | X | | X | | | |
| Brazil | | X | | | | |
| Bulgaria | X | | | | | |
| Canada | | X | | | | |
| Croatia | X | | | | | |
| Cyprus | X | | | | | |
| Czech Republic | X | | | | | |
| Denmark | X | X | | X | | |
| Estonia | X | | | | | |
| Finland | X | X | | | | |
| France | X | X | X | X | | |
| Georgia | X | | | | | |
| Germany | X | X | | X | | |
| Greece | X | X | | | | |
| Guatemala | | | | | X | |
| Hong Kong | | X | | | | |
| Hungary | X | X | X | X | | |
| Iceland | X | X | | X | | |

---

[109] *Canepa v. Canada*, Communication No. 558/1993, U.N. Doc CCPR/C/59/D/558/1993 (1997).

| | Must weigh family ties as Party to ECHR | As a matter of domestic law (DL): must weigh family ties prior to deportation | DL: Must weigh proportionality prior to deportation | DL: Must weigh ties to a country prior to deportation | DL: Must give due process prior to deportation | DL: Must consider human rights prior to deportation |
|---|---|---|---|---|---|---|
| Ireland | X | X | | X | | |
| Israel | | X | | | | |
| Italy | X | | | | X | X |
| Japan | | | | | X | |
| Latvia | X | | | | | |
| Liechtenstein | X | | | | | |
| Lithuania | X | | | | X | X |
| Luxembourg | X | | | | | |
| Macedonia | X | X | | X | | |
| Malta | X | | | | | |
| Moldova | X | | | | | |
| Monaco | X | | | | | |
| Netherlands | X | X | | | | |
| New Zealand | | | | | X | |
| Norway | X | X | X | X | | |
| Poland | X | | | | | |
| Portugal | X | X | | | | |
| Romania | X | | | | | |
| Russia | X | | | | | |
| San Marino | X | | | | | |
| Serbia | X | | | | | |
| Singapore | | | X | | | |
| Slovakia | X | | | X | | |
| Slovenia | X | X | | X | | |
| South Africa | | X | | | | X |
| South Korea | | | | | X | |
| Spain | X | X | | | | |
| Sweden | X | X | | X | | |
| Switzerland | X | X | X | X | | |
| Tajikistan | | | X | | | |
| Turkey | X | | | | | |
| United Kingdom | X | | | | X | X |
| Ukraine | X | | | | | |
| Venezuela | | | X | | X | |

**Source:** This chart is based on international comparative law research and analysis performed for Human Rights Watch by the international law firm of Sidley Austin, LLP, February 2007 (legal memo on file with Human Rights Watch).

ER-1010

AR.09051

**Case Study: Deportation and Post-Traumatic Stress: Kannareth C.**[110]

Kannareth C., a young man facing deportation to Cambodia, came to the United States with his mother from a refugee camp in Thailand when he was 10 years old. The family entered the United States legally as refugees and became lawful permanent residents. At the age of 15, Kannareth was placed on probation for driving without a license. While he was on probation he was charged with pick pocketing. He also violated his probation by failing to report.

Kannareth has a fiancée and a daughter who was three years old when he went to renew his green card for employment purposes and his criminal record was checked. He was placed in immigration detention and in deportation proceedings. Kannareth wrote,

"I came to the United States of America legally for the opportunities offered of a good life. I was making the best of those opportunities by attending college to learn a trade for the chance at a good employment career. I held a job at the same time to provide for my family. My fiancée and I plan to marry and raise our daughter together. I value my family and have come to realize how much my family need me to be there for them. The thought of having my daughter ask how come I'm not home, saddens me. I regret putting my family through the strain of not having me home, and I regret this matter is before the court. Please understand that I am not a bad person, nor am I a violent person. I just got caught up and lost sight of direction. I have since gotten back on course …. I can once again provide for my family. I ask that you not destroy my dreams and plans to be a devoted father and husband, and my ambition to provide a good life to my family."

Punthea C., Kannareth's mother, spoke (with the help of an interpreter) with a Human Rights Watch researcher. She was under the care of a psychologist because the problems with her son were triggering old memories associated with her flight from Cambodia. She said,

"I feel very lost without my son. It happened again like during the communist years and the civil war. Basically, that is all coming back. Now, we are being separated again. It makes my chest feel very tight. I can't talk. And breathing is … in other words it's like something that lumps in your throat and you can't talk … I feel very bad inside for my child. He went all through his life not having a father, not having a father figure. With my situation in the camp … I couldn't give him a normal upbringing, that's one of the reasons why things happened the way they did. After escaping what I went through and escaping from death, now to come to this point. It's a lot to lose."

---

[110] This text box is based on a Human Rights Watch interview with Punthea C. (pseudonym) regarding her son Kannareth C. (pseudonym) and Punthea's social worker, Long Beach, California, April 7, 2006.

A clinical social worker who is a therapist at the Program for Torture Victims in California gave a professional evaluation of Punthea, reporting that she is suffering from severe post-traumatic stress disorder and major depressive disorder, and that it is her "professional opinion that the deportation of [Punthea's] son to Cambodia would be severely damaging to [Punthea's] psychological well-being. She is extremely fearful for her son's well-being and safety if he is sent to Cambodia, and the thought of him in Cambodia triggers painful and frightening memories of her own torture and the other traumas she experienced in Cambodia."

## Proportionality

Since deportation is such an inherently severe sanction, governmental decisions to impose it are subject to human rights constraints. A person's status as a non-citizen, his or her conviction of a crime, or the combination of the two, does not extinguish his or her claim to just treatment at the hands of the government, nor does it free a government to ignore fundamental rights in its actions. Even in an area in which governmental powers are known to be robust, such as in immigration, governments must uphold basic notions of fairness and proportionality. The gravely serious burdens that are imposed as a result of deportation require government to act within bounds of reasonableness.

The idea that infringements upon rights must be proportional is explicitly included in the domestic law of many countries around the world,[111] including the United States.[112] International law uses proportionality to ensure that rights are not denied arbitrarily. Bodies enforcing those laws, such as the European Union, the Human Rights Committee and the

---

[111] In Austria, limitations on fundamental rights have been held to be permissible only where the limitation is in the public interest and the limitation is in proper proportion to the weight of the public interest and the gravity of the limitation. Albrecht Weber, ed., *Fundamental Rights in Europe and North America* (Leiden, Netherlands: Brill Academic Publishers, 2001), p. 78. In the Czech Republic, the principle of proportionality where fundamental rights are intruded upon is "one of the unwritten rules" that has been recognized by the constitutional court. Weber, ed., *Fundamental Rights*, p. 48. In Finland, the law requires that fundamental rights be limited only where a legitimate aim cannot be reached by other, less intrusive means. Weber, ed., *Fundamental Rights*, p. 37. Germany also applies the doctrine of proportionality to cases involving violations of fundamental rights. Weber, ed., *Fundamental Rights*, p. 57. France has developed a doctrine of proportionality for fundamental rights cases, influenced by the German practice. Weber, ed., *Fundamental Rights*, p. 58. In Ireland, the High Court has adopted a test for constitutional rights violations that requires a proportionality interest which was influenced in its development by the case law of the European Court of Human Rights as well as Canada. Weber, ed., *Fundamental Rights*, p. 65. In Canada, the Supreme Court applies the "Oakes test" in analyzing infringements of rights guaranteed by the Canadian Charter of Rights and Freedoms, which includes an inquiry into whether the infringement is proportionate to the valid governmental purpose. Vicki C. Jackson, "Ambivalent Resistance and Comparative Constitutionalism: Opening up the Conversation on 'Proportionality,' Rights and Federalism," *University of Pennsylvania Journal of Constitutional Law*, vol. 1 (1999), pp. 606-607.

[112] For example, the United States Supreme Court uses "strict scrutiny" to examine state policies based on race, by balancing the right to be free from discrimination against any compelling governmental interest in the policy under consideration. See, for example, *Grutter v. Bollinger*, 539 U.S. 306 (2003), *Korematsu v. United States*, 323 U.S. 214 (1944).

International Court of Justice have all applied proportionality when analyzing states' decisions to infringe on important rights, including in the context of deportation.[113]

However, US courts do not consider deportation a form of punishment,[114] and therefore they do not weigh the seriousness of the consequence of deportation against the seriousness of a particular non-citizen's criminal offense. Striking the right balance in the United States is therefore left to the legislative branch.  Whether the proportionality analysis is done in a court, or whether it is done by the legislature, and irrespective of whether deportation is considered a punishment under US law, it is a very severe penalty that seems to outweigh some of the crimes that currently trigger it. This is especially so when mitigating and aggravating factors are not weighed in an individualized hearing.

For example, despite the plain meanings of the words "aggravated" and "felony," this category includes misdemeanor crimes, even though misdemeanors are generally less serious and involve less violence than felonies. Figure 8 outlines some of the offenses that trigger deportation from the United States. For some of these offenses, deportation seems a very harsh additional penalty to add to a criminal sentence that is comparatively inconsequential, reflecting the minor nature of the crimes involved.

---

[113] The European Union has decided that before deporting a long-term resident alien, states must consider factors such as duration of residence, age, consequences for the deportee and his or her family, and links with the expelling and receiving country. Council of the EU – Council Directive 2003/109/EC of 25 November 2003 concerning the status of third-country nationals who are long-term residents, Article 12. The Human Rights Committee has explained, in the context of the prohibition of arbitrary interference with family rights, that "[t]he introduction of the concept of arbitrariness is intended to guarantee that even interference provided for by law should be in accordance with the provisions, aims and objectives of the Covenant and should be, in any event, reasonable in the particular circumstances." UN Human Rights Committee, General Comment No. 16: The right to respect of privacy, family, home and correspondence, and protection of honour and reputation (Art. 17):. 08/04/88. The International Court of Justice has found that where limitations on freedom of movement are concerned, they must be limited by proportionality to the least intrusive means possible for achieving a legitimate state purpose. *Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory* (2004) ICJ Gen. List No. 131, decided July 9, 2004, at para. 136. In addition, the Inter-American Court of Human Rights has held that measures that discriminate against one group in favor of another must be bound by proportionality. Inter-American Court of Human Rights, Advisory Opinion OC-18/03 of September 17, 2003, Requested by the United Mexican States, Juridical Condition and Rights of the Undocumented Migrants, 100. The Special Rapporteur for the Prevention of Discrimination and the Rights of Non-citizens has called for distinctions between citizens and non-citizens to be proportional. The use of proportionality is also widespread in the European Court of Justice, where the doctrine was invoked either by litigants or the court in over 500 cases between 1955 and 1994. Vicki C. Jackson, "Ambivalent Resistance and Comparative Constitutionalism: Opening up the Conversation on 'Proportionality,' Rights and Federalism," *University of Pennsylvania Journal of Constitutional Law*, vol. 1 (1999), p. 604 n.81. The European Court of Human Rights has "consistently held that the principle of proportionality is inherent in evaluating the right of an individual person and the general public interests of society." Yutaka Arai-Takahashi, *The Margin of Appreciation Doctrine and the Principle of Proportionality in the Jurisprudence of the ECHR* (Belgium: Intersentia, 2002), p. 14; Ian Brownlie, *Principles of Public International Law* (Oxford, UK: Oxford University Press 2003), p. 551.

[114] Two 19th century United States Supreme Court decisions established that deportation is not "punishment" under the US Constitution and thus rendered inapplicable constitutional protections afforded in criminal proceedings, as well as prohibitions on cruel and unusual punishment, ex post facto laws and bills of attainder. *Chae Chan Ping v. United States*, 130 U.S. 581 (1889); and *Yue Ting v. United States*, 149 U.S. 698 (1893).

AR.09054

**Figure 8 – Criminal Sentences Contrasted with Penalty of Deportation**

| Criminal Offense | Immigration Consequence | Examples of Likely Federal or State (NY law used) Sentence |
|---|---|---|
| 2 Shoplifting offenses | Mandatory detention and deportation[115] | For first conviction individual could receive sentence to several days of community service.[116] For second conviction, individual could receive a sentence of up to six months. |
| Tax evasion, causing loss of more than $10,000 | Mandatory detention and deportation[117] | Fine equaling tax loss plus zero to six months' imprisonment[118] |
| Possessing stolen property within five years of entry to the US | Mandatory detention and deportation[119] | Restitution of property, plus one year's imprisonment[120] |
| Possession with intent to sell of 35 grams of marijuana | Mandatory detention and deportation[121] | Between 15 days and up to one year of imprisonment[122] |

The case of Suwan provides an example of a relatively minor offense for which deportation seems a disproportionate penalty. He was deported to Cambodia at the age of 34, after living in the United States as a refugee with his wife and two young children. Suwan was a supervisor on a construction crew in Houston, Texas. The crime for which he was deported involved two counts of indecent exposure. Suwan committed these offenses because, according to him, there was no toilet at the construction site that he was supervising, and he was forced to urinate outdoors. After his deportation to Cambodia, Suwan told a CNN reporter, "I think that the crime that I commit … [was not] bad enough to deport me here …. [I had] made it in the States [with my] wife, two kids, a home. Drive to work and back home … I could live the rest of my life [in the United States]."[123]

---

[115] Two shoplifting offenses constitute two crimes of moral turpitude, which render a non-citizen deportable even if he or she received no prison sentence for the offenses. 8 U.S.C. Section 1227(a)(2)(A)(ii).

[116] New York Penal Law Section 155.25 (definition of petit larceny); Section 70.15 (sentence for Class A misdemeanors); Section 400.14 (relating to second crime offenders).

[117] Tax evasion causing loss of more than $10,000 is considered an aggravated felony under 8 U.S.C. Section 1227(a)(2)(A)(iii).

[118] United States Sentencing Guideline Section 2T1.1.

[119] Possessing stolen property constitutes a crime of moral turpitude, which is a deportable offense under 8 U.S.C. Section 1227(a)(2)(A)(i). See also *Michel v. INS*, 206 F.3d 253 (2d Cir. 2000) (a conviction for possessing stolen property involves moral turpitude without regard to the triviality of the offense).

[120] New York Penal Law Section 70.00.

[121] Conviction of a crime relating to a controlled substance, other than simple possession of 30 grams or less of marijuana, is a deportable offense under 8 U.S.C. Section 1227(a)(2)(B)(i).

[122] New York Penal Law Section 221.35.

[123] "One Way Ticket for Convicted Cambodians," CNN, November 19, 2002; Human Rights Watch interview with Nil Samorn, Cambodian Association of Illinois, Chicago, Illinois, February 3, 2006; Bruce Stokes, "Between Two Nations," *National Journal*, January 13, 2007.

In another example, Jose A., originally from El Salvador, entered the United States in 1980 and became a lawful permanent resident in 1990. Jose has three US citizen children and is facing deportation for breaking into a car, a misdemeanor conviction; and for shoplifting a $10 bottle of eye drops from a drug store.[124] Jose A. paid a fine for his first offense, and was sentenced to two months' imprisonment for the shoplifting offense, which he served. His two crimes are considered "crimes of moral turpitude," making him subject to deportation.

Jose has paid federal income taxes in the United States, and has worked as a technician for a sink and water fountain company. Jose's wife is a US citizen, with whom he has a young daughter.[125] Jose spoke about his wife and reflected on his past crimes and his pending separation from his wife and children:

> [My wife] works, has started a credit line. She has a good job, a little house.
> It's her time to chase her dreams. I acted foolishly and should pay for those
> decisions. But I do think the penalty is too harsh. I have been here for 26
> years and I would thank the US and say I'm sorry for what I did. I would even
> accept the deportation if I killed someone or robbed a bank. But now what
> they are doing to me is robbing my children of their future and their ability to
> make their own choices … It is a severe punishment to put you in exile away
> from your whole world. That is the same as taking away your identity.[126]

Another example is the case of Hamok Yun,[127] originally from Korea, who lived in the United States as a lawful permanent resident since the age of two. Yun is married to a US citizen, served in the US Coast Guard, attended Michigan public schools, and worked for seven years at Idra Prince (an industrial machine builder), but lost his job due to his problems with his immigration status.

Yun is facing deportation because he pled guilty to two counts of attempted third degree criminal conduct. After his discharge from the Coast Guard, at the age of 22, Yun began a

---

[124] Human Rights Watch interview with Jose A. (pseudonym), Eloy Detention Facility, Eloy, Arizona, May 2006.

[125] Jose A. is separated from the mother of his two oldest children, but he pays child support and was suing for custody at this writing because the mother of his children had a drug problem. Jose's son Isaac was having severe problems in school ever since his father was put into immigration detention pending deportation. Isaac's first grade teacher wrote a letter of concern about her young student: "Academically Isaac is functioning in the lowest 10 percent of my class. Behaviorally, Isaac is struggling as well …. I am VERY concerned about this student and his success here at school. I have referred him to our school counselor to get some help." Letter from Valerie Dixon, Ogden City Schools, Ogden, Utah, February 3, 2006.

[126] Human Rights Watch interview with Jose A., May 2006.

[127] Olivia Cobiskey, "Man Pledged Allegiance to the Flag Daily, but Still Could be Deported," Associated Press, December 13, 2004.

AR.09056

relationship with a 15-year-old girl. It was this relationship that caused the girl's parents to bring charges against Yun for statutory rape, resulting in his third degree criminal conduct conviction. A newspaper account of his case explained that "the parents of the girl say they have no ill will toward Yun. In fact, her mother wrote a letter to the immigration judge saying she did not think Yun should be deported. 'I am stepping forward to say that I feel he has been punished appropriately and to a higher extent than I thought he would be. I feel it is not needed that he be returned to his former country…. I feel that no further punishment is needed.'"[128]

The principle of proportionality in international law may counsel against imposing the penalty of deportation for these types of offenses, which are less serious than intentional violent crimes such as homicide or (non-statutory) rape.

### Case Study: Deportation after Questionable Legal Advice[129]

Every non-citizen deported for a crime had a separate criminal case prior to his or her deportation hearing. Defense attorneys across the country work hard to stay informed about immigration law, but nevertheless there are some who may give their clients bad advice, which then triggers deportation. It is nearly impossible for these immigrants to convince courts to reopen their criminal cases and resentence them, and thereby nullify the order of deportation.

In one such criminal case, Oscar Hernandez, originally from Mexico, arrived in the United States in 1979 at the age of four and became a lawful permanent resident at the age of 12. As a child, Oscar attended elementary, junior high, and high school in Phoenix. In 1993 Oscar was arrested and placed on probation. He became a father in 1994 and now has two US citizen daughters who live with their mother. Also in 1994, like many other lawful permanent residents, Oscar was recruited by the US Army, though he did not end up joining.

In 1995, while on probation, Oscar was arrested for carjacking. Although Oscar claimed then and now that he was innocent of the carjacking, his attorney advised Oscar to sign a plea agreement in 1998, claiming that he would be sentenced to time served (he had been in jail for three years)

---

[128] Ibid.

[129] The information contained in this text box comes from: Human Rights Watch interview with Oscar Hernandez, Eloy Detention Facility, Eloy, Arizona, May 2006; Human Rights Watch interview with Juanita Chacon, Phoenix, Arizona, May 2006; Letter from Mr. Frank Ballesteros, June 17, 1992 (on file with Human Rights Watch); Letter from Col. John C. Meyers, US Army to Oscar Hernandez, October 11, 1994 (on file with Human Rights Watch); Affidavit of Oscar Hernandez, Criminal Court of the State of Arizona, County of Maricopa, March 2006 (on file with Human Rights Watch). Federal courts throughout the US have held that deportation is not a direct consequence of a conviction, and therefore unforeseen results from a criminal case relating to immigration, such as deportation, can rarely serve as a basis for overturning a guilty plea or conviction. John J. Francis, "Failure to Advise Non-Citizens of Immigration Consequences of Criminal Convictions: Should This Be Grounds to Withdraw a Guilty Plea?" *University of Michigan Journal of Law Reform*, vol. 36 (2003), p. 701.

ER-1016                                                                    AR.09057

and there would be no immigration consequences. Instead, Oscar was sentenced to one year and two months, which he appealed, but which would have made him deportable if his appeal failed. In a shocking turn of events, while Oscar was waiting for his appeal, he was deported by US immigration authorities under his codefendant's name. Oscar explained his attempts to correct the mistaken identity problem before he was deported:

"I requested to see a supervisor … I told her she was mistaken but she did not listen to me. I was deported as my codefendant, Oscar Barerra Sanchez. I continuously attempted to inform the guards that they had the wrong man and I was repeatedly ignored …. In June 1999 I was deported to Mexico and the following day I returned to the United States with my school identification my brother delivered to me. One-and-a-half years later, in November 2000, I was pulled over for driving without a license."

Eventually, Oscar was prosecuted for illegal re-entry and sentenced to 57 months in prison. He was once again awaiting deportation when Human Rights Watch interviewed him in 2006. He wrote to the court,

"I … should not have been deported in 1999 as my codefendant. I want to stay in the United States and live here legally. I have been apart from my family for close to 10 years and would like to live with my mother in Phoenix and assist her as she grows older."

When asked what would happen to Oscar, to his daughters, and to herself if he was deported back to Mexico, Oscar's mother (who is confined to a wheelchair since she had an accident at her factory job) said,

"He doesn't know anywhere outside of the US …. All of his brothers are here. Where is he going to go and with who? Right now, he's the only one that accompanies me. He takes care of me because I can't do anything.  He cooks for me, he cleans the house, he picks up my medicine, and he takes me to the doctor. And if my son weren't here, what would become of me? … Like I told the judge once, if I would have seen that my son was bad, I myself would have turned him in to the police because I don't want any of my children to be delinquents. I hope in God that he listens to me, that they take him out of jail and not out of the country."

## Family Unity

The international human right to family unity finds articulation in numerous human rights treaties. The concept is also incorporated into the domestic law of the United States. For example, in the context of custody rights for grandparents, the US Supreme Court has held

that the "right to live together as a family" is an important right deserving constitutional protection, and an "enduring American tradition."[130]

The Universal Declaration of Human Rights states that "[t]he family is the natural and fundamental group unit of society and is entitled to protection by society and the State."[131] The International Covenant on Civil and Political Rights states in Article 17(1) that no one shall be "subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence."  Article 23 states that "[t]he family is the natural and fundamental group unit of society and is entitled to protection by society and the state," and that all men and women have the right "to marry and to found a family." The right to found a family includes the right "to live together."[132]

As the international body entrusted with the power to interpret the ICCPR and decide cases brought under its Protocol, the Human Rights Committee has explicitly stated that family unity imposes limits on states' power to deport.[133]  In *Winata v. Australia*,[134] the committee found a violation where Australia sought to deport two Indonesian nationals whose 13-year-old son, Barry, had been born in, and had become a citizen of, Australia. The committee was unimpressed by Australia's arguments that the petitioners were asserting a "claim[] to residence by unlawfully present aliens," noting that instead the petitioners merely asserted that "forcing them to leave would be arbitrarily interfering with their family life."[135]

The committee also rejected Australia's argument that the family had the power to decide whether or not to separate, since they could choose to return to Indonesia as a group. The

---

[130] *Moore v. City of East Cleveland*, 431 U.S. 494, 500, 503, n.12 (1977) (plurality); Linda Kelly, "Preserving the Fundamental Right to Family Unity: Championing Notions of Social Contract and Community Ties in the Battle of Plenary Power Versus Aliens' Rights," *Villanova Law Review*, vol. 41 (1996), pp. 729-730 (Discussing various non-immigration areas of law in which the Supreme Court has stressed the importance of legal protections for family unity and family life), Nancy Morawetz, "Symposium: Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review*, vol. 113, pp. 1950-1951 (2000) (Discussing instances of members of Congress and the INS expressing the importance of family in the immigration context).

[131] Universal Declaration of Human Rights (UDHR), adopted December 10, 1948, G.A. Res. 217A(III), U.N. Doc. A/810 at 78 (1948), art. 16(3). The Declaration also states, "Motherhood and childhood are entitled to special care and assistance." UDHR, art. 25(2).

[132] UN Human Rights Committee, "General Comment 19: Protection of the Family, the right to marriage and equality of the spouses," art. 23, July 27, 1990.

[133] UN Human Rights Committee, "General Comment 15: The Position of aliens under the Covenant," November 4, 1986.

[134] *Winata v. Australia*, Communication No. 930/2000, U.N. Doc. CCPR/C/72/D/930/2000 (2001).

[135] Ibid.

AR.09059

committee looked at the strong family ties to Australia and also the impact on Barry[136] to decide that deportation would constitute not only arbitrary interference with the family under Article 17 in conjunction with Article 23, but also a failure to provide necessary measures for the protection of a minor under Article 24.[137]

Even in a case in which the governmental interest in deportation was strong because a non-citizen was found deportable due to prior criminal convictions, the committee found a violation of the same rights in *Madafferi v. Australia*, involving an Italian national who had married an Australian national and had four Australian children, and who had been ruled deportable based on prior crimes in his native Italy.[138]

The Council of the European Union, without challenging in general states' power to deport non-citizens, imposes limitations in order to protect family relationships. When making deportation decisions, the council has found that the state must consider "the severity or type of offence against public policy or public security committed by the family member, or the dangers that are emanating from that person."[139] According to the council, states must also "take due account of the nature and solidity of the person's family relationships and the duration of his residence in the Member State and of the existence of family, cultural and social ties with his/her country of origin."[140]

Case law from the European Court on Human Rights (see case study: Boultif Test, above) has provided additional guidance to member countries on respecting family unity during deportation on criminal grounds, finding that they should weigh several factors including: the nature and seriousness of the offense; the length of stay in the host country; rehabilitation; spousal relationships; the existence of children; and the potential difficulties family members would face in relocating to the country of origin.[141]

---

[136] Barry was described in a psychologist's report as "an Inner Western Sydney multicultural Chinese Australian boy … [who] would be completely at sea if he was to be left there while [his parents] returned to Indonesia."

[137] *Winata v. Australia*, Communication No. 930/2000, U.N. Doc. CCPR/C/72/D/930/2000 (2001).

[138] *Madaferri v. Australia*, Communication No. 1011/2001, U.N. Doc. CCPR/C/81/D/1011/2001 (2004).

[139] Council of the EU, "Council Directive 2003/86/EC of 22 September 2003 on the right to family unification," art. 6(2).

[140] Ibid., art. 17.

[141] *Boultif v. Switzerland*, ECHR 5427/00 (2001).

The American Declaration of the Rights and Duties of Man[142] features several provisions relevant to the question of deportation of non-citizens with criminal convictions and strong family ties. Article V protects every person against "abusive attacks upon … his private and family life."[143] Under Article VI, "[e]very person has the right to establish a family, the basic element of society, and to receive protection therefor."[144] The American Convention on Human Rights, to which the United States is a signatory,[145] contains analogous provisions.[146] The Inter-American Commission on Human Rights case, *Wayne Smith and Hugo Armendáriz v. United States of America,* relies on several of these provisions to challenge the US policy of deporting non-citizens with criminal convictions without regard to family unity.[147] The *Smith and Armendáriz* case was ruled admissible by the Inter-American Commission on Human Rights,[148] and Human Rights Watch has submitted an amicus curiae brief to the Commission in support of Petitioners Smith and Armendáriz. As of this writing, hearings in the case are expected in July 2007.

In light of these strong international standards, the United States has fallen far behind the practice of governments around the world in terms of providing protection for family unity in deportation proceedings. As shown above (Figure 7), 52 governments are required by domestic and/or international law to weigh family relationships when deporting non-citizens.

One immigrant, Hector J., who was deported from the United States away from his family in 2004, spoke about his loss of family in a way that summed up the sentiments of many others interviewed for this report. Hector spoke with a Human Rights Watch researcher by telephone, after he had been deported to Santo Domingo. Hector entered the United States

---

[142] The American Declaration of the Rights and Duties of Man is not a binding treaty, but is enforceable on member states of the American system. Laurence R. Helfer, "Overlegalizing Human Rights: International Relations Theory and the Commonwealth Caribbean Backlash against Human Rights Regimes," *Columbia Law Review*, vol. 102 (2002), p. 1885.

[143] American Declaration of the Rights and Duties of Man, art. V., http://cidh.oas.org/Basicos/basic2.htm.

[144] Ibid., art. VI, http://cidh.oas.org/Basicos/basic2.htm.

[145] American Convention on Human Rights "Pact of San Jose, Costa Rica," General Information on the Treaty, http://www.oas.org/juridico/english/Sigs/b-32.html (accessed May 30, 2007).

[146] Article 17 states that "[t]he family is the natural and fundamental group unit of society and is entitled to protection from society and the state." American Convention on Human Rights, Article 17. Article 11 protects the family against "arbitrary or abusive interference." American Convention on Human Rights, Article 11. Under Article 19, "[e]very minor child has the right to the measures of protection required by his condition as a minor on the part of his family, society and the state."

[147] *Wayne Smith and Hugo Armendáriz v. United States of America*, Case No. 12.561, Inter-American Commission on Human Rights.

[148] Admissibility Petition 8-03, Wayne Smith, Report Number 56/06, Inter-American Commission on Human Rights, July 20, 2006, http://www.cidh.oas.org/annualrep/2006eng/USA8.03eng.htm (accessed May 30, 2007); Admissibility Petition 526-03, Hugo Armendáriz, Report Number 57/06, Inter-American Commission on Human Rights, July 20, 2006, http://www.cidh.oas.org/annualrep/2006eng/USA526.03eng.htm (accessed May 30, 2007).

at age 17 and lived with his mother in Brooklyn, New York. He attended public school in New York and completed an associate degree in human resources. After graduating, Hector worked as a community organizer and monitor for two non-profit organizations in Brooklyn that assisted homeless and low income families.[149] Hector's deportation separated him from his oldest daughter, Serena, and from his mother. He told Human Rights Watch,

> [Y]ou know, being with your family, there is nothing that you can compare to anything in life. It's just that warmness of the home, time with your loved ones … its something that you really can't describe. What do I do without it now? Also something I can't describe.[150]

Ramon H. (introduced in Chapter IV), who was facing deportation for conviction of an aggravated felony, had such strong family ties to the United States that his attorney submitted a great deal of additional information to the court, even though the judge had no discretion to waive the deportation. Ramon's wife told the court that her husband "is a wonderful and great husband and father to his two daughters. We both work to support our family … Our lives will not be the same if my husband is not with us. It will be very difficult for my daughters and myself."[151]

Ramon's daughter, Pamela Alicia, told the court, "My dad is the one who mainly supports the family. My father helps us when we need help on things like school and at home. My dad has given us everything we need to make us happy."[152] Pamela Alicia's math teacher wrote a letter to the court, stating,

> I am writing to respectfully request that [Ramon] … be allow[ed] to remain in the United States as a husband to his wife and as a father to [Pamela Alicia] and her younger sibling. In my experience with [Pamela Alicia], she has always been an excellent student … I must confess that a significant part of her growth as a thinker and student is due to the stability of her home …. It is

---

[149] Human Rights Watch telephone interview with Hector J. (pseudonym), Santo Domingo, Dominican Republic, July 7, 2006. Hector spoke with pride about his work: "when you are helping out people … its not only the pay it's more than that … it's the spiritual pay that you get when you feel that you are doing something well for people. And due to the fact that I speak two languages, I was also helping out people that couldn't communicate [in English]. I had that ability to become a bridge."

[150] Ibid.

[151] Affidavit of Pamela H. (pseudonym), October 2, 2004 (on file with Human Rights Watch).

[152] Affidavit of Pamela Alicia (pseudonym), October 1, 2004 (on file with Human Rights Watch).

rare to find a home environment that supports the student in the way that [Pamela Alicia] is supported.[153]

In another example, Jeremiah E., originally from Jamaica, came to the United States when he was eight years old as a lawful permanent resident and lived in California for 17 years. Jeremiah's stepmother and father, both of whom are lawful permanent residents, petitioned to have him and his brother join the family. Jeremiah's biological mother has not been involved in his life. Jeremiah's other brother, his sister, two of his aunts, and two of his uncles are all US citizens.

Jeremiah was in detention in late 2006 facing deportation back to Jamaica for two offenses: possession of a controlled substance, for which he received 36 months of probation; and possession of a firearm, for which he also received 36 months of probation. Jeremiah's stepmother wrote to the court,

> [Jeremiah] and I always have [had] a great relationship, [when he was] a little boy we would go to Church together, and on our way we would sing songs from the tapes and at times we would just talk. As an only child for nine years we would do a lot of things together. When his sister was born he was excited and would help in many ways, the same with his brother. He is a loving son and brother and also helps around the home …. He also has a son of his own that he loves and adore[s]. We all love [Jeremiah], and I will continue to do so until God takes me home. I know he has made some wrong decisions, but I do hope that he has learned from them and … that he will be given another chance to be a positive leader both in the community and for his son.[154]

After Jeremiah's son was born, he and his son's mother lived in their own home together. During this time, Jeremiah worked as a carpenter, was a member of a union, and paid taxes for several years prior to his incarceration pending deportation. He was the sole financial support for his son and girlfriend. His father wrote, "I remember he would get up at four in the morning to fit in work and school into his day."[155] Jeremiah's stepmother wrote,

---

[153] Affidavit of Clarence Terry, Mathematics Department, Madrid Middle School, September 27, 2004 (on file with Human Rights Watch).

[154] Letter from Jeremiah's stepmother regarding her stepson's deportation, July 26, 2005 (on file with Human Rights Watch).

[155] Ibid.

AR.09063

> All [Jeremiah] talks about is his son. Whenever he calls home, he asks about his son. It bothers him tremendously that he cannot take care of his son while he is detained. [Jeremiah] Jr. needs his father here—no one else can take a father's place. If Jeremiah is deported, [Jeremiah] Jr. would be another child growing up without a dad. [156]

Seventeen-year-old Michael Hinds, Jr. may lose his father, 58-year-old Michael Hinds, Sr., to deportation. At the age of 10, Hinds Jr. was reunited with his father because his dad returned to the United States after his mother, who was a lawful permanent resident, died of AIDS and he had no parent to raise him. Hinds Sr. returned to the United States from Jamaica after having already been deported in 1994 for attempted sale of a controlled substance in the third degree.[157] He was facing deportation again for re-entering the country after deportation.

Speaking with obvious pride about his son's academic and musical achievements (he is a pianist), Hinds Sr. told a Human Rights Watch researcher that he worked in construction, which he did in order to rent an apartment in the same neighborhood his wife had lived in, and to ensure his son's attendance in school, and provide for him between 2000 and 2006.[158] Hinds Sr.'s partner told a Human Rights Watch researcher that his son "is very obedient of his father. He never talks back to him. [Michael] tells his son to 'try to keep his head up' even though he's been through so much and now his Dad is in detention. But it's not easy. It's not easy at all."[159]

---

[156] Letter from Jeremiah's stepmother regarding her stepson's deportation, May 16, 2005 (on file with Human Rights Watch).

[157] *US v. Michael Hinds*, Complaint, Southern District of New York, Affidavit of Christopher Quinn, Senior Special Agent with DHS/ICE.

[158] Human Rights Watch interview with Michael Hinds, Metropolitan Detention Center, Brooklyn, New York, August 2006.

[159] Human Rights Watch telephone interview with Kaima [last name withheld], New York, New York, August 2006.

AR.09064



**Drawing by a child facing separation from her father due to deportation © 2005 private**

Cases like those described above, and in fact all such cases of family separation are particularly poignant because they are examples of families whose rights would have received greater protection when 212(c) hearings were still available.

Courts in the United States have been extremely reluctant to rely on international human rights law to overturn deportation decisions, even when family relationships are very strong and compelling. Few cases have looked at the human rights standards in detail, preferring to give these international treaties short shrift. However, the only US court to conduct a careful and thorough analysis of US human rights treaty obligations found that it would be inconsistent with those obligations to allow a deportation to go forward when it would interfere with the right to family unity. In *Beharry v. Reno*,[160] Mr. Beharry, who entered the US from Trinidad as a lawful permanent resident when he was seven years old, had been ordered deported because of an aggravated felony conviction and denied a section 212(c) hearing as a result. He appealed that decision, raising the right to family unity under international law as a defense. The appellate court in the Southern District of New York highlighted Beharry's impending separation from several close family members, including his lawful permanent resident mother and his six-year-old US citizen daughter.

---

[160] *Beharry v. Reno*, 183 F. Supp. 2d 584 (E.D.N.Y. 2002).

AR.09065

After considering several human rights instruments, including the Universal Declaration of Human Rights, the Convention on the Rights of the Child, and the International Covenant on Civil and Political Rights as aids in interpreting US immigration law, the District Court found that "[s]ummary deportation of this long-term alien without allowing him to present the reasons he should not be deported violates the ICCPR's guarantee against arbitrary interference with one's family, and the provision that the alien shall 'be allowed to submit the reasons against his expulsion.'"[161] The Court further found that denial of a hearing balancing Beharry's family ties "would violate the principles of customary international law that the best interests of the child must be considered where possible."[162]

The US government appealed this decision. The Second Circuit Court of Appeals reversed the lower district court's decision by finding that Beharry had not followed the correct procedures to raise the issues the district court considered. Therefore, the Court of Appeals did not address any of the international law issues; it declined to discuss "the merits of the district court's analysis of the interaction between international law, the Supremacy Clause, and § 212(h)."[163]

However, in later cases the Second Circuit rejected the reliance on international human rights law outright, holding that Congress's unambiguous intent controlled the availability of a waiver of deportation notwithstanding any perceived conflict with international law, customary or otherwise, of the sort discussed in Beharry.[164] To date, no other US court has followed the District Court's reasoning in Beharry.[165]

---

[161] Ibid., p. 604.

[162] Ibid.

[163] *Beharry v. Ashcroft*, 329 F.3d 51, 54-55 (2d Cir. 2003).

[164] *Guaylupo-Moya v. Gonzales*, 432 F.3d 121, 136 (2d Cir. 2005); *Oliva v. U.S. Dep't of Justice*, 433 F.3d 229, 235 (2d Cir. 2005) (rejecting immigrant's argument that international law, as discussed in *Beharry*, warranted relief from deportation based on family unity).

[165] The following cases all criticize or distinguish the District Court's decision in *Beharry*: *Verissimo v. INS*, 71 F. App'x 859, 861-62 (1st Cir. 2003), cert. denied, 540 U.S. 1080 (2003); *Bankole v. INS*, 126 F. App'x 503 (2d Cir. 2005); *Gordon v. Mule*, 153 Fed. Appx. 39 (2d Cir. 2005); *Gonzalez Polanco v. United States INS*, 148 Fed. Appx. 60 (2d Cir. N.Y. 2005); *Pichardo v. Ashcroft*, 374 F.3d 46 (2d Cir. N.Y. 2004); *Chen v. Ashcroft*, 85 F. App'x 700, 704-05 (10th Cir. 2004); *Salazar-Regino v. Trominski*, 415 F.3d 436 (5th Cir. Tex. 2005); *Ferris v. INS*, 303 F. Supp. 2d 103 (D. Conn. 2004); *Campbell v. Ganter*, 353 F. Supp. 2d 332 (E.D.N.Y. 2004); *Jimenez v. United States Immigration Serv.*, 2004 U.S. Dist. LEXIS 22524 (S.D.N.Y. Oct. 27, 2004); *Guaylupo-Moya v. Ashcroft*, 2004 U.S. Dist. LEXIS 17871 (S.D.N.Y. Sept. 7, 2004); *Holmes v. McCoy*, 2004 U.S. Dist. LEXIS 16764 (S.D.N.Y. Aug. 22, 2004); *Adebeyo v. Ashcroft*, 2003 U.S. Dist. LEXIS 27048 (E.D.N.Y. Mar. 6, 2003); *Marino Cabreja v. U.S. Immigr. Serv.*, No. 02CIV5441(GEL), 2003 WL 22697957 (S.D.N.Y. Nov. 3, 2003); *Guerra v. Ashcroft*, No. Civ. A. 301CV1562H, 2002 WL 1359706 (N.D. Tex. June 19, 2002); *Ayala-Caballero v. Coleman*, 58 Fed. Appx. 669 (9th Cir. Wash. 2002); *Alvarez-Garcia v. United States INS*, 234 F. Supp. 2d 283 (S.D.N.Y. 2002); *Gonzalez-Polanco v. United States INS*, 2002 U.S. Dist. LEXIS 14303 (S.D.N.Y. Aug. 5, 2002); *Tavaeras-Lopez v. Reno*, 127 F. Supp. 2d 598 (M.D. Penn. 2000).

AR.09066

**Case Study: Loss of a Caretaker: Jimmy X.'s Story**[166]

Jimmy X., originally from Laos, came to the United States with his parents as a refugee when he was four years old. His parents "made a little raft to cross the Mekong River [with] inner tubes and stuff like that." Jimmy's parents had difficulties adjusting to life in the United States. His father was "an abusive alcoholic. He used to beat my mom, me, and my sister up all the time." Jimmy's parents were divorced in 1989. His mother "would do that sweatshop stuff, you know making like five cents per item .... That's why I really stick by her now, because I'm more mature now and I see all the struggle she did."

As a teen growing up in Los Angeles, Jimmy joined a gang. He was 18 years old when he was convicted for robbery and home invasion, an aggravated felony. He was sentenced to seven years. In prison, Jimmy earned his GED. He told a Human Rights Watch researcher, "I used to get straight A's when I was in school, so the GED wasn't anything difficult .... Believe it or not, I was spelling bee champion in elementary school. Those were fun days, better days, best days."

Jimmy told Human Rights Watch that after serving his criminal sentence (he was released after four years for good behavior) he had no idea that he would face deportation. He said, "I had my green card and everything, so I didn't worry about it. This was the first time I ever heard anything about they're deporting people. But that happens to everybody. You just don't know until it happens to you."

At the time of his interview with Human Rights Watch, Jimmy was a community outreach organizer for a non-profit group serving troubled youth involved in gangs. He explained,

"I really changed my life around. I don't do anything bad anymore. I've been out five years, and I haven't done anything illegal. I've made it a point to actually help others and prevent others from doing anything illegal. In the gang lifestyle you get used to doing things in certain ways ... I'm working on my language right now, speaking in the best intellectual way. If only the government would actually see that some of us try so hard to change and do right."

Although Jimmy has a final order of deportation, he has not yet been sent to Laos because the United States has not obtained the necessary travel documents. Jimmy has a lot of responsibility at work and at home. He cares for his mother and supports her. He told a Human Rights Watch researcher,

"[My mother] has suffered from depression and post-traumatic war, you know, stress. She is a little bit lost. I hate to say it, but she's crazy. To the point where she always thinks someone's

---

[166] Human Rights Watch interview with Jimmy X. (pseudonym), Los Angeles, California, April 5, 2006.

AR.09067

after me. She really does think so. She thinks the phones are tapped and all that stuff. She got worse once I was put in deportation. She couldn't understand. Because we're here legally, she's got all the paperwork and everything … She doesn't leave the house at all, she doesn't open the curtains, the lights are always off, she goes to the bathroom in the darkness …  I use all my connections [from his work] to community agencies. That's what pisses me off: I can help the whole damn world, but I can't help my mom. I can't get her like any government aid, anything like that."

Jimmy barely speaks Laotian. When asked what would happen if he were sent to Laos, he said,

"My mom would go crazy. There would be no one here to take care of her. My sister can't handle my mom. I mean, even I can't handle her, but I still do my best with her. My mom can't imagine me back there in Laos. She knows I'm an American boy. I mean, they didn't give me a Lao name, they gave me an American name. Like any parents, they had all those hopes for me, for their kids."

## Children's Rights

Beyond family unity in general, the rights of children to be raised by their parents is one of the strongest human rights counseling against the separation of families through deportation. Article 24 of the International Covenant on Civil and Political Rights, to which the United States is a party, entitles children "to such measures of protection as are required by [their] status as a minor, on the part of the family, society and the state."

Article 9 of the Convention on the Rights of the Child (CRC), which the United States has signed but not ratified,[167] requires that "States Parties shall ensure that a child shall not be separated from his or her parents against their will, except when … such separation is necessary for the best interests of the child."[168] Thus, the CRC weighs *in favor* of non-citizens' rights not to be deported if it is contrary to the best interests of the child. Accordingly, the Committee on the Rights of the Child often notes concerns over states' failure to put the best interest of children first and foremost in immigration proceedings.[169]

---

[167] Convention on the Rights of the Child (CRC), adopted November 20, 1989, G.A. Res. 44/25, annex, 44 U.N. GAOR Supp. (No. 49) at 167, U.N. Doc. A/44/49 (1989), entered into force September 2, 1990, signed by the United States on February 16, 1995, http://www.ohchr.org/english/countries/ratification/11.htm (accessed on May 31, 2007).

[168] CRC, art. 9(1).

[169] See, for example, "Concluding Observations of the Committee on the Rights of the Child," Canada, U.N. Doc. CRC/C/15/Add.215 (2003) ("the Committee remains concerned that the principle that primary consideration should be given to the best interests of the child is still not adequately defined and reflected in some legislation, court decisions and policies affecting certain children, especially those facing situations of divorce, custody and deportation, as well as Aboriginal

Almost every case study featured in this report presents an example of a family that was denied their right to remain together by US deportation policy. However, the following cases include particularly strong testimonies about the kinds of parent-child relationships that are harmed by deportation.

For example, eight-year-old Angelito Martinez is facing separation from his father, Eduardo. Eduardo explained his relationship to Angelito and his wife, Jennifer:

> We used to do so many things together. I was his soccer coach at school. We would go fishing a lot. I took him to soccer, Jennifer took him to swimming lessons. I would help him with his homework. He is great at spelling. The school said maybe he should be in a higher grade, but I don't want to do that right now. I think that's too much pressure on him right now. As a family, we also ask him his opinion on decisions like that. The three of us talk about those decisions together. That's why I don't want to leave this country. My family. That's it.[170]

Eduardo came to the United States at the age of 19. After several years in the United States, Eduardo said, "The most beautiful thing happened to me. I met my wife, Jennifer." They were together for three years before getting married, and have been married for seven years. Eduardo and his wife applied to have his immigration status adjusted, but the paperwork was not final when he was arrested for possession of a marijuana joint and two grams of marijuana and for illegal possession of a weapon, which Eduardo said he "bought to protect my family. I kept it in the house, out of reach of my son. It is true that I smoked marijuana. I should not have done that. It's shameful." [171]

Four-year-old Rosita and 10-year-old Carlos are facing separation from their father and stepfather, Miguel Y., who is currently in immigration detention waiting for deportation. His wife, Carmela Y., told a Human Rights Watch researcher, "[m]y son cries because he doesn't understand why daddy disappeared."[172]

---

children"); and "Concluding Observations of the Committee on the Rights of the Child," United Kingdom of Great Britain and Northern Ireland, U.N. Doc. CRC/C/15/Add.188 (2002) ("the Committee is concerned that the principle of primary consideration for the best interests of the child is not consistently reflected in legislation and policies affecting children throughout the State party, notably in the juvenile justice system and immigration practices").

[170] Human Rights Watch interview with Eduardo Martinez-Herrera, Eloy Detention Facility, Eloy, Arizona, May 2006.

[171] Ibid.

[172] Human Rights Watch interview with Carmela Y. (pseudonym), Los Angeles, California, April 7, 2006.

AR.09069

Carmela was struggling to get by on her salary, to pay for rent, feed her two young children, and cover lawyers' fees now that Miguel was in deportation proceedings. She explained that she couldn't make ends meet on her salary alone:

> I'm waiting for the tenth of the month. How can I help my kids? What will we eat for the next three days? Look—[she opens the refrigerator to show a Human Rights Watch researcher that it is empty apart from some milk and a half-eaten carton of fast food]—there's nothing there! This is all I have to last us until I get paid again.[173]

Miguel had been convicted of possession of marijuana with the intent to sell,[174] and later in 1996 with receiving stolen property, an aggravated felony. His defense attorney advised Miguel to plead guilty in exchange for a 16-month sentence, without advising his client of the immigration consequences. Prior to his convictions, Miguel had lived in the country as a lawful permanent resident since the age of 13.

Deported to El Salvador, Miguel returned to the US in 1998, where he lived without getting in trouble with the law again (although his re-entry is a new deportable offense under immigration law). Miguel worked and supported Carmela, who was going to college to get her Bachelor's degree when Miguel was arrested for illegal re-entry and detained. She explained what happened:

> He got dragged out of the house in front of my two-year-old [Rosita]. He was handcuffed. [Rosita] put up a fight because she was … she didn't want her daddy to leave.[175]

Losing a parent to deportation can be devastating for children, bringing about tragic results. Gerardo Anthony Mosquera, Jr., a US citizen, was the son of a 29-year-long legal permanent resident who was deported after committing the aggravated felony of selling a $10 bag of marijuana to an undercover police officer.[176] Unable to be consoled after the loss of his father, Gerardo, a strong student interested in sports and taking care of his younger siblings, committed suicide by shooting himself in the head.

---

[173] Ibid.

[174] Possession of cocaine with intent to distribute has been found to be a particularly serious crime by immigration courts. See *Matter of Buscemi*, Immigration & Nationality Laws Administrative Decisions, vol. 19, decision 628 (BIA 1998).

[175] Human Rights Watch interview with Carmela Y. (pseudonym), Los Angeles, April 7, 2006.

[176] Patrick J. McDonnell, "Deportation Shatters Family," *Los Angeles Times*, March 14, 1998.

## Ties to a Country

The US Supreme Court stated in *Landon v. Plasencia* that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly."[177] Despite this accepted constitutional maxim, a non-citizen's ties to the United States, including length of residence, military service, and business, educational, and community ties that are separate from family relationships, are often not considered when he or she faces deportation because of a criminal conviction.

Under human rights law, the state power of deportation should be limited if it infringes upon an individual's right to a private life, which includes his or her ties to the country of immigration not including any family ties. Article 17 of the ICCPR provides that "[n]o one shall be subjected to arbitrary or unlawful interference with his privacy ... home or correspondence .... Everyone has the right to the protection of the law against such interference or attacks."[178]

The Human Rights Committee has explained that this "guarantee[s] that even interference provided for by law should be in accordance with the provisions, aims, and objectives of the Covenant and should be, in any event, reasonable in the particular circumstances."[179] Further, the committee has stated that the term "home" "is to be understood to indicate the place where a person resides or carries out his usual occupation."[180]

Therefore, the right to protection against arbitrary interference with privacy and home encompasses those relationships and ties that an immigrant develops with the community outside of his or her family. For example, the Inter-American Commission has found that the right encompasses "the ability to pursue *the development of one's personality* and aspirations, determine one's identity, and define one's personal relationships."[181]

The European Court of Human Rights has weighed an individual's ties to a country as a part of his private life (and separate from family life) in deportation cases. In *C v. Belgium*, the

---

[177] *Landon v. Plasencia*, 459 U.S. 21, 33 (1982).

[178] ICCPR, art. 17.

[179] UN Human Rights Committee, General Comment 16, para. 4, 1988.

[180] Ibid., para. 5.

[181] *Maria Eugenia Morales De Sierra v. Guatemala*, Session № 4/01, Case 11.625, Jan. 19, 2001, http://www.cidh.org/women/guatemala11.625.htm (accessed July 3, 2007). English translation found at: www.cidh.org/women/guatemala11.625aeng.htm (accessed July 3, 2007) (emphasis added).

AR.09071

ECHR found that the petitioner's private life included the petitioner's "real social ties in Belgium":[182]

> He lived there from the age of 11, went to school there, underwent vocational training there and worked there for a number of years. He accordingly also established a private life there within the meaning of Article 8 (art. 8), which encompasses the right for an individual to form and develop relationships with other human beings, including relationships of a professional or business nature.[183]

The court ultimately found that the petitioner's very serious crime outweighed countervailing factors, allowing him to be deported from Belgium, but only after a hearing that weighed his right to a private life against his crime. In another case, *Beljoudi v. France,* deportation was not allowed because of the rights violations faced by Mr. Beljoudi, including his right to privacy as well as his right to family unity. In the decision, one judge emphasized the right to privacy, finding that the applicant's "links with France, and the absence of them with Algeria, are such that there must be much stronger arguments to justify an interference with his right to respect of his private life."[184]  He continued,

> [I]f there is a country responsible for the education and behavior of the applicant, there is room to consider that it is France, rather than Algeria. If it is not illegal, it is in any case morally rejectable to send to Algeria those of the numerous immigrants who become criminals, while those who contribute to the prosperity of the country can remain in France.[185]

Two additional cases, *Moustaquim v. Belgium* and *Lamguindaz v. United Kingdom*, involved non-citizens who the court found should not be deported because they had spent the vast majority of their lives in the host state, even though they had been convicted of various crimes as well.[186]  In each case, the individual had grown up and completed his education in

---

[182] European Court of Human Rights, *C v. Belgium*, (App. 21794/93), Judgment of 7 August 1996, (paragraphs 32 and 33).

[183] Ibid.

[184] European Court of Human Rights, *Beldjoudi/Teychene v. France*, 1990, (App. 12083/86) (Rapport de la Commission) (Opinion Concordante de M. H.G. Schermers à laquelle Mme G.H. Thune Declare se rallier).

[185] Ibid. The *Beldjoudi* case and additional European precedent is also discussed in the report, Human Rights Watch, *France - In the Name of Prevention: Insufficient Safeguards in National Security Removals*, Volume 19, No. 3(D), June 2007, http://hrw.org/reports/2007/france0607/.

[186] European Court of Human Rights, *Moustaquim v Belgium*, Judgment of February 18, 1991, Series A No. 193; European Court of Human Rights, *Lamguindaz v. The United Kingdom*, Judgment of June 28, 1993, Series A No. 258-C.

the host state, which the ECtHR found constituted elements of his private life that required careful weighing prior to deportation.[187]

The European Union has taken steps to further codify the practice of weighing ties to a country before deportation by issuing a Council Directive on the issue in 2003. The Directive states that countries expelling long-term residents must take account of the length of their stay in the country when making a decision to expel[188] and that long-term residents are entitled to "reinforced protection against expulsion."[189]

Therefore, these international standards recognize that the right to private life is put at risk by deportation that fails to weigh the various ties and relationships that non-citizens develop with their host countries. In the United States, these ties and relationships can be subdivided into several parts, including: the length of legal residence in a country; military service in a country's armed forces; legal residence in a country since childhood; and economic and business ties.

## Length of Legal Residence

Many immigrants facing deportation from the US have stronger ties to the US than to their countries of origin, but unlike in Europe these ties receive no consideration in deportation proceedings. For example, 35-year lawful US resident and Cuban national, Sergio C., came to the United States at the age of six. His entire family[190] was admitted into the United States, which gave Sergio legal permission to remain in the country. He attended school through the 10th grade in Miami, Florida. After leaving high school, he went to work for the Continental Marketing Group, where he was employed for 20 years, and paid income tax. Sergio pled guilty to two acts of fraud, for which he received a sentence of 20 months imprisonment and was required to pay restitution. He wrote to Human Rights Watch,

---

[187] Kees Groenendijk, Elspeth Guild and Halil Dogan, *Security of Residence of Long-Term Migrants: A Comparative Study of Law and Practice in European Countries* (Strasbourg: Council of Europe, 1998), p. 6.

[188] Council of the EU, "Council Directive 2003/109/EC of 25 November 2003 Concerning The Status Of Third-Country Nationals Who Are Long-Term Residents," art. 12.

[189] Ibid., para.16.

[190] Sergio C. (pseudonym) entered the US with his mother, father, three brothers, and four sisters, all of whom were sponsored by Sergio's lawful permanent resident grandparents. Sergio married a lawful permanent resident, Alexa (pseudonym), with whom he had two children, Giuseppe (pseudonym), who was age 21 in 2007, and Erica (pseudonym), who was age 18 in 2007. Sergio and Alexa were married for 20 years before divorcing.

AR.09073

I have entered my plea and served my punishment. I only wish to return to the community from which I was raised to be the man and father I am known to be.[191]

Jared L., originally from Jamaica, entered the United States as a lawful permanent resident in 1972, which was 34 years prior to his arrest in 2006. He worked for a construction company for most of his adult life, and is facing deportation for unlawful transport or sale of a controlled substance, and aiding and abetting that transport or sale. Jared L. wrote to Human Rights Watch from immigration detention, "I have no one in Jamaica, all my family are here in the states." Prior to his arrest and detention, Jared L. was injured on the job and was receiving treatment for five degenerated discs in his lower back. Now in immigration detention in Los Angeles, Jared is confined to a wheelchair. His treatments are paid for by the insurance of his employer, which "does not cover [him] outside of California, much less outside of the U.S.A."[192]

## Legal Residence in the United States Since Childhood

The international definitions of private life embrace the ties and relationships that a person builds with his or her country of immigration. Non-citizens who have lived in the United States from a very young age have developed a particularly strong connection to the country; nevertheless, these ties are given no weight in deportation hearings.

For example, Chris L. was born in a Cambodian refugee camp in Thailand and entered the United States legally as a refugee with his entire family when he was just three months old. However, Chris was charged and tried as an adult with attempted murder at the age of 15, convicted at age 16, served 10 years in prison, and now faces deportation to Cambodia.[193]

He told a Human Rights Watch researcher about his early childhood in the United States. Chris and his mom, dad, grandmother, and two sisters first lived in Dallas, Texas, and soon moved to Napa, California. His life in Napa was "good, normal. I was a regular American boy." Then when Chris turned 12, his family moved to Riverside, California, where he "started hanging out with the wrong people." [194]

---

[191] Letter from Sergio C. (pseudonym) to Human Rights Watch, July 17, 2005.

[192] Letter from Jared L. (pseudonym) to Human Rights Watch, August 19, 2006.

[193] Human Rights Watch interview with Chris L. (pseudonym), Eloy Detention Facility, Eloy, Arizona, May 2006.

[194] Ibid.

Once in Riverside, Chris had friends who were gang members. On the night of his crime, he told a Human Rights Watch researcher, he had "tried to scare someone by shooting in the air. But no one was even hurt in my crime. I never should have taken the deal for attempted murder. I was only age 15. I did 10 years. My mistake was not thinking right at age 15, but I'm 25 now."[195] Chris said, "I didn't know anything about being deported. Then, after serving my 10 years, immigration came to get me. My family is devastated. My grandma had a mild heart attack. Everyone in my family is afraid for me if I go back to Cambodia." [196]

When asked what he would do if he wasn't deported, Chris said, "I want to start a fresh life. I would like to study biology and psychology. I got my GED in prison. I have a certificate in computer repair. My sister would let me move in with her in Riverside. I know I could do it."[197] During his incarceration in California, Chris's entire family—his mother, father, sister, and brother—all became US citizens.

### Case Study: "I am Legally Here"[198]

Lan X. was brought to the United States when he was four years old. He was convicted of second degree murder at the age of 16 and sent to prison in California. Lan's crime was gang-related, in which he shot a rival gang member who had shot at his house and assaulted his cousin. After serving his sentence in prison, Lan was facing deportation. Ironically, Lan's parents are actually Laotian, but he was born in Cambodia, and so Lan faces deportation there even though he does not speak Khmer. He explained to a Human Rights Watch researcher about his family circumstances at the time of his offense:

"Before I joined the gang, I used to look at my mother and I just didn't want to be at home because it would be a burden to my family. I said, 'Okay [the gang will] take care of me, they feed me, they bathe me, they watch me. . .' [It was] the worst mistake I ever did in my life. I thought, 'My family—I'll just leave them alone where you don't have to worry about having to spend the extra money just to help me out.' I felt like I was a burden to my family and plus, my mom was just a single mom. She came here with no education. She couldn't do anything."

After serving eight years in prison for his crime, Lan was shocked to learn he would be deported to Cambodia. He explained,

---

[195] Ibid.

[196] Ibid.

[197] Ibid.

[198] This text box is based on information from a Human Rights Watch interview with Lan X. (pseudonym), Long Beach, California, April 6, 2006.

AR.09075

"I understood about illegal immigration, but I thought 'your honor, that is not pertaining to me.' I am not an illegal immigrant. I am legally here and a permanent resident here. Also, I didn't think I was considered an adult. I was 16. But none of that mattered. I was convicted as an adult and now I'm being deported even though I thought I was a lawful permanent resident. Do you think as a 16-year-old I could have said to my mom, 'Hey, Mom, you need to go to an INS place to get your citizenship?' Do you think a 16-year-old would think of that? If you think a 16-year-old would think of that and should be tried as an adult, then you might as well think that an 11-year-old should drink beer."

Lan said he knew his crime was horrible, and one that he deserved punishment for, but he emphasized the fact that he pled guilty to his crime, served his eight-year sentence, and that "it didn't take me two or three times [to learn my lesson], it took me once in my life. When I was incarcerated, I went and got my education, my high school diploma, and then I got my college degree. I always worked two or three jobs. But that doesn't matter. That's how society is right now, all they judge you for is what happened in the past. They won't judge you for who you are now."

Lan was under a final order of deportation when he was interviewed by Human Rights Watch, but he had been released on parole while the immigration authorities tried to make travel arrangements to send him to Cambodia. When he is deported to Cambodia (or Laos), Lan will leave behind two brothers and two sisters. Lan was using his time on parole pending deportation to work to help his siblings and nieces and nephews out financially.

"I work as much as I can 'cause I'm the oldest one in the family. I try to take care of them as much as I can. I want to be married too one of these days, but the only thing that scares me is what happens if they take me away? If I have to tell my girl, how are you going to survive? Can you fend for yourself? And what happens if I have kids? Who's going to take care of my daughter or my son when I'm in Cambodia? And what am I gonna do in Cambodia? They might as well send me to the gas chamber or to shark infested waters. I'm more Americanized. I don't even speak their language!"

Reflecting on his crime and on his pending deportation, Lan concluded, "I did the crime, I knew I had to do the time, but with immigration law and everything around it, it's like a chain reaction. I didn't know. But it's all too late now to rewind back time."

*Military Service*

Military service is another example of an individual's ties to the community. Like schooling, work experience, and friends, it is one of the elements of an individual's private life which ought to be weighed prior to deportation.

Forty-two-year-old Andre R. has lived in the United States as a lawful permanent resident for 36 years. He entered the country when he was five years old. Andre attended public school throughout his childhood and entered the US military upon graduation from high school. He served in the US army in Panama in 1982 and 1985. Upon leaving the army in 1986, he applied for US citizenship but says that he never received the notice of his citizenship hearing. As a result, he was recorded as failing to appear for the hearing, although he remained a lawful permanent resident. Then, in 1995 he pled guilty to an aggravated felony that rendered him deportable once the immigration laws were changed in 1996. He explained that he pled guilty "thinking that it was the best for me so I could go to work and not miss any time … I should be able to be home with my family[199] working and doing what a man is to do to take care of his children."[200]

Andre owned his own company in the United States. As he wrote to Human Rights Watch, "I have paid tax all my life to this country until DHS detained me." He concludes, "All I ask for is a fair chance to fight for what is right and that is my family and my right to be in a country that I fought for in the military. When I joined the army they never asked me if I was an alien."[201]

A second example is that of Joe Desiré, originally from Haiti, who has lived in the United States as a lawful permanent resident for 40 years, since he was 11 years old.  Desiré was married in 1971, and has four United States citizen sons, two of whom are in the military. Desiré himself was in the US military from 1970 to 1974. He was based in North Carolina, Oklahoma, Fort Dix, Okinawa, Panama, Korea, and did a one-month tour of duty in Vietnam. Desiré told a Human Rights Watch researcher that during his years in the military he developed the habit of using "marijuana, acid, and sometimes cocaine."[202]

Desiré admits that it was his drug habit that caused him to get in trouble with the law. He has two drug possession convictions and one drug sale conviction—all from the mid-1990s—for which he served his criminal sentence, and now was facing deportation back to Haiti, a

---

[199] Andre R.'s legally present grandmother, mother, and five US citizen children (ranging in age from eight to 20) all live in the United States.

[200] Letter from Andre R. (pseudonym) to Human Rights Watch, 2006.

[201] Ibid.

[202] Human Rights Watch interview with Joe Desiré, Eloy Detention Facility, Eloy, Arizona, May 2006.

country in which he has no family or contacts. He told a Human Rights Watch researcher, "What I know of Haiti, I've read. I know nothing of the place. Nothing."[203]

Despite his drug habit and three convictions, Desiré worked his entire life. He was a welfare fraud investigator and went to college at night after leaving the military. He explained, "my intention was to go into law enforcement, but then I got into my own business. I became a certified cable technician and worked for HBO, and NACOM, and as a sales manager for American Cable Systems. I also worked on the side as a limo driver."[204]

As of this writing, Desiré has spent eight years in immigration detention awaiting deportation to Haiti. He told a Human Rights Watch researcher, "I have lived here most of my life. I want to be in touch with my sons. I have been clean and sober now for ten years. I cannot see myself going back to that style of life."[205]

### Training and Employment

International human rights law emphasizes the importance of education, vocational training, and employment in a host country "for a number of years" as elements of an individual's private life placed at risk by deportation.[206] These factors receive no consideration in US deportation law.

For example, Lingyan Zhuang, originally from China, owned his own store in Highland Park, Illinois, and had lived in the United States as a lawful permanent resident since the 1980s. He pled guilty in 2003 to illegally smuggling family members into the United States, for which he served 15 months in prison. Zhuang's crime made him deportable. Zhuang's wife is a naturalized US citizen and the couple has two US citizen children. The cost of fighting her husband's deportation has caused her to work seven days a week at the couple's store. Zhuang's attorney said, "[a]ny American who sees the case, sees his children here and his family here, would decide that he's someone who should not be deported. As the whole town of Highland Park has decided by their strong support … he's someone who benefits the community, and we need people like him here."[207]

---

[203] Ibid.

[204] Ibid.

[205] Ibid.

[206] European Court of Human Rights, *C v. Belgium*, (App. 21794/93), Judgment of 7 August 1996, (paragraphs 32 and 33).

[207] Ken Tarbous, "Deportation Fight Weighs Heavily on Family," *HomeNews Tribune* (New Jersey), June 30, 2005.

Non-citizens who reside in the United States for a significant amount of time have deep ties to the country that extend beyond their immediate families. Once a non-citizen establishes a lengthy residence in the United States, the impact of deportation without a balancing hearing can produce a devastating violation of the right to private life.

## Protection from Return to Persecution for Refugees

The principle of non-refoulement places well recognized limits on states' powers to deport refugees. The 1967 Protocol Relating to the Status of Refugees, to which the United States is a party, binds parties to abide by the provisions of the Refugee Convention, including that no state "shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."[208]

Given the imperative of protecting refugees from return to a place where they would likely be persecuted, refugee law permits a very narrow exception to non-refoulement, which only applies in extremely serious cases. Article 33(2) of the Refugee Convention states that protection against refoulement may not be claimed by a refugee, "who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."[209]

Procedures must be in place to ensure careful application of this narrow exception. The Refugee Convention and Protocol require that a refugee should be "allowed to submit evidence to clear himself, and to appeal to and be represented for the purpose before competent authority or a person or persons specially designated by the competent authority."[210] UNHCR's Executive Committee has explained that deporting a refugee under Article 33(2) "may have very serious consequences for a refugee and his immediate family members ... [and therefore should only happen] in exceptional cases and after due consideration of all the circumstances."[211] The exceptions to non-refoulement in Article 33(2) were intended to be used only as a "last resort" where "there is no alternative mechanism to protect the community in the country of asylum from an unacceptably high risk of harm."[212]

---

[208] Convention relating to the Status of Refugees (Refugee Convention), 189 U.N.T.S. 150, entered into force April 22, 1954, art. 33.

[209] Ibid., art. 33(2).

[210] Ibid., art. 32(2).

[211] UN High Commissioner for Refugees (UNHCR) Executive Committee, Conclusion No. 7 (1977).

[212] James C. Hathaway, *The Rights of Refugees under International Law* (Cambridge, UK: Cambridge University Press, 2005), p. 352.

Therefore, an individualized determination must occur before deportation in compliance with Article 33(2),[213] during which states must weigh two elements: that a refugee has been convicted of a particularly serious crime *and* that he or she constitutes a danger to the community.[214]

With regard to the first prong of the inquiry, the determination of a particularly serious crime cannot be merely rhetorical: It requires that the crime in question be distinguished from other crimes.[215] The UNHCR has defined such a crime as a "capital crime or a very grave punishable act."[216]

With regard to the second prong, a government must separately assess the danger the individual poses to the community: "A judgment on the potential danger to the community necessarily requires an examination of the circumstances of the refugee as well as the particulars of the specific offence."[217]

Thus, under the Refugee Convention, even individuals convicted of serious crimes are guaranteed the right of a hearing to show that they do not in fact pose a danger to the community. Indeed, the "danger to the community" exception "hinges on an appreciation of a *future* threat from the person concerned rather than on the commission of some act in the past."[218] Past criminality is not per se evidence of future danger.[219]

---

[213] Hathaway, *The Rights of Refugees*, p. 351; Kathleen M. Keller, "A Comparative and International Law Perspective on the United States (Non) Compliance with its Duty of Non-Refoulement," *Yale Human Rights and Development Law Journal*, vol. 7, p. 189.

[214] Rene Bruin and Kees Wouters, "Terrorism and the Non-derogability of Non-refoulement," *International Journal of Refugee Law*, vol. 15, no. 1 (2003), p. 18; Keller, "Comparative Perspective," p. 188; Hathaway, *The Rights of Refugees*, p. 344.

[215] Hathaway, *The Rights of Refugees*, p. 344.

[216] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* (Geneva: UNHCR, January 1992), para. 155. Note that the requirement that the crime must be a "capital crime or a very grave punishable act" was a description of what constitutes a "'serious' non-political crime" for the purposes of Article 1F. The "particularly serious crime" exception in Article 33(2) is presumed to require that the individual refugee be even more dangerous in order to fall under this exception. See Sir Elihu Lauterpacht & Daniel Bethlehem, UNHCR, "Opinion: The Scope and Content of the Principle of Non-Refoulement," June 20, 2001, paragraph 147 ("Article 33(2) indicates a higher threshold than Article 1F . . .").

[217] UNHCR, "Nationality Immigration and Asylum Bill 2002: UNHCR comments relating to serious criminals and statutory review," 2002, paragraph 3; UNHCR, *Handbook*, p. 157 ("The fact that an applicant convicted of a serious non-political crime has already served his sentence or has been granted a pardon or has benefited from amnesty is also relevant.").

[218] UNHCR, "The Scope and Content," paragraphs 147 and 164 ("While past conduct may be relevant to an assessment of whether there are reasonable grounds for regarding the refugee to be a danger to the country in the future, the material consideration is whether there is a prospective danger to the security of the country."); Geoff Gilbert, "Current Issues in the Application of the Exclusion Clauses," Background Paper for UNHCR Global Consultations (2001), p. 27, http://www.unhcr.org/publ/PUBL/419dba514.pdf (accessed May 31, 2007) ("[M]ere conviction of a particularly serious crime in the country of refuge, unless there is also evidence that the refugee poses a danger to the community in the future, should not satisfy Article 33.2," criticizing the US court decision in *In re Q-T-M-T-* to deny withholding without consideration of mitigating circumstances and future danger to the community.).

Unfortunately, US law falls short of these standards, which are binding on the United States because of its ratification of the Refugee Protocol. The less protective standard used by the United States is known as "withholding." Withholding states that protection may not be claimed by a refugee, who "having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States,"[220] and a subsequent section states that for purposes of interpreting this clause,

> [A]n alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have been convicted of a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime.[221]

As this section states, in addition to all refugees convicted of aggravated felonies with five year sentences, the Attorney General has statutory authority to send refugees to persecution with sentences of *less* than five years. In a decision under this statutory authority, the Attorney General has issued the blanket statement that aggravated felonies with sentences of less than five years "presumptively constitute particularly serious crimes," meaning that the non-citizen would have the difficult burden of overcoming the Attorney General's presumption that his or her crime was "particularly serious" in deportation procedures.[222]

The automatic nature of this bar to refugee protection without judicial scrutiny of the details of the particular crime committed or the nature and likelihood of persecution feared violates the standards provided in international law for two reasons. First, it fails to weigh individually the seriousness of the crime. Second, it fails to assess whether the potential deportee poses a risk of dangerousness to the community of the United States. In sum, it fails to protect refugees from return to persecution and to carefully and narrowly apply the

---

[219] For example, the Australian High Court has ruled that in addition to weighing whether a conviction constitutes a particularly serious crime *and* whether that conviction renders a refugee a danger to the community, mental disabilities of the refugee must be taken into account. Hathaway, *The Rights of Refugees*, p. 350. German law requires an additional inquiry into the personal characteristics of the refugee and whether he or she is likely to relapse into crime. Keller, "Comparative Perspective," p. 188.

[220] 8 U.S.C. Section 1231 (b)(3)(B)(ii).

[221] 8 U.S.C. Section 1231 (b)(3)(B).

[222] *In re Y-L-*, Immigration & Nationality Laws Administrative Decisions, vol. 23, decision 270, (B.I.A. 2002).

AR.09081

exception to this standard. The US is therefore regularly violating its obligations under international refugee law.

Juan Ramirez,[223] a gay man originally from Guatemala, was tortured, detained arbitrarily, and raped prior to fleeing his country in 1992. Since 1998 he had been working in the United States under a valid work visa until he was placed in removal proceedings after being convicted of possession for sale of a small quantity of methamphetamine. The immigration judge in his case found that his conviction constituted a particularly serious crime, and therefore barred him from applying for withholding of removal. Ramirez claimed he feared persecution because of his status as a gay man, and because of his previous experience of persecution in Guatemala. His case is currently under appeal to the Board of Immigration Appeals.[224]

In another example, Mark McAllister, originally from Northern Ireland, was barred from protection against return to persecution because of his conviction for three counts of possession with intent to distribute the drug known as ecstasy. McAllister's fear of persecution was based on his family's political opinion in Ireland. His father was repeatedly arrested, beaten and jailed by the Royal Ulster Constabulary (RUC) for his activities with the Irish National Liberation Army (INLA). His mother was also repeatedly arrested. Soon after the RUC's security files on the McAllisters ended up in the hands of paramilitaries, the family's house was repeatedly shot at while the family was at home. The pattern matched other cases of murders of INLA members and their families in Ireland. McAllister's parents feared for their lives and were warned to leave the country, which they did: while McAllister was still a juvenile in 1996, they legally entered the United States. After his conviction, McAllister asked the immigration judge, the BIA, and the district court to grant him withholding of removal, but all three levels of review determined that his conviction was an aggravated felony and a particularly serious crime, which barred him from protection against return to persecution. [225]

---

[223] Juan Ramirez is a pseudonym.

[224] Email communication from Sital Kalantry, assistant clinical professor of law, Cornell Law School, to Human Rights Watch, April 18, 2007 (Kalantry is Juan Ramirez's current attorney).

[225] *McAllister v. Ashcroft*, 2004 U.S. Dist. LEXIS 29598, (D. N.J. July 21, 2004).

AR.09082

## VII. Conclusion: The Need for a Legislative Solution

An estimated 1.6 million spouses and children of immigrants have suffered terribly because of US deportation policies. Families have had to sell their homes, children have had to undergo psychological treatment, and relatives have had to try to keep their families unified in spirit, even when US law keeps them physically apart. Refugees have been sent to places where they would likely be persecuted, even though the crimes they have committed are not sufficiently serious to warrant stripping them of protection. Immigrants also have been deported for relatively minor and non-violent crimes, raising the question of whether deportation is a proportionate penalty to impose on top of the criminal sentences they have already served.

When Congress set out to change immigration laws in 1996, it wanted to ensure that the worst non-citizen offenders were deported from the United States and to reduce the number of court cases brought by immigrants. But the changes were so overbroad as to impose permanent exile from the United States for non-violent, misdemeanor crimes—even in cases where the court determined that the crime was so minor that it did not warrant a prison sentence. Moreover, given the complexity and drastic consequences of the laws, the average number of appeals of deportation orders in each of the seven years after the 1996 laws took effect was nearly twice the average number of appeals in the prior seven years. And while Congress appeared to be focused on ensuring that *illegal* immigrants were swiftly deported from the United States, each year the mix of deportees includes tens of thousands of lawful permanent residents who have been in the country for years.

Ten years later, it is time for Congress to amend these laws, restore proportionality to the law, and eliminate their unintended consequences. A relatively simply set of amendments to the Immigration and Nationality Act would do just that, by accomplishing the following three things: (1) restore hearings to weigh an immigrant's connections to the US, especially their family relationships, in deciding whether someone should be deported; (2) ensure that refugees who would likely face persecution upon return are allowed to remain in the US as long as they have not committed a particularly serious crime and do not pose a danger to the community of the United States; and (3) amend definitions in the current law to ensure that immigrants are not deported for minor (especially non-violent) offenses or for offenses that were not grounds for deportation at the time they were committed.

AR.09083

These limited and logical fixes to US immigration laws appeal to three core values traditionally embraced by the United States and reflected in international law: a fundamental respect for the protection of family unity, a justifiably proud history of protecting refugees from return to persecution, and a belief in fundamental fairness and proportionality in all governmental actions.

The United States has a proud tradition of welcoming immigrants. It is a country founded on notions of human rights and equal treatment. Like all nations, it offers important protections to families and to children, as members of society requiring special protections. Congress should reform immigration law to conform to these proud traditions and values instead of dismissing and undermining them on a regular basis in US deportation procedures.

# Appendix: A History of Human Rights Watch's FOIA Request for Deportation Data

|  | Date | Description |
|---|---|---|
| 1 | March 15, 2006 | Human Rights Watch and the Center for Human Rights and International Justice at Boston College submit FOIA request to DHS. |
| 2 | March 27, 2006 | FOIA request is acknowledged by DHS, it is referred to Marshall Fields "for processing and direct response." |
| 3 | April 2006 | Human Rights Watch contacts Marshall Field's offices to follow up on our request; we are directed to Mr. Sal Vakalahee who indicates that he cannot locate our request and asks that it be re-faxed to DHS. HRW re-faxes our request to DHS. |
| 4 | May 3, 2006 | Mr. Vakalahee assigns us case number FOIA #06-22074, and asks that we transmit the original response sent by his own agency to HRW so that he may follow up. We fax DHS's response letter back to DHS as requested. |
| 5 | May 18, 2006 | Mr. Vakalahee indicates to an HRW staff member that the necessary information is located in the Office of Detention and Removal (ODRO) and that they may be able to combine our request with others they have recently received. Nevertheless, he claims that he has misplaced our original request and again asks that we fax it to his office, which we do on this date. |
| 6 | June 2006 | Through multiple phone contacts with Mr. Vakalahee we learn that our request is pending with the ODRO. |
| 7 | July 2006 | Mr. Vakalahee moves to the Office of Detention and Removal and informs HRW that he will no longer handle our file. Instead, we are directed to contact Ms. Margaret Elizalde, the director of that office. |
| 8 | July 20—24, 2006 | HRW leaves voice messages with Ms. Elizalde. |
| 9 | July 25, 2006 | Ms. Elizalde asks for more information about the reference number we were provided by Mr. Vakalahee. We were then told to contact Mr. Vakalahee, which we did and he explained that our request was "in a box" and we would be updated once the request was located. |
| 10 | August 10, 2006 | Ms. Elizalde and Mr. Vakalahee explained that Mr. Vakalahee would be leaving the ODRO office and that we should continue to follow up with Ms. Elizalde. |
| 11 | August 11, 2006 | Human Rights Watch faxed a modification of our original request to Ms. Elizalde, limiting our original request to one single year of records, August 11, 2005—August 11, 2006, in a good faith effort on the part of HRW to help expedite agency response to our request. |
| 12 | August 14, 2006 | HRW spoke with Ms. Elizalde who indicated that we should have by Wednesday, August 16, 2006, some sense of the time it will take to produce the records. Ms. Elizalde also indicated that it might be possible that there would be no charge for the narrowed set of records. |
| 13 | August 18, 2006 | HRW spoke with Linda Thomas, in Ms. Elizalde's office, who informed us that all the data we required was available on line at https://www.uscis.gov/graphics/shared/statistics/publications |
| 14 | August 18, 2006 | HRW left voicemail for Ms. Thomas explaining that HRW had already conducted thorough searches of all available data sources through USCIS, DRO, BJS, DOJ, |

| | Date | Description |
|---|---|---|
| | | and BOP, and stated unequivocally that the original purpose of our FOIA was to obtain data that was not publicly available at any location, having thoroughly researched this issue prior to our March 2006 request. |
| 15 | August 18, 2006 | HRW receives a cost estimate of $7,946 for producing the records requested in FOIA #06-22074. This estimate makes no mention of our request for a fee waiver, filed with our original request six months previously in March 2006. We are informed by Ms. Thomas that the cost estimate would remain the same irrespective of whether DHS produced records for a single year as per our amended request—see above item 11—or 10 years as we originally requested. |
| 16 | September 11, 2006 | Again in an effort to amicably resolve the matter, HRW emails Ms. Thomas and Ms. Elizalde to make two alternative requests: First, that DHS make a decision to grant HRW and Boston College a fee waiver, or that DHS supply HRW and Boston College with CD-Roms containing all data for aliens removed on criminal grounds (as defined in the original request). |
| 17 | September 21, 2006 | HRW contacts DHS to find out their response to our queries of September 11, 2006. We are told to contact Margaret Elizalde. Ms. Elizalde informs us that "a preliminary response was received but more detail is expected." |
| 18 | October 3, 2006 | HRW emails DHS to ask for an update on status of our request. |
| 19 | October 4, 2006 | Ms. Thomas writes to say that they will be "in touch in the near future." |
| 20 | October 5, 2006 | HRW contacts DHS to offer that we will travel to Washington DC to meet with the relevant officials to seek a response to our request. |
| 21 | October 12, 2006 | Ms. Thomas writes to say that they are "diligently working on a resolution." HRW writes back to inform DHS that DOJ recently sent us data in response to a FOIA request without charging any fees. |
| 22 | October 18, 2006 | Ms. Thomas tells HRW that our request is being reviewed by the legal advisor's office. |
| 23 | October 31, 2006 | HRW is told again that our request is pending with the legal advisor's office. HRW writes to request additional family-related data to our pending request (based on new information provided to HRW). We also reiterate our offer to receive all records regarding "criminal removals" and conduct the data analysis ourselves and to stipulate to preserve the confidentiality of non-responsive or confidential records. |
| 24 | November 2, 2006 | HRW is informed by DHS that the legal advisor's office is expected to make its decision by early the following week. |
| 25 | November 13, 2006 | HRW is told that the legal advisor's office still has not rendered its decision. |
| 26 | November 20, 2006 | HRW receives a letter response to our request modifying FOIA #06-22074 (see item 23, above) indicating once again that the data we seek is available online, a claim which we know to be false and have explained as such (see item 13, above). |
| 27 | November 21, 2006 | HRW responds to DHS letter in correspondence sent from Executive Director Kenneth Roth pointing out the need for a timely response and the unresponsive treatment our request has thus far received. |
| 28 | November 30, 2006 | DHS General Counsel letter announcing treatment of case as appeal. |
| 29 | December 6, | DHS letter setting forth additional items in response to November 21, 2006 |

AR.09086

| | Date | Description |
|---|---|---|
| | 2006 | letter. |
| 30 | December 15, 2006 | HRW responds to DHS letter, pointed out several factual inaccuracies, as well as legal inaccuracies, and reiterating our request for a timely response. |
| 31 | January 4, 2007 | HRW places calls to follow up on December 15 letter. |
| 32 | January 12, 2007 | DHS calls HRW to explain it will take immediate action to determine whether a fee waiver can be granted. |
| 33 | January 22, 2007 | HRW receives three-page letter denying our FOIA request in full from DHS and ODRO. |
| 34 | January 23, 2007 | HRW meets with pro bono counsel to discuss litigation in response to denial letter. |
| 35 | January 25, 2007 | As decided during meeting with counsel on January 23, 2007, HRW makes final telephone approach to contacts in DRO and DHS to propose a narrowed request that would be less onerous on the agency. |
| 36 | January 29, 2007 | ODRO and DHS inform HRW that no further discussions can be had on the original request since that FOIA file is closed and that a separate and new FOIA request must be submitted. |
| 37 | January 29, 2007 | DHS contacts HRW to explain that they are willing to discuss FOIA with HRW; a call is scheduled for the following day. |
| 38 | January 30, 2007 | ODRO contacts HRW to explain that they have changed their position and are now willing to discuss an amicable resolution with HRW. |
| 39 | January 30, 2007 | Margaret Elizalde (ODRO) and Alison Parker (HRW) have telephone conversation in which HRW proposes narrowed request from 17 items to 5 as an amicable means by which HRW can obtain the requested information. |
| 40 | January 30, 2007 | HRW sends to ODRO the revised five-item request in writing as per telephone conversation. |
| 41 | February 6, 2007 | HRW sends a follow-up email seeking a response to our January 30, 2007 email. |
| 42 | February 7, 2007 | ODRO replies indicating that our "request continues to be reviewed." |
| 43 | February 22, 2007 | HRW sends another follow-up email seeking a response to our January 30, 2007 email. |
| 44 | February 26, 2007 | HRW files administrative appeal. |
| 45 | April 16,2007 | HRW contacts FOIA appeals officer to enquire about the status of our appeal. We receive no response. |
| 46 | May 30, 2007 | HRW contacts FOIA appeals officer to again enquire about the status of our appeal. We receive no response. |
| 47 | June 19, 2007 | On the eve of publication of this report, Human Rights Watch receives correspondence from Catrina Pavlik-Keenan, Director of ICE's FOIA office, in response to our administrative appeal in which ICE claims it could provide records responsive to three of the five types of information we had requested, and assesses fees without responding to our application for a fee waiver as an organization that publicizes information "in the public interest" about the "operation or activities of the [US] government." |
| 48 | June 27, 2007 | Human Rights Watch, through our pro bono counsel, Carter Ledyard & Milburn, LLP, appeals ICE's finding that we are not entitled to a fee waiver. |

ER-1046

AR.09087

350 Fifth Avenue, 34th Floor
New York, NY 10118-3299
Tel:       212-290-4700
Fax:       212-736-1300; 917-591-3452



**HRW.org**

**US PROGRAM**

Nicole Austin-Hillery, *Executive Director*
Dreisen Heath, *Senior Coordinator*
Elizabeth Kennedy, *El Salvador Researcher*
Rachel Kent, *Press Officer*
Clara Long, *Senior Researcher*
Grace Meng, *Senior Researcher*
Alison Leal Parker, *Managing Director*
Laura Pitter, *Interim Deputy Director*
Thomas Rachko, *Coordinator*
John Raphling, *Senior Researcher*
Brian Root, *Quantitative Analyst*
Ariana Sawyer, *Assistant Researcher*
Jasmine L. Tyler, *Advocacy Director*
Sarah St. Vincent, *Researcher/Advocate*

**Human Rights Watch**

Kenneth Roth, *Executive Director*
Nic Dawes, *Deputy Executive Director*
Michele Alexander, *Deputy Executive Director, Development and Global Initiatives*
Emma Daly, *Deputy Executive Director, Media (Acting)*
Liesl Gerntholtz, *Deputy Executive Director, Program (Acting)*
Chuck Lustig, *Deputy Executive Director, Operations*
Bruno Stagno Ugarte, *Deputy Executive Director, Advocacy*

Babatunde Olugboji, *Deputy Program Director*
Dinah PoKempner, *General Counsel*
Tom Porteous, *Deputy Program Director*
James Ross, *Legal & Policy Director*
Joe Saunders, *Deputy Program Director*
Frances Sinha, *Human Resources Director*

**Board of Directors**

Hassan Elmasry, *Co-Chair*
Robert Kissane, *Co-Chair*
Oki Matsumoto, *Vice-Chair*
Amy Rao, *Vice-Chair*
Amy Towers, *Vice-Chair*
Catherine Zennström, *Vice-Chair*
Bruce Rabb, *Secretary*
Akwasi Aidoo
Jorge Castañeda
George Coelho
Natasha Dolby
Kimberly Marteau Emerson
Loubna Freih
Leslie Gilbert-Lurie
Paul Gray
Caitlin Heising
Karen Herskovitz
Zeid Ra'ad Al Hussein
Susan Kane
David Lakhdhir
Louisa Lee-Reizes
Alicia Miñana
Joan R. Platt
Neil Rimer
Shelley Frost Rubin
Ambassador Robin Sanders
Sidney Sheinberg*
Bruce Simpson
Joseph Skrzynski
Donna Slaight
Siri Stolt-Nielsen
Darian W. Swig
Marie Warburg

*In Memoriam (1935—2019)*

January 21, 2020

Submitted via https://www.regulations.gov/document?D=EOIR-2019-0005-0001

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
US Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

To Whom it May Concern:

I am writing on behalf of Human Rights Watch to express our strong opposition to the above-referenced Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Human Rights Watch is a nonprofit, nongovernmental human rights organization. We operate in 90 countries and have been investigating, documenting, and exposing human rights abuses around the world for more than four decades. We have published numerous reports on the human rights

AMSTERDAM · BEIRUT · BERLIN · BRUSSELS · CHICAGO · GENEVA · JOHANNESBURG · LONDON · LOS ANGELES · MOSCOW · NAIROBI · NEW YORK · PARIS · SAN FRANCISCO · TOKYO · TORONTO · WASHINGTON · ZURICH

ER-1047

AR.09088

of migrants and asylum seekers within the US immigration system. In particular, we have analyzed extensively the ways in which the US asylum system has failed to meet US obligations under the 1967 Protocol relating to the Status of Refugees with regard to federal criminal prosecutions for unauthorized entry and reentry and with regard to the application of the "particularly serious crime" asylum bar.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing persecution are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact Grace Meng at mengg@hrw.org for further information.

Sincerely,

Nicole Austin-Hillery
Executive Director
US Program, Human Rights Watch

_____

DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41

I.    Introduction

On December 19, 2019, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. These changes would violate United States obligations not to return people to harm under the 1951 Convention relating to the Status of Refugees (the "Refugee Convention") and the 1967 Protocol relating to the Status of Refugees (the "1967 Protocol").

2

ER-1048

The United States is obligated to uphold the central provisions of the Refugee Convention by its accession to the 1967 Protocol.[1] The US government passed the Refugee Act of 1980 in order to bring the country's laws into conformity with the Refugee Convention and 1967 Protocol, by incorporating into US law the convention's definition of a "refugee" as a person with a well-founded fear of being persecuted on account of race, religion, nationality, membership of a particular social group, or political opinion, and by incorporating the principle of non-return (also called "nonrefoulement"), which prohibits the return of people whose lives or freedom would be threatened on account of their race, religion, nationality, membership of a particular social group, or political opinion.[2]

However, even under the existing US asylum system, the US has in recent years returned individuals to danger and serious harm, including death.[3]

The laws, regulations, and process governing asylum adjudications are already harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from remote detention centers where pro bono legal assistance and family and community support are extremely limited. The obstacles to being granted asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[4] Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants.[5]

---

[1] Convention relating to the Status of Refugees (Refugee Convention), 189 U.N.T.S. 150, entered into force April 22, 1954, http://www.unhcr.org/3b66c2aa10.html; UN Protocol relating to the Status of Refugees (1967 Protocol), 606 U.N.T.S. 268, entered into force October 4, 1967. The United States acceded to the 1967 Protocol in 1968.

[2] The US incorporated the provisions of the 1967 Protocol into domestic law through the Refugee Act of 1980, Pub. L. No. 96- 212, 94 Stat. 102 (1980). As the US Supreme Court has confirmed, a primary purpose of Congress in passing the Refugee Act "was to bring United States refugee law into conformance with the 1967 United Nations Protocol." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 426 (1987); see also *INS v. Stevic*, 467 U.S. 407, 416-24 (1984) (providing a history of the incorporation of the Refugee Convention standards into US law through the 1967 Protocol and the Refugee Act of 1980).

[3] Sarah Stillman, "When Deportation is a Death Sentence," *New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence (accessed January 14, 2020); Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018 https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/ (accessed January 14, 2020); Amanda Sperber, "Deported to Death: What It Means to 'Go Back' to Somalia," *Daily Beast*, August 9, 2019, https://www.thedailybeast.com/deported-to-death-this-is-what-it-means-to-go-back-to-somalia (accessed January 14, 2020).

[4] Transactional Records Access Clearinghouse, "Asylum Decisions and Denials Jump in 2018," November 29, 2018, https://trac.syr.edu/immigration/reports/539/ (accessed January 16, 2020).

[5] Human Rights Watch, *"We Can't Help You Here": US Returns of Asylum Seekers to Mexico*, (July 2, 2019), https://www.hrw.org/report/2019/07/02/we-cant-help-you-here/us-returns-asylum-seekers-mexico; Human Rights

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction for a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. §1324(a), even if the asylum seeker committed the offense for the purpose of bringing his or her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. §1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, punitive, and unlawful gutting of the asylum protections enshrined in United States and international law. Human Rights Watch submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the protection the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

II.  Proposed Regulations Exacerbate the Ongoing Failure of US Asylum Law to Define "Particularly Serious Crime" as a Bar to Asylum Eligibility in Accordance with International Law

Current US law already falls short of international human rights standards governing when criminal convictions should render an individual ineligible for asylum. The proposed rules exacerbate this failure by creating additional categorical criminal bars to asylum that render the phrase "particularly serious crime" meaningless and fail to provide individualized consideration of whether an individual poses a current threat to public safety.

---

Watch, *"US: New Rule Flouts Asylum Norms,"* July 15, 2019, https://www.hrw.org/news/2019/07/15/us-new-rule-flouts-asylum-norms.

4

AR.09091

Article 33(2) of the Refugee Convention states that protection against refoulement may not be claimed by a refugee, "who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."[6] The United Nations High Commissioner for Refugees (UNHCR) maintains that a "'particularly serious crime' must belong to the gravest category…normally punished with long imprisonment," and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[7] Moreover, UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[8] UNHCR's Executive Committee has further explained that deporting a refugee under Article 33(2) "may have very serious consequences for a refugee and his immediate family members … [and therefore should only happen] in exceptional cases and after due consideration of all the circumstances."[9]

Therefore, in accordance with international refugee law, procedures need to be in place to ensure careful application of this narrow exception.[10] Even individuals convicted of "particularly serious"

---

[6] Refugee Convention, art. 33(2).

[7] UN High Commissioner for Refugees (UNHCR), Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading ¶ 7 (July 2007) [hereinafter "Briefing for House of Commons"], http://www.unhcr.org/enus/576d237f7.pdf.

[8] Ibid.

[9] UN High Commissioner for Refugees (UNHCR) Executive Committee, Conclusion No. 7 (1977). The exceptions to non-refoulement in Article 33(2) were intended to be used only as a "last resort" where "there is no alternative mechanism to protect the community in the country of asylum from an unacceptably high risk of harm." James C. Hathaway, *The Rights of Refugees under International Law* (Cambridge, UK: Cambridge University Press, 2005), p. 352.

[10] The Refugee Convention and Protocol require that a refugee should be "allowed to submit evidence to clear himself, and to appeal to and be represented for the purpose before competent authority or a person or persons specially designated by the competent authority." Ibid., art. 32(2). An individualized determination must occur before deportation, during which states must weigh two elements: 1) that a refugee has been convicted of a particularly serious crime and 2) that he or she constitutes a danger to the community. James C. Hathaway, *The Rights of Refugees under International Law*, pp. 344-351; Rene Bruin and Kees Wouters, "Terrorism and the Non-derogability of Non-refoulement," *International Journal of Refugee Law*, vol. 15, no. 1 (2003), p. 18. With regard to the first prong of the inquiry, the determination of a particularly serious crime cannot be merely rhetorical: It requires that the crime in question be distinguished from other crimes. The "particularly serious crime" exception in Article 33(2) is presumed to require that the individual refugee be even more dangerous in order to fall under this exception. See Sir Elihu Lauterpacht & Daniel Bethlehem, UNHCR, "Opinion: The Scope and Content of the Principle of Non-Refoulement," June 20, 2001, paragraph 147 ("Article 33(2) indicates a higher threshold than Article 1F . . .") With regard to the second prong, a government must separately assess the danger the individual poses to the community: "A judgment on the potential danger to the community necessarily requires an examination of the circumstances of the refugee as well as the particulars of the specific offence." UNHCR, "Nationality Immigration and Asylum Bill 2002: UNHCR comments relating to serious criminals and statutory review," 2002, paragraph 3; UNHCR, *Handbook*, p. 157 ("The fact that an applicant convicted of a serious non-political crime has already served his sentence or has been granted a pardon or has benefited from amnesty is also relevant.")

AR.09092

crimes are guaranteed the right of an individualized hearing to establish whether or not they pose *a current threat*. Indeed, the "danger to the community" exception "hinges on an appreciation of a future threat from the person concerned rather than on the commission of some act in the past."[11] Accordingly, under international refugee law, past criminality is not *per se* evidence of future danger.

US law already falls short of these standards.

Conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking, it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated.[12] Conduct that has been deemed to be an "aggravated felony" includes shoplifting and misdemeanor possession of an illicit substance with intent to distribute.[13] In many cases, individuals deemed to have an "aggravated felony" conviction under US immigration law were given short sentences or even simply probation because their conduct was not deemed to warrant more serious punishment in the criminal legal system.[14] The existing crime bars should be narrowed, not expanded.

The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient." But an individualized analysis is exactly what the Refugee Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and who present a future danger are placed at risk of refoulement.

Furthermore, many of the proposed categories of conduct include offenses that the general public would not consider "particularly serious." The Proposed Rules could bar from protection a parent convicted of smuggling his or her own children, an individual who fled her or his country of persecution with a fake passport, and an individual with two convictions for simple possession of marijuana.

---

[11] UNHCR, "The Scope and Content of the Principle of Non-Refoulement," paras. 147 and 164, June 20, 2001, https://www.unhcr.org/en-us/protection/globalconsult/3b33574d1/scope-content-principle-non-refoulement-opinion.html (accessed October 18, 2019) ("While past conduct may be relevant to an assessment of whether there are reasonable grounds for regarding the refugee to be a danger to the community in the future, the material consideration is whether there is a prospective danger to the security of the country").

[12] Human Rights Watch, *Forced Apart: Families Separated and Immigrants Harmed by United States Deportation Policy* (2007), https://www.hrw.org/reports/2007/us0707/.

[13] Ibid. See also Human Rights Watch, *A Price Too High: US Families Torn Apart by Deportations for Drug Offenses* (June 16, 2015), https://www.hrw.org/report/2015/06/16/price-too-high/us-families-torn-apart-deportations-drug-offenses.

[14] Ibid.

AR.09093

As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder,* a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[15] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community. Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence. These measures ensure that asylees with convictions are given an opportunity to demonstrate that they have become contributing and responsible members of their communities before they become lawful permanent residents. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.

### III.   Proposed Regulations Violate US and International Treaty Obligations by Imposing a Penalty for Improper Entry into the US

The proposed rule to expand the asylum bar to people who have been convicted of reentering the United States without inspection pursuant to INA § 276 directly violates the Refugee Convention's prohibition on imposing penalties for improper entry.

Article 31(1) of the 1951 Refugee Convention states, "The Contracting States shall not impose penalties, on account of their *illegal entry* or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of Article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence."[16] The protections of article 31 have been interpreted to include asylum seekers (those whose claims have not yet been adjudicated) because it cannot be determined at the point of entry whether the person qualifies as a refugee or not.[17] This prohibition is a foundational principle of the Convention because it

---

[15] *Delgado v. Holder,* 648 F. 3d 1095 (9th Cir. 2011) (*en banc*).

[16] Refugee Convention, art. 31(1) (emphasis added).

[17] See UNHCR, "Guidelines on Applicable Criteria and Standards relating to the Detention of Asylum Seekers," February 26, 1999, http://www.refworld.org/cgi-bin/texis/vtx/rwmain?docid=3c2b3f844 (accessed May 10, 2013).

7

AR.09094

recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge and in some cases may be compelled to use false documents or otherwise break immigration laws in order to escape persecution and seek protection.

It is also not unusual that new threats crop up in countries that produce refugees. A person who may not previously have needed asylum and who was legitimately deported could subsequently encounter a threat unrelated to their previous reasons for entering the United States. The refugee protection principles at the foundation of US asylum law require the examination of new fear-of-persecution claims.

Under existing US policies, asylum seekers are routinely prosecuted for illegal entry and reentry. Even before the advent of the Trump administration's "zero-tolerance policy," Human Rights Watch and others have documented the frequent criminal prosecution of people who fear return to their home countries.[18] Human Rights Watch's research indicates many people who illegally reenter the US after deportation are not driven by criminal motives, but are desperately seeking protection from harm.[19]

For example, Maira Alvarado, the wife of Joel Reyes-Isais, told Human Rights Watch in 2013 that she and her husband entered the United States together after beatings and threats from the police in Ciudad Juarez. When they were apprehended, Alvarado had just fallen from a bridge and suffered serious injuries—a broken nose, broken leg, and fractured skull—and was taken to the hospital. She said her husband told the Border Patrol, "We're running because the police of Juarez are trying to kill us," but he was referred for criminal prosecution and convicted of illegal reentry.[20]

Similarly, "Brenda R." (pseudonym) told Human Rights Watch in 2012 that she fled Mexico in fear for her life after she began investigating the deaths of her two adult sons, but she entered the US three times without authorization as she was repeatedly criminally prosecuted and deported without being afforded an opportunity to apply for asylum.[21]

---

[18] Human Rights Watch, *Turning Migrants Into Criminals: The Harmful Impact of US Border Prosecutions* (May 2013), https://www.hrw.org/report/2013/05/22/turning-migrants-criminals/harmful-impact-us-border-prosecutions; Human Rights First, "The Rise in Criminal Prosecutions of Asylum Seekers," July 20, 2017, https://www.humanrightsfirst.org/resource/rise-criminal-prosecutions-asylum-seekers (accessed January 16, 2020).

[19] Human Rights Watch, *Turning Migrants Into Criminals: The Harmful Impact of US Border Prosecutions* (May 2013).

[20] Human Rights Watch interview with Maira Alvarado, El Paso, Texas, September 27, 2012. Human Rights Watch, *Turning Migrants Into Criminals* (May 2013).

[21] Human Rights Watch interview with Brenda R. (pseudonym), Pecos, Texas, September 24, 2012; court documents from *United States v. [name withheld]*. Human Rights Watch, *Turning Migrants Into Criminals* (May 2013).

8

AR.09095

Such prosecutorial policies already violate US obligations under the Refugee Convention.[22] Even the Office of Inspector General for the Department of Homeland Security has stated that such prosecutions may violate US treaty obligations, even when convictions do not result in a categorical bar to asylum eligibility.[23] Imposing a categorical bar to asylum eligibility based on a conviction for illegal reentry would violate even further the United States' obligation not to impose penalties on asylum seekers for improper entry.

IV.    Convictions Obtained through the US Criminal Legal System Should Not Be Used for Categorical Bars to People Seeking Asylum from Serious Harm

Human Rights Watch has documented severe injustices in the US criminal legal system. Hundreds of thousands of people are held in custody pre-trial merely because they cannot afford bail, forcing many who might have otherwise contested their charges to plead guilty. Many face harsh sentences that do not accurately reflect the severity of their conduct, and laws and policies are routinely applied in an arbitrary and discriminatory manner, disproportionately impacting poor and minority communities.[24] Immigrants and asylum seekers in particular may not be fully informed of the potentially life-threatening immigration-related consequences of guilty pleas.

The Proposed Rules, however, fail to consider these issues in the criminal legal system by proposing to dramatically expand the definition of a "particularly serious crime" to categorically include an even wider range of offenses than is already encompassed in the definition of an "aggravated felony." Such an enormous expansion of the "particularly serious crime" bar to asylum could lead to more refugees being denied protection and being returned to harm because of conduct that many would not consider "particularly serious."

The Proposed Rules state that the definition of a "felony" will depend on the potential sentence, not the actual sentence imposed, thereby failing to even take into account the cases in which mitigating circumstances led a judge to impose a more lenient sentence. The Proposed Rules even forego the limited protection of due process by proposing that arrests and allegations can be sufficient to bar asylum in the categories of domestic violence and "gang-related" activity.

---

[22] Human Rights Watch, *Turning Migrants Into Criminals* (May 2013).

[23] Office of Inspector General, US Department of Homeland Security, "Streamline: Measuring Its Effect on Illegal Border Crossing," May 15, 2015, https://www.oig.dhs.gov/assets/Mgmt/2015/OIG_15-95_May15.pdf (accessed January 16, 2020).

[24] Human Rights Watch Submission to the United Nations Human Rights Council's Universal Periodic Review of the United States of America, October 3, 2019, https://www.hrw.org/news/2019/10/03/human-rights-watch-submission-united-nations-human-rights-councils-universal.

9

AR.09096

Human Rights Watch opposes the expansion of the "particularly serious crime" bar with regard to all of the proposed areas of conduct for all of the reasons noted above, but opposes certain categories of conduct for additional reasons as described below.

With regard to "gang-related crimes," the Proposed Rules expansion to encompass those accused of gang involvement in the commission of minor offenses gives undue weight to methods of gang identification that have been found rife with error. Recent reports have found local law enforcement agencies around the country have created gang databases that misidentify people as gang members and rely heavily on racial profiling.[25] And as stated above, even if an individual is a former gang member, the relevant test for asylum eligibility under international human rights law is whether the person is a *current* threat to public safety. A categorical bar based on racially discriminatory and often inaccurate gang policing practices fails to conform to that standard.

With regard to domestic violence, incidents of domestic violence sometimes involve the arrest of both the primary perpetrator of abuse and the survivor. These "cross-arrests" do not always yield clear determinations of victim and perpetrator.[26] Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances. The exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar. Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

With regard to the inclusion of misdemeanor drug offenses, US drug laws in particular are exceedingly harsh and make felons out of many who possess drugs for personal use, rather than

---

[25] Ali Winston, "You may be in California's gang database and not even know it," *Reveal: Center for Investigative Reporting*, March 23, 2016, https://www.revealnews.org/article/you-may-be-in-californias-gang-database-and-not-even-know-it/ (accessed January 16, 2020); Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?", *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html (accessed January 16, 2020); Mick Dumke, "Chicago's Gang Database is Full of Errors – And Records We Have Prove It," *ProPublica*, April 19, 2018, https://www.propublica.org/article/politic-il-insider-chicago-gang-database (accessed January 16, 2020).

[26] David Hirschel, "Making Arrests in Domestic Violence Cases: What Police Should Know, US Department of Justice, Office of Justice Programs, National Institute of Justice, In Short: Toward Criminal Justice Solutions, June 2009, https://www.ncjrs.gov/pdffiles1/nij/225458.pdf (accessed January 16, 2020); Sarah Smith, "In Connecticut, Calling for Help Carries Risks for Victims of Domestic Violence," *ProPublica*, February 16, 2017, https://www.propublica.org/article/in-connecticut-calling-for-help-carries-risks-victims-of-domestic-violence (accessed January 16, 2020).

10

AR.09097

offering the possibility of drug treatment and rehabilitation to those who need and want it.[27]
Human Rights Watch has explained in previous reports and analyses that offenses that constitute
"drug trafficking" and therefore an "aggravated felony" under US immigration law should not
categorically be considered a "particularly serious crime," for the reasons summarized above.[28]
Possession of drugs for personal use should not be a criminal offense, let alone constitute a
"particularly serious crime" that would bar an individual from asylum.

V.    Those precluded from asylum eligibility will be gravely impacted even if granted
      withholding of removal or protection under the Convention against Torture

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal
by pointing to the continued availability of alternative forms of relief for those precluded from
asylum eligibility under the new rules. The availability of these alternative forms of relief,
however—known as withholding of removal and protection under the United Nations Convention
against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT)—does not
nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by
CAT and by statutory withholding of removal are limited in scope and duration, and they are harder
to obtain. As a result, a Rule that limits bona fide refugees to withholding of removal and CAT
protection would impose a very real harm on individuals who have come to the United States in
search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is
removal to persecution and torture, and the existence of withholding of removal does not account
for that risk. CAT and withholding protections demand a higher level of proof than asylum claims:
a clear probability of persecution or torture. Thus, an individual with a well-founded fear of
persecution could have a valid asylum claim but be unable to meet the higher standard under the
other forms of relief and therefore could be removed to their country of origin, where they would
face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to
significant limits on their rights. For example, they have no ability to travel internationally and
return to the United States. The Refugee Convention affords refugees the right to travel. Article 28
states, "Contracting States shall issue to refugees lawfully staying in their territory travel
documents for the purpose of travel outside their territory." Withholding and CAT recipients do not
have access to a travel document as contemplated by article 28. By regulation, refugee travel

---

[27] Human Rights Watch, *Every 25 Seconds: The Human Toll of Criminalizing Drug Use in the United States* (October 12, 2016), https://www.hrw.org/report/2016/10/12/every-25-seconds/human-toll-criminalizing-drug-use-united-states.
[28] Human Rights Watch, *A Price Too High: US Families Torn Part by Deportations for Drug Offenses* (June 16, 2015).

AR.09098

documents are available only to asylees. Individuals granted only withholding of removal are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. For many, this will mean that the Proposed Rules institute an effective policy of family separation.

Recently, a mother who was subject to the Migrant Protection Protocols (also known as "Remain in Mexico") and the "Third-Country Asylum Rule" (also known as the asylum "transit ban"), making the mother ineligible for asylum, was granted withholding of removal.[29] However, the immigration judge found her young children were unable to independently establish their own claims as being more likely than not to face persecution or torture. The judge was precluded from giving the children derivative withholding based on their mother's claim. As a result, the judge ordered the children removed even as their mother was recognized as needing protection.[30] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status. Asylum, once granted, protects an asylee against removal unless and until that status is revoked. None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to

---

[29] US Department of Homeland Security, "DHS and DOJ Issue Third-Country Asylum Rule," July 15, 2019, https://www.dhs.gov/news/2019/07/15/dhs-and-doj-issue-third-country-asylum-rule (accessed January 16, 2020).
[30] Adolfo Flores, "An Immigrant Woman Was Allowed to Stay in the US – But Her Three Children Have a Deportation Order," December 21, 2019, *Buzzfeed News*, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not (accessed January 16, 2020).

12

AR.09099

potential check-ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.

Finally, Human Rights Watch writes to highlight a different hardship and disadvantage that will flow from the rule: one relating both to judicial efficiency and fairness. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members (particularly children), this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.

## VI.    Conclusion

The US asylum system already violates international law in its overbroad, categorical definition of a "particularly serious crime," and in its criminal prosecutions of asylum seekers. The Proposed Rules dramatically exacerbate the dissonance between US law and international law and should be rescinded in their entirety.

ER-1059

AR.09100



**H U M A N**

**R I G H T S**

**W A T C H**

# TURNING MIGRANTS INTO CRIMINALS

The Harmful Impact of US Border Prosecutions

AR.09101



# Turning Migrants into Criminals
The Harmful Impact of US Border Prosecutions

AR.09102

All rights reserved.

Printed in the United States of America

ISBN: 978-1-62313-0145

Cover design by Rafael Jimenez

Human Rights Watch is dedicated to protecting the human rights of people around the world. We stand with victims and activists to prevent discrimination, to uphold political freedom, to protect people from inhumane conduct in wartime, and to bring offenders to justice. We investigate and expose human rights violations and hold abusers accountable. We challenge governments and those who hold power to end abusive practices and respect international human rights law. We enlist the public and the international community to support the cause of human rights for all.

Human Rights Watch is an international organization with staff in more than 40 countries, and offices in Amsterdam, Beirut, Berlin, Brussels, Chicago, Geneva, Goma, Johannesburg, London, Los Angeles, Moscow, Nairobi, New York, Paris, San Francisco, Tokyo, Toronto, Tunis, Washington DC, and Zurich.

For more information, please visit our website: http://www.hrw.org

AR.09103



**MAY 2013**

978-1-62313-0145

# Turning Migrants into Criminals
## The Harmful Impact of US Border Prosecutions

Summary ..................................................................................................................... 1

Recommendations ..................................................................................................... 7
    To the US Congress .................................................................................................. 7
    To the US Department of Justice and US Attorneys ................................................ 7
    To US Customs and Border Protection (CBP) ......................................................... 7
    To US Immigration and Customs Enforcement (ICE) ............................................. 8
    To the US Sentencing Commission ......................................................................... 8

Methodology .............................................................................................................. 9

I. Background ............................................................................................................ 11
    Illegal Entry and Reentry Crimes ........................................................................... 11
    What the Federal Sentencing Guidelines Say ....................................................... 14
    Who is Being Prosecuted for Illegal Entry and Reentry? ...................................... 17
    Relevant Border Patrol Policies ............................................................................. 18

II. Criminal Prosecutions Fail to Focus on Serious Threats .................................. 23
    Increased Prosecution of Unauthorized Immigrants with Minor Criminal Histories ................... 24
    Critical Views of Judges and Attorneys ................................................................. 33
    Rapid-Fire Group Trials: Operation Streamline ..................................................... 35
    Secure Communities and State Immigrant Laws ................................................... 39
    Diverting Resources from Serious Crimes ............................................................. 41

III. Criminal Prosecutions Impinge on the Rights to Family Unity and to Seek Asylum ........ 43
    Family Unity ............................................................................................................ 44
    Asylum Seekers ...................................................................................................... 62

IV. Is It Worth It? ...................................................................................................... 69
    Limited Deterrent Effect ......................................................................................... 69
    Significant Financial Costs ..................................................................................... 73
    Due Process Shortcuts ........................................................................................... 76

Acknowledgments .................................................................................................... 82

AR.09104

AR.09105

# Summary

### "I have not lost the desire to try again"

When Human Rights Watch met Alicia S. (pseudonym) at a women's shelter in Tijuana, Mexico, it had been two-and-a-half years since she had last seen her daughters. Alicia came to the United States without authorization in 2000. She met and married another unauthorized immigrant, and they had two US-born daughters, now 11 and 9 years old. At the age of 5, her younger daughter's kidneys began to fail. In 2009, Alicia's husband was deported (and she has not heard from him since). A year later, police stopped Alicia for pulling out of a parking lot without her lights on. Surrounded by several squad cars, she was arrested for not having paid a ticket for driving without insurance. She was taken away while her daughters cried in the back seat.

That was the last time Alicia saw her daughters. She was soon after deported to Mexico.

Her daughters are now in foster care. Soon after being deported, Alicia received word that her daughter had successfully received a kidney transplant. "I felt so much joy, I was so happy," Alicia said, smiling at the memory even as she cried. "But I felt sad that I could not be in the hospital taking care of her."

Alicia has tried to return to the US several times. The first time, she was stopped near the border and placed in immigration detention for three months. The second time, she was abandoned by smugglers without water and food in Texas, apprehended, and criminally prosecuted for the federal misdemeanor of illegal entry. She told us that at the hearing in federal court, where she stood with two dozen other defendants, "I begged the judge to forgive me, that I was desperate because of my daughters." He gave her a criminal sentence of 13 days in prison. A lawyer later told her the conviction would make it almost impossible for her ever to get a US visa, and if she were to return, she could face prosecution for the felony of illegal reentry. But Alicia cannot imagine living without her daughters. She told us, "I have not lost the desire to try again."[1]

---

[1] Human Rights Watch interview with Alicia S. (pseudonym), Tijuana, Mexico, October 17, 2012.

Alicia S. is one of the tens of thousands of migrants each year who face criminal prosecution on top of deportation and other civil penalties, for illegal entry or reentry to the United States. Illegal entry, the misdemeanor of entering the country without authorization, and illegal reentry, the felony of reentering the country after deportation, are now the most prosecuted federal crimes in the United States.

The criminal prosecution of illegal entrants has grown exponentially over the past 10 years. In 2002, there were 3,000 prosecutions for illegal entry and 8,000 for illegal reentry; a decade later, in 2012, these prosecutions had increased to 48,000 and 37,000, respectively. These cases now outnumber other frequently prosecuted federal offenses such as drug, firearm, and white-collar crimes.

The US Department of Homeland Security (DHS), the agency that enforces US immigration laws, refers more cases for prosecution to the US Department of Justice than do the Federal Bureau of Investigations (FBI), the Drug Enforcement Administration (DEA), the Alcohol, Tobacco, Firearms, and Explosives agency (ATF), and the US Marshals service combined.[2] Nearly everyone charged with these offenses pleads guilty, and they end up serving federal prison sentences ranging from a few days to 10 years or more for felony reentry before they are eventually deported.

The rapid growth in federal prosecutions of immigration offenses is part of a larger trend in which criminal law enforcement resources have been brought to bear on immigration enforcement, traditionally considered a civil matter. The US government claims these prosecutions have two purposes: to keep dangerous criminals from entering the United States and to deter illegal immigration in general. As detailed below, however, a close examination of who is being imprisoned for illegal entry and reentry suggests that many of the prosecutions are not meeting their purported goals.

Many of the people now being criminally prosecuted for illegal entry and reentry have no criminal history or were convicted in the past of only minor, nonviolent crimes. And, as

---

[2] Syracuse University, Transactional Records Access Clearinghouse (TRAC), "Going Deeper" tool, Prosecutions for 2011, http://tracfed.syr.edu/index/index.php?layer=cri (accessed May 10, 2013). See also Migration Policy Institute, "Immigration Enforcement in the United States: The Rise of a Formidable Machinery," January 2013, http://www.migrationpolicy.org/pubs/enforcementpillars.pdf (accessed April 7, 2013), p. 10.

Alicia's comments above suggest, many are not likely to be deterred by the threat of prison: people seeking to join their children or other loved ones are not likely to simply give up. Meanwhile, the costs of the increased prosecutions are significant and growing. The costs include an estimated $1 billion annually in incarceration costs alone and lasting damage to the lives of migrants and their family members, tens of thousands of whom are US citizens or permanent residents.

This report is based on analyses of publicly available data from the US Sentencing Commission and other agencies, as well as 191 interviews with individuals charged with illegal entry or reentry, their families, other unauthorized migrants who have repeatedly entered the United States, criminal defense attorneys, immigration attorneys, prosecutors, judges, and representatives of humanitarian and advocacy organizations. In many cases, we corroborated details of individuals' accounts with publicly available court records. This report was also informed by meetings with officials in the US Customs and Border Protection agency, and in two divisions within the US Department of Justice: the Civil Rights Division and the Executive Office of Immigration Review.

For years, federal prosecutors have claimed that prosecutorial resources for felony illegal reentry are focused on unauthorized migrants who pose a threat to public safety. In the past, a majority of people charged with felony immigration crimes indeed had a prior conviction for a serious felony. Data from the US Sentencing Commission reveals, however, that the criminal histories of defendants sentenced to federal prison under the "illegal entry offense" guideline has shifted dramatically over the past decade. In 2002, 42 percent had criminal convictions considered most serious by the Commission—such as a conviction for a crime of violence or a firearms offense—while only 17 percent had no prior felony convictions. By 2011, the proportion of defendants with convictions considered most serious had dropped to 27 percent, while the proportion of defendants with no prior felony convictions had increased to 27 percent.

The lack of selectivity in prosecution is exacerbated by the ways in which conviction for misdemeanor illegal entry and subsequent deportation can become a predicate for felony illegal reentry charges. Illegal entry and reentry prosecutions have grown along the US-Mexico border as part of US Border Patrol strategy to deter illegal immigration. Once convicted of illegal entry, including through a mass-prosecution program like Operation Streamline, a migrant who attempts to reenter the US illegally is more likely to be

prosecuted for illegal reentry because he or she now has a criminal record. With each new crossing and arrest, the criminal sanction becomes increasingly harsh. While the maximum sentence for a first-time misdemeanor entry conviction is six months, the sentence for illegal reentry is enhanced by every prior criminal conviction, up to a maximum of 20 years for a prior aggravated felony conviction. As one criminal defense attorney stated, "There's a class of people doing life sentences on the installment plan."

There is limited evidence on the extent to which these prosecutions deter illegal immigration. Given the powerful economic and political "push factors" driving migration to the US, and the fact that US demands for migrant labor far exceed the number of available visas, it is reasonable to conjecture that the deterrent effect of criminal prosecution in this area would be less than in many other areas, at least for migrants who are desperate. Such prosecutions are particularly less likely to deter migrants, even repeat offenders, when they are motivated by very basic human needs such as the desire to reunite with children or other close family members or evade violence or persecution at home.

The increasing reliance on criminal prosecution in this context also raises serious human rights concerns. As Human Rights Watch has previously documented, US civil immigration law fails to adequately protect families and makes it nearly impossible for many who have been deported to reunite with their families legally in the United States. Recent surveys, as well as reports from humanitarian organizations along the border, indicate that a growing number of people seeking entry into the United States are not traditional migrants but former long-term residents seeking to return to their families. Increasingly, the US immigration system is splitting families through deportation and then subjecting the deported family member to potentially lengthy prison terms for trying to reunite with loved ones. The focus on criminal prosecutions also means that asylum seekers fleeing violence or persecution can face serious obstacles to obtaining the protection guaranteed by international refugee law ratified by the United States.

Although international law does not explicitly prohibit the use of criminal sanctions against unauthorized immigrants, United Nations human rights experts have urged the use of civil law, and strongly cautioned against using criminal law, to punish illegal entrants. The UN special rapporteur on the human rights of migrants has stated, "[I]rregular entry or stay should never be considered criminal offences: they are not per se crimes against persons, property, or national security."

AR.09109

The breadth and scope of criminal prosecutions for illegal entry and reentry, moreover, have led to procedural shortcuts, including rapid-fire group trials in Operation Streamline, that imperil the due process rights of immigration defendants.

The considerable financial costs of criminally prosecuting unauthorized migrants also militate against the current prosecution-heavy approach. A September 2012 report estimated that incarceration costs alone for those sentenced for illegal entry and reentry reached $1 billion in fiscal year 2011. Defendants serving sentences for illegal entry and reentry are a source of the burgeoning federal prison population, and given overcrowding, many end up in costly facilities run by private prison companies. Other costs relating to criminal prosecution—including criminal defense attorneys, prosecutors, and more—add to the costs. Not surprisingly, a number of prosecutors, other law enforcement officials, and federal judges have criticized the huge reallocation of resources toward prosecuting people who do not pose a threat to public safety or national security, particularly when the civil immigration system has its own penalties for illegal entry and reentry.

Human Rights Watch acknowledges that all sovereign states have a legitimate interest in regulating entry into their territories. We recognize that states have a particular interest in deterring the illegal entry or reentry of persons who pose a threat to public safety. The US government has decided that this is best accomplished through criminal prosecution rather than just civil enforcement of immigration law. But the prosecutions of illegal entry offenses happening today are overbroad, reaching people who do not belong in prison, and are thus draining resources that could go to efforts to increase public safety and create a more secure, efficient, and humane immigration system.

As the Obama administration and Congress debate a potential overhaul of the country's immigration laws, there is a danger that prosecutions and statutory penalties for these offenses will increase in the name of increased "border security." But the US cannot afford simply more of the same. A program permitting legalization would be an important step in addressing the vulnerability of many migrants to abuse and the inequities of the current immigration system. But rights to family unity and to seek asylum, as well as to due process, will not be protected unless US policymakers also address the current misguided and costly overreliance on criminal prosecution in policing the border.

Prosecuting asylum seekers prior to adjudication of their asylum applications violates US obligations under international refugee law and should cease. And the significant impact criminal prosecutions have on unauthorized migrants seeking to reunite with children and other close family members, particularly where there is no evidence the migrants are dangerous, argues for applying civil rather than criminal immigration remedies and penalties. At the very least, the US government should take this opportunity to evaluate whether the existing emphasis on criminal prosecutions meets its intended goals, to limit the growth of such prosecutions (including by suspending Operation Streamline), and to ensure that US immigration practices are as respectful of fundamental human rights as they can be.

# Recommendations

## To the US Congress

- Amend US immigration law to better protect family unity:
  - Allow for family ties and other positive factors to be factored into any deportation decision, including in cases involving non-citizens with prior criminal convictions.
  - Allow non-citizens whose deportations under existing law bar them from returning to the United States to apply for waivers of these bars based on evidence of strong ties to US citizen or permanent resident family members.
- Amend the Immigration and Nationality Act to impose only civil penalties, not criminal penalties, on illegal entry and illegal reentry. At a minimum, restore the prior version of the statute—making illegal reentry punishable by up to 2 years in federal prison, instead of 20—and prohibit the prosecution of asylum seekers.
- Repeal or amend authorization for Operation Streamline and other programs that facilitate mass prosecutions and undercut the due process rights of those charged with illegal entry offenses.

## To the US Department of Justice and US Attorneys

- Discontinue Operation Streamline and similar programs.
- Enact national guidelines recommending against prosecution of illegal entry and reentry where the migrant has close family ties or fears violence and persecution abroad.
- Support changes to the Sentencing Guidelines to ensure that the most severe sentences are imposed on those with convictions for serious, violent felonies.

## To US Customs and Border Protection (CBP)

- Ensure that all asylum seekers are able to begin the process to apply for asylum when they are first apprehended by CBP personnel.
- Refer non-citizens for criminal prosecution only when they have recent convictions for serious, violent felonies.
- Discontinue Operation Streamline and similar programs.

- Develop a policy allowing CBP agents to consider factors such as close family ties and extenuating circumstances in deciding whether to grant parole.

## To US Immigration and Customs Enforcement (ICE)

- Refer non-citizens for criminal prosecution only when they have recent convictions for serious, violent felonies.
- Ensure consistent, nationwide application of the existing ICE policy on prosecutorial discretion to limit deportations of non-citizens with ties to US families.

## To the US Sentencing Commission

- Conduct a study assessing whether the current system of sentence enhancements for illegal entry offenses is furthering appropriate criminal justice goals and is well-tailored to best meet those goals.
- Revise the sentencing guideline for illegal entry offenses to ensure that the most severe penalties are imposed on those with recent convictions for serious, violent felonies.
- Conduct research to determine the proportion of defendants convicted of illegal entry offenses who have ties to US families, and the extent to which these ties impact reentry rates.

AR.09113

# Methodology

This report is based on interviews and research conducted from February 2012 to April 2013. In all, Human Rights Watch conducted 191 interviews with individuals charged with illegal entry or reentry, their families, unauthorized migrants who have repeatedly entered the United States, criminal defense attorneys, immigration attorneys, prosecutors, judges, and representatives of humanitarian and advocacy organizations. We interviewed 55 people convicted of illegal entry or reentry, and interviewed family members or lawyers in another 18 cases—for a total of 73 separate case accounts. We examined publicly available court records in 62 cases, including some cases for which we also had interviews and some for which we did not. Finally, we corresponded with 35 individuals (including two whose family members we interviewed) serving sentences in federal prison for illegal entry or reentry, who consented to participate in our research.

The cases were identified in a variety of ways. In some cases, criminal defense or immigration attorneys and local advocates referred us to individuals and families. In other cases, interviews with migrants in Nogales, Tijuana, and Rosarito, Mexico led us to individuals who had been charged with illegal entry or reentry. We also identified defendants and attorneys through searches of news or legal databases, or communicated with the attorney or family directly after observing a court proceeding. Most of the individuals who corresponded with us, and some of the defendants and family members we interviewed, contacted Human Rights Watch directly after hearing from other inmates about our research.

Our cases do not constitute a random sample, but they include non-citizens both with and without strong ties to US families and with a variety of prior criminal records.

The cases documented in this report are largely from the federal court jurisdictions (federal districts) with the most illegal entry and reentry prosecutions—Arizona, New Mexico, the Western and Southern Districts of Texas, and the Southern and Central Districts of California. Human Rights Watch conducted interviews with some defendants while they were in detention awaiting sentencing or serving their sentences in Los Angeles, California; Raymondville, Marfa, Pecos, and El Paso, Texas; and Florence, Arizona. We conducted interviews with individuals who had been deported in Nogales, Tijuana, and Rosarito, Mexico, and with family members affected by these prosecutions in Arizona, California,

AR.09114

and Texas. In many cases, we obtained publicly available federal court documents from PACER (Public Access to Court Electronic Records) to corroborate information provided by defendants, family members, and attorneys.

We also documented cases and interviewed criminal defense attorneys, immigration attorneys, and prosecutors in the District of Columbia, Florida, Kansas, Minnesota, New York, and other states which we have not identified at the request of the interviewees. The views expressed by all assistant federal defenders are their own and not representative of their offices.

The majority of interviews were conducted in person; some were conducted by telephone or videoconference and are indicated as such in the relevant citations. Interviews were conducted in English, Spanish, or a combination of the two, depending on the interviewee's preference. Interviews in Spanish were conducted by a Human Rights Watch researcher fluent in Spanish or with the assistance of an interpreter. All participants were informed of the purpose of the interview and consented orally. No interviewee received compensation for providing information. Where appropriate, Human Rights Watch provided interviewees with contact information for organizations providing legal, counseling, or social services. We have used pseudonyms to protect the privacy of certain individuals at their request.

Human Rights Watch researchers and an intern observed illegal entry and reentry hearings, including Operation Streamline proceedings, in Brownsville, Del Rio, and El Paso, Texas; Tucson and Phoenix, Arizona; and Los Angeles, California. Human Rights Watch also reviewed press reports and reports by nongovernmental organizations.

We analyzed publicly available data and reports from the US Sentencing Commission, the Administrative Office of the US Courts, the Executive Office of US Attorneys, and the Bureau of Justice Statistics, as well as data from the Transactional Records Access Clearinghouse (TRAC). Human Rights Watch, with other advocacy organizations, met in February 2013 with US Customs and Border Protection officials and officials at the US Department of Justice (Civil Rights Division and the Executive Office of Immigration Review); we thank them for taking the time to provide information on this issue. We also submitted a list of questions to the US Department of Justice and requests for information under the Freedom of Information Act to US Customs and Border Protection and US Immigration and Customs Enforcement, to which we have yet to receive a response.

AR.09115

# I. Background

Illegal entry and presence in the United States without authorization violate US civil immigration law and are punishable by removal from the country and other civil law penalties. The act of entering the United States without authorization (illegal entry) and the act of reentering after deportation (illegal reentry) are also federal crimes. Both offenses have existed as federal crimes in various forms since the early 20th century, but the sentences, rates of prosecution, and justifications for prosecution have changed over the years.

## Illegal Entry and Reentry Crimes

Under US federal law, at 8 US Code Section 1325, a non-citizen who enters or seeks to enter the United States at a place other than a port of entry, or by fraud or false documents, commits a federal misdemeanor offense that is punishable by up to six months in prison. A subsequent conviction for illegal entry can be punishable by up to two years.[3]

Under 8 US Code Section 1326, reentering or being found in the United States without authorization after deportation constitutes felony illegal reentry. The non-citizen must have been formally removed before he or she reentered; he or she cannot have left the United States voluntarily.[4]

Over the years, Congress has amended the illegal reentry statute to increase the maximum penalties for different categories of defendants. In 1952, the maximum punishment for all people convicted of illegal reentry was two years in prison. In 1986, the Immigration Reform Act upped the maximum penalty to 20 years in prison for defendants who reenter the United States after prior convictions for aggravated felonies (lower maximum sentences apply to defendants with other prior criminal convictions).[5] "Aggravated felony" in this context is defined in the same broad way as it is in the Immigration and Nationality Act, and can include nonviolent crimes and even state misdemeanors that match one of the many enumerated crimes.[6] These changes reflect a change in the justification for these

---

[3] Immigration and Nationality Act Section 275, 8 US Code Section 1325 (2012).

[4] Immigration and Nationality Act Section 276, 8 US Code Section 1326 (2012).

[5] See Doug Keller, "Re-thinking Illegal Entry and Re-entry," *Loyola University Chicago Law Journal*, vol. 44, Fall 2012.

[6] See Immigration and Nationality Act Section 101(a)(43), 8 US Code Section 1101(a)(43) (2012).

AR.09116

prosecutions: the penalties have increased as legislators' focus has shifted from deterring illegal reentry to targeting dangerous criminals who might commit new crimes in the US, with the existence of a prior criminal record serving as a proxy for dangerousness.[7]

As Figure I demonstrates, prosecutions for illegal entry and reentry have increased significantly over the past decade. For most of the 1990s, relatively few border-crossers were charged with illegal entry. Prosecutions jumped dramatically in 2004, and under President Barack Obama, the surge has continued.[8] Although illegal entry prosecutions have dropped slightly from a historic high of 54,000 in 2009, the level of prosecutions remains high. Illegal reentry prosecutions have increased dramatically as well, albeit more steadily.

---

[7] See Keller, "Rethinking Illegal Entry and Re-entry," Fall 2012.

[8] Transactional Records Access Clearinghouse (TRAC), "Lead Charges for Criminal Immigration Prosecutions: FY 1986-FY 2011," 2011, http://trac.syr.edu/immigration/reports/251/include/imm_charges.html (accessed April 12, 2013).

**TURNING MIGRANTS INTO CRIMINALS**      12

AR.09117

**FIGURE 1: ILLEGAL ENTRY AND REENTRY PROSECUTIONS AND CONVICTIONS FROM 2002 TO 2012**





Source: Transactional Records Access Clearinghouse (TRAC), Syracuse University, TradFed Express Tool, http://tracfed.syr.edu/index/index.php?layer=cri

Immigration cases now outnumber all other types of federal criminal cases filed in US district court.[9] These cases do not include the tens of thousands of first-time illegal entry cases that conclude in federal magistrate court.



FIGURE 2: NUMBER OF CASES TERMINATED IN US DISTRICT COURTS BY OFFENSE CATEGORY AND PERCENT CHANGE 2002-2012

Source: Executive Office of the United States Attorneys, "Annual Statistical Reports", http://www.justice.gov/usao/reading_room/foiamanuals.html#reports , Accessed 04/15/2013.

## What the Federal Sentencing Guidelines Say

Sentences within the federal criminal system are calculated according to guidelines promulgated by the US Sentencing Commission. The Commission is charged with developing guidelines to achieve "reasonable uniformity" among sentences for the same

---

[9] Executive Office of US Attorneys, "Annual Statistical Reports," 2002-2012, http://www.justice.gov/usao/reading_room/foiamanuals.html (accessed April 15, 2013). In 2012, immigration cases made up 40.6 percent of criminal cases filed. Eighty-five percent of "immigration cases" involved illegal entry or reentry charges. Administrative Office of US Courts, Caseload Statistics 2012, "Table D-2: Defendants Commenced, by Major Offenses, 2008 through 2012," http://www.uscourts.gov/Statistics/FederalJudicialCaseloadStatistics/FederalJudicialCaseloadStatistics2012.aspx (accessed May 6, 2013). Because drug cases often involve several defendants, the total number of defendants charged for drug offenses in US district courts in 2012 (31,739) was higher than the number of defendants charged with immigration offenses in US district court (26,572).

AR.09119

offenses, as well as "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity."[10]

In 2005, the Supreme Court ruled in *United States v. Booker* that the sentencing guidelines were not mandatory and that judges have the discretion to depart from these guidelines.[11] Judges, however, must still consult the guidelines, and according to a 2012 report by the Commission, "[t]he sentencing guidelines have remained the essential starting point in all federal sentences and have continued to exert significant influence on federal sentencing trends over time."[12]

The sentencing guidelines apply to felonies and Class A misdemeanors (misdemeanors for which the maximum sentence is one year or less but more than six months).[13] Sentencing guideline 2L1.2, for "Unlawfully Entering or Remaining in the United States," applies to defendants convicted of felony illegal reentry or a second or subsequent charge of misdemeanor illegal entry.[14]

Guideline sentences are calculated based on a combination of the "offense level" and the defendant's criminal history. The offense level for an illegal entry offense is based on the defendant's prior conviction or convictions. Guideline 2L1.2 treats certain prior criminal convictions—for crimes of violence, drug trafficking (for which a sentence of 13 months or more was imposed), child pornography, firearms offenses, national security or terrorism offenses, human trafficking, or alien smuggling—as most serious, warranting a significant 16-level increase in offense level. Other prior convictions result in increases of 4, 8, or 12 offense levels.[15]

---

[10] US Sentencing Commission, 2012 Sentencing Guidelines Manual, http://www.ussc.gov/Guidelines/2012_Guidelines/index.cfm (accessed April 12, 2013).

[11] *United States v. Booker*, 543 U.S. 220 (2005).

[12] US Sentencing Commission, "Report on the Continuing Impact of *US v. Booker* on Federal Sentencing," 2012, http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Booker_Reports/2012_Booker/Part_A.pdf (accessed April 25, 2013).

[13] 18 US Code Section 3559(a)(6) (2012).

[14] US Sentencing Guideline 2L1.2, Unlawfully Entering or Remaining in the United States (2012).

[15] Ibid. A conviction for a drug trafficking offense for which the sentence imposed was 13 months or less results in an increase of 12 levels; a conviction for an aggravated felony, 8 levels; a conviction for any other felony, 4 levels; and convictions for three or more misdemeanors that are crimes of violence or drug trafficking offenses, 4 levels (with some variations for older offenses).

The defendant's criminal history category is determined based on the number and seriousness of the defendant's prior convictions, with I being least serious (including those with no or one minor prior conviction) and VI being most serious.[16] Convictions that are more than 15 years old are generally not counted in assigning the defendant to a criminal history category, though they do count for the offense level.[17]

The offense level and the criminal history category are considered together to come up with a "guideline" sentence. For example, a defendant with one prior felony conviction for illegal reentry, for which he received a sentence of six months, who was then arrested for a second illegal reentry offense while on supervised release (i.e., probation), would be at offense level 12 and criminal history category III, and face a guideline sentence of 15 to 21 months. A defendant with one prior aggravated assault conviction who served one year in prison would be at offense level 24 and criminal history category II, and thus face a guideline sentence of 57-71 months.[18] For all federal crimes, a defendant who pleads guilty will typically get a reduction in offense level for "acceptance of responsibility," and many defendants accept "Fast-Track" plea deals in which they receive a significant reduction in offense levels in exchange for a waiver of certain rights.[19] So the above calculations are based on what defendants would face if they were convicted at trial.

In 2010, the US Sentencing Commission amended the sentencing guideline for "unlawfully entering or remaining in the United States" to recognize "cultural assimilation" as a valid reason for granting a lower-than-guideline sentence, to be considered in cases where, in part, "those cultural ties provided the primary motivation for the defendant's illegal reentry or continued presence in the United States."[20] The provision, however, has not necessarily led to more "departures" from the guidelines (more lenient criminal sentences). (For more information, see section III: Criminal Prosecutions Impinge on the Rights to Family Unity and to Seek Asylum.)

---

[16] US Sentencing Guideline 4A1.1 (2012).

[17] Ibid.

[18] See US Sentencing Commission, 2012 Federal Sentencing Guidelines Manual, "Sentencing Table," http://www.ussc.gov/Guidelines/2012_Guidelines/Manual_PDF/Sentencing_Table.pdf (accessed April 7, 2013).

[19] US Sentencing Guideline 3E1.1 (2012) ("Acceptance of Responsibility"); Memorandum for all US Attorneys from James M. Cole, deputy attorney general, US Department of Justice, "Department Policy on Early Disposition or 'Fast-Track' Programs," January 31, 2012, http://www.justice.gov/dag/fast-track-program.pdf (accessed April 7, 2013).

[20] US Sentencing Guideline 2L1.2.

The guideline for illegal entry offenses has been criticized by many criminal defense attorneys and some judges for being excessively harsh, and by some former and current assistant US attorneys for being vague and difficult to apply.[21]

## Who is Being Prosecuted for Illegal Entry and Reentry?

Individuals convicted of immigration offenses (the vast majority of whom are convicted of illegal entry and reentry) come from very different populations than individuals convicted of other federal crimes. According to data received by the US Sentencing Commission, 88 percent of defendants convicted of immigration offenses in 2012 were Hispanic, while only 31 percent of defendants convicted of other federal crimes were Hispanic.[22] Eighty-two percent of immigration offenders did not finish high school, while 37 percent of other federal offenders did not finish high school.[23]

Among illegal entry cases prosecuted in district court in 2010 (which excludes the 40,000-plus cases processed in magistrate court), 86 percent of defendants were men.[24] The majority of defendants were under age 35, but 32 percent were 35 to 49 years old. Among illegal reentry cases, 97 percent of defendants were men, 42 percent were between 25 and 34 years old, and another 41 percent were 35 to 49. In 2010, of the 23,489 defendants charged with illegal entry or reentry in US district court, 32 illegal entry defendants and 50 illegal reentry defendants were US citizens. Seventy percent of illegal entry defendants and 85 percent of illegal reentry defendants were Mexican nationals.[25]

---

[21] See Keller, "Rethinking Illegal Entry and Reentry," Fall 2012. Thirty-four percent of federal judges surveyed in 2010 agreed that guideline sentences for these offenses are too long. US Sentencing Commission, "Results of Survey of United States District Judges from January 2010 to March 2010," June 2010,
http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf (accessed April 7, 2013). See also Caleb E. Mason &Scott M. Lesowitz, "A Rational Post-*Booker* Proposal for Reform of Federal Sentencing Enhancements for Prior Convictions," *Northern Illinois University Law Review*, 2011,
http://www.niu.edu/law/organizations/law_review/pdfs/full_issues/31_2/Mason_6.pdf (accessed May 10, 2013).

[22] US Sentencing Commission, 2012 Sourcebook, "Table 46: Demographic and Offense Information for Immigration Offenses," http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2012/Table46.pdf (accessed April 16, 2013).

[23] Ibid.

[24] Mark Motivans, US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, "Immigration Offenders in the Federal Criminal System, 2010," July 2012, http://bjs.gov/index.cfm?ty=pbdetail&iid=4392 (accessed April 12, 2013), p. 22.

[25] Ibid.

## Relevant Border Patrol Policies

Non-citizens apprehended entering the United States without authorization are expelled from the country in a number of different ways.

### Voluntary Return

Border Patrol agents sometimes allow a non-citizen to depart voluntarily without going through a formal removal (that is, deportation). Processing time is shortest for voluntary return, and the non-citizen will not face any immigration penalties, such as a bar from entering the US at a later date.[26] In 2011, 324,000 individuals were returned in this manner or granted voluntary departure, a substantial decrease from 10 years earlier, when over 1 million individuals were returned voluntarily.[27]

### Removal

If a non-citizen is ordered removed—that is, deported—he or she faces penalties under both immigration law and federal criminal law if he or she tries to reenter.

If a non-citizen is deported through "expedited removal," which does not require an order by an immigration judge, he or she is barred from the United States for five years.[28] If a non-citizen is ordered removed by an immigration judge, or accepts "stipulated removal," he or she is barred from the United States for 10 or 20 years, depending on the number of removals; he or she is barred for life if ordered removed for an "aggravated felony."[29] If a non-citizen tries to return to the US illegally after removal, he or she is subject to prosecution for illegal reentry.

---

[26] Testimony of Michael J. Fisher, chief, US Border Patrol, US Customs and Border Protection (CBP), before US House of Representatives, Committee on Homeland Security, Subcommittee on Border and Maritime Security, October 4, 2011, http://www.dhs.gov/news/2011/10/04/written-testimony-cbp-house-homeland-security-subcommittee-border-and-maritime (accessed April 14, 2013).

[27] American Immigration Council, Immigration Policy Center, "A Decade of Rising Immigration Enforcement," http://www.immigrationpolicy.org/just-facts/decade-rising-immigration-enforcement (accessed April 25, 2013). This figure includes individuals who received "voluntary departure," a form of relief from removal granted by immigration judges. However, in fiscal year 2011, immigration judges granted voluntary departure in 30,385 cases, a small number compared to the almost 300,000 returned voluntarily by Border Patrol. US Department of Justice, Executive Office of Immigration Review, Office of Planning, Analysis, and Technology, "FY 2011: Statistical Year Book," February 2012, http://www.justice.gov/eoir/statspub/fy11syb.pdf (accessed April 22, 2013).

[28] Immigration and Nationality Act Section 212(a)(9)(A)(i) (2012).

[29] Immigration and Nationality Act Section 212(a)(9)(A)(ii) (2012).

AR.09123

The Obama administration deported a record 1.6 million non-citizens through such formal removals between fiscal year 2009 and 2012.[30]

**Referrals for Criminal Prosecution and Operation Streamline**

Both US Customs and Border Protection (CBP) and US Immigration and Customs Enforcement (ICE) are empowered to refer unauthorized immigrants for federal criminal prosecution before formally deporting them. CBP refers significantly more cases. In 2012, CBP referred 86 percent of all illegal entry cases and 46 percent of all illegal reentry cases; ICE referred 1 percent of illegal entry and 25 percent of illegal reentry cases.[31]



An artist's rendering of an Operation Streamline hearing in Tucson, Arizona on May 6, 2013.
© 2013 Maggie Keane for Human Right Watch

---

[30] US Immigration and Customs Enforcement (ICE), "Removal Statistics," http://www.ice.gov/removal-statistics (accessed April 12, 2013).

[31] Transactional Records Access Clearinghouse (TRAC), "Going Deeper" tool, Prosecutions filed by agency, 2012, http://tracfed.syr.edu/index/index.php?layer=cri (accessed May 10, 2013). See also TRAC, "Continued Decline and Shifting Focus Seen in Criminal Immigration Prosecutions," November 19, 2012, http://trac.syr.edu/immigration/reports/300/ (accessed April 14, 2013).

Before 2005, CBP only referred non-citizens with criminal records or repeat offenders for criminal prosecution. Others, including first-time migrants, were returned or removed. In 2005, however, that policy changed with the advent of Operation Streamline in Del Rio, Texas. Touted as a "zero-tolerance" program toward all non-citizens caught crossing the border without authorization, CBP claimed that they were prosecuting nearly everyone they apprehended in the Del Rio sector.[32] CBP no longer promotes Streamline as a "zero-tolerance" program, and CBP does not come close to referring every migrant apprehended for criminal prosecution; immigration authorities in 2010 made about 17 federal criminal arrests per 100 apprehensions in Southwest Border Patrol sectors.[33] Rather, CBP describes criminal prosecution as one option in its "consequence delivery system," which is designed to "uniquely evaluate each subject and apply the appropriate post-arrest consequences … to break the smuggling cycle and end the subject's desire to attempt further illegal entry."[34]

---

[32] Joanna Lydgate, "Assembly-Line Justice: A Review of Operation Streamline," The Chief Justice Earl Warren Institute on Race, Ethnicity, and Diversity, University of California, Berkeley Law School, January 2010, http://www.law.berkeley.edu/files/Operation_Streamline_Policy_Brief.pdf (accessed April 25, 2013).

[33] Human Rights Watch meeting with US Customs and Border Protection, February 23, 2013; Motivans, "Immigration Offenders in the Federal Justice System, 2010," July 2012, http://bjs.gov/index.cfm?ty=pbdetail&iid=4392, p. 8.

[34] US Customs and Border Protection, "2012-2016: Border Patrol Strategic Plan," http://nemo.cbp.gov/obp/bp_strategic_plan.pdf (accessed April 12, 2013).

**TURNING MIGRANTS INTO CRIMINALS**      20

AR.09125



FIGURE 3: NUMBER AND PERCENTAGE OF PROSECUTIONS BY US FEDERAL DISTRICT (2008-2012)

Source: Transactional Records Access Clearinghouse (TRAC), Syracuse University. TRACFED Express Tool
http://tracfed.syr.edu/index/index.php?layer=cri



An artist's rendering of an Operation Streamline hearing in Tucson, Arizona on May 6, 2013.
© 2013 Maggie Keane for Human Right Watch

Operation Streamline is active in many, but not all, federal courts in the Western and Southern Districts of Texas, New Mexico, and Arizona, making the Southern District of California the only exception among states on the southern border. Ninety-eight percent of prosecutions for illegal entry and seventy-seven percent of prosecutions for illegal reentry in 2012 were in the four judicial districts in which Streamline is active.[35] Not all of these prosecutions take place in the mass hearings characteristic of Streamline, but the push to prosecute is clearly greatest in the districts in which Streamline is active. A large number of prosecutions used to occur in the Southern District of California, but there has been a significant drop in recent years: the 2,727 cases prosecuted in the district accounted for just 3 percent of all illegal entry and reentry cases in 2012. Of those cases, only 206 were for illegal entry, representing just 0.4 percent of all illegal entry prosecutions.[36] In districts elsewhere in the country, there are only a couple of dozen prosecutions each year.

---

[35] TRAC, "Express" tool, Prosecutions under 8 USC Section 1325 and 1326 by judicial district, from fiscal year 2008 to 2012, http://tracfed.syr.edu/index/index.php?layer=cri (accessed May 10, 2013).
[36] Ibid.

AR.09127

## II. Criminal Prosecutions Fail to Focus on Serious Threats

When Congress increased the maximum penalty for illegal reentry in 1988, lawmakers explained that their rationale was to target "alien drug traffickers who are considering illegal entry into the United States," and cited in particular the example of a drug kingpin who was wanted for about 50 murders.[37] Prosecution policies today are generally set by individual US Attorneys and vary from district to district, but outside of programs like Operation Streamline, prosecutors continue to affirm that prosecutorial resources, particularly for charging felony illegal reentry, are reserved for dangerous criminals who are a threat to public safety.[38] Similarly, John Morton, director of US Immigration and Customs Enforcement (ICE), in testimony before Congress in March 2013, asserted that immigration enforcement resources are focused on the apprehension and removal of "individuals who fall within our highest enforcement priorities, namely national security and public safety threats."[39]

The US government has a strong public safety interest in keeping dangerous criminals from entering its borders. Human Rights Watch's research, however, indicates that prosecutions are targeting many persons who pose no such threat. The rapid overall growth in criminal prosecution has been accompanied by the even more rapid growth in prosecution of unauthorized immigrants with no or minor criminal records.

The existence of a prior criminal conviction is not necessarily an accurate proxy for future dangerousness, particularly with regard to old convictions, and a prosecutorial policy built on such a faulty rationale can result in a system of preventive detention that violates fundamental rights.

---

[37] See Doug Keller, "Re-thinking Illegal Entry and Re-entry," *Loyola University Chicago Law Journal*, vol. 44, Fall 2012.

[38] Anna Gorman, "Illegal reentry into the US increasingly leads to prison," *Los Angeles Times*, March 16, 2008, http://articles.latimes.com/2008/mar/16/local/me-crackdown16 (accessed March 28, 2013) (quoting Julie L. Myers, then assistant secretary of Immigration and Customs Enforcement, stating, "They are some of the worst of the worst.... They are people that citizens of any community would want off the streets."); Kent Faulk, "Charges for illegal re-entry on rise in Alabama," *Birmingham News*, September 25, 2011, http://blog.al.com/spotnews/2011/09/charges_for_illegal_re-entry_o.html (accessed March 28, 2013) (quoting US Attorney Joyce White Vance, stating, "We target people who are a risk to the community.")

[39] Statement of John Morton, director, US Immigration and Customs Enforcement (ICE), "Regarding a Hearing on Immigration Enforcement," US House of Representatives, Committee on the Judiciary, March 19, 2013, http://www.ice.gov/doclib/news/library/speeches/130319morton.pdf (accessed April 12, 2013).

AR.09128

Even if one assumes that prior criminal records can be a useful predictor of future dangerousness, the data show a significant shift in who is being sentenced under the sentencing guideline for illegal entry offenses.

## Increased Prosecution of Unauthorized Immigrants with Minor Criminal Histories

Human Rights Watch is still awaiting responses to requests under the Freedom of Information Act for data from US Customs and Border Protection (CBP) and ICE, as well as a response to a request for information from the US Department of Justice (DOJ), on the criminal records of defendants charged with illegal entry and reentry from 2002 to the present. According to a recent Bureau of Justice Statistics report, only 20 percent of defendants charged with illegal reentry in 2010 had prior felony convictions for violent offenses.[40] An analysis of available data from the US Sentencing Commission ("the Commission") indicates that this figure is part of a growing trend toward increased prosecution of immigrants with records, if they have records at all, for nonviolent or minor offenses.

---

[40] Mark Motivans, US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, "Immigration Offenders in the Federal Criminal System, 2010," July 2012, http://bjs.gov/index.cfm?ty=pbdetail&iid=4392 (accessed April 12, 2013), p. 26 (showing that 64.8 percent of defendants charged with illegal reentry and 20.3 percent of defendants charged with illegal entry (Class A misdemeanors only) in federal courts have a prior felony conviction).

AR.09129

### Sentencing Commission Data: Limits and Discrepancies

One of the responsibilities of the US Sentencing Commission is the collection and analysis of sentencing data from federal court judgments, indictments, and other relevant documents.[41] It receives and examines information on all cases in which the sentencing guidelines are applied (felonies and Class A misdemeanors, meaning misdemeanors for which the maximum sentence is one year or less but more than six months).[42]

Commission data on Guideline 2L1.2, for "Unlawfully entering or remaining in the United States," thus includes information on tens of thousands of illegal reentry cases, and a couple hundred second or subsequent illegal entry cases, but not information on first-time convictions for illegal entry. It therefore does not provide a complete look at all illegal entry and reentry cases.

The Commission's data on the application of this guideline is also incomplete because the Commission excludes from its analysis cases in which the pre-sentence report—which details a defendant's criminal, work, and family history—is missing. In fiscal year 2011, for example, the Commission excluded 8,164 cases of illegal entry offenses because the court had waived the pre-sentence report.[43] This may explain why the Commission's total number of illegal entry offense cases each year is significantly lower than the number of convictions for illegal entry and reentry reported by the Transaction Records Access Clearinghouse, which analyzes data received from the Executive Office of US Attorneys.[44]

---

[41] US Sentencing Commission, 2011 Sourcebook of Federal Sentencing Statistics, "Introduction," http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2011/sbtoc11.htm (accessed March 28, 2013).

[42] Human Rights Watch email correspondence with Christine Kitchens, US Sentencing Commission, Office of Research and Data, February 28, 2013; and telephone interviews with Christine Kitchens, March 4, 2013 and April 18, 2013. See also 18 US Code Section 3559, Sentencing Classification of Offenses.

[43] Human Rights Watch email correspondence and interviews with Christine Kitchens; and US Sentencing Commission, "Report on the Continuing Impact of *US v. Booker* on Federal Sentencing," 2012, http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Booker_Reports/2012_Booker /Part_A.pdf (accessed April 25, 2013), p. 52.

[44] For example, the Commission reported 21,487 cases in which Guideline 2L1.2 was applied in fiscal year 2011. TRAC, however, reported 33,602 convictions for illegal reentry and 33,044 convictions for illegal entry in fiscal year 2011. Even if we limit comparison of the Commission's cases to TRAC's data on illegal reentry convictions, there is a difference of 12,115 cases.

AR.09130

Guideline 2L1.2 for illegal entry offenses increases the offense level, and the possible sentence, based on the defendant's prior criminal record. Thus, by looking at Commission data on how the guideline was applied in each case, one can determine what kind of prior criminal convictions the defendant had. Even acknowledging the limitations of Commission data (see text box above), it is clear that the criminal backgrounds of defendants sentenced for illegal entry offenses are significantly less serious today than they were 10 years ago.

In 2002, 42 percent of defendants sentenced under guideline 2L1.2 for illegal entry offenses ("illegal entry offenders") had prior convictions that warranted a 16-level increase in offense levels—such as a conviction for a crime of violence or a drug trafficking offense resulting in a sentence of 13 months or more.[45] Only 17 percent had no conviction warranting an increase in offense levels. But by 2011, the proportion of illegal entry offenders with prior convictions resulting in a 16-level increase had decreased to 27 percent, while defendants with no prior felony convictions had increased to 27 percent.[46]

---

[45] US Sentencing Commission, "Guideline Application Frequencies (2002-2011)," http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Guideline_Application_Frequencies/index.cfm (accessed April 25, 2013).

[46] Ibid. A prior felony conviction, or three or more misdemeanors that are crimes of violence or drug trafficking offenses, result in a 4-level increase. US Sentencing Guideline 2L1.2.

**TURNING MIGRANTS INTO CRIMINALS**          26

AR.09131



FIGURE 4: ILLEGAL ENTRY OFFENDERS BY PRIOR CRIMINAL CONVICTION FROM 2002 TO 2011

Source: US Sentencing Commission Guideline Application Frequencies (2002 - 2011) http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Guideline_Application_Frequencies/2011/GAF_FY2011.cfm Accessed: 4/9/2013.

## TABLE 1: ILLEGAL ENTRY OFFENDERS BY PRIOR CRIMINAL RECORDS FROM 2005 TO 2011

| Criminal Records of Illegal Entry Offenders | Type of Offense | Fiscal Year | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| No prior conviction resulting in increase | No conviction | 2,148 | 2,449 | 2,183 | 3,619 | 4,983 | 5,735 | 5,687 |
| Prior felony or three or more misdemeanors resulting in a 4- level increase | Prior felony or three or more misdemeanors resulting in a 4- level increase | 1,415 | 1,703 | 2,821 | 3,479 | 4,611 | 5,979 | 6,890 |
| Prior aggravated felony or drug conviction resulting in an 8 or 12- level increase | Aggravated felony | 1,869 | 2,100 | 1,286 | 1,299 | 1,577 | 1,573 | 1,627 |
| | Drug offense resulting in a sentence of less than 13 months | 798 | 772 | 739 | 784 | 1,009 | 1,086 | 1,431 |
| Prior felony conviction resulting in a 16- level increase | Drug offense resulting in a sentence of 13 months or more | 2,448 | 2,369 | 2,022 | 2,224 | 2,496 | 2,404 | 2,720 |
| | Crime of violence | 1,367 | 1,573 | 1,529 | 1,791 | 2,117 | 2,532 | 2,689 |
| | Alien smuggling | 115 | 171 | 200 | 190 | 234 | 385 | 379 |
| | Firearms | 28 | 28 | 17 | 26 | 35 | 49 | 49 |
| | Human trafficking | 36 | 26 | 24 | 12 | 17 | 14 | 9 |
| | Child pornography | 4 | 2 | 3 | 6 | 7 | 8 | 6 |
| | National security/Terrorism | 1 | 1 | 0 | 3 | 3 | 2 | 0 |

Source: US Sentencing Commission Guideline Application Frequencies (2002 - 2011) http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Guideline_Application_Frequencies/2011/GAF_FY2011.cfm Accessed: 4/9/2013. Prior to 2005, the US Sentencing Commission did not publish data categorized by the types of offenses listed above.

This shift has occurred at the same time that these prosecutions have skyrocketed. The total number of illegal entry offenders increased by 227 percent during the 10 years analyzed. While the number of cases in which the defendant had a prior conviction for an offense considered most serious increased over the 10 years by 113 percent, the number of cases in which the defendant had less serious criminal histories (felonies less serious than "aggravated felonies" or three or more misdemeanors resulting in a 4-level increase) increased by 725 percent. The number of cases in which the defendant had *no* prior felony conviction nor any misdemeanor convictions resulting in an increase in offense levels increased by 418 percent.

AR.09133

**TABLE 2: PERCENT CHANGE IN THE APPLICATION OF THE ILLEGAL ENTRY OFFENSE SENTENCING GUIDELINE FROM 2002 TO 2011**

| | 2002 | 2011 | Percent Change FY 2002 - FY 2011 |
|---|---|---|---|
| No prior conviction resulting in increase | 1,097 | 5,687 | 418% |
| Prior felony or three or more misdemeanors resulting in a 4-level increase | 835 | 6,890 | 725% |
| Prior aggravated felony or drug conviction resulting in an 8 or 12-level increase | 1,891 | 3,058 | 62% |
| Prior felony conviction resulting in a 16-level increase | 2,747 | 5,852 | 113% |
| Total | 6,570 | 21,487 | 227% |

Source: US Sentencing Commission Guideline Application Frequencies (2002 - 2011), http://www.ussc.gov/Data_and_Statistics/Federal_Sentencing_Statistics/Guideline_Application_Frequencies/2011/GAF_FY2011.cfm (accessed April 9, 2013).

Looking at this data another way, in 2011, 26 percent of those sentenced under this guideline had no prior felony conviction and 59 percent had prior felony convictions for nonviolent offenses.[47]

According to federal public defenders, pre-sentence reports are generally waived only when the defendant has no or minimal criminal history.[48] If one includes the 8,164 cases the Commission excluded from its analysis because of the absence of a pre-sentence report and adds those cases to the no-prior-felony category, the percentage of defendants with no prior felony conviction is even higher, at 46 percent.

---

[47] We have defined "nonviolent offense" to exclude "crimes of violence," firearms offenses, child pornography, national security or terrorism offenses, human trafficking, and alien smuggling.

[48] A federal public defender in Texas told us that his office waives the pre-sentence report in cases where the defendant has no prior felony convictions and is eligible for a sentence of straight probation. Federal public defenders in Arizona said pre-sentence reports are generally waived in "flip-flop" prosecutions, where the defendant is charged with both illegal reentry and illegal entry, and then is offered a plea deal in which he or she would plead guilty to illegal entry and have the reentry charge dismissed. According to these attorneys, these prosecutions generally do not include people with serious prior criminal convictions. Human Rights Watch email correspondence with Chris Carlin, assistant federal defender, Alpine, Texas, April 10, 2013; and Human Rights Watch interview with Milagros Cisneros and Susan Anderson, assistant federal defenders, Phoenix, Arizona, April 2, 2013.

AR.09134

Commission data on the criminal history categories of defendants also provides evidence of a trend toward prosecuting individuals with minor or no criminal history. As noted above, the length of defendants' sentences for illegal entry offenses are based on their criminal history category, which gives a sense of both the number and seriousness of prior convictions, as well as their offense level. Whereas defendants in the most serious criminal history categories (IV, V, and VI) made up about 50 percent of all defendants sentenced for illegal entry offenses in 2002, by 2012, they only made up 30 percent of such defendants. At the same time, the proportion of defendants in the lowest criminal history categories (I and II) increased from 22 percent in 2002 to 41 percent in 2012.[49]



Figure 5: Proportion of Illegal Entry Offenders in Each Criminal History Category from 2002 to 2011

Source: US Sentencing Commission Sourcebooks. ‹ http://www.ussc.gov/Data_and_Statistics/Archives.cfm › Accessed 4/14/2013

---

[49] US Sentencing Commission, Annual Sourcebooks (2002-2012), http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/index.cfm (accessed April 25, 2013).

AR.09135

The rising number of prosecutions of people with minor criminal histories is in part the product of a self-perpetuating cycle: once convicted of illegal entry, an immigrant who attempts to reenter the US is more likely to be prosecuted for illegal reentry because he or she now has a criminal record. Prior convictions for illegal entry offenses alone could be sufficient to put a defendant in criminal history categories I, II, or III. Although we do not have access to the criminal records of these defendants, our documentation of specific cases (as discussed in greater detail in the next section) indicates that, in many cases, the prior convictions are illegal entry and reentry convictions.

Average sentences for illegal entry offenses have also decreased significantly over the past 10 years. In 2002, the mean sentence for illegal entry offenses was 30 months, and the median sentence was 24 months.[50] In 2012, the mean sentence was 19 months, and the median sentence was 13 months.[51] This is in large part due to the use of "Fast-Track" plea offers by the US government, in which defendants receive automatic reductions in calculations of offense level in exchange for waiving certain rights and agreeing to faster conclusion of their cases.[52] But if these Fast-Track plea offers result in sentences the government considers appropriate punishment, the decrease in sentences may also indicate the US government views these defendants as less dangerous.

---

[50] US Sentencing Commission, 2002 Annual Sourcebook of Federal Sentencing Statistics, "Table 50: Mean and Median Sentences of Offenders Sentenced Under Immigration Guidelines by Departure Status," http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2002/Table50.pdf (accessed April 25, 2013).

[51] Ibid.

[52] US Sentencing Commission, "Report on the Continuing Impact of *US v. Booker* on Federal Sentencing," Part C: Immigration Offenses, 2012, http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Booker_Reports/2012_Booker /Part_C8_Immigration_Offenses.pdf (accessed April 25, 2013), p. 118.



FIGURE 6: MEDIAN SENTENCE OF ILLEGAL ENTRY OFFENDERS FROM 2002 TO 2012

Source: US Sentencing Commission Sourcebooks. ‹ http://www.ussc.gov/Data_and_Statistics/Archives.cfm ›
Accessed 4/14/2013. For 2004 and 2005, the USSC provides data in pre- & post- Blakely and Booker formats.
The median sentences for these two years are a weighted median.

To some extent, these national trends may mask even more pronounced regional trends. According to a Justice Department report, in 2010, a high percentage of immigration defendants (including but not limited to those convicted of illegal entry offenses) had a prior violent or drug felony conviction in certain districts, such as the Central District of California (including Los Angeles), where 79 percent of immigration defendants had such prior records. In comparison, in New Mexico, the Western District of Texas, northern New York State, Michigan, and southern Florida, a relatively lower percentage (from 1 to 33 percent) of defendants had a prior violent or drug felony conviction.[53]

---

[53] Motivans, "Immigration Offenders in the Federal Justice System, 2010," July 2012, p. 28.

AR.09137

## Critical Views of Judges and Attorneys

Our research and interviews with judges and attorneys provide additional evidence of an increased focus on prosecuting unauthorized immigrants with minor criminal histories. Magistrate Judge Philip Mesa in El Paso, Texas, who has spent 18 years presiding over illegal entry and reentry cases, told Human Rights Watch, "The people who before would have been prosecuted as misdemeanors are now being charged as felonies. Any who [would have gotten] voluntary return are now being prosecuted for misdemeanors."[54] Judge Robert Brack in Las Cruces, New Mexico, who estimated he has sentenced defendants for felony reentry in over 11,000 cases, said in the majority of the cases he sees, "They have absolutely no criminal history."[55] Judge Sam Sparks in Austin, Texas, issued a court order in 2010 demanding that the US Attorney's Office provide "substantive reason(s)" why each of three illegal reentry defendants "without any significant criminal record" should be prosecuted, given the "mind boggling" costs.[56]

Defense attorneys reported a similar pattern. Milagros Cisneros, an assistant federal defender in Phoenix, said that when she began 11 years ago, the majority of her clients were charged with illegal reentry after a prior aggravated felony conviction. Now she sees mainly people with lesser felony convictions or no felony convictions at all.[57] In El Paso, Texas, assistant federal defender Edgar Holguin similarly observed that 10 years ago, he only saw prosecutions of people with prior criminal convictions, but in the past 5 years, he increasingly sees people whose only prior convictions are for immigration offenses.[58] He said, "Clients used to ask, 'Why am I getting so much time?' Now they ask, 'Why am I getting time at all?'"[59]

---

[54] Human Rights Watch interview with Magistrate Judge Philip Mesa, El Paso, Texas, September 26, 2012.

[55] Human Rights Watch telephone interview with Judge Robert Brack in Las Cruces, New Mexico, April 25, 2013.

[56] *United States v. Juan Ordones-Soto*, 2009-CR-590; *United States v. Ignacio Ontiveros-Vasquez*, 2009-CR-592; *United States v. Angel Hernandez-Garcia*, 2009-CR-597, Order, February 5, 2010. Notably, since the appointment of Robert Pittman as US Attorney for the Western District of Texas, the number of illegal reentry prosecutions has dropped 46 percent from a year earlier. According to the *Austin-American Statesman*, "[Judge] Sparks said in recent months that he has sentenced mostly undocumented immigrants who have serious criminal histories—not ones he had seen in recent years who did little else wrong besides return to the United States to work." Steven Kreytak, "Prosecutions of immigrants in Austin down," *Austin American Statesman*, September 29, 2012, http://www.statesman.com/news/news/local/prosecutions-of-immigrants-in-austin-down/nSPjS/ (accessed April 12, 2013); and Steven Kreytak, "Federal judge questions immigration prosecutions," *Austin American Statesman*, February 6, 2010, http://www.statesman.com/news/news/local/federal-judge-questions-immigration-prosecutions-1/nRkNB/ (accessed April 29, 2013).

[57] Human Rights Watch interview with Milagros Cisneros, assistant federal defender, Phoenix, Arizona, April 2, 2013.

[58] Human Rights Watch interview with Edgar Holguin, assistant federal defender, El Paso, Texas, September 25, 2012.

[59] Ibid.

AR.09138

Maureen Franco in El Paso also noted, "[Defendants] are not caught ... [because they've] committed another crime. They're caught coming across the border."[60]

The shift is less pronounced in districts that focus primarily on illegal reentry prosecutions (as opposed to illegal entry misdemeanors) such as in the Central and Southern Districts of California, where defense attorneys observed their clients generally have prior felony convictions. But even in these districts, attorneys noted seeing a decrease in people with serious criminal records and an increase in people whose prior convictions are for minor nonviolent offenses, such as drug possession."[61]

Several attorneys also recounted cases in which the last offense had been committed 10 or more years ago, which raises serious doubts about whether these individuals are currently a threat to public safety. Angela Viramontes, an assistant federal defender in Riverside, California, observed of her illegal reentry clients, "I see a lot of people who have really transformed their lives.... A lot of these crimes they committed as young men."[62] Firdaus Dordi, an assistant federal defender in Los Angeles, California, described a case in which a client had committed two burglaries 16 and 13 years prior to his illegal reentry charge. "He had a drinking problem, he swore to his wife after the second conviction that he would clean up his act." He committed no new offenses and instead became a "business owner, homeowner, [he did] great things in his community," but he still received a two-year sentence for illegal reentry.[63] A judge in a 2011 illegal reentry case in New Mexico noted how the defendant's criminal convictions were close to 20 years old and that "[i]t appears [the defendant] has been a good neighbor and a good community member over the last 20 years."[64]

---

[60] Human Rights Watch interview with Maureen Franco, federal public defender, El Paso, Texas, September 25, 2012.

[61] Human Rights Watch telephone interview with Victor Torres, criminal defense attorney in San Diego, California, June 29, 2012; and interview with Shaffy Moeel and Bridget Kennedy, assistant federal defenders, San Diego, California, September 5, 2012. Candis Mitchell noted that many of her clients have no prior criminal convictions but are prosecuted for presenting false documents. Human Rights Watch interview with Candis Mitchell, assistant federal defender, San Diego, California, July 22, 2012.

[62] Human Rights Watch interview with Angela Viramontes, assistant federal defender, Los Angeles, California, October 29, 2012.

[63] Human Rights Watch interviews with Firdaus Dordi, assistant federal defender, Los Angeles, California, August 30, 2012 and January 24, 2013. The two-year sentence his client received was already below the sentence he would have received under the US sentencing guidelines.

[64] *United States v. Agustin DeHoyos-Banderas*, 2011 US Dist. LEXIS 37812, No. CR 10-2674 JB (D. N.M. 2011).

AR.09139

According to court records and their own accounts, many defendants interviewed by Human Rights Watch similarly had no prior criminal convictions.[65] Several had prior convictions only for illegal entry or reentry.[66] While a significant number had prior felony convictions, and two had prior convictions for "alien smuggling,"[67] most involved nonviolent drug offenses. In a couple of cases, defendants had prior convictions for violent offenses that were over 15 years old.[68]

## Rapid-Fire Group Trials: Operation Streamline

One of the most significant reasons for the increase in prosecutions of unauthorized immigrants with no or minor criminal histories is Operation Streamline. Through the cooperation of CBP, the federal courts, the US Attorney's Office, the US Marshals Service, ICE, and the Executive Office of Immigration Review, special proceedings have been created that quickly process people charged with illegal entry or reentry.[69] Operation Streamline's name and exact prosecution policy varies from district to district, but all Streamline proceedings are fast and have predictable outcomes: a guilty plea from virtually every defendant for misdemeanor illegal entry.[70] One magistrate judge, who estimates he has presided over 17,000 cases, described his role as "a factory putting out a mold."[71]

---

[65] The pre-sentence report is the court document that is most likely to include a complete record of a defendant's criminal history, but these reports are confidential, and in many cases, the sentencing memoranda filed by the prosecutor and the defense attorney that reference the pre-sentence report are filed "under seal" and are not publicly available. Human Rights Watch was able to corroborate defendants' accounts of their criminal convictions in many cases, however, such as where the sentencing memoranda were not under seal or where there was a published decision either by the sentencing judge in district court or the appellate court.

[66] Human Rights Watch interviews with Jorge G. (pseudonym), Marfa, Texas, September 21, 2012; Alberto M. (pseudonym), Marfa, Texas, September 21, 2012; Victor S. (pseudonym), Marfa, Texas, September 21, 2012; Sonia H. (pseudonym), Marfa, Texas, September 21, 2012; and Brenda R. (pseudonym), Pecos, Texas, September 24, 2012; Human Rights Watch telephone interview with Norma Pulcher, daughter of Rosa Emma Manriquez, October 24, 2012.

[67] Human Rights Watch interview with Jerry Lopez, Rosarito, Mexico, October 19, 2012; *US v. Cuellar-Valerio*, 2010 US Dist. LEXIS 98628 (N.M. 2010).

[68] Human Rights Watch interviews with Elmer Cardenas Gonzalez, Rosarito, Mexico, October 18, 2012; Heather Gonzales, wife of Elmer Cardenas Gonzales, Ontario, California, March 24, 2013; Milton Cruz, Los Angeles, California, October 29, 2012; and Micaela Remijio, fiancée of Milton Cruz, Riverside, California, February 28, 2013.

[69] Testimony of Michael J. Fisher, chief, US Border Patrol, US Customs and Border Protection (CBP), before the US House of Representatives, Committee on Homeland Security, Subcommittee on Border and Maritime Security, October 4, 2011, http://www.dhs.gov/news/2011/10/04/written-testimony-cbp-house-homeland-security-subcommittee-border-and-maritime (accessed April 14, 2013).

[70] Human Rights Watch interviews with criminal defense attorneys and judges, in Texas, September 18, 20, 21, 25, and 26, 2012; and in Arizona, February 11 and 12, 2013; and Human Rights Watch court observations of Streamline proceedings in Brownsville, Texas, September 18, 2012; Del Rio, Texas, September 20, 2012; and Tucson, Arizona, February 11, 2013 and April 3, 2013. Data from the Administrative Office of US Courts includes only prosecutions of illegal entry and reentry in federal district court, not magistrate court (as in Streamline), but those statistics reveal a high percentage of defendants

AR.09140

Although Streamline proceedings result in convictions for misdemeanor illegal entry, they also play a significant role in the increasing felony prosecution of defendants with minor or no criminal history. Most defendants in Streamline do not have a prior criminal record.[72] But once an immigrant has pled guilty in a Streamline proceeding to illegal entry, he or she becomes a "criminal alien," increasing the likelihood of future prosecution for illegal reentry should he or she attempt to enter the United States again.[73] In Magistrate Judge Recio's opinion, the US government has created a "felony class" of non-citizens; he emphasized that "where there's no criminal history, no immigration history, the criminalization of these defendants is something that's very difficult [for me]."[74] Human Rights Watch documented eight cases in which individuals with no prior non-immigration criminal histories were charged with or convicted of felony illegal reentry after a prior conviction for misdemeanor illegal entry.[75]

Such cases are particularly troubling given that the "streamlined" process resulting in those first illegal entry convictions involves many shortcuts to the usual due process requirements. After CBP apprehends and refers a migrant to federal prosecution, he or she appears in federal court anywhere from one day to two weeks later. A single proceeding may include two dozen defendants or more than 100, depending on the district.[76] For all of

---

pleading guilty as well. In 2012, 826 of 876 defendants charged with illegal entry (94 percent) and 23,423 of 24,089 defendants charged with illegal reentry (97 percent) in district court pleaded guilty. Administrative Office of US Courts, Federal Judicial Caseload Statistics 2012, "Table D-4: Defendants Disposed of, by Type of Disposition and Offense," http://www.uscourts.gov/Viewer.aspx?doc=/uscourts/Statistics/FederalJudicialCaseloadStatistics/2012/tables/D04Mar12.pdf (accessed April 25, 2013).

[71] Human Rights Watch interview with Magistrate Judge Felix Recio, Brownsville, Texas, September 18, 2012.

[72] Human Rights Watch interviews with criminal defense attorneys and judges, in Texas, September 18, 20, 21, 25, and 26, 2012; and in Arizona, February 11 and 12, 2013.

[73] Since early 2013, the Streamline proceedings in Tucson, Arizona no longer include straight misdemeanor prosecutions, but only "flip-flop" prosecutions for both illegal entry and illegal reentry, as the proceedings only include defendants who previously have been formally removed from the United States. Although they all are offered (and accept) plea agreements to plead guilty to misdemeanor illegal entry and to have the felony reentry charge dismissed, the prevalence of "flip-flop" prosecutions increases the number of prosecutions for illegal reentry of defendants with no or minor criminal records. Human Rights Watch interviews with Magistrate Judge Bernardo Velasco, Tucson, Arizona, April 3, 2013; and with assistant federal defenders and criminal defense attorneys, Tucson, Arizona, February 11 and 12, 2013.

[74] Human Rights Watch interview with Magistrate Judge Felix Recio, September 18, 2012.

[75] Not all of the misdemeanor convictions occurred in Streamline proceedings, but these cases illustrate how increased prosecutions of misdemeanor cases are fueling increased felony prosecutions.

[76] Human Rights Watch court observations of Streamline proceedings in Brownsville, Texas, September 18, 2012; Del Rio, Texas, September 20, 2012; and Tucson, Arizona, February 11, 2013 and April 3, 2013; Human Rights Watch telephone interview with Brenda Sandoval, assistant federal defender in Yuma, Arizona, February 7, 2013.

AR.09141

these defendants, the stages of a federal criminal court case that normally could take months or even years are truncated into a single day.

All defendants are appointed a defense lawyer, but the amount of time they spend with their attorney before they plead guilty may be as little as 5 to 10 minutes.[77] Each lawyer, depending on the district, may be assigned 6 clients, several dozen, or over 100 per Streamline proceeding. Brenda Sandoval, an assistant federal defender in Yuma, Arizona, reported that she was recently assigned 107 clients. With the assistance of a colleague who offered to cover 20 of the cases, she ended up representing 87.[78]

For the vast majority of defendants whom Border Patrol apprehends along the border, there are few defenses to the charge that they entered or reentered the country without US government consent. But the defenses that do exist—such as acquired or derivative citizenship[79] and a prior wrongful removal order—require considerable investigation. Firdaus Dordi, who has no Streamline clients as a federal public defender in Los Angeles, said he normally reserves at least two hours for his first meeting with his clients, and that sometimes just going through a client's immigration file (the "A" file) and initial research can take three to four hours. If he does find a defense, investigation can sometimes take months.[80] At a minimum, a criminal defense attorney would have to ask questions about where a client's parents and grandparents were born, to determine whether there may be a claim to citizenship. But several migrants who had recently been deported after serving a Streamline sentence reported to Human Rights Watch that their attorneys asked no questions about their families.[81] A recent study by the University of Arizona Center for Latin American Studies found that only 40 percent of defendants said their lawyers had mentioned basic legal rights, and only 1 percent said their lawyers had inquired into family

---

[77] Human Rights Watch interviews with recently deported migrants, Nogales, Mexico, April 4 and 5, 2013; and with Ricardo Calderon, criminal defense attorney, Del Rio, Texas, September 20, 2012.

[78] Human Rights Watch telephone interview with Brenda Sandoval, February 7, 2013.

[79] Persons who are born outside the United States can gain citizenship through their parents in certain circumstances. To determine whether an individual is a US citizen, several facts and issues must be investigated and proven, including, but not limited to, the laws in effect at the time of the individual's birth, the citizenship of the individual's parents or grandparents, the amount of time the individual's US citizen parent spent in the United States, and whether or not the individual's parents were married. US Citizenship and Immigration Services, "Citizenship Through Parents," last updated January 22, 2013, http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextchannel=32dffe9dd4aa3 210VgnVCM100000b92ca60aRCRD&vgnextoid=32dffe9dd4aa3210VgnVCM100000b92ca60aRCRD (accessed April 25, 2013).

[80] Human Rights Watch interviews with Firdaus Dordi, August 30, 2012 and January 24, 2013.

[81] Human Rights Watch interviews with recently deported migrants, Nogales, Mexico, April 4 and 5, 2013.

AR.09142

connections.[82] In the opinion of Magistrate Judge Bernardo Velasco, the defense attorneys function merely as "ushers on the conveyer belt to prison."[83]

The prosecutors in Streamline proceedings are generally not prosecutors from the US Attorney's Office, but ICE or CBP attorneys who have been deputized as "special assistant US attorneys."[84]

Magistrate judges have their own obligations under the US Constitution to ensure each defendant understands the charges before him or her and the consequences of a guilty plea. In the past, magistrate judges might have addressed 70 defendants in unison and received guilty pleas uttered in unison, but in 2009, the Ninth Circuit US Court of Appeals ruled in *United States v. Roblero-Solis* that *en masse* plea hearings violate federal law.[85]

Human Rights Watch observed that magistrate judges find different ways to get through so many cases while avoiding such *en masse* plea hearings. For example, in two hearings we observed in Tucson, Arizona, Magistrate Judge Leslie Bowen began by addressing all 60 to 70 defendants together, then called up five defendants at a time, providing some information to them as a group, and finally questioned defendants individually about their pleas.[86] But no matter what measures a judge takes, the outcome is almost always a foregone conclusion. Once the defendant pleads guilty, the magistrate judge sentences each defendant to time-served (usually a couple of days) or up to six months,[87] which the defendant serves in the custody of US Marshals or the Bureau of Prisons before being deported.

Although Streamline proceedings are fast, they require significant resources. In addition to the resources required for defense attorneys, prosecutors, judges, court interpreters, and

---

[82] The Center for Latin American Studies, University of Arizona, "In the Shadow of the Wall: Family Separation, Immigration Enforcement and Security: Preliminary Data from the Migrant Border Crossing Study," March 2013, http://las.arizona.edu/sites/las.arizona.edu/files/UA_Immigration_Report2013web.pdf (accessed April 12, 2013), p. 29.

[83] Human Rights Watch interview with Magistrate Judge Bernardo Velasco, February 3, 2013.

[84] Joanna Lydgate, "Assembly-Line Justice: A Review of Operation Streamline," The Chief Justice Earl Warren Institute on Race, Ethnicity, and Diversity, University of California, Berkeley Law School, January 2010, http://www.law.berkeley.edu/files/Operation_Streamline_Policy_Brief.pdf (accessed April 25, 2013).

[85] *United States v. Roblero-Solis*, 588 F. 3d 962 (9th Cir. 2009).

[86] Human Rights Watch court observations, Tucson, Arizona, February 11, 2013 and April 3, 2013.

[87] Ibid; Human Rights Watch interviews with assistant federal defenders and criminal defense attorneys, Tucson, Arizona, February 11 and 12, 2013.

AR.09143

other court staff, Streamline proceedings require the participation of the US Marshals, pretrial service personnel, and additional Border Patrol agents in the courtroom.

## Secure Communities and State Immigrant Laws

As with Operation Streamline, federal immigration enforcement programs run by ICE likely play a major role in the spike in federal prosecutions of illegal entry and reentry. From 2006 to 2010, ICE referrals for prosecutions of illegal reentry more than doubled.[88] By 2012, 25 percent of prosecuted cases were from ICE referrals.[89] Under programs like Secure Communities, an unauthorized immigrant who comes into contact with local or state police can end up detained for ICE, and ultimately referred by ICE for criminal prosecution.[90] We examined a number of such cases. In some instances, the individuals had been arrested or convicted of new offenses (usually involving drugs). But in many other cases, defendants came to the attention of local law enforcement for things as minor as a traffic stop.[91]

In Arizona, some defense attorneys told us that some of their clients had ended up being referred for federal prosecution after they were asked about their immigration status by local police, as police are authorized to do under SB 1070, Arizona's new immigrant law enacted in April 2010.[92] Daniel Anderson, a criminal defense attorney in Tucson, told us that in one case, a police officer had seen his client, who had been in Arizona for several years, at a bus stop and asked to see her papers; that encounter led to her prosecution in Operation Streamline.[93] And an unauthorized immigrant who had lived in Arizona for 17 years similarly told us he was prosecuted for illegal reentry after a traffic stop.[94]

---

[88] Syracuse University, Transactional Records Access Clearinghouse (TRAC), "Criminal Immigration Prosecutions Are Down, But Trends Differ by Offense," March 17, 2010, http://trac.syr.edu/immigration/reports/227/ (accessed April 14, 2013).

[89] TRAC, "Going Deeper" tool, Prosecutions filed by agency, 2012, http://tracfed.syr.edu/index/index.php?layer=cri (accessed May 10, 2013).

[90] Secure Communities allows local and state police to check fingerprints of people they arrest against federal immigration databases. US Immigration and Customs Enforcement (ICE), "Secure Communities," http://www.ice.gov/secure_communities/ (accessed May 9, 2013).

[91] Human Rights Watch interviews with Yafit Muchtar, Los Angeles, California, October 12, 2012; Adriana Quesado, El Paso, Texas, September 27, 2012; Carlos Santana, Tijuana, Mexico, October 23, 2012; Mark O'Brien, San Diego, California, October 22, 2012; Antonio Camacho, Rosarito, Mexico, October 18, 2012; Susan Anderson, assistant federal defender, Phoenix, Arizona, February 15, 2013; and Peter Kirchheimer, attorney-in-charge of the Eastern District Office, Federal Defenders of New York, Brooklyn, New York, July 11, 2012.

[92] The provision empowering police to inquire into immigration status was enjoined until the Supreme Court's decision to uphold that particular provision in *Arizona v. United States*, 567 US __ (2012).

[93] Human Rights Watch interview with Daniel Anderson, Tucson, Arizona, February 11, 2013.

[94] Human Rights Watch interview with Alberto Brockman Rodriguez, Tucson, Arizona, April 3, 2013.

AR.09144

Prosecutors in Maricopa County, Arizona, have been using the new state law to bring felony charges against non-citizens found with false work authorization documents.[95] Two assistant federal defenders in Arizona told us they had clients with no prior criminal record who were convicted under Arizona law on false document charges and then faced higher maximum sentences during the ensuing federal illegal reentry prosecution because of the state felony conviction.[96] We interviewed one person who had served a two-year state prison sentence for such a conviction, and was soon after sentenced to a six-month federal prison sentence for illegal reentry.[97] If he had not been convicted of a felony, he would have been eligible for deferred action under the Obama administration's new policy for immigrants who were brought without authorization as children.[98]

In other cases, defendants had not had any contact with law enforcement after reentering the United States, but ICE agents arrested them in their homes or at work.[99]

To support its claim that it gives priority to the removal of those who are a threat to public safety, the Obama administration has touted statistics indicating it has removed a record number of non-citizens with criminal convictions. But in 20 percent of the cases in 2011, the criminal convictions were for immigration offenses, such as illegal entry or reentry, and did not suggest the individuals posed a threat.[100] And, as noted above, our research indicates that even among those with criminal convictions for non-immigration offenses, many have convictions for offenses committed decades ago, raising additional doubts about the dangerousness of the individuals prosecuted for illegal entry offenses.

---

[95] Jim Walsh, "Latinos assail Maricopa County Attorney Montgomery over ID-theft charges," *The Republic*, February 15, 2013, http://www.azcentral.com/news/articles/20130215latinos-assail-maricopa-county-attorney-montgomery.html?nclick_check=1 (accessed April 14, 2013).

[96] Human Rights Watch interview with Susan Anderson and Milagros Cisneros, February 15, 2013.

[97] Human Rights Watch videoconference interview with Mario S. (pseudonym) in Phoenix, Arizona, April 3, 2013.

[98] Ibid. See US Citizenship and Immigration Services, "Consideration of Deferred Action for Childhood Arrivals," updated January 18, 2013, http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=f2ef2f19470f7310Vgn VCM100000082ca60aRCRD&vgnextchannel=f2ef2f19470f7310VgnVCM100000082ca60aRCRD (accessed April 14, 2013).

[99] Human Rights Watch interviews with Elmer Cardenas Gonzalez, October 18, 2012; Heather Gonzales, wife of Elmer Gonzales, March 24, 2013; Milton Cruz, October 29, 2012; Micaela Remijio, fiancée of Milton Cruz, February 28, 2013; and Firdaus Dordi, August 30, 2012 and January 24, 2013.

[100] US Department of Homeland Security, "Immigration Enforcement Actions: 2011," Annual Report, September 2012, http://www.dhs.gov/sites/default/files/publications/immigration-statistics/enforcement_ar_2011.pdf (accessed April 25, 2013).

AR.09145

## Diverting Resources from Serious Crimes

A number of law enforcement officials have noted that the increasing criminal prosecution of unauthorized immigrants with no or minor prior criminal histories has diverted resources from more pressing law enforcement and border security concerns.

Terry Goddard, who was attorney general of Arizona from 2003 to 2011, has been outspoken in his criticism of the federal government's border enforcement policies. "I never could understand why so much was being put into these particular individuals, who were not our high-level criminals…. [I]t's a use of resources disproportionate to the threat," he told Human Rights Watch. He also asserted,

> Certainly apprehending and deterring illegal entry is part of border security, but it's not the whole enchilada. Border security involves criminal conspiracy, significant criminal conspiracy…. I see a failure of law enforcement, a failure of basic intelligence, to analyze the operations of the cartels to identify their leaders and disrupt their operations…. Some of the resources that went into deportation and Operation Streamline could have been used very effectively for international cooperation and the detection, the analysis, prosecution, and incarceration of some of [their leaders].[101]

Goddard said that if the US government were serious about going after illegal entry by migrants, they would target resources on smugglers and not the individuals who are smuggled. According to a Justice Department report, in 2010, "alien smuggling" represented only 4.7 percent of all immigration matters concluded, while unlawful entry or reentry constituted 93 percent.[102]

In 2012, Arizona US Marshal David Gonzales said that 80 percent of the individuals detained under his jurisdiction were arrested on an immigration charge, and he echoed the

---

[101] Human Rights Watch interview with Terry Goddard, former Arizona attorney general, Phoenix, Arizona, April 1, 2013.

[102] Motivans, "Immigration Offenders in the Federal Justice System, 2010," July 2012. Notably, almost half of all defendants charged with "alien smuggling" are US citizens, while over 99 percent of defendants charged of illegal entry or reentry are non-citizens (0.3 percent of defendants were found to be US citizens).

concern that resources were being drained from more important security concerns, such as activity by Mexican organized crime.[103]

Carol Lam, former US Attorney for the Southern District of California, was fired in 2007; US Department of Justice officials stated she did not prosecute enough immigration cases. She explained her decision not to prosecute cases that "simply drove the statistics":

> If two-thirds of a U.S. attorney's office is handling low-level narcotics and immigration crimes, young prosecutors may not have the opportunity to learn how to do a wiretap case, or learn how to deal with the grand jury, or how to use money laundering statutes or flip witnesses or deal with informants and undercover investigations.… That's not good law enforcement.[104]

---

[103] Lillian Reid, "US Marshal sees threat in Mexican mafia, not illegal immigration," *Verde Independent*, October 10, 2012, http://verdenews.com/main.asp?SectionID=1&SubSectionID=1189&ArticleID=50575 (accessed April 14, 2013).

[104] Solomon Moore, "Push on Immigration Crimes Is Said to Shift Focus," *New York Times*, January 11, 2009, http://www.nytimes.com/2009/01/12/us/12prosecute.html?pagewanted=all&_r=0 (accessed April 12, 2013).

AR.09147

# III. Criminal Prosecutions Impinge on the Rights to Family Unity and to Seek Asylum

My heart is there. My body is here.

—Juan S. (pseudonym), Tijuana, Mexico, October 22, 2012

For 10 years now, I've been presiding over a process that destroys families every day and several times each day.

—Judge Robert Brack, Las Cruces, New Mexico, April 25, 2013

Nearly every person charged with illegal entry or reentry who spoke to Human Rights Watch said they came to the United States for one of three reasons: 1) to seek work; 2) to reunite with family, often after many years of residence in the United States; or 3) to flee violence or sometimes persecution abroad. For purposes of prosecution under the US statutes prohibiting illegal entry and reentry, the motives with which people seek to enter the US are irrelevant. But their motives for entry highlight why criminal prosecutions may be misguided and, in some cases, impinge on fundamental human rights.

International human rights law acknowledges that every country has a clear interest in regulating the entry and stay of migrants in its territory, and it does not explicitly prohibit the use of criminal sanctions against unauthorized immigrants. However, United Nations human rights experts have emphasized the importance of using civil rather than criminal law to accomplish this task. The UN special rapporteur on the human rights of migrants has noted, "[Irregular entry or stay] are not per se crimes against persons, property, or national security."[105] Moreover, "[ir]regular entry or stay should never be considered criminal offences."[106] Likewise, the UN Working Group on Arbitrary Detention has determined that "criminalizing illegal entry into a country

---

[105] UN Human Rights Council, Report of the Special Rapporteur on the human rights of migrants, Francois Crepeau, UN Doc. A/HRC/20/24, April 2, 2012, http://www.ohchr.org/Documents/HRBodies/HRCouncil/RegularSession/Session20/A-HRC-20-24_en.pdf (accessed May 10, 2013), para. 13.

[106] Ibid.

AR.09148

exceeds the legitimate interest of States to control and regulate irregular immigration and leads to unnecessary detention."[107]

The criminal prosecution of unauthorized migrants raises particular concerns where the migrants in question have been separated from their children or other close family members by deportation, and when they may be eligible for asylum under international refugee law. In each case, when there is no genuine threat to public safety, the United States has chosen to criminally prosecute conduct that undermines rights that the government appropriately has an interest in protecting and promoting, namely the rights to family unity and to seek asylum from persecution.

Though this chapter focuses on these two categories, we note there are also serious questions about whether criminal sanction and incarceration are appropriate punishments for migrants seeking work. In several cases Human Rights Watch documented or observed, defendants spoke about dire economic needs, often for medical or education expenses. One man we met in a Texas jail, who was facing a likely sentence of 8 to 14 months in federal prison for illegal reentry after prior illegal entry and reentry convictions, asked his attorney, "Can we ask the judge for less time because my children have nothing to eat?"[108]

## Family Unity

The stereotypical migrant who enters the US illegally is a young, single man seeking work. But increasingly, such migrants are older and have previously lived in the United States, sometimes for many years. Many are trying to rejoin their families, including US citizens and permanent residents.[109]

Staff at a women's migrant shelter in Tijuana reported that the large majority of migrants they see are no longer people who are trying to cross for the first time, but people who were

---

[107] UN Human Rights Council, Report of the Working Group on Arbitrary Detention, UN Doc. A/HRC/7/4/, January 10, 2008, http://daccess-dds-ny.un.org/doc/UNDOC/GEN/G08/100/91/PDF/G0810091.pdf?OpenElement (accessed May 10, 2013), para. 53.

[108] Human Rights Watch interview with Jorge G. (pseudonym), Marfa, Texas, September 21, 2012; Human Rights Watch court observation, El Paso, Texas, September 26, 2012.

[109] Damien Cave, "Crossing Over, and Over," *New York Times*, October 2, 2011, http://www.nytimes.com/2011/10/03/world/americas/mexican-immigrants-repeatedly-brave-risks-to-resume-lives-in-united-states.html?pagewanted=all (accessed March 27, 2013).

AR.09149

recently deported,[110] a trend also noted by staff at a humanitarian organization that aids migrants in Nogales.[111] A recent study of 1,000 Mexican deportees found that one-fourth said they had US-born children and 28 percent considered the United States home.[112]

Human Rights Watch has requested but not yet received information from ICE and CBP on ties to families in the United States among the unauthorized immigrants they have referred for criminal prosecution, but recently released data indicates that in the past two years, over 205,000 parents of US citizens were deported.[113] That number does not include the many deportees with US citizen or permanent resident spouses, parents, or siblings.

Article 17 of the International Covenant on Civil and Political Rights (ICCPR), to which the United States is a party, states that no one shall be "subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence."[114] Article 23 provides that "[t]he family is the natural and fundamental group unit of society and is entitled to protection by society and the state," and that all men and women have the right "to marry and to found a family."[115] The UN Human Rights Committee, the international expert body that monitors compliance with the ICCPR, has stated that despite a state's power to regulate entry or residence, non-citizens may still enjoy the protection of the Covenant, particularly when considerations of respect for family life arise."[116] The right to found a family, the Committee has noted elsewhere, includes the right "to live together."[117] Even

---

[110] Human Rights Watch interview with Mary Galvan, Instituto Madre Assunta para Mujeres Migrantes, Tijuana, Mexico, October 16, 2012.

[111] Human Rights Watch interviews with Sister Alma Delia Isais Aguilar, Nogales, Mexico, April 4, 2013; and with Sister Maria Engracia Robles, Kino Border Initiative, Nogales, Mexico, April 5, 2013.

[112] Center for Latin American Studies, University of Arizona, "In the Shadow of the Wall: Family Separation, Immigration Enforcement and Security, Preliminary Data from the Migrant Border Crossing Study," March 2013, http://las.arizona.edu/sites/las.arizona.edu/files/UA_Immigration_Report2013web.pdf (accessed April 14, 2013). See also Michael Danielson, "Documented Failures: The Consequences of Immigration Policy on the US-Mexico Border," Kino Border Initiative, Jesuit Refugee Service/USA, Jesuit Conference of the United States, February 2013, http://www.jesuit.org/jesuits/wp-content/uploads/Kino_FULL-REPORT_web.pdf (accessed May 2, 2013) (finding almost one in three parents deported between January and March 2012 had at least one child living in the United States).

[113] Seth Freed Wessler, "Nearly 205K Deportations of Parents of US Citizens in Just Over Two Years," *Colorlines*, December 17, 2012, http://colorlines.com/archives/2012/12/us_deports_more_than_200k_parents.html (accessed January 22, 2013).

[114] International Covenant on Civil and Political Rights (ICCPR), G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force March 23, 1976, ratified by the United States on June 8, 1992, art. 17.

[115] Ibid., art. 23.

[116] UN Human Rights Committee, General Comment No. 15, "The position of aliens under the covenant" (Twenty-seventh Session, 1986), UN Doc. HRI/GEN/1/Rev.1 at 18 (1994), para. 5.

[117] UN Human Rights Committee, General Comment No. 19 (The Family), Protection of the Family, the Right to Marriage and Equality of the Spouses (Thirty-ninth session, 1990), UN Doc HRI/GEN/1/Rev.6 at 149 (2003), para. 5.

where the government has a strong interest in deporting an individual because of the non-citizen's prior criminal convictions, the right to family unity should be weighed against the seriousness of the offenses.

Yet family ties are given little weight in US immigration law in determining whether a person should be deported, and even where they may be a factor, most non-citizens have little opportunity to provide evidence of such ties.[118] Once a non-citizen is ordered removed by an immigration judge, he or she is barred from the United States for at least 10 years—or, if deported for certain criminal convictions, for life. These life-changing decisions are made in immigration court hearings that may raise serious due process problems (including no right to appointed counsel), as previously documented by Human Rights Watch,[119] or outside of proceedings altogether, through "stipulated removal," which non-citizens have subsequently reported they were pressured or misled to accept, even when they might have been eligible to apply for permission to stay.[120] Susan Anderson, an assistant federal defender, reported that three-quarters of her clients charged with illegal reentry had been removed without ever seeing an immigration judge.[121]

Immigration law is also particularly harsh on those who have long lived in the US without status, leave the US temporarily (often to visit a sick or dying relative), and then try to enter

---

[118] Under Immigration and Nationality Act Section 240A, a form of relief called "cancellation of removal" is available for unauthorized immigrants who have resided continuously in the United States for 10 years and can demonstrate that a US citizen or permanent resident parent, spouse, or child would suffer exceptional and unusual hardship, a standard that requires hardship beyond the usual hardship suffered because of deportation. This form of relief is available only for 4,000 individuals per year. A similar form of relief is available for permanent residents, with no cap. But the standard of "exceptional and unusual hardship" is hard to meet, and people with certain criminal convictions are barred from these waivers. About 8,000 unauthorized immigrants and permanent residents were granted cancellation of removal in fiscal year 2011, representing about 2 percent of all persons removed in that year. US Department of Justice, Executive Office of Immigration Review, Office of Planning, Analysis, & Technology , FY 2011 Statistical Year Book, February 2012, http://www.justice.gov/eoir/statspub/fy11syb.pdf (accessed April 29, 2013).

[119] Human Rights Watch and American Civil Liberties Union, *Deportation by Default: Mental Disability, Unfair Hearings, and Indefinite Detention in the US Immigration System*, July 25, 2010, http://www.hrw.org/reports/2010/07/26/deportation-default-0; Human Rights Watch, *Locked Up Far Away: The Transfer of Immigrants to Remote Detention Centers in the United States*, December 2, 2009, http://www.hrw.org/reports/2009/12/02/locked-far-away-0; Human Rights Watch, *Forced Apart: Families Separated and Immigrants Harmed by United States Deportation Policy*, July 16, 2007, http://www.hrw.org/reports/2007/07/16/forced-apart-0.

[120] Human Rights Watch interview with Natalia D. (pseudonym), San Juan, Texas, September 16, 2012. See also Jennifer Lee Koh et al., "Deportation Without Due Process," a joint publication of Western State University College of Law, Stanford Law School, and the National Immigration Law Center, 2011, http://www.stanford.edu/group/irc/Deportation_Without_Due_Process_2011.pdf (accessed April 14, 2013).

[121] Human Rights Watch interview with Susan Anderson and Milagros Cisneros, assistant federal defenders, Phoenix, Arizona, February 15, 2013.

AR.09151

again illegally; such individuals' prior unlawful stay bars them from the US regardless of family ties.[122] For the vast majority of these people, there is no legal way to return and if apprehended, they are often put in expedited removal proceedings that ignore the fact that they have been long-term residents, making them ineligible for certain kinds of relief from deportation.

Not surprisingly, non-citizens who are barred from returning and separated from their families are highly motivated to reenter the United States illegally. When they do return, many end up prosecuted for illegal entry or reentry. Those most desperate to be with their families return again and again, undeterred even by repeat prosecutions and long prison sentences. The University of Arizona study of 1,000 Mexican deportees referred to above found that more than half said they were going to try to cross again; 70 percent who considered the US home indicated they would keep trying to enter.[123] In several cases we documented, defendants who had served federal sentences for illegal reentry stated they did not plan to try again, because they feared getting more time if they returned. But others remain undeterred and end up serving back-to-back criminal sentences. Said one criminal defense attorney, "There's a class of people doing life sentences on the installment plan."[124] Alicia Estrada, whose brother is mentally disabled and has repeatedly reentered illegally, recognized the pull his family had on him: "If we stay here, we're going to see my brother live his life in jail."[125]

In criminally prosecuting non-citizens who have been separated from their families for illegal entry and reentry, the US government is giving insufficient attention to the right to family unity, a fundamental human right. The laws creating criminal penalties for illegal entry and reentry provide no exceptions for individuals whose motive is to rejoin their children or other close family members, and the agencies whose decisions lead to prosecutions also do not to take these ties into account. As Candis Mitchell, an assistant federal defender, noted, "The guy who is coming in to reunite with family is treated as just as culpable as someone who is paid to bring drugs into the US."[126] The failure to protect family unity begins with US immigration law, and that law needs to be reformed. But the use of federal criminal law against those seeking reunification with their families also undermines this fundamental human right.

---

[122] 8 US Code Section 1182(a)(9)(C)(I)(i) (2012).

[123] Center for Latin American Studies, "In the Shadow of the Wall," p. 15.

[124] Human Rights Watch telephone interview with Victor Torres, June 29, 2012.

[125] Human Rights Watch interview with Alicia Estrada, sister of Reynaldo Estrada-Baltazar, Azusa, California, October 24, 2012.

[126] Human Rights Watch interview with Candis Mitchell, assistant federal defender, San Diego, California, July 20, 2012.

AR.09152

**"They didn't take a minute to look at her situation ... [to ask] why are we separating her from her family"**



Rosa Emma Manriquez with her US-born grandson. © Private

In March 2012, Rosa Emma Manriquez, a 62-year-old grandmother, was sentenced to four months in federal prison for illegal entry. She is now living in Ciudad Juarez, Mexico, several hundred miles and a world away from her six adult children and numerous grandchildren, who are all US citizens or permanent residents.

According to her daughter, Norma Pulcher, Manriquez was told from childhood that she had been born in Texas and was a US citizen. Although she had no birth certificate to prove it, she had lived without incident in the US for over 40 years, living a quiet life that revolved around cleaning houses, going to church, and being with her family. She had a Social Security number and a valid Texas drivers' license, which she had used for years to travel to Juarez to visit or shop.

In the fall of 2011, Manriquez went to Juarez for dental work. On her way back, she was stopped at the port of entry in El Paso, Texas. According to the complaint, she presented her driver's license and said she was a US citizen, as she always had. She was charged with illegal entry based on a false claim to US citizenship. Pulcher and her siblings hired a criminal defense lawyer, but she said, "[H]e did nothing for my mom. My mom said he never even talked to her, just once before the court, and he told her that if you want to be free, you just need to plead guilty. He never told her that pleading guilty meant she was going to be deported to Mexico." Manriquez was deported immediately afterward.

With no family in Juarez, Manriquez tried to return two months later with false documents. This time, after pleading guilty again to illegal entry, she was sentenced to four months and transferred from the jail in Pecos to the Federal Detention Center in Houston. The entire process was horrifying to her family. Pulcher described how her eight-year-old son Christopher cried at the sentencing hearing when he saw his grandmother's hands shackled to her feet.

AR.09153

Being in jail in Pecos was hard on Manriquez, Pulcher told Human Rights Watch. She was taken to the emergency room at one point when she experienced shortness of breath, and was diagnosed with high blood pressure and anxiety disorder. But the federal detention facility in Houston was even worse. "She said it was very rough," Pulcher said. "Never, never in her life had she been in one of these places, the Christian lady in federal prison.... Every time I went to see her, all of us would cry. She would start crying so bad, she'd start shaking."

Manriquez now lives in Juarez alone. All the lawyers her family has consulted have said the same thing: because she pled guilty the first time, all doors were closed and she would never be able to come back to the United States.

When her mother was deported, Pulcher felt like "she had died," and she began to be treated for depression. She continues to worry about her mother's safety in Juarez and has considered moving to Mexico to be with her mother, but she cannot make that decision for her husband and her son.



Rosa Emma Manriquez at a family dinner with her US citizen daughter, Norma Pulcher. © Private

Pulcher lost her stepson last year; he died while serving in the US military in Afghanistan. Before he died, he had tried to help the woman he considered "granny" by contacting his congressional representative. Pulcher is angry that the US government has taken her mother away from her as well: "It doesn't matter how much pain and suffering children and grandchildren are going through, it didn't touch [the US officials'] hearts. They didn't take a minute to look at her situation ... [to ask] why are we separating her from her family?"[127]

---

[127] Human Rights Watch telephone interview with Norma Pulcher, October 24, 2012. A call to the prosecutor for comment on this case was not returned.

There is no data yet available on how many unauthorized immigrants referred for prosecution have US citizen or permanent resident children or other close relatives, but the defense attorneys, judges, and prosecutors we interviewed all said that many of them do have immediate family members who are US citizens or permanent residents. Estimates varied from district to district, but in Los Angeles and San Diego, where there are few prosecutions for illegal entry but many prosecutions for illegal reentry, several defense attorneys estimated that 80 to 90 percent of their clients charged with illegal reentry have US citizen family members.[128] When asked how often he sees illegal reentry defendants with US citizen family members, Judge Robert Brack in Las Cruces, New Mexico estimated he sees it in 30 to 40 percent of his cases, adding, "It's an everyday occurrence."[129]

Individuals charged with illegal entry are less likely to be returning to join US families, but even among these defendants, ties to US citizen or permanent resident family are not uncommon. When asked about clients' ties to US citizen families, Heather Williams, who represents six clients every day she is on duty for Operation Streamline in Tucson, said, "All six clients a day, they're coming here usually to reunite with family members or because their situation is so desperate."[130] In the course of this research, Human Rights Watch observed Streamline hearings in Tucson, Arizona and Brownsville and Del Rio, Texas, as well as numerous hearings outside the Streamline process; we observed many defendants tell the judge that they had previously resided in and have immediate family in the United States.[131]

A significant number of these defendants also appeared to have strong ties to the United States based on their having have been raised in the country. Human Rights Watch observed several defendants in hearings speak fluent English and participate without the help of an interpreter, which Magistrate Judge Philip Mesa noted is "not unusual." In his

---

[128] Human Rights Watch telephone interview with Victor Torres, June 29, 2012; Human Rights Watch interviews with Liliana Coronado, assistant federal defender, Los Angeles, California, August 30, 2012; with Firdaus Dordi, assistant federal defender, Los Angeles, California, August 30, 2012 and January 24, 2013; and with Brandon LeBlanc, assistant federal defender, San Diego, California, September 5, 2012.

[129] Human Rights Watch telephone interview with Judge Robert Brack in Las Cruces, New Mexico, April 25, 2013.

[130] Human Rights Watch interviews with Heather Williams, first assistant federal defender, by telephone, August 1, 2012, and in Tucson, Arizona, February 13, 2013.

[131] Human Rights Watch courtroom observations in Brownsville, Texas, September 18, 2012; Del Rio, Texas, September 20, 2012; and Tucson, Arizona, February 11, 2013.

experience, "One or two out of ten will be English-speaking. There are defendants who don't speak Spanish, who grew up in the US."[132]

Defendants who grew up in the US from a young age, whose entire families are in the US, and who have no ties to the countries of their birth are so common, the US Sentencing Commission in 2010 amended the sentencing guideline to recognize "cultural assimilation" as a valid reason for granting a lower-than-guideline sentence, to be considered in cases where, in part, "those cultural ties provided the primary motivation for the defendant's illegal reentry or continued presence in the United States."[133]

Nearly every defense attorney interviewed, however, stated they had rarely seen judges cite this provision in granting lower sentences. Because there are many defendants in this situation, reducing sentences every time someone has strong family ties arguably would defeat the purpose of the guideline, which aims to set the sentence for the majority of defendants. For example, in ruling on a case in which the defendant had grown up in El Paso since the age of 10 and had parents, siblings, and children in the US, the judge noted, "Unfortunately, the Court sees a number of illegal aliens who come into the United States around age 10, and the Court has trouble distinguishing [the defendant] from the many others before the Court."[134] Angela Viramontes, an assistant federal defender in Riverside, California, said she had heard a judge tell her colleague, "If I apply it in this case, I'd have to apply it to all cases."[135] Defense attorneys also noted that "cultural assimilation can be a double-edged sword,"[136] as judges sometimes see these very ties as evidence that the defendant is likely to come back and should be more harshly sentenced in order to provide a stronger deterrent.

Human Rights Watch acknowledges that many illegal reentry defendants with strong family ties have prior criminal convictions in the United States, and human rights law recognizes that the privilege of living in any country as a non-citizen may be conditional upon obeying

---

[132] Human Rights Watch interview with Magistrate Judge Philip Mesa, El Paso, Texas, September 26, 2012.

[133] US Sentencing Guideline 2L1.2, Unlawfully Entering or Remaining in the United States (2012).

[134] *United States v. Santibanez-Salais*, 2011 US Dist. LEXIS 21199 *12 (D. N.M. 2011).

[135] Human Rights Watch interview with Angela Viramontes, assistant federal defender, Los Angeles, California, October 29, 2012.

[136] Human Rights Watch telephone interview with Milagros Cisneros, assistant federal defender in Phoenix, Arizona, September 10, 2012; Human Rights Watch interviews with Susan Anderson, April 2, 2013; and with Davina Chen, assistant federal defender, Los Angeles, California, September 6, 2012.

that country's laws. But as we have previously documented, the US government regularly withdraws that privilege without adequately weighing family ties, evidence of rehabilitation, and other factors against the seriousness of the criminal offense.[137] In the vast majority of deportations for criminal convictions, the non-citizens are deported for nonviolent offenses.[138] No matter how many years have passed since the offense was committed and no matter how minor the offense was, it is almost impossible for non-citizens deported for criminal convictions to enter the United States, even for a visit, regardless of family ties.

For example, Heather Gonzales, a US citizen, reported that when her husband, Elmer Gonzales, applied for permission to reenter the United States, the interviewing officer initially was positive. "[He said], 'I'm going to get you back home, I think I can, your case is good, you're a good guy, I can tell, you haven't been convicted of anything for over a decade'—it had been 15 years," she told Human Rights Watch. "And then the supervisor comes back [and says,] 'You're never coming back.'"[139]

---

**"Whether they deport her or release her … we're still a family"**

Benny Lopez is a 38-year-old US citizen born in Kansas. He and his wife, Gabriela Cordova-Soto, have four US-born children. Until Christmas 2011, the family lived in a comfortable home in Wichita, Kansas, where Benny had a successful siding and remodeling business. In September 2012, when Human Rights Watch met him, he and his children were sharing a cramped apartment in a small Texas border town, waiting to find out if Gabriela will ever be allowed to return to the US.

Gabriela was nine months old when she was brought to the United States. She is now 35. She was a legal resident and grew up in Texas and Kansas, where she and Benny met. Benny said that in their twenties, he and Gabriela were hanging out with the wrong crowd and got into drugs. Gabriela was convicted of possession of methamphetamine in 2005. Benny was a US citizen and he went into drug treatment, but Gabriela, who was put on

---

[137] Human Rights Watch, *Forced Apart*, July 16, 2007.

[138] Ibid.

[139] Human Rights Watch interview with Heather Gonzales, Ontario, California, March 24, 2013.

AR.09157

probation and did not serve any time in prison, was deported. In November 2005, she lost her status as a legal resident and was told she was permanently barred, as an "aggravated felon," from returning to the US.

With only distant relatives in Mexico and no real experience living there, Gabriela soon returned to the United States to be with her family.[140] Benny said, "We just changed our whole lives." Benny started a successful business and began building a new home. Their twin daughters regularly made the honor roll; their oldest son was a star chess player. For five years, said Benny, "We were going to church every Sunday, on Wednesdays. We were just living life like we should be."

In 2010, immigration authorities came to their house and arrested Gabriela again. The fact that she had changed her life did not matter for immigration purposes, and she was deported again—even though in the meantime, the Supreme Court had ruled a drug possession conviction like Gabriela's did not constitute an "aggravated felony." Benny

tried to maintain two households, but it was too difficult, and he gave up his business and the house he had just finished building. He and the children moved to Piedras Negras, Mexico, just on the other side of the border, so the family could be together. But Benny and his children were unable to live a productive life in Mexico. They do not speak Spanish and Benny could



Benny Lopez (right) and his four US-born children, in their Texas apartment, near the Mexican border. Their mother, formerly a permanent resident of the US, was deported after a conviction for drug possession. Lopez uprooted his family from his native Kansas to be closer to his wife. ©2012 Grace Meng/Human Rights Watch.

---

[140] The exact manner of Gabriela Cordova-Soto's entry is part of ongoing litigation. The National Immigrant Justice Center is currently representing her in her effort to reopen her earlier deportation case.

not earn enough money to support the family. When Benny's truck was stolen, he suspected drug traffickers were responsible; the police would not investigate.

Benny and the children returned to the United States. When Gabriela tried to join them, she was caught and prosecuted for illegal reentry. She has been in federal jail since September 2012. "Whether they deport her or release her here legally, we're still a family," Benny said. "I can't just leave their mom. I know it's hard on the kids. What am I to do? I don't know what to do."[141]

The impact of family separation and prosecution falls not only on the defendants themselves, but also on their US family members. Firdaus Dordi, an assistant federal defender in Los Angeles, estimated that in 12 years of practice, among his clients alone, about 6,000 US citizen children have likely been directly affected by illegal reentry prosecutions of their parents.[142] For Heather Gonzales, whose husband and father of their two children was deported and then prosecuted for illegal reentry, when the US government "took away one illegal person, they ruined the lives of three US citizens."[143]

Several defendants told Human Rights Watch that they had come back because their deportation had been hard on their children, the impact varying from depression and decreased performance in school to abusive conditions that could have led them to end up in the custody of the state.

Artemio Lechuga-Lechuga, for example, whom we interviewed in the federal detention center in El Paso, Texas, told us he came back to the US because his 16-year-old daughter, a US citizen, is mentally disabled and recently had become pregnant.[144] His wife, a permanent resident, agreed that their daughter "started showing signs of depression more strongly … [and] things got worse" when her father was deported in 2010.[145] The rest of his family was suffering as well. He was concerned about his sons, including his 13-year-old

---

[141] Human Rights Watch interview with Benny Lopez, Eagle Pass, Texas, September 19, 2012.

[142] Human Rights Watch interview with Peter Kirchheimer, attorney-in-charge of the Eastern District Office, Federal Defenders of New York, Brooklyn, New York, July 11, 2012; and telephone interview with Heather Williams, August 1, 2012.

[143] Human Rights Watch interview with Heather Gonzales, March 24, 2013.

[144] Human Rights Watch interview with Artemio Lechuga-Lechuga, El Paso, Texas, September 25, 2012.

[145] Human Rights Watch interview with Adriana Quesado, El Paso, Texas, September 27, 2012.

who was starting to get in trouble with the police and using drugs. Without his income, his wife was unable to make the mortgage payments on their house, so she and the six children were about to lose their home. Although the only offenses on his record apart from illegal entry and reentry are traffic violations, he is permanently barred from gaining legal status through his wife, in part because of mistakes an immigration lawyer made in 2000.[146] He now has a felony conviction for illegal reentry, as well as a misdemeanor conviction for illegal entry.[147]

Others reported how the pain their deportation had brought on their parents and siblings compelled them to return. Roberto Huerta Huerta, a former permanent resident who had lived in the US since he was 14, said that he was deported after a conviction for possession of one gram of cocaine. According to the complaints in his two cases for illegal reentry, Huerta had tried to reenter and been removed six times.[148] He wrote in a letter while serving a one-year sentence,

> [My mother] already had a heart condition when I got arrested and by the time I was deported her condition worsened to the point where she was constantly being hospitalized. This last time I crossed the border line was to see her because I was afraid she might die and I would not be able to attend her funeral."[149]

Huerta also left a son behind in the US. He told us that when his son was killed, he was unable to go to the funeral.[150]

In several cases, defendants or their attorneys reported that they had returned to the US because of specific family emergencies. Heather Williams recounted a case in which her client returned illegally because his permanent resident wife was dying of cancer; he had been denied permission to enter temporarily, and he wanted to arrange for his oldest

---

[146] Human Rights Watch interview with Artemio Lechuga-Lechuga, September 25, 2012

[147] Court documents in *United States v. Artemio Lechuga-Lechuga*, 2012-CR-1931 (W.D. Texas 2012).

[148] Court documents in *United States v. Roberto Huerta Huerta*, 2007-CR-190 (Ariz. 2007) and 2011-CR-4189 (Ariz. 2012).

[149] Letter from Roberto Huerta Huerta to Human Rights Watch, September 24, 2012.

[150] Ibid.

daughter to take legal custody of her younger siblings.[151] In another case, a judge in a 2011 illegal reentry case in New Mexico gave a below-guideline sentence, noting that there was strong evidence the defendant had returned to the United States because of reports his children were being sexually abused.[152]

In several cases, people cited fear of losing custody or seeking to regain custody of their children as a reason they returned. Yanir Pioquinto Cruz, interviewed while serving a Streamline sentence in Florence, Arizona, reported he had entered illegally because he had heard that his US citizen wife, struggling with a drug addiction, had lost custody of their five children to the child welfare system in Atlanta, Georgia. His goal had been to keep his parental rights and return with his children to Mexico.[153] Maureen Franco, an assistant federal defender in El Paso, recounted the case of a client who had been told by a caseworker that if he did not come get his children, they would end up in foster care.[154]

---

[151] Human Rights Watch telephone interview with Heather Williams, August 1, 2012.

[152] *United States v. Ledezma-Ledezma*, 808 F. Supp. 2d 1301 (D. N.M. 2011)

[153] Human Rights Watch telephone interview with Yanir Pioquinto Cruz, April 8, 2013.

[154] Human Rights Watch interview with Maureen Franco, federal public defender, El Paso, Texas, September 25, 2012. Similar accounts were shared in Human Rights Watch interviews with Milagros Cisneros, April 2, 2013; and with Shaffy Moeel, assistant federal defender, San Diego, California, September 5, 2012.

AR.09161

**"Though I'm in jail here, I feel closer to my kids than I did there, free"**

Roberto Lopez, called Robert, first came to the United States when he was three years old and grew up in Los Angeles, California. He has four US-born children; his mother and siblings live in the United States as well. He is now 28 years old and spoke fluent English in a calm, low voice when we interviewed him in a federal detention center. He is currently serving a sentence of four-and-a-half years for illegal reentry.[155]

Despite living in the US since he was a toddler, Robert has no legal status. In 2006, after being put into removal proceedings for a criminal conviction for assault, Robert left the United States and moved to Mexico under a voluntary departure order. He found life in Tijuana hard. He worked two jobs but could not make enough to send money to his family in the US. Like other Mexicans who had lived in the United States for many years, he reported being regularly harassed by the Mexican police.



Three of Robert Lopez's US-born children.
© Private



Robert Lopez and his US-born daughter.
© Private

Still, Robert stayed in Tijuana for several years, believing that an application for permanent resident status for him was pending in the US. (He did not know that his criminal conviction

---

[155] Human Rights Watch interview with Robert Lopez Francisco, Los Angeles, California, October 11, 2012.

could make it nearly impossible to return.) But then his mother told him his wife Amanda had developed a drug addiction. He told Human Rights Watch, "You hear all this bad news [in Tijuana], and you feel like you're in jail because you're incapable of doing anything." Robert worried that his children could be taken away from his wife and end up in foster care. So in 2010, he tried to return. He was caught at the border and deported in his first attempt, but he made it to Los Angeles the second time.

Robert said that for a year he worked and visited Amanda regularly at a rehabilitation center. But he suspected his wife was still using drugs. Robert filed for divorce, sought custody of their children, and was granted emergency custody. He said, "That's when my wife called immigration."

Robert said that he had pleaded guilty in 2003 on the advice of his public defender, who said he would only receive two or three weeks in jail, and Robert did not think it would lead to deportation. Instead, he received a one-year sentence and served 11 months. He has no other criminal convictions. But under the federal Sentencing Guidelines, a single prior conviction for a "crime of violence," whether stemming from a fight or from murder, can lead to a significant prison sentence. His sentence of four-and-a-half years for illegal reentry is over four times as long as the time he served for his assault conviction 10 years earlier.

Robert does not regret coming back to the US. His children are now in the custody of his mother. He wishes that his 54-year-old mother, who works seven days a week as a housekeeper, could rest instead of raising four kids, and he is sorry to have "left her with a big responsibility." But at the same time, "Even though I'm in jail here, I feel closer to my kids than I did there, free." He reports his children are "happy, they're healthy." When he asks them if they want to go back to their mother, they say they would rather stay with their grandmother.

What Robert's children do not fully understand is why he is in prison. "My oldest daughter, she asks me, 'Did you commit a crime?' And I say, 'I came back for you.'"[156]

---

[156] Ibid. The special assistant US attorney assigned to this case declined to comment because the case is pending on appeal.

**Turning Migrants Into Criminals**        58

AR.09163

Immigration law separates these families, but the federal criminal system makes the situation even worse for families. As Jorge Luis Lopez-Duran wrote from prison, where he was serving a 100-day sentence for illegal entry,

> The emotional and economic [impact] that my detention has had on my loved ones, especially my children is incomprehensible…. In school they are being taught that criminals belong in prison for not obeying the laws. In some sense they see me as a criminal but in another sense, they see me as their father … whose crime is wanting to be with his children.[157]

Over and over, defendants and their family members expressed a desire for a process that would allow them to enter the US and reunite with their family legally. Heather Gonzales wished there could be some probationary period in which her husband, despite his criminal record, could have stayed in the US legally: "We do have to implement the law, but in a way that families who have been here and people who are being productive can remain here to still have a family, and still be productive in the community as they have been."[158]

---

[157] Letter from Jorge Luis Lopez-Duran to Human Rights Watch, October 12, 2012.

[158] Human Rights Watch interview with Heather Gonzales, March 24, 2013. Similar concerns were expressed in Human Rights Watch interviews with Mark O'Brien, San Diego, California, October 22, 2012; Alicia Estrada, Azusa, California, October 24, 2012; Daniel Tabacznyf, Florence, Arizona, February 12, 2013; and Micaela Remijio, Riverside, California, February 28, 2013.

### "An 11-year-old girl needs her mother"

After living in the United States for over 20 years, Sonia H. (pseudonym) went to Mexico, not to move back to the country of her birth but to bury her son, a Mexican police officer who had been killed in a roadside shootout. Sonia, 50, shared her story while sitting in a jail in Marfa, Texas, awaiting sentencing for an illegal reentry conviction.

When Sonia's son was killed in 2011, she felt she had to go to Mexico to bury him. But, Sonia said, "My whole life is in the US." Her other son, a US citizen, had petitioned for her to gain legal status, and she had been saving money to pay for the second part of the application. She and her long-term partner, a permanent resident, were raising an 11-year-old daughter, also a US citizen. Sonia had a good job at a dry cleaner, where the owners valued her so much they drove her to and from work, since she could not get a driver's license as an unauthorized immigrant.

In January 2012, Sonia tried to return to the US illegally using false documents and was immediately caught and convicted of illegal entry. According to her current attorney in Texas, the federal judge in the earlier case recommended that she not be deported, but he had no power to enforce that recommendation. Thus, after serving 45 days in jail for her illegal entry conviction, she was deported immediately through expedited removal. She said a Border Patrol agent told her to "sign here." If she had been put into regular removal proceedings, she might have been eligible to apply for cancellation of removal, an application for legal status in which her many years of residence in the US and the impact of deportation on her US family would have been considered by an immigration judge. Sonia had never been in trouble with the law before. "I never even drove without a driver's license," she said.

Sonia moved her daughter to Mexico and they tried to live in Chihuahua, her home state, but Chihuahua is one of the Mexican states most affected by crime and violence related to drug trafficking. Sonia said there were shootouts in front of her daughter's school and rumors that kidnappers

AR.09165

were targeting schoolchildren as potential victims. She said her daughter begged her, "Mommy, let's go, let's go." Sonia's sister encouraged her to try, saying, "Your daughter is suffering."

Sonia's daughter, as a US citizen, was sent to California, but when Sonia tried to join her, she was caught again and charged this time with felony illegal reentry, as well as fraud. "I realize I committed a crime presenting false papers," Sonia said. "But I only did it for my daughter's sake."

Sonia was glad that her daughter is safe in California, but she had heard her daughter was having trouble sleeping and concentrating in school. She also had a new fear, that child protective services might take her daughter away from her father because he has a drinking problem. Her voice broke as she said, "Imagine what will happen to me if I lose my daughter after I lost my son."

According to Elizabeth Rogers, the supervisory assistant federal defender in the Alpine, Texas, office, Sonia exemplifies recent changes in how federal criminal law is being applied in immigration cases: "Four years ago, [Sonia] wouldn't have been prosecuted."[159]

Sonia's daughter did not know her mother was imprisoned, and thought she was in Mexico waiting for permission to return. Sonia talked to her once a week, using phone cards that cost her $20 for 15 minutes, and her daughter kept asking her, "Are you going to come? When are you going to come?" Sonia described a card her daughter had sent her to send to President Obama, which said, "My mom had to go back to Mexico because my brother was killed. If you had that happen, what would you do? All I ask is that you let my mom be with me. An 11-year-old girl needs her mother. If you refuse, then I ask God to forgive you."[160]

---

[159] Human Rights Watch interview with Elizabeth Rogers, supervisory assistant federal defender, Marfa, Texas, September 21, 2012.
[160] Human Rights Watch interview with Sonia H. (pseudonym), Marfa, Texas, September 21, 2012.

## Asylum Seekers

In recent years, Mexico has seen a staggering increase in violence related to Mexican government efforts to combat organized crime. The widespread crime, as well as abuses committed by the Mexican security forces, have had a tremendous impact on Mexican society, including on many who have no ties to illegal activity.[161] According to recent figures released by Mexico's federal government, over 70,000 Mexicans were killed from December 2006 to December 2012 in drug-related violence, and more than 26,000 people went missing or were "disappeared" in Mexico during the same period.[162] Virtually none of these serious crimes have been adequately investigated and prosecuted; less than 2 percent of crimes reported in Mexico lead to convictions.

Not surprisingly, US federal defense attorneys, particularly along the Texas-Mexico border, report that an increasing number of their clients say they entered the United States because of fear of violence. In several cases documented by Human Rights Watch, citizens of Central American countries also cited fears of ongoing violence as a reason for coming to the US. Defendants in 14 out of 73 cases documented by Human Rights Watch cited crime, violence, or persecution in their home countries as a reason for trying to enter the United States, while several defendants currently in prison said the same in letters to us.[163] Norma Ramirez told Human Rights Watch that her brother, a former permanent resident, has served a total of over 13 years in prison for three reentry convictions: "The way things were in Juarez, with all the violence and all the shootings, he preferred being incarcerated here."[164]

The use of the federal justice system to criminally prosecute individuals who are fleeing violence abroad would seem to be a misguided and wasteful expenditure of prosecutorial

---

[161] Human Rights Watch, *Neither Rights Nor Security: Killings, Torture, and Disappearances in Mexico's 'War' on Drugs*, November 9, 2011, http://www.hrw.org/reports/2011/11/09/neither-rights-nor-security-0; *Mexico's Disappeared: The Enduring Cost of a Crisis Ignored*, February 20, 2013, http://www.hrw.org/reports/2013/02/20/mexicos-disappeared.

[162] Ibid.

[163] Human Rights Watch did not independently investigate these cases to determine whether they would necessarily constitute claims to asylum under US law, but the fact that a good number of migrants we spoke with cited fear as a reason for seeking to enter the US suggests that at least some asylum seekers may be among those prosecuted. A 2013 report by a migrant humanitarian organization found that 4.3 percent of migrants surveyed between March and August 2012 cited violence as a reason for migrating, with a significantly higher percentage (12.7 percent) of Central Americans citing it as a reason. Danielson, "Documented Failures: the Consequences of Immigration Policy on the US-Mexico Border," February 2013. It should be noted that even if only a small percentage of all migrants have potential asylum claims, the absolute number would be in the thousands, if not higher.

[164] Human Rights Watch interview with Norma Ramirez, sister of Jose Fernando Ramos Cardoza, El Paso, Texas, September 26, 2012.

AR.09167

resources. The problems were highlighted in three cases reported to Human Rights Watch in which defendants said that men associated with organized crime had actually compelled them to cross the border. One defendant, Robin Whiteley, even won his case at jury trial, one of the few times a defendant has ever been acquitted of illegal reentry.[165]

Even more problematic is the potential impact on asylum seekers. Not all persons who fear returning to Mexico or another country have a fear of persecution that would support a claim to asylum under US law.[166] However, based on our research, Human Rights Watch believes that prosecutions for illegal entry or reentry may include a number of defendants with a colorable claim to asylum. The Universal Declaration of Human Rights, which is considered reflective of customary international law, provides that everyone has a right to seek asylum from persecution.[167]

The criminal prosecution of individuals fleeing violence or persecution at home is problematic for at least two reasons. First, the prosecutions impede the asylum process, which is intended to assist the most vulnerable migrants.[168] Criminal prosecution and incarceration can delay asylum applications, exacerbate trauma or psychological problems, and potentially discourage people from pressing their asylum claims at all. Thus, illegal

---

[165] Human Rights Watch interview with Stephen Castro, Pecos, Texas, September 24, 2012; videoconference interview with Juan Cruz Guera, Phoenix, Arizona, April 2, 2013; interview with Lorrie and Royce Whiteley, Austin, Texas, September 14, 2012; interview with Robin Whiteley, Tijuana, Mexico, October 22, 2012; and telephone interview with Nigel Cohen, attorney for Robin Whiteley, August 14, 2012. In 2012, 2 out of 24,089 cases were acquitted, and both were acquitted by bench trial. The 45 defendants who were tried by jury were all convicted. Administrative Office of US Courts, Federal Judicial Caseload Statistics 2012.

[166] Under US law, general violence or strife is not a grounds for seeking asylum. An asylum applicant must provide evidence of past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. Immigration and Nationality Act Section 101(a)(42)(A), 8 US Code Section 1101(a)(42)(A). Mexicans who fear particular persecution on one of these grounds, however, have increasingly sought to apply for asylum. See Molly Hennessy-Fiske, "More Mexicans seek asylum in U.S. as drug violence rises," *Los Angeles Times*, October 28, 2012, http://articles.latimes.com/2012/oct/28/nation/la-na-texas-asylum-20121028 (accessed April 10, 2013) (stating that applications have tripled from five years ago, and the approval rate has increased from 7 to 9 percent).

[167] Universal Declaration of Human Rights, G.A. res. 217A (III), U.N. Doc A/810 at 71 (1948), art. 14.

[168] A conviction for illegal entry or reentry should not generally bar a non-citizen from pursuing protection before removal, under the 1951 Convention relating to the Status of Refugees (1951 Refugee Convention) (to which the US is bound through ratification of the related 1967 Protocol). Convention relating to the Status of Refugees (1951 Refugee Convention), 189 U.N.T.S. 150, entered into force April 22, 1954; Protocol relating to the Status of Refugees (1967 Protocol), done January 31, 1967, entered into force Oct. 4, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 267. By ratifying the 1967 Protocol in 1968, the United States bound itself to respect articles 2 through 34 of the 1951 Refugee Convention. See article 1(F) of the 1951 Refugee Convention for categories of persons who may not be eligible for refugee status. Human Rights Watch remains concerned about whether the US government might construe multiple reentry convictions as a "particularly serious crime" that would deny eligibility for asylum or withholding of removal. 8 US Code Section 1101(a)(43)(O).

AR.09168

entry and reentry prosecutions can be at cross purposes with another goal of US immigration law—the recognition and protection of genuine refugees.

Second, charging such individuals with illegal entry or reentry contravenes a fundamental principle of international refugee law: asylum seekers should not be penalized for using improper means to enter the country where they are seeking asylum. Article 31(1) of the 1951 Refugee Convention states, "The Contracting States shall not impose penalties, on account of their *illegal entry* or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of Article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence."[169] The protections of article 31 have been interpreted to include asylum seekers (those whose claims have not yet been adjudicated) because it cannot be determined at the point of entry whether the person qualifies as a refugee or not.[170]

Ordinarily, when a US Border Patrol agent apprehends a non-citizen who expresses a fear of returning to his or her native country, CBP is supposed to refer the individual to a US Citizenship and Immigration Services asylum officer, who will provide a "credible fear interview," in which the non-citizen is given a chance to explain his or her fear. If the person passes the credible fear interview, the case will be referred to an immigration judge for proceedings to determine whether he or she should be granted asylum or another form of relief under international law.[171] If an asylum seeker has been previously removed, however, CBP would refer the person to a "reasonable fear interview," which has a higher standard of proof, but also allows the asylum seeker to eventually have his or her claim reviewed by an immigration judge.[172]

---

[169] 1951 Refugee Convention, art. 31(1) (emphasis added).

[170] See United Nations High Commissioner for Refugees, "Guidelines on Applicable Criteria and Standards relating to the Detention of Asylum Seekers," February 26, 1999, http://www.refworld.org/cgi-bin/texis/vtx/rwmain?docid=3c2b3f844 (accessed May 10, 2013).

[171] US Citizenship and Immigration Services, "Obtaining Asylum in the United States," last updated March 10, 2011, http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=dab9f067e3183210Vg nVCM100000082ca60aRCRD&vgnextchannel=f39d3e4d77d73210VgnVCM100000082ca60aRCRD (accessed April 10, 2013).

[172] US Citizenship and Immigration Services, "Questions & Answers: Reasonable Fear Screenings," last updated September 4, 2009, http://www.uscis.gov/portal/site/uscis/menuitem.5af9bb95919f35e66f614176543f6d1a/?vgnextoid=b1b2549bf0683210Vg nVCM100000082ca60aRCRD&vgnextchannel=f39d3e4d77d73210VgnVCM100000082ca60aRCRD (accessed April 10, 2013).

AR.09169

Edgar Holguin, an assistant federal defender in El Paso, stated that in his experience, this approach is not consistently followed. Instead, most of those who have been previously deported are referred for criminal prosecution before being given a reasonable fear interview.[173] Some of the cases we investigated support this view. Maira Alvarado, the wife of Joel Reyes-Isais, told Human Rights Watch that she and her husband entered the United States together after beatings and threats from the police in Ciudad Juarez. When they were apprehended, Alvarado had just fallen from a bridge and suffered serious injuries—a broken nose, broken leg, and fractured skull—and was taken to the hospital. She said her husband told Border Patrol, "We're running because the police of Juarez are trying to kill us," but he was referred for criminal prosecution without a reasonable fear interview.[174] Reyes had been previously removed after a conviction for a drug offense in 2007 and so spent four months in federal jail awaiting sentencing for illegal reentry before he was transferred to immigration custody, where he was finally able to request asylum.[175] Advocates elsewhere in the United States have recently reported encountering cases in which CBP appears to have conducted inadequate screening for fear of persecution during apprehensions along the southern border.[176]

> **"A lawyer can't help you with nothing"**
>
> Brenda R. (pseudonym), a 45-year-old former long-term resident of Dallas, Texas, has tried three times to return to the United States because of her fears of staying in Mexico. Each time, she says, she was criminally prosecuted and given no chance to apply for asylum.
>
> In April 2012, Brenda's two adult non-citizen sons were killed in Mexico. They had grown up in the United States, but one was deported to Mexico and the other had gone back voluntarily. They were living together in a small town in the state of

---

[173] Human Rights Watch interview with Edgar Holguin, assistant federal defender, El Paso, Texas, September 25, 2012.

[174] Human Rights Watch email correspondence with a researcher in the Law Offices of Carlos Spector, May 9 and 10, 2013.

[175] Human Rights Watch interview with Maira Alvarado, El Paso, Texas, September 27, 2012; court records for Joel Reyes-Isais, showing sentence of time-served, four months after the charges were first filed.

[176] Email from Katharina Obser, Women's Refugee Commission, to Human Rights Watch, November 9, 2012; email from Barbara Hines, University of Texas Law School, Immigration Clinic, to Human Rights Watch, October 3, 2012; Detention Watch Network listserv emails to Human Rights Watch, September 26 and 27, 2012 (reports from immigration attorneys in New Jersey, New York, and Pennsylvania).

AR.09170

Chihuahua, a site of considerable drug-related violence. Brenda said her sons were not involved in any criminal activity, but one had befriended a woman said to be the girlfriend of a local drug trafficker. After receiving threats, Brenda's son and his brother decided to leave town, she said. But before they could leave, they were gunned down in the parking lot of a bar.

Brenda traveled to Chihuahua to bury her sons. She said, "I [also] went to investigate.… When I got [to the crime scene], there were still blood stains and bone fragments of my sons." Fighting back tears, she said, "I felt [one of my son's] presence saying, 'Please, mom, take me from here … please bring me home.'" She started to ask questions about the investigation and filed a formal complaint with the Chihuahua state human rights commission. She hoped it would help bring some attention to the case, even though local residents and the police warned her to stop her inquiries, stating it was too risky for them to investigate the case.

When Brenda tried to return in June 2012 to her husband and two US-citizen children in Dallas, Texas, Border Patrol apprehended her and referred her for criminal prosecution for "illegal entry." She said she tried to explain her fear of returning to Chihuahua, but the agent just told her "sign here." She was convicted, spent five days in jail, and then (according to court documents) was returned voluntarily to Mexico. A month later, she tried again by presenting a friend's border-crossing permit in El Paso and was charged with document fraud. Brenda said, "I described my fear. I cried with immigration." Her husband tried to get her a lawyer, but she said the Border Patrol agent responded, "The lawyer can't help you with nothing." She was convicted of document fraud, sentenced to nine days in jail, and deported by expedited removal soon afterward, according to court documents.

In September 2012, Brenda tried to cross again and was criminally prosecuted and convicted of illegal entry, as part of the "Retributive Justice Initiative." She was serving her 60-day sentence when we interviewed her, and she continued to struggle with the trauma of what had happened to her: "Every time I close my eyes, all I see is the photos of [my sons] shot and … in their caskets."[177]

---

[177] Human Rights Watch interview with Brenda R. (pseudonym), Pecos, Texas, September 24, 2012; court documents from *United States v. [name withheld]*. The assistant US attorney on this case declined to comment because he could not recall the case.

In addition to the trauma criminal prosecution and incarceration may impose on asylum seekers, an asylum seeker who is not given a credible fear interview before being prosecuted and deported faces significant challenges to seeking refugee protection, including longer waits in detention and a higher standard of proof once his or her asylum claim is heard.[178]

The case of Juan Alanis-Gonzalez provides an example. Family members told Human Rights Watch that Alanis-Gonzalez had been repeatedly kidnapped and assaulted by organized crime groups in Matamoros, Mexico; his attorney showed Human Rights Watch photos of injuries he allegedly suffered in the attacks. When he tried to reenter the United States shortly after one such attack, Border Patrol apprehended him and referred him for criminal prosecution because he had been previously deported. A federal judge deemed him incompetent to stand trial and sent him to a facility in North Carolina for psychological treatment. Thirteen months later, US Marshals returned Alanis-Gonzales to Brownsville, Texas for continued prosecution,[179] and he was sentenced to prison for 21 months, a sentence he will have to complete before even starting the process of seeking protection as a refugee.[180]

The rapidity with which most illegal entry and reentry cases are prosecuted can also have a particularly severe impact on asylum seekers. As described in greater detail in the next section, the volume of cases has led the Department of Justice to institute a national policy in which "Fast-Track" plea agreements are offered, with substantially reduced sentences, to most illegal reentry defendants. In about half the federal districts, these agreements require the defendants to waive their right to immigration remedies.[181] In at least one

---

[178] For example, Brenda would have been transferred to immigration detention after completing her sentence. There, if she expressed a fear of persecution, she should have been referred for a "reasonable fear interview." According to Denise Gilman at the University of Texas School of Law Immigration Clinic, the current wait for a credible fear interview is one to two months, but the wait for a reasonable fear interview is six months. Gilman further noted that with asylum seekers who are in proceedings after having their prior removal orders reinstated, immigration judges generally assume they do not have the power to release them on bond. In other words, Brenda would have to wait in detention six months for a credible fear interview, and if she passed that, stay in detention even longer while awaiting a decision before an immigration judge, all after criminal prosecution and incarceration for illegal entry. Human Rights Watch telephone interview with Denise Gilman, University of Texas, School of Law, Immigration Clinic, October 5, 2012.

[179] Human Rights Watch interviews with Maria Linda Gonzales, attorney, and with Lilia G. Alanis and Orlando Alanis-Trevino, Brownsville, Texas, September 18, 2012.

[180] *United States v. Juan Alanis-Gonzalez*, 11-CR-815, Judgment (S.D. Tex. 2012).

[181] Human Rights Watch telephone interview with Kari Converse, assistant federal defender in Albuquerque, New Mexico, February 6, 2012; and follow-up email correspondence, March 26, 2013 and April 26, 2013.

district court, in Phoenix, Arizona, the standard plea agreement goes even further to specify, "The defendant admits that he does not have a fear of returning to the country designated in the previous order."[182] Milagros Cisneros, an assistant federal defender in Phoenix, expressed concern that 30 days—the amount of time defendants have to decide whether to accept the agreement—is insufficient for an attorney to investigate a potential claim for asylum.[183] For one client of Kari Converse who expressed a fear of persecution, the choice seemed clear: accept the plea deal or risk a much higher sentence. Converse's client was able to eventually have a hearing on his claim before an immigration judge.[184]

Consistent with US and international law, asylum seekers should be able to seek asylum "irrespective of [their] status," which means at any time and regardless of any plea agreement.[185] However, we remain concerned that these plea agreements may discourage asylum seekers from continuing the application process, particularly if they are offered as part of a fast Streamline proceeding.[186]

---

[182] Human Rights Watch interview with Milagros Cisneros, April 2, 2013.

[183] Ibid.

[184] Human Rights Watch telephone interview with Kari Converse, February 6, 2012; and follow-up email correspondence, March 26 and April 26, 2013. Converse noted in her last email that the plea agreements offered by the US Attorney's Office in her district no longer require a waiver of all immigration remedies.

[185] Immigration and Nationality Act Section 208(a) (2012).

[186] Human Rights Watch has reviewed at least one plea agreement used in Tucson as part of "flip-flop" prosecutions, and found it included a waiver of all immigration remedies. *United States v. Roberto Moran Diaz*, Case No. 12-26809M, US District Court, District of Arizona-Tucson, filed May 15, 2012.

AR.09173

# IV. Is It Worth It?

The US government's stated rationale for prosecutions for illegal entry and reentry is two-fold: they help deter illegal immigration and keep dangerous criminals outside the United States. There is reason to question whether increasing reliance on prosecutions is doing as much to deter illegal immigration as the government seems to think, and with increasing numbers of nonviolent migrants being swept into prison, the prosecution-heavy approach to border control cannot be said to be targeting mainly dangerous criminals. To the extent that the current approach is advancing important goals, moreover, its successes should be weighed against its costs.

The costs to the federal government of prosecuting so many cases are tremendous and continue to grow. Even as the federal inmate population increases, the population of inmates in state prisons around the United States has started to drop, as state governments have begun asking whether the costs of incarcerating so many people, and in particular nonviolent drug offenders, outweigh the benefits.[187] If the impact on non-citizens with strong family ties in the US does not get consideration, at least the costs of an overcrowded federal prison population should prompt US officials to consider the amount spent prosecuting and incarcerating people, many of whom never committed a serious offense and most of whom will eventually be deported.

## Limited Deterrent Effect

Setting criminal justice policy is not an exact science, but in the case of illegal entry and reentry, the behavior the federal statutes prohibit is particularly challenging to control through criminal sanctions for several reasons.

The number of unauthorized migrants apprehended in recent years near the southern border has decreased significantly.[188] US Customs and Border Protection (CBP) has

---

[187] Brad Plumer, "The US prison population is shrinking. But will it last?" *Washington Post*, January 5, 2013, http://www.washingtonpost.com/blogs/wonkblog/wp/2013/01/05/americas-prison-population-is-shrinking-but-will-it-last/ (accessed April 14, 2013).
[188] US Customs and Border Protection (CBP), US Border Patrol, "Southwest Border Sectors, Total Illegal Alien Apprehensions by Fiscal Year,"

ER-1133                                    AR.09174

credited the decrease to both enhanced enforcement efforts and changes in the US and Mexican economies. But to the extent CBP's border enforcement activities have played a role, it is not clear that criminal prosecution, as opposed to other aspects of enforcement, merits the credit.

In general, deterrence requires information about the consequences of a criminal act reaching the potential offender, generally through consistent application of the law.[189] But it is difficult to design a system that can inform millions of non-citizens of a US criminal law and how it may be applied. Despite the rapid growth of prosecutions, only a small percentage of unauthorized immigrants are referred for criminal prosecution.

In the southwest border patrol sectors in 2010, immigration authorities made about 17 federal criminal arrests per 100 apprehensions.[190] Juan Rocha, a federal public defender, recounted a case in which his client, a migrant farmworker, had been apprehended 53 times before he was criminally prosecuted. After having been returned or civilly removed each time, he was understandably shocked to find himself criminally prosecuted for the first time.[191] The threat obviously had not gotten through to him. Although such statistics often lead lawmakers to call for increased prosecution, the current level of prosecutions is already overwhelming the federal courts, to the point that in 2011, the chief judge of the US District of Arizona declared a judicial emergency.[192] Notably, rates of apprehension of unauthorized migrants are also down significantly in southern California, where Operation Streamline is not active, as well as in districts where the program is ongoing.[193]

---

http://www.cbp.gov/linkhandler/cgov/border_security/border_patrol/usbp_statistics/usbp_fy12_stats/appr_swb.ctt/appr_swb.pdf (accessed April 26, 2013). In 2000, there were 1.64 million apprehensions nationwide by CBP; by 2012, there were 357,000.

[189] See Valerie Wright, The Sentencing Project, "Deterrence in Criminal Justice: Evaluating Certainty versus Severity of Punishment," November 2010, http://www.sentencingproject.org/doc/deterrence%20briefing%20.pdf (accessed April 26, 2013) (summarizing research indicating enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment).

[190] Mark Motivans, US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, "Immigration Offenders in the Federal Criminal System, 2010," July 2012, http://bjs.gov/index.cfm?ty=pbdetail&iid=4392 (accessed April 12, 2013), p. 8.

[191] Human Rights Watch telephone interview with Juan Rocha, August 8, 2012.

[192] United States Courts, "Judicial Emergency Declared in District of Arizona," January 25, 2011, http://www.uscourts.gov/News/NewsView/11-01-25/Judicial_Emergency_Declared_in_District_of_Arizona.aspx (accessed April 14, 2013).

[193] CBP, US Border Patrol, "Total Illegal Alien Apprehensions by Fiscal Year," http://www.cbp.gov/linkhandler/cgov/border_security/border_patrol/usbp_statistics/usbp_fy12_stats/nationwide_appr_2000_2012.ctt/nationwide_appr_2000_2012.pdf (accessed April 26, 2013) (showing apprehensions in San Diego decreased from 152,000 in 2000 to 28,461 in 2012).

CBP also claims that its statistics indicate a reduced rate of recidivism among unauthorized migrants who are referred for prosecution, either through Operation Streamline or standard prosecution.[194] And the agency claims it is increasingly using criminal prosecution, through Operation Streamline and otherwise, where it is likely to have the strongest deterrent effect, such as against suspected smugglers or migrants with prior criminal convictions.[195] US Immigration and Customs Enforcement (ICE) has similarly indicated that one of its main targets for deportation is "repeat offenders."[196]

While all governments obviously have a legitimate interest in deterring people from repeatedly violating the law, an effective strategy needs to take into account the motivations of offenders. When it comes to immigration offenses, that means the motivations people have for entering and reentering the United States. As noted by an assistant federal defender in Los Angeles, "The motivations for committing [illegal reentry] are not the motivations for committing most other crimes.… [I]t's basically your desire to be with your family."[197]

Numerous defense attorneys and judges told Human Rights Watch how criminal prosecution and even lengthy prison sentences frequently do not deter people from trying to enter the United States again, particularly when they have strong family ties to the US. Ricardo Calderon, a defense attorney in Texas who regularly represents clients in Streamline, said, "I've had people come back as clients—they return pretty often. Some return within the same week or month, generally within the year."[198] At the time of our interview, Ricardo M. (pseudonym) had tried to return to the United States four times—and been detained or prosecuted each time, up to four months the last time, when he was held as a material witness in an alien smuggling case—but he remained steadfast in his desire

---

[194] Human Rights Watch meeting with US Customs and Border Protection (CBP), February 23, 2013. See also US Government Accountability Office (GAO), "Border Patrol: Goals and Measures Not Yet in Place to Inform Border Security Status and Resource Needs," February 26, 2013, http://www.gao.gov/assets/660/652331.pdf (accessed April 26, 2013). This GAO report analyzes data on recidivism in different sectors and finds the recidivism rate has decreased overall, but is highest in San Diego, El Centro, and Tucson.

[195] Ibid.

[196] US Immigration and Customs Enforcement (ICE), "Removal Statistics," http://www.ice.gov/removal-statistics/ (accessed April 26, 2013).

[197] Human Rights Watch interviews with Firdaus Dordi, assistant federal defender, Los Angeles, California, August 30, 2012 and January 24, 2013.

[198] Human Rights Watch interview with Ricardo Calderon, criminal defense attorney, Del Rio, Texas, September 20, 2012.

to return to his wife and two US-born daughters.[199] "The thought [that] prosecution will be effective when their entire family is in the US is questionable," said Magistrate Judge Bernardo Velasco.[200] A US Department of Justice (DOJ) report found that 14 percent of immigration offenders were readmitted to federal prison within three years, and most of them were returned for another immigration offense.[201]

Not all who seek to reenter repeatedly are people who are motivated to return to US families. One man, who said he wanted to go to the US to work to pay for his younger sister's education, had been convicted twice through Streamline and most recently served a 75-day sentence, but he said he would try again.[202] But given the millions of people the US has deported in recent years, and the decrease in migration from Mexico, it is likely that an increasing proportion of "repeat offenders" have family ties.

In most analyses of criminal recidivism, strong family ties are generally seen as a positive factor associated with reduced likelihood of future crimes. In the context of illegal entry crimes (which are neither violent nor property offenses), however, strong family ties are actually a motivating factor for recidivism. For many defendants, deciding not to offend again actually requires them to cut off ties from their families, and several of the defendants who told Human Rights Watch they would not try to reenter had done precisely that.[203] One man who had served 77-month and 90-month sentences for illegal reentry said from Mexico, where he plans to stay, "[The hardest part is] to accept the fact that you've lost everybody, your kids, your baby's mom. The prison people become your family. You have to be mentally prepared to lose everybody."[204]

To the extent that CBP seeks to avoid indiscriminate prosecution of migrants and to target particularly dangerous offenders, the selective use of criminal prosecution as part of a "consequence delivery system" is a commendable effort. But CBP's categories do not adequately take into account whether rejoining family members is a motive for any

---

[199] Human Rights Watch interview with Ricardo M. (pseudonym), Tijuana, Mexico, October 16, 2012.

[200] Human Rights Watch interview with Magistrate Judge Bernardo Velasco, Tucson, Arizona, April 3, 2013.

[201] Motivans, US Department of Justice, "Immigration Offenders in the Federal Justice System, 2010," July 2012, p. 36.

[202] Human Rights Watch interview with Manuel D. (pseudonym), Nogales, Mexico, April 4, 2013.

[203] Human Rights Watch interviews with Elmer Cardenas-Gonzales, Rosarito, Mexico, October 18, 2012; and with Jerry Lopez, Rosarito, Mexico, October 19, 2012.

[204] Human Rights Watch videoconference interview with Pedro H. (pseudonym) in Rosarito, Mexico, November 5, 2012.

AR.09177

particular migrant. Criminal statutes and prosecution policies that seek to deter recidivism without consideration of family ties as a motive are doomed to fail.

## Significant Financial Costs

While politicians and policymakers continue to debate whether or not criminal prosecutions for illegal entry and reentry are meeting their goals, the sharp increase in such prosecutions continues to incur tremendous costs.

The rapid increase in the number of non-citizens serving prison sentences for illegal entry offenses is contributing to the burgeoning and overcrowded federal prison system. As of March 2013, 22,526 persons were incarcerated for immigration offenses in the federal prison system.[205] Because many immigration offenders serve short sentences, the number of immigration offenders in the federal prison population at any given time does not fully capture the increase in numbers of offenders entering the federal prison system each year.

According to a recent Congressional Research Service report, in 2010, immigration offenders accounted for approximately 30 percent of all inmates entering the federal prison system, a significant increase from 1998, when they comprised 18 percent of all inmates entering the system.[206] Although drug offenders continue to make up the largest category of offenders in the federal prison system, the number of immigration offenders among new admissions now approaches the number of drug offenders among new admissions.[207] In contrast, the proportion of federal inmates incarcerated for a violent offense decreased from 12 percent in 1998 to 6.4 percent in 2010.[208]

---

[205] US Department of Justice, Federal Bureau of Prisons, "Quick Facts About the Bureau of Prisons," last updated March 30, 2013, http://www.bop.gov/news/quick.jsp#4 (accessed April 25, 2013).

[206] Nathan James, Congressional Research Service, "The Federal Prison Population Buildup: Overview, Policy Changes, Issues, and Options," January 22, 2013, http://www.fas.org/sgp/crs/misc/R42937.pdf (accessed April 14, 2013).

[207] Ibid., p. 5.

[208] Ibid.



FIGURE 7: IMMIGRATION OFFENSE PRISONERS IN FEDERAL PRISON ON SEPTEMBER 30, EACH YEAR (1999 - 2011)

Source: Bureau of Justice Statistics, "Prisoners in 20xx." http://www.bjs.gov/index.cfm?ty=pbse&sid=40. For years 2002, 2004, & 2005 totals are estimated from Mark Motivans, "Immigration Offenders in Federal Justice System, 2010", Bureau of Justice Statistics, 2012, because the data for those years was not provided in BJS' "Prisoners in 20xx". All prisoner counts are the number of immigration offense prisoners in federal prisons on a single day of the year, September 30, except for the year 2011, when data was from December 31, 2011.

In addition to time spent in federal prison after conviction, non-citizens charged with illegal entry or reentry are also detained pre-conviction because they are ineligible to receive bond while awaiting the conclusion of their case. Pre-trial detention of non-citizens for immigration offenses increased 664 percent from 1995 to 2010, and thus is the primary factor in the doubling of pre-trial detainees in the federal system from 1995 to 2010.[209] A September 2012 report examining both pre- and post-conviction incarceration calculated that in fiscal year 2011, the US government spent over $1 billion incarcerating individuals convicted of illegal entry and reentry.[210]

Many non-citizens held in pre-trial detention or serving sentences for illegal entry or reentry are held in private prisons. The Associated Press reported in 2012 that the Federal

[209] US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, "Pretrial Detention and Misconduct in Federal District Courts, 1995-2010," February 2013, http://www.bjs.gov/content/pub/pdf/pdmfdc9510.pdf (accessed April 26, 2013). In 2000, immigration defendants comprised 22 percent of suspects in US Marshals custody. By 2010, they made up nearly half (46 percent) of suspects booked by US Marshals.
[210] Alistair Graham Robertson et al., Grassroots Leadership, "Costs and Consequences," September 2012, http://grassrootsleadership.org/sites/default/files/uploads/GRL_Sept2012_Report-final.pdf (accessed April 26, 2013).

AR.09179

Bureau of Prisons has contracts worth $5.1 billion with private companies to hold criminal non-citizens.[211]

The cost of incarcerating non-citizens convicted of immigrations offenses might be the easiest expense to calculate, but it is not the only one. Because these are criminal prosecutions, the government is obligated to ensure representation by defense counsel, as well as increased resources for prosecutors and courts.

Heather Williams, until recently the first assistant federal defender in Tucson, Arizona, has estimated that the cost of defense attorneys for Operation Streamline in Tucson alone would amount to $2.9 million for fiscal year 2013.[212] According to Williams, defense attorneys assigned to Streamline defendants in Tucson are fluent in Spanish, but if interpreters were needed, that would add another $1.5 million for fiscal year 2013. As she noted, these calculations do not include the unknown costs of court hearings (court staff, magistrate judges, US Marshals, special assistant US attorneys, Border Patrol), nor the cost of infrastructure (space for court staff and space to hold defendants pre- and post-trial). These costs would be in addition to her estimate of at least $100 million for incarceration of Streamline defendants in Tucson each year.[213]

Human Rights Watch is awaiting information from DOJ on the total costs of these prosecutions. But in 2009, DOJ requested a funding increase of $231.6 million for fiscal year 2010 to support its contributions to immigration enforcement along the southwest border.[214] Specifically, DOJ requested an additional $8.1 million and 75 positions for the US Attorneys' offices to respond to "cross-border criminal activities and to the increases in immigration cases resulting from the substantial increases in Border Patrol Agents and the U.S. Government's overall effort to gain operational control of the border"; an additional $144.3 million and 700 positions for the US Marshals, including $11 million for courthouse construction, to allow the US Marshals to "meet its responsibilities for protecting and

---

[211] "Private prisons profit from illegal immigrants," *Associated Press*, August 2, 2012, http://www.cbsnews.com/8301-201_162-57485392/ap-private-prisons-profit-from-illegal-immigrants/?pageNum=2 (accessed April 25, 2013).

[212] Statement of Heather Williams, first assistant federal defender, before the US Senate, Judiciary Committee, Briefing on Operation Streamline, Washington, DC, February 22, 2013.

[213] Ibid.

[214] US Department of Justice, FY 2010 Budget Request, "Safeguarding our Southwest Border, +231.6 million in Enhancements," http://www.justice.gov/jmd/2010factsheets/pdf/safeguarding-our-swb.pdf (accessed April 14, 2013).

securing federal detainees before, during, and after their judicial proceedings"; and an additional $44.6 million for the office of Federal Detention Trustee to "meet the substantial increases in Southwest Border arrests resulting from federal prosecutions."[215]

Magistrate Judge Felix Recio questioned the goal of expending such resources: "Who's benefiting from this system? [Judges with] our salaries?"[216] Ray Ybarra, formerly an assistant federal defender in Tucson, Arizona, said, "The only people who are benefitting are private attorneys who get paid $125 per hour and people who get jobs, with more border patrol agents and judges."[217]

## Due Process Shortcuts

Human Rights Watch has concerns about the violation of defendants' due process rights in illegal entry and reentry prosecutions. We plan to detail these concerns in a subsequent report, but outline some of them below.

Defense attorneys repeatedly expressed frustration at being part of a system in which their ability to represent their clients was severely limited.[218] Gabriel Reyes, who previously worked at an immigrant advocacy organization, described the criminal justice system's treatment of his clients charged with illegal entry and reentry:

> We thought [the immigration system] was egregious… but this is totally different. This is like that on steroids: you will sit in jail, you will be in the general population, you will end up with a criminal conviction. And after that happens, good luck with the immigration system.[219]

Reyes' colleague, Chris Carlin, noted that in one of his cases involving a woman who had repeatedly been prosecuted for trying to enter illegally, a federal judge had even tried to recommend that she not be deported: "I'm running up against a system that literally,

---

[215] Ibid.

[216] Human Rights Watch interview with Magistrate Judge Felix Recio, Brownsville, Texas, September 18, 2012.

[217] Human Rights Watch telephone interview with Ray Ybarra, then-assistant federal defender in Tucson, Arizona, July 31, 2012.

[218] Human Rights Watch interview with Heather Williams, Tucson, Arizona, February 13, 2013.

[219] Human Rights Watch interview with Gabriel Reyes, Chris Carlin, and David Fannin, assistant federal defenders, Alpine, Texas, September 21, 2012.

AR.09181

there is nowhere to run. There is nowhere to go…. The horrible part about that case [is that] before she ever got here, mistakes were made that prevent her from ever adjusting status."[220] Robin Whiteley, who was a permanent resident, was deported for a drug possession conviction that was later ruled not to be an "aggravated felony" by the Supreme Court, and he is now seeking to reopen his case based on wrongful removal. But the first two times he was charged with illegal reentry, he says his appointed criminal defense attorney pressured him repeatedly to plead guilty, telling him in effect, "'The best thing for you to do is be a good cow,' and that's how they run us, as cattle."[221]

Operation Streamline is one of the most dramatic examples of how mass prosecutions have led to procedural short cuts, putting the basic due process rights of defendants at serious risk. As noted above, the defenses that are available for defendants charged with illegal entry or reentry—US citizenship and prior unlawful removal—are difficult to investigate and present in the short period of time Streamline attorneys have with their clients.

Deirdre Mokos, a federal public defender in Tucson, described a case in which her client had been deported after a conviction for possession of less than 30 grams of marijuana. He had been brought to the United States when he was five years old, and some aspects of his story raised concerns for Mokos, who had previously practiced immigration law. She requested his "A" file representing his immigration history, but in the meantime, against her advice, he pled guilty. When she received the "A" file one month later, she saw that although he had been deported as an unauthorized immigrant, he actually had been a lawful permanent resident (unbeknownst to him). He was ultimately able to retain his status as a permanent resident. She believes if he had been appointed an attorney with no background in immigration law, he would never have found out about the wrongful removal.[222]

But even outside of Operation Streamline, the breadth and scale of these cases have forced the creation of new avenues for rapid prosecution that result in tremendous

---

[220] Ibid.

[221] Human Rights Watch interview with Robin Whiteley, Tijuana, Mexico, October 22, 2012.

[222] Human Rights Watch telephone interview with Deirdre Mokos, assistant federal defender in Tucson, Arizona, March 4, 2013; and email from Deirdre Mokos to Human Rights Watch, April 26, 2013.

pressure to accept the government's offer of a plea agreement and waive important rights. Defendants who are offered "flip-flop" agreements in which they are charged with both illegal entry and illegal reentry, but plead guilty to illegal entry, have about two weeks to decide. Defendants charged with illegal reentry, under a national Fast-Track policy implemented by the Department of Justice in January 2012, have anywhere from 3 to 8 weeks to decide, depending on the district.[223] One assistant federal defender called these Fast-Track agreements a "quiet hammer" in the hands of prosecutors.[224]

In some districts, these plea agreements require defendants to waive "all challenges, constitutional or otherwise, to reinstatement of defendant's prior deportation/removal order."[225] In Phoenix, as noted above, the plea agreement requires the defendant to "admit[] that he does not have a fear of returning to the country designated in the previous order."[226] Human Rights Watch found that criminal defense attorneys regularly see cases in which the defendant was wrongly denied relief from removal. Sometimes, with the help of immigration attorneys, they have even been able to prove lawful permanent residents were wrongfully deported and have their permanent resident status restored.[227]

Several attorneys described cases in which their clients had turned out to be US citizens under complex laws governing acquired and derivative citizenship, but in some cases they had been removed repeatedly before they ever found an attorney who investigated that possibility. Sara Peloquin, a federal public defender in San Diego, recounted having represented several clients who turned out to be US citizens. In one case, her client had served 41 months on a prior illegal reentry conviction before he reentered, was charged, and was assigned to her. She emphasized that many attorneys, judges, and immigration

---

[223] Human Rights Watch interview with Davina Chen, assistant federal defender, Los Angeles, California, September 6, 2012 (citing 4 weeks); interview with Susan Anderson and Milagros Cisneros, assistant federal defenders, Phoenix, Arizona, February 15, 2013 (citing 3 weeks); and telephone interview with Sara Peloquin, assistant federal defender, San Diego, California, April 26, 2013 (citing 6-8 weeks).

[224] Human Rights Watch interview with Davina Chen, September 6, 2012.

[225] Sample plea agreement provided by Kari Converse, assistant federal defender in Albuquerque, New Mexico, to Human Rights Watch.

[226] Sample plea agreement provided by Milagros Cisneros, assistant federal defender in Phoenix, Arizona, to Human Rights Watch.

[227] Gabriel Reyes, Sarah Rose Weinman, and Kim Ybarra, "These Lives Matter: Collaboration and Success in a Joint Federal Defender-Immigration Case," post to *Immigrant Justice* (blog), National Immigrant Justice Center, August 24, 2012, http://immigrantjustice.org/staff/blog/these-lives-matter-collaboration-and-success-joint-federal-defender-immigration-case#.UXr3dKLqmSp (accessed April 26, 2013); Human Rights Watch interview with Brandon LeBlanc, assistant federal defender, San Diego, California, September 5, 2012.

AR.09183

officials had looked at this case: "This client who's been deported twice, twice charged with illegal reentry, and deported erroneously with a pending N600 (certification of citizenship) appeal had been a US citizen from the time he was born."[228]

"I've had four or five US citizens, every lawyer has had at least one," said Maureen Franco, a federal defender in El Paso, Texas. "The more they prosecute, the more it's happening."[229] Given the significant problems with due process within the civil immigration system, the federal criminal system has the capacity to further perpetuate serious violations.

The plea agreements also require defendants to waive all rights to other possible sentence reductions, which renders individual factors irrelevant in sentencing decisions. In Tucson, Arizona, where flip-flop plea agreements in Streamline proceedings have eliminated any room for variance in sentencing, there is nearly no discussion of individual circumstances. "A lot of [my clients] feel their human condition should matter, but it doesn't," said Daniel Anderson, who regularly represents defendants in Streamline.[230] In contrast, in Texas, where magistrate judges still decide individual sentences, Human Rights Watch observed that defense attorneys and defendants raise such factors as a need to pay for treatment for a family member's illness or the desire to reunite with US family as motives to enter the country.

In addition to raising due process concerns and questions about whether they are undercutting the requirement that federal sentencing consider "the history and characteristics of the defendant,"[231] streamlined procedures contribute to the dehumanizing impact of the US criminal justice system on tens of thousands of non-citizens.

The drive to prosecute cases, even where the defendant is a victim of egregious prior due process violations, is particularly striking. One illegal reentry case was recently dismissed in Massachusetts, a state in which only 44 people were prosecuted for illegal

---

[228] Human Rights Watch telephone interview with Sara Peloquin, April 26, 2013.

[229] Human Rights Watch interview with Maureen Franco, federal public defender, El Paso, Texas, September 25, 2012.

[230] Human Rights Watch interview with Daniel Anderson, criminal defense attorney, Tucson, Arizona, February 11, 2013.

[231] 18 US Code Section 1553 (2012).

reentry in 2011. Judge William G. Young severely questioned the prosecutor's decision to pursue this case:

> The basic fairness considerations in this case favor a decision declining to prosecute Ms. Bolieiro. Ms. Bolieiro was a lawful permanent resident. Yes, Ms. Bolierio was convicted of a drug offense, was ordered deported, and was actually removed. Moreover, her reentry into the United States under this set of circumstances was a crime. But it is also fact that the conviction precipitating this set of events was constitutionally invalid. She was deprived of legal status by a deportation order based on what has now been judged to be a constitutionally infirm conviction. The current prosecution is thus attempting to enforce a deportation order that stems from a now-vacated, constitutionally unjust conviction. The wisdom of pursuing a case under such circumstances is dubious at best.... [I]t is inexplicable why the government has continued to pursue this criminal case.[232]

---

### "Was it worth it for us to do this to him?"

Carlos Santana grew up in San Diego, California from the age of 4 and was a legal permanent resident.[233] His mother and sister are naturalized US citizens. Carlos was a nursing assistant with an interest in art and graphic design.

Nine years ago, Carlos, who is slightly built, got into a fight at a gay bar in Oregon. "It's the only fight I've ever been in," he told Human Rights Watch in Tijuana, Mexico. Carlos said he was convicted of attempted assault 2 in the lesser degree, which he was told could eventually be expunged.

Carlos was not deported immediately, but he said in 2009, with nothing else on his record, he went to court to pay a traffic ticket, where he was apprehended and deported permanently to Mexico for his prior conviction, which was classified as an "aggravated felony."

---

[232] *United States v. Lucia Maria Boliero*, Memorandum and Order, CR 11-10221-WGY, District of Massachusetts, February 13, 2013.
[233] Carlos Santana's full name is Juan Carlos Salgado Santana, but he goes by Carlos Santana.

AR.09185

Upon arrival in Mexico, Carlos, who is HIV-positive, said Mexican health officials told him it would be a year before he could get the medications he needed. He knew he would not survive without these drugs, so he immediately returned without permission to the United States. Soon afterward, he met Mark O'Brien, a US citizen, and although it was difficult for him to get the kind of work he was used to without a permanent resident card, Carlos and Mark began planning a life together in San Diego. Then, in April 2011, Carlos was biking home from Mark's apartment when he was stopped by the police, perhaps because he was biking in the wrong lane. The police referred Carlos to immigration authorities and he was eventually charged with felony illegal reentry.

Carlos received a sentence of one-and-a-half years; his attorney told him he could have received five years. Carlos and Mark had agreed that if Carlos was sentenced to more than one year, they would end their relationship, but Mark continued to visit him in prison. Carlos was first held in the federal detention center in downtown San Diego and then sent to a private facility run by the Corrections Corporation of America at Otay Mesa. Mark was angered by the way Carlos was treated at the facility in Otay Mesa: "Why are you housing him with drug dealers and gang members? This guy's only form of a weapon is a piece of paper—that's it—illegal documentation." Mark reported that Carlos was beaten up by other inmates, forced to sleep on the floor because there was not enough space, and denied food and other privileges on an arbitrary basis. Mark was particularly distraught that Carlos' imprisonment was just a precursor to his deportation: "Save us all some money, deport him, so we can get on with our lives."

He could not understand why the US government chose to treat Carlos this way. "Why can't we have a process that looks at individuals to allow him to come back? He can't even get a visa.… What did he do wrong to be closed completely out of ever coming back to the United States, to his mom, his dad, his sister, his sister's husband, his nephews, everybody here that he knows?... Was it worth it for us to do this to him? I've never been so disheartened with my country."[234]

---

[234] Human Rights Watch interviews with Carlos Santana, Tijuana, Mexico, October 23, 2012; and with Mark O'Brien, San Diego, California, October 22, 2012. A call to the prosecutor for comment on this case was not returned.

# Acknowledgments

This report was researched and written by Grace Meng, US Program researcher at Human Rights Watch, with research assistance from Ricardo Sandoval-Palos, US Program researcher; Antonio Ginatta, US Program advocate; and David Maung and Jorge Melchor, consultants. Data analysis and visualization was done by Brian Root, quantitative analyst at Human Rights Watch. It was edited by Alison Parker, US Program director; James Ross, Legal and Policy director; and Joe Saunders, deputy Program Office director. Bill Frelick, Refugees Program director; Nik Steinberg, Americas Division senior researcher; and Jamie Fellner, US Program senior advisor, also reviewed and commented on the report.

Samantha Reiser and Elena Vanko, US Program associates, provided invaluable research, editing, and production assistance, as did US Program interns Linda Corchado, Anna Hainze, and Olivia Meader. Gabriela Haymes translated the report into Spanish; Maria McFarland, US Program deputy director, reviewed the Spanish-language version. Grace Choi, publications director; Kathy Mills, publications specialist; and Fitzroy Hepkins, administrative manager, provided production assistance.

We thank the many immigrants and their families who generously and courageously shared their experiences with us for this report. We also thank the criminal defense attorneys, immigration attorneys, prosecutors, judges, community and advocacy organizations, and government officials who shared their expertise with us for this report. We thank in particular Doug Keller, former assistant federal defender, who reviewed a draft of this report, and the many federal public defenders who shared with us their personal experiences. We also thank the National Immigrant Justice Center, the Kino Border Initiative, Instituto Madre Assunta para Mujeres Migrantes, Casa del Migrante, Coalicion Pro-Defensa del Migrante, and No More Deaths. This report was informed by meetings with officials at the US Customs and Border Protection agency and at the Civil Rights Division and Executive Office of Immigration Review of the US Department of Justice, and we thank these agencies for those meetings.

For assistance with our still-pending Freedom of Information Act requests, we thank Ryan Lincoln and Matthew Richards of the law firm of Nixon Peabody for their pro bono counsel.

# TURNING MIGRANTS INTO CRIMINALS
## The Harmful Impact of US Border Prosecutions

Illegal entry and reentry to the United States are today the most prosecuted federal crimes. Although immigration enforcement is normally a civil law matter—involving fines and deportation—US officials claim that increased criminal prosecution is necessary to deter illegal immigration and keep dangerous criminals out of the country.

*Turning Migrants Into Criminals*—based on statistical analysis and nearly 200 interviews with migrants, family members, government officials, and experts— examines the recent increase in immigration prosecutions, their growing costs, and their human impact.

Human Rights Watch found that many of these prosecutions involve defendants who are not easily deterred because they seek to reunite with their US citizen children or other close family members; some are fleeing violence and persecution abroad. And the US government's own data suggests that an increasing number of non-dangerous migrants are getting swept into prison. In 2002, 42 percent of those prosecuted had prior convictions for crimes considered most serious by the US Sentencing Commission and only 17 percent had no prior felony convictions. In 2011, those figures were well on their way to reversing: the proportion previously convicted of the most serious offenses had dropped to 27 percent, and the proportion with no prior felony conviction had increased to 27 percent. Meanwhile, the prosecutions impose significant financial costs on the US, from incarceration in the expensive and overcrowded federal prison system to additional court staff, defense attorneys, prosecutors, and US Marshals.

*Turning Migrants Into Criminals* concludes that the current focus on criminal prosecution of immigration offenders is misguided and in many cases impinges on fundamental human rights. It urges US policymakers and officials to take steps to ensure that asylum seekers and non-violent offenders seeking to rejoin loved ones are not prosecuted. More generally, it urges policymakers to reassess the current prosecution-focused approach and ensure that government resources are being used effectively to protect public safety and advance US immigration objectives.



*Men recently deported from the United States wait in line to be registered with Mexican authorities at the border in Nogales, Mexico.*

*© 2010 Associated Press*

**hrw.org**

AR.09188





**HUMAN RIGHTS WATCH**

# A PRICE TOO HIGH

US Families Torn Apart by Deportations for Drug Offenses

AR.09189

AR.09190



# A Price Too High

US Families Torn Apart by
Deportations for Drug Offenses

AR.09191

Copyright © 2015 Human Rights Watch

All rights reserved.

Printed in the United States of America

ISBN: 978-1-6231-32453

Cover design by Rafael Jimenez

Human Rights Watch defends the rights of people worldwide. We scrupulously investigate abuses, expose the facts widely, and pressure those with power to respect rights and secure justice. Human Rights Watch is an independent, international organization that works as part of a vibrant movement to uphold human dignity and advance the cause of human rights for all.

Human Rights Watch is an international organization with staff in more than 40 countries, and offices in Amsterdam, Beirut, Berlin, Brussels, Chicago, Geneva, Goma, Johannesburg, London, Los Angeles, Moscow, Nairobi, New York, Paris, San Francisco, Sydney, Tokyo, Toronto, Tunis, Washington DC, and Zurich.

For more information, please visit our website: http://www.hrw.org

AR.09192



**JUNE 2015**                                                    978-1-6231-32453

# A Price Too High

Detention and Deportation of Immigrants in the US for Minor Drug Offenses

**Summary** ................................................................................................. 1

    Deportations for Drug Offenses ................................................................. 5

    Deportations under the Obama Administration ......................................... 9

    Drug Reform Should Include Immigration Reform ..................................... 10

**Key Recommendations** ........................................................................... 12

    To the United States Congress ................................................................. 12

    To the Department of Homeland Security ................................................. 12

    To State and Local Governments .............................................................. 13

**Methodology** ........................................................................................... 14

**I. Background** .......................................................................................... 15

    US Deportation Policy for Immigrants with Criminal Convictions ............. 15

    Harsh US Drug Policies ........................................................................... 16

    Recent Reforms in US Drug Policy ........................................................... 17

**II. Immigrants and the "War on Drugs"** ................................................... 20

    Historical Link between US Immigration Policy and Drug Policy ............... 20

    Deportations of Non-Citizens with Drug Convictions ............................... 22

    Immigrants' Perceived Propensity to Commit Crime ............................... 26

**III. Lawful Permanent Residents Deported for Drug Offenses** ................. 27

    "Drug Trafficking" is a Deceptive Label .................................................. 27

        Low-Level Offenses that Constitute Drug Trafficking ........................ 27

        The Difference an Individualized Hearing Can Make .......................... 33

        US Supreme Court Response to Unjust Interpretations of "Drug Trafficking" .................... 35

    Deportation for Simple Possession Offenses ........................................... 37

    Immigration Arrests for Old Offenses ...................................................... 39

    Permanent Exile and Bars to Reentering the US ....................................... 43

**IV. Permanent Denial of Legal Resident Status** ....................................... 46

1

AR.09193

The "Controlled Substance" Bar ............................................................. 46

No Individualized Assessment .............................................................. 49

## V. Drug Convictions as Bars to Asylum ............................................ 51

## VI. Mandatory Detention ................................................................. 54

Pre-Trial Detention in the Criminal Justice System versus Pre-Removal Detention in the
Immigration Detention System .............................................................. 54

Imposing Barriers to Due Process, Severe Hardship to Families ...................... 58

Recent Legal Challenges to Mandatory Detention ..................................... 62

## VII. The Overly Broad Definition of "Conviction" ......................... 64

When Successful Completion of a Diversion Program Leads to Deportation ........... 64

The Limited Impact of Pardons .............................................................. 68

## VII. The Role of Criminal Defense Attorneys and Prosecutors ........... 71

Pleading Guilty with No Counsel ............................................................ 71

Law Enforcement Consideration of Immigration Consequences ..................... 73

Limited Post-Conviction Remedies .......................................................... 75

## VIII. Drug Control, Immigration Control, and Human Rights ............ 79

US Deportation Policy and Human Rights ................................................. 79

Proportionality and Discrimination ....................................................... 79

The Right to Raise Defenses to Deportation ............................................ 81

Family Unity .................................................................................. 83

Children's Rights .............................................................................. 85

Ties to the United States .................................................................... 86

Non-Refoulement .............................................................................. 86

Lex Mitior ...................................................................................... 87

US Detention Policy and Human Rights ................................................... 88

Criminalization of Drug Use and Possession ............................................ 89

## Recommendations ........................................................................ 90

To the United States Congress .............................................................. 90

To the Department of Homeland Security ................................................. 91

To the US Attorney General and the US Department of Justice ....................... 92

To State and Local Governments ............................................................ 92

To Local Law Enforcement Agencies and Prosecutors ................................. 92

## Acknowledgments ........................................................................ 93

ER-1153

AR.09194

# Summary

### Finally Off Drugs But Facing Deportation and Family Separation

MARSHA AUSTIN is facing deportation for a 1995 conviction for attempted criminal sale of a controlled substance in the third degree, stemming from her long struggle with a dependency on crack cocaine. A 67-year-old great-grandmother, Austin came from Jamaica to New York as a lawful permanent resident in 1985. Other than two sons in Jamaica, her entire family— husband, seven children, grandchildren and great-grandchildren—lives in the United States. They are all US citizens or permanent residents.



Marsha Austin (second from right) with her US citizen husband and three of her daughters, all US citizens or lawful permanent residents. Austin, a lawful permanent resident from Jamaica, is currently fighting deportation as an "aggravated felon" because a 1995 conviction for attempted sale of a controlled substance stemming from a long struggle with dependency on crack cocaine. © 2014 Private

AR.09195

"I live in a drug-infested area," Austin said, describing her neighborhood in the Bronx in New York City. According to Austin, she began using drugs when her mother was killed after being hit by a train. For eight days, her family did not know what had happened to her. Austin said she was devastated by her death and accepted a cigarette laced with crack cocaine at her funeral.

Austin said she managed to hide her dependency from her family for many years, but her drug dependency led to a lengthy record of minor convictions, mostly for simple possession. The 1995 conviction for attempted sale happened, Austin said, when an undercover police officer asked her to go to a roof and buy five units of crack cocaine for him, for which he gave her five dollars. She pled guilty to attempted sale. She said her criminal defense attorney failed to tell her the conviction could lead to deportation.

Austin's convictions led to little or no jail time, but in 2010, Austin said her husband had a seizure, and she drank alcohol, a violation of probation, to calm herself. Her probation violation led to a 90-day sentence, at the end of which, immigration authorities arrested her. Austin eventually spent two-and-a-half years in immigration detention at a jail in Hudson County, New Jersey. ICE repeatedly opposed her release, asserting she was under mandatory detention for her drug crimes, but then unexpectedly released her in March 2013. Two days after her release, Austin was back in her treatment program. Austin proudly reports that she has been "clean as a whistle" for the past five years.

The US government continues to argue, however, that she is subject to deportation for the "aggravated felony" of her 1995 attempted sale conviction.

Austin is desperate to remain in the US. Her husband is in very bad health, as is her daughter who suffered a breakdown after her own daughter's serious illness. Austin said, "My kids and grandkids, that's what I'm living for now."[1]

---

[1] Human Rights Watch interview with Marsha Austin and Sonia Lin (Austin's attorney), New York, New York, May 5, 2014. Human Rights Watch also reviewed documents provided by Austin's attorney, including Austin's affidavit in support of her request for prosecutorial discretion.

AR.09196

## Detained and Denied the Chance to Say Goodbye to His Dying Father

According to **ARNOLD AGUAYO**, his parents brought him to the US from Mexico when he was less than a year old. He grew up in Compton, California, with parents and siblings who are all US citizens and permanent residents. Aguayo, now 38, is himself a permanent resident with five US-born children.

Aguayo said he was particularly close to his father growing up. "I was a daddy's boy, I would follow him around." Aguayo is a plumber, and he credits his father for having taught him how to fix anything, as well as "how to be humble with people, to basically be a good person." His father suffered from gout and diabetes, and Aguayo reported he had been his caregiver: "I used to do everything for him…. I was always there making sure he took his medicine."

Aguayo struggled with dependency on methamphetamine for many years. He tried to keep it "stable" and not to let it affect his family, but he ended up getting arrested several times. One time, the police pulled him over, he said, claiming his music was too loud, but he believed, "Out here, you look young, they're just going to pull you over for the hell of it." He ultimately got arrested in September 2011 for violating probation because he had not gone to treatment. Aguayo said he had already sobered up by then, motivated by his wife and children, but going to treatment required him to miss work. After he had served four months in LA County Jail for violating probation, immigration authorities picked him up and told him the US government wanted to deport him.



Arnold Aguayo, holding a photo of his father, Arnoldo Aguayo, for whom he is named. Aguayo, a lawful permanent resident who grew up in the US, was held in mandatory immigration detention for seven months in 2011 and 2012 while he fought deportation for drug convictions. During that time, his father, a US citizen, had two heart attacks and died. Aguayo requested but was denied a short leave from detention to say goodbye. © 2015 Timothy Wheeler for Human Rights Watch

AR.09197

Aguayo, as a permanent resident with possession convictions, was eligible to apply for a type of pardon, lawful permanent cancellation of removal, and fight deportation. But under US law, any drug conviction triggers mandatory immigration detention while proceedings are pending. If Aguayo had been arrested for a criminal offense, he would have had a right to a bail hearing. He had no such right to apply for an immigration bond.

Aguayo was ultimately in immigration detention for seven months. During that time, his father had two heart attacks and eventually died. His attorney and his family tried desperately to get him released so he could see his father one last time, but he said immigration authorities responded, "It's not that important." Aguayo even considered accepting deportation just so he could be released and see his father, but his family talked him out of it. "I still haven't gotten over it," he said.

Aguayo had been the primary breadwinner, and without him, his partner and children could no longer pay the rent on their home. His oldest son was diagnosed with depression. He says his detention put such a strain on his relationship that they broke up, and his partner, who is Mexican, went back to Mexico and took their two children with her. Aguayo said he now only sees them on holidays and during school vacations.

If he had never been detained, Aguayo believes, "I would still have a stable home, I'd still have my kids living with me.…Whatever I had planned [for the future] was shattered." He wanted to share his case with Human Rights Watch because, "I don't want this to happen to anyone else."[2]

There is growing consensus in the United States today that existing criminal drug laws and policies—defined by criminalization of drug use and possession, and disproportionately severe sentences for drug offenses overall—are not working and, in many respects, are doing more harm than good.

Legislators from both major political parties have called for reforms of harsh federal mandatory minimum sentencing laws. The US Department of Justice has announced new reforms and initiatives intended to address the fact that half of the more than 200,000

---

[2] Human Rights Watch interview with Arnold Aguayo, Los Angeles, California, May 19, 2014.

A PRICE TOO HIGH                                    4

AR.09198

people in federal prisons are incarcerated for drug offenses. Dozens of states have enacted far-reaching reforms, from providing judges with more discretion in sentencing drug offenders to decriminalizing and even legalizing possession of marijuana. Many jurisdictions have created drug courts and other diversion programs to minimize the use of incarceration and criminal sanctions, reflecting the principle that the harms of drug dependency are often better treated as a public health issue, rather than a criminal justice matter.

Reformers are often motivated by concerns that harsh drug laws and enforcement policies are unjust, racially discriminatory, ineffective, and wasteful, and that mandatory minimum laws in particular unfairly apply a one-size-fits-all policy to people who deserve more individualized consideration. Although existing and proposed reforms could and should go further, the momentum toward reform is a welcome effort to remedy the many ways in which drug law enforcement has contributed to serious human rights violations in the US.

This careful reexamination of US drug policy, however, has stopped short of investigating and reforming US immigration laws that essentially mandate detention, deportation, and exile each year for tens of thousands of immigrants, including lawful permanent residents, convicted of drug offenses—sometimes for offenses so minor as to result in no criminal justice sentence of imprisonment.

## Deportations for Drug Offenses

According to data released by the US Immigration and Customs Enforcement (ICE) in response to a Human Rights Watch Freedom of Information Act (FOIA) request, deportations of non-citizens whose most serious conviction was for a drug offense increased 22 percent from 2007 to 2012, totaling more than 260,000 deportations over the same period. Deportations of non-citizens with convictions for drug possession increased 43 percent. ICE claims that it does not keep track of whether these individuals were lawful permanent residents or undocumented immigrants. But, as detailed in this report, the US is deporting a significant number of both permanent residents and undocumented individuals with strong family and community ties to the US, often for minor or old drug offenses.

US immigration law began to dictate severe immigration consequences for non-citizens with drug offenses in the 1980s and 1990s, often as part of legislation passed in support of the US "War on Drugs."

Lawful permanent residents— that is, people with legal immigrant status in the US— can be deported for any drug offense, with the sole exception of a conviction for possession of 30 grams or less of marijuana. Many lawful permanent residents with convictions for simple possession are eligible to apply for and receive "cancellation of removal" to remain in the US, but they must often fight their cases while being detained without bond. If the offense is considered "drug trafficking," even if it is a low-level sales offense involving small amounts of drugs—such as selling ten dollars-worth of cocaine—permanent residents face deportation as "aggravated felons," and are disqualified from almost every defense to deportation. In such cases, immigration judges, like judges forced to impose mandatory minimum sentences in criminal cases, are barred from considering each case individually and taking into account such factors as the circumstances of the offense, rehabilitation, length of residence in the US, and ties to US family.

Unauthorized immigrants with any drug conviction, even a minor possession offense, face a lifetime bar from ever gaining legal status even if they have close US citizen relatives. US law imposes a bar to gaining legal status for other crimes as well, but while non-citizens with convictions for many other crimes, like assault or fraud, can apply for a "waiver" of the bar if they can show a US citizen or permanent resident family member would suffer extreme hardship, no such waiver exists for drug offenses (the sole exception is a single conviction for possession of 30 grams or less of marijuana).

Once deported, non-citizens are permanently barred by their drug offenses from returning to live with their families in the US. For many, as described by one immigration attorney, deportation can feel like a life sentence without the possibility of parole.

Non-citizens who fear persecution if returned to their countries are ineligible for asylum if they have a drug conviction that has any element of sale, because such offenses are all considered drug trafficking convictions and deemed "particularly serious crimes."

US immigration law also mandates detention, with no opportunity to apply for bond, for anyone (including lawful permanent residents) with a conviction for a controlled substance offense. Thus, immigrants who received no sentence, or relatively short criminal sentences, for minor drug offenses can end up spending months or even years in immigration detention.

A Price Too High        6

AR.09200

Immigrants who successfully complete drug diversion programs and have their convictions expunged can still end up deported and permanently separated from their families for these offenses. Even pardons do not eliminate the immigration consequences of a drug crime.

Criminal defense attorneys have an obligation, under the 2010 Supreme Court case *Padilla v. Kentucky* (involving a permanent resident who pled guilty to transporting marijuana) to advise their non-citizen clients about the immigration consequences of a guilty plea, and defense attorneys who are well-versed in immigration law are sometimes able to negotiate plea deals that allow their clients to avoid deportation. But numerous immigrants and immigration attorneys reported cases in which the criminal defense attorneys had failed to properly advise their clients. Indigent immigrants must rely on court-appointed counsel, whose access to immigration law expertise and other resources can vary widely from state to state and county to county. Furthermore, because minor drug offenses increasingly carry little jail time, criminal defense counsel may be particularly unaware that severe immigration consequences can follow a conviction or plea. In some jurisdictions, the drug offenses that trigger detention and deportation are so minor that individuals regularly plead guilty to these crimes without a lawyer.

The ability of defense counsel to negotiate "immigration-safe" pleas can also vary widely depending on the willingness of prosecutors in that jurisdiction to consider immigration collateral consequences. While some prosecutors have publicly spoken out against unfair immigration collateral consequences, others remain reluctant and sometimes actively hostile toward efforts by defense counsel to avoid such consequences. Immigrants who plead guilty without proper advice from their attorneys can sometimes vacate their pleas and avoid deportation, but the feasibility of post-conviction relief also varies significantly from jurisdiction to jurisdiction.

Among the cases reported to Human Rights Watch are the following:

- Raul Valdez, a permanent resident from Mexico who had grown up in the US from the age of one, was deported in 2014 because of a 2003 conviction for possession of cannabis with intent to deliver, for which he had been sentenced to 60 days in jail.

- Ricardo Fuenzalida, a permanent resident from Chile, spent three months in mandatory immigration detention in 2013 fighting deportation because of two marijuana possession convictions that occurred 13 years earlier.

- Abdulhakim Haji-Eda, a refugee from Ethiopia who came to the US at the age of 13, was ordered removed as a drug trafficker for a single conviction for selling a small quantity of cocaine at the age of 18. Now 26 years old, he has no other convictions and is married to a US citizen and has two US citizen children.

- Marion Scholz, a permanent resident from Germany who had lived in the US for over 45 years, was deported in 2014 because of two convictions for misdemeanor possession stemming from drug dependency, which she has since overcome.

- "Antonio S.," who came to the US from Mexico when he was 12 and was eligible for a reprieve from deportation as a "DREAMer" under the executive program Deferred Action for Childhood Arrivals, was detained for over a year and deported after a conviction for possession of marijuana, a municipal violation to which he pleaded guilty without an attorney.

- "Alice M.," a 41-year-old graphic designer and Canadian citizen, reported she is barred from living in the US with her US citizen fiancé because of a single 1992 conviction for cocaine possession she received in Canada in her last year of high school, a conviction that was pardoned long ago in Canada.

- "Mr. V.," a refugee and permanent resident from Vietnam, was ordered deported in 2008 for a 1999 conviction for possession of crack cocaine. Although he has since been granted a full and unconditional pardon from the state of South Carolina, Mr. V. remains under a deportation order and remains in the US only because of restrictions on the repatriation of certain Vietnamese nationals.

Drug offenses are not the only types of crime that trigger such draconian immigration consequences. Human Rights Watch has long advocated for changes to the US immigration system that essentially mandate deportation, exile, and family separation for a wide range of offenses. But this report focuses on the impact drug convictions have had on immigrants because the categorical treatment of nearly all drug offenses as warranting detention and deportation, on top of any criminal justice sentence, is in such sharp contrast to the growing recognition that severely punitive sentences for drug offenses in the criminal justice system are unwarranted and ineffective.

AR.09202

## Deportations under the Obama Administration

The impact of abusive immigration laws has been exacerbated by the Obama administration's pursuit of a deportation policy focused on immigrants with criminal convictions.

Despite the administration's claims that enforcement targets those who pose a threat to public safety, many of the cases reported to Human Rights Watch involve immigration arrests of people with convictions for drug offenses, many of them minor or committed many years earlier. Those arrested were often lawful permanent residents or unauthorized immigrants with US citizen family.

In announcing his executive action in November 2014, President Obama said "[O]ver the past six years, deportations of criminals are up 80 percent. And that's why we're going to keep focusing enforcement resources on actual threats to our security. Felons, not families. Criminals, not children. Gang members, not a mom who's working hard to provide for her kids." But the reforms, while a positive step in some respects, largely fail to address the dynamic of targeting immigrants who pose little to no threat to public safety.

At the same time, the executive actions hold out the possibility of a more nuanced approach. The eligibility requirements for its executive programs (Deferred Action for Childhood Arrivals, which began in June 2012, and the newer programs announced in 2014) do not automatically disqualify anyone with a misdemeanor conviction for simple possession, though they do disqualify anyone with a felony conviction. The most recent enforcement priorities memorandum issued by the US Department of Homeland Security (DHS), effective January 5, 2015, also states the administration would be willing to consider exercising prosecutorial discretion in favor of individuals with criminal convictions, including those that make them enforcement priorities, if they can show strong equities, such as length of time since the conviction, length of time in the US, and family or community ties to the US.

As of date of publication, DHS has not issued any data or other information regarding the implementation of the memorandum and the implementation of the newer executive actions has been delayed by an injunction granted in response to a federal lawsuit.

## Drug Reform Should Include Immigration Reform

The Obama administration recognizes that the US criminal justice system can produce deeply unjust outcomes and can have a particularly devastating impact on communities of color. Attorney General Eric Holder, referring to "the destabilizing effect [of the federal criminal justice system] on particular communities, largely poor and of color," specifically noted in a 2013 speech to the American Bar Association that "tens of thousands of statutes and regulations … impose unwise and counterproductive collateral consequences," and further stated his department's intent "to consider whether any proposed regulation or guidance may impose unnecessary collateral consequences on those seeking to rejoin their communities."[3] Yet by doggedly pursuing the deportation of non-citizens with criminal convictions, without more nuanced acknowledgment that not all "criminal aliens" actually pose a threat to public safety or national security, the US government has exacerbated the consequences of harsh drug enforcement and barred hundreds of thousands of people with convictions for nonviolent drug offenses from rejoining their communities.

At the same time, the US Congress has shown no inclination to reform draconian laws that have denied lawful permanent residents and long-term unauthorized immigrants with criminal convictions the opportunity to have an individualized hearing before an immigration judge, the kind of discretion liberals and conservatives increasingly recognize is needed in the criminal justice system. Congress has sought instead to include more offenses in the category of "aggravated felonies" that require deportation of non-citizens with criminal convictions, regardless of how minor or old the offense and without any opportunity for the affected individual to get an individualized hearing before a judge Hundreds of thousands of families have been separated due to such laws.

Under international human rights law, the US government has the right to regulate its borders, and states have a particular interest in restricting the entry of those who pose a threat to public safety. But current US immigration policies toward drug offenders violate several provisions and principles of international law, including that punishment be

---

[3] US Department of Justice, "Attorney General Eric Holder Delivers Remarks at the Annual Meeting of the American Bar Association's House of Delegates," August 12, 2013, http://www.justice.gov/opa/speech/attorney-general-eric-holder-delivers-remarks-annual-meeting-american-bar-associations (accessed May 26, 2015).

AR.09204

proportional to the offense, the right to present defenses to deportation, the right to family unity, and the best interests of the child.

The president, Congress, and all who care about reforming US drug policy and reducing excessive punishment for drug offenses should extend their reform efforts to include US immigration law and policy. The US should restore immigration judges' discretion to consider cases involving drug offenses and other criminal convictions on a case-by-case basis, weighing such factors as the seriousness of the offense, evidence of rehabilitation, family ties, the best interests of any minor children, and other similar factors.

Congress should eliminate the permanent bar to entering the US for any drug offense, and at the very least, should create a waiver that provides those with strong family ties the opportunity to demonstrate they are not a threat to public safety. Congress should also eliminate mandatory detention and amend the overly broad definition of a conviction that can include expunged and pardoned drug offenses.

State and local governments and law enforcement agencies should help minimize the collateral consequences of nonviolent drug offenses by creating diversion programs that help non-citizens avoid a conviction, as defined by immigration law, and decriminalizing the personal use of drugs.

It is encouraging that many US legislators and policymakers are working to create a criminal justice system that treats drug offenders more fairly and humanely. We urge these legislators and policymakers not to ignore US families and communities being destroyed by detention, deportation, and family separation that can follow convictions for the same offenses.

AR.09205

# Key Recommendations

## To the United States Congress

- Eliminate deportation based on convictions for simple possession of drugs.

- Ensure that all non-citizens in deportation proceedings, including those with convictions for drug offenses, have access to an individualized hearing where the immigration judge can weigh evidence of rehabilitation, family ties, and other equities against a criminal conviction.

- Ensure that refugees and asylum seekers with convictions for sale, distribution, or production of drugs are only considered to have been convicted of a "particularly serious crime" through case-by-case determination that takes into account the seriousness of the crime and whether the non-citizen is a threat to public safety.

- Ensure that non-citizens who are barred from entering the US and/or gaining lawful resident status because of a criminal conviction, including for drug offenses, are eligible to apply for individualized consideration, i.e., a waiver of the bar, based on such factors as the above mentioned.

- Eliminate mandatory detention and ensure all non-citizens are given an opportunity for an individualized bond hearing.

- Redefine "conviction" in immigration law to exclude convictions that have been expunged, pardoned, vacated, or are otherwise not recognized by the jurisdiction in which the conviction occurred.

- Decriminalize the personal use of drugs, as well as possession of drugs for personal use.

## To the Department of Homeland Security

- Provide clear guidance to immigration officials that a positive exercise of prosecutorial discretion may be appropriate even in cases involving non-citizens with criminal convictions, with particular consideration for lawful permanent residents and non-citizens whose most serious convictions are for nonviolent offenses, including drug convictions, that occurred five or more years ago.

AR.09206

- Provide all non-citizens who have been in detention for six months or more with a bond hearing.

## To State and Local Governments

- Ensure drug courts and diversion programs do not require a guilty plea from defendants that would constitute a conviction that triggers deportation, mandatory detention, and other immigration consequences even upon successful completion of the program.

- Remove barriers to post-conviction relief for non-citizens convicted of nonviolent drug offenses through legal error, including through guilty pleas obtained without adequate advice from defense counsel on the potential immigration consequences of the plea.

- Decriminalize the personal use of drugs, as well as possession of drugs for personal use.

# Methodology

This report is based primarily on interviews conducted between February 2014 and June 2015 and information obtained from a Freedom of Information Act (FOIA) request. It also relies on federal court decisions, news articles, and other publicly available sources.

Human Rights Watch conducted more than 132 interviews with non-citizens who had been arrested for or convicted of drug offenses, the vast majority of whom were placed into deportation proceedings; family members; immigration and criminal defense attorneys and paralegals; prosecutors; law enforcement officials; and drug policy and criminal justice reform advocates. We interviewed individuals, family members, and attorneys regarding a total of 71 cases and reviewed news articles and federal court decisions in several additional cases.

Criminal defense and immigration attorneys and local advocates referred us to individuals and families in many cases. In others, individuals contacted us directly to share their stories. The 70 cases we reviewed do not represent a random sample of non-citizens with drug convictions who were put into deportation proceedings, but they involve non-citizens from 17 different countries with convictions for possession, distribution, and production of a variety of drugs, obtained under drug laws in 16 states (California, Colorado, Florida, Illinois, Maryland, New York, New Jersey, North Carolina, Ohio, Oregon, South Carolina, Tennessee, Texas, Virginia, Washington, Wisconsin), in the federal criminal justice system, and in other countries.

We also analyzed data received in response to a Freedom of Information Act request submitted to US Immigration and Customs Enforcement for individualized record data on non-citizens deported for criminal convictions. We examined publicly available data published by other organizations, such as the Transactional Records Access Clearinghouse, as well as US government agencies, such as the US Department of Homeland Security, US Immigration and Customs Enforcement, and the Bureau of Justice Statistics.

Interviews were conducted in person or by telephone, and in English, Spanish, Korean, and Cantonese, with an interpreter for the Spanish and Cantonese interviews. All participants were informed of the purpose of the interview and consented orally. No interviewee received compensation for providing information. Where appropriate, Human Rights Watch provided interviewees with contact information for individuals and organizations providing legal, counseling, or other supportive services at the conclusion of the interview. We have used pseudonyms to protect the privacy of certain individuals at their request.

# I. Background

## US Deportation Policy for Immigrants with Criminal Convictions

In 2007 and 2009, Human Rights Watch published reports documenting how hundreds of thousands of families had been forced apart by punitive and inflexible US deportation policies against non-citizens with criminal convictions, regardless of how minor or old the offense.[4] We found that between 1997 and 2007, of the almost 900,000 non-citizens with criminal convictions who had been deported, 72 percent had been deported for nonviolent offenses. Twenty percent had been in the US legally, often for decades.

Since our reports, the Obama administration has pursued policies that have resulted in a record number of deportations: more than 2.3 million from fiscal years 2009 through 2014.[5] The administration claims its focus is on serious criminals, particularly with regard to enforcement in the interior of the country.[6] According to US government data, the proportion of deportations involving individuals with criminal convictions is at a record high. In fiscal year 2014, 56 percent of removals involved people who had previously been convicted of a crime.[7]

Yet the government's own numbers indicate that a significant majority of these deportations involve people with convictions for minor and nonviolent offenses. The Transactional Records Access Clearinghouse at Syracuse University found that in fiscal year 2013, only 12 percent of all deportees had committed an offense labeled a serious or "Level 1" offense, according to the Department of Homeland Security (DHS)

---

[4] Human Rights Watch, *Forced Apart: Families Separated and Immigrants Harmed by United States Deportation Policy*, July 2007, http://www.hrw.org/reports/2007/07/16/forced-apart-0.; Human Rights Watch, *Forced Apart (By the Numbers): Non-Citizens Deported Mostly for Nonviolent Offenses*, April 2009, http://www.hrw.org/reports/2009/04/15/forced-apart-numbers-0.

[5] US Department of Homeland Security, Yearbook of Immigration Statistics: 2012, Enforcement Actions: Table 39: Aliens Removed or Returned: Fiscal Years 1982 to 2012, last published January 17, 2014, http://www.dhs.gov/yearbook-immigration-statistics-2012-enforcement-actions (accessed August 27, 2014); US Department of Homeland Security, US Immigration and Customs Enforcement, "FY 2014 ICE Immigration Removals," https://www.ice.gov/removal-statistics/ (accessed April 16, 2015).

[6] US Department of Homeland Security, US Immigration and Customs Enforcement, "FY 2014 ICE Immigration Removals," http://www.ice.gov/removal-statistics (accessed April 15, 2015).

[7] Ibid.

AR.09209

definition.[8] The most serious conviction held by half of those who were deported was an immigration or traffic violation.[9]

The increase in deportations, including of those with criminal convictions, was aided significantly by Secure Communities, a program that began in 2008 and was fully implemented throughout the US in 2013, that effectively linked the US immigration enforcement system with local law enforcement activities.[10] In November 2013, DHS announced it was discontinuing the program, and would now request that local law enforcement agencies notify ICE of pending releases of non-citizens convicted of certain priority criminal offenses or believed to pose a danger to national security.[11] The impact of this change is still being evaluated.

## Harsh US Drug Policies

Throughout the US, individuals are regularly convicted of possession, production, and distribution of drugs under stringent laws and as a result of aggressive policing and prosecution policies. In 2013, nearly half a million people in the US were in prisons and jails for drug offenses, a dramatic increase from 40,900 people in 1980.[12]

First-time offenders can end up with severe sentences under mandatory minimum sentencing laws for being found with a certain quantity of certain types of drugs, rather than because the evidence shows they played a significant role in drug trafficking.[13] Thus, prosecutors can charge a low-level courier delivering drugs with the same crime as the

---

[8] Transactional Records Access Clearinghouse, "Secure Communities: A Failed Program?," April 18, 2014, http://trac.syr.edu/immigration/reports/349/ (accessed August 11, 2014).

[9] Ibid. See also Ginger Thompson and Sarah Cohen, "More Deportations Follow Minor Crimes, Records Show," *New York Times*, April 6, 2014, http://www.nytimes.com/2014/04/07/us/more-deportations-follow-minor-crimes-data-shows.html (accessed August 11, 2014).

[10] US Immigration and Customs Enforcement, "Secure Communities," http://www.ice.gov/secure-communities (accessed April 16, 2015).

[11] Memorandum of Jeh Johnson, US Department of Homeland Security Secretary, to Thomas S. Winkowski, US Immigration and Customs Enforcement Acting Director, et al., "Secure Communities," November 20, 2014, http://www.dhs.gov/sites/default/files/publications/14_1120_memo_secure_communities.pdf (accessed April 16, 2015).

[12] The Sentencing Project, "Trends in US Corrections Fact Sheet," http://www.sentencingproject.org/detail/publication.cfm?publication_id=398 (accessed May 28, 2015).

[13] Human Rights Watch, *Cruel and Unusual: Disproportionate Sentences for New York Drug Offenders*, March 1997, http://www.hrw.org/reports/1997/usny/.

AR.09210

drug boss who receives the package. The threat of long mandatory minimum sentences can also pressure defendants to plead guilty, rather than risk going to trial.[14]

Drug law enforcement, as documented in several Human Rights Watch reports, is also marked by severe and unjustifiable racial disparities.[15]

## Recent Reforms in US Drug Policy

The US continues to spend billions of dollars on drug law enforcement each year, but there is a growing consensus among state and federal legislators and policymakers that harsh criminal sanctions for drug use and distribution may not be the most just, effective, or cost-efficient way to address the societal harms of such conduct.

On a federal level, Congress and the executive branch have enacted reforms that seek to reduce the severely punitive effects of mandatory minimum sentencing laws for drug crimes. In 2010, Congress passed the Fair Sentencing Act to reduce the massive disparity in the amounts of crack versus powder cocaine that triggered mandatory minimum sentences, a disparity that had had a disproportionate impact on African Americans.[16]

---

[14] Human Rights Watch, *An Offer You Can't Refuse: How US Federal Prosecutors Force Drug Defendants to Plead Guilty*, December 5, 2013, http://www.hrw.org/reports/2013/12/05/offer-you-can-t-refuse.

[15] According to 2012 surveys conducted by the federal Substance Abuse and Mental Health Services Administration (SAMHSA), rates of drug use do not vary significantly among ethnicities: 11.3 percent of African Americans and 8.3 percent of Hispanics report illicit drug use, compared to 9.2 percent among whites. But African Americans and Hispanics are significantly overrepresented among those serving prison sentences for drug offenses. In 2011, African Americans and Hispanics made up 24.3 and 25.5 percent of new admissions to state prison for drug offenses, despite making up only 13 and 17 percent of the US population in general. E. Ann Carson and Daniela Golinelli, "Prisoners in 2012," US Department of Justice, Bureau of Justice Statistics, December 2013, http://www.bjs.gov/content/pub/pdf/p12tar9112.pdf, Table 8; US Census Bureau, "Quick Facts," http://quickfacts.census.gov/qfd/states/00000.html (accessed August 5, 2014). See also Californians for Safety and Justice, "Latino Voices: The Impacts of Crime and Criminal Justice Policies on Latinos," June 2014, http://www.safeandjust.org/news-media/LatinoReportRelease (accessed August 5, 2014). The Uniform Crime Reports issued by the Federal Bureau of Investigations does not keep track of arrest data by ethnicity, but in New York City, Latinos are arrested for marijuana possession at four times the rate of whites. See Lynda Garcia, "The War on Marijuana Has a Latino Data Problem," ACLU Blog of Rights, June 14, 2013, https://www.aclu.org/blog/criminal-law-reform-racial-justice/war-marijuana-has-latino-data-problem (accessed August 13, 2014); Christopher Mathias, "NYPD Still making Thousands of Marijuana Arrests, and One Lawmaker Has Had Enough," *Huffington Post*, May 28, 2014, http://www.huffingtonpost.com/2014/05/28/nypd-marijuana-hakeem-jeffries_n_5400453.html.

[16] Human Rights Watch, "US: End in Sight for Infamous Crack Cocaine Laws: Legislation to Address Racial Disparity in Sentencing Heads to President Obama's Desk," July 28, 2010, http://www.hrw.org/news/2010/07/28/us-end-sight-infamous-crack-cocaine-laws. Although Congress did not eliminate the disparity altogether and refrained from making the change retroactive, so as to reduce sentences for people convicted before enactment of the new law, the US Sentencing Commission in 2011 voted unanimously to make the new federal crack cocaine sentencing guidelines retroactive. Human Rights Watch, "US: Crack Cocaine Ruling a Victory for Rights," July 1, 2011, http://www.hrw.org/news/2011/07/01/us-crack-cocaine-ruling-victory-rights.

AR.09211

Since then, federal lawmakers from both the Democratic and Republican parties have called for further reforms. Senator Rand Paul at a 2013 hearing before the Senate Judiciary Committee called federal mandatory minimums "a major culprit in our unbalanced and often unjust drug laws."[17] Attorney General Eric Holder and the US Department of Justice have made several efforts in recent years to minimize the effects of mandatory minimum sentences in the federal system, including instructions to US Attorneys to charge defendants in a way to avoid triggering mandatory minimum sentences and a clemency program for drug convicts serving longer sentences than they would have received under current law.[18]

On a state level, 29 state legislatures have rolled back state mandatory minimum sentencing laws since 2000, and most of them have addressed nonviolent drug-related offenses.[19] Thus, although drug offenders continue to comprise a significant proportion of the US prison population, new commitments of individuals to state prisons for drug offenses decreased 22 percent between 2006 and 2011.[20]

Numerous states, counties, and localities have also created drug courts and other types of diversion programs intended to provide defendants with drug dependency problems opportunities to seek treatment, avoid incarceration, and reduce drug use relapse and criminal recidivism. There are now more than 2,800 drug courts across the US.[21] Some have criticized drug courts for continuing a punitive approach toward drug use[22], but their

---

[17] Statement of Rand Paul, "Reevaluating the Effectiveness of Federal Mandatory Minimum Sentences," Hearing before the Senate Judiciary Committee, September 18, 2013. http://www.randpaul2016.com/2013/09/senator-rand-pauls-testimony-senate-judiciary-committee-reevaluating-effectiveness-mandatory-minimum-sentences/ (accessed August 27, 2014).

[18] Sari Horwitz, "Holder seeks to avert mandatory minimum sentences for some low-level drug offenders," *Washington Post*, August 12, 2013, http://www.washingtonpost.com/world/national-security/holder-seeks-to-avert-mandatory-minimum-sentences-for-some-low-level-drug-offenders/2013/08/11/343850c2-012c-11e3-96a8-d3b921c0924a_story.html (accessed August 5, 2014); Josh Gerstein, "Obama drug clemency guidelines issued," *Politico*, April 23, 2014, http://www.politico.com/blogs/under-the-radar/2014/04/obama-drug-clemency-guidelines-issued-187266.html (accessed August 5, 2014).

[19] Ram Subramanian and Ruth Delaney, Vera Institute of Justice, "Playbook for Change?: States Reconsider Mandatory Sentences," Policy Report, February 2014 (Updated April 4, 2014), http://www.vera.org/sites/default/files/resources/downloads/mandatory-sentences-policy-report-v3.pdf (accessed August 5, 2014).

[20] Carson and Golinelli, "Prisoners in 2012," http://wwww.bjs.gov/content/pub/pdf/p12.pdf, p. 2.

[21] US Department of Justice, Office of Justice Programs, "Drug Courts," May 2014, https://ncjrs.gov/pdffiles1/nij/238527.pdf (accessed August 5, 2014).

[22] See, e.g., Drug Policy Alliance, "Drug Courts Are Not the Answer: Toward a Health-Centered Approach to Drug Use," March 2011, http://www.drugpolicy.org/sites/default/files/Drug%20Courts%20Are%20Not%20the%20Answer_Final2.pdf (accessed August 5, 2014).

A Price Too High      18

AR.09212

proliferation reflects some agreement that drug and drug-related offenses may stem from drug dependency requiring treatment as a public health issue, not a criminal one. A few jurisdictions, such as Seattle-King County, Washington, and Santa Fe, New Mexico, have begun to experiment with pre-arrest diversion, in which police have the option to offer community-based services to low-level offenders instead of jail and prosecution.[23]

The changes have been most pronounced with respect to marijuana. Eighteen states have decriminalized possession of small amounts of marijuana, and Colorado, Washington, Alaska, Oregon, and the District of Columbia have legalized recreational use of marijuana altogether.[24] These changes reflect a major shift in US public opinion, with only 45 percent in 2014 opposing the legalization of marijuana, compared to 78 percent in 1991.[25]

---

[23] Drug Policy Alliance, "Law Enforcement Assisted Diversion (LEAD): Reducing the Role of Criminalization in Local Drug Control," February 2014, http://www.drugpolicy.org/sites/default/files/DPA_Fact_sheet_Law_Enforcement_Assisted_Diversion_LEAD_Feb2014.pdf (accessed August 5, 2014).

[24] NORML, "States that have decriminalized," http://norml.org/aboutmarijuana/item/states-that-have-decriminalized (accessed April 8, 2015). See also Drug Policy Alliance, "Marijuana Legalization and Regulation," http://www.drugpolicy.org/marijuana-legalization-and-regulation (accessed April 6, 2015). Although Washington, DC, voters approved a bill legalizing the recreational use of marijuana, Congress has sought to block implementation of the law. William Cummings, "Pot now legal in D.C. despite threats from Congress," *USA Today*, February 25, 2015, http://www.usatoday.com/story/news/nation/2015/02/25/dc-marijuana-legalization/24033803/ (accessed April 6, 2015).

[25] Pew Research, Center for the People & the Press, "Majority Now Supports Legalizing Marijuana," April 4, 2013, http://www.people-press.org/2013/04/04/majority-now-supports-legalizing-marijuana/ (accessed August 5, 2014).

# II. Immigrants and the "War on Drugs"

## Historical Link between US Immigration Policy and Drug Policy

Drug crimes have been deportable offenses since 1922,[26] but the harshest immigration consequences for drug crimes and other offenses came into effect in the 1980s and 1990s, when US legislators began to include immigration regulation as a major component of the so-called "War on Drugs."

The Anti-Drug Abuse Act of 1986 enacted harsh mandatory minimum sentences for drug offenses, including severely disparate sentences for crack versus powder cocaine. The ADAA of 1986 also authorized the use of "detainers," under a subsection titled the "Narcotics Traffickers Deportation Act," by which immigration authorities could request that local law enforcement agencies hold people arrested for controlled substance offenses until they could be taken into immigration custody.[27] These detainers have since been interpreted by DHS to allow for immigration holds on people arrested for a much wider range of offenses, leading to considerable controversy and federal litigation in recent years.[28]

Two years later, the Anti-Drug Abuse Act of 1988 sought to further address "an expansive drug syndicate established and managed by illegal aliens," in the words of Florida senator Lawton Chiles.[29] The ADAA of 1988 created the concept of the "aggravated felony," limited at that point to three crimes: murder, firearms trafficking, and drug trafficking. As one law professor put it, "Congress … viewed these crimes as, if not analogous, at least worthy of mention in the same breath."[30] Those convicted of aggravated felonies were now subject to mandatory detention and fewer procedural rights so as to expedite deportation.[31]

---

[26] Narcotic Drugs Import and Export Act of 1922. The Immigration and Nationality Act in 1952 codified exclusions and deportations of non-citizens who are "narcotic drug addicts" or convicted of a drug offense into the modern immigration system. Immigration and Nationality Act of 1952, 82 P.L. 414; 666 Stat. 163; 82 Cong. Ch. 477.

[27] Anti-Drug Abuse Act, Pub. L. No. 99-570, 100 Stat. 3207, § 1751 (1986). *See also* Cesar Cuauhtemoc Garcia Hernandez, "Immigration Detention as Punishment," *UCLA Law Review*, Vo. 61, No. 5, June 2014, p. 1363.

[28] See Julia Preston, "Sheriffs Limit Detention of Immigrants," *New York Times*, April 18, 2014, http://www.nytimes.com/2014/04/19/us/politics/sheriffs-limit-detention-of-immigrants.html (accessed April 15, 2015).

[29] Opening Statement of Senator Lawton Chiles, "Illegal Alien Felons: A Federal Responsibility," Hearing before the Subcommittee on Federal Spending, Budget, and Accounting of the Committee on Governmental Affairs, 100th Cong. 1st session, March 12, 1987.

[30] Garcia Hernandez, "Immigration Detention as Punishment," *UCLA Law Review*, p.1366.

[31] Anti-Drug Abuse Act of 1988, Section 7343.

AR.09214

Soon afterward, then-President George H. W. Bush signed the Immigration Act of 1990 into law, declaring that it "meets several objectives of my Administration's war on drugs and violent crime" and "improves this Administration's ability to secure the U.S. border—the front lines of the war on drugs."[32] It eliminated the "Judicial Recommendations Against Deportation," a provision that had previously allowed sentencing judges to make recommendations against deportation for non-citizens. The 1990 law also disqualified noncitizens with aggravated felony convictions who had served a term of imprisonment of at least five years from 212(c) relief, a now-defunct form of relief from deportation by which legal residents who were deportable for criminal convictions could present evidence of family ties, rehabilitation, and other positive factors to the immigration judge tasked with deciding whether to deport them.[33] The Immigration Act of 1990 also made certain criminal convictions, including those for controlled substance offenses, bars to entering the US.[34]

In 1996, with the passage of the Anti-Terrorism and Effective Death Penalty Act and the Illegal Immigration Reform and Immigrant Responsibility Act, Congress substantially expanded its efforts to deport and bar non-citizens with criminal convictions. It dramatically broadened the definition of an "aggravated felony" to encompass a whole host of minor offenses—capturing offenses as minor as shoplifting and turnstile jumping—and completely eliminated eligibility for relief from deportation through an individualized hearing before an immigration judge for anyone convicted of an "aggravated felony," regardless of the length of sentence imposed. Congress also significantly broadened the definition of a "conviction" to include dispositions that the criminal justice system does not consider a "conviction," including convictions that have been expunged, such as those following diversion programs like those offered by drug courts. And it expanded grounds for mandatory detention to include any controlled substance offense (and other non-drug offenses) as well as drug trafficking offenses.[35]

---

[32] George H. W. Bush, "Statement on Signing the Immigration Act of 1990," November 29, 1990, http://www.presidency.ucsb.edu/ws/index.php?pid=19117#axzz1OsUYZ1g (accessed March 31, 2015). See also Garcia Hernandez, "Immigration Detention as Punishment," *UCLA Law Review*, p. 1366.

[33] Immigration Act of 1990, Pub. L. 101-649, 104 Stat. 4978 (November 29, 1990). See also Norton Tooby and Joseph Justin Rollin, "Evolution of the Definition of Aggravated Felony," 2007, http://nortontooby.com/pdf/FreeChecklists/EvoAggFelonyStatute.pdf (accessed April 15, 2015).

[34] Nancy Morawetz, "Article: Rethinking Drug Inadmissibility," *William and Mary Law Review*, vol. 50, October 2008, p. 174-175.

[35] The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA),Pub. L. No. 104-132, 110 Stat. 1214 279 (April 24, 1996); the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRAIRA), Pub. L. No. 104-208, 100 Stat. 3009 (September 30, 1996).

## Deportations of Non-Citizens with Drug Convictions

US deportation policy toward immigrants with criminal convictions was shaped initially by concerns about curtailing international drug trafficking. But as the US government's own numbers show, many of the hundreds of thousands of non-citizens who have been deported for drug offenses over the years have not been engaged in drug trafficking but rather, engaged in more minor conduct.



FIGURE 1: DEPORTATION OF NON-CITIZENS WITH A DRUG CONVICTION

Number of non-citizens deported each fiscal year whose most serious conviction was for a drug offense.

Source: ICE data provided to HRW through a Freedom of Information Act request. On file with Human Rights Watch.

According to data Human Rights Watch received from ICE in response to a request under the Freedom of Information Act, between 2007 and 2012 almost 266,000 deported non-citizens had a drug conviction as their most serious conviction. They constituted one out of every four removals of non-citizens with a criminal conviction.[36]

---

[36] DHS's published numbers do not match the data provided to us by ICE, suggesting that the definition of removals used by ICE in response to our FOIA request differed from the definition used by DHS in its annual publications. However, DHS's data also reveals how common drug offenses are among deported non-citizens. Until 2012, "dangerous drugs—US immigration authorities' catch-all term for drug offenses—was consistently the most common category of crimes for which non-citizens had convictions before being deported. In 2013, immigrants with a drug conviction as their most serious conviction were only

AR.09216



FIGURE 2: TYPES OF CONDUCT IN DRUG CONVICTIONS, FY2007-2012

Percentage of drug convictions, by type of conduct, held by deported non-citizens whose most serious conviction was for a drug offense.

Possession **38.3%**

Unspecified 30.9%

Sales/ Manufacturing/ Smuggling **30.8%**

Source: ICE data provided to HRW through a Freedom of Information Act request. On file with Human Rights Watch.

The type of conduct was unspecified in 31 percent of cases, but possession convictions were most common (38 percent), with the remainder involving sale, smuggling, trafficking, and manufacturing.[37] It should be noted that convictions for sale can include low-level sales offenses that often result in little or no prison time in the criminal justice system.

---

outnumbered by those with convictions for immigration offenses. US Department of Homeland Security, "Immigration Enforcement Actions: 2013," p. 7.

[37] The data Human Rights Watch received from ICE included crime codes from the National Crime Information Center (NCIC) Code Manual. The "unspecified" convictions in our dataset are offenses where the type of conduct or drug is not decipherable from the NCIC codes used.



**FIGURE 3A:**
Number of non-citizens deported each fiscal year by type of conduct.

**19,554** in FY2012 for Possession

**15,259** for Sales/ Manufacturing/ Smuggling

**11,922** for Unspecified

13,630
12,397
11,218

**FIGURE 3B:**
Percent change between 2007 – 2012 in number of annual deportations of non-citizens with drug convictions by type of conduct.

Possession **43**%

Sales/ Manufacturing/ Smuggling **23**%

Unspecified **6**%

Source: ICE data provided to HRW through a Freedom of Information Act request. On file with Human Rights Watch.

Notably, deportations after drug convictions increased significantly from 2007 to 2012. In particular, deportations after convictions for drug possession increased 43 percent, while deportations after convictions for sales, smuggling, or manufacture increased 23 percent.



**FIGURE 4: TYPES OF DRUGS INVOLVED IN DRUG CONVICTIONS, FY2007-2012**
Percentage of convictions, by type of drug involved, held by deported non-citizens whose most serious conviction was for a drug offense.

- Cocaine 30%
- Marijuana 25%
- Unspecified 24%
- Amphetamine 10%
- Other 6%
- 5% Heroin, Opium or Derivatives

Source: ICE data provided to HRW through a Freedom of Information Act request. On file with Human Rights Watch.



**FIGURE 5: FIVE MOST FREQUENT DRUG OFFENSES, FY2007-2012**
Number of non-citizens deported, by drug offense, whose most serious conviction was for a drug offense.

- Unspecified: 51,512
- Cocaine Possession: 41,925
- Marijuana Possession: 34,337
- Cocaine Sale: 27,899
- Marijuana Sale: 18,151

Source: ICE data provided to HRW through a Freedom of Information Act request. On file with Human Rights Watch.

In nearly 25 percent of these cases, the drug type was unspecified. Another quarter involved a conviction for marijuana. Over 34,000 deported non-citizens had a marijuana possession conviction as their most serious conviction.

ER-1178

AR.09219

## Immigrants' Perceived Propensity to Commit Crime

Immigrants are sometimes perceived by legislators and the US public as having a greater propensity toward crime than native-born persons. Congressman Lawrence Smith of Florida stated during a 1989 hearing before the House Judiciary Committee that "aliens coming across the border seem to be prone to more violent kinds of crime, more drug-related types of crime," and that by allowing them to remain in the US, "we are unleashing an army of criminal aliens on American citizens."[38]

Several studies have shown, however, that foreign-born persons are less likely to commit crimes and less likely to be imprisoned than native-born persons.[39] A 2007 study of California's adult population in correctional institutions, focusing on males between 18 and 40, found native-born institutionalization rates to be 10 times that of foreign-born immigrants.[40] The same study found that on average, between 2000 and 2005, California cities with a higher share of recent immigrants saw their crime rates fall further than cities with a lower share, particularly with regard to violent crimes.[41] The study concluded, "[s]pending additional dollars to reduce immigration or to increase enforcement against the foreign-born will not have a high return in terms of public safety."[42]

---

[38] Statement of Congressman Lawrence Smith, Texas, *Criminal Aliens: Hearing on H.R. 3333 before Sub. on Immigration, Refugees, and International Law of the House Judiciary Committee*, 100th Cong. 36 (November 1, 1989).

[39] Ruben G. Rumbaut, "Undocumented Immigration and Rates of Crime and Imprisonment: Popular Myths and Empirical Realities," Invited Address to the "Immigration Enforcement and Civil Liberties: the Role of Local Police" National Conference, Police Foundation, Washington, DC, August 2008, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1877365 (accessed August 5, 2014); Kristin F. Butcher and Anne Morrison Piehl, "Why are Immigrants' Incarceration Rates So Low? Evidence on Selective Immigration, Deterrence, and Deportation," 2005, National Bureau of Economic Research, NBER Working Paper 13229, July 2007, http://www.nber.org/papers/w13229 (accessed April 15, 2015).

[40] Kristin F. Butcher, Anne Morrison Piehl, and Jay Liao, Public Policy Institute of California, *Crime, Corrections, and California: What Does Immigration Have to Do With It?*, February 2008, http://www.ppic.org/main/publication.asp?i=776 (accessed April 2, 2015).

[41] Ibid.

[42] Ibid.

AR.09220

# III. Lawful Permanent Residents Deported for Drug Offenses

There is no publicly available information on how many permanent residents are deported each year for drug offenses. ICE claimed, in response to a 2012 Freedom of Information Act request, not to keep information on the immigration status of those deported on criminal grounds. Numerous interviews with immigrants, their families, and attorneys, make clear, however, that lawful permanent residents are regularly put into deportation proceedings for offenses ranging from marijuana possession to trafficking in cocaine.

## "Drug Trafficking" is a Deceptive Label

International human rights law does not preclude a government from deporting non-citizens convicted of serious offenses, such as drug trafficking, after weighing the totality of the circumstances. But US law considers drug offenses that have an element of sale or distribution, even of a small amount of drugs, to be drug trafficking offenses and "aggravated felonies," triggering severe and permanent consequences.[43] Such convictions make non-citizens, including lawful permanent residents, ineligible for almost all forms of relief from deportation and result in mandatory detention, near-automatic deportation, and permanent exile.

### Low-Level Offenses that Constitute Drug Trafficking

Several immigration and criminal defense attorneys told Human Rights Watch that many of their clients who are charged as deportable for drug trafficking had convictions for offenses that are quite minor. As one attorney put it, "I represent a lot of guys with drug trafficking convictions, but I've never represented a drug trafficker."[44]

The definition of "aggravated felony" is overly broad with regard to many offenses, as documented in several Human Rights Watch reports.[45] But while many crimes are

---

[43] The term "aggravated felony" includes "illicit trafficking in a controlled substance (as defined in section 802 of title 21), including a drug trafficking crime (as defined in section 924(c) of title 18)." 8 US Code Section 1227(a)(43)(B).

[44] Human Rights Watch telephone interview with Daniel Conklin, former staff attorney, Pennsylvania Immigrant Resource Center, April 17, 2014.

[45] Human Rights Watch, *Torn Apart: Families and US Immigration Reform*, August 5, 2014, http://www.hrw.org/sites/default/files/related_material/US_2014_Torn_Apart.pdf ; Human Rights Watch, *Forced Apart: Families Separated and Immigrants Harmed by US Deportation Policy*, Volume 19, No. 3(G), July 2007, http://www.hrw.org/reports/2007/07/16/forced-apart-0.

AR.09221

considered "aggravated felonies" only if a sentence of one year or more is imposed[46] or other factors are present,[47] *all* crimes involving sale, distribution, or production of drugs are deemed "drug trafficking" and thus "aggravated felonies."

Among non-citizens deported for an aggravated felony from 2007 to 2012 who had a drug conviction as their most serious crime, about a quarter (13,000) had a conviction for possession or use of a drug.[48] Although we cannot determine the underlying conduct in these cases, it is likely that many had committed offenses that fall short of what most people would consider drug trafficking.

Erika Pinheiro, a legal services attorney, said many of the immigrant detainees she meets end up with trafficking convictions even if they never sold drugs, because "addicts will buy multiple bags [of methamphetamine]" and then end up charged with possession with intent to sell.[49] And several of the cases reported to Human Rights Watch involved defendants who claimed that they had not known about the drugs they allegedly possessed.[50] Andrew Free, a private immigration attorney, described a case in which his client, a lawful permanent resident who lived near the Mexican border in Texas, was convicted of possession with intent to distribute because he was hired to drive a truck in which a large amount of marijuana was found. There was strong evidence to support his claim he did not know there were illicit drugs in the truck, but Free said, "You can still be convicted of possession with intent to distribute marijuana despite the fact that the government can't prove you knew the type and amount of contraband in the vehicle you're driving."[51]

Robert Jaeggli, an attorney in Washington, reported that one of his clients had been prescribed pain medication, did not like it, and gave it away with no remuneration. But he was convicted of attempted delivery of a controlled substance. "When he was caught by the

---

[46] 8 US Code Section 1101(a)(43)(F) and (G).

[47] For example, an offense involving fraud or deceit is an aggravated felony only if it involves the loss to the victim exceeds $10,000. 8 US Code Section 1101(a)(43)(M)(i).

[48] Possession with intent to distribute is commonly categorized as an aggravated felony.

[49] Human Rights Watch interview with Erika Pinheiro, February 6, 2014.

[50] Human Rights Watch telephone interview with Robert Jaeggli, immigration attorney, May 29, 2014; telephone interview with Diana Wride, March 25, 2014; interview with "Samuel D.," Washington, June 11, 2014; telephone interview with Amanda Esquivel, June 4, 2014.

[51] Human Rights Watch telephone interview with R. Andrew Free, immigration and criminal defense attorney, April 30, 2014. See also *United States v. Cruz-Velez*, United States Court of Appeals for the Fifth Circuit, case no. 09-40958, Unpublished Opinion, filed June 22, 2010.

AR.09222

police, he confessed to the activity because he had no idea he wasn't supposed to be doing that," Jaeggli said. His client was in his 60s, had lived in the US as a green card holder since the 1970s, had his entire family living in the US, and had no other criminal record. His client was able to withdraw his guilty plea and enter a new plea to solicitation, which does not constitute "drug trafficking," and Jaeggli is hoping on that basis to terminate deportation proceedings. But in the meantime, his client spent six months in immigration detention, during which time he lost his job, his apartment, and almost everything he owned.[52]

In a case published in *Politico Magazine*, Howard Bailey, a veteran of the Persian Gulf War, claimed he had been convicted for possession of marijuana with intent to distribute after he accepted some packages in the mail for an acquaintance. Ten years later, in 2012, he was deported to Jamaica, while his US citizen wife and two US citizen children remain in the US.[53]

In many of the cases reported to Human Rights Watch, permanent residents facing deportation for their drug trafficking conviction had convictions so minor, the judges in their criminal cases had sentenced them to little or no time in prison.

- Lundy Khoy, a refugee from Cambodia and a permanent resident, said she was convicted of possession with intent to distribute when, as a college student, she was arrested with ecstasy pills her boyfriend gave her. The criminal justice system imposed a punishment of three months' imprisonment and four years' probation, but because that conviction constituted "drug trafficking" and thus an "aggravated felony," she has been ordered deported. She remains in the US only because Cambodia has not issued a travel document for her.[54]

- "Mario F.," a lawful permanent resident from Colombia, was stopped at the airport in February 2013 and put into removal proceedings for a single 10-year-old conviction for sale of methamphetamine for which he received only probation.[55]

---

[52] Human Rights Watch telephone interview with Robert Jaeggli, immigration and criminal defense attorney, May 29, 2014.

[53] Howard Bailey, "I Served My Country. Then It Kicked Me Out," *Politico Magazine*, April 10, 2014, http://www.politico.com/magazine/story/2014/04/howard-dean-bailey-deported-i-served-my-country-and-then-it-kicked-me-out-105606_Page2.html#.U86w9uNdV8E (accessed July 22, 2014).

[54] Human Rights Watch telephone interview with Lundy Khoy, March 18, 2014; Tara Bahrampour, "After run-in with law, Cambodian immigrant's permanent residency is at risk," *Washington Post*, October 3, 2012, http://www.washingtonpost.com/local/after-run-in-with-law-cambodian-immigrants-permanent-residency-is-at-risk/2012/10/03/3ecf7ad2-0cd7-11e2-bb5e-492c0d3obff6_story.html (accessed July 10, 2014).

[55] Human Rights Watch interview with "Mario F." (pseudonym) and his attorney, Brooklyn, New York, April 27, 2014.

AR.09223

## Deported for a Ten-Year-Old Cannabis Conviction

Raul Valdez, a 36-year-old lawful permanent resident, moved to the US when he was one year old and grew up in the suburbs of Chicago. His entire family lives in the US. They are US citizens and permanent residents. But in 2014, Valdez was deported for a 2003 conviction for unlawful possession of cannabis with intent to deliver.

Speaking by phone from Guadalajara, Mexico, Valdez told Human Rights Watch that he used to smoke marijuana, but said he had not been a dealer. However, when his brother's friend got in trouble, "he told on me, and they found the drugs in my house." His criminal defense attorney did not tell him he could get deported. After Valdez pled guilty, he was sentenced only to 60 days in prison and 2 years' probation.

Ten years later, however, immigration came and arrested Valdez. "They picked me up out of nowhere," he said. He said immigration agents told him, "We're deporting people with drug convictions." Valdez was placed in immigration detention, where he remained for over two years as he fought to stay in the country he considers home.

According to family members who submitted affidavits on his behalf, Valdez, who also had misdemeanor convictions from his teenage years, had turned his life around since his earlier brush with the law. Valdez had a union construction job that paid well, and his employer praised his work in a letter submitted to immigration authorities. He provided financial and emotional support to his elderly parents. He was engaged to a US citizen, who attested, "My children [from a previous marriage] see Raul as a father figure and know he is someone they can always count on."

But Valdez's conviction constituted drug trafficking and an "aggravated felony." As such, the immigration judge could not consider the minor nature of his conviction, evidence of his rehabilitation, and his strong ties to his family and the US, but instead had to order him removed. His pro bono attorney sought a grant of prosecutorial discretion, citing all the positive factors in his case and the fact that his last conviction was over 10 years old. The US government denied his request, and Valdez now lives in Mexico, a country he barely knows.[56]

---

[56] Ibid.

AR.09224

## Facing Deportation and Family Separation for a Teenage Drug Offense

Abdulhakim Haji-Eda was born in Ethiopia but grew up in a refugee camp in Kenya. When he was 13 years old, he and his family came to the US as refugees and settled in Seattle, Washington. He said he struggled academically, but he loved basketball and as a teenager, he and his friends set up a basketball league for local Muslim youth, with the goal of being mentors and helping them keep out of trouble.[57]



Abdulhakim Haji-Eda and his US citizen wife, Hani Hamza, and their two children, Haroun (left) and Nasreen, also US citizens. Haji-Eda, a refugee from Ethiopia, has been ordered deported as a drug trafficker for a single conviction for selling a small amount of cocaine at the age of 18. Now 26, he has no other convictions and is seeking a stay of removal to remain in the US with his family.  © 2015 Private

When he was 15 years old, Haji-Eda's father kicked him out of their house because he had gone to Oregon for a basketball game without asking his father's permission. Haji-Eda went to live with a cousin, who told him, "I can't buy you food every day, go sell [drugs]." According to Haji-Eda, he tried hard to find another job and did stop selling drugs when he was briefly able to live with a girlfriend's family, but he

[57] Human Rights Watch interview with Abdulhakim Haji-Eda, Hani Hamza (Haji-Eda's wife), and Lori Walls (Haji-Eda's attorney), Seattle, Washington, June 10, 2014.

AR.09225

eventually had to return to his cousin's home.

"It's not something that I chose," he said, "It's something that for me was to survive."

In 2006, days after he turned 18, Haji-Eda was arrested for selling a small quantity of cocaine at a bus stop in downtown Seattle. He was ultimately convicted of possession with intent to manufacture or deliver and sentenced to one year in prison, of which he served six months. Haji-Eda said his criminal defense attorney gave him no warning that pleading guilty could result in the loss of his legal status and permanent deportation. But at the end of his six-month sentence, immigration authorities arrested Haji-Eda. He was put into removal proceedings and charged with being deportable for the aggravated felony of drug trafficking.[58]

Now a soft-spoken 26-year-old, Haji-Eda is married to Hani Hamza, a US citizen, and they have two US-born children, a three-year-old son and a two-year-old daughter. His parents are US citizens, as are all his brothers and sisters. Haji-Eda has worked steadily since his arrest, and he has no other criminal conviction. But because his conviction is considered an aggravated felony, the immigration judge could not consider these factors, and ultimately ordered him deported. Lori Walls, his current immigration attorney, pointed out, "The judge in his criminal case…sentenced him to the extreme low-end. The flexibility that's available in criminal court is not there in the immigration court."[59]

Haji-Eda currently remains in the US only because the US government temporarily granted a stay of removal, but it expired in August 2014 and his status remains in limbo.

Hamza, Haji-Eda's wife, has heard President Obama claim he is focusing on deporting serious criminals. On paper, she understands that her husband would be seen as a drug trafficker and as one of these serious criminals. But if she could meet President Obama, she told us, she would say to him: "Are you sure you know what you're talking about? Why don't you sit down and talk to him? Why don't you meet him? Why don't you meet his family?"[60]

---

[58] Ibid.
[59] Ibid.
[60] Ibid.

AR.09226

Not every non-citizen with a conviction for "drug trafficking" receives an insignificant prison sentence. Human Rights Watch interviewed several people with more serious drug trafficking convictions, including people who had convictions for manufacturing methamphetamine, cultivating marijuana, and trafficking in crack cocaine, who had been sentenced to considerably more time. In some of these cases, however, the defendants were sentenced under the kind of disproportionately harsh mandatory minimum sentencing laws that are currently being reexamined at both the state and federal level. To immigrants who have served these long sentences, deportation only further compounds the harshness of the punishment.

### The Difference an Individualized Hearing Can Make

Before the 1996 amendments to immigration law, lawful permanent residents convicted of aggravated felonies, including drug trafficking, were still able to get an individualized hearing before an immigration judge where they could present evidence of their family ties, residence in US, rehabilitation, and other factors in favor of their application to remain in the US. This relief, called "212(c)" for its provision number in the Immigration and Nationality Act, was available before 1990 to all permanent residents with any aggravated felony conviction, and before 1996, to all permanent residents with an aggravated felony conviction if they had received criminal sentences of five years or less.[61] After protracted litigation around whether the 1996 amendments should be applied retroactively to those who were convicted before 1996, the Supreme Court ruled that certain lawful permanent residents who pled guilty before 1996 are still eligible for 212(c) relief.[62] Almost 20 years after these amendments went into effect, there are still permanent residents who are eligible for 212(c) relief because they are still being arrested by immigration authorities for their pre-1996 convictions.

---

[61] The Anti-Terrorism and Effective Death Penalty Act of 1996 eliminated 212(c) relief for anyone convicted of an aggravated felony, while the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 eliminated 212(c) relief altogether and replaced it with lawful permanent resident cancellation of removal. The five-year sentence limit on 212(c) relief was imposed by the Immigration Act of 1990. Before then, a lawful permanent resident convicted of an aggravated felony with any sentence of imprisonment was eligible to apply for 212(c) relief. See Norton Tooby and Joseph Justin Rollin, "Evolution of the Definition of Aggravated Felony."

[62] *INS v. St. Cyr*, 533 US 289 (2001).

AR.09227

The case of "Luis A.," reported to Human Rights Watch by his son Jorge, illustrates how eligibility for such an individualized hearing, rather than the imposition of a one-size-fits-all policy, can make all the difference for a lawful permanent resident and his family.[63]

Luis first came to the US in 1966, and eventually raised four children, all US citizens, with his wife, also a US citizen. He was a farmworker for many years in the Central Valley of California, and now runs a popular stand at a local farmers' market.

But in 1989, Jorge said, his father was approached by an undercover police officer who told him he had a very ill father and needed to obtain drugs to try to make money to help his dad. "My dad had been working in [his town] since the 1960s, and he knew the good, the bad, and the ugly," he said. He connected the undercover police officer to some of these contacts, and Luis was soon afterward arrested, convicted, and sentenced to one year in prison for possessing and transporting cocaine.

Although that year of imprisonment was hard on the entire family, they thought they had put this conviction behind them, as Luis never got in trouble again. Jorge said, "He never even got a parking ticket." But in 2009, 20 years later, immigration authorities arrested his father and put him in immigration detention in Eloy, Arizona, and placed him in removal proceedings.

Because his father had been convicted in 1989 and released from his prison sentence before October 1998,[64] he was not subject to mandatory detention for his drug crime and he was still eligible for 212(c) relief, even though his conviction constitutes an "aggravated felony" under current law. The government did not contest it and the judge granted him relief immediately. Soon afterward, Luis applied for and was granted naturalization.

Luis is still scarred by his experience of six weeks in immigration detention. He developed a thyroid condition and high blood pressure in detention and suffered from depression. He is uncomfortable in crowds and he refuses to stay at parties or gatherings for more than an hour. But they know they were lucky that Jorge, who has a law degree, was able to obtain

---

[63] Human Rights Watch telephone interview with Jorge A. (last name withheld), July 7, 2014.

[64] A non-citizen is not subject to mandatory detention under if he or she was released from his or her custodial sentence on or before October 1998. *Matter of Adeniji*, 22 I & N Dec. 1102 (BIA 1999).

---

**A PRICE TOO HIGH**

AR.09228

good counsel and navigate the complex immigration system to get his father released and eventually end his ordeal.[65]

## US Supreme Court Response to Unjust Interpretations of "Drug Trafficking"

Over the years, the very broad definition of "drug trafficking" used by the US government has led to protracted litigation, often involving long-term lawful permanent residents facing deportation for minor offenses. Although permanent residents with low-level offenses continue to be placed in proceedings as drug traffickers, Supreme Court decisions have placed some limits on the US government's interpretation of drug trafficking.

In 2006, the Supreme Court heard a challenge by Jose Antonio Lopez, a permanent resident whom the US government sought to deport as a drug trafficker for a single conviction in South Dakota for aiding and abetting another person's possession of cocaine. This offense would have been treated as a misdemeanor under federal law, but South Dakota, like many states, categorized this crime as a felony. The Court ruled that a state felony conviction for possession of a controlled substance is not a drug trafficking aggravated felony if the same offense would be punishable only as a misdemeanor under federal law.[66]

Since then, the Supreme Court has further rejected the US government's interpretation of "drug trafficking" to include a second or subsequent conviction for simple possession of a controlled substance (*Carachuri-Rosendo v. Holder*),[67] and ruled that a conviction for an offense that could include social sharing cannot be considered "drug trafficking" (*Moncrieffe v. Holder*).[68]

These rulings have allowed some permanent residents in deportation proceedings to argue against deportation and apply for cancellation of removal, and thereby present

---

[65] Human Rights Watch telephone interview with Jorge A., July 7, 2014.

[66] *Lopez v. Gonzales*, 549 US 47 (2006).

[67] *Carachuri-Rosendo v. Holder*, 560 US 563 (2010). Jose Angel Carachuri-Rosendo, a permanent resident who had lived in the US since he was five years old, was nearly deported as a "drug trafficker" because he had a conviction for possession of a small amount of marijuana and a second conviction for possession of a single anti-anxiety tablet without a prescription.

[68] *Moncrieffe v. Holder*, 133 S. Ct. 1678, 185 L. Ed. 2d 727 (2013). Moncrieffe, a lawful permanent resident from Jamaica, had been convicted in Georgia of possession with intent to distribute marijuana after police found 1.3 grams of marijuana in his car. The Court declared, "This is the third time in seven years that we have considered whether the Government has properly characterized a low-level drug offense as 'illicit trafficking in a controlled substance,' and thus an 'aggravated felony.' Once again, we hold that the Government's approach defies 'the commonsense conception of these terms.'" 133 S. Ct. at 1694.

AR.09229

evidence of their strong ties to the US. Other Supreme Court decisions have also expanded options for some lawful permanent residents with old convictions.[69] But in the meantime, there are likely thousands of permanent residents, if not more, who have been deported as aggravated felons for offenses that are no longer considered "aggravated felonies," or who have otherwise been deported under incorrect interpretations of US law.

Once deported, it is extremely difficult for such former residents to come back to the US legally. It is not enough for them to show that they were deported under incorrect interpretations of the law. They must meet strict time, number, and procedural requirements to reopen or reconsider their cases.[70] Once deported, US government regulations state that they can no longer file a motion to reopen or reconsider. Although some courts have found that these requirements and bars do not apply in certain situations,[71] reopening a case is a complex procedure that is practically impossible for an immigrant who has been deported to navigate, particularly without an attorney. According to Jessica Chicco, staff attorney at the Post-Deportation Human Rights Project at Boston College, "[F]or many people, if they're not in a position to file a motion to reopen in 90 days [of their removal order], they'll have a very difficult time."[72]

For example, Marco Merino, a permanent resident who came to the US from Chile when he was five months old, was unable to reopen his case after being deported in 2007 for two possession convictions, one for a marijuana joint and one for LSD, convictions he received when he was 18. According to Merino, these convictions were so minor, "I never received

---

[69] For example, *INS v. St. Cyr*, 533 US 289 (2001) and subsequent rulings have ruled 212(c) relief from deportation is available for permanent residents convicted of crimes before 1996 that were retroactively defined as "aggravated felonies" by the 1996 amendments to US immigration law.

[70] A motion to reopen is a request to review a decision because of new evidence or changed circumstances. A motion to reconsider is a request to review a decision based on new or additional legal arguments. A person who has been deported can only file one motion to reconsider within 30 days of the final administrative order, and one motion to reopen within 90 days of the final order. 8 US Code Sections 1229a(c)(6) and 1229a(c)(7). *See also* Post-Deportation Human Rights Project, Center for Human Rights and International Justice, Boston College Law School, "Post-Departure Motions to Reopen or Reconsider," March 2014, https://www.bc.edu/content/dam/files/centers/humanrights/doc/Post-Departure%20MTR%20Advisory%2012-2012_FINAL.pdf, accessed (April 15, 2015).

[71] Post-Deportation Human Rights Project, Center for Human Rights and International Justice, Boston College Law School, "Post-Departure Motions to Reopen or Reconsider."

[72] Human Rights Watch telephone interview with Jessica Chicco, staff attorney, Post-Deportation Human Rights Project, Boston College Law School, March 5, 2014.

AR.09230

one day in jail."[73] But over 10 years later, when he returned from traveling abroad, he was placed in immigration proceedings and eventually deported under the interpretation the Supreme Court later held was incorrect in *Lopez*.[74] The Post-Deportation Human Rights Project took Merino's case after he was deported, but the Fifth Circuit US Court of Appeals ruled in 2012 that Merino did not meet the strict procedural requirements to reopen his case and seek a legal way to return.[75]

## Deportation for Simple Possession Offenses

Lawful permanent residents can be deported for any drug offense, including simple possession (other than a conviction for possession of a small amount of marijuana).[76] However, permanent residents with simple possession convictions can try to avoid deportation by applying for "lawful permanent resident cancellation of removal" if they meet certain requirements for length of residency and lawful status,[77] and get the kind of individualized hearing permanent residents with drug trafficking convictions are denied.

According to several dozen immigration lawyers interviewed by Human Rights Watch, many of their permanent resident clients who are put in deportation proceedings for simple possession offenses are able to win cancellation of removal. However, in the meantime, most are placed in mandatory detention while proceedings are pending, which can take months or even years, during which time many lose their jobs and their homes. They must navigate the complexities of a deportation proceeding in which they have no right to a court-appointed

---

[73] Human Rights Watch telephone interview with Marco Merino, May 6, 2014.

[74] Human Rights Watch telephone interview with Marco Merino, May 6, 2014; Human Rights Watch telephone interview with Jessica Chicco, March 5, 2014; email from Jessica Chicco to Human Rights Watch, August 29, 2014.

[75] *Merino-Fernandez v. Holder*, Docket No. 11-60010 (5th Cir. 2012).]

[76] Specifically, a noncitizen convicted of an offense "relating to a controlled substance (as defined in section 802 of title 21), other than a single offense involving possession of 30 grams or less of marijuana, is deportable." 8 US Code Section 1227(a)(2)(B)(i). Some states regulate substances that are not federally prohibited, and if a non-citizen's record of conviction does not indicate a controlled substance prohibited by federal law, making it unclear from the record whether a federally controlled substance was involved, that conviction is not a deportable offense. *Matter of Paulus*, I & N Dec. 274 (Board of immigration Appeals 1965). This is a narrow exception that can sometimes help lawful permanent residents avoid deportation for a drug offense. See also the US Supreme Court decision *Mellouli v. Holder*, Docket No. 13-1034, June 1, 2015; and Immigrant Legal Resource Center, Controlled Substances, January 2013, http://www.ilrc.org/files/documents/n.8-controlled_substances.pdf (accessed April 15, 2015).

A lawful permanent resident can also be deported without a conviction if he or she, after gaining permanent resident status, is or ever was a "drug abuser or addict." 8 US Code Section 127(a)(2)(B)(ii), but this ground of deportability is rarely charged.

[77] 8 US Code Section 1229b(a). The non-citizen must have been a lawful permanent resident for at least five years, have resided in the US for at least seven years in any legal status, and not been convicted of an aggravated felony.

AR.09231

lawyer if they cannot afford to pay for one themselves. (More information on the human rights impact of mandatory detention for drug offenses can be found in Section IV of this report.) Some permanent residents are not eligible for cancellation of removal because they do not meet the strict residency and status requirements, despite having lived in the US for many years and having strong family and community ties.

For example, Iris del Carmen Morales, a grandmother and a lawful permanent resident from Guatemala, told Human Rights Watch in 2014 while in immigration detention that she was ineligible for cancellation of removal, even though she has lived in the US since 1989, because her 2013 conviction for possession of methamphetamine occurred just three days before she would have accrued the required seven years of lawful status. Morales has five children, four of whom live in the US and are citizens or permanent residents. She became dependent on drugs, she said, after she lost her job and her home and began hanging out with "the wrong people." Morales said the judge agreed to send her to a drug treatment program, but instead of starting the program after her six-month sentence, she was arrested by ICE and put into removal proceedings.[78]

Eswin Figueroa Lemus, a lawful permanent resident from Guatemala who had lived in the US since 1990, told Human Rights Watch he was facing imminent deportation for being found with a very small amount of cocaine. Figueroa claimed he was not a drug user but had accepted the drug from an acquaintance. He had built a life with his wife and three US citizen children, working in construction and paying taxes for over 20 years. "I'm not a drug addict," Figueroa said. "I don't know why I took it, why I saved it….my mistake with the drug has cost me my family."[79] Despite his 20-plus years in the US, Figueroa had only been a permanent resident since 2006, and his 2012 conviction cut off his eligibility for lawful permanent resident cancellation of removal.

Lawful permanent residents are also ineligible for cancellation of removal if they previously were granted cancellation of removal or 212(c) relief, a similar form of relief that existed before the 1996 amendments. Persons who struggle with drug dependency often

---

[78] Human Rights Watch interview with Iris del Carmen Morales, Santa Ana City Jail, April 1, 2014.
[79] Human Rights Watch interview with Eswin Figueroa Lemus, Denver Contract Detention Facility, Aurora, Colorado, May 23, 2014.

AR.09232

relapse after initial efforts at drug treatment. The consequences of such relapse for permanent residents are severe.[80]

Marion Scholz, a lawful permanent resident from Germany who has lived in the US for almost 50 years, was deported in 2014 after two misdemeanor convictions for possession of methamphetamine. Scholz said she had struggled with dependency on methamphetamine for many years. She was first convicted of misdemeanor possession of a controlled substance in 1993. When the government sought to deport her in 1998, Scholz applied for and received a grant of cancellation of removal. She sought treatment and was off drugs for four months, but fell back into drug dependency and was convicted again in 2005 for possession, which led to new deportation proceedings.

After almost two years in immigration detention, ICE released Scholz in 2010 with an ankle monitor, and she immediately entered a drug treatment program. According to Scholz and her attorney, she turned her life around completely. She has been off drugs for over six years, and she was promoted at the job she had before getting deported. She repaired relationships with her family, including a son, all US citizens. But she was nevertheless deported to a country where she does not speak the language and knows no one. She is now living in a shelter. Scholz wishes the US government could "understand what addiction is," and "look at what [people are] doing now to better themselves."[81]

## Immigration Arrests for Old Offenses

The US immigration law makes no distinction between drug offenses committed recently and drug offenses committed many years ago. Human Rights Watch documented numerous cases in which immigrants with old convictions for drug offenses were put into removal proceedings in recent years.[82]

---

[80] Human Rights Watch interview with Nicolas Rios Garibay, Northwest Detention Center, Tacoma, Washington, June 11, 2014; interview with Niloufar Khonsari, executive director, Pangea Legal Services; Marie Vincent, co-director, Pangea Legal Services; Bianca Santos, director of international human rights program, Pangea Legal Services, San Francisco, California, June 26, 2014.

[81] Human Rights Watch telephone interview with Marion Scholz, March 19, 2014; telephone interview with Raha Jorjani, Scholz's attorney, March 17, 2014; telephone interview with Marion Scholz, June 3, 2015.

[82] Several attorneys reported many of their cases involved old convictions, often from the 1990s. Human Rights Watch interview with Henry Cruz, immigration attorney, Seattle, Washington, June 10, 2014; interview with Elissa Steglich, May 6, 2014; telephone interview with R. Andrew Free, April 30, 2014; telephone interview with Holly Cooper, April 30, 2014.

AR.09233

In some cases, permanent residents traveled abroad and their convictions were flagged by US Customs and Border Protection upon their return, or they applied for naturalization or some other immigration benefit, not knowing their convictions could lead to their deportation. For example, "Mario F.," a lawful permanent resident from Colombia, was put into removal proceedings in 2013, upon returning to the US from a trip abroad, for a 2003 conviction for sale of methamphetamine.[83] "Luis A." (case described above) believed he was put into removal proceedings in 2009 for a 1988 conviction because he had applied to renew his green card.[84] Henry Cruz stated one client, a 63-year-old Korean woman with a ten-year-old conviction for using communication devices to assist in drug trafficking, was put into removal proceedings after she applied for naturalization.[85]

Advocates reported some people are identified through traffic stops or more recent arrests, often for minor, non-deportable offenses.[86]

Some immigrants and immigration advocates reported immigration authorities actively sought out individuals at their homes or at work, years after their criminal conviction. ICE officials came to Raul Valdez's home almost 10 years after his 2003 conviction for possession of cannabis with intent to deliver, leading to his deportation in 2014.[87] Ricardo Fuenzalida reported that immigration authorities came to his home in 2013 to put him in detention and removal proceedings for two marijuana possession convictions 13 years earlier.[88] Talia Peleg and Ruben Loyo, immigration attorneys at Brooklyn Defender Services, described cases in which lawful permanent resident clients with possession convictions had been arrested at home years after their convictions.[89] Similarly, Erika Pinheiro at Esperanza Immigrant Rights Project in Los Angeles recounted

---

[83] Human Rights Watch interview with "Mario F." (pseudonym) and Cristina Velez, staff attorney, HIV Law Project, Brooklyn, New York, April 17, 2014.

[84] Human Rights Watch telephone interview with Jorge A., July 7, 2014.

[85] Human Rights Watch interview with Henry Cruz, June 10, 2014.

[86] Ibid., Human Rights Watch telephone interview with Linus Chan, March 31, 2014; interview with Justin Valas, Colorado Immigrant Rights Coalition, Denver, Colorado, April 18, 2014.

[87] Human Rights Watch telephone interview with Raul Valdez, April 29, 2014.

[88] Human Rights Watch interview with Ricardo Fuenzalida, Union City, New Jersey, May 6, 2014.

[89] Human Rights Watch interview with Talia Peleg, staff attorney, Brooklyn Defender Services, Immigration Unit, Brooklyn, New York, May 7, 2014; interview with Ruben Loyo, staff attorney, Brooklyn Defender Services, Immigration Unit, Brooklyn, New York, May 7, 2014

AR.09234

a case in which immigration authorities had shown up at her client's door years after his one 1998 conviction for sale of marijuana.[90]

In *Preap v. Johnson*, three non-citizens in 2014 brought a federal habeas corpus class action lawsuit against DHS in California challenging their mandatory detention based on the fact that all three had been arrested by immigration officials five to ten years after their relevant convictions.[91] All three plaintiffs have convictions for drug offenses, in addition to other offenses.[92] Since the lawsuit was filed, the court has granted plaintiffs' motion for class certification and granted their motion for a preliminary injunction requiring the government to give them bond hearings.[93] Similar challenges have been brought and granted in several district courts across the country.[94]

It should be noted that the most recent enforcement priorities memorandum issued by DHS Secretary Jeh Johnson states "extended length of time since the offense of conviction" will be considered, along with other factors, in determining whether prosecutorial discretion should be exercised even when the past criminal conviction makes the case an enforcement priority.[95]

---

[90] Human Rights Watch interview with Erika Pinheiro, February 6, 2014.

[91] *Preap v. Johnson*, 2014 WL 1995064 (N.D. Cal. 2014).

[92] Ibid.

[93] American Civil Liberties Union of Northern California, "Judge Rules to Limit Mandatory Detention of Immigrants in California," May 15, 2014, https://www.aclunc.org/news/judge-rules-limit-mandatory-detention-immigrants-california (accessed April 15, 2015).

[94] *Castaneda v. Souza*, 952 F. Supp. 2d 307 (D. Mass. 2013); *Nimako v. Shanahan*, 2012 WL 4121102 (D.N.J. 2012); *Khoury v. Asher*, 2014 WL 954920 (W.D. Wash. 2014). Other courts have ruled non-citizens arrested years after their convictions remain subject to mandatory detention. *Sylvain v. Attorney Gen. of U.S.*, 714 F. 3d 150 (3d Cir. 2013); *Hosh v. Lucero*, 680 F. 3d 375 (4th Cir. 2012).

[95] Memorandum from Jeh Charles Johnson, US Department of Homeland Security Secretary, to Thomas S. Winkowski, Acting Director, US Immigration and Customs Enforcement, et al., "Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants," November 20, 2014.

## Fearing Deportation for Being in the Wrong Place at the Wrong Time 20 Years Ago

"Daniel P.," now 42, is a social worker, husband, and father to three children. His wife, children, mother, and sister are all US citizens. Daniel is a lawful permanent resident who has lived in the US since he moved from the Dominican Republic at the age of seven. He has been at the same job for 14 years, as an employee of the City of New York.

Although Daniel is proud of his work and his family, he said, "Since 1996, my life has been a nightmare." In 1996, when he was 23 years old, Daniel pled guilty to criminal sale of a controlled substance in the third degree, his sole conviction. Daniel claimed he "was in the wrong place at the wrong time." He had stopped to say hello to some friends hanging out on the street, he said, on his way home from work. He did not know the police were watching his friends, who were selling drugs. They arrested everyone, and even though no drugs were found on him, Daniel was charged with conspiracy to sell drugs. His attorney told him that if he pleaded guilty, he would not get a prison sentence, and he was right. Daniel was sentenced to five years' probation and a $155 fine.

Daniel said he met all the terms of his probation. One of his probation officers noticed that he was always on time, and he recommended he apply for a certificate of relief from disabilities. In New York, such certificates are meant to "contribute to the complete rehabilitation of first offenders and their successful return to responsible lives in the community."[96] Daniel received the certificate, went to college and graduate school, and continued with his life.

Soon afterward, though, Daniel heard news reports that permanent residents like him were being deported for criminal convictions. Since then, he has not traveled outside of the US for fear that he will be stopped at the airport and put into removal proceedings. When his father died in the Dominican Republic, he was unable to go to the funeral. He has not been able to visit his 87-year-old grandmother and 105-year-old great-grandmother for almost 20 years. Daniel said, "This type of law is breaking up families, destroying families."[97]

---

[96] New York State Division of Criminal Justice Services, "Certificates of Relief from Disabilities and Certificates of Good Conduct; Licensure and Employment of Offenders," http://dpca.state.ny.us/pdfs/certificatesofrelieffromforfeituresanddisabilitiesqanda.pdf (accessed July 31, 2014).
[97] Human Rights Watch interview with "Daniel P." (pseudonym), New York, New York, May 5, 2014.

AR.09236

## Permanent Exile and Bars to Reentering the US

Those who are deported have no legal way to return, and no matter how many years have passed without a new arrest, they are forever barred from returning to live in the US with their families.

Carlos Guillen, a lawful permanent resident from Ecuador, was arrested in 1992 in Texas for possession of drugs with intent to distribute after police found a large amount of cocaine in his home. His brother has since admitted the drugs belonged to him, but Guillen went on to serve seven years in prison and was deported to Ecuador in 1999. After being separated from his US citizen wife and three US citizen children for 15 years, and suffering from serious medical conditions, his daughter Diana Wride reported that her father, now almost 70 and desperate, tried to reenter the US illegally. Because it had been over 20 years since the date of the offense, and it was Guillen's only conviction, his daughter applied for prosecutorial discretion so her father could spend his remaining years with his family. Their application was denied.[98]

Many of those who do return illegally face criminal prosecution for the federal crime of "illegal reentry" and additional time in prison with sentences that are enhanced by their prior drug convictions. Among defendants convicted and sentenced for felony reentry or second or subsequent illegal entry in 2013, more than 3,000 or 17 percent had a prior conviction for a drug offense.[99]

Jesus Octavio Perez Ochoa, according to federal court documents filed by his federal public defender, grew up in the US with his entire family. He was deported in 1993 after a conviction for distribution of cocaine, although he was using and sharing drugs, not selling them. He had pled guilty on the advice of his criminal defense attorney who assured him he would only receive a sentence of probation. Perez Ochoa returned illegally to the US and was living

---

[98] Human Rights Watch telephone interview with Diana Wride, March 25, 2014; email correspondence with Diana Wride, April 29, 2014.

[99] US Sentencing Commission, "Use of Guidelines and Specific Offense Characteristics, Offender Based, Fiscal Year 2013," p. 52-53, http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2013/Use_of_Guidelines_and_Specific_Offense_Characteristics_Offender_Based_Revised.pdf (accessed August 13, 2014). Sentencing Guideline 2L1.2 applies different offense levels based on prior convictions. A prior drug trafficking offense that resulted in a sentence of more than 13 months results in an increase of 12 or 16 offense levels (which affects the final sentence); 11.3 percent had such prior convictions. A prior drug offense resulting in a sentence of less than 13 months can result in 8, 12, or 16 offense levels; 5.6 percent had such prior convictions.

quietly with his permanent resident wife and their US-born daughter when he was the victim of a hit-and-run accident and waited for the police to arrive. He was then arrested and transferred to immigration authorities.[100] Sixteen years after his drug conviction, Perez Ochoa was prosecuted for illegal reentry and sentenced to 13 months in prison.[101]

### "This is All from One Mistake, One Poor Choice He Made."

Francisco Equihua Lemus was first deported in 2001 after a conviction stemming from manufacture of methamphetamines. According to his US citizen daughters, Cecilia and Lili Equihua, Francisco first came to the US in 1967 and had been a lawful permanent resident.

Separated from their mother but devoted to his two young daughters in the US, Francisco came back illegally soon after his deportation. Cecilia and Lili, now 24 and 22 years old, said he lived a quiet life for nine years, dedicated to spending time and rebuilding his relationship with his daughters. The sisters remembered "Sunday was father day." They lived with their mother in Las Vegas, Nevada, while their father lived in California. So every Sunday, he would leave California at 4 am to be in Las Vegas by 8 am. He would wake them up, take them to church, and then go to lunch or the movies. He would leave at 5 pm so he could be home in time to go to work early Monday morning. The sisters saw him sacrifice as much as possible for their sakes—their father lived for them. Even their mother came to respect and appreciate him because he provided as much financial support as he could.

In 2010, the Sundays came to an end. Cecilia remembered he had come to take them shopping for school. "We had such a good time, it was almost painful to see him leave." He began driving back to California and two hours later, she called him, as she always did, but there was no answer. Cecilia stayed up all night calling him and heard nothing.

Two weeks later, they finally heard from their father. He had been stopped for a broken taillight, taken to immigration detention, and immediately deported. He was only able to get in touch with them once he was back in Mexico.

---

[100] *US v. Jesus Octavio Perez Ochoa*, United States District Court for the District of New Mexico, case no. 08-CR-381, Defendant's Sentencing Memorandum, filed May 1, 2008, provided by Kari Converse, assistant federal public defender.
[101] *US v. Jesus Octavio Perez Ochoa*, case no. 08-CR-381, Docket, 2008.

AR.09238

A week or so later, Francisco tried to enter the US illegally again. He was caught and prosecuted for felony illegal reentry and sentenced to two years in prison, which he served in New Mexico. In 2012, Francisco was deported again. His daughters worry for his safety in Mexico because of drug cartel violence, but they hope he will stay in Mexico and out of US prison.

Cecilia and Lili understand their father committed a serious crime, but they feel that their family is continuing to be punished for one poor decision he made years ago. They long for a way for their father to come back to the US legally, so he can be here for their graduations and other milestones. Lili said, "There are still so many things he could be a part of."[102]



Francisco Equihua Lemus, with his two US-citizen daughters, Lili (left) and Cecilia in 1993. Equihua was deported in 2001 after a conviction stemming from manufacture of methamphetamines. According to his daughters, he reentered illegally and lived without incident for nine years. When Equihua was stopped for a broken taillight in 2010, he was deported again.

---

[102] Human Rights Watch interview with Cecilia and Lili Equihua, Los Angeles, California, March 21, 2014.

AR.09239

# IV. Permanent Denial of Legal Resident Status

## The "Controlled Substance" Bar

The US, like many countries around the world, bars non-citizens from gaining legal resident status if they have certain criminal convictions, including drug offenses. A state may legitimately consider the existence of convictions in determining who may or may not reside within its borders, particularly as a long-term immigrant. The draconian nature of the bar for any controlled substance offense, however, stands out because of the severe impact it has on the ability of affected immigrants to live with their US citizen families in the US. And given the changes in how the criminal justice system views drug offenses, the bar seems increasingly arbitrary.

Other bars based on criminal convictions require the conviction to be recent or significant. A "crime involving moral turpitude," which can include such offenses as assault or fraud, will not necessarily bar a non-citizen from becoming a legal immigrant if it was a "petty offense," defined as having a maximum sentence of less than one year and resulting in an actual sentence of six months or less. Juvenile offenses are also not a bar if the crime was committed more than five years before the date of application for the visa.[103] Even if a crime involving moral turpitude does result in a bar to gaining legal status, the non-citizen can apply to have that bar "waived" under Section 212(h) of the Immigration and Nationality Act, if he or she can show that a US citizen or permanent resident spouse, parent, or child would suffer "extreme hardship."[104] Even an "aggravated felony" may be waived in some cases.[105] In this way, US immigration law recognizes at least in a limited

---

[103] A "petty offense" exception applies for a single conviction for a "crime involving moral turpitude," such as fraud or assault, if the maximum penalty possible for the crime did not exceed one year of imprisonment, and if the non-citizen was sentenced to a term of imprisonment of six months or less. An exception is also made for juvenile convictions, when committed more than 5 years before the date of application for the visa. Neither exception applies to drug offenses. 8 US Code Section 1182(a)(2)(A)(II).

[104] To apply for a 212(h) waiver, the non-citizen applicant for permanent resident status must provide evidence that a US citizen or permanent resident spouse, parent, or child would suffer "extreme hardship" if the applicant were denied a green card. This waiver is available for non-citizens with multiple criminal convictions, as well as those who are barred because of involvement in prostitution or criminal activity for which they asserted immunity from prosecution. Immigration and Nationality Act Section 212(h), 8 US Code Section 1182(h).

[105] The US government, through the administrative court of the Board of Immigration Appeals, has held that all permanent residents with an aggravated felony conviction are barred from applying for 212(h) relief if they have an aggravated felony conviction. *Matter of Rodriguez*, 25 I & N Dec. 784 (BIA 212). Six US Courts of Appeal, however, have held the bar does not apply to permanent residents who adjusted status to permanent resident status in the US. In these jurisdictions, the BIA follows the reasoning of *Martinez v. Mukasey*, 519 F. 3d 532 (5th Cir. 2008). In other jurisdictions, the BIA continues to apply the rule in

---

way that a balancing test should be performed that takes into account the individual applicant and the needs of US citizen and permanent resident family members.

Drug offenses, however, are treated very differently. *Any* drug offense, from possession of marijuana to cocaine trafficking, results in a bar to gaining legal immigrant status.[106] There is no exception for minor offenses or even for juvenile offenses. The 212(h) waiver is unavailable for drug offenses (categorized with murder and torture), with the sole exception of a single conviction for possessing 30 grams or less of marijuana.[107] Even without a conviction, an admission of having committed a controlled substance offense can bar a non-citizen from gaining permanent resident status.[108]

The controlled substance bar can have a devastating impact on those who want to immigrate and join loved ones in the US. "Alice M.," a 41-year-old graphic designer and Canadian citizen, told Human Rights Watch that she is barred from living in the US with her US citizen fiancé because of a single 1992 conviction for cocaine possession she received in Canada when she was in her last year of high school. Alice said that her conviction, for which she received one year probation and no jail time, was pardoned long ago in Canada and the records are sealed. But 23 years later, Alice has been told she can never gain permanent resident status in the United States. Her fiancé has an established business in the US that he has run for 30 years and cannot start over in Canada. Her six-year-old daughter is very close to him and does not understand why they cannot all live together. "This is now a life sentence for two people who are innocent, who had nothing to do with it," Alice said. "It's a mistake that I made as a kid that has now impacted the two people I love the most."[109]

---

*Rodriguez.* See Katherine Brady, Immigrant Legal Resource Center, "Update: The LPR Bars to § 212(h) – To Whom Do They Apply," 2014, http://www.ilrc.org/files/documents/212h_matter_of_rodriguez_update_2014.pdf (accessed August 11, 2014).

[106] Specifically, a non-citizen is "inadmissible" or ineligible to get a visa or gain lawful permanent resident status if he or she has a conviction for an offense "relating to a controlled substance (as defined in section 802 of title 21)." 8 US Code Section 1182(a)(2)(A)(i)(II).

[107] Immigration and Nationality Act Section 212(h), 8 US Code Section 1182(h).

[108] A non-citizen can be inadmissible for drug-related conduct even without a conviction. A non-citizen is inadmissible if he is a current drug addict or abuser. 8 US Code Section 1182(a)(1)(A)(iv). A non-citizen is inadmissible if he formally admits all of the elements of a controlled substance conviction, when that offense was not charged in criminal court. 8 US Code Section 1182(a)(2)(A)(i). A non-citizen is inadmissible if immigration authorities have "reason to believe" the person participated in drug trafficking, or is the spouse or child of a trafficker who benefited from trafficking within the last five years. 8 US Code Section 1182(a)(2)(C). See also Immigrant Legal Resource Center, Controlled Substances, January 2013, http://www.ilrc.org/files/documents/n.8-controlled_substances.pdf (accessed April 15, 2015).

[109] Human Rights Watch telephone interview with "Alice M." (pseudonym), August 18, 2014.

The bar also means immigrants who have lived in the US for many years, with US citizen families and other longstanding ties to the US, can never gain legal resident status.

Many undocumented immigrants in the US have US citizen spouses or adult children, who under existing law could petition for them to gain legal status. Although they may face other barriers to gaining legal status, the controlled substance bar for those with drug convictions stands out because there is no waiver available. Elizabeth Cordoba, an immigration attorney in New Jersey, explained how this lack of a waiver for drug offenses affected her client, a 43-year-old man from Haiti who has been in the US for over 20 years. He applied for lawful permanent resident status through his US citizen wife, but was denied in 2012 because of a 1996 conviction for possession of marijuana that he received when he was a teenager. The government claimed the amount of marijuana involved was more than 30 grams. Because the conviction is almost 20 years old, Cordoba said it was difficult to get the transcripts of the guilty plea and determine the exact amount of marijuana. If her client were eligible for a waiver, he would be a strong candidate, she said, because he has three US citizen children, including a baby that was born premature and has significant health issues. But instead, he is now at risk of being put into proceedings and deported away from his family permanently.[110]

"Young K.," a 58-year-old Korean woman who has lived in the US since 1981, when she entered with her then-spouse, a military serviceman, has been unable to gain lawful permanent resident status for the past 30-plus years because of a 1977 drug conviction in South Korea. According to Young, while she was still living in South Korea, some Americans she had met had asked her to find some marijuana, which led to her arrest and conviction. After she married in 1980, she entered the US with her then-husband on a visitor visa and they raised two children in Alabama. She also now has two US citizen grandchildren. Her husband applied for her to gain permanent resident status, but her conviction barred her. Young said her lack of legal status has had a devastating impact on her life. She could not travel out of the country or go to school. When their marriage ended, her husband took custody of their children. He threatened her with deportation if she fought the arrangement. She said, "When the children needed me, I couldn't be there, that was the hardest." Young was only able to reestablish a relationship with them after her

---

[110] Human Rights Watch telephone interview with Elizabeth Cordoba, immigration attorney, April 11, 2014.

AR.09242

husband passed away. [111] Young is now married to another US citizen, but according to her attorney, she was ordered deported in 2009, and her appeal to the 11th Circuit was denied in 2011. Young remains in the US under a stay of the removal order. According to her attorney, under South Korean law, Young no longer even has a conviction, as convictions are effectively expunged after a certain period of time.[112] But US immigration law, with a limited exception, does not recognize expungements.[113]

## No Individualized Assessment

A limited form of relief from deportation is available for immigrants who are put into deportation proceedings, called non-lawful permanent resident (non-LPR) cancellation of removal, which allows them to apply for legal status if they have lived in the US for many years, have good moral character, and can prove a US citizen or permanent resident child, spouse, or parent would suffer "exceptional and unusual hardship."[114] This is one of the few instances in which US immigration law recognizes the right to family unity for undocumented immigrants, albeit in an extremely limited way, as "exceptional and unusual" is a very high standard, met in such cases as when the qualifying relative has a serious medical condition that cannot be treated in the non-citizen's native country.

A conviction for any controlled substance offense, however, eliminates eligibility for this form of relief. Non-citizens with one conviction for "a crime involving moral turpitude" are still eligible if the maximum possible sentence is less than one year and the sentence imposed was six months or less.[115] But non-citizens with convictions for drug offenses, no matter how minor or how short the potential sentence, are ineligible.

"Samuel D.," an undocumented immigrant from Mexico who has lived in the US for over 15 years, told Human Rights Watch he is ineligible for non-LPR cancellation because of minor

---

[111] Human Rights Watch telephone interview with "Young K." (pseudonym), June 13, 2014

[112] Human Rights Watch interview with Henry Cruz, June 10, 2014.

[113] Immigration and Nationality Act 101(a)(43)(A) defines "conviction" as "a formal judgment of guilt of the alien entered by a court, or if adjudication of guilt has been withheld, where – (i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed." 8 US Code Section Section 1101(a)(43)(A). Subsequent state rehabilitative expungements still constitute convictions. *Murilla-Epspinoza v. INS*, 261 F.3d 771, 774 (9th Cir. 2001). For more information, see Section V. below.

[114] 8 US Code Section 1229b(b)(1).

[115] Matter of Cortez, 25 I&N Dec. 301 (BIA 2010); Matter of Pedroza, 25 I&N Dec. 312 (BIA 2010).

drug possession convictions from 2001. According to his attorney Bob Pauw, Samuel would have a strong application for cancellation of removal if not for these convictions. Two of Samuel's four children, all US-born, have learning disabilities that Pauw believes would result in "exceptional and unusual hardship" if they were forced to live in Mexico. When he first came to the United States, Samuel said he shared houses in California with many other immigrants. When drugs were found in these houses, he was convicted of drug possession, even though Samuel said he never used or sold drugs himself. Over 10 years later, after he had moved to Washington, started to raise a family, and built a steady work history, immigration authorities came to his home looking for someone else, but arrested Samuel.[116] With no other options, Pauw is preparing an application for prosecutorial discretion.[117]

---

[116] Human Rights Watch interview with "Samuel D." (pseudonym) and his wife, Washington, June 11, 2014; interview with Bob Pauw, immigration attorney, Seattle, Washington, June 10, 2014.
[117] Ibid.

AR.09244

# V. Drug Convictions as Bars to Asylum

The principle of non-*refoulement* places strict limits on a government's ability to return a person to a country where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group, or political opinion. There is a very limited exception to this principle if the asylum seeker "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."[118]

US law falls short of international standards requiring this exception to be applied narrowly and after individualized determination of whether the refugee has been convicted of a particularly serious crime and whether he or she constitutes a danger to the community. Instead, under US law, certain types of crimes are categorically deemed to be "particularly serious crimes" that bar eligibility for asylum and withholding of removal, forms of protection otherwise available for asylum-seekers and refugees.[119]

Drug trafficking offenses, in particular, are the subject of an interpretation issued by the US Attorney General, that asserts they are presumptively "particularly serious crimes." In

[118] UN General Assembly, Convention relation to the Status of Refugees (Refugee Convention), 189 U.N.T.S. 150, entered into force April 22, 1954, art. 33.

[119] For non-citizens who fear returning to their home countries, US law provides several forms of protection: asylum, withholding of removal under the Immigration and Nationality Act (INA), and withholding of removal and deferral of removal under the Convention against Torture (commonly described as "CAT"). Asylum is available for an applicant who can establish past persecution or a "well-founded fear" of future persecution on account of a protected ground, race, religion, nationality, membership in a particular social group, or political opinion, and meets other eligibility requirements. In the US, a non-citizen granted asylum—an "asylee" —is granted significant benefits—he or she may remain indefinitely in the US, can apply for permanent resident status after one year and can apply for his or her spouse and children to gain derivative asylee status. A non-citizen who does not meet all the requirements for asylum, including procedures requiring that applications are filed within one year of arrival, may remain eligible for withholding of removal. Many of the benefits afforded to asylees are not afforded to those granted withholding of removal, and it requires the applicant to meet a higher burden of proof than for asylum, a greater than 50 percent chance of being persecuted. Protection under the Convention against Torture has the highest bar, as it requires a non-citizen to prove "it is more likely than not" that he or she would suffer the severe level of pain and suffering of being tortured if returned and must show that a state agent perpetrated or acquiesced in the torture; it does not, however, require the applicant to establish that the likelihood of being tortured would be on account of one of the five protected grounds for asylum or withholding of removal. Like withholding of removal, there are few other benefits that attach to a grant of relief in relation to torture other than the bar on return to the country of origin, and the person can still be removed to a country other than their home country. 8 Code of Federal Regulations Sections 208.18(a) and 1208.18(a).

A conviction for a "particularly serious crime" bars eligibility for asylum and withholding of removal under the INA and under CAT but not deferral of removal under CAT. Any "aggravated felony" conviction is a "particularly serious crime" barring eligibility for asylum; an "aggravated felony" conviction is presumptively a "particularly serious crime" barring eligibility for withholding of removal under the INA and under CAT. 8 US Code Sections 1158(b)(2)(B) and 1231(b)(3)(B), 8 Code of Federal Regulations 208.16(d)(3).

*Matter of Y-L-*, the US Attorney General overruled the US Board of Immigration Appeals, which had found in three separate cases that the applicants' convictions for cocaine-related trafficking offenses were not particularly serious crimes, emphasizing such factors as the applicants' cooperation with federal authorities, their limited criminal history records, and the fact they were sentenced at the low-end of the sentencing guidelines. In disagreeing, the US Attorney General's interpretation stated, "only under the most extenuating circumstances that are both extraordinary and compelling would departure from this interpretation be warranted or permissible."[120]

In one attorney's experience, the Attorney General's decision in *Matter of Y-L-* makes possession of a controlled substance with intent to distribute one of "the worst crimes to have." Daniel Conklin, former staff attorney at the Pennsylvania Immigrant Resource Center, has found, "It's easier to argue that robbery or assault is not a particularly serious crime because there's no decision like *Matter of Y-L-*."[121]

Because of *Matter of Y-L-*, numerous federal courts have held that minor offenses involving small amounts of drugs that nonetheless fall within the broad US definition of "drug trafficking" crimes bar non-citizens who fear persecution in their native countries from applying for asylum or withholding of removal. In *Tunis v. Gonzales*, a lawful permanent resident fearing female genital mutilation in Sierra Leone had a conviction for selling less than one gram of cocaine, for which she served seven months in prison; this conviction made her ineligible for asylum or withholding of removal.[122] Similarly, in *Diaz v. Holder*, the immigrant had been involved in a sale of 16 ecstasy pills for $320, for which he had received a suspended sentence and three years' probation, while in *Hussein v. Attorney General*, the immigrant was convicted of possession with intent to deliver khat, a drug commonly used in Africa, for which he received one year probation.[123] Both were ruled ineligible for withholding of removal because of these "particularly serious crimes."

---

[120] *Matter of Y-L-*, 23 I & N Dec. 270 (AG 2002). The opinion further highlighted how rare it should be to find any drug trafficking crime not "particularly serious" by stating, "I emphasize here that such commonplace circumstances as cooperation with law enforcement authorities, limited criminal histories, downward departures at sentencing, and post-arrest (let alone post-conviction) claims of contrition or innocence do not justify such a deviation."

[121] Human Rights Watch telephone interview with Daniel Conklin, former staff attorney, Pennsylvania Immigrant Resource Center, April 17, 2014.

[122] *Tunis v. Gonzales*, 447 F.3d 547 (7th Cir. 2006).

[123] *Diaz v. Holder*, 2012 U.S. App. Lexis 22452 (10th Cir. 2012); *Hussein v. Attorney General*, 2008 U.S. App. Lexis 7553 (3rd Cir. 2008).

AR.09246

Non-citizens with drug trafficking convictions remain eligible for deferral of removal under the Convention against Torture (ratified by the US in 1994), but they must meet a much higher standard than for asylum or withholding of removal, and they are eligible for few benefits other than a guarantee that they will not be returned to their countries of origin.

Non-citizens with convictions for simple drug possession may still be eligible for asylum or withholding of removal, depending on such factors as the sentence and whether the drugs were for personal use, but such convictions still trigger mandatory detention, which can severely limit their ability to gather the evidence needed to support an asylum claim.[124]

---

[124] Human Rights Watch, *Costly and Unfair: Flaws in US Immigration Detention Policy*, May 6, 2010, https://www.hrw.org/reports/2010/05/06/costly-and-unfair-0.

ER-1206

AR.09247

# VI. Mandatory Detention

Policymakers and legislators who seek to reform US drug policy often cite the damaging and wasteful effects of prolonged incarceration for nonviolent drug offenses. Many states have accordingly sought to reduce the amount of time people spend in prison for drug offenses, and defendants with minor convictions often serve short sentences or no term of incarceration.

Yet under US immigration law, any controlled substance offense, along with a range of convictions for other criminal offenses, triggers mandatory detention in a setting similar, if not identical, to US jails and prisons.[125] The law makes no distinction between permanent residents and undocumented immigrants, or between minor and serious drug offenses.

## Pre-Trial Detention in the Criminal Justice System versus Pre-Removal Detention in the Immigration Detention System

In the US criminal justice system, criminal defendants are generally presumed to be eligible to be released pending trial, after consideration of whether the defendant is a flight risk or a danger to the community.[126] In contrast, non-citizens who have committed a wide range of offenses, even minor ones, are subject to mandatory immigration detention pending their removal proceedings and are ineligible to apply for release on bond.[127]

The vast majority of the individuals we interviewed and the cases we examined involved non-citizens, including many permanent residents, who had spent at least some time in immigration detention, ranging from a few days to over two years. Many reported that they spent more time in immigration detention than in jail or prison for their drug conviction, often because they sought relief from deportation.

---

[125] Immigration and Nationality Act Section 236(c), 8 US Code Section 1226(c). There is an exception for individuals who are released from their criminal sentences on or before October 1998, the expiration date of the Transition Period Custody Rules. *Matter of Adeniji*, 22 I & N Dec. 1102 (BIA 1999). See also US Department of Justice, Executive Office of Immigration Review, Immigration Judge Benchbook, http://www.justice.gov/eoir/vll/benchbook/ (accessed July 24, 2014).

[126] American Bar Association, *ABA Criminal Justice Standards: Pretrial Release*, http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_pretrialrelease_toc.html (accessed August 28, 2014).

[127] 8 US Code 1226(c).

AR.09248

- The most time Marsha Austin, a permanent resident, had spent in jail had been 90 days for violating probation, and she had never served more than a day or two in jail for her drug convictions, but she was detained by immigration authorities for two-and-a-half years.[128]

- Marco Merino, a permanent resident, reported he had never spent any time in jail for his convictions for possession of marijuana and LSD, but he spent six months in immigration detention before he was ultimately deported to Chile.[129]

- Nazry Mustakim, a permanent resident from Singapore, said he had received only a sentence of probation for his conviction for possession of methamphetamine with intent to deliver, but was held in immigration detention for 10 months.[130]

- Amanda Esquivel reported that her husband, Jesus, had been sentenced only to probation for his drug possession conviction, but had been in immigration detention for over six months by the time of her interview.[131]

- Marion Scholz spent 8 months in jail for violating her probation after a drug conviction; she spent almost two years in immigration detention afterward.[132]

- Hans Meyer, an attorney in Colorado, reported that possession of marijuana paraphernalia, conduct which no longer even constitutes a crime in that state, led to mandatory detention of his client.[133]

---

[128] Human Rights Watch interview with Marsha Austin and Sonia Lin (Austin's attorney), New York, New York, May 5, 2014.

[129] Human Rights Watch telephone interview with Marco Merino, May 6, 2014.

[130] Human Rights Watch telephone interview with Nazry and Hope Mustakim, June 3, 2014.

[131] Human Rights Watch telephone interview with Amanda Esquivel, June 4, 2014.

[132] Human Rights Watch telephone interview with Marion Scholz, March 19, 2014.

[133] Human Rights Watch interview with Hans Meyer, immigration and criminal defense attorney, and Julie Gonzalez, immigration advocate, Denver, Colorado, May 22, 2014.

AR.09249

### Permanent Resident Detained in Immigrant Jail for Marijuana Possession

Ricardo Fuenzalida, now 34, said he came to the US from Chile when he was 11 years old. He became a permanent resident when he turned 18 and is now married to a US citizen and has twin 10-year-old daughters, born in the US.

When he was about 20 years old, Fuenzalida pled guilty on two occasions to misdemeanor possession of marijuana. He said his public defender never told him it could affect his immigration status, and he never spent a day in jail. As a family man who worked hard at his job in construction and spent most of his free time as his daughters' soccer coach, he thought these marijuana convictions would never affect his life.

But over 13 years later, on January 2, 2013, immigration authorities knocked on Fuenzalida's door. They took him into custody but did not tell him why he had been arrested. He said he did not see an immigration judge until three weeks later, which is when he found out the government wanted to deport him for his two marijuana misdemeanor convictions. "[The immigration judge] explained to me since my case is drug-related, I get no bail, I have to fight the case from the inside," Fuenzalida said.

Fuenzalida ultimately was able to avoid deportation by applying for "lawful permanent resident cancellation of removal," a defense to deportation in which permanent residents must show they deserve to be allowed to remain in the US. He had an excellent case, given his strong family ties, steady work history, and very minor criminal record. But his likelihood of success did not allow him to avoid mandatory detention.

"The worst was being far from my wife and kids," Fuenzalida remembered. He and his wife decided not to tell their daughters where he was because he knew they would want to visit. "It would be too much for them.… I didn't want to to see me in the setting I was in," he said. But when he called his wife every night, she told him their daughters cried every night for their father. Even though Fuenzalida was not being charged with a crime, he still had to deal with the serious challenges of living in a jail-like setting, with bad food, harsh temperatures, and guards banging on their doors. He said he lost 12 pounds, and that "[e]verybody loses weight in there."

Despite having avoided deportation, Fuenzalida's life has not gone completely back to normal. Fuenzalida's wife had to drop out of school, where she was training to be a respiratory therapist, but they still have to pay back the student loans she had already taken out. They also owe his boss thousands of dollars, since he paid for Fuenzalida's immigration attorney. The strain of having the main breadwinner in detention "pulled [his] family apart" and the formerly warm relationship between his wife and mother deteriorated.[134]

---

[134] Human Rights Watch interview with Ricardo Fuenzalida, Union City, New Jersey, May 6, 2014.

AR.09250

### After 20 Years in Federal Prison, Fearing Persecution and Torture in Jamaica

Claudette Hubbard, a lawful permanent resident from Jamaica, was sentenced in 1992 to 30 years in federal prison for conspiracy with intent to possess and distribute crack cocaine, plus 5 years for a small gun that was found on her nightstand.

Hubbard told Human Rights Watch she first came to the US from Jamaica in the 1970s, when she was 17. She eventually had two US-born children. At the time she was sentenced, mandatory minimum sentences for crack cocaine were triggered by significantly smaller amounts of drugs than for powder cocaine, resulting in a "100-to-1" sentencing disparity that Human Rights Watch long criticized for its racially disproportionate impact on African Americans.[135] According to her current immigration attorney, Hubbard took advantage of every rehabilitative program available, earned a business degree, served as a mentor, and was a model prisoner. Hubbard credits the time she spent in prison as helping to make her a better person. Hubbard's sentence was reduced in 2011 to reflect the Fair Sentencing Act, which reduced the crack cocaine-powder cocaine disparity, and she served less time because of her good behavior. Nevertheless, she spent almost 20 years in federal prison.[136]

After she completed her criminal sentence, Hubbard was transferred to immigration detention, which she found much harder than federal prison. Hubbard said it was like going "from the palace to the dump." Hubbard, a lesbian who had suffered severe abuse and persecution in Jamaica, applied for protection under the Convention against Torture (CAT) (her conviction disqualified her from asylum and withholding of removal), but the immigration judge and Board of Immigration Appeals denied her application, applying a legal standard for government acquiescence in torture that her attorney argued was incorrect. During her appeal, Hubbard was subject to mandatory immigration detention. Although her prison sentence had been long, Hubbard knew the exact date she would be released, whereas in administrative immigration detention, she didn't know if she was going to be able to stay or get deported. Hubbard lost 27 pounds. She said, "I had to get psych meds, it was driving me up the wall. I couldn't sleep, I couldn't eat.… I couldn't hold a conversation without tears." Hubbard ended up spending two additional years in immigration detention before being released on $7,500 bond, paid through contributions from a community of her supporters. After Hubbard appealed to the Ninth Circuit US Court of Appeals, the US government agreed to remand her case for full consideration of her claim.[137]

---

[135] Human Rights Watch, "Cracked Justice: Addressing the Unfairness in Cocaine Sentencing," Written Statement Submitted by Carol Chodroff, US Advocacy Director, to the House Judiciary Committee, Subcommittee on Crime, Terrorism, and Homeland Security, February 26, 2008, http://www.hrw.org/news/2008/02/25/cracked-justice-addressing-unfairness-cocaine-sentencing.

[136] Human Rights Watch interview with Claudette Hubbard and Toya Green (Hubbard's daughter), Los Angeles, California, June 20, 2014; US v. Hubbard, United States District Court for the Middle District of Florida, case no. 6:11-cr-350-Orl-28DAB, Order, filed November 4, 2011.

[137] Human Rights Watch interview with Claudette Hubbard and Toya Green (Hubbard's daughter), Los Angeles, California, June 20, 2014; telephone interview with Holly Cooper, clinical professor, University of California, Davis School of Law, April 30, 2014.

AR.09251

## Imposing Barriers to Due Process, Severe Hardship to Families

As previous reports[138] by Human Rights Watch and others have demonstrated, detention impedes non-citizens from accessing attorneys, obtaining evidence in support of their claims, and staying in touch with their families and support systems, especially when they are transferred to immigration detention centers far from home.[139] It imposes severe hardships on families, including US citizens and permanent residents, particularly when the detained immigrant was the primary wage earner.

Many studies have found that criminal defendants held in pre-trial detention are more likely to plead guilty than those who are not.[140] Non-citizens in immigration detention similarly struggle to defend themselves and assert their rights to apply for forms of relief from deportation for which they are eligible. In the experience of Talia Peleg, an immigration attorney at Brooklyn Defenders, "Mandatory detention is absolutely damaging.… I've had numerous clients take removal orders when they were eligible for defenses simply because they would have to be detained during the pendency of their cases."[141]

Unlike criminal defendants, immigrants in deportation proceedings who cannot afford an attorney are not entitled to court-appointed counsel. Detention can significantly impede an immigrant's ability to find an attorney. Many detention centers are located in isolated, rural locations. Several North Carolina attorneys interviewed by Human Rights Watch said they did not represent individuals held in Stewart Detention Center in Lumpkin, Georgia, which detains non-citizens in the Southeast US. According to one attorney, Stewart Detention Center is a seven-hour drive from him and three hours from the closest airport, and it is "unfeasible" to provide effective representation to a client

---

[138] Human Rights Watch, *Costly and Unfair: Flaws in US Immigration Detention Policy*, May 6, 2010, http://www.hrw.org/reports/2010/05/06/costly-and-unfair-0.

[139] Human Rights Watch, *Locked Up Far Away: The Transfer of Immigrants to Remote Detention Centers in the United States*, December 2, 2009, http://www.hrw.org/reports/2009/12/02/locked-far-away-0; Human Rights Watch, *A Costly Move: Far and Frequent Transfers Impede Hearings for Immigrant Detainees in the United States*, June 14, 2011, http://www.hrw.org/reports/2011/06/14/costly-move-0.

[140] Human Rights Watch, *The Price of Freedom: Bail and Pretrial Detention of Low Income Nonfelony Defendants in New York City*, December 3, 2010, http://www.hrw.org/node/94581.

[141] Human Rights Watch interview with Talia Peleg, May 7, 2014.

AR.09252

in Stewart: "It's a hellhole, it's where cases go to die."[142] Griselda Barrera, a paralegal with a nonprofit organization that regularly visits the South Texas Detention Center, about an hour from San Antonio, Texas, reported that detained immigrants routinely find it difficult to find attorneys willing to represent them.[143] Natalia Drelichman described how in one case, she could not talk to her detained client on the phone because those calls were not confidential, but that to visit him, she had to make a five to six-hour round-trip drive from her office.[144]

Detention can also impede an immigrant from obtaining the evidence necessary to apply for relief from deportation. A lawful permanent resident applying for cancellation of removal, for example, will need to provide court records for any conviction, evidence of lawful permanent or US citizen status for any qualifying relative, evidence of his or her good moral character such as letters of support from community members, evidence of rehabilitation, and evidence of any other positive factors supporting their application. Documents can be extremely difficult to obtain while detained, particularly if the immigrant is unable to obtain legal representation or is detained far from family and community. Unauthorized immigrants who came to the US as children may be eligible for a temporary reprieve from deportation under the executive program Deferred Action for Childhood Arrivals, but those who must enroll in a General Equivalency Degree program to meet the education requirement often cannot do so if detained because, as reported to Human Rights Watch, detention centers generally do not offer GED classes.

Evidence of rehabilitation or a strong intent to seek treatment for drug addiction can be particularly difficult to obtain when immigrants are held in detention centers where few programs are available. Two immigrants who had spent about 20 years each in federal prison separately reported that they found federal prison easier than immigration detention because there were programs available in federal prison.[145]

---

[142] Human Rights Watch telephone interview with Rob Herroy, immigration attorney, June 3, 2014. Immigration attorneys in Atlanta, Georgia, and Charlotte, North Carolina, concurred. Human Rights Watch telephone interview with Charles Kuck, June 4, 2014; telephone interview with Tin Nguyen, June 5, 2014.

[143] Human Rights Watch telephone interview with Griselda Barrera, accredited representative, Legal Orientation Program, American Gateways, June 18, 2014.

[144] Human Rights Watch telephone interview with Natalia Drelichman, staff attorney, American Gateways, June 6, 2014.

[145] Human Rights Watch interview with Courtney Fuller, June 11, 2014; interview with Claudette Hubbard, June 20, 2014.

Numerous immigrants reported that detention resulted in severe financial hardship, including loss of their homes and trauma to their children. While "Samuel D." was in detention, he said his children did not want to go to school. One son continues to see a psychologist, and when the children are in the car with him and they see the police, they are afraid.[146] Amanda Esquivel, whose husband has been in mandatory detention for over six months for a drug possession conviction, said, "My 13 year-old and 10-year-old were crazy about daddy, they were with him all the time.… My daughter has to see a psychiatrist because she's having serious issues."[147]

---

[146] Human Rights Watch interview with "Samuel D." (pseudonym), Washington, June 11, 2014.
[147] Human Rights Watch telephone interview with Amanda Esquivel, June 4, 2014.

AR.09254

### DREAMer Deported for Possession of Marijuana

"Antonio S.," now in his early 20s, first came to the US from Mexico when he was 12 years old. According to his attorney, Violeta Chapin at the University of Colorado Law School Criminal and Immigration Defense Clinic, Antonio was arrested in Wyoming in December 2012 for possessing a small amount of marijuana. Antonio pled guilty without an attorney,[148] having no idea that this conviction for violating a municipal ordinance could change his life. After 11 days in jail for the marijuana conviction, immigration authorities arrested him and transferred him to a detention facility in Colorado, where he was held for over a year. Unable to afford an immigration attorney, he tried to apply for asylum on his own and was denied, at which point his mother, also undocumented, got in touch with the University of Colorado immigration law clinic.

Antonio's sole conviction for possession of marijuana would not have disqualified him from Deferred Action for Childhood Arrivals (DACA), the administrative program created by the Obama administration for some immigrants who came to the US as children. But because of this conviction, he was also subject to mandatory detention. To be eligible for DACA, the applicant must have a high school diploma or GED, or be currently enrolled in school. Antonio had dropped out of high school to work, and would have been happy to go back to school, but because he was in detention and the facility had no GED programs, Antonio could not enroll. His attorney tried desperately to get him released on bond or on electronic monitoring, but she was told that because he had a drug conviction, he was under mandatory detention. She was working on vacating his Wyoming conviction, on the basis that he had been given no information on the immigration consequences of the guilty plea, but the US government deported him in the spring of 2014 before she could get the transcripts of his plea.

Chapin reports Antonio was bewildered and repeatedly asked her, "How could this possibly be happening to me?" Possession of small amounts of marijuana for personal use is now legal in Colorado, the state in which Antonio was detained. Chapin cannot believe how much the US government spent to detain and deport Antonio "for a tiny bag of weed." "I'd like them to focus on their priorities, murderers and kidnappers," she said, "and not municipal weed violators."[149]

---

[148] Defendants accused of misdemeanor municipal offenses regularly waive their right to an attorney, sometimes under pressure from judges. Robert C. Boruchowitz et al., National Association of Criminal Defense Lawyers, "Minor Crimes, Massive Waste: The Terrible Toll of America's Broken Misdemeanor Courts," April 2009, https://www.nacdl.org/reports/misdemeanor/ (accessed August 27, 2014).

[149] Human Rights Watch telephone interview with Violeta Raquel Chapin, assistant clinical professor of law, University of Colorado-Boulder School of Law, May 29, 2014.

AR.09255

## Recent Legal Challenges to Mandatory Detention

The US Supreme Court in 2003 ruled that pre-removal mandatory detention under section 236(c) of the Immigration and Nationality Act (INA) is constitutional. The decision, *Demore v. Kim*, has been criticized for relying on misleading government statistics on the average length of detention, as the court found detention pending removal under 236(c) "lasts roughly a month and a half in the vast majority of cases—and about five months in the minority of cases in which the alien chooses to appeal."[150]

Since then, three appellate courts have found that *Demore* only applies where detention is brief and that 236(c) does not authorize detention without bond in cases where the duration of detention is not "reasonable." The Ninth Circuit US Court of Appeals in *Rodriguez v. Robbins* created a bright-line six-month rule, holding that once detention becomes "prolonged"—when it exceeds six months—the detained individual is entitled to a bond hearing.[151] The Third and Sixth Circuits have also recognized a need to limit the duration of detention under 236(c) but have settled on a "reasonableness" standard requiring case-by-case analysis.[152] Some districts courts throughout the US have issued similar rulings.[153]

As a result, some individuals subject to mandatory detention for controlled substance offenses have been released after six months. In several cases, particularly in the Ninth Circuit, attorneys and immigrants reported that release from detention made a significant difference in the ability of immigrants to pursue relief from deportation.[154] It allowed them to remain with their families, continue to support themselves and their families financially, and to participate in programs and activities that would help them build evidence of rehabilitation. But their cases also highlight how differently immigrants with similar drug convictions can be treated depending on the state or circuit in which they live.

---

[150] *Demore v. Kim*, 538 U.S. 510, 530 (2003).

[151] *Rodriguez v. Robbins*, 715 F. 3d 1127, 1138 (9th Cir. 2013).

[152] *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003); *Diop v. ICE/Homeland Security*, 656 F. 3d 211 (3d Cir. 2011).

[153] See *Reid v. Donelan*, WL 2199780 (D. Mass. 2014); *Bracamontes v. Desanti*, WL 2942760 (E.D. Va. 2010).

[154] Human Rights Watch interview with Claudette Hubbard and Toya Greene, June 20, 2014; interview with "Samuel D," June 11, 2014; interview with Bob Pauw, immigration attorney, Seattle, Washington, June 10, 2014; telephone interview with Marion Scholz, March 19, 2014. *See also* American Civil Liberties Union, "Restoring Due Process: How Bond Hearings Under Rodriguez v. Robbins Have Helped End Arbitrary Immigration Detention," December 2014, https://www.aclu.org/restoring-due-process-how-bond-hearings-under-rodriguez-v-robbins-have-helped-end-arbitrary (accessed April 15, 2015).

AR.09256

### Released to Son and Rehabilitative Program

"Maria S.," now 29 years old, said she first came to the US from Mexico when she was 15, as a permanent resident through a petition filed by her US citizen stepfather. She said she did well in school, graduating from high school with a 3.8 GPA, and even got a scholarship to go to the University of Washington, but she did not go to college because she needed to work full time.

Maria met and married a US citizen, with whom she has a two-and-a-half-year-old son, but she said her husband became verbally abusive. She started using drugs and became dependent on painkillers. She was trying to get off the drugs when she got arrested with another woman for selling stolen property to buy drugs. She was convicted of possession of stolen property, possession of a controlled substance, and two charges of identity theft and sentenced in September 2013 to 30 days in jail, with restitution, drug and alcohol assessment, and one year probation.

After her time in jail, Maria was transferred to immigration detention in the Josephine County jail, eight hours from her family in Tacoma, Washington, and was told the US government wanted to take away her green card and deport her. There were no rehabilitative programs available. The facility was too far for her family to visit her, and she relied on daily phone calls with her mother to help her endure detention. "Without my family, I probably would have given up in there," she said. As hard as it was, Maria felt, "In a way it was good. I was doing drugs, and that got me clean and sober and opened my eyes to an abusive relationship with my ex."

After six months in immigration detention, Maria's attorney, Karin Tolgu, was able to get a *Rodriguez* hearing for her and she was released on $15,000 bond in May 2014. Since her release, Maria has signed up for a drug and alcohol treatment program. Maria is grateful to be able to fight her case without remaining in detention. Her ex-husband currently has custody of her son but she visits him regularly, and her hope is that once she has a job and is in a more stable situation, she will be able to share custody of her son. "[J]ust seeing his face and hugging him and kissing him was the best thing." She knows she has to prove she has rehabilitated so she can stay in the US, and she believes that being free will enable her to prove she can.[155]

---

[155] Human Rights Watch interview with "Maria S." (pseudonym), Seattle, Washington, June 12, 2014.

AR.09257

# VII. The Overly Broad Definition of "Conviction"

## When Successful Completion of a Diversion Program Leads to Deportation

The 1996 amendments to US immigration law significantly broadened the definition of a "conviction" to include dispositions that would not be considered convictions by the criminal justice system.[156] If at any point, a non-citizen is found guilty, either by a judge or through a guilty plea, regardless of whether charges are later dismissed or the records expunged, that non-citizen's conviction exists in perpetuity for immigration purposes.

This extremely broad definition affects immigrants with convictions for a wide range of minor offenses, but the effect is particularly pronounced with drug offenses, which the US criminal justice system increasingly addresses through drug courts and other diversion programs that often promise an expunged record for successful completion. Erika Pinheiro, an immigration attorney at Catholic Charities in Los Angeles stated, "I see so many people who are told by their public defender that they'll be fine, there's a diversion program."[157]

Diversion programs vary widely from state to state and county to county, but in general they follow one of two models: pre-plea or post-plea. In a pre-plea or deferred prosecution drug court, defendants are not required to plead guilty and those who successfully complete treatment are never prosecuted. Those who fail to complete the program, however, are then prosecuted. In a post-plea or deferred entry of judgment program, defendants must first plead guilty to their charges, but then have their sentences deferred or suspended during their participation in a treatment program. Those who successfully complete the program will have their sentence waived and sometimes, their conviction expunged, while those who fail will be sentenced on their guilty plea.[158]

---

[156] Immigration and Nationality Act 101(a)(43)(A) defines "conviction" as "a formal judgment of guilt of the alien entered by a court, or if adjudication of guilt has been withheld, where—(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed."

[157] Human Rights Watch interview with Erika Pinheiro, February 6, 2014.

[158] Ryan King and Jill Pasquarella, Sentencing Project, "Drug Courts: A Review of the Evidence," April 2009, http://www.sentencingproject.org/doc/dp_drugcourts.pdf (accessed August 5, 2014).

AR.09258

For immigration purposes, a pre-plea program will generally not result in a conviction that can lead to deportation.[159] But a post-plea program, even one where successful completion results in an expunged conviction, will result in a conviction that can lead to detention and deportation.[160] Malcolm Seawell, a criminal defense attorney in Colorado, explained, "[S]omeone who just wasn't born here, who's been here his whole life, who makes a small mistake … [isn't] given the same opportunities to put these cases behind them."[161]

Human Rights Watch interviewed several individuals and attorneys who reported cases in which successful completion of diversion programs still resulted in a conviction that the US government used in deportation proceedings.

- Jose Francisco Gonzalez pled guilty to marijuana cultivation in 2001 to participate in a California diversion program and was told he no longer had a criminal record after successful completion, but 13 years later, ICE came to his home and arrested him.[162]

- "Samuel D." reported he had successfully completed diversion programs for possession of small amounts of marijuana and methamphetamine in California, but those convictions still made him ineligible for non-permanent resident cancellation of removal when he was put into deportation proceedings 10 years later.[163]

- Malcolm Seawell reported that his client Josh Lee, who had been in the US since he was a child, had been arrested for possession of a very small quantity of cocaine in Colorado. Lee had pleaded guilty to participate in a diversion program, but immigration came and placed him in detention. Seawell had to withdraw the guilty

---

[159] To fully avoid immigration consequences, pre-plea diversion programs must also allow the non-citizen to avoid making any statements that would constitute an admission of guilt, as a conviction is not necessary for immigration consequences to be imposed.

[160] *In re Salazar-Regino*, 23 I & N Dec. 223 (BIA 2002). The Board of Immigration Appeals held in 2002 that a permanent resident who had lived in the US since 1977 was deportable as an "aggravated felon" for a first-time drug conviction for third degree felony possession of marijuana, for which she received a deferred adjudication of guilt and probation for 10 years. A very limited exception for expunged drug convictions exists for immigrants with certain drug convictions in western states bound by decisions of the US Court of Appeals for the Ninth Circuit. A first drug possession conviction occurring before July 14, 2011, is considered to be erased for immigrants in such states who are in deportation or other immigration proceedings. *Nunez-Reyes v. Holder*, 646 F.3d 684 (9th Cir. 2011).

[161] Human Rights Watch telephone interview with Malcolm Seawell, criminal defense attorney, June 20, 2014. See also Kelsey Whipple, "Eldren's Josh Lee: Musicians rally around violinist detained by ICE," *Denver Westword Blogs*, June 22, 2012, http://blogs.westword.com/latestword/2012/06/eldren_josh_lee_immigration_detained_ice.php (accessed July 30, 2014).

[162] Human Rights Watch interview with Jose Francisco Gonzalez and Pita Sanchez (Jose's partner), Anaheim, California, April 30, 2015.

[163] Human Rights Watch interview with "Samuel D.," June 11, 2014; interview with Bob Pauw, immigration attorney, Seattle, Washington, June 10, 2014.

plea and have him plead to a different offense to avoid the immigration consequences of a drug conviction.[164]

- Helen Lawrence, an immigration attorney in Oakland, California, described a case in which her client had a single conviction for possession of ecstasy from a New Year's Eve celebration. Although he had participated in a diversion program, the program had required a guilty plea and he still had a conviction for immigration purposes. He had entered the US on a tourist visa at the age of seven and was now married to a US citizen. The conviction barred him from gaining lawful permanent resident status through his wife until Lawrence was able to vacate his conviction.[165]

- A client of Michael Mehr, an attorney in Santa Cruz, California, was not so lucky. The client also had successfully completed a diversion program over 10 years ago for possession of a small amount of cocaine and had the charges dismissed, but was in removal proceedings because he had pleaded guilty and immigration still considered him to have a conviction. Mehr sought post-conviction relief, but the prosecutor opposed vacating the conviction because, under California law, the charges had already been dismissed. The prosecutor could not understand that the dismissed charges still constituted a conviction under US immigration law. As a result, he says his client was deported away from his wife and US citizen children.[166]

- Tony Lococo, a permanent resident from Australia, was deported in 2013 as an "aggravated felon" after being arrested with three bags of crack cocaine. According to news reports, Lococo had been dependent on crack cocaine, but had pleaded guilty in Connecticut to sale of narcotics in order to enter a drug treatment program. Eight years later, he was put into removal proceedings and ultimately deported away from his US citizen wife, parents, and children, after having lived in the US since 1967.[167]

---

[164] Human Rights Watch telephone interview with Malcolm Seawell, criminal defense attorney, June 20, 2014. See also Kelsey Whipple, "Eldren's Josh Lee: Musicians rally around violinist detained by ICE," *Denver Westword Blogs*, June 22, 2012, http://blogs.westword.com/latestword/2012/06/eldren_josh_lee_immigration_detained_ice.php (accessed July 30, 2014).

[165] Human Rights Watch interview with Helen Lawrence, immigration attorney, Oakland, California, June 26, 2014.

[166] Human Rights Watch interview with Michael Mehr, criminal and immigration attorney, Santa Cruz, California, June 27, 2014.

[167] Eric Parker, "Family fights to keep husband, father from being deported," *Eyewitness News WFSB*, February 25, 2013, updated March 25, 2013, http://www.wfsb.com/story/21339142/family-fights-to-keep-husband-father-from-being-deported (accessed July 30, 2014). Emails from Karen Lococo (Tony Lococo's wife) to Human Rights Watch.

AR.09260

### Fearing Deportation as a "Drug Trafficker" after a Guilty Plea in a Diversion Program

"Miguel R." came to the US from Ecuador in 1993, when he was in his early 20s. He is a lawful permanent resident; he said his wife, parents, brothers, and sisters are all US citizens. They all live near each other in the Bronx in New York City. According to Miguel, for many years, he was a truck driver and he drove all over the country with his wife and his dog.

Miguel was proud of his job and the good money he made, but for several years, he struggled with a dependency on heroin. Gregarious and open, Miguel said, "I used to weigh 200 pounds but I went down to 115." He decided to get clean, he said, because, "I was dying. It was the worst thing I ever did in my life."

Because of his dependency, Miguel was arrested several times but was charged mainly with disorderly conduct. But the conviction that makes Miguel automatically and permanently deportable as an "aggravated felon" happened in 2013, after Miguel had begun drug treatment at a methadone clinic.

Miguel said he went to the methadone clinic as he normally does each day, and someone approached him and asked, "You got methadone?" The stranger claimed his brother had not been able to come to his treatment program for three days and begged him to sell him some of his methadone for twenty dollars. When Miguel gave him the methadone, he was immediately arrested and charged with sale of a controlled substance.

Andrew Wachtenheim, Miguel's lawyer at the Bronx Defenders, said cases in which an undercover officer will go to a methadone clinic, pretend he is in withdrawal, and persuade someone who is getting methadone for treatment to sell him some are quite common in the Bronx.

Miguel was offered a diversion program in which he would plead guilty, and then if he completed treatment, the charges would be dismissed. His attorneys explained that this still constitutes a conviction and that he could get deported. Miguel was shocked. "I didn't rob or hurt somebody. I'm doing something bad but to myself getting into drugs." But he was afraid to go to trial, with the possibility of receiving a prison sentence, and so he pleaded guilty. At the time of the interview he was complying with all the terms of his treatment program.

Miguel knows that if immigration authorities find out about his participation in this diversion program, they will view him as a "drug trafficker" and try to deport him for an aggravated felony.[168]

---

[168] Human Rights Watch interview with "Miguel P." and Andrew Wachtenheim, staff attorney, Bronx Defenders, New York, New York, April 19, 2014.

AR.09261

One promising new rehabilitative program based on pre-arrest diversion could help non-citizens avoid immigration consequences for minor drug offenses. LEAD, or Law Enforcement Assisted Diversion, was first piloted by the city of Seattle, Washington.[169] A collaboration involving several organizations, including local law enforcement and criminal justice reform advocates, LEAD is a pre-booking diversion program that allows people arrested for low-level drug and prostitution offenses to enter intensive, community-based social services, rather than the criminal justice system. It began in response to evidence of stark racial disparities in drug arrests in Seattle.[170] Santa Fe, New Mexico, has begun its own LEAD program, limited to those caught possessing or selling three grams or less of opioids, while other localities are considering their own pilot projects.[171]

## The Limited Impact of Pardons

Immigrants facing deportation for criminal convictions, after having exhausted all other avenues, sometimes seek pardons to avoid deportation. Some states have even set up special panels to consider applications from immigrants who face deportation for their criminal convictions. Soon after the 1996 INA amendments, the Georgia Board of Pardons and Parole granted 138 pardons to permanent residents who had suddenly faced deportation retroactively for past convictions.[172] In 2010, New York State created a special pardon panel to review applications from immigrants facing deportation for criminal convictions. When announcing which applications had been granted, Governor David Paterson justified these pardons by stating, "That our federal government does not credit rehabilitation, nor account for human suffering, is antithetical to the ideals this country represents."[173]

---

[169] Human Rights Watch interview with Kris Nyrop, LEAD Program Director, Racial Disparity Project, Public Defender Association, Seattle, Washington, June 12, 2014. See also "Law Enforcement Assisted Diversion," http://leadkingcounty.org/ (accessed August 13, 2014).

[170] Drug Policy Alliance, "Law Enforcement Assisted Diversion (LEAD): Reducing the Role of Criminalization in Local Drug Control," February 2014,
http://www.drugpolicy.org/sites/default/files/DPA_Fact_sheet_Law_Enforcement_Assisted_Diversion_LEAD_Feb2014.pdf (accessed August 13, 2014).

[171] Ibid.

[172] Danny Hakim and Nina Bernstein, "New Paterson Policy May Reduce Deportations," *New York Times*, May 3, 2010.

[173] Press Release, New York State Governor's Office, "Governor Paterson Announces Pardons," December 24, 2010, http://www.governor.ny.gov/archive/paterson/press/122410-GovPatersonAnnouncesPardons.html (accessed July 31, 2014).

A PRICE TOO HIGH                    68

AR.09262

However, the power of pardons to eliminate the immigration consequences of drug convictions is not absolute. The INA states that certain criminal grounds of deportability—crimes of moral turpitude, multiple criminal convictions, aggravated felony, or high speed flight from an immigration checkpoint—will not apply if there is a "full and unconditional pardon by the President of the United States or by the Governor of any of the several states."[174] (Pardons to avoid immigration consequences alone are insufficient to avoid deportation.) But the INA does not mention other criminal grounds of deportability, such as firearms offenses, domestic violence offenses, and controlled substance offenses. It also does not mention how pardons affect criminal grounds of inadmissibility, i.e., bars to entering the US.[175]

The few administrative and court decisions that have addressed this issue have found that pardons do not eliminate deportability or inadmissibility for convictions that are not explicitly mentioned as being pardonable.[176]

Tin Nguyen, an immigration attorney in North Carolina, described how the lack of clarity around pardons for drug convictions has affected his client, "Mr. V." Mr. V. entered the US in 1994 as a refugee from Vietnam, and soon afterward became a lawful permanent resident. Mr. V.'s entire family is in the US; his parents and siblings are now US citizens. In 1999, Mr. V. pled guilty to possession of crack cocaine in South Carolina. His criminal defense attorney gave him no information as to how the conviction would affect his immigration status. He paid a fine and received a suspended sentence of five years and probation for two years. Five years later, Mr. V. was put into removal proceedings. The first two immigration attorneys he hired failed to represent him effectively—the first did not apply for lawful permanent resident cancellation of removal (for which Mr. V. was eligible), and the second failed to file briefs on his appeal and was eventually disciplined by the State of California. Mr. V. ended up with a final removal order in 2008.

---

[174] 8 US Code Section 1227(a)(2)(A)(vi).

[175] See Jason A. Cade, "Deporting the Pardoned," *UC Davis Law Review*, Vol. 46, No. 2, December 2012.

[176] Ibid. In the administrative decision *Matter of Suh*, the Board of Immigration Appeals found that a full pardon from Georgia for sexual battery of a minor no longer made the immigrant deportable as an "aggravated felon," but he did remain deportable on the ground of a conviction for a crime of domestic violence or child abuse. *Matter of Suh*, 23 I & N Dec. 626 (BIA 2003). The Ninth Circuit US Court of Appeals ruled in *Aguilera-Montero v. Mukasey* that a Mexican citizen who sought to adjust status through his US citizen wife was still inadmissible because of his conviction for possession of cocaine, even though the state of Washington had pardoned him. *Aguilero-Montero v. Mukasey*, 548 F.3d 1248 (9th Cir. 2008).

Mr. V., with the help of Nguyen, applied for and was granted a pardon from the South Carolina Parole Board in 2010. Nguyen stated that the South Carolina Parole Board found his application compelling: "They were so interested in his family history, his background, his dad's service to the South Vietnamese government and what they've done for themselves since coming here." But despite the pardon, the conviction still exists for immigration purposes, and Nguyen is now trying to vacate the already-pardoned conviction in South Carolina, although he says there is no clear procedure for it. Mr. V. has only avoided deportation thus far because the current repatriation agreement with Vietnam restricts deportations of Vietnamese nationals who entered the US before 1995. Should the repatriation agreement change, Mr. V. could find himself deported to Vietnam and away from his family for a one-time mistake he made over 15 years ago that South Carolina saw fit to pardon.[177]

George Kidan also lives with the constant threat of deportation under a removal order based on a controlled substance conviction from 1987 for which he received a full pardon in 2006. Kidan came to the US legally as a student from Kuwait when he was 17 years old; he is now 51. As a college student, he was convicted of selling marijuana. He admitted he used marijuana himself, but he had gotten marijuana for a friend. He asserted he had never been a dealer. Kidan said the judge believed him and did not sentence him to prison. "I was able to go to school after that and finish my education and apply to work. And I thought it's over, I don't have to worry about it." But in 1999, immigration authorities arrested and detained him. Kidan only avoided deportation then because he is stateless and no country is willing to accept him. Kidan eventually applied for and received a pardon from the governor of Ohio in 2006. Kidan is married to a US citizen, and would be eligible to gain permanent resident status but for his pardoned drug conviction. Kidan, who has an engineering degree, strong work history, and volunteers in his community, said, "I'm a very good person.… You shouldn't be punished … for the rest of your life."[178]

---

[177] Human Rights Watch telephone interview with Tin Nguyen, June 5, 2014; email from Tin Nguyen to Human Rights Watch, June 6, 2014.

[178] Human Rights Watch telephone interview with George Kidan, March 6, 2015.

AR.09264

# VII. The Role of Criminal Defense Attorneys and Prosecutors

Numerous immigration attorneys and criminal defense attorneys told Human Rights Watch that the only way for their clients to avoid deportations for drug offenses was to avoid getting a conviction for a drug offense in the first place. In 2010, the Supreme Court in *Padilla v. Kentucky* ruled that criminal defense attorneys who do not adequately inform their clients of the immigration consequences of a guilty plea violate their obligation to provide effective assistance of counsel.[179] Some public defender offices and criminal defense attorneys have interpreted their *Padilla* obligations to include negotiating plea deals whenever possible to avoid deportation consequences, and several attorneys reported to Human Rights Watch that they have been able to work with prosecutors and agree to have their clients plead guilty to non-deportable offenses instead. The ability of defense counsel to avoid drug convictions varies significantly, however, from county to county.

For indigent immigrants, they must rely on court-appointed counsel, whose access to immigration law expertise and other resources can vary widely from state to state and county to county. And despite *Padilla*, many of the cases reported to Human Rights Watch involved plea deals in which the defense attorney had not properly advised his or her client of the immigration consequences.

## Pleading Guilty with No Counsel

Human Rights Watch received reports of several indigent immigrants who pleaded guilty to drug offenses without legal representation. Many jurisdictions pressure indigent clients into waiving their right to appointed counsel for misdemeanor offenses.[180] In some jurisdictions, attorneys said their clients were not eligible for court-appointed counsel because the municipal drug charge they faced carried no potential sentence of

---

[179] *Padilla v. Kentucky*, 559 US 356, 130 S. Ct. 1473 (2010).

[180] Robert C. Boruchowitz et al., National Association of Criminal Defense Lawyers, "Minor Crimes, Massive Waste: The Terrible Toll of America's Broken Misdemeanor Courts," April 2009, https://www.nacdl.org/reports/misdemeanor/ (accessed August 27, 2014), citing courtroom observations in a number of jurisdictions where courts made clear to defendants that they must waive counsel to proceed.

incarceration.[181] Yet guilty pleas entered without representation still constitute convictions for immigration purposes.

Linus Chan, a clinical professor at the University of Minnesota, has represented more than one client who pleaded guilty without an attorney. He stated that in many municipal courts, there is no right to an attorney, resulting in "an assembly-line situation" where people regularly plead guilty to minor charges, not knowing they can have serious immigration consequences.[182] Hans Meyer concurred, saying the same happened in Colorado when he was a public defender: "Everybody just showed up in those municipal courtrooms, walked in and pleaded, slaughterhouse-style, $100 fine, walk out.… These are the [pleas] that trigger mandatory detention, destroy cancellation of removal, trigger lifetime inadmissibility."[183]

Amanda Esquivel reported that her husband, Jesus Esquivel, pleaded guilty without an attorney to possession of cocaine in Kenosha, Wisconsin, in 2009, even though he was adamant the cocaine was not his. According to Amanda, Jesus is a permanent resident who has lived in the US since he was four or five years old. Amanda is a US citizen, as are their five children and two grandchildren. Amanda said Jesus explained to the judge he had grabbed his nephew's jacket to go to work. When police had stopped and frisked him, they found cocaine that Jesus claimed he had known nothing about. Amanda said, "We had an amazing judge. He explained the whole thing to her, and she even gave him a lecture, 'Don't ever grab anybody's jacket.' We know she really believed us." She sentenced him to probation, and Amanda said, "We thought it was over." But several years later, an encounter with police at his sister's home led to immigration authorities detaining Jesus and putting him into deportation proceedings.[184]

---

[181] The US Supreme Court ruled in *Alabama v. Shelton* that states do not need to provide appointed counsel for indigent defendants in criminal cases where there is no potential for imprisonment. *Alabama v. Shelton*, 535 US 654, 658 (2002). See Heidi Altman, "Prosecuting Post-Padilla: State Interests and the Pursuit of Justice for Non-Citizen Defendants," *Georgetown Law Journal*, Vol. 101, No. 1, November 2012; Alice Clapman, "Petty Offenses, Drastic Consequences: Toward a Sixth Amendment Right to Counsel for Noncitizen Defendants Facing Deportation," *Cardozo Law Review*, Vol. 33, No. 2, December 2011.

[182] Human Rights Watch telephone interview with Linus Chan, clinical professor, University of Minnesota, March 31, 2014.

[183] Human Rights Watch interview with Hans Meyer and Julie Gonzalez, May 22, 2014. See also Jason A. Cade, "The Plea Bargain Crisis for Noncitizens in Misdemeanor Court," *Cardozo Law Review*, vol. 34 , May 2013.

[184] Human Rights Watch telephone interview with Amanda Esquivel, June 4, 2014.

In another case already described above, Violeta Chapin, a clinical professor at the University of Denver, Colorado School of Law, reported a case in which her client had pled guilty to a municipal violation for possession of marijuana in Wyoming without the assistance of appointed counsel. He was ultimately detained for over a year and deported.[185]

## Law Enforcement Consideration of Immigration Consequences

Even when immigrants have criminal defense attorneys who are well-versed in immigration law, their ability to negotiate "immigration-safe" pleas depends heavily on the approaches of prosecutors' offices and sometimes the attitudes of individual prosecutors assigned to their clients' cases.

Some law enforcement officials are aware that some people in their communities may be facing more severe consequences than citizens for offenses they consider minor. George Gascon, district attorney in San Francisco and a former police chief, stated his office is willing to consider the immigration collateral consequences when negotiating plea deals because "we try to provide similar treatment to others who are not facing immigration consequences."[186] Robert Johnson, a former Minnesota prosecutor and former president of the National District Attorneys Association, similarly stated in a 2013 op-ed addressing Congressional debate on immigration reform, "I have felt obligated to accept different pleas or amend the charges I brought against someone because I knew that mandatory detention and deportation would be unjust.... It is inappropriate and unjust for immigration penalties to far surpass the criminal sanctions for these offenses."[187] Steven Jansen, vice-president of the Association of Prosecuting Attorneys, echoed these sentiments when he wrote in another op-ed, "[U]nder current immigration law] prosecutors and defense attorneys alike are concerned that they cannot ensure fair sentences."[188]

Some counties have issued policies explicitly outlining their criteria for considering immigration consequences. The policy of Alameda County, California, states that there is

---

[185] Human Rights Watch telephone interview with Violeta Raquel Chapin, May 29, 2014.

[186] Human Rights Watch telephone interview with George Gascon, district attorney of San Francisco, California, February 23, 2015.

[187] Robert Johnson, "Justice System Should Determine Which Immigrants are Public Safety Risk," *Roll Call*, May 16, 2013, http://www.rollcall.com/news/justice_system_should_determine_which_immigrants_are_public_safety_risk-224879-1.html?zkPrintable=true (accessed August 7, 2014).

[188] Steve Jansen, "A prosecutor's call: Justice for all," *The Hill*, May 21, 2013, http://thehill.com/blogs/congress-blog/judicial/300903-a-prosecutors-call-justice-for-all (accessed August 7, 2014).

"no specific formula that can be applied in every case," but that it is "generally considered appropriate to offer an accommodation if the collateral consequences are disproportionate to the crime and sentence being discussed."[189] It further states, "consideration of collateral consequences is not typically appropriate in serious or violent felony cases."[190] Santa Clara County has a similar policy based on the principle: "The highest duty of the prosecutor is to ensure that both the charges and ensuing punishment fit the crime...in those cases where the collateral consequences are significantly greater than the punishment for the crime itself, it is incumbent upon the prosecutor to consider, and if appropriate, take reasonable steps to mitigate those collateral consequences."[191] Like Santa Clara and Alameda counties, other counties with formal policies typically do not limit consideration to immigration consequences, but to all collateral consequences that could be suffered by citizens and non-citizens.

Such policies, however, are not widespread. One study by Ingrid Eagly at the University of California, Los Angeles, found that among 50 county-level prosecutor's offices located in the five states with the highest levels of non-citizen prisoners, the majority did not have a written plea policy that mentions immigration status or immigration consequences.[192] Two prosecutors' offices, in Cochise County, Arizona, and San Mateo, California, had policies that explicitly prohibit prosecutors from considering immigration status or future deportation during the course of plea bargaining.[193]

Harris County in Texas treats undocumented immigrant defendants punitively with regard to plea bargaining, as well as bail and sentencing. Undocumented defendants are not eligible to participate in drug courts or diversion programs for first-time offenders. Prosecutors are directed never to offer probation.[194] Maricopa County may go even further, as defense attorneys report that prosecutors seek convictions and records that will ensure deportation.[195]

---

[189] Office of the District Attorney, Alameda County, "Guidelines Regarding the Consideration of Collateral Immigration Consequences During Plea Negotiations," October 8, 2012, on file with Human Rights Watch.

[190] Ibid.

[191] Memorandum from Jeff Rosen, District Attorney, Santa Clara County, to Fellow Prosecutors, "Collateral Consequences," September 14, 2011, on file with Human Rights Watch.

[192] Ingrid V. Eagly, "Criminal Justice for Noncitizens: An Analysis of Variation in Local Enforcement," *New York University Law Review*, Volume 88, No. 4, October 2013.

[193] Ibid.

[194] Ibid.

[195] Ibid.

AR.09268

## Limited Post-Conviction Remedies

Despite the Supreme Court's decision in *Padilla*, non-citizens still regularly plead guilty without having been provided adequate information on the immigration consequences of their pleas from their criminal defense attorneys. In such cases, immigrants are sometimes able to seek post-conviction relief and vacate their convictions for having been obtained through legal error.

Post-conviction remedies exist in all 50 states, as well as in federal law, but the requirements vary widely.[196] Some states have procedural requirements that can be challenging to meet. Some have statutes of limitations; some require that the applicant still be "in custody."[197] For example, according to Ann Benson, supervising attorney for the Washington Defender Association Immigration Project, Washington has a "draconian" one-year deadline, "so if you don't pursue [post-conviction relief] in one year, it's super difficult to get your case procedurally heard."[198] In California, Raha Jorjani, immigration attorney at the Office of the Alameda County Public Defender, noted that the "in custody" requirement for post-conviction relief is particularly onerous for non-citizens. "ICE can come after you 10 years later but you can't fix your conviction 10 years later."[199] In contrast, New York State does not impose such requirements on individuals seeking post-conviction relief. In "Mario F.'s" case, his attorney, Cristina Velez at the HIV Law Project, reported she was able to pursue post-conviction relief for his 10-year-old conviction for possession with intent to sell an eighth of an ounce of methamphetamine based on ineffective assistance of counsel. Because this conviction was vacated, Mario, a permanent resident, can now apply for cancellation of removal and has a good chance to avoid deportation.[200] The availability of post-conviction relief also depends on how the convicting jurisdiction has interpreted the scope of defense

---

[196] Rachel Rosenbloom, "Will Padilla Reach Across the Border?," *Northeastern University School of Law, Northeastern Public Law and Theory Faculty Working Papers Series No. 52-2011*, citing Donald E. Wilkes, Jr., *State Postconviction Remedies and Relief Handbook: with Forms* (2009-2010 ed.); Larry W. Yackle, *Postconviction Remedies* (1981).

[197] Ibid.

[198] Human Rights Watch telephone interview with Ann Benson, supervising attorney, Washington Defenders Association Immigration Project, May 20, 2014.

[199] Human Rights Watch interview with Raha Jorjani, immigration attorney, Office of the Alameda County Public Defender, Oakland, California, June 27, 2014.

[200] Human Rights Watch interview with "Mario F." and Cristina Velez, staff attorney, HIV Law Project, Brooklyn, New York, April 17, 2014.

ER-1228

AR.09269

counsel's obligation under *Padilla* and whether the obligation is retroactive from the date of the Supreme Court's decision.[201]

The process can also take a considerable amount of time. When Violeta Chapin wanted to pursue post-conviction relief for a young man who had waived his right to an attorney when he pled guilty to a marijuana possession ordinance, she reported, "We couldn't get the conviction vacated fast enough.… We got a call from the officer saying they were going to deport him."[202] Another attorney noted that when a client is detained—and anyone with a drug conviction is subject to mandatory detention—the case generally moves faster and some detained docket judges are not inclined to grant continuances so the individual can seek post-conviction relief. She was able to get post-conviction relief for a client who had already successfully completed a diversion program, but she did not think she would have been able to do so if her client had been detained.[203] Conor Gleason, an attorney at Bronx Defenders, believed that in one case his client had a good chance to get his conviction vacated through post-conviction relief, but his client was in severe pain and was not receiving adequate treatment in the detention center; he decided to accept deportation away from his US citizen fiancée and daughter rather than fight his case.[204]

A recent report by the New York University School of Law Immigration Clinic and the advocacy organization Families for Freedom found that the ability of immigrants in New York to seek post-conviction relief is often blocked by ICE's refusal to bring detained applicants to their state post-conviction relief hearings and to stay removals while post-conviction applications are pending.[205]

---

[201] The Supreme Court in *Chaidez v. US*, 113 S. Ct. 1103 (2013), found that defense counsel's obligation under *Padilla* does not retroactively apply to convictions that became final before March 31, 2010, when *Padilla* was decided. Some states had ruled prior to *Padilla* that the obligation to provide advice on immigration consequences existed under state constitutional principles. *See* Immigrant Defense Project, "Seeking Post-Conviction Relief Under *Padilla v. Kentucky* After *Chaidez v. US*," February 28, 2013, http://immigrantdefenseproject.org/wp-content/uploads/2013/03/Chaidez-advisory-FINAL-201302281.pdf (accessed May 12, 2015). There has also been litigation around the scope of defense counsel's obligation, such as whether it encompasses the duty to ask whether the defendant is a US citizen or whether it applies to immigration consequences other than deportation. *See* Immigrant Defense Project, "Padilla Post-Conviction Relief," http://immigrantdefenseproject.org/criminal-defense/padilla-pcr (accessed May 12, 2015).

[202] Human Rights Watch telephone interview with Violeta Chapin, May 29, 2014.

[203] Human Rights Watch interview with Helen Lawrence, immigration attorney, Oakland, California, June 26, 2014.

[204] Human Rights Watch interview with Conor Gleason and "David B.," Kearny, New Jersey, April 17, 2014.

[205] NYU School of Law Immigrant Rights Clinic and Families for Freedom, "Immigration and Customs Enforcement Prevents Immigrants from Fighting Unlawful Criminal Convictions," July 2014, http://familiesforfreedom.org/sites/default/files/resources/Justice%20Detained%2C%20Justice%20Denied-

AR.09270

## Post-Conviction Relief as a "Miracle"



Nazry Mustakim with his US citizen wife, Hope, and their US citizen son, Ezra, in a photo announcing an expected baby. In 2011, Nazry Mustakim, a lawful permanent resident from Singapore, spent 10 months in mandatory detention fighting deportation for a college-age conviction for possession of methamphetamine with intent to distribute. At the time of his 2007 conviction, he had recovered from his own drug dependency and was counseling others. He was able to avoid deportation only because his conviction was vacated (voided) due to his defense attorney's failure to advise him of the immigration consequences of the plea. ©2015 Private.

For Nazry Mustakim, a long-time permanent resident who was almost deported for a drug crime, and his US citizen wife Hope Mustakim, Nazry's successful effort to get post-conviction relief meant he was able to avoid deportation as an "aggravated felon" and remain in the US with his family.

Nazry came to the US from Singapore when he was 13 years old and grew up in Texas. In 2005,

%20Immigration%20and%20Customs%20Enforcement%20Prevents%20Immigrants%20from%20Fighting%20Unlawful%20 Criminal%20Convictions%20%20.pdf (accessed August 1, 2014).

ER-1230

AR.09271

Nazry was arrested after being found with drugs. He admits he was using methamphetamine, but by the time he was convicted in 2007 of possession with intent to distribute, he had been free of drugs for a year, and the judge agreed to sentence him only to 10 years' probation. His attorney, he said, provided no information about the immigration consequences. Nazry went on to meet his wife Hope at a homeless shelter where they both worked.

One day in 2011, however, ICE came to the home he shared with Hope at 7 a.m. and put him in immigration detention, where he ultimately remained for 10 months. Hope was then a student at Baylor University studying social justice issues, and she became an activist fighting for her husband to remain in the US. She drove four hours each way every weekend to visit her husband and could only speak to him through a partition and a phone. The financial burden was immense, on top of the costs of Hope's schooling and their recent purchase of a house and two cars. With the phone bills for calling the detention center, the attorney fees, and the travel costs of visiting Nazry every weekend, Hope said she had to sell "T-shirts, bracelets, little pens" from their website calling for Nazry's release. "If it hadn't been for student loans, family, friends, strangers, people sending us money, I wouldn't have been able to do it," she said.

Nazry was ultimately able to win relief from deportation through post-conviction relief that vacated his felony drug conviction, based on ineffective assistance of counsel at the time of his guilty plea. Nazry and Hope said the prosecutor initially wanted him to re-plead to another charge, which would have carried a three-year minimum sentence. They were prepared for him to accept this deal in order to have a chance to fight deportation, but ultimately, the prosecutor dismissed the case because the evidence from the case was no longer available. "That was a miracle in and of itself," he said.

Nazry and Hope, who now have a young son, continue to share their story and are active in advocating for immigrant detainees because they know "millions of families are going through this, and they don't have the resources we had, the English, the finances." Nazry would like Congress to look at "criminal aliens" as individuals. "Give them another chance for the sake of their family members," he said. "Don't put them in a box as drug traffickers. There may have been a point in their lives where they made bad decisions, but this one chance may have been the only thing they needed, like me."[206]

---

[206] Human Rights Watch telephone interview with Nazry and Hope Mustakim, June 3, 2014.

AR.09272

# VIII. Drug Control, Immigration Control, and Human Rights

## US Deportation Policy and Human Rights

Governments have the right to regulate their borders, including the right to set deportation criteria and procedures. But under international human rights law, governments do not have unfettered discretion to deport all non-citizens in all circumstances.[207] The ways in which US immigration law treats immigrants who have committed drug offenses violates several important human rights.[208]

### *Proportionality and Discrimination*

Deportation and related immigration detention are not considered punishment under US law, but they are severe penalties that often outweigh the criminal justice penalties that trigger them.[209] International human rights law recognizes that persons within the territory of a state may have certain rights that may not be curtailed by deportation except where "necessary" and proportional. A person's status as a non-citizen, his or her conviction of a crime, or the

---

[207] UN Human Rights Committee, General Comment 15, The position of aliens under the Covenant (Twenty-seventh session, 1986), Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.1 at 18 (1994). ("It is in principle a matter for the State to decide who it will admit to its territory. However, in certain circumstances an alien may enjoy the protection of the Covenant even in relation to entry or residence, for example, when considerations of non-discrimination, prohibition of inhuman treatment and respect for family life arise"); Inter-American Commission on Human Rights – Report No. 49/99 Case 11.610, *Loren Laroye Riebe Star, Jorge Alberto Barón Guttlein and Rodolfo Izal Elorz v. Mexico*, April 13, 1999, section 30 (recognizing state authority to control immigration but stressing that this power is limited by the American Convention on Human Rights' guarantees); Gerald P. Heckman, "Securing Procedural Safeguards for Asylum Seekers in Canadian Law: An Expanding Role for International Human Rights Law?," *International Journal of Refugee Law*, vol. 15, no. 2 (2003), p. 214 ("[o]nce widely accepted as a nearly unfettered discretion derived from state sovereignty, the power of states to control the entry and residence of aliens on their territories is increasingly understood to be circumscribed by domestic law and customary and conventional international law."); *Boughanemi v. France* (App. 22070/93), Judgment of 24 April 1996 (recognizing that a state's right to control immigration is "well-established international law," but that it must be tempered by Article 8's protection of family life). For a more extensive analysis of the human rights violated by US deportation policy, see the Human Rights Watch report, *Forced Apart: Families Separated and Immigrants Harmed by United States Deportation Policy*, July 2007, http://www.hrw.org/reports/2007/07/16/forced-apart-0.

[208] For a more detailed analysis of the human rights implicated by deportation policy for non-citizens with criminal convictions, see Human Rights Watch, *Forced Apart: Families Separated and Immigrants Harmed by US Deportation Policy*, July 17, 2007, sec. VI: , "US Deportation Policy Violates Human Rights,  http://www.hrw.org/node/10856/section/8.

[209] See Bill Ong Hing, "Re-examining the Zero-Tolerance Approach to Deporting Aggravated Felons: Restoring Discretionary Waivers and Developing New Tools," Harvard Law & Policy Review, vol. 8, 141 (2014); Michael J. Wishnie, "Immigration Law and the Proportionality Requirement UC Irvine Law Review, vol. 2, 415 (2012).

AR.09273

combination of the two, does not extinguish his or her claim to just treatment at the hands of the government, nor does it free a government to ignore fundamental rights in its actions. International bodies enforcing international law, like the European Union, the United Nations Human Rights Committee, and the International Court of Justice, have applied proportionality when analyzing states' decisions that restrict important rights, including in the context of deportation.[210]

US courts, however, do not consider deportation "punishment," but a civil sanction that does not trigger the same due process protections as required for those who are charged with criminal offenses.[211] At the same time, the US Supreme Court recognized in *Padilla v. Kentucky* that "deportation is an integral part—indeed, sometimes the most important part—of the penalty that may be imposed on non-citizen defendants who plead guilty to specified crimes."[212] And practically speaking, for immigrants who find themselves in removal proceedings and immigration detention after a criminal conviction, deportation is indistinguishable from punishment.

Irrespective of whether deportation is considered a punishment under US law, it is a severe penalty that is disproportionate to the restrictions on freedom and family life that US citizens convicted of the same crimes incur, especially when mitigating and aggravating factors are not given individualized consideration. In general, states may not discriminate between aliens and citizens in the application of such basic rights as the right to be free

---

[210] Some of the rights that may be restricted by an order of deportation are the right to a family life and rights to be free from discrimination, torture, ill-treatment, and persecution. For example, the European Union has decided that before deporting a long-term resident alien, states must consider factors such as duration of residence, age, consequences for the deportee and his or her family, and links with the expelling and receiving country. Council of the European Union – Council Directive 2003/109/EC of 25 November 2003 concerning the status of third-country nationals who are long-term residents, art. 12. The Human Rights Committee has explained that, in the context of the prohibition of arbitrary interference with family rights, "[t]he introduction of the concept of arbitrariness is intended to guarantee that even interference provided for by law should be in accordance with the provisions, aims and objectives of the Covenant and should be, in any event, reasonable in the particular circumstances." UN Human Rights Committee, CCPR General Comment No. 16: Article 17 (Right to Privacy), The Right to Respect of Privacy, Family, Home and Correspondence, and Protection of Honour and Reputation (Thirty-second Session, 1988), adopted April 8, 1988, UN Doc. HRI/GEN/1/Rev.9 (1988).

[211] Two 19th century United States Supreme Court decisions established that deportation is not "punishment" under the US Constitution and thus that constitutional protections afforded in criminal proceedings, as well as prohibitions on cruel and unusual punishment, ex post facto laws, and bills of attainder, are not applicable in deportation proceedings. *Chae Chan Ping v. United States*, 130 U.S. 581 (1889) and *Yue Ting v. United States*, 149 US 698 (1893).

[212] *Padilla v. Kentucky*, 559 US 356, 364 (2010).

AR.09274

from arbitrary interference with their privacy, family, home, or correspondence.[213] The UN expert on the rights on non-citizens (the special rapporteur on the rights of non-citizens) has highlighted the importance of combatting arbitrary differences in how citizens and non-citizens are treated, and stated distinctions between citizens and non-citizens should serve a legitimate purpose and be proportional to that purpose. He has stated in particular, "[D]eportation is justified only if the interference with family life is not excessive compared to the public interest to be protected."[214] The disproportional discrimination is increasingly obvious in the context of criminal convictions arising from drug offenses, some of which (personal use and possession) should not be criminalized at all, and many of which are increasingly treated by the criminal justice system as minor offenses, or as offenses that are better addressed through treatment rather than through criminal sanctions.

US laws that subject immigrants not only to criminal sanction, but also to permanent exile and family separation for drug offenses therefore raise particularly serious concerns with regard to proportionality and acceptability under international human rights standards.

### The Right to Raise Defenses to Deportation

As described above, non-citizens are almost completely blocked from raising the closeness of their family relationships or other ties to the United States as well as the likelihood that they may be returned to persecution if they have drug convictions that would constitute drug trafficking aggravated felonies. Without an ability to raise these equities, deportation hearings provided for immigrants with such convictions are devoid of justice, and they violate international standards.

---

[213] UN Human Rights Committee, General Comment 15, The position of aliens under the Covenant (Twenty-seventh session, 1986), Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.1 at 18 (1994).

[214] David Weissbrodt, Special Rapporteur on the rights of non-citizens, "Final report on the rights of non-citizens," UN Doc E/CN.4/Sub.2/2003/23 (2003). The Inter-American Court of Human Rights has also held that measures that discriminate against one group in favor of another must be bound by proportionality. Inter-American Court of Human Rights, Advisory Opinion OC-18/03 of September 17, 2003, Requested by the United Mexican States, Juridical Condition and Rights of the Undocumented Migrants, 100. The use of proportionality is also widespread in the European Court of Justice, where the doctrine was invoked either by litigants or the court in over 500 cases between 1955 and 1994. Vicki C. Jackson, "Ambivalent Resistance and Comparative Constitutionalism: Opening up the Conversation on 'Proportionality,' Rights and Federalism," *University of Pennsylvania Journal of Constitutional Law*, vol. 1 (1999), p. 604, n.81. The European Court of Human Rights has "consistently held that the principle of proportionality is inherent in evaluating the right of an individual person and the general public interests of society." Yutaka Arai-Takahashi, *The Margin of Appreciation Doctrine and the Principle of Proportionality in the Jurisprudence of the ECHR* (Belgium: Intersentia, 2002), p. 14; Ian Brownlie, *Principles of Public International Law* (Oxford, UK: Oxford University Press 2003), p. 551.

The International Covenant on Civil and Political Rights (ICCPR), which the United States ratified in 1992,[215] states in article 13 (to which the United States has entered no reservations, understandings or declarations):

> An Alien lawfully in the territory of a State Party to the present covenant may be expelled therefrom only in pursuance of a decision reached in accordance with law and shall, except where compelling reasons of national security otherwise require, *be allowed to submit the reasons against his expulsion* and to have his case reviewed by, and be represented for the purpose before, the competent authority or a person or persons especially designated by the competent authority.[216]

The UN Human Rights Committee, which monitors state compliance with the ICCPR, has interpreted the phrase "lawfully in the territory" to include non-citizens who wish to challenge the validity of the deportation order against them. In addition, the Human Rights Committee has made this clarifying statement: "if the legality of an alien's entry or stay is in dispute, any decision on this point leading to his expulsion or deportation ought to be taken in accordance with article 1.… An alien must be given full facilities for pursuing his remedy against expulsion so that this right will in all the circumstances of his case be an effective one."[217]

While the ability to raise defenses to deportation is provided for in these human rights treaties, not every possible argument against deportation is important enough to call into question the legitimacy of a hearing that denies such arguments' consideration. For example, a non-citizen who for reasons of personal predilection prefers the economic opportunities and climate in one country to another could not legitimately challenge his hearing under human rights law if he was prevented from making this argument as a defense to deportation.

---

[215] International Covenant on Civil and Political Rights (ICCPR), adopted December 16, 1966, G.A. Res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, entered into force March 23, 1976, ratified by the United States on June 8, 1992, http://www.ohchr.org/en/professionalinterest/pages/ccpr.aspx (accessed June 3, 2015).

[216] ICCPR, art. 13 (emphasis added).

[217] UN Human Rights Committee, General Comment 15, paras 9 and 10.

AR.09276

However, some defenses implicate very important and fundamental rights that non-citizens should be able to raise in their deportation hearings in the United States, including the rights to family unity, ties to a country, proportionality, and the likelihood of return to persecution upon return. Without a hearing that allows for the weighing of these concerns, the right to raise defenses to deportation is undermined.

### Family Unity

The international human right to family unity finds articulation in numerous human rights treaties. The concept is also incorporated into US domestic law.[218]

The Universal Declaration of Human Rights states that "[t]he family is the natural and fundamental group unit of society and is entitled to protection by society and the State."[219] The International Covenant on Civil and Political Rights states in article 17(1) that no one shall be "subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence." Article 23 states that "[t]he family is the natural and fundamental group unit of society and is entitled to protection by society and the state," and that all men and women have the right "to marry and to found a family." The right to found a family includes the right "to live together."[220]

Various international bodies have interpreted the right to family unity as imposing limits on states' power to deport.[221] In *Winata v. Australia*,[222] the Human Rights Committee found

---

[218] For example, in the context of custody rights for grandparents, the US Supreme Court has held that the "right to live together as a family" is an important right deserving constitutional protection, and an "enduring American tradition." *Moore v. City of East Cleveland*, 431 U.S. 494, 500, 503, n.12 (1977) (plurality); Linda Kelly, "Preserving the Fundamental Right to Family Unity: Championing Notions of Social Contract and Community Ties in the Battle of Plenary Power Versus Aliens' Rights," *Villanova Law Review*, vol. 41 (1996), p. 729-730 (discussing various non-immigration areas of law in which the Supreme Court has stressed the importance of legal protections for family unity and family life); Nancy Morawetz, "Symposium: Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review*, vol. 113, p. 1950-1951 (2000) (discussing instances in which members of Congress and the INS emphasized the importance of family in the immigration context).

[219] Universal Declaration of Human Rights (UDHR), adopted December 10, 1948, G.A. Res. 217A(III), U.N. Doc. A/810 at 78 (1948), art. 16(3). The Declaration also states, "Motherhood and childhood are entitled to special care and assistance." UDHR, art. 25(2).

[220] UN Human Rights Committee, General Comment 19, Article 23, Protection of the Family, the right to marriage and equality of the spouses (Thirty-ninth session, 1990), Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.1 at 2

[221] UN Human Rights Committee, General Comment 15.

[222] *Winata v. Australia*, Communication No. 930/2000, U.N. Doc. CCPR/C/72/D/930/2000 (2001).

AR.09277

a violation where Australia sought to deport two Indonesian nationals whose 13-year-old son, Barry, had been born in, and had become a citizen of, Australia.[223]

Even in a case in which the governmental interest in deportation was strong because a non-citizen was found deportable due to prior criminal convictions, the Committee found a violation of the same rights in *Madafferi v. Australia*, involving an Italian national who had married an Australian national and had four Australian children, and who had been ruled deportable based on prior crimes in his native Italy.[224]

Case law from the European Court on Human Rights has provided additional guidance to member countries on respecting family unity during deportation on criminal grounds, finding that they should weigh several factors including: the nature and seriousness of the offense; the length of stay in the host country; rehabilitation; spousal relationships; the existence of children; and potential difficulties family members would face in relocating to the country of origin.[225]

The Inter-American Commission on Human Rights in *Wayne Smith and Hugo Armendáriz v. United States of America* held that the US did not follow international norms in denying petitioners Smith and Armendariz (both permanent residents with "aggravated felony" drug convictions) an opportunity to defend themselves from deportation.[226]

In light of these strong international standards, the United States has fallen far behind the practice of governments around the world in terms of providing protection for family unity in deportation proceedings.

---

[223] Ibid.

[224] *Madaferri v. Australia*, Communication No. 1011/2001, U.N. Doc. CCPR/C/81/D/1011/2001 (2004).

[225] *Boultif v. Switzerland*, ECHR 5427/00 (2001). Recent cases grant relief from deportation to non-citizens with criminal convictions include *M.P.E.V. and Others v. Switzerland*, no. 3910/13, ERCH 8 July 2014 (finding deportation of an Ecuadorian national would be disproportionate in view of the moderate nature of his criminal record, his poor state of health, and his desire to stay in close contact with his daughter)), and *Udeh v. Switzerland*, no. 12020/09, ERCH 16 April 2013 (holding that a Nigerian's expulsion would violate his right to family life, after weighing the seriousness of his convictions for drug trafficking and drug possession, with his relationship with his two Swiss national children).

[226] *Wayne Smith and Hugo Armendáriz v. United States of America*, Report No. 81/10, Case 12.562, Inter-American Commission on Human Rights, July 12, 2010. Human Rights Watch submitted an amicus brief in this case.

*Children's Rights*

Beyond family unity in general, the right of children to be raised by their parents is one of the strongest human rights counseling against the separation of families through deportation. Article 24 of the International Covenant on Civil and Political Rights, to which the United States is a party, entitles children "to such measures of protection as are required by [their] status as a minor, on the part of the family, society and the state."

Article 9 of the Convention on the Rights of the Child (CRC), which the United States has signed but not ratified,[227] requires that "States Parties shall ensure that a child shall not be separated from his or her parents against their will, except when … such separation is necessary for the best interests of the child."[228] The Committee on the Rights of the Child has interpreted the CRC further, stating:

> "States should refrain from detaining and/or deporting parents if their children are nationals of the destination country. Instead, their regularisation should be considered. Children should be granted the right to be heard in proceedings concerning their parents' admission, residence, or expulsion, and have access to administrative and judicial remedies against their parents' detention and/or deportation order, to ensure that decisions do not negate their best interests. Alternatives to detention and deportation in accordance with the child's best interests, including regularisation, should be established by law and through practice."[229]

Thus, the CRC weighs-in in favor of non-citizens' rights not to be deported if it is contrary to the best interests of the child.[230]

---

[227] Convention on the Rights of the Child (CRC), adopted November 20, 1989, G.A. Res. 44/25, annex, 44 U.N. GAOR Supp. (No. 49) at 167, U.N. Doc. A/44/49 (1989), entered into force September 2, 1990, signed by the United States on February 16, 1995, http://www.ohchr.org/en/professionalinterest/pages/crc.aspx (accessed June 3, 2015).

[228] CRC, art. 9(1).

[229] Committee on the Rights of the Child, Report of the 2012 Day of General Discussion on the Rights of All Children in the Context of International Migration, September 28, 2012, http://www2.ohchr.org/english/bodies/crc/docs/discussion2012/2012CRC_DGD-Childrens_Rights_InternationalMigration.pdf (accessed June 3, 2015).

[230] See, for example, Concluding Observations of the Committee on the Rights of the Child, Canada, U.N. Doc. CRC/C/15/Add.215 (2003). ("the Committee remains concerned that the principle that primary consideration should be given to the best interests of the child is still not adequately defined and reflected in some legislation, court decisions and policies affecting certain children, especially those facing situations of divorce, custody and deportation, as

*Ties to the United States*

The US Supreme Court stated in *Landon v. Plasencia* that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly."[231] Despite this accepted constitutional maxim, a non-citizen's ties to the United States, including length of residence, military service, and business, educational, and community ties that are separate from family relationships, are often not considered when he or she faces deportation because of a criminal conviction.

Under human rights law, the state power of deportation should be limited if it infringes upon an individual's right to a private life, which includes his or her ties to the country of immigration apart from any family ties. Article 17 of the ICCPR provides that "[n]o one shall be subjected to arbitrary or unlawful interference with his privacy ... home or correspondence .... Everyone has the right to the protection of the law against such interference or attacks."[232] The European Court of Human Rights has weighed an individual's ties to a country as part of his private life in deportation cases. In *C v. Belgium*, for example, the ECHR found that the petitioner's private life included the petitioner's "real social ties in Belgium," and considered that he had lived in Belgium since he was 11 and had received his education there.[233]

As these decisions recognize, the right to private life is put at risk when non-citizens are ordered deported without first weighing the various ties and relationships they have developed with their host countries.

*Non-Refoulement*

The principle of non-refoulement in international refugee law imposes well-recognized limits on states' powers to deport a refugee to places where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social

---

well as Aboriginal children"); and Concluding Observations of the Committee on the Rights of the Child, United Kingdom of Great Britain and Northern Ireland, U.N. Doc. CRC/C/15/Add.188 (2002) ("the Committee is concerned that the principle of primary consideration for the best interests of the child is not consistently reflected in legislation and policies affecting children throughout the State party, notably in the juvenile justice system and immigration practices").

[231] *Landon v. Plasencia*, 459 U.S. 21, 33 (1982).

[232] ICCPR. art. 17.

[233] European Court of Human Rights, *C v. Belgium*, (App. 21794/93), Judgment of 7 August 1996, (paragraphs 32 and 33). The court ultimately found that the petitioner's very serious crime outweighed countervailing factors, allowing him to be deported from Belgium, but only after a hearing that weighed his right to a private life against his crime.

A PRICE TOO HIGH                                    86

AR.09280

group, or political opinion. Refugee law permits a very narrow exception to non-refoulement under article 33(2) of the Refugee Convention if the refugee "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."[234]

Human Rights Watch has previously raised concerns about the presumption in the United States that any aggravated felony is a "particularly serious crime."[235] The near-automatic bar to refugee protection for non-citizens with drug trafficking convictions in the US even more clearly violates the standards provided in international law. It fails to weigh individually the seriousness of the crime, and it fails to assess whether the potential deportee poses a risk of dangerousness to the community of the US.

International human rights law, particularly the Convention against Torture, provides additional and absolute bars to refoulement that make no exception for people who have committed crimes. Non-citizens who are ruled ineligible for asylum and withholding because of a drug trafficking conviction are still eligible for deferral of removal under the Convention against Torture. However, it is more difficult for an applicant to meet the treaty's standard of a likelihood of being tortured than the asylum standard of a well-founded fear of being persecuted or the US law standard for withholding of removal (more likely than not facing a threat to life or freedom). By failing to protect refugees from return to persecution and to carefully and narrowly apply the exception to this standard, the US is regularly violating its obligations under international refugee law.

## Lex Mitior

As noted above, the Supreme Court has issued several major decisions limiting the definition of the aggravated felony of drug trafficking, but many thousands of permanent residents have already been deported under the earlier, wrongful interpretations of law. The serious challenges former immigrants face to reopening these cases after deportation present concerns under the principle of *lex mitior*, which states that when a law is

---

[234] Convention relating to the Status of Refugees (Refugee Convention), 189 U.N.T.S. 150, entered into force April 22, 1954, art. 33.
[235] Human Rights Watch, *Forced Apart*, July 16, 2007.

AR.09281

amended, the more lenient penalty should be applied to those convicted under the prior law, as captured in article 15(1) of the ICCPR.[236]

## US Detention Policy and Human Rights

The United Nations Working Group on Arbitrary Detention recognizes "the sovereign right of states to regulate migration" and yet cautions, "if there has to be administrative detention, the principle of proportionality requires it to be a last resort."[237] This means that immigration detention should only be used in those cases in which legitimate government interests cannot be fulfilled through any other means.

While the United States has a legitimate interest in detaining some non-citizens to guarantee their appearance at hearings and to ensure the deportation of those judged to be removable, the power of immigration authorities to detain people is currently too broad, leading to unwieldy, unnecessary, and costly detention.

To remain true to human rights principles and standards of efficiency, the United States should detain only those immigrants who are dangerous or unlikely to appear for hearings unless they are locked up. But mandatory detention of those convicted of nonviolent controlled substance offenses denies those immigrants the opportunity for an individualized assessment of their circumstances. Mandatory detention often applies even when the offense was committed years ago, making the argument that they are a present danger to the community more tenuous. And where individuals, including lawful permanent residents, are eligible for relief from deportation and have a strong incentive to appear for their individual hearings, mandatory detention is particularly wasteful and unnecessary.

The fact that non-citizens can spend significantly longer periods of time in immigration detention than they did for their criminal offenses also raises serious proportionality concerns.

---

[236] We recognize that the United States has entered a reservation to this article.

[237] UN Commission on Human Rights, Report of the Working Group on Arbitrary Detention, A/HRC/13/30, January 18, 2010, para. 59.

A PRICE TOO HIGH                    88

AR.09282

## Criminalization of Drug Use and Possession

Human Rights Watch opposes the criminalization of personal drug use or possession of drugs for personal use. Subjecting individuals to criminal sanctions for such acts restricts individuals' autonomy and right to privacy. Limitations on autonomy and privacy cannot be justified unless they meet the criteria of legitimate purpose, proportionality, necessity, and non-discrimination. Governments have many non-penal measures available to encourage people to make good choices around drugs and to protect drug users from harming their own health, including offering substance abuse treatment and social support. Arrest, incarceration, and a criminal record amount to an inherently disproportionate government response to someone who has done no more than use drugs.

As Human Rights Watch has explained elsewhere, criminal sanctions on the production and distribution of drugs have also contributed to serious human rights violations around the world.[238] In the US, as detailed in Section I of this report, enforcement of criminal prohibitions on the production, distribution, and use of drugs has been frequently abusive or racially discriminatory.

The harm to the human rights of those who suffer criminal sanctions under US drug laws is amplified when they also result in harsh immigration consequences, including deportation, permanent exile, family separation, and mandatory detention.

---

[238] Maria McFarland Sanchez-Moreno, "The Human Rights Case for Drug Reform," in Human Rights Watch, 2014 *World Report 2014*, January 2015, available at http://www.hrw.org/world-report/2014/essays/human-rights-case-for-drug-reform.

AR.09283

# Recommendations

## To the United States Congress

- Eliminate deportation based on convictions for simple possession of drugs.

- Ensure that all non-citizens in deportation proceedings, including those with convictions for drug offenses, have access to an individualized hearing before an impartial adjudicator in which the non-citizen's interest in remaining in the United States is weighed against the US interest in deporting the individual, through consideration of such factors as:

  - Family relationships in the US,

  - Hardship family members will experience as a result of deportation,

  - The best interests of any children in the family,

  - Legal presence in the US,

  - Length of time in the US,

  - Evidence of rehabilitation,

  - Contributions to community and the US, such as military service, business enterprises, property ownership, and/or tax payments,

  - Lack of connection to the country of origin.

- Ensure that refugees and asylum seekers with convictions for sale, distribution, or production of drugs are only considered to have been convicted of a "particularly serious crime" through case-by-case determination that takes into account the seriousness of the crime and whether the non-citizen is a threat to public safety.

- Amend the drug offense bars to entering the US and gaining lawful permanent resident status to

  - Eliminate the bar based on simple possession of drugs;

  - Ensure that non-citizens who are barred from entering the US and/or gaining lawful resident status because of a conviction for a drug offense

    · Are subject to the same exceptions available to those with convictions for "crimes involving moral turpitude," including the

ER-1243

"petty offense exception" and the exception for old and juvenile offenses;

· Are eligible for a waiver of the bar, based on consideration of such factors as the above;

· Are barred for a set period of time rather than permanently barred.

- Amend immigration laws to eliminate mandatory detention and ensure all non-citizens are given an opportunity for an individualized bond hearing.

- Amend immigration laws to redefine "conviction" so as to exclude convictions that have been expunged, pardoned, or vacated, or are otherwise not recognized by the jurisdiction in which the conviction occurred.

- Amend immigration laws to implement a "statute of limitations" ensuring that convictions for nonviolent drug offenses that occurred a certain number of years ago do not trigger deportation or mandatory detention.

- Amend immigration laws to restore the power of state and federal criminal judges to issue judicial recommendations against deportation when sentencing non-citizens convicted of crimes.

- Decriminalize the personal use of drugs, as well as possession of drugs for personal use.

## To the Department of Homeland Security

- Provide clear guidance to immigration officials that a positive exercise of prosecutorial discretion may be appropriate even in cases involving non-citizens with criminal convictions, with particular consideration for lawful permanent residents and non-citizens whose most serious convictions are for nonviolent offenses, including drug convictions, that occurred five or more years ago;

- Restrict the use of detainers to hold non-citizens with convictions for nonviolent offenses, including drug convictions, that occurred five or more years ago.

- Expand the use of alternatives to detention for non-citizens, including those subject to mandatory detention.

- Provide all non-citizens who have been in detention for six months or more with a bond hearing.

AR.09285

## To the US Attorney General and the US Department of Justice

- Withdraw *Matter of Y-L-*, the Attorney General opinion finding that nearly all convictions for drug trafficking constitute a "particularly serious crime" barring eligibility for asylum and withholding of removal.

## To State and Local Governments

- Amend statutes and processes to allow drug courts and diversion programs not to require guilty pleas from defendants that constitute convictions triggering deportation, mandatory detention, and other immigration consequences even when they successfully complete the programs;

- Amend remedies for post-conviction relief to remove barriers to relief for non-citizens convicted of nonviolent drug offenses through legal error, including the failure of defense counsel to adequately inform them of the potential immigration consequences of a guilty plea.

- Decriminalize the personal use and possession for personal use of drugs.

## To Local Law Enforcement Agencies and Prosecutors

- Ensure collateral immigration consequences are given appropriate consideration in plea negotiations and applications for post-conviction relief.

ER-1245

AR.09286

# Acknowledgments

This report was researched and written by Grace Meng, US Program senior researcher. Maria McFarland, US Program co-director, provided research assistance and edited the report. Dinah PoKempner, general counsel, and Joe Saunders, deputy program director, reviewed the report, as did Bill Frelick, director of the Refugees division; Megan McLemore, senior health and human rights researcher; Clara Long, US Program researcher; and Antonio Ginatta, US Program Advocacy Director. Samantha Reiser and W. Paul Smith, associates in the US Program, also contributed to editing. Katherine Collins, intern in the US Program, and Nora Hirozawa, volunteer in the US Program, provided research assistance. Grace Choi, publications director; Kathy Mills, publications specialist; and Fitzroy Hepkins, administrative manager, provided production assistance..

We thank the many immigrants and their families who generously shared their stories for this report. We also thank the lawyers, prosecutors, law enforcement officials, immigrant rights organizations, public defender offices, and others who shared their expertise with us for this report.

For assistance with our still-pending Freedom of Information Act requests, we thank the law firm Nixon Peabody for their pro bono counsel.

# A PRICE TOO HIGH

## US Families Torn Apart by Deportations for Drug Offenses

The United States is home to 13 million lawful permanent residents and 11 million unauthorized immigrants. Over two million immigrants have been deported by the Obama administration. While the government claims to focus on deporting serious, dangerous criminals, data obtained by Human Rights Watch shows that over a quarter of a million deportations from 2007 to 2012 involved non-citizens whose most serious conviction was for a drug offense. And, increasingly, individuals are being deported following convictions for drug possession. This trend contrasts sharply with the reforms many US states are undertaking to legalize, decriminalize, or offer drug treatment instead of prison for low-level drug offenders.

*A Price Too High* is based on interviews with over 130 affected individuals, family members, attorneys, advocates, and law enforcement officials, as well as previously unavailable government data obtained through a Freedom of Information Act request. The report documents the scope of the problem, including a 43 percent increase between 2007 and 2012 in the number of individuals deported following drug possession convictions. It shows how lawful permanent residents and unauthorized immigrants with strong ties to the US, including US citizen family members, regularly face mandatory detention without bond and deportation for offenses so minor they resulted little or no jail time under criminal law. Even expunged or pardoned convictions can trigger deportation. The consequences are devastating for immigrants, their families, and communities.

Human Rights Watch urges US lawmakers to reform immigration laws to eliminate deportation based on simple possession convictions alone, and to ensure that all non-citizens in deportation proceedings, including those with convictions for drug offenses, have access to an individualized hearing where the immigration judge can weigh evidence of family ties, rehabilitation, and other equities against a criminal conviction.



*Melida Ruiz, a lawful permanent resident, pictured with her daughter, Mercedez Ruiz, and her grandson, Christopher Gonzalez. In 2011, Melida was held in immigration detention for seven months while she fought deportation based on a 2002 misdemeanor drug conviction, her sole conviction in more than 30 years in the United States.*

© 2013 Platon for Human Rights Watch

**hrw.org**

AR.09288

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekh-m57k
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0376
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

I am writing to express my strong opposition to this proposed rule change.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For these reasons, I call upon the Trump administration to withdraw this proposal.

AR.09289

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekh-umeg
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0377
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Elena Jimenez Gutierrez

## General Comment

As an immigrant from Costa Rica who has lived in the U.S. for 15 years, I am deeply concerned that this rule change would send people who fled violence back to danger and death. I believe strongly that our nation must welcome people fleeing violence, and I am strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state. As a volunteer at Physicians for Human Rights' Asylum Newtwork, I perform medical evaluations and documentations of torture and other human rights abuses. I am concerned this rule would put many people in danger of recurrent abuses and death. Thank you very much for your consideration.

AR.09290

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 21, 2020
**Tracking No.** 1k4-9ekh-f6n2
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0378
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Denise Woods

---

## General Comment

Hello,

As a volunteer for Capital Area Immigrant Rights Coalition I talk to many people who fled persecution and torture. To send them back is to risk almost certain death and at the very least could cause deep trauma. Pls ensure racial profiling is not a part of a criminal justice system which is offering freedom for people fleeing violence based on their social identity.

Thanks so much!

Peace,

Denise Woods, MS MA

AR.09291