No. 20-17490

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PANGEA LEGAL SERVICES, et al.
Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

### APPELLANTS' EXCERPTS OF RECORD
### VOL. 8 OF 12

JOHN V. COGHLAN
*Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice
Civil Division
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
PATRICK GLEN
CHRISTINA P. GREER
*Senior Litigation Counsel*
CRAIG NEWELL
*Trial Attorney*

# CHAPTER VI: Executory and Transitory Provisions

### *Article 35*

**CO-OPERATION OF THE NATIONAL AUTHORITIES WITH THE UNITED NATIONS**

**1.** The Contracting States undertake to co-operate with the Office of the United Nations High Commissioner for Refugees, or any other agency of the United Nations which may succeed it, in the exercise of its functions, and shall in particular facilitate its duty of supervising the application of the provisions of this Convention.

**2.** In order to enable the Office of the High Commissioner or any other agency of the United Nations which may succeed it, to make reports to the competent organs of the United Nations, the Contracting States undertake to provide them in the appropriate form with information and statistical data requested concerning:

(a) The condition of refugees,

(b) The implementation of this Convention, and;

(c) Laws, regulations and decrees which are, or may hereafter be, in force relating to refugees.

### *Article 36*

**INFORMATION ON NATIONAL LEGISLATION**

The Contracting States shall communicate to the Secretary-General of the United Nations the laws and regulations which they may adopt to ensure the application of this Convention.

### *Article 37*

**RELATION TO PREVIOUS CONVENTIONS**

Without prejudice to article 28, paragraph 2, of this Convention, this

ER-1852

Convention replaces, as between parties to it, the Arrangements of 5 July 1922, 31 May 1924, 12 May 1926, 30 June 1928 and 30 July 1935, the Conventions of 28 October 1933 and 10 February 1938, the Protocol of 14 September 1939 and the Agreement of 15 October 1946.

## CHAPTER VII: Final Clauses

### *Article 38*

#### SETTLEMENT OF DISPUTES

Any dispute between parties to this Convention relating to its interpretation or application, which cannot be settled by other means, shall be referred to the International Court of Justice at the request of any one of the parties to the dispute.

### *Article 39*

#### SIGNATURE, RATIFICATION AND ACCESSION

**1.** This Convention shall be opened for signature at Geneva on 28 July 1951 and shall thereafter be deposited with the Secretary-General of the United Nations. It shall be open for signature at the European Office of the United Nations from 28 July to 31 August 1951 and shall be re-opened for signature at the Headquarters of the United Nations from 17 September 1951 to 31 December 1952.

**2.** This Convention shall be open for signature on behalf of all States Members of the United Nations, and also on behalf of any other State invited to attend the Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons or to which an invitation to sign will have been addressed by the General Assembly. It shall be ratified and the instruments of ratification shall be deposited with the Secretary-General of the United Nations.

**3.** This Convention shall be open from 28 July 1951 for accession by the States referred to in paragraph 2 of this article. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

*Article 40*

**TERRITORIAL APPLICATION CLAUSE**

**1.**   Any State may, at the time of signature, ratification or accession, declare that this Convention shall extend to all or any of the territories for the international relations of which it is responsible. Such a declaration shall take effect when the Convention enters into force for the State concerned.

**2.**   At any time thereafter any such extension shall be made by notification addressed to the Secretary-General of the United Nations and shall take effect as from the ninetieth day after the day of receipt by the Secretary-General of the United Nations of this notification, or as from the date of entry into force of the Convention for the State concerned, whichever is the later.

**3.**   With respect to those territories to which this Convention is not extended at the time of signature, ratification or accession, each State concerned shall consider the possibility of taking the necessary steps in order to extend the application of this Convention to such territories, subject, where necessary for constitutional reasons, to the consent of the Governments of such territories.

*Article 41*

**FEDERAL CLAUSE**

In the case of a Federal or non-unitary State, the following provisions shall apply:

(a)   With respect to those articles of this Convention that come within the legislative jurisdiction of the federal legislative authority, the obligations of the Federal Government shall to this extent be the same as those of Parties which are not Federal States;

(b)   With respect to those articles of this Convention that come within the legislative jurisdiction of constituent States, provinces or cantons which are not, under the constitutional system of the federation, bound to take legislative action, the Federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of states, provinces or cantons at the earliest possible moment;

(c)   A Federal State Party to this Convention shall, at the request of any other Contracting State transmitted through the Secretary-General of

the United Nations, supply a statement of the law and practice of the Federation and its constituent units in regard to any particular provision of the Convention showing the extent to which effect has been given to that provision by legislative or other action.

### *Article 42*
#### RESERVATIONS

**1.**  At the time of signature, ratification or accession, any State may make reservations to articles of the Convention other than to articles 1, 3, 4, 16(1), 33, 36-46 inclusive.

**2.**  Any State making a reservation in accordance with paragraph 1 of this article may at any time withdraw the reservation by a communication to that effect addressed to the Secretary-General of the United Nations.

### *Article 43*
#### ENTRY INTO FORCE

**1.**  This Convention shall come into force on the ninetieth day following the day of deposit of the sixth instrument of ratification or accession.

**2.**  For each State ratifying or acceding to the Convention after the deposit of the sixth instrument of ratification or accession, the Convention shall enter into force on the ninetieth day following the date of deposit by such State of its instrument or ratification or accession.

### *Article 44*
#### DENUNCIATION

**1.**  Any Contracting State may denounce this Convention at any time by a notification addressed to the Secretary-General of the United Nations.

**2.**  Such denunciation shall take effect for the Contracting State concerned one year from the date upon which it is received by the Secretary-General of the United Nations.

**3.**  Any State which has made a declaration or notification under article 40

ER-1856

AR.09894

may, at any time thereafter, by a notification to the Secretary-General of the United Nations, declare that the Convention shall cease to extend to such territory one year after the date of receipt of the notification by the Secretary-General.

### *Article 45*
#### REVISION

**1.** Any Contracting State may request revision of this Convention at any time by a notification addressed to the Secretary-General of the United Nations.

**2.** The General Assembly of the United Nations shall recommend the steps, if any, to be taken in respect of such request.

### *Article 46*
#### NOTIFICATIONS BY
#### THE SECRETARY-GENERAL OF THE UNITED NATIONS

The Secretary-General of the United Nations shall inform all Members of the United Nations and non-member States referred to in article 39:

(a) Of declarations and notifications in accordance with section B of article 1;

(b) Of signatures, ratifications and accessions in accordance with article 39;

(c) Of declarations and notifications in accordance with article 40;

(d) Of reservations and withdrawals in accordance with article 42;

(e) Of the date on which this Convention will come into force in accordance with article 43;

(f) Of denunciations and notifications in accordance with article 44;

(g) Of requests for revision in accordance with article 45.

IN FAITH WHEREOF the undersigned, duly authorized, have signed this Convention on behalf of their respective Governments,

DONE at Geneva, this twenty-eighth day of July, one thousand nine hundred and fifty-one, in a single copy, of which the English and French texts are

ER-1857

equally authentic and which shall remain deposited in the archives of the United Nations, and certified true copies of which shall be delivered to all Members of the United Nations and to the non-member States referred to in article 39.

## SCHEDULE

### *Paragraph 1*

**1.** The travel document referred to in article 28 of this Convention shall be similar to the specimen annexed hereto.

**2.** The document shall be made out in at least two languages, one of which shall be English or French.

### *Paragraph 2*

Subject to the regulations obtaining in the country of issue, children may be included in the travel document of a parent or, in exceptional circumstances, of another adult refugee.

### *Paragraph 3*

The fees charged for issue of the document shall not exceed the lowest scale of charges for national passports.

### *Paragraph 4*

Save in special or exceptional cases, the document shall be made valid for the largest possible number of countries.

### *Paragraph 5*

The document shall have a validity of either one or two years, at the discretion of the issuing authority.

### *Paragraph 6*

**1.** The renewal or extension of the validity of the document is a matter for the authority which issued it, so long as the holder has not established lawful residence in another territory and resides lawfully in the territory of the said

ER-1859

AR.09897

authority. The issue of a new document is, under the same conditions, a matter for the authority which issued the former document.

**2.** Diplomatic or consular authorities, specially authorized for the purpose, shall be empowered to extend, for a period not exceeding six months, the validity of travel documents issued by their Governments.

**3.** The Contracting States shall give sympathetic consideration to renewing or extending the validity of travel documents or issuing new documents to refugees no longer lawfully resident in their territory who are unable to obtain a travel document from the country of their lawful residence.

### *Paragraph 7*

The Contracting States shall recognize the validity of the documents issued in accordance with the provisions of article 28 of this Convention.

### *Paragraph 8*

The competent authorities of the country to which the refugee desires to proceed shall, if they are prepared to admit him and if a visa is required, affix a visa on the document of which he is the holder.

### *Paragraph 9*

**1.** The Contracting States undertake to issue transit visas to refugees who have obtained visas for a territory of final destination.

**2.** The issue of such visas may be refused on grounds which would justify refusal of a visa to any alien.

### *Paragraph 10*

The fees for the issue of exit, entry or transit visas shall not exceed the lowest scale of charges for visas on foreign passports.

### *Paragraph 11*

When a refugee has lawfully taken up residence in the territory of another

Contracting State, the responsibility for the issue of a new document, under the terms and conditions of article 28, shall be that of the competent authority of that territory, to which the refugee shall be entitled to apply.

### *Paragraph 12*

The authority issuing a new document shall withdraw the old document and shall return it to the country of issue if it is stated in the document that it should be so returned; otherwise it shall withdraw and cancel the document.

### *Paragraph 13*

**1.** Each Contracting State undertakes that the holder of a travel document issued by it in accordance with article 28 of this Convention shall be re-admitted to its territory at any time during the period of its validity.

**2.** Subject to the provisions of the preceding sub-paragraph, a Contracting State may require the holder of the document to comply with such formalities as may be prescribed in regard to exit from or return to its territory.

**3.** The Contracting States reserve the right, in exceptional cases, or in cases where the refugee's stay is authorized for a specific period, when issuing the document, to limit the period during which the refugee may return to a period of not less than three months.

### *Paragraph 14*

Subject only to the terms of paragraph 13, the provisions of this Schedule in no way affect the laws and regulations governing the conditions of admission to, transit through, residence and establishment in, and departure from, the territories of the Contracting States.

### *Paragraph 15*

Neither the issue of the document nor the entries made thereon determine or affect the status of the holder, particularly as regards nationality.

ER-1861

AR.09899

*Paragraph 16*

The issue of the document does not in any way entitle the holder to the protection of the diplomatic or consular authorities of the country of issue, and does not confer on these authorities a right of protection.

ER-1862

**ANNEX**
Specimen Travel Document

The document will be in booklet form (approximately 15 x 10 centimetres).

It is recommended that it be so printed that any erasure or alteration by chemical or other means can be readily detected, and that the words "Convention of 28 July 1951" be printed in continuous repetition on each page, in the language of the issuing country.

---

*(Cover of booklet)*
TRAVEL DOCUMENT
*(Convention of 28 July 1951)*

---

**No.**……………………

**(1)**
TRAVEL DOCUMENT
*(Convention of 28 July 1951)*

This document expires on ……………………………………………………
unless its validity is extended or renewed.
Name …………………………………………………………………………
Forename(s) ……………………………………………………………………
Accompanied by ……………………………………… child (children).

**1.** This document is issued solely with a view to providing the holder with a travel document which can serve in lieu of a national passport. It is without prejudice to and in no way affects the holder's nationality.

**2.** The holder is authorized to return to ……………………………………..
[state here the country whose authorities are issuing the document] on or before ……………………………………………………………………………

ER-1863

unless some later date is hereafter specified. [The period during which the holder is allowed to return must not be less than three months.]

**3.** Should the holder take up residence in a country other than that which issued the present document, he must, if he wishes to travel again, apply to the competent authorities of his country of residence for a new document. [The old travel document shall be withdrawn by the authority issuing the new document and returned to the authority which issued it.][1]

(This document contains……..pages, exclusive of cover.)

## (2)

Place and date of birth ……………………………………………………….
Occupation ……………………………………………………………………… .
Present residence …………………………………………………………………..
*Maiden name and forename(s) of wife ………………………………………..
………………………………………………………………………………………….
*Name and forename(s) of husband ………………………………………… .
………………………………………………………………………………………….

*Description*

Height……………………………………………… .
Hair…………………………………………………… .
Colour of eyes ……………………………………….. .
Nose ………………………………………………… .
Shape of face ……………………………………… .
Complexion………………………………………… .
Special peculiarities……………………………….

*Children accompanying holder*

| Name | Forename(s) | Place and date of birth | Sex |
|---|---|---|---|
| ………………… . | ……………… . | ………………………… | ………….. |
| ………………… . | ……………… . | ………………………… | ………….. |
| ………………… . | ……………… . | ………………………… | ………….. |

*Strike out whichever does not apply
(This document contains……..pages, exclusive of cover.)

(1) The sentence in brackets to be inserted by the Governments which so desire.

ER-1864 AR.09902

## (3)

Photograph of holder and stamp of issuing authority

Finger-prints of holder (if required)

Signature of holder……………………………………………………….

(This document contains…….pages, exclusive of cover.)

## (4)

1. This document is valid for the following countries:………………………
………………………………………………………………………………
………………………………………………………………………………
………………………………………………………………………………

2. Document or documents on the basis of which the present document is issued:…………………………………………………………………… .
………………………………………………………………………………
………………………………………………………………………………
………………………………………………………………………………

Issued at……………………………

Date………………………………….

Signature and stamp of authority
issuing the document:

Fee paid:

(This document contains…….pages, exclusive of cover.)

## (5)

Extension or renewal of validity

Fee paid:                                         From………………………………….

To………………………………….

Done at…………………………………. Date………………………………….

Signature and stamp of authority
extending or renewing the validity of
the document:

## ER-1865

AR.09903

Extension or renewal of validity

Fee paid:                          From……………………………….
                                   To…………………………………..
Done at ………………………………. Date …………………………………..
                                   Signature and stamp of authority
                                   extending or renewing the validity of
                                   the document:

(This document contains……..pages, exclusive of cover.)

## (6)

Extension or renewal of validity

Fee paid:                          From……………………………….
                                   To…………………………………..
Done at ………………………………. Date …………………………………..
                                   Signature and stamp of authority
                                   extending or renewing the validity of
                                   the document:

Extension or renewal of validity

Fee paid:                          From……………………………….
                                   To…………………………………..
Done at ………………………………. Date …………………………………..
                                   Signature and stamp of authority
                                   extending or renewing the validity of
                                   the document:

(This document contains……..pages, exclusive of cover.)

## (7-32)

Visas

The name of the holder of the document must be repeated in each visa.

(This document contains……..pages, exclusive of cover.)

ER-1866                                          AR.09904

## PROTOCOL RELATING TO THE STATUS OF REFUGEES

THE STATES PARTIES TO THE PRESENT PROTOCOL,

**CONSIDERING** that the Convention relating to the Status of Refugees done at Geneva on 28 July 1951 (hereinafter referred to as the Convention) covers only those persons who have become refugees as a result of events occurring before 1 January 1951,

**CONSIDERING** that new refugee situations have arisen since the Convention was adopted and that the refugees concerned may therefore not fall within the scope of the Convention,

**CONSIDERING** that it is desirable that equal status should be enjoyed by all refugees covered by the definition in the Convention irrespective of the dateline 1 January 1951,

**HAVE AGREED** as follows:

### *Article I*

### GENERAL PROVISION

**1.** The States Parties to the present Protocol undertake to apply articles 2 to 34 inclusive of the Convention to refugees as hereinafter defined.

**2.** For the purpose of the present Protocol, the term "refugee" shall, except as regards the application of paragraph 3 of this article, mean any person within the definition of article 1 of the Convention as if the words "As a result of events occurring before 1 January 1951 and ..." "and the words"... "a result of such events", in article 1 A (2) were omitted.

**3.** The present Protocol shall be applied by the States Parties hereto without any geographic limitation, save that existing declarations made by States already Parties to the Convention in accordance with article 1 B (1) (a) of the

ER-1867

Convention, shall, unless extended under article 1 B (2) thereof, apply also under the present Protocol.

## *Article II*

**CO-OPERATION OF THE NATIONAL AUTHORITIES WITH THE UNITED NATIONS**

**1.** The States Parties to the present Protocol undertake to co-operate with the Office of the United Nations High Commissioner for Refugees, or any other agency of the United Nations which may succeed it, in the exercise of its functions, and shall in particular facilitate its duty of supervising the application of the provisions of the present Protocol.

**2.** In order to enable the Office of the High Commissioner, or any other agency of the United Nations which may succeed it, to make reports to the competent organs of the United Nations, the States Parties to the present Protocol undertake to provide them with the information and statistical data requested, in the appropriate form, concerning:

  (a) The condition of refugees;

  (b) The implementation of the present Protocol;

  (c) Laws, regulations and decrees which are, or may hereafter be, in force relating to refugees.

## *Article III*

### INFORMATION ON NATIONAL LEGISLATION

The States Parties to the present Protocol shall communicate to the Secretary-General of the United Nations the laws and regulations which they may adopt to ensure the application of the present Protocol.

## *Article IV*

### SETTLEMENT OF DISPUTES

Any dispute between States Parties to the present Protocol which relates to its interpretation or application and which cannot be settled by other means shall be referred to the International Court of Justice at the request of any one of the parties to the dispute.

*Article V*

**ACCESSION**

The present Protocol shall be open for accession on behalf of all States Parties to the Convention and of any other State Member of the United Nations or member of any of the specialized agencies or to which an invitation to accede may have been addressed by the General Assembly of the United Nations. Accession shall be effected by the deposit of an instrument of accession with the Secretary-General of the United Nations.

*Article VI*

**FEDERAL CLAUSE**

In the case of a Federal or non-unitary State, the following provisions shall apply:

(a) With respect to those articles of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol that come within the legislative jurisdiction of the federal legislative authority, the obligations of the Federal Government shall to this extent be the same as those of States Parties which are not Federal States;

(b) With respect to those articles of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol that come within the legislative jurisdiction of constituent States, provinces or cantons which are not, under the constitutional system of the federation, bound to take legislative action, the Federal Government shall bring such articles with a favourable recommendation to the notice of the appropriate authorities of States, provinces or cantons at the earliest possible moment;

(c) A Federal State Party to the present Protocol shall, at the request of any other State Party hereto transmitted through the Secretary-General of the United Nations, supply a statement of the law and practice of the Federation and its constituent units in regard to any particular provision of the Convention to be applied in accordance with article I, paragraph 1, of the present Protocol, showing the extent to which effect has been given to that provision by legislative or other action.

ER-1869

*Article VII*

## RESERVATIONS AND DECLARATIONS

**1.** At the time of accession, any State may make reservations in respect of article IV of the present Protocol and in respect of the application in accordance with article I of the present Protocol of any provisions of the Convention other than those contained in articles 1, 3, 4, 16 (1) and 33 thereof, provided that in the case of a State Party to the Convention reservations made under this article shall not extend to refugees in respect of whom the Convention applies.

**2.** Reservations made by States Parties to the Convention in accordance with article 42 thereof shall, unless withdrawn, be applicable in relation to their obligations under the present Protocol.

**3.** Any State making a reservation in accordance with paragraph 1 of this article may at any time withdraw such reservation by a communication to that effect addressed to the Secretary-General of the United Nations.

**4.** Declarations made under article 40, paragraphs 1 and 2, of the Convention by a State Party thereto which accedes to the present Protocol shall be deemed to apply in respect of the present Protocol, unless upon accession a notification to the contrary is addressed by the State Party concerned to the Secretary-General of the United Nations. The provisions of article 40, paragraphs 2 and 3, and of article 44, paragraph 3, of the Convention shall be deemed to apply *mutatis mutandis* to the present Protocol.

*Article VIII*

## ENTRY INTO FORCE

**1.** The present Protocol shall come into force on the day of deposit of the sixth instrument of accession.

**2.** For each State acceding to the Protocol after the deposit of the sixth instrument of accession, the Protocol shall come into force on the date of deposit by such State of its instrument of accession.

ER-1870

*Article IX*

**DENUNCIATION**

**1.** Any State Party hereto may denounce this Protocol at any time by a notification addressed to the Secretary-General of the United Nations.

**2.** Such denunciation shall take effect for the State Party concerned one year from the date on which it is received by the Secretary-General of the United Nations.

*Article X*

**NOTIFICATIONS**
**BY THE SECRETARY-GENERAL OF THE UNITED NATIONS**

The Secretary-General of the United Nations shall inform the States referred to in article V above of the date of entry into force, accessions, reservations and withdrawals of reservations to and denunciations of the present Protocol, and of declarations and notifications relating hereto.

*Article XI*

**DEPOSIT IN THE ARCHIVES**
**OF THE SECRETARIAT OF THE UNITED NATIONS**

A copy of the present Protocol, of which the Chinese, English, French, Russian and Spanish texts are equally authentic, signed by the President of the General Assembly and by the Secretary-General of the United Nations, shall be deposited in the archives of the Secretariat of the United Nations. The Secretary-General will transmit certified copies thereof to all States Members of the United Nations and to the other States referred to in article V above.

ER-1871

AR.09909

## GENERAL ASSEMBLY RESOLUTION 2198 (XXI)

# Protocol relating to the Status of Refugees

THE GENERAL ASSEMBLY,

**CONSIDERING** that the Convention relating to the Status of Refugees, signed at Geneva on 28 July 1951[1], covers only those persons who have become refugees as a result of events occurring before 1 January 1951,

**CONSIDERING** that new refugee situations have arisen since the Convention was adopted and that the refugees concerned may therefore not fall within the scope of the Convention,

**CONSIDERING** that it is desirable that equal status should be enjoyed by all refugees covered by the definition in the Convention, irrespective of the dateline of 1 January 1951,

**TAKING NOTE** of the recommendation of the Executive Committee of the Programme of the United Nations High Commissioner for Refugees[2] that the draft Protocol relating to the Status of Refugees should be submitted to the General Assembly after consideration by the Economic and Social Council, in order that the Secretary-General might be authorized to open the Protocol for accession by Governments within the shortest possible time,

---

(1) United Nations, *Treaty Series*, vol. 189 (1954), No. 2545.

(2) See A/6311/Rev.1/Add.1, part two, para. 38.

**CONSIDERING** that the Economic and Social Council, in its resolution 1186 (XLI) of 18 November 1966, took note with approval of the draft Protocol contained in the addendum to the report of the United Nations High Commissioner for Refugees and concerning measures to extend the personal scope of the Convention[3] and transmitted the addendum to the General Assembly,

1. **TAKES NOTE** of the Protocol relating to the Status of Refugees, the text of which[3] is contained in the addendum to the report of the United Nations High Commissioner for Refugees;

2. **REQUESTS** the Secretary-General to transmit the text of the Protocol to the States mentioned in article V thereof, with a view to enabling them to accede to the Protocol[4].

*1495th plenary meeting, 16 December 1966*

---

(3) Ibid., part one, para. 2.

(4) The Protocol was signed by the President of the General Assembly and by the Secretary-General on 31 January 1967.

AR.09912



PUBLISHED BY:

**UNHCR**

Communications
and Public
Information Service

P.O. Box 2500
1211 Geneva 2
Switzerland

www.unhcr.org

For information
and inquiries,
please contact:

Communications
and Public
Information Service
hqpi00@unhcr.org

AR.09913

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020<br>**Received:** January 21, 2020<br>**Status:** Posted<br>**Posted:** January 22, 2020<br>**Tracking No.** 1k4-9ekn-718o<br>**Comments Due:** January 21, 2020<br>**Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0493
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Emily Leung
**Address:**
    Justice Center of Southeast Massachusetts
    62 Main Street, Suite 302
    Brockton,  MA,  02301
**Email:** eleung@justicema.org
**Phone:** 5086380153

---

## General Comment

See attached file(s)

---

## Attachments

Justice Center of SEMA Public Comment - EOIR Docket 18-0002

AR.09914

# *JUSTICE CENTER OF SOUTHEAST MASSACHUSETTS LLC*

*Subsidiary of South Coastal Counties Legal Services, Inc.*
*Serving Southeastern Massachusetts, Cape Cod & Islands*

*Submitted via www.regulations.gov*

Lauren Alder Reid, Assistant Director
Office of Policy
Executive Office of Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

**Re: U.S. Department of Homeland Security, Procedures for Asylum and Bars to Asylum
Eligibility, EOIR Docket No. 18-0002; RIN 1125-AA87, 1615-AC41**

To Whom It May Concern:

We are writing on behalf of the Justice Center of Southeast Massachusetts in response to
the Department of Homeland Security (DHS, or the Department) and Department of Justice's
(DOJ, or the Department) Notice of Proposed Rulemaking (NPRM or proposed rule), to express
our strong opposition to changes to the procedures for asylum and bars to asylum eligibility,
published in the Federal Register on December 19, 2019.

The Justice Center of Southeast Massachusetts, a subsidiary of South Coastal Counties
Legal Services, provides free civil legal services to indigent and elderly individuals in our
service area. We serve communities in Plymouth, Bristol, Dukes, Nantucket, and Barnstable
Counties, as well as residents of the towns of Avon and Stoughton. Our mission is to achieve
equal justice for the poor and disadvantaged through community based legal advocacy. The
Justice Center of Southeast Massachusetts provides civil legal services in the areas of housing,
family law, education, immigration, and benefits. We are currently serving over 30 asylum
seeking clients and their families, many of whom would be adversely affected by this rule.

The Justice Center of Southeast Massachusetts strongly opposes the changes being
proposed to the asylum process as they will place an undue burden on our already very
vulnerable clients.  The criminal bars being proposed do not make communities safer, ignore the
trauma and vulnerability of this class of immigrants, and will ultimately contribute to the backlog
by decreasing efficiency in immigration courts. The proposed rule will seriously jeopardize the
asylum claims of domestic violence and intimate partner violence survivors and raises serious
due process concerns in how it proposes to evaluate alleged criminal conduct that does not result
in conviction. Generally, the proposed bars are overbroad, unclearly defined, with overly narrow
exceptions, and insufficient guidance, which will result in meritorious asylum claims being
denied. We strongly oppose the proposed rule and urge the Departments to rescind the rule.

AR.09915

1. **The proposed rule expands bars for an already difficult to acquire immigration benefit. The bars should be narrowed, not broadened.**

The proposed rule seeks to add seven categorical bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits. These categorical bars are cruel and do not serve the purported goal of making communities safer and barring criminals from a discretionary benefit. Instead, it will be barring some asylum seekers with meritorious cases and complex circumstances from an immigration benefit they desperately need to stay *alive.* The burden on asylum seekers under current laws and regulations is already high. In the context of a complicated system of immigration laws and regulations, asylum seekers must bear the evidentiary burden of establishing their eligibility[1] often without legal counsel and often from within detention centers.[2] Additional regulations under the current administration have placed further bars on asylum eligibility based on asylum seekers' manner of entry, path to reaching the United States, and national origin.[3]

In regards to criminal bars, the current bars in place are already broad and somewhat vague. Any offense that falls under the category of an aggravated felony can be considered a "particularly serious crime" and preclude asylum eligibility. Over the past several decades, an aggravated felony went from only consisting of murder, weapons trafficking, and drug trafficking, to including over 30 offenses. Some of those offenses now include crimes such as failing to appear in court, filing a false tax return, and theft.[4] Further categorical bars are not needed when the current bars are already so broad. Even if an asylum seeker is not barred due to one of the current criminal bars, an asylum adjudicator still retains full discretion to deny asylum.[5] In order to justify these broad categorical bars, the proposed rule points to the availability of CAT and withholding of removal, however, this does not nullify the harm of this proposed rule. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are significantly harder to obtain.[6] The continue

---

[1] USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[2] Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* (September 25, 2019), available at https://www.usatoday.com/indepth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[3] National Immigrant Justice Center "A Timeline of the Trump Administration's Efforts to End Asylum", (updated January 2020) available at https://www.immigrantjustice.org/issues/asylum-seekers-refugees

[4] American immigration Council, "Aggravated Felonies: An Overview", (December 16, 2016), available at https://www.americanimmigrationcouncil.org/research/aggravated-felonies-overview

[5] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[6] Dagmar Myslinska,,"Which Should I Apply for: Asylum, Withholding of Removal, and/or Protection Under Convention Against Torture?", *NOLO* (updated 2019), available at https://www.nolo.com/legal-encyclopedia/differences-asylum-withholding-removal-protection-convention-against-torture.html

AR.09916

availability of CAT and withholding of removal does not justify the addition of numerous eligibility bars that have limited connection with public safety and security.

This proposed rule states, "Although Congress prescribed that all aggravated felonies constitute particularly serious crimes, Congress further provided that the Attorney General 'may designate by regulation offenses that will be considered' a 'particularly serious crime,' by reason of which the offender 'constitutes a danger to the community of the United States'". [7] In explaining their authority to implement these regulations the proposed rule further states that, "the additional limitations on eligibility must simply be established by regulation, and must be consistent with the rest of 8 U.S.C. §1158." These additional bars are arguably not consistent with 8 U.S.C. 1158. While 8 U.S.C. §1158 provides the authority to determine what counts as a particularly serious crime that could endanger others, it does not provide the authority to create arbitrary asylum bars that do not speak to the dangerousness of the asylum seeker.

Additionally, this proposed rule is at direct odds with the United States' international treaty obligations. The 1967 Protocol Relating to the Status of Refugees binds parties to the UN Convention Relating to the Status of Refugees.[8] The United States, in signing onto this, is essentially bound to create their refugee laws in a manner that complies with the Protocol. The Protocol's principle of non-refoulment, or returning refugees back to a place where they will be persecuted on protected grounds, is a key part of the agreement.[9] While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. The Convention allows states to exclude individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country." However, this has generally been interpreted to encompass the most serious or extreme cases and the United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum," and do not include lesser crimes such as theft or use of narcotic substances. This proposed rule is directly at odds with the nature of the protocol.

## 2. Creating an eligibility bar based on migration related offenses is inhumane and illogical.

Barring asylum eligibility for immigrants convicted of migration-related offenses punishes them for fleeing persecution and seeking safety for their children or other family members. More and more asylum seekers arrive to the United States in family units[10]- this does not suggest that their asylum claims are non-meritorious or that this "crime" of harboring a family member would make them a danger to US communities. The proposed rule states that "even first-time alien

---

[7] INA 208 (b)(2)(A)(ii), (B)(ii)., 8 U.S.C. 1158(b)(2)(A)(iii),(B)(ii).

[8] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[9] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[10] Joel Rose and John Burnett, "Migrant Families Arrive in Busloads as Border Crossings Hit 10-year High), *NPR,* (March 5, 2019), available at https://www.npr.org/2019/03/05/700428069/migrant-families-arrive-in-busloads-as-border-crossings-hit-10-year-high

AR.09917

smuggling offenses involving immediate family members display a serious disregard for U.S. immigration law and pose a potential hazard to smuggled family members, which often include a vulnerable child or spouse." It is illogical to conclude that the hazard posed to a child or spouse being "smuggled" is a greater hazard than they would face in their native country from which they are fleeing *violence* and *persecution* because of their race, nationality, religion, political opinion or particular social group.

Additionally, it is illogical to assume that asylum seekers showing up at the US border after fleeing violence and persecution understand complicated portions of U.S. immigration law and/or have the resources to understand it. This proposed bar to asylum is direct violation with human nature itself. Parents fleeing unsafe circumstances are not going to leave behind their children. This proposed bar is particularly underhanded due to the recently released, now- public documents that reveal this administration's well thought out plan to utilize smuggling prosecutions to deport parents and caregivers that brought children to the United States.[11] The document, acquired through litigation, states that ICE sought "an interagency 90- to 120-day operation focusing on transnational criminal organizations (TCO) engaged in smuggling unaccompanied alien children (UAC) with an emphasis on the identification, investigation, and arrest of human smuggling facilitators, including, but not limited to, parents and family members."[12] This bar places families in a truly difficult position of choosing between leaving family members in danger or bringing them to the U.S. nullifying their ability to receive protection as a family. Importantly, cutting off asylum eligibility will eliminate family reunification options, which will result in permanent separation of families.

Additionally, this administration has put into place numerous impediments to legal entry into the United States, making it more difficult for immigrants to enter (or reenter) legally, and removing due process. It is unfair to bar asylum seekers from eligibility for not entering legally, when this administration has actively dismantled the pathways and processes to legal entry through regulation and policy. Chaos at the border has resulted in immigration proceedings being conducted in tent courts with video conferenced judges.[13] The policy of Migrant Protection Protocols (MPP), colloquially called "return to Mexico," sent asylum seekers to wait in camps on the Mexican side of the border while their asylum claims were being processed and adjudicated. This caused asylum seekers, who chose to follow the Trump Administration's rules and not enter unlawfully, to be disqualified from asylum eligibility based on additional Trump Administration rule. The administration limited the amount of asylum seekers they would allow through the legal ports of entry. Those asylum seekers waited on unofficial waiting lists in Mexico via MPP. Despite DHS' claim that "Mexico will provide them with all appropriate humanitarian protections for the duration of their stay,"[14] these camps were dangerous and unsanitary.[15] The

---

[11] USCIS "Concept of Operations: Unaccompanied Alien Children Human Smuggling Disruption Initiative" (May 15, 2017), available at https://www.documentcloud.org/documents/5980596-Smuggling-Initiative-ConOP html
[12] USCIS "Concept of Operations: Unaccompanied Alien Children Human Smuggling Disruption Initiative" (May 15, 2017), available at https://www.documentcloud.org/documents/5980596-Smuggling-Initiative-ConOP html
[13] Priscilla Alvarez, "Confusion and Frustration in Tent Courts Along the Texas Border", *CNN* (September 21, 2019) available at https://www.cnn.com/2019/09/21/politics/texas-tent-courts/index.html
[14] US Department of Homeland Security, "Migrant Protection Protocols", (January 24, 2019) available at https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols

AR.09918

new rule, published as an interim final rule in July of 2019, bars asylum seekers from eligibility if they passed through a "third country" to get to the United States and did not apply for asylum there first.[16] So the asylum seekers who chose to follow the law and not enter illegally while waiting in Mexico, are now barred from asylum.[17]

Just this month, two programs were expanded that cut off asylum seekers from accessing counsel and rushed them through their credible fear interviews. The Prompt Asylum Claim Review (PACR), applying to individuals other than Mexican nationals, and the Humanitarian Asylum Review Process (HARP), applying to Mexican nationals, keeps those individuals at the border in Customs and Border Patrol Custody rather than transferring them to ICE.[18] The rates of credible fear interview passage are incredibly low, and most are sent back to the dangerous situations they came from. Legal counsel is essentially unavailable in CBP custody.[19] In instances like this, legitimate asylum seekers with meritorious cases may not have any other options than to unlawfully reenter the country in order to save their own lives. It is laughable and disingenuous that the administration purports that there are "alternative means to presenting a claim to persecution" aside from unlawfully entering the United States. The myriad policies rapidly issued and developed to prevent individuals from lawfully seeking asylum violate domestic and international laws and the proposed bars for unlawful entry and harboring are yet another example of the administration's abject hostility to asylum seekers.

Because this proposed rule bars any asylum seekers who have an illegal reentry conviction, this unfairly harms asylum seekers who have fled persecution multiple times. The proposed rule treats all illegal entry the same – whether it was multiple entries by immigrants having prior removal orders, asylum seekers who have entered multiple times without having their asylum claims heard, or even perhaps someone who was originally removed before the onset of the circumstances that caused fear of persecution and then returned. This is justified in the rule by stating that "Illegal reentry also reflects a willingness to repeatedly disregard the immigration laws despite alternative means of presenting a claim of persecution." But as previously discussed, chaos at the border has resulted in few alternative means of presenting a claim of persecution, and has muddied the pathway to legal entry. The rule further justifies this by loosely connecting the idea of criminal recidivism and dangerousness, without regard to the seriousness of the prior convictions. It provides no evidence to back up this claim that illegal reentry and dangerousness are related or correlated in any way. Discretion must be preserved to grant asylum on a case by case basis, otherwise meritorious asylum seekers will likely be deemed ineligible.

---

[15] Zacahry Mueller, "Immigration 101: What is 'Remain in Mexico', or the Migration Protection Protocols (MPP)?", *America's Voice,* (November 15, 2019) available at https://americasvoice.org/blog/remain-in-mexico-mpp/?gclid=EAIaIQobChMI1Zbd4PiK5wIVg5yzCh1TPgbuEAAYASAAEgIYrvD_BwE

[16] Human Rights First, "Trump Administration's Third-Country Transit Bar is An Asylum Ban that Will Return Refugees to Danger", (updated September 2019), available at https://www.humanrightsfirst.org/sites/default/files/Third-Country-Transit-Ban.pdf

[17] Dara Lind, "Asylum-Seekers Who Followed Trump Rule Now Don't Qualify Because of New Trump Rule", *ProPublica,* July 22, 2019) available at https://www.propublica.org/article/asylum-seekers-that-followed-trump-rule-now-dont-qualify-because-of-new-trump-rule

[18] National Immigrant Justice Center "Asylum Seekers and Refugees: A Timeline Of The Trump Administration's Efforts To End Asylum", (updated January 2020) available at https://www.immigrantjustice.org/issues/asylum-seekers-refugees

[19] US District Court for the District of Columbia, "PACR HARP Amended Complaint" (December 5, 2019) available at "https://www.aclutx.org/sites/default/files/aclu_complaint_expedited_removal_program_pacr_harp.pdf

AR.09919

Finally, this proposed rule is internally inconsistent. Under the section of the proposed rule that discusses the use of fraudulent documents, 7(a), there is an exception for aliens that "used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a US port of entry." The proposed rule itself, through this exception, acknowledges that when fleeing persecution and violence, an asylum seeker may need to enter the United States utilizing fraudulent documents, yet, it seeks to bar from eligibility individuals unlawfully enter the United States by crossing the border. This distinction penalizes asylum seekers who travel by land to the U.S., with no reasonable basis for this distinction. The bar for migration related crimes is wholly inconsistent with the plight of asylum seekers and seriously undermines the asylum process.

### 3. The bar on felonies is overbroad and no data is provided to support the idea that sentences over one year relate to rates of recidivism and dangerousness.

The proposed rule states that a noncitizen would be ineligible for asylum based on a conviction for "any felony under Federal, State, tribal, or local law," where the term "felony" is defined as "any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment."[20] Within the state of Massachusetts, this bar would remove eligibility for many asylum seekers who have committed even just minor crimes. In Massachusetts, the result of this rule would be incredibly far reaching. There are many misdemeanors in Massachusetts that would be classified as federal felonies. A misdemeanor by Massachusetts law is defined as an offense that cannot be punished by a *state* prison sentence.[21] Therefore there are misdemeanors, punishable by over a year in a house of correction, not a state prison, that would be defined as a federal felony and bar asylum eligibility. Many of these federal felonies are not a public safety threats, which is the justification provided by the Department for the expansion of the bar. The proposed rule states that it would "eliminate inefficiencies…by providing that all felonies would constitute particularly serious crimes." It goes on further and states that "crimes with the potential for longer sentences tend to indicate that the offenders who commit such crimes are greater dangers to the community." However, there is no basis in fact for this statement. The following crimes under Massachusetts law would be considered a federal felony and bar asylum seekers from eligibility:

- unauthorized recording of a live performance[22]
- unauthorized reproduction of a recording [23]
- larceny of a trade secret (no matter the value of the secret)[24]
- false report of a motor vehicle theft[25]
- negligent operation of a motor vehicle or leaving the scene of property damage[26]
- shoplifting over $250 [27]

---

[20] Proposed Rule 8 C.F.R. 208.13 (c)(6)(vi) and 8 C.F.R. 208.13 (c)(7) (i).
[21] M.G.L c. 274 s 1 available at https://malegislature.gov/Laws/GeneralLaws/PartIV/TitleI/Chapter274/Section1
[22] M.G.L. c. 266 s. 143B
[23] M.G.L. c. 266 s. 143A
[24] M.G.L. c. 266 s. 30(4)
[25] M.G.L. c. 268 §39
[26] M.G.L. c. 90 § 24(2)(a),
[27] M.G.L. c. 266 §30A

AR.09920

- simple assault, which includes a mere offensive touching[28]

All of these abovementioned crimes are considered misdemeanors under Massachusetts law because they are not punishable by a state prison sentence. However, because they could result in a sentence of more than one, they would be categorized as federal felonies. Crimes with longer sentences do not necessarily indicate a greater danger to society, and using that as the justification for this overbroad bar, without backing it up with data is unreasonable. For example, unauthorized recording of a live performance (if between 7 and 65 audio video recordings) is punishable of up to 2 years in prison, a $100,000 fine, or both. When Congress adopted a mandatory criminal bar in 1996 for those convicted of "particularly serious crimes," Congress did not intend an unauthorized recording of live performance to be "particularly serious crime" which would bar someone from asylum eligibility.

Convictions are not necessarily reflective of criminal conduct.[29] Firstly, this proposed rule ignores the possibility that some people will plead guilty to a crime to avoid a more severe sentence or to secure a more imminent release.[30] Additionally, this felony bar has no exceptions for survivors of abuse or trafficking. Many survivors of trafficking have felonies as a part of their victimization. In 2016, the National Survivor Network conducted a survey on criminal records related to trafficking. 91% of their respondents reported having been arrested at least once and over half of them believed all of their arrests were directly related to being trafficked. These arrests include things like prostitution, intent to solicit, drug sales, and drug possession, which in some states and circumstances can result in felony convictions.[31] Many survivors of domestic violence also have felony convictions as a result of their victimization. A 1999 study by the Department of Justice found that about half of women who had been imprisoned had been sexually or physically abused by a partner prior to their incarceration.[32] A 2007 study by the Department of Corrections in New York found that 2/3 of the women incarcerated for killing someone had been previously sexually or physically abused by that person.[33] Several states have introduced bills that advocate that victims of domestic violence and abuse should receive greater legal protections within the criminal justice system. For instance, in 2016 Illinois passed a law that requires judges to consider the role of abuse in sentencing. In 2012, California passed laws that allowed victims of abuse to challenge their incarceration if their original trial had limited testimony about abuse and it required the parole board to consider abuse during parole hearings.[34] Again, this proposed rule removes all discretion and context with an overbroad bar that does not take into account asylum seekers' circumstances.

---

[28] M.G.L. c. 265 §13A(a)

[29] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157,
https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.
[30] *Id*

[31] National Survivor Network, "Impact of Criminal Arrest and Detention on Survivors of Human Trafficking", (August 2016)   https://nationalsurvivornetwork.org/wp-content/uploads/2017/12/VacateSurveyFinal.pdf
[32] US Department of Justice, "Prior Abuse Reported
by Inmates and Probationers", (April 1999) available at  https://www.bjs.gov/content/pub/pdf/parip.pdf
[33] New York County Lawyer's Association, "Women and Incarceration, (October 21, 2014) available at https://www.nycla.org/PDF/Women%20in%20Incarceration%20-%2010.21.14.pdf
[34] The Atlantic, "When Abuse Victims Commit Crimes", (May 21, 2019) available at https://www.theatlantic.com/politics/archive/2019/05/new-york-domestic-violence-sentencing/589507/

AR.09921

Finally, this proposed rule does not take into account the trauma that asylum seekers have experienced in their home countries and potentially on their journey to seek safety in the United States. Studies have found that at a minimum, one of every three asylum seekers suffers from depression, anxiety or PTSD.[35] PTSD has been highly linked with substance abuse disorders. Individuals with PTSD are 14 times more likely to struggle with drugs and alcohol.[36] Asylum seekers who have previously struggled with addiction and may have an offense related to that addiction and should not be automatically barred from eligibility, since the conviction is closely related to the persecution they suffered. Many asylum seekers do not have immediate access to social support systems or medical treatment upon arriving to the United States.[37] Under the current system, they would not have the opportunity to explain their past trauma and how that may have resulted in a drug related conviction or driving under the influence convictions. Under this proposed rule, asylum seekers would be cruelly barred from asylum eligibility with no discretion.

### 4. Barring asylum seekers from eligibility utilizing the standard that immigration judges "have reason to believe" they have been involved in crimes "in furtherance" of gang activity is essentially removing standards altogether. This proposed bar opens the door for racially biased adjudications based on inaccurate gang databases.

This proposed rule bars individuals who have been involved in crimes, felonies or misdemeanors, related to gang activity or in furtherance of gang activity. The proposed rule itself acknowledges that the criteria is unclear stating that, "The states…have enacted numerous laws that address gang-related crimes, but they have not enacted a uniform definition of what constitutes activity taken 'in furtherance' of a gang-related crime." This "reason to believe" standard allows for the consideration of all reliable evidence to determine whether a crime was committed to furtherance of criminal gang activities. "All reliable evidence" is an incredibly broad scope allowing advocates on both sides to present essentially limitless evidence about gang connections or lack thereof. Asylum hearings in which an adjudicator has to assess gang activity is going to greatly increase the amount of time asylum proceedings take and will likely result in an increase in appeals. Increased efficiency is frequently cited as a reason behind the proposed rule, yet this provision will decrease efficiency substantially by creating mini-trials in asylum adjudication. Immigration judges are not experts in criminal law. Giving them the authority and responsibility to determine if there is reason to believe any conviction is in furtherance of gang activity will effectively remove standards altogether.

---

[35] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[36] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[37] Journal of Health Care for the Poor and Underserved, "Barriers to Health Care Access among Refugee Asylum Seekers", (April 2011) available at https://www.researchgate.net/publication/51107234_Barriers_to_Health_Care_Access_among_Refugee_Asylum_Seekers

AR.09922

Additionally, because there is a lack of evidentiary rules in immigration proceedings, applicants will have a difficult task in rebutting negative evidence against them, even if the evidence is false. The likelihood that the evidence will be false is high. Gang databases are notoriously inaccurate. In <u>Commonwealth v. Wardsworth</u>, 482 Mass. 454, 470 (2019), the Supreme Judicial Court of Massachusetts vacated convictions for first degree murder, armed assault with intent to murder, and firearm offenses, and remanded for a new trial in part due to the introduction of an expert opinion regarding gang-affiliation that was based on information from the Boston Regional Intelligence Center (BRIC) gang database. The Court concluded that, to the extent the database contains opinions about which individuals are gang members, these are hearsay and are not independently admissible. Currently, the Massachusetts ACLU is suing the Boston Police Department to gain access to the Department's Gang Assessment Database, run by the Boston Regional Intelligence Center over concerns regarding how that information is being used in immigration court proceedings.[38] Immigration adjudicators have been relying on information from the database in immigration proceedings to make determinations about gang affiliation. The records request that led to the lawsuit demonstrated that the database primarily includes men of color and that youth are being labeled as gang members simply by the people they are seen with and the clothing they wear.[39] Gang databases are not isolated to Boston. Los Angeles and Chicago have also come under fire for racial profiling and the amount of unreliable information contained in gang databases.[40]

The Department asked for comments on what should be a "sufficient link" between a conviction and the gang related activity. A gang related bar should not be introduced at all due to complexity of the issue and frequency which individuals are mislabeled as being a part of a gang. The risk of erroneously barring legitimate asylum seekers from eligibility is too high.

5. **The proposed bar for domestic assault or battery, stalking, or child abuse is overly broad and will negatively impact victims of domestic and intimate partner violence.**

The proposed bar for domestic assault or battery, stalking, or child abuse would render individuals convicted of offenses *involving conduct amounting to* domestic assault or battery, stalking, or child abuse in the domestic context ineligible for asylum. Additionally, the rule proposes to bar individuals from asylum who have "engaged in acts" of battery and extreme cruelty in a domestic context "regardless of whether such conduct resulted in a criminal conviction." The proposed rule is overbroad, vague, and will require immigration officials and immigration judges to become experts in the domestic criminal laws of every jurisdiction in the

---

[38] *See* "ACLU Demands Records on Boston's 'Gang Database' Used in Deportations," November 15, 2018, available at https://www.aclum.org/en/news/aclu-demands-records-bostons-gang-database-used-deportations
[39] WBUR News, "Here's What We Know About Boston Police's Gang Database", (July 26, 2019) available at https://www.wbur.org/news/2019/07/26/boston-police-gang-database-immigration
[40] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ctmet-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

AR.09923

U.S. The rule on its face is ambiguous and vague as it directs immigration officials and judges to evaluate whether conduct "amounts to" domestic assault or battery, stalking, or child abuse or whether an individual has "engaged in such acts" regardless of whether or not there is a conviction, regardless of whether or not the charged crime is a felony or misdemeanor, and regardless of what the actual criminal charges alleged. The language necessarily requires adjudicators to look beyond the criminal record and examine the acts of the underlying alleged crime and make the adjudicator a fact finder to try to determine whether or not the individual is barred from asylum eligibility.

First of all, this will severely impact judicial efficiency, as adjudicators will be required to undertake time consuming investigations to determine whether the new criminal bars apply. Certain proposed bars, such as the bar on domestic violence and child abuse related crimes, will be particularly time intensive as the standard is not well-defined and requires an examination not only of the criminal record, but of the underlying "acts" or "conduct," and of the relationships between the alleged victims and perpetrators to determine whether a "domestic context" exists. The proposed standard is very problematic as there is no guidance provided as to how adjudicators will determine whether the conduct or underlying relationships meet the unclear requirements. This standard also raises serious due process concerns, as the evidentiary standards in immigration court are significantly less robust than in a criminal proceeding. The administration claims that the proposed rule will *increase* efficiency, but requiring adjudicators to undertake intensive fact investigation will inevitably lead to longer hearings, further delaying a system that the administration claims is already overburdened.

The proposed rule will lead to dramatically different outcomes for individuals based on the assessment of their conduct by adjudicators who unlikely to be properly equipped to undertake this type of criminal investigation. As the agencies note, many of these offenses are already considered under the aggravated felony bar and the particularly serious crime bars for asylum, yet the administration takes issue with the categorical approach for evaluating the criminal offenses. The approach proposed in the rule contradicts Supreme Court precedent, which has long found against a "post hoc investigation into the facts of predicate offenses," as the administration proposes in this regulation.[41] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court. As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact." In Moncrieffe v. Holder, the Court forewarned of exactly the sort of harm that would arise from proposed rules such as this one, and the Court rejected the government's proposal that immigration adjudicators determine the nature

---

[41] *See Mathis v. United States*, 136 S.Ct. 2243 (2016); *Descamps v. United States*, 570 U.S. 254 (2013); *Moncrieffe v. Holder*, 569 U.S. 184 (2013)

AR.09924

and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.

Finally, the exception that the proposed rule provides for individuals who have been battered or subjected to extreme cruelty is insufficient, vague, and places a high burden on victims. The rule purports to except from the bar "aliens who have been battered or subjected to extreme cruelty and who were not the primary perpetrators of violence in their relationships." However, it fails to provide any guidance on how one would demonstrate that the exception applies, whether an individual would need to affirmatively raise this defense, or what type of evidence may be considered. The plain language of the exception is problematic since there is no clear definition of whether a person is a "primary perpetrator" of violence in their relationship. The lack of standard places a high burden on victims to prove their victimhood and also to demonstrate that they were not the "primary perpetrator" of violence in their relationship. The proposed rule fails to account for the complexities of domestic violence in relationships and may require individuals to provide evidence that may be impossible (or unsafe) for them to obtain. What standard do the agencies intend to apply to determine whether or not someone has been battered or subjected to extreme cruelty? What type of evidence will individuals be required to produce? Statistics demonstrate that many individuals, particularly females, who have been incarcerated, have suffered past abuse, and that the links between incarceration or criminal activity and abuse are very strong. However, the exception proposed by the agencies fails to encompass the complexities of the relationship between abuse and criminal activity. A 2016 study by the Vera Institute found that 86% of women in jail are survivors of sexual violence and 77% are survivors of intimate partner violence.[42] Other studies have shown that the criminal justice system insufficiently accounts for the impacts of intimate partner and sexual violence on criminal activity, an issue that will be further exacerbated by the proposed rule.[43]

### 6. The proposed bars for certain misdemeanors is overly broad, penalizes conduct that is not related to public safety, and fails to provide exceptions for violations that arise directly as a result of the harm asylum seekers have fled.

The rule also proposes to make certain offenses a bar to asylum eligibility including the use of fraudulent documents and the receipt of public benefits under false pretenses, even if such

---

[42] Vera Institute, Elizabeth Swavola, Kristine Riley, and Ram Subramanian, "Overlooked: Women and Jails in an Era of Reform," 2016, available at https://www.vera.org/downloads/publications/overlooked-women-and-jails-report-updated.pdf.

[43] *See* The Atlantic, Victoria Law, "When Abuse Victims Commit Crimes," (May 21, 2019), available at https://www.theatlantic.com/politics/archive/2019/05/new-york-domestic-violence-sentencing/589507/; The Highlight by Vox, Char Adams, "These women survived abuse and assault. Now they're behind bars. Should they be?" (Aug. 30, 2019), available at https://www.vox.com/the-highlight/2019/8/23/20828367/cyntoia-brown-sexual-domestic-abuse-prison-pipeline.

AR.09925

offenses are misdemeanors. The proposed bars for document and benefits offenses fail to recognize the vulnerable situation of asylum seekers and provide insufficient or no exceptions for individuals that may have unknowingly engaged in such conduct or needed to engage in such conduct to escape persecution and seek protection. The bars are overbroad and fail to provide necessary exceptions accounting for the life circumstances of asylum seekers.

First of all, the bar for document fraud includes a narrow exception for individuals who utilized fraudulent identification documents to enter the United States *and* claim a fear of persecution "without delay upon presenting himself or herself to an immigration officer upon arrival." This standard is unrealistic and fails to account for the distrust that many asylum seekers have of government officials upon arrival to the United States and the trauma that many of them have experienced. The proposed exception clearly recognizes that asylum seekers may be forced, due to the circumstances of their persecution, to undertake document fraud to escape persecution and seek protection. However, the exception is overly narrow and unclear as it requires expedient presentation to government officials, without defining the time period or recognizing the realities asylum seekers face. Many asylums seekers are fleeing harm perpetrated by government actors or by actors closely protected or associated with their governments. The distrust of government institutions and particularly of law enforcement entities is very common, and the current administration has also created an environment and rhetoric that could be characterized as hostile towards asylum seekers.[44] These factors would easily lead many asylum seekers to delay in making their claims for protection to government officials as they cope with their distrust, trauma, and learn the legal rights that they may have in the United States – cutting them off from critical protection that should account for these difficulties rather than punish them for their victimization. The document fraud bar is extremely overbroad and will foreclose eligibility for many qualified asylum seekers.

The administration further makes unsubstantiated claims regarding document fraud that is wholly unsupported. The agencies claim that "fraudulent document offenses pose such a significant affront to government integrity that even misdemeanor fraudulent document offenses should disqualify aliens from eligibility for asylum." Yet, the agencies have provided no evidence to support this claim and once again fail to recognize the uniquely difficult circumstances of asylum seekers, who often flee their countries to escape exigent danger leaving behind all identity and other documentation. The current bars to asylum are more closely linked to issues of public safety and danger, as well as some procedural measures meant to combat alleged fraud in the asylum system. However, the new proposed bars for benefits and document fraud go far beyond the scope of past practice without a demonstrated reasonable basis.

---

[44] Melissa Carlson, Laura Jakli, and Katerina Linos, "Refugees Misdirected: How Information, Misinformation, and Rumors Shape Refugees' Access to Fundamental Rights," Va. J. Int'l. L. Vol 57:3 (2018), available at https://scholarship.law.berkeley.edu/cgi/viewcontent.cgi?article=4039&context=facpubs; Amnesty International, "USA: 'You Don't Have Any Rights Here,'" (2018), available at https://www.amnesty.org/download/Documents/AMR5191012018ENGLISH.PDF.

AR.09926

In relation to public benefits offenses, the agencies have greatly overstated the perceived problem and have provided no information or date to support their claims of the "inherently pernicious nature" of public benefits offenses. On the contrary, data demonstrates that the incidents of these types of fraud crimes are minimal, for example, the incidents of fraud in the Supplemental Nutrition Assistance Program (SNAP) is estimated at 1.5% for *all incidents of fraud*, including individuals of all citizenship categories and including both fraud committed by agencies, retailers/shops, and individuals. [45] The report further details that many incidents of overpayment of SNAP benefits are the result of error, either by the agency or individual, that do not entail any intentional fraud.[46] The proposed bar for benefits fraud is overbroad and could sweep up individuals who accidentally collected benefits they were not eligible for. The provision of government benefits is extremely complex, for example, the oversight of SNAP is conducted by 53 different government agencies.[47] The sheer complexity could easily result in misdemeanor convictions of individuals who unintentionally enrolled in benefits they were not eligible for. Add another layer of complexity to account for the prevalence of mixed-status households and for the intervention of social service agencies and social workers in enrolling individuals into benefit programs, and individuals could easily unintentionally receive benefits. The definition that the agencies utilize leaves too much room for unintentional behavior since it defines the bar to include individuals who have been convicted of crimes relating to "unlawful receipt of benefits," but there is no provision that the unlawful receipt be connected to fraud or require intentionality.

### 7.  The proposed rule provisions regarding the effect of post-conviction relief violates due process and fails to give full faith and credit to state courts.

The agencies propose to limit the recognition of modified or vacated criminal charges, which unfairly penalizes asylum seekers. The proposed rule creates many additional factors that an asylum seeker must demonstrate in order for their criminal modification or vacatur to be recognized, which violates due process. Additionally, the proposed rule would create a rebuttable presumption that any modification entered after initiation of removal proceedings or more than one year from the date of conviction or sentencing is not effective for immigration purposes.

The agencies suggest that the timing of initiating post-conviction relief is an indicator of the purpose behind the modification; however, this reasoning fails to consider that many individuals are unaware of the immigration consequences of their criminal proceedings until removal proceedings have commenced. The Supreme Court in *Padilla v. Kentucky*, 559 U.S. 356 (2010), explicitly recognized the substantive constitutional deficiencies of many criminal proceedings and many individuals pursued post-conviction relief, well outside one year of their original conviction, based upon this precedent. For example, in Massachusetts many cases of post-

---

[45] Congressional Research Service, Randy Alison Aussenberg, "Errors and Fraud in the Supplemental Nutrition Assistance Program (SNAP)," September 28, 2018, available at https://fas.org/sgp/crs/misc/R45147.pdf.
[46] *Id*.
[47] *Id*.

AR.09927

conviction relief are based on the failure of defense counsel to provide the constitutionally required advice regarding the immigration, pursuant to *Padilla v. Kentucky*, and *Commonwealth v. Clarke*, 460 Mass. 30 (2011), or the failure of the state court judge to provide the immigration warnings, as required by M.G.L. c. 278, § 29D. Though vacaturs upon these bases may appear to be related to immigration consequences, they are based upon substantive constitutional defects, and therefore should be considered effective modifications or vacaturs for immigration purposes. Imposing a presumption against the validity of a plea withdrawal or vacatur will inevitably result in many immigrants wrongly being denied asylum eligibility because they were unable to rebut the presumption. The proposed bar is unjust and violates due process.

Additionally, the proposed rule would allow adjudicators to explicitly look beyond the face of the criminal court orders to determine whether it will be effective for immigration purposes, "notwithstanding the putative basis of the order on its face." This is a clear violation of the full faith and credit due to state court judges and courts, and also makes immigration adjudicators act as fact finders that must go behind the clear record from the state court to make a determination of the "true" purpose of the modification, clarification, or vacatur. As other parts of this proposed rule, this would create mini-trials within the immigration court proceedings to review the basis of a vacated or modified conviction, a task that would further burden the court system.

**Conclusion**

We strongly oppose the proposed rule regarding "Procedures for Asylum and Bars to Asylum Eligibility." The rule dramatically expands the bars to asylum eligibility in violation of international law and norms and our obligations under the 1967 Protocol Relating to the Status of Refugees. The proposed rule creates bars for minimal criminal activity that have little to no connection to public safety or that may be directly connected to the impacts of persecution. The proposed rule fails to protect victims of human trafficking and domestic violence in the broad and indiscriminate construction of the bars. The rule further undermines state court authority, by instructing immigration officials to "look behind" the findings and orders of state court judges, in violation of the full faith and credit owed to state courts. The rule will also create many different mini-trials within immigration proceedings to adjudicate the various bars, which have unclear and undefined standards, which will undoubtedly result in longer proceedings, larger court backlogs, and more appeals. The agencies have failed to provide sufficient reason for the expansion of the asylum bars, and claim that the continued availability of protection under the Convention Against Torture and withholding of removal affords them nearly limitless abilities to restrict asylum eligibility. However, the proposed rule clearly frustrates the fundamental purpose of asylum protection.

We request that the agencies and any other reviewing agency consider the contents of our citations (including any articles that are linked to in our footnotes) together with our comments. For all these reasons, we urge DHS and DOJ not to implement the proposed changes to asylum procedures and eligibility.

AR.09928

Sincerely yours,

Emily Leung, Supervising Attorney, Immigration Unit
The Justice Center of Southeast Massachusetts, LLC
Subsidiary of South Coastal Counties Legal Services, Inc.
62 Main Street, Suite 302, Brockton, MA 02301-4040
Direct Line: (508) 638-0153

Jill O'Bryan, AmeriCorps Legal Advocates of Massachusetts
Justice Center of Southeast Massachusetts, LLC
Subsidiary of South Coastal Counties Legal Services, Inc.
62 Main Street, Suite 302, Brockton, MA 02301-4040
Direct Line: 508-586-0570

AR.09929

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekn-652e
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0494
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Camilla Walter

## General Comment

To Whom it may concern,
I am writing to share that I oppose this rule change, and am very concerned. We must remain welcome as a noation to people fleeing vioelence, and immigrants are a valued and welcome part of my community. I worry that racial profiling would increase for people seeking asylum in our country, and punish individuals who have already been detained and served time.
Please withdraw this proposed change, for the sake of American neighborhoods like mine.
Thank you,
Camilla

AR.09930

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-z650
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0495
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

Jan. 21, 2020

To Whom it May Concern:

I am writing in response to the above-referenced Proposed Rules to express my strong opposition to the Proposed
Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19,
2019.

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are
coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer.
They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from
Central America and the Global South, and those routinely criminalized because of their identities, racially

AR.09931

disparate policing practices, or in connection with experiences of trafficking and domestic violence. For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community. Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence. These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.

Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution. The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States. The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States. The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents already prosecuted from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only humantaking all necessary steps to protect their children.

Many of the people in my church with children would no longer be able to seek asylum under these proposed rules.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.


Sincerely,
Elsa Kunz

_____

AR.09932

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-uo2l
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0496
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Else Drooff
**Address:**
    PO Box 8009
    Santa Fe,  NM,  87504
**Email:** info@santafedreamersproject.org
**Phone:** 505-490-2789
**Organization:** Santa Fe Dreamers Project

---

## General Comment

To Whom it May Concern:

Santa Fe Dreamers Project is writing in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Santa Fe Dreamers Project provides legal representation to hundreds of asylum-seekers in West Texas and New Mexico under the jurisdiction of the El Paso Immigration Court.Through our work, we regularly encounter clients with strong merits to their asylum claims for whom phony criminal charges are one of the ways in which they were persecuted in their countries of origin due to being a minority race, religion or particular social group such as LGBTQ. We also have represented many who have faced the ultimate decision on behalf of their children and family members - to flee their countries and come to the U.S. without prior authorization due to persecution, or the possibility of death and torture in their home countries. Many of these clients have prevailed in their asylum claims and gone on to be contributing members of our society in the U.S. with good character and no further criminal issues. We oppose the expansion of criminal bars outlined by the Proposed Rules because they unnecessarily and cruelly exclude bona fide refugees from asylum eligibility. We believe that bars to asylum based on offenses related to harboring, smuggling of non-citizens by parents and family members and those previously removed further criminalize vulnerable populations fleeing persecution.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution.

AR.09933

This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States. For instance, a mother from Michoacan, Mexico fled to the United States with her young daughter due to ongoing persecution and extortion by the local police based on her family's well-known access to wealth. After surviving a kidnapping and receiving death threats toward her daughter's life, the mother decided to seek refuge in the United States to protect her daughter from danger she perceived in Mexico. Although she entered without inspection with her minor daughter, the client was ultimately granted asylum and her daughter derivative status based on the discretion of the Immigration Judge. However, because she was criminally prosecuted and convicted of unlawful entry, under the new Proposed Rules she would be ineligible for asylum. As stated in the Proposed Rules, "Even first-time alien smuggling offenses involving immediate family members display a serious disregard for U.S. immigration law and pose a potential hazard to smuggled family members, which often include a vulnerable child or spouse." Yet, in accordance with international asylum law, the mother appropriately sought asylum and did what she thought was best to keep her daughter out of harm's way. To deny her the ability to apply for asylum in the United States demonstrates a 'serious disregard' for the intensely vulnerable and precarious situations that many Mexican and Central American families find themselves in due to state-sponsored, or at the very least state-condoned violence. In fact, the Proposed Rules pose a real 'hazard' to credible asylum-seekers that have no other option than to cross the border in search of safety.

The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents already prosecuted from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only humantaking all necessary steps to protect their children. Based on firsthand experience providing legal representation to family members impacted by family separation in the summer of 2018, SFDP Legal Director Emma O'Sullivan distinctly remembers that asylum-seekers were assured by U.S. immigration officials that their asylum cases would not be damaged if they plead guilty to smuggling or harboring offenses. So, for those asylum seekers that are still waiting for their cases to be processed nearly two years later, the Proposed Rules signify not only a broken promise, but a flagrant disregard for human decency.

Therefore, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

# Attachments

SFDP_Comment_OpposeBanExpansion

*Submitted via* https://www.regulations.gov/document?D=EOIR-2019-0005-0001

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 21, 2020

To Whom it May Concern:

Santa Fe Dreamers Project is writing in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Santa Fe Dreamers Project provides legal representation to hundreds of asylum-seekers in West Texas and New Mexico under the jurisdiction of the El Paso Immigration Court.Through our work, we regularly encounter clients with strong merits to their asylum claims for whom phony criminal charges are one of the ways in which they were persecuted in their countries of origin due to being a minority race, religion or particular social group such as LGBTQ. We also have represented many who have faced the ultimate decision on behalf of their children and family members - to flee their countries and come to the U.S. without prior authorization due to persecution, or the possibility of death and torture in their home countries. Many of these clients have prevailed in their asylum claims and gone on to be contributing members of our society in the U.S. with good character and no further criminal issues. We oppose the expansion of criminal bars outlined by the Proposed Rules because they unnecessarily and cruelly exclude bona fide refugees from asylum eligibility. We believe that bars to asylum based on offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalize vulnerable populations fleeing persecution.

AR.09935

Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer. The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[1] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[2] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[3] For instance, a mother from Michoacan, Mexico fled to the United States with her young daughter due to ongoing persecution and extortion by the local police based on her family's well-known access to wealth. After surviving a kidnapping and receiving death threats toward her daughter's life, the mother decided to seek refuge in the United States to protect her daughter from danger she perceived in Mexico. Although she entered without inspection with her minor daughter, the client was ultimately granted asylum and her daughter derivative status based on the discretion of the Immigration Judge. However, because she was criminally prosecuted and convicted of unlawful entry, under the new Proposed Rules she would be ineligible for asylum. As stated in the Proposed Rules, "Even first-time alien smuggling offenses involving immediate family members display a serious disregard for U.S. immigration law and pose a potential hazard to smuggled family members, which often include a vulnerable child or spouse." Yet, in accordance with international asylum law, the mother appropriately sought asylum and did what she thought was best to keep her daughter out of harm's way. To deny her the ability to apply for asylum in the United States demonstrates a 'serious disregard' for the intensely vulnerable and precarious situations that many Mexican and Central American families

---

[1] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[2] *Id*.; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[3] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

AR.09936

find themselves in due to state-sponsored, or at the very least state-condoned violence. In fact, the Proposed Rules pose a *real* 'hazard' to credible asylum-seekers that have no other option than to cross the border in search of safety.

The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children. Based on firsthand experience providing legal representation to family members impacted by family separation in the summer of 2018, SFDP Legal Director Emma O'Sullivan distinctly remembers that asylum-seekers were assured by U.S. immigration officials that their asylum cases would *not* be damaged if they plead guilty to smuggling or harboring offenses. So, for those asylum seekers that are still waiting for their cases to be processed nearly two years later, the Proposed Rules signify not only a broken promise, but a flagrant disregard for human decency.

Additionally, the Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[4] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[5] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[6] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

---

[4] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[5] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[6] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

AR.09937

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[7] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

In sum, the Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[8] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[9] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[10]

For the reasons detailed above, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to

---

[7] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[8] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[9] 8 U.S.C. § 1159(c) (2012).

[10] 8 C.F.R. § 208.24(a) (2012).

AR.09938

ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact us at info@santafedreamersproject.org or 505-490-2789.

Sincerely,

Else Drooff on behalf of the Santa Fe Dreamers Project
PO Box 8009
Santa Fe, NM 87504

AR.09939

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-uwbg
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0497
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Kate Jastram
**Organization:** Center for Gender & Refugee Studies

## General Comment

See attached file(s)

## Attachments

CGRS Asylum Bars FINAL 2020.1.21

AR.09940

CENTER FOR

# Gender & Refugee
STUDIES

*Protecting Refugees • Advancing Human Rights*

January 21, 2020
Via Federal e-Rulemaking Portal
http://www.regulations.gov

Lauren Alder Reid
Assistant Director, Office of Policy
Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn
Chief, Division of Humanitarian Affairs
Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re:      Request for Comments on *Procedures for Asylum and Bars to Asylum Eligibility* (December 19,
2019) EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41

Dear Ms. Reid and Ms. Dunn,

The Center for Gender & Refugee Studies (CGRS) writes in response to EOIR Docket No. 18-0002, A.G.
Order No. 4592-2019; RIN 1125-AA87, 1615-AC41, the Executive Office for Immigration Review (EOIR)
and U.S. Citizenship and Immigration Services (USCIS) Request for Comments on *Procedures for Asylum
and Bars to Asylum Eligibility* (December 19, 2019) (hereinafter, the Rule).

CGRS was founded in 1999 by Karen Musalo following her groundbreaking legal victory in *Matter of
Kasinga[1]* to meet the needs of asylum seekers fleeing gender-based violence. CGRS protects the
fundamental human rights of refugee women, children, LGBTQ individuals, and others who flee
persecution and torture in their home countries. CGRS is an internationally respected resource for
gender asylum, renowned for our knowledge of the law and ability to combine sophisticated legal
strategies with policy advocacy and human rights interventions. We take the lead on emerging issues,
participate as counsel or *amicus curiae* in impact litigation to advance the rights of asylum seekers,[2]
produce an extensive library of litigation support materials, maintain an unsurpassed database of
asylum records and decisions, and work in coalitions with immigrant, refugee, LGBTQ, children's, and

---

[1] 21 I&N Dec. 357 (BIA 1996).
[2] *See, e.g., Innovation Law Lab v. McAleenan,* 924 F.3d 503 (9th Cir. 2019); No.3:19-cv-00807-RS (D.N.Cal.)
(pending); *Damus v. McAleenan*;  No. 1:18-cv-00578-JEB (D.D.C.) (pending); *see also Damus v. Nielsen*, No. 18-578,
313 F.Supp.3d 317 (D.D.C. Jul. 2, 2018); *Grace v. Barr,* 344 F.Supp.3d 96 (D.D.C. Dec. 18, 2018), *appeal docketed*,
No. 195013 (D.C.Cir. Jan. 30, 2019)); and *Matter of A-B,* 27 I&N Dec. 316 (A.G. 2018).

women's rights networks. Since our founding, we have also engaged in international human rights work to address the underlying causes of forced migration that produce refugees—namely, violence and persecution committed with impunity when governments fail to protect their citizens.

As a critical part of our mission, CGRS serves as a resource to decision makers to promote laws and public policies that recognize the legitimate asylum claims of those fleeing persecution, with a special focus on women, children and LGBTQ refugees. Our goal is to create a U.S. framework of law and policy that responds to the rights of these groups and aligns with international law.

For the reasons set forth below, CGRS urges EOIR and USCIS to refrain from adding additional criminal bars to asylum eligibility. It is our expert opinion that these proposed changes are inconsistent with our treaty obligations and will be particularly harmful for women and LGBTQ people seeking asylum in the United States.[3]

**Outline of Comments**

**I. THE PROPOSED CRIMINAL BAR FOR REENTRY WITHOUT INSPECTION VIOLATES THE REFUGEE CONVENTION AND PROTOCOL**
   **A. The Rule Violates Article 31 of the Refugee Convention**
   **B. The Rule is Inconsistent with Article 33 of the Refugee Convention**
   **C. The Rule Incorrectly Relies on Article 34 of the Refugee Convention**
   **D. The Rule is Contrary to U.S. Law in Denying the Right to Seek Asylum Because of Reentry Between Official Ports of Entry**

**II. THE PROPOSED CRIMINAL BAR RELATED TO PERPETRATORS OF DOMESTIC VIOLENCE VIOLATES THE REFUGEE CONVENTION AND PROTOCOL AND POSES A RISK TO SURVIVORS OF SUCH VIOLENCE**
   **A. The Rule Puts Survivors of Domestic Violence at Risk**
   **B. The Rule is Inconsistent with Article 33 of the Refugee Convention**

**III. THE REMAINING PROPOSED CRIMINAL BARS TO ASYLUM ARE ALSO OVERBROAD IN VIOLATION OF THE REFUGEE CONVENTION AND PROTOCOL**
   **A. The Proposed Categories of Crimes are Unreasonably Broad and Will Exclude From Refugee Protection, in Violation of International Law, Asylum Seekers Who Did Not Commit Particularly Serious Crimes**
   **B. The Rule's Categorical Approach Precludes the Use of a Balancing Test as Envisioned by the Refugee Convention in Order to Weigh Any Criminal Behavior Against the Fear of Harm Faced by an Asylum Seeker, as well as to Consider the Full Context of the Crime**

---

[3] CGRS has limited our comments to the proposed additional bars to asylum eligibility for certain criminal convictions. This should not be construed as CGRS's acceptance of the second section of the Rule providing a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility or the third section which proposes to rescind a provision in the current regulations regarding the reconsideration of discretionary asylum.

AR.09942

## COMMENTS

CGRS is of the view that all seven of the new categorical grounds of ineligibility based on crimes violate our obligations under international law. We are particularly concerned about the bar for reentry without inspection, and the bar based on committing domestic violence, and begin our comments with an analysis of those elements of the Rule.

## I. THE PROPOSED CRIMINAL BAR FOR REENTRY WITHOUT INSPECTION VIOLATES THE REFUGEE CONVENTION AND PROTOCOL

The Rule will bar asylum seekers from receiving asylum if they were convicted of illegal re-entry after previous deportation pursuant to 8 U.S.C. § 1326, without exception. Rule at 69648. The Administration justifies this proposed bar based on an erroneous interpretation of Article 34 of the 1951 Convention Relating to the Status of Refugees and without mention of U.S. obligations under Articles 31 and 32 of the Refugee Convention. In addition, the government wrongly asserts that entering without inspection reflects a disregard of U.S. immigration laws justifying a bar to asylum and reinforces this assertion by stating that asylum seekers could present themselves at a port of entry. Rule at 69648.

### A. The Rule Violates Article 31 of the Refugee Convention

The Rule fails to address U.S. obligations under Article 31 of the Refugee Convention. This Article, which is binding on the U.S. through our ratification of the 1967 Protocol Relating to the Status of Refugees, specifically prohibits States from imposing penalties on refugees on account of their illegal entry or presence.[4] This prohibition does not include an exception for those who have been previously removed from a territory. Moreover, the United States, as a member of the United Nations High Commissioner for Refugees (UNHCR)'s Executive Committee, has joined an international consensus in agreeing that even in situations of large-scale influx, asylum seekers "should not be penalized or exposed to any unfavorable treatment solely on the ground that their presence in the country is considered unlawful."[5] Barring an asylum seeker from applying for asylum based solely on her reentry without inspection would be such a penalty. Accordingly, if implemented, this rule would be in direct violation of U.S. obligations under Article 31 of the Refugee Convention.

---

[4] 1951 Convention relating to the Status of Refugees, Art. 31(1). https://www.ohchr.org/EN/ProfessionalInterest/Pages/StatusOfRefugees.aspx. *See also Introductory note* by the Office of the United Nations High Commissioner for Refugees (UNHCR) to the Text of the 1951 Convention Relating to the Status of Refugees Text of the 1967 Protocol Relating to the Status of Refugees Resolution 2198 (XXI) adopted by the United Nations General Assembly, available at https://www.unhcr.org/en-us/protection/basic/3b66c2aa10/convention-protocol-relating-status-refugees.html.

[5] Protection of Asylum-Seekers in Situations of Large-Scale Influx, No. 22 (XXXII) II.B.2(a) - 1981 Executive Committee 32nd session. Contained in United Nations General Assembly Document No. 12A (A/36/12/Add.1). Conclusion endorsed by the Executive Committee of the High Commissioner's Programme upon the recommendation of the Sub-Committee of the Whole on International Protection of Refugees. https://www.unhcr.org/en-us/excom/exconc/3ae68c6e10/protection-asylum-seekers-situations-large-scale-influx.html.

AR.09943

**B. The Rule is Inconsistent with Article 33 of the Refugee Convention**

The Refugee Convention does not require States to provide asylum to those who, having been convicted by a final judgment of a particularly serious crime, constitute a danger to the community of the asylum State. This limitation on the principle of *non-refoulement* is found in Article 33(2) of the Refugee Convention. However, under no reasonable interpretation of either criminal law or asylum law can the crime of reentry without inspection be considered a particularly serious crime.

Article 33(2) is intended for extreme cases. UNHCR has advised that a particularly serious crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[6]

Leading scholars support this interpretation, explaining that:

> The text of Article 33(2) makes it clear that it is only convictions for crimes of a particularly serious nature that will come within the purview of the exception. This double qualification – *particularly* and *serious* – is consistent with the restrictive scope of the exception and emphasizes that *refoulement* may be contemplated pursuant to this provision only in the most exceptional of circumstances. Commentators have suggested that the kinds of crimes that will come within the purview of the exception will include crimes such as murder, rape, armed robbery, arson, etc.[7]

Moreover, UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[8]

Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors. Again, leading experts are in agreement.

> In our view, and as a matter of international law, the interpretation and application of this concept in the context of an exception to *non-refoulement* ought necessarily to involve an assessment of all the circumstances, including the nature of the offense, the background to its commission, the behaviour of the individual, and the actual terms of any sentence imposed. … *[A] priori* determinations of seriousness by way of legislative labelling or other measures substituting executive determinations for judicial (and judicious) assessments are inconsistent with the *international* standard which is required to be applied, and with the humanitarian intent of the Convention.[9]

---

[6] UNHCR, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[7] Sir Elihu Lauterpacht and Daniel Bethlehem, *The Scope and Content of the Principle of Non-Refoulement: Opinion*, in REFUGEE PROTECTION IN INTERNATIONAL LAW: UNHCR'S GLOBAL CONSULTATIONS ON INTERNATIONAL PROTECTION (edited by Erika Feller, Volker Türk and Frances Nicholson, Cambridge University Press, 2003) (emphases in original).

[8] UNHCR, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 10 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[9] Guy S. Goodwin-Gill and Jane McAdam, *THE REFUGEE IN INTERNATIONAL LAW*, 3rd ed. (Oxford University Press, 2007), pp. 239-240 (emphasis in original).

AR.09944

### C. The Rule Incorrectly Relies on Article 34 of the Refugee Convention

With regard to U.S. obligations under the Refugee Convention, the Rule states that if the asylum seeker's grounds for persecution arose after the initial removal and subsequent reentry without inspection, the asylum seeker could still seek other forms of protection such as that found under the Convention Against Torture. Rule at 69649. The government asserts that the Rule is therefore consistent with U.S. obligations under the Refugee Convention, including its obligation of *non-refoulement*. Its reasoning is based on the implementation of Article 34 which the government notes concerns "assimilation of refugees, which is precatory and not mandatory." Rule at 69649.

Article 34 of the Refugee Convention is titled "Naturalization" and states:

> The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees. They shall in particular make every effort to expedite naturalization proceedings and to reduce as far as possible the charges and costs of such proceedings.[10]

While the Administration is correct that the language of Article 34 is not mandatory in that it requires States only to make every effort to naturalize refugees, it is simply not applicable to an asylum seeker's access to the asylum system. It is completely inapposite to suggest that Article 34 supports the Rule in making a person ineligible for asylum due to reentry without inspection. Although under U.S. law the granting of asylum is a discretionary act, it does not therefore follow that any and every whim of the government in creating grounds of ineligibility is consistent with our treaty obligations.

The intent of Congress in enacting the Refugee Act of 1980 was to bring the U.S into alignment with international law, specifically the Refugee Convention and Protocol. The intent of this Rule is to minimize the number of people who may be granted asylum by creating unwarranted and overly expansive grounds of ineligibility far beyond the structure set forth in the Convention. The Rule is a bad faith interpretation of our treaty obligations and the will of Congress. Accordingly, the government's conclusion that because Article 34 does not require the United States to naturalize all refugees, the Rule comports with its obligations under the Refugee Convention and Protocol is simply incorrect.

### D. The Rule is Contrary to U.S. Law in Denying the Right to Seek Asylum Because of Reentry Between Official Ports of Entry

In addition to violating international law as described above, the government's bar of asylum for reentering without inspection is contrary to U.S. law given the provisions that Congress has specifically enacted for those seeking asylum. The Rule states with reference to reentering without inspection that it "reflects a willingness to repeatedly disregard the immigration laws despite alternative means of presenting a claim of persecution." The justification continues that an asylum seeker "seeking protection, even one who has previously been removed from the United States, may present himself or herself at a port of entry without illegally reentering the United States." Rule at 69648.

This argument is callously flawed. The government fully disregards that for those fleeing for their lives, reentering without inspection may be the only possible option, particularly given current U.S. violations of international and domestic law regarding access to territory. These include the practice of metering,

---

[10] https://www.unhcr.org/en-us/protection/basic/3b66c2aa10/convention-protocol-relating-status-refugees.html.

AR.09945

the Migrant Protection Protocols (MPP), the third country transit ban, and the asylum cooperative agreements established with Guatemala, Honduras and El Salvador.

This is particularly true for women and LGBTQ individuals approaching the U.S. border. Credible reports of rape, kidnappings and torture of those waiting in Mexico under the MPP highlight the need for many vulnerable individuals to find an immediate means to enter the U.S. in search of safety.[11] Given the extremely dangerous conditions and lack of social services including food, shelter, and medical care in northern Mexico, it is unreasonable to expect a woman or LGBTQ individual fleeing for their lives to wait for weeks or months in line to present themselves for entry.

Finally, it is unlawful to differentiate between asylum seekers who approach a port of entry and those who enter without inspection. In accordance with our international treaty obligations, Congress for almost 40 years has clearly supported the right to claim asylum *anywhere* on the U.S. border or at a land, sea or air port of entry. In the Refugee Act of 1980, Congress authorized asylum claims by any foreign national "physically present in the United States or **at a land border** or port of entry".[12] Later, Congress expressly reaffirmed the eligibility for asylum of "any" foreign national "who is physically present in the United States or who arrives in the United States (**whether or not at a designated port of arrival**)".[13] This inclusive provision reflected Congress's ongoing intent to comply with international law, as well as its recognition that allowing an applicant for refugee status to assert a claim for asylum at any point along a land border is a necessary component of essential refugee protections because asylum seekers often flee for their lives and cannot pick and choose where they will ask for protection.[14]

## II.   THE PROPOSED CRIMINAL BAR RELATED TO PERPETRATORS OF DOMESTIC VIOLENCE VIOLATES THE REFUGEE CONVENTION AND PROTOCOL AND POSES A RISK TO SURVIVORS OF SUCH VIOLENCE

The Rule will render asylum seekers convicted of conduct "amounting to domestic assault or battery, stalking, or child abuse in the domestic context ineligible for asylum, irrespective of whether those offenses qualify as felonies or misdemeanors." Rule at 69651. The Rule provides a limited exemption, discussed below. Rule at 69653.

### A.   The Rule Puts Survivors of Domestic Violence at Risk

As an organization with deep expertise in protecting asylum seekers fleeing gender-based violence, CGRS is especially concerned by this proposed new bar.

To begin with, the Rule may serve to empower abusers by giving them another means of controlling and punishing their victims. Of particular concern regarding this proposed bar is the phenomenon where abusers falsely accuse survivors of domestic violence as a means of terrorizing and controlling them. For example, in a case where CGRS assisted an asylum seeker, her abuser did precisely that.

---

[11] *See e.g.* Human Rights First: "Delivered to Danger: The Trump Administration Sending Asylum Seekers and Migrants to Danger," available at https://deliveredtodanger.org/**.**

[12] https://www.govinfo.gov/content/pkg/STATUTE-94/pdf/STATUTE-94-Pg102.pdf (emphasis added).

[13] https://casetext.com/statute/united-states-code/title-8-aliens-and-nationality/chapter-12-immigration-and-nationality/subchapter-ii-immigration/part-i-selection-system/section-1158-asylum (emphasis added).

[14] See https://www.humanrightsfirst.org/sites/default/files/US-Southern-Border-Fact-Sheet.pdf (providing a detailed explanation of why some asylum seekers cross the U.S. southern border between ports of entry).

AR.09946

Alejandra (a pseudonym) entered the United States after fleeing persecution she suffered in Mexico on account of her status as a transgender woman. After entering the U.S., Alejandra began a relationship with man who was a U.S. citizen. The man soon became verbally and physically abusive to Alejandra and often threatened to call immigration and have her deported. Alejandra feared contacting the police. When Alejandra finally gathered the strength to leave her partner, he wouldn't let her go and they began to argue. Her partner called the police, accused Alejandra of attacking him, and insisted that they arrest her. Alejandra was placed in the jail with the male population. She pleaded guilty to simple battery and completed probation. An immigration judge found that she was eligible for asylum and that based on her credible testimony about the facts and circumstances surrounding her arrest and conviction, she was deserving of asylum in the exercise of discretion.

Under the Rule, Alejandra would have been ineligible for asylum and would have faced the additional obstacle of showing that she qualified for the limited exemption provided.

Even if the abuser does not initiate a call to the police, as Alejandra's did, it is well-documented that there has been an increase in dual arrests, where responding officers will arrest both parties in a domestic incident.[15] Although many states require an officer to determine who is the primary aggressor, there are widespread variations in practice as to how this mandate is carried out.[16] Such variation does not provide a uniform basis for fulfilling our international obligations to protect refugees.

### B. The Rule is Inconsistent with Article 33 of the Refugee Convention

The domestic violence bar specifically includes misdemeanor offenses. This alone reveals that it is impermissibly broad and will violate international law by barring eligible asylum seekers who have been convicted of minor offenses that cannot reasonably be considered particularly serious crimes. Please see section I.B above for an explanation of the problem with the overly broad reach of all of the proposed new bars, including this one.

An additional problem is that this new ground of ineligibility – unlike the other six new grounds of ineligibility – also bars asylum seekers who engage in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction. Rule at 69651. Failing to require a criminal conviction leads the U.S. even further astray from our treaty obligations by dramatically expanding the potential for excluding people from being granted asylum. Nor is there any convincing explanation provided for why conduct that does not result in a conviction is included in the bar. The Rule states that not requiring a conviction "allow[s] the adjudicator to consider what conduct the [asylum seeker] engaged in to determine if the conduct amounts to a covered act of battery or extreme cruelty." Rule at 69652.

However, asylum officers in particular have neither the training nor the expertise in domestic violence law in the United States – particularly since the Rule references federal, state, tribal and local law – to make such a determination. This is why the Refugee Convention requires a conviction in order to consider exclusion from refugee status.

---

[15] Melissa E. Dichter (2013): "'They Arrested Me—And I Was the Victim': Women's Experiences With Getting Arrested in the Context of Domestic Violence," *Women & Criminal Justice*, 23:2, 81-98.
[16] David Hirschel, PhD, Philip D. McCormack, PhD, and Eve Buzawa, PhD, "A 10-Year Study of the Impact of Intimate Partner Violence Primary Aggressor Laws on Single and Dual Arrest," *Journal of Interpersonal Violence* 1-35 (2017).

AR.09947

Finally, the limited exemption proposed does not cure the defects of the bar. The Rule cross-references another, non-asylum, portion of the Immigration and Nationality Act, whose multiple elements would have to be met to fit within the exemption. The proposed bar is unlawful because a conviction is not required to trigger the bar. The limited exemption is insufficient and unworkable because the complex statutory scheme referenced in the Rule for determining if the exemption is available is completely outside the expertise of the Asylum Office. It is unrealistic in the extreme to expect – as the Rule asserts – that "[a]sylum officers or immigration judges could thus make factual determinations regarding whether an [asylum seeker] fit into this category, making the exception more administrable and uniform in the asylum context."

III.    **THE REMAINING PROPOSED CRIMINAL BARS TO ASYLUM ARE ALSO OVERBROAD IN VIOLATION OF THE REFUGEE CONVENTION AND PROTOCOL**

A.    **The Proposed Categories of Crimes are Unreasonably Broad and Will Exclude From Refugee Protection, in Violation of International Law, Asylum Seekers Who Did Not Commit Particularly Serious Crimes**

Each of the seven categories proposed by the Rule contains within it crimes that do not meet the criteria envisioned to be particularly serious crimes and will therefore exclude deserving asylum seekers from protection in violation of international law. This section discusses the remaining five proposed bars.

**The first new categorical bar,** "Aliens Convicted of a Felony Under Federal, State, Tribal or Local Law," will define a felony crime as "crimes designated as felonies by the relevant jurisdiction or crimes punishable by more than one year's imprisonment." Rule at 69645. The justification for this expansion is to systematize and streamline adjudicators' determinations of which convictions can bar asylum, as the current approach to the bar for aggravated felonies has resulted in inconsistent and time-consuming analyses.

However, this means that any crime punishable by over a year in prison will be deemed serious enough to bar a person from applying for asylum, even if it is a non-violent crime. For example, in Florida, if an asylum seeker stole $301 worth of groceries to feed her family, she could be charged with and convicted of a felony[17] and be rendered ineligible for asylum. If the government enacts its proposed restrictions on work authorization and imposes fees for asylum applications and work authorization, such survival crimes will likely increase.

**The second new categorical bar,** "Federal Convictions for Harboring Aliens" includes convictions for "smuggling or harboring" an individual under 8 U.S.C. § 1324(a). Although certain smuggling offenses already qualify as aggravated felonies that bar asylum seekers from receiving asylum, there is an exception for a first offense involving an immigrant's spouse, child or parent. Rule at 69647. The proposed rule changes this and would explicitly cover first time offenders, including those smuggling immediate family members. Rule at 69648. The stated rationale for this expansion is to preclude those who show a "serious disregard for U.S. immigration laws" from receiving asylum.

---

[17] https://www.miamiherald.com/news/politics-government/state-politics/article228723334.html

AR.09948

There is no consideration given for whether the act is predicated on bringing a family member to safety. Consider the case of a family separated by the Migrant Protection Protocols, where the father and son are now in the U.S. but the mother and daughter remain in danger in Mexico.[18]

> "Rosa" is a 23-year-old asylum seeker who fled Honduras with her husband, five-year-old daughter, Marisela, and seven-year-old son, Oscar, after receiving death threats due to Rosa's participation in the Partido Nacional de Honduras (National Party of Honduras), and the Honduran president's political campaign. In Mexico City, the family was kidnapped and extorted for money.
>
> Once the kidnappers released the family, they traveled to Juarez and crossed into the United States. CBP detained them under the International Bridge with thousands of other migrants. Rosa and their daughter Marisela were separated from Rosa's husband and their son Oscar when Marisela got very sick and went to the hospital. When Rosa and Marisela returned from the hospital, the other two were already released into the United States. Rosa and Marisela were returned to Mexico without ever being screened for fear of return there.
>
> Rosa was screened for fear of return to Mexico only following an initial court hearing in April 2019. She recounted the family's earlier kidnapping but was still returned to Juarez with Marisela. The shelter where they previously stayed was full, so they went to live in a crowded hotel room with a group of other mothers and young children.
>
> Rosa and Marisela were later kidnapped and held for ransom a second time, this time by a taxi driver and other armed men. Rosa knows they were targeted because they were migrants; the taxi driver told her that he knew she was not from Mexico and so she had to have family in the United States who could pay for her release. The kidnappers released Rosa and Marisela once Rosa's family paid a ransom. When Rosa tried to file a police report, the police told her "Nothing has happened, it was just a scare." Days later, a man armed with a knife tried to break into the hotel room they were sharing with other women and children. The women managed to block him by covering the door with furniture. They called the police but do not believe a report was filed.
>
> During her next hearing on May 17, 2019, Rosa recounted these two new instances to the immigration judge and later had a second fear screening. However, she was still returned to Mexico.

Under the Rule, if Rosa's husband tried to protect his wife and daughter and reunite their family by paying someone to help them enter the United States to escape the extreme danger they face in Mexico,[19] he would be barred from asylum protection. Yet such an action would not endanger the public and should not be considered a crime serious enough in nature to bar someone from asylum.

**The fourth new category,** "Federal, State, Tribal, or Local Convictions for Offenses Involving Criminal Street Gangs," proposes to bar from asylum all those who are convicted of a crime involving criminal

---

[18] https://www.splcenter.org/sites/default/files/documents/2019.06.26_-_049_-_brief_of_amicus_curiae_human_rights_first_iso_plfs-appellees.pdf

[19] *See e.g.* Human Rights First: "Delivered to Danger: The Trump Administration Sending Asylum Seekers and Migrants to Danger," available at https://deliveredtodanger.org/.

AR.09949

street gangs, regardless of whether that crime qualifies as a felony or as a misdemeanor. Rule at 69649. The fact that this category, even under U.S. law, includes misdemeanor offenses reflects that it is impermissibly broad and will violate international law by barring asylum seekers who have committed crimes which cannot be considered serious enough in nature to bar someone from asylum.

**The fifth new category**, "Convictions for Offenses Involving Driving While Intoxicated or Impaired," proposes to bar from asylum individuals who have been convicted of "certain offenses" involving driving while intoxicated or impaired. Rule at 69651. In describing which offenses would fall within this category, the government states "[e]ven if some of the proposed DUI-related bars could not be characterized as 'particularly serious crimes' for purposes of U.S. immigration law, the Attorney General and Secretary of Homeland Security could still legally bar asylum on this basis." Rule at 9651. The Rule justifies this by noting that courts have upheld discretionary denials of asylum for drunk driving convictions in cases where it was unclear if the conviction was for a crime that rose to the level of being particularly serious. This reasoning, however, ignores that creating blanket DUI-related bars takes away an adjudicator's opportunity to exercise discretion based on the facts before them. Thus, this overly broad category could violate international law if it impermissibly barred asylum seekers who have not committed a particularly serious crime.

**The seventh and final new categorical bar** is for "Convictions for Certain Misdemeanor Offenses." Misdemeanor is defined as "a lesser crime punishable by a fine and/or county jail time for up to one year."[20] Accordingly, this category, by definition, cannot contain offenses severe enough to be punished by death or considered "extremely grave" as intended under international refugee law. This category includes use of fraudulent documents, public benefits offenses and minor drug convictions. Rule at 69653. The Rule justifies disqualifying asylum seekers who have committed these misdemeanor offenses with the broad statement that "these offenses inherently undermine public safety or Government integrity." Rule at 69653. This disingenuous explanation does not reasonably justify categorizing these crimes as "particularly serious" – which even under U.S. law is the standard to bar asylum seekers from eligibility – given the consequences of such a designation.

If the government relies on these sweeping categories to bar asylum, it will be violating international law by impermissibly denying asylum to individuals who are eligible under international refugee law and should not be deemed ineligible for asylum based on a minor criminal conviction or behavior.

> **B. The Rule's Categorical Approach Precludes the Use Of a Balancing Test as Envisioned by the Refugee Convention in Order to Weigh Any Criminal Behavior Against the Fear of Harm Faced by an Asylum Seeker, As Well As to Consider the Full Context of the Crime**

The UNHCR *Handbook on Procedures and Criteria for Determining Refugee Status* provides that in determining whether to exclude an asylum seeker or refugee who has been convicted of a crime, the crime must be weighed against the severity of the harm feared by the asylum-seeker if deported.[21] According to the *Handbook*,

---

[20] https://dictionary.law.com/Default.aspx?selected=1259.
[21] UN High Commissioner for Refugees (UNHCR), *Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, December 2011, HCR/1P/4/ENG/REV. 3, available at: https://www.refworld.org/docid/4f33c8d92.html , para. 156.

AR.09950

In applying this exclusion clause, it is also necessary to strike a balance between the nature of the offence presumed to have been committed by the applicant and the degree of persecution feared. If a person has well-founded fear of very severe persecution, e.g. persecution endangering his life or freedom, a crime must be very grave in order to exclude him. If the persecution feared is less serious, it will be necessary to have regard to the nature of the crime or crimes presumed to have been committed in order to establish whether the applicant is not in reality a fugitive from justice or whether his criminal character does not outweigh his character as a bona fide refugee.[22]

Furthermore, the *Handbook* instructs that the adjudicator must include the nature of the crime as well as the circumstances of the crime and its punishment in his or her adjudication. According to the *Handbook*,[23]

In evaluating the nature of the crime presumed to have been committed, all the relevant factors – including any mitigating circumstances – must be taken into account. It is also necessary to have regard to any aggravating circumstances as, for example, the fact that the applicant may already have a criminal record.

However, the Rule does not provide an opportunity for such an analysis, and instead imposes a complete bar to asylum based on the seven categories of convictions, with one limited exception. By removing the opportunity for an asylum officer or immigration judge to undertake this balancing analysis, the government is violating its international obligations to allow the adjudicator to determine whether the asylum seeker's character as an asylum seeker outweighs his or her criminal character.

In conclusion, the Rule's seven proposed bars will violate U.S. international obligations, flout Congressional intent, result in unnecessary suffering, and increase the vulnerability of an already traumatized population. We call upon USCIS and EOIR to refrain from implementing the proposed Rule and instead work to make criminal bars to asylum consistent with international law.

Thank you for the opportunity to submit comments on the Rule.

Sincerely,

*Kate Jastram*

Kate Jastram
Director of Policy & Advocacy
Center for Gender & Refugee Studies
jastramkate@uchastings.edu

---

[22] *Id.*
[23] *Handbook,* para. 157.

AR.09951

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-e5to
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0498
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Julia Wilson
**Organization:** OneJustice

## General Comment

OneJustice submits the attached public comment in opposition to the proposed rule on Procedures for Asylum and Bars to Asylum Eligibility.

## Attachments

OneJustice Comment Draft on Asylum Eligibility Rule

AR.09952

January 21, 2020

*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

To Whom it May Concern,

OneJustice respectfully submits this comment on the above-referenced Proposed Rules to amend regulations relating to eligibility for asylum published on December 19, 2019. We are deeply concerned about the proposed changes and request that the Department of Homeland Security and the Department of Justice ("the Departments") withdraw all provisions that restrict access to eligibility for asylum.

Asylum is meant to be a protection for the most vulnerable populations in our global and domestic communities; it should therefore as accessible as possible. The proposed regulations significantly restrict access to this crucial protection for individuals with viable asylum claims, while failing to meaningfully contribute to the safety or well-being of our nation.

OneJustice is legal nonprofit organization in California that brings life-changing legal assistance to people in need by transforming the civil legal aid system. Our organization believes access to legal assistance is a basic human right.  OneJustice has dedicated years developing and implementing innovative solutions to expand access to legal aid programs for California residents. Through OneJustice's pro bono programs, we partner with law firms, law schools, corporations, stakeholders, community organizers, and legal services organizations and mobilize free legal clinics in rural and isolated communities throughout California.

OneJustice is committed to increasing access to justice for low-income and underrepresented immigrants. Since 2009, OneJustice's pro bono program has engaged over 2,000 pro bono volunteers, implemented over 190 immigration clinics and 100 record clearance clinics, and provided legal assistance to more than 3,500 immigrants. Our pro bono programs include legal

clinics providing asylum and post-conviction relief services, in addition to other types of legal services.

For the reasons detailed in the comments below, we urge the Departments to withdraw the proposed regulatory changes that will severely affect the lives of thousands fleeing from persecution, oppression, violence, and inevitable danger. The Departments should instead dedicate their efforts to ensuring individuals fleeing violence are granted full and equal access to asylum protection in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules that will drastically amend regulations relating to asylum eligibility. Please do not hesitate to contact me at jwilson@one-justice.org with any questions or if we can provide any additional information.

Sincerely,

Julia R. Wilson
CEO

---

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

I. **Introduction**

On December 19th, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. OneJustice strongly opposes each of these changes. The proposed changes serve only to increase the criminalization of migrants exercising their legal rights to seek asylum and to block access to crucial humanitarian protections provided for under United States and international law.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any

2

AR.09954

conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

The proposed changes constitute a harsh and unlawful dismantling of the asylum protections enshrined in United States and international law. The United States has historically been a world leader in refugee protection and it is unconscionable that the administration continues to create barriers to prohibit migrants from exercising their legal right to seek asylum. OneJustice submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's increased efforts to exclude refugees from obtaining the protections the United States asylum system has long committed to. We urge that the Proposed Rules be rescinded in their entirety. OneJustice will focus on a few of the proposed changes in this public comment.

## II. The Proposed Rules Unnecessarily and Cruelly Exclude Bona Fide Refugees from Asylum Eligibility

### A. The Barriers to Asylum for Those Previously Involved in the Criminal Legal System are Already Sweeping in Scope; Adding More Barriers is Cruel and Unnecessary.

The Refugee Act of 1980 ("Act"), designed and approved by a bipartisan Congress, established the United States asylum system in order to protect the world's most vulnerable people from persecution. The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[1] The United States is a signatory to the 1967 Protocol of the 1951 Convention Relating to the Status of Refugees and therefore has a legal obligation to accept asylum seekers who seek protection and safety. Asylum provides physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still be in grave danger abroad.[2]

---

[1] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[2] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described

The United States asylum system demonstrates the nation's commitment to never repeat its failure to save thousands of Jewish refugees that were refused entry to the United States and others fleeing the Holocaust.[3] For individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[4] It is imperative that the Proposed Rules not go into effect. The proposed changes would result in asylum seekers being denied protections they may be eligible for under federal law that has been in place for decades.

The current processes governing asylum adjudications are already exceedingly harsh and challenging for migrants who were forced to leave their home countries in search of safety. Asylum seekers experience immense trauma and are forced to navigate a new country without knowing the language or laws and without access to appointed counsel. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[5] while navigating a complex web of laws and regulations, often without counsel and from a remote immigration jail.[6] The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[7] Today, newly imposed barriers to accessing asylum in the United States are extraordinarily cruel and unprecedented. Currently, asylum seekers fleeing persecution from countries all over the globe are seeking refuge at the southern border and are being forced to return to dangerous border cities in Mexico while navigating a web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or flight path.[8] There are consistent reports of the documented deaths and brutalities endured by those who sought, but were denied, asylum in

---

throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[3] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[4] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[5] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[6] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[7] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[8] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

AR.09956

the United States.[9] The administration continues to create numerous barriers that exclude refugees from fairly accessing our asylum system.

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[10] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[11] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[12] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[13] The existing crime bars should be narrowed, not expanded.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[14] Further categorical bars are not needed and will have a devastating impact on asylum seekers who have valid asylum claims. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning. The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice, and the agencies have proffered no evidence or data to support these changes.

---

[9] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[10] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[11] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[12] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[13] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[14] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

Conviction for a crime does not, without more, make one a present or future danger[15] —which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[16]

The Proposed Rules abandon this rationale. First, they assume that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no meaningful evidence is provided to support that assumption. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. The Proposed Rules also fail to address or account for the fact that a significant number of people may agree to plead to a crime to avoid the threat of a severe sentence. Not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[17] The Proposed Rules additionally fail to take into consideration convictions for conduct influenced by mental illness or duress. Finally, the Proposed Rules would have a racially disparate impact on asylum seekers of color who are subject to racially disparate policing, resulting in racial disparities in rates of guilty pleas to minor offenses.[18]

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[19] Yet because of the categorical nature of the seven new bars proposed here,

---

[15] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[16] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[17] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

[18]The Sentencing Project, "Report of The Sentencing Project to the United Nations Special Rapporteur on Contemporary Forms of Racism, Racial Discrimination, Xenophobia, and Related Intolerance: Regarding Racial Disparities in the United States Criminal Justice System" March 2018, https://www.sentencingproject.org/publications/un-report-on-racial-disparities/, (describing racial disparities including imprisonment rates for black and Hispanic adults that are 5.9 and 3.1 times the rate for white adults)

[19] *Pula*, 19 I.&N. Dec. at 474.

AR.09958

asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

B. *The Proposed Rules Cruelly Disregard the Connections Between Trauma and Involvement in the Criminal Legal System.*

OneJustice firmly believes the harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. The proposed additional mandatory bars to asylum eligibility fail to allow for consideration of how past trauma may lead to interaction with the criminal legal system or to provide space and support for a person to address such issues. The changes also threaten to compound trauma and punish individuals struggling with resulting mental health challenges.

Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the dangerous journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder ("PTSD").[20] One recent study found the mental health problems facing refugees and asylum seekers are so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[21] Categorically barring asylum seekers with DUI or drug possession convictions ignores a common link between mental health and substance use, with the cruel result of punishing people for what are, in reality, health issues. A more punitive and complex asylum system will also exacerbate stress and trauma for a group who deserve support, empathy, and protection.

---

[20] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.
[21] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

7

AR.09959

In our legal clinics, OneJustice has often observed the trama associated with migration and compounded by inhumane immigration policies. OneJustice receives phone calls or text messages on a weekly basis from individuals who are in a state of high anxiety or depression due to challenges navigating our nation's immigration system.

- A 24 year-old DACA recipient called us a few months ago, pleading for help. On her boyfriend's birthday, he was picked up on the street by Immigration and Customs Enforcement, and his family did not know where he was taken. The caller began sobbing over the phone as she explained her search to locate her boyfriend. She was overwhelmed with frustration about how difficult the system is to navigate. Unfortunately, many clients we serve have similar experiences navigating the immigration system - experiences that are traumatic for the clients themselves and for their loved-ones.

At OneJustice's immigration legal clinics, it is common for us to have incredibly vulnerable, personal, and difficult conversations with our clients due to their prior experiences in their home countries.

- At a recent legal clinic in Monterey Bay, CA, a young client was uncomfortable throughout her appointment. She was reliving trauma. She was abused by her mother's partner at a young age and was fleeing violence in her home country. Through our clinic, she was able to find out she qualified for asylum. The fear from the violence she fled was visibly still present for her, even though she was safely in the United States.

OneJustice has provided legal assistance to many clients experiencing ongoing trauma and believes these individuals deserve a fair opportunity to present their asylum cases to be analyzed on an individual basis. This process allows for the decision maker to take into account the impact of past persecution and trauma on an asylum-seeker's record, and to determine if the conviction actually merits denial of safety and protection for that individual. Immigration adjudicators already have the authority to use their discretion to deny asylum to individuals with criminal convictions included in the proposed bars. To deny asylum seekers even the opportunity to present countervailing factors of their past trauma and potential recovery is cruel and neglectful of the difficult journey many people have to this country.

III.     **The Proposed Rules Criminalize Migrants and Migration and Fail to Distinguish Between Vastly Different Types of Criminal Records**

The proposed additional criminal bars to asylum are overbroad and put unconscionable limits on asylum access. The Proposed Rules will disparately impact vulnerable populations, including asylum seekers hailing primarily from Central America and the Global South and those

routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[22] For these populations, the discretion currently delegated to asylum adjudicators is especially crucial. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

> A. *The Proposed Bars Based on Felony, DUI and Controlled Substance Convictions are Overbroad and Inconsistent with Principles of Asylum*

OneJustice is concerned about the overbroad scope of the proposed mandatory criminal bars to asylum and the categorical exclusion of individuals with valid asylum claims based on past convictions that do not involve particularly serious crimes.

According to the UNHCR, before barring an individual from asylum protection based on a particularly serious crime, an adjudicator must conduct an individualized analysis and consider any mitigating factors.[23] This requirement recognizes that a conviction in-an-of itself is not an indication of dangerousness and that asylum should be broadly accessible. The Proposed Rules run counter to this principle. For example, they exclude from protection anyone who was convicted of a felony and then define "felony" as "any crime punishable by more than one year of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules describe the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient."[24] However, an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger, are placed at risk of refoulement.

Additionally, the Board of Immigration Appeals and the Courts of Appeals have generally held that, outside of the aggravated felony context, low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[25] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused, or simple

---

[22] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[23] *Id*. at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

[24] Proposed Rules at 69646.

[25] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).

possession of a controlled substance or paraphernalia, would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[26] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[27] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[28] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

OneJustice strongly believes that a record alone is not an indication of future danger to the community. We often see clients in our Expungement and Immigrant Post-Conviction Relief Clinics with past DUI or low-level drug possession convictions who have moved past these mistakes and who are valued parents, employees, and community members.

In 2019, our Immigrant Post-Conviction Relief Clinic served 15 noncitizen clients with prior convictions. Three of these clients have two misdemeanor DUIs on their record, and one has a drug possession conviction. The Proposed Rules assert that these prior convictions show dangerousness and a disregard for the law, making these individuals undesirable as members of our community. This is an incorrect and damaging assumption. Each of these individuals has had a clean record for ten-plus years. Each has their own story about the difficult time in their lives that led to their convictions. One mother with two DUIs from her early 20's shared with us how an abusive relationship led to those incidents, how she is now sober and an active member of her church community. She is on her way to becoming a Lawful Permanent Resident. The client with a possession conviction spoke with us about his struggle with addiction, his path to getting clean, and the four children he and his wife are raising. He and the other two clients with multiple prior DUIs are all in the process of naturalizing and will have no trouble showing the good moral character required to become a citizen. The proposed rule would bar other individuals with similar stories from asylum protections and the same path to safety and a stable legal status.

---

[26] 648 F.3d at 1110 (J. Reinhardt, concurring).
[27] *Id*. at 1110.
[28] *Id*. at 1110.

OneJustice objects to the categorical exclusion of individuals from asylum protections based only on a minor conviction or potential sentence, without an individualized analysis, and believes that asylum should remain accessible.

### B. The Proposed Illegal Re-Entry & Smuggling Bars Criminalize the Act of Migration and Constitute Unconscionable Limits on Asylum Access

The expanded criminal bars also exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, punish them for fleeing persecution and/or seeking safety for their children, and do not accomplish the stated goal of making communities safer. OneJustice strongly opposes these limitations.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[29] is unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[30] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

An illegal reentry alone should not bar asylum seekers from protection who have a legitimate claim and are fleeing persecution. Illegal re-entry does not itself indicate a likelihood to commit future crimes, but is more likely a reflection of an individual's desperation to flee persecution. Regardless of the reason behind a previous entry, an asylum claim should be considered with the current set of facts that demonstrate the person's fear of persecution.

Since May 2019, OneJustice has partnered with law schools, law firms, and legal services organizations to pilot an Asylum Legal Clinic that provides free legal assistance to recently-arrived asylum seekers in Los Angeles. Through three legal clinics, we have provided legal assistance to over 80 families seeking asylum in the United States with cases pending before the Los Angeles Immigration Court. Several migrant families were forced to wait months in extremely dangerous border cities in Mexico because they were subject to the arbitrary "metering" policy that Customs and Border Protection ("CBP") has been implementing at the southern border. As a result, families have traveled through ports of entry with their children in order to seek asylum and obtain safety. The Migration Protection Protocols ("MPP"), metering

---

[29] Proposed Rules at 69659, 69660.
[30] Refugee Convention, *supra*, at art 31.

policies, and other policies have put migrants in grave danger simply for exercising their legal right to seek asylum. Migrants should not be criminalized for seeking safety and protection. The proposed criminal bars further put asylum seekers in grave danger and undermine federal and international law.

The Proposed Rules would also ban asylum for parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help their minor children enter the United States to flee persecution. This expansion further criminalizes vulnerable refugee populations.[31] It is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of a strategy to deter families from seeking asylum in the United States.[32] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[33] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children.

The Proposed Rules suggest that refugees seeking protection should utilize "alternative means" of seeking protection by presenting themselves at a port of entry.[34] This is a disingenuous suggestion, given that this administration has made this option dangerous and impractical for many families and individuals fleeing persecution through the above-mentioned policies.[35] For many migrants facing kidnapping, violence, homelessness, illness, and hunger while waiting to present themselves at a port of entry, illegal re-entry or helping a child cross the border may be the only way to keep themselves and their family safe. Leaving children behind while fleeing is not an option for many parents. The Proposed Rules multiply the harms parents and caregivers

---

[31] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[32] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[33] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[34] Proposed Rules at 69648.

[35] Human Rights Watch, "Mexican Asylum Seekers Ordered to Wait:Mexicans Fleeing Violence Stuck in Dangerous Conditions at US Border," December 23, 2019, https://www.hrw.org/news/2019/12/23/us-mexican-asylum-seekers-ordered-wait

have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

## IV. The Proposed Definition of "Conviction" and "Sentence" for the Purposes of the New Bars Further Excludes Those in Need of Protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility imposes an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or more than one year after a conviction. It also denies full faith and credit to state court proceedings by attributing improper motives to state court actors.[36]

OneJustice serves noncitizen clients with prior criminal records through our Immigrant Post-Conviction Relief Clinic; based on our knowledge and experience in this area, we strongly oppose this section of the Proposed Rules.

### A. The Proposed Rules Undermine Sixth Amendment Protections and Harms Immigrants Unfamiliar with the Complex Criminal and Immigration Framework Governing Prior Convictions.

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility. The proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[37] This newly-created presumption contravenes constitutional protections in criminal proceedings, ignores due process deficiencies that many noncitizen defendants face, and unfairly penalizes asylum applicants.

In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[38] In practice, many

---

[36] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[37] Proposed Rules at 69655.

[38] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

noncitizens in criminal proceedings are not advised of immigration consequences of a plea bargain presented to them. Many asylum seekers, especially those in vulnerable populations geographically and financially isolated from resources, may not become aware of constitutional defects in, or have the opportunity to seek review of their prior criminal proceedings, until applying for asylum.[39]

In our work providing immigration and post-conviction legal services in under-resourced areas of California, OneJustice has observed that many individuals learn of their right to effective assistance of counsel and of adverse immigration consequences of a conviction only when they are put in removal proceedings or when they seek legal advice about their immigration status, which may happen several years after a conviction.

Of the 15 clients screened through our Post-Conviction Relief Clinic in 2019, 10 had convictions impacting immigration eligibility; only one was aware of a potential issue. These convictions are all from non-urban counties, where access to quality, affordable legal services is limited. Two client stories demonstrate how the proposed presumption ignores this reality and would disproportionately harm vulnerable populations:

- M. is a long-time Lawful Permanent Resident and mother of four who came to our clinic to naturalize, only to find out that a 30-year old conviction made her deportable. The conviction suffers from multiple constitutional and statutory errors, of which she was not aware. She is currently seeking a vacatur.

- T. is a long-time Lawful Permanent Resident who learned that a prior conviction made him deportable only when he was put in removal proceedings upon returning from a funeral abroad. T. was shocked, as his criminal defense counsel had advised him that his plea was immigration safe. After six months of looking for appropriate and affordable legal counsel, he finally found OneJustice. We helped vacate the conviction based on due process and Sixth Amendment violations, and he was able to remain in his community with his US citizen partner, young child, siblings, and parents.

As these cases show, is unrealistic to expect a person who has not received accurate advice about a conviction to learn of the violation of their rights and to be able to legally challenge that violation within one year or before being placed in removal proceedings. The Proposed Rules' conflation of a court's reasons for vacating a conviction with the timing of a

---

[39] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

post-conviction relief motion is incredibly problematic given that many people learn of procedural or substantive defects underlying a conviction only when they learn of adverse immigration consequences.

The proposed presumption would hold asylum seekers whose rights were violated under *Padilla* to a different standard than noncitizens seeking different forms of immigration relief. Even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers would be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid.

The Proposed Rules therefore compound the harm to one of the most vulnerable groups of immigrants: those who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

B. *The Proposed Rules Violate the Full Faith, and Credit to Which State Court Decisions are Entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[40] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. Immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rules go well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. They cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order.

---

[40] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).

15

AR.09967

Had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[41] In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which the Proposed Rules rely.[42] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[43] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry.[44] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[45] Moreover, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen*. stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[46] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry and grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief, transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

---

[41] *Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959).

[42] *See id*. (*citing Matter of Pickering*, 23 I.&N. Dec. 621).

[43] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

[44] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263.

[45] *Id*.

[46] *Rodriguez v. U.S. Att'y Gen*., 844 F.3d 392, 397 (3d Cir. 2006) ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

## V.    Conclusion

OneJustice believes that access to legal assistance is a basic human right. Our pro bono programs include legal clinics providing asylum and post-conviction relief services. In our clinics, interacting over the phone with the immigrant community, and partnering with on-the-ground community organizers and grassroot organizations, we have observed how the immigration and criminal system impacts the clients we serve.

The Proposed Rules contravene United States and International law and impose cruel and unnecessary limitations on access to asylum. For the reasons stated above, OneJustice opposes the Proposed Rules in their entirety. We urge the Departments to immediately withdraw the Proposed Rules, which would severely limit access to our nation's asylum system. Asylum should remain as accessible as possible given the life and death situations those eligible for this protection and their families face if denied a safe haven in the United States.

17

AR.09969

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-56bz
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0499
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Pramila Jayapal
**Address:** United States,
**Email:** amy.fischer@mail.house.gov
**Phone:** 202-225-3235
**Organization:** U.S. House of Representatives

## General Comment

See attached file(s)

## Attachments

Asylum Rule Comments FINAL

AR.09970

January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

Dear Ms. Reid and Ms. Dunn:

We the undersigned write to express our strong opposition to the Proposed Rules published by the Executive Office for Immigration Review (EOIR) and U.S. Citizenship and Immigration Services (USCIS) to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Asylum is a bedrock of the U.S. immigration system. Human lives depend on an asylum system that works and does not dangerously return people to the very harm they fled. The proposed rule creates new and overly broad categorical bars to asylum that undermine congressional intent behind the Refugee Act of 1980. The Department of Homeland Security and the Department of Justice should withdraw this notice of proposed rulemaking and instead ensure that individuals fleeing violence are granted full and fair access to asylum protections in the United States, in accordance with U.S. law and treaty obligations.[1]

The proposed rule creates seven mandatory bars to asylum eligibility based on an individual's past criminal conduct. These newly-created bars do not target asylum seekers who may pose a danger to the community; instead, they sweep broadly to cover a wide range of minor criminal conduct. For example, individuals who are convicted of unauthorized reentry under 8 U.S.C. § 1326 are categorically ineligible, as are individuals convicted of certain minor state misdemeanors. The proposed rule also creates a multifactor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for purposes of determining asylum

---

[1] *United Nations Protocol Relating to the Status of Refugees*, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.
Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954

AR.09971

eligibility and rescinds a preexisting provision regarding the reconsideration of discretionary asylum.

Congress enacted asylum laws that provide safety to those fleeing unimaginable persecution, a roadmap to citizenship, and the opportunity to rescue immediate family members who may still be facing danger in home country. Having a robust, functional, and inclusive asylum and refugee system is of high importance for the United States. It is a responsibility that serves U.S. foreign policy interests abroad, and a mutual duty we share with our peer nations, amidst the highest numbers of refugees and forcibly displaced people in history.

Congress first took action on asylum through the Refugee Act of 1980, described by legal scholars as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[2] The Refugee Act of 1980 brought U.S. law into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugee, creating a "broad class" of refugees eligible for a discretionary grant of asylum.[3] In the first section of the Act, Congress clearly stated its intent, "declar[ing] that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands[.]"[4]

For individuals seeking asylum, the stakes are incredibly high. Denial of asylum could literally mean death or persecution for the individual in question.[5] Just over 80 years ago, the *MS St. Louis* returned to Europe with 937 survivors fleeing the Holocaust after being denied safety by the United States, resulting in the death of 254 people at the hands of the Nazis.[6] Congress intended to create an asylum system which would prevent a similar tragedy from ever happening again.

Yet, current asylum law requires individuals fleeing persecution to navigate an extremely complex and demanding system. Asylum seekers bear the burden of establishing their eligibility for asylum, often without the benefit of an attorney, and while detained in a remote detention center.[7] Our asylum laws already contain broad criminal bars: any conviction for an offense determined to be an "aggravated felony" is considered a "particularly serious crime" and therefore a mandatory bar to asylum.[8] "Aggravated felony" is a notoriously vague term that

---

[2] Deborah Anker, *The Refugee Act of 1980: An Historical Perspective*, In Defense of the Alien Vol. 5 (1982) https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[3] *I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[4] Refugee Act of 1980 § 101(a), Pub. L. No. 96-212 (Mar. 17, 1980).

[5] Kevin Sieff, *When death awaits deported asylum seekers*, Washington Post (Dec. 26, 2018) https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[6] Candice Norwood, *A Twitter Tribute to Holocaust Victims,* The Atlantic (Jan. 27, 2017) https://www.theatlantic.com/politics/archive/2017/01/jewish-refugees-in-the-us/514742/

[7] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d)

Daniel Connolly, Aaron Montes, and Lauren Villagran, *Asylum seekers in U.S. face years of waiting, little chance of winning their cases*, USA Today, (Sep. 25, 2019) https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[8] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

2

AR.09972

exists only in immigration law. This term has evolved to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[9]

New criminal bars, like those included in the proposed rulemaking, are entirely unnecessary. Immigration judges may already use their discretion to deny asylum to those who have a well-founded fear of persecution but have been convicted of a crime.[10] The proposed rule's new bars are an unnecessary, cruel, and transparent attempt to further limit asylum, denying refuge to nonviolent asylum seekers who pose no danger to our communities. A criminal conviction does not make one a present or future danger. This is precisely why the Refugee Convention's particularly serious crime bar, made part of U.S. law through the asylum code, should only apply if a migrant is both convicted of a particularly serious crime and a separate assessment shows that they are a present or future danger.[11]

By targeting offenses related to alcohol and drug use, the proposed rule also ignores overwhelming evidence that asylum seekers are a highly traumatized population, as at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[12] Studies show a high correlation between PTSD and substance use disorders, with individuals with PTSD up to 14 times more likely to struggle with a substance use disorder.[13] Since asylum seekers in the United States are often disqualified for health insurance and unable to access affordable medical care, some turn to drugs and alcohol in an effort to self-medicate for their past trauma.[14] The proposed bars relating to drug and alcohol related offenses ignore the evidence of the particular vulnerabilities of asylum seekers, which should be addressed with treatment and care rather than categorical denial of asylum.

As Members of Congress, we are particularly concerned that the proposed rule attempts to rewrite immigration law, including by weaponizing the "particularly serious crime" bar to asylum in ways that Congress did not authorize. Our asylum laws grant the Attorney General limited discretion to designate certain offenses as "particularly serious crime[s]," provided that an alien convicted of such a crime also "constitutes a danger to the community of the United

---

[9] 8 U.S.C. § 1101(a)(43).

Nancy Morawetz, *Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms*, Harvard Law Review 113 (2000).

Melissa Cook, *Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation*, Boston College Third World Law Journal (2003): 293.

[10] *Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[11] U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* (July 2007) http://www.unhcr.org/en-us/576d237f7.pdf

[12] Giulia Turrini et al., *Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies*, International Journal of Mental Health Systems 11 (Aug. 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[13] Jenna L McCauley et al., *Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment*, Clinical Psychology Science and Practice 19, 3 (Oct. 2012) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[14] Samantha Artiga and Maria Dias, *Health Coverage and Care of Undocumented Immigrants,* Kaiser Family Foundation (Jul. 15, 2019) https://www.kff.org/disparities-policy/issue-brief/health-coverage-and-care-of-undocumented-immigrants/

Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/

States."[15]  Here, the proposed rule adopts a definition of "particularly serious crime" so expansive that it categorically denies asylum to individuals who pose no danger to our community.  This definition is inconsistent with our nation's asylum laws.[16]  The Department of Homeland Security and Department of Justice are therefore rewriting our asylum laws without congressional authorization.

We are also dismayed by the overly short comment period. The proposed rule puts forth substantive and complex changes to asylum eligibility in the United States and should be subject to the standard 60-day comment period. To demand that the public review, analyze, and provide meaningful comments on this proposal during the designated 30-day comment period is unreasonable.

Due to the potentially enormous impact on those seeking safety in the United States and the clear violation of congressional intent, we strongly encourage the Department of Homeland Security and the Department of Justice to withdraw the proposed rulemaking. It is the responsibility of the United States to have an asylum system that protects vulnerable communities, not categorically deny them the protection their lives depend on.

Sincerely,


PRAMILA JAYAPAL
Member of Congress

VERONICA ESCOBAR
Member of Congress


JERROLD NADLER
Member of Congress

ZOE LOFGREN
Member of Congress


ANNA G. ESHOO
Member of Congress

ADRIANO ESPAILLAT
Member of Congress


SYLVIA R. GARCIA
Member of Congress

RAÚL M. GRIJALVA
Member of Congress


DEB HAALAND
Member of Congress

HENRY C. "HANK" JOHNSON, JR.
Member of Congress

---

[15] *See* 8 U.S.C. § 208(b)(2)(A)(ii) (particularly serious crime bar); *id.* § 208(b)(2)(A)(ii) (grant of limited discretion to the Attorney General).
[16] 8 U.S.C. § 208(b)(2)(C) (allowing Attorney General to "establish additional limitations" on asylum eligibility insofar they are "consistent with this section")

4

AR.09974

JOSEPH P. KENNEDY, III
Member of Congress

JOHN LEWIS
Member of Congress

ALEXANDRIA OCASIO-CORTEZ
Member of Congress

MARK POCAN
Member of Congress

JAMIE RASKIN
Member of Congress

LINDA T. SÁNCHEZ
Member of Congress

JAN SCHAKOWSKY
Member of Congress

ADAM SMITH
Member of Congress

MIKE THOMPSON
Member of Congress

ER-1937

AR.09975

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-xa1v
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0500
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Robert Shultz
**Address:**
  6926 N Upper Skyline Dr.
  Peoria, IL, 61614
**Email:** barneyshultz52@gmail.com
**Phone:** 618 560 9294

## General Comment

I write in opposition to the Proposed Rule: Procedures for Asylum and Bars to Asylum Eligibility. I recently retired from the active practice of law. I was in private practice for nearly 34 years before practicing with a large insurance organization for the past seven and one-half years.

In addition to the many substantive objections raised by others concerning the unfairness and illegality of the proposed rules as they would be applied, it is my legal judgment that the proposed rules are facially invalid. The discretion vested in the immigration adjudicator is ill-defined, as are the offenses for which asylum may be denied.

If I have learned anything in my 41 years of practicing law it is that the law must provide a sufficient degree of certainty so that others can understand and conform their conduct to the law's requirements. These rules will expand an already vague set of rules. As written, these proposed rules will aggravate, rather mitigate, the harshness faced by those who seek asylum in our country.

We should endeavor to be a nation based on laws, rather than men. The vast discretion these proposed rules will put into the hands of the adjudicators in inconsistent with that standard.

Respectfully submitted,
Robert H. Shultz, Jr.

AR.09976

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-qrae
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0501
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Tim Lacy
**Address:**
  1444 W. Elmdale Ave., Apt. 3
  Chicago, IL, 60660
**Email:** timothy.n.lacy@gmail.com
**Phone:** 773-632-6323

## General Comment

I am opposed to this rule change.

I work in higher education, particularly medical education. Asylum sekers are valuable students who bring unique experiences to the classroom. I also live in Chicago's Edgewater neighborhood. Its diversity is enhanced by asylum seekers and immigrants.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would also inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

I am opposed to this rule change.

AR.09977

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-occb
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0502
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Melissa Chan

## General Comment

I am a concerned member of the public and a child of immigrants who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state. Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them. For these reasons, I call upon the Trump administration to withdraw this proposal.

AR.09978

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020 |
| **Received:** January 21, 2020 |
| **Status:** Posted |
| **Posted:** January 22, 2020 |
| **Tracking No.** 1k4-9eko-lefs |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0503
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Kevin Herrera
**Address:**
    3450 Wilshire Blvd
    Los Angeles,  CA,  90010
**Email:** herrera@nilc.org
**Phone:** 213-770-1325
**Organization:** National Immigration Law Center

## General Comment

See attached file(s)

## Attachments

NILC.Comments.84 FR 69640

AR.09979



*Submitted via regulations.gov*

January 21, 2019

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

**Re:    Comments in Opposition to Proposed Rulemaking: Procedures for
Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No.
18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

Dear Ms. Alder Reid & Ms. Dunn,

We write on behalf of the National Immigration Law Center ("NILC") in strong opposition
to the above-referenced Proposed Rules to amend regulations relating to eligibility for
asylum. The Proposed rules were published in the Federal Register on December 19, 2019.
We are filing these comments by the deadline of January 21, 2020.

As an organization exclusively dedicated to defending and advancing the rights of low-
income immigrants, NILC is uniquely situated to identify the humanitarian,
administrative, and legal harms that the Proposed Rules present. Founded in 1979, NILC
focuses on issues that affect the well-being and economic security of low-income
immigrants: health care and safety net programs; education and training; workers' rights;
and federal and state policies affecting immigrants.  NILC works to ensure that all low-
income immigrants have the opportunity to achieve their full potential by protecting access
to immigration relief that is established by statute and is reflective of our nation's inclusive
values.  When necessary, NILC has successfully defended low-income immigrants and their
families in litigation against the government to protect their fundamental and
constitutional rights, supporting its clients by using organizational expertise around
policies affecting low-income immigrants.

www.nilc.org

LOS ANGELES (Headquarters)
3450 Wilshire Blvd. Box #108 – 62
Los Angeles, CA 90010
213 639-3900
213 639-3911 fax

WASHINGTON, DC
PO Box No. 34573
Washington, DC 20043
202 216-0261
202 216-0266 fax

AR.09980

At NILC, we believe that all people who live in the U.S. should have the opportunity to achieve their full potential. As experts in the complex intersection between immigration law and the multifaceted political, social, and economic issues affecting low-income immigrant communities, NILC's staff helps to shape federal policy by meeting with and educating members of Congress. Our fact sheets and briefing papers have long been used by policymakers interested in ensuring the future prosperity of their constituents.

NILC's specifically dedicated interest in the wellbeing and just treatment of applicants for asylum is reflected in its ongoing efforts to assure consistent, evenhanded application of statutes governing eligibility for and adjudication of asylum applications. For example, NILC participates in ongoing monitoring and enforcement of the injunction originally ordered in *Orantes-Hernandez v. Smith*.[1] Through *Orantes* — a nation-wide, permanent injunction that requires the Department of Homeland Security ("DHS") to uphold certain rights of Salvadoran nationals in immigration detention — NILC staff has seen firsthand the myriad legal barriers, administrative challenges, and abuses that lax enforcement of asylum protections in immigration laws can expose vulnerable migrants to. NILC strongly opposes any changes that would create additional risks for asylum applicants.

In 1982, a U.S. district court issued a preliminary injunction based on evidence that the Immigration and Naturalization Service ("INS") had detained and removed Salvadoran nationals eligible for asylum by using coercive tactics, provided misleading information to Salvadoran detainees regarding their right to apply for political asylum, denied Salvadoran detainees adequate access to counsel and to information about their rights, and placed Salvadoran detainees into solitary confinement without a hearing.[2] After a lengthy trial, the court in 1988 entered a permanent nationwide injunction mandating that the INS provide Salvadorans placed in immigration custody with a written notice about their rights, ensure Salvadorans access to telephones, counsel, and legal materials in detention, and refrain from coercing Salvadorans into signing voluntary departure agreements.[3]

In 2007, the U.S. District Court for the Central District of California denied nearly all of the government's motion to dissolve the injunction, finding that the government had failed to show significantly changed conditions for Salvadoran detainees sufficient to warrant dissolving the injunction, and modifying the injunction only slightly. The U.S. Court of Appeals for the Ninth Circuit upheld this decision in 2009,[4] and the government must abide by the terms of the modified permanent injunction nationwide.

The *Orantes* injunction applies to citizens and nationals of El Salvador who are eligible to apply for political asylum, and who have been, are, or will be taken into custody by agents of the Department of Homeland Security (DHS).[5] The detainee does not need to have applied for asylum in order for the injunction to apply. While enforcement of the *Orantes*

---

[1] *Orantes-Hernandez v. Smith*, 541 F. Supp. 351 (C.D. Cal. 1982).

[2] *Id*. at 354.

[3] *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1511-13 (C.D. Cal. 1988).

[4] *Orantes-Hernandez v. Holder*, 321 Fed. Appx. 625, 2009 WL 905454 (9th Cir. Apr. 6, 2009).

[5] *Orantes-Hernandez v. Meese*, 685 F. Supp. at 1491, *aff'd*., 919 F.2d 549 (9th Cir. 1990).

AR.09981

injunction is intended to benefit Salvadoran individuals, many elements of the injunction effectively benefit all detainees in immigration detention, especially those seeking asylum under current protections.

NILC has additionally supported asylum seekers by, for example, advocating for legislation that would repeal a proclamation seeking to limit access to asylum for people entering the United States without inspection between ports of entry at the southern border.[6]

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

## A. Introduction

On December 19th, 2019, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules concerning three sets of changes to the rules governing asylum adjudications. These changes, considered in their totality, frustrate the purpose of the comprehensive statutory scheme governing access to asylum in the United States. The changes also directly contravene NILC's mission as an organization dedicated to defending and advancing the rights of immigrants with low income and their ability to seek freedom from violence and persecution while fulfilling their potential in the United States. NILC's commitment to asylum access — as demonstrated by its work pursuing full enforcement of the *Orantes* injunction and by its related federal advocacy — is uniquely frustrated because of the ways in which the Proposed Rules will exacerbate the already persistent barriers to asylum access. The Proposed Rules will needlessly create additional obstacles to the United States in fulfilling its humanitarian obligations under statute, requiring hours of work by immigration advocates to ensure that the spirit and letter of laws guaranteeing the existence of asylum protections are not frustrated.

The first proposed set of changes adds the following seven <u>categorical</u> bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction or <u>accusation</u> of conduct for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including <u>any</u> drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

---

[6] https://www.whitehouse.gov/presidential-actions/presidential-proclamation-addressing-mass-migration-southern-border-united-states/

AR.09982

The second set of the Proposed Rules creates a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third set rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes are an unnecessary, harsh, and unlawful gutting of the asylum laws of the United States. NILC submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude vulnerable populations — especially people of color, LGBTQ, low-income, and other persecuted groups — from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

### B. The Proposed Rules cruelly exclude bona fide refugees from asylum eligibility without rational support or justification

The United States asylum system was first codified in statute through the Refugee Act of 1980. The Act was designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees — creating a "broad class" of refugees eligible for a discretionary grant of asylum.[7] Asylum protections provided by United States law are sacred, providing those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger. For those individuals seeking asylum in the United States, the stakes could not be higher — a claim denied often means return to death or brutal persecution.[8]

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[9] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[10] The obstacles to winning asylum are very high; depending on the location of the application and the adjudicator, it can be nearly impossible to obtain relief, even in bona fide cases.[11] Newly imposed restrictions of seeking asylum subject thousands seeking safety at the southern border to return to dangerous conditions in Mexico and an overlapping web of policies preclude

---

[7] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[8] *See*, *e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[9] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[10] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[11] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

AR.09983

asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[12] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[13]

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[14] The agencies' efforts to add seven new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The proposed changes to implementing regulations render the phrase "particularly serious crime" in 8 U.S.C. § 1158 virtually meaningless.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice and the agencies have proffered no evidence or data to support these changes. Because the Proposed Rules are divorced from the purposes animating their underlying statute and devoid of any discernable rationale beyond animus, they almost certainly run afoul laws governing federal rulemaking processes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[15] Conviction for a crime does not, without more, make one a present or future danger — which is why the particularly serious crime bar found in 8 U.S.C. § 1158

---

[12] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[13] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[14] *See id.*

[15] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

AR.09984

should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[16]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[17] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[18] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. In the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of mere allegations of conduct without any adjudication of guilt.[19]

## C. The Proposed Rules will undermine judicial efficiency by creating "mini-trials" in immigration court, while also encouraging racially biased decision-making by immigration adjudicators

The Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct — untethered from a criminal court adjudication — triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[20] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[21]

---

[16] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[17] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

[18] *Pula*, 19 I.&N. Dec. at 474.

[19] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

[20] *See* Proposed Rules at 69649.

[21] *See* Proposed Rules at 69652.

AR.09985

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, conduct, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[22] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct — assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[23] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

The Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[24] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[25] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[26] In *Moncrieffe v. Holder*, the Court forewarned of exactly the

---

[22] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[23] *See* Proposed Rules at 69646, 69656-8.

[24] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[25] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[26] *Moncrieffe*, 569 U.S. at 200-201.

AR.09986

sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[27]

Particularly in the context of the new proposed bar related to alleged gang affiliation, NILC cautions that creating a blanket exclusion for anyone who is convicted of a crime — including a misdemeanor — that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts — the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[28]

The Proposed Rules' drafters curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[29] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes* — including misdemeanor property crimes — that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best and tinged with racial animus at worst.

The Departments seek comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for

---

[27] *Id.* at 201.

[28] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[29] Proposed Rules at p. 69650.

8 | P a g e

AR.09987

asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

### D. The Proposed Rules will have especially devastating impacts among vulnerable populations, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color, who are already routinely criminalized

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[30] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[31] Furthermore, asylees with convictions that render them inadmissible must

---

[30] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[31] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

AR.09988

apply for a waiver at the time of their applications for permanent residence.[32] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[33]

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[34] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[35] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[36] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without

---

[32] 8 U.S.C. § 1159(c) (2012).

[33] 8 C.F.R. § 208.24(a) (2012).

[34] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[35] *Id*.; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[36] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

consideration of the seriousness of prior convictions.[37] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

> *Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[38] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[39]

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[40] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[41] The continued availability of asylum to low-

---

[37] Proposed Rules at 69,648.

[38] *See Pula*, 19 I.&N. Dec. at 474.

[39] *Id.*

[40] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[41] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

AR.09990

wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

> *The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[42] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[43] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[44] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

As an organization concerned with the intersecting challenges immigrants confront as they navigate forced migration due to persecution and violence, NILC is highly concerned that the Proposed Rule will exacerbate the vulnerabilities of LGBTQ immigrants. Regulations

---

[42] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[43] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[44] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

AR.09991

guiding asylum seekers should provide more support in addressing the unique challenges these individuals face, rather than creating a scheme that would be wrought with pitfalls likely to disqualify extremely compelling cases from asylum protections.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[45] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[46] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[47] The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[48] These

---

[45] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

[46] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as possession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[47] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

[48] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or

"cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[49] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

> *Barring asylum for immigrants convicted of "gang-related crimes" is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals — including children — has generated tremendous concern among advocates and the communities they serve.[50] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[51] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[52]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both

---

both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").
[49] 8 U.S.C. § 1227(a)(7)(A).
[50] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.
[51] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.
[52] *See* Jonathan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

AR.09993

houses of Congress.[53] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[54] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[55]

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is *ultra vires* and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[56] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[57]

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty

---

[53] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[54] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[55] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

[56] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that the asylum adjudicator may consider "all reliable evidence" in making their decision.

[57] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

AR.09994

pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[58]

### E. The Proposed Rules are *ultra vires* to the federal immigration statute, as they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[59] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[60] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[61]

Here, however — seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[62] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[63] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is *ultra vires* to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of

---

[58] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[59] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).

[60] 8 U.S.C. § 1158(b)(2)(B)(ii).

[61] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility  to seek asylum.

[62] 8 U.S.C. § 1252(a)(2)(D).

[63] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

AR.09995

status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[64]

Congress's explicit definition of a particularly serious crime as a bar to asylum forecloses the expansion of disqualifying factors. Where Congress has created a list intended to create parameters around a given scheme, canons of statutory construction govern: "[E]xpressing one item of [an] associated group or series excludes another left unmentioned."[65] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation and places the Proposes Rules *ultra vires* to the statute.

**Conclusion**

The categorical bars to asylum and related policy changes raise grave concerns about continued access to asylum among eligible individuals who rightfully apply under the law. Full implementation of the Proposed Rules would undermine the spirit and the letter of immigration laws in the United States by, among other problems, enacting a system *ultra vires* categorical bars to asylum relief that were never anticipated under the INA. Such a broad, reflexive system of adjudication will inevitably subject individuals and families who have a colorable claim to asylum to severe harm and potentially death, contravening the purpose of asylum provisions dedicated to statute. Moreover, the Proposed Rules threaten to further ensnare applicants for asylum in an already voluminous backlog of cases by adding unnecessary layers of adjudication to the asylum application process.

Furthermore, DHS has provided virtually no governmental justification for the proposed changes to established asylum law. On their face, the Proposed Rules are a needless effort to undo protections for individuals fleeing persecution and violence and who reasonably

---

[64] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.
[65] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

AR.09996

seek safe haven in the United States. These proposals will harm the interests of a broad swath of individuals and communities, including those of the United States and its longtime residents. For these reasons, the Department of Justice and the Department of Homeland Security should abandon the Proposed Rules.

**NILC urges USCIS against expanding categorical bars to asylum, noting the Proposed Rules' damage to eligible individuals and families, its clear hindrance to judicial efficiency, and is contrariness to law.** NILC is available and willing to discuss its opposition to the Proposed Rules and can be reached a herrera@nilc.org or moussavian@nilc.org.

Respectfully submitted,

Avideh Moussavian
Legislative Director, National Immigration Law Center

Kevin L. Herrera
Staff Attorney, National Immigration Law Center

AR.09997

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-mzvq
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0504
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Stacy Suh

## General Comment

I write to express my strong opposition to this proposed rule change. I work with immigrant and refugee survivors of domestic violence, who have a criminal conviction due to experiencing gender based violence (self-defense, fleeing from abusive partner to seek safety, migration, etc). Unfortunately, the reality is that vast majority of people incarcerated in women's prisons have experienced gender based violence prior to their incarceration (up to 94% in some women's prisons). Many immigrant and refugee survivors are criminalized and punished for surviving abuse, including self-defense, fleeing from violence, and being blamed for the actions of their abusers. Furthermore, we know that women of color, queer, trans, and gender non-conforming people are disproportionately affected by the racist criminal legal system. The proposed rule change is cruel and will further punish survivors of gender based violence who are seeking asylum to find safety and to rebuild their lives. For these reasons, I urge the Trump administration to withdraw this proposal.

AR.09998

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-r5ef
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0505
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Cristina Velez
**Address:**
   2201 Wisconsin Ave., NW
   Suite 200
   Washington,  DC,  20007
**Email:** cvelez@nipnlg.org
**Phone:** 617-227-9727 x6
**Fax:** 617-227-5495
**Organization:** Immigrant Justice Network

---

## General Comment

See attached file(s)

---

## Attachments

NIP-ILRC-IDP-JFL-IJN Comment re Procedures for Asylum and Bars to Asylum Eligibility FINAL

AR.09999



   

*Submitted via www.regulations.gov*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 21, 2020

To Whom it May Concern:

We write on behalf of the Immigrant Justice Network (IJN) and its four organizational members, Immigrant Legal Resource Center (ILRC), Immigrant Defense Project (IDP), Just Futures Law (JFL), and the National Immigration Project of the National Lawyers Guild (NIPNLG), in response to the above-referenced Proposed Rules published in the Federal Register on December 19, 2019. We write to express our strong opposition to this proposal to amend the asylum eligibility regulations.

IJN is a leading voice against the criminalization of immigrants in the United States. Grounded in racial justice values, we build power to defend the dignity of immigrants. We fight for a world where our communities are thriving and free from policing, deportation, and imprisonment. Since 2006, IJN has partnered with community groups and directly impacted individuals who have navigated or survived the detention, deportation, and criminal legal systems to achieve these goals. These partnerships help build long-lasting power for

1

AR.10000

transformational change of our criminal and immigration systems.  A description of each of IJN's four organizational members follows.

- The NIPNLG is a national nonprofit organization that provides support, referrals, and legal and technical assistance to attorneys, community organizations, families, and advocates seeking to advance the rights of noncitizens. NIPNLG focuses especially on the immigration consequences of criminal convictions, and its mission is to fight for justice and fairness for noncitizens who have contact with the criminal legal system.

- The ILRC is a national non-profit that provides legal trainings, educational materials, and advocacy to advance immigrant rights. The ILRC's mission is to work with and educate immigrants, community organizations, and the legal sector to continue to build a democratic society that values diversity and the rights of all people. Since its inception in 1979, the ILRC has provided technical assistance on hundreds of thousands of immigration law issues, trained thousands of advocates and pro bono attorneys annually on immigration law, distributed thousands of practitioner guides, provided expertise to immigrant-led advocacy efforts across the country, and supported hundreds of immigration legal non-profits in building their capacity.

- IDP is a New York-based non-profit that conducts litigation and provides training, education, and advocacy in support of advancing the rights of immigrants who are subject to the criminal legal system. IDP's mission is to secure fairness and justice for immigrants in the United States. The organization provides technical assistance to hundreds of immigration attorneys, DOJ-accredited representatives, and criminal and family defense attorneys on issues related to immigration, criminal, and family law, particularly the immigration consequences of law enforcement interactions and criminal court adjudications.

- JFL is a transformational immigration legal shop rooted in movement lawyering.  JFL defends and builds the power of immigrants' rights groups working to disrupt and dismantle our deportation and mass incarceration systems.  We are legal workers and lawyers with decades of experience, grounded in the core value that lawyering should serve movement organizing.  JFL staff have worked on many cases involving the intersection of immigration and criminal law, including recent high-impact decisions on behalf of individuals and amicus curiae, including *Saget v. Trump* (challenging termination of Haiti's Temporary Protected Status), *Catalan-Ramirez v. Wong* (Chicago Police Department's gang database and ICE's unlawful raid on Catalan-Ramirez), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) (holding that immigration crime of violence definition is unconstitutionally vague).

For the reasons detailed in the comment that follows, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

2

AR.10001

## I.      Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would substantially change the rules governing asylum adjudications.  For asylum seekers affected by these rules, the stakes could not be higher—a claim denied often means return to death or brutal persecution. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain in danger abroad. This is why restrictions on asylum eligibility must be undertaken with the utmost care, adherence to the law and treaties that form the basis of asylum protection, and consideration of the impact on vulnerable populations meriting relief.  The Proposed Rules violate these principles and will have immediate and long-lasting effects on the equal protection, due process, and statutory rights of affected people.  For these reasons, we urge that the Proposed Rules be rescinded in their entirety.

The Proposed Rules would make three major changes that narrow asylum eligibility.  The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; and (7) any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Our comment focuses on the proposal to expand the criminal bars to asylum and the proposed framework for evaluating convictions or sentences. These proposed changes are arbitrary, capricious, and ultra vires. They would gut the asylum protections enshrined in United States and international law. We submit this comment to express grave concerns about the administration's continued efforts to undermine due process protections for noncitizens and to exclude refugees and their families from obtaining the security and stability the United States asylum system has long promised.

## II.     The Agencies Failed to Give the Public and Affected Parties Adequate Opportunity to Comment on the Proposed Rule

At the outset, we note that DOJ and DHS have not provided a meaningful opportunity for the public to comment on the Proposed Rules. The 30 day comment period provided by the

AR.10002

agencies, ending January 21, 2020, includes multiple federal and religious holidays, including the national workplace holidays of Christmas Eve, Christmas Day, and New Years Day when businesses and federal and state governments are closed. It also included other religious holidays, such as Hanukkah and Kwanzaa. Despite requests to extend the comment period, the agencies have taken no such steps to provide the public and affected parties adequate time to comment on such drastic and harmful proposed changes to asylum adjudications.

The complexity of the Proposed Rules requires a full 60 day comment period. The Proposed Rules propose seven categorical bars to asylum eligibility, create guidelines for the evidence that adjudicators may consider in determining whether any of these bars applies, provides a confusing and convoluted reasoning for eschewing the categorical analysis—the bedrock of analysis of criminal convictions in immigration adjudications, and attempts to establish a multi-factor legal test for determining when a state court order vacating a criminal conviction may be considered valid for immigration purposes. Assessing the merits of the agencies' position with respect to each of these proposed changes and their justifications requires a full comment period.

Moreover, the Proposed Rules provide no calculations of the time and cost burden on immigration judges, asylum officers, immigration attorneys, and criminal defense attorneys.[1] The public and affected parties cannot meaningfully comment without enough time to gather data or to conduct the analysis needed to rebut the agencies' supposition that the agencies "do not expect the proposed additional mandatory bars to increase the adjudication time for immigration court proceedings involving asylum applications"[2] or that "[t]o the extent there are any impacts of this rule, they would almost exclusively fall on" asylum applicants.[3] The public also cannot evaluate the agencies' information under the Information Quality Act or assess the agency's proposal against objective or publicly available information.[4] The comment period here does not permit sufficient time for completing these analyses. Nevertheless IJN attempts to address the many issues of concern to immigrant communities and their advocates, but strongly believes the Proposed Rules require an extended comment period.

### III. The Categorical Expansion of the Particularly Serious Crime Bar to Asylum Is Ultra Vires to the Federal Immigration Statute and Violates International Treaty Obligations

The United States asylum system was first codified in the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a

---

[1] Proposed Rules at 69658 (explaining "there is no precise quantification available for the impact, if any, of this rule beyond the general notion that it will likely result in fewer grants of asylum on the whole").

[2] Proposed Rules at 69658.

[3] *Id.*

[4] 44 U.S.C. § 3516 note. *See Harkonen v. United States DOJ*, 800 F.3d 1143 (9th Cir. 2015) (discussing the Information Quality Act).

4

AR.10003

unique historic role as a haven for persons fleeing oppression."[5] The Refugee Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[6]

By acceding to the 1967 Protocol Relating to the Status of Refugees,[7] which binds parties to the United Nations Convention Relating to the Status of Refugees,[8] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of *nonrefoulement* (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. Specifically, the Convention allows states to exclude and/or expel individuals who, "having been convicted by a final judgement of a particularly serious crime, constitute[] a danger to the community of that country."[9] This clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[10]

The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the *gravest category*" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[11] Ordinary or common crimes do not meet this "threshold of seriousness."[12] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or *the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness*."[13] Finally, the UNHCR has urged that when determining whether a

---

5 Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

6 *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

7 United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

8 Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

9 *Id*. at art. 33(2).

10 U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

11 U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf [Emphasis added].

12 U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.  *See also Immigrant Defense Project & The Harvard Immigration and Refugee Clinical Program*, "United States Failure to Comply with the Refugee Convention: Misapplication of the Particularly Serious Crime Bar to Deny Refugee Protection From Removal to Countries Where Their Life or Freedom is Threatened," Fall 2018, https://blogs.harvard.edu/clinicalprobono/2018/09/21/hirc-idp-release-particularly-serious-crime-bars-report-and-chart/ (discussing the history of the particularly serious crime bar and its implementation throughout the signatory states.)

13 U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 10 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf [Emphasis added].

AR.10004

person should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[14]

Rather than taking steps to better adhere to the Convention, however, the Proposed Rules further diminish the protections for refugees by expanding the bar to ever more "common" offenses, like misdemeanors and non-violent felonies, and alleged activity.[15] Under the long-standing approach to the particularly serious crime bar, low-level offenses like misdemeanor driving under the influence where no injury is caused, or simple possession of a controlled substance or paraphernalia, that do not fall within the aggravated felony definition, simply cannot constitute a particularly serious crime.[16] The Proposed Rules defend the expansion of the particularly serious crime bar on the grounds that case-by-case adjudication is "inefficient."[17] However, the proposed framework still relies on case-by-case adjudication by creating fact-specific criteria for a number of the bars, meaning that the Proposed Rules do not even meet their stated purpose. Furthermore, the purported justification disregards the directive of the Convention to ensure that only people who have been convicted of crimes that are truly egregious and therefore present a future danger are placed at risk of *refoulement*.

Adjudicators have repeatedly recognized that crimes specifically contemplated for inclusion by the Proposed Rules are not "particularly serious crimes."[18] When declining to find that a fraudulent document offense was particularly serious, the Board of Immigration Appeals (BIA) cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution[,] the danger of persecution should generally outweigh all but the most egregious of adverse factors."[19] The BIA has also observed that an alien smuggling offense could be "motivated by love, charity, kindness, or religious principles," and adjudicators should "exercise great caution in designating such an offense as a particularly serious crime" for the purpose of barring eligibility for withholding of removal.[20] As noted in the concurrence to *Delgado v. Holder*, a decision the Proposed Rules cite in support of the expanded bars, barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar

---

14 *Id.* at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

15 Note that the BIA has ruled that unless there are unusual circumstances, a single conviction of a misdemeanor offense is not a particularly serious crime. *See Matter of Juarez*, 19 I&N Dec. 664 (BIA 1988).

16 *See Immigrant Defense Project & The Harvard Immigration and Refugee Clinical Program*, "United States Failure to Comply with the Refugee Convention: Misapplication of the Particularly Serious Crime Bar to Deny Refugee Protection From Removal to Countries Where Their Life or Freedom is Threatened," Fall 2018, https://blogs.harvard.edu/clinicalprobono/2018/09/21/hirc-idp-release-particularly-serious-crime-bars-report-and-chart/

17 Proposed Rules at 69646.

18 For a thorough examination of the standards used to designate particularly serious crimes in caselaw *see* Fatma Marouf, "A Particularly Serious Exception to the Categorical Approach," *Boston Univ. Law Review* 97 (2017): 1427.

19 *Matter of Pula*, 19 I.&N. Dec. at 474.

20 *In re L-S-*, 22 I.&N. Dec. 645, 655 (BIA 1999) (citing *In re Tiwan*, 19 I.&N. Dec. 875 (BIA 1989)).

AR.10005

meaningless. [21] The Proposed Rules therefore represent a significant and baseless departure from past practice and the construction of the term "particularly serious crime."

For the same reasons, the Proposed Rules violate the plain meaning of the term "particularly serious crime."[22] The Immigration and Nationality Act ("the INA") "does not define [this] phrase," so it carries "its ordinary meaning," and that common-sense understanding aligns with how the term originated and has been interpreted. [23] There is no ordinary, accepted use of the term "particularly serious crime" that would encompass all of the offenses the Proposed Rules would sweep in. In no way can a misdemeanor document crime, simple drug possession, or even a DUI, be truly considered a "particularly serious crime." The statutory phrase "constitutes a danger to the community of the United States" bolsters this conclusion. Again, no ordinary usage of "danger to the community" would include (for example) simple drug possession. And even if this language is at all ambiguous, the proposal is, for the reasons explained above, "'untethered to Congress's approach'" in implementing our treaty obligations, and therefore impermissible.[24]

## IV. The Agencies Fail to Account for the Time and Cost Burden that the Proposed Rules will have on the Agencies as well as Criminal and Immigration Attorneys

The Proposed Rules impose a complex legal inquiry that may require analysis of statutes, review of case law and, in some cases, review of evidence beyond the record of conviction. In so doing, the agencies fail to calculate or consider the substantial burden of training costs and time that they must expend in order to train asylum officers and immigration judges on the criminal statutes of the fifty states as well as the District of Columbia and the U.S. territories in order to determine whether a criminal conviction meets one of the proposed bars.[25] The Proposed Rules would also impose an extraordinary burden of time and cost on the representatives of asylum seekers and asylum seekers proceeding *pro se*, who are the most prejudiced by the new scheme.

The Proposed Rules would supplant the current longstanding case-by-case framework by adding to the regulations seven categorical bars to asylum eligibility. However, the offenses included do not match any uniform label of such crimes (which does not currently exist). Indeed, multiple federal circuit courts of appeals have emphasized the substantial burden that such regulatory bars would have on the agencies, "considering the vast array of crimes defined by each of the fifty states' criminal codes."[26] Such research and legal analysis would need to be conducted by adjudicators who are not all attorneys, and who are already adjudicating a backlog

---

[21] *Delgado v. Holder*, 648 F.3d 1095, 1099-1110 (9 Cir. 2011) (Reinhardt, concurring)

[22] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[23] *Burrage v. United States*, 571 U.S. 204, 210 (2014).

[24] *See NRDC v. EPA*, 777 F.3d 456, 469 (D.C. Cir. 2014).

[25] *See* Proposed Rules at 69658.

[26] *Ali v. Achim*, 468 F.3d 462, 469 (7th Cir. 2006) ("require[ing] the Attorney General and his agents to sift through each state's code and prospectively identify by regulation every single crime that would qualify as 'particularly serious' would impose an onerous burden"); *see also Gao v. Holder*, 595 F.3d 549, 557 (4th Cir. 2010) (explaining "the Attorney General would also face immense practical difficulties if he were required to act through rulemaking alone. It would be a Herculean task to "sift through each state's code and prospectively identify by regulation every single crime that would qualify as particularly serious." [internal quotes removed]).

7

AR.10006

of cases under immense time pressure.[27] The amount of training required to conduct such an analysis is substantial and has not been included in the costs enumerated in the proposed regulation.

Furthermore, the agencies have not considered the time or cost burden that the addition of such vague and broadly worded criminal bars to asylum will add to immigration attorneys, DOJ-accredited representatives, and *pro se* asylum applicants. The Proposed Rules will also undoubtedly increase the time and cost of providing technical assistance, as our organizations advise legal services providers on issues such as criminal bars to eligibility for asylum. Overall, the Proposed Rules will add many layers of confusion and uncertainty to the asylum application process, for both asylum seekers and their legal advocates, who will be unable to tell how they will determine whether countless criminal convictions will bar an applicant from asylum. This lack of predictability will create a substantial burden on immigration legal services providers, who will be unable to advise their clients as to their asylum eligibility, a long-term and stable form of protection from persecution. Thus, many people who are entitled to asylum will be too afraid to apply and will instead remain in the shadows.

Finally, this vague and unclear language presents constitutional problems. Due process prohibits laws and regulations that fail to "give ordinary people fair warning about what the law demands of them,"[28] and the Equal Protection Clause requires the government to treat similarly situated people the same way.[29] As written, the Proposed Rules fail to give affected people fair notice of which offenses will bar asylum and which will not. And for the reasons set forth above, they will very likely result in applicants, whose acts are materially indistinguishable, being treated differently.

## V.      Withholding of Removal and CAT are Not Sufficient to Meet Statutory and Treaty Obligations Violated By The Proposed Rules

Throughout the Proposed Rules, the agencies defend their harsh and broad proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[30] The availability of these alternative forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not render the proposal lawful or nullify the harm created by the Proposed Rules' new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a policy that limits *bona fide* refugees to withholding of removal and CAT protection continues to violate the international treaty obligations enshrined in US immigration law.

First and foremost, the most serious harm that can befall a person as a result of these Proposed Rules is removal to persecution and torture, a risk that is not mitigated by the

---

[27] *See*, e.g., EOIR Memorandum, Case Priorities and Immigration Court Performance Measures, James R. McHenry III, Director (Jan. 17, 2018).

[28] *U.S. v. Davis*, 139 S. Ct. 2319, 2323 (2019).

[29] *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

[30] *See, e.g.,* Proposed Rules at 69644.

8

AR.10007

availability of other forms of relief. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[31] Thus, an applicant may have a valid asylum claim but be unable to meet the higher evidentiary standard for the other forms of relief and be removed to their country of origin, where they would face persecution or even death.  The asylum applicants most prejudiced by the Proposed Rules are those with meritorious claims.

Withholding and CAT recipients also face permanent separation from their families. Their spouses and children cannot reunite with them in the United States, because only immediate relatives of asylees and refugees are eligible to join them as derivatives.[32] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief.  Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.[33]

Withholding and CAT recipients cannot travel internationally, which compounds their separation from family. The United States's treaty obligations under the United Nations Convention Relating to the Status of Refugees afford refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory."[34] Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[35] Moreover, the BIA requires

---

[31] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[32] 8 C.F.R. § 208.21(a).

[33] Recently, this scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban," which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own. *See* Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

[34] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).

[35] 8 C.F.R. § 223.1.

AR.10008

that an individual granted withholding or CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel, regardless of what country they travel to, a "self-deportation."[36]

Perhaps the most pernicious result of these Proposed Rules is that withholding and CAT recipients are not eligible for adjustment of status to permanent residence, and subsequently citizenship. Those with meritorious claims for relief from persecution or torture, who are barred from asylum as a result of the Proposed Rules, will be blocked from a pathway to citizenship and all of its attendant privileges, including the right to vote.

Finally, judicial and administrative efficiency are not served by expanded asylum bars that funnel more applicants into removal proceedings to seek withholding of removal and CAT relief. Implementation of the Proposed Rules would further overload the immigration courts and cause applicants to wait years for a decision. During these extended proceedings, bona fide asylum seekers would remain in limbo, facing permanent separation from their families in their home countries. At the same time, their derivative family members in the United States would be required to seek separate forms of relief, further compounding administrative and judicial backlogs.

## VI. Immigration Law Includes a Waiver of Inadmissibility for Asylees Broader than the Criminal Bars Proposed in These Rules

The Proposed Rules impose stricter limits on asylum eligibility than the immigration statute contemplates. Currently the INA provides that one year after being granted asylum, a successful applicant can apply to adjust their status to permanent residence. Asylees with a wide array of convictions that would otherwise make them inadmissible are entitled to apply for a waiver of inadmissibility that is broader than almost any other in the statute. The waiver, found at section 209(c), is to be applied liberally to provide asylees with safe haven and a pathway to citizenship, serving the overall goals of the asylum law and our treaty obligations.[37] The Proposed Rules directly conflict with these aims and would render the existence of this waiver superfluous.

Under section 209(c) of the INA, asylees seeking adjustment of status are completely exempt from certain grounds of inadmissibility, including 212(a)(4), which relates to the likelihood of becoming a public charge.[38] Section 209(c) also authorizes the waiver of almost any other ground of inadmissibility under section 212(a) for humanitarian, family unity, and public interest purposes, with two exceptions. The two exceptions to the waiver are broadly consistent with the existing law governing the determination of particularly serious crimes. First, section 209(c) cannot be used to waive inadmissibility if the government has "reason to believe"

---

[36] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[37] 8 U.S.C. §1159(c).

[38] Under section 209(c) of the INA, eligible asylees and refugees seeking adjustment of status are exempt from the following grounds of inadmissibility: sections 212(a)(4) (relating to public charge), 212(a)(5) (relating to labor certification), and 212(a)(7)(A) (relating to presence in the United States without proper immigrant documentation) of the INA. 8 U.S.C. §§ 1159(c); 1182(a).

10

AR.10009

the applicant has engaged in drug trafficking.39 Second, the waiver cannot be granted to an asylee who has been convicted of a "violent or dangerous" crime, unless the person shows "exceptional and extremely unusual hardship" or foreign policy concerns justify issuance of the waiver.40 Apart from those two exceptions, the waiver can forgive any offense, including an inadmissible conviction that also is an aggravated felony, for example for theft or fraud, or a non-trafficking drug offense.

The proposal's dramatic expansion of criminal bars to asylum clashes with the breadth of the waiver available to asylee applicants for adjustment of status. Under the Proposed Rules, an applicant would be barred from eligibility for asylum, in the first instance, because of a criminal conviction that could be waived by section 209(c). The outcome of such a system is that otherwise eligible asylum applicants are blocked from the pathway to citizenship that the immigration statute clearly contemplates for them. This represents a significant conflict with the statute, for which the agencies offer no justification. And agencies may not adopt statutory interpretations that render statutory language superfluous or ineffective.41

## VII. The Proposed Rules Improperly Authorize Asylum Adjudicators Applying the Particularly Serious Crime Bar to Conduct Criminal Factfinding Using Unreliable and Racially Biased Evidence

The Proposed Rules authorize immigration adjudicators to seek out unreliable evidence obtained in violation of due process to determine whether an asylum applicant's conduct—considered independently of a criminal court adjudication—triggers the particularly serious crime bar. This aspect of the proposal violates the statutory text and would produce burdensome and inefficient proceedings with arbitrary outcomes.

At the outset, we note that the statute allows the Attorney General to bar only those noncitizens who, "having been *convicted by a final judgment of a particularly serious crime*, constitutes a danger to the community of the United States." On its face, this language does not allow the government to decouple the seriousness determination from the conviction. That is, the statute prohibits applying the particularly serious crime bar based on unadjudicated facts. The bar may be applied only where the "final judgment" of "convict[ion]" itself establishes that the crime was particularly serious.42 That conclusion is bolstered by the Supreme Court's repeated recognition that "[s]imple references to a 'conviction,' . . . are 'read naturally' to denote the 'crime as *generally* committed,'" rather than the defendant's "actual conduct."43 Specifically, the

---

39 *See In re Y-L-*, 23 I.&N. Dec. 270 (BIA 2002) Although barred from asylum eligibility as an aggravated felon, a noncitizen convicted of a drug trafficking offense may still qualify for withholding of removal. As a withholding recipient, however, the immigrant would not be eligible to apply for adjustment of status to permanent residence, a result that is consistent with the terms of the 209(c) waiver.

40 *Matter of Jean*, 23 I.&N. Dec. 373 (AG 2002)

41 *E.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009).

42 See *Delgado v. Eric H. Holder Jr.*, 648 F.3d 1095, 1109 n.1 (9th Cir. 2011) (en banc) (Reinhardt, J., concurring) (the Attorney General's authority to designate particularly serious crimes "applies principally to the *categorical* classification of offenses as particularly serious, rather than to the classification of *individual* criminal acts as particularly serious").

43 *Sessions v. Dimaya*, 138 S. Ct. 1204, 1217 (2018).

11

AR.10010

Proposed Rules' extension of the asylum bar to *conduct* not requiring any conviction that the asylum adjudicator alone determines is related to domestic violence explicitly violates this textual directive.[44] Moreover, the inclusion of unadjudicated facts in the determination whether any minor offense was committed in furtherance of gang activity also runs afoul of this limitation in the statute to the extent that it sweeps in a vast array of convictions that would not otherwise even trigger an inquiry into whether the particularly serious crime bar applies.

The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[45] Yet requiring adjudicators to engage in minitrials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency—and predictability—in the asylum adjudication process. As the immigration courts contend with backlogs that now exceed one million cases,[46] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[47] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequences of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[48] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[49] In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police

---

[44] *See* Proposed Rules at 69652.

[45] *See* Proposed Rules at 69646, 69656-8.

[46] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[47] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[48] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."); *United States ex rel. Guarino v. Uhl*, 107 F.2d 399, 400 (2d Cir. 1939) (L. Hand, J.) (holding that "deporting officials may not consider the particular conduct for which the alien has been convicted"). ."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[49] *Moncrieffe*, 569 U.S. at 200-201.

12

AR.10011

officer who recalls to the contrary," with the end result being a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[50]

Although it has not been decided that a categorical approach should apply to the particularly serious crime bar, these due process principles remain crucial to prevent governmental overreach. Certainly, the statute's use of crime categories and the emphasis on the finality of a conviction militates against the fact-finding inquiry contained in the Proposed Rules. So too, is the use, for much of the last century, of some form of the categorical analysis to determine the immigration consequences of convictions.[51] The departure from that approach in these Proposed Rules, in violation of the statutory language and Congress's policy, makes them ultra vires and an unauthorized exercise of executive power.

A. *The Proposed Rules Empower Adjudicators to Rely on Unreliable, Unproven, and Racially Biased Evidence of Gang Involvement*

The Proposed Rules also allow an adjudicator to apply the particularly serious crime bar to anyone who is convicted of a crime—including a misdemeanor—that the adjudicator deems linked to gang activity based on evidence that has no indicia of accuracy. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the sole responsibility to determine if there is "reason to believe" that *any* conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[52]

This aspect of the proposal is unlawful in two other ways. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang activities," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[53] The rule's operative phrase—"in support, promotion, or furtherance of the activity of a criminal street gang"—fails to "give ordinary people fair warning about what the law demands of them,"[54] particularly in conjunction with the malleable "reliable evidence" and "reason to

---

[50] *Id.* at 201.

[51] *See* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689-1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf (providing a history of the development of the categorical approach in immigration law).

[52] *See* Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[53] *See* Proposed Rules at 69649.

[54] *Davis v. United States*, 139 S. Ct. 2319, 2323 (2019).

AR.10012

believe" standards. For example, while "a minor traffic infraction is not 'particularly serious'" by itself,[55] the proposal would allow an adjudicator to deem a traffic violation a particularly serious crime if, in the adjudicator's view, there is "reason to believe" the violation was somehow "in support, promotion, or furtherance" of gang activity. This result not only contravenes the plain meaning of the phrase "particularly serious crime," as explained above, but also deprives people of fair notice. The rule provides no indication of what degree of relation is required to establish "support" or "promotion," especially given that law enforcement agencies have sometimes deemed people to be promoting gang affiliations based merely on their tattoos or style of dress,[56] which have nothing to do with the nature of any particular offense.

The effect of these provisions of the Proposed Rules would be to expand the number and type of convictions for which an asylum seeker might be found ineligible for relief, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rules), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[57] In making these determinations, asylum adjudicators improperly relying on uncorroborated allegations contained in arrest reports, could nevertheless shield their decisions by relying on discretion.[58] The Proposed Rules contain no safeguards to ensure against such erroneous determinations.

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[59] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[60] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This

---

[55] *Guerrero v. Whitaker*, 908 F.3d 541, 545 (9th Cir. 2018).

[56] LAPD, *How Are Gangs Identified*, http://www.lapdonline.org/get_informed/content_basic_view/23468.

[57] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that the asylum adjudicator may consider "all reliable evidence" in making their decision.

[58] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

[59] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[60] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

14

AR.10013

outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[61]

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security based on information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers. That is true even though past legislative efforts to expand the grounds of removal and inadmissibility in the INA to include gang membership have failed to pass both houses of Congress.[62] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[63] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as a result of unsubstantiated information about supposed gang ties.[64] Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations presents serious due process concerns and will inevitably result in the return of many refugees back to harm.[65]

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The INA and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern to an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

---

[61] *See* Jonathan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[62] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[63] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[64] *See* Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

[65] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

AR.10014

B. *The Proposed Rules Empower Adjudicators to Rely on Unreliable, Unproven, and Biased Evidence of Domestic Violence in Direct Contravention of the Statute*

The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses and conduct related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[66]

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is *not required*. This provision of the Proposed Rules is undeniably an ultra vires exercise of authority, in conflict with the statute and treaty obligations, and has a disparate impact on vulnerable populations including survivors of domestic violence. The Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense," and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[67]

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the INA does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar based on unadjudicated facts.[68] Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[69] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention in domestic disturbances. Moreover, it exceeds the authority delegated to the Attorney General by the immigration statute.

## VIII. The Proposed Rules Will Disparately Impact Vulnerable Populations Already Routinely Criminalized, Including LGBTQ Immigrants, Survivors of Trafficking and Domestic Violence, and Immigrant Youth of Color

---

[66] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as posession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[67] *See* Proposed Rules at 69652.

[68] 8 U.S.C. § 1227(a)(7)(A).

[69] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

AR.10015

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with trafficking and domestic violence.[70] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for becoming fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides latitude for asylum adjudicators to deny relief to anyone whose final criminal convictions show they are a danger to the community.[71] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[72] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[73]

A.    *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring and smuggling of noncitizens by parents and family members and those previously removed further

---

[70] *See* D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[71] Apart from the statutory aggravated felony bar to asylum, the BIA and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu,* 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[72] 8 U.S.C. § 1159(c).

[73] 8 C.F.R. § 208.24(a).

17

AR.10016

criminalizes vulnerable populations fleeing persecution.[74] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[75] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly grave in light of the administration's efforts to prosecute parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[76] The Proposed Rules seek to take this strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what they must—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the nature or seriousness of prior convictions.[77] Rather, the Proposed Rules treat all immigration violations as similar in seriousness without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not knowingly have abandoned their right to apply for asylum. Some asylum seekers have also wrongly been assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances

---

[74] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[75] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[76] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[77] Proposed Rules at 69648.

18

AR.10017

giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might previously have occurred.

B. *Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. Yet again, this expansion is flatly inconsistent with the plain statutory language. "As a matter of ordinary usage,"[78] no one would describe a misdemeanor document offense as a "particularly serious crime" that renders the offender "a danger to the community."

This expansion also ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[79] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[80]

Moreover, migrants in vulnerable communities who struggle to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[81] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[82] The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

C. *The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these people may become aware of their ability to apply for asylum only after law enforcement

---

[78] *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018).

[79] *See Matter of Pula*, 19 I.&N. Dec. at 474.

[80] *Id.*

[81] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[82] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

19

AR.10018

encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may already have experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[83] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[84] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[85] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. Trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[86] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from using a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

[83] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[84] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[85] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

[86] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

20

AR.10019

### IX. The Proposed Definition of "Conviction" and "Sentence" for the Purposes of the New Bars Further Excludes Those in Need of Protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility violates the INA. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings for longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[87]

#### A. *The Proposed Rules undermine Sixth Amendment protections and harm immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility. This proposal begins from the premise that "[n]o order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect."[88] This presumption is overcome only if the adjudicator finds that the court had authority to issue the order and the order "was not entered for rehabilitative [or immigration] purposes." And an order presumptively fails this test if it was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[89]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[90] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[91] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to

---

[87] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the BIA stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[88] Proposed Rules at 69660.

[89] Proposed Rules at 69655.

[90] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

[91] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

21

AR.10020

immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

> B. *The Proposed Rules violate the full faith and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[92] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders.

Apart from their textual infirmity, the Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be BIA offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies.[93] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative

---

[92] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).

[93] *See id.* (*citing Matter of Pickering*, 23 I.&N. Dec. 621).

AR.10021

immigration consequences, the BIA was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[94] Similarly, in *Reyes-Torres v. Holder,* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry.[95] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[96] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[97] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[98] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> C. *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute.

To start, nowhere does the plain text of the INA support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. On its face, the statute requires a "convict[ion] by a final judgment." A vacated judgment is neither "final" nor a "judgment"—it "has no effect" whatsoever.[99] Likewise, a vacated conviction is no conviction at all. Nothing in the statutory definition of "conviction" suggests a different approach here.[100]

---

94 *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

95 *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263.

96 *Id.*

97 *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").

98 *Id.* ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

99 *E.g.*, *Fort Knox Music Inc. v. Baptiste*, 257 F.3d 108, 110 (2d Cir. 2001).

100 8 U.S.C. § 1101(48)(A) ("The term 'conviction' means, with respect to an alien, a formal judgment of guilt of the alien entered by a court or, if adjudication of guilt has been withheld, where—(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed.").

23

AR.10022

Thus, nothing in the statute allows the government to treat a vacated judgment as valid and effective based on when, how, or why it was vacated. Put differently, the validity of a court order does not depend on the judge's apparent subjective reasons for entering it, or even whether the judge's legal reasoning was wrong,[101] and the statute leaves no room for the proposal's contrary presumption. The only even arguably permissible criterion in the proposal is whether the vacating court had jurisdiction to issue the order—but even then, the proposal errs by presuming that a vacatur order is invalid unless the adjudicator is shown otherwise. Court orders are presumptively valid, not the other way around.[102]

The same is true of orders modifying, clarifying, or altering a judgment or sentence. Again, nothing in the statute authorizes the government to ignore such an order based on the order's timing or the adjudicator's view of the reasons behind it. And there is no serious argument that Congress, in using the phrase "convicted by a final judgment," contemplated federal asylum adjudicators second-guessing state courts in this way. The statute's plain language flatly forecloses this aspect of the proposal. The BIA recognized this in *Matter of Cota-Vargas*, where it concluded that applying "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act."[103]

Nor does the legislative history support such a rule. Based on the text of the INA and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board in *Matter of Cota-Vargas* determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[104] The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

---

[101] *E.g.*, *Patton Boggs, LLP v. Chevron Corp.*, 825 F. Supp. 2d 35, 40 (D.D.C. 2011).

[102] *E.g.*, *Lee v. Ali (In re Ali)*, No. 17-30413, at *5 (Bankr. S.D. Tex. Jan. 30, 2018) ("A court's orders are generally *presumed valid*; therefore, the burden of establishing that the Harris County Court's order was invalid rests with [the challenger].").

[103] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).

[104] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).

AR.10023

## X.    Conclusion

For the foregoing reasons, IJN and its four member organizations, ILRC, IDP, JFL, and NIPNLG, strongly oppose this rule.  In addition to the arguments made above, the Proposed Rules represent a sweeping and unauthorized change to asylum in the United States.  The Proposed Rules would endanger the lives of untold thousands by leaving them at greater risk of *refoulement* in violation of our nation's treaty obligations, and do not make communities safer.  As organizations that work closely with immigrant communities, criminal defenders, and immigration attorneys, we encourage the agencies to rescind these harmful Proposed Rules in full.

We request that the agencies consider this comment on the Proposed Rules.  Please do not hesitate to contact Cristina Velez at cristina@nipnlg.org if you have any questions or need any further information. Thank you for your consideration.


Oliver Merino
Immigrant Justice Network Coordinator
Immigrant Justice Network
1015 15th Street NW, 6th Floor
Washington, DC 20005

Sirine Shebaya
Executive Director
National Immigration Project of the National Lawyers Guild
2201 Wisconsin Ave., NW, Suite 200
Washington, DC 20007

Sameera Hafiz, Esq.
Policy Director
Immigrant Legal Resource Center
1015 15th Street NW, 6th Floor
Washington, DC 20005

Alisa Wellek
Executive Director
Immigrant Defense Project
40 W. 39th Street, 5th Floor
New York, NY 10018

Paromita Shah
Executive Director
Just Futures Law
95 Washington Street, Suite 104-149
Canton, MA 02021

AR.10024

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-7cr6
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0506
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Irena Sullivan
**Organization:** Tahirih Justice Center

## General Comment

Attached please find comments in pdf form from the Tahirih Justice Center in response to the EOIR proposed rule: Procedures for Asylum and Bars to Asylum Eligibility.

## Attachments

Tahirih Asylum bars NPRM comments Final

AR.10025



*Protecting Immigrant
Women and Girls
Fleeing Violence*

January 21, 2020

*Submitted via www.regulations.gov*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
United States Department of Justice

**Re:** **Comments in Response to Proposed Rule:** *Procedures for Asylum and Bars to Asylum Eligibility*: EOIR Docket No. 18-0002; 84 F.R. 69640 / A.G. Order No. 4592-2019

Dear Assistant Director Reid:

The Tahirih Justice Center (Tahirih) is pleased to submit the following comments in response to the Executive Office for Immigration Review's (EOIR) and United States Citizenship and Immigration Services' (USCIS) Proposed Rule (NPRM) and Request for Comment on *Procedures for Asylum and Bars to Asylum Eligibility;* EOIR Docket No. 18-0002; 84 F.R. 69640 / A.G. Order No. 4592-2019 issued on December 19, 2019.

## I.      Introduction

Tahirih is a national, nonpartisan policy and direct services organization that has assisted over 25,000 immigrant survivors of gender-based violence (GBV) over the past twenty-two years.  Our clients endure horrific abuses such as human trafficking, domestic violence, sexual assault, forced marriage, and honor crimes. **As an organization that promotes safety and justice for survivors, we are strongly opposed to this NPRM ("the proposed rule') and urge EOIR and USCIS to promptly rescind it for reasons including the following.**

## II.      The Proposed Rule Will Cause Irreparable Harm to Survivors of GBV

1.      <u>Barring Asylum for those who have Committed Domestic Violence Acts and/or Offenses will Punish Survivors, Despite the Rule's Exception for Non-Primary Perpetrators</u>

The NPRM proposes to amend current regulations to render ineligible for asylum any individuals who have been convicted of a crime involving domestic violence, and those whom there are "serious reasons for believing" have engaged in acts of domestic "battery or extreme cruelty."[i]  The rule provides a narrow exception modeled after the waiver of the domestic violence ground of deportability, for those who themselves have endured battery or extreme cruelty and who are/were not the "primary perpetrator" of abuse.  For the exception to apply, a finding must be made that the applicant "(1) … acted in self-defense; (2) …

**ATLANTA**
230 Peachtree Street NW
Atlanta, GA 30303
Tel: 470-481-4700
Fax: 470-481-7400
Atlanta@tahirih.org

**BALTIMORE**
211 E. Lombard Street
Suite 307
Baltimore, MD 21202
Tel: 410-999-1900
Fax: 410-630-7539
Baltimore@tahirih.org

**GREATER DC | NATIONAL**
6402 Arlington Boulevard
Suite 300
Tel: 571-282-6161
Fax: 571-282-6162
TTY: 711
Falls Church, VA 22042
GreaterDC@tahirih.org
Justice@tahirih.org

**HOUSTON**
1717 St. James Place
Suite 450
Houston, TX 77056
Tel: 713-496-0100
Fax: 713-481-1793
Houston@tahirih.org

**SAN FRANCISCO BAY AREA**
881 Sneath Lane
Suite 115
San Bruno, CA 94066
Tel: 650-270-2100
Fax: 650-466-0006
SFBayArea@tahirih.org

**tahirih.org**

AR.10026

was found to have violated a protection order intended to protect him or her; or (3) ... committed, was arrested for, was convicted of, or pled guilty to committing a crime that did not result in serious bodily injury, and there was a connection between the crime and the applicant's having been battered or subjected to extreme cruelty."[ii]   For several reasons, this exception will prove inadequate in practice to shield survivors from its reach, and will result in grave injustices.

> a.   It is Difficult to Determine the Primary Perpetrator of Domestic Violence in Dual Arrest Cases, Particularly when Immigrant Victims are Involved

As recognized by the rule's proposed exception, dual arrests are well-known to arise in the domestic violence context.[iii]   Dual arrests are in fact often the product of jurisdictions' zealous response to domestic violence but can unwittingly function to the detriment of victims.  Such arrests typically occur when a victim acts in self-defense or when, to avoid accountability or retaliate, an abuser fabricates a cross-complaint for abuse against the victim.   In these cases, even trained law enforcement officers can be reluctant to determine which party is the primary aggressor when arriving at the scene of an incident.[iv]  Language and/or cultural barriers exacerbate the situation, which is frequently the case when the survivor is an immigrant.[v]  Well-aware of this reality, abusers are quick to exploit it and manipulate a victim's particular vulnerability in the abuser's favor.

In 2017, Tahirih conducted a nationwide survey of immigrant women and advocates working with them to determine the most urgent and prevalent challenges immigrant women face in the United States.  The responses to that survey indicate that language barriers faced by survivors allow many abusers to control the narrative in dual-arrest situations.  One advocate noted that an interpreter "is often someone the victim knows personally. I've even had cases where the only available interpreter was the accused perpetrator of the crime." Another stated: "We've had women arrested when they were abused by their spouse because they can't explain to the officer what happened, especially since they are under so much stress in that moment."  Other problematic scenarios arise when children are used as interpreters. Children who translate for their mothers regarding abuse are traumatized by that experience. Children might not have the vocabulary or cognitive ability to adequately express what they are seeing or hearing, while also being primary or secondary victims of abuse themselves.[vi] Faced with an impossible "choice," some intentionally mistranslate their mother's words for fear of sending their father to jail or causing his deportation.[vii]

Abusers are also known to retaliate against victims by framing them for crimes.  Tahirih is aware of a case in which an abuser planted drugs in his wife's car and then smashed her tail light to get her pulled over and arrested.  In another case, an abuser set fire to his home himself and called the fire department to report that his wife did it. She was arrested and jailed for weeks.  These examples show the insidious lengths to which perpetrators are willing to go to manipulate the legal system to silence and intimidate their victims.

As another tool of abuse, perpetrators notoriously try to thwart survivors' immigration cases by fabricating damaging information about the survivor and then reporting it to DHS.   In the marriage-based visa petitioning context, Congress expressly recognized and addressed this through the bipartisan Violence Against Women Act.[viii] There are no analogous protections in the asylum context to protect a survivor from the devastating effects of a vindictive abuser's unfounded

allegations. Furthermore, steps the Administration has recently taken to allow for anonymous tips to be submitted on an online form and establishing a dedicated office and phone line to receive complaints from supposed "victims" of immigrants has undoubtedly emboldened perpetrators more and newly lent more strength to otherwise weak accusations.[ix]

      b.      *The Proposed Rule's Evidentiary Standards are Unjustly Low and Allow DHS Unfettered, Unreviewable Discretion in Implementing them*

Under the proposed rule, asylum-seekers will be subject to the domestic violence bar where there are "serious reasons for believing" that they have engaged in acts of domestic "battery or extreme cruelty."[x]   Furthermore, the limited exception theoretically available to abused non-primary perpetrators will fall short of protecting those swept up in the bar because "all reliable evidence"[xi] can be considered in administering it:

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the asylum officer is not limited to facts found by the criminal court or provided in the underlying record of conviction.[xii]

The proposed rule leaves the door wide open for adjudicators to abuse discretion in deciding, subjectively, that there are "serious reasons for believing" that an applicant has engaged in acts of domestic battery or extreme cruelty.  It is unclear how "serious" will be defined, and whether and how detrimental and potentially false information provided by abusers will be considered in decision-making.  The risk of erroneous decisions at the expense of survivors is high.

In addition, this limited primary perpetrator exception will be extremely challenging for adjudicators to apply.  Law enforcement agents are themselves ill-equipped to make primary aggressor determinations for the reasons explained above.  Immigration adjudicators are even further removed from the immediate circumstances involved.  The dynamics of domestic violence are nuanced and complex, particularly when victims are immigrants, as even more tools can be employed to cruel advantage by abusers to isolate, control, and intimidate their victims.  It is essential for decisionmakers to have a deep understanding of these dynamics and the exploitative patters abusers engage in to manipulate their victims. It is likewise critical that evidence be deemed inherently "unreliable" when provided by an alleged abuser.  While the proposed exception to the asylum bar ostensibly aims to promote protection of individuals from domestic violence, we are deeply concerned that in practice, it will instead inflict harm on victims.

            i.      A high Standard of Proof is Appropriate When a Denial of Protection is at Stake

To bolster the validity of applying a liberal "conduct-specific" inquiry to trigger the bar, the rule notes that this same inquiry is used in the VAWA context when domestic violence victims seek lawful status based on the abuse they have suffered.[xiii]  In other words – DHS argues that because self-petitioners must only meet a low standard of proof to establish eligibility for protection, so, too

should DHS be entitled to a similarly low evidentiary burden to trigger a bar to asylum. Yet, the equivalence drawn here is superficial. The vastly different interests at stake in these circumstances demand different burdens of proof. A low burden is appropriate and necessary to protect victims in the VAWA self-petitioning context because 1) more harm is done by erroneously denying relief than erroneously granting it;[xiv] 2) a low standard maximizes the self-petitioner's confidentiality and therefore, safety;[xv] 3) certain forms of evidence can be inaccessible to a victim precisely because the abuser has blocked her access to doctors or courts, for example; and 4) no liberty interests are implicated for alleged perpetrators. By contrast, a rigorous burden of proof is appropriate when potentially barring applicants from asylum. The consequences of invoking the bar are dire, with the applicant's life and safety hanging in the balance. Per the Supreme Court, asylum itself is granted to those who establish a well-founded fear of persecution – i.e., where the chance of persecution is "one in ten,"[xvi] for this very reason.

     c.    *The Domestic Violence Asylum Bar and Primary Perpetrator Exception Must Not be Implemented Arbitrarily*

Tahirih firmly opposes the proposed rule. If finalized, however, we urge USCIS and EOIR to implement each of the following measures in their entirety to mitigate the harm the bar will inflict and maximize the utility of the primary persecutor exception for victims:

- Highly specialized relevant training in the dynamics of domestic violence and the unique vulnerabilities of immigrant victims should be required for all adjudicators, informed by meaningful input from all stakeholders, including advocates for survivors
- When an applicant is deemed not to meet the exception to the bar, the decision should be automatically subject to supervisory review
- Adjudicators should provide a detailed description as to how a decision that an applicant does not merit the exception was made; i.e., the adjudicator should indicate in writing what and how specific factual findings were made and how they were weighed against other evidence
- Adjudicators should also explain in detail, in writing, their initial decision to apply the bar, i.e., how they determined that "serious reasons" existed for believing that the applicant engaged in acts of domestic violence or extreme cruelty
- When an applicant doesn't meet the exception, adjudicators should identify what, if any, evidence was relied on that was provided by the alleged primary perpetrator, how it was weighed, and what the adjudicator did to determine whether it was false or fabricated
- Agencies should regularly engage with stakeholders to assess the impact of the bar/exception on survivors

    2.    <u>Removing Automatic Review of Solely Discretionary Denials of Asylum is Arbitrary and Capricious and will Needlessly Harm Survivors of GBV</u>

The proposed rule rescinds the current regulation requiring automatic reconsideration of a solely discretionary denial of asylum.[xvii] While an asylum applicant in this context is still granted withholding of removal, she 1) can no longer protect and/or reunite with her spouse or minor

children at home; 2) is susceptible to removal at any time; 3) cannot travel abroad; and 4) cannot regularize her status to secure lawful permanent residence and ultimately citizenship.

In revoking this provision, the NPRM claims confusion, inefficiency, and lack of necessity as the justification. Among the sources of confusion are 1) who is to reconsider the denial of asylum; and 2) how the process for reconsideration should be initiated. The NPRM goes on to say that "continued litigation on these questions would be an ongoing burden for applicants, the immigration system, and courts."[xviii] As to lack of necessity, the NPRM points to various other avenues for review of asylum denials.[xix] However, in light of the dire interests at stake in the asylum context – the loss of life and freedom – it is arbitrary and capricious to attempt to cure this provision's alleged deficiencies by simply eliminating it entirely, without considering viable alternatives. Put another way, it is USCIS' obligation to develop a clear process for reconsideration, and it cannot evade this responsibility by claiming before undertaking it that it would simply be too difficult.

Withholding of removal is an insufficient substitute for asylum, and those fleeing persecution should have every opportunity to pursue asylum. This is particularly evident in cases where an individual has fled persecution, but they cannot protect their family through asylum and they are ultimately harmed in their home country.

In one Tahirih case, Sarah* from Nigeria, fled to the US after suffering severe domestic violence. It was unsafe for Sarah's 14-year-old daughter to accompany her initially. While Sarah's claim was pending, someone brutally attacked her daughter on her way home from school and she died the next day of her injuries. Sarah's husband had been threatening her children for months. Sarah's other son is in hiding and her attorney is requesting humanitarian parole for him and an expedited asylum interview as a result.[xx]

Confusion and inconsistency within the current provision's implementation can be addressed through amending the rule and/or issuing guidance outlining a specific process to implement reconsiderations, as is done routinely in other contexts. We urge EOIR and USCIS to do either or both, with meaningful input from stakeholders, including those serving asylum seekers, given the grave protection interests at issue.

## III. The Proposed Rule Violates the Fourteenth Amendment as it Disproportionately Harms Non-White Immigrants

The proposed rule also raises serious equal protection concerns. Asylum seekers are predominantly people of color.[xxi] By targeting asylum seekers specifically for additional bars to relief, the NPRM seeks to operationalize the animus that high-ranking government officials, including the supposed Acting Director of USCIS, have repeatedly expressed about keeping non-white immigrants from places as disparate as Central America, Haiti, Mexico, the Middle East, and Nigeria out of the country.[xxii] A policy implemented on that basis violates the Equal Protection Clause of the Fourteenth Amendment.

## IV. Conclusion

Excluding from asylum individuals deemed to have committed domestic violence offenses will ultimately punish those escaping life-threatening persecution at home and have a particularly harsh impact on survivors of domestic violence themselves. This sweeping proposed rule is not necessary to serve any government interest. While the NPRM purports to protect survivors and deter domestic abuse, in practice, the rule's potential to deepen trauma and double-down on injustice for survivors is very high. **We therefore urge EOIR and USCIS to immediately abandon the proposed rule. If the rule is finalized, we ask that our recommendations to ensure accountability in its application and to mitigate the harms that will result from its application are adopted and implemented.**

We look forward to your detailed feedback on these comments, and please contact me at irenas@tahirih.org or 571-282-6180 for additional information.

Respectfully,

Irena Sullivan
Senior Immigration Policy Counsel

---

[i] Proposed Rule §§208.13(c)(6)(v) and (vii).

[ii] Proposed Rule §208.13(c)(6)(vii)(F); *See also* INA §237(a)(7)(A) and (a)(2)(E)(i)-(ii).

[iii] https://permanent.access.gpo.gov/lps104035/usdoj/www.ojp.usdoj.gov/nij/publications/dv-dual-arrest-222679/dv-dual-arrest.pdf; https://www.tandfonline.com/doi/abs/10.1080/08974454.2013.759068; https://digitalcommons.law.yale.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1279&context=yjlf

[iv] *See* https://journals.sagepub.com/doi/abs/10.1177/0886260517739290?journalCode=jiva

[v] https://journals.sagepub.com/doi/abs/10.1177/0886260517739290?journalCode=jiva&; Finn, M. A., & Bettis, P. (2006). Punitive action or gentle persuasion: Exploring police officers' justifications for using dual arrest in domestic violence cases. Violence Against Women, 12, 268-287.

[vi] §208.13(c)(6)(v)(A) of the proposed rule also bars from asylum an individual who has been convicted of a crime involving child abuse, neglect, or abandonment. Yet, many states have "failure-to-protect" statutes that have been used to prosecute battered mothers for not shielding their children from being abused by a spouse or partner, or even from being exposed to the abuse of the mother. Such statutes already penalize the victim who is often put in an impossible position, as she is likely to lose her children and exacerbate the violence if she attempts to leave and may have nowhere to go and no supports available to her. Women are more often prosecuted than men under such statutes. Exacerbating the immigration consequences that can flow from this kind of punitive use of such statutes (to justify the state's removal of children from the mother, or to coerce the mother to testify against the abuser) subjects the victim to further institutional violence and systemic injustice. *See, e.g.,* Sarah Rogerson, Special Issue: Immigration and the Family Court: Special Issue Article: Unintended and Unavoidable: the Failure to Protect Rule and its Consequences for Undocumented Parents and their Children, 50 fam. ct. rev. 580 (October 2012) and Margo Lindauer, Symposium: Theory and Praxis in Reducing Women's Poverty: Damned if you Do, Damned if you Don't: Why Multi-Court-Involved Battered Mothers Just Can't Win, 20 am. U.J. Gender Soc. Pol'y & l. 797 (2012).

[vii] http://www.tahirih.org/wp-content/uploads/2018/01/Tahirih-Justice-Center-Survey-Report-1.31.18-1.pdf; *See also* Casa de Esperanza: National Latin@ Network. Wrongful Arrests and Convictions of Immigrant Victims of Domestic Violence: Stories from the Field. Retrieved from https://www.nationallatinonetwork.org/images/files/Quote_Sheet_for_Hill_Visits_-_Service_Providers.pdf.

[viii] *See* 8 U.S.C. §1367.

AR.10031

ix *See* https://www.federalregister.gov/documents/2019/08/08/2019-17022/agency-information-collection-activities-new-collection-uscis-tip-form#addresses and https://www.ice.gov/voice.

x Proposed rule §§208.13(c)(6)(v) and(vii).

xi Proposed rule at 69652.

xii Proposed rule §208.13(c)(6)(v)(B).

xiii *See* proposed rule FN 4: "…a conviction would not be required in certain situations involving battery or extreme cruelty. That conduct-specific inquiry is essentially identical to the inquiry already undertaken in situations in which an alien seeks to obtain immigration benefits based on domestic violence that does not necessarily result in a conviction. *See, e.g.,* INA 240A(b)(2)(A), 8 U.S.C. 1229b(b)(2)(A); 8 CFR 204.2(c)(1)(i)(E), (c)(1)(vi), (c)(2)(iv), (e)(1)(i)(E), (e)(1)(vi), and (e)(2)(iv)."

xiv And, in fact, historically very low rates of fraudulent filings have been found among VAWA self-petitions. According to USCIS data from 2012-2018, the rate of fraud among VAWA self-petitions was miniscule – a mere .142%. Data is available upon request. *See also* Congressional Research Service report, "Immigration Provisions of the Violence Against Women Act (VAWA)", by William Kandel, June 7, 2012 (hereafter CRS Report), 2nd page of summary: "While some suggest that VAWA provides opportunities for dishonest and enterprising foreign nationals to circumvent U.S. immigration laws, empirical evidence offers minimal support for these assertions."

xv Requiring further proof might involve seeking documents and statements directly from an abuser that would put him on notice that the victim was trying to escape, immediately exacerbating the risk to her safety.

xvi *INS v. Cardoza–Fonseca*, 480 U.S. 421, 1987.

xvii §208.16(e) would be rescinded; See proposed rule at 69660.

xviii *See* proposed rule at 69656-7; *See Shantu* v. *Lynch,* 654 F. App'x 608, 613-14 (4th Cir. 2016) (discussing these ambiguities); *see also* v. *INS,* 436 F.3d 89, 93 (2d Cir. 2006). These ambiguities have not been "definitively resolved," *Shantu,* 654 F. App'x at 614.

xix *See* proposed rule at 69657.

xx Sarah is applying for asylum, but the facts illustrate how dangerous it is for family unable to follow to join relatives who have fled to the US.

xxi *See* Transactional Records Access Clearinghouse, *Asylum Decisions*, https://trac.syr.edu/phptools/immigration/asylum (showing nationality of people seeking asylum in the United States).

xxii *See, e.g.*, Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://perma.cc/F7LT-A8MC; President Donald Trump, Remarks on the Illegal Immigration Crisis and Border Security (Nov. 1, 2018), https://perma.cc/F4DX-RZ84; Jeff Sessions, U.S. Att'y Gen., Remarks on Immigration Enforcement, Las Cruces, NM (Apr. 11, 2018), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-immigration-enforcement (Last accessed Dec. 12, 2019), https://perma.cc/DT3U-X4UG; Rebekah Entralgo, *Conservatives want a man who compared immigrants to rats to lead DHS* (Apr. 11, 2019), https://thinkprogress.org/conservatives-cuccinelli-dhs-immigrants-trump-7233d8f6f1ce/

AR.10032

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-xu56
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0507
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Thng Phan

## General Comment

I oppose the cruel and harmful deportation of asylum seekers. The government should reform its asylum, refugee and immigration policies to create a more just world.

AR.10033

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eko-y4t2
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0508
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Joshua Leach
**Address:**
    689 Massachusetts Ave.
    Cambridge,  MA,  02139
**Email:** jleach@uusc.org

## General Comment

See attached file(s)

## Attachments

UUSC_Public Comment_1.21.20

AR.10034

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for
Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of
Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 21, 2020

To Whom It May Concern:

I write on behalf of the Unitarian Universalist Service Committee (UUSC) to express our strong opposition to the above-referenced proposed rules establishing seven new bars to eligibility for asylum. By categorically denying asylum on the basis of relatively minor criminal offenses—and, in some cases, mere *allegations* of criminal conduct—the proposed rules will almost certainly lead to the refoulement of people in desperate need of humanitarian protection.

Contrary to the proposed rules' assertions, these concerns are not adequately addressed by the fact that asylum-seekers subject to the new bars would have recourse to withholding of removal and Convention Against Torture (CAT) protections. Both alternative forms of protection mandate much higher burdens of proof, requiring an asylum-seeker to establish a greater than 50% likelihood of persecution in their home countries.

This is an extremely exacting standard that is very difficult to meet for people who have left homes and belongings behind. Such a high burden of proof should certainly never be applied in such a sweeping manner to cases where the consequence of a wrongful deportation may be torture or death.

Under the proposed rules, a person would be compelled to meet this high burden of proof merely on the basis of past low-level drug offenses, harmless immigration-related violations such as "illegal reentry," convictions for using false documents, allegations of certain acts of violence regardless of conviction, or smuggling or harboring offenses—even if they are asylum-seekers who were in fact "smuggling" their own child to safety.

Neither international law nor domestic practice has ever countenanced treating minor criminal offenses as grounds for categorically denying asylum. The right to life and security does not stop at the point at which a person has made mistakes. Categorical bars on the basis of real or alleged minor crimes also have a disproportionate impact on members of communities that are unjustly criminalized, overpoliced, and targeted by law enforcement, including Black and Trans communities.

For these reasons, we urge you to withdraw the proposed rules from consideration and focus on restoring the integrity of the right to seek asylum as enshrined in U.S. and international law.

Sincerely,
Joshua Leach
Policy Analyst
Unitarian Universalist Service Committee

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-im5a
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0509
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Daniel Kosten
**Organization:** National Immigration Forum

## General Comment

See attached file(s)

## Attachments

National Immigration Forum Comments on Additional Limitations on Eligibility for Asylum

AR.10036



NATIONAL IMMIGRATION FORUM

**Practical Solutions for Immigrants and America**

January 21, 2020

Ms. Lauren Alder Reid
Assistant Director
Office of Policy
Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

**Re: 8 CFR Part 1208 (EOIR Docket No. 18-0002)**

Dear Ms. Reid:

The National Immigration Forum (Forum) submits the following comments on the proposed rule titled 8 CFR Part 1208 (EOIR Docket No. 18-0002; AG Order No. 4592-2019), published in the Federal Register by the Department of Justice and the Department of Homeland Security (DHS) on December 19, 2019.

Founded in 1982, the Forum advocates for the value of immigrants and immigration to the nation. We play a leading role in the national debate about immigration, knitting together innovative alliances across diverse faith, law enforcement, veterans and business constituencies in communities across the country.

The Forum urges DOJ and DHS not to move forward with the proposed rule, as it is overbroad, departing from the existing clear statutory standard while undermining congressional intent. The proposed rule creates seven new bars to asylum that will dramatically scale back who can be eligible for asylum. These changes are in direct tension with both U.S. and international law. The proposed rule does not provide an adequate and comprehensive analysis of the potential impact of these seven bars, including whether the bars would prevent the United States from meeting its existing legal obligations, under statute and under treaties to which the United States is a party, including the Convention Against Torture.

This proposed rule would create even greater barriers to gaining asylum in a system that is already challenging to navigate, put asylum seekers with valid claims in danger, and undermine due process.

**The New Felony Bar is Overbroad and Inconsistent with Congressional Intent**

Congress currently bars asylum seekers convicted of aggravated felonies from obtaining asylum. While the Attorney General and DHS Secretary have authority to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," the additional conditions cannot be "inconsistent with this chapter."

As DOJ and DHS acknowledge in the Notice of Proposed Rulemaking, the definition of felony in the proposed rule "might be over-inclusive." While the Forum appreciates that the agencies are seeking public comment on that point, we believe that the new bar is clearly overbroad and inconsistent with congressional intent. Creating a new, categorical bar to anyone with a felony conviction is plainly inconsistent with congressional intent, which explicitly differentiated between aggravated felonies and others felonies. Because aggravated felonies pose additional dangers to public safety, Congress defined (and over the years, expanded) that category, assigning additional adverse immigration consequences to it. By erasing the distinction between aggravated felonies and lesser felonies,

particularly those that lack a violent component, the proposed rule negates the careful work Congress has done in this area. While the Attorney General and the Secretary retain the ability to add additional categories of convictions to the list of barred offenses, the categorical natural of this new bar likely renders it invalid.

The new felony asylum bar will also be difficult to implement. Unlike the specific series of offenses set out by Congress to constitute aggravated felonies, jurisdictions vary in which offenses they define as felonies. The new felony bar will accordingly vary by jurisdiction and will not be uniform, leading to inconsistent outcomes.

The Forum believes that the felony bar is not consistent with congressional intent, over-expansive, and will lead to inconsistent outcomes. DOJ and DHS should reconsider it.

### New Bars Associated with Immigration Offenses Are Overbroad

The proposed rule creates several new bars associated with immigration offenses – bars related to harboring, illegal reentry, and document offenses. While in certain circumstances, these offenses may justify denial of asylum, we believe that such decisions should be left to the discretion of immigration judges. These categorical bars are over-inclusive and will prevent asylum seekers with valid claims from obtaining relief, to which they are otherwise entitled.

The proposed rule's new bar against those with harboring offenses is not limited to human trafficking, having been broadened to cover first-time offenders who attempt to aid family members. Under the proposed rule, parents or spouses can be barred from obtaining asylum if they take steps to bring undocumented children or spouses into the United States. We believe that this bar is too harsh, preventing immigration judges from assessing the violations on a case-by-case basis, and threatening to undermine the sanctity of the family. We also have concerns that existing prohibitions against harboring, specifically the language about "transportation", could be applied to punish those who engage in routine conduct like driving someone to work or to a doctor's appointment. The Forum would favor the ability for immigration judges to make these assessments rather than creating a categorical bar for such offenses.

Similarly, the Forum is opposed to the creation of a new bar for illegal reentry. As the NPRM acknowledges this bar will commonly come into tension with U.S. treaty obligations, preventing valid asylum seekers fleeing danger from making their claims. While, as the NPRM explains, some asylum seekers may have alternative avenues for relief available to them, including statutory withholding of removal or protection, these alternatives are granted to only a handful of recipients, and are rare for those seeking relief without counsel. In most cases, it is likely that those with valid claims for asylum, falling under this bar, would be returned to danger, in violation of U.S. treaty obligations.

In addition, we note that entering the United States to seek asylum is permitted under federal law, making the use of the asylum processes for deterrent purposes particularly problematic.

A new bar for those with document offenses is over-inclusive. While persons convicted of preying upon innocent people to engage in identity theft should face criminal penalties and immigration consequences, some situations may not warrant such punishment such as when a spouse or child is unaware of the fraudulent nature of the documentation. Immigration judges should retain the discretion to evaluate the circumstances of the violation and be permitted to afford asylum relief where justified.

AR.10038

DOJ and DHS should not create new categories of asylum bars related to immigration offenses, but instead should allow immigration judges to continue to be able to use discretion to evaluate the claims of asylum seekers who otherwise would fall under the new bars.

**New Bars Related to Criminal Offenses Are Unnecessary and Overly Punitive**

The Forum has concerns about the proposed rule's new asylum bars relating to street gangs, domestic violence, drugs, and driving under the influence (DUI). Congress specifically defined the category of aggravated felonies to cover serious offenses that threaten the public safety. In addition, Congress and/or DOJ/DHS have added existing limitations for several additional offenses falling into these categories, such as those with multiple DUI offenses. The Forum agrees that certain gang, domestic violence, drug, and DUI offenses should be disqualifying for relief. However, as set out in the proposed rule, the bars may be over-expansive and prevent people with valid asylum claims from obtaining relief, even when they pose no danger to the public.

We are concerned that the standard for street gang-related offenses in the proposed rule may sweep in individuals who are not associated with street gangs. Because the proposed rule does not fully detail how an individual qualifies as a street gang member or how an activity is categorized as a gang related event, we have concerns about over-breadth. Will this be based on gang databases falling commonly have been found to include significant numbers of non-gang members and lack due process protections? Will qualifying activities be determined by the location in which they occur? We have concerns that categorical bars to relief will be mistakenly applied to those who are not actually associated with gangs.

In addition, this particular expansion does not take into consideration the circumstances of the offense. In other words, did the asylum seeker voluntarily and freely engage in the offense or was coercion involved. Was the individual forced to engage in certain gang-related activity at the risk of losing their life or endangerment to a family member? We believe that immigration judges should be permitted to at least evaluate such circumstances prior to granting or denying relief.

We are similarly concerned that the new domestic violence bar to asylum relief will sweep in non-offenders. Because this bar does not require a criminal conviction, a categorical bar is troubling. We are particularly concerned about situations in which a domestic violence victim has been initially arrested along with her/his abuser, even when she/he is not the party at fault. Given existing bars against those with domestic violence convictions, as well as existing bars to those with aggravated felony convictions, we believe the expansion is unnecessary. Rather, we believe immigration judges should retain discretion in these situations and be permitted to grant relief in situations where the asylum seeker is not at fault.

We also have concerns about the expansion of the bar for those who have DUI convictions. While DUIs are serious offenses, immigration judges should retain discretion to determine whether they are disqualifying in the immigration context. Such review would be particularly important for first offenses where no one has been injured or killed or convictions in the distant past, including those who have pled guilty or no contest to prior offenses without understanding the immigration consequences. The bar for those convicted of drug offenses is also overbroad. Applying to those with possession offenses, not just drug traffickers, and failing to account for jurisdictions that have decriminalized certain drugs like cannabis, we again believe this bar is overbroad. With serious drug offenses already being considered to be aggravated felonies, we believe further bars to asylum for less serious offenses are unnecessary.

AR.10039

A majority of Americans (two-thirds) are united in believing that people who qualify for asylum should be allowed to come to the U.S. Eroding asylum through this proposed rule undermines our fundamental national values to provide protection to deserving asylum seekers. The proposed rule is in tension with federal law, including treaties to which the U.S. is a party. Because it is flawed and overbroad, we believe, DOJ and DHS should rescind the rule as currently proposed.

Thank you for considering these comments.

Sincerely,

Ali Noorani
Executive Director
National Immigration Forum

AR.10040

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-wxa0
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0510
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Rebecca Mitchell

---

## General Comment

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

AR.10041

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-f7h3
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0511
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Jorge Baron
**Address:**
   615 2nd Ave., Ste 400
   Seattle, WA, 98104
**Email:** jorge@nwirp.org
**Phone:** 206-587-4009
**Fax:** 206-587-4025

## General Comment

Northwest Immigrant Rights Project (NWIRP) strongly opposes the Proposed Rules and urges the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) to reject this proposal in full. Please find attached our full comment.

## Attachments

NWIRP Comments re Asylum Bars to Eligibility Final 01-21-20

AR.10042



Western Washington Office
615 Second Avenue
Suite 400
Seattle, Washington 98104

PHONE: 206-587-4009   TOLL-FREE: 800-445-5771   FAX: 206-587-4025   WEB: WWW.NWIRP.ORG

January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

*Submitted VIA* www.regulations.gov

Dear Assistant Director Reid and Chief Dunn,

I am writing on behalf of Northwest Immigrant Rights Project (NWIRP) to submit this comment regarding the Notice of Proposed Rule-Making (NPRM) and request for comment titled "Procedures for Asylum and Bars to Asylum Eligibility," EOIR Docket No. 18-0002, A.G. Order No. 4592-2019, published at 84 Fed. Reg. 69,640 (Dec. 19, 2019) ("Proposed Rules"). As outlined more fully below, NWIRP is strongly opposed to this proposed rule and urges the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) to abandon this proposal and maintain the current regulatory framework.

**Interest in Proposed Rule**

Northwest Immigrant Rights Project (NWIRP) is a nationally-recognized legal services organization founded in 1984. Each year, NWIRP provides direct legal assistance in immigration matters to over 15,000 low-income people from over 130 countries, speaking over 60 different languages and dialects. NWIRP also strives to achieve systemic change to policies and practices affecting immigrants through impact litigation, public policy work, and community education. NWIRP serves the community from four offices in Washington State in Seattle, Granger, Tacoma, and Wenatchee.

Granger Office
121 Sunnyside Avenue
P.O. Box 270, Suite 146
Granger, Washington 98932

Tacoma Office
1119 Pacific Avenue
Suite 1400
Tacoma, Washington 98402

Wenatchee Office
620 North Emerson Avenue
Suite 201
Wenatchee, Washington 98801

NWIRP is a 501(c)(3) non-profit organization

ER-2005                                                                                     AR.10043

NWIRP has particular expertise in the topic of the Proposed Rules. NWIRP has been providing immigration legal services for 35 years and is currently the largest nonprofit organization focused exclusively in providing immigration legal services in the Western United States. As explained below, NWIRP is deeply concerned about the impact the proposed rules will have on the client communities NWIRP serves as well as immigrant communities around the country. NWIRP was founded in 1984 as the Joint Legal Task Force for Central American Refugees, serving asylum seekers from Central America, and has provided legal assistance to asylum seekers throughout its existence. Each year, NWIRP provides legal assistance to hundreds of individuals seeking asylum protection in the United States.

**Opposition to the Proposed Regulatory Changes**

### I.      Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. NWIRP submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

### II.      The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

2

AR.10044

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[2]

The asylum protections provided by United States law are essential. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger.[3] Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[4] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[5] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[6]

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[7] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[8] The obstacles to winning asylum are exceedingly high; indeed in some parts of

---

[1] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[2] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[3] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[4] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[5] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[6] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[7] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[8] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

AR.10045

the country and before certain immigration judges, almost no one succeeds.[9] Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[10] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[11]

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[12] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[13] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[14] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[15] The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[16]

NWIRP's experience in serving asylum seekers informs our perspective that the proposed categorical bars are unnecessary and will prevent refugees from being able to obtain critical humanitarian protections.  For instance, one of our former clients (whom we'll refer to as "A.B.") sought asylum from Haiti where he would have been detained in a mental institution or prison, beaten, and tortured on account of his diagnosis with a severe mental illness. The conditions in Haitian mental institutions are

---

[9] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[10] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[11] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[12] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[13] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[14] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[15] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the '"Alice-in-Wonderland-like definition of the term 'aggravated felony"'); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[16] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

4

AR.10046

notoriously dire - physical and sexual abuse of patients is rampant and patients are denied proper medical treatment and left to languish in filthy and unsanitary conditions. Like many people diagnosed with serious mental illness, A.B. lived homeless for extended periods of time and self-medicated with controlled substances, resulting in criminal justice system involvement. Under the current asylum regime, the Immigration Judge was provided with discretion to balance the seriousness of A.B.'s convictions with his mental state / mental health diagnoses at the time of conviction. However, under the proposed regulations, A.B. would be categorically barred from asylum.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[17] Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[18] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that they are a present or future danger.[19]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[20] In

---

[17] *See id.*

[18] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[19] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[20] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

AR.10047

addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[21] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[22]

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

> *The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[23] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[24]

---

[21] *Pula*, 19 I.&N. Dec. at 474.

[22] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

[23] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[24] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

6

AR.10048

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[25] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[26] some turn to drugs and alcohol in an effort to self-medicate.[27] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum-seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

Here again our perspective about the negative impact of the Proposed Rules is informed by our experience serving asylum seekers who have been impacted by trauma. One of our clients, whom we'll refer to as "C.D." is seeking asylum in the U.S. based on being trafficked for sex as a minor in Mexico. C.D. ran away from home after suffering sexual abuse in her family home, and quickly fell under the control of human traffickers, who forced her to dance for bar patrons - including military and police officers. C.D.'s traffickers plied her with illegal drugs to control her behavior and threatened to harm her if she tried to escape. C.D. eventually sought safety in the United States and had three U.S. citizen children. Unfortunately, the addiction to controlled substances encouraged by her traffickers plagued C.D.'s first few years in the U.S. and she was convicted of several minor drug-related offenses and illegal re-entry. Under the proposed rules, C.D. would be separated from her children and denied asylum due to offenses directly connected to her trauma.

Another example is that of a client we will refer to as "E.F." E.F. grew up surviving extremely severe trauma and persecution as a child in Central America. When he reunited with relatives in the U.S., still a child seeking protection from the harm he experienced, he increasingly had difficulty managing his emotions around the past. E.F. turned to substances to medicate and was convicted of possession of a controlled substance - an anti-depressant for which he did not have a prescription. With therapy he has learned other tools to address his emotional struggles. However, the proposed regulation would bar him from asylum, even though he has lived much of his life now in the U.S.

---

[25] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[26] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[27] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

AR.10049

### III.    The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees,[28] which binds parties to the United Nations Convention Relating to the Status of Refugees,[29] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[30] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[31] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[32] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[33] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[34]

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the

---

[28] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[29] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[30] *Id.* at art. 33(2).

[31] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

[32] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[33] *Id.* at ¶ 10.

[34] *Id.* at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

AR.10050

Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient,"[35] but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[36] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[37] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[38] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[39] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[40] is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[41] This prohibition is a critical part of the Convention because it recognizes that

---

[35] Proposed Rules at 69646.

[36] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).

[37] 648 F.3d at 1110 (J. Reinhardt, concurring).

[38] *Id*. at 1110.

[39] *Id*. at 1110.

[40] Proposed Rules at 69659, 69660.

[41] Refugee Convention, *supra*, at art 31.

9

AR.10051

refugees often have little control over the place and manner in which they enter the country where they are seeking refuge. The proposal also runs counter to the asylum statute (INA § 208) itself, which recognizes an individual's ability to seek asylum regardless of the manner of entry or the individual's immigration status.

Here again NWIRP has served individuals who were ultimately deemed as needing and being eligible for asylum protection but who would be denied under the Proposed Rules. We would again highlight the case example of our client C.D. that is outlined on page 7 of the comments. C.D. had been convicted of illegal re-entry but was able to obtain asylum protection despite that conviction. The Proposed Rules would deny others like C.D. the opportunity to obtain asylum.

### IV. Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[42] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[43] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees[44] affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel

---

[42] *See, e.g.,* Proposed Rules at 69644.

[43] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[44] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).

AR.10052

documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[45] And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[46] Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status.[47] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief.  Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban,"[48] which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[49] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They

---

[45] 8 C.F.R. § 223.1.

[46] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[47] 8 C.F.R. § 208.21(a).

[48] 8 C.F.R. § 1208.13(c)(4).

[49] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

ER-2015

AR.10053

must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[50]

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[51] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[52] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[53] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[54]

Finally, NWIRP writes to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.[55]

## V. The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang activities," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[56] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine

---

[50] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

[51] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

[52] *See* 8 U.S.C. § 1158(c)(1)(A).

[53] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[54] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

[55] See, e.g., Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://bit.ly/2sJuEWR.

[56] *See* Proposed Rules at 69649.

AR.10054

whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[57]

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[58] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[59] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[60] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[61] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials

---

[57] *See* Proposed Rules at 69652.

[58] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[59] *See* Proposed Rules at 69646, 69656-8.

[60] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[61] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

AR.10055

conducted long after the fact."[62] In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[63]

Particularly in the context of the new proposed bar related to alleged gang affiliation, NWIRP is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[64]

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[65]

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[66] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition

---

[62] *Moncrieffe*, 569 U.S. at 200-201.

[63] *Id.* at 201.

[64] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[65] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

[66] Proposed Rules at p. 69650.

AR.10056

of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

### VI. The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[67]

> *The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[68]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[69] In *Padilla v.*

---

[67] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[68] Proposed Rules at 69655.

[69] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction

15

AR.10057

*Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[70] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

> *The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering.*[71] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a

---

based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

[70] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

[71] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).

16

AR.10058

judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[72] In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies.[73] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[74] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry.[75] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[76] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[77] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[78] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the

---

[72] *Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959).

[73] *See id.* (*citing Matter of Pickering*, 23 I.&N. Dec. 621).

[74] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

[75] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263).

[76] *Id.*

[77] *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").

[78] *Id.* ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

AR.10059

language of the Act."[79] Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[80] The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

VII.    **The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color**

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[81] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to

---

[79] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).

[80] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).

[81] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017,  https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

AR.10060

anyone found to pose a danger to the community.[82] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[83] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[84]

> *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[85] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[86] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[87] The

---

[82] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[83] 8 U.S.C. § 1159(c) (2012).

[84] 8 C.F.R. § 208.24(a) (2012).

[85] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[86] *Id*.; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[87] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/

ER-2023

AR.10061

Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[88] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

> *Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[89] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[90]

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and

---

(describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).
[88] Proposed Rules at 69648.
[89] *See Pula*, 19 I.&N. Dec. at 474.
[90] *Id.*

AR.10062

documentation that turn out to be fraudulent.[91] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[92] The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

Our perspective on this issue is informed by the experience of one of our clients, whom we'll refer to as "G.H." G.H. was an asylum-seeker from Sierra Leone, who survived the horrific civil war and fled to a neighboring country. In a precarious situation in a refugee camp, and without travel documents, he used a friend's passport to enter the U.S. Like many refugees and asylum seekers, he faced the choice of living in danger or using travel documents that were not his own or were not authentic. He disclosed the use of his friend's passport when he applied for asylum and other immigration benefits, and since being granted relief has been able to reunite with family in the U.S. Under the proposed regulation, he would be denied asylum and family reunification simply because he was a refugee who fled without travel documents.

*The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[93] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[94] Members of these communities also experience isolation from their kinship and

---

[91] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[92] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

[93] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[94] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014,

ER-2025

AR.10063

national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[95] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[96] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[97] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[98]  The blunt approach adopted by the Proposed Rules is

---

https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[95] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

[96] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

[97] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as posession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[98] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

AR.10064

inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[99] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[100] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

> *Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[101] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[102] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact

---

[99] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[100] 8 U.S.C. § 1227(a)(7)(A).

[101] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[102] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

ER-2027

AR.10065

of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[103]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress.[104] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[105] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[106]

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[107] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[108]

---

[103] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[104] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[105] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[106] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

[107] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that the asylum adjudicator may consider "all reliable evidence" in making their decision.

[108] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11ᵗʰ Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

AR.10066

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices.  These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[109]

### VIII.  The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[110] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[111] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[112]

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[113] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[114] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by

---

[109] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[110] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).

[111] 8 U.S.C. § 1158(b)(2)(B)(ii).

[112] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility  to seek asylum.

[113] 8 U.S.C. § 1252(a)(2)(D).

[114] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

AR.10067

numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[115]

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned."[116] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

\*\*\*

For all of the reasons articulated above, NWIRP strongly objects to the Proposed Rules and urges DHS and EOIR to reject this proposal in full. While NWIRP outlined specific objections to certain aspects of the proposal, we wish to emphasize that we oppose the entirety of the Proposed Rules and urge DHS and EOIR to reject them.

Please do not hesitate to contact me if you have any questions. You may reach me at (206) 957-8609 or via email at jorge@nwirp.org.

Sincerely,

Jorge L. Barón
Executive Director

---

[115] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scherer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

[116] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

26

AR.10068

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-huk7
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0512
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** An Bui

---

## General Comment

I strongly oppose this proposed rule change that would unjustly criminalize asylum seekers. For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system. This proposed Trump rule would punish people who endure mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook. I am speaking up for racial justice and standing against this proposed rule today!

AR.10069

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-j1dj
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0513
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Anna Krasner

## General Comment

The DHS should withdraw this proposal immediately.

he first proposed set of changes adds the following seven categorical bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction or accusation of conduct for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including any drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

Asylum eligibility should not be predicated on convictions for minor misdemeanors, and, in one case, the mere accusation of a crime. It violates the justice system's guiding principle of innocent until proven guilty, and subject asylum seekers to racial profiling. Also, asylum seekers cannot be accused of a crime when entering the United States illegally, as there is no illegal entry when reasonably seeking asylum. This criminalizes people for the very act of seeking asylum, thereby barring them from asylum. Essentially, this rule stands the risk of banning people from seeking asylum altogether.

This is un-American, undemocratic, and unjust. Please do not move forward with this proposal.

AR.10070

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-nsya
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0514
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Katherine Fite
**Organization:** Safe Passage Project

## General Comment

See attached file(s)

## Attachments

Safe Passage Project Comment

AR.10071



185 West Broadway
New York, NY 10013
**t** 212-324-6558 | **f** 347.368.2213
**www.safepassageproject.org**

*Via Federal e-Rulemaking Portal*
*https://www.regulations.gov/document?D=EOIR-2019-0005-0001*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

**Re: Comment on Proposed Rule, "Procedures for Asylum and Bars to Asylum Eligibility,"**
**EOIR Docket No. 18–0002, A.G. Order No. 4592–2019**

January 21, 2020

To the Department of Justice and the Department of Homeland Security:

Safe Passage Project respectfully submits this comment to the Department of Justice and the Department of Homeland Security Joint Notice of Proposed Rulemaking on Procedures for Asylum and Bars to Asylum Eligibility, EOIR Docket No. 18–0002, A.G. Order No. 4592–2019, Federal Register Vol. 84, No. 224, issued December 19, 2019 (the "Proposed Rules").

Safe Passage Project is a registered 501(c)(3) nonprofit corporation based in New York City. We provide free lawyers to refugee and immigrant children in New York City and on Long Island who face deportation back to life-threatening situations. Safe Passage Project was founded in 2006 at New York Law School and in 2013 fully incorporated as an independent nonprofit. Safe Passage Project recruits, trains, and mentors volunteer attorneys to represent unaccompanied minors in immigration court and before the U.S. Citizenship and Immigration Services ("USCIS") Asylum Office, and in New York Family Court. Without the legal services we provide, many of these children would be unrepresented and unaware of the available options to legalize their immigration status.

Our organization has a number of concerns about the Proposed Rules, including their legal validity under international treaty obligations and the Full Faith and Credit clause of the Constitution. However, in light of our organization's mission to provide legal services to immigrant youth, we are focusing our comment upon the ways in which these Proposed Rules

AR.10072

harm children who have fled violence in their home countries to seek asylum in the United States and impacts the immigration court system.

## I.    Background

Safe Passage Project works with children from all over the world who are seeking asylum in the U.S. Many of our clients are fleeing record levels of violence in the Northern Triangle of Central America—El Salvador, Guatemala and Honduras. Children in these countries are often forcibly recruited by criminal syndicates commonly referred to as "gangs." They are forced to engage in criminal activities or engage in violent acts, or forced to provide sexual services to gang members. Children may also be targeted as members of families who are themselves targeted for persecution on account of their race, religion, nationality, membership in a particular social group, or political opinion. In many regions, the government is well aware of the criminal activity and does not protect the populace, and may in fact be benefitting from corrupt criminal payments. In many cases, children flee these conditions on their own, and arrive at the border unaccompanied by an adult family member. *See, generally, e.g.*, *Children on the Run: Unaccompanied Children Leaving Central America and Mexico and the Need for International Protection,* United Nations High Commissioner for Refugees, available at https://www.unhcr.org/about-us/background/56fc266f4/children-on-the-run-full-report.html.

In their searches for safety and security, many such children exercise their legal rights to apply for asylum in the U.S. On December 19, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications that would make the process much more difficult for such children.

First, the Proposed Rules add the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits. The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. Safe Passage Project submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude asylum-seeking children from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

2

AR.10073

## II.     The Proposed Rules unnecessarily and cruelly exclude bona fide young refugees from asylum eligibility.

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] The Act created a "broad class" of refugees eligible for a discretionary grant of asylum.[2] Asylum provides people, including children, fleeing horrors in their home countries with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger.[3] For children seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[4]

The laws, regulations, and processes governing asylum adjudications are already exceedingly harsh. Those seeking asylum bear the evidentiary burden of establishing their eligibility for asylum[5] in the face of a complex web of laws and regulations, with no right to free legal counsel; these hurdles are even more difficult for children, who are particularly ill equipped to navigate the labyrinthine legal system.[6] The obstacles to winning asylum are exceedingly high. Indeed, in some parts of the country and before certain immigration judges, almost no one succeeds.[7]

Even without the Proposed Rules, existing bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad.[8] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[9] "Aggravated felony" is a notoriously vague term that exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[10] it has

---

[1] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[2] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[3] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[4] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[5] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[6] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[7] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[8] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[9] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[10] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

AR.10074

metastasized to encompass hundreds of offenses, many of which are neither aggravated nor felonies, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[11] The existing crime bars should be narrowed, not expanded.

The Proposed Rules' bars are unnecessary not only because of the vast scope of existing criminal bars, but also because immigration adjudicators already have tremendous discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[12] Further categorical bars are not needed when adjudicators are already entitled to deny asylum claims on those grounds.

> *The Proposed Rules' application to children, especially children with overlapping vulnerabilities, is particularly cruel.*

The above arguments all apply to young asylum seekers as much as they do adults, but the Proposed Rules' application to children is especially harsh. Even our youngest clients, children who are too young to have faced criminal allegations themselves, will be harmed, because many rely on the support of asylum-seeking parents or guardians who will face the same eligibility bars. Children may also be derivative applicants in family member's now-excluded asylum claims. Realistically, for many young people, the deportation of their U.S. caregivers means their own deportation as well. Infants and other very young children should not be made to bear the burden of the immigration system's cruel attempts to exclude their parents from the country.

The harm to children is particularly great because the Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children. Because children are often derivatives on their parents' asylum applications, and in any case often have no one else to care from them in the U.S. should their parents be deported, it penalizes the children as well.

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

Further, the Proposed Rules pose a unique threat to immigrant youth with overlapping vulnerabilities. For example, young LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life

---

[11] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[12] *See id.*

4

AR.10075

in their home countries.[13] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[14] Members of these communities also experience isolation from their kinship and national networks following their migration. Together, these factors render many young LGBTQ immigrants vulnerable to trafficking, domestic violence, and substance abuse (in addition to discriminatory policing practices). The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps children who have survived trafficking into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Under the Proposed Rules, young people like these, whose cases should be met with empathy and understanding, would instead be barred from seeking asylum altogether.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps children who have survived trafficking into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[15] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

Additionally, young immigrants of color, especially boys and men, are especially vulnerable to false allegations of gang association. In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[16] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[17] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended

---

[13] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[14] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[15] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

[16] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[17] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

5

adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar young people who are themselves fleeing violence from gangs in their home countries.[18]

Overall, the Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective: in cases of young people with past trauma overlapping vulnerabilities. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[19] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[20] These measures ensure that asylum applicants in vulnerable populations like those our organization represents have access to supportive resources. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[21]

> *The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system, especially for drug offenses.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. This is especially true for children and young people seeking asylum, whose ages make them even less equipped to process violence. Many asylum-seeking children traveled to the U.S. without a parent or guardian, a difficult journey that risks compounding their existing trauma, and are adjusting to life in a new country where they frequently do not yet speak the language.

Unsurprisingly, then, existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[22] One recent study found the mental health problems facing refugees and asylum seekers so acute that

---

[18] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[19] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez,* 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu,* 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[20] 8 U.S.C. § 1159(c) (2012).

[21] 8 C.F.R. § 208.24(a) (2012).

[22] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

AR.10077

more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[23]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[24] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[25] some turn to drugs and alcohol in an effort to self-medicate.[26] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

> *The agencies have not proven that the Proposed Rules will improve the safety of the American public.*

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice in the supposed name of public safety, but the agencies have proffered no evidence or data to suggest that the Proposed Rules will improve safety at all.

For example, one assumption fundamentally underlying the Proposed Rules is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[27] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a judge has actually concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly

---

[23] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[24] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[25] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[26] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

[27] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

AR.10078

apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[28]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[29] Even further, in the case of the domestic-violence-related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[30]

## III. The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially biased decision-making.

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[31] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[32]

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum

---

[28] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[29] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

[30] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

[31] *See* Proposed Rules at 69649.

[32] *See* Proposed Rules at 69652.

AR.10079

trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[33] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[34] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process. Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[35] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[36] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in mini-trials conducted long after the fact."[37]

## IV. The Proposed Rules undermine Sixth Amendment protections and harms immigrant youth unfamiliar with the complex criminal and immigration framework governing prior convictions.

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[38]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for

---

[33] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[34] *See* Proposed Rules at 69646, 69656-8.

[35] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[36] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[37] *Moncrieffe*, 569 U.S. at 200-201.

[38] Proposed Rules at 69655.

AR.10080

asylum.[39] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[40] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially the young people our organization represents, who are often isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

## V.    Conclusion

The Proposed Rules cruelly and unnecessarily threaten the ability of young people with meritorious asylum claims to pursue their cases. Safe Passage Project affirms that the Proposed Rules as drafted would be harmful to our clients, vulnerable unaccompanied immigrant youth who have fled persecution and who risk harm and even death if removed from the U.S.


Yours truly,


Katherine Fite                Alexandra Rizio              Michelle Caldera-Kopf
Equal Justice Works Fellow    Managing Attorney            Managing Attorney
Safe Passage Project          Safe Passage Project         Safe Passage Project,
                                                           Long Island Office

---

[39] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

[40] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

10

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-4jqy
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0515
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Charlie Sciammas

## General Comment

My name is Charlie Sciammas, I am a resident of San Francisco, California and I am an immigrant. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

I do not agree with thew new proposed rules. I urge the administration to uphold the human and civil rights of our migrant communities.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

Sincerely,

AR.10082

Charlie Sciammas

AR.10083

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-njnu
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0516
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Antonio Diaz

---

## General Comment

My name is Antonio Diaz, I am a resident of Oakland, California and I am a descendant of immigrants. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

The Administration should not place further obstacles for people seeking asylum. The US should abide by its values adn policies to be a place of refuge and respect for human rights.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

Sincerely,

AR.10084

Antonio Diaz

AR.10085

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-lkn0
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0517
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Laurie Almoslino
**Address:**
  2707 NE 95TH ST
  SEATTLE, WA, 98115
**Email:** LAURIE@PCDATABASESOLUTIONS.COM
**Phone:** 206-735-8781

---

## General Comment

I urge you to reject these new bars to Asylum Eligibility. There is already a complex web of regulations and bars that make it extremely difficult to successfully apply for asylum. When you consider how desperate someone must be to leave their country, make their way here, and jump through all the necessary hoops - it is not an undertaking that is attempted lightly or for mere material advantage.

This being the case, adding even more complexity and giving the US even more reasons to reject someone does not serve any legitimate purpose. The fact that these new procedures are vague and can be interpreted in different ways is not conducive to a fair and just consideration of the right to asylum. Justice should be at the very foundation of our system. to quote the Bible:

"Judges and officers shall you appoint in all your gates, which the Lord your G-d gives you, throughout your tribes; and they shall judge the people with just judgment. You shall not pervert judgment; you shall not respect persons, nor take a bribe; for a bribe blinds the eyes of the wise, and perverts the words of the righteous. Justice, justice shall you pursue, that you may live, and inherit the land which the Lord your God gives you. (Deut. 16:18-20)"

AR.10086

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-jcwf
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0518
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Marilyn Duran

---

## General Comment

My name is Marilyn Duran, I am a resident of San Francisco, California and I am a child of immigrants. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

The act of seeking protection under threats of violence for oneself and family members should not be criminalized, especially under a racist administration that seeks to regress our nation instead of progress it.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

Sincerely,

AR.10087

Marilyn Duran

AR.10088

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-6hvf
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0519
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Jacqueline Gutierrez

---

## General Comment

My name is Jacqueline Gutierrrez, I am a resident of San Francisco, California and I am a child of immigrants. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

Asylum seekers already are fleeing growing threats of violence, climate catastrophe and death. This process will only increase the risk of safety to asylum seekers and their families. No more deaths at the border, no more children in cages, we must protect human life.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

AR.10089

Sincerely,
Jacqueline Gutierrez

AR.10090

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-nin2
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0520
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Amy Aguilera

---

## General Comment

My name is Amy Aguilera, I am a resident of San Francisco, California and I am a child of immigrants. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

Our country must stand behind its values and continue to be a place of refuge for those fleeing violence and persecution. By agreeing with this proposal, the US is doing the opposite and turning its back on our migrant/immigrant communities. I ask that the administration not move forward with the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

Sincerely,
Amy Aguilera

AR.10091

AR.10092

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-31c8
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0521
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Laura Melgarejo

---

## General Comment

My name is Laura Melgarejo, I am a resident of San Francisco, California and I am an immigrant. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.

This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.

Families fleeing violence should have the right to seek asylum and protect themselves from their predators, Their families deserve to live in peace, safety and with dignity. This proposed rule would only harm our communities by punishing them instead of protecting them. Thus, I write to express my strong opposition to this proposed rule change.

I urge the Administration to withdraw the proposed "Procedures for Asylum and Bars to Asylum Eligibility," which would drastically undermine our community and go against our values. I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Thank you for resolving this issue.

AR.10093

Sincerely,
Laura Melgarejo

AR.10094

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-s6mj
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0522
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Claudia Cubas
**Address:**
    1612 K Street NW
    Ste. 204
    Washington,  DC,  20006
**Email:** claudia.cubas@caircoalition.org
**Phone:** (202) 899-1416
**Fax:** (202) 379-9052
**Organization:** Capital Area Immigrants' Rights Coalition

## General Comment

See attached file(s)

## Attachments

Comments on Asylum Crim Bars FINAL PACKET

AR.10095



*Fighting for equal justice for all immigrants at risk of detention and deportation*

**www.caircoalition.org**

1612 K Street, NW  Suite 204    **T** 202 / 331.3320
Washington, DC 20006            **F** 202 / 331.3341

January 21, 2020

*Submitted via www.regulations.gov*

Lauren Alder Reid
Assistant Director, Office of Policy
Executive Office for Immigration Review
5107 Leesburg Pike
Suite 2616
Falls Church, VA 22041

> **Re:**  **EOIR Docket No. 18-0002; A.G. Order No. 4592–2019, Comments in Response to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**

Dear Ms. Reid:

The Capital Area Immigrants' Rights (CAIR) Coalition appreciates the opportunity to comment on the Department of Homeland Security (DHS) and the Department of Justice's (DOJ) Joint Notice of Proposed Rulemaking (Proposed Rules) "Procedures for Asylum and Bars to Asylum Eligibility" published in the Federal Register on December 19, 2019 (84 Fed. Reg. 69,640). The CAIR Coalition strongly opposes the Proposed Rules because they are inconsistent with statutory requirements enacted by Congress under the Immigration and Naturalization Act (INA), 8 U.S.C. §§ 1103(a)(1), (3), 1158, 1225, 1226, 1231, 1324(a). CAIR Coalition also opposes the Proposed Rules because they are arbitrary and capricious, violate constitutional due process, and fail to protect the vulnerable population we serve.

**CAIR Coalition's Expertise in Serving the Immigrant Community**

Established in 1999, CAIR Coalition strives to ensure equal justice for all immigrant adults and children at risk of detention and deportation in the D.C. metropolitan area and beyond through direct legal representation, know your rights presentations, impact and advocacy litigation, and the enlistment and training of attorneys to defend immigrants.

Our work with asylum seekers cuts across all our programs, most significantly in our Detained Adult and Detained Children's Programs. Our Detained Adult Program helps detained immigrants learn to understand the Immigration Court and deportation process so they can make better informed decisions about their cases. This program also helps people connect with pro bono attorneys if they are unable to pay for an attorney to represent them. We have represented numerous asylum seekers, with and without criminal convictions, in Immigration Court and before the Board of Immigration Appeals (BIA).

Our Detained Children's Program provides legal services to unaccompanied immigrant children detained by the Office of Refugee Resettlement (ORR) at juvenile facilities in Maryland and

Virginia. The facilities include ORR long-term foster care programs, large shelter programs, and secure detention facilities. Our staff also routinely represents minors who have been reunified with a sponsor in the region and have pending asylum applications.

In our attached comments, we have addressed specific aspects in which these Proposed Rules contradict the INA, are arbitrary and capricious, and violate due process. In particular, we have highlighted six major issues with the Proposed Rules: (1) The Proposed Rules violate both the text and the spirit of the INA; (2) In forming the Proposed Rules, DHS and DOJ fail to provide sufficient reasons for departing from prior agency policy and fail to examine the relevant data; (3) The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum; (4) The Proposed Rules implicate serious due process concerns as they adversely affect people with mental health issues including addiction; (5) The Proposed Rules unfairly impact applicants regardless of whether they are granted withholding of removal or protection under the Convention Against Torture (CAT); and (6) the Proposed Rules undermine criminal judgments and violate due process by allowing DOJ and DHS to look outside of the criminal record to bar individuals from asylum.

For the reasons detailed in the attached comments, the CAIR Coalition strongly opposes the Proposed Rules. The Proposed Rules unfairly bar large swaths of individuals from asylum, depriving them of their right to an individualized analysis of their claims, based on the agencies' poorly reasoned and conclusory rationale. A court will surely view these rules as contradictory to the INA, arbitrary and capricious, and a violation of the due process protections of the Constitution. DOJ and DHS should withdraw the Proposed Rules, as only a thorough, case-by-case approach to asylum claims, in conformance with statutory and constitutional protections and international law, will properly protect asylum seekers.

Respectfully submitted,

Claudia Cubas, Esq.
Litigation Director
Capital Area Immigrants' Rights (CAIR) Coalition
1612 K Street NW, Suite 204
Washington, DC 20006
(202) 899-1416

AR.10097

**THE CAIR COALITION'S COMMENTS ON THE PROPOSED RULES**

**TABLE OF CONTENTS**

I.        **INTRODUCTION** ....................................................................................... **2**

II.      **THE PROPOSED RULES VIOLATE THE TEXT AND THE SPIRIT OF THE FEDERAL IMMIGRATION STATUTE.** ....................................................... **3**

III.    **THE PROPOSED RULES ARE ARBITRARY AND CAPRICIOUS BECAUSE THEY PROVIDE INSUFFICIENT REASON FOR DEPARTING FROM PRIOR AGENCY POLICY AND FAIL TO EXAMINE THE RELEVANT DATA.** ............. **9**

IV.    **THE PROPOSED RULES UNNECESSARILY AND CRUELLY EXCLUDE BONA FIDE REFUGEES FROM ASYLUM ELIGIBILITY AND WILL LEAD TO UNJUST AND IMBALANCED RESULTS THAT UNDERMINE ESTABLISHED CASE LAW..** .......................................................................................... **13**

V.      **THE PROPOSED RULES RAISE DUE PROCESS CONCERNS BECAUSE THEY ADVERSELY AFFECT VULNERABLE POPULATIONS, SUCH AS ASYLUM SEEKERS WHO SUFFER FROM MENTAL HEALTH ISSUES AND THOSE WHO LACK LEGAL REPRESENTATION.** ................................................ **17**

VI.    **APPLICANTS BARRED FROM ASYLUM WILL BE SIGNIFICANTLY IMPACTED, EVEN IF THEY ARE GRANTED WITHHOLDING OF REMOVAL OR PROTECTION UNDER THE CONVENTION AGAINST TORTURE** ........... **21**

VII.   **THE PROPOSED RULES UNDERMINE CRIMINAL JUDGMENTS AND VIOLATE DUE PROCESS BECAUSE THEY ALLOW DOJ AND DHS TO LOOK OUTSIDE OF THE CRIMINAL COURT RECORD IN BARRING INDIVIDUALS FROM ASYLUM.** .......................................................................................... **26**

    A.   The Proposed Rules disregard the established analysis for determining whether a conviction constitutes a bar to asylum and will encourage the use of unsubstantiated and weak evidence to categorically bar persecuted individuals from asylum. ............ 27

    B.   The Proposed Rules violate due process and undermine criminal court adjudications by expanding the inquiry of what constitutes a conviction or sentence for asylum purposes into the motives for a court's vacatur, modification, or correction of a conviction or sentence. .............................................................................. 34

    C.   The Proposed Rules are vague and overbroad, create inefficiencies, and adversely impact vulnerable populations....................................................................... 36

VIII.  **CONCLUSION** .......................................................................................... **38**

## I.     INTRODUCTION

On December 19, 2019, the Department of Homeland Security (DHS) and the

Department of Justice (DOJ) published in the Federal Register a Notice of Proposed Rulemaking

titled "Procedures for Asylum and Bars to Asylum Eligibility" ("Proposed Rules").[1] The

Proposed Rules should be withdrawn because they run afoul of the Immigration and Nationality

Act (INA); lack evidentiary support; are not the product of reasoned decision making; undermine

the purpose of asylum; and violate the due process rights of asylum seekers.

The Proposed Rules would make three primary changes to the rules governing asylum

adjudications. The first proposed set of changes adds the following seven *categorical* bars to

asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or

harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the

purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal

reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street

gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5)

any second conviction for an offense involving driving while intoxicated or impaired; (6) any

conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and

any conviction for several newly defined categories of misdemeanor offenses, including *any*

drug-related offense except for a first-time marijuana possession offense, any offense involving a

fraudulent document, and fraud in public benefits. The second section of the Proposed Rules

provides a multi-factor test for immigration adjudicators to determine whether a criminal

conviction or sentence is valid for the purpose of determining asylum eligibility. The third

---

[1] 84 FR 69640.

2

AR.10099

section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. The Capital Area Immigrants' Rights (CAIR) Coalition submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

These comments highlight the following major flaws with the Proposed Rules: (1) The Proposed Rules violate both the text and the spirit of the INA; (2) In forming the Proposed Rules, DHS and DOJ fail to provide sufficient reasons for departing from prior agency policy and fail to examine the relevant data; (3) The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum; (4) The Proposed Rules implicate serious due process concerns as they adversely affect people with mental health issues including addiction; (5) The Proposed Rules unfairly impact applicants regardless of whether they are granted withholding of removal or protection under the Convention Against Torture (CAT); and (6) the Proposed Rules undermine criminal judgments and violate due process by allowing DOJ and DHS to look outside of the criminal record to bar individuals from asylum.

## II.  THE PROPOSED RULES VIOLATE THE TEXT AND THE SPIRIT OF THE FEDERAL IMMIGRATION STATUTE.

When DHS and DOJ promulgate regulations regarding asylum, they must act consistent with their statutory authority and Congressional intent in creating the asylum system. Asylum seekers have a statutory right to apply for asylum.[2] "The purpose of the Refugee Act was to

---

[2] 8 U.S.C. § 1158(a)(1).

3

AR.10100

protect refugees, i.e., individuals who are unable to protect themselves from persecution in their native country."[3] The Refugee Act of 1980 was passed "to align domestic refugee law with the United States' obligations" under the United Nations Protocol Relating to the Status of Refugees, "to give statutory meaning to 'our national commitment to human rights and humanitarian concerns,' and 'to afford a generous standard for protection in cases of doubt.'"[4]

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[5] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[6] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and to disqualify a person with such a conviction from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[7] However, simply because the Attorney General has some discretion in creating new bars to asylum does not mean that he can make a rule "that is contrary to the will of Congress."[8]

In an attempt to insulate the Proposed Rules from review, the Attorney General and Acting Secretary of Homeland Security ("Acting Secretary") delineate new bars to asylum both by designating offenses as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and by rendering aliens who have committed or been convicted of such offenses categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C.

---

[3] *Grace v. Whitaker*, 344 F. Supp. 3d 96, 123–24. (D.D.C. 2018).
[4] *Id.* at 106 (quoting *Matter of S-P-*, 21 I. & N. Dec. 486, 492 (B.I.A. 1998) (quoting S. REP. NO. 256, 96th Cong., 2d Sess. 1, 4, reprinted in 1980 U.S.C.C.A.N. 141, 144)).
[5] *See, e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).
[6] 8 U.S.C. § 1158(b)(2)(B)(ii).
[7] *Id.*
[8] *See Akram v. Holder*, 721 F.3d 853, 865 (7th Cir. 2013).

4

AR.10101

§ 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney

General to, if he wishes, designate some classes of offenses as particularly serious crimes; such

designations are reviewable for legal and constitutional error (and as explained below, the

commenters believe these expansions are unlawful).[9] However, if the offense is not a particularly

serious crime, then a discretionary decision must be rendered on the application. It is true that the

Attorney General may also provide for "additional limitations and conditions" on asylum

applications so long as they are "consistent" with the with the asylum statute.[10] In this case,

however, the Proposed Rules add sweeping categories of offenses that automatically remove an

applicant from the consideration of discretion—a regulatory proposal that is *ultra vires* to the

plain text of the INA.

To the extent that the Proposed Rules would adopt a bar to asylum based on a categorical

discretionary bar, rather than a particularly serious crime designation, they are similar to

former rules denying adjustment of status to non-citizens granted parole but placed in removal

proceedings, which were stuck down by multiple Courts of Appeals. Purporting to exercise

discretion categorically, then-Attorney General Reno rendered non-citizens granted parole status

who had been placed in removal proceedings ineligible for adjustment of status, even though the

statute defined persons who have parole status as eligible for adjustment of status and carved out

multiple exceptions. Multiple Circuit Courts of Appeals struck down the proposed regulations, in

light of the fact that the statute carefully defined the categories of people eligible to apply for

adjustment of status. In doing so, the Courts rejected the Attorney General's argument that the

regulation must be upheld as a permissible exercise of her ultimate discretion to deny adjustment

---

[9] 8 U.S.C. § 1252(a)(2)(D).
[10] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

AR.10102

of status.[11] This reasoning is equally applicable to the Proposed Rules here. Where Congress specifically create a comprehensive statutory scheme to define asylum eligibility, the agencies cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned."[12] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules *ultra vires* to the statute.

The Proposed Rules further contravene Congressional intent by designating additional offenses as bars to asylum that were rejected by Congress in enacting the relevant portions of the INA. In creating the most recent statutory bars to asylum with the passage of the 1996 Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Congress specifically omitted several types of offenses that appeared elsewhere in the INA from constituting *per se* bars to asylum. For example, the legislature specifically designated all controlled substance offenses

---

[11] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006).
[12] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

AR.10103

(with the exception of "a single offense involving possession for one's own use of 30 grams or less of marijuana")[13] and domestic violence, stalking, and violation of protection order crimes[14] as grounds for deportability but not *per se* bars to asylum. This demonstrates that Congress was well-aware of these types of offenses, had considered the proper immigration consequences for them, and rejected them as *per se* bars to asylum. By attempting to add these types of offenses, and others that have been already assigned other immigration consequences in the INA, as automatic bars to asylum, the Proposed Rules run afoul of Congress' intent in enacting the INA and its amendments.

The Proposed Rules' attempt to expand the definition of the statutory term "particularly serious crime" is especially problematic, as it gives the term a new meaning that is incongruous with the INA. With regard to the grounds of inadmissibility, the INA defines the term "serious criminal offense" as: "(1) any felony; (2) any crime of violence, as defined in section 16 of title 18; or (3) any crime of reckless driving or of driving while intoxicated or under the influence of alcohol or of prohibited substances *if* such crime involves personal injury to another."[15] Under the plain meaning of the word "particularly," by definition, a "particularly serious crime" must apply to more egregious offenses than a "serious criminal offense." The Proposed Rules seek to designate numerous additional offenses as particularly serious crimes, many of which—such as crimes involving criminal street gangs, driving under the influence (without causing personal injury to another), and stalking—may constitute misdemeanors and not involve any physical injury at all.  In so doing, the Proposed Rules contradict the language of the INA by expanding

---

[13] 8 U.S.C. § 1227(a)(2)(B)(i).
[14] 8 U.S.C. § 1227(a)(2)(E).
[15] 8 U.S.C. § 1101(h) (emphasis added).

7

AR.10104

the definition of "particularly serious crime" to the point that it covers less culpable conduct than that for "serious criminal offense."

The Proposed Rules' extension of the term "particularly serious crime" as to felonies further violates the language of the INA. Under the statute, the term "aggravated felony" encompasses an enumerated list of generic offenses set forth in 8 U.S.C. § 1101(a)(43)(A)-(U). This list includes four categories of offenses designated as aggravated felonies, one of which is certain offenses that have a maximum sentence of one year or more, including crimes of violence, theft, burglary, bribery, forgery, obstruction of justice, and perjury.[16] Thus, in designating these offenses as aggravated felonies based on their maximum sentence, the INA relies on the federal definition of a felony.[17] Here, however, the Proposed Rules attempt to expand offenses that are *per se* "particularly serious crimes" from aggravated felonies, as designated by the INA, to all felonies, defined as all offenses that the relevant jurisdiction deems felonies, in addition to all offenses that have a maximum term of over a year.

By expanding the application of particularly serious crimes from certain offenses that are felonies based on their maximum sentence to all offenses that are felonies based on their maximum sentence or designation, the Proposed Rules impermissibly render the INA's definition of aggravated felony superfluous, thus violating Congressional intent. The Supreme Court has recognized that "one of the most basic interpretive canons, [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or

---

[16] 8 U.S.C. § 1101(a)(43)(F) (crimes of violence); (G) (theft or burglary); (R) (bribery and forgery); (S) (obstruction of justice and perjury). The additional three categories are (1) Offenses defined solely by the nature of the crime, including murder, rape, sexual abuse of a minor, drug trafficking, firearm trafficking, and prostitution business offenses; (2) Offenses that involve fraud or deceit with loss to the victim of more than $10,000; and (3) Attempts or conspiracy to commit an aggravated felony. 8 U.S.C. § 1101(a)(43).

[17] *See* 18 U.S.C. § 3559.

8

AR.10105

superfluous, void or insignificant."[18] This canon also applies in the context of Administrative Procedure Act (APA) challenges to agency rules, barring rules that render superfluous the statute they are interpreting.[19] Thus, if enacted, the Proposed Rules that expand particularly serious crimes to all felonies would exceed the Attorney General's and Acting Secretary's authority by rendering portions of the INA superfluous. The fact that the Proposed Rules violate the word and the spirit of the INA is, in itself, sufficient reason to not promulgate them.

## III.    THE PROPOSED RULES ARE ARBITRARY AND CAPRICIOUS BECAUSE THEY PROVIDE INSUFFICIENT REASON FOR DEPARTING FROM PRIOR AGENCY POLICY AND FAIL TO EXAMINE THE RELEVANT DATA.

In issuing rules, DHS and DOJ must adhere to basic tenets of administrative law like any other federal agency. Action by DHS and DOJ "must be the product of reasoned decision-making."[20] To meet this standard, agencies must "examine the relevant data and articulate a satisfactory explanation for [their] action including a rational connection between the facts found and the choice made."[21]

Courts will not uphold arbitrary and capricious agency action. "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[22]  Judicial review is generally confined to the administrative record, meaning that the rulemaking record

---

[18] *Corley v. United States*, 556 U.S. 303, 314 (2009) (brackets and internal quotation marks omitted).

[19] *See Abbott Radiology Associates v. Shalala*, 992 F. Supp. 212, 222 (W.D.N.Y. 1997) (rejecting "interpretation of the regulation would, in effect, render the [corresponding] statute superfluous").

[20] *Grace*, 344 F. Supp. 3d at 125.

[21] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

[22] *Id.*

9

AR.10106

must contain sufficient evidence to support the agency's action and courts "may not supply a reasoned basis for the agency's action that the agency itself has not given."[23] Additionally, an agency may not "proffer conclusory statements or unsubstantiated claims in defense of its decisions."[24]

The Proposed Rules are arbitrary and capricious because they depart from prior Board of Immigration Appeals (BIA) analysis on bars to asylum based on conclusory and insufficient reasoning. A rule change complies with the APA if the agency (1) displays "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."[25] As discussed above, the Proposed Rules violate the second prong of this test by cutting against the language of the INA. The Attorney General and Acting Secretary further violate the fourth prong by failing to provide "good reasons" for the new policy, including "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."[26]

Apart from the statutory aggravated felony bar to asylum, the BIA and Attorney General have historically utilized a highly circumstantial approach to the particularly serious crime

---

[23] *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

[24] *Nat'l Treasury Emp. Union v. Horner*, 654 F. Supp. 1159, 1163 (D.D.C. 1987); *see also Int'l Union, United Mine Workers v. Mine Safety and Health Admin.*, 626 F. 3d 84, 93 (D.C. Cir. 2010) (holding that provision in final rule was "arbitrary and capricious" because its only explanation was a "conclusory statement unsupported by the rulemaking record.").

[25] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (emphasis omitted).

[26] *See id.*

AR.10107

determination that would bar an immigrant from receiving asylum.[27] The BIA has also directed

that, when denying asylum on a discretionary basis, adjudicators must analyze cases using a

case-by-case approach, adopting a "totality of the circumstances" test to determine whether

someone should be discretionarily denied.[28]

The Proposed Rules deem the increased categorization of the particularly serious crime

bar necessary because the case-by-case adjudication previously used for non-aggravated felony

offenses was "inefficient" and lead to "unpredictable results," where "aliens convicted of the

exact same offense can receive different asylum treatment."[29] But this result is the very nature

and purpose of considering the totality of the circumstances in determining whether a non-

aggravated felony offense is a particularly serious crime, rather than applying *per se* bars based

solely on the type of offense. The Acting Secretary and Attorney General cannot possibly argue

that they did not foresee this result when the prior agency policy was firmly rooted in applying a

case-by-case analysis. Nor can they now attempt to deprive asylum seekers of a thorough

consideration of their claims under the guise of administrative efficiency, knowing that a case-

by-case analysis has always encompassed a thorough analysis of each individual's claim.

Accordingly, the Attorney General and Acting Secretary fail to justify the Proposed Rules under

---

[27] *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu,* 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).
[28] *Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).
[29] 84 FR 69645-46

11

the standards of the APA by offering "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."[30]

The Proposed Rules are also arbitrary and capricious because DHS and DOJ have failed to "examine the relevant data" in issuing them.[31] The agencies do not fully consider the effects of the Proposed Rules on asylum seekers, as they fail to give any kind of estimate of the additional number or percentage of asylum seekers who would be barred from asylum based on the proposed mandatory bars.[32] DHS and DOJ instead unhelpfully "note that the proposed expansion of the mandatory bars for asylum would likely result in fewer asylum grants annually" and allege that they are unable to provide any estimates of "the expected decrease" "because asylum applications are inherently fact-specific, and because there may be multiple bases for denying an asylum application."[33] The agencies further admit, "the full extent of the impacts [of the Proposed Rules] . . . is unclear."[34]

Not only do DHS and DOJ fail to provide any sort of estimate of the number of asylum applicants who would be affected, outside of citing general numbers regarding the total number of asylum cases and number of asylum grants, DHS and DOJ provide no statistics at all to substantiate their bases for the Proposed Rules. Their reliance on conclusory statements in the absence of any data is the precise opposite of reasoned and rational decision-making.[35] Moreover, recent reports that the Executive Office for Immigration Review (EOIR), the agency

---

[30] *See Fox Television Stations*, 556 U.S. at 515–16.
[31] *Genuine Parts Co. v. EPA*, 890 F.3d 304, 311–12 (D.C. Cir. 2018).
[32] *See* 84 FR 69658. DHS and DOJ provide an estimate of the number of cases that will be impacted by a section of the Proposed Rules that removes the provisions at 8 CFR §§ 208.16(e), 1208.16(e) regarding reconsideration of discretionary denials of asylum but do not provide any estimate for the number of cases affected by these other changes.
[33] 84 FR 69658.
[34] *Id.*
[35] *See Nat'l Treasury Emp. Union*, 654 F. Supp. at 1163; *Int'l Union, United Mine Workers*, 626 F.3d at 93.

12

AR.10109

overseeing the immigration court system, has been providing "garbled" and "inconsistent" data about immigration court cases and may have deleted 1 million immigration court records do little to foster any confidence in the veracity of the conclusory statements the agencies rely on in attempts to justify the Proposed Rules.[36]

## IV. THE PROPOSED RULES UNNECESSARILY AND CRUELLY EXCLUDE BONA FIDE REFUGEES FROM ASYLUM ELIGIBILITY AND WILL LEAD TO UNJUST AND IMBALANCED RESULTS THAT UNDERMINE ESTABLISHED CASE LAW.

DHS and DOJ's justification for the Proposed Rules is insufficient to justify the unduly harsh and discriminatory effects the Proposed Rules will have on asylum seekers. In promulgating the Proposed Rules, DHS and DOJ allege that these changes are necessary because the current "mix of case-by-case adjudication and per se rules is an inefficient means of identifying categories of offenses that should constitute particularly serious crimes[]."[37] Apart from the reality that the agencies' desire for efficiency is not what the Proposed Rules would actually accomplish, as described in various sections of these comments, the Proposed Rules would also lead to unjust and imbalanced results.

The laws, regulations, and processes governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, frequently without the benefit of appointed counsel and often from a remote immigration jail. The obstacles to winning asylum

---

[36] *See* Susan Monyak, "DOJ Accused of Wiping Nearly 1 Million Immigration Records," Law 360 (Nov. 1, 2019), available at: https://www.law360.com/articles/1215854/doj-accused-of-wiping-nearly-1-million-immigration-records.
[37] 84 FR 69646.

13

AR.10110

are exceedingly high; indeed, in some parts of the country and before certain Immigration Judges, almost no one succeeds.[38]

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and overbroad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking, this definition has been expanded to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such shoplifting,[39] simple misdemeanor battery, or sale of counterfeit DVDs.[40]

Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum. For example in *Gao v. Holder*, the Fourth Circuit determined that a conviction under 50 U.S.C. § 1702, for unlawful export of items on a Commerce Control list, was a particularly serious crime.[41] The Court acknowledged that the offense itself may seem innocuous and in some instances might not be particularly serious, but ruled that the circumstances in that case warranted this finding because they implicated issues of national security where the petitioner sold military technology information to Chinese quasi-government entities.[42]

---

[38] See *Las Americas Immigrant Advocacy Center v. Trump*, 3:19-cv-02051-SB (D. Or.) (Complaint filed on Dec. 18, 2019) (describing numerous courts as "asylum-free-zones" where data shows immigration courts with denial rates at or beyond 85%; and one immigration court had an asylum denial rate of 95.7%).

[39] *U.S. v. Christopher*, 239 F.3d 1191 (11th Cir. 2001).

[40] *Magasouba v. Mukasey,* 543 F.3d 13 (1st Cir. 2008).

[41] 595 F.3d 549 (4th Cir. 2010).

[42] *Id.* at 553.

14

This decision reiterates the concept that, as applied, the current bars and applicable analytical framework are sufficient to allow courts the flexibility to label circumstances "particularly serious" when they see them, in addition to denying asylum applications based on discretion. Indeed, the CAIR Coalition has had clients found ineligible for asylum as a matter of discretion where the offenses were neither aggravated felonies nor crimes involving moral turpitude. One case involved a young LGBTQI Central American man who had entered initially as an unaccompanied minor. The minor was originally in custody of the Office of Refugee Resettlement (ORR) but after reaching majority, he was transferred to civil adult immigration detention. It was during this time that the young man was involved in an altercation with a dorm officer. He ignored orders to return to his bunk, so officers sprayed him with mace. In response, the client punched the officer and threw a nearby plastic chair at him. While the officer was not injured, the Immigration Judge ultimately denied our client asylum, deeming his response to the detention disciplinary procedures as disproportionate and sending the wrong message to other detainees in removal proceedings applying for similar relief. Further categorical bars are not needed.

The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria also undermine past decisions by the Supreme Court. The Proposed Rules include a categorical bar against individuals convicted of misdemeanor offenses, such as driving while intoxicated, and possession of a controlled substance, including drug paraphernalia. These proposed bars track Supreme Court cases finding that these types of convictions are not aggravated felonies or offenses triggering removability.[43] If the

---

[43] *See Leocal v. Ashcroft,* 543 U.S. 1 (2004) (holding that a conviction for driving under the influence was not an aggravated felony crime of violence); *Carachuri-Rosendo v. Holder*, 560 U.S. 563 (2010) (ruling that a subsequent marijuana possession offense is not an aggravated

15

AR.10112

administration wishes to abrogate these rulings, it should do so by passing new legislation to supersede the Supreme Court's interpretation of this statute, not by proposing the unlawful Rules.[44] The Proposed Rules therefore effectively drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious because they rely on faulty premises. One assumption fundamentally underlying the Proposed Rules, for example, is that every non-citizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption.

The Proposed Rules are further capricious, in that they peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a non-citizen is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.

---

felony); *Mellouli v. Lynch*, 575 U.S. 798 (2015) (holding possession of paraphernalia was not a controlled substances offense).

[44] *Neal v. United States,* 516 U.S. 284, 295 (1996) ("Congress is free to change this Court's interpretation of its legislation." (quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977)).

16

AR.10113

**V.     THE PROPOSED RULES RAISE DUE PROCESS CONCERNS BECAUSE THEY
ADVERSELY AFFECT VULNERABLE POPULATIONS, SUCH AS ASYLUM
SEEKERS WHO SUFFER FROM MENTAL HEALTH ISSUES AND THOSE
WHO LACK LEGAL REPRESENTATION.**

The CAIR Coalition has been one of the leading legal experts in the area of representing

immigrants with mental illness. We published one of the nation's first manuals on providing

representation to clients with mental health disabilities in 2009, and a second edition of the

manual in 2013.[45] We were also co-counsel in the precedent-setting case *Temu v. Holder*, 740

F.3d 887 (4th Cir. 2014), which established that a person's mental illness can be a protected

ground for asylum. Indeed, every year, we represent a sizable number of immigrants with mental

disabilities who have been deemed incompetent by Immigration Judges in various immigration

courts.

The CAIR Coalition has represented individuals whose underlying mental health issues—

including trauma and persecution-related mental health issues—have contributed to conduct that,

under the Proposed Rules, could be considered in determining if an offense categorically bars

someone from asylum. In *Gomez-Sanchez v. Sessions*, the Ninth Circuit held that all reliable,

relevant information must be taken into consideration when making a particularly serious crime

determination, "including the defendant's mental condition at the time of the crime, whether it

was considered during the criminal proceedings or not."[46] Yet the Proposed Rules provide no

such safeguards for the mentally ill and allow asylum adjudicators to consider non-adjudicated

evidence to categorically bar them from asylum.

---

[45] The CAIR Coalition, Practice Manual for Pro Bono Attorneys: Representing Detainees
with Mental Disabilities in the Immigration Detention and Removal System (2d ed.
2013), available at
https://www.caircoalition.org/sites/default/files/Cair%20Coalition%20Mental%20Health%20Practice%20Manual%202013.pdf.
[46] 892 F.3d 997 (9th Cir. 2018).

17

AR.10114

The CAIR Coalition also has particular concerns for the unrepresented, detained individuals with whom we work. Many of those individuals may not fully understand the purported evidence that DHS offers to disqualify post-conviction orders or to categorically bar them from asylum, especially when such evidence was not a basis for conviction or even presented in the criminal proceeding.[47] Moreover, the unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions is particularly damaging to unrepresented, detained individuals, who may face severe challenges in obtaining the evidence they would need to rebut the presumption.[48]

Similarly, the Proposed Rules fail to address or account for the fact that many offenses related to possession or ingestion of controlled substances actually reflect bigger issues related to substance abuse and mental illness affecting our community at large, for which punitive methods are not the answer. The United States is in the midst of a growing opioid epidemic.[49] As a result, we are seeing growing incarceration rates for individuals struggling with addiction, who are the victims of this epidemic.[50] Despite these statistics, the National Institute on Drug Abuse reports that institutions in the criminal justice system have been reticent to treat opioid use disorder or to

---

[47] *See e.g. Moncrieffe*, 569 U.S. at 201 (noting that individuals in removal proceedings are not similarly situated to defendants in criminal proceedings and explaining that they face certain challenges such as limited ability to collect evidence).

[48] *Id.*

[49] Vedan Anthony-North, Leah G. Pope, Stephanie Pottinger, and Isaac Sederbaum, "Corrections-Based Responses to the Opioid Epidemic: Lessons from New York State's Overdose Education and Naloxone Distribution Program," Vera Institute of Justice (Mar. 2018), at 3, *available at* https://www.vera.org/downloads/publications/corrections-responses-to-opioid-epidemic-new-york-state.pdf.

[50] Tyler N.A. Winkelman, Virginia W. Chang, and Ingrid A. Binswanger, "Health, Polysubstance Use, and Criminal Justice Involvement Among Adults With Varying Levels of Opioid Use," JAMA Network (Jun. 15, 2018), *available at* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2687053.

18

AR.10115

use methods that actually curb recidivism and overdose.[51] The Proposed Rules would further contribute to this failure to address the root cause of the problem. Instead, under the Proposed Rules, people who have become addicted and therefore convicted of even a single possession of a controlled substance or drug paraphernalia offense would be completely barred from asylum. In essence, people would be barred from asylum—relief from removal that could assist them in recovery—based on the very substance abuse problem that led to their conviction.

Offenses related to controlled substances are also a marker of attempts by people with mental illnesses to self-medicate. In a study reported by the National Institutes of Health, researchers found the use of illicit drugs increased with unmet need for mental health care, and that alcohol abuse was higher among people with no mental health care use.[52] Under the Proposed Rules, all people that may have a mental illness and, as a result, used controlled substances and were convicted of even a single offense (not marijuana) would be barred from asylum. The overbreadth of such a categorical bar would lead to the denial and unfair treatment of immigrants with untreated mental illnesses who are convicted due to behavior directly related to their illnesses. And while it stands that not all people with mental illnesses will use illicit controlled substances and be convicted for it, as applied, the Proposed Rules bar from asylum all mentally ill people who do. Additionally, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The BIA has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of

---

[51] National Institute on Drug Abuse, "Medications to Treat Opioid Use Disorder" (Jun. 2018), available at https://www.drugabuse.gov/publications/medications-to-treat-opioid-addiction/how-opioid-use-disorder-treated-in-criminal-justice-system.

[52] Katherine M. Harris and Mark J. Edlund, "Self-Medication of Mental Health Problems: New Evidence from a National Survey," 40 Health Serv. Res. 1 (2005), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1361129/.

19

AR.10116

persecution should generally outweigh all but the most egregious of adverse factors."[53] Yet because of the categorical nature of the seven new bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances, particularly in light of the opioid epidemic or mental illness, merit such a harsh penalty.

Take for example the circumstances of a recent asylum client we represented in removal proceedings. This client was a man born in the Caribbean who had entered on a visitor visa and overstayed. He had one conviction for possession of marijuana and another for possession of another controlled substance. He had received treatment at a hospital after neighbors had caught him attempting to commit suicide in a neighborhood park. His family reported that, around this time, he became more secretive and paranoid, engaging in strange behavior such as staying up throughout the night and talking to himself. In an effort to calm himself down, the client often used marijuana, which was sometimes laced with other substances, which led to his second conviction on one instance.

After he was placed in removal proceedings, the Immigration Judge found our client incompetent based on his inability to answer basic questions and devolvement into fits of crying and ranting. The client was eventually diagnosed with several mental illnesses, including the possibility of schizophrenia. In fact, the client was in his late 20s, the average age of onset for schizophrenia. This man had no family back home; he had come to visit his step-siblings who were all settled in the United States. What awaited him in his home country was likely incarceration and torture by government officials and his community based on ill-conceived notions of his mental illness and behavior. Under the Proposed Rules, regardless of the fact that

---

[53] *Matter of Pula,* 19 I.&N. Dec. at 474.

he had little to no history of violent conduct or criminal history or that his convictions occurred during a series of events showing the onset of his mental health illness, our client would be barred from asylum.

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is cruel and unjust.

## VI. APPLICANTS BARRED FROM ASYLUM WILL BE SIGNIFICANTLY IMPACTED, EVEN IF THEY ARE GRANTED WITHHOLDING OF REMOVAL OR PROTECTION UNDER THE CONVENTION AGAINST TORTURE.

Throughout the Proposed Rules, the government defends the harsh and broad nature of the bars by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules, including withholding of removal under INA § 241(b)(3) and protection under the CAT. The availability of these alternative forms of relief, however—known as withholding of removal and CAT protection—does not nullify the harm created by the Proposed Rules' new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection

21

AR.10118

would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard under these other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Second, for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees. And, unlike asylum, when a person is granted withholding or protection under CAT, an Immigration Judge issues two orders. One order withholds removal of that person to the country where they are likely to be persecuted or tortured and a simultaneous order orders that person removed.[54] This is because these forms of relief are country-specific, meaning that any international travel will act as "self-deportation."

---

[54] *See Calla Mejia v. Sessions*, 866 F.3d 573 (4th Cir. 2017) ("Moreover, while withholding of removal only prevents the removal of an alien to the specific country where she faces persecution—thereby leaving open the possibility of transfer to a third country.")

AR.10119

Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted alternative relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an Immigration Judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban," which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An Immigration Judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[55] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing

---

[55] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order" (Dec. 21, 2019), *available at* https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

AR.10120

parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

This is exactly the situation that the petitioner in *Calla Mejia v. Sessions*, 866 F.3d 573 (4th Cir. 2017), faced and why she challenged her statutory bar from asylum on appeal. Ms. Calla-Mejia was a mother of two children who was married to a police officer in her home country who repeatedly raped and hurt her. She entered the United States once but was summarily deported after an Immigration Judge did not explain her rights adequately, leading her to feel disillusioned and accept deportation. Following her return to her country, Ms. Calla-Mejia's husband found her and raped her, and so she fled to the United States again. This second time, however, because she was previously deported, she was placed in limited removal proceedings that reinstated her previous removal order and barred her from asylum. While Ms. Calla-Mejia was eventually granted withholding of removal, she worried about the safety of her children who remained in the care of her parents back in her home country. She was especially concerned about the welfare of her eldest daughter who was going through puberty and had already been the victim of inappropriate activity and desire by her police officer husband. Because Ms. Calla-Mejia had been granted withholding of removal, this protection did not extend to her children and so she was unable to petition for them as derivatives on her asylum application. Ms. Calla-Mejia appealed her bar from asylum based on her prior deportation and subsequent reinstatement but eventually lost because the Court found the Attorney General's interpretation of this statutory bar to asylum plausible. To this day, Ms. Calla-Mejia has been unable to see her children again.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in

24

their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards to the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work. And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a non-citizen is granted asylum, the person receives a legal status. Asylum, once granted, protects an asylee against removal unless and until that status is revoked. None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they have a removal order, are vulnerable to the permanent prospect of deportation to a third country, and are subject to potential check-ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.

Returning to the example of Ms. Calla-Mejia, unlike the bars proposed in these Rules, the bar that applied to Ms. Calla-Mejia was based on explicit wording in the INA foreclosing her and others from discretionary relief, like asylum, based on her prior deportation and reinstatement of deportation order.[56] While the CAIR Coalition believes this outcome was unjust, the outcome did not rely on an implausible reading of the statute and so we understand why the Court upheld that bar. Nevertheless, through these Proposed Rules, the agencies seek the same desired unjust consequences of family separation, limited employment and travel, etc., based on statutory authority less explicit than in *Calla-Mejia*. This is cruel and unjust.

Finally, the CAIR Coalition writes to highlight a different form of prejudice that will flow from the Proposed Rules—one relating to judicial efficiency. Neither withholding of

---

[56] *Calla Mejia*, 866 F.3d at 580.

25

AR.10122

removal nor CAT protection allows family members who are in the United States together and

pursuing protection on the same basis to apply as derivatives on a principal application. As a

result, family claims for those rendered ineligible for asylum by the Proposed Rules will have to

be adjudicated separately and potentially before different adjudicators even when the claims are

interrelated or when minor children may not be in a position to explain their claim. In addition to

being unjust to the affected family members, this approach would result in gross inefficiencies,

which should be avoided in a system that already contains a significant backlog of pending cases.

VII.    **THE PROPOSED RULES UNDERMINE CRIMINAL JUDGMENTS AND
        VIOLATE DUE PROCESS BECAUSE THEY ALLOW DOJ AND DHS TO LOOK
        OUTSIDE OF THE CRIMINAL COURT RECORD IN BARRING INDIVIDUALS
        FROM ASYLUM.**

The Proposed Rules pertaining to gang-related offenses, domestic violence offenses, and

the effects of criminal convictions are deeply problematic in that they violate due process by

undermining the criminal legal system and the criminal judgments issued by criminal courts, by

requiring asylum adjudicators to look beyond the scope of criminal adjudications. The Proposed

Rules' additional bars to asylum will further cause extreme hardship to the CAIR Coalition's

clients, as discussed below.

The Proposed Rules violate due process because they require adjudicators to engage in

decision-making to determine whether an asylum applicant's conduct—considered

independently of any criminal court adjudication—triggers a categorical bar to asylum and

whether a vacated or modified conviction or sentence still constitutes a conviction or sentence

that implicates a bar to asylum. First, the agencies propose that immigration adjudicators be

permitted to consider "all reliable evidence" to determine whether there is "reason to believe [a]

crime was committed in furtherance of criminal street gang activity."[57] Second, the Proposed

---

[57] 84 FR 69649.

26

Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense," and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[58] Third, the Proposed Rules permit an adjudicator to "look to evidence other than the order [vacating or expunging a conviction or modifying a sentence] to determine whether the order was issued for rehabilitative or immigration purposes."[59] The Proposed Rules also impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions.[60]

A.  The Proposed Rules disregard the established analysis for determining whether a conviction constitutes a bar to asylum and will encourage the use of unsubstantiated and weak evidence to categorically bar persecuted individuals from asylum.

For the purposes of asylum, a conviction for an aggravated felony constitutes a conviction for a particularly serious crime.[61] The legal framework for determining whether an asylum seeker has been convicted of an aggravated felony is known as the "categorical approach."[62] Under this approach, the court "must first determine the meaning of the offense listed in the INA and then compare that 'generic' definition to the elements of the crime under state law."[63] This analysis is more complex if the crime is divisible under state law. In that case, a "modified categorical" approach applies, under which the IJ may "consult a limited class of documents" to determine which alternative element of the crime formed the basis for the asylum

---

[58] 84 FR 69652, 69661.
[59] 84 FR 69660, 69654-55.
[60] 84 FR 69660, 69655.
[61] 8 U.S.C. § 1158(b)(2)(A)(ii), (B)(i).
[62] *Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013).
[63] *Etienne v. Lynch*, 813 F.3d 135, 143 (4th Cir. 2015).

27

AR.10124

seeker's conviction.[64] Although the modified approach permits the review of certain reliable documents, it retains the categorical approach's emphasis on the elements, rather than the specific facts, of the crime.[65] The "INA's provisions ask what the noncitizen was 'convicted of,' not what he did, and the inquiry in immigration proceedings is limited accordingly.[66] For both the aggravated felony determination and the particularly serious crime determination, the relevant initial inquiry, and in many cases the only inquiry, is the conviction offense and its elements, not the specific conduct.

The Proposed Rules regarding gang-related and domestic violence offenses undermine criminal judgments and violate due process because they disregard the established framework for determining whether a conviction constitutes an aggravated felony and categorical bar to asylum. Instead of looking first to the elements of the conviction offense, the Proposed Rules require an asylum adjudicator to consider "gang-related" or "domestic violence" conduct that may not have been part of the required elements for conviction, and for that reason, may not have been objected to by an asylum applicant or their attorney during the criminal proceeding.[67] The categorical bars involving circumstance-specific particularly serious crimes proposed by these Rules vitiate from the clearly delineated aggravated felony grounds listed in the INA because

---

[64] *See Descamps v. United States*, 570 U.S. 254, 257 (2013).
[65] *Id.* at 263.
[66] *Moncrieffe*, 569 U.S. at 200 (internal quotation omitted); *see also* 8 U.S.C. § 1158(b)(2)(A)(ii) (providing that an individual is ineligible for asylum if he "having been convicted by a final judgment of a particularly serious, constitutes a danger to the Community of the United States."). 
[67] *Descamps*, 570 U.S. at 270 (warning that "[a] defendant, after all, often has little incentive to contest facts that are not elements of the charged offense—and may have good reason not to. At trial, extraneous facts and arguments may confuse the jury. (Indeed, the court may prohibit them for that reason.) And during plea hearings, the defendant may not wish to irk the prosecutor or court by squabbling about superfluous factual allegations.").

AR.10125

they encompass convictions and even activity that the asylum seeker may not ultimately be convicted for at all.[68]

The Proposed Rules expand the group of individuals ineligible for asylum far beyond the scope of the INA's specific limitations—which only bar those who have been *convicted* of a *particularly serious* crime from receiving asylum.[69] In *Moncrieffe v. Holder*, the Supreme Court forewarned of exactly the sort of harm that would arise from these Proposed Rules. In that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction.[70] The Court noted that, should this occur, "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result of a disparity of outcomes depending on the whims of the individual Immigration Judge and a further burdened immigration court system.[71] Moreover, the Court provided that a practical purpose of the categorical approach was to "promote judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[72]

In contrast, the Proposed Rules' circumstance-specific approach undermines judicial efficiency and forces asylum seekers to try to disprove any allegations of gang-related activity or domestic violence that DHS has raised, which would result in relitigation of convictions or

---

[68] *See* 8 U.S.C. §§ 1101(a)(43), 1158(b)(2)(A)(ii).

[69] *See* 8 U.S.C. § 1158(b)(2)(A)(ii). The INA further defines a "conviction" as "a formal judgment of guilt of the alien entered by a court or, . . . where—(i) a judge or jury has found the alien guilty or the alien has entered a plea of guilty or nolo contendere or has admitted sufficient facts to warrant a finding of guilt, and (ii) the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty . . . ." 8 U.S.C. § 1101(48)(A).

[70] 569 U.S. 184, 200-01 (2013).

[71] *Id.*

[72] *Id.*

29

litigation of past conduct that fell outside of the conviction. The agencies have justified these Proposed Rules on the basis that the current application of the particularly serious crimes bar has led to "unpredictable results,"[73] yet by proposing a categorical bar based on circumstances described in unreliable documents, and not actual convictions, the government runs afoul of the same alleged problem it purports to address. These proposed changes are therefore arbitrary and capricious because they do not serve the stated purposes for these changes and are not adequately supported by relevant facts.[74]

This proposed approach is particularly troubling for many individuals that the CAIR Coalition encounters in detention facilities, because such individuals often lack representation and would be forced to disprove these circumstantial presumptions while detained, which greatly limits their ability to locate witnesses and evidence.[75] Additionally, the CAIR Coalition has grave due process concerns regarding the types of evidence DHS may use in an attempt to categorically bar asylum seekers from asylum under the Proposed Rules. As recognized by the Fourth Circuit in *Prudencio v. Holder*,[76] allegations or facts gleaned only from police reports where a police report is the basis for an allegation "often contain little more than unsworn witness statements and initial impressions" and "because these submissions are generated early in an investigation, they do not account for later events, such as witness recantations, amendments, or corrections."[77] Several Circuit Courts of Appeals have also spoken as to the

---

[73] 84 FR 69645-46.
[74] *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (an agency must supply reasoned basis for a decision).
[75] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).
[76] 669 F.3d 472, 483-84 (4th Cir. 2012).
[77] *Id.*

30

AR.10127

unreliability of RAP sheets,[78] probation reports,[79] and investigation reports,[80] which under the Proposed Rules would be sufficient to categorically bar individuals from asylum. And when an I-213 Record of Deportable/Inadmissible Alien contains allegations that the non-citizen disputes, at least one circuit has ruled that the I-213 holds no independent value and is not entitled to evidentiary weight.[81] Despite these pronouncements of concern by the Circuit Courts of Appeals, now through this Proposed Rule, DHS and DOJ wish to allow the use of these unreliable documents to categorically bar people from asylum; this cannot be the product of reasoned decision-making.

For the proposed bar for gang-related offenses, the CAIR Coalition is further concerned that creating a blanket exclusion for anyone who is convicted of a crime—including a misdemeanor—that an immigration adjudicator deems linked to gang activity will prevent bona fide asylum seekers from receiving protection. The factual and due process concerns presented by the introduction of unsubstantiated gang allegations in immigration court have been well

---

[78] *Francis v. Gonzales*, 442 F.3d 131, 143 (2d Cir. 2006) (RAP sheets are products of "agencies whose jobs are to seek to detect and prosecute crimes" and thus "do not necessarily emanate from a neutral, reliable source")

[79] *Dickson v. Ashcroft*, 346 F.3d 44, 54 (2d Cir. 2003) (Because factual narratives in probation reports "are prepared by a probation officer on the basis of interviews with prosecuting attorneys, police officers, law enforcement agents, etc., they may well be inaccurate" and are "not a highly reliable basis for a decision of such importance as deportation.")

[80] *Banat v. Holder*, 557 F.3d 886, 891 (8th Cir. 2009) ("Reliance on reports of investigations that do not provide sufficient information about how the investigation was conducted are fundamentally unfair.").

[81] *Murphy v. INS,* 54 F.3d 605, 610 (9th Cir. 1995)

31

AR.10128

documented in scholarly articles,[82] lawsuits against local police departments and DHS,[83] and the daily news.[84] Gang membership and gang association are not defined in the INA or the Proposed Rules, and definitions of a "gang" differ among law enforcement and other state and federal agencies.[85] State and local law enforcement agencies maintain gang databases for criminal investigations and they enter into information sharing agreements that allow Immigration and Customs Enforcement (ICE) to access this data for removal purposes.[86] Yet many states and municipalities have found the errors in their gang databases so disturbing that they have either

---

[82] *See* Sean Garcia-Leys, Meigan Thompson, Christyn Richardson, *Mislabeled: Allegations of Gang Membership and their Immigration Consequences*, UCI School of Law Immigrant Rights Clinic (2016) [hereinafter *Mislabeled: Allegations of Gang Membership and their Immigration Consequences*]; *see generally,* Rebecca A. Hufstader, Note, Immigration Reliance on Gang Databases: Unchecked Discretion and Undesirable Consequences, 90 N.Y.U. L. REV. 671, 679 (2015) [hereinafter *Immigration Reliance on Gang Databases: Unchecked Discretion and Undesirable Consequences*]; Katherine Conway, Note, Fundamentally Unfair: Databases, Deportation, and the Crimmigrant Gang Member, 67 AM. U. L. REV. 269, 273–74 (2017) [hereinafter *Fundamentally Unfair: Databases, Deportation, and the Crimmigrant Gang Member*]; Michael Cannell, *Assumed Dangerous Until Proven Innocent: The Constitutional Defect in Alleging Gang Affiliation at Bail Hearings*, 63 DEPAUL L. REV. 1027 (2014); Jennifer M. Chacón, *Whose Community Shield?: Examining the Removal of the "Criminal Street Gang Member,"* 2007 U. CHI. LEGAL F. 317, 321 (2007) ) [hereinafter "Whose Community Shield?: Examining the Removal of the "Criminal Street Gang Member"].

[83] *See Saravia v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) (upholding the district court's preliminary injunction, requiring a prompt hearing before a neutral decision maker at which the minor plaintiffs could contest the gang allegations that led to their detention by ICE).

[84] *See* Hannah Dreier, *How a Crackdown on MS-13 Caught Up Innocent High School Students*, N.Y. Times (Dec. 27, 2018) [hereinafter, *How a Crackdown on MS-13 Caught Up Innocent High School Students*], https://www.nytimes.com/2018/12/27/magazine/ms13-deportation-ice.html; Christie Thompson, *How ICE Uses Secret Police Databases to Arrest Immigrants*, MARSHALL PROJECT (Aug. 28, 2017, 7:00 AM) https://www.themarshallproject.org/ 2017/08/28/how-ice-uses-secret-police-databases-to-arrest-immigrants#.c9orEGMWg; Ali Winston, *Vague Rules Let ICE Deport Undocumented Immigrants as Gang Members*, INTERCEPT (Feb. 17, 2017, 7:12 PM), https://theintercept.com/2017/02/17/ loose-classification-rules-give-ice-broad-authority-to-classify-immigrants-as-gangmembers; Nicole Narea, Immigrant *Teens Unjustly Jailed as Gang Members: ACLU*, LAW360 (Aug. 14, 2017, 3:29 PM), https://www.law360.com/articles/953705.

[85] *Fundamentally Unfair: Databases, Deportation, and the Crimmigrant Gang Member*, at 289; 84 FR 69649, 69659.

[86] *See Whose Community Shield?: Examining the Removal of the "Criminal Street Gang Member*, at 321.

32

AR.10129

ordered systemic investigations or overhauled the database procedures completely. The most

notable entities to come under fire for error-ridden gang databases are Long Island, NY[87];

Portland, OR[88]; Chicago, IL[89]; and the entire state of California.[90]

Furthermore, the "evidence" of gang participation underlying a database entry, if

presented at all, is often based on a check-list of generally innocuous behavior and traits, such as

social media photos depicting youth wearing popular brands and sports paraphernalia (for

example photos of Michael Jordan or the Chicago Bulls logo), wearing colors associated with

gang membership, having a certain country of origin, or residence in a certain neighborhood

"known for gang activity."[91] Even where the behavior is less innocuous, gang membership

allegations can be raised by a single, unidentified witness and do not need to be substantiated.[92]

Individuals entered into these databases are rarely notified of their designation and there is no

---

[87] Nicole Narea, *Immigrant Teens Unjutly Jailed as Gang Members*: ACLU, LAW360 (Aug. 14, 2017, 3:29 PM), https://www.law360.com/articles/953705

[88] *See* Carli Brosseau, *Who's on Portland's gang list?* The Oregonian, (Nov. 4, 2016, 2:29 pm), https://www.oregonlive.com/portland/2016/11/at_least_i_was_on_some_kind_of.html (the documents reviewed by the Oregonian showed that "[p]eople who challenge a gang designation are more likely than not to prevail; Police rarely cite a gang-related crime to justify designating someone a gang member; Almost every time police label someone a gang member, they say the person admitted it; Lies can land people on the list").

[89] Jacqueline Serrato, *Chicago Police admits gang database error that enabled ICE raid*, The Chicago Tribune (Dec. 6, 2017), https://www.chicagotribune.com/hoy/ct-chicago-police-admits-gang-database-error-20171206-story.html.

[90] *See* Ali Winston, *California's gang database gets less secretive, but problems linger*, Reveal (September 30, 2016), available at: https://www.revealnews.org/blog/californias-gang-database-gets-less-secretive-but-problems-linger/.

[91] *See Mislabeled: Allegations of Gang Membership and their Immigration Consequences; see also How a Crackdown on MS-13 Caught Up Innocent High School Students*; Nicole Narea, Immigrant Teens Unjustly Jailed as Gang Members: ACLU, LAW360 (Aug. 14, 2017, 3:29 PM), https://www.law360.com/articles/953705; *Reliance on Gang Databases: Unchecked Discretion and Undesirable Consequences*, 679–80 (listing differing criteria requirements per different state statutes, such as Texas's requirement that an individual meet two of eight criteria before entry into a local or regional gang database versus Minnesota's requirement that every individual have a criminal conviction before entry into its Gang Pointer File).

[92] *Id.*

33

AR.10130

meaningful mechanism to contest such a designation.[93] Where gang allegations arise from a criminal investigation, such allegations can continue to persist even where the suspect is cleared of any criminal wrongdoing, raising serious concerns about due process and fundamental fairness.[94] Accordingly, the Proposed Rules will only exacerbate the general due process and data accuracy problems presented by sharing unchecked gang allegations with federal immigration officials and will unfairly bar persecuted individuals from receiving asylum.

B. <u>The Proposed Rules violate due process and undermine criminal court adjudications by expanding the inquiry of what constitutes a conviction or sentence for asylum purposes into the motives for a court's vacatur, modification, or correction of a conviction or sentence.</u>

The Proposed Rules also improperly authorize immigration adjudicators to second-guess both state and federal criminal court adjudications.[95] Current BIA precedent requires that, to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings.[96] The Proposed Rules go far beyond that requirement, by examining the motives of the immigrant in challenging their conviction and sentence.[97] Many Circuit Courts of Appeals have already ruled that the inquiry

---

[93] *See Mislabeled: Allegations of Gang Membership and their Immigration Consequences*. To date, California is the only state that requires notice for individuals included in gang databases.

[94] *See Whose Community Shield?: Examining the Removal of the "Criminal Street Gang Member,"* at 321; *How a Crackdown on MS-13 Caught Up Innocent High School Students*; Nicole Narea, *Immigrant Teens Unjustly Jailed as Gang Members: ACLU*, LAW360 (Aug. 14, 2017, 3:29 PM), https://www.law360.com/articles/953705. *See generally, Fundamentally Unfair: Databases, Deportation, and the Crimmigrant Gang Member*.

[95] *Compare Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[96] *Matter of Thomas and Thompson*, 27 I.&N. Dec. 674, 684 (A.G. 2019)

[97] The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set

AR.10131

for determining the purpose of a vacatur or modification focuses on the criminal court order rather than any imputed motive of the immigrant.[98]

The Proposed Rules include a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[99] The Attorney General and Acting Secretary provide no support for the assertion that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds."[100] Common sense rejects such an assertion. After the Supreme Court invalidated the Armed Career Criminal Act's residual clause as void for vagueness in *Johnson v. United States*,[101] federal courts were inundated with post-conviction motions from individuals who had valid legal and constitutional challenges to their sometimes decades-old convictions.[102] The mere fact that some of these post-conviction motions

---

forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

[98] *See e.g Pickering*, 465 F.3d at 267-70 (holding that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur); *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (holding that the motive of the respondent was not the relevant inquiry and that, "the inquiry must focus on the state court's rationale for vacating the conviction"); *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "the IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction" and the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons ... the [adjudicator's] inquiry must end there).

[99] 84 FR 96956.

[100] 84 FR 96956.

[101] 135 S. Ct. 2551 (2015).

[102] Thomas H. Gabay, *Using Johnson v. United States to Reframe Retroactivity for Second or Successive Collateral Challenges*, 84 Fordh. L. Rev. 4, 1615, n. 26 (2016) (noting several

were over a year old in no way diminished that the movants sought relief—and were granted relief—on substantive grounds.

Moreover, the presumption raises due process concerns because it ignores the realities of indigent people who have been convicted of crimes. Criminal defendants frequently lack legal representation in post-conviction proceedings.[103] Therefore, they may not have the knowledge, means, or the will to fight their conviction until they are advised to do so when they are in removal proceedings. By applying the presumption against the validity of an overturned or modified conviction or sentence, the Proposed Rules hold asylum seekers to a higher standard than those seeking other forms of relief in removal proceedings, by forcing only asylum seekers to rebut the presumption despite the existence of actual defects in their underlying criminal proceedings. The Proposed Rules therefore compound the harm to asylum seekers who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

C.     The Proposed Rules are vague and overbroad, create inefficiencies, and adversely impact vulnerable populations.

The vagueness in the Proposed Rules also raises due process concerns.[104] The Proposed Rules are overbroad in that they do not explain what types of evidence or non-adjudicated conduct an Immigration Judge may rely on to categorically bar immigrants from asylum or to decide that a post-conviction order is for rehabilitative or immigration purposes. As discussed above, the types of evidence currently used to support gang allegations are suspect. Without clear

---

decisions from various courts of appeals vacating inmate sentences and remanding for resentencing in light of *Johnson*).

[103] *Pennsylvania v. Finley*, 481 U.S. 551 (1997) (providing that the right to appointed counsel extends only to the "first appeal of right," but not to further collateral attacks on a conviction).

[104] 84 FR 69649, 69652, 69659, 69661.

36

delineations as to what types of conduct are sufficient to implicate the gang or domestic violence bars and what evidence constitutes "reliable evidence" of gang allegations, domestic violence related conduct, or whether a post-conviction order is for rehabilitative or immigration purposes, the Proposed Rules "fail[] to give adequate notice to people of ordinary intelligence concerning the conduct [they] proscribe[]," and therefore violate due process.[105]

If these bars are insufficient to give people proper notice, they surely implicate further due process and constitutional rights in the criminal justice system. This is especially so as it relates to a criminal defendant's Sixth Amendment right to be accurately apprised by defense counsel of the immigration consequences of his guilty plea to criminal charges.[106] Despite this significant right at issue, the agencies have wholly failed to account or prioritize these real world consequences of the Proposed Rules. As is applicable here, "no deference is owed to an agency action that is based on an agency's purported expertise where the agency's explanation for its action lacks any coherence."[107]

The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[108] However, they create additional burdens for the already overwhelmed immigration court system by tasking adjudicators with highly nuanced, resource-intensive assessments of the connection of a conviction to gang activity, the domestic nature of alleged criminal conduct, and the motives of an immigrant in challenging a conviction—assessments far outside adjudicators' areas of expertise.[109] These in-depth assessments will prolong asylum

---

[105] *See United States v. Doremus,* 888 F.2d 630, 634 (10th Cir. 1989).
[106] *Padilla v. Kentucky,* 559 U.S. 356 (2010).
[107] *Grace*, 344 F. Supp. 3d at 125.
[108] *See* 84 FR 69646, 69656-8.
[109] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point (explaining that many immigration judges come from non-immigration related legal

37

AR.10134

proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. Requiring adjudicators to engage in minitrials to determine the applicability of categorical criminal bars or the presumption that post-conviction relief for those who sought it while in removal proceedings or longer than one year after conviction, rather than relying on judgements arising out of the criminal legal system, will dramatically decrease efficiency in the asylum adjudication process and create more bases for appeals.

## VIII.  CONCLUSION

For the reasons detailed in the comments above, the CAIR Coalition strongly opposes DHS and DOJ's Proposed Rules. The Proposed Rules unfairly bar large swaths of individuals from asylum, depriving them of their right to an individualized analysis of their claims, based on the agencies' poorly reasoned and conclusory rationale. A court will surely view these rules as contradictory to the INA, arbitrary and capricious, and a violation of the due process protections of the Constitution. DHS and DOJ should withdraw the Proposed Rules, as only a thorough, circumstance-specific approach to asylum claims, in conformance with statutory and constitutional protections and international law will properly protect asylum seekers.

---

backgrounds, and stating that, as of August 2019, the number of pending cases in immigration court reached a "historic high of slightly more than 1 million.").

38

AR.10135

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-10on
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0523
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** TROY ELDER
**Address:**
　634 S Spring Street
　Los Angeles,　90014
**Email:** Troy@immdef.org
**Phone:** 2136347601
**Organization:** Immigrant Defenders Law Center

## General Comment

Please see attachments.

## Attachments

ImmDef Comment Asylum Bars Final Submitted

AR.10136



January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

> Re:     84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019;
> RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed
> Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

To Whom it May Concern:

We are writing on behalf of Immigrant Defenders Law Center ("ImmDef") to express our strong opposition to the proposed amendment of certain regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019 ("Proposed Rules").

ImmDef is the largest provider of in-court asylum representation in the State of California.   Our clientele includes some of the most vulnerable individuals in, and at the borders of, the nation's most populous state.   The Proposed Rules would have grave and unnecessary consequences on our clients' ability to avail themselves of international protections which they urgently need.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact the undersigned for further information.

Sincerely,

/s/Lindsay Toczylowski          /s/Munmeeth K. Soni          /s/ Troy Elder
Lindsay Toczylowski              Munmeeth K. Soni              Troy Elder
Executive Director               Director of Litigation and    Supervising Attorney for
                                 Advocacy                      Litigation and Advocacy

---

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

## I.      Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications.  Taken together, these rules would bar significant numbers of ImmDef's clients from seeking asylum.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility.  The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law.  ImmDef submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the Administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.     The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*



The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, opens a path to citizenship, and preserves family unity. The domestic asylum system is a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust. Domestic asylum policy plays an important role in serving the United States' foreign policy interests abroad. For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail. The obstacles to winning asylum are exceedingly high; indeed, in some parts of the country and before certain immigration judges, almost no one succeeds. Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path. There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. Originally limited to murder, weapons trafficking and drug trafficking, it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. If anything, the existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

ImmDef's docket testifies to the potency of immigration judges' ability to make such discretionary denials.    For example, in November 2019, an immigration judge sitting in Los Angeles, upon reviewing a mentally ill Salvadoran asylum applicant's history of encounters with law enforcement, deemed him ineligible for asylum on



3
AR.10139

discretionary grounds, even though counsel for DHS had stipulated that none of the convictions met the "particularly serious" standard.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that he or she is poses a future danger.

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct. In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Yet because of the categorical nature of the seven new bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking



mothers convicted for bringing their own child across the southern border in an effort to find safety.

The proposed new criminal bars would unfairly prejudice large-numbers of ImmDef's asylum-seeking clients, particularly those with mental health disorders—often the very basis upon which they seek international protection from the barbaric methods employed by many countries to subdue, "treat," or "cure" them. Given the high correlation between mental illness and adverse encounters with law enforcement, often due to extreme poverty, self-medication, and homelessness, the Proposed Rules would penalize ImmDef asylum clients such as:

- A 25-year old DACA-eligible Guatemalan man suffering from a traumatic brain injury and catatonia that led him to self-medicate with methamphetamines. His single conviction in 2018 under Cal. H&S § 11364(a), for possession of unlawful drug paraphernalia, resulted in a two-*day* jail sentence. An immigration judge in Adelanto, California found that this conviction was insufficiently severe to disqualify him from asylum, an outcome that would have been foreclosed under the Proposed Rules' bar on *any* drug-related offense (except for a first-time marijuana possession offense).

- A 38-year old Honduran man who had been gravely injured when riding a bicycle in 2015, resulting in severe brain injury, depression, and other mental health concerns. His 2016 conviction for spousal injury under Cal. PC 273.5(A) resulted in a 3-year probation and was accompanied by evidence from his domestic partner, who had been his caregiver in the wake of his accident, that she had not wished to file charges. In granting asylum, the immigration judge also noted that the sentence was minimal. However, under the Proposed Rules' prohibition of asylum for any conviction *or accusation of conduct* for acts of battery involving a domestic relationship, our client would have been barred from asylum.

*The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). CITE? One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.

This is particularly true with a substantial portion of ImmDef's asylum caseload. As a provider under the National Qualified Representative Program ("NQRP"), ImmDef

serves as appointed counsel in cases for asylum-seekers who have been found to be incompetent to represent themselves in their immigration proceedings because of a serious mental disorder.  These clients suffer from serious mental or developmental disabilities and have often suffered persecution and torture in their home countries because of their mental disabilities.

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder. Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate.   Indeed, the Ninth Circuit Court of Appeals has recognized that an accused's mental health at the time of the crime may be taken into account by immigration judges when evaluating whether convictions meet the particularly serious crime standard.  Yet the proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum-seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

III.    **Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture**

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules. The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard

6
AR.10142

under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees. And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation." Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban," which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future. Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

ImmDef has a strong and growing presence on the southern U.S. border, and with it a corresponding docket of families subjected to differing relief eligibility frameworks due to manner and/or date of entry and other factors. Accordingly, ImmDef clients subject to the transit ban, MPP, and other expanded asylum bars risk even more serious

7

AR.10143

harm if the ability to petition for a spouse and children to join them as derivatives is compromised.

Withholding of removal recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status. Asylum, once granted, protects an asylee against removal unless and until that status is revoked. None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.

Finally, ImmDef's clients suffering from mental and intellectual disabilities, already vulnerable, will lose opportunities for federal public benefits if limited to withholding of removal and CAT relief. Federal means-tested public benefits such as supplemental security income, food stamps, Medicaid, and cash assistance are limited to "qualified aliens," a status conferred upon asylees and recipients of withholding of removal (but not CAT deferral) for a period of seven years, following which an asylee is presumed to have adjusted status to that of lawful permanent resident and naturalized. Because as explained above neither withholding of removal nor CAT provide a pathway to permanent residence and citizenship, disabled, elderly, and other categories of vulnerable immigrants who rely on federal means-tested public benefits, particularly for long-term medical conditions, would be further harmed by the Proposed Rules.

## IV. The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court



actors.

> *The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum. In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea. By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

In non-asylum contexts, ImmDef's clients have benefitted from these important constitutional safeguards and the opportunity to seek post-conviction relief. Recent examples include:

- An NQRP client in his mid 50's had been an LPR since 2009. He had a minor criminal record (vandalism, with one drug possession dismissed through diversion). Due to untreated symptoms of schizophrenia, he was charged and pled

to a felony charge of criminal threats resulting from an altercation with his employer and was sentenced to 16 months in prison. Through habeas litigation showing ineffective assistance of counsel, the plea and conviction were vacated and he entered a plea to an immigration-safe charge for the same sentence, credit for time served. His immigration case, on appeal, was remanded and terminated, for want of sustainable grounds of removal.

- Another NQRP client, also an LPR, was an attorney who became symptomatic with schizophrenia and set a small fire of documents in his apartment. He was charged and convicted of arson--a categorical aggravated felony. ImmDef filed a motion to vacate based on failure to meaningfully understand and defend against the immigration consequences of his plea. The district attorney did not oppose and his arson conviction was vacated. He pled to a vandalism charge for probation and less than a year in custody, time served. His immigration case was terminated.

- A 20-year-old LPR, who was charged and convicted of assault and sentenced to prison. ImmDef litigated a motion to vacate and, over strenuous opposition from the district attorney, the court granted the motion and the charge was ultimately dismissed based on insufficiency of evidence of guilt. After the charge was dismissed, the client was released on bond, and DHS moved to terminate proceedings.

*The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*. The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is

10
AR.10146

evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself." In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies. In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur. Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry. Rather, "the inquiry must focus on the state court's rationale for vacating the conviction." In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction." Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there." The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act." Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding

practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum. The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

* * *

For these reasons, we urge that the Department of Homeland Security and the Department of Justice immediately withdraw their current proposal.



ER-2110

12
AR.10148

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-ilfi
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0524
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Harper Jean Tobin
**Organization:** National Center for Transgender Equality

## General Comment

See attached files:
(1) Comments of the National Center for Transgender Equality on the Proposed Rule; and,
(2) Report of the 2015 U.S. Transgender Survey (discussed in the above comments).

## Attachments

NCTE comment on DHS DOJ asylum eligibility NPRM 1 21 20

USTS Main Report

AR.10149



*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

January 21, 2020

**Re: Procedures for Asylum and Bars to Asylum Eligibility; Proposed Rule; 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

The National Center for Transgender Equality (NCTE) submits the following comments in opposition to the Departments' Proposed Rule to amend regulations relating to eligibility for asylum.

Founded 2003, NCTE works to improve the lives of the nearly two million transgender people in the United States and their families through sound public policy, public education, and groundbreaking research. NCTE has worked with countless employers as well as local, state, and federal agencies on equal employment opportunity (EEO) and other policies and enforcement efforts. In 2015, NCTE conducted the U.S. Transgender Survey, the largest survey to date of transgender people with nearly 28,000 respondents from all 50 states.

Existing asylum regulations and procedures are unduly harsh, requiring individuals fleeing life-altering and life-threatening violence to meet a heavy evidentiary burden, often without counsel and from remote detention facilities. In the current system, grants of asylum are exceedingly rare despite staggering conditions of persecution in many asylum-seekers' countries of origin. For many of these asylum-seekers, deportation is a death sentence.[1] The Departments proposed to add seven new categorical bars to asylum eligibility; adopt a multi-factor test for determining whether a criminal conviction is valid for the purpose of asylum eligibility; and to rescind provisions regarding reconsideration of discretionary grants of asylum. In combination, these

---

[1] *See, e.g.,* Sarah Stillman, "When deportation is a death sentence," *New Yorker*, Jan. 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence; Maria Sachetti, "'Death is waiting for him,'" *Washington Post*, Dec. 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/; Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, Dec. 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers.

AR.10150

proposals are arbitrary, contrary to law, create economic and non-economic costs that exceed any benefits, and are extraordinarily cruel. The proposed rule should therefore be withdrawn.

A very large number of transgender immigrants are asylum-seekers, fleeing often life-threatening violence in countries around the world. The extraordinary levels of violence and persecution toward transgender people in many nations around the world today are well-documented by the U.S. State Department, international bodies, and non-governmental organizations.[2] Many transgender people applying for asylum today have fled repeated sexual assault, gang-rape, brutal assaults, torture, and death threats, with government officials either openly tolerating or actively participating in this violence.[3]

In the 2015 U.S. Transgender Survey, 7% of non-U.S. citizen respondents had applied for asylum at some point.[4] Of non-citizens who did not apply for asylum, 51% said they did not do so because other forms of immigration status were available to them, 17% said they did not know how to apply, and only 12% said they did not need protection or were not eligible.[5] Of asylum-seeker respondents, 48% had already received asylum, while 32% received withholding of removal.[6]

NCTE regularly hears from asylum-seekers and immigration attorneys who are struggling to meet their basic needs without work authorization during the long pendency of their legal immigration claims. While NCTE is not a social service organization, we frequently hear from these individuals because they are not sure where to turn, especially given the social stigma that still faces transgender people. NCTE tries to connect individuals and their counsel whenever possible with information and resources concerning social and legal services in their areas. We also regularly communicate with service providers and attorneys looking for advice in serving asylum-seekers. NCTE anticipates that if the proposed rule were adopted, NCTE would have to

---

[2] *See, e.g.*, U.S. Dep't of State, 2018 Country Reports on Human Rights Practices (accessed Dec. 28, 2019), https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/; Council for Global Equality, A Call on Secretary Pompeo to Respond to Rising Violence and Discrimination Against LGBTI People Globally (Apr. 26, 2018), available at: https://globalequality.wordpress.com/2018/04/26/a-call-on-secretary-pompeo-to-respond-torising-violence-and-discrimination-against-lgbti-people-globally (summarizing human rights abuses against LGBTI people around the world as described in U.S. Department of State 2017 country reports); Amnesty International, "No Safe Place": Salvadorans, Guatemalans and Hondurans Seeking Asylum in Mexico Based on their Sexual Orientation and/or Gender Identity (2017), https://www.amnestyusa.org/reports/no-safe-place-lgbti-salvadorans-guatemalansand-hondurans-seeking-asylum-in-mexico; United National High Commissioner for Refugees, *Protecting Persons with Diverse Sexual Orientations and Gender Identities: A Global Report on UNHCR's Efforts to Protect Lesbian, Gay, Bisexual, Transgender, and Intersex Asylum-Seekers and Refugees* (Dec. 2015), available at http://www refworld.org/docid/566140454.html.

[3] *See, e.g.,* Molly Hennessy-Fiske, For transgender migrants fleeing death threats, asylum in the U.S. is a crapshoot, *Los Angeles Times*, Oct. 29, 2019, https://www.latimes.com/world-nation/story/2019-10-29/trump-administration-returns-vulnerable-lgbt-asylum-seekers-to-mexico; Tamaryn Nelson & Hajar Habbach, "If I went back, I would not survive." Asylum Seekers Fleeing Violence in Mexico and Central America, *Physicians foro Human Rights*, Oct. 9, 2019, https://phr.org/our-work/resources/asylum-seekers-fleeing-violence-in-mexico-and-central-america/; Elizabeth Trovall, Escaping Brutal Violence, Transgender Migrants Start Over In Texas, *Houston Public Media*, Sept. 10, 2019, https://www.houstonpublicmedia.org/articles/news/in-depth/2019/09/10/345466/escaping-brutal-violence-transgender-migrants-start-over-in-texas/.

[4] Sandy E. James et al., *The Report of the 2015 U.S. Transgender Survey* (National Center for Transgender Equality, 58 (2016).

[5] *Id.*

[6] *Id.*

AR.10151

expend resources in understanding and explaining the changes to members of the public and in handling an increase in contacts seeking information and referrals. The Departments must consider the burdens imposed on organizations such as NCTE, and the even greater burdens imposed by the proposed rule on organizations that provide direct assistance to individuals seeking asylum."

## The Departments have failed to follow settled rulemaking requirements

Supreme Court precedents make clear that an agency must "pay[] attention to the advantages *and* the disadvantages"[7] of adopting a regulation, and that an agency action may be arbitrary and capricious if it "failed to consider an important aspect of the problem.[8] Executive Orders 12866 and 13563 permit agencies to propose a rule only after conducting an accurate assessment of costs and benefits, and after reaching a reasoned determination that the benefits outweigh the costs and that the regulations are tailored "to impose the least burden on society."[9] Executive Order 12866 requires agencies to "assess *all* costs and benefits" and "should select those approaches that maximize *net* benefits."[10] Even those costs or benefits that are "difficult to quantify" are "nevertheless essential to consider."[11]

In addition, under the Administrative Procedure Act and binding Supreme Court precedent, when an agency seeks to change regulations in a manner that departs from prior policy, the agency must provide a "reasoned analysis for the change."[12] Since the Department previously chose to implement the asylum statutes through rulemaking, a reasoned analysis is required when amending or repealing such regulation. An agency change in regulation should not be based on solely a policy disagreement. Agencies have ample latitude to change existing policies; however, when agencies change course, the presumption is "*against* changes in current policy that are not justified by the rulemaking record."[13]

As Justice Kennedy wrote in *FCC v. Fox Television Stations, Inc.*:

> Where there is a policy change the record may be much more developed because the agency based its prior policy on factual findings. In that instance, an agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so. An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past, any more than it can ignore inconvenient facts when it writes on a blank slate.[14]

---

[7] *Michigan v. EPA*, 135 S.Ct. 2699, 2707 (2015) (emphasis in original).

[8] *State Farm*, 463 U.S. at 43.

[9] Exec. Order 13563 § 1(b)(2), 76 Fed. Reg. 3821 (Jan. 21, 2011); Exec. Order 12866 § 1(b)(11), 58 Fed. Reg. 51735 (Oct. 4, 1993).

[10] Exec. Order 12866, Regulatory Planning and Review (Sept. 30, 1993) (emphasis added).

[11] Exec. Order 12866 § 1(a) (1993).

[12] *Motor Vehicles Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 30 (1983).

[13] *Id.* at 42 (emphasis in original).

[14] 556 U.S. at 537 (Kennedy, J., concurring in part and in judgment).

AR.10152

The Proposed Rules clearly fail that standard. To the extent the Departments explain their departure from longstanding rules, they do so based on claims without evidence or contrary to evidence.

The proposal to add new categorical bars is premised on the assumption that all criminal convictions punishable by one year or more in prison reflect a danger to the community. This is plainly untrue.[15] The Departments fail to consider, for example, that in many cases sentencing judges impose noncustodial sentences for such convictions based precisely on the finding of no danger to the community.

The Departments also fail to consider obvious scenarios in which such a conviction is unlikely to be a clear indicator of danger, such as where an individual previously convicted of an offense related to alcohol or substance use has since sought successful treatment, or convictions related to being a victim of severe domestic violence.

The Departments fail to provide a reasoned explanation for why offenses that clearly reflect no danger to the community but may simply reflect the desperation of asylum-seekers—such as document fraud offenses related to immigration status, or parents' convictions for bringing their own children across the border—should be subject to a categorical bar.

The Department fails to explain how the proposed categorical bar for convictions of reentry without inspection under INA § 276 bears any relationship to community danger or public safety. It does not. This offense contains no element of violence, danger, or harm to any person. The Departments also fail to explain how this bar could possibly be consistent with the Refugee Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence. It plainly is not.

Fundamentally, the Departments fail to explain how this is consistent with the text and history of 8 U.S.C. § 1158, which requires a separate finding of danger for the "particularly serious crime" bar applies. It is not.

Moreover, this proposal appears to bear no real relation to public safety and instead be geared to drive the number of those fleeing violence who can obtain asylum as close to zero as possible.

Existing rules are premised on both the statutory text and the recognition that, as the Board of Immigration Appeals has said, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[16] The Departments have recognized the importance of this principle in past rulemakings, but fail to do so here.

## **The Departments failed to consider important economic and non-economic costs, which would plainly exceed any speculative benefits**

---

[15] *See, e.g.,* U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[16] *Matter of Pula*, 19 I.&N. Dec. 467, 474 (BIA 1987).

AR.10153

The Departments' primary stated reason for adopting new categorical bars is that the exercise of discretion has created inefficiency and inconsistency. The Departments point to examples of specific case outcomes, but presents no data or evidence to support a factual finding that any such benefits exceed the rules' potential costs, or why such concerns compel deviating from longstanding practice. Additionally, applying the proposed new categorical bars will often not be a simple mechanical exercise. As the very case law cited by the Departments in describing how the bars will be applied, applying terms such as "related to," "in support of," "in furtherance of," "criminal street gang," and others will itself raise numerous questions of law and fact that will create new judicial burdens and inconsistencies. The Departments' estimates of benefits in judicial economy fail to take account of these factors and are unreliable for that reason alone.

Moreover, the Departments make no attempt to estimate or consider numerous potential economic and noneconomic costs to this rule, including:

- Costs to individuals, families, and communities from the detention and deportation of individuals who would otherwise have meritorious asylum claims;
- Costs to individuals, families, and communities in the U.S. from the torture and killings of deported asylum-seekers;
- Economic and non-economic costs to asylum-seekers' families, including financial hardships and potential impacts on housing and food security, nutrition, physical and mental health, and family relationships;
- Costs to individuals, families, and communities from the dramatic differences in benefits for individuals who may only obtain lesser protection in the form of withholding of removal or Convention Against Torture (CAT) protection as a result of this rule, including:
  - The lack of any pathway to permanent residency or U.S. citizenship;
  - Inability to travel outside the United States;
  - Long-term separation from spouses, children, and family members;
  - Denial of eligibility for critical safety-net benefits available to asylees;
  - Additional delays and fees in applying for employment authorization (which DHS is proposing to dramatically increase);
  - Burdensome requirements for continuing ICE supervision; and,
  - The potential (although rare) to be deported to a third country.
- Costs to businesses that currently employ asylum-seekers;
- Costs to small businesses patronize by asylum-seekers who would lose earned income;
- Intangible costs to society and international relations from the diminution of respect for U.S. treaty obligations.
- Intangible costs to society from the diminution of respect for human life and the safety of asylum-seekers.

The Departments also fail to mention, let alone assess, the costs to judicial efficiency that would be caused by requiring family claims for those currently eligible for asylum to be converted into numerous separate adjudications for withholding or CAT relief.

The Departments state summarily that they cannot "quantify precisely the expected decrease" in asylum grants, but the Administrative Procedure Act and Executive Order 12866 require the Departments to use the best methods available to estimate regulatory costs and benefits, even if

AR.10154

those estimates cannot be precise. It is routine for agencies to provide a high and low estimate for potential regulatory impacts, but the Departments fail to even attempt that here.

The Departments similarly fail to consider the costs of the rule for asylum-seekers, families, and communities, because they lack "data at such a level of granularity" to estimate the "full extent of the impacts." Again, this is no excuse for giving no estimate at all. Comments on this and other recent asylum-related rulemakings have provided the Departments with ample data regarding the impacts of a denial of asylum. The Departments regularly adopt estimates of regulatory impacts based on such social, health, and economic data. It is the Departments', rather than the public's, responsibility to provide such estimates.

The Departments falsely suggest that any costs of the categorical bars are cured because "it is possible" that individuals would qualify for withholding of removal. There are two glaring flaws in this suggestion. First, as the Departments acknowledge in a footnote, there is a higher evidentiary bar for withholding of removal, and the Departments make no attempt whatsoever to assess how many individuals subject to the new categorical bars could meet this additional hurdle. Second, the Departments fail to acknowledge or address the obvious, numerous, and substantial differences between the protections of asylum and the sharply circumscribed parameters of withholding of removal. The same inadequacies apply to the Departments' suggestion that those barred could apply for CAT protection. Both the evidentiary standards and the economic and non-economic consequences of asylum and withholding are dramatically different, and any assessment of the rule's impact must account for those differences.

At bottom, the Departments are required to make a reasoned assessment of the rule's costs based on available data and methods that falls between the "precise quantification" they claim is impossible, and the "the general notion that it will likely result in fewer grants of asylum on the whole." Under Executive Order 12866, the Departments must take into account costs that are "difficult to quantify but nevertheless important to consider." The Departments present no data, estimates, nor any reasoning for the conclusion that "the expected costs of this proposed rule are likely to be *de minimis*."

**For all these reasons, the Departments should withdraw the proposed rule.**

AR.10155



## THE REPORT OF THE

## 2015

## U.S.

## TRANSGENDER

## SURVEY



AR.10156

## About the National Center for Transgender Equality

The National Center for Transgender Equality (NCTE) is the nation's leading social justice policy advocacy organization devoted to ending discrimination and violence against transgender people. NCTE was founded in 2003 by transgender activists who recognized the urgent need for policy change to advance transgender equality. NCTE now has an extensive record winning life-saving changes for transgender people. NCTE works by educating the public and by influencing local, state, and federal policymakers to change policies and laws to improve the lives of transgender people. By empowering transgender people and our allies, NCTE creates a strong and clear voice for transgender equality in our nation's capital and around the country.

© 2016 The National Center for Transgender Equality. We encourage and grant permission for the reproduction and distribution of this publication in whole or in part, provided that it is done with attribution to the National Center for Transgender Equality. Further written permission is not required.

## RECOMMENDED CITATION

James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The Report of the 2015 U.S. Transgender Survey*. Washington, DC: National Center for Transgender Equality.

AR.10157

# The Report of the
# **2015 U.S. Transgender Survey**

by:

Sandy E. James

Jody L. Herman

Susan Rankin

Mara Keisling

Lisa Mottet

Ma'ayan Anafi

**December 2016**

AR.10158

# Table of Contents

Acknowledgements ............................................................................................ 1

Executive Summary ......................................................................................... 3

Chapter 1: Introduction ............................................................................... 18

Chapter 2: Methodology ............................................................................... 21

Chapter 3: Guide to Report and Terminology ...................................... 39

Chapter 4: Portrait of USTS Respondents ......................................... 43

Chapter 5: Family Life and Faith Communities ................................. 64

Chapter 6: Identity Documents ............................................................... 81

Chapter 7: Health ......................................................................................... 92

Chapter 8: Experiences at School ........................................................ 130

Chapter 9: Income and Employment Status ..................................... 139

Chapter 10: Employment and the Workplace ................................... 147

Chapter 11: Sex Work and Other Underground Economy Work ..... 157

Chapter 12: Military Service ................................................................... 166

Chapter 13: Housing, Homelessness, and Shelter Access ........... 175

Chapter 14: Police, Prisons, and Immigration Detention ........... 184

Chapter 15: Harassment and Violence ............................................... 197

Chapter 16: Places of Public Accommodation and Airport Security ..... 212

Chapter 17: Experiences in Restrooms ............................................. 224

Chapter 18: Civic Participation and Policy Priorities ................... 231

About the Authors ...................................................................................... 241

Appendix A: Characteristics of the Sample ..................................... 243

Appendix B: Survey Instrument (Questionnaire) .......................... 250

Appendix C: Detailed Methodology ..................................................... 291

AR.10159

# **Acknowledgements**

**T**he report authors extend our gratitude to all the members of the transgender community who participated in the 2015 U.S. Transgender Survey and the hundreds of individuals and organizations that made this survey report possible.

The following individuals in particular are recognized for their contributions during one or more stages of the process, including survey development, implementation, distribution, data preparation and analysis, and reporting:

| | | | |
|---|---|---|---|
| Osman Ahmed | Andrew Cray | Chai Jindasurat | Gabriel Rodenborn |
| M. V. Lee Badgett | Kate D'Adamo | JoAnne Keatley | Shelby Rowe |
| Kellan Baker | Laura Durso | Elliot Kennedy | Brad Sears |
| Genny Beemyn | Jake Eleazer | Paul Lillig | Jama Shelton |
| Aaron Belkin | Gary J. Gates | Emilia Lombardi | Jillian Shipherd |
| Walter Bockting | Jaime Grant | Jenifer McGuire | Sharon Stapel |
| Kyler Broadus | Emily Greytak | Ilan Meyer | Michael Steinberger |
| David Chae | Ann Haas | Shannon Price Minter | Catalina Velasquez |
| Cecilia Chung | Jack Harrison-Quintana | Aaron Morris | Bianca Wilson |
| Loree Cook Daniels | Mark Hatzenbuehler | Asaf Orr | |
| Kerith Conron | Darby Hickey | Dylan Orr | |
| Ruby Corado | Lourdes Ashley Hunter | Sari Reisner | |

*The authors extend special gratitude to the following individuals for their contributions to the project:*

**Ignacio Rivera**, Survey Outreach Coordinator, for leading the survey outreach efforts and building a network of individuals and organizations that led to the unprecedented levels of participation in this survey.

**Andrew Flores** for assistance with questionnaire development and the weighting procedures to prepare the data for analysis.

**Daniel Merson** for continued work in cleaning the data set, re-coding the data, and providing population numbers for comparative purposes in the final report.

**Michael Rauch** for programming and implementation of the complex survey.

*Appreciation is also extended to **NCTE interns, law fellows, staff, and volunteers** who assisted with the project, including outreach across the country, development of outreach materials, and translation:*

| | | | |
|---|---|---|---|
| Bre Kidman | Mati Gonzalez Gil | Kory Masen | Cullen O'Keefe |
| Cyres Gibson | Romeo Jackson | Imari Moon | Nowmee Shehab |

*A special thanks is also extended to **USTS Interns, Fellows, and Assistants** for their work at various stages of the project:*

| | | | |
|---|---|---|---|
| Rodrigo Aguayo-Romero | Shabab Mirza | Jeymee Semiti | Venus Selenite |
| Willem Miller | Davida Schiffer | Danielle Stevens | |

*The authors also thank the **USTS Advisory Committee** (UAC) members, who devoted their time to the project by giving valuable recommendations around project development and community outreach:*

| | | | |
|---|---|---|---|
| Danni Askini | Brooke Cerda Guzman | Angelica Ross | Brynn Tannehill |
| Cherno Biko | Trudie Jackson | Nowmee Shehab | |
| Thomas Coughlin | Andrea Jenkins | Stephanie Skora | |

Additional acknowledgement goes to the **more than 300 transgender, LGBT, and allied organizations** that promoted and distributed the survey to its members throughout the country for completion.

*The authors also acknowledge current and former NCTE staff for their work on the project, particularly:*

**Theo George** and **Vincent Villano** for their pivotal work in survey project development and distribution through their respective roles in digital media and communication strategy.

**Arli Christian, Joanna Cifredo, K'ai Smith**, and **Harper Jean Tobin** for their contributions as report co-writers, including lending their subject-matter expertise and analysis to the findings included in this report.

*Various individuals and firms assisted in spreading the word about the survey, both prior to and during the data collection phase, and they also assisted with survey translation, design, and reporting. Thanks goes to:*

| | | |
|---|---|---|
| Sean Carlson | Anna Zuccaro | ThoughtWorks |
| Leah Furumo | Design Action Collective | TransTech Social Enterprises |
| Molly Haigh | Dewey Square Group | ZERN |

Additionally, NCTE would like to express special appreciation to **an anonymous donor** for providing the largest share of the funds needed to conduct and report on the U.S. Transgender Survey. Other important funders were the **Arcus Foundation**, the **Gill Foundation**, the **Human Rights Campaign Foundation**, and the **David Bohnett Foundation**. NCTE is also grateful to its other funders, many of which supported this project through general operating support, including the **Ford Foundation**, the **Evelyn & Walter Haas, Jr. Fund**, and the **Tides Foundation**.

Finally, NCTE would like to give special thanks to the **National LGBTQ Task Force**, for its previous partnership in conducting the National Transgender Discrimination Survey as a joint project from 2008 to 2011, as well as for its support of NCTE's re-development of it as the U.S. Transgender Survey.



# EXECUTIVE
# SUMMARY

EXECUTIVE SUMMARY

AR.10162   **3**

# USTS Executive Summary

**T**he 2015 U.S. Transgender Survey (USTS) is the largest survey examining the experiences of transgender people in the United States, with 27,715 respondents from all fifty states, the District of Columbia, American Samoa, Guam, Puerto Rico, and U.S. military bases overseas. Conducted in the summer of 2015 by the National Center for Transgender Equality, the USTS was an anonymous, online survey for transgender adults (18 and older) in the United States, available in English and Spanish. The USTS serves as a follow-up to the groundbreaking 2008–09 National Transgender Discrimination Survey (NTDS), which helped to shift how the public and policymakers view the lives of transgender people and the challenges they face. The report of the 2015 USTS provides a detailed look at the experiences of transgender people across a wide range of categories, such as education, employment, family life, health, housing, and interactions with the criminal justice system.

The findings reveal disturbing patterns of mistreatment and discrimination and startling disparities between transgender people in the survey and the U.S. population when it comes to the most basic elements of life, such as finding a job, having a place to live, accessing medical care, and enjoying the support of family and community. Survey respondents also experienced harassment and violence at alarmingly high rates. Several themes emerge from the thousands of data points presented in the full survey report.

## Pervasive Mistreatment and Violence

Respondents reported high levels of mistreatment, harassment, and violence in every aspect of life. One in ten (10%) of those who were out to their immediate family reported that a family member was violent towards them because they were transgender, and 8% were kicked out of the house because they were transgender.

The majority of respondents who were out or perceived as transgender while in school (K–12) experienced some form of mistreatment, including being verbally harassed (54%), physically attacked (24%), and sexually assaulted (13%) because they were transgender. Further, 17% experienced such severe mistreatment that they left a school as a result.

In the year prior to completing the survey, 30% of respondents who had a job reported being fired, denied a promotion, or experiencing some other form of mistreatment in the workplace due to their gender identity or expression, such as being verbally harassed or physically or sexually assaulted at work.

In the year prior to completing the survey, 46% of respondents were verbally harassed and 9% were physically attacked because of being transgender. During that same time period, 10% of respondents were sexually assaulted, and nearly half (47%) were sexually assaulted at some point in their lifetime.

# Severe Economic Hardship and Instability

The findings show large economic disparities between transgender people in the survey and the U.S. population. Nearly one-third (29%) of respondents were living in poverty, compared to 12% in the U.S. population. A major contributor to the high rate of poverty is likely respondents' 15% unemployment rate—three times higher than the unemployment rate in the U.S. population at the time of the survey (5%).

Respondents were also far less likely to own a home, with only 16% of respondents reporting homeownership, compared to 63% of the U.S. population. Even more concerning, nearly one-third (30%) of respondents have experienced homelessness at some point in their lifetime, and 12% reported experiencing homelessness in the year prior to completing the survey because they were transgender.

# Harmful Effects on Physical and Mental Health

The findings paint a troubling picture of the impact of stigma and discrimination on the health of many transgender people. A staggering 39% of respondents experienced serious psychological distress in the month prior to completing the survey, compared with only 5% of the U.S. population. Among the starkest findings is that 40% of respondents have attempted suicide in their lifetime—nearly nine times the attempted suicide rate in the U.S. population (4.6%).

Respondents also encountered high levels of mistreatment when seeking health care. In the year prior to completing the survey, one-third (33%) of those who saw a health care provider had at least one negative experience related to being transgender, such as being verbally harassed or refused treatment because of their gender identity. Additionally, nearly one-quarter (23%) of respondents reported that they did not seek the health care they needed in the year prior to completing the survey due to fear of being mistreated as a transgender person, and 33% did not go to a health care provider when needed because they could not afford it.

# The Compounding Impact of Other Forms of Discrimination

When respondents' experiences are examined by race and ethnicity, a clear and disturbing pattern is revealed: transgender people of color experience deeper and broader patterns of discrimination than white respondents and the U.S. population. While respondents in the USTS sample overall were more than twice as likely as the U.S. population to be living in poverty, people of color, including Latino/a (43%), American Indian (41%), multiracial (40%), and Black (38%) respondents, were more than three times as likely as the U.S. population (12%) to be living in poverty. The unemployment rate among transgender people of color (20%) was four times higher than the U.S. unemployment rate (5%). People of color also experienced greater health disparities. While 1.4% of all respondents were living with HIV—nearly five times the rate in the U.S. population (0.3%)—the rate among Black respondents (6.7%) was substantially higher, and the rate for Black transgender women was a staggering 19%.

Undocumented respondents were also more likely to face severe economic hardship and violence than other respondents. In the year prior to completing the survey, nearly one-quarter (24%) of undocumented respondents were physically attacked. Additionally, one-half (50%) of undocumented respondents have experienced homelessness in their lifetime, and 68% have faced intimate partner violence.

Respondents with disabilities also faced higher rates of economic instability and mistreatment. Nearly one-quarter (24%) were unemployed, and 45% were living in poverty. Transgender people with disabilities were more likely to be currently experiencing serious psychological distress (59%) and more likely to have attempted suicide in their lifetime (54%). They also reported higher rates of mistreatment by health care providers (42%).

# Increased Visibility and Growing Acceptance

Despite the undeniable hardships faced by transgender people, respondents' experiences also show some of the positive impacts of growing visibility and acceptance of transgender people in the United States.

One such indication is that an unprecedented number of transgender people—nearly 28,000—completed the survey, more than four times the number of respondents in the 2008–09 NTDS. This number of transgender people who elevated their voices reflects the historic growth in visibility that the transgender community has seen in recent years. Additionally, this growing visibility has lifted up not only the voices of transgender men and women, but also people who are non-binary, which is a term that is often used to describe

people whose gender identity is not exclusively male or female, including those who identify as having no gender, a gender other than male or female, or more than one gender. With non-binary people making up over one-third of the sample, the need for advocacy that is inclusive of all identities in the transgender community is clearer than ever.

Respondents' experiences also suggest growing acceptance by family members, colleagues, classmates, and other people in their lives. More than half (60%) of respondents who were out to their immediate family reported that their family was supportive of them as a transgender person. More than two-thirds (68%) of those who were out to their coworkers reported that their coworkers were supportive. Of students who were out to their classmates, more than half (56%) reported that their classmates supported them as a transgender person.

Overall, the report provides evidence of hardships and barriers faced by transgender people on a day-to-day basis. It portrays the challenges that transgender people must overcome and the complex systems that they are often forced to navigate in multiple areas of their lives in order to survive and thrive. Given this evidence, governmental and private institutions throughout the United States should address these disparities and ensure that transgender people are able to live fulfilling lives in an inclusive society. This includes eliminating barriers to quality, affordable health care, putting an end to discrimination in schools, the workplace, and other areas of public life, and creating systems of support at the municipal, state, and federal levels that meet the needs of transgender people and reduce the hardships they face. As the national conversation about transgender people continues to evolve, public education efforts to improve understanding and acceptance of transgender people are crucial. The rates of suicide attempts, poverty, unemployment, and violence must serve as an immediate call to action, and their reduction must be a priority. Despite policy improvements over the last several years, it is clear that there is still much work ahead to ensure that transgender people can live without fear of discrimination and violence.

# Overview of Key Findings

## Family Life and Faith Communities

- **A majority of respondents (60%) who were out to the immediate family they grew up with said that their family was generally supportive of their transgender identity**, while 18% said that their family was unsupportive, and 22% said that their family was neither supportive nor unsupportive.

- **Those who said that their immediate families were supportive were less likely to report a variety of negative experiences related to economic stability and health**, such as experiencing homelessness, attempting suicide, or experiencing serious psychological distress**.**



- **One in ten (10%)** respondents who were out to their immediate family reported that **a family member was violent towards them** because they were transgender.

- **One in twelve (8%)** respondents who were out to their immediate family **were kicked out of the house**, and one in ten (10%) ran away from home.

- **Nineteen percent (19%) of respondents who had ever been part of a spiritual or religious community left due to rejection**. Forty-two percent (42%) of those who left later found a welcoming spiritual or religious community.

ER-2129

# Identity Documents

- **Only 11% of respondents reported that *all* of their IDs had the name and gender they preferred, while more than two-thirds (68%) reported that *none* of their IDs had the name and gender they preferred.**



**Updated name or gender on ID**
OUT OF THOSE WHO HAD ID AND WANTED TO UPDATE IT (%)

| | Updated name | Updated gender |
|---|---|---|
| Driver's license/state-issued ID | 44% | 29% |
| Social Security records | 43% | 23% |
| Student records (current or last school attended) | 31% | 18% |
| Passport | 28% | 18% |
| Birth certificate | 18% | 9% |

- **The cost of changing ID documents was one of the main barriers respondents faced**, with 35% of those who have not changed their legal name and 32% of those who have not updated the gender on their IDs reporting that it was because they could not afford it.

- Nearly **one-third (32%)** of respondents **who have shown an ID with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted.**

# Health Insurance and Health Care

- **One in four (25%) respondents experienced a problem in the past year with their insurance related to being transgender**, such as being denied coverage for care related to gender transition or being denied coverage for routine care because they were transgender.

- **More than half (55%) of those who sought coverage for transition-related surgery in the past year were denied**, and 25% of those who sought coverage for hormones in the past year were denied.

- **One-third (33%) of those who saw a health care provider in the past year reported having at least one negative experience related to being transgender**, with higher rates for people of color and people with disabilities. This included being refused treatment, verbally harassed, or physically or sexually assaulted, or having to teach the provider about transgender people in order to get appropriate care.

- In the past year, **23% of respondents did not see a doctor when they needed to because of fear of being mistreated as a transgender person**, and 33% did not see a doctor when needed because they could not afford it.

# Psychological Distress and Attempted Suicide

- **Thirty-nine percent (39%) of respondents experienced serious psychological distress** in the month before completing the survey (based on the Kessler 6 Psychological Distress Scale), compared with only 5% of the U.S. population.

- **Forty percent (40%) have attempted suicide *in their lifetime*, nearly nine times the rate in the U.S. population (4.6%).**

- **Seven percent (7%) attempted suicide *in the past year*—nearly twelve times the rate in the U.S. population (0.6%).**

# HIV

- Respondents were **living with HIV (1.4%) at nearly five times the rate in the U.S. population (0.3%).**

- **HIV rates were higher among transgender women (3.4%)**, especially transgender women of color. **Nearly one in five (19%) Black transgender women were living with HIV**, and American Indian (4.6%) and Latina (4.4%) women also reported higher rates.

ER-2131

# Experiences in Schools

- **More than three-quarters (77%)** of those who were out or perceived as transgender at some point between Kindergarten and Grade 12 (K–12) **experienced some form of mistreatment**, such as being verbally harassed, prohibited from dressing according to their gender identity, disciplined more harshly, or physically or sexually assaulted because people thought they were transgender.

- **Fifty-four percent (54%)** of those who were out or perceived as transgender in K–12 **were verbally harassed, nearly one-quarter (24%) were physically attacked, and 13% were sexually assaulted in K–12 because of being transgender.**

- **Seventeen percent (17%) faced such severe mistreatment as a transgender person that they left a K–12 school.**

- **Nearly one-quarter (24%)** of people who were out or perceived as transgender in college or vocational school **were verbally, physically, or sexually harassed.**



**Experiences of people who were out as transgender in K–12 or believed classmates, teachers, or school staff thought they were transgender**

| EXPERIENCES | % OF THOSE WHO WERE OUT OR PERCEIVED AS TRANSGENDER |
|---|---|
| Verbally harassed because people thought they were transgender | 54% |
| Not allowed to dress in a way that fit their gender identity or expression | 52% |
| Disciplined for fighting back against bullies | 36% |
| Physically attacked because people thought they were transgender | 24% |
| Believe they were disciplined more harshly because teachers or staff thought they were transgender | 20% |
| Left a school because the mistreatment was so bad | 17% |
| Sexually assaulted because people thought they were transgender | 13% |
| Expelled from school | 6% |
| **One or more experiences listed** | **77%** |

EXECUTIVE SUMMARY

ER-2132

AR.10170

11

# Income and Employment Status

- **The unemployment rate among respondents (15%) was three times higher than the unemployment rate in the U.S. population (5%),** with Middle Eastern, American Indian, multiracial, Latino/a, and Black respondents experiencing higher rates of unemployment.



**Unemployment rate**
**RACE/ETHNICITY (%)**

Overall: 15% / 5%
American Indian: 23% / 12%
Asian: 10% / 4%
Black: 20% / 10%
Latino/a: 21% / 7%
Middle Eastern*: 35%
Multiracial: 22% / 9%
White: 12% / 4%

■ % in USTS (supplemental survey weight applied)  ■/□ % in U.S. population (CPS)
* U.S. population data for Middle Eastern people alone is unavailable in the CPS.

- **Nearly one-third (29%) were living in poverty, more than twice the rate in the U.S. population (12%).**

# Employment and the Workplace

- **One in six (16%)** respondents who have ever been employed—or 13% of all respondents in the sample—**reported losing a job because of their gender identity or expression** in their lifetime.

- **In the past year, 27%** of those who held or applied for a job during that year—19% of all respondents—**reported being fired, denied a promotion, or not being hired for a job they applied for because of their gender identity or expression.**

- **Fifteen percent (15%) of respondents who had a job in the past year were verbally harassed, physically attacked, and/or sexually assaulted** at work because of their gender identity or expression.

- **Nearly one-quarter (23%) of those who had a job in the past year reported other forms of mistreatment** based on their gender identity or expression during that year,

ER-2133

AR.10171

such as being forced to use a restroom that did not match their gender identity, being told to present in the wrong gender in order to keep their job, or having a boss or coworker share private information about their transgender status without their permission.

- **Overall, 30% of respondents who had a job in the past year reported being fired, denied a promotion, or experiencing some other form of mistreatment related to their gender identity or expression.**

- **More than three-quarters (77%)** of respondents who had a job in the past year **took steps to avoid mistreatment in the workplace**, such as hiding or delaying their gender transition or quitting their job.

## Housing, Homelessness, and Shelter Access

- **Nearly one-quarter (23%) of respondents experienced some form of housing discrimination in the past year**, such as being evicted from their home or denied a home or apartment because of being transgender.

- **Nearly one-third (30%) of respondents have experienced homelessness at some point in their lives.**

- **In the past year, one in eight (12%) respondents experienced homelessness** because of being transgender.

- **More than one-quarter (26%) of those who experienced homelessness in the past year avoided staying in a shelter because they feared being mistreated as a transgender person**. Those who did stay in a shelter reported high levels of mistreatment: **seven out of ten (70%)** respondents who stayed in a shelter in the past year reported some form of mistreatment, including being harassed, sexually or physically assaulted, or kicked out because of being transgender.

**Seven out of ten respondents who stayed in a shelter in the past year reported being mistreated because of being transgender.**



- Respondents were nearly **four times less likely to own a home (16%) compared to the U.S. population (63%)**.

# Sex Work and Other Underground Economy Work

- Respondents reported high rates of experience in the underground economy, including sex work, drug sales, and other work that is currently criminalized. **One in five (20%) have participated in the underground economy** for income at some point in their lives—including 12% who have done sex work in exchange for income—and 9% did so in the past year, with higher rates among women of color.

- Respondents who interacted with the police either while doing sex work or while the police mistakenly thought they were doing sex work reported high rates of police harassment, abuse, or mistreatment, with **nearly nine out of ten (86%) reporting being harassed, attacked, sexually assaulted, or mistreated in some other way by police**.

- **Those who have done income-based sex work were also more likely to have experienced violence.** More than three-quarters (77%) have experienced intimate partner violence and 72% have been sexually assaulted, a substantially higher rate than the overall sample. Out of those who were working in the underground economy at the time they took the survey, nearly half (41%) were physically attacked in the past year and over one-third (36%) were sexually assaulted during that year.

# Police Interactions and Prisons

- **Respondents experienced high levels of mistreatment and harassment by police.** In the past year, of respondents who interacted with police or law enforcement officers who thought or knew they were transgender, **more than half (58%) experienced some form of mistreatment.** This included being verbally harassed, repeatedly referred to as the wrong gender, physically assaulted, or sexually assaulted, including being forced by officers to engage in sexual activity to avoid arrest.

- **Police frequently assumed that respondents—particularly transgender women of color—were sex workers.** In the past year, of those who interacted with law enforcement officers who thought or knew they were transgender, one-third (33%) of Black transgender women and 30% of multiracial women said that an officer assumed they were sex workers.

- **More than half (57%)** of respondents said they would feel **uncomfortable asking the police for help** if they needed it.

- Of those who were arrested in the past year (2%), **nearly one-quarter (22%) believed they were arrested because they were transgender**.



**Transgender women reporting that police assumed they were sex workers in the past year (out of those who interacted with officers who thought they were transgender)**
RACE/ETHNICITY (%)

| | |
|---|---|
| Overall* | 11% |
| American Indian women | 23% |
| Asian women | 20% |
| Black women | 33% |
| Latina women | 25% |
| Middle Eastern women** | |
| Multiracial women | 30% |
| White women | 11% |

*Represents respondents of all genders who interacted with officers who thought they were transgender
**Sample size too low to report

- Respondents who were held in jail, prison, or juvenile detention in the past year faced **high rates of physical and sexual assault by facility staff and other inmates**. In the past year, nearly one-quarter (23%) were physically assaulted by staff or other inmates, and one in five (20%) were sexually assaulted. Respondents were over **five times more likely to be sexually assaulted by facility staff** than the U.S. population in jails and prisons, and over **nine times more likely to be sexually assaulted by other inmates**.

# Harassment and Violence

- **Nearly half (46%) of respondents were verbally harassed** in the past year because of being transgender.

- **Nearly one in ten (9%) respondents were physically attacked** in the past year because of being transgender.

- **Nearly half (47%) of respondents were sexually assaulted** at some point in their lifetime and **one in ten (10%) were sexually assaulted in the past year.** Respondents who have done sex work (72%), those who have experienced homelessness (65%), and people with disabilities (61%) were more likely to have been sexually assaulted in their lifetime.

- **More than half (54%) experienced some form of intimate partner violence**, including acts involving coercive control and physical harm.

- **Nearly one-quarter (24%) have experienced severe physical violence by an intimate partner, compared to 18% in the U.S. population.**

AR.10174

# Places of Public Accommodation

- Respondents reported being denied equal treatment or service, verbally harassed, or physically attacked at many places of public accommodation—places that provide services to the public, like retail stores, hotels, and government offices. Out of respondents who visited a place of public accommodation where staff or employees thought or knew they were transgender, **nearly one-third (31%) experienced at least one type of mistreatment in the past year in a place of public accommodation**. This included 14% who were denied equal treatment or service, 24% who were verbally harassed, and 2% who were physically attacked because of being transgender.

- **One in five (20%) respondents did not use at least one type of public accommodation in the past year because they feared they would be mistreated as a transgender person.**

| Denied equal treatment or service, verbally harassed, or physically attacked in public accommodations in the past year because of being transgender | |
| --- | --- |
| LOCATION VISITED | % OF THOSE WHO SAID STAFF KNEW OR THOUGHT THEY WERE TRANSGENDER |
| Public transportation | 34% |
| Retail store, restaurant, hotel, or theater | 31% |
| Drug or alcohol treatment program | 22% |
| Domestic violence shelter or program or rape crisis center | 22% |
| Gym or health club | 18% |
| Public assistance or government benefit office | 17% |
| Department of Motor Vehicles (DMV) | 14% |
| Nursing home or extended care facility | 14% |
| Court or courthouse | 13% |
| Social Security office | 11% |
| Legal services from an attorney, clinic, or legal professional | 6% |

# Experiences in Restrooms

The survey data was collected before transgender people's restroom use became the subject of increasingly intense and often harmful public scrutiny in the national media and legislatures around the country in 2016. Yet respondents reported facing frequent harassment and barriers when using restrooms at school, work, or in public places.

- **Nearly one in ten (9%) respondents reported that someone denied them access to a restroom in the past year.**

- In the past year, **respondents reported being verbally harassed (12%), physically attacked (1%), or sexually assaulted (1%)** when accessing a restroom.

ER-2137

AR.10175

- **More than half (59%)** of respondents **avoided using a public restroom** in the past year because they were afraid of confrontations or other problems they might experience.

- **Nearly one-third (32%)** of respondents **limited the amount that they ate and drank** to avoid using the restroom in the past year.

- **Eight percent (8%)** reported having a **urinary tract infection, kidney infection, or another kidney-related problem** in the past year as a result of avoiding restrooms.

**More than half (59%)** of respondents **avoided using a public restroom** in the past year because they were afraid of confrontations or other problems they might experience.

# Civic Participation and Party Affiliation

- **More than three-quarters (76%) of U.S. citizens of voting age in the sample reported that they were registered to vote in the November 2014 midterm election**, compared to 65% in the U.S. population.

- **More than half (54%)** of U.S. citizens of voting age **reported that they had voted in the midterm election,** compared to 42% in the U.S. population.

- **Half (50%) of respondents identified as Democrats, 48% identified as Independents, and 2% identified as Republicans**, compared to 27%, 43%, and 27% in the U.S. population, respectively.

| Political party affiliation | | |
|---|---|---|
| **POLITICAL PARTY** | **% IN USTS** | **% IN U.S. POPULATION (GALLUP)** |
| Democrat | 50% | 27% |
| Independent | 48% | 43% |
| Republican | 2% | 27% |

AR.10176

EXECUTIVE SUMMARY



# CHAPTER 1
# Introduction

This report presents the findings of the 2015 U.S. Transgender Survey (USTS), a study conducted by the National Center for Transgender Equality (NCTE). With 27,715 respondents, it is the largest-ever survey examining the lives of transgender people in the United States. The USTS provides a detailed portrait of the experiences of transgender people across many areas, including health, family life, employment, and interactions with the criminal justice system.

The USTS serves as a follow-up to the National Transgender Discrimination Survey (NTDS), which was developed by NCTE and the National LGBTQ Task Force and conducted in 2008–09. The NTDS was the first comprehensive survey examining the lives and experiences of transgender and gender nonconforming people in the United States. With 6,456 respondents reporting on a range of experiences throughout their lives, the NTDS was a groundbreaking study. The results were published in the 2011 report, *Injustice at Every Turn*, and showed that discrimination against transgender people was pervasive in many areas of life, including education, employment, health care, and housing. The report also highlighted the resilience of transgender people in the face of such discrimination and found that family and peer support could have a substantially positive impact on a transgender person's quality of life. The report quickly became a vital source of information about transgender people and continues to serve as an important resource for advocates, policymakers, educators, service providers, media, and the general public.

ER-2139

AR.10177

Much has changed since the NTDS was conducted in 2008–09 and results were published in 2011, including increased visibility of transgender people in the media and in society in general. Despite making significant strides in the five years since the report was published, there is still a substantial amount of work to be done to address critical needs in transgender communities throughout the United States. Transgender people continue to experience discrimination and anti-transgender bias in virtually all areas of life.

The 2015 U.S. Transgender Survey was developed by the National Center for Transgender Equality to provide updated and more detailed data to inform a wide range of audiences about the experiences of transgender people, how things are changing, and what can be done to improve the lives of transgender individuals in the United States. It is the largest survey of transgender people conducted to date, far surpassing the previous survey, with 27,715 respondents. This study explores a wider range of topics than the previous survey and more deeply examines specific issue areas where transgender people are disparately impacted, such as health care, HIV/AIDS, housing, workplace discrimination, immigration, sex work, and police interactions. Additionally, by closely mirroring questions from federal and other existing surveys, this study seeks to fill in the gaps left by the lack of data collected about transgender people in national surveys. Since federal survey data is often used by government agencies to make key determinations about policies and programs that affect individuals in many areas of life, such as employment and health, it is important to provide specific data on the potential impact of such policies on transgender people. This report on the U.S. Transgender Survey data draws comparisons between transgender people and the U.S. population and examines disparities across multiple issue areas.

This report demonstrates that transgender people continue to face discrimination in numerous areas that significantly impact quality of life, financial stability, and emotional wellbeing, including employment, education, housing, and health care. Furthermore, many respondents experienced discrimination in multiple areas of their lives, the cumulative effect of which leads to severe economic and emotional hardship and can in turn have devastating effects on other outcome areas, such as health and safety.

Although issues impacting transgender people have become more visible in the years since the NTDS was published, the data overwhelmingly demonstrates that there is still a long way to go towards eliminating harmful discrimination and providing sustainable systems of support for transgender people throughout their lives. These findings are presented with the recognition that advocates, researchers, and transgender communities will greatly benefit from additional research conducted using this extensive data source. The authors encourage subsequent analyses to delve into areas of the data that this report is unable to address, and as before, will strive to make the dataset available for such analyses.

INTRODUCTION

ER-2140

# Report Roadmap

The next chapter of the report will give an overview of the study's methodology, which will be followed by a guide to this report, including information about terminology used throughout. These will be followed by chapters discussing respondents' experiences across a range of areas that impact transgender people's lives:

- Portrait of USTS Respondents

- Family Life and Faith Communities

- Identity Documents

- Health

- Experiences at School

- Income and Employment Status

- Employment and the Workplace

- Sex Work and Other Underground Economy Work

- Military Service

- Housing, Homelessness, and Shelter Access

- Police, Prisons, and Immigration Detention

- Harassment and Violence

- Places of Public Accommodation and Airport Security

- Experiences in Restrooms

- Civic Participation and Policy Priorities

The report also contains three appendices, which offer more detailed information related to the study:

Appendix A: Characteristics of the Sample

Appendix B: Survey Instrument (Questionnaire)

Appendix C: Detailed Methodology

ER-2141

AR.10179



# CHAPTER 2
# Methodology

The U.S. Transgender Survey is the largest survey ever conducted to examine the experiences of transgender people in the United States. The survey instrument was comprised of thirty-two sections reflecting 1,140 distinct variables that covered a broad array of topics, such as health and health care access, and experiences around employment, education, housing, law enforcement, and public accommodation.[1] The survey was developed by a team of researchers and advocates and administered online to transgender adults residing in the United States.[2] The survey was accessible via any web-enabled device (e.g., computer, tablet, netbook, smart phone), accessible for respondents with disabilities (e.g., through screen readers), and made available in English and Spanish. Rankin & Associates Consulting hosted the survey on several secure servers. The survey was accessed exclusively through a website created specifically for the promotion and distribution of the survey.[3] Data was collected over a 34-day period in the summer of 2015,[4] and the final sample included 27,715 respondents from all fifty states, the District of Columbia, American Samoa, Guam, Puerto Rico, and U.S. military bases overseas. The survey contained mainly closed-ended questions, but respondents were also offered the opportunity to provide write-in responses in fifty-three of the survey questions. Over 80,000 write-in responses were provided by respondents.

METHODOLOGY

# I. About the U.S. Transgender Survey

The U.S. Transgender Survey (USTS) was developed as the follow-up to the groundbreaking National Transgender Discrimination Survey (NTDS), which was the first study to comprehensively measure experiences and life outcomes of transgender people in the United States. Fielded in late 2008 to early 2009 by the National Center for Transgender Equality (NCTE) and the National LGBTQ Task Force ("the Task Force"), the NTDS provided data that has informed policymakers, advocates, and educators since its publication in 2011. However, the NTDS report acknowledged that the study had "just scratched the surface of this extensive data source" and encouraged advocates and researchers to conduct additional research to continue collecting data aimed at identifying and addressing the needs of transgender people.[5] The NTDS authors also examined the survey instrument and concluded that there were "imperfections" in the manner in which several questions had been posed.[6] The authors addressed areas for potential improvement with respect to both survey question design and substantive content in an "issues and analysis" section of the report.[7] These recommendations were considered in the development of the U.S. Transgender Survey.

In subsequent years, researchers have performed additional analyses using the NTDS public use dataset provided by NCTE and the Task Force. These analyses provided further insight into the experiences of transgender people, but also increased awareness of the questions that remained unanswered after the NTDS report was published. In some instances, there was insufficient information to draw nuanced comparisons between life outcomes of transgender people collected in the NTDS and the U.S. general population. In other cases,

the ability to form additional conclusions was limited due to a lack of follow-up questions. For example, the NTDS asked a single question about suicide attempts, which did not allow for a clear examination of suicidal thoughts and behaviors.[8] Additionally, given the deficiency of longitudinal data on outcomes specific to transgender people, there remained a need to collect data that could speak to the experiences of transgender people over time and how outcomes may have changed in the years since the NTDS was published. In these respects, the NTDS provided an important platform upon which to build the USTS to address identified areas for improvement and collect data that would enable new insights to be drawn about transgender people in the United States.

The study was renamed the U.S. Transgender Survey for several reasons. One was to clarify the geographical location of the intended study sample both during the data collection period and following report publication. The use of "U.S." signaled that this study was developed with the unique needs of transgender people in the United States and U.S. territories in mind, considering relevant policies, procedures, and practices applicable to residents of the United States at the time of the study in areas such as health care and insurance, income, employment, housing, and education. Recognizing the contextual differences between the experiences of transgender people in the U.S. and in other parts of the world, the research team sought to dispel any confusion arising from the use of "national" in the title. The new name was also intended to reflect the depth and breadth of the experiences of transgender people in the U.S. and elevate a variety of narratives beyond discrimination, including the resilience and resourcefulness of the transgender community in the face of hardship, as well as experiences of acceptance and affirmation. "Discrimination" was removed from the title to clarify that the survey was designed to capture all such experiences. Additionally, removing the word

ER-2143

reduced potential bias in respondents' answers or resulting from primarily attracting respondents who felt they had experienced discrimination.

# II. USTS Respondents

The study population included individuals who identified as transgender, trans, genderqueer, non-binary, and other identities on the transgender identity spectrum, in order to encompass a wide range of transgender identities, regardless of terminology used by the respondent. Although "transgender" was defined broadly for the purposes of this study as being inclusive of a wide range of identities—such as genderqueer, non-binary, and crossdresser—the research team recognized that many individuals for whom the study was intended may have used different terminology or definitions and might have assumed that the term "transgender" did not include them. To address this, promotional materials affirmed that the survey was inclusive of all transgender, trans, genderqueer, and non-binary people. Additionally, materials specified that the survey was for adults at any stage of their lives, journey, or transition to encourage participation among individuals with diverse experiences regarding their transgender identity. An in-depth description of survey respondents is available in the *Portrait of USTS Respondents* chapter.

The study included individuals aged 18 and older at the time of survey completion, as did the NTDS. The study was not offered to individuals under the age of 18 due to limitations created by specific risk factors and recommendations associated with research involving minors. These considerations, including requirements for parental/guardian consent, would have impacted the survey's scope and content and also reduced the literacy level at which the survey could be offered.[9] Furthermore, the current experiences and needs of transgender youth often differ from those of adults in a number of key areas, including experiences related to education, employment, accessing health care, and updating identity documents, and many of these experiences or needs could not be adequately captured in a survey that was not specifically tailored to transgender people under the age of 18.

The sample was limited to individuals currently residing in a U.S. state or territory, or on a U.S. military base overseas, since the study focused on the experiences of people who were subject to U.S. laws and policies at the time they completed the survey. Individuals residing outside of the U.S. may have vastly different experiences across a number of outcome measures based on each respective country's laws, policies, and culture, particularly in the areas of education, employment, housing, and health care. Additionally, many survey questions were taken from U.S. federal government surveys that also limit their sample population to individuals in the U.S., and the research team sought to examine a similar population with regard to geographical location to allow for comparisons to the U.S. general population.

# III. Developing the Survey Instrument

The USTS survey instrument was developed over the course of a year by a core team of researchers and advocates in collaboration with dozens of individuals with lived experience, advocacy and research experience, and subject-matter expertise. When developing the survey instrument, the research team focused on creating a questionnaire that could provide data to address both current and emerging needs of transgender people while gathering information about disparities

that often exist between transgender people and non-transgender people throughout the U.S. To achieve this, questions were included that would allow comparisons between the USTS sample and known benchmarks for the U.S. population as a whole or populations within the U.S. Consequently, questions were selected to best match those previously asked in federal government or other national surveys on a number of measures, such as measures related to income and health.[10] Changes were made to the language of comparable questions whenever it was required to more appropriately reflect issues pertaining to transgender people and language in common use in the transgender community while maintaining comparability to the best extent possible. However, in many cases, language was preserved to ensure that responses to a USTS question would maintain maximum comparability with surveys such as the U.S. Census Bureau's American Community Survey and Current Population Survey.

Several questions were also included in an attempt to provide comparability between the NTDS, where possible, to determine how certain outcomes may have changed since the NTDS data was collected in 2008–09. While the USTS provides crucial updated data, it is important to note that many of the questions asked in the NTDS were either not included in the USTS, or they were asked in a manner that reduced comparability with the NTDS. For example, many USTS questions asked about whether certain experiences occurred within the past year instead of asking whether those experiences occurred at any point during an individual's lifetime. These questions were included for both comparability with federal government or other national surveys and also to yield improved data regarding changing experiences in future iterations of the USTS. In such instances, the NTDS continues to provide the best available data regarding experiences that occurred over respondents' lifetime. The authors suggest referring to both the USTS and

the NTDS to gain a full picture of issues impacting transgender people.

The survey instrument was reviewed by researchers, members of the transgender community, and transgender advocates at multiple intervals throughout the development process. This included thorough reviews of sections that addressed specific subject matter and the entire questionnaire. The questionnaire was revised based on feedback from dozens of reviewers.

## a. Pilot Study

Prior to finalizing the survey instrument and launching the survey in field, a pilot study was conducted to evaluate the questionnaire. The pilot study was conducted among a small group of individuals with characteristics that were representative of the sample the study was intended to survey. The pilot study was administered through an online test site using the same platform and format in which the final survey later appeared. The purpose of the pilot study was to provide both a substantive and technical evaluation of the survey. Approximately 100 individuals were invited to complete and evaluate the survey online during a specified period of time. In order to receive access to the pilot study test site, invitees were required to confirm their participation by indicating that they met the following pilot study criteria: they were (1) 18 years or older, (2) transgender, (3) willing to provide feedback that would be used to make improvements to the survey, (4) available to take the survey online during specified dates, and (5) agreeing to not share the questions in the pilot study with anyone so as to not compromise the study. Forty (40) individuals confirmed their participation and received access to the pilot study test site. Thirty-two (32) people completed the study and submitted feedback on the questionnaire, including participants in fifteen states ranging in age from 19 to 78. Participants

ER-2145

reported identifying with a range of gender identities[11] and racial and ethnic identities, including 34% who identified as people of color.[12]

In addition to providing general feedback on individual questions and the entire questionnaire, pilot study participants were asked to address specific questions as part of their evaluation, including: (1) how long it took to complete the survey, (2) what they thought about the length of the survey, (3) whether any existing questions were confusing or difficult to answer, (4) whether they found any questions offensive or thought they should be removed or fixed, (5) whether they experienced technical or computer issues while taking the survey, and (6) what they thought about the statement explaining why the term "trans" was used throughout the survey.[13] All participant feedback was compiled, discussed, and used to further develop the questionnaire, such as through the revision of language and the addition of questions to more thoroughly examine an issue.

### b. Length

The final survey questionnaire contained a total of 324 possible questions in thirty-two discrete sections addressing a variety of subjects, such as experiences related to health and health care access, employment, education, housing, interactions with law enforcement, and places of public accommodation. The online survey platform allowed respondents to move seamlessly through the questionnaire and ensured they only received questions that were appropriate based on previous answers. This was accomplished using skip logic, which created unique pathways through the questionnaire, with each next step in a pathway being dependent on an individual respondent's answer choices. For example, respondents who reported that they had served in the U.S. Armed Forces, Reserves, or National Guard received a series of questions about their military service, but those who had not served

did not receive those questions. Due to the customized nature of the survey, the length varied greatly between respondents, and no respondent received all possible questions. Prior to the pilot study, estimates indicated a survey-completion time of 30–45 minutes. The completion-time estimate was extended to 60 minutes based on feedback from pilot study participants, and it was consistent with many reports during the fielding period.[14]

Despite observations about survey length discussed in the NTDS,[15] evolving data needs relating to issues affecting transgender people required an in-depth treatment of multiple issue areas. This often required multiple questions to thoroughly assess an issue—including in areas where the NTDS asked only one question—and resulted in a lengthier survey. Survey instrument length was assessed throughout its development to ensure it would be manageable for as many participants as possible. Furthermore, through multiple reviews and evaluations of the survey instrument—including the pilot study—survey takers reported that the length was appropriate for a survey addressing such a wide range of issues and the need for data outweighed concerns about the overall length of the survey.

# IV. Survey Distribution and Sample Limitations

The survey was produced and distributed in an online-only format after a determination that it would not be feasible to offer it in paper format due to the length and the complexity of the skip logic required to move through the questionnaire. With so many unique possibilities for a customized survey experience for each respondent, the intricate level of navigation through the survey

METHODOLOGY

would have created an undue burden and confusion for many respondents. This could have led to questions being answered unnecessarily or being skipped completely, which could have increased the potential for missing data in the final dataset.[16] This made online programming the best option for ensuring that respondents received all of the questions that were appropriate based on their prior answers, decreasing the probability of missing data. However, the potential impact of internet survey bias on obtaining a diverse sample has been well documented in survey research,[17] with findings that online and paper surveys may reach transgender respondents with "vastly different health and life experiences."[18] With those considerations in mind, outreach efforts were focused on addressing potential demographic disparities in our final sample that could result from online bias and other issues relating to limited access. Although the intention was to recruit a sample that was as representative as possible of transgender people in the U.S., it is important to note that respondents in this study were not randomly sampled and the actual population characteristics of transgender people in the U.S. are not known. Therefore, it is not appropriate to generalize the findings in this study to all transgender people.

# V. Outreach

The main outreach objective was to provide opportunities to access the survey for as many transgender individuals as possible in different communities across the U.S. and its territories. Additionally, outreach efforts focused on reaching people who may have had limited access to the online platform and who were at increased risk of being underrepresented in such survey research. This included, but was not limited to, people of color, seniors, people residing in rural areas, and low-income individuals. The outreach strategy was a multi-pronged approach to reach transgender people through various connections and points-of-access, including transgender- or LGBTQ-specific organizations, support groups, health centers, and online communities.

Outreach efforts began approximately six months prior to the launch of the data-collection period with a variety of tactics designed to raise awareness of the survey, inform people when it would be available, and generate opportunities for community engagement, participation, and support. A full-time Outreach Coordinator worked for a period of six months to develop and implement the outreach strategy along with a team of paid and volunteer interns and fellows.[19]

An initial phase of outreach involved developing lists of active transgender, LGBTQ, and allied organizations who served transgender people and would eventually support the survey by spreading the word through multiple communication platforms and in some cases providing direct access to the survey at their offices or facilities. Establishing this network of "supporting organizations" was an essential component of reaching a wide, diverse sample of transgender people.

Over 800 organizations were contacted by email, phone, and social media, and they were asked if they would support the survey by sharing information about it with their members and contacts. Specifically, supporting organizations were asked to share information through email blasts and social media channels, and the research team provided language and graphics for organizations to use in an effort to recruit appropriate respondents into the study. Of the organizations contacted, approximately half responded to requests for support, resulting in direct recruitment correspondence with nearly 400 organizations at regular intervals during the pre-data-collection period and while the survey was in the field.[20,21] These organizations

performed outreach that contributed to the far reach of the survey and unprecedented number of respondents.[22] The organizations were also featured on the survey website so potential respondents could determine whether organizations they knew and trusted had pledged support for the survey.

Nearly 400 organizations responded to outreach and confirmed their support for the survey. The remaining organizations did not respond directly to invitations to learn more about the survey and become supporters. Consequently, these organizations did not receive correspondence aimed at directly recruiting respondents prior to the survey launch or during the data-collection period. It is possible, however, that survey respondents were still made aware of the survey through those organizations. Since there is no information regarding whether these organizations shared information about the survey through their channels, it is difficult to assess the full scope of the outreach efforts.

## a. Advisory Committee

A significant element of outreach involved convening a USTS Advisory Committee (UAC). The UAC was created to increase community engagement in the survey project and raise awareness by connecting with transgender people in communities across the country through a variety of networks. The UAC was comprised of eleven individuals with advocacy, research, and lived experience from a wide range of geographical locations.[23] Members were invited to join the committee as advisors on survey outreach to facilitate the collection of survey data that would best reflect the range of narratives and experiences of transgender people in the U.S. Each member brought unique skills and expertise to contribute to the committee's objectives. UAC members participated in five monthly calls with members of the USTS outreach team from May

to September 2015. UAC monthly calls focused on providing project updates and identifying pathways by which outreach could be conducted to increase the survey's reach and promote participation from a diverse sample. Members suggested organizations, individuals, and other avenues through which to conduct outreach, shared ideas and strategies for improving outreach to specific populations of transgender people, and spread the word about the survey through their professional and personal networks.

## b. Survey-Taking Events

In an effort to increase accessibility of the survey, the outreach team worked with organizations across the country to organize events or venues where people could complete the survey. *Survey-Taking Events*,[24] or "survey events," were spaces in which organizations offered resources to provide access to the survey, such as computers or other web-enabled devices. These organizations provided a location in which to take the survey at one particular time or over an extended period of time, such as during specified hours over the course of several days.[25] The events were created with the intention of providing access to individuals with limited or no computer or internet access, those who may have needed assistance when completing the survey, or those who needed a safe place to take the survey. Additionally, the population that had previously been identified as being more likely to take a paper survey than an online survey were considered,[26] and the events were developed to target those individuals.

Given the potential variety of these survey events—including the types of available resources and times at which they were conducted—guidelines were needed to maintain consistency across the events and preserve the integrity of the data-collection process. A protocol was developed outlining the rules for hosting a survey event to advise hosts on best practices for ensuring

METHODOLOGY

a successful data-collection process, including guidelines to prevent the introduction of bias into survey responses. The protocols described the steps for becoming a survey-event host and tips for how to conduct outreach about the event. The protocol also specified that hosts should inform NCTE of their event prior to hosting and report on how many people attended the event and how many people completed and submitted the survey. This was helpful information for evaluating the relative success and benefits of these events. All confirmed supporting organizations were invited to become survey event hosts, and those who accepted the invitation were sent the protocol. Seventy-one (71) organizations accepted the invitation and confirmed the date(s) and time(s) of their events.[27]

Survey events were promoted on the survey website and given a specific designation on the supporting organization map (described further in the "Survey Website" section), including information about where and when people could attend. Hosts were encouraged to promote their event through multiple channels and consider outreach methods beyond online avenues, such as direct mail or flyers, to better reach transgender people with limited or no internet access. Additionally, hosts were provided with flyer templates so they could promote the events in their facilities or through communications with their members or constituents. Of the organizations who confirmed their survey events, 46 reported information about attendance at the event. The hosts reported that 341 people attended their events, including transgender and non-transgender friends, family, and volunteers. Approximately 199 respondents completed the survey at these events.[28] However, survey responses indicate that additional unreported survey events or similar gatherings may have been held where participants had an opportunity to complete the survey.[29] Event-related information submitted by organizations following the fielding period was not comprehensive enough to make a thorough determination as to whether the events had achieved their previously stated objectives.[30]

## c. Incentives

As an incentive for completing the survey, participants were offered a cash-prize drawing. Incentives, such as cash prizes are widely accepted as a means by which to encourage and increase participation in survey research.[31] Studies have shown that such incentives may have a positive effect on survey response rate, which is the proportion of individuals in the population of interest that participates in the survey.[32] Research has also found that lottery-style cash drawings may be beneficial in online surveys,[33] since they offer a practical method for providing incentives in surveys with a large number of respondents by eliminating the potential high cost of both the cash incentive and prize distribution.[34]

USTS respondents were offered the opportunity to enter into a drawing for one of three cash prizes upon completion of the survey, including one $500 cash prize and two $250 cash prizes.[35] After completing and submitting their anonymous survey responses, USTS respondents were re-directed away from the survey hosting site[36] to a web page on the NCTE-hosted USTS website. In addition to being thanked for their participation on this page, respondents received a message confirming that their survey had been submitted and any further information they gave would not be connected to their survey responses. Only individuals who completed and submitted the survey were eligible for one of the cash prizes. To enter into the prize drawing, respondents were required to check a box giving their consent to be entered.[37] Respondents were also asked to provide their contact information in order to be notified if selected in the drawing. The final drawing contained 17,683 entrants. Each entrant was assigned a number, and six numbers were randomly chosen by a non-NCTE party: three

ER-2149

numbers for the prize winners and three for alternates if necessary. The three prize winners were contacted and awarded their prizes upon acceptance.

# VI. Communications

Communications for the survey required a multifaceted approach and a coordinated effort with the outreach strategy to most effectively reach a wide range of transgender people and ensure a robust sample size. The goals of survey communications were to: (1) inform people that NCTE would be conducting a survey to further the understanding of the experiences of transgender people in the U.S initially gleaned through the NTDS, (2) communicate when the survey would be available to complete and how it could be accessed, and (3) find creative ways of reaching diverse populations of potential respondents. This involved raising awareness of the survey through several communication methods, including email, social media, and print media, as well as through additional unique campaigns. Many survey promotional materials were produced in English and Spanish to increase the accessibility of the survey.[38]

## a. Survey Website

A website was created and designed specifically for the promotion and distribution of the survey.[39] This website served as a platform for providing information about the survey starting several months prior to its release in the field, such as a description of the survey, information about the team working on the survey, frequently asked questions, and sample language and graphics for individuals and organizations to use for email and social media communications, including sample Facebook and Twitter postings. The website also featured an interactive map, which included

information about organizations that had pledged to support the survey. Additionally, the map distinctly indicated information about organizations that were hosting survey-taking events, including the date, time, and location of such events. The website later served as the only platform through which the survey could be accessed and provided English and Spanish links to enter the survey, since there was no direct link available to the off-site hosting platform.

## b. Survey Pledge

The survey pledge campaign was developed to raise awareness about the survey and generate investment in the project. The campaign engaged potential participants and allies by inviting them to pledge to take the survey and/or spread the word about the survey. The survey pledge was a critical method of both informing people that the survey would be launching and sustaining engagement with potential respondents in the months leading up to the fielding period. Pledges received reminders about the survey launch date and availability through email communications. Beginning in January 2015, pledge palm cards were distributed at a variety of events across the country, including conferences and speaking engagements. The cards contained information about the upcoming survey and asked people to sign up to help by committing to: (1) spread the word about the survey; and/or (2) take the survey. Transgender and non-transgender individuals were asked to complete the pledge information, either through a palm card or directly online through the survey website. Individuals who completed pledge information received email communications throughout the pre-data-collection phase. Pledge information was collected continuously for several months, and by the time of the survey launch, over 14,000 people had pledged to take the survey. Additionally, more than 500 people pledged to promote the survey among their transgender friends and family.[40] The pledge proved to be

AR.10188