**No. 20-17490**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PANGEA LEGAL SERVICES, et al.
Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

**APPELLANTS' EXCERPTS OF RECORD**

**VOL. 10 OF 12**

JOHN V. COGHLAN
*Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice
Civil Division
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
PATRICK GLEN
CHRISTINA P. GREER
*Senior Litigation Counsel*
CRAIG NEWELL
*Trial Attorney*

*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and
Bars to Asylum Eligibility

January 21, 2020

To Whom it May Concern:

I am writing on behalf of Dolores Street Community Services in response to the above-
referenced Proposed Rules to express our agency's strong opposition to the Proposed Rules to
amend regulations relating to eligibility for asylum published in the Federal Register on
December 19, 2019.

Dolores Street Community Services ("DSCS"), established in 1982, is a 501(c)(3) non-profit
organization that serves low-income and unstably housed individuals in and around San
Francisco, California. DSCS provides free services and support in the areas of housing, tenants'
rights, workers' rights, and immigration/deportation defense. The organization's first program,
the Dolores Housing Program, was established to provide basic services to refugees fleeing war
and famine in Central America. Today, DSCS provides free legal representation to individuals
facing deportation, many of whom are seeking asylum. Our clients are survivors of community
and domestic violence; workplace exploitation and human trafficking; and homelessness or
housing instability. Many of our clients suffer from severe mental illness. All are extremely low
income.

For the reasons detailed below, the Department of Homeland Security and the Department of
Justice should immediately withdraw their current proposal, and instead dedicate their efforts to
ensuring that individuals fleeing violence are granted full and fair access to asylum protections in
the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate
to contact me at (415) 282-6209, ext. *123, or kate@dscs.org, to provide further information.

Sincerely,


/s/Katherine Mahoney
Katherine Mahoney
Litigation Director
Dolores Street Community Services

---

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

**TABLE OF CONTENTS [with jump-links]**

| | |
|---|---|
| I. | Introduction |
| II. | The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility |
| III. | The Proposed Rules violate the letter and spirit of United States international treaty obligations |
| IV. | Those precluded from asylum eligibility will be gravely impacted even if granted withholding or protection under the Convention Against Torture |
| V. | The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making |
| VI. | The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection |
| VII. | The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color |
| VIII. | The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion |
| IX. | Conclusion |

**I.     Introduction**

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. The proposed rules would disproportionately impact low-income immigrants and immigrants of color, including many of DSCS's clients, denying them protection and condemning them to persecution or even death in their home countries.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5)

AR.10489

any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. DSCS submits these comments to express opposition to the entirety of the Proposed Rules and explain its grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability that the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.    The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression." The Act—among other measures designed to bring the United States' domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail. The obstacles to winning asylum are very high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds. Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path. There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.

AR.10490

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking, and drug trafficking, it has been expanded to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. Moreover, even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum. These bars are already sweeping in scope and should be narrowed, not expanded.

The case of DSCS's recent client, Mario,*[1] illustrates adjudicators' broad discretion to deny asylum based on past contact with the criminal justice system. Mario came to the United States as an unaccompanied minor after suffering years of child abuse, domestic violence, and threats and beatings by gang members in his native El Salvador. Gang members continued to stalk, recruit, and threaten Mario in the U.S., demonstrating the gang's continuing desire to punish him for his refusal to join. When he was 16 years old, Mario received a juvenile adjudication. The asylum officer concluded that Mario would likely face persecution in El Salvador, but he nevertheless denied Mario's claim for asylum, finding that this negative factor outweighed the positive equities in his case. This case shows that, even under the current rules, a juvenile adjudication several years prior to the asylum interview can bar an applicant from receiving protection.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Indeed, immigration judges themselves routinely assess an individual's supposed dangerousness in the context of custody redetermination hearings, frequently finding that respondents can be released on bond (i.e. are not a danger to the community) despite lengthy criminal histories. The Proposed Rules'

---

[1] All client names referenced throughout this comment have been changed to protect client confidentiality and are indicated with an asterisk (*).

AR.10491

presumption of dangerous could potentially have rippling effects in all aspects of immigration proceedings, turning decades of legal precedent on its head and prejudicing thousands of respondents, all at great cost to the Government. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct. In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

For example, DSCS successfully represented George*, who won his asylum case despite having suffered two DUI convictions. George had been kidnapped, beaten, and threatened in Honduras for organizing on behalf of an opposition political party there. When he arrived in the U.S., he was traumatized and isolated, and he unfortunately turned to alcohol as a means of self-medication. Since winning asylum, however, George has achieved more stability in his life, which has allowed him to adopt more effective practices for coping with his past trauma. He is a loving father and a productive member of his community. Under the proposed rules, however, George would have been barred from asylum and removed to Honduras, where he almost certainly would have been killed by his political opponents.

*The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

AR.10492

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders: individuals with PTSD are *up to 14 times more likely* to struggle with a substance use disorder. Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate. The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

DSCS's asylum-seeking clients, like George*, have suffered unspeakable abuse before coming to the U.S., often during childhood. Unfortunately, lacking strong support networks, education, or knowledge of the dangers of substance abuse, many individuals turn to alcohol and drugs to try to "block out" painful memories of past trauma. Studies show that it is common for "males who were severely abused in childhood, severely traumatized and depressed, and . . . introduced to alcohol at a frighteningly early age; these individuals have a very high risk to using alcohol excessively in order to self-medicate their troubling symptoms." (Psychological evaluation of a DSCS client, citing *Haller, M., and Chassin, L.* (2013). The influence of PTSD symptoms on alcohol and drug problems: internalizing and externalizing pathways. *Psychological Trauma: Theory, Research, Practice, and Policy*, 5(5): 483-494.) As described above in the case of George*, however, winning asylum alone can often provide a sense of stability and safety that allows our clients to begin their recovery.

For example, DSCS currently represents Richard*, who came to the U.S. more than 30 years ago in the aftermath of the Guatemalan civil war. Even today, Richard experiences panic attacks, insomnia, and depressive symptoms, as a result of suffering severe, chronic abuse as a child. Richard's alcoholic grandfather forced him to drink alcohol when he was 10 years old; later, when Richard could not cope with his severe post-traumatic stress symptoms, he began to abuse alcohol, resulting in several alcohol-related convictions. Several mental-health experts have evaluated Richard throughout his case, and all agree that his alcohol abuse is a direct result of his PTSD. With DSCS's help, Richard has now gone through treatment and has been sober for several years, but the proposed asylum bars could prevent him from obtaining the immigration relief that he so desperately needs.

AR.10493

### III. The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country." However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act." The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum." Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness." Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.

As noted above, legislation and agency interpretation of the INA have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one year of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient," but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

AR.10494

*[Insert here stories of members/clients who have been granted asylum but would have been barred under the felony bar due to the possible sentence for the offense.]*

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes. Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*, a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury. Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record." Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

*[Insert stories of clients or members who have been granted asylum but would have been barred under the Proposed Rules for two DUI convictions or possession of a controlled substance/paraphernalia, excluding 30 grams of less of marijuana.]*

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276 is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence. This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

Many of DSCS's clients entered the United States illegally due to factors beyond their own control. Particularly in recent years, the U.S. policy of forcing asylum seekers to wait in Mexico under the "metering" program has driven many, in particular families with small children, to attempt to enter the country illegally out of fear of what might happen to them if they wait in Mexico. One of our staff members visited Tijuana in 2019 to meet with asylum seekers there; families are living in squalid conditions, lacking potable water, sanitary food, or access to medical care. Beyond the living conditions, asylum seekers waiting at the border are highly vulnerable to robbery, sexual assault, and other crimes. Some families are forced to wait like

AR.10495

this for months, and parents often end up making the difficult decision to enter the U.S. illegally rather than subject their children to these dangerous conditions.

In other cases, individuals are forced to enter the U.S. illegally out of fear of their persecutors. For example, DSCS's client,

## IV.  Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules. The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees. And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation." Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure

AR.10496

that her children will be able to obtain protection in the United States with her if she is granted relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban," which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future. Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to make an impossible choice: send their children home on their own, or return to countries where it has been established they more likely than not will face persecution and torture.

Many of DSCS's clients are families like the one described above: mothers and fathers who fled home with their young children, hoping for humanity and protection in the U.S. Although none of our clients have been prosecuted for human smuggling, threats from the Department of Homeland Security have us on high alert that such prosecutions may soon be pursued. Under the Proposed Rules, dozens of our child clients, some as young as two or three years old, could be denied derivative protection because of their parents' decision to bring them to this country for protection. These derivatives are children, too young to speak for themselves, let alone represent themselves in an independent asylum claim. The Proposed Rules would unquestionably deny these children relief.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.

And perhaps most fundamentally, withholding and CAT recipients face an ongoing threat of deportation that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status. Asylum, once granted, protects an asylee against removal unless and until that status is revoked. None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.

Finally, this de facto barring of derivatives by extension would severely undermine judicial economy. Neither withholding of removal nor CAT protection allows family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for

AR.10497

asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.

**V.  The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making**

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case. Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because there are no concrete evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes. Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here. Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to

determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court. As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact." In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.

Particularly in the context of the new proposed bar related to alleged gang affiliation, DSCS is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor—that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes." They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments ask for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining

the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act (INA) and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## VI.    The proposed definitions of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the INA. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.

*The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum. In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea. By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their

AR.10500

consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

For example, DSCS's client, Bryan*, has been a lawful permanent resident for many years. Bryan suffers from psychotic disorder and related substance abuse issues; as a result of these mental health challenges, he was convicted of several crimes many years ago. Unfortunately, one of these convictions resulted in Bryan being placed in removal proceedings. With DSCS's help, for the first time Bryan has been able to access substance abuse and mental health treatment; DSCS has also helped Bryan vacate several of his prior convictions, because he did not understand the nature of his criminal proceedings at the time due to his mental illness. Under current law, these vacaturs carry legal weight even though they were obtained after Bryan was placed in proceedings, as they well should: Bryan's constitutional rights were violated at the time of his criminal cases, and he should not now suffer immigration consequences as a result of those unlawful proceedings. The Proposed Rules, however, would severely prejudice respondents like Bryan by requiring him to demonstrate these illegalities yet again in immigration court.

   *The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*. The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself." In *Matter of F-*, the Board of Immigration Appeals *upholds* the proposition that an adjudicator should

AR.10501

presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies. In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur. Similarly, in *Reyes-Torres* the Ninth Circuit held that the motive of the respondent was not the relevant inquiry. Rather, "the inquiry must focus on the state court's rationale for vacating the conviction." In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction." Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there." The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the INA support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act." Based on the text of the INA and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum. The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly

AR.10502

interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

## VII. The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence. For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community. Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence. These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.

*Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution. The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States. The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

AR.10503

The Proposed Rules expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions. Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

DSCS's client, Josue*, would be categorically barred from asylum under this proposed rule, notwithstanding the very real danger he faces if returned to his home country. Josue is a severely mentally ill man who was removed more than 10 years ago. After facing threats and harm in his home country, he illegally reentered the U.S., and he was later prosecuted and convicted of illegal reentry. Josue has a bona fide claim to asylum: as a severely mentally ill person, he is likely to be mistreated, harmed, or even tortured in a country where mental illness is severely stigmatized and government agencies do not provide adequate treatment or protection for the mentally ill. Presenting his asylum case is already a tremendous challenge given Josue's mental illness; the proposed rule would impose yet another obstacle and completely bar him from the relief he so desperately needs.

*Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances. Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent. Many noncitizens working in

AR.10504

the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights. The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

Many of DSCS's clients use fraudulent documents to live, work, and generally function in the U.S. With rent to pay and mouths to feed, many clients have no choice but to use false documents to work or find housing. Just as often, our clients use false documents to travel to or enter the U.S., so desperate are they to escape persecution. For example, a DSCS attorney represented Mary*, who had fraudulently obtained a tourist visa in order to flee Russia, where she had been raped because of her ethnic identity. If returned to Russia, Mary undoubtedly would have faced further violence or even death; under the Proposed Rules, however, Mary would likely have been completely barred from relief because of her use of false documents.

*The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries. Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population. Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community. The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for

AR.10505

discretion in the determination of criminal culpability. The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities. The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances. The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor. These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the INA does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar. Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

*Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve. The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement. The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in

AR.10506

asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.

Past legislative efforts to expand the grounds of removal and inadmissibility in the INA to include gang membership have failed to pass both houses of Congress. In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available. Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity. In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.

## VIII.    The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs. Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes." As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically

AR.10507

exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful). However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute. In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned." The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

## IX. Conclusion

DSCS works closely with asylum seekers and immigrants who have been involved in the criminal justice system. The existing criminal bars to asylum, which are already overly broad and harsh, already preclude many with viable asylum claims from obtaining relief. The proposed rules would be the most sweeping change to asylum law that this administration has yet enacted, barring countless immigrants who are not dangerous, who have already been penalized in the criminal system, and who have bona fide claims for asylum. DSCS urges the agencies to rescind the proposed rules.

AR.10508

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekp-3zvx
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0528
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Sara Hundt
**Address:**
  2055 CENTER ST
  Apt 720
  BERKELEY, CA, 94704
**Email:** sarajhundt@gmail.com
**Phone:** 2404757953

## General Comment

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

1/21/2020

To Whom it May Concern:

I am writing on behalf of myself in response to the above-referenced Proposed Rules to express my/our strong
opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal

AR.10509

Register on December 19, 2019.

The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making. For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Please review the attached comment for more information about my opposition.


Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me at sarajhundt@gmail.com to provide further information.

Sincerely,
Sara Hundt

---

# Attachments

Sara Hundt comment

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case. Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated conduct "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, conduct, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes. Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically decrease efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here. Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court. As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact." In Moncrieffe v. Holder, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that

immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.

Particularly in the context of the new proposed bar related to alleged gang affiliation, [insert organization name] is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.

Indeed, asylum applicants are already frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants categorically excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes." They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that all crimes—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all.

AR.10512

The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

AR.10513

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-rlke
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0529
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Sanaa Abrar
**Address:** United States,
**Email:** sanaa@unitedwedream.org
**Organization:** United We Dream

## General Comment

See attached file(s)

## Attachments

UWD Comment on Proposed Asylum Bar Rule

AR.10514



*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

1/21/2020

To Whom it May Concern:

I am writing on behalf of United We Dream in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

United We Dream is the largest immigrant youth-led organization in the nation, a non-partisan, membership-based network made up of over 500,000 members, five branches with over 100 affiliate organizations across 28 states. UWD's vision is to build a multi-racial, multi-ethnic movement of young people who organize and advocate at the local and national levels for the dignity and justice of immigrants and communities of color in the United States.

As a network of immigrant youth and families with organizers, we know first-hand how harmful these new asylum bars would be to our communities and members.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact Sanaa@unitedwedream.org to provide further information.

Sincerely,
Sanaa Abrar
Advocacy Director

AR.10515



**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. United We Dream (UWD) has an unique interest in this proposed rule because our staff, leadership and membership are directly affected by changes made to the asylum eligibility criteria.

The first proposed set of changes adds the following seven categorical bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction or accusation of conduct for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including any drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. United We Dream submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

**1. The Proposed Rules unnecessarily and cruelly exclude legitimate refugees from asylum eligibility**

The existing barriers to asylum are already extremely prohibitive. Asylum seekers have to prove and present evidence of their eligibility on their own[1], many times after having fled danger abruptly and with no resources. They have to face a complex system of laws and regulations, most of the time without a lawyer and from a remote location.[2] The barriers to winning asylum are growing every day because of this administration new rules, forcing people to navigate an extremely convoluted system from another country altogether, with ever shrinking chances of succeeding in their claims; indeed in some parts of

---

[1] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[2] See Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," USA Today, September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

AR.10516



the country and before certain immigration judges, almost no one succeeds.[3] Additionally, because of these new rules, seeking asylum in the United States has become increasingly dangerous. There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[4]

Specifically, the bars to asylum based on allegations of criminal conduct are already sweeping and over-broad in nature and scope.[5] Any conviction for an offense determined to be an "aggravated felony" is considered a per se "particularly serious crime" and therefore a mandatory bar to asylum.[6] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[7] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[8] The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[9]

Griselda Cruz Lopez, an immigrant from El Salvador who came to the United States in 2005 fleeing gang violence only to suffer through domestic violence, received a U-Visa certification from the Chicago Police in 2017. She was then turned into ICE by her abusive former partner and was deported immediately before her asylum case could be heard. Still under the threat of gang violence, she decided to come back to the United States in 2018 and had been detained for over a year until she was deported yet again. "Organizers working on her case believe her latest appeal was denied despite the visa certification because her family members in El Salvador haven't provided the necessary evidence for her asylum case, out of fear they will be targeted by the same gangs."[10] Griselda's story highlights the obstacles of getting an asylum claim approved. The difficulty in gathering evidence, the disregard from government agencies for the rule of law and the swiftness of the deportation machine while ignoring life-threatening circumstances all contribute to the failure of the current asylum system.

---

[3] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" Washington Post, July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[4] See, e.g., Stillman, "Death Sentence," supra (reporting on a database of more than sixty cases of individuals killed after deportation); see also Maria Sachetti, "'Death is waiting for him,'" The Washington Post, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," Washington Post, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[5] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[6] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[7] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[8] 8 U.S.C. § 1101(a)(43). See also Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," Harvard Law Review 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," Boston College Third World Law Journal (2003): 293.

[9] See Matter of Pula, 19 I.&N. Dec. 467 (BIA 1987).

[10] See "Undocumented mom set to be deported despite certification that she's a victim of domestic violence" https://thinkprogress.org/ice-set-to-deport-domestic-violence-survivor-after-one-year-of-detention-6f7cbf30c9d0/

AR.10517



Creating further obstacles to asylum claims will only carry the United States further from its responsibility as a world leader, hurting our standing on the international stage and our foreign policy interests abroad.[11]

**2. These new rules will disproportionately affect vulnerable populations already unfairly targeted by the Criminal Justice System.**

In expanding the definition of aggravated felony to include any offense with a sentence of a year or more, the proposed rules ignore the racism built into the criminal justice system that disproportionately punishes the poor and people of color, two populations also disproportionately affected by other rules proposed by this administration, such as the increases in immigration benefit fees and new rules redefining public charge.

By assuming that any noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community, it unnecessarily criminalizes refugees who would otherwise qualify for asylum. However, no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[12] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[13]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[14] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

---

[11] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[12] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[13] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[14] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

AR.10518



Furthermore, the expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[15] is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[16] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge. This provision would disproportionately affect refugees from Mexico and Central America who have crossed the border looking for safety for themselves and their families, not knowing of their rights to claim asylum, who make up the large majority of undocumented immigrants already in the United States.[17]

Particularly in the context of the new proposed bar related to alleged gang affiliation, United We Dream is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity.

This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[18]

Indeed, asylum applicants are already frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants categorically excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[19]

**3. The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection by presuming improper motives by state courts.**

---

[15] Proposed Rules at 69659, 69660.

[16] Refugee Convention, *supra*, at art 31.

[17] Those from Mexico, El Salvador and Guatemala alone make up 64 percent of unauthorized population in U.S. https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US

[18] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[19] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," Pro Publica, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

AR.10519



The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[20]

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in Matter of Thomas and Thompson," and to bring the analysis of post-conviction orders in line with Matter of Pickering.[21] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from Matter of F- in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[22] In Matter of F-, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the presumption of irregularity put forward in the Proposed Rules.

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on Matter of Thomas and Thompson is flawed. The Attorney General's decision in Matter of Thomas and Thompson has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in Matter of Cota-Vargas, where it concluded that the application of "the Pickering rationale to sentence modifications has no discernible basis in the

---

[20] See Saleh v. Gonzales, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[21] Proposed Rules at 69655-56 (citing Matter of Thomas and Thompson, 27 I.&N. Dec. 674 (A.G. 2019) and Matter of Pickering, 23 I.&N. Dec. 621 (BIA 2003), rev'd on other grounds by Pickering v. Gonzales, 465 F.3d 263, 267-70 (6th Cir. 2006)).

[22] Matter of F-, 8 I.&N. Dec. 251, 253 (BIA 1959).

AR.10520



language of the Act."[23] Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, Matter of Thomas and Thompson lacks Congressional support for its rule and should not be extended.

4. **The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color**

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[24] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[25] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[26] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that

---

[23] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).

[24] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[25] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-*, 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[26] 8 U.S.C. § 1159(c) (2012).

AR.10521



adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.

This proposed rule would take away officers' discretion from where it is needed to grant claims and only allow it when it can be used to deny them. It is United We Dream's position that discretion should be used the opposite way, in order to grant asylum claims and not to deny them.

**Conclusion**

These new proposed rules would further dismantle the already weak asylum system in this country. It would affect vulnerable populations who need refuge the most. This administration has targeted low-income, immigrant communities of color to further their white supremacist agenda of maintaining a white majority in the United States. However, it seeks this end by implementing unnecessarily cruel policies that harm our immigrant communities.

United We Dream vehemently opposes these new rules, as they will cause irreparable harm and threaten the lives of our members and their families by denying their asylum claims and deporting them to dangerous situations they had already narrowly avoided. The United States should be expanding its asylum system, creating new categories of asylum given the predictions on climate change migrants and the latest UN human rights ruling declaring governments cannot deport people back to countries if their lives are in danger due to climate change.[27]

---

[27] "It is unlawful for governments to return people to countries where their lives might be threatened by the climate crisis" in
https://www.theguardian.com/world/2020/jan/20/climate-refugees-cant-be-returned-home-says-landmark-un-human-rights-ruling?CMP=share_btn_tw&__twitter_impression=true

AR.10522

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-nyhy
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0530
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Sophia Gurul
**Organization:** The Bronx Defenders

## General Comment

See attached file(s).

## Attachments

The Bronx Defenders Comment on Proposed Rules to Asylum Eligibility

AR.10523

*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

**Re:     84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**

January 21, 2020

To Whom It May Concern:

I am writing on behalf of The Bronx Defenders in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

**Interest in the Proposed Rule:**

The Bronx Defenders is a public defender non-profit that is transforming how low-income people in the Bronx are represented in various legal systems. Our staff of nearly 400 includes interdisciplinary teams made up of criminal, civil, immigration, and family defense attorneys, as well as social workers, benefits specialists, legal advocates, parent advocates, investigators, and team administrators, who collaborate to provide holistic advocacy to address the causes and consequences of legal system involvement.  Over fifteen years ago, our Immigration Practice pioneered the model of integrated criminal defense and immigration representation. Through this integrated team-based structure, we have pioneered a groundbreaking, nationally-recognized model of representation called holistic defense that achieves better outcomes for our clients. Each year, we defend more than 20,000 low-income Bronx residents in criminal, civil, child welfare, and immigration cases, and reach thousands more through our community intake, youth mentoring, and outreach programs.

Our Immigration Practice pioneered the model of integrated criminal defense and immigration representation over fifteen years ago. Immigration attorneys work closely with clients and their advocates throughout the pendency of their cases in both criminal and family court to avoid or mitigate negative immigration consequences. Additionally, immigration attorneys represent clients in deportation proceedings in both detained and non-detained settings, provide affirmative immigration services, and pursue community-based systemic reform litigation and advocacy

AR.10524

aimed at reforming federal immigration laws. Since November 2013, our immigration attorneys have also served as assigned counsel at the Varick Street Immigration Court under the New York Immigrant Family Unity Project (NYIFUP), the first-ever universal representation project in immigration court.

**Introduction**:

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. We vehemently reject the Proposed Rules to drastically expand criminal bars to asylum eligibility as they are cruel, unjust, and unlawful measures aimed at targeting our most vulnerable populations, including those who are heavily policed, struggling with severe trauma, mental health needs, substance addiction, and poverty.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. The Bronx Defenders submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

**Comments on the Proposed Rule:**

As a public defender office that defends Bronx and local community members disproportionately subjected to racist policing, criminalization, incarceration, and family separation, we strongly oppose the Proposed Rules. Through our advocacy work at the intersection of varying legal systems, we know that the expanded criminal bars will not accomplish the stated goal of making communities safer but will instead marginalize and dehumanize vulnerable populations. As public defense attorneys who regularly litigate asylum hearings, for both detained and non-detained

immigrants, we have extensive experience providing legal representation to individuals who struggle with severe trauma, untreated mental health needs, substance use, poverty, and criminalization. We therefore understand the importance of fair and just adjudications that take into account each individual's circumstances and experiences.

For vulnerable populations, especially asylum seekers hailing primarily from Central America and the Global South, the discretion currently delegated to asylum adjudicators is crucial. Many of the individuals we represent in asylum hearings have survived severe trauma in the countries from where they are fleeing -- including sexual violence, gang violence, and extreme poverty -- and have mental health needs and substance addiction as result of that trauma. Many of these same individuals also have contact with the criminal legal system due to untreated mental health needs, substance addiction, poverty, and over-policing. Our holistic defense model underscores that no individual person's contact with the criminal legal system occurs in a vacuum absent mitigating circumstances. We uplift the humanity of each individual we represent in immigration court, including individuals with criminal convictions. The immigration judge then bears the responsibility, in her discretion, to determine whether an individual merits asylum in the United States based on the law and evidence presented. By transforming asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective, the Proposed Rules aim to further punish individuals for their poverty, trauma, mental health diagnoses, and self-medication. The Bronx Defenders therefore vehemently rejects these Proposed Rules as well as any and all efforts to dehumanize individuals due to their criminal legal system contact.

The Proposed Rules also seek to undermine existing legal frameworks through which criminal convictions are analyzed in asylum hearings. Currently, if an individual has a criminal conviction, asylum adjudicators must determine if that offense falls within the particularly serious crime bar for that individual to be eligible for asylum. The particularly serious crime bar therefore already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[1] Moreover, in addition to the particularly serious crime bar, asylum adjudicators must analyze whether the applicant merits a favorable exercise of discretion in each case, by employing a totality of the circumstances analysis.[2] Asylum seekers with criminal convictions that render them inadmissible must also apply for a waiver at the time of their applications for permanent residence.[3] These preexisting eligibility and discretionary requirements pertaining to criminal convictions demonstrate a system that already limits who qualifies for asylum. As such, the

---

[1] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[2] *Matter of Pula*, I&N Dec. 467, 472-4 (BIA 1987)(reaffirmed in *Matter of A-B*, I&N Dec. 316 (A.G. 2018)).

[3] 8 U.S.C. § 1159(c) (2012).

AR.10526

Proposed Rules represent a thinly veiled attempt to prevent otherwise eligible asylum seekers from lawfully seeking refuge in the United States.

Additionally alarming is that the Proposed Rules aim to bar people from applying for asylum where they may be accused but not convicted of certain criminal activity. As detailed in the Immigration & Nationality Act, an asylum adjudicator must assess whether an individual has been "convicted by a *final judgment* of a particularly serious crime" to determine whether an individual is statutorily eligible for asylum. *See* INA § 208(b)(2)(A)(ii) (emphasis added). By weaponizing allegations or accusations of criminal conduct to bar individuals from qualifying for asylum, the Proposed Rules undermine pre-existing legal protections for individuals with criminal legal system contact. The Proposed Rules continue to erode individualized determinations and circumscribe due process that has been codified in federal immigration law for decades.

That the Proposed Rules also seek to bar individuals with "any conviction for an offense involving criminal street gangs," ignores the growing consensus that both local police and ICE consistently rely on racist policing techniques to identify gang activity that rarely results in criminal convictions.[4] It is revealing that the Proposed Rules do not delineate what may constitute a conviction "involving criminal street gangs" but instead give broad authority to asylum adjudicators to investigate *any* evidence to determine applicability. We at The Bronx Defenders understand the significance of these Proposed Rules: through NYIFUP, we have witnessed ICE officers and prosecutors rely on specious gang allegations wholly lacking in reliable evidence or corroborating information to support such allegations. Based on our first-hand litigation experience representing clients who have been the victim of uncorroborated "gang allegations", we fear that the Proposed Rules will amplify the power of law enforcement agencies to engage in unreliable, racist policing techniques under the guise of safety and security and at the expense of those in need of legal protections.

The breadth and the cruelty of the Proposed Rules cannot be overstated. At The Bronx Defenders, we represent dozens of individuals each year in asylum hearings who would be negatively impacted by these Proposed Rules, barred from ever seeking safety and refuge in the United States regardless of the persecution they face in the country from which they fled. We have represented many people in asylum hearings who, despite their contact with the criminal legal system, were granted asylum but who would otherwise be barred from ever applying under the currently Proposed Rules. In those hearings, the asylum adjudicators had the opportunity to engage in both a legal and discretionary analysis of each individual's experiences and fear of return. And in those instances the asylum adjudicators recognized the humanity and complexity of the human experiences presented. By obliterating discretionary determinations for an overwhelming number of people who have had contact with the criminal legal system contact as detailed in the Proposed

---

4 Hannah Dreir, He Drew His School Mascot -- And ICE Labeled Him A Gang Member, ProPublica (Dec. 27, 2018), https://features.propublica.org/ms-13-immigrant-students/huntington-school-deportations-ice-honduras/; *see also* Josmar Trujillo & Alex S. Vitale, Gang Takedowns In The De Blasio Era: The Dangers of "Precision Policing," December 2019, https://static1.squarespace.com/static/5de981188ae1bf14a94410f5/t/5df14904887d561d6cc9455e/1576093963895/2019+New+York+City+Gang+Policing+Report+-+FINAL%29.pdf; Mark Puente & Richard Winton, LAPD's Data-Driven Culture Under Scrutiny Amid Scandal over fake gang identifications, L.A. Times (Jan. 21, 2020), https://www.latimes.com/california/story/2020-01-21/lapd-measured-the-number-of-gang-members-its-metro-officers-interviewed.

AR.10527

Rules, the DHS and DOJ make clear their true goal: shrinking the protections offered by pre-existing asylum law as well as eroding any semblance of due process and justice for those seeking safety and refuge in this country.

**Conclusion:**

In sum, The Bronx Defenders categorically opposes the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019. The Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts and taxpayer-funded resources to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for considering this statement.

Sincerely,

Sarah Deri Oshiro
Managing Director, Immigration Practice,
The Bronx Defenders

AR.10528

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-jqtg
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0531
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Mario Paredes
**Organization:** Massachusetts Law Reform Institute/Prisoners' Legal Services

## General Comment

See attached file(s)

## Attachments

MLRI PLS_DOJ DHS Bars to Asylum Comment Final

AR.10529



**MASSACHUSETTS
LAW REFORM
INSTITUTE**

**40 COURT STREET
SUITE 800
BOSTON, MA 02108**

**617-357-0700 PHONE
617-357-0777 FAX
WWW.MLRI.ORG**

January 21, 2020

Submitted via www.regulations.gov

Lauren Alder Reid
Assistant Director, Office of Policy
Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: Procedures for Asylum and Bars to Asylum Eligibility: EOIR Docket No. 18-0002

To Whom it May Concern:

The Massachusetts Law Reform Institute (MLRI) and Prisoners' Legal Services (PLS) welcome the opportunity to comment on the Department of Justice's and the Department of Homeland Security's (collectively, "the Departments") proposed rule, entitled "Procedures for Asylum and Bars to Asylum Eligibility" published in the Federal Register on December 19, 2019 (hereinafter "proposed rule").

Established in 1968, MLRI is a statewide nonprofit poverty law and policy center. Our mission is to provide advocacy and leadership in advancing laws, policies, and practices that secure economic, racial, and social justice for low-income people and communities in Massachusetts. As a state-level legal services support center, MLRI also provides substantive expertise and technical assistance in several areas of poverty law to civil legal aid providers, policymakers, and a large number of organizations that work with and/or serve low income people and vulnerable populations in Massachusetts.

Established in 1972, PLS promotes the safe, humane and lawful treatment of Massachusetts prisoners through civil rights litigation, administrative advocacy, client counseling, and outreach to policy makers and the public. The focus of the Immigrant Detention Condition Project recently launched by PLS and MLRI is to advocate on behalf of immigrants civilly detained in Massachusetts detention centers. The project aims to improve conditions and address multiple issues faced by detained immigrants, including discrimination, placement in solitary confinement, language access needs, medical and mental health care, food and sanitation, and access to programming and services.

**I.    Introduction**

On December 19, 2019 the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make significant changes in asylum policy in a manner that will disproportionately harm immigrants of color and unjustifiably restrict access to asylum in other ways.

The Proposed Rules seek to add seven categorical bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any

AR.10530

conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction or accusation of conduct for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including any drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits. The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

As detailed below, this proposed rule is deeply problematic in a number of ways. If finalized, it would further gut asylum protections in the United States by adding new categorical bars based on convictions that disproportionately affect low-income people of color and penalize asylum-seekers who pursue "second chances" remedies, such as vacating a conviction or modifying a sentence, which have been established to restore unfairly denied due process or reduce impediments to reentry into society for people of color who have historically suffered without such second chances.

For all these reasons, as detailed below, and for the reasons elaborated more generally in the comments submitted by the Massachusetts Committee for Public Counsel and the National Immigrant Justice Center in collaboration with the National Immigration Project, which we endorse here, MLRI and PLS strongly urge the Departments to withdraw this rule proposal in its entirety, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

## II.    The proposed rules unnecessarily eliminate the individualized evaluation that adjudicators undertake when deciding whether to grant asylum under current law

The proposed rules would further erode the discretion that officials should exercise in order to individually assess each asylum-seeker's application fairly. The laws, regulations, and process governing asylum adjudications are already exceedingly strict. Under current law, asylum seekers bear the evidentiary burden of establishing their eligibility for asylum,[1] despite the complexity of asylum laws and regulations that they must navigate without the benefit of appointed counsel and often without any counsel or from a remote immigration jail. Further, criminal bars to asylum are already sweeping and overbroad in nature and scope.[2] Any conviction for an offense determined to be an "aggravated felony" is considered a "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a vague term that, although originally limited to murder, weapons trafficking and drug trafficking,[3] now encompasses hundreds of offenses, many of them neither a felony nor aggravated.[4] Even for those who are not categorically barred from relief, the immigration adjudicator maintains full discretion to deny their asylum applications. Therefore, the expansion of crime bars is excessive and unjustifiably punitive. Fashioning additional bars to asylum only serves to further constrain adjudicators who would otherwise be able to look into the facts of each particular asylum applicant, including past trauma or rehabilitation or other equally compelling humanitarian factors that may explain or mitigate any criminal conduct or convictions.

---

[1] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[2] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[3] "Aggravated Felonies: An Overview," American Immigration Council (Dec. 16, 2016), https://www.americanimmigrationcouncil.org/research/aggravated-felonies-overview.

[4] 8 U.S.C. § 1101(a)(43).

1

AR.10531

### III.   The addition of several new categorical bars to asylum eligibility primarily harms low-income immigrants of color

If enacted, the proposed rule would create seven new categories of criminal convictions or alleged conduct that would make a person ineligible for asylum. Most, if not all, of these new categories would disproportionately harm low-income immigrants of color and minority ethnic groups. The largest recent growth in asylum seekers are those fleeing from Central and South America[5], and historically have been from Asia and Africa.

The evidence of racial disparities in the criminal justice system is overwhelming. Research demonstrates that because black and latinx people in the United States are more likely to be stopped, arrested, and incarcerated than their white counterparts,[6] black and latinx immigrants are disproportionately vulnerable to deportation.[7] Thus, racial bias present in the criminal-justice system has consequences in the immigration context. All of this occurs despite strong evidence that immigrants are less likely to commit serious crimes, and high rates of immigration are associated with lower rates of violent crime and property crime.[8]

A similar pattern emerges when considering the criminalization of poverty and the immigration consequences that result from wealth disparities in the criminal justice system. A 2015 report published by the Prison Policy Initiative found that incarcerated people ages 27-42 had a median annual income of $19,185 prior to incarceration, a figure that is 41 percent less than non-incarcerated people of a similar age, and found that incarcerated individuals of "all gender, race and ethnicity groups earned substantially less prior to their incarceration than their non-incarcerated counterparts of similar age."[9] The disproportionate representation of low-income individuals caught up in our criminal justice system is due to the fact that

---

[5] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," Pew Research Center (Dec. 7, 2017), https://www.pewresearch.org/hispanic/wpcontent/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[6] A study in Boston found racial disparities in the Boston Police Department's stops-and-frisks that could not be explained by crime or other non-race factors. Blacks during that period were the subjects of 63.3% of police-civilian encounters, although less than a quarter of the city's population is Black. Additionally, Boston police gave essentially no justification for 75% of these encounters, simply listing "investigate person" as the reason More than 200,000 encounters led to no arrest, and only 2.5% led to seizure of contraband. Jeffrey Fagan, et al., "An Analysis of Race and Ethnicity Patterns in Boston Police Department Field Interrogation, Observation, Frisk, and/or Search Reports," Columbia, Rutgers and the University of Massachusetts (Jun. 15, 2015), https://s3.amazonaws.com/s3.documentcloud/documents/2158964/full-boston-police-analysis-on-race-and-ethnicity.pdf. Across the county in 2016, black Americans comprised 27% of all individuals arrested—double their share of the total population. African-American adults are 5.9 times as likely to be incarcerated than whites and Hispanics are 3.1 times as likely. As of 2001, one of every three black boys born in that year could expect to go to prison in his lifetime, as could one of every six Latinos—compared to one of every seventeen white boys. "Report to the United Nations on Racial Disparities in the U.S. Criminal Justice System," The Sentencing Project (Apr. 19, 2018), https://www.sentencingproject.org/publications/un-report-on-racial-disparities/.

[7] A 2016 report found that although black immigrants represent about 7 percent of the non-citizen population, 1) black immigrants make up more than 10 percent of immigrants in removal proceedings and 2) 20 percent of immigrants facing deportation on criminal grounds are black. "The State of Black Immigrants," NYU Law Immigrant Rights Clinic and Black Alliance for Just Immigration (2016), http://www.stateofblackimmigrants.com/assets/sobi-fullreport-jan22.pdf.

[8] Walter Ewing et al., "The Criminalization of Immigration in the United States," American Immigration Council (July 13, 2015), https://www.americanimmigrationcouncil.org/research/criminalization-immigration-united-states.

[9] Daniel Kopf and Bernadette Rabuy, "Prisons of Poverty: Uncovering the pre-incarceration incomes of the imprisoned," Prison Policy Initiative (July 9, 2015), https://www.prisonpolicy.org/reports/income.html.

2

AR.10532

even when accounting for other differences, low-income individuals are more likely than high-income individuals to be targeted for enforcement related purposes.[10]

### a. Expanding the bar for convictions for illegal reentry under 8 U.S.C. § 1326

If finalized, the proposed rules would expand the asylum bar to all individuals who have fled persecution multiple times and thereafter been convicted of illegal reentry[11] into the United States. Currently, only some convictions under § 1326 render someone ineligible for asylum.[12]

This attempt to expand the use and application of § 1326 is part of a larger trend aimed at criminalizing immigrants. In fact, enforcement of immigration-related offenses has been the primary driver of growth over the past several decades in the number of offenders sentenced in federal courts.[13] In recent years, criminal prosecutions for illegal entry, illegal re-entry, and similar immigration violations have made up a majority of all federal prosecutions.[14] In fiscal year 2019, the DOJ prosecuted the highest number of immigration-related offenses since record keeping began more than 25 years ago.[15]

The sharp growth in enforcement of immigration related crimes, including that of § 1326, has dramatically altered the ethnic composition of offenders sentenced in federal courts. In 1992, latinx individuals made up 23 percent of sentenced federal offenders, but by 2012, that share had grown to 48 percent.[16] In fiscal year 2018, over 54 percent of all federal offenders were latinx.[17] Over the same period, the share of offenders who did not hold U.S. citizenship also increased dramatically. Among federal sentenced offenders in 1992, 12% were non-U.S. citizens, but by 2012, that share had increased to 40%.[18] In fiscal year 2018, over 42 percent of all federal offenders were non-U.S. citizens.[19] Further, non-U.S. citizens sentenced in federal courts are more likely to receive a prison sentence than U.S. citizens.[20]

The racial and ethnic disparity in the number of sentenced offenders is even more pronounced in the context of illegal reentry. Notably, latinx immigrants are disproportionately impacted by over-prosecution of illegal reentry offenses and harsh sentencing of illegal reentry convictions. The Sentencing Commission's data shows that 98.8 percent of illegal reentry offenders are latinx.[21] The greatest concentration of illegal reentry

---

[10] Karen Dolan and Jodi L.Carr, "The Poor Get Prison: The Alarming Spread of the Criminalization of Poverty," Institute for Policy Studies (Mar. 18, 2015), https://ips-dc.org/the-poor-get-prison-the-alarming-spread-of-the-criminalization-of-poverty/.

[11] 8 U.S.C. § 1326.

[12] 8 U.S.C. § 1158(b)92)(B)(i).

[13] Michael T. Light et al., "The Rise of Federal Immigration," Pew Research Center (Mar. 18, 2014), https://www.pewresearch.org/hispanic/2014/03/18/the-rise-of-federal-immigration-crimes/.

[14] "Immigration Now 52 Percent of All Federal Criminal Prosecutions," TRAC REPORTS (Nov. 28, 2016), https://trac.syr.edu/tracreports/crim/446/.

[15] The U.S. Department of Justice, "Department of Justice Prosecuted a Record-Breaking Number of Immigration-Related Cases in Fiscal Year 2019" (Oct. 17, 2019), https://www.justice.gov/opa/pr/department-justice-prosecuted-record-breaking-number-immigration-related-cases-fiscal-year.

[16] *See supra* note 13.

[17] U.S. Sentencing Commission, "Overview of Federal Criminal CasesFiscal Year 2018" (June 2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/FY18_Overview_Federal_Criminal_Cases.pdf.

[18] *See supra* note 13.

[19] *See supra* note 17.

[20] Id.

[21] U.S. Sentencing Commission, Quick Facts on Illegal Reentry Offenses (Aug. 2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY18.pdf.

3

AR.10533

convictions are in heavily latinx areas in Texas, New Mexico, Arizona, and Utah.[22] Nearly all of those sentenced for unlawful reentry in federal courts receive a prison sentence.[23]

This regulation ignores the reality of asylum seekers who often seek to have their claims heard and can be turned away without even receiving a credible fear interview, or face changed circumstances after having returned to their country, or who previously attempted entry into the United States to flee persecution but were not aware of the system to request asylum or aware they could be abandoning a claim if they exited and reentered. Especially given the high stakes of removing an asylum seeker, preserving discretion in these circumstances provides a critical opportunity for meritorious asylum claims.

### b. Expanding the bar to conviction for an offense "involving criminal street gangs"

Creating a new category that bars from asylum all those who are convicted of a crime "involving criminal street gangs" will also have a disproportionately negative impact on the latinx community – particularly youth. This new category is particularly troublesome given the seemingly wide latitude given to the adjudicator of the grant of asylum to also be the person determining whether a crime fits into the vague category of the new language: "in support, promotion, or furtherance of the activity of a criminal street gang." Further, this determination is proposed to be based on the overly broad and alarmingly vague standard of "hav[ing] reason to believe" that a sufficient link exists between the underlying conviction and gang-related activity. It is highly troubling to trigger a categorical bar based on complicated legal analysis and vague standards of possible links. Troubling as well is the wide-breadth of consideration of "all reliable evidence" to make that determination, rather than a precise, careful rubric of analysis.

As the immigration courts contend with backlogs that now exceed one million cases,[24] and asylum offices face backlogs of years in assigning interview dates, tasking adjudicators with a complex, resource-intensive assessment of the connection of a conviction to gang activity—an assessment far outside their areas of expertise—will prolong asylum proceedings and wait-times, and invariably lead to erroneous determinations that will give rise to an increase in appeals. This is in complete opposition to the stated goals of the proposed rules which repeatedly cite increased efficiency as justification for many of the proposed changes.[25] Because of the lack of robust evidentiary rules in immigration proceedings, it will and has already been nearly impossible for many applicants to rebut negative evidence marshaled against them, even if false. Further the burdens of proof have been incorrectly applied in numerous situations in immigration proceedings, such as in bond hearings, often involving criminal information. Allegations of gang activity made by the DHS on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States frequently lead to miscarriages of

---

[22] Id. See generally Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017) https://www.justice.gov/opa/press-release/file/956841/download; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," Los Angeles Times (May 11, 2018), https://www.latimes.com/local/california/la-me-ln-immigrantprosecutions-20180511-story.html.

[23] See supra note 13.

[24] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," Migration Policy Institute (Oct. 3, 2019), https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[25] See Proposed Rules at 69646, 69656-8.

4

AR.10534

justice.[26] Empowering immigration adjudicators to categorically exclude asylum seekers from protection on discredited methods of gang identification will inevitably result in the return of refugees back to harm.[27]

The databases have been shown to be shockingly inaccurate, outdated, and infected by racial bias.[28] Using such data will ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly in cases of misdemeanors.[29] At the very time that cities across the country are increasingly scrutinizing the unreliability of such data, this rule would increase the use of such sources even though the validity has been seriously undermined.  For example, the New York Police Department (NYPD) maintains a controversial gang database that, at one recent point, was 99 percent black and latinx.[30] Here in Boston, black people comprise about 25 percent of all Boston residents, latinx people about 20 percent and white people more than 50 percent, yet 66 percent of those in its database are black, 24 percent are latinx and 2 percent are white. Several legal challenges are ongoing to these databases.  The growing use of flawed methods of identifying and targeting black and latinx youth suspected of gang involvement is particularly worrisome given the murky current entanglement between local police, federal immigration officials and even schools. School administrators, school resource officers, teachers, and other school staff habitually report students merely suspected of being gang members to ICE and law enforcement.[31] The sharing of information about students between schools and federal officials creates a school-to-prison-to deportation pipeline that has led to public criticism and lawsuits in places like Boston[32] which recently introduced a city order calling

---

[26] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by the city's inspector general as unchecked and unreliable," Chicago Tribune (Apr. 11, 2019), https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html.

[27] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," ProPublica (July 8, 2019), https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

[28] Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," Los Angeles Times (May 9, 2019), https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.  *See also* Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," The Intercept (Aug. 11, 2016), https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-todeport-undocumented-immigrants/.

[29] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," Cornell Law Review 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

[30] Daryl Khan, "New York City's Gang Database is 99% People of Color, Chief of Detectives Testifies," Juvenile Justice Information Exchange (June 14, 2018), https://jjie.org/2018/06/14/new-york-citys-gang-database-is-99-people-of-color-chief-of-detectives-testifies/.

[31] Nermeen Arastu and others, "Swept up in the Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," New York Immigration Coalition and City University of New York School of Law's Immigrant and Non-Citizen Rights Clinic (2018), https://www.nyic.org/2018/06/swept-up-in-the-sweep-report/.

[32] Shannon Dooling, "Citing New Documents, Advocates Call On Boston Public Schools To Stop Sharing Info With ICE," WBUR (Jan. 6, 2020), https://www.wbur.org/news/2020/01/06/bps-ice-information-sharing-new-documents.

5

AR.10535

for 'sanctuary' schools.[33] These troublesome practices and the devastating effects they have on communities of color have inspired many cities to reconsider the use of "gang databases."[34]

Massachusetts' highest court recently rejected evidence based on such databases as unreliable in a 2019 case in which the Supreme Judicial Court vacated convictions and remanded for a new trial in part due to the introduction of an expert opinion regarding gang-affiliation that was based on information from the Boston Regional Intelligence Center (BRIC) "gang database," concluding that the database opinions about which individuals are gang members is hearsay and not independently admissible.[35]  The court also raised serious concern about reliance on such databases as violating the Confrontation Clause.[36]

Creating a system in which non-expert adjudicators essentially engage in "mini-trials" to determine the applicability of evidence used in these databases, rather than relying on determinations obtained through a thorough criminal legal system process, is not based in practical fact or efficiency  Giving wide adjudicatory powers to immigration adjudicators—who generally are not judges, lawyers, criminologists, sociologists, or criminal law experts—to rely on a "reason" to "believe" a conviction that stems from activity related to gang activity will ensnare asylum seekers of color who are members of the very communities that systematically experience racial profiling, and who face a criminal legal system filled with incentives to plead guilty to some crimes, particularly misdemeanors, in order to avoid detention[37] which is a particularly powerful and frightful threat to asylum seekers who often have fled unjust jailings and government crack-downs.

> ### c. Including a bar for any second conviction for an offense involving driving while intoxicated or impaired

The proposed new bars to asylum include any second conviction for an offense involving driving while intoxicated or impaired.  The Bureau of Justice Statistics report on interactions between police stops and the public clearly shows that the correlation between stops, and consequently the use of force, is highly racially discriminatory, and impairs the public trust of the police.[38]

Of note, the report reveals that across the board, black residents are more likely to be stopped in traffic or on the street than non-black residents, and that black and latinx residents are more likely to have multiple contacts with the policy than white residents.  One study outlines the disparity as black drivers being twice as likely to be pulled over, and then about twice as likely to be searched - a 400 percent disparity from non-black drivers.[39]  This large difference in lived experiences for whites and minority drivers should not be compounded into the dramatic and possibly deadly results of deporting an asylum seeker.  Multiple interactions with police which may lead to such charges like DUI, whether or not those charges can be

[33] Steph Solis, "Julia Mejia's first order in Boston City Council calls for 'sanctuary' schools after news of ICE seeing BPS incident reports," MassLive (Jan. 15, 2020), https://www.masslive.com/boston/2020/01/julia-mejias-first-order-in-boston-city-council-calls-for-sanctuary-schools-after-news-of-ice-seeing-bps-incident-reports.html.

[34] Portland, Oregon, discontinued its database in 2017 after it was revealed more than 80% of people listed on it were minorities.  Philip Marcelo, "Gang database made up mostly of young black, Latino men," Associated Press (July 30, 2019), https://apnews.com/dd5643e358c3456dbe14c16ade03711d.

[35] *Commonwealth v. Wardsworth*, 482 Mass. 454, 468-70 (2019).

[36] *Id.*

[37] *See supra* note 29.

[38] Alexi Jones, "Police stops are still marred by racial discrimination, new data shows," Prison Policy Initiative (Oct. 12, 2018), https://www.prisonpolicy.org/blog/2018/10/12/policing/.

[39] Tanvi Misra, "Is It Time to Reconsider Traffic Stops?," CityLab (June 6, 2018), https://www.citylab.com/life/2018/06/is-it-time-to-reconsider-traffic-stops/561557/.

6

AR.10536

sustained or are justified[40], have negative racial impact and will negatively affect these populations in their immigration cases.

Further, there are varying penalties in every state for drivers who are accused of operating vehicles while intoxicated; some do not classify impaired driving offenses as crimes, while others consider it a misdemeanor criminal offense. Multiple offenses are charged differently in states, some as misdemeanors while others as felonies.[41] Clouding the clarity on the issue are also vast prosecutorial variations regarding this offense.

The approach to this rule seemingly ignores that many asylum seekers suffering from post-traumatic stress disorder (PTSD), depression, and/or anxiety may have concomitant difficulties with substance use disorders or self-medication issues, such as alcohol or marijuana.[42] Often these challenges can be remedied with rehabilitation, mitigation, family support and other means, factors which are important for an adjudicator to be able to consider as part of the whole of the asylum case given the life and death situations many asylum seekers face if deported.[43] The disregard for the pivotal issue of trauma in this vulnerable population ignores the increased vulnerability of the one out of every three asylum seekers who struggle with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[44]

### d. Convictions for several newly defined categories of misdemeanor offenses, including any drug-related offense except for a first-time marijuana possession offense, offenses involving the use of fraudulent documents, and offenses involving the unlawful receipt of public benefits

#### i. 2nd Time Marijuana Possession

The proposed rules would designate a conviction of any drug-related offense, except for a first-time marijuana possession offense involving one's own use of 30 grams or less, as disqualifying for the purposes of asylum. This new disqualifying category is unnecessary, overly broad, and racially discriminatory.

Current immigration law already bars asylum seekers if they have an offense that constitutes an aggravated felony."[45] The rationale for expanding this bar to include all convictions, with only one narrow exception, presents vague and alarmist statements about the harmful nature of drugs in general. The references in the preamble to the proposed rule to Congress' broad efforts to reduce drug use as a primary reason for the expansion of drug-related criminal bars to asylum[46] is inadequate to support such a large expansion.

---

[40] Branko Marcetic, "A Chicago Cop Falsely Arrested Over 130 People for Drunk Driving. Anita Alvarez Didn't Charge Him," InTheseTimes (Mar. 11, 2016), http://inthesetimes.com/article/18965/just-one-more-thing-to-tarnish-anita-alvarezs-career.

[41] "Criminal Status of State Drunken Driving Laws," National Conference of State Legislatures (Apr. 4, 2014), https://www.ncsl.org/research/transportation/criminal-status-of-state-drunk-driving-laws.aspx

[42] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," International Journal of Mental Health Systems 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[43] See, e.g., Sarah Stillman, "When deportation is a death sentence," The New Yorker (Jan. 8, 2018), https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[44] *See supra* note 42.

[45] *See* INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i); *see also* INA 101(a)(43)(B), 8 U.S.C. 1101(a)(43)(B); *United States v. Valdivia-Flores*, 876 F.3d 1201, 1206-07 (9th Cir. 2017) (controlled-substances offenses are aggravated felonies under the INA if they meet the definition of trafficking or involve state analogues to federal trafficking offenses).

[46] *See* Proposed Rules at 69654.

7

AR.10537

The likely discriminatory effects of this proposed rule on people of color are even clearer in the context of policing and enforcement of marijuana offenses in the United States. In Massachusetts, black people are arrested at higher rates for marijuana offenses than white people, despite the fact that white people use and sell marijuana at similar rates.[47] Black people are only 8 percent of the population of Massachusetts, but comprise 24 percent of marijuana possession arrests and 41 percent of sales arrests.[48] Researchers found that while black people made up 22 percent of Boston's population, they accounted for 66 percent of marijuana possession cases from 2000 through 2018.[49] Meanwhile, white people, who make up 47 percent of Boston's population, only accounted for 33 percent of possession cases.[50] The marijuana possession arrest rate for black people was 3.2 times higher than for white people in 1994, 2.2 times higher in 2000, and 5.4 times higher in 2009 (immediately after decriminalization).[51] Similar trends exist within the Latinx community, where from 2000 to 2013 they made up 6% to 10% of the Massachusetts population, but were 12% of marijuana-related arrests.[52] Even as states legalize marijuana, racial disparities in marijuana arrests persist.[53]

This policy is contrary to the current trend toward rescinding policies that have been shown to clearly disadvantage people of color, such as drug-free school zone laws with mandated sentencing enhancements for people caught selling drugs in designated school zones. For example, the expansive geographic range of school zones coupled with high urban density has disproportionately affected residents of urban areas, and particularly those in high-poverty areas who are largely people of color, such as in New Jersey, where legislators changed their state law after a study found that 96% of persons subject to these enhancements were African American or Latino.[54]

### ii. Unlawful Benefits Receipt Misdemeanor Convictions

Imposing a categorical asylum bar based on misdemeanor convictions for unlawful use of public benefits is likely to result in denying asylum primarily to low-income people, who are disproportionately people of color. Among the disenfranchised groups affected, asylum seekers are among the most vulnerable and will suffer. Accusations of misdemeanor fraud arise in a variety of circumstances, many on account of the complexity and misunderstandings of benefits laws intersecting with immigration status. Frequent cases of changes in an individual's eligibility for or level of benefits, such as changes in employment or housing circumstances, can easily result in overpayments, and miscalculations in the complex evaluations of assets, income, and household composition which are confusing and difficult, especially for low-income perons who have literacy challenges, or have low-level education, or limited English proficiency.[55] Because public

---

[47] Jon B. Gettman et al., "The War on Marijuana in Black and White," ACLU (Oct. 2016), https://www.aclum.org/sites/default/files/wp-content/uploads/2016/10/TR-Report-10-2016-FINAL-with-cover.pdf.

[48] *Id.*

[49] Naomi Martin, "In Massachusetts, people of color are the first to get arrested for marijuana - and the last to be licensed," The Boston Globe (Apr. 8, 2019), https://www.bostonglobe.com/news/marijuana/2019/04/08/massachusetts-people-color-are-first-get-arrested-for-marijuana-and-last-licensed/1qtGXphtaaRubiTxFws7HL/story.html.

[50] *Id.*

[51] *See supra* note 47.

[52] Shira Schoenberg, "Study tracks racial disparities in Massachusetts marijuana arrests," MassLive (Apr. 5, 2019), https://www.masslive.com/news/2019/04/study-tracks-racial-disparities-in-massachusetts-marijuana-arrests.html.

[53] *See supra* note 49.

[54] *See* "The Sentencing Project" *supra* note 6.

[55] "Overpayment and how it affects you," Community Legal Aid (June 2018), https://www.communitylegalaid.org/node/754/overpayment-public-benefits-and-how-it-affects-you.

8

AR.10538

benefits programs are disproportionately relied upon by low-income people of color who have historically lacked equal access to socio-economic opportunities,[56] reliance on such convictions will unfairly harm these communities making this new regulations particularly objectionable and unfair.

In the receipt of food stamps, for example, large gaps have been documented across core social and demographic groups: women were about twice as likely as men (23% vs. 12%) to have received food stamps at some point in their lives; Blacks are about twice as likely as whites to have used this benefit during their lives (31% vs. 15%); about 22% of latinx individuals report collecting food stamps; Minority women in particular are far more likely than their male counterparts to have used food stamps; About four-in-ten black women (39%) have received help compared with 21% of black men; 31% of latinx women versus 14% of latinx men received assistance; white women are about twice as likely as white men to receive food stamp assistance (19% vs. 11%).[57]

Working with a fixed set of measurable risk factors has determined the correlation between welfare-participation rates and four categorized race-ethnic groups and the degree to which the exposure to "risk factors" is quantified using well-established statistical methods.[58] A multivariate regression analysis is applied to yield the "effect" of each risk factor on welfare-participation rates, resulting in the findings that the vast majority of the differences in rates are explained by the risk factors.[59] For example there is only a 89 percent of the gap between non-Hispanic Blacks and non-Hispanic Whites in welfare-participation when adjusted for risk factors. Thus, the differences across groups in factors that can be identified and measured—income, family structure, in education, and in related variables representing disadvantaged status more generally —provide the explanation for the higher welfare-participation rates of the four minority groups.[60] These measurable substantial racial and ethnic differences in welfare participation have changed little over time emphasizing the need for policy attention to the underlying risk factors and their causes, not increasing penalties if welfare reduction is truly the policy goal. [61]

Further, recent increases in collecting long-standing overpayments are negatively impacting these disenfranchised communities, and could have devastating effects on asylum seekers. Categorizing government mistakes in overpayment as types of fraud is overly prosecutorial in nature in the population of asylum seekers who are seeking safety and refuge in the U.S. to start a new life. The 1996 changes to the public assistance system shifting the view of government administrative error that redefined overpayments of any kind – whether due to agency mistakes, client error or fraudulent misrepresentation – as debt have had long-term consequences for many low-income families.[62] As state agencies' power to collect overpayments is coupled with new new collection programs, and the 2008 Farm Bill liting of the 10-year limit on collecting overpayments, more people than ever are suffering negative consequences of the government's miscalculations.[63] The December 2010 Claims Resolution Act with its discrete provision which expanded which debts could be referred to Treasury, from only those due to fraud to those resulting from unintentional errors, has wide-reaching consequences. With the consolidation and modernization of

---

[56] Robert A.Moffitt and Peter T.Gottschalk, "America Becoming: Racial Trends and Their Consequences - Chapter 7 Ethnic and Racial Differences in Welfare Receipt in the United States" (2001), https://www.nap.edu/read/9719/chapter/8#156.

[57] Morin, Rich, "The Politics and Demographics of Food Stamp Recipients," Pew Research Center (July 12, 2013), https://www.pewresearch.org/fact-tank/2013/07/12/the-politics-and-demographics-of-food-stamp-recipients/

[58] *See supra* note 56.

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] Eubanks, Virginia, "Zombie debts are hounding, thousands of Americans, Will you be next?" The Guardian (Oct. 15, 2019), https://www.theguardian.com/law/2019/oct/15/zombie-debt-benefits-overpayment-poverty.

[63] *Id.*

9

AR.10539

the public public assistance eligibility processes into streamlined, integrated digital systems through the Affordable Care Act of 2010, this process is becoming streamlined.[64] To now place the most vulnerable population of asylum seekers in the bullseye of these types of claims and mixing administrative errors into claims of fraud given the increased understanding of how negatively these practices are affected low-income individuals is highly objectionable. This tactic of raising the threat that any use of benefits may result in accusations of fraud which has the serious consequence of preventing you from succeeding on a claim of asylum is contrary to the intentions and goals of the asylum law and should be rejected.

### iii. Fraudulent Document Use

Immigrants fleeing persecution have historically and understandably had to use false documents to leave the country where they faced persecution, and courts have long recognized the use of false documents in transit arrangements of escape as a factor to consider. Manner of entry is a factor which is weighed in the determination of refugee status, often supporting the veracity of a claim when someone cannot obtain a valid travel document from a government which is persecuting them, rather than being construed against an asylum seeker and certainly not to be a bar to asylum. Courts have specifically noted that if illegal entry were a reason to deny asylum, "virtually no persecuted refugees would obtain asylum." [65]

Even though this regulation contemplates a system of exceptions for asylum seekers who have convictions for fraud if the use of the false documents can be shown to be related to fear of persecution, the bar will have grave consequences for asylum seekers when the circumstances don't fit squarely within the exceptions, such as an asylum seeker who obtains false documents when passing through a third country, or for asylum seekers unable to prove the factors needed for the exemption. It certainly will be a deterrent to asylum seekers to admitting to the use of such documents as part of their asylum claim given that a conviction and bar and deportation back to the country from which they fled could be the consequence of such admissions.

Imposing a per se categorical bar for convictions of use of fraudulent documents, especially those for entry to seek asylum, is contrary to the fundamental basis for asylum protection, which narrowly defines actions so grave that they would bar an asylum seeker's meritorious case. Decades of case law have treated an asylum applicant's manner of flight as one of many factors to be considered in the exercise of discretion. Moreover, as outlined in detail in other sections, the prosecutorial conviction rate of all crimes - misdemeanors and felonies- are higher in minority communities, and adding the conviction of fraud as a bar is another category which will unfairly impact the black and latinx asylum seeking population.

The bar would also upend the important policy of encouraging truth telling and veracity of testimony as an asylum seeker explains the means by which they fled and entered the U.S., and now seek a more permanent residence in safety as asylee. Asylum seekers fleeing to the U.S. often rely on "coyotes", or "skinheads" for the journey to the U.S., and while in the U.S. during the pendency of their asylum proceedings, they are often exploited by unscrupulous intermediaries, "notarios", who offer advice and documentation that may turn out to be fraudulent.[66] Many of the details of asylum seekers ultimately assist the government in understanding the changing migration patterns and actors and methods involved along with the increasing range of tools used by law enforcement and border patrol to address such fraud.[67] The vulnerability and

---

[64] *Id.*

[65] *Wu Zheng Huang v. INS*, 436 F.3d 89, 100 (2d Cir. 2006); *see also Lin v. Gonzales*, 445 F.3d 127, 133-34 (2d Cir. 2006).

[66] *See* "About Notario Fraud," American Bar Association (July 19, 2018), https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[67] "Human Rights First Congressional Testimony: Asylum Fraud: Abusing America's Compassion," Human Rights First (Feb. 11, 2014),

10

AR.10540

precarious position of asylum seekers fleeing for their lives, freedom and safety and facing the complex process of navigating a journey to a safe place and through a foreign legal system is a critical consideration in rejecting this additional hurdle to asylum.

IV. **Burdening asylum-seekers with a multi-factor test in order to have their vacated, expunged, or modified criminal convictions or sentences recognized is antithetical to the national movement for criminal justice reform**

As more and more studies reveal the gross inequities in sentencing for minority populations, reforms have rapidly spread across states to revise, reverse and replace laws and reduce rates of imprisonment and address negative collateral consequences for persons with criminal convictions.[68] The inequities in sentencing have gained broad attention among diverse constituencies, including lawmakers, faith leaders, and civil rights advocates, contributing to a more receptive political environment for criminal justice reform. This regulation is a reversal of that important trend. Burdening asylum seekers with more barriers in having their vacated, expunged or modified criminal convictions properly recognized is antithetical to the national movement of criminal justice reform. Efforts by lawmakers to produce thoughtful policy reforms which recalibrate punitive sentencing policies and address racial disparity in sentencing is especially valuable for the vulnerable population of asylees.

Racial disparity permeates every stage of the United States criminal justice system, from arrest to trial to sentencing to post prison experiences, including post conviction relief.[69] The racial disparities which first arise in policing, and pretrial factors, are compounded by "discretionary decisions and sentencing policies that disadvantage people of color because of their race or higher rates of socioeconomic disadvantage."[70] The system outlined in the proposed rule to determine whether a conviction that has been vacated by a state court will disqualify an individual from a grant of asylum - that is imposing a "presumption" against asylum eligibility for applicants who seek post-conviction relief for the first time while in removal proceedings or longer than one year after their initial conviction - is contrary to criminal justice reform and modern-day awareness of the importance and fairness of post-conviction relief, and penalizes the populations that are unjustly burdened with those convictions to begin with.

Creating an "inference" for post-conviction proceedings after the commencement of removal proceedings "that the resulting order was issued for immigration or rehabilitative purposes" ignores the important legal tenent that many states will only award post-conviction relief based on substantive matters, such as failure of defense counsel to provide constitutionally required advice regarding the immigration consequences of criminal convictions. In Massachusetts, for example, the basis of the post-conviction motion is based on a failure of defense counsel to provide the constitutionally required advice regarding the immigration consequences of the criminal conviction[71] or the failure of the state court judge to provide the immigration warnings, as required by M.G.L.C. 278, § 29D, during the plea colloquy.[72] This regulation runs contrary to the recognition by our highest court that immigration consequences of a conviction are sufficiently serious that accurate advice is required before a plea of guilty.[73] The fact that vacating such a conviction would be

---

https://www.humanrightsfirst.org/resource/human-rights-first-congressional-testimony-asylum-fraud-abusing-america's-compassion.

[68] *See* Nicole D. Porter, "State Advances in Criminal Justice Reform, 2016," The Sentencing Project (Jan. 19, 2017), https://www.sentencingproject.org/publications/state-advances-criminal-justice-reform-2016/.

[69] *See* "The Sentencing Project" *supra* note 6.

[70] *Id.*

[71] *Padilla v. Kentucky*, 559 U.S. 356 (2010); *Commonwealth v. Clarke*, 460 Mass. 30 (2011).

[72] *Commonwealth v. Grannum*, 457 Mass 128 (2010); *Commonwealth v. Valdez*, 475 Mass. 178 (2017).

[73] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

11

AR.10541

constitutionally required undercuts the idea that a vacatur could be merely for immigration purposes in such cases.

Because such noncitizens do not receive immigration advice, it is not until they are in removal proceedings or applying affirmatively for asylum or other relief, that they become aware of the unwarned consequences. Thus, adding a timeline presumption for post-conviction relief "more than a year after the conviction" ignores practical factors which prevent an individual of becoming aware of procedural or substantive defect in their conviction until many years later - often for the first time in their immigration matters. Further cases involving substantive defects are often not uncovered until years later as revealed in cases upon cases across the U.S. involving revelations of trumped up drug charges and plants, and other falsification of evidence scandals.[74] Just last year, upwards of 47,000 drug convictions were overturned in Massachusetts based on the uncovering of a massive scandal involving the falsification of evidence in the state drug labs affected convictions over the ten year period from 2003-2013.[75] Placing a burden on immigrants seeking asylum to adequately rebut a presumption in a confusing and complex, and often brief, immigration court case setting, is unfair and impractical.

Looking beyond state orders is not the role of the immigration court and creating new "mini trials" on these issues is contrary to res judicata and double jeopardy. Where the criminal court documents reflect vacatur based on substantive or procedural defects, such permission to look beyond the state court order undermines the authority of state court judges and violates the full faith, and credit to which state court decisions are entitled.

**Conclusion**

The tremendous vulnerability of this population cannot be understated, as asylum seekers often arrive in this country with no means and assets, having fled for their lives under varying difficult circumstances and with various fraudulent means. Providing asylum is a fundamental protection of their lives and freedom and ability to become productive and healthy members of their communities in spite of the adversities they have overcome. These regulations would undercut strategies that diminish systemic barriers for communities of color and immigrant communities; and increase disparities and bias in this vulnerable population and ultimately undermine equality of rights and opportunity for asylum seekers of these minority communities.

For the reasons provided here, MLRI and PLS urge that the Proposed Rules be rescinded in their entirety, as they constitute an unnecessary, harsh, and unlawful restrictions on the asylum protections enshrined in United States and international law and would disproportionately harm low-income immigrants of color who seek asylum protection. We appreciate the opportunity to submit comments on the proposed rule.

Respectfully submitted,

| | |
|---|---|
| Massachusetts Law Reform Institute (MLRI) | Prisoners' Legal Services (PLS) |
| Deirdre M. Giblin, Esq., | Elizabeth Matos, Esq. |
| Iris Gomez, Esq. | Mario Paredes, Esq. |
| Mario Paredes, Esq. | |

---

[74] See e.g. Safia Samee Ali, "Former Florida deputy arrested for planting drugs on drivers during traffic stops," NBC News (July 11, 2019), https://www.nbcnews.com/news/us-news/former-florida-deputy-arrested-planting-drugs-drivers-during-traffic-stops-n1028991.

[75] *See* Shawn Musgrave, "The Chemists and the Cover Up," REASON (Feb. 9, 2019), https://reason.com/2019/02/09/the-chemists-and-the-cover-up/.

12

AR.10542

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-e4zf
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0532
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** T. Renee Anonymous

---

## General Comment

I am writing on behalf of myself and a large faith-based organization's social action committee in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

The Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Sincerely,
Volunteer advocate of immigrants with children
Indiana Faith-based Organization
Social Action Committee, Immigration

Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules. The availability of these alternatives forms of relief, howeverknown as withholding of removal and protection under the Convention Against Torture (CAT)does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits bona fide refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and

AR.10543

withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees. And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation." Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Under the expanded bars in the Proposed Rules, scenarios of real family with children will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own. This is wrong. The children, above all else, should be protected from further trauma.

AR.10544

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-lrmu
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0533
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anne Montgomery

---

## General Comment

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

21 January 2020

To Whom it May Concern:

I am writing in response to the above-referenced Proposed Rules to express my opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

As a primary care doctor in San Francisco, I take care of numerous individuals who have come to the United States as asylum seekers, fleeing poverty, violence, and inadequate medical care in their home countries. By placing additional barriers to asylum eligibility, we risk deterring these individuals from seeking help, including medical care, leading to additional costs to our system and risks to their life. I am particularly opposed to the increased scrutiny placed on individuals who assist family members in coming to the United States in order to seek asylum. These policy changes will almost certainly lead to increased victimization of the world's most marginalized.

For the reasons above, I suggest that the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal. Thank you for the opportunity to submit comments on the Proposed Rules.

Sincerely,
Anne Montgomery, MD

AR.10545

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-lumc
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0534
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Yasmine Farhang
**Address:**
  253 Broadway
  New York,  New York,  10007
**Email:** yfarhang@moia.nyc.gov
**Phone:** 6466348631
**Organization:** Th City of New York

---

## General Comment

Re: Procedures for Asylum and Bars to Asylum Eligibility
EOIR Docket No. 18-0002; A.G. Order No. 4592-2019

Please find attached comment from the City of New York.

---

## Attachments

NYC Comment - Procedures for Asylum and Bars to Asylum Eligibility

AR.10546



**THE CITY OF NEW YORK**
**OFFICE OF THE MAYOR**

January 21, 2020

<u>Department of Justice, Executive Office for Immigration Review,</u>
<u>Department of Homeland Security, U.S. Citizenship and Immigration Services</u>
*Via electronic submission*

**Re:     Procedures for Asylum and Bars to Asylum Eligibility**
         EOIR Docket No. 18-0002; A.G. Order No. 4592-2019

         The City of New York ("the City") submits this comment to oppose the Department of
Homeland Security's ("DHS") proposed rule entitled "Procedures for Asylum and Bars to
Asylum Eligibility," which was published in the Federal Register on December 19, 2019
("Proposed Rule").

         The Proposed Rule joins a slew of attacks on the asylum application process, such as the
Migrant Protection Protocol ("MPP") and the Third Country Transit Bar, as well as other
recently published proposed rules related to employment authorization for asylum-seekers.[1] This
latest Proposed Rule would do further damage to an already vulnerable population by impeding
those fleeing persecution from receiving due process in the asylum adjudication process. The
Proposed Rule is organized into three sections. The first proposes to add seven unprecedented
categorical bars to asylum eligibility altogether. The second proposes a multi-factor test for
adjudicators to determine whether the applicant's criminal conviction or sentence is relevant for
purposes of determining asylum eligibility. The third seeks to rescind a critical provision in
current rules regarding the reconsideration of discretionary asylum. Cumulatively, these
proposed changes seek to further dismantle the existing asylum protections rooted in United
States and international law, and to create unjustified, punitive bars to asylum for the most
vulnerable. This Proposed Rule would harm immigrant New Yorkers who are seeking asylum as
well as their families—including U.S. citizens—and their local communities. In turn, the
Proposed Rule would harm the social and economic well-being of New York City. For these

---

[1] *See* c*omment in opposition to Asylum Eligibility and Procedural Modifications (8/15/2019); 83 FR
55934 (Nov. 9, 2019); 84 FR 62280 (Nov. 14, 2019), 84 FR 67243 (Dec. 9, 2019); *Policy Guidance for
Implementation of the Migrant Protection Protocols,* (January 25, 2019) *available at*
https://www.dhs.gov/sites/default/files/publications/19_0129_OPA_migrant-protection-protocols-policy-
guidance.pdf; See comment in opposition to Asylum Application, Interview, and Employment
Authorization for Applicants  CIS No. 2648-19; DHS Docket No. USCIS-2019-0011 (January 13, 2019)
*available at* https://www.regulations.gov/document?D=USCIS-2019-0011-0656 *also available at*
https://www1.nyc.gov/assets/immigrants/downloads/pdf/comments/DHS-Docket-No-USCIS-2019-0011-
NYC-Comment.pdf.

AR.10547

reasons, the City strongly opposes the Proposed Rule, and calls upon DHS to withdraw it in its entirety.

## I.    The Proposed Rule Harms the Most Vulnerable in New York City and Stands in Stark Contrast to Local Policy and International Treaty Obligations.

The United States asylum system, which was codified in statute through the Refugee Act of 1980, sought to ensure that the United States legal code would comply with the 1967 Protocol Relating to the Status of Refugees[2] which binds parties to the United Nations Convention Relating to the Status of Refugees.[3] Asylum protections are critical to ensure that those fleeing persecution have due process safeguards in place as they seek safety and stability for themselves and their families. As is, the process of seeking asylum is complex and challenging because the evidentiary burden rests on the asylum-seeker to navigate a complex system with no right to counsel. This new Proposed Rule joins the many other changes that have and will continue to impede asylum seekers from achieving stability.

New York City is the ultimate city of immigrants, with immigrants making up almost 40% of its population, or over 3.2 million people. This immigrant population is deeply tied to the City as a whole, with nearly 60% of New Yorkers living in households that have at least one immigrant.[4] Asylum seekers are a particularly vulnerable population in the City, having often made the perilous journey to the United States to flee persecution in their home countries or who have a well-founded fear of future persecution. The Proposed Rule would have grave consequences to those immigrant New Yorkers who are asylum seekers by creating unprecedented barriers to eligibility for asylum that fly in the face of due process and long-standing policy. It also runs contrary to the country's moral obligation to protect those fleeing from persecution.

The City has long recognized that policies that welcome immigrants lead to a stronger and more prosperous community. As such, the City has taken great strides to welcome those fleeing persecution and provide them with a safe home.[5] In addition, the City has invested in immigration legal services, so that immigrants—including those fleeing persecution—are provided with much needed support as they rebuild their lives here. Additional barriers for asylum seekers undermine the City's commitment to immigrants and are inconsistent with the City's and the country's core values.

---

[2] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[3] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[4] *New York City Mayor's Office of Immigrant Affairs, State of Our Immigrant City: MOIA Annual Report for Calendar Year 2018, 11, available at* https://www1.nyc.gov/assets/immigrants/downloads/pdf/moia_annual_report%202019_final.pdf.

[5] *See e.g.,* https://www.nbcnewyork.com/news/local/syria-refugee-new-york-mayor-bill-de-blasio-immigrant/1274304/; https://www.nytimes.com/2016/09/20/opinion/our-immigrants-our-strength.html.

AR.10548

As it stands now, the U.S. asylum system already applies asylum bars in a manner that is overly broad in the context of our obligations under the Refugee Convention.[6] The drafters of the Refugee Convention intended the particularly serious crime exception to non-refoulement to apply only to refugees who constitute a serious threat to the host country's national security.[7] While many countries around the world have adopted the United Nation's High Commissioner for Refugees' interpretations of the original intent of Article 33(2),[8] the United States has deviated substantially from this norm. In the United States, refugees can be barred from relief from removal by statute for relatively minor, nonviolent offenses like theft, filing a false tax return or failing to appear in court, with no individualized assessment of the circumstances surrounding those offenses and whether such individuals currently pose a credible threat to national security.[9] Given that the current bars are already extremely overbroad, the City opposes the federal administration's efforts to further expand the bars to asylum.

## II. The Proposed Rule Undermines the City's Investments in Ensuring Due Process for Immigrants and Public Safety.

Were the Proposed Rule to go into effect, it could threaten public safety in the City by imposing a chilling effect on victims, witnesses, and defendants. For example, adding "any accusation of conduct for acts of battery involving a domestic relationship" as a bar to asylum could have the unintended consequence of disincentivizing victims of domestic violence from reporting their abuse to law enforcement.[10] All survivors of domestic violence face difficult and complex choices when deciding to report to the police, as reporting abuse can result in loss of housing, financial resources, and child custody for the victim. For undocumented survivors, the decision involves even greater risk, including the possibility of deportation for the victim. For example, abusers often cross-claim allegations of violence or mutual combat against survivors who are subsequently charged with acts constituting domestic violence, which could result in the denial of the survivor's asylum claim. These additional risks are reflected in the already lower reporting rates of domestic violence among that population.[11] Given these complex dynamics,

---

[6] *See* Philip L. Torrey, Clarissa Lehne, Collin Poirot, Manuel D. Vargas, Jared Friedberg, *United States Failure to Comply with the Refugee Convention: Misapplication of the Particularly Serious Crime Bar to Deny Refugees Protection from Removal to Countries Where Their Life or Freedom is Threatened*, (2018) *available at* https://www.immigrantdefenseproject.org/wp-content/uploads/IDP_Harvard_Report_FINAL.pdf.

[7] Id.

[8] See Convention Relating to the Statute of Refugees art. 33(2), July 28, 1951, 140 U.N.T.S. 1954.

[9] *See United States Failure to Comply with the Refugee Convention: Misapplication of the Particularly Serious Crime Bar to Deny Refugees Protection from Removal to Countries Where Their Life or Freedom is Threatened*, (2018) *available at* https://www.immigrantdefenseproject.org/wp-content/uploads/IDP_Harvard_Report_FINAL.pdf.

[10] Given that domestic violence is already underreported, the Proposed Rule could further limit law enforcement's ability to track and respond to complaints in domestic violence cases, of which there were more than 86,000 filed in 2018 alone. See NYPD's annual report on Domestic Violence Complaints: https://www1.nyc.gov/assets/nypd/downloads/pdf/analysis_and_planning/domestic-violence/dv-local-law-38-annual-2018.pdf (last accessed January 14, 2020).

[11] N.Y. Times, *Fewer Immigrants Are Reporting Domestic Abuse. Police Blame Fear of Deportation* https://www.nytimes.com/2018/06/03/us/immigrants-houston-domestic-violence.html (last accessed January 13, 2020).

AR.10549

barring asylum to anyone who is merely *accused* of domestic violence without conviction would further discourage a reluctant, vulnerable population from seeking necessary services and support, jeopardizing the safety of all New Yorkers. Moreover, this rule would in effect further remove protections for domestic violence survivors who have already escaped violence and are seeking to adjust their status.

Similarly, the addition of criminal offenses "involving criminal street gangs" broadly as a bar to asylum could discourage at-risk persons from participating in programs that seek to curb violence and reduce recidivism. Without definition or parameters, designating offenses "involving criminal street gangs" as a bar to asylum would undermine the ability of any programs that might seek to recruit and engage at-risk individuals, youth especially, as involvement with the programs could be viewed as creating a record of gang contact or affiliation. This chilling effect could undermine efforts to reduce violence and recidivism and prevent crime through holistic, long-term solutions.

Further, the Proposed Rule's addition of very broad and undefined categories of offenses would undermine the City's investments in ensuring that immigrant defendants receive adequate counsel. In 2010, the Supreme Court held that criminal defendants must be informed of the possible immigration consequences of their criminal convictions.[12] New York State has long afforded similar protections to immigrant defendants.[13] Consistent with these standards, the City spends millions of dollars per year to fund access to immigration-related advisals and training and education for practitioners representing criminal defendants. The Proposed Rule would impose added burdens on City-funded legal service providers to fulfill constitutionally mandated immigration-related responsibilities to criminal defendants.

In addition, the Proposed Rule would burden and clog the City's courts because increased uncertainty as to the consequences of criminal convictions would delay reasonable dispositions. As the Supreme Court has recognized, immigration consequences are often more important than any possible term of imprisonment to a non-citizen.[14] It reasonably follows that uncertainty as to the consequences accompanying a plea or allocution would unnecessarily prolong the life of a criminal case, prevent the parties from entering into a reasonable plea negotiation, and force costly and resource-draining trials.[15] In sum, the proposed sweeping change to asylum law would prove costly and threaten the courts' ability to serve all New Yorkers—citizens and non-citizens—with the timely adjudication and process justice and the Constitution demands.

Lastly, the Proposed Rule unreasonably cuts against the City's authority to evaluate the impact and consequences certain conduct should have on its residents by adding broad misdemeanor offenses as a bar to asylum relief. In 2017, the City Council enacted

---

[12] *Padilla v. Kentucky*, 559 U.S. 356, 374 (2010) (holding that Constitutional right to effective assistance of counsel requires that counsel inform their clients whether a criminal plea carries a risk of deportation).

[13] *People v. McDonald*, 1 NY3d 109, 115 (N.Y. 2003) (finding that petitioner's criminal defense attorney failed to meet an "objective standard of reasonableness" when he misinformed petitioner as to the possible immigration consequences of his plea).

[14] *See Padilla*, 559 U.S. at 368 (acknowledging that a defendant's right to remain in the United States could be more important to the defendant than any potential jail sentence).

[15] *See Padilla*, 559 U.S. at 373 (noting that an understanding of the immigration consequences of criminal convictions is closely linked to "satisfying the interests" of both the prosecution and the defendant and ensuring the efficient use of court resources).

AR.10550

Administrative Code 10-179,[16] which created the civil offense of Disorderly Behavior. After engaging stakeholders in the City's criminal justice system, the Council enacted this law to reduce the number of arrests associated with Disorderly Conduct, Penal Law Section 240.20, thereby reducing unnecessary criminalization and unfair collateral exposure for non-citizen New Yorkers.[17] The law was drafted taking into consideration established principles of immigration-related consequences of arrests. The Proposed Rule would upend those principles. In so doing, it would undermine the City's sovereign prerogative to shape its law enforcement policies to best account for its complex social and political realities.

### III.  The Proposed Rule Criminalizes Vulnerable Populations Fleeing Persecution, Including Parents and Caregivers.

The Proposed Rule would expand the criminal bars to asylum to include offenses related to the harboring and smuggling of noncitizens by parents and family members and those previously removed. In particular, this would impact parents and other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed change would serve to further criminalize vulnerable populations fleeing persecution[18] and further punish those trying to help children while being in danger themselves. Furthermore, this proposed bar comes at a time that now-public documents have revealed this administration's efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[19] This expansion of criminal bars to asylum would expand on this reprehensible strategy by barring parents who have already been prosecuted from obtaining asylum protections for themselves and their children. This cruelly targets parents and caregivers and continues the separation of families.

The Proposed Rule would also expand the asylum bar to those who have fled persecution and returned to the United States after a previous deportation, many of whom have been convicted of illegal reentry as a result.[20] As justification for this change, the agency offers only

---

[16] For the full text of Disorderly Behavior, see NYC Administrative Code 10-179: https://nycadministrativecode.readthedocs.io/en/latest/c09/#chapter-1-public-safety (last accessed January 14, 2020).

[17] See City Council Committee Report dated October 16, 2017: https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3028942&GUID=1058179C-1264-44A8-A9D0-D3B4A3C66B59&Options=&Search=, (last accessed January 13, 2020).

[18] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[19] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[20] *See* John Gramlich, *Far more immigration cases are being prosecuted criminally under Trump administration*, (Sept. 27, 2019) *available at* https://www.pewresearch.org/fact-tank/2019/09/27/far-more-immigration-cases-are-being-prosecuted-criminally-under-trump-administration/ (demonstrating

AR.10551

conclusory statements regarding the dangerousness of recidivist offenders. However, this discussion entirely lacks consideration of the seriousness of prior convictions.[21] All immigration violations are characterized as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute and does nothing to further the safety of our country.

The agency further conflates multiple entries by noncitizens who have prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution were not aware of the complex statutory regime that governs asylum claims and did not knowingly abandoned their right to apply for asylum. Additionally, immigrants can be wrongly assessed in prior credible-fear interviews, and others may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

## IV.    Conclusion

In creating more barriers for asylum seekers, the Proposed Rule continues this federal administration's trend of making the United States a hostile place for immigrants to the detriment of everyone in our communities. It is well documented that hostile climates for immigrants make the City less safe[22] and less prosperous.[23] As the City's Comptroller stated, "when immigrants are threatened, when their ability to live, work, and raise their families is compromised—our entire City pays a costly price."[24] For these reasons, and those articulated above, we call upon DHS to withdraw the Proposed Rule.

---

large increases in number of people arrested and criminally prosecuted for immigration offenses such as entering and reentering the United states illegally).

[21] Proposed Rules at 69648.

[22] Mike Males, *White Residents of Urban Sanctuary Counties are Safer From Deadly Violence Than White Residents in Non-Sanctuary Counties*, http://www.cjcj.org/uploads/cjcj/documents/white_residents_of_urban_sanctuary_counties.pdf?utm_content=%7BURIENCODE%5bFIRST_NAME%5d%7D&utm_source=VerticalResponse&utm_medium=Email&utm_term=CJCJ%27s%20report&utm_campaign=New%20Report%3A%20Sanctuary%20Counties%20Safer%20for%20White%20Residents (2017); *see* TCR Staff, *You're Safer in a 'Sanctuary City,' says New Study*, https://thecrimereport.org/2017/12/13/youre-safer-in-a-sanctuary-city-says-new-study/ (2017); Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ (2017).

[23] *See* https://immigrationforum.org/article/immigrants-as-economic-contributors-immigrant-tax-contributions-and-spending-power/; https://research.newamericaneconomy.org/report/from-struggle-to-resilience-the-economic-impact-of-refugees-in-america/.

[24] Scott Stringer, *Immigrant Population Helps Power NYC Economy*, (Jan. 11, 2017) *available at* https://comptroller.nyc.gov/newsroom/press-releases/comptroller-stringer-analysis-immigrant-population-helps-power-nyc-economy/.

AR.10552

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-py5w
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0535
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Desiree Hartman

## General Comment

I am writing to express my strong opposition to this proposed rule change for Asylum Eligibility.

As an American Citizen and Immigrant, I strongly believe that our nation must welcome children, families, and individuals fleeing violence without discrimination. I volunteer with immigrants in the community and volunteer as a visitor with asylum seekers in detention centers. Many of the people I have accompanied in detention centers are innocent of the crimes they were convicted of. And I watched and heard the few people who were guilty take full responsibility for their mistakes and transformed their beliefs and behaviors to pay their debts to society and act in alignment with their morals. I believe immigrants are economically, socially, and culturally a vital part of my community, the Greater Boston, my state of residence Massachusetts, and American at large.

With our nation's long history of racism connected to the justice system, I am highly concerned about racial profiling in the criminal legal system.

This proposed rule would inject racial profiling into the asylum process. And would put even more children, families, and individuals seeking asylum at risk of danger and death. This rule would in turn weaken one of the most important defenses community members have against deportation.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, equality, and respect for human rights.

For these reasons, I call upon the Trump administration to withdraw this proposal for changing Asylum Eligibility.

AR.10553

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-363e
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0536
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Jean Bruggeman
**Organization:** Freedom Network USA

## General Comment

FNUSA opposes these rule changes as they would cause harm to survivors of human trafficking. Please see attached comments.

## Attachments

FNUSAAsylumCrimBarCommentsFINAL

AR.10554



Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

*Submitted via* ***https://www.regulations.gov/document?D=EOIR-2019-0005-0001***

January 21, 2020

**RE: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**

To Whom it May Concern:

On behalf of Freedom Network USA (FNUSA), I submit these comments in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019, and to request that the Department of Homeland Security and the Department of Justice immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

FNUSA, established in 2001, is a coalition of 68 non-governmental organizations and individuals that provide services to, and advocate for the rights of, trafficking survivors in the United States. Our members include survivors themselves as well as former prosecutors, civil attorneys, criminal attorneys, immigration attorneys, and social service providers who have assisted thousands of trafficking survivors. Together, our members provide services to over 2,000 trafficking survivors each year.

These proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. FNUSA is especially

AR.10555

concerned about the extraordinary impact and harm that would befall human trafficking survivors, including those who were trafficked outside of the US and have fled to the US seeking safety and protection, and those who entered the US for any reason and were trafficked inside the borders of the US. These changes would preclude many trafficking survivors from the protection and support that the US Government has promised in domestic and international law.

## I.  Human Trafficking Survivors as Asylum-Seekers

Trafficking victims are often left unprotected or even trafficked by their own governments. Justice is often denied trafficking survivors, leaving them with no option but to seek safety in the US. Others respond to what they believe to be legitimate employment or travel offers, only to find themselves exploited and abused in the US. The proposed rule would bar many of these vulnerable and traumatized survivors from qualifying for asylum. According to DHS, the top countries for affirmative asylum filings in 2018[1] have all the US Department of State has identified as failing below Minimum Standards for the Elimination of Trafficking in Persons.[2] Both Venezuela and China, the number 1 and 4 source countries for affirmative asylum, have been found to neither meet the minimum standards, not even attempt to meet the standards. As a result, they are subject to restrictions on funding from the US Government. Guatemala, El Salvador, Mexico, and Honduras all received Tier 2 rankings, indicating that they do not meet the minimum standards, although there is some evidence of efforts to meet the standards.[3]

Trafficking victims may have been forced to commit crimes by their traffickers in their home country, on the journey to the US, or once they arrive in the US. Traffickers use forced criminality as a tactic to entrap their victims, causing them to fear reporting to law enforcement or seek social services. Once the trafficking victim has a criminal record, they feel trapped by the trafficker. Legal schemes that feed into this control tactic assist traffickers in isolating and abusing their victims. Instead, it is critical to remove barriers to services and support for trafficking survivors.

While many trafficking survivors present in the US apply for the T Visa[4], a visa specifically created for trafficking survivors, not all do. Those who experienced trafficking outside of the US are unlikely to qualify for a T Visa, but may be eligible for asylum. Unfortunately, some who are likely eligible for a T Visa may not apply for one because they are unaware that it exists. Few T Visas are approved annually[5], and far fewer immigration practitioners

---

[1] DHS Annual Flow Report: Asylees and Refugees 2018, available at: https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2018/refugees_asylees_2018.pdf
[2] Department of State, Trafficking in Persons Report, June 2019, available at: https://www.state.gov/wp-content/uploads/2019/06/2019-Trafficking-in-Persons-Report.pdf.
[3] Id.
[4] See 8 USC 1101 (15)(T).
[5] T Visa applications reached an all-time high of 1,613 in FY2018, but have fallen to 1,214 for FY2019. See USCIS, Form I-914 Data, available at: https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20

are experienced with T Visas than asylum applications. Therefore, those who have been trafficked both outside and inside of the US may be applying for, and qualified for, asylum in the US.

## II.   The Proposed Rule Will Unfairly Prevent Trafficking Survivors from Obtaining Asylum

The proposed rule seeks to add seven new criminal bars to asylum eligibility.[6] These new bars are extremely broad in scope, and several will particularly impact trafficking survivors who are in desperate need of protection and who would otherwise be eligible for asylum protections.

### A.   The Smuggling or Harboring Bar Will Harm Trafficking Survivors and Their Families

This expansion would make trafficking survivors who are convicted of helping their spouses and children escape the trafficker and enter the US ineligible for asylum. Traffickers often use violence or threats of violence against family members in the home country to entrap their victims and force them to continue working under exploitive conditions. As with survivors of domestic violence, many trafficking survivors continue to endure abuse in order to protect their family members. Those trafficked close to home, may take their family members with them when they escape to the US. Others may send money to connections in the home country to help their family members escape the traffickers. These actions demonstrate an admirable commitment, not a dangerous intent. The US government should not refuse to protect refugees simply because they love their family members and are desperate to protect them.

### B.   The Illegal Reentry Bar Harms Trafficking Survivors Seeking Safety

Barring all applicants convicted of illegal reentry from being eligible for asylum wholly ignores the reality that trafficking victims are often forced to travel, within and between countries, by their traffickers. Therefore, trafficking survivors may have reentered the US without authorization either because they were smuggled by the trafficker, or because they were removed by the US, and then returned to find safety.

---

Forms%20Data/Victims/I914t_visastatistics_fy2019_qtr4.pdf. By contrast, 105,472 affirmative asylum applications were filed in FY 2018. *See* https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2018/refugees_asylees_2018.pdf.

[6]  Individuals would be ineligible to seek asylum if they are convicted of 1) a felony offense; 2) "smuggling or harboring" under 8 U.S.C. § 1324(a); 3) illegal reentry under 8 U.S.C. § 1326; 4) an offense involving "criminal street gangs"; 5) a second offense of driving while intoxicated or impaired; 6) conviction or *accusation of conduct* of acts of battery or extreme cruelty in the domestic context; 7) certain newly defined misdemeanor offenses.

### C. The Conviction or Accusation of Battery or Extreme Cruelty Bar Harms Survivors Trafficked by Family Members

The proposed rule seeks to make ineligible for asylum not only all applicants who have been convicted of domestic assault or battery, stalking, or child abuse in the domestic context, but also those who are simply accused of engaging in battery and extreme cruelty. This proposed rule creates the *only* crime-related bar for which a conviction is not required. DHS and DOJ paint this proposal as a way to protect survivors; however, it will cause immense harm to immigrant survivors of violence.

First, it is important to note that trafficking can, and often does, happen within families. Traffickers can be parents, spouses, siblings, grandparents, aunts/uncles, or any other relative. However, these family members use force, fraud, or coercion to extract labor or services or commercial sex acts from the survivor. Traffickers often use physical and sexual violence as part of their abuse and exploitation scheme.

Second, in many cases immigrant survivors, not their abusive traffickers, are arrested and prosecuted for domestic violence offenses. Immigrant survivors who have limited English proficiency (LEP) may not be able to fully describe the situation and the abuse they experienced to police officers. They have also been threatened with retaliation if they report the abuse and exploitation to law enforcement. All too often, police officers turn to the *perpetrators* to interpret or rely more heavily on their explanations because they are more fluent in English or act less fearful of law enforcement. In other cases, survivors are arrested and face charges for domestic violence arising from acts of self-defense or because abusive partners or perpetrators manipulate the legal system by filing false claims of abuse. Service providers report that it is common to see abusers make false allegations to police and the courts to have immigrant survivors arrested. The proposed rule's lack of requirement of a conviction increases that likelihood, given the lack of completion of a fact-finding.

Although there is a proposed waiver for survivors who are deemed to not be the primary aggressor, it is wholly insufficient. Many survivors will believe that they are ineligible, or be too fearful to attempt to explain the situation. Survivors who are still fearful of the trafficker will be unwilling to accuse them of abuse and exploitation. Other survivors will be unable to articulate the details clearly, due to ongoing trauma from the trafficking experience.

### D. The Document Fraud Bar Ignores Trafficking-related Circumstances

There are many ways in which trafficking victims may end up with document fraud convictions as a result of their trafficking experience. This bar will enable the force, fraud, and coercion used by traffickers, and punish immigrant survivors instead.

First, traffickers routinely provide their victims with fraudulent documents for use in crossing borders. When survivors are caught by law enforcement while they are still under the control of the trafficker, they are unlikely to explain the circumstances fully. Traffickers

often provide legal representation for the victims, or have threatened the victims so thoroughly with retaliation that they do not disclose the circumstances to the court. Trauma can also make it difficult for trafficking survivors to explain the circumstances of their exploitation without appropriate supportive services. Thus, trafficking survivors are left with document fraud convictions for documents they were forced to use as part of the trafficking scheme.

Second, traffickers routinely confiscate, hide, or destroy survivors' documents in order to exert dominance and prevent survivors from being able to escape or seek assistance. Immigrant survivors who do, amazingly, escape from trafficking are, therefore, often left without documentation. This leaves survivors highly vulnerable to individuals who falsely claim to have the ability to prepare legal documentation for them.

Finally, trafficking is a financial crime, leaving the survivors without financial resources and dependent on the trafficker for housing, food, health care, and other basic needs. Many foreign national trafficking survivors have debts in their home country, created as part of the trafficking scheme to keep the survivor compliant. Survivors who escape from traffickers therefore risk falling into poverty and homelessness and may resort to any measure to work. Barring immigrant survivors from asylum for taking measures to ensure that they could feed, clothe, and house themselves and their children is cruel and will only serve to render them even more vulnerable to exploitation.

### E. The 'Gang Affiliation' Bar Harms Survivors Trafficked by Gangs

Gangs are engaged in trafficking for both labor and sex. They recruit and groom their victims, force them to engage in unlawful activity, and then entrap them in the ongoing labor or sex trafficking scheme. Survivors often believe that they are to blame for their failure to avoid the gang, their willingness to engage in initial activities, or because of their shame and trauma. The vague, and yet overly broad, language of the proposed rule would bar all victims of gang-based trafficking from being granted the very protection they need to escape the trafficking. There is no version of this analysis that can protect victims who have experienced the trauma and shame of gang-related trafficking victimization.

### III. The Proposed Definitions of "Conviction" and "Sentence" Particularly Harm Trafficking Survivors

The Proposed Rule includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[7] This flies in the face of the understanding that trafficking victims are routinely forced to commit crimes as part of the trafficking scheme, rarely raise this defense at the time of the arrest or prosecution, and justice can only be served through extensive post-conviction relief remedies including vacating, expunging, and modifying

---

[7] Proposed Rules at 69655.

convictions.[8] Conviction records leave survivors unable to access safe housing, employment, education, federal loans, and professional credentialing.[9]

As a general matter, trafficking survivors are not aware of the defects in their underlying criminal proceedings until they consult with an immigration attorney, a trafficking attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. While states are increasingly offering criminal record relief for trafficking survivors, few offer an affirmative defense.[10] Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will particularly harm trafficking survivors who may have multiple convictions from multiple jurisdictions, all due to the trafficking scheme.

## IV. Withholding of Removal or Protection Under the Convention Against Torture Are Not Sufficient Alternatives to Asylum for Trafficking Survivors

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[11] The availability of these alternatives forms of relief, however—known as withholding of removal (Withholding) and protection under the Convention Against Torture (CAT)—are not sufficient alternatives to asylum. The protections afforded by Withholding and CAT are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees fleeing human trafficking to Withholding and CAT would impose a very real harm to these survivors.

First, Withholding and CAT protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[12] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and

---

[8] American Bar Association, Workable Solutions for Criminal Record Relief: Recommendations for Prosecutors Serving Victims of Human Trafficking, 2019, available at https://www.americanbar.org/content/dam/aba/administrative/domestic_violence1/SRP/aba-cdsv-workable-solutions.pdf

[9] National Survivor Network, National Survivor Network Members Survey: Impact of Criminal Arrest and Detention on Survivors of Human Trafficking, August 2016, available at https://mvlslaw.org/wp-content/uploads/2017/06/NSN-Survey-on-Impact-of-Criminalization-2017-Update.pdf

[10] Polaris Project, Grading Criminal Record Relief Laws for Survivors of Human Trafficking, 2019, available at https://polarisproject.org/resources/state-report-cards-grading-criminal-record-relief-laws-for-survivors-of-human-trafficking/

[11] *See, e.g.,* Proposed Rules at 69644.

[12] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

therefore would be removed to their country of origin, where they would face persecution or even death at the hands of the traffickers.

Even if they are successful, Withholding and CAT recipients are not as protected as those granted asylum. For example, they have no ability to travel internationally. Withholding and CAT recipients do not have access to a travel document. By regulation, refugee travel documents are available only to asylees.[13] And the Board of Immigration Appeals requires that an individual granted Withholding or CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[14] Trafficking survivors granted only Withholding or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, they cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives.[15]

Withholding recipients also face hurdles in access to employment. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[16] After escaping the trauma and financial ruin of human trafficking, they will be forced to face long-term uncertainty for their financial future.

Perhaps most fundamentally, there is continuing jeopardy for Withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[17] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[18] None of these protections exists for Withholding and CAT recipients. They have no access to permanent residency or citizenship.[19] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[20]

---

[13] 8 C.F.R. § 223.1.

[14] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[15] 8 C.F.R. § 208.21(a).

[16] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

[17] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

[18] *See* 8 U.S.C. § 1158(c)(1)(A).

[19] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[20] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

V.    **Conclusion**

In summary, these proposed revisions would put severe restrictions on access to asylum protections that would very specifically harm survivors of human trafficking seeking protection in the US. These harms cannot be mitigated with small edits or by providing exemptions for trafficking survivors. The existence of these barriers will deter survivors from even coming forward for protection and support, leaving them in continued abuse and exploitation. The US Government must act to protect survivors, not embolden traffickers. Therefore, Freedom Network USA urges the Departments to discard these proposed changes and to, instead, stand in solidarity with human trafficking survivors.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me at jean@freedomnetworkusa.org to provide further information.

Sincerely,

Jean Bruggeman
Executive Director
Freedom Network USA

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-52h4
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0537
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Judy Chen

---

## General Comment

January 21, 2020

To Whom It May Concern:

On behalf of the Washington State Coalition Against Domestic Violence (WSCADV), I am submitting comments in response to the Department of Homeland Security (DHS) and Department of Justice's (DOJ) Joint Notice of Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility published in the Federal Register on December 19, 2019. We strongly oppose these proposed changes to the asylum process and asylum eligibility.

WSCADV is the leading voice to end domestic violence in Washington State. We improve how communities respond to domestic violence and are working to create a world where all people can live and love freely without fear. Founded in 1990 by survivors and their allies, WSCADV is a non-profit 501(c)(3) network of more than 70 domestic violence programs. Our member programs work tirelessly across the state to help survivors towards safety and freedom.

From our work, we know that Immigrant survivors who flee to the U.S. to seek asylum have endured horrific domestic violence, sexual assault, rape, and other gender-based forms of abuse that have threatened their and their children's lives. The journey to the U.S. is a dangerous one. Still, survivors traverse the hundreds to thousands of miles because they strongly believe that it is safer to make the journey for the possibility of finding safety and protection in the U.S. than to stay in their home countries where their governments do little to protect them from their abusers and perpetrators.

Many survivors and their children of domestic violence have endured years of abuse, terror, fear, and powerlessness before they finally take the steps to escape from their abusers to come to the U.S. Many immigrant survivors of sexual assault and rape are subjected to multiple attacks, stalked, or at risk of being murdered by

ER-2527

AR.10563

their perpetrators. They are compelled to flee to the U.S. because they recognize that they will never be able to feel safe again if they remain in their home countries. Asylum is therefore for many immigrant survivors their only chance of finally obtaining safety and protection. Immigrant survivors of violence do not make the choice to seek asylum in the U.S. lightly. They must leave everything they know, brace themselves for the tremendous peril that awaits them and their children during their journey, and traverse the many miles with very few possessions of their own - often with nothing but the clothing on their backs.

The proposed rule released by DHS and DOJ proposes to bar many of these vulnerable and traumatized immigrant survivors of violence from qualifying for asylum. Specifically, the proposed rule seeks to 1) establish seven new bars to eligibility for asylum, 2) authorize immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining eligibility for asylum, and 3) rescind a provision in the current regulation regarding reconsideration of discretionary denials of asylum. Immigrant survivors of violence already face numerous barriers to applying for asylum, and these proposed changes will only serve to create more barriers and prevent immigrant survivors from obtaining the asylum protections they desperately need. Rather than restricting access to protection, the administration should continue to expand opportunities for vulnerable immigrant survivors to access safety and protection.

WSCADV has grave concerns regarding the immense harm that these changes in the proposed rule will have on immigrant survivors of domestic violence, sexual assault, and other gender-based abuses. We urge DHS and DOJ to withdraw the proposed rule in its entirety.

Respectfully submitted,

Washington State Coalition Against Domestic Violence
Judy Chen
Executive Director
206-389-2515, ext. 206
judy@wscadv.org

AR.10564

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-grcx
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0538
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

The three proposed changes, to establish additional bars to eligibility for asylum for aliens with certain criminal convictions, to clarify the effect of criminal convictions, and to remove the regulations regarding reconsideration of discretionary denials of asylum, are regulations I believe are unjust and should be dismissed.

The US asylum system, policies currently enforced (such as Migrant Protection Protocols and metering), and security checkpoints are some of the obstacles that make it difficult for migrants to seek asylum. Implementing these new changes would further prevent them from aiming for a better life. By establishing additional bars to eligibility for asylum for aliens with certain criminal convictions, it would prevent those who may have a criminal past due to certain circumstances that do not make them a threat to others. Clarifying the effect of criminal convictions is not an efficient way of determining if they are eligible to request asylum because there is not a set of criteria that can rightfully and accurately define if they are qualified. Therefore, this can unjustly influence their chance for eligibility. Lastly, by removing the regulations regarding reconsideration of discretionary denials of asylum, it will restrict migrants' eligibility for discretion concerning any degree of criminal behavior, which may not make them a danger to society at all.

The new changes proposed will prevent those who are eligible and, therefore, we ask for these regulation proposals to be revoked. Thank you for taking time to read this comment.

AR.10565

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-hk7a
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0539
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Canh Tran

## General Comment

I write to express my strong opposition to this proposed rule change. As a refugee from Vietnam who has lived in the U.S. for 29 years, I am deeply concerned that this rule change would send people who fled violence back to danger and death.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.

I believe we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

For these reasons, I call upon the Trump administration to withdraw this proposal.

AR.10566

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-eymc
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0540
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anne Bloomenthal
**Address:**
   Lawrence Township, NJ, 08648
**Email:** ABloomenthal@live.com

---

## General Comment

Please withdraw this proposed rule change that would hurt many asylum seekers.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution, but these changes would instead put even more people seeking asylum at risk of danger - and death. This would, in turn, gut one of the most important defenses community members have against deportation.

The rule change would bar many people from seeking asylum based on contact with the U.S. criminal legal system . Given that the criminal legal system is deeply flawed, and plagued by pervasive racial disparities, this adds another layer rof injustice to the restrictions being placed on applicants for aylum.

As a nation, we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Act for justice and withdraw this proposed rule change.

AR.10567

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-pnpr
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0541
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Olga Byrne
**Organization:** International Rescue Committee

## General Comment

See attached file(s)

## Attachments

IRC_Public Comment Opposing Proposed Asylum Rules

AR.10568

Olga Byrne, Director, Immigration
International Rescue Committee
1730 M St NW #505
Washington, DC 20036

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and
Bars to Asylum Eligibility

January 20, 2020

To Whom It May Concern:

I am writing on behalf of the International Rescue Committee in response to the above-
referenced Proposed Rules amending eligibility for asylum, as published in the Federal Register
on December 19, 2019. The International Rescue Committee (IRC) would like to express its
strong opposition to these amendments, which unnecessarily expands the barriers to asylum to
the detriment of the most vulnerable who have sought protection in the United States.

Established in 1933, the IRC provides relief, protection, resettlement, and integration services to
refugees and other vulnerable immigrants. It is one of nine U.S. agencies sponsored by the State
Department's Bureau of Population, Refugees and Migration (PRM) to provide reception and
placement services to refugees arriving in the United States. The IRC provides resettlement and
integration assistance to thousands of refugees who have been lawfully admitted to the United
States as well as Iraqi and Afghan special immigrants, asylum-seekers, asylees, victims of human
trafficking, humanitarian parolees, Temporary Protected Status (TPS) holders, lawful permanent
residents and others.

The IRC works with asylum seekers from around the world. Since the beginning of 2019, over
6,000 parents and children seeking asylum have received emergency humanitarian assistance
from the IRC in Phoenix. At IRC's Welcome Center, the IRC provides critical, immediate
services to those being released from detention en route to their final destinations where they can
pursue legal protections under asylum. We also provide comprehensive case management and
other social support services to over 300 asylum seeking families in key destinations in the U.S.
Many of the asylum seeking families arrive in the U.S. with little to no resources, and have
already experienced extreme difficulty in accessing the asylum system.

As an organization, the IRC responds to the world's worst humanitarian crises and helps people
whose lives and livelihoods are shattered by conflict and disaster to survive, recover, and gain
control of their future. People fleeing persecution who fear for their lives, safety, and well-being
due to the hostile environments from which they flee deserve fair access to safety and protection
through the U.S. asylum system. The IRC strongly objects to the Proposed Rules as they violate
statutory law on asylum, expand the criminal bars to asylum to cover almost all conceivable
crime (including non-violent misdemeanors), promote a reprehensible policy of family
separation, and deny clearly articulated non-refoulement provisions from a variety of different
domestic and international legal documents. Although the reasoning in this comment highlights
some of the key problems of the Proposed Rules, for the sake of space and time, the comment

AR.10569

herein is limited in scope and should not be taken as an indication that the issues raised within the comment are exhaustive.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact Olga Byrne, Olga.Byrne@Rescue.org, to provide further information.

Sincerely,
Olga Byrne, Director, Immigration

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

## I.     Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence that has been vacated, expunged, or modified should be recognized for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary and punitive overhaul of the asylum protections enshrined in U.S. and international law. The IRC submits these comments to express strong opposition to the entirety of the Proposed Rules and grave concerns

1

ER-2534

AR.10570

with the administration's continued efforts to exclude refugees[1] from obtaining the security and stability the U.S. asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.     The current barriers to asylum for people involved in the criminal justice system are already sweeping in scope; adding more barriers is cruel and unnecessary.

The laws, regulations, and processes governing asylum adjudications are already adequately addressing criminal history and are incredibly difficult to navigate. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel, and often from a remote, secure detention facility. The obstacles to winning asylum are exceedingly high, and in some jurisdictions, almost no one succeeds.[2]

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and overly broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking, it has expanded exponentially to encompass hundreds of offenses, many of them neither a felony nor aggravated in the U.S. criminal justice system. These include petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. The existing crime bars should be narrowed, not expanded.

The 1951 Convention Relating ot the Status of Refugees clearly contemplates excluding individuals who have engaged in serious criminal acts from asylum protections. Refugee protections under the Convention do not apply to persons who have "committed a crime against peace, a war crime, or a crime against humanity" as defined in international law, or have "committed a serious non-political crime outside the country of refuge prior to admission." U.S. laws and regulations already exceeded this narrow exception to refugee protection. As a signatory to the 1967 Protocol, the United States is bound by provisions of the 1951 Convention.

---

[1] A "refugee" is defined under international law in article 1 of the 1951 Convention Relating to the Status of Refugees as a person who is outside his or her country of nationality and, owing to a well-founded fear of persecution on account of race, religion, nationality, membership of a particular social group, or political opinion, is unwilling to avail him/herself of the protection of that country. Under international law, asylum seekers who meet the definition of a refugee must be afforded the protection of the 1951 Convention and benefit from certain provision of the Convention (such as article 31 on non-penalization and article 33 on non-refoulement) even before they are recognized as refugees by states party to the Convention. *See eg*, Dr. Cathryn Costello, "Legal and Protection Policy Research Series: Article 31 of the 1951 Convention Relating to the Status of Refugees," UNHCR, July 2017.

[2] Although there is clear disparity from judge to judge and jurisdiction to jurisdiction, one thing that is common across the country is the backlog of cases. The worse the backlog in the jurisdiction, the worse the experience will be for immigrants who have waited years for a hearing. When their case is finally heard, they may be one of 90 cases heard by the judge that day, and they may not have access to a translator. In many hearings, a continuance is issued and the immigrant is sent back to detention to wait for their next hearing – which is often scheduled several years in the future. Under these conditions, successful outcomes are far and few between, and when they do come, it is after several years of limbo within the complex immigration system. See Kate Brumback, "AP Visits Immigration Courts Across US, Finds Non-Stop Chaos." Jan. 17, 2020. https://apnews.com/7851364613cf0afbf67cf7930949f7d3

2

AR.10571

The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria are unnecessary and cruel. There is a difference in-kind between the aggravated felonies contemplated by the Refugee Act and the vast extensions in the Proposed Rules. Barring individuals from asylum based on relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless, and places the United States in violation of treaty obligations.

The Proposed Rules are also arbitrary and capricious and constitute a marked departure from past practice. The agencies have offered no evidence to support these changes. One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not in, fact, reliably predict future dangerousness.[3] Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime to avoid the threat of a severe sentence. IRC has seen this happen innumerable times through our immigration legal service programs. Even where proper advisals were not provided according to *Padilla v. Kentucky*, the practical and procedural barriers to obtaining post-conviction relief are often more than vulnerable immigrants can overcome.

## III.     The Proposed Rules violate the letter and spirit of U.S. treaty obligations.

The United States acceded to the 1967 Protocol Relating to the Status of Refugees, thereby binding it to the United Nations Convention Relating to the Status of Refugees. As such, the United States is obligated to develop and interpret U.S. refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where refugees have allegedly committed criminal offenses. As noted above, adjudicators already have overly broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

The provision which most notably violates this principle is the expansion of the asylum bar to include individuals who have been convicted of reentering or attempting to reenter the United States pursuant to 8 U.S.C. § 1326. This is an offense with no element of danger or violence to others. Barring asylum based on the manner of entry directly violates the prohibition in article 31 of the Convention on imposing penalties based on a refugee's manner of entry or

---

[3] Today, over 97% of criminal cases are resolved through plea deals instead of criminal trials. This is a result of a phenomenon known as the "trial penalty." The 'trial penalty' refers to the substantial difference between the sentence offered in a plea deal prior to trial versus the sentence a defendant could potentially receive at trial. An alarming outcome of the trial penalty is the prevalence of innocent people who, instead of going to trial and risking hefty jail sentences, plead guilty to crimes they did not commit. As a result, innocent people with no violent or criminal tendencies have criminal records that can later count against them. See "Report: Guilty Pleas on the Rise, Criminal Trials on the Decline." August 7, 2018. https://www.innocenceproject.org/guilty-pleas-on-the-rise-criminal-trials-on-the-decline/

3

AR.10572

unlawful presence. This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

Furthermore, the U.S. asylum system is failing to offer access at Ports of Entry for those seeking to claim asylum at the border. The Proposed Rules indicate that an individual seeking asylum can proclaim this at entry, so there should be no reason for entry without inspection. However, the administration's informal policy of "metering," which limits the number of asylum seekers it will accept at ports of entry, has caused many asylum seekers—who would have presented at official ports of entry—to attempt entry between ports out of desperation as they face months-long waiting lists in northern Mexico. The administration's "metering" policy has been documented by numerous non-governmental organizations, as well as the U.S. Department of Homeland Security Office of Inspector General.[4]

## IV.      Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture.

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules. The availability of these alternative forms of relief, however - known as withholding of removal and protection under the Convention Against Torture (CAT) - does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution, torture, and possible death. The existence of withholding of removal does not mitigate or address the risk imposed by these Proposed Rules.

Additional harms are incurred, even for those who meet the higher standard. For example, they have no ability to travel internationally and attempting to do so may result in removal. This means that refugees granted only withholding of removal or CAT protection are effectively trapped within the United States, often separated from their families because they cannot travel to reconnect in a third country. Further, they cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same

---

[4] U.S. Department of Homeland Security Office of Inspector General, *Special Review – Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy*, OIG-18-84, Sept. 27, 2018.

AR.10573

basis to apply as derivatives on a principal application. For many, this will mean that the Proposed Rules institute yet another formal policy of family separation.

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status. Asylum, once granted, protects an asylee against removal unless and until that status is revoked. None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country.

V.   **The Proposed Rules require immigration judges to make criminal justice determinations, which are outside the expertise and scope of the immigration court system and will undermine judicial efficiency.**

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence." Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct* even where it has not been prosecuted by a competent state authority, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless. Because of the lack of strong evidentiary rules in immigration proceedings, it will be nearly impossible for many applicants to rebut negative evidence marshaled against them, even if false. In other cases, asylum applicants will struggle to find evidence in support of their case (especially for those detained). Individual hearings in immigration court, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues. As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals.

VI.   **The Proposed Rules undermine Sixth Amendment protections and harm immigrants unfamiliar with the complex criminal and immigration framework.**

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility. The proposal includes a rebuttable presumption "against the effectiveness" of an order

AR.10574

vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum. In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious to invoke Sixth Amendment rights, and to require that a noncitizen defendant be competently advised of them before agreeing to a guilty plea. By imposing a presumption against the validity of a withdrawal or vacatur of a plea (setting aside the plea), the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard. Even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the U.S. legal system.

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court. The proffered justification for this broad presumption against post-conviction relief is to ensure persons seeking protection "do not have their convictions vacated or modified *for purported rehabilitative purposes that are, in fact, for immigration purposes*." The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. Immigration law only requires that orders vacating or modifying convictions be based on substantive or procedural error. The Proposed Rule goes well beyond that requirement.

VII.   **The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color.**

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence. For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will further marginalize asylum seekers already struggling with trauma and discrimination.

*Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and seeking safety for minors, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to the smuggling of noncitizens by parents and family members and those previously removed, further

6

AR.10575

criminalizes vulnerable populations fleeing persecution. The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of our communities. The Proposed Rules expand the asylum bar to parents convicted of smuggling or harboring offenses after taking steps to help their children enter the United States in order to flee persecution. This penalizes parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions. Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors in the process.

*Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing and must rely on informal networks to navigate their new circumstances. Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion. Moreover, Congress specifically omitted unlawful employment as a ground of inadmissibility for asylee adjustment—indicating its intent to not punish legitimate refugees for seeking to support themselves out of desperation after fleeing persecution.

*The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

Survivors of domestic violence include trafficking survivors and the LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities. The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. Domestic violence incidents often involve the arrest of both the primary perpetrator and the survivor and do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic

7

AR.10576

assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

## VIII.    DHS and DOJ have not fulfilled regulatory requirements to adequately and appropriately assess impact of the Proposed Rules.

The Office of Information and Regulatory Affairs, Office of Management and Budget (OMB), has designated this rule a "significant regulatory action" under section 3(f)(4) of Executive Order 12866. The Departments are under obligation to adhere to Executive Order 12866, section 1(b), Executive Order 13563, and Executive Order 13771 in drafting these comments. However, the agencies have failed to include information on the impact the proposed changes would have on the target population or the general population, and do not provide any evidence or indication that an attempt at quantifying this impact, as required in Executive Order 13563, was made.

The agencies admit that the proposed expansion will likely result in fewer asylum grants annually, but fail to attempt to quantify or evaluate the impact of the decrease. In saying that these individuals would possibly qualify for withholding does not detract from the agencies' responsibility to assess the impact in a decrease of asylees. As expounded upon above, withholding and asylum offer vastly different protections and greatly impact the asylum-seeking population. Because of the vast differential in ability to integrate into U.S. society, withholding and asylum also impact the general population and American communities, a fact which is not even mentioned or explored in the Proposed Rules.

Furthermore, the statement that "there is no precise quantification available for the impact, if any, of this rule beyond the general notion that it will likely result in fewer grants of asylum on the whole" is exceedingly misleading. The agencies' off-hand dismissal to account for or consider the impact of the access to lawful permanent residency and citizenship that asylum affords is unjustified and unrealistic. The IRC assists over 3,000 asylees, refugees, and immigrants annually to adjust status to lawful permanent residency, and around 7,000 to apply for citizenship. We work on a daily basis with asylees who are eager and grateful to pursue lawful permanent status in safety and freedom in the U.S. after experiences of torture and other persecution, and often after years of instability regarding status. Asylees often face barriers to continuing on their path to residency and citizenship, including inadequate knowledge and education around their immigration options, insufficient financial means to pay for the high USCIS fees associated with the applications, language barriers, and lack of access to high quality legal assistance. The IRC provides Know Your Rights information sessions to asylees, working with USCIS in some locations to provide information on support services and immigration paths after asylum is granted. We see first-hand that asylees face barriers to lawful permanent status that cannot be easily dismissed, and that despite this, asylees often do become lawful permanent residents and U.S. citizens.

The Departments indicate that they "do not expect the proposed additional mandatory bars to increase the adjudication time for immigration court proceedings involving asylum applications." The reasoning included is that immigration judges already consider the documentation of the

AR.10577

applicant's criminal record in proceedings. However, there is no evidence or analysis to support this statement. In fact, the introduction of seven new bars includes a large expansion to not only criminal convictions but also much more nuanced assessments of criminal conduct and charges that have not been deemed convictions in the criminal justice system. Claiming that this additional type of assessment will not take more time is counter-intuitive and illogical, assuming that each case receives due diligence and a fair hearing.

## IX.    Conclusion

For the reasons detailed above, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

AR.10578

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-w1s8
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0542
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Laura St. John
**Organization:** The Florence Immigrant & Refugee Rights Project

---

## General Comment

On behalf of The Florence Immigrant & Refugee Rights Project ("The Florence Project"), I am writing in response to the above-referenced Proposed Rules to express our vehement opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

The Florence Project is a non-profit organization that provides free legal and social services to the over 7,000 men, women, and children who are detained in immigration custody on any given day in Arizona. The Florence Project was founded in 1989 when Immigration Judge John J. McCarrick publicly urged Arizona lawyers to support immigrants, largely asylum seekers, being held in the remote detention center in Florence, Arizona. Judge McCarrick issued his call to action because then, as now, the U.S. was seeing an unprecedented number of people fleeing extreme violence and insecurity in Central America and many of those individuals were forced to plead their case for asylum while detained in remote immigration jails with little to no meaningful access to counsel. Judge McCarrick was deeply concerned about the due process implications of people going before the Court without adequate information or understanding of the law and being potentially wrongfully denied asylum or other forms of relief. The Florence Project was born out of this call to action and has worked extensively with asylum seekers for the past 30 years.

Many of the people we serve come to the U.S. fleeing horrible violence and untenable conditions in their home countries. The majority of such clients have experienced profound trauma in their home countries and in the course of their journey towards safety. Additionally, once here in the U.S., the people we serve face discrimination and criminalization such that they are repeatedly retraumatized within our communities and, particularly, in our legal systems. The proposed regulations are most likely to harm those who are the most traumatized, most vulnerable, and most abandoned by society. The significant expansion of mandatory bars to relief will inevitably result in people being unfairly denied access to asylum without ever having their cases meaningfully reviewed. It also violates both the letter and the spirit of the United States' obligations under international treaties designed to ensure fundamental humanitarian protections to people facing persecution.

AR.10579

Thus, for the many reasons explained in our detailed comment below, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal in its entirety, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

# Attachments

2020.01.21 - FIRRP Comment Asylum EOIR 2019-005 - Criminal Bars to Asylum NPRM - FINAL

AR.10580



*Submitted via https://www.regulations.gov/document?D=EOIR-2019-0005-0001*

**FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT**

PHOENIX OFFICE
P.O. Box 32670
Phoenix, AZ 85064
Tel: 602-307-1008
Fax: 602-340-0596

TUCSON OFFICE
P.O. Box 86299
Tucson, AZ 85754
Tel: 520-777-5600
Fax: 520-829-4154

www.firrp.org

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 21, 2020

To Whom it May Concern:

On behalf of The Florence Immigrant & Refugee Rights Project ("The Florence Project"), I am writing in response to the above-referenced Proposed Rules to express our vehement opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

The Florence Project is a non-profit organization that provides free legal and social services to the over 7,000 men, women, and children who are detained in immigration custody on any given day in Arizona. The Florence Project was founded in 1989 when Immigration Judge John J. McCarrick publicly urged Arizona lawyers to support immigrants, largely asylum seekers, being held in the remote detention center in Florence, Arizona. Judge McCarrick issued his call to action because then, as now, the U.S. was seeing an unprecedented number of people fleeing extreme violence and insecurity in Central America and many of those individuals were forced to plead their case for asylum while detained in remote immigration jails with little to no meaningful access to counsel. Judge McCarrick was deeply concerned about the due process implications of people going before the Court without adequate information or understanding of the law and being potentially wrongfully denied asylum or other forms of relief. The Florence Project was born out of this call to action and has worked extensively with asylum seekers for the past 30 years.

Many of the people we serve come to the U.S. fleeing horrible violence and untenable conditions in their home countries. The majority of such clients have experienced profound trauma in their home countries and in the course of their journey towards safety. Additionally, once here in the U.S., the people we serve face discrimination and criminalization such that they are repeatedly retraumatized within our communities and, particularly, in our legal systems. The proposed regulations are most likely to harm

AR.10581

those who are the most traumatized, most vulnerable, and most abandoned by society. The significant expansion of mandatory bars to relief will inevitably result in people being unfairly denied access to asylum without ever having their cases meaningfully reviewed. It also violates both the letter and the spirit of the United States' obligations under international treaties designed to ensure fundamental humanitarian protections to people facing persecution.

Thus, for the many reasons explained in our detailed comment below, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal in its entirety, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Please do not hesitate to contact Laura St. John, lstjohn@firrp.org to provide further information.

Sincerely,

s/ Laura St. John

Laura St. John
Legal Director
The Florence Immigrant & Refugee Rights Project

_____
_____

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

## I.        Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. The proposal includes a sweeping expansion of the types of criminal offenses that will categorically bar people from being eligible to seek asylum. By barring individuals from asylum based on immigration offenses like unlawful re-entry, misdemeanor drug possession for personal use, or any felony regardless of specific findings of danger the Proposed Rules cast an unjustifiably broad net that will inevitably result in people being unfairly denied access to asylum with no meaningful consideration of the dangers that they face. Such an expansion is at direct odds with the United States' obligations under the United Nations Convention on Refugees that allows states to exclude people from refugee protection **only** in "extreme cases" in which a person has been convicted of a particularly serious crime or constitutes a danger to the community.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility:

(1) Any conviction of a felony offense, without any individualized investigation into danger, as is required under the Convention;

(2) Any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety or to provide humanitarian aid;

(3) Any conviction for illegal reentry under 8 U.S.C. § 1326, regardless of whether the person ever had a meaningful opportunity to seek asylum in the past;

(4) Any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability, regardless of the fact that many of the databases and information around such gang involvement are rife with errors;

(5) Any second conviction for an offense involving driving while intoxicated or impaired, without regard for the circumstances or trauma that an individual may have suffered that led to such convictions or their rehabilitation;

(6) Any conviction *or accusation of conduct* for acts of battery involving a domestic relationship, again without regard for the circumstances of the accusation or the reality that many cases of domestic violence are handled by police at the outset as potential situations of mutual combat

AR.10583

even if ultimately the evidence demonstrates that one party is the primary abuser; and

(7) Any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility.

The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes are unnecessary, harsh, and unlawfully gut the asylum protections enshrined in United States and international law. The Florence Project submits these comments to express our vehement opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.     The Proposed Rules unjustly and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

U.S. asylum law, first codified in the Refugee Act of 1980, was a bipartisan attempt to reconcile rhetoric of the United States as a nation with a strong humanitarian tradition and a unique role as a haven for persons fleeing oppression with our law. The Act sought to bring the United States domestic laws into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees, creating a "broad class" of refugees eligible for a discretionary grant of asylum. Implementation of these Proposed Rules would be a significant betrayal of the laudable goals espoused in the adoption of the Act.

The asylum protections provided by United States law are sacred. Asylum provides those fleeing violence and persecution with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may remain abroad in danger. The domestic asylum system arose in the wake of the horrors of the Holocaust and, for many, it is a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States. For people seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.

The laws, regulations, and process governing asylum adjudications are already overly harsh and complex. Asylum seekers bear the burden of establishing eligibility for

AR.10584

asylum in the face of a convoluted web of laws and regulations, without the benefit of appointed counsel. Our clients face these hurdles from remote immigration jails which further exacerbate the difficulty in obtaining evidence and the assistance of counsel. The obstacles to winning asylum are exceedingly high. Indeed, here in Arizona several judges grant less than 10% of all asylum claims that come before them, with one judge only granting 3% of cases. On average, across all of our detained judges, less than 15% of the thousands of asylum claims that came before them were granted between FY2014 and FY2019.[1]

The criminal bars to asylum are *already* sweeping and over-broad in nature and scope. By adding seven new, broad categories of offenses that would categorically bar individuals from being eligible for asylum, the Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning, contravening our international treaty obligations. Even under current law, any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. However, "aggravated felony" is a notoriously vague term and though originally limited to murder, weapons trafficking and drug trafficking, it now encompasses hundreds of offenses, many of which are neither felonies nor particularly aggravated under state laws, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. The existing crime bars should be narrowed, not expanded.

Even for those not categorically barred from relief under the current system the immigration adjudicator maintains full discretion to deny asylum based on criminal conduct to a person otherwise deemed a refugee. It is in the interest of justice to allow adjudicators to exercise this discretion rather than implement new categorical bars to relief because many asylum seekers have experienced significant trauma that may have directly led to certain types of criminal offenses. Discretion allows an adjudicator to consider a person's entire experience, including those factors that led to criminal behavior as well as the steps towards rehabilitation that individuals have taken. Additional categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. The agencies putting forward the Proposed Rules have proffered no evidence or data to sufficiently justify these sweeping changes. Indeed, the Proposed Rules appear to rely on the presumption that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. However, no evidence is provided to support that assumption, and a criminal record, particularly a non-violent criminal record, does not, in fact, reliably predict future dangerousness. The Proposed Rules are so capricious, they peremptorily assume a noncitizen's supposed danger to the community even in the face of direct evidence demonstrating that the criminal judge concluded that no danger exists by, for example, imposing a noncustodial sentence. Mere conviction for a crime does not make one a present or future danger—which is

---

[1] These figures are based on the averages found in the latest TRAC data from FY2014 to FY2019.

AR.10585

why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers who have been convicted of their own children across the southern border in an effort to find safety.

One example of how the implementation of the Proposed Rules will disproportionately harm the most vulnerable asylum seekers for minor criminal conduct is our client "Mariam" (names have been changed to protect privacy). Mariam was born and raised in Eritrea and her father was a well-connected politician in the government. When Mariam was about ten years old, soldiers ransacked her home and imprisoned and later killed her father. Mariam fled to the U.S. as a refugee in her teens. Despite showing enormous academic potential in science, Mariam dropped out of college and became homeless. She did not understand that she was showing the first signs of schizophrenia. She hated the medication that doctors provided because it made her feel lethargic and slow. She turned to street drugs to self-medicate for the frightening hallucinations she was experiencing. She later received two convictions for possession of methamphetamine as well as assault. After being placed in removal proceedings, she applied for asylum and cancellation of removal. She demonstrated that employees of the mental health system in Eritrea routinely relied on physical restraints, beatings, and other forms of physical harm to control people who have been diagnosed with mental health disabilities. Eventually the BIA affirmed that the case presented a strong record in favor of humanitarian asylum and the IJ granted Miriam protection. Were this rule to pass, people like Mariam whose convictions stem from a mental health disability and would suffer serious harm in their home countries would not be eligible for asylum.

*The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

AR.10586

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder. Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate. The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum-seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

One example of how trauma and substance use disorders can come together to unjustly bar people under the Proposed Rule is the case of "Mateo" (name changed to protect privacy). Mateo is an older indigenous man who experienced extreme violence and genocidal attacks in his community during the Guatemalan Civil War. As a result of his trauma, Mateo turned to alcohol as a coping mechanism and eventually developed a serious mental health condition. In the U.S. this led to several convictions for DUI, although at least one court found him mentally incompetent to stand trial. Despite his convictions, Mateo eventually won Humanitarian Asylum based on the severity of the harm he'd previously suffered and the likelihood he would face other serious harm in light of his mental health condition should he be forcibly returned to Guatemala. Had the Proposed Rules been in effect, Mateo would have been categorically ineligible to seek asylum and likely would not have qualified for any other form of protection.

The Proposed Rules will also exclude from asylum protection countless members of other vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. For example, many LGBTQ immigrants have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries and hate violence towards undocumented LGBTQ immigrants in the U.S. is already disproportionately high when compared to other members of the LGBTQ community. The isolation many such LGBTQ immigrants face from both their kinship and national networks renders this population uniquely vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. Thus, the Proposed Rule will have a disparate impact on LBGTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

AR.10587

*Barring asylum for immigrants convicted of or accused of conduct involving acts of battery in a domestic relationship is likely to punish victims of domestic violence and does not make communities safer.*

The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances. The blunt approach adopted by the Proposed Rules, allowing disqualification based on any conviction or *accusation*, is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor. These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under INA § 237(a)(7)(A) does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar. Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel, with limited English proficiency, and from a detention center.

For example, imposition of the Proposed Rule would place people like Juan's family (names have been changed to protect privacy) in an impossible situation. Juan was an adult suffered from schizoaffective disorder. However, because he lacked legal status in the U.S., he was not able to receive regular treatment. While his family paid for what they could out of pocket, when Juan was not taking medication, he behaved unpredictably and, at times, violently. His parents and siblings tried to restrain him, but Juan could overpower them when he experienced hallucinations. The family's only option was to call the police, who would then transport Juan either to jail or to a mental health crisis center, where he would receive treatment for 24 hours before being discharged home. After one such incident, Juan was detained by immigration where he applied for and won asylum in removal proceedings, showing numerous reports demonstrating that Mexican mental health system is characterized by severe abuse and neglect. Were the Rule to pass and bar applicants from asylum for "any conviction or *accusation of conduct f*or acts of battery involving a domestic relationship," Juan would not have been able to seek asylum, even though those acts were the result of

AR.10588

symptoms of his mental health disability. Nor would he have been able to qualify for the waiver under section 237(a)(7)(A).

> *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution. The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States. The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States. The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

Moreover, here in Arizona, this administration also has aggressively utilized this same harboring statute to prosecute individuals seeking to provide basic humanitarian aid to migrants in the brutal Arizona deserts.[2] Thus, the Proposed Rule not only potentially harms parents seeking to protect their families, but also Samaritans seeking to protect human lives.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions. Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

At the Arizona border, we regularly encounter individuals who were wrongfully returned through expedited removal proceedings without being questioned as to their fear of return as required under law. Our experience is not unusual. In three separate

---

[2] *See U.S.A. v. Warren*, 4:18-cr-00223-RCC-DTF-1 (Dist. Az. 2019).

AR.10589

reports the U.S. Commission on International Religious Freedom, an independent, bipartisan commission, has found that despite established procedures requiring officers to screen for fear during expedited removal, in practice these regulations are frequently flouted in a significant and ongoing pattern of noncompliance that means asylum seekers are removed without ever getting an opportunity to seek relief.[3] Despite the fact that such people have never received any opportunity to present their case for asylum, the Proposed Rules would create categorical barriers for these individuals to have an opportunity to seek asylum if they re-enter and are prosecuted under 8 U.S.C. § 1326.

The Proposed Rules conflates multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard in other ways as well. Many immigrants who attempted entry to the United States to flee persecution are not aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

> *Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Proposed Rule fails to provide any rational for why use of fraudulent documents renders an individual a danger to the community. Nor does it explain why a categorical bar is necessary when asylum adjudicators are already required to make explicit credibility findings in asylum cases. Moreover, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new

---

[3] *See Report on Asylum Seekers in Expedited Removal,* U.S. Commission on International Religious Freedom, 2005, available at http://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/Volume_I.pdf (finding significant failure by border patrol to follow procedural safeguards for asylum seekers); *Expedited Removal Study Report Card: 2 Years Later*, USCIRF, 2007, available at http://www.uscirf.gov/sites/default/files/resources/stories/pdf/scorecard_final.pdf  (CBP failed to implement any recommendations for improvement from USCIRF 2005 report); *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal*, USCIRF, August 2016, available at http://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf. (finding continuing and new concerns about asylum seekers' treatment, USCIRF's 2005 recommendations were mostly not implemented, and, flaws now affect more asylum seekers given expansion of expedited removal); *See also* Human Rights Watch, *You Don't Have Rights Here: US Border Screening and Returns of Central Americans to Risk of Serious Harm* (October 16, 2014), at 3-4, https://www.hrw.org/report/2014/10/16/you-dont-have-rights-here/us-border-screening-and-returns-central-americans-risk (finding that many asylum seekers are turned away through expedited removal).

AR.10590

circumstances. Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent. Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights. The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

### III. The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude potential refugees from protection, a state may only do so in limited circumstances. Specifically, the Convention allows states to exclude a person from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country." However, this clause is meant to be limited to only "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act." The United Nations High Commissioner for Refugees (UNHCR) has explained that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited to those who pose "an extremely serious threat to the country of asylum due to the severity of crimes perpetrated." Moreover, the UNHCR has also specifically clarified that the particularly serious crime bar should not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would **not** meet the threshold of seriousness." Despite this guidance, the Proposed Rules would categorically bar people from asylum for exactly these types of minor offenses. Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors, a requirement that again the Proposed Rule would eliminate for a broad swath of convictions.

AR.10591

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one year of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient," but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes. Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime. The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*, a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury. Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

As addressed above, the expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276 is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence. This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

Additionally, as noted above, a significant number of people who have been convicted for reentering the U.S. without inspection pursuant to INA §276 (8 U.S.C. §1326) have never been afforded a meaningful chance to seek asylum in the first instance because the Customs and Border Patrol are engaged in a pattern and practice of

AR.10592

failing to properly conduct regulatorily mandated fear screenings for people placed in expedited removal proceedings.[4]

## IV.     The possibility of relief under withholding of removal or protection under the Convention Against Torture is an inadequate substitute for asylum protection

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief – withholding of removal and protection under the Convention Against Torture – for those precluded from asylum eligibility under the new rules. The availability of these alternative forms of relief, however, does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are significantly harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

This is equally true for those who are eligible for humanitarian asylum under 8 C.F.R. § 1208.13(b)(1)(iii) based on the severity of past harm or the reasonable possibility that they will suffer other serious harm if returned to their country of origin, as these individuals are unlikely to meet the heightened threshold requirements to establish eligibility for withholding of removal or protection under the CAT.

Even for those who meet the higher standard, withholding and CAT recipients are still prejudiced as the level of protection provided for by either of those forms of relief are significantly less than those available under asylum. For example, they have no ability to travel internationally, which is contrary to the United Nations Convention Relating to the Status of Refugees which affords refugees the right to travel in mandatory terms. Because regulations only provide for travel documents for asylees, refugees granted only withholding of removal or CAT protection are effectively trapped within the United States in long-term limbo and in direct contravention of provisions of the Convention.

Withholding and CAT recipients also face permanent separation from their spouses and children. They can neither reunite with them in a third country, as international travel is prohibited, nor can they petition for their family to join them in the United States. Thus, the Proposed Rules will institute yet another formal policy of

---

[4] *See infra* FN 3.

AR.10593

family separation. To the extent families seek to reunite, family members will have to independently seek asylum in the U.S. which is not only inefficient for the impacted families and back-logged asylum adjudication systems, but also invites inconsistent rulings as different adjudicators assess essentially the same case in various forums.

Withholding and CAT recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." However, recipients of withholding and CAT enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.

And perhaps most fundamentally, there is continuing jeopardy of potential future removal for withholding and CAT recipients that does not exist for asylum recipients. While asylum, once granted, protects an asylee against removal unless and until that status is revoked, no such protection exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they are subject to a removal order, vulnerable to the permanent prospect of deportation to a third country, and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.

## V.     The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang activity," or "in furtherance of gang-related activity," triggering ineligibility for asylum in either case. Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior. These mini-trials are particularly burdensome and

AR.10594

unfair to the approximately 86% of all detained respondents who lack access to counsel to assist them with the type of evidence gathering and arguments necessary to refute these extremely broad grounds. Asylum merits hearings, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues and, thus, the implementation of the Proposed Rules would run a very real risk of creating conditions in which asylum-seekers' due process rights are routinely violated.

As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes. Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process and undermine faith in the fairness of immigration adjudication institutions.

Particularly in the context of the new proposed bar related to alleged gang affiliation, the Florence Project is concerned about the due process implications and potential for erroneous deprivation of asylum for people based on a blanket exclusion for anyone convicted of a crime that an adjudicator deems linked to gang activity. Gang databases are notoriously inaccurate, outdated, and infected by racial bias. By conferring on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity, this rule will necessarily ensnare asylum seekers of color who are tainted by these databases because of the neighborhood where they live and the color of their skin.

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the wrongful return of many refugees back to harm. The attempt to shoehorn even minor property related offenses into the particularly serious crime category by virtue of a "reason to believe" that an offense is gang-related will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

While the Departments asks for comments to identify what types of links should be sufficient or how else to otherwise define what gang-related activity should bar

AR.10595

asylum, those questions are misguided and based on the wrong premise. A vague "gang related" bar should not be introduced at all. The INA and existing regulations already provide broad bars to asylum for criminal behavior as well as discretion to asylum adjudicators where criminal behavior by an asylum seeker causes concern. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

**VI.** **The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection**

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is ultra vires and is not authorized by the INA. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.

*The Proposed Rules undermine Sixth Amendment protections and harms those unfamiliar with the complex criminal and immigration framework governing prior convictions.*

In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea. By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard. Although they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

*The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

AR.10596

The Proposed Rules also improperly allows immigration adjudicators to second-guess state court decisions, even where the order on its face cites substantive and procedural defects in the underlying proceeding. While the Government claims that such a rule is justified in order to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," the immigration law already requires that orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings to be effective for immigration purposes. The Proposed Rule goes well beyond that requirement, however, by authorizing immigration adjudicators to ignore otherwise valid state court orders.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order. Had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself." In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits. In *Pickering v. Gonzales*, the same *Pickering* on which the Government relies, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the BIA was limited to reviewing the court order as to the basis for his vacatur. Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry. Rather, "the inquiry must focus on the state court's rationale for vacating the conviction." Likewise, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction." Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there." The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

AR.10597

**VIII.** **The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion**

When Congress speaks clearly through a statute, the plain meaning of that statute governs. Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes." As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, we believe these proposed expansions are unlawful). However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute. In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned." The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort

AR.10598

violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

## IX.    Conclusion

For all of the reasons states above, the Florence Project firmly opposes the Proposed Rules. They are contrary to U.S. asylum law and both the spirit and letter of our international treaty obligations. They will profoundly harm the most vulnerable asylum-seekers and will inevitably result in people with valid claims being wrongfully returned to countries where they face persecution or death. The administration should immediately withdraw their current proposal in its entirety, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

AR.10599

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-7240
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0543
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Ilene Levine
**Address:**
    524 Ewing Street
    Princeton,  08540
**Email:** ilenejlevine@gmail.com
**Phone:** 6099157184

---

## General Comment

Please withdraw this proposed rule change that would hurt many asylum seekers.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution, but these changes would instead put even more people seeking asylum at risk of danger - and death. This would, in turn, gut one of the most important defenses community members have against deportation.

The rule change would bar many people from seeking asylum based on contact with the U.S. criminal legal system . Given that the criminal legal system is deeply flawed, and plagued by pervasive racial disparities, this adds another layer of injustice to the restrictions being placed on applicants for asylum.

As a nation, we must recognize the humanity of every person, including immigrants, and protect our neighbors from discrimination and abuse. Our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights - not trample them.

Act for justice and withdraw this proposed rule change.

AR.10600

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** k5o-pqn4-k1p3
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0544
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Anonymous Anonymous

---

## General Comment

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

1/21/20

To Whom it May Concern:

I am writing in response to the above-referenced Proposed Rules to express my/our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

I am an emergency physician in Alameda County, California. I volunteer my time to do forensic evaluations of asylum seekers. I am deeply troubled by attempts to make it more difficult for asylum seekers to get asylum in the united states. I am concerned that these proposed regulations are unnecessarily broad and limit judges discretion in deciding asylum cases. Asylum right now is and always has been completely discretionary. This means that the adjudicator, whether an Asylum Officer or an Immigration Judge, can decide NOT to grant asylum for any reasonable cause – such as a conviction of anything. But this proposed ruled takes away discretion, not allowing the adjudicator to look at the whole case, the whole situation, mitigating factors, rehabilitation, trauma suffered, etc. And asylum can later be revoked for bad acts. There is just no rational basis for this proposed draconian rule.

For the reasons detailed, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules.

AR.10601

Sincerely,
Mac Henry MD

AR.10602

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-v21b
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0545
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Judy London
**Address:**
    610 S. Ardmore Ave.
    Los Angeles,  CA,  90005
**Email:** jlondon@publiccounsel.org

## General Comment

See attached file(s)

## Attachments

Comments 0121

AR.10603

BOARD OF DIRECTORS
TANYA M. ACKER
Progress LLP
ANGELA C. AGRUSA
DLA Piper LLP
LAURA M. AHART
Abacus Credit Counseling
RAND S. APRIL*
Skadden, Arps, Slate, Meagher & Flom LLP (Ret.)
JENNIFER S. BALDOCCHI
Paul Hastings LLP
WAYNE M. BARSKY*
Gibson, Dunn & Crutcher LLP
SHARON BEN-SHAHAR MAYER
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.
DR. YING CHEN
Chen Yoshimura LLP
VINCENT H. CHIEFFO
Greenberg Traurig, LLP
ROSEMARIE CHIUSANO-DROHAN
Indicate West
ALLISON K. CHOCK
Bentham IMF
MORGAN CHU
Irell & Manella LLP
ALFRED W. CLARK
Locke Lord LLP
DANIEL CLIVNER*
Sidley Austin LLP
CORY COPELAND
LexisNexis
BRUCE CORMICLE
Law Offices of Bruce Cormicle
BERT H. DEDLER
Kendall Brill & Kelly LLP
MICHAEL J. FINNEGAN
Pillsbury Winthrop Shaw Pittman LLP
WILLIAM FLUMENBAUM
The Capital Group Companies, Inc.
KAREN N. FREDERIKSEN
The Walt Disney Company
LAURENCE R. GOLDMAN
KARLENE GOLLER*
The Law Office of Karlene Goller PC
DANIEL GRUNFELD
MARK E. HADDAD
Sidley Austin LLP (Ret.)
JACQUELINE J. HARDING
Wilson Elser Moskowitz Edelman & Dicker LLP
YAKUB HAZZARD
Mitchell Silberberg & Knupp LLP
MATTHEW T. HEARTNEY
Arnold & Porter Kaye Scholer LLP
CHRISTOPHER M. HOPKINS
Brener International Group, LLC
KATHY J. HUANG
Alston & Bird LLP
MELISSA D. INGALLS
Kirkland & Ellis LLP
DAVID G. JOHNSON*
Act 4 Entertainment
PETER J. KENNEDY
Reed Smith LLP
MOE KESHAVARZI
Sheppard Mullin Richter & Hampton LLP
JESSIE A. KOHLER
Panish Shea & Boyle LLP
TONY LEE
Dickerson Employee Benefits Insurance
Services, Inc.
JEROME L. LEVINE
Holland & Knight LLP
DAVID R. LIRA
Girardi | Keese
BARBARA E. MATHEWS
Southern California Edison
JOHN M. MCCOY
21st Century Fox
MARK R. MCDONALD
Morrison & Foerster LLP
MARCELLUS A. MCRAE
Gibson, Dunn & Crutcher LLP
MARTIN R. MELONE
SALVADOR J. MENDOZA
City National Bank
OWEN W. MURRAY
PricewaterhouseCoopers LLP
STEVEN A. NISSEN
NBCUniversal
THOMAS J. NOLAN
Latham & Watkins LLP
NEIL R. O'HANLON
LAURA R. PETROFF
Winston & Strawn LLP
STEPHEN E. PICKETT
BARRY PORTER
Clarity Partners
WILLIAM T. QUICKSILVER
Manatt, Phelps & Phillips, LLP
PHILIP R. RECHT
Mayer Brown LLP
FRANK REDDICK
Akin Gump Strauss Hauer & Feld LLP
KEVIN D. RISING
Barnes & Thornburg LLP
GREG ROBINS
Latham & Watkins LLP
JOHN A. ROGOVIN
Warner Bros. Entertainment
RICK R. ROTHMAN
Morgan, Lewis & Bockius LLP
ERIC C. RUUD
Thomson Reuters
MARC L. SALLUS
Oldman, Cooley, Sallus,
Bornberg & Coleman, L.L.P.
MARK A. SAMUELS
O'Melveny & Myers LLP
ROBERT F. SCOULAR*
Dentons US LLP
STUART N. SENATOR
Munger, Tolles & Olson LLP
STEPHEN SHERLINE
Union Bank
ROMAN M. SILBERFELD*
Robins Kaplan LLP
MICHAEL S. SPINDLER
GlassRatner Advisory & Capital Group LLC
DEBORAH L. STEIN
Simpson Thacher & Bartlett LLP
JOSH FREEMAN STINN*
Loeb & Loeb LLP
BRIAN R. STRANGE
Strange & Butler LLP
G. THOMAS STROMBERG
Jenner & Block
RANDALL J. SUNSHINE
Liner LLP (Ret.)
PAUL W. SWEENEY, JR.*
K&L Gates LLP
GAIL MIGDAL TITLE*
ADR Services, Inc.
JOEL R. WEINER
Katten Muchin Rosenman LLP
ROBERT S. WOLFE
LAURA A. WYTSMA
Loeb & Loeb LLP
MARTIN S. ZOHN*
Proskauer

*Past Chairperson

OFFICERS OF THE BOARD
JAMIE BRODER
Chairperson
MICHAEL H. STEINBERG
Vice Chairperson
Sullivan & Cromwell LLP
PHILIP E. COOK
Treasurer
The Cook Law Firm, P.C.
JONATHAN H. ANSCHELL
Secretary
CBS Television

MARGARET M. MORROW
President and CEO

ELIZABETH BLUESTEIN
Chief Operating Officer, Vice President
and General Counsel

TRACY K. RICE
Vice President, Development

FREDERICK M. NICHOLAS
Founder

**Public Counsel**

The nation's largest pro bono law firm

January 21, 2020

*Submitted via https://www.regulations.gov/document?D=EOIR-2019-0005-0001*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; **Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**

To Whom it May Concern:

I am the Directing Attorney of Public Counsel's Immigrants' Rights Project in Los Angeles, California. I am writing on behalf of Public Counsel to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

I have represented hundreds of asylum seekers before U.S. Citizenship and Immigration Services (USCIS), the Executive Office of Immigration Review, and the federal courts over the past 26 years. For 10 years, I also taught asylum law at the University of California Los Angeles (UCLA) School of Law. For over 30 years, Public Counsel has provided pro bono legal services to asylum seekers from all over the world. Our staff attorneys presently represent approximately 200 children seeking asylum before the Los Angeles Immigration Court. We also provide in-house representation and mentor pro bono attorneys from the

greater Los Angeles legal community who provide pro bono representation to several hundred asylum applicants – both detained and non-detained -- whose claims are pending before USCIS, the Executive Office for Immigration Review, and federal courts.

In addition to providing legal representation to individual asylum seekers, we also have significant experience analyzing federal immigration policy and identifying and challenging those polices which are unlawful. For example, we are currently class counsel in several lawsuits seeking to vindicate immigrants' rights within the current system, including *JOP v. DHS*, a class action lawsuit challenging the government's unlawful attempt to limit USCIS jurisdiction over asylum claims filed by unaccompanied minors, and *J.L. v. Cissna*, a class action lawsuit challenging USCIS's unlawful policy to deny petitions for special immigrant juvenile status filed by a class of petitioners who obtained SIJS orders in California probate courts. In both cases, federal courts have found USCIS policies impacting the rights of our clients to be unlawful.

For the reasons explained below, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead work to ensure that individuals fleeing persecution are provided full and fair access to asylum protections in the United States. Both our own laws and international law require no less.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me to provide further information. I can be reached by telephone at (213) 385-2977 ext. 103, and by email at jlondon@publiccounsel.org.

Sincerely,

Judy London
Directing Attorney, Immigrants' Rights Project

2

AR.10605

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

### I.  Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. The primary rationales provided for these changes are to enhance efficiency of the asylum system and increase public safety. The changes will do neither. To the contrary, they will unnecessarily complicate proceedings which applicants, attorneys and adjudicators already struggle to understand. And they will further criminalize immigrants of color who already face obstacles to equal justice in the United States and have the misfortune to be born in countries that do not protect their citizens' human rights. The new criminal bars are based on false narratives and are unsupported by evidence.  Put simply, these proposed changes, if implemented, will eliminate the ability of countless asylum applicants to access the protections embedded in our laws, will further separate families, and will diminish our country's historical role as a defender of human rights.

Taken together, these proposed changes eviscerate the asylum protections enshrined in United States and international law. Public Counsel opposes each of the Proposed Rules and urges that they be rescinded in their entirety.

### II.  The Proposed Rules scapegoat immigrants and endanger the lives of those whom our asylum laws are designed to protect. The new rules will unnecessarily exclude bona fide refugees from asylum eligibility, without making our communities any safer.

The United States asylum system was first codified in statute through the Refugee Act of 1980. The Act is a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United

---

[1] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

3

AR.10606

Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[2]

Under current law, asylum provides those fleeing persecution with physical safety, a path to citizenship and the ability to reunite with immediate family members who often remain abroad in danger.[3] Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[4] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[5] For those individuals seeking asylum in the United States, a claim denied often means return to death or brutal persecution.[6]

The laws, regulations, and process governing asylum adjudications are already extremely restrictive. Asylum applicants must establish their eligibility for asylum[7] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[8] They often do not speak English yet must complete lengthy asylum applications in the English language, relying on others who may lack the language skills to serve as accurate translators. The obstacles to winning asylum are exceedingly high; indeed, in some parts of the country and before certain immigration judges, almost no one succeeds.[9] Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to life-threatening conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[10] There are

---

[2] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[3] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[4] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[5] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[6] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[7] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[8] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[9] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[10] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at

AR.10607

consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[11]

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[12] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[13] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[14] its meaning has expanded to include hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[15] The existing crime bars should be narrowed, not expanded, to further the humanitarian goals of the asylum laws. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[16]

In our experience, the breadth of the existing criminal bars has been a roadblock to relief in cases where asylum was plainly merited. For example, we represented a man with a severe intellectual disability. While he was in his late 20s when we met him, the client had the mental capacity of a child as young as two years old by some measures. This individual had a strong claim for asylum based on the harm he would surely suffer if sent back to a country where people with his condition were institutionalized in public facilities renowned for their torturous conditions, including people being tied to wheelchairs, wrapped in gauze strips from head to toe for full-body restraint, and subject to forced lobotomies.[17] However, our client also had a single criminal conviction: a felony assault that was the result of his throwing a rock in the midst of a

---

https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[11] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[12] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[13] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[14] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[15] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'''); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[16] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[17] *See* Disability Rights International, "Abandoned and Disappeared: Mexico's Segregation and Abuse of Children and Adults with Disabilities," (2010), *available at* https://www.driadvocacy.org/wp-content/uploads/Abandoned-Disappeared-web.pdf

fight between individuals whom he did not know or understand were involved in a gang. He received a 365-day sentence that rendered his conviction an "aggravated felony" for immigration purposes, barring the Immigration Judge (IJ) from even considering whether our client should be subject to the particularly serious crime bar in light of significant evidence mitigating the severity of the crime. The proposed regulations would only exacerbate the problem by sweeping in far less serious offenses and taking away an adjudicator's ability to properly exercise their discretion by considering those offenses in their real-life context.

The Proposed Rules are also arbitrary and capricious. They constitute a marked departure from past practice, and they have been proposed by agencies which have offered no evidence to support these changes. The new rules appear to be part of a relentless campaign to make asylum eligibility so restrictive that virtually no one can qualify. For example, a key assumption underlying the Proposed Rules is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[18] The Proposed Rules are so capricious as to peremptorily establish a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[19]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[20] In addition, the Proposed Rules make no exception for convictions for conduct influenced by mental illness or duress. This means that someone who had no intention or capacity to engage in any criminal conduct would be treated identically to the individual who engaged in premeditated criminal conduct. Under current rules, adjudicators are granted

---

[18] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[19] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[20] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157,
https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

discretion precisely because of the common sense understanding that people are complex, and their conduct can only be be understood by examining its full context.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[21] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, regardless of the horrors that asylum seekers will face if removed to their country of origin. Immigration adjudicators will lose discretion to determine whether the circumstances merit such a harsh penalty. In the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[22] This violates the most basic notion of due process.

These categorical bars will send asylum seekers back to countries where they will be at risk of torture or death, while making the United States no safer. Several years ago, Public Counsel represented a woman seeking asylum who fled relentless persecution because she and her husband expressed opposition to the ruling government in her country. Security forces tortured and jailed her husband, and ultimately killed him. They sexually assaulted our client, tortured her elderly parents, and jailed and tortured her brother. She was fortunate enough to flee to the United States, but could not bring her three young children with her. The children went into hiding, while our client fought for asylum in the immigration court. During this period our client was diagnosed with severe Post Traumatic Stress Disorder (PTSD) and was trapped in an abusive relationship, as she was dependent on her abuser for housing. On one occasion, our client got into a dispute with her landlord, who threatened to call police to evict her. Desperate that she would be forced to live on the streets, our client acted rashly, and picked up her landlord's cell phone and threw it onto the floor. Police arrested her. Since she lacked the financial means to pay bond, she lingered in jail, not understanding the charges against her or their consequences. She pled guilty to a felony charge of using force to prevent a victim from making a police report.

After finding that our client had established a well-founded fear of persecution, the IJ carefully weighed the seriousness of the crime and its circumstances against the horrific persecution our client had suffered, and the future persecution she would face if returned to her home country. Based on all of the evidence, the IJ determined that our client merited a favorable exercise of discretion and granted asylum. When she applied for permanent residency, the

---

[21] *Pula*, 19 I.&N. Dec. at 474.

[22] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

7

AR.10610

Department of Homeland Security had yet another opportunity to assess whether our client merited favorable discretion. Once again, an adjudicator assessed all of the circumstances of her crime and granted her waiver application made under INA Section 209(c). Once our client had permanent protection in the United States, her PTSD symptoms became controlled, and she had no further contact with the criminal justice system. The judge's asylum grant enabled our client to find safety, recover from unimaginable persecution, and save the lives of her three children through the asylee relative petition process. Today, she works as a security guard, her daughter is a college sophomore studying to become a nurse, and her youngest son plans to join the U.S. military. Under the proposed asylum bars, the judge would have had no discretion in this case and would have been forced to deny asylum as a result of our client's felony conviction. Even if granted withholding or CAT relief, she never would have been able to bring her children to safety, and they likely would have not survived conditions in their home country.

## III.    The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees,[23] which binds parties to the United Nations Convention Relating to the Status of Refugees,[24] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, this can only occur in limited circumstances. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[25] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[26] The

---

[23] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[24] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[25] *Id.* at art. 33(2).

[26] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[27] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[28] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[29]

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one year of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient,"[30] but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[31] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a false document would constitute a particularly serious crime.

---

[27] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.
[28] *Id.* at ¶ 10.
[29] *Id.* at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).
[30] Proposed Rules at 69646.
[31] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).

9

AR.10612

Earlier this year, pro bono attorneys working with Public Counsel won asylum for a transgender woman who suffered frequent abuse in her native Mexico because of her feminine appearance and behavior. She was raped as a young child and forced to endure repeated physical violence and sexual abuse at the hand of a neighbor when she was a teenager. The client fled to the United States when she was about nineteen years old. After her arrival, she picked up a single conviction for possession of a controlled substance. She realized her error in attempting to self-medicate for her trauma, and in the many years between her conviction and her final asylum hearing had no further trouble with the law. The immigration judge considered the client's single offense, but nevertheless exercised his discretion to grant the client asylum in light of the weight of the evidentiary record of past harm and likelihood of future persecution based on gender identity. If this proposed regulation were in place, the immigration judge's hands would be tied, and the client would be automatically ineligible for asylum. That result is plainly contrary to both the spirit and letter of the Refugee Act.

The creation of asylum bars based on an applicant's manner of entry directly violates the Refugee Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[32] The proposal to bar from asylum those convicted of document fraud often relates to a refugee's manner of entry or presence. Numerous courts as well as the Board of Immigration Appeals recognize that the use of fraudulent documents by asylum seekers is often necessary to escape persecution, and cannot form the basis for a finding of adverse credibility.[33]

We previously represented an asylum seeker who was persecuted on account of her religion. She had no way to exit her country without use of a false passport. Prior to being referred to immigration court, she was convicted of using a false identity document, and sentenced to sixty days of confinement. Under current law, the immigration judge was able to examine all the circumstances of her crime before determining that she merited a favorable exercise of discretion and granting asylum. His decision granting her relief enabled her to bring her son to safety and build a secure and productive life in this country. There was no evidence that our client was ever a danger to the community. After gaining asylum, she had no further contact with the criminal justice system. Under the proposed rule, she would be categorically denied asylum, even though she presents no risk to the public, and even though her use of a false document was necessitated by the persecution she suffered.

## IV. Those precluded from asylum eligibility will suffer great harm even if granted withholding of removal or protection under the Convention Against Torture

---

[32] Refugee Convention, *supra*, at art 31.

[33] *See Edimo-Doualla v. Gonzales*, 464 F.3d 276, 288-89 (2d Cir. 2006); *Kaur v. Ashcroft*, 379 F.3d 876, 889 (9th Cir. 2004); and *Matter of O-D-*, 21 I&N Dec. 1079, 1081 (BIA 1998).

10

AR.10613

Throughout the Proposed Rules, the agencies minimize the harsh nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[34] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—is illusory. These forms or relief are rarely granted in our experience. Even when granted, they are limited in scope and duration, and cruelly prevent an individual deserving of humanitarian protection from ever reunifying with her immediate family members.[35] The Proposed Rules, by limiting *bona fide* refugees to withholding of removal and CAT protection, would impose a very real harm on individuals who have come to the United States in search of protection.

The most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[36] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death. If these Rules are finalized, asylum seekers will lose their lives.

Even those few fortunate enough to be granted withholding and CAT will suffer greatly. As noted above, they will be permanently separated from a spouse and/or children who remain abroad. They cannot even visit their families, as they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees[37] affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[38] And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any

---

[34] *See, e.g.,* Proposed Rules at 69644.

[35] *See* 8 C.F.R. § 208.21(a).

[36] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[37] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).

[38] 8 C.F.R. § 223.1.

11

AR.10614

international travel a "self-deportation."[39] Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Public Counsel has represented a number of clients who became suicidal due to prolonged separation from their spouse and/or children who remained at risk of persecution abroad. Many of our clients' primary goal in fleeing to the United States is to save the lives of their children. Their inability to win security for and reunification with their children is devastating. We had one client whose asylum case was continued multiple times by government delays. After nearly eight years of postponements, he returned to the country where security forces had tortured him. He could no longer bear separation from his children, and so returned to his homeland even though he faced the real threat of additional torture and death. This client was effectively denied access to our asylum protections by the chronic delays in our asylum system. Rather than address such delays by taking steps to truly reduce the asylum backlog, the Proposed Rules will institute yet another formal policy of family separation, which will have devastating consequences on bona-fide refugees, whether or not granted withholding of removal or CAT relief.

Perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[40] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[41] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[42] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[43]

Finally, neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as adequately as a parent. In addition to being unjust to the

---

[39] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[40] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

[41] *See* 8 U.S.C. § 1158(c)(1)(A).

[42] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[43] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

ER-2579

AR.10615

affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.[44]

**V.      The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making**

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of" gang-related activity, triggering ineligibility for asylum in either case.[45] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[46]

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present extensive arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained).

As the immigration courts contend with backlogs that now exceed one million cases,[47] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules

---

[44] See, e.g., Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://bit.ly/2sJuEWR.

[45] *See* Proposed Rules at 69649.

[46] *See* Proposed Rules at 69652.

[47] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

repeatedly cite increased efficiency as justification for many of the proposed changes.[48] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Particularly in the context of the new proposed bar related to alleged gang affiliation, Public Counsel is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[49]

Indeed, on January 6, 2020, the Los Angeles Times revealed that Los Angeles Police Department is investigating its officers who are suspected of falsely portraying people as gang members and falsifying papers.[50] For decades, Public Counsel's clients of color have contested misidentification by law enforcement as being gang affiliated. Consistently, we have investigated and seen no basis for these claims, and now the Los Angeles Police Department is uncovering inaccuracies which may lead to criminal charges against its officers.

It is not only U.S. databased that are riddled with error. Asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically*

---

[48] *See* Proposed Rules at 69646, 69656-8.

[49] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[50] Richard Winton and Mark Puente, "Officers Falsely portrayed people as gang members, falsified records, LAPD says," *Los Angeles Times*, January 6, 2020, https://www.latimes.com/california/story/2020-01-06/dozens-of-lapd-officers-accused-of-portrayed-innocent-people-as-gang-members-falsifying-records.

14

AR.10617

excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[51]

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[52] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow.

Just recently, we handled two cases that expose the egregious impact that racial bias has in our criminal justice system, and the catastrophic consequences of such discrimination for people of color who are non-citizens. Our Latino client is a gifted artist, who earns a living painting signs. He was employed to paint the outside of a building, and asked to do his work in the evening when the business was closed. Police approached him and arrested him on suspicion of graffiti, despite his claim that he was simply doing his job. Before his employer could travel to the police station to verify our client's employment, the police had already transferred him to ICE custody where he languished in ICE detention for many months. Had he not secured counsel, he likely would have been convicted of graffiti, which under the new rules would enable an adjudicator to link this conviction to gang activity (despite no basis for such a link) and then bar him from asylum. In a second case involving graffiti, our client petitioned for a U visa. In adjudicating his U visa, the Department asked our client to provide evidence that he was rehabilitated, as a result of a single conviction for vandalism, in which he engaged in graffiti. This single adult conviction nearly led to a denial of his U visa on discretionary grounds, even though the graffiti had no link whatsoever to gang activity. Fortunately, with our legal representation, he was able to successfully challenge the allegation that he was a danger to the community. He is a gifted artist who recently collaborated with the Los Angeles Police Department to paint a mural on the outside of a police station. He also is employed to teach art to at risk youth at schools throughout Los Angeles County. But under the new proposed rules, an adjudicator could determine his single conviction for vandalism is a gang related activity barring him from asylum.

The current discretionary element in asylum adjudications already provides a tool for adjudicators to investigate criminal history and deny asylum if the facts warrant denials. The two clients described above were at risk of removal under existing law, simply because they were victimized by police practices which criminalize young men of color. But for access to

---

[51] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

[52] Proposed Rules at p. 69650.

counsel, these two men – despite their invaluable contributions to their communities - may have been erroneously linked to gang activity, and on that basis alone, denied discretionary relief.

The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where an applicant's criminal behavior causes concern by an adjudicator. And even without a specific bar an adjudicator always retains discretion to deny asylum. Adding this additional, vague bar linked to gang activity will erroneously exclude bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## VI.     The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[53] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[54] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of

---

[53] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[54] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu,* 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

their applications for permanent residence.[55] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[56]

Barring asylum for immigrants convicted of migration-related offenses turns asylum law on its head; it punishes people for fleeing persecution and/or seeking safety for their children, and does not make communities safer. The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[57] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[58] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[59] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

---

[55] 8 U.S.C. § 1159(c) (2012).

[56] 8 C.F.R. § 208.24(a) (2012).

[57] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[58] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[59] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

AR.10620

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[60] We currently have a client whose asylum claim has been pending in immigration court for five years. She survived relentless persecution in Central America on account of her political opinion. Her persecutors raped her on multiple occasions, raped her daughter, and threatened to kill her, her husband, and their four children. She and her family members fled their country with nothing but the clothes on their back. Her two youngest children were quickly granted asylum, but our client's claim lingered in the immigration court backlog. Desperate to feed her family, she worked in the United States with a false document that she was advised to use to find employment. Like so many mothers, she did what was necessary to keep her children alive. She was arrested and convicted for misdemeanor document fraud, and was not sentenced to even a day in jail. Under the Proposed Rules, she would not be eligible for asylum. She is unlikely to meet the greater evidentiary burdens required to establish eligibility for withholding or CAT relief. If deported, she not only would face the risk of being killed back in her own country, but her children, who have already known unimaginable trauma, would lose their mother, perhaps permanently. While this family would be destroyed, community safety would not be furthered in the least, as there is no evidence that our client is a danger to anyone. As noted, she was not sentenced to any time in custody, precisely because the criminal court did not view her as posing any threat to public safety. To the contrary, her presence in this country enhances safety. Her vigilance as a mother keeps her children safe, and her emotional and financial support of her children ensures that they recover from their trauma and become contributing members of their community.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[61] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[62] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence,

---

[60] See American Bar Association, "About Notario Fraud," July 19, 2018,
https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[61] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalization, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017),
https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[62] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014,
https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

18

AR.10621

and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[63] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

Our office has represented scores of LGBTQ community members, including many transgender women, who in many instances have had some interaction with law enforcement as a result of profiling or past trauma. In many cases, our clients, such as the transgender woman described *supra*, have used drugs or alcohol to self-medicate for serious physical harm— including rape and sexual assault—until they were able to access the help they needed to address past harms. In these cases, immigration judges have regularly used their discretion to consider whether the crimes they have committed are indeed "particularly serious" or render them a danger to the community in light of the complete evidentiary record. If the proposed rules go into effect, they will undoubtedly disproportionately and unfairly bar from asylum members of particularly vulnerable communities, including the LGBTQ community, who have some of the strongest claims to and need for asylum in this country.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[64] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[65] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific

---

[63] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

[64] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[65] 8 U.S.C. § 1227(a)(7)(A).

inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

*Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[66] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[67] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[68]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress.[69] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[70] Creating a "gang-related crime" bar will only exacerbate the

---

[66] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[67] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

[68] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[69] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[70] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

AR.10623

due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[71]

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[72] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[73]

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[74]

As noted above, Public Counsel has prevented two clients – both young men of color – from being wrongly determined to be involved with gangs and on such basis, denied immigration relief. But for our representation, they would likely have been denied humanitarian relief based on unfounded allegations of gang activity, under existing law.

---

[71] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

[72] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that the asylum adjudicator may consider "all reliable evidence" in making their decision.

[73] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

[74] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

21

AR.10624

## VII.  Conclusion

For over 30 years, Public Counsel has dedicated its efforts to securing asylum for survivors of torture who seek safety in the United States. We are committed to honoring the intent of those who authored the Refugee Act of 1980, and insuring our clients' access to the Act's protections. The Proposed Rules cannot be reconciled with our country's asylum laws, enacted to provide a safe have to those who have a well-founded fear of persecution on account of race, religion, political opinion or membership in a particular social group.

The Propose Rules follow an unprecedented campaign by the current administration to demonize asylum seekers by perpetuating myths about asylum seekers that have no evidentiary basis. These Rules impermissibly untether the particularly serious crime bar from any assessment of dangerousness. Under the new categorical crime bars, countless asylum seekers found by criminal courts to pose no danger to the community will be prohibited from the life saving protections of asylum. Along with punishing asylum seekers for minor misconduct, the Proposed Rules will accelerate the demonstrated inequities of our criminal justice system, impacting primarily immigrants of color who already face overwhelming obstacles to securing equal justice. Finally, the Proposed Rules, justified by the need for greater efficiency, will achieve the very opposite. Adjudicators will be charged with holding mini trials to make complex determinations about the applicability of new crime bars, without any clear guidance or fair rules to afford due process. Ultimately, these punitive changes will result in our government sending countless refugees back to their home countries, where the will face the likelihood of further persecution or death.  We urge you to rescind the Proposed Rules and commit to a fair and humane asylum system.

Respectfully submitted by:

Judy London, Directing Attorney
Immigrants' Rights Project
Public Counsel

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekq-7rdv
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0546
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Professor Margaret Taylor
**Address:**
PO Box 7206
P.O. Box 7206
Winston Salem,  27109
**Email:** taylormh@wfu.edu
**Phone:** 3367585897

## General Comment

Please see the attached comment of Professor Margaret Taylor.

## Attachments

M. Taylor comment on proposed categorical asylum bars

ER-2590

AR.10626



WAKE FOREST
U N I V E R S I T Y
SCHOOL *of* LAW

Margaret H. Taylor
Professor of Law

Telephone:    (336) 758-5897
FAX:          (336) 758-4496
Email:  taylormh@wfu.edu

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and
Bars to Asylum Eligibility

January 21, 2020

**Submitted via regulations.gov**

To Whom it May Concern:

        I am writing in response to the above-referenced Proposed Rules to express my strong
opposition to the Proposed Rules to amend regulations relating to eligibility for asylum
published in the Federal Register on December 19, 2019.  I am a Professor of Law at Wake
Forest University School of Law.  I teach and publish scholarship on Immigration Law and
Administrative Law topics.  I have over twenty-five years of experience in these areas.  In my
work I have advised legislators, policy-makers, and judges.  I have, for example, testified before
Congress and the U.S. Commission on Immigration Reform, and for six years served as a
consultant on immigration for the Committee on Federal State Jurisdiction of the Judicial
Conference of the United States.

### Introduction

        The proposed regulations would add seven *categorical* bars to asylum eligibility: (1) any
conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. §
1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own
spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4)

Professor Margaret H. Taylor
Comment on Proposed Procedures for Asylum and Bars to Asylum Eligibility
Page 2

any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The restrictions on asylum proposed in the regulations are breathtaking in scope. The Executive Office for Immigration Review (EOIR) and U.S. Citizenship and Immigration Services (USCIS) (together referred to as "the promulgating agencies") propose categorical bars to asylum for misdemeanor convictions that cannot be considered a particularly serious crime. In addition, the proposed categorical bars are inconsistent with the statutory right to apply for asylum that Congress enacted in INA § 208(a)(1). Thus, the proposed bars are in excess of the promulgating agencies' statutory jurisdiction under APA § 706(2)(C). The promulgating agencies' also fail provide an adequate explanation for these provisions, rendering them arbitrary and capricious under APA § 706(2)(A). While these objections apply to each of the proposed bars, by way of illustration I address my comment specifically to that part of the proposed rule that would make applicants ineligible for asylum when they are convicted of a federal, state, tribal, or local *misdemeanor* for the possession or use, without lawful authority, of an identification document, authentication feature, or false identification document as defined in 18 U.S.C. 1028(d). *See* 84 Fed. Reg. 69653, 69659-60.

## I. The proposed bar for misdemeanor convictions—for example, for possession or use without lawful authority of an identification document—are not authorized by statute

The promulgating agencies claim three inter-related sources of statutory authority to codify these bars: First, the asylum statute states that its protections do not apply if the promulgating agencies determine than an applicant "having been *convicted* by a final judgment *of a particularly serious crime, constitutes a danger to the community of the United States*" (INA § 208(b)(2)(A)(ii)). Second, the statute provides that the promulgating agencies "may designate by regulation offenses that will be considered to be a [particularly serious] crime described in clause (ii)." (INA § 208(b)(2)(B)(ii). Third, the statute also states that the promulgating agencies "may be regulation establish additional limitations and conditions, *consistent with this section*, under which an alien shall be ineligible for asylum." (INA § 208(b)(2)(C)). Read together, these provisions grant authority for the promulgating agencies to issue rules barring categories of applicants for asylum *only* in two scenarios: (1) the regulation is promulgated to designate a particularly serious crime, the conviction of which indicates that an applicant constitutes a danger to the community of the United States; or (2) the regulation establishes a limitation on asylum that is consistent with INA § 208.

Plainly, a misdemeanor conviction is not a "particularly serious crime. By definition, a misdemeanor is a low-level criminal offense punishable by a fine or jail time of less than a year. Misdemeanors are distinguished from more serious felony offenses, punishable by a year or more in prison. *See generally* Alexandra Natapoff, PUNISHMENT WITHOUT CRIME: HOW OUR

AR.10628

Professor Margaret H. Taylor
Comment on Proposed Procedures for Asylum and Bars to Asylum Eligibility
Page 3

MASSIVE MISDEMEANOR SYSTEM TRAPS THE INNOCENT AND MAKES AMERICA MORE UNEQUAL (2018).

The preamble to the proposed rule states: "The Attorney General and the Secretary believe that fraudulent document offenses pose such a significant affront to government integrity that even misdemeanor fraudulent document offenses should disqualify aliens from eligibility for asylum." 84 Fed. Reg. 69653. But Congress did not authorize the promulgating agencies to bar asylum applicants based on the opinion of these officials as to what constitutes an "affront to government integrity." To the contrary, the statute authorizes the promulgating agencies to designate as bars to asylum convictions for "a particularly serious crime, [which] constitutes a danger to the community of the United States." Applying the framework of *Chevron v. National Resources Defense Council,* 467 U.S. 837 (1984), Congress has spoken directly to the precise question at issue. A misdemeanor conviction for using or possessing a false identification cannot by any reasonable interpretation be considered a conviction for "a particularly serious crime which constitutes a danger to the community of the United States." Thus, this proposed bar is not authorized by INA §§ 208(b)(2)(A)(ii) and 208(b)(2)(B)(ii).

This same argument applies to other provisions in the proposed rule that propose to bar asylum applicants for misdemeanor convictions, or for alleged criminal conduct without any conviction. None of these proposals are consistent with the statutory provision permitting the promulgating agencies to bar asylum applicants who have been convicted of a "particularly serious crime, [which] constitutes a danger to the community of the United States." The proposed rule embodies a clear intent to bar low-level criminal offenders, and those accused of crimes, from seeking asylum in the United States when Congress in fact authorized regulations to codify categorial bars only for particularly serious and dangerous offenders.

The regulation is also not authorized by the more general authority of INA § 208(b)(2)(C) because under that provision any "additional limitations and conditions" imposed by the promulgating agency must be "*consistent with this section"*—i.e., INA § 208. The proposed rule is not consistent with the statute because it violates INA § 208(a)(1), which creates a statutory right to apply for asylum for "*[a]ny* alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status. . ." who is not subject to specific bars. INA § 208(a)(1). This provision unambiguously applies equally to all asylum applicants, regardless of their mode of transportation or the circumstances of their entry into the United States. It unambiguously extends the statutory right to asylum those who are "physically present" in the U.S. regardless of their immigration status. It is abundantly clear that Congress did not intend for statutory right to apply for asylum to extend only to applicants who land in U.S. airports while excluding those who enter without inspection or arrive at our southern border. *O.A. v. Trump*, 404 F.Supp.3d 109 (D.D.C. 2019).

The proposed rule barring asylum applicants with misdemeanor identify document convictions expressly contemplates that unlawful distinction. It provides an exception to the proposed bar based on misdemeanor possession or use of identification documents "if the alien can show that the document was presented before boarding a common carrier for the purpose of

Professor Margaret H. Taylor
Comment on Proposed Procedures for Asylum and Bars to Asylum Eligibility
Page 4

coming to the United States." 84 Fed. Reg. 69653. This exception excuses those using a false identification document to board a plane traveling to the United States, who presumably were inspected and admitted, were later convicted for a misdemeanor false identification offense, and then seek to apply for asylum. In contrast, asylum applicants who traveled by land seeking asylum at the southern border do not benefit from any exemption. The promulgating agencies offer no explanation for this distinction, and it clearly violates INA § 208(a)(1) in that it bars certain asylum seekers based on their mode of transportation and circumstances of entry into the United States.

## II. The proposed bar for misdemeanor convictions involving possession or use, without lawful authority, of an identification document is arbitrary and capricious

As explained above, the promulgating agencies have failed to provide a reasoned explanation why misdemeanor convictions for fraudulent document offenses should bar an otherwise qualified applicant seeking humanitarian protection in the United States from applying for asylum. This is especially true when this provision is considered in conjunction with a separate proposed rule, *Asylum Application, Interview, and Employment Authorization for Applicants*, proposed by the Department of Homeland Security (DHS) on November 14, 2019. 84 Fed. Reg. 62374. That proposed rule would extend the waiting period for asylum applicants to apply for employment authorization from the current 180 days to 365 days. It would also exclude aliens who, absent good cause, entered or attempted to enter the United States at a place and time other than lawfully through a U.S. port of entry from eligibility employment authorization. *Id.*

Thus, in one proposal DHS will severely restrict asylum applicants' ability to work with authorization. But asylum applicants awaiting a final determination of their claim must feed, clothe, and house themselves and their families. Those who lack other resources for support will by necessity work without authorization. Some will secure false identification documents, and risk criminal prosecution in state or federal court for this minor offense. Those who are convicted will then be barred by proposed *Procedures for Asylum and Bars to Asylum Eligibility*. Taken together, these two rules create a Catch-22 for asylum seekers, clearly designed to thwart their access to asylum in contravention the statutory right to apply for asylum in INA § 208(a)(1).

In the context of notice-and-comment rulemaking, an executive branch agency must explain the rationale and the impact of its proposal. Failure to provide a satisfactory explanation renders the regulation arbitrary and capricious. *See, e.g., Motor Vehicle Manufacturers Association of the United States v. State Farm,* 463 U.S. 29 (1983). The promulgating agencies' failure to explain and justify how the separate proposed restrictions on employment authorization interacts with the proposed bar for misdemeanor convictions involving possession or use, without lawful authority, of an identification document renders both regulations arbitrary and capricious.

AR.10630

Professor Margaret H. Taylor
Comment on Proposed Procedures for Asylum and Bars to Asylum Eligibility
Page 5


      Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me at taylormh@wfu.edu if you desire further information.


Sincerely,

Margaret H. Taylor
Professor of Law

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekr-pzob
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0547
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Margaret Moran
**Address:**
   Greater Boston Legal Services, Immigration Unit
   197 Friend Street, 8th Floor
   Boston,  MA,  02114
**Email:** mmoran@gbls.org
**Phone:** 617-603-1808

## General Comment

See attached file(s) of Greater Boston Legal Services Immigration Unit

## Attachments

Greater Boston Legal Services Immigration Unit Comments on EOIR Docket No 18 0002 re Asylum Eligibility
Proposed Rules

AR.10632



# GREATER BOSTON
## LEGUM SERVICES

*...and justice for all*

January 21, 2020

*Submitted via www.regulations.gov*

Lauren Alder Reid
Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22014

Maureen Dunn
Chief
Division of Humanitarian Affairs
Office of Policy and Strategy,
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts NW
Washington, DC 20529-2140

**Re:** **EOIR Docket No. 18-0002, Procedures for Asylum and Bars to Asylum Eligibility, Proposed Rulemaking of the Department of Justice and the Department of Homeland Security, published December 19, 2019 at 84 Fed. Reg. 69640 (the "Proposed Rules").**

Dear Assistant Director Reid and Chief Dunn:

The Immigration Unit of Greater Boston Legal Services (hereinafter "IU" or the "Immigration Unit") submits this comment in opposition to the joint proposal of the Department of Justice and the Department of Homeland Security (together, "the Departments") entitled "Procedures for Asylum and Bars to Asylum Eligibility," published December 19, 2019 at 84 Fed. Reg. 69640 (hereinafter, "the Proposed Rules").

Greater Boston Legal Services (GBLS), a nonprofit legal aid organization, is the primary provider of legal aid in Massachusetts in matters including immigration, family law, housing, employment and disability services, serving over 10,000 low-income families in the Greater Boston area annually. The GBLS Immigration Unit serves approximately 1,000 low-income immigrants each year, primarily applicants for humanitarian relief, including applicants for asylum, VAWA relief, U and T visas, temporary protected status, deferred action for childhood arrivals, family-based immigrant petitions and cancellation of removal. We represent many clients who have suffered persecution, torture, and other violence, including unaccompanied children, adults and families, and individuals pursuing their claims while detained. The GBLS IU also engages in appellate and impact advocacy on critical immigration issues affecting our

clients and works with numerous community organizations to provide policy education and community legal education.

The Immigration Unit of GBLS strongly opposes the Proposed Rules for several reasons. First, the Departments' rationale for the Proposed Rules is not supported by evidence and is disingenuous. Second, the Proposed Rules are an extreme departure from statutory provisions and established legal precedent. Third, the Proposed Rules are at odds with long-standing U.S. and international legal principles and policies regarding protection of the refugee. Because the Proposed Rules if implemented will represent a dramatic break with legal precedent and policy regarding protection of the refugee, the GBLS Immigration Unit implores the Departments to reconsider their joint proposal and be mindful that, as a signatory to the 1967 Protocol of the 1951 Convention Relating to the Status of Refugees, the U.S. has a legal and moral obligation to accept asylum seekers who seek protection. The many circumstances under which implementation of the Proposed Rules would deny protection for refugees flies in the face of the U.S.'s treaty obligations and the basic intent of the 1980 Refugee Act.

The Departments' failure to consider the special circumstances of the refugee is evident in the extent to which they characterize and emphasize asylum as a discretionary benefit, beginning with the very first substantive sentence of the Proposed Rules, in the Background section, and repeatedly thereafter throughout the Proposed Rules. Although true that the refugee seeking asylum in the U.S. does not always have a claim for mandatory protection,[1] it is also true that the Refugee Act of 1980 reflected Congress' intent to expand the availability of refugee protection in the U.S.[2]

The Refugee Act of 1980 was enacted to bring the U.S. into compliance with its obligations under the 1967 Protocol Relating to the Status of Refugees. As a party to the Protocol, the U.S. agreed to be bound by the terms of the Convention and to provide certain designated rights to refugees falling under its protection. The U.S. provided statutory assurance of the principle of *nonrefoulement*, enacting basic, mandatory protection for the refugee whose life or freedom would be threatened, as well as the more expansive asylum protection for those who have a well-founded fear of harm. The manner and tenor of the Departments' emphasis on the refugee's burden to demonstrate that she merits asylum as a matter of discretion is an aggressive approach to limiting protection that is not in keeping with the U.S. law and Congressional intent regarding U.S. obligations under the Convention and the Protocol. The asylum applicant does have the burden of establishing that a favorable exercise of discretion is warranted.[3] But the Departments' justification for the Proposed Rules wrongly casts this burden as though equivalent to the applicant's burden to demonstrate that she has a well-founded fear of persecution. Citing the Attorney General's recent decision in *Matter of A-B-,* the Departments stress that "'[a]sylum is a discretionary form of relief from removal, and an applicant bears the burden of proving not only statutory eligibility for asylum but that he also merits asylum as a matter of discretion,'" and, further, "'[o]nce an applicant has established eligibility . . . , it remains within the Attorney General's discretion to deny asylum.'" The Departments' reliance on *Matter of A-B-* in this way is problematic because in the Attorney General's assertion of his discretion in *Matter of A-B-,* he

---

[1] INA Sec. 208(a); *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 441 (1987)

[2] *Id.* at 424.

[3] *Matter of Pula*, 19 I&N Dec. 467 (BIA 1987) (citing *Matter of Shirdel*, 19 I&N Dec. 33 (BIA 1984)).

2

AR.10634

did not acknowledge that the cases cited therein took a more cautious, restrained view of the Attorney General's discretion. For example, in a foundational decision regarding the Attorney General's discretion in granting asylum, *Matter of Pula*, the Board of Immigration Appeals (hereinafter, the "Board" or the "BIA") admonished:

> discretionary factors should be carefully evaluated in light of the unusually harsh consequences which may befall an alien who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors.[4]

Similarly, and ironically, *Moncrieffe v. Holder* and *Delgado v. Mukasey*, the cases cited along with *Matter of A-B-* in the Proposed Rule by the Departments in support of the Attorney General's wide discretionary power in fact, like *Matter of Pula*, caution against unchecked power and unrestrained discretion on the part of the Attorney General. In *Moncrieffe*, the Court rejected the Government's attempt to "conduct *post hoc* investigations into the facts of noncitizens' predicate offenses" and "minitrials" in lieu of the long-established categorical approach to consideration of criminal convictions.[5] Finding the Government's concerns about the Court's decision "exaggerated," the *Moncrieffe* Court noted the "absurd consequences that would flow from the Government's narrow understanding of the categorical approach," and that the Government's proposed solution was a "cure worse than the disease," and "simply wrong." [6] Although in *Delgado*, the court ultimately accorded *Chevron* deference and found the BIA's interpretation of the aggravated felony statutory provision, it did so only after first asserting its jurisdiction to review the Attorney General's discretionary authority and overruling its earlier decision in *Matzuk v INS*, that the jurisdiction-stripping provision at 8 USC 69641-44§ 1252 barred the court's judicial review.[7]

In the same way that the Departments emphasize the Attorney General's discretionary authority in their justification of the Proposed Rules, they highlight the fact of past mandatory restrictions against asylum eligibility as though the Proposed Rules are simply the next step in a logical process endorsed by Congress as well as the courts.[8] They are not.

The Departments list each legislative and regulatory or executive decision passed or implemented since adoption of the Refugee Act of 1980, but many of these pertain to eligibility bars that call into question the asylum seeker's need for asylum in the United States. Examples include the safe third country and firm resettlement bars regarding the asylum seeker's past or future option of living safely in another place, and the changed circumstances and safe internal relocation options limiting asylum eligibility.[9] Although purporting to provide historic background and place the Proposed Rules in the context of previous eligibility provisions, the Departments do not mention important, long-standing jurisprudential and statutory history regarding the effect of convictions for particularly serious crimes in the context of refugee

---

[4] *Matter of Pula* at 474.
[5] *Moncrieffe v. Holder*, 569 U.S. 184, 200 - 01(2013)
[6] *Id.* at 203.
[7] *Delgado v. Holder*, 648 F.3d 1095, 1097 (9th Cir. 2011)
[8] See Proposed Rules at 69641-44.
[9] *Id.*

AR.10635

protection. By ignoring this jurisprudential and legislative history, the Departments mask the extreme departure from past practice that the Proposed Rules represent. See our comments regarding this jurisprudential and legislative history below.

At the same time, the Departments are dismissive of the extremely harsh, potentially fatal, consequences of the Proposed Rules when they disingenuously state that "aliens whose asylum applications are denied may nonetheless be able to obtain protection from removal under other provisions of the immigration laws," because an asylum application is "also automatically deemed an application for statutory withholding of removal," and "[a]n immigration judge may also consider an alien's eligibility for withholding and deferral of removal under [the Convention Against Torture]."[10] This is meaningless assurance and hollow comfort to refugees seeking asylum for several reasons. It also demonstrates the Departments' indifference to the will and acts of Congress.

As the Departments well know, Congress passed § 208 of the INA to provide asylum protection to refugees who are found to have a well-founded fear of harm (who face a reasonable possibility or at least a 10 % chance of persecution), but who may not be able to demonstrate a probability of persecution (that they will more likely than not be persecuted if returned to their country).[11] In furtherance of Article 34 of the 1951 Convention Relating to the Status of Refugees, providing that contracting States shall as far as possible facilitate the assimilation and naturalization of refugees, Congress' enactment of § 208 was to create a broad class of refugees who could find safe haven and a future in the United States, as distinct from the subcategory of those entitled to withholding of removal, who would not be offered the possibility of permanence that includes options for family reunification and other aspects of full assimilation and naturalization.[12] The Departments offer that "'the state parties to the Refugee Convention sought to deny admission to their territories of criminals who would present a danger to security and public order.'"[13] Indeed, the particularly serious crime bar in U.S. asylum law comes from Article 33 of the Refugee Convention.[14] Although initial drafts of the Refugee Convention did not include any exceptions to th[e] fundamental principle of *nonrefoulement*,[15] proposals were made regarding exceptions to *nonrefoulement* in "cases where the presence of a refugee would . . . constitute a danger to national security or public order[,]" "in situations where 'refugees engaged in subversive activities threatening the security of their country of asylum.'"[16] Notably, "the U.S. representative [on the committee responsible for drafting the Refugee Convention] thought 'it would be highly undesirable to suggest in the text of that Article that there might be cases, even highly exceptional cases, where a man might be sent to death or persecution.'"[17] States'

---

[10] The Proposed Rules at 69642.

[11] *Cardoza-Fonseca,* 480 U.S. at 440.

[12] *Cardoza-Fonseca,* 480 U.S. at 441.

[13] Proposed Rules at 69644.

[14] Fatma Marouf, *A Particularly Serious Exception to the Categorical Approach*, 97 Boston Univ. L. Rev., 1427, 1454 (2017).

[15] *Id.* (citing Guy S. Goodwin-Gill & Jane McAdam, *The Refugee in International Law* 203-04 (3d ed 2007)).

[16] *Id.* at 1455 (citing Research Ctr. For Int'l Law, Univ. of Cambridge, *The Refugee Convention, 1951: The Travaux Preparatoires Analysed* 326 (Paul Weis ed., 1995).

[17] *Id.* (citing Guy S. Goodwin-Gill & Jane McAdam, *The Refugee in International Law* 203-04 (3d ed 2007)).

4

AR.10636

representatives were concerned about protecting national security,[18] and "worried that some refugees would be 'tempted to engage in activities on behalf of a foreign Power against the country of their asylum.'"[19]

During the deliberations, Article 33(2) language that would have made exception to *nonrefoulement* for "offences" or "acts" was rejected, and instead "convicted by a final judgment of a particularly serious crime" was the language included in the final version.[20] Addressing what "particularly serious crime" meant, commentary indicated that "Article 33(2) should be interpreted narrowly," "the refugee must constitute a danger to the national security of the country[,]" and "capital crimes, such as murder, rape, armed robbery and arson are included" in the 'high standard' to warrant the exception.[21] Moreover, Article 33(2) has been understood to require both that the refugee have been convicted of a particularly serious crime *and* that he constitutes a danger.[22] Finally, "'[t]he principle of proportionality has to be observed,'" such that "the seriousness of the crime must be balanced against the risk of persecution if the person is sent home."[23] In keeping with this understanding, UNHCR has interpreted the particularly serious crime bar to "'appl[y] to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them.'"[24] Also, for the sake of consistency, UNHCR has urged that "'the gravity of the crimes should be judged against international standards not simply by its categorization in the host State or the nature of the penalty.'"[25] Importantly, "'[i]f it is generally understood that a 'serious crime' is a capital or a very grave crime normally punished with a long imprisonment, it follows that a 'particularly serious crime,' must belong to the gravest category.'"[26]

In 1980, when the U.S. codified these international obligations in the Refugee Act, both parts of the *nonrefoulement* exception in Article 33(2) were included, providing for an exception to withholding of removal if "there are reasonable grounds to believe that the alien is a danger to the security of the United States, and if "the alien, having been convicted by a final judgment of a particularly serious crime is a danger to the community of the United States." [27] The foregoing regarding the genesis of the term "particularly serious crime" gives meaning to its place in U.S. law, and shows that Congress, the Attorney General, and the courts did not start with a blank slate when applying the particularly serious crime bar to refugees seeking withholding of removal or asylum. For the past 40 years, the meaning of "particularly serious crime" in U.S. law has been the subject of considerable statutory, regulatory, and case law

---

[18] *Id.* (citing Research Ctr. For Int'l Law, Univ. of Cambridge, *The Refugee Convention, 1951: The Travaux Preparatoires Analysed* 326, 329-30 (Paul Weis ed., 1995).

[19] Id. (citing Research Ctr. For Int'l Law, Univ. of Cambridge, *The Refugee Convention, 1951: The Travaux Preparatoires Analysed* 326, 330 (Paul Weis ed., 1995).

[20] Fatma Marouf, *A Particularly Serious Exception to the Categorical Approach*, 97 Boston Univ. L. Rev., 1427, 1454-56 (2017).

[21] *Id.* (citing Research Ctr. For Int'l Law, Univ. of Cambridge, *The Refugee Convention, 1951: The Travaux Preparatoires Analysed* 326, 342 (Paul Weis ed., 1995).

[22] *Id.*

[23] *Id.*

[24] *Id.* (citing U.N. High Comm'r for Refugees (UNHCR), Criminal Justice and immigration Bill: Briefing for the House of Commons at Second Reading ¶ 7 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf).

[25] *Id.* (citing UNHCR Briefing ¶ 10).

[26] *Id.* (citing UNHCR Briefing ¶ 7).

[27] *Id.* at 1456 (citing 8 USC §§1231(b)(3)(B)(iv)(2012) and (ii)).

5

AR.10637

development as well as scholarly analysis, and the GBLS Immigration Unit's comments here cannot give a full presentation of the challenges adjudicators and appellate agencies and courts have had in interpreting and analyzing the relevant criminal and immigration laws and standards over these decades. But the foregoing review of the genesis and initial meaning of "particularly serious crime" as it was understood when first introduced in the context of international refugee is instructive. It is obvious that the premise, the scope, and the effect of the Proposed Rules' particularly serious crime provisions bear almost no resemblance or connection to the original purpose and relevance of "particularly serious crime" convictions and refugee status.

**The Proposed Rules Depart From Any Reasonable Understanding of "Particularly Serious Crime," Impose a Draconian Categorical Approach to Asylum Eligibility Bars, and Fail to Allow for Genuine, Discerning Implementation of the Particularly Serious Crime Bar.**

In addition to the overriding concerns we have with the Departments' apparent abandonment of the U.S.' obligation to provide protection to the refugee, implementation of the specific provisions of the Proposed Rules would result in an unworkable system, one that would be less fair, less uniform, less efficient, and that would increase delays and confusion.
Purporting to establish new conditions and limitations that are not inconsistent with the INA's asylum provisions, the Departments' tellingly include the Tenth Circuit's observation that "Congress was prepared to accept administrative dilution of the asylum guarantee." [28] Here, the Departments signal that they do not regard asylum protection of the refugee as anything sacred or sacrosanct, as the protection often is viewed, perhaps due to religious teachings and stemming from the historical and religious tradition of places of worship being places of protection or sanctuary.

In any event, the Departments' Proposed Rules clearly and wrongly focus on the worthiness of the refugee rather than any realistic assessment of danger she poses. A consideration of some of the Proposed Rules' provisions illustrate the Departments' true concerns:

1. **Convictions for or allegations of domestic violence offences**

The Proposed Rules require immigration courts to step into the roles of criminal courts and determine whether an asylum applicant's conduct triggers a categorical bar to asylum eligibility. To do this, the Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether that conviction amounts to a domestic violence offence," and even extends the bar to consider whether conduct that has not resulted in a conviction nonetheless "amounts to a covered act of battery or extreme cruelty."[29]

This expands the functions of the immigration courts beyond their intended scope, requiring them to make complex determinations they are not equipped or designed to make on the nature and scope of a particular conviction or even conduct. Immigration courts do not have the same robust evidentiary rules, making it difficult if not impossible for many applicants to rebut negative evidence, even if false. Additionally, asylum trials, typically three or fewer hours under current policies, would provide insufficient time to probe both sides and present their arguments

---

[28] The Proposed Rules at 69643 (quoting R-S-C-, 869 F.3d 1176 (10th Cir. 2017)).
[29] *See* Proposed Rules at 69652

6

AR.10638

on these complex inquiries. Furthermore, asking the immigration adjudicator to examine additional evidence outside of the conviction to determine whether an applicant is barred from asylum requires them to re-litigate the nature and/or circumstances of a conviction – or conduct where there is the *lack* of one – thus violating the full faith and credit to which state court decisions are entitled.

Imposing this resource-intensive and highly-nuanced assessment on a venue not equipped to perform these tasks would prolong asylum proceedings and inevitably lead to erroneous determinations that would give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes, yet they require immigration adjudicators to engage in "minitrials" rather than relying on adjudications obtained through the criminal legal system. This could only serve to dramatically decrease efficiency and defeat the purported aim of the Proposed Rules.

The Proposed Rules fail to take a nuanced approach that situations involving possible domestic violence warrant, and in doing so threaten to capture both survivors and perpetrators in this category. The domestic violence sections of the Proposed Rules include the only automatic bar to asylum for which a conviction is not required, however domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[30] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault in the absence of a judicial determination unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

The Supreme Court has cautioned against this type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[31] Instead, for more than a century, the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[32] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[33] In *Moncrieffe v. Holder*, the Court

---

[30] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[31] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013)

[32] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[33] *Moncrieffe*, 569 U.S. at 200-201

7

AR.10639

forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[34]

## 2. Convictions for Certain Misdemeanors

The Proposed Rules seek to automatically designate certain misdemeanor offenses as particularly serious crimes that would preclude an applicant from asylum eligibility: 1) "the possession or use, without lawful authority, of an identification document, authentication feature, or false identification document"; 2) "the unlawful receipt of public benefits";[35] and 3) controlled-substances offenses, "other than a single offense involving possession for one's use of 30 grams or less of marijuana[.]"[36] However, in contravention of the statute and United States international treaty obligations, the Proposed Rules have failed to show any link between these offenses and dangerousness. Furthermore, other forms of immigration relief provide for a waiver of inadmissibility for those seeking status with misdemeanors on their records, yet the Proposed Rules trigger an automatic bar to asylum eligibility, making asylum disproportionately and counterintuitively more difficult to obtain for some of the most vulnerable people. The automatic consequences of this Proposed Rule would affect asylum-seekers more severely than applicants for other forms of immigration relief, and are inconsistent with the greater framework of our immigration laws and regulations.

The Proposed Rules also create a sweeping automatic bar to asylum eligibility for convictions involving document fraud and ignore the circumstances that give rise to such convictions. They purport to carve out an exception for "convictions for use or misuse of identification documents if the alien can show that the document was presented before boarding a common carrier for the purpose of coming to the United States, that the document relates to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry."[37] However, the exception is too narrowly defined and ignores the complexities and dangerous contingencies that asylum-seekers must navigate. Individuals fleeing persecution are often compelled to resort to fraudulent means to enter the United States or to remain safely as they wait for their asylum applications to process, but also must rely on informal networks that would prevent them from falling in the exception. Moreover, asylum-seekers are in uniquely vulnerable positions and may find themselves struggling while their applications are pending, and thus are often exploited by intermediaries who offer documentation that turn out to be

---

[34] *Id.* at 201.
[35] Proposed Rules at 69653
[36] *Id.* at 69654
[37] Proposed Rules at 69653

8

AR.10640

fraudulent.[38] On the other hand, the Proposed Rules provide no evidence or further elaboration on how fraudulent document offenses pose a danger, only citing that identity documents are "critical for general national security and public safety reasons."[39] All enforcement of violations are for the benefit of public safety, but not all of them qualify as particularly serious crimes barring an applicant from asylum; the agencies' reasoning is insufficient.

Similarly, there is no connection between unlawful receipt of public benefits and dangerousness. The Proposed Rules themselves do not state that the unlawful receipt of public benefits presents a danger to society, instead only offering that such conduct is "inherently pernicious" without providing evidence or grounds to support the statement. Though they state that it "burdens taxpayers and drains a system intended to assist lawful beneficiaries," this does not fall under the meaning of "particularly serious crimes" that the INA or the Protocol Relating to the Status of Refugees intended.[40] All enforcement of violations requires allocation of government resources. The reasoning the agencies provide does not distinguish individuals unlawfully receiving benefits as a danger to U.S. society, and it does not justify imposing the consequences of particularly serious crimes on these individuals. The BIA also suggests through its past precedential decisions that offenses rising to the level of particularly serious crimes involve an element of intentional or threatened use of force.[41] The unlawful receipt of public benefits has no such element.

Finally, the Proposed Rules also unreasonably punish drug-related offenses with disregard for the factors surrounding complex trauma and access to physical and mental health services. While some drug-related crimes may be dangerous to society, not all are, and the Proposed Rules unfairly affect people suffering from PTSD. Currently, drug-related aggravated felonies only include illicit trafficking in a controlled substance and drug trafficking. Simple possession of a controlled substance is not a "drug trafficking" crime unless it would be treated as a felony if prosecuted under federal law, as held by the Supreme Court.[42] Simple possession of any controlled substances except for Flunitrazepam are not treated as felonies and thus not considered aggravated felonies.[43] Some second convictions for possession may qualify as drug trafficking aggravated felonies, but not all.[44] The different treatment of these offenses by courts,

---

[38] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[39] Proposed Rules at 69653

[40] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268. "The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."

[41] *Delgado v. Holder*, 648 F.3d 1095 (9th Cir. 2011) ( Reinhardt, J., concurring in part and dissenting in part, "The agency's past precedential decisions also help to illuminate the definition of a "particularly serious crime." Crimes that the Attorney General has determined to be "particularly serious" as a categorical matter, regardless of the circumstances of an individual conviction, include felony menacing (by threatening with a deadly weapon),5 armed robbery,6 and burglary of a dwelling (during which the offender is armed with a deadly weapon or causes injury to another).7 Common to these crimes is the intentional or threatened use of force, the implication being that the perpetrator is a violent person.")

[42] Lopez v. Gonzales, 549 U.S. 47 (2006).

[43] *See*, 21 U.S.C. § 844

[44] *Carachuri-Rosendo v. Holder*, 560 U.S. 563 (2010); *Berhe v. Gonzales*, 464 F.3d 74, 85-86 (1st Cir. 2006).

9

AR.10641

including the Supreme Court, suggest that they do not merit blanket treatment of the same severity. Yet, the Proposed Rules seek to expand the current bars to subsume nearly all drug-related offenses and impose severe consequences across the board. Asylum-seekers are often unable to access affordable care for complex trauma, yet are much more likely to suffer from PTSD, causing them to turn to substances in a desperate attempt to self-medicate. The agencies pass blanket judgment over individuals with drug-related offenses and justify the additional categorical bar while citing misleading evidence that does not create a link between dangerousness and the offense. While the nation currently faces widespread opioid abuse, this problem is rooted in over-prescription by healthcare providers based on the assurances of pharmaceutical companies; this example is not relevant for any justification for the additional bars created by the Proposed Rules.[45] Additionally, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[46]

The foregoing sets forth some of the reasons the GBLS Immigration Unit believes the Departments should not implement the Proposed Rules. Thank you for your time and attention to the concerns we are submitting for your consideration.

Very truly yours,

Immigration Unit,
Greater Boston Legal Services

---

[45] https://www.hhs.gov/opioids/about-the-epidemic/index.html

[46] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 10 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf

10

AR.10642

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekr-ey4y
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0548
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Aleisa Moussa

---

## General Comment

America can only endure by expanding the pool of immigrants we welcome into our country. With the climate crisis on our doorstep and an increasingly mechanized economy, our definition of who deserves a safe home and place in society must expand. It feels absurd to argue the humanity and worth of those fleeing natural and man-made disasters- such people are human beings with the full spectrum of human experience and potential. These are the basic ideals that generations of immigrants fought and died for, ideals your grandparents fought to defend in WW2.

Fleeing domestic violence is an existential crisis, running from a failing government or collapsing economy or toxic environment is an existential crisis. Existing as a member of the LGBTQIA+ community in so many countries worldwide, is an existential crisis, not having the opportunity or means for necessary medical care, belonging to a persecuted group of people, is an existential crisis. Indeed, our country was formed and shaped for the better, by exactly these kinds of existential crises. I beg you to recognize the parallels between our founders, our refugees, and those suffering in detention on our borders. Both believed in the dream of a tolerant, welcoming, diverse America.

AR.10643

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekr-v9e7
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0549
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Rosemarie Hidalgo
**Address:**
   540 Fairview Ave. N
   St. Paul, 55104
**Email:** rhidalgo@casadeesperanza.org
**Phone:** 651-646-5553
**Organization:** Casa de Esperanza: National Latin@ Network for Healthy Families and Communities

---

## General Comment

See attached file(s)

---

## Attachments

AsylumEligibityBars_PublicComments-CDE-NLN_Jan2020

AR.10644

*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

To Whom It May Concern:

I am writing on behalf of Casa de Esperanza: National Latino Network for Healthy Families and Communities in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Casa de Esperanza was founded in 1982 in Minnesota to provide emergency shelter and support services for women and children experiencing domestic violence. Additionally, in 2009 Casa de Esperanza launched the National Latino Network for Healthy Families and Communities, which is a national resource center that provides training & technical assistance, research, and national policy advocacy focused on addressing and preventing gender based violence, primarily in Latino and immigrant communities. Our organization works directly with immigrant victims of domestic and sexual violence seeking services and safety. Additionally, our research staff has been involved in community participatory research projects that highlight the experiences and traumatic impact on immigrant women and their children who have fled gender-based violence from their countries of origin.[1] Based upon these local and national experiences, we strongly oppose the proposed rule.

---

[1] Casa de Esperanza's research director collaborated with two other researchers to conduct a study regarding the impact of detention on immigrant women and children who were fleeing gender-based violence. *See* Heffron, Laurie Cook; Serrata, Josie V.; and Hurtado, Gabriela, "Latina Immigrant Women & Children's Well-Being & Access to Services After Detention" (2018). *Latino Public Policy*. 6. https://scholar.smu.edu/latino-policy/6

1

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

I.   Immigrant Survivors Flee to the U.S. to Seek Asylum as a Last Resort in Desperate Hope of Finding Safety and Protection.

Immigrant survivors who flee to the U.S. to seek asylum have endured horrific domestic violence, sexual assault, rape, and other gender-based forms of abuse that have threatened their and their children's lives. The journey to the U.S. is a dangerous one. Still, survivors traverse the hundreds to thousands of miles because they strongly believe that it is safer to make the journey for the possibility of finding safety and protection in the U.S. than to stay in their home countries where their governments fail to provide adequate protections for them from their abusers and perpetrators.

Many survivors of domestic violence and their children have endured years of abuse, terror, fear, and powerlessness before they finally take the steps to escape from their abusers to come to the U.S.[2] Many immigrant survivors of sexual assault and rape are subjected to multiple attacks, stalked, or at risk of being murdered by their perpetrators. They are compelled to flee to the U.S. because they recognize that they will never be able to feel safe again if they remain in their home countries.[3] Asylum is therefore for many immigrant survivors their only chance of finally obtaining safety and protection. Immigrant survivors of violence do not make the decision to seek asylum in the U.S. lightly. They must leave everything and everyone they know, brace themselves for the tremendous peril that awaits them and their children during their journey, and traverse the many miles with very few possessions of their own – often with nothing but the clothing on their backs.

The proposed rule released by DHS and DOJ proposes to bar many of these vulnerable and traumatized immigrant survivors of violence from qualifying for asylum. Specifically, the proposed rule seeks to 1) establish *seven* new bars to eligibility for asylum, 2) authorize immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining eligibility for asylum, and 3) rescind a provision in the current regulation regarding reconsideration of discretionary denials of asylum. Immigrant survivors of violence

---

[2] See for example, Dilawar, A. (August 10, 2018). How Anti-Immigration Policy Spurs Domestic Violence. *Pacific Standard*. Retrieved from https://psmag.com/social-justice/how-anti-immigration-policy-spurs-domestic-violence; Morrisey, K. (October 1, 2018). Refugee women struggle to confront domestic violence amid deportation fears. *San Diego Union Tribune*. Retrieved from https://www.sandiegouniontribune.com/news/immigration/sd-me-refugees-dv-20181001-story.html ; Stillman, S. (January 8, 2018). When Deportation Is a Death Sentence. The New Yorker. Retrieved from https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.
[3] *Id.*

already face numerous barriers to applying for asylum for which the standard is already high[4], and these proposed changes will only serve to create more barriers and prevent immigrant survivors from obtaining the asylum protections they desperately need. Rather than restricting access to protection, the administration should continue to expand opportunities for vulnerable immigrant survivors to access safety and protection.

In 2018, immigrants from Venezuela and the Northern Triangle countries – Guatemala, El Salvador, and Honduras – made up one half of the asylum seekers who filed for affirmative asylum – meaning individuals seeking asylum who are present in the U.S. and are not in removal proceedings.[5] Immigrants from these same countries also made up the majority of the asylum seekers in the defensive asylum process – meaning asylum seekers who are in removal proceedings.[6] Venezuela and the Northern Triangle countries are notorious for being places where it is extremely dangerous to be a woman. Many immigrant women and children who flee from these four countries to seek asylum in the U.S. have survived horrendous violence and trauma. As a local domestic violence service provider in the Twin Cities in Minnesota, we have heard these stories from advocates working to help immigrant survivors. Furthermore, as a national network and resource center, we have heard similar stories from advocates and researchers in numerous states in their interactions with immigrant survivors.

In Venezuela, women and girls become victims of homicide by a rate of 24.5 per every 100,000 women, putting Venezuela as the country with the second highest femicide rate in 2016 when looking at countries that are not currently in an armed conflict.[7] According to one journalist, "In 2019, despite the mass migration and even the drop in certain violent crimes, the number of femicides in Venezuela, instead of dropping, has increased. From January to July of 2019, 262 women have been murdered,"[8] which is indicative that femicide rates are still very high. Furthermore, among 357 cases brought before the International Criminal Court regarding violence, abuse, and torture perpetrated by security forces against political prisoners, 190 were about rape and sexual abuse.[9]

---

[4] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" Washington Post, July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story html.

[5] Mossaad, N., United States Department of Homeland Security, Office of Immigration Statistics, Office of Strategy, Policy & Plans (October 2019). Refugees and Asylees: 2018. Available at https://www.dhs.gov/sites/default/files/publications/immigration-statistics/yearbook/2018/refugees_asylees_2018.pdf

[6] *Id.*

[7] Mathema, S. (2018, June 1). They Are (Still) Refugees: People Continue to Flee Violence in Latin American Countries. *Center for American Progress*. Retrieved from: https://www.americanprogress.org/issues/immigration/reports/2018/06/01/451474/still-refugees-people-continue-flee-violence-latin-american-countries/.

[8] Galaviz, Daisy. August 2019. "More Misery, More Femicides in Venezuela." Caracas Chronicles. Available at: https://www.caracaschronicles.com/2019/08/30/more-misery-more-femicides-in-venezuela/

[9] United States Department of Justice (2018). Venezuela 2018 Human Rights Report. Retrieved from: https://www.justice.gov/eoir/page/file/1160296/download.

El Salvador and Honduras have among the highest death rates for women in the world.[10] However, with a 95% impunity rate for sexual assault crimes and femicide crimes, perpetrators and abusers in Honduras rarely face consequences.[11] The rate of violent death for women in El Salvador is the third highest in the world,[12] and seven out of every ten victims of sexual violence are under the age of 20.[13] In Guatemala, acts of violence against women are the most reported crimes, with an average of 560,000 reports a year.[14] Physical and sexual violence against women and girls is generally committed by gang members and family members, but also by law enforcement and other governmental actors.[15] Rape and other sexual violence is deeply embedded within gang culture and frequently used as a form of territorial domination.[16] The United Nations has categorized this type of violence and the forced recruitment of girls and women as constituting a contemporary form of slavery.[17] Domestic violence and family violence are also pervasive in all three countries. According to one local NGO in El Salvador, approximately 70 percent of sexual assault perpetrators know the victim and 20 percent are family members.[18]

The asylum protections in the United States need to enhance access to protections and safety for survivors of domestic violence and sexual assault fleeing gender-based persecution, not continue to roll back asylum protections and add increased barriers. For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[19]

---

[10] Small Arms Survey (November 2016). A Gendered Analysis of Violent Deaths. Small Arms Survey Research Notes, Number 63, 1-8. Retrieved from: http://www.smallarmssurvey.org/fileadmin/docs/H-Research_Notes/SAS-Research-Note-63.pdf.

[11] United Nations Human Rights Office of the Commissioner (10 July 2014). Honduras: UN human rights expert calls for urgent action to address impunity for crimes against women and girls. Retrieved from: https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=14847&LangID=E.

[12] O'Toole, M. (2018, March 4). El Salvador's Gangs Are Targeting Young Girls. *The Atlantic*. Retrieved from: https://www.theatlantic.com/international/archive/2018/03/el-salvador-women-gangs-ms-13-trump-violence/554804/.

[13] Lobo-Guerrero, C. (2017, September 2). In El Salvador, 'Girls Are a Problem.' *The New York Times*. Retrieved from: https://www.theatlantic.com/international/archive/2018/03/el-salvador-women-gangs-ms-13-trump-violence/554804/.

[14] Piette, C. (2015, December 5). Where women are killed by their own families. *BBC News*. Retrieved from: https://www.bbc.com/news/magazine-34978330.

[15] See Women on the Run; see also Kids in Need of Defense, Neither Security nor Justice: Sexual and Gender Based Violence in El Salvador, Honduras, and Guatemala, May 4, 2017, https://supportkind.org/wp-content/uploads/2017/05/Neither-Security-nor-Justice_SGBV-Gang-Report-FINAL.pdf.

[16] Andrea Fernández Aponte, Latin America Working Group, "Left in the Dark: Violence Against Women and LGBTI Persons in Honduras and El Salvador," Mar. 7, 2018, https://www.lawg.org/left-in-the-dark-violence-against-women-and-lgbti-persons-in-honduras-and-el-salvador/.

[17] Kids in Need of Defense, Latin America Working Group, Women's Refugee Commission, "Sexual and Gender Based Violence (SGBV) & Migration Fact Sheet," July 2018, https://supportkind.org/wp-content/uploads/2018/08/SGBV-Fact-sheet.-July-2018.pdf.

[18] Fernández Aponte, "Left in the Dark".

[19] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

4

AR.10648

II.     The Proposed Rule Violates U.S. Obligations Under Both Domestic and International Law.

The United States has long served as a beacon of hope for immigrant survivors of domestic and sexual violence and other gender-based abuses. As a party to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the U.S. developed section 208 of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1158 to extend asylum protections to immigrants fleeing persecution. For over forty years, the United States has continued to uphold its commitment to helping and protecting those who are fleeing persecution, including gender-based persecution. However, by carving out categorical bars from asylum protection and grossly expanding the serious crime bar beyond the Convention's definition of "capital crime or a very grave punishable act," the proposed rule violates our obligations under the Refugee Convention and the INA to provide asylum seekers with fair access to asylum protections. These increased and arbitrary hurdles to protection are wholly incongruent with the letter and spirit of the commitment the United States made in the Refugee Convention and the INA to protect vulnerable refugees fleeing persecution.

III.    The Proposed Rule Will Unfairly Prevent Many Vulnerable Immigrant Survivors from Obtaining Asylum.

The proposed rule seeks to add seven new criminal bars to asylum eligibility.[20] These new bars are sweeping in scope, and several will render ineligible many vulnerable immigrant survivors who are in desperate need of protection and who would otherwise be eligible for asylum protections.

   A. The Categorical Bar for an Offense of "Smuggling or Harboring" Will Harm and Fracture Immigrant Survivors and Their Families.

The proposed rule seeks to expand the "smuggling and harboring" asylum eligibility bar to include immigrants who are convicted of assisting their spouse, children, or parents escaping persecution to come to the U.S. Under this proposal, efforts to bring children to safety will disturbingly be considered "particularly serious crimes" and classified as aggravated felonies.

Immigrant survivors who are convicted of helping their children escape from an abuser or perpetrator of sexual violence and enter the U.S. will therefore be branded as felons and ineligible for asylum. Survivors who have seized their last possible chance of protecting their children by fleeing to the U.S. will essentially be punished for seeking to build a life free from violence for themselves and their children. By depriving traumatized immigrant survivors and their children of the ability to obtain asylum protections, the proposed rule will only serve to re-traumatize survivors

---

[20]  Individuals would be ineligible to seek asylum if they are convicted of 1) a felony offense; 2) "smuggling or harboring" under 8 U.S.C. § 1324(a); 3) illegal reentry under 8 U.S.C. § 1326; 4) an offense involving "criminal street gangs"; 5) a second offense of driving while intoxicated or impaired; 6) conviction or *accusation of conduct* of acts of battery or extreme cruelty in the domestic context; 7) certain newly defined misdemeanor offenses.

and their children and cause them to remain vulnerable to experiencing even more violence and abuse.

What we have found through our shelter services is that keeping families unified and in stable environments helps them heal from their experiences of domestic violence and sexual assault. They begin to feel safe, heal, and strengthen in their resilience. Separating and criminalizing families for helping one another seek safety would be a cruel response to their realities.

> B. The Bar for Illegal Reentry Lacks Credible Justification and Criminalizes Immigrant Survivors Desperately Fleeing Violence.

The proposed rule seeks to bar all applicants convicted of illegal reentry from being eligible for asylum. This proposal wholly ignores the reality that immigrant survivors of violence who are sent back to their countries of nationality are at risk of violent retaliation from their abusers or perpetrators and may even face death. Survivors therefore often make the treacherous journey to the U.S. again after they are removed for the same exact reason they fled the time(s) before – to escape horrific domestic and sexual violence, desperately hoping that this time, they will be granted asylum and finally be safe.

Restricting asylum eligibility to exclude immigrant survivors who are convicted of illegal reentry for fleeing from violence multiple times is antithetical to the mission of the U.S. to protect the most vulnerable. An immigrant survivor who re-enters the U.S. in search of asylum is willing to undertake great risk to make the journey again to try to escape the even greater risk of being subjected to worse domestic or sexual violence when they are sent back to their country of nationality. By denying these survivors the ability to seek asylum, the proposed rule will be denying protection to some of the individuals who need it most.

> C. The Bar for Conviction or an Accusation of Conduct of Battery or Extreme Cruelty Harms Survivors.

The proposed rule seeks to make ineligible for asylum all applicants who have been convicted of domestic assault or battery, stalking, or child abuse in the domestic context. The proposed rule alarmingly takes this one step further so that immigrants who are simply accused of engaging in battery and extreme cruelty are ineligible for asylum. This proposed rule creates the *only* crime-related bar for which a conviction is not required. DHS and DOJ try to present this proposal as a way to protect survivors; however, it will cause immense harm to immigrant survivors of violence.

There are many cases in which immigrant survivors, not their abusers, are arrested and prosecuted for domestic violence offenses. Immigrant survivors who have limited English proficiency (LEP) may not be able to fully describe the situation and the abuse they experienced to police officers. In many situations where the police fail to provide meaningful language access, police officers may then turn to the *perpetrators* to interpret. In fact, a service provider explained that many survivors

are arrested in dual arrests because the police use perpetrators as interpreters.[21] In other cases, survivors are arrested and face charges for domestic violence arising from acts of self-defense or because abusive partners or perpetrators manipulate the legal system by filing false claims of abuse. Service providers report that it is common to see abusers make false allegations to police and the courts to have immigrant survivors arrested, particularly if they want them removed so that they cannot hold the abuser accountable. The proposed rule's lack of requirement of a conviction increases that likelihood, given the lack of completion of the important fact-finding role of a court. Although there is a proposed waiver for survivors who are deemed to not be the primary aggressor, the waiver is insufficient to mitigate the harm that many survivors will experience.

Additionally, not only will victim-defendants be swept in, but survivors and their families will be harmed in those cases where the allegedly abusive family member has demonstrated actual rehabilitation and accountability and provides an important contribution to the well-being and stability of the family.

Furthermore, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[22] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

### D. The Proposed Rules Cruelly Disregard the Connections Between Trauma and Involvement in the Criminal Legal System.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions.

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression,

---

[21] Casa de Esperanza: National Latin@ Network. Wrongful Arrests and Convictions of Immigrant Victims of Domestic Violence: Stories from the Field. Retrieved from https://www.nationallatinonetwork.org/images/files/Quote_Sheet_for_Hill_Visits_-_Service_Providers.pdf.

[22] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

anxiety, and/or post-traumatic stress disorder (PTSD).[23] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[24]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[25] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[26] some turn to drugs and alcohol in an effort to self-medicate.[27] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. Particularly given the vulnerabilities of asylum-seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery and rehabilitation is simply cruel.

> E.  The Eligibility Bar for Misdemeanor Document Fraud Ignores Migration-related Circumstances.

One of the misdemeanor offenses that would render an immigrant ineligible for asylum is the use of fraudulent documents. This bar will sharpen the tools of control and coercion used by abusers and punish immigrant survivors who have themselves fallen victim to fraud. Abusers often hide or destroy survivors' documents in order to exert dominance and prevent survivors from being able to leave the relationship. As such, immigrant survivors who escape from violence must often search for other ways to obtain documentation. This leads survivors to be highly vulnerable to

---

[23] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[24] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[25] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[26] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[27] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

falling prey to fraud by individuals who falsely claim to have the ability to prepare legal documentation for them. This is particularly the case in terms of fraud perpetrated by "notarios" who claim to be immigration attorneys. Migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by these unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[28] Immigrant survivors who have fraudulent documents may therefore genuinely believe that they had taken the necessary steps to acquire legal documents.

Most survivors of violence have experienced financial abuse, where the abuser has limited their access to financial resources and forced survivors to depend on them for housing, food, health care, and other basic needs. Survivors who escape from abusive relationships therefore risk falling into poverty and homelessness. In the alternative, they are often prey for traffickers who try to lure them into situations of commercial sex trafficking, knowing that they are desperate to earn money to meet their basic needs. As such, survivors may be compelled to resort to other measures to instead obtain documentation so that they can work and sustain themselves and their children, so as not to fall into abusive situations. Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[29] Access to economic resources is absolutely critical in supporting the safety of survivors who are fleeing domestic violence, sexual assault, and human trafficking. The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. On the other hand, the expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

Barring immigrant survivors from asylum for taking measures to ensure that they could feed, clothe, and house themselves and their children is cruel and will only serve to render them even more vulnerable to exploitation.

IV.    The Proposed Rule Creates Inconsistency in Adjudications and Provides Immigration Adjudicators with an Unprecedented Amount of Authority.

The proposed rule aims to permit immigration adjudicators to determine whether a conviction or conduct related to domestic violence or battery and extreme cruelty would render an immigrant ineligible for asylum. First, the definition of battery and extreme cruelty in particular differs from state-law domestic violence criminal definitions, creating inconsistency in determining who is covered by the asylum bar. While such language is appropriate in providing protection for those

---

[28] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[29] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

seeking it, it is highly inappropriate in the context of barring individuals seeking protection against persecution. In addition, in order to properly and accurately assess domestic violence, battery, or extreme cruelty, one must have experience and in-depth knowledge of the intricacies of abuser-survivor relationships and dynamics; the nuances of the tactics abusers and perpetrators use to control, intimidate, and manipulate survivors; understanding of the ongoing pattern of behavior in abusive relationships; an understanding of specific vulnerabilities of immigrants to being victimized; and many other important analyses of the nature of abusive conduct in domestic violence situations. Immigration adjudicators, in all likelihood, lack this expertise and understanding. As such, putting the responsibility on immigration adjudicators to make these complex decisions about whether conduct amounts to a covered act of battery or extreme cruelty without court findings, following presentations of evidence under oath by adverse parties, is wholly inappropriate, and will likely result in erroneous determinations that will cruelly strip immigrant survivors of their right to seek asylum.

The proposed rule also seeks to provide immigration adjudicators with the authority to determine whether a vacated, expunged, or modified conviction or sentence should be recognized in determining whether an immigrant is eligible for asylum. This proposed change undermines the authority of state courts that have experience and expertise and allows immigration adjudicators to essentially question and disbelieve the decisions of court judges. Providing immigration adjudicators with this broad and overextending authority will compromise the ability for immigrant survivors to have a fair and full proceeding.

Additionally, the Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution, the danger of persecution should generally outweigh all but the most egregious of adverse factors."[30] Yet because of the categorical nature of the seven new bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without sufficient basis.. This will not provide adequate access to relief for asylum seeks.

V.    Alternative Forms of Relief Are Insufficient to Protecting Immigrant Survivors of Violence

The proposed rule states that immigrants who become ineligible for asylum under the seven new bars of asylum ineligibility could still qualify for other forms of protection, namely withholding of removal or protection under the Torture Convention (CAT). However, these forms of relief require a higher burden of proof than asylum, meaning that many asylum seekers excluded from eligibility under the proposed rule will face deportation back to harm if they cannot meet this higher burden. Furthermore, the protections afforded by CAT and by statutory withholding of removal are limited in scope and duration. Withholding of removal and CAT protection do not provide a path to lawful permanent residence and do not allow for freedom of travel or for family reunification, with detrimental consequences for other family members fleeing domestic and

---

[30] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

sexual violence and trafficking. Limiting protections for immigrant survivors to withholding of removal and CAT will leave them in a continued state of limbo and unable to truly build a safe and secure life for themselves and their children.

VI. Removing Reconsiderations of Discretionary Denials of Asylum Will Deprive Immigrant Survivors of the Opportunity to Seek Safety Despite Having Viable Claims of Asylum.

The proposed rule seeks to remove automatic review of a discretionary denial of an asylum seeker's application in the event that the immigrant is denied asylum solely in the exercise of discretion. Rescinding the review of discretionary denials will be extremely harmful to immigrant survivors of violence. Many immigrant survivors have limited English proficiency or lack the financial resources to retain an attorney. The immigration legal system is incredibly complex and difficult to navigate, and many immigrant survivors with viable claims for asylum find their cases denied due to these barriers. Even if the survivor is granted withholding of removal or protection under CAT, as detailed in the section above, these alternative forms of protection do not allow for the same level of relief and benefits as asylum protection. Maintaining reconsiderations of discretionary denials of asylum is therefore absolutely critical to ensuring that immigrant survivors who are eligible for asylum have another opportunity to defend and prove their right to obtain asylum protections and remain in the U.S.

VII. Conclusion

For the foregoing reasons, Casa de Esperanza: National Latino Network for Healthy Families and Communities urges DOJ and DHS to rescind the proposed rule, which violates our nation's laws and moral obligations and cruelly prevents many survivors of domestic violence, sexual assault, and human trafficking who are fleeing persecution from obtaining the asylum protections they need and deserve. We instead urge DOJ and DHS to promote policies that account for the dire reality that traumatized refugees face and seek to maximize their access to safety and protection throughout the asylum process.

Thank you for the opportunity to submit comments on the Joint Notice of Proposed Rulemaking Procedures for Asylum and Bars to Asylum Eligibility. Please contact me if you have any questions relating to these comments.

Respectfully submitted,

*Rosemarie Hidalgo*

Rosemarie Hidalgo, J.D.
Senior Director of Public Policy
Casa de Esperanza: National Latin@ Network for Healthy Families and Communities
540 Fairview Ave. N
St. Paul, MN 55104
Tel: 651-646-5553

11

AR.10655

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekr-m8a9
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0550
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Pablo DeJesus
**Organization:** Unitarian Universalists for Social Justice (UUSJ)

---

## General Comment

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 21, 2020

To Whom it May Concern:

I am writing on behalf of Unitarian Universalists for Social Justice (UUSJ) in response to the above-referenced
Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to
eligibility for asylum published in the Federal Register on December 19, 2019.

Unitarian Universalists for Social Justice is a religious, nonprofit educational and advocacy organization whose
members comprise individuals and congregations in the United States. Founded in 2000, the mission and work of
UUSJ is grounded in the principles of the Unitarian Universalist faith which recognize the inherent worth and

AR.10656

dignity of every person, the responsibility of the larger community to seek justice, equity and compassion in human relations, and the interdependent web of all existence of which we are a part. Our mission is to mobilize and amplify the voice of Unitarian Universalists as we seek to change the world through acts of love and justice.

Nearly all of our social justice activities are based on these foundational principles which inform our actions regarding immigration. We believe that many of the current policies of the United States Government are antithetical to a just, moral and equitable system of immigration of persons seeking to enter and remain in the United States of America.

For the reasons detailed in the comments that follow (uploaded), the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposals, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on these Proposed Rules. Please do not hesitate to contact Charlotte Jones-Carroll of the UUSJ Immigration Task Force to provide further information.

Sincerely,

Bob Denniston
Board Chair
Unitarian Universalists for Social Justice
7750 16th Street, NW
Washington, DC 20012

---

# Attachments

UUSJ Comments on PROPOSED RULES EXPANDING BARS TO ASYLUM ELIGIBILITY (Jan 21, 2020)

AR.10657



**Unitarian Universalists
for Social Justice**

*Submitted via www.regulations.gov*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and
Bars to Asylum Eligibility

January 21, 2020

To Whom it May Concern:

I am writing on behalf of Unitarian Universalists for Social Justice (UUSJ) in response to the
above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to
amend regulations relating to eligibility for asylum published in the Federal Register on
December 19, 2019.

Unitarian Universalists for Social Justice is a religious, nonprofit educational and advocacy
organization whose members comprise individuals and congregations in the United States.
Founded in 2000, the mission and work of UUSJ is grounded in the principles of the Unitarian
Universalist faith which recognize the inherent worth and dignity of every person, the
responsibility of the larger community to seek justice, equity and compassion in human relations,
and the interdependent web of all existence of which we are a part. Our mission is to mobilize
and amplify the voice of Unitarian Universalists as we seek to change the world through acts of
love and justice.

Nearly all of our social justice activities are based on these foundational principles which inform
our actions regarding immigration. We believe that many of the current policies of the United

AR.10658

States Government are antithetical to a just, moral and equitable system of immigration of persons seeking to enter and remain in the United States of America.

For the reasons detailed in the comments that follow (uploaded), the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposals, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on these Proposed Rules. Please do not hesitate to contact Charlotte Jones-Carroll of the UUSJ Immigration Task Force to provide further information.

Sincerely,

Bob Denniston
Board Chair
Unitarian Universalists for Social Justice
7750 16th Street, NW
Washington, DC 20012

---

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

**TABLE OF CONTENTS**

I. Introduction

II. The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

III. The Proposed Rules violate the letter and spirit of United States international treaty obligations

IV. Those precluded from asylum eligibility will be gravely impacted even if granted withholding or protection under the Convention Against Torture

V. The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

VI. The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

VII. The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

VIII. The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

IX. Conclusion

**I. Introduction**

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. These changes are unnecessary to protect public safety, are vindictive, vague and overly broad, and place unreasonable burdens on the ability of people to seek asylum protection in the United States. These changes should be abandoned, and the government should devote its limited resources to adjudicating the asylum claims of hundreds of thousands of people who seek a fair due process hearing.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

These proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections promised in and required by the laws and treaties of the United States. UUSJ submits these comments in opposition to all of the Proposed Rules and to express our grave concerns with the government's efforts to prevent refugees from obtaining the security and protection the United States asylum system has long promised. The Proposed Rules should be entirely withdrawn.

## II. The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking, it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator

of past criminal conduct. In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

*The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder. Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate. The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

AR.10662

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

### III.  The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), *even where potential refugees have allegedly committed criminal offenses.* As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country." However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act." The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum." Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness." Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the disconnection between U.S. refugee law and the Convention and would violate U.S. obligations under the Convention by creating additional categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define

AR.10663

"felony" as "any crime punishable by more than one year of imprisonment" without any reference to other factors, including dangerousness.

The Proposed Rules attempt to justify the additional categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient," but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious are placed at risk of being returned to the countries that will likely persecute, torture, and/or kill them.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute "particularly serious crimes". Under this long-standing interpretation of the "particularly serious crime" bar in the INA, there is ***no*** scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a "particularly serious crime".

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*, a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury. Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record." Excluding individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276 is also unlike any of the other "particularly serious crime" bars previously established by the Board of Immigration Appeals or Circuit Courts of Appeals. Entering without inspection is an offense with no element of danger or violence to others, and has no victim. Most significantly, and even more obviously than the other bars contained in the Proposed Rules, barring asylum based on the applicant's manner of entry clearly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence. This prohibition is an essential part of the Convention, because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

IV.    **Those precluded from asylum eligibility will be gravely impacted, even if granted withholding of removal or protection under the Convention Against Torture**

8

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules. The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to the possibility of relief that is incomplete an unlikely to be granted would severely impact people who have come to the United States seeking protection.

The most serious harm that can befall a person otherwise eligible for asylum as a consequence of these Proposed Rules is also the most likely. When a migrant faces persecution and torture upon removal to their country of origin, the fact that he or she can seek withholding of removal or protection under CAT does not remove that risk; it only makes it more likely. CAT and withholding protections demand a higher level of proof than an asylum claim: one must show a clear probability of persecution or torture, not just a likelihood. In addition, for a CAT claim to be successful, one must show that the government of the country of origin is itself involved in or knowingly tolerating the person's torture, not just that it is unable or unwilling to prevent it, as is the case with asylum claims. Thus, an individual could have a valid asylum claim but be unable to meet the higher requirements of these other forms of relief, and, therefore, would be removed to their country of origin, where they would face persecution or death.

Even those few who might meet the higher standards for withholding or CAT relief are granted very limited legal rights. They have no path to citizenship. Furthermore, they cannot travel outside the United States, despite the fact that the United Nations Convention Relating to the Status of Refugees requires refugees to have the right to travel. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document.

Under current US immigration regulations, refugee travel documents are available only to asylees. And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation." Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite their family in the United States, because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status.

AR.10665

For many, this will mean that the Proposed Rules will institute yet another official US policy to separate families. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her, if she is granted relief under CAT or withholding of removal. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban," which made the mother ineligible for asylum. This situation required the children to establish their eligibility for withholding and CAT protection independently of their mother. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future. Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, because they do not want to leave their children on their own.

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status. Asylum, once granted, protects an asylee against removal unless and until that status is revoked. None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they are subject to a removal order and, therefore, vulnerable to the permanent possibility of deportation to a third country to which they have no connection.

## V. The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency, and result in racially-biased decision-making

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case. Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts

AR.10666

to a domestic violence offense;" and to go even further by considering whether *non-adjudicated conduct* "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct not resulting in conviction*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of what could be "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of strict evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false. Asylum applicants (especially those detained) will struggle to find evidence connected to events that may have happened years prior. Asylum trials, which typically take three or fewer hours under current policies, will provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations. In turn, those will increase the number and complexity of appeals.

The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes. Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here. Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court. As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."

In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police

AR.10667

officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.

Particularly in the context of the new proposed bar related to alleged gang affiliation, UUSJ is concerned that creating a blanket exclusion from asylum for anyone convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will inevitably result in errors excluding bona fide asylum seekers. The proposed rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity.

This rule will ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial and ethnic bias.

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the erroneous return of many asylum seekers back to harm.

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes." They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then illogically leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow. In fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have a minor conviction such as a property crime.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## VI.     The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.

*The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence, if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker sought the order more than one year after the date the original conviction or sentence was entered.

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum. In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea. By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard. Even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

*The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*. The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself." In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies. In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur. Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry. Rather, "the inquiry must focus on the state court's rationale for vacating the conviction." In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction." Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there." The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

AR.10670

*The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act." Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum. The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

## VII. The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence. For

these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community. Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence. These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.

*Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution. The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States. The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States. The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration

AR.10672

of the seriousness of prior convictions. Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

*Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances. Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent. Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights. The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

*The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these

individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries. Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population. Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community. The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability. The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities. The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances. The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor. These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar. Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

*Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve. The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement. The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress. In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available. Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules

would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity. In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.

## VIII. The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs. Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes." As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful). However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications as long as they are "consistent" with the asylum statute. In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

AR.10676

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that "expressing one item of [an] associated group or series excludes another left unmentioned." The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

## IX.    Conclusion

The mission and work of UUSJ is grounded in the principles of the Unitarian Universalist faith which recognize the inherent worth and dignity of every person, the responsibility of the larger community to seek justice, equity and compassion in human relations, and the interdependent web of all existence of which we are a part. Our mission is to mobilize and amplify the voice of Unitarian Universalists as we seek to change the world through acts of love and justice.

Nearly all of our social justice activities are based on these foundational principles and inform our actions regarding immigration. We believe that the proposed rules expanding bars to asylum eligibility are antithetical to a just, moral and equitable system of immigration.

These changes are not necessary to protect public safety, are vindictive, vague and overly broad, and place unreasonable burdens on the ability of people to seek asylum protection in the United States. Furthermore, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections promised in and required by the laws and treaties of the United States. UUSJ opposes all of the proposed rules and has grave concerns with the government's efforts to prevent migrants from obtaining the security and protection the United States asylum system has long promised.

AR.10677

These rule changes should be abandoned, and the government should devote its limited resources to adjudicating the asylum claims of hundreds of thousands of people who seek a fair due process hearing. The Department of Homeland Security and the Department of Justice should immediately withdraw their current proposals to expand bars to asylum eligibility and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekr-pxt1
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0551
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Meggie Weiler
**Address:**
   1300 Spring Street
   Suite 500
   Silver Spring,  MD,  20910
**Email:** meggie.weiler@hias.org
**Phone:** 8189152749
**Organization:** HIAS

## General Comment

The two national Jewish organizations below respectfully submit this comment to oppose the Department of Homeland Security U.S. Citizenship and Immigration Services (USCIS) and the Department of Justice Executive Office for Immigration Review (EOIR) Notice of Proposed Rulemaking on the changes to Procedures for Asylum and Bars to Asylum Eligibility.

We are particularly concerned by the expansion of criminal bars to asylum included in the Proposed Rules, EOIR Docket No. 18-002, issued December 19, 2019. The Proposed Rules will punish vulnerable individuals seeking protection in the United States. It will further limit access to asylum and will be especially detrimental to already routinely criminalized individuals, including LGBTQ+ immigrants.

For the reasons detailed in the comments that follow, DHS and DOJ should immediately withdraw the Proposed Rules and dedicate their efforts to advancing policies that allow individuals to exercise their fundamental right to seek asylum. Please do not hesitate to contact us with any questions or for further information.

## Attachments

HIAS_ADL Joint Comment - EOIR Docket 18-0002 - 01212020

AR.10679

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review (EOIR)
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Service
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

January 21, 2020

**Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**

Dear Assistant Director Reid and Chief Dunn,

The two national Jewish organizations below respectfully submit this comment to oppose the Department of Homeland Security U.S. Citizenship and Immigration Services (USCIS) and the Department of Justice Executive Office for Immigration Review (EOIR) Notice of Proposed Rulemaking on the changes to Procedures for Asylum and Bars to Asylum Eligibility.

We are particularly concerned by the expansion of criminal bars to asylum included in the Proposed Rules, EOIR Docket No. 18-002, issued December 19, 2019. The Proposed Rules will punish vulnerable individuals seeking protection in the United States. It will further limit access to asylum and will be especially detrimental to already routinely criminalized individuals, including LGBTQ+ immigrants.

For the reasons detailed in the comments that follow, DHS and DOJ should immediately withdraw the Proposed Rules and dedicate their efforts to advancing policies that allow individuals to exercise their fundamental right to seek asylum. Please do not hesitate to contact us with any questions or for further information.

Karen Levit, Esq.
National Civil Rights Counsel, ADL

Meggie Weiler
Policy Officer, HIAS

AR.10680




**DETAILED COMMENTS in opposition to 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**

The two undersigned Jewish organizations welcome the opportunity to comment on the Proposed Rules to add seven additional categorical bars to asylum eligibility, EOIR Docket No. 18-002.

ADL is a leading anti-hate organization founded in 1913 to stop the defamation of the Jewish people and to secure justice and fair treatment for all. We are rooted in a community that has experienced the plight of living as refugees throughout its history. ADL has advocated for fair and humane immigration policy since our founding and has been a leader in exposing anti-immigrant and anti-refugee hate that has poisoned our nation's debate.

HIAS, founded in 1881, is the oldest refugee serving organization in the world. Today, in addition to our work in partnership with local organizations resettling and supporting refugees, HIAS works in Mexico. There, we assist asylum seekers in obtaining legal protection, conduct "know your rights" presentations and individual screenings, and help asylum seekers navigate the difficult U.S. asylum processes. Our attorneys in Mexico assess particular cases for referral to our legal partners on the U.S. side of the border for representation and also represent people who are seeking protection in Mexico.

We write today to oppose the Department of Homeland Security U.S. Citizenship and Immigration Services (USCIS) and the Department of Justice Executive Office for Immigration Review (EOIR) Notice of Proposed Rulemaking on the changes to Procedures for Asylum and Bars to Asylum Eligibility.

**United States Asylum Law Has Already Strayed far From Our Obligations under International Treaties, Returning to This Country's Shameful History of Turning Away Displaced People**

ADL and HIAS are mindful that Jews have a long history of displacement throughout the world. Many Jewish American families first came to this country as refugees and asylum seekers. We are also acutely aware of what happens when the United States flatly denies asylum to displaced

1

AR.10681

persons without consideration for the harm they may face once turned away from this country's protection, for the incident of the *St. Louis* is burned into our collective memory.

In 1939, the German ship *St. Louis* sailed for Cuba carrying 937 passengers. Almost all of them were Jews fleeing Nazi Germany. Most of the Jewish passengers had applied for U.S. visas and were planning to stay in Cuba only until they could enter the United States. However, political conditions in Cuba changed abruptly just before the ship sailed and only 28 passengers were actually admitted by the Cuban government. The remaining 908 passengers were left in limbo – unable to disembark and be admitted to Cuba and terrified of turning back. The *St. Louis* was ordered out of Cuban waters on June 2, 1939 and sailed so close to Miami that passengers could see its lights. Some of them cabled President Franklin D. Roosevelt asking for refuge. He never responded. Instead, the State Department sent a passenger a telegram stating that passengers must "await their turns on the [visa] waiting list and qualify for and obtain immigration visas before they may be admissible into the United States."[1]

The asylum seekers aboard the *St. Louis* had no choice but to return to Europe. Notably, they did not return to Germany. Jewish organizations were able to negotiate with four European governments to secure entry visas for the passengers. Germany invaded Western Europe in May 1940, trapping 532 former *St. Louis* passengers. About half – 254 people – were murdered in the Holocaust.[2]

Since turning away the *St. Louis*, the United States has become a signatory to the 1967 Protocol Relating to the Status of Refugees,[3] which binds parties to the United Nations Convention Relating to the Status of Refugees ("Refugee Convention").[4] This obligates the U.S. to comply with the principle of *non-refoulement* – an asylum seeker cannot be sent to another territory or state where they fear threats to their life or freedom on protected grounds, even if potential refugees have allegedly committed criminal offenses. Although the Refugee Convention allows signatory states to exclude and/or expel asylum seekers, this is only permitted in limited circumstances.

Under the Refugee Convention, a person can only be excluded and/or expelled if that person "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[5] This is only meant to be applied in "extreme cases" in which

---

[1] United States Holocaust Memorial Museum, Holocaust Encyclopedia, "Voyage of the St. Louis," https://encyclopedia.ushmm.org/content/en/article/voyage-of-the-st-louis.
[2] *Id.*
[3] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.
[4] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954.
[5] *Id*. at art. 33(2).

2

AR.10682

the particularly serious crime committed is a "capital crime or a very grave punishable act."[6] The United Nations High Commissioner for Refugees (UNHCR) has further elucidated what qualifies as a particularly serious crime. To be considered a particularly serious crime, the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[7] UNHCR specified that the particularly serious crime bar does not encompass less severe crimes: "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[8] Even if an asylum seeker has been convicted of a particularly serious crime, an adjudicator considering whether an individual should be barred from protection for that conviction must conduct an individualized analysis and consider any mitigating factors.[9]

It was not until 1980 that the United States asylum system was codified in statute through the Refugee Act. Along with other measures designed to bring the U.S. domestic legal code into compliance with the Refugee Convention, the Refugee Act created a "broad class" of refugees eligible for a discretionary grant of asylum.[10]

Under the current asylum system, displaced persons seeking asylum have the evidentiary burden of establishing that they are eligible for asylum.[11] They must do this in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[12] The obstacles to winning asylum are overwhelmingly high; indeed, in some areas of the country and before some immigration judges, it is almost impossible to succeed.[13]

---

[6] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

[7] U.N. High Commissioner for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[8] *Id.* at ¶ 10.

[9] *Id.* at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

[10] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[11] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[12] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[13] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

3

AR.10683

**The Proposed Rules Will Preclude Even More Individuals from Asylum Protections**

The Proposed Rules come at a time when a number of newly imposed barriers to accessing asylum in the United States have made the system even harder for refugees to navigate.[14] A series of policies enacted over the past several years act as an overlapping web to preclude asylum eligibility for untold numbers of displaced persons simply because of their national origin, manner of entry, or flight path.[15] This includes a July 2019 Interim Final Rule in which the Administration barred from asylum any individual who transits through a third country before arriving at the United States Southern border, disqualifying all but Mexican asylum seekers at the Southern border.[16]

In addition to these policy changes, included in the Proposed Rules is a bar for individuals convicted of illegal reentry under Section 1326 of the Immigration Nationality Act from asylum.[17] The agencies justify this change by arguing that this crime suggests repeated disregard for immigration laws given that asylum seekers can present their claim at a port of entry without reentering the United States.[18]

However, for asylum seekers today, illegal reentry is not a disregard of the laws but rather an attempt – at any cost – to seek safety in light of policies that physically prevent them from doing so. For several years, through the practice of "metering," the United States has been blocking access to asylum at the Southern border by refusing to process protection requests and forcing individuals to wait on a list before they are able to even approach a border agent.[19] In a study of the policy published by the Department of Homeland Security (DHS) Office of Inspector General (OIG), the agency determined that metering would push many migrants – who attempted to present to border agents – to subsequently cross between ports of entry in an attempt to secure safety faster.[20] Additionally, just last week the Administration began implementation of an Asylum Cooperative Agreement (ACA) with Guatemala at the border, which permits the U.S. to send asylum seekers from Honduras, El Salvador, and possibly Mexico to Guatemala to seek

---

[14] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees.

[15] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees.

[16] 84 Federal Rg. 33829 (July 16, 2019). https://www.federalregister.gov/documents/2019/07/16/2019-15246/asylum-eligibility-and-procedural-modifications

[17] *See* 8 U.S.C. § 1326.

[18] Proposed Rules at 69648.

[19] Congressional Research Service, "The Department of Homeland Security's Reported "Metering" Policy: Legal Issues," August 13, 2019. https://fas.org/sgp/crs/homesec/LSB10295.pdf

[20] Department of Homeland Security Office of Inspector General, OIG 18-84, *Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy.* (2018).

4

AR.10684

protection.[21] The establishment of these policies, coupled with the devastating Migrant Protection Protocols, are evidence that it is virtually impossible for asylum seekers – especially those arriving at the Southern border – to access the U.S. asylum system at all. This leaves them with few other options for reaching safety beyond crossing between ports of entry.

Precluding this population from being eligible for asylum protections is a clear violation of Article 31 of the 1951 Refugee Convention that states "[t]he Contracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of article 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence."[22] Taking away eligibility for asylum – for those who have been pushed back from official ports of entry or from speaking with border agents – because they reenter the United States out of fear for their lives, represents a clear abdication of both our responsibilities under the Refugee Convention and adherence to our own asylum practices and laws.

**Alternative Forms of Relief Are Not Adequate Substitutes for Asylum Ineligibility**

As a means of justifying these additional bars to asylum eligibility, the Administration has pointed to the availability of alternative forms of relief.[23] However, the availability of these protections does not nullify the harm caused by the Proposed Rules' new limits on asylum.

The two alternatives, withholding of removal and protection under the Convention Against Torture (CAT), do not offer the same protections as asylum and are significantly harder to obtain. To qualify, asylum seekers must prove that there is a clear probability they will face persecution or torture – a higher bar than the credible fear threshold for asylum.[24] Due to this higher burden of proof, many individuals with a valid refugee claim who may have obtained asylum had they not been barred due to the Proposed Rules will be removed to their country of origin to face persecution or even death.

---

[21] Mica Rosenberg, "U.S. Implements plan to send Mexican asylum seekers to Guatemala," *Reuters,* January 6, 2020. https://www.reuters.com/article/us-usa-immigration-idUSKBN1Z51S4

[22] Refugee Convention, *supra*, at art 31.

[23] *See, e.g.,* Proposed Rules at 69644.

[24] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

5

AR.10685

Even for those individuals who are able to meet the higher standard, withholding and CAT still fall short.[25] In addition to the fact that recipients do not have access to permanent residency or citizenship, there are risks of prolonged family separation and significant hurdles to accessing employment authorization. Withholding and CAT do not allow for international travel and recipients cannot be reunited with family in the United States because only those granted asylum are eligible to petition for a spouse or child to join them as derivatives on that status.[26] As such, this protection leaves many individuals in limbo; it does not offer them the security and safety needed for refugees to heal from trauma and to fully rebuild their lives.

**The Proposed Rules are Unnecessary Given the Existing Bars to Asylum**

Asylum is a discretionary immigration benefit. Immigration adjudicators already have vast discretion to deny asylum to those who meet the definition of refugee but have been convicted of certain types of criminal conduct. Therefore, the agencies' efforts to add additional categories of barred conduct for asylum eligibility is simply unnecessary.

There already exist several outright bars to asylum, including: individuals who are convicted of a "particularly serious crime;" individuals who committed a "serious nonpolitical crime outside of the United States;" individuals who are a danger to the security of the United States; individuals who are inadmissible or removable due to terrorist activity; individuals who were "firmly resettled" in another country prior to arriving in the United States; and individuals who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.[27]

Under current law, an individual with a criminal record can have asylum denied by an Immigration Judge or Asylum Officer as a matter of discretion. The Proposed Rules specifically outline the conduct that will preclude asylum seekers from obtaining protection, which removes the life-saving discretion of immigration adjudicators to determine whether the circumstances of a specific case merit preclusion from asylum protection that, for many, will end in removal and persecution.

These Proposed Rules are particularly troubling when it comes to criminal behavior related to the smuggling or harboring of an alien. Under the current law, smuggling an undocumented person into the country is already a ground of inadmissibility, a ground of deportability, a crime

---

[25] Ibid.

[26] 8 C.F.R. § 208.21(a).

[27] "Asylum Bars", U.S. Citizenship and Immigration Services, April 1, 2011, https://www.uscis.gov/humanitarian/refugees-asylum/asylum/asylum-bars

6

AR.10686

indicative of moral turpitude, a bar to a finding of good moral character,[28] and a conviction for alien smuggling is considered an aggravated felony.[29]

A conviction for alien smuggling can be an aggravated felony, which is considered a particularly serious crime.[30] Courts have explained that harboring or transporting undocumented immigrants is a separate offense that does not in and of itself trigger the inadmissibility or deportability ground for alien smuggling. However, it may carry criminal penalties and a conviction for harboring or transportation may trigger the aggravated felony ground of deportability.[31] An aggravated felony is a ground of deportability, a bar to many forms of relief, and a permanent bar to establishing good moral character if the conviction occurred on or after November 29, 1990. Someone can be convicted of alien smuggling even if that person was not paid and was helping a friend or relative, and even if no sentence was imposed. This would still be considered an aggravated felony for immigration purposes.[32]

At the moment, there is only a narrow, discretionary waiver available to asylum seekers who would otherwise be deemed inadmissible on the grounds of an alien smuggling conviction. The person applying for the waiver must have one of two specified legal statuses and, notably, must have been convicted of smuggling only their spouse, parent, or child – and no other individual. This discretionary waiver is already unavailable for convictions based on smuggling siblings, fiancés, grandparents, cousins, or other relatives. Furthermore, a discretionary waiver of inadmissibility or deportability for alien smuggling will not help an applicant who must establish good moral character.[33]

The Proposed Rules specifically seek to close this exception. They "would broaden [the asylum] bar so that first-time offenders who engage in illegal smuggling or harboring to aid certain family members, in violation of section 1324(a)(1)(A) or (2), are deemed to have committed particularly serious crimes."[34] The existing exception acknowledges the human need to be with one's family, and accordingly treats an asylum seeker who committed a crime in furtherance of that basic need as not having committed a "particularly serious crime" for asylum purposes. Under the change being sought, asylum seekers with a valid refugee claim will end up barred

---

[28] Good moral character is a requirement for naturalization, non-Lawful Permanent Resident cancellation of removal, self-petitioning and cancellation of removal under the Violence Against Women Act (VAWA), registry, and one of the forms of voluntary departure.

[29] Alison Kamhi and Rachel Prandini, "Alien Smuggling: What It Is and How It Can Affect Immigrants," Immigrant Legal Resource Center, *Practice Advisory*, July 2017, https://www.ilrc.org/sites/default/files/resources/alien_smuggling_practice_advisory-20170718.pdf at 6.

[30] INA § 274(a)(1)(A), INA § 274(a)(2).

[31] Kamhi at 3.

[32] Kamhi at 6.

[33] *Id.* at 4.

[34] Proposed Rules: Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. 69640, 69647-8 (Dec. 19, 2019).

7

AR.10687

from protection and facing unusually harsh consequences for reconciling with immediate family members.

Given that adjudicators already have the discretion to deny relief to most asylum seekers who have been convicted of smuggling or harboring an alien, this proposed change is an unnecessary check on judicial discretion in asylum cases. Indeed, its primary effect will be to further tear apart families seeking refuge in this country – a more subtle version of the family separation practices already in effect at the Southern border. This would be in line with revelations of the Administration's efforts to use smuggling prosecutions against parents and caregivers as a strategic cudgel in its efforts to discourage displaced families from seeking asylum within our borders.[35] That does not make the Proposed Rules any less an abdication of both our moral duty and our responsibilities under the Refugee Convention.

**Differentiating Among Misdemeanor Convictions**

The United States will only be moving further from its international treaty obligations governing displaced persons by adding Fraudulent Document Offenses, Public Benefits Offenses, and Controlled Substances Offenses as bars to asylum. In previous cases, the Board of Immigration Appeals has cautioned against unusually harsh punishment, and we agree with their assessment that "in such a case, the discretionary factors should be carefully evaluated in light of the unusually harsh consequences which may befall an alien who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[36]

Under the Refugee Convention, a signatory state is only supposed to deny an asylum applicant's valid claim if that person commits a particularly serious crime and therefore poses a danger to the community.[37] The additional bars to asylum put forth in the Proposed Rules simply do not meet that very high standard. Indeed, UNHCR has already specified that less severe crimes, including the possession of illicit substances for personal use, do not meet the standard of being particularly serious crimes demonstrating that one is a danger to the community.[38] Yet the Proposed Rules seek to disqualify any person from asylum eligibility who is convicted of possession or trafficking of a controlled substance or controlled-substance paraphernalia other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

---

[35] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[36] Ibid.

[37] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

[38] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

8

AR.10688

This would put someone with two possession convictions for personal-use quantities of marijuana in the same category as a career drug dealer.[39] It is precisely in cases like these that a fact-specific inquiry and adjudicator discretion remain a vital necessity for asylum determinations.

Asylum can mean the difference between life and death. Without access to asylum, displaced people who are guilty of minor infractions will find themselves banished to a place where they risk persecution or death – a punishment that clearly does not fit the crime. Therefore, these minor misdemeanor crimes should continue to fall within the discretion of an asylum adjudicator so they can be assessed on a case-by-case basis and should not be part of a designated list of bars to asylum eligibility.

**The Proposed Rules Will Disproportionately Harm LGBTQ+ Refugees**

The Proposed Rules will have the cumulative effect of making it even more difficult to obtain asylum relief for LGBTQ+ refugees who are also vulnerable to being survivors of trafficking and/or survivors of domestic violence. These refugees are particularly unlikely to know that they are eligible for asylum relief until a law enforcement encounter leads them to a service provider who can advise them of their options. Under the Proposed Rules, that advice may already come too late.

For LGBTQ+ asylum seekers, their home countries may have been a site of violence and disenfranchisement from the public sphere.[40] Following their migration, LGBTQ+ refugees often find themselves isolated from their kinship and national networks. Although they came here seeking safety, undocumented LGBTQ+ immigrants are the disproportionate targets of anti-LGBTQ+ hate violence in the United States.[41] This isolation, violence, and the general discrimination against the LGBTQ+ community leave many LGBTQ+ refugees vulnerable to trafficking, substance abuse, and domestic violence.

The inclusion of offenses related to domestic violence in the expanded asylum bars – the only categorical bar to asylum for which a conviction is not required – harms members of the LGBTQ community who are survivors of domestic violence and/or trafficking.[42] This is especially true

---

[39] *Proposed Rules* at 69654.

[40] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[41] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[42] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as

AR.10689

because domestic violence incidents often involve the "cross-arrest" of both perpetrator and survivor.[43] Allowing asylum adjudicators to determine the primary perpetrator of domestic violence, absent a conviction, places an unfair burden on survivors who are wrongly arrested. Additionally, increased cooperation between local law enforcement and federal immigration officials further harms LGBTQ immigrants by leaving them particularly vulnerable to the fear of reporting intimate partner and hate violence and the domino effects of over-policing.[44] Thus, LGBTQ asylum seekers caught up in biased policing practices or whose involvement in the criminal justice system is often related to trauma will be disparately impacted by the Proposed Rules that increase the bars to asylum eligibility.

**Recommendations for DHS and DOJ**

As demonstrated above, the Proposed Rules are harmful to refugees seeking protection in the United States and unnecessary given the discretionary nature of asylum. We believe that the discretion of immigration adjudicators in assessing each individual asylum claim is critical to maintain the protections outlined in the 1951 Refugee Convention, the 1967 Protocol, and the United States' own laws. Instead of expanding the existing crime bars to asylum, DHS and DOJ should instead:

1. Invest in more asylum officers and immigration judges to review, process, and adjudicate asylum claims. This will allow for the critical discretionary nature of asylum to continue in a way that provides refugees with the opportunity to exercise their fundamental right to seek protection and have their claims heard and evaluated through a fair process. It will also address the overwhelming backlog of pending asylum cases, which just last year hit a record high of 1,071,036, and leaves asylum seekers waiting for months and years for final decisions on their status, and[45]

2. End any efforts to expand the already comprehensive list of bars to asylum. Each asylum claim is different, and each asylum seeker has unique circumstances. Given the humanitarian nature of asylum, immigration adjudicators should be able to hear the

---

posession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[43] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[44] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

[45] TRAC Immigration, Syracuse University, *Backlog of Pending Cases in Immigration Courts As of November 2019* (November 2019). https://trac.syr.edu/phptools/immigration/court_backlog/apprep_backlog.php

10

AR.10690

asylum claims of those in need of protection and should have the discretion to make decisions on a case-by-case basis. Expanding widespread bars to asylum that prevent individuals from exercising their right to make a claim for protection undermine both the Refugee Convention and U.S. law.

We believe that the U.S. should be investing in building a more efficient asylum system to ensure that all asylum claims are heard and adjudicated fairly. We do not believe in placing obstacles in the way of refugees seeking protection, either through access to asylum in the courts or at our borders.

11

AR.10691

# PUBLIC SUBMISSION

| |
|---|
| **As of:** January 23, 2020 |
| **Received:** January 21, 2020 |
| **Status:** Posted |
| **Posted:** January 22, 2020 |
| **Tracking No.** 1k4-9ekr-x4ob |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0552
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Kelly Anderson
**Address:**
    1530 James M Wood Blvd
    Los Angeles,  CA,  90015
**Email:** kanderson@ccharities.org
**Phone:** 213-251-3527

## General Comment

Please see attached comment on behalf of Esperanza Immigrant Rights Project in opposition to the Proposed Rules.

Sincerely,

Esperanza Immigrant Rights Project
Catholic Charities of Los Angeles

## Attachments

Comment to Proposed Rule

AR.10692




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachuesetts Ave NW
Washington, DC 20529-2140

 Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125
 AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for
 Asylum and Bars to Asylum Eligibility

January 21, 2020

To Whom it May Concern:

I am writing on behalf of Esperanza Immigrant Rights Project, a program of Catholic Charities
of Los Angeles (hereinafter, "Esperanza") in response to the above-referenced Proposed Rules to
express our strong opposition to the Proposed Rules to amend regulations relating to eligibility
for asylum published in the Federal Register on December 19, 2019.

Esperanza is an immigration-focused public interest organization that advocates for the rights of
immigrants through community education and direct representation. Upon appointment by the
immigration court, Esperanza also represents *Franco-Gonzalez v. Holder* class members, who
are individuals that the immigration court identifies as incompetent to represent themselves in
detention or removal proceedings. We assist individuals, whether *pro se* or by direct
representation, in applying for relief in the forms of asylum, withholding of removal, and
protection under the United Nations Convention Against Torture.

For the reasons detailed in the comments that follow, the Department of Homeland Security and
the Department of Justice should immediately withdraw their current proposal, and instead
dedicate their efforts to ensuring that individuals feeling violence are granted full and fair access
to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate
to contact Kelly Louise Anderson, at kanderson@ccharities.org to provide further information.

AR.10693



**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax



Sincerely,

Kelly Louise Anderson
Managing Attorney
Esperanza Immigrant Rights Project

ER-2658

AR.10694




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

### I.     Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. The Proposed Rules seek to bar asylum to those who constitute a "danger to the community" due to criminal convictions or conduct, even though the asylum laws already extensively prohibit asylum to individuals with criminal convictions. Immigration laws are civil in nature, not criminal, and yet the DHS and the DOJ, by their reasoning for the Proposed Rules, seek to additionally punish noncitizens who have already served sentences under U.S. state or federal criminal laws; and to punish noncitizens for criminal conduct that has not been found to be true by a criminal court. The current asylum laws already bar individuals convicted of aggravated felonies and particularly serious crimes from receiving asylum, which obviates the need for additional criminal bars. Thus, Esperanza adamantly opposes the Proposed Rules.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. Esperanza submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the

AR.10695





**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.[1]

## II. The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility.

The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope, and adding more barriers is cruel and unnecessary. The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[2] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[3]

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger.[4] Many see the

---

[1] Commenters should be guided by the following administrative law principles:

- Commenters bear the burden of showing that any comment reflects a material issue that should be considered. *See, e.g.*, *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553–54 (1978); *see also Thompson v. Clark*, 741 F.2d 401, 408-09 (D.C. Cir. 1984) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)); *accord Petaluma FX Partners, LLC v. C.I.R.*, 792 F.3d 72, 81 (D.C. Cir. 2015).
- For purposes of preserving an issue for litigation, comments must be specific enough to provide the agency with meaningful notice of the issue. *U.S. Dep't of Transp. v. Public Citizen,* 541 U.S. 752, 764 (2004) (quoting *Vermont Yankee*, 435 U.S. 519, 553 (1978)); *see generally Post-Acute Medical at Hammond, LLC v. Azar*, 311 F.Supp.3d 176, 185 (D.D.C. 2018).
- To preserve an issue for litigation, the issue need only be adequately raised by one commenter. If an organization decides to bring a legal challenge on a particular issue, it need not have raised that issue itself, so long as some other organization discussed the issue in their comments. *See Natural Res. Def. Council, Inc. v. EPA*, 824 F.2d 1146, 1151 (D.C.Cir.1987); *Central New York Fair Business Ass'n. v. Jewell*, 2015 WL 1400384, at *10 (N.D.N.Y. 2015); *Northern Arapaho Tribe v. Burwell*, 118 F.Supp.3d 1264, 1279 (D. Wyo. 2015).

[2] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[3] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[4] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief see described

AR.10696




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[5] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[6] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[7]

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[8] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[9] The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[10] Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[11] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[12]

---

throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[5] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[6] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[7] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[8] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[9] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[10] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[11] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[12] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6,




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[13] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[14] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[15] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[16] The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum, including for serious criminal history.[17]

Esperanza defends children, families, and adults who are seeking asylum, which include people who have recently arrived to our country's borders fleeing persecution; people who have come to the United States for a better life but who are now facing deportation and threat of harm in their home countries; and people who have serious mental health issues who would not receive the treatment they need in their home countries and face harm as a result. Many of Esperanza's detained clients, particularly those with mental health issues, already are ineligible for asylum due to criminal convictions without the new Proposed Rules. Even clients with significant criminal records who are statutorily eligible for asylum are often denied asylum at Immigration Judge's discretion. Clients with criminal records already face an uphill battle when applying for asylum despite the likelihood that they will face persecution or torture if returned to their home countries. In fact, having a criminal record in the United States often makes the likelihood of persecution in certain countries even greater.

---

2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[13] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[14] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[15] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[16] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[17] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

AR.10698




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

Being convicted of a crime does not erase the reality that the person convicted would face persecution or torture in the country to which they are deported. Even without the Proposed Rules, Esperanza's clients have been and will continue to be denied asylum and deported to countries that will persecute or torture them for such things as being a woman, for being a part of the LGBTQ community, for speaking out against their country's political climate, for being perceived gang members, for having serious mental health diagnoses, and for being criminal deportees. The Proposed Rules only create needless categories for what is already occurring in large numbers, while eliminating the opportunity for individuals with legitimate asylum claims and relatively minor criminal histories to show that they have rehabilitated and merit relief.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[18] Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes. One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than one year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[19] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. The Proposed Rules, however, would create a bar to asylum for individuals convicted of any crime that have a <u>potential</u> sentence of more than one year, even if a judge has ordered that the individual serve no time at all. Thus, conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[20]

---

[18] *See id.*
[19] *See* U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).
[20] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee

AR.10699

 

**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[21] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

Many of Esperanza's clients who have criminal convictions are not found guilty by a judge or jury in criminal proceedings. In fact, many of the Esperanza's clients end up with criminal convictions for pleading *nolo contendere*, or no contest. No contest pleas are not formal admissions of guilt, but rather are a type of plea that allow a defendant to be sentenced without having to admit to the factual allegations of the crime.[22] To avoid the possibility of harsh sentences, a defendant may agree to "a plea of nolo contendere to a lesser offense reasonably related to the offense charged."[23] However, no contest pleas are still considered "convictions" for immigration purposes. Thus, the Proposed Rules would deem many Esperanza clients ineligible for asylum simply because, according to the DHS and DOJ, they are inherently dangerous to the community–even though the clients chose to plead no contest under a perfectly reasonable and viable legal option under California law.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[24] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[25]

---

Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").
[21] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.
[22] Cal. Pen. Code § 1016.
[23] *People v. West*, 3 Cal.3d 595, 595 (1970).
[24] *Pula*, 19 I.&N. Dec. at 474.
[25] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

AR.10700





**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

The Proposed Rules also cruelly disregard the connections between trauma and involvement in the criminal legal system. The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[26] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[27]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[28] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[29] some turn to drugs and alcohol in an effort to self-medicate.[30] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving

---

[26] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[27] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[28] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[29] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[30] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

AR.10701



**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax



under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order. Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

The Immigration Court itself appoints qualified representatives from Esperanza to individuals who struggle with mental health issues and are incompetent to represent themselves. Esperanza currently represents more than 75 individuals who have been found incompetent by the Immigration Court. These individuals suffer from a range of mental health diagnoses including, but not limited to, severe PTSD, major depressive disorder, schizophrenia, psychotic disorders, neurocognitive deficits, dementia, traumatic brain injuries, and intellectual disabilities. Unfortunately, clients with mental health symptoms tend to struggle with poverty and end up self-medicating with drugs or alcohol. This poverty and subsequent self-medication has led many clients to being convicted of drug and alcohol-related offenses. However, Esperanza's clients have access to a case manager who connects clients with rehabilitation services, housing, and treatment to prevent their recidivism. In some cases, qualified representatives have been able to reunite clients with their estranged families, which has led to their full recovery. Many clients are successful and go on to live productive and healthy lives, especially if they are granted asylum in the end. The Proposed Rules would discount the work that Esperanza's program does on behalf of clients with mental health issues. The Proposed Rules would make ineligible for asylum individuals that have, through the most difficult of circumstances, cleaned up their lives–simply because of their past convictions that undoubtedly relate to their untreated mental health.

**III.    The Proposed Rules violate the letter and spirit of United States international treaty obligations.**

By acceding to the 1967 Protocol Relating to the Status of Refugees,[31] which binds parties to the United Nations Convention Relating to the Status of Refugees,[32] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad

---

[31]  United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[32] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

AR.10702




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

    While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[33] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[34] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[35] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[36] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[37]

    As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case

---

[33] *Id.* at art. 33(2).
[34] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).
[35] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.
[36] *Id.* at ¶ 10.
[37] *Id.* at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

AR.10703





**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

adjudication previously used for non-aggravated felony offenses was "inefficient,"[38] but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

In California, many crimes are considered "wobbler" offenses, meaning that the same crime could be charged as either a misdemeanor or a felony, depending on the context. Esperanza represents individuals who have been convicted of such "wobbler" offenses, including people convicted of common offenses such as driving under the influence (DUI). The Proposed Rules would disqualify anyone convicted of a felony offense, defined by the jurisdiction where the person was convicted, or defined as an offense for which a sentence of one or more years could be imposed. Thus, the Proposed Rules would potentially disqualify any individual convicted of a misdemeanor in California that could have been charged as a felony, even where the actual offense charged is a misdemeanor and by definition, is not as serious as a felony offense.

Outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[39] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[40] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[41] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[42] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

---

[38] Proposed Rules at 69646.
[39] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).
[40] 648 F.3d at 1110 (J. Reinhardt, concurring).
[41] *Id*. at 1110.
[42] *Id*.

AR.10704




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

Again, just because an individual has been convicted of a crime does not erase the fact that they have a reasonable fear of future persecution in their home country. Esperanza has represented many individuals who have been granted asylum due to fears of future persecution based on protected grounds, who would otherwise have been barred under the Proposed Rules.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[43] is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[44] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

Esperanza represents clients who, for various reasons outside of their control, have entered the United States without inspection. For example, Esperanza represents clients who have been trafficked to the United States and entered the country without permission because of the trafficking. When entering through a U.S.-Mexico port of entry, people fleeing violence in Mexico often have to "take a number" and wait for long periods of time in order to present themselves to officials to ask for asylum, even though their lives are in danger in Mexico. Clients have expressed that they intended to present themselves to border officials but were unable to because they were led by their "guides" in the wrong direction, and ended up crossing the border without being inspected. These are all examples of individuals who would no longer be eligible for asylum, despite them being victims of severe harm in their home countries.

IV.    **Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture.**

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[45] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal

---

[43] Proposed Rules at 69659, 69660.
[44] Refugee Convention, *supra*, at art 31.
[45] *See, e.g.,* Proposed Rules at 69644.

AR.10705



**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax



are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[46] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees[47] affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[48] And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[49] Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as

---

[46] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[47] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).
[48] 8 C.F.R. § 223.1.
[49] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

AR.10706




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

derivatives on that status.[50] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban,"[51] which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[52] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Esperanza frequently represents individuals such as the mother described above, and provides *pro se* assistance to many similarly-situated children and families who would be impacted by these Proposed Rules. Such rules would create an inefficient system whereby parents effectively must abandon their children in order to seek relief in the United States, and the children would then have to seek separate relief simply because their parents are found to be ineligible for asylum.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[53]

---

[50] 8 C.F.R. § 208.21(a).
[51] 8 C.F.R. § 1208.13(c)(4).
[52] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

[53] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

AR.10707




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[54] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[55] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[56] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[57]

Finally, Esperanza writes to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.[58]

## V. The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making.

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering

---

[54] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

[55] *See* 8 U.S.C. § 1158(c)(1)(A).

[56] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[57] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

[58] See, e.g., Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://bit.ly/2sJuEWR.

AR.10708



**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax



ineligibility for asylum in either case.[59] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[60]

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior, especially for those detained. Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[61] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[62] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[63] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to

---

[59] *See* Proposed Rules at 69649.
[60] *See* Proposed Rules at 69652.
[61] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.
[62] *See* Proposed Rules at 69646, 69656-8.
[63] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

AR.10709





**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[64] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[65] In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[66]

Particularly in the context of the new proposed bar related to alleged gang affiliation, Esperanza is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[67]

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security

---

[64] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[65] *Moncrieffe*, 569 U.S. at 200-201.

[66] *Id.* at 201.

[67] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[68]

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[69] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. By affording adjudicators discretionary authority to grant or deny asylum applications, the Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## VI. The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection.

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their

---

[68] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.
[69] Proposed Rules at p. 69650.

AR.10711





**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[70]

The Proposed Rules undermine Sixth Amendment protections and harm immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions. The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[71]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[72] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[73] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings,

---

[70] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[71] Proposed Rules at 69655.

[72] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

[73] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

AR.10712



**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax



which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

Esperanza has represented clients who have had no idea that pleading guilty to particular offenses would make them ineligible for immigration relief. Typically, clients do not realize that pleading guilty to particular offenses could impact their immigration relief in the future, until they become clients of Esperanza and consult with an attorney about their immigration options. This could be, and often is, many years after they pleaded guilty. The State of California also allows for post-conviction relief for purposes beyond rehabilitation or immigration impact.[74] Thus, although the impetus for finding out about post-conviction relief as an option is often because the conviction impacts the client's immigration case, there are many reasons that someone is eligible for post-conviction relief that have nothing to do with immigration or rehabilitation.

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[75] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court,

---

[74] *See, e.g.*, Cal. Pen. Code §§ 1203.4(a), 1203.41, and 1203.42 (expungements); Cal. Pen. Code §§ 1473.7, 1016.5, and 1018 (vacaturs for cause).

[75] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).



**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax



unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[76] In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies.[77] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[78] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry.[79] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[80] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[81] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[82] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying

---

[76] *Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959).

[77] *See id.* (*citing Matter of Pickering*, 23 I.&N. Dec. 621).

[78] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

[79] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263.

[80] *Id.*

[81] *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").

[82] *Id.* ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

AR.10714





**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act."[83] Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[84] The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

### VII. The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color.

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[85] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial

---

[83] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).
[84] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).

[85] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

AR.10715



**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax



for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[86] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[87] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[88]

Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer. The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[89] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United

---

[86] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[87] 8 U.S.C. § 1159(c) (2012).

[88] 8 C.F.R. § 208.24(a) (2012).

[89] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

AR.10716



**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax



States.[90] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[91] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[92] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances

---

[90] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.
[91] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).
[92] Proposed Rules at 69648.

AR.10717




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

Further, extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer. The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[93] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[94]

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[95] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[96] The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

The Proposed Rules will also harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence. The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration

---

[93] *See Pula*, 19 I.&N. Dec. at 474.

[94] *Id.*

[95] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[96] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

AR.10718




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[97] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[98] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[99] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[100] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

---

[97] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[98] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[99] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

[100] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

AR.10719




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[101] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[102] The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[103] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

---

[101] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as possession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[102] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

[103] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

AR.10720





**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

Additionally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[104] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

Finally, barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer. In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[105] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[106] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[107]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress.[108] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang

---

[104] 8 U.S.C. § 1227(a)(7)(A).

[105] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-

[106] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

[107] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[108] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

AR.10721





**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[109]  Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[110]

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences.  Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[111] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[112]

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices.  These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[113]

---

[109] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.
[110] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

[111] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that  the asylum adjudicator may consider "all reliable evidence" in making their decision.
[112] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).
[113] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on

AR.10722




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

Esperanza has assisted individuals who in fact fear return to their home countries for the likelihood that notorious gangs such as MS-13 and 18th Street will attempt to recruit them. Sometimes, clients fear return because their family members are affiliated with rival gangs, or because they have visible tattoos that may be seen as gang-related. The "reason to believe" standard would cause asylum-seekers who have credible fears of returning to gang-ridden home countries to tow a fine line between discussing the reasons why gang members will target them if deported, and the reasons why the adjudicator should not find that they have committed a supposed gang-related offense that renders them ineligible for asylum. The Proposed Rules make it impossible for bona-fide asylum seekers who fear gangs to talk in detail about the heart of their asylum claims.

**VIII.    The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion.**

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[114] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[115] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[116]

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[117] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the

---

California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.
[114] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).
[115]  8 U.S.C. § 1158(b)(2)(B)(ii).
[116] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility  to seek asylum.
[117] 8 U.S.C. § 1252(a)(2)(D).

AR.10723




**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax

Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the asylum statute.[118] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[119]

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that, "expressing one item of [an] associated group or series excludes another left unmentioned."[120] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

---

[118] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

[119] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

[120] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

AR.10724



**Esperanza Immigrant Rights Project**
Catholic Charities of Los Angeles, Inc.
1530 James M. Wood Blvd., Los Angeles, CA 90015
(213) 251-3505 Tel. (213) 487-0986 Fax



## IX.    Conclusion

Esperanza strongly opposes the Proposed Rules because the Proposed Rules will unnecessarily exclude bona fide refugees from asylum protection. The current asylum laws already broadly disqualify refugees convicted of crimes from receiving asylum. The Proposed Rules will result in inefficiencies, racially-biased decision-making, and will disparately impact already vulnerable populations. Esperanza strongly urges the DHS and the DOJ to withdraw the Proposed Rules and instead dedicate their efforts to ensure that individuals fleeing from violence are not denied but granted protection.

AR.10725

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekr-jpxo
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0553
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Julie Neuman

## General Comment

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review 5107 Leesburg Pike, suite 2616
Falls Church, VA 22041
Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140
Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility
January 22, 2020
To Whom it May Concern:
I am writing in response to the above-referenced Proposed Rules to express my strong opposition to the Proposed
Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19,
2019.
I have volunteered as a pro bono attorney at a detention center near the Mexico border working with women who
were fleeing their countries due to extreme violence. I have also volunteered as a pro bono attorney with legal
nonprofit organizations hearing clients' asylum claims.
For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department
of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that
individuals fleeing violence are granted full and fair access to asylum protections in the United States.
Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me at
jsommersneuman@aol.com to provide further information.
Sincerely,
Julie Sommers Neuman

# Attachments

Copy of Template comment - Asylum Ban Expansion NPRM (1)

AR.10727

1

AR.10728

*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 22, 2020

To Whom it May Concern:

I am writing in response to the above-referenced Proposed Rules to express my strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

I have volunteered as a pro bono attorney at a detention center near the Mexico border working with women who were fleeing their countries due to extreme violence. I have also volunteered as a pro bono attorney with legal nonprofit organizations hearing clients' asylum claims.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me at jsommersneuman@aol.com to provide further information.

Sincerely,
Julie Sommers Neuman

2

AR.10729

**Introduction**

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. Having volunteered many hours as a pro bono attorney working with clients who have suffered egregious I

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. I submit these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

**The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility**

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

3

AR.10730

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[2]

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger.[3] Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[4] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[5] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[6]

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[7] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[8] The obstacles to winning asylum

---

[1] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[2] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

[3] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[4] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[5] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[6] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[7] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[8] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

4

AR.10731

are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[9] Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[10] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[11]

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[12] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[13] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[14] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[15] The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[16]

---

[9] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[10] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[11] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post,* December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[12] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[13] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[14] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[15] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[16] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

ER-2696

AR.10732

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[17] Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. There is no place for this under the rule of law of our country. Our immigration policies should be consistent and fair, not arbitrary and capricious. These Proposed Rules would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[18] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[19]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[20] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

---

[17] *See id.*

[18] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[19] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[20] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

AR.10733

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[21] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[22]

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

*The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[23] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[24]

---

[21] *Pula*, 19 I.&N. Dec. at 474.
[22] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."
[23] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.
[24] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

7

AR.10734

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[25] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[26] some turn to drugs and alcohol in an effort to self-medicate.[27] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

### The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees,[28] which binds parties to the United Nations Convention Relating to the Status of Refugees,[29] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

---

[25] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[26] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[27] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

[28] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[29] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

8

AR.10735

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[30] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[31] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[32] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[33] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[34]

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient,"[35] but an individualized analysis is exactly what the Convention requires to ensure only those individuals

---

[30] *Id.* at art. 33(2).
[31] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).
[32] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.
[33] *Id.* at ¶ 10.
[34] *Id.* at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).
[35] Proposed Rules at 69646.

9

AR.10736

who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[36] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[37] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[38] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[39] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[40] is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[41] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

---

[36] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).
[37] 648 F.3d at 1110 (J. Reinhardt, concurring).
[38] *Id*. at 1110.
[39] *Id*. at 1110.
[40] Proposed Rules at 69659, 69660.
[41] Refugee Convention, *supra*, at art 31.

10

**Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture**

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[42] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[43] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees[44] affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by

---

[42] *See, e.g.,* Proposed Rules at 69644.

[43] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[44] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).

11

AR.10738

Article 28. By regulation, refugee travel documents are available only to asylees.[45] And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[46] Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status.[47] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban,"[48] which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[49] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Our country is better than this. I represented a 14-year old female who travelled alone to the US fleeing her home country due to continued death threats. It was extremely difficult for her to convey her fears due to immature age and trauma and her Asylum claim was denied. To

---

[45] 8 C.F.R. § 223.1.

[46] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[47] 8 C.F.R. § 208.21(a).

[48] 8 C.F.R. § 1208.13(c)(4).

[49] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

12

AR.10739

expect any children to establish their own eligibility before an immigration judge is not humane nor just.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[50]

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[51] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[52] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[53] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[54]

Finally, I am writing to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.[55]

---

[50] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

[51] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

[52] *See* 8 U.S.C. § 1158(c)(1)(A).

[53] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[54] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

[55] See, e.g., Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://bit.ly/2sJuEWR.

13

AR.10740

**The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making**

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[56] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[57]

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[58] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[59] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical

---

[56] *See* Proposed Rules at 69649.
[57] *See* Proposed Rules at 69652.
[58] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019,
https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.
[59] *See* Proposed Rules at 69646, 69656-8.

14

AR.10741

criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[60] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[61] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[62] In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[63]

Particularly in the context of the new proposed bar related to alleged gang affiliation, I am concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[64]

---

[60] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[61] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[62] *Moncrieffe*, 569 U.S. at 200-201.

[63] *Id.* at 201.

[64] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita

15

AR.10742

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[65]

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[66] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

I met with many female clients who were wrongly linked to gangs by virtue of their spouse or significant other. In these cases, the female was under a threat of death if she did not comply with her spouse's requests and was wrongly accused of being "gang related."

---

Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.
[65] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.
[66] Proposed Rules at p. 69650.

16

AR.10743

**The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection**

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[67]

*The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[68]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[69] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[70] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying

---

[67] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

[68] Proposed Rules at 69655.

[69] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

[70] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

17

AR.10744

criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

*The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[71] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court,

---

[71] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).

18

AR.10745

unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[72] In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies.[73] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[74] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant inquiry.[75] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[76] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[77] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[78] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The

[72] *Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959).
[73] *See id.* (*citing Matter of Pickering*, 23 I.&N. Dec. 621).
[74] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).
[75] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263.
[76] *Id.*
[77] *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").
[78] *Id.* ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

19

AR.10746

Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act."[79] Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[80] The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

### The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate

---

[79] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).
[80] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).

20

AR.10747

policing practices, or in connection with experiences of trafficking and domestic violence.[81] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[82] Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[83] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[84]

> *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[85] The vast expansion of migrant

---

[81] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[82] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu,* 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[83] 8 U.S.C. § 1159(c) (2012).

[84] 8 C.F.R. § 208.24(a) (2012).

[85] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time

21

AR.10748

prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[86] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[87] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

Every pro bono client I worked with at the Detention center was personally at risk and travelled with at least on child. Each woman risked their life and their child's life - not to simply seek a better life- but because their lives were threatened and they could not remain in their home country. They did not want to leave their homes; they had no choice if they wanted to save their own and their child's lives. This is not smuggling this is life-saving; what any parent would do if their child's life was at risk.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[88] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly

---

entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[86] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[87] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

[88] Proposed Rules at 69648.

22

AR.10749

serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

> *Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[89] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[90]

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[91] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[92] The continued availability of asylum to low-wage

---

[89] *See Pula*, 19 I.&N. Dec. at 474.
[90] *Id.*
[91] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.
[92] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

23

AR.10750

immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

> *The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[93] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[94] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[95] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

---

[93] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[94] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[95] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

24

AR.10751

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[96] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[97] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[98] The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all

---

[96] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

[97] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as posession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[98] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

25

AR.10752

too often involve the arrest of both the primary perpetrator of abuse and the survivor.[99] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[100] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

*Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[101] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[102] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This

---

[99] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[100] 8 U.S.C. § 1227(a)(7)(A).

[101] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[102] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

26

AR.10753

outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[103]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress.[104] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[105] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[106]

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[107] In making these determinations, asylum adjudicators would be unable to rely on

---

[103] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[104] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[105] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[106] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

[107] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that the asylum adjudicator may consider "all reliable evidence" in making their decision.

27

AR.10754

uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[108]

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[109]

### The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[110] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[111] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[112]

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious

---

[108] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

[109] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[110] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).

[111] 8 U.S.C. § 1158(b)(2)(B)(ii).

[112] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility to seek asylum.

28

AR.10755

crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[113] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[114] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[115]

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that,"expressing one item of [an] associated group or series excludes another left unmentioned."[116] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

---

[113] 8 U.S.C. § 1252(a)(2)(D).

[114] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

[115] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scherrer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

[116] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

29

AR.10756

**Conclusion**

As a volunteer attorney, I oppose these Rules and request that rather than quickly pushing these through, they should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9ekr-2ibr
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0554
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Cecilia Candia
**Address:**
  1254 Market Street
  3rd Floor
  San Francisco,  94102
**Email:** cecilia@lsc-sf.org
**Phone:** 4157806359
**Fax:** 4158637708
**Organization:** Legal Services for Children

## General Comment

Please see attached comment for Legal Services for Children, opposing the Proposed Rules.

## Attachments

LSC Comment on Asylum Bar Expansion

AR.10758

*Submitted via https://www.regulations.gov/document?D=EOIR-2019-0005-0001*
Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

> **Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility**

January 21, 2020

To Whom It May Concern:

I am writing on behalf of Legal Services for Children in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

Legal Services for Children is a nonprofit organization located in San Francisco, California. As one of our practice areas, we represent minors and transitional age youth in their immigration cases, focusing in particular on children who do not live with a parent or guardian. The majority of our clients have been designated to be an Unaccompanied Alien Child (UAC) by the federal government. We provide legal representation for children in custody of the Office of Refugee Resettlement who are facing prolonged detention. We assist children and youth in their petitions for asylum, Special Immigrant Juvenile Status, T visas, U visas, DACA and other forms of relief. As such, the Proposed Rules would greatly affect our clients and our organization.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me at (415) 780-6359 or cecilia@lsc-sf.org to provide further information.

1

AR.10759

Sincerely,

Cecilia B. Candia
Associate Legal Director
Legal Services for Children

2

AR.10760

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

**TABLE OF CONTENTS [with jump-links]**

   I.     Introduction

   II.    The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

   III.   The Proposed Rules violate the letter and spirit of United States international treaty obligations

   IV.   Those precluded from asylum eligibility will be gravely impacted even if granted withholding or protection under the Convention Against Torture

   V.    The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

   VI.   The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

   VII.  The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

  VIII.  Conclusion

**I.    Introduction**

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. Legal Services for Children (LSC) works with children who have been abused and neglected by their parents and caretakers, who often have no supports in their home country or the United States, who are survivors of human trafficking and domestic violence, who are almost entirely youth of color, and many of whom identify as LGBTQ. We opposed the Proposed Rules as these would exclude bona fide refugees from asylum and would disparately impact the particularly vulnerable populations of children and youth we serve.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street

gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. Legal Services for Children submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II. The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[2]

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to

---

[1] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.
[2] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

4

AR.10762

reunite with immediate family members who may still remain abroad in danger.[3] Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[4] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[5] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[6]

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[7] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[8] Some asylum seekers are unaccompanied children in the custody of the Office of Refugee Resettlement. The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[9] Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[10] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[11]

---

[3] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[4] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[5] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[6] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[7] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[8] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[9] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[10] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[11] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018,

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[12] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[13] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[14] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[15] The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[16]

As I've noted above, Legal Services for Children represents unaccompanied children in the custody of the Office of Refugee Resettlement ("ORR"). Some of our clients have been detained in government custody for over a year, sometimes two or more years. These children are often those who have experienced the most atrocious trauma and display symptoms of severe Post Traumatic Stress Syndrome or mental health needs. When children are in ORR custody that long, they are often transferred from one facility in one state to another, and sometimes by the time we have contact with them, they have already been held in five different facilities. ORR provides inadequate mental health services for children, and therefore the children are further traumatized and their mental health worsens.[17] Unfortunately, we regularly encounter 16 and 17-year-old minors in ORR custody in California who have been charged and convicted for a misdemeanor as adults in Texas for behavior that clearly stems from their untreated trauma and the additional institutional trauma they are enduring. For cases such as these, the asylum officer closely scrutinizes the behavior and charge and in some cases, the officer has indicated that they may deny asylum to a minor, in their discretion, even though the conviction and underlying behavior is not a categorical bar to asylum.

---

https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[12] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[13] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[14] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[15] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[16] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[17] *See* Disability Rights California, *The Detention of Immigrant Children with Disabilities in California*, 2019, https://www.disabilityrightsca.org/system/files/file-attachments/DRC-ORR-Report.pdf

6

AR.10764

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[18] Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[19] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[20]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[21] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of

---

[18] *See id.*

[19] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[20] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[21] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

AR.10765

persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[22] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[23]

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

*The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[24] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[25]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance

---

[22] *Pula*, 19 I.&N. Dec. at 474.

[23] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

[24] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[25] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

8

AR.10766

use disorder.[26] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[27] some turn to drugs and alcohol in an effort to self-medicate.[28] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

Legal Services for Children has successfully represented clients who have been granted asylum, but who would be denied under the Proposed Rules. These clients include those who have self-medicated with alcohol or drugs in order to cope with untreated and undiagnosed trauma. We regularly see cases where the persecutor/abuser forced our client to consume drugs in order to exert control over them. We also regularly see cases where the child or young adult resorts to alcohol or drugs to self-soothe, such as decreasing anxiety in order to be able to sleep, or using stimulating drugs in order to stay awake in dangerous situations. In fact, this last example is common for children and youth who live in the streets – it is a way to remain awake and therefore decrease the likelihood of sexual assault while they sleep. Drug and alcohol use in children and youth may lead to involvement with the juvenile and criminal legal system. In the majority of cases, the young person is able to recover with the appropriate supports and services. As these examples show, it is crucial for asylum seekers to be afforded an opportunity to provide context and mitigating evidence for their charges.

## III.    The Proposed Rules violate the letter and spirit of United States international treaty obligations

---

[26] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[27] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[28] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

By acceding to the 1967 Protocol Relating to the Status of Refugees,[29] which binds parties to the United Nations Convention Relating to the Status of Refugees,[30] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[31] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[32] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[33] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[34] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[35]

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated

---

[29] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[30] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[31] *Id.* at art. 33(2).

[32] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

[33] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[34] *Id.* at ¶ 10.

[35] *Id.* at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

10

AR.10768

in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient,"[36] but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes.[37] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[38] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[39] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[40] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[41] is also unlike any of the

---

[36] Proposed Rules at 69646.

[37] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).

[38] 648 F.3d at 1110 (J. Reinhardt, concurring).

[39] *Id*. at 1110.

[40] *Id*. at 1110.

[41] Proposed Rules at 69659, 69660.

11

AR.10769

other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[42] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

Although the majority of Legal Services for Children's clients are minors, we do work with transitional age youth ages 18 - 24. For example, some of our clients who are apprehended as minors at the border and placed in ORR custody ask for repatriation due to detention fatigue. After removal, some of these same youth flee to the United States a second or third time after facing the same or new persecution in their home country. We have even had clients who are fleeing their traffickers, and the quickest and safest way to escape harm is to cross the U.S. – Mexico border without inspection. In these cases, the clients have literally run away from their trafficker/persecutor who chased them with guns drawn. If these youth had been prosecuted for illegal re-entry, under the Proposed Rules they would not be eligible for asylum.

## IV. Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[43] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[44] Thus, an individual could have a

---

[42] Refugee Convention, *supra*, at art 31.

[43] *See, e.g.,* Proposed Rules at 69644.

[44] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her

valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees[45] affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[46] And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[47] Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status.[48] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban,"[49] which made the mother ineligible for asylum and thus required the children to establish their

---

country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[45] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).

[46] 8 C.F.R. § 223.1.

[47] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[48] 8 C.F.R. § 208.21(a).

[49] 8 C.F.R. § 1208.13(c)(4).

independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[50] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Some of Legal Services for Children's clients have children of their own who they were forced to leave back in their home country as they fled for safety in the United States. For youth who themselves have been abused and neglected by caretakers, our clients feel very strongly their responsibility and duty to care for their own children in ways they were never cared for. It would be extremely cruel to deny them the possibility to reunify with their children if the Proposed Rules were approved.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[51]

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[52] Asylum, once granted, protects an asylee against removal unless and until that status is revoked.[53] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[54] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[55]

---

[50] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

[51] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

[52] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

[53] *See* 8 U.S.C. § 1158(c)(1)(A).

[54] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[55] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

AR.10772

Finally, Legal Services for Children writes to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.[56]

Currently, Legal Services for Children is the legal services provider for an ORR shelter housing pregnant and parenting UAC teens. We advise and often represent family units of a teen mother and her baby or babies. In these cases, if the Proposed Rules were in effect and applied to the teen mother, we would need to pursue individual asylum applications for each member of the family, including babies who are only weeks old. This would be extremely inefficient and redundant as the claim is basically the same for all members, and the baby cannot participate independently of their UAC mother in their legal cases.

V.   **The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making**

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity," triggering ineligibility for asylum in either case.[57] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[58]

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially

---

[56] See, e.g., Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://bit.ly/2sJuEWR.
[57] *See* Proposed Rules at 69649.
[58] *See* Proposed Rules at 69652.

limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[59] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[60] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[61] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[62] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[63] In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police

---

[59] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.

[60] *See* Proposed Rules at 69646, 69656-8.

[61] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

[62] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[63] *Moncrieffe*, 569 U.S. at 200-201.

officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[64]

Particularly in the context of the new proposed bar related to alleged gang affiliation, Legal Services for Children is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[65]

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[66]

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[67] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious

---

[64] *Id.* at 201.
[65] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story html.
[66] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.
[67] Proposed Rules at p. 69650.

crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## VI.    The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[68] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[69] Furthermore,

---

[68] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[69] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270

asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[70] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[71]

> *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[72] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[73] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[74] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the

---

(A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[70] 8 U.S.C. § 1159(c) (2012).

[71] 8 C.F.R. § 208.24(a) (2012).

[72] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[73] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[74] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[75] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

> *Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[76] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[77]

---

[75] Proposed Rules at 69648.

[76] *See Pula*, 19 I.&N. Dec. at 474.

[77] *Id.*

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[78] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[79] The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

> *The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[80] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[81] Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal

---

[78] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[79] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

[80] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[81] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014, https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[82] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[83] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[84] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[85]   The blunt approach adopted by the Proposed Rules is inconsistent with the

[82] *See eg.,* Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

[83] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

[84] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as posession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

[85] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

AR.10780

approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[86] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[87] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

Legal Services for Children has had and continues to have clients who have experienced domestic violence. In some of these cases, because the abuser speaks better English and is more familiar with the systems in the United States, our client is arrested under the accusation of being the perpetrator of violence. In these cases, our clients would be penalized by being barred from asylum under the proposed rules.

> *Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[88] The use of gang databases by local law enforcement and

---

[86] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[87] 8 U.S.C. § 1227(a)(7)(A).

[88] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights*

Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[89] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[90]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress.[91] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[92] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[93]

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the

*Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[89] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

[90] *See* Jonanthan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[91] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[92] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[93] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[94] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[95]

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[96]

In fact, a 2016 audit of California's gang database revealed that it had significant glaring errors, such as 42 people whose birth dates indicated they were one year of age or younger at the time they were entered into the list. Of those babies, 28 were entered for "admitting to being gang members."[97] Although California has taken steps to clean up the database, there are reports of police officers wrongly labelling individuals as gang members. Just a few weeks ago, Los Angeles police officers were suspended after falsifying reports in order to place a child on the gang database.[98]

Many of Legal Services for Children's clients have been homeless at one time or another. Simply being a brown youth on the street will invite scrutiny and profiling by police officers, who question the youth and their friends. Some youth are labeled to be gang affiliated because they speak to other youth at school or on the street. I myself had one minor teen client who was labelled as gang affiliated because, according to the police officer, she associated with a suspected gang member. This suspected gang member was my client's younger brother, whom

---

[94] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that the asylum adjudicator may consider "all reliable evidence" in making their decision.

[95] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

[96] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[97] Richard Winton, "California gang database plagued with errors, unsubstantiated entries, state auditor finds.," *Los Angeles Times,* August 11, 2016, https://www.latimes.com/local/lanow/la-me-ln-calgangs-audit-20160811-snap-story.html.

[98] Heather Murphy, "Los Angeles Officers Suspended After Boy Is Wrongly Labeled a Gang Member," *Los Angeles Times*, January 8, 2020, https://www.nytimes.com/2020/01/08/us/lapd-gang-database.html.

AR.10783

she lived with, fed, and walked to school. The act of being a responsible older sister was sufficient for this police department to label her a gang affiliate.

## VII.    The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[99] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[100] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus to disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se* particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[101]

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[102] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[103] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute

---

[99] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).
[100] 8 U.S.C. § 1158(b)(2)(B)(ii).
[101] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility  to seek asylum.
[102] 8 U.S.C. § 1252(a)(2)(D).
[103] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[104]

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that,"expressing one item of [an] associated group or series excludes another left unmentioned."[105] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation, and places the Proposes Rules ultra vires to the statute.

## VIII.   Conclusion

Legal Services for Children serves children and youth who have been abused and neglected by their parents and caretakers. These young people often have no supports in their home country or the United States. Many are survivors of trafficking, torture, and domestic violence. Some of them identify as LGBTQ.  We oppose the Proposed Rules because we belive these will exclude many of our clients from asylum, and we believe the Proposed Rules would disparately impact our clients and exclude many of them from asylum.

---

[104] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scheerer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.
[105] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

27

AR.10785

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eks-o6yj
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0555
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Linda Theophilus
**Address:**
    420 Nike Drive
    Pittsburgh,  15235
**Email:** revtheophilus@live.com
**Phone:** 412-401-5742

## General Comment

I oppose these changes. I support the ideal of America as a place which welcomes the persecuted. I support welcoming all people who value due process, justice and human rights because these things have been denied them by their own country of origin. As a Christian pastor, I support freedom of religion for all people and all religions. I also support asylum for victims of domestic violence and gender violence, as well as those who are in danger because of their sexual orientation, resistance to drug cartels and gang intimidation. Anything which makes the asylum process harder is in fact, denial of due process and far too often sends those who deserve welcome back to danger and death.

AR.10786