No. 20-17490

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PANGEA LEGAL SERVICES, et al.
Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

### APPELLANTS' EXCERPTS OF RECORD

### VOL. 11 OF 12

JOHN V. COGHLAN
*Deputy Assistant Attorney General*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice
Civil Division
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
PATRICK GLEN
CHRISTINA P. GREER
*Senior Litigation Counsel*
CRAIG NEWELL
*Trial Attorney*

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eks-j61x
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0556
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Sonia Marquez
**Organization:** Brooklyn Defender Services

## General Comment

Attached please find the public comment of Brooklyn Defender Services ("BDS") opposing the Proposed Rule

## Attachments

BDS Public Comment re Asylum Bars (EOIR Docket No. 18-0002) - AS FILED

AR.10787



January 21, 2020

Via Federal e-Rulemaking Portal

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

> RE:  Procedures for Asylum and Bars to Asylum Eligibility
> 84 FR 69640 (Dec. 19, 2019)
> EOIR Docket No. 18-0002, A.G. Order No. 4592-2019
> RIN 1125-AA87, 1615-AC41

Dear Assistant Director Alder Reid and Chief Dunn,

Brooklyn Defender Services ("BDS") submits these comments to the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") (collectively, the "Departments") Notice of Proposed Rulemaking regarding "Procedures for Asylum and Bars to Asylum Eligibility," published in 84 FR 69640, issued on December 19, 2019, EOIR Docket No. 18-0002, A.G. Order No. 4592-2019 (hereinafter, the "Proposed Rule"). For the reasons set forth below, BDS requests that DHS immediately halt implementation of the Proposed Rule.

BDS is a full-service public defender organization in Brooklyn, New York that provides multi-disciplinary and client-centered criminal defense, family defense, immigration, and civil legal services, along with social work and advocacy support. BDS represents low-income people in nearly 30,000 criminal, family, civil, and immigration proceedings each year. Since 2009, BDS has counseled, advised, or represented more than 15,000 clients in immigration matters including deportation defense, affirmative applications, advisals, and immigration consequence consultations in Brooklyn's criminal court system. About a quarter of BDS's criminal defense clients are foreign-born, roughly half of whom are not naturalized citizens and therefore at risk of losing the opportunity to obtain lawful immigration status as a result of criminal or family defense cases. Our criminal-immigration specialists provide support and expertise on thousands of such

Brooklyn Defender Services    177 Livingston Street, 7th Floor    T (718) 254-0700    www.bds.org
Brooklyn, New York 11201    F (718) 254-0897
ER-2753    AR.10788

Page 2

cases. BDS's immigration practice represents people in applications for immigration relief, including asylum, before U.S. Citizenship and Immigration Services ("USCIS"), and in removal proceedings in New York's immigration courts. In addition, BDS is one of three New York Immigrant Family Unity Project ("NYIFUP") providers and has represented more than 1,400 people in detained deportation proceedings since the inception of the program in 2013.

As set forth below, BDS strongly opposes the proposed expansion of criminal bars to asylum that would significantly increase the number of asylum seekers who are categorically barred from applying for asylum. The proposed criminal bars are extremely harsh, encompassing a wide swath of convictions and conduct, including misdemeanors and non-criminal offenses. The current criminal bars to asylum are already overbroad and unjust, and they should be narrowed not expanded. The additional proposed bars would not only aggravate an already unfair situation, but constitute a marked departure from past practice, would drain any sensible meaning from the phrase "particularly serious crime," and contravene U.S. obligations and international norms.

The proposed bars would have a disparate impact on already vulnerable communities, as they cover conduct that disproportionally stems from homelessness, lack of resources, trauma, substance abuse, and mental health issues. Asylum seekers often come from vulnerable communities that are at heightened risk for arrest and policing, such as communities of color, and lesbian, gay, and transgender individuals, and may be more susceptible to have minor infractions or low-level offenses. These bars prevent otherwise eligible asylum seekers from exercising their right to apply for asylum and presenting their asylum case.

BDS asks that the Proposed Rule be rescinded in its entirely as all asylum seekers deserve a fair opportunity to have their asylum cases heard and to be protected from persecution and death.

## A.    Background

Under United States law, asylum provides those fleeing persecution and violence with physical safety, a green card and a pathway to citizenship, and the opportunity to reunite with and provide status to immediate family members.[1] The 1951 United Nations Convention Relating to the Status of Refugees (the "Convention") is a multilateral treaty that provides the rights of refugees and the responsibilities of nations. The 1967 Protocol Relating to the Status of Refugees,[2] which binds parties to the Convention,[3] mandates the principle of non-refoulement: the commitment not to return refugees to a country where they will face persecution on protected grounds, even where potential refugees have

---

[1] *See generally* 8 U.S.C. §§ 1158-1159.

[2] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[3] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

Brooklyn Defender Services        177 Livingston Street, 7th Floor        T (718) 254-0700        www.bds.org
                                  Brooklyn, New York 11201              F (718) 254-0897

ER-2754                                                                    AR.10789

Page 3

allegedly committed criminal offenses.[4] By acceding to the Protocol, the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the principle of non-refoulement. The Convention sets forth two exceptions to the non-refoulement principle, one of which is where a refugee who has been convicted "by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."[5] This clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act.[6] The United Nations High Commissioner for Refugees ("UNHCR") has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[7] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[8] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[9]

The United States asylum system was codified in statute through the Refugee Act of 1980 (the "Refugee Act") to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[10] Most of the Convention's provisions have been incorporated in the Refugee Act, which was intended to bring the domestic legal code of the United States into compliance with the Protocol and created a "broad class" of refugees eligible for a discretionary grant of asylum.[11] There is evidence that "convicted by a final judgment of a particularly serious crime" and

---

[4] Article 33(1) of the Convention.

[5] Article 33(2) of the Convention.

[6] U.N. High Commissioner for Refugees ("UNHCR"), *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019) ("UNHCR Handbook").

[7] UNHCR, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[8] *Id.* at ¶ 10.

[9] *Id.* at ¶ 10-11; UNHCR, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004); UNHCR, Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading ¶ 11 (July 2007) (hereinafter "Briefing for the House of Commons") ¶ 10, http://www.unhcr.org/en-us/576d237f7.pdf.

[10] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[11] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987). Specifically, the Refugee Act provides that individual had the right to apply for asylum "irrespective of immigration status." *See* Refugee Act of 1980, Pub. L. No. 96-212, § 208 (codified as amended at § 1158)).

Brooklyn Defender Services      177 Livingston Street, 7th Floor      T (718) 254-0700      www.bds.org
Brooklyn, New York 11201      F (718) 254-0897

ER-2755

AR.10790

Page 4

"danger to the community" were meant to be two elements under Article 33(2) of the Convention.[12] A House Committee report suggests that the drafter of the Refugee Act may have conflated the two elements and separated them into two provisions.[13] The conflation causes the subsequent broad interpretation of "particularly serious crime," contrary to what the Convention intended.[14] In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, Div. C, 110 Stat. 3009, which amended the Immigration and Nationality Act ("INA"). The amended §1158(a)(1) provides that "[a]ny alien who is physically present in the United States . . . irrespective of such alien's status, may apply for asylum." At the same time, Congress set forth parameters that bar certain refugees from being granted asylum, including those who have been "convicted by a final judgment of a particularly serious crime." § 1158 (b)(2)(A)(ii). The existing framework for determining if a final conviction falls within the current particularly serious crime bar, includes an assessment of whether the individual is found to pose a danger to the community.[15]

The current bars to asylum based on criminal convictions are already sweeping and over-broad in nature and scope.[16] Any conviction for an offense determined to be an "aggravated felony" is considered a per se "particularly serious crime" and, therefore, is a mandatory bar to asylum.[17] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[18] it has been broadened to encompass hundreds of offenses, many of them

---

[12] Briefing for the House of Commons ¶ 11 http://www.unhcr.org/en-us/576d237f7.pdf ("Conviction of a particularly serious crime in and of itself is not sufficient. The person concerned must, in view of this crime, also present a danger to the community.").

[13] Torrey et al., Misapplication of the Particularly Serious Crime Bar to Deny Refugees Protection from Removal to Countries Where Their Life or Freedom is Threatened, Immigrant Defense Project (Fall 2018), 12 [hereinafter "IDP Harvard Report"] https://www.immigrantdefenseproject.org/wp-content/uploads/IDP_Harvard_Report_FINAL.pdf (citing H.R. rep. No. 96-608, at 18 (1979) (noting that the Convention provides exceptions to the protection against refoulement for "aliens . . . who have been convicted of particularly serious crimes which make them a danger to the community of the United States.)).

[14] *Id.* (citing Fatma Marouf, A Particularly Serious Exception to the Categorical Approach, 97 Boston Univ. L. Rev. 1427, 1456 (2017)).

[15] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals ("BIA") and Attorney General have historically utilized a circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-*, 23 I.&N. Dec. 270 (A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[16] 84 Fed. Reg. 69640, 69641 (Dec. 19, 2019).

[17] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[18] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

Brooklyn Defender Services      177 Livingston Street, 7th Floor      T (718) 254-0700      www.bds.org
Brooklyn, New York 11201      F (718) 254-0897

ER-2756

AR.10791

Page 5

neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[19] Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[20] Immigration adjudicators already have vast discretion to deny asylum to those who are eligible for asylum, but have been convicted of criminal conduct,[21] and further categorical bars are neither needed nor appropriate.

For asylum seekers, the stakes of being denied asylum despite being eligible are extremely high: being returned to their home country, where they will face violence, brutal persecution, and even death. It is already exceedingly difficult to win an asylum claim and the laws, regulations, and processes governing asylum in the United States have become increasingly harsh.[22] During asylum cases, individuals must show not only that they have suffered persecution or will suffer future persecution if returned to their home countries, but also that the persecution was based on one of five enumerated grounds.[23] In doing so, individuals bear the evidentiary burden of establishing eligibility,[24] must corroborate their claim with supporting documentation and evidence (including official documents and affidavits from their home country and medical or physiological evaluations),[25] and must be perceived credible by the adjudicator. Even eligibility is not sufficient; in addition, they must demonstrate that they merit a favorable exercise of discretion.[26] Asylum seekers may be detained, lack access to counsel, and must overcome barriers such as past trauma, language access, and mental health issues.

Further aggravating an already extremely difficult and complex process, this Administration has sought to impose additional barriers to asylum, which are aimed at stopping lawful asylum seekers at the southern border from exercising their right to apply for asylum in the United States. These include forcing those seeking safety to return to

---

[19] 8 U.S.C. § 1101(a)(43); *see also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[20] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[21] *See id.*

[22] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post,* July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html; Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* Sept. 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[23] *See* 8 U.S.C. § 1158(b)(1)(B)(i).

[24] See *id.*

[25] See 8 U.S.C. § 1158(b)(1)(B)(ii)-(iii).

[26] See 8 U.S.C. § 1158(b)(2)(A).

---

Brooklyn Defender Services     177 Livingston Street, 7th Floor     T (718) 254-0700     www.bds.org
Brooklyn, New York 11201     F (718) 254-0897

ER-2757

AR.10792

Page 6

dangerous conditions in Mexico[27] and a web of policies that bar eligible applicants from being granted asylum for a myriad of reasons, including their national origin, manner of entry, or the path they took to the United States.[28] Another set of policies would make it more expensive to apply and would force asylum seekers to suffer financial distress while they wait for their cases to be heard.[29]

Consistent with these efforts to undermine the United States asylum system, on December 19, 2019, DHS and DOJ issued the instant Proposed Rule that significantly increases the types of criminal offenses and conduct that would categorically bar an asylum seeker from applying for asylum. First, the Proposed Rule would add seven bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), regardless of familial relationship, motivation, or circumstances; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense vaguely "involving criminal street gangs," with the adjudicator empowered to look at any evidence to make the determination; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction or accusation of conduct involving acts of battery in a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including any drug-related offense except for a first-time, minor marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits. Second, the Proposed Rule creates a multi-factor test for asylum adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. And third, the Proposed Rule rescinds a provision in the current rules regarding the reconsideration of discretionary asylum. Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the

---

[27] *See* Human Rights First, *Delivered to Danger* (Dec. 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[28] *See, e.g.,* Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33829 (July 16, 2019) (proposing to bar asylum to anyone who enters or attempts the United States via the southern border after failing to apply for protection in a third country through which they passed en route); Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act, 84 Fed. Reg. 63994 (Nov. 19, 2019) (proposing to bar asylum to any applicant who transited through a country with which the United States has entered into certain bilateral agreements).

[29] *See, e.g.,* Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47148 (Sept. 9, 2019) (proposing to remove 30-day processing requirement for asylum applicants' work permit applications); Asylum Application, Interview, and Employment Authorization for Applicants, 84 Fed. Reg. 62374 (Nov. 14, 2019) (proposing to extend the waiting period for asylum seekers to request a work permit and deny work permits to individuals who did not enter the United States through a port of entry or who applied for asylum over one year after entering the United States); Presidential Memorandum on Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System § 3(c) (Apr. 29, 2019), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-additional-measures-enhance-border-security-restore-integrity-immigration-system/ (instructing Attorney General and Secretary of Homeland Security to institute a fee for asylum applications); Acting Secretary of Homeland Security Kevin McAleenan, Remarks to the Council of Foreign Relations (Sept. 23, 2019), https://www.dhs.gov/news/2019/09/23/acting-secretary-mcaleenans-prepared-remarks-council-foreign-relations (stating that DHS would keep families applying for asylum detained at the border).

Brooklyn Defender Services     177 Livingston Street, 7th Floor     T (718) 254-0700     www.bds.org
Brooklyn, New York 11201     F (718) 254-0897

ER-2758

AR.10793

Page 7

asylum protections enshrined in United States and international law. BDS opposes the Proposed Rule in its entirety.

**B.    The Proposed Categories of Criminal Offenses and Conduct that Would Bar Asylum Eligibility are Vague, Overbroad, and Would Have a Disparate Impact on Low-Income and Communities of Color**

A criminal conviction itself does not mean an individual is a danger to the community and should not be sufficient to strip an asylum seeker of their right to apply for asylum. Not only is a conviction an unreliable predictor of future danger, it is also an unreliable indicator of past criminal conduct because of disparate policing practices and the significant number of people who may plead to a crime for a number of reasons.[30] This is precisely the reason that the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only apply if both (1) an individual is convicted of a particularly serious crime, and (2) a separate assessment, taking into considerations the totality of the circumstances, shows that they are a present or future danger.[31] Indeed, UNHCR has expressly noted that ordinary or common crimes do not meet this "threshold of seriousness."[32] And international norms bolster the UNHCR's approach. For example, the threshold of seriousness in Canada includes "generally serious criminality, national security, human rights violations, and organized criminality;" in France, the threshold includes "only relatively severe crimes, and the government must find that the individual is a 'serious threat to the public order.'"[33]

As set forth below, the Proposed Rule dilutes the already broad meaning of a "particularly serious crime" under U.S. law, such that many types of offenses and conduct will make an asylum seeker ineligible for asylum. The proposed categorical bars are far broader than what the non-refoulment exceptions allow: they do not require "final judgments," are a departure from what is considered "particularly serious crimes," and are not tailored to identify those who pose a danger to the community. The Departments have failed to provide sufficient rationales for sweeping in such broad categories of conduct to bar asylum. Moreover, the Departments fail to address that the proposed conduct-base categorical bars will have a disparate impact on communities of color given the realities of the criminal justice and child welfare systems. The Proposed Rule ignores these realities of structural racism and would exacerbate these inequalities.

---

[30] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

[31] *See* Briefing for the House of Commons ¶ 11, http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[32] Briefing for the House of Commons ¶ 10.

[33] IDP Harvard Report at 19.

Brooklyn Defender Services        177 Livingston Street, 7th Floor        T (718) 254-0700        www.bds.org
                                   Brooklyn, New York 11201               F (718) 254-0897

ER-2759

AR.10794

Page 8

Because the Proposed Rule amplifies the dissonance between U.S. asylum law and the Convention, and violates U.S. obligations under the Convention, the Departments do not have the legal authority to add these proposed criminal bars.

1. Felony Bar

The proposed felony bar would bar asylum seekers with any conviction that is deemed a felony under the applicable penal code, or where the offense is punishable by more than a year in prison.[34] Not every felony in the United States is a particularly serious crime, nor is every noncitizen convicted of an offense punishable by more than a year a danger to the community. For example, for certain types of offenses the difference between misdemeanors and felonies is not aggravating conduct or heightened risk to the public, but rather a single factual element, such as the alleged dollar value of a stolen good. Thus, the simple fact of whether a crime is a felony or not, is not a reliable measure of the dangerousness of the individual and should not be used as a categorical bar.

Moreover, by defining a felony by whether the offense can be punishable by more than a year, regardless of the actual sentence, the Proposed Rule undermines its claim that it seeks to measure the seriousness of the conduct and danger to the community. The Proposed Rule claims its definition is appropriate, because the actual sentence imposed takes into account "offender characteristics" that do not depend on "the gravity of the crime"; however, sentencing courts routinely take into account the seriousness of the conduct at issue. Criminal proceedings are already thorough, detailed, fact-finding proceedings designed to keep the public safe while also reaching a just result. Where it occurs, leniency in sentencing can result from many factors, including, *inter alia*, serious concerns about the defendant's culpability, the existence of viable affirmative defenses, a lack of aggravating circumstances (or a wealth of mitigating ones), or the defendant's cooperation with law enforcement. Thus, actual sentences reflect a careful consideration of many important factors. By looking to the maximum possible sentence of an offense, rather than the actual sentence imposed, the Proposed Rule serves to undermine the careful consideration of district attorneys and criminal sentencing courts, all of which are already charged with considering public safety. What the Proposed Rule labels "offender characteristics" that it seeks to ignore, are precisely the kind of specific facts and mitigating evidence the Departments are required to analyze when seeking to bar asylum seekers from their right to apply for asylum. For example, individuals who are convicted of a New York felony, but for whom a district attorney and sentencing judge saw fit to grant probation and no jail time based on cooperation with the district attorney, could be barred from asylum protection, even where they have fled attempts on their life and were told by law enforcement in their home country that they could not protect them. Under current law, these individuals could be granted the protection they deserve.

---

[34] 84 Fed. Reg. at 69645-48.

Brooklyn Defender Services    177 Livingston Street, 7th Floor    T (718) 254-0700    www.bds.org
Brooklyn, New York 11201    F (718) 254-0897

ER-2760      AR.10795

Page 9

2.    Controlled Substance Offenses ("CSO") and Driving Under the Influence ("DUI") Bars

The proposed new bars to asylum include drug-related conviction (with one exception for a first, minor marijuana possessory offense) and any second conviction for driving under the influence.[35]  Both the DUI and CSO bars include convictions that are misdemeanors and violations—considered non-criminal offenses in New York State. Both are excessively overbroad in the convictions and conduct covered, and are not tailored to identify conduct that is "serious" or identify individuals who pose a danger to the community.  For example, an asylum seeker who was convicted of multiple counts of marijuana possession in violation of N.Y.P.L. § 221.05, or driving while ability impaired in violation of New York State, V.T.L. § 1192(1), could be categorically ineligible for asylum—despite the fact that these offenses are not crimes under New York law.[36]  In New York, a DUI offense could include those for which an individual's blood alcohol level was under the legal limit, *i.e.,* not legally intoxicated.[37]

Moreover, as asylum seekers are dealing with significant trauma,[38] they may also be dealing with substance abuse issues as a result.[39]  Particularly given the vulnerabilities of asylum-seeking populations, prior struggles with addiction should be addressed in an individualized, fact-dependent proceeding in front of an adjudicator who hears the totality of the asylum seeker's circumstances and exercises the discretion they see fit. Immigration adjudicators maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion.  The Proposed Rule denies asylum seekers the opportunity to present the countervailing factors of their past trauma and potential recovery.

3.    Gang-related Bar

The Proposed Rule creates an inquiry of whether any criminal conviction—either misdemeanors or felonies—"involved criminal street gangs" or was "in furtherance of a gang-related crime."[40]  The criminal street gang bar is overbroad and is not tailored to the rationale provided.  An asylum seeker could be barred if their convictions is considered a "gang" offense in the prosecuting jurisdiction, or if the asylum adjudicator had "reason to

---

[35] *Id.* at 69650-51, 69654.

[36] A violation under New York law is not a crime.  *See* New York State Penal Law, Article 10.

[37] New York State, V.T.L. § 1192(1).

[38] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems; Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017) at 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[39] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/; *see also infra* Section E.

[40] 84 Fed. Reg. at 69649.

Brooklyn Defender Services          177 Livingston Street, 7th Floor          T (718) 254-0700          www.bds.org
                                     Brooklyn, New York 11201               F (718) 254-0897

ER-2761                                                                                        AR.10796

believe" the crime was committed "in furtherance of criminal street gang activity."[41] This standard would expand the number and types of convictions for which an analysis into eligibility is required, and would sweep in even petty offenses that would otherwise not trigger immigration consequences. Thus, the Proposed Rule expands the criminal bars to asylum to include those accused of gang involvement in the commission of minor criminal offenses. For example, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity. Such definitions are substantially broader than the violent, national or multi-national street gangs the Proposed Rule claims it is targeting.[42] For example, the definition of a gang assault offense in New York is where an individual is aided by "two or more persons actually present," and "conspiracy" in New York is agreeing to perform a crime with one other person (regardless of whether an individual ever engaged in criminal conduct).[43]

In support of the proposed bar, the Departments claim that any "gang-related" misdemeanors and felonies could "reasonably be designated" as particularly serious crimes, that those convictions "display[] a disregard for basic societal structures in preference of criminal activities that place" people in danger, and that gangs "are a significant threat to the security and safety of the American people."[44] At no point do the Departments acknowledge the significant disparate impact this bar would have on asylum applicants of color, particularly young men. The purported explanations in the Proposed Rule fail to account for the reality of how "gang"-related prosecutions play out, who "gang"-related prosecutions target, and the immense and arbitrary power this proposed bar gives asylum adjudicators to bar young men of color from applying for asylum.

In practice, law enforcement often target for arrest and conspiracy prosecution large groups of young men from the same housing project or neighborhood, alleging they are in a gang—whether or not that is indeed the case.[45] Where a fight might involve a group of young men, gang allegations often result. In many instances, allegation of gang involvement is never proven: it is easy to allege and difficult to disprove. Even more problematic, once the NYPD determines a person is a gang member, there is no way to challenge that administrative designation in court or elsewhere, even for those who are arrested and whose charges are later dismissed by a factfinder. Thus, the proposed bar would not target those who have been convicted of illicit and violent criminal street gang

---

[41] *Id.*

[42] 84 Fed. Reg. at 69650.

[43] *See, e.g.*, N.Y.P.L. 120.06; 105.00.

[44] *Id.*

[45] Alice Speri, The Largest Gang Raid In NYC History Swept Up Dozens Of Young People Who Weren't In Gangs, The Intercept, Apr. 25, 2019, https://theintercept.com/2019/04/25/bronx-120-report-mass-gangprosecution-rico/ (describing a raid conducted by local and state law enforcement in conjunction with federal agencies and ICE that swept up individuals not part of gang); Professor Babe Howell & Priscilla Bustamante, Report on the Bronx 120 Mass "Gang" Prosecution (CUNY School of Law 2019), https://bronx120.report/.

Brooklyn Defender Services     177 Livingston Street, 7th Floor     T (718) 254-0700     www.bds.org
Brooklyn, New York 11201     F (718) 254-0897

ER-2762

AR.10797

activity—as the Proposed Rule suggests—but rather would target asylum seekers because they are from a particular country, live in a particular neighborhood or housing project, go to a specific school, or "look" to law enforcement or asylum adjudicators like gang members purportedly look.[46]

That is why the "reason to believe" standard is arbitrary, capricious, and ultra vires. It represents an open-ended, arbitrary, adjudicative process where asylum adjudicators will inevitably and unfairly rely on discredited methods of gang identification. The gang-related inquiry into eligibility mandated by the Proposed Rule would not be an individualized inquiry that considers the basis for the asylum claim, the applicant's story, or even the seriousness of the conduct at issue—rather, the sole inquiry is whether there is a "reason to believe" the conduct is "in furtherance" of gang-activity. In practice, this could mean that the individual was flagged in the gang database by law enforcement without any investigation or due process, that ICE made unsubstantiated gang allegations during an enforcement action, that the prosecutor alleged (but never proved) the individual was in a gang, or that they were charged with—but never convicted of—a gang offense or acting as part of a conspiracy or in concert with others.

For example, inclusion in the New York Police Department ("NYPD") database is racially disproportionate, and represents a mass surveillance of the Black and Latinx communities.[47] The NYPD uses arbitrary criteria to determine gang membership or affiliation for purposes of the gang database, including where an individual lives, what they wear, any scars or tattoos, hand signals they make in social media posts, or "affiliation" with "known gang members" *i.e.,* others in the database. Notably, commission of any crime is not among the criteria. Further, the NYPD gang database has no meaningful oversight, accountability, or due process protections to ensure that people are not erroneously placed or kept on the database. Nor is there any transparency on whether someone is on the database or remedy to remove someone from the database. The unreliability of the information in the database, as well as lack of due process protections, means the NYPD gang database, and others like it,[48] should not be used to

---

[46] *See* K. Babe Howell, Gang Policing: The Post Stop-and-Frisk Justification for Profile-Based Policing, 5 Univ. Denver Crim. Law Rev. 1 (2015), https://academicworks.cuny.edu/cgi/viewcontent.cgi?article=1067&context=cl_pubs.

[47] Nearly 66% of those added to the NYPD's gang database between Dec. 2013 and Feb. 2018 were Black and 33% were Latinx. Alice Speri, New York Gang Database Expanded By 70 Percent Under Mayor Bill De Blasio, The Intercept, June 11, 2018, https://theintercept.com/2018/06/11/new-york-gang-database-expanded-by-70-percentunder-mayor-bill-de-blasio/; *see also* Howell, Gang Policing, 5 Univ. Denver Crim. L. Rev. 16 (Data based on NYPD FOIL responses show the NYPD added 21,537 people to its gang database between 2001 and August 30, 2013. 48% were Black and 44% were Latino; only 1% of the individuals added to the NYPD's gang database were white. An additional 17,000 people were added to the database in the past four years, with less than 1% being white, and a majority being young people, as young as 13).

[48] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/. "People have been put on gang databases for as little as living in an area that's considered a high-crime gang neighborhood, wearing a red jersey, or being caught hanging out in the living room of a cousin who may be involved with gangs." Julianne Hing, "ICE Admits Gang Operations Are Designed to Lock Up Immigrants," The Nation (Nov. 20, 2017),

Brooklyn Defender Services          177 Livingston Street, 7th Floor          T (718) 254-0700          www.bds.org
                                     Brooklyn, New York 11201                 F (718) 254-0897

ER-2763

AR.10798

strip an eligible asylum seeker of their right to apply for asylum. Moreover, the cooperation between local law enforcement and ICE on supposed gangs-related raids, have demonstrated the inaccurate and racial disparate impact of gang-related claims by local law enforcement.[49] The Proposed Rule would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[50]

Immigration adjudicators already routinely premise enforcement, detention, discretionary denials of relief, or release on bond on purported gang membership, where ICE makes gang allegations on the basis of questionable evidence and deference to this evidence is often granted by immigration adjudicators.[51] For example, an ICE agent "admitted during a predawn raid on a supposed gang member that the only known crime the suspect had committed was being undocumented."[52] General and unsubstantiated claims of gang membership often appear in a Form I-213 in a manner that is rife with indicia of unreliability. For example, during Operation Matador, a joint immigration enforcement initiative between ICE and local law enforcement agencies in and around New York City, the assistant special agent admitted: "The purpose of classifying [one detainee] as a gang member or a gang associate is because once he goes in front of an immigration judge, we don't want him to get bail."[53] Form I-213s prepared with the goal

https://www.thenation.com/article/ice-admits-gang-operations-are-designed-to-lock-up-immigrants/.

[49] For example, the Chicago Police have admitted that errors in its gang database enabled ICE raids. Jacqueline Serrato, "Chicago Police admits gang database error that enabled ICE raid." Chicago Tribune (December 6, 2017), http://www.chicagotribune.com/hoy/ct-chicago-police-admits-gang-database-error-20171206-story.html.

[50] *See* Jonathan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[51] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf. For an illustration of ICE's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html. A DHS internal memo from July 2017 instructed federal agents to detain teenagers who met at least two criteria of gang membership. Jacqueline Serrato, "Chicago Police admits gang database error that enabled ICE raid." Chicago Tribune (December 6, 2017), http://www.chicagotribune.com/hoy/ct-chicago-police-admits-gang-database-error-20171206-story.html; *see also* Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

[52] Julianne Hing, "ICE Admits Gang Operations Are Designed to Lock Up Immigrants," The Nation (Nov. 20, 2017), https://www.thenation.com/article/ice-admits-gang-operations-are-designed-to-lock-up-immigrants/.

[53] ICE Press Release, *Operation Matador Nets 39 MS-13 Arrests in Last 30 Days* (June 14, 2017), https://www.ice.gov/news/releases/operation-matador-nets-39-ms-13-arrests-last-30-days; CBS, "Inside ICE's Controversial Crackdown on MS-13" (Nov. 16, 2017), https://www.cbsnews.com/news/ms-13-gang-ice-crackdown-thomas-homan/.

Brooklyn Defender Services     177 Livingston Street, 7th Floor     T (718) 254-0700     www.bds.org
Brooklyn, New York 11201     F (718) 254-0897

ER-2764

AR.10799

Page 13

of ensuring someone is denied bond in immigration court—or stripped of the right to apply for asylum under the Proposed Rule—is an ulterior motive that rebuts its reliability.[54]   Nonetheless, as demonstrated above in the context of the gang database, once the claim of gang affiliation is made it is very difficult to disprove.

Creating a "gang-related crime" bar will only exacerbate the existing harm and due process issues with the gang databases and unsubstantiated claims of gang affiliation, which are disproportionately levied against young men of color and notoriously inaccurate, outdated, and infected by racial bias.[55]  The Proposed Rule, thus, invites extended inquiry into the character of young men of color who are otherwise eligible for asylum, based on information gained through racially disparate policing practices and as a result of racially disparate rates of guilty pleas to minor offenses.

The Proposed Rule asks what constitutes a "sufficient link" between an underlying conviction and gang-related activity for purposes of barring asylum eligibility:[56]  any individual, regardless of where they live or what they look like, should be allowed to apply for asylum, present their case, and receive an individualized determination from asylum adjudicators.

4.    Domestic Violence ("DV") Bar

The categorical domestic violence bar does not require a final conviction.  The proposed DV bar provides that "offenses involving conduct amounting to domestic assault or battery, stalking, or child abuse in the domestic context" make an individual ineligible for asylum,[57] and instruct asylum adjudicator to "assess all reliable evidence in order to determine whether that conviction amounts to a domestic violence offense," or, if there is no conviction, "to consider what conduct" the asylum seeker engaged in "to determine if the conduct amounts to a covered act of battery or extreme cruelty."[58]  The Proposed Rule does not state the standard to be used in these determinations, where the burden lies, or what would prompt these inquiries—rather, the Rule would allow for a

---

[54] *See Barradas v. Holder*, 582 F.3d 754, 763 (7th Cir. 2009) (listing reasons I–213 may not be inherently reliable, including when it is "carelessly or maliciously drafted or was intended to serve as anything other than an administrative record").

[55] An analysis of Chicago's gang database by the UIC Policing in Chicago Research Group showed that 96 percent of the nearly 65,000 people identified as suspected gang members are Black or Latino. Individuals are included in the gang database without any notification by CPD and then they are not allowed any opportunity to contest their inclusion in the gang database.  Jacqueline Serrato, "Chicago Police admits gang database error that enabled ICE raid." Chicago Tribune (December 6, 2017), http://www.chicagotribune.com/hoy/ct-chicago-police-admits-gang-database-error-20171206-story.html; *see also* Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019.

[56] 84 Fed. Reg. at 69650.

[57] *Id*. at 69651-52.

[58] *Id*. at 69652.

Brooklyn Defender Services     177 Livingston Street, 7th Floor     T (718) 254-0700     www.bds.org
Brooklyn, New York 11201     F (718) 254-0897

ER-2765

AR.10800

general and sweeping inquiry every time there is an arrest and, potentially, any time a child welfare agency or family court system is involved.

The Proposed Rule again ignores the reality of how domestic violence cases are prosecuted, the minor conduct that can lead to such cases, and the disparate impact this will have on low-income and communities of color. In Brooklyn, generally any time there is an incident involving intimate partners or children, the case is designated a domestic violence case from the beginning, orders of protection are almost always issued regardless of any individual assessment of danger, and, if a child is involved, a child welfare case is opened. Often, all parties involved are arrested in "cross-arrests." If the prosecutor cannot prove the allegations, the case is dismissed, an individual may plead to a violation—a non-criminal offense, or accept an adjournment contemplating dismissal during which an order of protection could be in place as a matter of standard practice, rather than an individualized assessment of danger or threat.

Nonetheless, because the proposed DV bar is focused on alleged conduct, not conviction, the incident and arrest alone would trigger an inquiry into an asylum seeker's purported conduct. In doing so, the Proposed Rule undermines the criminal justice system and the constitutional due process protections mandated for criminal defendants. The Proposed Rule not only allows but actually requires an asylum adjudicator to re-try an applicant without providing the applicant with any protections or tools—such as discovery, subpoena, or even counsel—needed to defend themselves again. For example, an individual who is a political activist and fleeing persecution and torture with their family could be barred from asylum for being arrested and having an order of protection issue against them. Even if the individual has never been convicted of a domestic violence offense, they could still be categorically ineligible for asylum under the new rules if an adjudicator conducts an independent inquiry into the incident underlying the order of protection. This would result not only in the applicant being barred from asylum, it would also prevent their children and spouse—who the government is allegedly trying to protect—from gaining any relief. While withholding of removal and Convention and Against Torture ("CAT") relief would still be available to the primary applicant, those forms of relief do not provide any relief for derivative family members. The unfairness and difficulty in adjudicating these broad inquiries will be exacerbated where asylum seekers do not have access to counsel or fully understand why an immigration judge is asking them about past incidents.

Under the Proposed Rule even an unsubstantiated civil, non-criminal case in family court could potentially be used to bar an individual from asylum. For example, cases have been brought for "endangering the welfare of a child" where a child was briefly left alone in their home because a single parent had to run to the store, or where there was a lapse in babysitting for a working parent.[59] Neglect cases have been brought against both parents for having an altercation while a child is sleeping in the other room, where a parent has a substance abuse or mental health issue, or against individuals who are only temporary caretakers of a child. Child welfare cases can be started by anonymous tips or

---

[59] *See, e.g.,* WNYC, "Family Separations in Our Midst", https://www.wnyc.org/story/child-removals-emergency-powers/.

Brooklyn Defender Services     177 Livingston Street, 7th Floor     T (718) 254-0700     www.bds.org
Brooklyn, New York 11201     F (718) 254-0897

ER-2766

AR.10801

mandatory reporters, where children and parents are first interviewed without protections, such as counsel, and the inquiry into a family could last months or years.[60] While these cases are often eventually dismissed or otherwise resolved in family court, the allegations themselves could be the basis to deny an entire family asylum.

Moreover, the types of families most susceptible to intrusive policing and child welfare supervision are low-income and families of color and, as such, this overbroad conduct-based inquiry will disparately impact asylum seekers from these communities.[61] In BDS's Family Defense Practice, the vast majority of those represented are people of color living in poverty, often raising their children in homeless shelters or public housing, and in highly-policed neighborhoods, making them vulnerable to government surveillance. Asylum seekers are often in financial distress, as they may have been forced to flee their home countries without bringing financial resources with them or having contacts in the United States, and may have been excluded from economic opportunities in their home countries for the very reasons they are applying for asylum. Families living in homeless shelters, under incredible economic stress, are living under the fear that one argument between parents or one moment of impatience with a child may lead to a knock on their door from a child welfare worker. School attendance interrupted by homelessness or an angry landlord seeking to evict a family illegally can result in a call to the child welfare authorities and begin an investigation into a family. For all these reasons, a factual admission or judicial finding in the family court process should not be used as a way to bar otherwise eligible asylum seekers.

## C. The Proposed Rule Undermines the Important Principle that Asylum and Non-Refoulement Inquiries Are Individualized

The Departments assert that the proposed limitations on eligibility for asylum are consistent with Article 34 of the Convention.[62] However, this is not so. By creating

---

[60] Describing the overly invasive way that child welfare cases can begin: "Caseworkers enter homes, not necessarily showing official documentation or identification indicating who they are and why they are there. Once in the home, they ask a series of questions, some related to the investigation at hand and others not. Parents do not understand that the caseworkers are collecting information that may result in an eventual Family Court petition alleging abuse and neglect, and give them an abundance of information (not always connected to their actual parenting) in hopes that if they are honest, they will be left alone." The New School, *Child Welfare Needs to Have Its 'Stop-and-Frisk Moment'*, June 27, 2018), http://www.centernyc.org/child-welfare-needs-to-have-its.

[61] Poor communities and communities of color are disproportionately impacted by the child welfare system. In New York State, Black children make up 40% of the children in foster care yet make up only 15% of the children in the state, whereas white children make up 25% of the children in foster care and 48% of the children across the state. *See* New York State CPS, 2018 Monitoring and Analysis Profiles With Selected Trend Data: 2014-2018, at 7 https://ocfs.ny.gov/main/reports/maps/counties/New%20York%20State.pdf. In NYC, despite making up only 23% of New York City's child population, Black children represent over 52% of foster care placements. New York City Administration of Children's Services Community Snapshots, (2010, 2011, 2013), http://www.nyc.gov/html/acs/html/statistics/statistics_links.shtml; *see also* NYS OCFS, Disproportionate Minority Representation (DMR) in Child Welfare and Juvenile Justice Systems (Dec. 2015) at 7, https://ocfs.ny.gov/main/bcm/DMR_Section%20Seven%20of%20Grant%20RFP_2015.pdf, page 7.

[62] 84 Fed. Reg. at 69640.

Brooklyn Defender Services    177 Livingston Street, 7th Floor    T (718) 254-0700    www.bds.org
                               Brooklyn, New York 11201          F (718) 254-0897

ER-2767

AR.10802

categorical particularly serious crimes through the aggravated felony definition and by interpreting aggravated felonies and particularly serious crimes to encompass broad types of convictions, the INA and agency interpretation (prior to the Proposed Rule) already expanded the non-refoulement exception far beyond what was contemplated in the Convention or provided for by the United Nations. UNHCR instructs the Convention signatories to consider "the nature of the act, the actual harm inflicted, the form of procedure used to prosecute the crime, and whether most jurisdictions would consider the act in question as a serious crime."[63] UNHCR also instructs that when analyzing whether a criminal issue bars an individual from asylum relief, adjudicators should balance the nature of the offense "with the degree of persecution" and "other relevant or mitigating factors."[64] Consideration of "the nature of the act" and balancing mitigating evidence means a case-by-case analysis, which a categorical bar contravenes.[65] For example, there are no per se bars to asylum in Canada, Austria, or Germany.[66] Some countries like Austria, Canada, Germany, and the United Kingdom require an independent finding of ongoing dangerousness before finding an offense "a particularly serious crime."[67] Some countries, including Austria, Canada, France, and Germany further require balancing the danger posed by the refugee against the risk of persecution in the refugee's home country,[68] as is consistent with United Nations guidance. By contrast, the Proposed Rule seeks to multiply the categorical bars to asylum where minor convictions, non-criminal offenses, and conduct without any final judgment will bar asylum; as such, the proposed categorical bars are unlawful.

The established principle that asylum determinations should be individualized and balance any negative factors against the persecution at issue and mitigating evidence is crucial given the substantial risk that returning asylum seekers to their home countries. These measures ensure that asylum applicants in vulnerable populations have the opportunity to present the totality of their case and not be defined by an arrest. Instead, the Proposed Rule undermines this important principle. To implement the proposed categorical bars, asylum adjudicators are directed to undermine and second-guess the results of the state criminal justice and family court systems. Immigration adjudicators would hold mini-trials to "re-prosecute" asylum seekers to determine whether a sentence, a conviction, or conduct fits into one of the vague categories proposed by the Rule, or to reverse lawful state court orders to vacate, expunge, or modify convictions and sentences. The Proposed Rule prevents individuals from presenting their asylum case and providing context and mitigating factors for criminal justice contacts.

The Departments do not sufficiently explain why such broad categorical bars are needed. For example, the Proposed Rule excludes from protection anyone who was convicted of a felony and defines "felony" as "any crime punishable by more than one year

---

[63] UNHCR Handbook ¶ 86.

[64] *Id.* ¶¶ 156-157.

[65] Briefing for the House of Commons ¶ 10.

[66] IDP Harvard Report at 21.

[67] *Id.* at 23-24.

[68] *Id.* at 25-26.

Brooklyn Defender Services      177 Livingston Street, 7th Floor      T (718) 254-0700      www.bds.org
Brooklyn, New York 11201      F (718) 254-0897

ER-2768

AR.10803

of imprisonment" without any reference to other factors, including dangerousness.[69]  The Proposed Rule claims the additional categorical bars that expand the definition of a particularly serious crime are necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient;"[70] but an individualized analysis is exactly what the Convention requires to ensure that only those individuals who have been convicted of crimes that are truly particularly serious and who present a future danger to the community are placed at risk of refoulement.  Even the BIA has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[71]  Asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct.  Indeed, in the case of the domestic violence and gang-related grounds, the categorical bar would be imposed on the basis of mere allegations of conduct.[72]

Furthermore, the Departments seek to justify their proposed changes, in part, by claiming the Attorney General has the discretion to enact them;[73] however, that discretion cannot be used to violate domestic law and international treaties—let alone fundamental human rights—as the Proposed Rule does here.  While asylum is a discretionary benefit and, therefore, corresponds to Article 34 of the Convention,[74] the Attorney General's discretion in establishing asylum procedures is limited by the criteria in §1158(b) and (d) and their legislative history,[75] which clearly incorporate international law and legal norms.

As such, the Proposed Rule is not a valid exercise of the Attorney General's discretion, but rather constitute a violation of the United States' international legal obligations.  It is well established that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."[76]  Furthermore, where the United States is a party to treaty, Congress must make a clear expression of any intent it may have to abrogate the treaty.[77]  The "law of nations" undoubtedly includes the

---

[69] 84 Fed. Reg. at 69659-60.

[70] *Id.* at 69646.

[71] *Pula*, 19 I.&N. Dec. at 474.

[72] The Proposed Rule explains that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."  84 Fed. Reg. at 69651

[73] The amended §1158 affords the Attorney General power to "establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum."  §1158 (b)(2)(C).

[74] *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 441 (1987) ,

[75] *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 758 (9th Cir. 2018).

[76]  *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804).

[77] The Supreme Court has further crystalized the avoidance of repeal or abrogation absent clear legislative intent.  *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984) ("a firm and obviously sound canon of construction against finding implicit repeal of a treaty in ambiguous congressional action"); *Cook v. United States*, 288 U.S. 102, 120 (1933) ("[a] treaty will not be deemed to

Brooklyn Defender Services          177 Livingston Street, 7th Floor          T (718) 254-0700          www.bds.org
Brooklyn, New York 11201          F (718) 254-0897

ER-2769

AR.10804

Page 18

Convention, a treaty to which the United States is a party, as well as international refugee law norms.[78]  The purpose of the Refugee Act was "to provide a permanent and systematic procedure for the admission to this country of refugees of special humanitarian concern to the United States."[79]  The text of the asylum statute tracks almost verbatim the United States' treaty obligations under the 1951 Convention and the 1967 Protocol.[80]  By adopting the Convention's language regarding a "final judgment of a particularly serious crime" that precludes granting asylum, Congress similarly indicated that the IIRIRA should be interpreted in accordance with international refugee law norms.[81]  Against the backdrop of this clear congressional scheme and background principles of comity, the Attorney General's discretion under 8 U.S.C. § 1158(b)(2)(C) to establish "additional limitations and conditions" confining asylum eligibility must stay within the legislative parameters.[82]

Simply put, existing asylum law in the United States has already deviated from the international norm and the Departments' proposed additional bars will only further disconnect the United States from its obligation to the Convention.  Instead of working towards greater congruence with the terms of the Convention, the Proposed Rule carves out further categorical bars from protection that violate both the language and spirit of the treaty.

have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed.").

[78] The "laws of nations" under *Charming Betsy* has been further held to include treaties and customary international law.  *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 251 (2d Cir. 2003); *see also The Paquete Habana*, 175 U.S. 677, 700, 20 S. Ct. 290, 299, 44 L. Ed. 320 (1900) ("International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination.").

[79] *Marincas v. Lewis*, 92 F.3d 195, 198 (3d Cir. 1996) (citing Pub.L. 96–212, tit. I, § 101(b), 94 Stat. 102 (1980)); H.R. Rep. No. 96-608 (1979) at 12-14 (explaining that by changing the statutory phrase "special concern" to "special humanitarian concern" in what became § 1157(a), the House committee "intends to emphasize that the plight of the refugees themselves, as opposed to national origins or political considerations, should be paramount in determining which refugees are to be admitted to the United States"); *see also* Pub. L. No. 96-212 § 201 (a) (providing a universal, nondiscriminatory definition of "refugee" closely paralleling that of the United Nations Conventions Relating to the Status of Refugees (1951)), codified at 8 U.S.C. § 1101(a)(42).

[80] *See, e..g, I.N.S. v. Stevic*, 467 U.S. 407, 426 n.20 (1984) ("As with the asylum provision, the Committee feels that the proposed change in section 243(h) is necessary so that U.S. statutory law clearly reflects our legal obligations under international agreements") (quoting H.R. Rep. No. 96-256, at 17–18 (1979)).

[81] *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 185 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.").

[82] *E. Bay Sanctuary Covenant*, 932 F.3d at 774 ("[w]here 'Congress itself has significantly limited executive discretion by establishing a detailed scheme that the Executive must follow in [dealing with] aliens,' the Attorney General may not abandon that scheme because he thinks it is not working well") (citing *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 368 (2005)).  Indeed, 8 U.S.C. § 1158(b)(2)(C) expressly provides that in establishing "additional limitations and conditions," the Attorney General must be "consistent with" existing law.  *E. Bay Sanctuary Covenant*, 932 F.3d at 754.

Brooklyn Defender Services          177 Livingston Street, 7th Floor          T (718) 254-0700          www.bds.org
                                     Brooklyn, New York 11201                F (718) 254-0897

ER-2770

AR.10805

Page 19

### D. The Proposed Rule Undermines State Court Orders Vacating or Expunging Convictions, and Altering Sentences

The Proposed Rule outlines a new multifactor process that asylum adjudicators must use to determine whether a vacated, expunged, or modified conviction remains valid for asylum purposes.[83] This process unfairly burdens asylum seekers, undermines their right to sound advice on the consequences of a conviction, and denies the full faith and credit to which state court orders are entitled. Specifically, the Rule would subject state court orders to a searching inquiry by asylum adjudicators. It would also create an unreasonable presumption that postconviction relief is for an illicit purpose if ordered while the asylum seeker is in immigration proceedings or if sought more than one year after the original conviction.[84]

As the Supreme Court held in *Padilla v. Kentucky*, the Sixth Amendment guarantees noncitizens competent advice on the immigration consequences of a guilty plea. The Proposed Rule undermines this right by creating a rebuttable presumption that asylum seekers are engaging in gamesmanship if they receive postconviction relief based on *Padilla* while in immigration proceedings or move for such relief more than one year after the underlying conviction. Asylum seekers would thus face a heightened standard in showing ineffective assistance of counsel and would be unfairly prejudiced for not identifying a deficiency before consulting with an immigration attorney. As the Court stated in *Padilla*, "[t]here is no reason to doubt that lower courts . . . can effectively and efficiently use [the ineffective assistance] framework to separate specious claims from those with substantial merit." 559 U.S. at 372.

The Proposed Rule, furthermore, instructs asylum adjudicators to second-guess the reasoning of state court orders beyond what has previously been permitted by circuit and agency precedent. The agencies claim that this requirement would "codify the principle set forth in *Matter of Thomas and Thompson*," a recent decision holding that any state court postconviction altering of sentences must be based "on a procedural or substantive defect in the underling proceedings" in order to be valid for immigration purposes.[85] (That standard had previously applied only to vacaturs.) However, the Proposed Rule in fact goes far beyond this standard. Instead of requiring asylum seekers to show the legal basis of the postconviction order, the Proposed Rule would require them to prove that the state court's "purpose" in entering the order was *not* related to rehabilitation or immigration considerations. The Rule would further authorize asylum adjudicators to "look beyond the face of [the] order" in making this determination.[86] The

---

[83] 84 Fed. Reg. at 69654-56.

[84] *Id.*

[85] The authority of the Attorney General to decide *Thomas & Thompson* in the manner that provides support for this rule change may consitute policymaking beyond the scope of his power and contravening principles of administrative law providing that an adjudication be limited to the facts and law applicable to the case. *See* 5 U.S.C. § 554(b) (requiring that the parties have notice of "the matters of fact and law asserted.")

[86] 84 Fed. Reg at 69655.

Brooklyn Defender Services    177 Livingston Street, 7th Floor    T (718) 254-0700    www.bds.org
Brooklyn, New York 11201    F (718) 254-0897

ER-2771

AR.10806

legal support for this proposal is shaky at best.[87] Adjudicators would have indefinite authority to search for an impermissible immigration "purpose" not present on a facially valid postconviction order.

Taken together, these requirements obscure the meaning of "conviction" for immigration purposes. If an asylum adjudicator can reject the validity of any state court order based on anything in the record, then it becomes unclear whether a vacated or modified conviction still stands, or whether any subsequent plea or new conviction is itself valid. For example, where a New York appeals court reversed the conviction based on a constitutional deficiency, and the individual then entered a plea that did not have the serious immigration consequences of the original conviction. Under the Proposed Rule, the asylum adjudicator would be able to look beyond the constitutional deficiency identified in the court order and determine that an invisible immigration purpose underlay the grant of relief. The asylum adjudicator would then be faced with two irreconcilable convictions that are both 'valid' for immigration purposes. The example illustrates the confusion and unfairness that the Proposed Row would create.

## E.    The Proposed Rule Will Disparately Impact Vulnerable Communities

The Proposed Rule will disparately impact vulnerable populations, including asylum seekers hailing primarily from Central America and the Global South, and those who are routinely criminalized because of their nationality or identities, because of racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[88] As a result of trauma, asylum applicants may have been homeless, in abusive relationships, or have dealt with substance abuse—all of which can lead to low-level offenses. During an individualized assessment before an asylum adjudicator, they may be able to provide important context for the offense or arrest, and explain the steps taken since. By categorically barring eligibility for asylum, the proposed bars would prevent any such inquiry.

Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. The mental health problems facing refugees and asylum seekers may be acute, and can include, among other issues, depression, anxiety, post-traumatic stress disorder

---

[87] The Proposed Rule cites two cases from the Third Circuit, *Rodriguez v. U.S. Attorney General* and *Cruz v. Attorney General*, to support this change, however, the Departments fail to note the lack of consensus among the circuits on this issue. *See Pinho v. Gonzales*, 432 F.3d 193, 215 (3d Cir. 2005) (permitting adjudicators to look behind the order in only certain circumstances and cautions against extrapolating about the motives of state officials); *Pickering v. Gonzales*, 454 F.3d 525, 528 (6th Cir.), opinion amended and superseded on other grounds, 465 F.3d 263 (6th Cir. 2006) (explaining that "the motive of the Petitioner in seeking to have his conviction quashed is of limited relevance to our inquiry" and that it has relevance only if the court relied on it in quashing the conviction).

[88] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, Dec. 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

Brooklyn Defender Services          177 Livingston Street, 7th Floor          T (718) 254-0700          www.bds.org
                                     Brooklyn, New York 11201               F (718) 254-0897

ER-2772                                                                                          AR.10807

Page 21

("PTSD"), and suicidal thoughts. [89]  Unable to access affordable medical care and treatments for complex trauma, asylum seekers may turn to drugs and alcohol in an effort to self-medicate.[90]  The proposed new bars to asylum include drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence.  This approach ignores the evidence of the effects of trauma and is inconsistent with the movement towards emphasizing rehabilitation and recovery, over criminalizing substance abuse issues.

In addition, the expansion of asylum bars to include various non-criminal and misdemeanor offenses that were not previously considered particularly serious will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers of color, survivors of trafficking, and survivors of domestic violence.  Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options.  LGBTQ immigrants in particular may have already experienced a high degree of violence, discrimination, and exclusion from economic and political life in their home countries.[91]  Members of these communities also experience isolation from their kinship and national networks following their migration to the United States.  This isolation, compounded by continuing discrimination towards the LGBTQ population at large, leaves many in the LGBTQ immigrant community vulnerable to homelessness, trafficking, domestic violence, and substance abuse, in addition to discrimination and over-policing.[92]

The Proposed Rule also unfairly targets trafficking survivors, who frequently come into contact with intervention resources and service providers only after contact with law enforcement.  Innovative criminal justice reform efforts currently being adopted across

---

[89] Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder ("PTSD").  Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (Aug. 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.  One recent study on refugees found that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.  Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[90] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/; Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/ ("individuals with PTSD are up to 14 times more likely to struggle with a substance use disorder").

[91] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[92] *See e.g.,* Sharita Gruber, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

Brooklyn Defender Services       177 Livingston Street, 7th Floor       T (718) 254-0700       www.bds.org
                                 Brooklyn, New York 11201            F (718) 254-0897

ER-2773

AR.10808

Page 22

the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[93]  A similar approach, where an asylum applicant is viewed holistically and in the context of the trauma they suffered, should be employed in the determination of asylum eligibility where the applicant's life and safety are on the line.

The Departments attempt to defend their excessively broad proposal by noting that alternative forms of relief will not be precluded under the same scheme.  The Departments do not consider, however, that the protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain.  CAT and withholding protections demand a higher level of proof than asylum:  a clear probability of persecution or torture.[94]  Thus, an otherwise eligible asylum seeker may be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Furthermore, the BIA requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed.[95]  Thus, they cannot travel internationally, meaning those granted withholding of removal or CAT are trapped within the United States in long-term limbo.  Withholding and CAT recipients may also face permanent separation from their spouses and children because, unlike asylees, they cannot include their spouses or children as derivatives on their applications.[96]  For many, this will mean that the Proposed Rule is yet another formal policy of family separation, where parents are faced to choose between leaving their children on their own or returning to a country where it has been established that they more likely than not will face persecution and torture.[97]

Most importantly, CAT and withholding do not offer the full protections afforded by asylum or allow beneficiaries the security and stability of a pathway to a green card

---

[93] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, Dec. 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*), https://www.courtinnovation.org/publications/NYC-sex-trade.

[94] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion."  *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum.  *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution).  For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[95] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

[96] 8 C.F.R. § 208.21(a).

[97] *See, e.g.*, Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, Dec. 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

Brooklyn Defender Services      177 Livingston Street, 7th Floor      T (718) 254-0700      www.bds.org
Brooklyn, New York 11201      F (718) 254-0897

ER-2774

AR.10809

Page 23

and citizenship. The Rule, thus, has the effect of excluding low-income individuals, communities of color, and other vulnerable populations from full membership to our society. A Rule that limits eligible asylum seekers to withholding of removal and CAT protection—and that has a disparate impact on low-income, communities of color, and LGBTQ individuals—would impose a very real harm on asylum seekers who have come to the United States in search of protection and constitute a violation of the United States' non-refoulement obligation.

\*       \*       \*       \*

For the reasons provided here, BDS requests that the Departments consider these recommendations and immediately halt the implementation of the Proposed Rule.

Please do not hesitate to contact us if you have questions regarding our comments. Thank you for your attention and consideration of our concerns.

Sincerely,

_/s/ Nyasa Hickey_
Nyasa Hickey
Director of Immigration Initiatives

_/s/ Sonia Marquez_
Sonia Marquez
Civil Rights—Immigration Attorney

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eks-oftj
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0557
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Phuoc Thang

## General Comment

I strongly oppose this I think it's very unfair that these immigrants are paying twice for their crimes

AR.10811

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eks-lod2
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0558
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Margaret Baker
**Address:**
  861 Vista Way
  Chula Vista,  CA,  91911
**Email:** mbakerdrph@gmail.com
**Phone:** 6198400463

## General Comment

See attached file(s)

## Attachments

Public Comment on Rule Criminalizing Asylum Seekers-SBPP_2010-01-21

AR.10812

On behalf of South Bay People Power, I am writing in strong opposition to the proposed rule changes that would do irreparable harm to many asylum-seeking individuals and their families.

South Bay People Power is a non-partisan, proactive group of residents of San Diego County who live near the US-Mexico international border. We are dedicated to promote policies and practices that reflect the values of justice, fairness and civil rights and to encourage civic engagement among all members of our diverse community. Based on the deeply-held humanitarian values and long-accepted principles of justice in our country, we vehemently oppose this cruel proposed rule change.

Many members of our group work closely, as part of the San Diego Rapid Response Network and other immigrant rights and local humanitarian organizations, with asylum-seekers in our community who are escaping violence, persecution and threats to themselves and their families. We have seen their fear first-hand and heard their stories of torture and escape. We have comforted them and their children and wished them well as most have moved on to other areas of the country where they will stay with sponsors as they await their asylum court proceedings. In several cases, we have spoken via Whatsapp with family members who remain in their countries of origin, where the dangers still exist. We have also seen photographs of burned homes, dead bodies and threatening graffiti on the sides of the former homes of the asylum-seekers who seek refuge in our midst. The violence, the horror, the persecution and the threats are ongoing.

In their quest for asylum, migrants are often subjected to further violence, abuse and injustices. The United State of America should not commit even more assaults on these individuals. Under the proposed rule change, many who have endured injustices such as racial profiling in our criminal legal system will be punished doubly – as they may be deported to the place they are fleeing – thus subjecting them to further violence and persecution.

For many asylum seekers, the obstacles of understanding the asylum process, obtaining an attorney and complying with all the changing demands of individual judges and false court dates, all while finding ways to meet their physical needs, can be overwhelming. Almost all of the families I have worked with suffer from anxiety and many stress-related medical problems due to the ongoing insecurity of their situations. I personally have helped support 3 families whose babies had pre-term births and were placed in NICU. I have accompanied a 34-year-old woman to multiple appointments with an endocrinologist because of chronic liver disease – she has never used alcohol or other drugs. High blood pressure and unchecked diabetes are other serious stress-related conditions that threaten the health and well-being of the asylum-seekers I am attempting to support. I have a doctorate in public health and know from research I have conducted and clinical work I have provided that stress is a major underlying factor. The current U.S. asylum process itself is a major contributing factor and an obstacle to their health, well-being and

AR.10813

ability to find safety and justice. And now, we just cannot add insult to injury with this proposed rule change!

Under the Refugee Act of 1980, anyone present or arriving in the U.S. can apply for asylum. The administration's proposed rules would make individuals involved in the criminal legal system ineligible for asylum. There are no grounds, no sound basis in law, for such rule changes. And our current criminal legal system has its own flaws, in particular, racial profiling. The new rules would allow racial profiling to place people who are seeking asylum at further risk. We believe it is wrong and unjust to punish individuals a second time after completing their sentences. They should not be subjected to deportation as a consequence of their membership in a particular racial group. As we have seen in recent weeks, deportation is a matter of life and death.

Therefore, we strongly object to the new rule. It is unjust, cruel and a disgrace to our values as humans and as a nation. We should protect due process for everyone, no matter what they look like or where they were born.

AR.10814

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eks-b5ue
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0559
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Jeanne Funk
**Address:**
   7 E Baltimore St
   Baltimore, MD, 21202
**Email:** jfunk@wr.org
**Phone:** 6035083884
**Organization:** World Relief

---

## General Comment

Submitted via portal: http://www.regulations.gov

Re: Executive Office for Immigration Review and U.S. Citizenship and Immigration Services, Procedures for Asylum and Bars to Asylum Eligibility (84 FR 69640;EOIR Docket No. 18-0002; A.G. Order No. 4592-2019, RIN 1125-AA87, 1615-AC41)
Dear Ms. Deshommes and Ms. Dunn,
I am writing on behalf of World Relief in opposition to the proposed USCIS amendment to the bars to asylum eligibility Procedures for Asylum and Bars to Asylum Eligibility (EOIR Docket No. 18-0002; A.G. Order No. 4592-2019) published in the Federal Register by the Department of Homeland Security (DHS) on December 19, 2019. World Relief appreciates the opportunity to participate and to submit comments and we are filing these comments by the deadline of January 21, 2020.

World Relief is a global Christian nonprofit organization founded by the National Association of Evangelicals (NAE) in 1944 to assist victims of World War II. The mission of World Relief is to empower the local church to serve the most vulnerable to overcome violence, poverty and injustice. Through love in action, it brings hope, healing and restoration to millions of the worlds most vulnerable women, men and children through vital and sustainable programs in disaster response, health and child development, economic development and peacebuilding. Since 1979, World Relief has resettled roughly 300,000 refugees and currently offers programs to encourage family integration to refugees, asylees, victims of human trafficking, and other immigrants in the United States. World Relief provides immigration legal services through attorneys and Department of Justice accredited representatives in numerous states in the U.S. World Relief currently has 17 active recognized and

AR.10815

accredited sites and is offering technical legal support to 40 church-based programs who are either currently recognized and accredited or in the application process.

Asylum seekers are some of the most vulnerable who are attempting to overcome violence and injustice. These are the people World Relief has been called to assist. For the reasons detailed in the comments that are attached, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to comment on this regulation.

# Attachments

WR Final Comment - 1-20-2020



7 E. Baltimore Street
Baltimore, MD 21202
T 443.451.1900 | F 443.451.1955
worldrelief.org

January 21, 2020

Lauren Alder Reid
Assistant Director, Office of Policy
Executive Office of Immigration Review
5107 Leesburg Pike, Suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Submitted via portal: http://www.regulations.gov

**Re: Executive Office for Immigration Review and U.S. Citizenship and Immigration Services, Procedures for Asylum and Bars to Asylum Eligibility (84 FR 69640;EOIR Docket No. 18-0002; A.G. Order No. 4592-2019, RIN 1125-AA87, 1615-AC41)**

Dear Ms. Deshommes and Ms. Dunn,

I am writing on behalf of World Relief in opposition to the proposed USCIS amendment to the bars to asylum eligibility *Procedures for Asylum and Bars to Asylum Eligibility* (EOIR Docket No. 18-0002; A.G. Order No. 4592-2019) published in the Federal Register by the Department of Homeland Security (DHS) on December 19, 2019. World Relief appreciates the opportunity to participate and to submit comments and we are filing these comments by the deadline of January 21, 2020.

World Relief is a global Christian nonprofit organization founded by the National Association of Evangelicals (NAE) in 1944 to assist victims of World War II. The mission of World Relief is to empower the local church to serve the most vulnerable to overcome violence, poverty and injustice. Through love in action, it brings hope, healing and restoration to millions of the world's most vulnerable women, men and children through vital and sustainable programs in disaster response, health and child development, economic development and peacebuilding. Since 1979, World Relief has resettled roughly 300,000 refugees and currently offers programs to encourage family integration to refugees, asylees, victims of human trafficking, and other immigrants in the United States. World Relief provides immigration legal services through attorneys and Department of Justice accredited representatives in numerous states in the U.S. World Relief currently has 17 active recognized and accredited sites and is offering technical legal support to 40 church-based programs who are either currently recognized and accredited or in the application process.

AR.10817

Asylum seekers are some of the most vulnerable who are attempting to overcome violence and injustice. These are the people World Relief has been called to assist. For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

## The proposed rule violates the United States obligations under the 1967 Protocol Relating to the Status of Refugees and the 1951 Convention Relating to the Status of Refugees

As a signatory to the 1967 Protocol which binds parties to the 1951 Refugee Convention, the U.S. obligated itself to develop and interpret U.S. refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. The Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[1]

This clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act." The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum." This proposed regulation impermissibly expands particularly serious crimes beyond those extreme cases covered by the Refugee Convention. The proposed regulation concludes that the possibility of a sentence of over one year would capture "crimes of a particularly serious nature because the offenders who commit such crimes are – as a general matter – more likely to be dangerous to the community than those offenders whose crimes are punishable by shorter sentences." This interpretation violates the Protocol under which the U.S. agreed to develop and interpret U.S. refugee law.

UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness." The Proposed Rules first exclude from protection anyone who was convicted of a felony and then later define a "felony" as "any crime punishable by more than one year of imprisonment" without any reference to other factors, including dangerousness. This proposed rule would encompass crimes as "particularly serious crimes" simply because of their potential punishment without consideration of the facts of the convictions. Crimes punishable by more than one year are not simply by their sentence extreme crimes as designated by UNHCR.

When determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors. This rule instead impermissibly aims to enact a categorical approach and does not allow for an individualized analysis or consideration of any mitigating factors.

---

[1]  Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention") at art. 33(2).

AR.10818

**The proposed regulation violates the Administrative Procedures Act, as it is arbitrary and capricious.**

The proposed rule is based on the premise that a categorical approach would eliminate inefficiencies by providing that all felonies would constitute a particularly serious crime and then defines a felony as a crime that contains the possibility of a sentence of over one year. USCIS and EOIR state that this would them to capture crimes of a particularly serious nature because offenders who commit crimes punishable by a sentence of over one year, as a general matter, are more likely to be dangerous to the community than those punished by shorter sentences.

"More likely" is not a determination that a particular offender is in fact more dangerous to the community. The factual conclusions USCIS and EOIR base this rule are not supported and they have failed to adequately articulate the basis for their conclusions.

Under the Administrative Procedure Act, an agency action, finding, or conclusion can be set aside where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or is "unsupported by substantial evidence."[2]. While this standard is "exceedingly deferential"[3] judicial review is proper if the agency action is not committed to the agency by discretion of law.[4]

The 10th Amendment to the U.S. Constitution defines powers delegated to the United States. It does not delegate police power to the United States. Under the 10th Amendment, powers not delegated to the US by the Constitution are reserved to the States. The individual states have been reserved police powers under the Constitution. The regulation is redefining what a felony is including state law, this is a power not committed to USCIS or EOIR by law. Therefore, judicial review of whether this regulation is arbitrary and capricious is proper.

USCIS and EOIR have not adequately articulated the basis for its conclusions. They solely rely on the inefficiency argument. They state that the mix of case-by-case adjudication and per se rules is an inefficient means of identifying categories of offenses that should constitute particularly serious crimes. They flatly conclude that convictions for which sentences are longer tend to be associated with crimes of a more consequential nature without providing any substantial evidence of this statement. This proposed regulation is arbitrary and capricious and should be withdrawn.

**The proposed regulation infringes on the police power reserved to the States under the 10th Amendment to the Constitution.**

This regulation is an improper interference of the Federal government into powers reserved to the States under the 10th Amendment. The 10th Amendment states, "The powers not delegated to the United States by the Constitution, nor prohibited to it by the States, are reserved to the States respectively, or to the people." One such power reserved to the States is the police power.

This statute redefines what is a felony, categorically defining all felonies as crimes involving a possible sentence of more than one year, "in accordance with the way that federal law defines felonies."

---

[2] 5 U.S.C. § 706(2)(A), (E)

[3] Defs. of Wildlife v. U.S. Dep't of Navy, 733 F.3d 1106, 1115 (11th Cir. 2013) (quoting Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009)).

[4] 5 U.S.C. § 701(a)(2); Heckler v. Chaney, 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985)

USCIS and EOIR are overriding States definitions under State statute by a Federal law definition, which is an impermissible infringement on the States' police power.

Colorado law, for instance, allows for sentence of 6-18 months for Class 1 and Class 2 misdemeanors.[5] Pennsylvania law provides up to 5 years in jail for Class 1 misdemeanors and 2 years for Class 2 misdemeanors.[6] This is just two instances of states where misdemeanor crimes have sentences of over one year. This regulation would redefine the State statute from classifying these crimes as misdemeanors and reclassify them as felonies, because it is more efficient to take a categorical approach.

The Constitution requires a distinction between what is truly national and what is truly local, and there is no better example of the police power. The Founding Fathers undeniably left reposed in the States and denied the central government, than the suppression of violent crime and vindication of its victims.[7] While the federal government has exclusive authority over immigration, the federal government should not regulate violent criminal conduct, power reserved to the States, under a federal power.[8]

This regulation is an improper interference of the Federal government into powers reserved to the States under the 10th Amendment. As James Madison wrote, "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite."[9] One such power that consistently has been held to be reserved to the states is the police power. This proposed regulation violates the principal of Federalism and the reservation of power to the States under the 10th Amendment.

**The proposed regulation will disparately impact vulnerable populations including survivors of trafficking and domestic violence.**

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options.

Misidentification or the failure to recognize a child bought or sold for sex as a victim of domestic minor sex trafficking continues to be a barrier to protective responses for these victims.[10] Misidentification causes a chain reaction of negative outcomes, including skewed data and the failure to investigate all criminals in a child sex trafficking case or to provide access to services and justice.[11]

Children can still be prosecuted as criminals for acts committed due to their sex trafficking, because "the law has not kept up with reality" when the reality is that these children are victims and should not be prosecuted as criminals.[12] This proposed regulation fails to consider the realities of

---

[5] CO Rev Stat 18-1.3-501

[6] 18 Pa.C.S.A. §1101 et seq

[7] United States v. Morrison, 529 U.S. 598 (2000)

[8] *Id.*, "Congress therefore may not regulate noneconomic, violent criminal conduct based solely on the conduct's aggregate effect on interstate commerce."

[9] The Federalist No. 45, pp. 292-293 (C. Rossiter ed. 1961). US v. Lopez 514 U.S. 549 (1995)

[10] Protected Innocence Challenge, *Toolkit 2019,* https://sharedhope.org/PICframe9/2019ProtectedInnocenceChallengeToolkit.pdf

[11] *Id.*

[12] Bean, Susanna, *Despite Sex Trafficking Laws, Kids Can be Charged with Prostitution in Majority of States While Exploiters Walk Away,* (November 17, 2016) https://sharedhope.org/2016/11/17/despite-sex-trafficking-laws-kids-can-charged-prostitution-majority-states-exploiters-walk-away/

AR.10820

trafficking victims who are not identified or misidentified and dealt with through the criminal justice system. Often the criminal justice system is the first contact a trafficking victim has in order to be able to be identified as a trafficking victim. It is possible that it takes multiple contacts with law enforcement for a trafficking victim to be identified.

One client received a conviction for prostitution but was not identified as a trafficking victim until a second, later arrest. It is possible for trafficking victims to be arrested multiple times, therefore increasing the "seriousness" of their sentence. A trafficking victim could have a valid claim to asylum, especially once identified; as they could fear persecution from their trafficker should they be returned to their home country. With a conviction that is possibly sentenced to a year or more, trafficking victims would be excluded from asylum simply because of the length of sentence and without any consideration of the mitigating factor that the person was a victim of human trafficking.

This regulation also fails to take into consideration the effects of trauma of victims of trafficking, victims of domestic violence and other asylum applicants. Since 2014, the number of children arriving at the U.S. border has risen dramatically, as unaccompanied children, adolescents, and young families have fled gang and other forms of violence in the Northern Triangle countries of El Salvador, Guatemala, and Honduras.[13]

A 2009 Department of Justice study showed that more than 60 percent of children surveyed were exposed to violence within the past year, directly or indirectly.[14] "Children's exposure to violence, whether as victims or witnesses, is often associated with long-term physical, psychological, and emotional harm. Children exposed to violence are also at a higher risk of engaging in criminal behavior later in life and becoming part of a cycle of violence."

"Complex trauma, as compared to acute or chronic trauma, involves exposure to multiple severe and pervasive events which have negative long-term effects."[15] 78 percent of children studied suffered direct physical violence, and 18 percent were subjected to sexual violence. Nearly three quarters (71 percent) were threatened with violence or death (71 percent), and 59 percent witnessed acts of violence.[16]

The proposed regulation is not trauma informed and fails to take into consideration the effects of trauma from persecution on asylum applicants. It simply takes a categorical approach, which could have a disastrous effect on asylum applicants fleeing persecution along with victims of trafficking and domestic violence. The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[17]

The rule allows adjudicators to consider charges of domestic violence that do not result in convictions. This is an abuse of discretion. Generally, criminal matters have to result in convictions to have an impact on an immigrant's case. In domestic violence situations, a victim can often be falsely reported to the police by their abuser for having committed domestic violence acts when in fact they were the victim and not the principal abuser. Clients have in fact faced domestic violence charges when they in

---

[13] Physicians for Human Rights, *Asylum-Seeking Children from Northern Triangle Suffer Multi-Dimensional, Recurrent, Sustained Trauma*, June 10, 2019

[14] Department of Justice archives, Defending Childhood
https://www.justice.gov/archives/defendingchildhood/facts-about-children-and-violence

[15] Ackerman, Kevin, et.al., Physicians for Human Rights, *"There Is No One Here to Protect You" Trauma Among Children Fleeing Violence in Central America,* June 10, 2019 https://phr.org/our-work/resources/there-is-no-one-here-to-protect-you/

[16] *Id.*

[17] *Matter of Pula*, 19 I.&N. Dec. 467, 474 (BIA 1987).

AR.10821

fact were victims. A domestic violence victim could defend herself against her abuser but because he is left with visible marks then she is arrested for domestic violence. These arrests only would lead a domestic violence victim barred from the humanitarian benefits of asylum.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. This regulation provides an abuse of discretion, fails to consider the trauma effects of abuse, trafficking and persecution and leaves the most vulnerable barred from the protection that could provide them the greatest stability and protection, asylum in the United States.

World Relief therefore requests the Department of Homeland Security withdraw this proposed rule regarding the procedures for asylum and bars to asylum eligibility and allow those most vulnerable to continue to seek the humanitarian protection of asylum. Maintaining the current relief is essential to provide the self-sufficiency and stability asylum seekers need to recover from persecution.

Respectfully Submitted,

Jeanne Funk, Esq.
Training and Technical Support Manager
7 E Baltimore St.
Baltimore, MD 21202
P: (603) 508-3884
E: JFunk@wr.org

AR.10822

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eks-43zq
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0560
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Carl Bergquist
**Address:** United States,
**Email:** cbergquist@chirla.org
**Organization:** Coalition for Humane Immigrant Rights (CHIRLA)

## General Comment

Please see the attached PDF for the comment of the Coalition for Humane Immigrant Rights on the proposed rule.

## Attachments

CHIRLA 2020 Asylum Bar Comment FINAL

AR.10823



**CHIRLA**
Coalition for Humane
Immigrant Rights

*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN
1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking:
Procedures for Asylum and Bars to Asylum Eligibility

January 21, 2020

Dear Assistant Director Reid and Chief Dunn:

On behalf of the Coalition for Humane Immigrant Rights (CHIRLA), the
largest statewide immigrant rights organization in California, I write in strong
opposition to the Executive Office for Immigration Review's (EOIR) and
Department of Homeland Security's (DHS) jointly proposed rule to further
restrict asylum eligibility by criminalizing those seeking refuge. It does so by
turning a blind eye to the racial profiling endemic in our criminal justice system,
and instead weaponizing it against those in need of protection and yearning to

ER-2789

AR.10824





unite with their families and communities. This rule will cause serious harm to individuals we assist in the asylum process, while continuing the unprecedented assault on the institution of asylum that the U.S. is actually bound to respect by both domestic and international law. For these reasons, and as detailed further below, I urge you to rescind this rule.

Since 1996 in particular, the immigrant community has suffered from an incessant push to criminalize those attempting to migrate here as well as those who already call the U.S. their home. Convictions, and more recently just arrests, often resulting from racial profiling by law enforcement, have resulted in immigrants experiencing the worst possible form of double jeopardy.[1] That is, being punished twice for the same offense: first with a conviction and/or an arrest, and then secondly, with deportation. A new category of offenses, labeled "aggravated felonies", were carved out in immigration law to automatically exclude those convicted from a future life in the U.S. with their family and community. Conviction of such an "aggravated felony" is already a categorical bar to asylum. By further expanding the bars to asylum eligibility beyond this anti-immigrant criminalization scheme, the proposed rule is truly setting a new low.

The U.S. criminal justice system has resulted in mass incarceration due to the biased enforcement of laws, such as those emanating from the War on Drugs, with racist origins. In the immigration arena historically, there was also no mistaking about the racial nature of various laws such as the Chinese Exclusion Act, the introduction of Section 1325 and National Origin Quotas.[2] Even the

---

[1] How Racial Profiling Goes Unchecked in Immigration Enforcement; ProPublica; June 8, 2018 https://www.propublica.org/article/racial-profiling-ice-immigration-enforcement-pennsylvania.
[2] The Dark, Racist History of Section 1325 of U.S. Immigration Law; Vice News, June 27, 2019; https://www.vice.com/en_us/article/a3x8x8/the-dark-racist-history-of-section-1325-of-us-immigration-law.

AR.10825





fundamental reforms of immigration law in 1965 and beyond did not escape this as they resulted in further restrictions on immigrants from our neighbor countries in the Western Hemisphere. At root, a bias against immigrants from Latin America was impossible to ignore. We submit that this misguided rule is heavily informed by this dark legacy, further targets these same populations and now wants to stop even the neediest among us simply because of their country of origin.

All of the proposed categorical bars to asylum are flawed in that they would arbitrarily and capriciously reduce eligibility to asylum, but here we point to three provisions in particular. First, to exclude those who have been convicted of Section 1326, illegal re-entry, is to condemn to persecution those who are simply trying to enter the U.S. to reunite with their family and community. Additionally, prosecutions of 1326 are subject to serious due process concerns that further undermine any rationale to use it as a bar to asylum.[3] They have already been punished for this one time AND been deported, and now in the face of possibly grave persecution, they are supposed to be categorically barred from asylum? This makes a mockery of any pretense at upholding the meaning of asylum in the first place.

Second, the proposed bars relating to driving under the influence (DUI) and non-marijuana drug and related paraphernalia possession are based on laws whose enforcement are heavily tainted by racial profiling.[4] These offenses, often the result of self-medication emanating from difficult personal circumstances, should result in treatment not in the threat of persecution or even death after a

---

[3] Prosecuting People for Coming to the United States; American Immigration Council; January 10, 2020; https://exchange.americanimmigrationcouncil.org/research/immigration-prosecutions.
[4] Latinxs and the Drug War; Drug Policy Alliance; http://www.drugpolicy.org/latinxs-and-drug-war/. Accessed on January 21, 2020.

AR.10826




denial of asylum. As a country, we are moving toward a harm reduction approach to combating drug and alcohol addiction, yet the proposed rule clings to the punitive mentality of the past that sought to stigmatize the ill.[5]

Third, the bar relating to gang offenses is particularly cruel in the wake of this Administration's refusal to countenance gang violence as a ground to asylum.[6] Instead of granting asylum to those fleeing the threat of gangs, the proposed rule envisions a world where asylum is also denied to those falsely labeled as gang members in databases from which escape is nigh impossible.[7] California has begun to oversee the use of CalGang, a state database, but Latinos, including many immigrants, are overrepresented by an astonishing 168%. Using this flawed and likely unconstitutional tool as a categorical bar to asylum is beyond the pale.[8]

Finally, to date the flawed asylum process at least allows for an automatic reconsideration of denials for asylum. Individual asylum seekers, particularly those without legal counsel in the first instance, may in an automatic reconsideration find time to secure counsel and succeed with their claim.[9]

---

[5] Principles of Harm Reduction; Harm Reduction Coalition; https://harmreduction.org/about-us/principles-of-harm-reduction/. Accessed on January 21, 2020.
[6] Asylum and Related Protections for Aliens Who Fear Gang and Domestic Violence; Congressional Research Service; January 15, 2019; https://fas.org/sgp/crs/homesec/LSB10207.pdf.
[7] Officers falsely portrayed people as gang members, falsified records, LAPD says; LA Times; January 6, 2020; https://www.latimes.com/california/story/2020-01-06/dozens-of-lapd-officers-accused-of-portrayed-innocent-people-as-gang-members-falsifying-records.
[8] Providence Police Gang Database Policy 'Tramples Fundamental Constitutional Rights,' Lawsuit Says; The Appeal; January 10, 2020; https://theappeal.org/rhode-island-police-gang-database/.
[9] Without A Lawyer, Asylum-Seekers Struggle With Confusing Legal Processes; National Public Radio; February 25, 2018; https://www.npr.org/2018/02/25/588646667/without-a-lawyer-asylum-seekers-struggle-with-confusing-legal-processes.

AR.10827





Eliminating this option is to stack the decks further against many in desperate need of protection.

CHIRLA directly represents individuals with asylum claims who could be adversely impacted by the proposed rule. These are cherished community members who contribute not only to their families but to the prosperity of our state and country. We also serve the broader immigrant community in California whose family members and loved ones would be similarly impacted. Again, for the reasons outlined above we respectfully request that you rescind it forthwith. Please contact me at cbergquist@chirla.org if you need additional information.

Sincerely,

Carl Bergquist, Policy Counsel, CHIRLA

AR.10828

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 22, 2020
**Tracking No.** 1k4-9eks-m1al
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0561
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Cecelia Levin
**Address:**
　P.O. Box 12
　Suffield,  06078
**Email:** cecelia@asistahelp.org
**Phone:** 2025055140

---

## General Comment

Please see attached comment from ASISTA in response to Comments in Response to Proposed Rulemaking
Procedures for Asylum and Bars to Asylum Eligibility
84 FR 69640; EOIR Docket No. 18-0002

---

## Attachments

ASISTA Asylum Comment 1.21.2020

AR.10829



January 21, 2020

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re:     Comments in Response to Proposed Rulemaking Procedures for Asylum and Bars to
         Asylum Eligibility
         84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019;
         RIN 1125-AA87, 1615-AC41;
         *Submitted via* [https://www.regulations.gov](https://www.regulations.gov)

Dear Ms. Reid and Ms. Dunn:

On behalf of ASISTA, we are submitting comments in response to the Department of Homeland
Security (DHS) and Department of Justice's (DOJ) Joint Notice of Proposed Rulemaking
Procedures for Asylum and Bars to Asylum Eligibility ("proposed rule") published in the Federal
Register on December 19, 2019.[1] We wish to express our strong opposition to the proposed
changes to the asylum process and eligibility requirements.

ASISTA's mission is to advance the dignity, rights, and liberty of immigrant survivors of
violence. For over 15 years, ASISTA has been a leader on policy advocacy to strengthen
protections for immigrant survivors of domestic violence, sexual assault, human trafficking and

---

[1] Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services,
Department of Homeland Security. "Procedures for Asylum and Bars to Asylum Eligibility" (hereinafter "proposed
rule"; 84 FR 69640 (December 19, 2019), available at:
[https://www.federalregister.gov/documents/2019/12/19/2019-27055/procedures-for-asylum-and-bars-to-asylum-elig](https://www.federalregister.gov/documents/2019/12/19/2019-27055/procedures-for-asylum-and-bars-to-asylum-elig)
[ibility](https://www.federalregister.gov/documents/2019/12/19/2019-27055/procedures-for-asylum-and-bars-to-asylum-eligibility)

1

AR.10830

other crimes created by the Violence Against Women Act (VAWA) and the Trafficking Victims Protection Act (TVPA). We assist advocates and attorneys across the United States in their work on behalf of immigrant survivors. We submit this comment based on these guiding principles and our extensive experience.

We firmly oppose the proposed rule as it diminishes access to asylum for survivors of domestic violence, sexual assault, human trafficking and other forms of gender-based violence. We urge DHS and DOJ to immediately withdraw the proposed rule, and instead work to ensure vulnerable immigrants can obtain immigration relief for which they are eligible.

## I.   General Comment

The proposed rule is extremely problematic in both substance and in form. Executive Order 12866 provides that agencies "should afford the public a ***meaningful opportunity*** to comment on any proposed regulation, which in most cases should include a comment period of ***not less than*** 60 days."[2] The proposed rule contains sweeping changes to U.S. asylum law and has only given the public 30 days to provide comment. As U.S. Senator Richard Blumenthal indicated in his letter to DHS and DOJ leadership, "Given the complexity of the legal and policy issues implicated by this rule, including the potential violation of the United States' domestic and international legal obligations, a thirty day comment period is simply inadequate, especially when those thirty days include two federal holidays."[3] In addition, the letter states:

> "This rule has the potential to inflict irreparable harm on those individuals who meet the definition of a refugee but are rendered ineligible for asylum under the rule—by definition, those individuals face the very real threat of torture, death, or other forms of persecution….Given the gravity and complexity of this proposed rule, a thirty day comment period is not sufficient."[4]

As DHS has made other significant changes to administrative policy within the same timeframe, the DHS and DOJ have not provided adequate opportunity to review ***this*** proposed rule.[5] DOJ

---

[2] [Emphasis added]. Executive Order 12866 58 Fed. Reg. 190 (September 30, 1993), available at https://www.archives.gov/files/federal-register/executive-orders/pdf/12866.pdf
[3] Letter to Attorney General William A Barr, Acting DHS Secretary Chad Wolf,  Acting USCIS Director Ken Cuccinelli et al (January 6, 2020), available at https://www.blumenthal.senate.gov/imo/media/doc/01.07.20%20-%20DOJ%20-%20Asylum%20Bar%20Comment%20Period.pdf
[4] *Id*. Internal citations omitted.
[5] *See e.g. U*.S. Citizenship and Immigration Service. "U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements"(hereinafter "proposed rule")  84 FR 62280 (November 14, 2019), available at https://www.regulations.gov/document?D=USCIS-2019-0010-0001

2

AR.10831

and DHS have willfully and deliberately made a mockery of the administrative process by providing such insufficient time to review and provide comments.

## II. The Proposed Rule will Harm Immigrant Survivors Seeking Protection in the United States

Many asylum seekers seeking protection in the United States may be fleeing horrific violence at the hands of intimate partners and criminal gangs, as well as face increased risks of human trafficking.[6] Sexual and gender-based violence was reported as a significant reason that causes women and girls from Honduras, Guatemala, El Salvador and Mexico to seek asylum protections.[7] Often asylum seekers undertake dangerous journeys because their abusers are able to commit atrocities without accountability, and government institutions fail to provide survivors with protection. For asylum seekers from the Northern Triangle countries of El Salvador, Honduras, and Guatemala, domestic violence is widespread[8] and they face some of the highest rates of femicides in the world.[9] This problem is not limited to these countries however, as survivors of gender-based violence elsewhere "struggle to have governments ensure, or in some cases recognize, their right to protection. In other countries, criminal law does not adequately focus on domestic violence."[10]

The proposed rule released by DHS and DOJ proposes to bar many asylum seekers from qualifying for relief in express violation of U.S. obligations under domestic and international law. In particular, the proposed rule seeks to 1) establish *seven* new bars to eligibility for asylum, 2) authorize immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining eligibility for asylum, and 3) rescind a provision in the current regulation regarding reconsideration of discretionary denials of asylum.

---

[6] Kids in Need of Defense, *Neither Security nor Justice: Sexual and Gender Based Violence in El Salvador, Honduras, and Guatemala,* May 4, 2017,
https://supportkind.org/wp-content/uploads/2017/05/Neither-Security-nor-Justice_SGBV-Gang-Report-FINAL.pdf.
[7] United Nations High Commissioner for Refugees, *Women on the Run* (Oct. 26, 2015),
http://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html;
[8] Kids in Need of Defense, Latin America Working Group, Women's Refugee Commission, *Sexual and Gender Based Violence (SGBV) & Migration Fact Sheet,* July 2018,
https://supportkind.org/wp-content/uploads/2018/08/SGBV-Fact-sheet.-July-2018.pdf
[9] Geneva Declaration of Armed Violence and Development, "Lethal Violence Against Women and Girls" in *Global Burden of Armed Violence 2015: Every Body Counts*, May 8, 2015, 87-120,
http://www.genevadeclaration.org/fileadmin/docs/GBAV3/GBAV3_Ch3_pp87-120.pdf.
[10] Human Rights Watch. "US: Protect Right to Asylum for Domestic Violence" (January 23, 2019), available at
https://www.hrw.org/news/2019/01/23/us-protect-right-asylum-domestic-violence This extends to gender-based violence more generally. For example, Ghana, India, Indonesia, Jordan, Lesotho, Nigeria, Oman, Singapore, Sri Lanka and Tanzania do not criminalize marital rape. *See* Equality Now. "The World's Shame: The Global Rape Epidemic" (February 2017), available at:
https://d3n8a8pro7vhmx.cloudfront.net/equalitynow/pages/208/attachments/original/1527096293/EqualityNowRape LawReport2017_Single_Pages.pdf?1527096293

Immigrant survivors of violence already face numerous barriers to applying for asylum, and these proposed changes will only create additional ones. The proposed rule will make it harder for immigrant survivors to obtain the asylum protections they desperately need. Instead, the administration should focus on expanding opportunities for vulnerable immigrant survivors to access safety and protection.

### III. The Proposed Rule Violates U.S. Obligations Under Both Domestic and International Law

For decades, the United States has been committed to protecting those who are fleeing persecution, including gender-based persecution. In particular, in 1968, the United States signed onto the 1967 Protocol Relating to the Status of Refugees,[11] which incorporated the provisions of United Nations Convention Relating to the Status of Refugees.[12] The proposed rule's significant and arbitrary hurdles to protection are wholly incongruent with the letter and spirit of the Refugee Convention and the Immigration and Nationality Act[13] to protect vulnerable refugees and asylum seekers fleeing persecution.

### IV. The Proposed Rule Will Unfairly Harm Survivors of Gender-Based Violence

The proposed rule seeks to add seven new criminal bars to asylum eligibility, which constitute an abuse of agency discretion and are sweeping in scope.[14] We incorporate by reference the comments made by the Asian Pacific Institute on Gender-based Violence (API-GBV) showing the harm that the categorical bar for smuggling or harboring as well as the bar for illegal reentry will have on survivors fleeing abuse in their home countries. However, given our expertise and experience working on protecting and enhancing survivor-based forms of relief under the Violence Against Women Act (VAWA) and Trafficking Victims Protection Act (TVPA), we are especially concerned about how the proposed rule distorts language contained in VAWA, a law designed to provide ameliorative benefits to survivors of domestic violence, in order to create barriers for asylum seekers, including those fleeing gender-based violence.

---

[11] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[12] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

[13] See e.g. INA 208

[14] See Proposed Rule at 69645. Individuals would be ineligible to seek asylum if they are convicted of 1) a felony offense; 2) "smuggling or harboring" under 8 U.S.C. § 1324(a); 3) illegal reentry under 8 U.S.C. § 1326; 4) an offense involving "criminal street gangs"; 5) a second offense of driving while intoxicated or impaired; 6) conviction or accusation of conduct of acts of battery or extreme cruelty in the domestic context; 7) certain newly defined misdemeanor offenses.

A.  The Bar for Domestic Violence Harms Survivors.

The proposed rule bars from asylum all applicants who have been convicted of domestic assault or battery, stalking, or child abuse in the domestic context. The proposed rule also alarmingly seeks to bar immigrants absent a conviction in cases where there are "serious reasons for believing" they engaging in battery and extreme cruelty.[15] Indeed, this provision is the only categorical bar to asylum for which a conviction is not required.  The Proposed Rule also broadly categorizes domestic violence offenses as particularly serious, which can have a detrimental impact on survivors.[16]

There are many cases in which immigrant survivors, not their abusers, are arrested and prosecuted for domestic violence offenses. Immigrant survivors who have limited English proficiency (LEP) may not be able to fully describe to police officers the situation and the abuse they experienced. In fact, a service provider explained that many survivors are arrested in dual arrests because the police use **perpetrators** as interpreters.[17] Survivors may be arrested for use of self-defense, or else because their abusers make false claims of abuse to get survivors arrested. One prosecutor notes,

> "Batterers are savvier about the laws. They have learned that calling 911 first to "tell their story" may help them avoid being held accountable. They have found that it helps to retaliate against the victim for previous police calls because the victims naturally become reluctant to make further calls to the police. With more allegations of women using violence at the scene, the case becomes 'messy' and hard to sort out. It is difficult for police officers to determine whom to arrest."[18]

Service providers report that it is common to see abusers make false allegations to police and the courts to have immigrant survivors arrested. The proposed rule's lack of requirement of a conviction increases that likelihood, given the lack of case completion or a judicial fact-finding. Furthermore, in the context of VAWA protections, Congress recognized that perpetrators will try to manipulate legal systems against survivors and created certain protections discouraging reliance on unreliable sources, i.e., abusers, crime perpetrators, and those associated with them. Congress stated that these protections, codified at 8 USC § 1367, are "designed to ensure that

---

[15] Proposed Rule at 69645, 69660.

[16] Proposed Rule at 69652.

[17] Casa de Esperanza: National Latin@ Network. Wrongful Arrests and Convictions of Immigrant Victims of Domestic Violence: Stories from the Field. Retrieved from
https://www.nationallatinonetwork.org/images/files/Quote_Sheet_for_Hill_Visits_-_Service_Providers.pdf.

[18] Gael B. Strack, "She hit me, too" Identifying the Primary Aggressor: A Prosecutor's Perspective, available at
http://www.ncdsv.org/images/she_hit_me.pdf

AR.10834

abusers and other perpetrators cannot use the immigration system against their victims."[19] DHS and other government agencies may not make adverse determinations on a survivor's immigration matter based on information solely provided by a perpetrator or a member of a perpetrator's household or family member.[20]

Congress created these statutory protections for survivors because it realized "threats of deportation are the most potent tool abusers of immigrant victims use to maintain control over and silence their victims and to avoid criminal prosecution."[21] DHS guidance provides that "when a DHS employee receives adverse information about a victim of domestic violence, sexual assault, human trafficking or an enumerated crime from a prohibited source, *DHS employees treat the information as inherently suspect*."[22] There is no similar provision in the asylum context that would protect survivors from the devastating impact of a false accusation.

### B. Evidentiary Standards for the Domestic Violence Bar Inappropriate and Unjust

Authorizing individual asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested. Under the proposed rule, asylum-seekers will be subject to the domestic violence bar where there are "serious reasons for believing" that they have engaged in acts of domestic "battery or extreme cruelty."[23] There is no indication what "serious reasons" may entail, and what evidence may be considered or evaluated in this determination.

Although there is a proposed waiver for survivors who are deemed to not be the primary aggressor, the waiver is insufficient to mitigate the harm that many survivors will experience. Adjudicators are not limited to facts found by the criminal court or provided in the underlying record of conviction.[24] The proposed rule seemingly creates no framework or limits to an adjudicator's considerations, and is silent on how false accusations may be considered. This will lead to inconsistent and unjust results in adjudication.

---

[19] "Department of Justice Appropriations Authorization Act, Fiscal Years 2006 through 2009: Report of the Committee on the Judiciary, House of Representatives, to accompany H.R. 3402" H.R. Rep. No. 109-233, at 120 (2005). Available at: https://www.congress.gov/109/crpt/hrpt233/CRPT-109hrpt233.pdf

[20] *See* 8 USC 1367, note there are extremely limited exceptions enumerated in 8 USC 1367(b).

[21] Representative Conyers Jr. Congressional Record 151: 164 (December 18, 2005) E2606, Available at: https://www.congress.gov/crec/2005/12/18/CREC-2005-12-18-pt1-PgE2605-4.pdf

[22] DHS. "Implementation of Section 1367 Information Provisions" available at https://asistahelp.org/wp-content/uploads/2019/04/Implementation-of-Section-1367-Information-Provisions-Instructions.pdf [Emphasis added]

[23] Proposed Rule at 69660.

[24] Proposed Rule at 69659.

AR.10835

C. The Proposed Rule Creates Inconsistency in Adjudications and Provides
Immigration Adjudicators with an Unprecedented Amount of Authority.

Under the proposed rule, DHS and DOJ aim to permit individual immigration adjudicators and immigration judge to determine whether a conviction or conduct related to domestic violence or battery and extreme cruelty would render an immigrant ineligible for asylum. First, the definition of battery and extreme cruelty in particular differs from state-law domestic violence criminal definitions, creating inconsistency in determining who is covered by the asylum bar. While such language is appropriate in providing protection for those seeking it, it is highly inappropriate in the context of barring individuals seeking protection against persecution.[25]

In addition, in order to properly and accurately assess domestic violence, battery, or extreme cruelty, one must have experience and in-depth knowledge of the intricacies of abuser-survivor relationships and dynamics; the nuances of the tactics abusers and perpetrators use to control, intimidate, and manipulate survivors; understanding of the ongoing pattern of behavior in abusive relationships; specific vulnerabilities of immigrants to being victimized; and many other important analyses of the domestic nature of abusive conduct. Indeed, the dynamics of domestic violence and the impact of trauma on survivors is a complex subject, which is why for the last several decades that survivor-based forms of immigration benefits like VAWA self-petitioners, U and T visa adjudications have been centralized at the Vermont Service Center (and later a U visa workshare at the Nebraska Service Center). These specialized units receive advanced and detailed training in order for them to appropriately adjudicate cases submitted by survivors of domestic violence, sexual assault, and other crimes.

Immigration adjudicators lack this expertise and detailed understanding. As such, putting the responsibility on immigration adjudicators to make these complex decisions about whether conduct amounts to a covered act of battery or extreme cruelty without court findings, following presentations of evidence by adverse parties, is wholly inappropriate, and will likely result in erroneous determinations that will deny immigrant survivors of their ability to seek asylum.

**V. Removing Reconsiderations of Discretionary Denials of Asylum Will Harm Immigrant Survivors**

The proposed rule seeks to remove automatic review of a discretionary denial of an asylum seeker's application in the event that the immigrant is denied asylum solely in the exercise of discretion. We strongly oppose this provision as it will detrimentally impact immigrant survivors of violence. Many immigrant survivors are LEP or do not have sufficient resources to find an attorney to help with their case. Given that the U.S. immigration legal system is extremely

---

[25] See Comment to Proposed Rule from Tahirih Justice Center, submitted January 21, 2020.

difficult to navigate, many immigrant survivors with viable claims for asylum find their cases denied due to these barriers.

Even if the survivor is granted withholding of removal or protection under CAT, these alternative forms of protection do not allow for the same level of relief and benefits as asylum protection. Maintaining reconsiderations of discretionary denials of asylum is therefore absolutely critical to ensuring that immigrant survivors who are eligible for asylum have access to due process and an opportunity to defend their ability to seek asylum protections.

**Conclusion**

For the foregoing reasons, ASISTA urges DOJ and DHS to rescind the proposed rule, which violates our nation's laws and moral obligations and prevents many survivors of domestic violence, sexual assault, and human trafficking who are fleeing persecution from obtaining the asylum protections they need and deserve.

Respectfully submitted,

Cecelia Friedman Levin
Policy Director
ASISTA

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 23, 2020
**Tracking No.** 1k4-9ejw-bxdw
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0562
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Craig Mousin
**Address:**
    Wellington Avenue United Church of Christ
    615 W. Wellington Avenue
    Chicago,  IL,  60657
**Email:** mousin@sbcglobal.net
**Phone:** 312-259-2379

## General Comment

I opposed the Proposed Rule: Procedures for Asylum and Bars to Asylum Eligibility on both substantive and moral grounds. Please see my attached letter and article asking that you rescind the Proposed Rule.

## Attachments

Comments submitted on proposed rules December 19. 2019

SSRN-id2784951

AR.10838

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and
Bars to Asylum Eligibility

To whom it may concern:

I write to oppose the Proposed Rules that the Department of Homeland Security (DHS)
and the Department of Justice (DOJ) issued on December 19, 2019 that would make three
primary changes to the rules governing asylum adjudications. Although my review of all the
rules leads me to opposed the entire set, I write specifically to address my concern that the rules
will preclude bona fide refugees from eligibility for asylum

I have worked with refugees since 1984 representing many from almost all regions of the
world. I also have taught refugee law at several institutions of higher learning since 1990 and
also train pro bono attorneys representing asylum applicants. I have also volunteered with the
National Immigrant Justice Center since 1990 and I have relied upon much of their research and
opposition to these rules in this letter, although I add my own particular perspective as well. As
an ordained clergy in the United Church of Christ, my ministry has focused on working with
refugees in assisting them work through the legal process. These proposed rules fail to meet our
commitments under the Refuge Act of 1980 and international law.

The first proposed set of changes adds the following seven *categorical* bars to asylum
eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or
harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the
purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal
reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street
gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5)
any second conviction for an offense involving driving while intoxicated or impaired; (6) any
conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and
any conviction for several newly defined categories of misdemeanor offenses, including *any*
drug-related offense except for a first-time marijuana possession offense, any offense involving a
fraudulent document, and fraud in public benefits.

AR.10839

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. I submit these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. I urge that the Proposed Rules be rescinded in their entirety.

## I.     The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[1] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[2]

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with a safe haven. Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[3] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[4]

---

[1] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[2] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987)

[3] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[4] *See*, *e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

AR.10840

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[5] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[6] The obstacles to obtaining asylum are exceedingly high; indeed, in some parts of the country and before certain immigration judges, almost no one succeeds. Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[7] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[8]

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[9] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[10]

In my work with refugees, I have witnessed the importance of a hearing or an asylum interview to explain the totality of the circumstances that surrounds an applicant's evidence. The nature of the persecution, the extent of the persecution, the need to escape persecution, and the difficulty of surviving in this nation may all present circumstances that explain the context of a person's life. None of that would be possible without a full hearing to determine the eligibility of the applicant. These bars would preclude that opportunity

---

[5] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[6] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today,* September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[7] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[8] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[9] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[10] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

AR.10841

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[11] Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[12] The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[13]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[14] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of

---

[11] *Id.*

[12] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

[13] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[14] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

AR.10842

persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[15] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[16]

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

*The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[17]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[18] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate. The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving

---

[15] *Pula, supra at 474.*

[16] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

[17] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[18] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

AR.10843

under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum-seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

In my work with refugees, I have had the honor of working with the Kovler Center for survivors of Torture in Chicago. Kovler staff and their clients have taught me the hard work necessary for survivors of torture to fully heal and explain the circumstances of their case. The Proposed Rules would bar many bona fide refugees who are in the midst of healing from pursuing their cases.

## II. The Proposed Rules Fail to Understand the Need For Mercy in Our Judicial System

Our system of laws has developed out of thousands of years of jurisprudence, in part, inspired by biblical understandings of the law. Asylum, as a discretionary remedy, includes the power of the adjudicator to balance the law with mercy. We would have a very different legal system absent the balancing of law and mercy. Please review the article I wrote on, *"You Were Told to Love the Immigrant, But What if the Story Never Happened? Hospitality and United States Immigration Law."[19]* I conduct a thought experiment in which I ask what would have happened if United States immigration law had been in place at the time of the Bible. As you will see, almost every major biblical protagonist would have been excluded or deported for an immigration violation or a crime. In effect, our immigration system would have eliminated most, if not all, of the biblical narrative that influenced the development of our legal system. A major inspiration of our legal system demands a balance between law and mercy for it to achieve all of its aims. Our law requires both law and mercy to be effective and to meet the concerns addressed by the drafters of the Refugee Act of 1980. The Proposed Rules would bar many eligible refugees to the detriment of not only the refugees, but our nation as well.

## III. Conclusion

The Refugee Act of 1980 requires the United States to establish a procedure for bona fide applicants to apply for asylum regardless of their status. Asylum applicants face tremendous difficulties based on the persecution they have endured and the difficulties in escaping persecution. The Proposed Rules violate the spirit and intent of the Refugee Act and our nation's

---

[19] Mousin, Craig B. (2016) "You Were Told to Love the Immigrant, But What if the Story Never Happened? Hospitality and United States Immigration Law," *Vincentian Heritage Journal:* Vol. 33: Iss. 1, Article 8, found at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2784951 see text at footnotes 64-107.

AR.10844

commitment to providing safe haven for those fleeing persecution. Therefore, I express my strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019. The Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me at mousin@sbcglobal.net to provide further information.

Very truly yours,

Rev. Craig B. Mousin
Associate Pastor for Immigrant Justice
Wellington Avenue Untied Church of Christ
615 Wellington Avenue
Chicago, Illinois 60657
mousin@sbcglobal.net

AR.10845

# You Were Told to Love the Immigrant, But What if the Story Never Happened? Hospitality and United States Immigration Law

REV. CRAIG B. MOUSIN


previous article


next article

AR 10846

The stories we tell ourselves define our lives.[1] We read and speak God's Word: "Love the immigrant, for you too were slaves in Egypt."[2] That command to love arises out of the biblical narrative of exile, return, and response to immigrants residing amidst a community that lived its history through stories of how its mothers and fathers in faith survived and coalesced from a wandering people into a nation. That biblical narrative constitutes both individual stories about persons and nations as well as an overarching story that provides a record of God's relationship and covenant with many generations of people. And, this narrative was especially important to Saint Vincent de Paul as he articulated the mission to serve the poor.

To examine how the Vincentian tradition would address immigration law, this article first explores the biblical stories and narratives that were crucial to the formation of religious and national communities. Part I explores the importance of the narratives both to our nation and the community of faith, particularly with specific reference to those gathered within and around the Congregation of the Mission founded by Vincent de Paul. It focuses on how the narrative impacts responses to immigration, and, specifically Vincentian hospitality to the immigrant. Part II focuses on how that biblical narrative and immigration law intersect. Immigration law defends a nation and protects its sovereignty. Citizens expect the law to regulate admission and determine the types of individuals a nation wants to welcome to further its growth while maintaining its security. To test the efficacy of those goals, Part II conducts a thought experiment by asking what would happen to the biblical narrative if its heroes and heroines had to face the strictures of immigration law during their wanderings. I argue that American immigration law as it is currently legislated and implemented would have scuttled the biblical narrative, leaving a story to neither tell nor guide for a contemporary moral framework. Given the draconian consequences many face under the rule of law, I posit that the law currently deprives the nation of the gifts of the sojourner to its detriment. Part III contemplates the critical significance of the biblical narrative on Vincentian hospitality to immigrants, and addresses two current issues for the more than eleven million unauthorized persons residing within the United States as well as the recent surge of unaccompanied minors at the nation's borders.[3] Part IV contends that Vincentian hospitality to immigrants would advocate fixing broken immigration law by expediting lawful residence for the undocumented and encouraging a humanitarian response to the

---

[1] Parts of this article were initially presented at talks at Dominican University in 2011, and at the Parish of the Epiphany in Winchester, Massachusetts, in 2014. I am grateful for the invitation to present as well as for the questions and discussion that provided new perspectives on these issues. I give thanks to Maribeth Conley, Randy Rapp, and Susan Schreiber for their valuable comments and critiques. I also thank my research assistant Christine Chen for her assistance.

[2] Lev. 19:33-34. I dedicate this article to Ms. Elizabeth Metzger, who taught Sunday school at the Westtown, New York, Presbyterian Church. Her faith and witness taught us the power and beauty of the biblical story.

[3] The specific number of unauthorized persons residing in the United States has "fluctuated" in recent years from a high of twelve million to approximately eleven million. Douglas S. Massey, Jorge Durand, and Karen A. Pren, "Border Enforcement and Return Migration by Documented and Undocumented Mexicans," 41 *Journal of Ethnic and Migration Studies* (2015), 1016-17.

AR.10847

Electronic copy available at: http://ssrn.com/abstract=2784951

current crisis of women and children and unaccompanied minors fleeing their homelands. The biblical narrative, however, whether a source of faith to believers or a source of law and inspiration to a democratic society where all are held up to be equal, remains a substantial resource for addressing solutions to this nation's broken immigration regime.

## I. The Biblical Narrative

Secular and religious narratives shape the meaning of individuals and communities. Phyllis Trible writes, "Stories are the style and substance of life. They fashion and fill existence."[4] The Tanakh,[5] the Christian Scriptures, and the Quran[6] have served as authoritative sources for understanding God and human responses for centuries. Martin Buber describes how the Jewish Bible has confronted each generation with the encounter between God and a people, forcing even those who do not believe to respond to its narrative.[7] For James Gustafson, "The Bible is the principle source of the Church's language. The identity of the Church is maintained by its use of the words and significant concepts of the Bible."[8] As Stanley Hauerwas summarizes, "The nature of Christian ethics is determined by the fact that Christian convictions take the form of a story, or perhaps better, a set of stories that constitutes a tradition, which in turn creates and forms a community."[9]

Whether it serves as history, theology, identity, culture or as a source of legal theory regarding freedom and sovereignty, the narrative has served a predominant role in religion, history, and culture. The Reformers declared, "the Bible is to be understood 'as Scripture' in the community that gathers in response to the claim that here God is decisively disclosed."[10] For many, the Bible remains a historical source of the Divine communication with the human. G. Ernest Wright underscored the importance of "Israel's preoccupation with history" as how "God made God known to the sojourners who fled Egypt."[11] Wright

---

[4]  Phyllis Trible, *Texts of Terror: Literary-Feminist Readings of Biblical Narratives* (Philadelphia: 1984), 1. Jack Balkin provides a similar conclusion in how we tell our national story: "We understand ourselves in terms of stories about who we are and how we came to be. These stories help us understand the situation we are currently facing and the ways we should respond to it." Jack Balkin, *Constitutional Redemption: Political Faith in an Unjust World* (Cambridge, 2011), 26.

[5]  Moses L. Pava, "Loving the Stranger and the Moral Myopia at Agriprocessors" in *Religious and Ethical Perspectives on Global Migration,* Elizabeth W. Collier and Charles R. Strain, eds. (Lanham, Md.: 2014), 131.

[6]  Azam Nizamuddin, "Islam and Immigration," *Ibid.,* 165, 170-71. The scope of this article is restricted primarily to the Vincentian response to immigration law, but its lessons will be applicable to any tradition, including secular society, that relies upon the biblical narrative for its moral and legal foundation.

[7]  Martin Buber, *On the Bible: Eighteen Studies*, Nahum N. Glatzer, ed. (N.Y.: 1968), 1-2.

[8]  James M. Gustafson, *Treasure in Earthen Vessels: The Church as a Human Community* (Chicago: 1961), 46.

[9]  Stanley Hauerwas, *The Peaceable Kingdom: A Primer in Christian Ethics* (Notre Dame: 1983), 24. Indeed, story critically influences the formation of new communities. The writers of the New Testament Gospels culled many stories from the Hebrew Scriptures to give greater credibility to their Gospel stories. André LaCocque, *Jesus, The Central Jew: His Times and His People* (Atlanta: 2015), 273.

[10]  Walter Bruggemann, *Theology of the Old Testament: Testimony, Dispute, Advocacy* (Minneapolis: 1997), 3; See also, John Calvin, *Institutes of the Christian Religion*, Henry Bevereidge, trans. (London: 1957), 64.

[11]  G. Ernest Wright, *God Who Acts: Biblical Theology as Recital* (London: 1954), 43.

AR.10848



Vincent de Paul in full surplice, hand upon a book.

Oil painting in the Vincentian provincial office, Paris.

*Courtesy St. Vincent de Paul Image Archive Online*

*http://stvincentimages.cdm.depaul.edu/*



click to enlarge

---

stresses the magnitude of how that history defined a people who were wandering in the wilderness only to be protected and saved by their God.[12] For Saint Vincent de Paul, the history of the persons within the Scripture became models of Vincentian mission and hospitality.

More than history, however, the Bible encourages the interpretation for the faithful to participate in the ongoing story. Gerhard von Rad argued that "Israel's faith is a narrative faith" which requires constant retelling.[13] Part of its prodigious influence stems from its diverse roles, particularly as narrative-as-theology. According to André LaCocque, Genesis reveals that there is "no better vehicle for 'theology' than narrative."[14] Johann Baptist Metz writes that the Scriptures demonstrate that, "…reasoning is not the original form of theological expression, which is above all that of narrative."[15] The combination of theology and story has influenced generations to "shape and sustain the ethos of the community,"[16] and provide a "crucial conceptual category for…displaying the content of Christian convictions."[17] Jean Luis Segundo, S.J., summarizes this critical interplay

---

[12] *Ibid.*, 44, 50.

[13] Bruggemann, *Theology*, 33.

[14] André LaCocque and Paul Ricoeur, *Thinking Biblically: Exegetical and Hermeneutical Studies*, David Pellauer, trans. (Chicago: 1998), 8.

[15] Johann Baptist Metz, "A Short Apology of Narrative," in Stanley Hauerwas and L. Gregory Jones, *Why Narrative? Readings in Narrative Theology* (Grand Rapids: 1989), 252.

[16] James Gustafson, "Varieties of Moral Discourse: Prophetic, Narrative, Ethical, and Policy," *Ibid.*, 2.

[17] *Ibid.*, 5. See also, H. Richard Niebuhr, "The Story of Our Life," *Ibid.*, 23: "tell[s] the story of the Christian community's life"; Brevard Childs, *Introduction to the Old Testament as Scripture* (Philadelphia: 1979), 671: "the authoritative witness to Gods' purpose in Jesus Christ for the church and the world."; Donald Senior, C.P., *Jesus: A Gospel Portrait* (New York: 1992): "...the gospels….are the privileged source for the life of Jesus. Anything the Church or the individual Christian asserts about Jesus must be authenticated in the light of the gospels."; James Cone, *God of the Oppressed* (Minneapolis: 1975), 31: "The Bible is the witness to God's self-disclosure in Jesus Christ. Thus the black experience requires that Scripture be a source of Black Theology."

AR.10849

between history and theology: "Christianity is a *biblical* religion. It is the religion of a *book*. Theology....must keep going back to its book."[18] It must keep going back because the story needs to be told in new settings that invoke new issues. While acknowledging the power of this narrative as a "life-sustaining source of commitment of God's reign," Mary Boys argues for redeeming the sacred story to "transform troubled tellings."[19]

Although many exegetes today find less certainty in the Bible as a historical document, the narrative still asserts power within our national understanding of morality; even those who critique how the interpretation has failed, or who seek to find additional sources of authority, must address this narrative. It may be true as some argue that this grand metanarrative has been lost.[20] Nonetheless, while process philosopher Lewis Ford argues modernity eviscerates the Bible's "…all-embracing horizon for our understanding of God, which must now be correlated with a greatly expanded world history, a scientific understanding of nature and man and a drastically altered social and ethical situation," he nonetheless acknowledges the new hermeneutical task requires "justice to its historical concerns."[21]

Historically, although the Republic and its constitutional protections necessitated that religion does not establish laws in our country, the narrative significantly influenced how the people governed themselves. The Puritans' conceptions of colonial governance arose out of "biblical constitutionalism."[22] The first European migrants to North America instituted new governance in their colonies, in part, to reform the corruption of the English church and nation. The colonists relied upon the same foundation of the biblical narrative that Vincent followed. John Winthrop erected a new "city on a hill" in 1630 based on his response to the biblical narrative.[23] Core elements were added to Winthrop's vision as the national story soon included belief that all humans were created equal—a vision the nation still struggles to achieve, while building upon this foundation. Those goals of justice,

---

[18] Juan Luis Segundo, S.J., *The Liberation of Theology* (Maryknoll: 1976), 7.

[19] Mary C. Boys, *Redeeming Our Sacred Story: The Death of Jesus and Relations Between Jews and Christians* (N.Y.: 2013), 25.

[20] See, e.g., Frederick Mark Gedicks, "Spirituality, Fundamentalism, Liberty: Religion at the End of Modernity," 54 *DePaul Law Review* (2005), 1197: "We no longer possess an understanding of the place and purpose of humanity that would infuse every life with the same ultimate meaning."

[21] Lewis S. Ford, *The Lure of God: A Biblical Background for Process Theism* (Philadelphia: 1978), 16.

[22] H. Richard Niebuhr, *The Kingdom of God in America* (Middletown, Ct.: 1988), 62. See also: John Witte Jr., *God's Joust: God's Justice Law and Religion in the Western Tradition* (Grand Rapids, Mi.: 2006), 8: "The precise shape and balance of the Western legal tradition has been determined, in part, by the Western religious tradition. And when the prevailing ideas, officials, symbols, and methods of the Western religious tradition have changed, the shape and balance of the Western legal tradition have changed as well."

[23] See, e.g., Perry Miller, *Errand into the Wilderness* (Cambridge, Ma.: 1956), 10-15. It is interesting to note that Vincent was simultaneously developing and implementing the concept of the Congregation of the Mission to reform corruption in the French Church, while educating the elite on the humanity of the poor. Subsequent research is needed to compare and contrast the developments in achieving their respective missions.

AR.10850

equality, and liberty intertwine within the religious and secular narratives.[24]

Thomas Jefferson's "unalienable rights" for all people stems from the same belief in humans created in God's image that Vincent also understood.[25] According to Robert Bellah the Bible was the only reading material for many in the earliest generations, and "biblical imagery provided the basic framework for imaginative thought in America up until quite recent times and, unconsciously, its control is still formidable."[26] Even as many contemporary judges, legislatures, scholars, and lawyers abandon reliance on a Divine source for law or develop legal themes based on legal positivism, they cannot ignore the foundation of the nation's law arising out of the biblical narrative or the religious tradition that formed the basis of much of western law. Marxist Terry Eagleton asserts, at the very least, contemporary "critics of the most enduring form of popular culture in human history have a moral obligation to confront that case at its most persuasive."[27] Even many who possess no particular claim to faith in one of those religions still witness the cultural and

---

[24] Reinhold Niebuhr, "Liberty and Equality," *Faith and Politics: A Commentary on Religion, Social and Political Thought in a Technological Age* (New York: 1968), 190-192.

[25] John M. Buchanan, "Patriot Cause," *The Christian Century* 131:14 (9 July 2014), 3. Jefferson's "all men are created equal" flows from Enlightenment thinkers and "the equally radical proposal that human beings are created in the image of the Creator." The Catholic Church has since recognized that reason also supports a finding of human dignity. See, John Noonan, *The Lustre of Our Country: The American Experience of Religious Freedom* (Berkeley: 1998), 349-350. Frank R. Strong provides another example of the biblical heritage within secular history. He notes that "the term 'federal' derives from the Latin, *foedus*, meaning covenant." He suggests that Ancient Israel's belief in the covenant between God and humanity may have "harbored the earliest seeds of the concept of federalism." Frank R. Strong, *Judicial Function in Constitutional Limitation on Governmental Power* (Durham, N.C.: 1997), 7-8.

   This article primarily addresses Vincentian hospitality, and is therefore, faith-based. Those who follow in the Vincentian tradition participate in this nation under its laws; as such, they must be able to articulate their faith understandings and make their arguments accessible and persuasive to others who may not believe in this faith-based story. The scope of this article does not fully permit arguing how the biblical narrative might persuade those who do not believe to love the immigrant. Nonetheless, the concepts of human dignity and covenantal relationships that find new meaning in democratic laws and procedures, that call for equality, liberty, and justice contain integral elements from the biblical constitutionalism of our nation's founding. Thus, the substance of the biblical narrative should be of interest even to those who claim no faith in the Bible.

[26] Robert N. Bellah, *The Broken Covenant: American Civil Religion in Time of Trial*, 2nd ed. (Chicago: 1992), 12. See, generally: *The Bible in American Law: Politics, and Political Rhetoric*, James Turner Johnson, ed. (Philadelphia: 1985); Martin E. Marty, *Pilgrims in Their Own Land: 500 years of Religion in America* (N.Y.: 1984), 302; Noonan, *Lustre*, 257.

[27] Terry Eagleton, *Reason, Faith, and Revolution: Reflections on the God Debate* (New Haven: 2009), 33.

AR.10851



The east facade of the United States Supreme Court Building includes Moses with the Ten Commandments.

*CC BY-SA 3.0*



click to enlarge

political impact the Bible has had on western civilization.[28]

For those within faith traditions, the narrative is far more than rote retelling of a factual past. In reciting the biblical narrative, persons of faith place themselves within an engaged community that reinterprets the story within the context of contemporary times. Judith Plaskow reminds that for Jews it is not just remembering, but rather re-living the event for "It is in telling the story of our past as Jews that we learn who we truly are in the present."[29] Plaskow recalls the Passover Seder where "families gather together not to memorialize the Exodus from Egypt, but to relive it."[30] H. Richard Niebuhr explains the Christian experience of transformation: "When we become members of such a community of selves, we adopt its past as our own and thereby are changed in our present existence…. the prophets of the Hebrews become our prophets and the Lord of the early disciples is acknowledged as our Lord."[31] Elisabeth Schüssler-Fiorenza celebrates the continuous contemporary engagement: "The Bible is not just a document of past history but functions

---

[28] André LaCocque, *Onslaught against Innocence: Cain, Abel, and the Yahwist* (Eugene, Or.: 2008), 5. See: Mark A. Noll, *A History of Christianity in the United States and Canada* (Grand Rapids, Mi.: 1992), 407: "The Bible has become part and parcel of North American culture because it has been constantly read, discussed, and studied."; John C. Bennett, *Christians and the State* (N.Y.: 1958), 154: noting "…the traditions which have nourished Anglo-Saxon democracy, a tradition that owes more to Calvinism than to the Enlightenment, which was expressed within the spiritual and political ferment in the Cromwellian period in England and in the realism of some of the American founding fathers."; John Courtney Murray, *We Hold These Truths: Catholic Reflections on the American Proposition* (Kansas City, Mo.: 1960), 39: "[t]he Bill of Rights…. is far more the product of Christian history." Northrop Frye concludes, "a student of English literature who does not know the Bible does not understand a good deal of what is going on in what he reads: the most conscientious student will be continually misconstruing the implications, even the meaning." Frye, *The Great Code: The Bible and Literature* (N.Y.: 1982), 4. *Accord*, Noll, *History of Christianity*, 420. Even Christians who disregard the Old Testament have lost "a model for true social justice and an ethos to support it." Marilynne Robinson, *When I Was a Child I Read Books* (N.Y.: 2012), 64. Moreover, even if the substance is not replicated, the language may be particularly relevant in the secular realm: Jack Balkin writes "…constitutional traditions have much in common with religious traditions, and especially religious traditions that feature a central organizing text that states the tradition's core beliefs. We must have a way to talk about the commitments of a people in a creedal tradition spanning many years, involving the work of many generations, constantly subject to change and circumstances that are sometimes recognized and sometimes not, and organized around the maintenance and interpretation of an ancient creedal text…. That is why the language of religion is particularly useful in understanding the path of the American Constitution, even if the constitutional project is secular." Balkin, *Redemption*, 7. Indeed, Jaroslav Pelikan states that the Constitution "functions as the normative American Scripture." Pelikan, *Interpreting the Bible and the Constitution* (New Haven, 2004), 21.

[29] Judith Plaskow, *Standing Again at Sinai: Judaism from a Feminist Perspective* (San Francisco: 1990), 29.

[30] *Ibid.*

[31] Niebuhr, "Story of Our Life," 37.

AR.10852



Inspection of immigrants at Ellis Island in 1897.
Etching by Ewald Thiel published in *Die Gartenlaube*.
*Public Domain*



as Scripture in present day religious communities."[32] Likewise, in specifically relating the Word to the Vincentian experience, José María Román, C.M., describes "when Vincent de Paul read the gospel it was no mere speculative exercise but a dynamic act of commitment."[33]

Today all who approach the Word must make an "interpretive decision about epistemological assumptions and whether to locate one's interpretive work in the narrative of modernity or the narrative of faith claims that refuse the skepticism of modernity."[34] Regardless of that decision, it remains imperative to interpret the narrative and to seek its wisdom for our lives together on this planet. For Gustafson, it may be as critical as mere survival because the biblical words and events give the church its identity.[35] But Marilynne Robinson reminds us that the loss impinges far more than just the identity of the church. She writes, "We live in an age of neo-Hobbism....If our myths and truths are only another exotic blossoming, the free play of possibility, then they are fully as real and as worthy of respect as anything else."[36] Community also suffers greatly when the narrative of the past is forgotten or lost. Theodore Adorno warned: "Forgetting is inhuman because man's accumulated suffering is forgotten....This is why tradition is nowadays confronted with an insoluble contradiction. It is not present and cannot be evoked, but as soon as all tradition is extinguished, inhumanity begins."[37]

If we believe God's Word in Leviticus that we have all been slaves in Egypt,[38] then, too, we must recognize that we all came across the Alaskan peninsula with the Native Americans, braved the seas on the Mayflower, poured through the Cumberland Gap,

---

[32] Elisabeth Schüssler Fiorenza, *In Memory of Her: A Feminist Theological Reconstruction of Christian Origins* (N.Y.: 1983), xxii. *See also*, Ched Myers and Matthew Colwell, *Our God is Undocumented: Biblical Faith and Immigrant Justice* (Maryknoll: 2012) 5.

[33] José María Román, C.M., *St. Vincent de Paul: A Biography*, Joyce Howard, D.C., trans. (London: 1999), 316.

[34] Bruggemann, *Theology*, 19.

[35] Gustafson, *Treasure*, 46.

[36] Marilynne Robinson, *The Death of Adam* (N.Y.: 2005), 2.

[37] T.W. Adorno, "Thesenüber Tradition," *OhneLeitbile* (Frankfurt: 1967), 34*ff.*, as quoted by Metz, in Hauerwas, *Narrative*, 260.

[38] Lev. 19:34.

AR.10853

walked the Trail of Tears, crossed the plains with the Mormons, climbed the long walk at Ellis Island, joined the Great Migration from the South to the Midwest, fled the Hungarian Revolution of 1956, or found ourselves tossed on the seas with Vietnamese boat people or Haitian refugees. As we meet the children crossing the Rio Grande, whom do we see? If, in Adorno's words, we forget our participation in the narrative, we invite that tragic inhumanity.

The biblical narrative speaks directly to the question of Vincentian hospitality and response to immigration today. Immigration law has played a significant role in giving meaning to this nation. Oscar Handlin confessed: "Once I thought to write a history of the immigrants in America. Then I discovered that the immigrants *were* American history."[39] Similarly, immigrants fill the stories within the biblical narrative. After tracing the vigorous centuries-old debate of Old Testament exegetical studies, Walter Bruggemann concludes that most scholars now agree that its final form is a product of and a response to the Babylonian exile[40] leading him to assert that the "core of faith, for Christians as for Jews, is situated in the matrix of exile."[41] The juxtaposition of living within the most powerful democratic republic in the world, while following a narrative whose core of faith finds its context within the matrix of exile, necessitates continuous interpretation of loving the immigrant. Such a central focus relies on more than mere proof-texting a line of scripture.

Rather, our faith response to immigration must explore that matrix of exile, and examine the human responses to a God who begins the human story through the exile of Adam and Eve with only the promise of God's protective love. The story of the Israelites starts with a departure from home to a new land that eventually ends in captivity in Egypt. With the Exodus, the people become refugees again, wandering before coming home.[42] The Exodus theme is rephrased in the narratives of exile to Babylon. Joseph, Mary, and Jesus become exiles shortly after the Bethlehem birth and the disciples scatter after the crucifixion. Saint Paul, perhaps the principal peregrine of the narrative, spread the promise of the gospel precisely because he rarely called a place home after his conversion.

It is out of this narrative that God told us to "love the immigrant."[43] Alice Hunt reminds us that in addition to loving God, loving the neighbor, God issues the imperative, "love

---

[39] Oscar Handlin, *The Uprooted: The Epic Story of the Great Migrations that Made the American People* (N.Y.: 1951), 3.

[40] Bruggemann, *Theology*, 74; See also, Frederick A. Norwood, *Strangers and Exiles: A History of Religious Refugees*, Vol. I (Nashville, TN: 1969), 21-90.

[41] Bruggemann, *Theology*, 76.

[42] Robert Bellah reminds that the founders of the United States saw this nation as the promised land: "God has led his people to establish a new sort of social order that shall be a light unto all the nations." "Civil Religion in America," in *Religion in America*, William G. McLoughlin and Robert N. Bellah, eds. (Boston: 1968), 10. To cite the ongoing influence of this ideal in the nation's history, Bellah quoted President Lyndon Johnson's inaugural address:

> They came here—the exile and the stranger brave but frightened—to find a place where a man could be his own man. They made a covenant with this land. Conceived in justice, written in liberty, bound in union, it was meant one day to inspire the hopes of all mankind; and it binds us still. If we keep its terms, we shall flourish.

*Ibid.* More recently, President Barack Obama stated: "Scripture tells that we shall not oppress a stranger, for we know the heart of a stranger. We were strangers once too." see: https://www.whitehouse.gov/issues/immigration/immigration-action

[43] Lev. 19:33-34.

AR.10854

the immigrant."[44] Not just be kind to or care for the immigrant, but love the immigrant. Moses Pava delves deeply into the juxtaposition of loving one's neighbor with loving the immigrant.[45] Agreeing that the concept is most difficult if not impossible to follow, he argues it remains critical to love the stranger to teach humanity how to discover its humanity.[46] The Bible, moreover, teaches not simply a command to love, but instructs why this gift of the immigrant enters the very core of our being. Marco Tavanti discusses one important aspect of the biblical message of hospitality to the stranger in this volume.[47] John Koenig concurs that the biblical story's ancient sacred bond between guest and host stands as a "pillar of morality upon which the universe stands."[48] Koenig adds a second rationale that finds recognition within Vincentian hospitality and Catholic Social Thought (CST). For Koenig, in addition to morality, the numinous intrudes through hospitality to the stranger, a place where "the advent of the divine stranger…offers blessings that cannot at first, be comprehended."[49]

Given the matrix of the exile, it is not surprising that this biblical narrative involves so many stories responding to the unexpected visitor. The Bible has many words for that stranger: sojourner, exile, immigrant, alien, *ger*.[50] Distinguished from foreigners who were foes or those who would not assimilate, the foreign-born living within the land—the *gerim*—were to be treated equally under the law. Because the Israelites had been strangers in Egypt and had lived in the foreign land of Babylon, they too should understand that the stranger should be treated with kindness. Recognizing that their outsider status would often lead them to be marginalized without the typical resources of land or connections within society, the *ger*, like the widow and orphan, taught Israel to meet vulnerability with love. Hunt emphasizes that most biblical references to the *ger* can be found in the context of treatment by law; a law that treats them favorably.[51] Given human worry over security, the desire to lock the gate or deny rights to the visitor can make the goal aspirational and difficult to fulfill, but the narrative does not retreat from this moral question.

The Bible records diverse human responses to God, and, therefore, its call of hospitality to the stranger is not univocal. Ruiz notes that as David's and Solomon's monarchies grew in power, other biblical voices sought to exclude the *gerim* from Israel's life.[52] Moreover,

---

[44] Alice Hunt, "Love the Immigrant," on file with the author. *Accord*, Robinson, *When I Was a Child*, 72.

[45] Pava, "Loving the Stranger," 132-22.

[46] *Ibid*, 136, quoting Hermann Cohen.

[47] Marco Tavanti, Ph.D., "Hospitality Ethos with Justice and Dignity: Catholic, Vincentian, and Jesuit Perspectives on Global Migration," in this volume of *Vincentian Heritage*.

[48] John Koenig, *New Testament Hospitality: Partnership with Strangers as Promise and Mission* (Philadelphia: 1985), 2.

[49] *Ibid.*, 5.

[50] André LaCocque, "The Stranger in the Old Testament," *Migration Today* 15 (1970); See also, Hunt, "Love"; and Francisco Ruiz Vasquez, "The Stranger that is Within Thy Gates," *Migration Today* 12 (1969), 44. Migrants were characterized in the Bible in multiple ways, see: http://classic.net.bible.org/dictionary.php?word=Stranger%20And%20Sojourner%20%28In%20The%20Old%20Testament%29

[51] Hunt, *Ibid.*

[52] Ruiz Vasquez, "Stranger," 48.

AR.10855

the narrative can fuel false efforts. Mere possession does not indicate whether the mantel of owning a narrative benefits the nation. The biblical narrative faces the same historical critique of a chosen people wandering for the Promised Land, limited to their exclusive benefit in contrast to a people chosen by the Divine One to be a "holy people" modeling justice and liberty for all humanity.[53] Similarly, the idea of a chosen people can be exploited by the worst aspects of American exceptionalism that dominate other nations and undermine the promises of liberty and justice for all; or it can serve as the model for building constitutional protections when nations throw off the yoke of dictatorship. Some have used the narrative to kill and displace indigenous peoples in the name of progress, or to enslave blacks in the name of economic efficiency, but the narrative has also been a resource for many who have sought to end these wrongs and combat genocide and tragedy.[54] Certainly, the biblical narrative contains many contested and sometimes contradictory voices, but the core story remains, a Divine call for human love when faced with the vulnerability of the exile.

Within this narrative, people of faith engage the question of whether love for the immigrant can be reconciled with the monarchial elements that exercise the power to exclude. Robinson articulates this ongoing interpretive debate: "Since the time of the Hebrew prophets it has been the role of the outsider to loosen these chains, or lengthen, if only by bringing the rumor of a life lived otherwise."[55] It is noteworthy, however, that loving the immigrant also influenced the laws of the local polity in biblical times. First century CE historian, Flavius Josephus wrote with pride, "It is good to see how equitable our lawgivers wished us to be in our treatment of foreigners."[56]

When lawmakers and citizens become too in love with our homes and our nation, we may be less inclined to understand the life God has intended for humankind. LaCocque emphasizes this gift, "What matters is that we should not ourselves in turn miss the opportunity which the presence of the [stranger]'*Ger*' in our midst represents."[57] The narrative calls people of faith to respond to God to counter the idols and temptations of the world that conspire to keep humans from choosing life.[58] The stranger who arrives opens eyes to understand the choice of seeking security through human hands or God's love. Certainly, a tension exists and humans must work to build communities in a world

---

[53] André LaCocque, *But As For Me: The Question of Election for God's People* (Atlanta: 1979).

[54] See, e.g., Martin E. Marty, *Righteous Empire: The Protestant Experience in America* (1970), 5-33; and Martin H. Belsky and Joseph Bessler-Northcutt, "African-Americans: Slavery and Segregation," in *Law and Theology: Cases and Readings* (Durham, N.C.: 2005), 25; These conflicts also reflect the finitude of the human condition. In a similar vein, Jack Balkin appropriates religious language when he notes "The Constitution, and therefore the Constitution-in-practice, always exists in a fallen condition. It was made in imperfect times by imperfect people… it is our job, standing later in history, to try to see farther than past generations could," Balkin, *Redemption*, 249.

[55] Robinson, *When I Was a Child*, 92-3.

[56] Flavius Josephus, *Contra Apionem*, 2, 28, quoted by Ruiz Vasquez, "Stranger," 47.

[57] LaCocque, "Stranger," 55.

[58] Deut. 30:19. Ethicist Robin Lovin states that this passage from Deuteronomy reminds us the world is a "morally serious place. And to that fundamental message, the Gospel adds only that the choice of life must be made in the midst of life, and that the blessing, likewise, is not a reward for a life well-lived, but the living of it." Lovin, "Sermon for Epiphany Season," Rockefeller Memorial Chapel, 2 February 1993, 5, on file with the author.

AR.10856



A Syrian refugee camp pictured in summer of 2015 during the ongoing crisis.

*Public Domain*



constantly threatened by human sin and environmental destruction. As Buber asserts, within the Bible "the desire to own land is not condemned and renunciation is not demanded" but God is God and "Lord of the land" while the human is simply the "sojourner" before God.[59] We are all aliens and strangers in this land.[60] Balancing the tension is never easy or simple. Human finitude and greed demand more than most are willing to admit. To paraphrase Jack Balkin's secular use of a religious term, we are a people engaged in redeeming the biblical narrative in our times.[61] Vincent de Paul, self-deprecating for all his failures, nonetheless reminded his friends to redeem their culture by imitating the ultimate stranger, the one who reveals God to us, Jesus.

This tension continues to the present day. CST emphasizes welcoming the stranger with an acceptance that the state has a duty to protect its sovereignty.[62] CST balances the state's responsibility to sovereignty by employing systems that recognize the dignity of all humans and that take particular care to address the vulnerability of the immigrant.[63] Immigration law is one manifestation of the tension to welcome newcomers through a just process while protecting national security. One way to test its efficacy in meeting these goals is to apply immigration law to the biblical narrative and consider the results.

## II. American Immigration Law Applied to the Narrative

Immigration law distinguishes between those seeking to immigrate to the United States or flee to these shores in response to persecution through a complex and not

---

[59] Buber, *On the Bible*, 3.

[60] 1 Pet. 2:11.

[61] Balkin, *Redemption*, 249.

[62] Elizabeth Collier, "And They Fled Into Egypt: Migration in the Light of Scriptures and Catholic Social Teaching," in Collier, *Religious and Ethical Perspectives*, 147.

[63] See: United States Conference of Catholic Bishops, *Strangers No Longer Together on the Journey of Hope*, 22 January 2003, at: http://www.usccb.org/issues-and-action/human-life-and-dignity/immigration/strangers-no-longer-together-on-the-journey-of-hope.cfm. See also: *And You Welcomed Me: Migration and Catholic Social Teaching*, Donald Kerwin and Jill Marie Gerschutz, eds. (Lanham, Md.: 2009); and Michael A. Scaperlanda, "Immigration Law: A Catholic Perspective on Immigration Justice" in *Recovering Self-Evident Truths: Catholic Perspectives on American Law*, Michael A. Scaperlanda and Teresa Stanton Collett, eds. (Washington, D.C.: 2007), 292.

AR.10857

always consistent policy of determining who may enter, who may stay and who, upon transgressing the nation's hospitality, may be deported or removed.[64] Currently, there are two compilations of enforcement laws—grounds of inadmissibility and grounds of deportability—that include categories of conduct or circumstances that may bar admission or eligibility for benefits once admitted, as well as make people subject to removal that leads to deportation and loss of permission to remain in the country. In essence, Congress, through immigration law, molds the character of our nation by determining who can be members, allowing entry for family reunification, specific job skills, and designated refugees, while also defining who may be removable because of conduct deemed inappropriate.

As a test to examine the efficacy of the law's ability to mold our national identity, consider what would happen if U.S. immigration law regulated migration in the lives of the biblical protagonists. Undergirding the biblical motif of exile, after the Bible commences "in the beginning," creation follows with Adam and Eve's exile, an exile story that repeats again and again throughout the narrative.[65]

The biblical metaphor that the vulnerable stranger is protected by God continues with Cain's murder of Abel.[66] Cain becomes our "common ancestor, the murdered 'fugitive and wanderer' in all of us."[67] But Cain is a murderer and as such under U.S. immigration law, he has committed a crime of violence which is designated as a crime of moral turpitude or

---

[64] All references to immigration law will be to United States immigration law. For a summary of American immigration law and history, see Hiroshi Motomura, *Outside the Law* (N.Y.: 2014), 31-49; Craig B. Mousin, "Immigration Reform: What Can Religious Voices Require From the State?" in Collier, *Religious and Ethical Perspectives*, 327; and Marie Friedman Marquardt, Timothy J. Steigena, Philip J. Williams, and Manuel A Vasquez, *Living "Illegal": The Human Face of Unauthorized Immigrants* (N.Y.: 2011), 46-56.

[65] See text ascribed to footnotes 40 and 41.

[66] Gen. 4:15.

[67] André LaCocque, *The Trial of Innocence: Adam, Eve, and the Yahwist* (Eugene, OR.: 2006), 204. Ched Myers points out that this story also shows God's protection for Cain, the wanderer, a "counterintuitive divine response" but also a challenge to those who follow the narrative to protect the sojourners in our midst despite their lack of legal status. Myers and Colwell, *Our God is Undocumented*, 56. The guilt of Cain juxtaposed with God's protection raises significant theological issues. See also: LaCocque, *Onslaught Against Innocence*. Victor Romero discusses similar issues of love and forgiveness for immigration violations through the lens of the parable of the Prodigal Son and immigration law. Victor C. Romero, "The Prodigal Illegal: Christian Love and Immigration Reform," 92 *Denver University Law Review* (2016), 927.

AR.10858



Edward Hicks painting, *Noah's Ark*, reveals one element of the biblical narrative's influence on United States culture. Oil on canvas, 1846. Currently held by the Philadelphia Museum of Art.

*Public Domain*



an aggravated felony. He would not be admissible and would certainly be deportable.[68]

Even when God protects, bad things happen under immigration law. When Noah built the ark to save his family, he took his wife, his three sons, and their wives.[69] But Noah, when disembarking from the ark in a foreign nation, violated the law barring smuggling. Although immigration law permits a waiver on the ground of inadmissibility for one to bring his or her spouse, parent, or children, nothing in the law provides a similar exemption for daughters-in-law. Noah was a smuggler.[70] His story stops when he is excluded at the border. Moreover, our refugee laws as currently adjudicated do not permit permanent refugee status for those fleeing environmental disaster. Noah is denied entry.

God calls Abraham and Sarah to: "Go forth from your country and your kindred…to the land that I show you."[71] They present an interesting dilemma posed by immigration law. Most nations recognize that humans are free to leave a nation, but name no concomitant right to enter another nation. Immigration law possesses authority because a nation has a

---

[68] I.N.A. §212(a)(2); 8 U.S.C. §1182(a)(2); I.N.A. §237(a)(2)(A)(i) or (iii); 8 U.S.C. §1227(a)(2)(A)(i) or (iii). Every immigration case involves many variables. For our purposes, in applying current immigration law to the biblical narrative, an individual may violate either a ground of admissibility barring entry, or a ground of deportation leading to removal. A person's actual immigration history and context would determine which charges the government would bring. The government often charges multiple grounds, but need only prove one to effectuate exclusion or removal. In this article, one or more grounds will be listed to suggest the difficulty the person would have remaining in lawful status or, in this experiment, removing them as a protagonist from the biblical narrative. I do not address all the potential remedies or waivers, although Congress has increasingly tightened the grounds over the last twenty years making relief more difficult to obtain. In any given example, an attorney might reach a successful outcome and permit admission or defeat removal. This experiment reflects another difficulty, however: the law does not provide attorneys at government cost. Immigrants in removal proceedings must hire their own attorney, seek limited *pro bono* or legal assistance attorneys, or face the power of the federal government without benefit of counsel. Having an immigration attorney to assist one's case can make a considerable difference in seeking remedies, waivers, exemptions, or discretionary rulings. Jaya Ramji-Nogales, Andres I. Schoenholtz, and Philip G. Schrag, "Refugee Roulette: Disparities in Asylum Adjudication," 60 *Stanford Law Review* (2007), 348: "whether an asylum seeker is represented in court is the single most important factor affecting the outcome of her case."; "Representation is Key in Immigration Proceedings Involving Children," Syracuse University Transactional Records Access Clearinghouse (TRAC), Immigration Reports, 18 February 2015. See: http://trac.syr.edu/immigration/reports/377/

[69] Gen. 7:13.

[70] I.N.A. §212(6)(E); 8 U.S.C. §1182(6)(E).

[71] Gen. 12:1.

AR.10859

right to decide who may cross that nation's borders.[72] God told Abraham and Sarah to go, but provided no visas for entry elsewhere. Once they showed up at the point of entry, they had no ties to the land, no family connections, and no job skills that were needed. Under the law, they were ineligible for family visas, and therefore, they would be denied entry. Once inadmissible, the biblical narrative concludes before the story begins and they must return or wander elsewhere—indeed the Bible calls them *gerim*—for they will always be the wanderers.[73]

Abraham and Sarah would present an additional challenge to an inspection officer. When the couple entered Egypt, they lied to the officials, claiming they were siblings rather than spouses. Immigration fraud leads to expedited removal, a prompt return to one's native land as the law precludes any opportunity to plead one's case in court.[74] Genesis records this state-ordered deportation: "And Pharaoh gave his men orders concerning him [Abraham]; and they set him on the way with his wife and all that he had."[75] Moreover, by committing fraud once and being deported, their names would enter the national database. Even if they subsequently earned the status to return, the prior fraud and deportation would make it much harder to do so; they would need discretionary permission to overcome their prior conduct. We have no story: no father and mother of the nations, no great multitude in this biblical narrative.

Subsequent generations again generate immigration issues. Rebecca and Jacob schemed to take away the inheritance Esau was rightfully entitled to when they fooled Isaac into giving his blessing to Jacob.[76] A conviction for fraud of over $10,000 constitutes the deportable offense of an aggravated felony, which their confession confirms.[77]

Joseph and his multicolored coat has become part of our culture as a simple, happy children's story and a Broadway musical, yet it includes actions by the parties involved that makes all subject to inadmissibility or removal. The brothers, who with Joseph had been destined to become heads of the twelve tribes of Israel, certainly were guilty of a crime of violence in kidnapping Joseph and selling him to slave traders. As such they would face immigration law consequences as traffickers, committing crimes of moral turpitude or

---

[72] *Fong Yue Ting v. U.S.*, 149 U.S. 698, 710, 13 S. Ct. 1016, 1021 (1893) (Gray, J.) The Court acknowledges: "the right to exclude or to expel all aliens…absolutely or upon certain conditions, in war or in peace, being an inherent and inalienable right of every sovereign and independent nation, essential to its safety, its independence, and its welfare."

[73] Gen. 23:4; I.N.A. §212(a)(7)(A); 8 U.S.C. §1182(a)(7)(A).

[74] I.N.A. §235(b); 8 U.S.C. §1225(b); I.N.A.§212(a)(6)(C)(i); 8 U.S.C. §1182(a)(6)(C)(i); See also, *Habib v. Lynch*, 787 F.3d 826, 831 (7th Cir. 2015). Inadmissible because obtained admission by misrepresenting marital status, but remanded on other grounds.

[75] Gen. 12:20; Like father, like son: in a similar incident, the biblical narrative reveals some of the difficulties persons living as undocumented in another's land face. Genesis reports that Isaac was living as a *ger*, in effect an undocumented immigrant, but God told him to remain. He informed the authorities, in this case King Abimelech, that Rebecca was his sister instead of his wife. When later confronted with the truth, the King at first told Isaac to go away, but the narrative subsequently demonstrates how the King and Isaac worked out their relationship, with Isaac remaining in Gerar. See, Gen. 26:6-11. As with Cain, the narrative thus provides another example of power providing hospitality to the stranger.

[76] Gen. 27:1-38.

[77] I.N.A. §101(a)(43)(M); 8 U.S.C. §1101(a)(43)(M); I.N.A. §237(a)(2)(A)(iii); 8 U.S.C. §1227(a)(2)(A)(iii). *Eke v. Mukasey*, 512 F.3d 372, 381 (7th Cir. 2008). Conspiracy to commit financial fraud was an aggravated felony.

AR.10860

aggravated felons.[78] Joseph himself would be inadmissible to Egypt for want of a visa, but he would probably enter with a T-visa, a generous act of Congress to permit persons who have been trafficked to remain rather than return to face the wrath of traffickers.[79] This, of course, assumes that Joseph would have had access to an immigration attorney who could help him navigate the complexity of the law to request a T-visa. But Joseph has even more problems subsequent to entry. Potiphar's wife accused him of rape. Although the narrative makes it clear he was innocent, he served at least two years in prison.[80] A conviction for an attempted rape with punishment exceeding one year in prison qualifies as an aggravated felony; Joseph would be deportable despite the T-visa.[81] Even though all who read the story know that Joseph was innocent, immigration law precludes the Immigration Judge from peering behind the record of the conviction to examine if a wrongful conviction occurred; the conviction proves the grounds of deportability, therefore, Joseph has no defense.[82] He is deported. The well-loved children's story, like the story of so many families whose members have been caught up in the complexity of criminal and immigration law, founders under the burden and dooms the happy ending. No Joseph narrative, and consequently, like many in Egypt, the world would not know him.

The Exodus story begins because a new Pharaoh did not know Joseph or the gifts he had brought to the Egyptians after he was pardoned.[83] Pharaoh exploits the Hebrews. Moses' mother and sister save him, but he subsequently kills an Egyptian.[84] Pharaoh seeks the death penalty for Moses who then flees to Midian. Immigration law bars Moses from entry with a crime of moral turpitude, and the Exodus never occurs because our law eliminates Moses from the narrative.[85]

The story of Ruth, the Moabite, the foreigner, has inspired many generations as a story of love and faith while simultaneously delineating the matriarchal lineage of King David and eventually Joseph, father of Jesus.[86] Fortunately, immigration law permits a foreign-born spouse to immigrate with the citizen spouse. If the application for a spousal visa is not filed when the marriage is intact, however, no visa would be available for the widow unless she self-petitioned within two years of her husband's death. Ruth did not intend to immigrate to Bethlehem until after her husband died, but even if she filed her petition when she decided to join Naomi, it would probably take at least a year under

---

[78] Gen. 37:1-28.

[79] I.N.A. §101(a)(15)(T); 8 U.S.C. §1101(a)(15)(T).

[80] Gen. 39:7-20; 41:1; Potiphar's wife claimed Joseph insulted her, but the biblical world clearly was aware that he was guilty of attempted rape. See, James L. Kugel, *In Potiphar's House: The Interpretive Life of Biblical Texts* (San Francisco: 1990), 21-26.

[81] I.N.A. §237(a)(2)(A)(iii); 8 U.S.C. §1227(a)(2)(A)(iii); *Castro-Baez v. Reno*, 217 F.3d 1057 (9th Cir. 2000). Rape conviction is an aggravated felony.

[82] *Palmer v. INS*, 4 F.3d 482, 490 (7th Cir. 1993).

[83] Ex. 1:8.

[84] Ex. 2:15.

[85] I.N.A. §212(a)(2)(A)(i); 8 U.S.C. §1182(a)(2)(A)(i).

[86] Ruth 4:13-18.

AR.10861

current processing times for her to enter.[87] She would also have to prove that she had a job or sufficient resources, or risk becoming a public charge which would bar entry. Gleaning a field's last fruits would probably not be sufficient; indeed, it confirms that she was poor and dependent upon the charity of the field's owner.[88] Ruth may not get to Bethlehem, or if so, she might arrive too late to meet Boaz. The law threatens her story as the great-grandmother of King David; therefore we have no David or any of his descendants.[89]

David, too, would have immigration problems. He conspires to have Bathsheba's husband killed in battle. Although within his prerogative as King to make battle plans, the prophet Nathan confronts David and declares that this was not military strategy but instead an extrajudicial killing inspired by his lust. Although David continues to rule, his confession to extrajudicial murder, and the attempted cover up under the fog of war, would make him deportable as an aggravated felon. His confession seals the deal.[90]

One might think that Jesus would be the ideal immigrant whom we would welcome into our nation with outstretched arms. Unfortunately, Jesus, too, would run afoul of immigration law. Matthew's birth story describes the flight of the family to Egypt.[91] They possess no ties with Egypt; therefore, they would have entered Egypt illegally. Despite Egypt's hospitality, God called the family home, but Jesus' immigration problems escalate. With all the events surrounding his birth, one wonders whether Joseph had time to register the family under the decree of Caesar Augustus. If the family registration might not have occurred, were their papers in proper order, and if not, would they have been permitted re-entry? Joseph may have sufficient paperwork, but Mary had just delivered a baby and she may not have registered. At the very least, Jesus had no passport or birth certificate.[92] As parents, Joseph and Mary had no papers proving he was their son and they might be subject to trafficking restrictions. Imagine the difficulty of convincing an immigration officer that Joseph was Jesus' biological father. Imagine the difficulty some families have today proving parentage after fleeing persecution in their homelands. Alternatively, they might have been detained for smuggling a baby back into Israel. If Jesus was denied re-entry, the gospel story as we know it ends at the Israel-Egypt border. Mary and Joseph would face the difficult decision faced by thousands: do they enter and leave the child outside or do they remain in Egypt, living a life as an undocumented family never able to return home?

---

[87] Ruth 1:15-18. INA § 201(2)(A)(i); 8 U.S.C. § 1151(2)(A)(i).

[88] Ruth 2:2-11; -18; I.N.A. §212(a)(4)(A); 8 U.S.C. §1182(a)(4)(A).

[89] The story of Ruth presents the paradigmatic biblical example of the foreigner who defies the law, yet also reveals God's love and righteousness in times when those in power seek only to emphasize the power of the law as the sole security for humanity. See, André LaCocque, *Ruth*: *A Continental Commentary* (Minneapolis: 2004), 27.

[90] 2 Sam. 12:1-13; *Matter of D-R-*, 25 I. & N. Dec. 445 (B.I.A. 2011).

[91] Mat. 2:13-23.

[92] Applying immigration law to the biblical narrative is not just a fanciful exercise with no contemporary examples. Although the Constitution recognizes birth citizenship, Texas has started to refuse to issue birth certificates to children born of undocumented parents, thus placing them at risk of statelessness because they will be unable to prove the location of their birth. See: Manny Fernandez, "Immigrants Fight Texas' Birth Certificate Rules," New York Times, 17 September 2015, at: http://www.nytimes.com/2015/09/18/us/illegal-immigrant-birth-certificates.html?emc=eta1&_r=0

AR.10862

Even if Jesus re-entered Israel, he would remain dogged without papers for the rest of his life. Immigration law presupposes one is an immigrant if one has no proof of citizenship or non-immigrant status.[93] The Bible tells us that Jesus had no papers. When religious authorities questioned the blind man who received sight from Jesus, the authorities stated, "We know that God has spoken to Moses, but as for this man, we do not know where he comes from."[94] If the authorities have no proof, and Jesus cannot prove his right to be in the nation, he is subject to removal as one who entered without inspection—some might call him an illegal alien.[95]

Congress has also shown great concern in preventing anyone from entering the country who may have provided material aid to terrorists or terrorist organizations. The law offers little leeway for innocent provision, or *de minimis* provision, of aid to suspected terrorists. In his kindness and hospitality, Jesus often provided aid to those who would meet the law's definition of terrorists. Significantly, his abundant generosity to all who came his way placed him at risk for providing aid to individuals who might be deemed terrorists by either side in that first century political struggle. Jesus healed the centurion's servant.[96] The centurion served in the Roman military that had slaughtered the innocents under Herod, and crucified thousands of Israelites when Pilate maintained law and order through terror.[97] Jesus' gift of hospitality would certainly place him at risk of removal for material support of terrorists. When Jesus fed the five thousand, many of whom Rome would have characterized as terrorists, his actions would subsequently be evidence of providing material support to terrorists opposed to Roman rule.[98] The courts have held that mere provision of food can constitute material support. One court denied asylum to an individual based on material support of terrorists when he provided one meal to seven members of the Kurdistan Worker's Party. Although that case has been remanded for review, other courts continue to stress that a very low level of aid constitutes material support.[99] For example, another court upheld the deportation of an individual when guerrillas had commandeered his kitchen to prepare meals. The court ordered him removed because he

---

[93] INA § 214(b); 8 U.S.C. 1184(b).

[94] John 9:29-30.

[95] I.N.A. §212(a)(7)(A); 8 U.S.C. §1182(a)(7)(A).

[96] Mat. 8:5-13.

[97] Mat. 2:16-18; Reza Aslan, *Zealot: The Life and Times of Jesus of Nazareth* (N.Y.: 2013), 47; See also, Boys, *Sacred Story*, 168.

[98] Mat. 14:13-21; Reza Aslan documents that strife and resistance were so great in Galilee at the time of Roman occupation, that Rome considered all Galileans rebels—perhaps similar to the U.S. State Department designating certain nations or groups of people as terrorists. Given the appellation of "rebels," some of the 5,000 persons Jesus fed would certainly have been considered terrorists of their day. Aslan, *Zealot*, 91. See also: Justo L. Gonzalez, *Faith & Wealth: A History of Early Christian Ideas on the Origin, Significance, and Use of Money* (San Francisco: 1990), 74-5.

[99] *Ayvaz v. Holder*, 564 Fed.Appx.625 (2nd Cir. 2014); but see: *Sesay v. Attorney General of U.S.*, 787 F.3d 215 (3rd Cir. 2015); See also, Deborah Anker, "Material Support of Terrorism," *Law of Asylum in the United States* (Thompson West: 2015), §6:27.

AR.10863

provided material support to terrorists.[100] Jesus offered hospitality to all who are children of God. He would be deported for material aid to terrorists.

The government routinely charges those it seeks to remove with all possible grounds for removal. Jesus would have faced additional charges. He was convicted and sentenced to death by Pilate as guilty of sedition and a threat to Rome,[101] branding him an aggravated felon. Even if he escaped the crucifixion, he would either be inadmissible or removable. As we saw with the Joseph conviction, his actual innocence would not matter; the state convicted him. Immigration law does not permit an inspector or immigration judge to look beneath the conviction to consider actual innocence. Jesus: convicted. Jesus: deported. Jesus: barred entry. No gospel story for us to read or tell.

Notwithstanding all these obstructions to the gospel story, even those who could tell whatever tale was left would be denied entrance under the law. The remaining disciples, unemployed and scattered by the Roman death sentence, would most likely be considered individuals who would become public charges. Therefore, even if they could have found a way to immigrate, they would be denied visas as the law denies entry to those without sufficient resources.[102]

Peter, the rock upon whom the Christian church was founded, would not be permitted to meet the resurrected Christ on the shores of that Galilean lake because, he too, faced severe immigration problems. Conspiracy to commit an aggravated felony is sufficient to warrant removal based upon the underlying aggravated felony bar. Jesus' conviction would also make Peter and the other disciples removable for the same crime for seditiously conspiring with him. Peter also faced a serious non-political crime of violence and an aggravated felony charge for attempted murder when he assaulted the servant at Gethsemane.[103] Peter's assault would bar his entry.

Consider also Paul. Paul's immigration problems would have prevented him from spreading the gospel message. Paul was a confessed persecutor because he "was ravaging the church by entering house after house; dragging off both men and women, he committed them to prison."[104] Immigration law does not permit entry of persecutors and bars asylum or any relief. In *Singh v. Gonzales*, the government ordered a person deported who "took innocent Sikhs into custody…and transported them to the police station, where he knew they would be subjected to unjustified physical abuse," and also guarded homes so residents could not escape while other officers went inside to arrest and beat them up.[105] Paul was

---

[100]  *Barahona v. Holder*, 691 F.3d 349, 352 (4th Cir. 2012). Guerrillas always brought their own food, but "generally utilized the water and cooking facilities of his home under duress," which still constitutes material support. See also: *Singh-Kaur v. Ashcroft*, 385 F.3d 293 (3rd Cir. 2004). Provision of food and setting up of tents for persons who would commit terrorist activities was material support and made one inadmissible under the law.

[101]  John 19:14-16; Boys, *Sacred Story*, 173; Aslan, *Zealot*, 155-56.

[102]  I.N.A. §212(a)(4)(A); 8 U.S.C. §1182(a)(4)(A).

[103]  John 18:10-11.

[104]  Acts 8:3.

[105]  417 F. 3d 736, 740 (7th Cir. 2005). See also, *Abdallahi v. Holder*, 690 F.3d 467, 476-7 (6th Cir. 2012). A guard who brought students to prison for torture, and stood outside while it occurred, is inadmissible for assisting with torture.

AR.10864

 

St. Vincent de Paul not only sent Missioners to serve prisoners and refugees but believed he, too, was sent by the Gospel of Luke to heal and advocate for the detained, refugees, and the maimed.

*Courtesy St. Vincent de Paul Image Archive Online*

*http://stvincentimages.cdm.depaul.edu/*





---

guilty of far worse, yet even his conversion on the road to Damascus, celebrated as it is in the Christian story, would not waive the penalty of the persecutor bar. He would be barred, leaving history with no messenger of the gospel. Neither gospel story nor any disciple remains to tell whatever story could still be constructed without actors or story tellers after the implementation of United States immigration law. Indeed, one is hard pressed to find any narrative left when both the narrator and all the protagonists are shoved off the stage, leaving none available to share the tale.

One final irony occurs in this experiment. Vincent de Paul founded the Congregation of the Mission based, in large part, on the gospel narrative. Here, too, immigration law interrupts and stops the story. Early in his ministry, Vincent rented a horse to seek repayment from an individual who owed the Congregation a substantial sum. Vincent subsequently confessed, "I sold the horse I had hired in Tulouse. I intended to pay for it on my return, which misfortune delayed so long that I am in great disgrace…."[106] Sorrowful he may be, but he remained guilty of theft. Bernard Pujo claims this theft made Vincent "guilty of a crime, which, in those days, was severely punished with imprisonment or even forced labor in the galleys."[107] Such severity would certainly be an aggravated felony today.[108] Those who claim to work in Vincent's legacy, lose twice: no gospel message and no Vincent de Paul to interpret the message for posterity. Without the scriptural narrative, Vincent possesses no blueprint to forge the mission. Immigration law would have deprived all of the gifts presented by these biblical sojourners.

---

[106] Document 1, "To Monsieur De Comet, in Dax," in *Vincent de Paul: Correspondence, Conferences, Documents*, ed. and trans. by Jacqueline Kilar, D.C., Marie Poole, D.C., et al, 1-14 (N.Y.: 1985-2014), 1:3. Hereafter *CCD*.

[107] Bernard Pujo, *Vincent de Paul: The Trailblazer*, Gertrud Graubart Champe, trans. (Notre Dame: 2003), 25.

[108] I.N.A. §101(a)(43); 8 U.S.C. §1101(a)(43).

AR.10865

## III. Vincentian Hospitality and Immigration Law

The good news is that the gift of the narrative has been received and acted upon. It provides meaning and ethos for those who participate in the Vincentian legacy. Unburdened by modern debate over whether the story was historically accurate or if post-modern critiques undermined its veracity and efficacy, Vincent, relying on Scripture, designed a distinctive ministry in founding the Congregation of the Mission. Based upon the biblical stories of a people struggling to live in covenant with God and to respond to the gospel of Jesus, Vincent sent Missioners out to meet the most vulnerable, whether on the streets of the city, the prisons of the galley slaves, or with refugees in war-torn border towns. Saint Vincent lived his belief that all humans created in God's image retain equal dignity.[109] That foundation undergirds the Vincentian mission: treating all people equally and serving in solidarity while encouraging full participation in society. This story has been well told in the histories of the Congregation of the Mission.[110] In terms of Vincentian hospitality and immigration law, however, we should build upon that foundation and address two additional elements: the significance of being sent out; and the critical anchors of faith and reason when confronting a broken immigration legal regime that denigrates human dignity.

### A. Sent on a Mission

Vincent stressed the necessity of being sent on mission to announce the gospel message of human dignity and God's love for the marginalized. In response, those sent agreed to assume the vulnerability of the immigrant absent from the perceived security of home, and through that vulnerability and presence, the sojourner reveals God.

#### 1. Sent out from security

Vincent established the Congregation of the Mission as something particularly innovative in living the gospel story through an active engagement with the most vulnerable. Its name designates going out and leaving the comfort and security of safe havens to meet the poor. As Vincent stated, "…there should be a Company…of the Mission…that it should be entirely dedicated to that purpose, going here and there through hamlets and villages, leaving the towns behind—something that's never been done."[111] Vincent prioritized the biblical narrative as the Congregation's blueprint with the opening line of the *Common Rules*: "We read in sacred scripture…."[112] In seeking to imitate the life of Jesus,

---

[109] Thomas F. McKenna, C.M., "People of the Scarred Coin," *Vincentian Heritage* 22:2 (2001): 210. Available at: http://via.library.depaul.edu/vhj/vol22/iss2/5/

[110] See John E. Rybolt, C.M., ed., *The Vincentians: A General History of the Congregation of the Mission*, Vols. 1-6a & 6b (N.Y.: 2009-2015). See, generally, Marco Tavanti, Ph.D., and Rev. Craig B. Mousin, eds., *What Would Vincent Do? Vincentian Higher Education and Poverty Reduction*, Special Issue of *Vincentian Heritage* 28:2 (2008), 356 pp., at: http://via.library.depaul.edu/vhj/vol28/iss2/

[111] Conference 180, "Observance of the Rules," 17 May 1658, *CCD*, 12:4.

[112] *Constitutions and Statutes of the Congregation of the Mission* (Philadelphia, 1989), 105.

AR.10866

actions become central to the mission of the Congregation, reminding all that "it seeks to imitate his virtues as well as what he *did*…."[113] The narrative matters, for it would be impossible to imitate a non-existent narrative. The primacy of going forth and being an immigrant permeates Vincent's words: "travel about,"[114] "send workers,"[115] and having "risked the dangers of a long journey."[116] He clearly sets forth that none could have a disproportionate liking for "any ministry, person, or place, *especially our native land*."[117] Relying on Providence, Vincentians are called to "pitch our tents" with the vulnerable and "be willing to discard some of our security."[118] Engaged in mission one should imitate Jesus, the ultimate stranger who had no place to lay his head.[119]

Retelling the story of being sent from the comfort of a secure home undergirds Jesus' purpose: "The Spirit of the Lord is upon me; therefore, he has anointed me. He has sent me to bring glad tidings to the poor, to proclaim liberty to captives, recovery of sight to the blind and release to prisoners, to announce a year of favor from the Lord."[120] These words codify the heart of the Vincentian mission.[121] Vincentian hospitality lifted up the paradox of the biblical narrative: it is not those in the walled-off kingdoms that know best the grace and security of God, but it is in the eyes of the poorest of the poor, the ones without rights or recognition by the state.

In addition, Vincent recognized sending out countered a natural human propensity to employ the power of the law to wall itself off from the poor. One had to leave the comforts and security to go to those places where the law, whether it be the King, the army, or the elite, divided some apart and abandoned them. Immigration law by design segregates humans, blessing some with the state's imprimatur of acceptance while banishing others through exclusion or detention. While society differentiates between human beings, classifying some as less worthy, Vincent's particular insight was that by being created

---

[113] Emphasis added, *Ibid.*; See also, Conference 1252, "Priestly Ministry," *CCD*, 11:194, citing Ex. 4:16 and Ex. 17:9-12.

[114] Letter 2936, "To Jean Parre in Saint-Quentin," 9 August 1659, *CCD*, 8:83.

[115] Conference 155, "Repetition of Prayer," 18 October 1656, *CCD*, 11:321.

[116] Letter 1951, "Letter to a Priest of the Mission," *CCD*, 5:462. *Compare* Jesus sending out his disciples with few possessions in Mark 6:7-11.

[117] Emphasis added, Document 117a., *Common Rules of the Congregation of the Mission*, Ch. II. Gospel Teaching, 17 May 1658, *CCD*, 13a:436.

[118] John Prager, C.M., "The Shadow Side of the Vincentian Mission," *Vincentian Heritage* 16:2 (1995): 181. Available at: http://via.library.depaul.edu/vhj/vol16/iss2/4/

[119] Mat. 8:20.

[120] Luke 4:18-20; *Constitutions and Statutes*, Part 1, 5; Robert P. Maloney, C.M., *The Way of Vincent de Paul: A Contemporary Spirituality in the Service of the Poor* (Brooklyn: 1992), 14. Luke 4 is central to Vincentian spirituality. See also, Thomas F. McKenna, C.M., "Vincent de Paul: A Saint Who Got His Worlds Together," *Vincentian Heritage* 18:1 (1997), 1, 14, at: http://via.library.depaul.edu/vhj/vol18/iss1/1/

[121] Luke's designation of the year of favor recalls the Torah's Jubilee year; a year that proclaimed equality for all humans, not just for followers of the biblical God. The Jubilee's promise to all humans, not just a particular nation or people, reinforces a universal twenty-first-century Vincentian mission: address the diversity of the world and, in particular, offer Vincentian hospitality to immigrants. See Rev. Craig B. Mousin, "Vincentian Leadership: Advocating for Justice," *Vincentian Heritage* 23-25:2; 26:1(2005): 243, 265-69, at: http://via.library.depaul.edu/vhj/vol26/iss1/14/; Robinson, *When I Was a Child*, 106-107.

AR.10867

in God's image, all humans were equal. In contrast, many societies define character by legal and social status, concluding that the poor deserved to be poor, criminalized, and outcast.[122]

When criminals were condemned to be galley convicts, respected members of society thought they deserved what was, in effect, a death penalty, and therefore, sought little contact with them. Contesting that societal perception, Vincent invited the Daughters of Charity to minister to the galley convicts. Today, strict enforcement of immigration laws often arises out of a disproportionate love of nation that distinguishes not only the lawful requirements of membership, but denigrates the other, the outsider, as illegal.[123] The nation's incarceration rates and deportation rates climb as if removing the person from the community, either through detention or deportation, solves the human problem. The law becomes a legal talisman that justifies acceptance of diminishing another human being's dignity and selfhood by naming them 'illegal,' and therefore, subject to less protection. Legal systems establish rights, but humans are divinely created in God's own image. For Vincent, the mission to the vulnerable meant to assist the sick and poor everywhere.[124] Two centuries later, Frédéric Ozanam stressed a similar sentiment when he said he must go to those "without rights."[125] In our nation, the law forces some underground to live without the protection of the law. Vincent would go to the vulnerable ones residing in an unauthorized status.

### 2. Experience the vulnerability of the sojourner and finding the Divine

Precisely because the Missioners left that security promised by the powerful, those sent experienced the vulnerability of the immigrant and necessitated a faith and reliance upon God's protection in conjunction with the support of the community. The good news of the biblical narrative as understood by Vincent was that the one marginalized and excluded by society becomes the one who offers the gift of the Divine. When asked how to enter the realm of God, Jesus illuminated the gift of the other, the one society deems expendable or removable, as the way to experience the Divine.[126] Vincent experienced that

---

[122] McKenna, "Saint," 1, 14. See also, Edward R. Udovic, C.M., "'What About The Poor?' Nineteenth-Century Paris and the Revival of Vincentian Charity," *Vincentian Her*itage 14:1(1992): 69, 74, at: http://via.library.depaul.edu/vhj/vol14/iss1/5/; Boys, *Sacred Story*, 168: Roman society distinguished between the privileged and non-privileged subject to crucifixion; Balkin, *Redemption*, 21-25.

[123] The appellation "illegal alien" is often placed on all unauthorized persons residing in this nation prior to any formal finding of a legal proceeding to determine whether a law has been broken. In recent litigation, District Court Judge Boasberg granted a preliminary injunction to prevent detention of women and children who had been found to have a credible fear of returning to Central America, noting "…neither those being detained nor those being deterred are certain wrongdoers, but rather individuals who may have legitimate claims to asylum in this country." *R.I.L.-R v. Johnson*, 80 F.Supp. 3d 164 (D.D.C. 2015), 189. Immigration law's complexity complicates determination of whether an individual is residing under color of law or has potential legal remedies that permit one to reside here while determining status. See Motomura, *Outside*, 22-31.

[124] Conference 135, "Repetition of Prayer," 22 August 1655, *CCD*, 11:264.

[125] Frédéric Ozanam, letter to M. Foisset, 22 February 1848, in *Lettres de Frédéric Ozanam* (Paris: 1873), 2:217; See also, Parker Thomas Moon, *The Labor Problem and the Social Catholic Movement in France* (N.Y.: 1921), 35.

[126] Mat. 25:44-46; McKenna, "Saint," 10.

AR.10868

grace, exclaiming refugees knew "true religion" that could be learned by serving them.[127] Indeed, Jesus, too, may have learned about hospitality from his own experience as a refugee. Pastor and poet Theodore Conklin points out the relationship of welcoming the stranger when he ponders the influence of the Egyptian border patrol:

> I wonder what Egyptian had a care
> When Joseph came to seek, and by whose grace
> The first were fed and sheltered; in what place
> Those aliens found, at length, a dwelling there?
>
> And afterward—I wonder if He told
> His friends to feed and clothe 'the least of these
> His brothers,' minding that Egyptian's part
> In serving strangers? But how clear ones sees
> He's still a 'displaced person' till He hold
> His proper dwelling—our surrendered hearts![128]

Vincentian hospitality reveals that the ones who thought they were the helpers become the helped.

## B. Faith and Reason

Human nature's innate concern for security for self and loved ones confronts and challenges the narrative's call to love the immigrant. Families lock doors to protect their homes. The reasonableness of that action suggests that nations lock their borders for security. Vincent contributed to the Catholic doctrine that reason complements faith.[129] He engaged his critics with prudence and faith when he countered those who disparaged his plans to send men and women out on mission. Immigration law raises issues of the law and the state, especially in a constitutional democracy charged to "provide for the common defense,[and] promote the general welfare."[130] Nations need a reasonable regulatory law to administer immigration.[131] Trafficking of humans across borders must be condemned and eliminated. Refugee crises need to be addressed. Yet, as in Vincent's time, the brokenness of the regulatory law that leads to harsh consequences necessitates calling that law into

---

[127] Conference 201, "Simplicity and Prudence," 14 March 1659, *CCD*, 12:142.

[128] Theodore Conklin, "Displaced Person," *The Christmas Poetry of Ted Conklin* (United States: 1984), 32.

[129] John Paul II, *Fides et Ratio*, 14 September 1998, "The Church remains profoundly convinced that faith and reason 'mutually support each other,'" article 100, at: http://w2.vatican.va/content/john-paul-ii/en/encyclicals/documents/hf_jp-ii_enc_14091998_fides-et-ratio.html

[130] The Constitution of the United States, Preamble. See: http://constitutionus.com/

[131] For a fascinating history of the diverse voices debating United States hospitality and immigration, see Daniel M. Tichenor, *Dividing Lines: The Politics of Immigration Control in America* (Princeton: 2002), 28-45.

AR.10869



Vincent warned that hospitality to asylees was not without risk as it could even threaten the safety of the Mother House at Saint-Lazare. This photograph shows Saint-Lazare after it was seized by the French government and turned into a prison in 1794.

*Courtesy St. Vincent de Paul Image Archive Online*

*http://stvincentimages.cdm.depaul.edu/*



question and adapting hospitable responses.[132]

Almost all of Vincent's life occurred during the religious wars of the seventeenth century. Indeed, the birth of the nation state grew out of the Treaty of Westphalia in 1648, just twelve years before his death. Vincent knew the destruction of war. He knew power that ravages kingdoms, villages, and human beings, and banishes refugees into exile.[133] Vincent certainly understood the prerogatives of power as he was intimately aware of the political machinations of the powerful. Secular forces often claim reason and pragmatism to necessitate stronger militaries and greater border control to combat an invasion of peoples into their sovereign nations.

Vincent's responses to both the biblical narrative and the political struggles he navigated provide lessons on Vincentian hospitality and immigration. He lived and spoke of faith, but still acknowledged the need for prudence when dealing with the wisdom of the world. He urged all to use prudence with faith. Vincent celebrated Jesus' prudential response of "rendering unto Caesar" that which Caesar owned, and he reveled in Jesus' ability to remain faithful while simultaneously avoiding the critics' trap.[134] But he was not averse from speaking to power when necessary, or using its authority to further serve the vulnerable. When his missioners sought to ease the misery of refugees from war, he interceded with the King to gain safe passage for their work providing food and medicine.[135] Once present, however, Vincent and his followers tended to all persons regardless of the state's designation as enemy or heretic.[136] Since then, many have followed that model. Sister

---

[132] See, e.g., Brianna Lee, "Immigration Reform 2015: U.S. Asylum Backlogs Soaring, Testing Patience For Those Fleeing Persecution," *International Business Times*, online edition, 20 July 2015, at: http://www.ibtimes.com/immigration-reform-2015-us-asylum-backlogs-soaring-testing-patience-those-fleeing-2014306. See generally, Margaret Taylor, "What Happened to Non-LPR Cancellation? Rationalizing Immigration Enforcement by Restoring Durable Relief from Removal," 30 *Journal of Law and Politics* (2015), 527; Massey, "Border Enforcement," 1016-17; David A. Martin, "Resolute Enforcement is Not Just for Restrictionists: Building a Stable and Efficient Immigration Enforcement System," 30 *Journal of Law and Politics* (2015), 416-17.

[133] Conference 125, "Repetition of Prayer," 24 July 1655, *CCD*, 11:189-190.

[134] "Simplicity and Prudence," *CCD*, 12:149.

[135] See Document 103, "Safe-conduct for Missionaries Sent to Champagne and Picardy," 14 February 1651, *CCD*, 13a:367.

[136] Román, *A Biography*, 522-524.

AR.10870

Rosalie Rendu, for example, ministered to the wounded of both sides in the revolution of 1848, refusing to accept the conventional wisdom of the day to only heal those from one's own side.[137]

Faith also compelled Vincent to challenge the King. When Cardinal de Retz fled France and the wrath of Cardinal Mazarin, the Vincentians at the Mission House in Rome gave him sanctuary—thus angering Mazarin and placing them under threat. Even the Mother House at Saint-Lazare faced some risk. Yet, Vincent responded by accepting it: "If you grant asylum to so many refugees, your house may be sacked sooner by the soldiers; I see that clearly. The question is, however, whether, because of this danger, you should refuse to practice such a beautiful virtue as charity."[138] Vincent also warned that reason could easily be subverted by rationalizing excuses. The outcast and the vulnerable, precisely because they knock at the door and present themselves as children of God and not as a status written by law, present a challenge for all who adopt Vincent's legacy. For Vincent, faith united with reason inspired his innovative responses.

## IV. Vincentian Hospitality: Responding to Today's Gerim in the United States

### A. Residing as Undocumented: "You shall not oppress the stranger." (Ex. 22:21)

Over eleven million undocumented persons reside in the United States. Many pay taxes, support families, and contribute to the common good. Experts say our nation possesses neither the legal nor financial resources to deport all of them.[139] Within our communities, they are today's biblical *gerim*, assimilating into our midst, but living in an unauthorized status. Although they occupy many different social strata, they share the common characteristic of lacking documents demonstrating lawful presence, with fewer legal rights than permanent residents or citizens. Under the intense effort to deport, many lead lives of constant fear. Although the Obama Administration claims to prioritize removals targeting the most serious criminals, the evidence suggests that many who may have committed misdemeanors, or simply been unlucky enough to be detained, constitute the greatest number of forced removals.[140] Not only have countless families been disrupted by deportation, but whole communities and churches composed of mostly United States citizens and lawful permanent residents have suffered unreasonable harm from the

---

[137] Louise Sullivan, D.C., *Sister Rosalie Rendu: A Daughter of Charity On Fire with Love for the Poor* (Chicago: 2006), 178-181.

[138] Letter 1678, "To Louis Champion, Superior, In Montmirail," 6 November 1653, *CCD*, 5:49. See also Pierre Coste, C.M., *The Life and Works of St. Vincent de Paul*, 3 vols. (Brooklyn: New City Press, 1987), 2:7-13.

[139] Most experts suggest this nation has the infrastructure and resources to deport about 400,000 persons per year. However, with over eleven million persons now facing potential deportation, other solutions are necessary. Motomura, *Outside*, 53. See also, Martin, "Resolute," 425-26.

[140] "Since President Obama took office, two-thirds of the nearly two million deportation cases involve people who had committed minor infractions, including traffic violations, or had no criminal record at all." Ginger Thompson and Sarah Cohen, "More Deportations Follow Minor Crimes, Records Show," *The New York Times*, 6 April 2014, at: http://www.nytimes.com/2014/04/07/us/more-deportations-follow-minor-crimes-data-shows.html?_r=0

AR.10871



Holding vigil outside the Broadview Immigration Staging Center in 2013.

*Courtesy of the author*



click to enlarge

intensive enforcement of the immigration law.[141]

Vincent understood and accepted the authority of the law; he did not call for the release of all the galley slaves. But he did minister to them and sought to improve their conditions. In so doing, he not only imitated the biblical narrative, but modeled it. In recruiting women to join his ministry, he recounted the transformative impact of charity. One sister, who worked with the galley slaves, told him that simply by her presence she "would not allow the jailers to beat the prisoners."[142] This young woman empowered by the Spirit stood up to the jailers and stopped the human rights violations. Vincent subsequently built a hospital to care for the galley slaves. Thus, a ministry of healing led to a reformation of the treatment of prisoners. In recognizing the humanity of the galley slave, the hearts and conduct of the prison guards were changed.

Similar acts of grace continue today. In 2007, an immigration attorney and two nuns gathered at the Broadview Immigration Staging Center to pray as the buses took deportees to O'Hare Airport. Out of that witness, some soon received permission to pray with the deportees on the buses. Further action inspired state legislation that required pastoral care for immigrants in Illinois detention facilities. The group established the Interfaith Committee for Detained Immigrants (ICDI) to coordinate pastoral visits including weekly visits in Woodstock, Illinois, and Kenosha, Wisconsin. Today, the ICDI continues those weekly pastoral vigils and visits as well as Court Watch Ministry and, most recently, they have opened two new housing facilities for released detainees to stay in prior to reunion

---

[141] See Friedman Marquardt, *Living "Illegal."* See also, *U.S. v. Aguilar*, 2015 WL 4774507 (D.C., E.D.N.Y.), 6: "children from separated families are particularly susceptible to psychological harm." See also, Bill Ong Hing, "Ethics, Morality, and Disruption of U.S. Immigration Laws," 63 *University of Kansas Law Review* (2015), 983. Federal enforcement efforts use "over-zealous tools that wreak unnecessary havoc on communities" and further lack "a common sense of humanity and decency."

[142] Letter from Vincent de Paul to subsequent generations of sisters working with the galley slaves, as quoted in Joseph I. Dirvin, C.M., *Louise de Marillac* (Toronto: 1970), 201.

AR.10872



Stewart Detention Center in Lumpkin, Georgia, one of the largest private detention centers built by the Corrections Corporation of America. It reported $459.3 million in revenue in the second quarter of 2015 alone, including $65.9 million from the women and children's detention center in Dilley, Texas. See: http://www.cca.com/press-releases?section=Investors

*Courtesy of the author*



---

with their families.[143]

ICDI's ministries mitigate the harshness of the law. Immigration law distinguishes between humans, segregates some as welcome and others as banned; it grants blessings to some while exiling others. The law, moreover, is one which almost all call broken.[144] It is a civil law, yet it adopts the harshest punishment that divides families, often permanently, and eviscerates parishes, undermines communities, and weakens the nation. The rhetoric of calling individuals "illegal aliens," cutting them off from society and calling for their immediate deportation, ignores what truly happens when these modern day *gerim* are taken away from the only society many of them have known. As Justice Douglas wrote about deportation:

> Banishment is punishment in the practical sense. It may deprive a man and his family of all that makes life worthwhile. Those who have their roots here have an important stake in this country. Their plans for themselves and their hopes for their children all depend on their right to stay. If they are uprooted and sent to lands no longer known to them, no longer hospitable, they become displaced, homeless people condemned to bitterness and despair.[145]

Hospitality to the immigrant, by accompanying the *gerim* of our community, exposes the brutality of the present deportation structure and how it hurts not just the

---

[143] www.icdichicago.org ; Although not witnessing any contemporary beatings as in Vincent's day, two of the founders of the ICDI report that their visits to immigrant detention centers in Illinois have had a beneficial impact on prison guards and administrators, improving conditions within the facilities. See interview with Sisters JoAnn Persch, S.M., and Pat Murphy, S.M., in *Prayer, Presence and Perseverance* (forthcoming 2016, Office of Mission and Values, DePaul University). The Georgia Detention Watch has engaged in similar work near the Stewart Detention Center in Lumpkin Georgia. See Friedman Marquardt, *Living "Illegal,"* 233-234.

[144] Rev. Craig B. Mousin, "Immigration Reform: What Can Religious Voices Require From the State?" in Collier, *Religious and Ethical Perspectives*, 333. See also, Eleanor Acer and Tara Magner, "Restoring America's Commitment to Refugees and Humanitarian Protection," 27 *Georgetown Immigration Law Journal* (2013), 445. Compare President Barack Obama naming the immigration system broken: https://www.whitehouse.gov/issues/immigration/immigration-action, to Representative Paul Ryan: "our immigration system is broken," at: http://paulryan.house.gov/issues/issue/?IssueID=9970

[145] *Harsiades v. Shaughnessy*, 342 U.S. 580, 600 (1952), J. Douglas, dissenting. See also *U.S. v. Aguilar, supra*.

AR.10873

individual, but the community and the nation. As the nation waits for Congress to address comprehensive immigration reform, this thought experiment suggests that the law's grounds for exclusions and deportation—those grounds that would have precluded all the major biblical protagonists' stories from being part of the creedal story—need to be re-examined. The harsh amendments from the last twenty years minimize mercy and discretion while failing to take account of the complexity of families residing in this nation for years.

The strictures of the law, moreover, have exacerbated the problem by limiting the individuals who otherwise would have voluntarily left. Some argue that the law has, in effect, caged them within the nation's borders.[146] In addition, the expansion of enforcement efforts has not been met with comparative funding for the judicial procedures, thus overwhelming the adjudicative process, causing severe backlogs in processing cases.[147] In recognizing the importance of an improved and effective regulatory immigration law, David Martin argues that remedies providing discretion and permanent relief should be expanded.[148] Moreover, he acknowledges that any effective reform will necessitate establishing a process wherein most of the eleven million unauthorized individuals can eventually obtain lawful status, thus removing an almost impossible burden on the current system.[149] Faith communities who accept this biblical narrative can support such goals while continuing to address the pastoral needs as members of the communities where they now reside. Loving the immigrant does not mean doing away with immigration law, but it does call for a more predictable and just process aided by the pastoral efforts of groups such as ICDI.

### B. Divided Families, Widows and Unaccompanied Minors: "You shall not abuse any widow or orphans." (Exodus 22:22)

The crisis that began in the summer of 2014, with over 68,000 unaccompanied minors as well as mothers and children fleeing gang violence and chaos arriving at our borders, raises a second pressing issue with its own subset of issues within those issues of the *gerim* in our midst.[150] World events, wars, environmental disasters, and civil anarchy have led these children to leave families to seek refuge in our land. The U.S. Department of Homeland Security's (DHS) first response encouraged immediate return, sending children back to

---

[146] Massey, "Border Enforcement," 1016-17.

[147] "Ballooning Wait Times for Hearing Dates in Overworked Immigration Courts," Syracuse University Transactional Records Access Clearinghouse (TRAC), Immigration Reports, 22 September 2015. See: http://trac.syr.edu/immigration/reports/405/

[148] Martin, "Resolute," 458-62. For a discussion of the role of mercy in immigration law, see Allison Brownwell Tirres, "Mercy in Immigration Law," 2013 *Brigham Young University Law Review* 1563. Victor Romero posits that Christian love "should err on the side of the powerless immigrant, not the powerful government." Romero, "Prodigal Illegal," 928.

[149] *Ibid.*, 425-26.

[150] ABA Commission on Immigration, "Family Immigration Detention: Why the Past Cannot Be Prologue" (31 July 2015), 17. See: http://www.americanbar.org/content/dam/aba/publications/commission_on_immigration/FINAL%20 ABA%20Family%20Detention%20Report%208-19-15.authcheckdam.pdf. See also, Susan J. Terio, *Whose Child Am I: Unaccompanied, Undocumented Children in U.S. Immigration Custody* (Oakland, CA: 2015), 11-12.

AR.10874



Archbishop Oscar Arnulfo Romero, most recently beatified by Pope Francis, was assassinated while saying Mass in San Salvador on 24 March 1980.

*Public Domain*



the violence, expediting deportation, pre-judging by proclaiming most have no remedy before permitting them to speak with attorneys or have their day in court, and promising long detention. Government policy included detention as a means of general deterrence of future immigration.[151] This crisis also occurs within a larger move toward using private detention centers to house many of the unauthorized awaiting legal determinations of their status.[152]

On 24 July 2015, one federal court described "the egregious conditions of the holding cells" for minors held with their mothers.[153] Commenting on the building of these detention centers to address the many women and children arriving at our borders, the Court said, "It is astonishing that Defendants (DHS) have enacted a policy that requires such expensive infrastructure…"; this, when the parties had agreed to a solution to the detention of children in preceding court cases over two decades previously.[154] Solutions exist under the law that might admit them as refugees.[155] Although DHS Secretary Jeh Johnson has subsequently announced an end to the general deterrence through detention policy along with other

---

[151] ABA Commission on Immigration, "Family Immigration Detention," 22-23. See also, Wil S. Hylton, "The Shame of America's Family Detention Camps," *The New York Times*, 4 February 2015, at: http://www.nytimes.com/2015/02/08/magazine/the-shame-of-americas-family-detention-camps.html

[152] The Immigration Detention Transparency and Human Rights Project, "NIJC Freedom of Information Act Litigation Reveals Systemic Lack of Accountability in Immigration Detention Contracting" (August, 2015). See: http://immigrantjustice.org/immigration-detention-transparency-and-human-rights-project-august-2015-report

[153] *Flores v. Johnson*, C.D.Ca. (2015), 18. See: http://immigrantjustice.org/sites/immigrantjustice.org/files/FloresRuling%20Family%20Detention%202015%2007%2024.pdf

[154] *Ibid.*, 23.

[155] See, for example, Dan Kowalski, "The Refugee Option Obama Will Ignore," *Huffington Post*, 10 July 2014, at: http://www.huffingtonpost.com/dan-kowalski/the-refugee-option-obama-immigration_b_5559991.html; *American Immigration Council, Children in Danger: A Guide to the Humanitarian Challenge at the Border*, 10 July 2014, at: http://www.immigrationpolicy.org/special-reports/children-danger-guide-humanitarian-challenge-border. See also, "Law Professors Letter to President Obama Regarding Fair Treatment for Unaccompanied Central American Children," 14 July 2014, at: http://lawprofessors.typepad.com/files/professorsletterfairnessforcentralamericanchildren.pdf

AR.10875

moderating conditions, substantial detention issues still exist.[156]

We have an enforcement law that, in the name of border control, requires the U.S. government to actually fill over 30,000 beds each night, regardless of the need to detain so many people.[157] Corporate profits in transporting deportees, building higher walls, and privatizing prisons expand while communities fracture.[158] Vincent and Catholic teaching suggest reason must dialogue with faith. But for the last several decades, Congress and the Executive have largely acted in the name of reason purportedly to increase border security before immigration reform debate commences.[159] Over the last twenty years, however, when Congress actually enacted greater restrictions and increased border controls, it failed its goals, as the number of undocumented increased almost four-fold to eleven million.[160]

Vincentian prudential thinking will help ground responses, but it will also challenge the unilateral requirement of increased enforcement or detention first, prior to comprehensively fixing the law or responding to the plight of women and children. Vincent was quick to cut behind the veil of the world's rationalizations to unmask the disguise of fear. The unaccompanied minor crisis exacerbates the ongoing impasse. While the detained minors provide witness to the tragedy of the orphan, pouring money into detention and deportation before comprehensively addressing all aspects of the law calls to mind the biblical parable of filling old wineskins with weak patches that fail to hold the wine.[161]

Increased militarization of the border is called for as a reasonable solution, yet military efforts in the last half century have increased refugee flows, destabilized governments, and increased migration throughout the world. Some of the largest refugee movements have happened due to military engagements that were subsequently seen as improper and wrongfully executed. Whether it was refugees fleeing Viet Nam in the 1970s, or the masses of people now fleeing a war-torn and destabilized Middle East in 2015, these were

---

[156] *Flores*, 11, n.7. ABA Commission on Immigration, "Family Immigration Detention." United States Commission on Civil Rights, "Statutory Enforcement Report: The State of Civil Rights at Immigration Detention Facilities" (September 2015), at: http://www.usccr.gov/pubs/Statutory_Enforcement_Report2015.pdf Despite this earlier statement, Secretary Johnson began 2016 with "concerted, nationwide operations to take into custody and return at a greater rate" and also continued to contest and fight the District Court decision in *Flores*, *supra*. Department of Homeland Security Press Office, "Statement by Secretary Jeh C. Johnson on Southwest Border Security," 4 January 2016, at: http://www.dhs.gov/news/2016/01/04/statement-secretary-jeh-c-johnson-southwest-border-security

[157] Authorities are "required to incarcerate people, no matter the circumstances or the affront to human rights." See "The Madness of U.S. Immigration Policy, Continued," *Bloomberg View*, 27 September 2013, at: http://www.bloombergview.com/articles/2013-09-26/the-madness-of-u-s-immigration-policy-continued. See also: "Immigrant Detention Bed Quota Timeline," National Immigrant Justice Center, at: http://www.immigrantjustice.org/search/node/Immigrant%20Detention%20Bed%20Quota%20Timeline

[158] Betsy Woodruff, "Prison Gets Rich Locking Up Preschoolers," 15 September 2015, at: http://readersupportednews.org/opinion2/277-75/32281-prison-gets-rich-locking-up-preschhoers

[159] Rep. Michael McCaul, chairman of the Committee on Homeland Security, stated, "Our border must be dealt with through regular order and in a step-by-step approach—not through any type of comprehensive immigration reform." See: http://homeland.house.gov/press-release/committee-homeland-security-passes-secure-our-borders-first-act. See also, "Secure Our Borders First Act of 2015," at: https://homeland.house.gov/secure-our-borders/

[160] Massey, "Border Enforcement," 1016-17.

[161] Matthew: 9:16-17.

AR.10876



Many of the martyrs of Central America are memorialized in an annual prayer vigil at Fort Benning, Georgia, each November in remembrance of the assassination of six Jesuit priests, their housekeeper and her daughter on 16 November 1989. The fence which excludes those seeking to cross becomes transformed with a portrait of the daughter, Celina Ramos, and crosses for Archbishop Oscar Romero, Jean Donavan, and others whose lives were lost to the tragic violence.

*Courtesy of the author*



click to enlarge

---

wars commenced under false pretenses that led to a crisis in the nation state's response to refugees. Central American refugees seeking safe haven by crossing our borders over the last three decades, including the recent arrival of women and children, were spawned in part by United States intervention in Central America. Such examples can be found in the 1954 coup in Guatemala, or the United States' training of many of the murderers of civilian leaders throughout the region, for instance the assassination of Archbishop Oscar Romero in 1980.[162] The murders of church leaders and the many non-governmental leaders who would otherwise have strengthened civil society in Central America has led, in part, to the chaos and gang violence now forcing thousands of youth to flee.[163] At the

---

[162] Penny Lernoux, *Cry of the People: The Struggle for Human Rights in Latin America—The Catholic Church in Conflict With U.S. Policy* (N.Y.: 1982); Stephen Schlesinger and Stephen Kinzer, *Bitter Fruit: The Untold Story of the American Coup in Guatemala* (Garden City: 1983); Raymond Bonner, *Weakness and Deceit: U.S. Policy and El Salvador* (N.Y.: 1984); Lesley Gill, *The School of the Americas: Military Training and Political Violence in the Americas* (Durham: 2004); and *From Madness to Hope: the 12 Year War in El Salvador: Report of the Commission for Truth for El Salvador*, United States Institute of Peace, 26 January 2001, 8: "By its response to the murder of the Jesuits, 10 years after the assassination of Monsignor Romero by the nightmarish creation of the 'death squads,' the military had showed how far its position had hardened in daring to eliminate those it viewed as opponents, either because they were opponents or they voiced concerns, including church workers and journalists." Available at: http://www.usip.org/sites/default/files/file/ElSalvador-Report.pdf. See also, *Matter of Carlos Eugenio Vides Casanova*, 26 I & N. Dec. 494, 502-04 (BIA 2015). Respondent who had been the Director of the Salvadoran National Guard and the Minister of Defense knew that the National Guard had been involved in thousands of extrajudicial killings and human rights abuses, including the four North American churchwomen murdered in 1980, a labor activist in charge of agrarian reform in 1981, and did not bring any of the individuals to justice. *Doe v. Gonzalez*, 484 F. 3d 445, 446 (7th Cir. 2007). Salvadoran Army Colonel ordered by superiors to assassinate Ignacio Ellacuría, S.J., the President of the University of Central America, in 1989. Ellacuría was murdered, along with five other Jesuit scholars, their housekeeper, and her daughter, on 16 November 1989. *Arce v. Garcia*, 434 F.3d 1254, 1264 (11th Cir. 2006). "The evidence includes reports on abductions, torture, and murder by the [Salvadoran] military." See also, Myers and Colwell, *Our God is Undocumented*, 11-12. The SOA Watch has attempted to identify some of the military personnel accused of violating human rights who received military training from the United States, see: http://www.soaw.org/about-the-soawhinsec/13-soawhinsec-graduates/4281-soa-grads-database-online-ur

[163] Certainly the complexity of this issue means there were other reasons for flight. See, e.g., "Childhood and Migration in Central and North America: Causes, Policies, Practices and Challenges," Center for Gender and Refugee Studies (February 2015), at: http://cgrs.uchastings.edu/sites/default/files/Childhood_Migration_HumanRights_FullBook_English.pdf. Deborah Anker and Paul Lawrence, "Third Generation Gangs, Warfare in Central America, and Refugee Law's Political Opinion Ground," *Immigration Briefings* (October 2014), 1. The impunity of the many that planned and implemented the human rights violations in Central America further exacerbates the failure to address these additional issues.

AR.10877

very least, the resultant dismantling of the non-governmental infrastructure essential for democratic societies under the rule of law left a gaping void of protection. This evisceration of civil society now gets labeled as an immigration problem, rather than looking deeper into the cause of human rights violations, or acknowledging the United States' role in the assassination of church workers, leaders, and civilians. James Luther Adams describes "the voluntary association as a distinctive and indispensable institution of democratic society" and that they serve "as mediation structures in making the consent of the governed into an effective, and often dissenting power."[164] The loss of those indispensable elements eviscerated the very core of the societies that could have prevented, or at least, mitigated the subsequent violence that forced people to flee their native lands.

If the failure of our civilian leaders to command the military properly produced so many refugees, why, in the name of reason, do some look to militarization first to solve our immigration problem?[165] Reason should expect militarization will cause more refugees. As Bruggemann notes, "With the worldwide economic and environmental crisis that indicates no soon-to-come abatement and with the frantic response of intensified militarism, the world political economy is actively engaged in the production of exiles, as was the old Babylonian empire."[166] We need the biblical narrative now more than ever to engage in the debate and expose the fallacy of expanding militarization as the only response.

Vincent grew fatigued by the constant warfare in his time and urged all to "pray for peace," but he also unceasingly worked to ease the suffering of refugees.[167] If reason and faith are to dialogue on how to improve our immigration laws, persons of faith can engage the debate to break the impasse and suggest changes. Although the political debate remains stymied, many proposals for effective change have been made.[168] The Obama Administration has taken executive action in the face of this obstruction but it too has been shackled by litigation.[169] The *Flores* litigation has provided a hopeful sign that the DHS will

---

[164] James Luther Adams, *Voluntary Associations: Socio-cultural Analyses and Theological Interpretation* (Chicago: 1986), 154, 218.

[165] Americans are mistaken to be "enthralled" with military solutions for all the world's problems. See, for example, Andrew J. Baccevich, *The New American Militarism, How Americans Are Seduced by War* (Oxford: 2005), 1, 3.

[166] Bruggemann, *Theology*, 78. Footnote omitted.

[167] Conference 125, "Repetition of Prayer," 24 July 1655, *CCD*, 11:189-90.

[168] See, e.g.: American Bar Association, "Reforming the Immigration System: Proposals to Promote Independence, Fairness, Efficiency, and Professionalism in the Adjudication of Removal Cases 23" (2010), at: http://www.americanbar. org/content/dam/aba/migrated/media/nosearch/immigration_reform_executive_summary_012510.authcheckdam.pdf. Motomura, *Outside*, 208-233.

[169] President Obama has taken steps to fix what he calls our broken immigration system. See: https://www.whitehouse. gov/issues/immigration/immigration-action. See also, Franczek Radelet, "White House Releases Report on Improving and Modernizing the Immigration System to Meet 21st Century Needs," 30 July 2015, at: http://www.lexology.com/ library/detail.aspx?g=560933cf-5836-48f3-bff3-60ed86755f84. President Obama has also implemented the Deferred Action for Childhood Arrivals (DACA) program that has provided temporary relief for young persons who were brought to the United States as children. See Motomura, *Outside*, 173, 175. Subsequent efforts to expand this program to others have been enjoined by a Texas court. *Texas v. United States*, 86 F. Supp. 3d 591, 604 (S.D. Tex.) *aff'd*, 809 F.3d 134 (5th Cir. 2015), *as revised* (25 Nov. 2015) *cert. granted*, No. 15-674, 2016 WL 207257 (U.S. 19 Jan. 2016).

AR.10878

be required to end the emphasis on detention, especially of women and minors.[170]

This article's main focus, however, seeks to illustrate the faith-based response based upon the biblical narrative, including alternatives to detention, and efforts to mitigate the harshness of any detention that might be necessary. The example of the ICDI visiting those in prison, praying with deportees, and expanding housing opportunities for the least of these echo some of Vincent's work. Such models should be replicated throughout the land. Religious organizations have had remarkable success in resettling refugees for decades. Instead of the costly, enormous detention infrastructure derided by the *Flores* court, some of those expenditures could be provided to not-for-profits to build upon the refugee resettlement model to house and care for those who do not have families or support.[171]

Second, critics ask whether generosity would simply serve as a magnet for more to come. They add that the biblical story of hospitality does not work in the real world today, and therefore we cannot afford to live the aspirational goals of a narrative that no longer applies. Vincent knew these arguments of conventional wisdom would confront his mission. He warned his friends that the alleged wisdom of the world would continually urge them not to go out and associate with the poor and distressed because it would be too hard, too dangerous, and too expensive. He was counseled against visiting the mentally ill or the galley slaves, but he did. He was warned not to go to the border towns where wars transformed residents into starving refugees, but he did. Most apt, especially for the current crisis of women and children at our border, critics challenged him to not care for the abandoned children as they were already overwhelmed by other ministries. Vincent reminded all:

> Let's remember, brothers, what Our Lord said to His disciples: 'Let the children come to me,' and be very much on our guard against preventing them from coming to us; otherwise, we'll be opposed to Him….If Our Lord were still living among us and saw children abandoned by their fathers and mothers, as these are, do you think…that He'd also be willing to abandon them? …we'd be unfaithful to His grace…if we were to refuse to accept the trouble we have with it.[172]

Finally, the biblical narrative's call still challenges people of faith to release the captives and bring good news to the poor. Vincent perceived that we misread that story if we fail to realize that it is we, those with the power to extend Vincentian hospitality, who

---

[170] See text at Note 153 for details on *Flores* litigation.

[171] The Catholic Church, and organizations such as Church World Service, Hebrew Immigrant Aid Society, and Refugee One have had a remarkable history of resettling refugees in this nation. As such they provide a model, along with the relatively new work of ICDI, as to what might be accomplished if funds that now go to private detention corporations were reallocated to religious organizations and other not-for-profits to house and address the needs of refugees and the *gerim* in our midst. See: http://www.usccb.org/issues-and-action/human-life-and-dignity/migrants-refugees-and-travelers/refugee-resettlement/index.cfm; http://cwsglobal.org/our-work/refugees-and-immigrants/; http://www.hias.org/work/resettling-refugees; http://www.refugeeone.org/. See also, Mousin, "Immigration Reform," 341-42.

[172] Conference 195, "Purpose of the Congregation of the Mission," 6 December 1658, *CCD*, 12:78-79.

AR.10879



St. Vincent's proclamation, "I am the captive" is captured in this Leon Bonnat painting of the galley slave's ball and chain being transferred to him as part of his ministry to the galley prisoners. Oil on canvas. Original in St. Nicolas-des-Champs.

*Courtesy St. Vincent de Paul Image Archive Online*

*http://stvincentimages.cdm.depaul.edu/*



are the captives in need of release.[173] Vincent confessed, "I'm held captive."[174] We are the captives: captive to the world's temptations that we seek to defend at all costs and to deny others created in God's image. In welcoming the stranger, providing hospitality to the sojourner, and loving the immigrant, we release the captives; we liberate ourselves as God intended us to be free. People of faith can glean the benefits of loving the neighbor and the immigrant, receiving their gifts and knowing God's freedom.

In what is probably Vincent's most fitting metaphor on Vincentian hospitality and immigration law, he asked of his friends who would turn their purpose away from the good works that had already begun. He answered this question, describing as those:

> …who seek only to enjoy themselves…people who have only a narrow outlook, confining their perspective and plans to a certain circumference within which they shut themselves away, so to speak, in one spot; they don't want to leave it, and if they're shown something outside it and go near to have a look, they immediately go back to their center, like snails into their shells.[175]

Instead, he pled with those living in his legacy to "stand firm" and "stand fast" against arguments to cease their ministries of service.[176] Given his faith and reason, how can we deport the abandoned children at our door when we have the means to assist? In the light of the failed militarization of our border, the misguided military interventions that have undermined civilian governments and generated the chaos forcing children to leave, reason fails to support our abandoning children to detention and deportation.

---

[173] See, for example, Conference 205, "Indifference,"16 May 1659, *CCD*, 12:187-200.

[174] "Indifference," *CCD*, 12:188, 194. Vincent states, "Openness to God's Will must set the captive free"; yet he also acknowledges "I'm held captive." See also, Romero, "Illegal Prodigal," 930-31.

[175] "Purpose of the Congregation of the Mission," *CCD*, 12:81.

[176] *Ibid.*, 81-82.

AR.10880

## V. Conclusion

The stories we tell define our lives and our nation. The biblical narrative of an Exodus people has inspired the laws and hospitality of our nation for over three centuries. Yet counter-narratives also contest for defining who we are as a people. Some story tellers have told us we can only survive as a nation if we deny, detain, and deport those who have contributed to our nation or who seek the safety of our land. To simply deny, detain, and deport does not comport with a call to love the immigrant.

Two contemporary crises—a broken immigration legal system that permits a class of persons with uncertain legal status to increase to over eleven million persons; and the thousands of unaccompanied minors, as well as mothers with children, who seek safety at our borders, invite all participants to find a better rule of law. All of us participate in a Republic whose founding members drew much from the Exodus narrative and whose laws provided both the substance and the inspiration to think about covenants, laws, and how societies define themselves and treat all as equals—whether through the Genesis story of being created in the image of God, or through the rights that became associated with equality for all.

Given that current immigration law, if it had been applied in biblical times, would have erased the biblical story—our faith communities and nation as we know them would not have happened. What does that law deny us today? The biblical narrative's call to love challenges all to recognize that the actual implementation of immigration law contradicts its very ethos. Our current system of denial, detention, and deportation has not served us well. Denying dignity of the sojourner in our midst, we have expanded the numbers of persons living in this nation without authorized status; detention has occurred at great cost while dividing families and violating human rights; and deportation of individuals who were contributing members of society has harmed our communities and overburdened the judicial system. If we forget the narrative we invite the inhumanity detention and banishment of our neighbors has caused. Our civil society weakens with each loss.

The biblical narrative suggests an alternative response. The narrative gives more credence to forgiveness. It suggests a community that welcomes the sojourner while still holding them accountable.[177] It teaches, moreover, that it is not just Vincentian hospitality, but a story of welcome that arises in the many stories told by people inspired by this narrative. As such, it offers hope for the many in this country, beyond those participating in the legacy of Vincent, to change our nation's laws. Vincent based his beliefs on the same biblical stories that have generated so many faith communities, and even the secular laws of our nation. Furthermore, while the nation debates or delays discussion on comprehensive immigration reform, we still belong to faith communities that have been sent out to be with the vulnerable. Organizations like the Interfaith Coalition for Detained Immigrants reveal

---

[177] See, for example, Thomas Schafer, "The Radical Reformation and the Jurisprudence of Forgiveness," in *Christian Perspectives on Legal Thought*, Michael W. McConnell, Robert F. Cochran Jr., and Angela C. Carmella, eds. (New Haven: 2001), 321.

AR.10881

the value of presence, prayer, and perseverance. While engaged in the political debate, those inspired by the narrative must also join similar efforts to strengthen our communities by welcoming the *gerim* in our midst.

We are told the force of the biblical narrative has been lost because modernity or post-modernity eviscerates its historical accuracy, or the metanarrative's demise leaves it as just one more competing story. Nonetheless, we still must make choices about what stories define us. We have a legacy of Vincentian hospitality and a legacy of biblical hospitality to love the immigrant. Our times invoke our story. The immigrants in our midst and at our door call us to continually reinterpret that narrative, and to give new meaning to loving the immigrant in our time.

AR.10882



Vincent de Paul preaching on charity.

From a series of engravings in Augustin Challamel, *Saint-Vincent de Paul* (1841).

*Courtesy St. Vincent de Paul Image Archive Online*

*http://stvincentimages.cdm.depaul.edu/*



AR.10883



Vincent de Paul in full surplice, hand upon a book.

Oil painting in the Vincentian provincial office, Paris.

*Courtesy St. Vincent de Paul Image Archive Online*

*http://stvincentimages.cdm.depaul.edu/*



AR.10884



The east facade of the United States Supreme Court Building includes Moses with the Ten Commandments.

*CC BY-SA 3.0*



AR.10885



Im Registrierungssaal auf Ellis Island.
Nach einer Photographie gezeichnet von Ewald Thiel.

Inspection of immigrants at Ellis Island in 1897.

Etching by Ewald Thiel published in *Die Gartenlaube*.

*Public Domain*



AR.10886



A Syrian refugee camp pictured in summer of 2015 during the ongoing crisis.

*Public Domain*



click to go back to article

AR.10887



Edward Hicks painting, *Noah's Ark*, reveals one element of the biblical narrative's influence on United States culture. Oil on canvas, 1846. Currently held by the Philadelphia Museum of Art.

*Public Domain*



AR.10888







St. Vincent de Paul not only sent Missioners to serve prisoners and refugees but believed he, too, was sent by the Gospel of Luke to heal and advocate for the detained, refugees, and the maimed.

*Courtesy St. Vincent de Paul Image Archive Online*

*http://stvincentimages.cdm.depaul.edu/*



ER-2854

AR.10889





Vincent warned that hospitality to asylees was not without risk as it could even threaten the safety of the Mother House at Saint-Lazare. This photograph shows Saint-Lazare after it was seized by the French government and turned into a prison in 1794.

*Courtesy St. Vincent de Paul Image Archive Online*

*http://stvincentimages.cdm.depaul.edu/*



AR.10890



Holding vigil outside the Broadview Immigration Staging Center in 2013.

*Courtesy of the author*



AR.10891



Stewart Detention Center in Lumpkin, Georgia, one of the largest private detention centers built by the Corrections Corporation of America. It reported $459.3 million in revenue in the second quarter of 2015 alone, including $65.9 million from the women and children's detention center in Dilley, Texas. See: http://www.cca.com/press-releases?section=Investors

*Courtesy of the author*





Archbishop Oscar Arnulfo Romero, most recently beatified by Pope Francis, was assassinated while saying Mass in San Salvador on 24 March 1980.

*Public Domain*





Many of the martyrs of Central America are memorialized in an annual prayer vigil at Fort Benning, Georgia, each November in remembrance of the assassination of six Jesuit priests, their housekeeper and her daughter on 16 November 1989. The fence which excludes those seeking to cross becomes transformed with a portrait of the daughter, Celina Ramos, and crosses for Archbishop Oscar Romero, Jean Donavan, and others whose lives were lost to the tragic violence.

*Courtesy of the author*



click to go back to article



St. Vincent's proclamation, "I am the captive" is captured in this Leon Bonnat painting of the galley slave's ball and chain being transferred to him as part of his ministry to the galley prisoners. Oil on canvas. Original in St. Nicolas-des-Champs.

*Courtesy St. Vincent de Paul Image Archive Online*



*http://stvincentimages.cdm.depaul.edu/*



AR.10895

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 18, 2020
**Status:** Posted
**Posted:** January 23, 2020
**Tracking No.** 1k4-9eij-co6w
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0563
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Megan Sprecher
**Address:**
   1400 E. Washington Ave, Ste 227
   Madison,  WI,  53703
**Email:** megans@endabusewi.org
**Phone:** 6082550539
**Organization:** End Domestic Abuse WI

## General Comment

Attached please find the comment from End Domestic Abuse Wisconsin, the Wisconsin Coalition Against Domestic Violence. We ask that all reports and data cited be included as part of our official comment.

## Attachments

End Abuse asylum ban expansion comment 01.18.2020

AR.10896

*Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]*

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87,
1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and
Bars to Asylum Eligibility

January 18, 2020

To Whom it May Concern:

I write on behalf of End Domestic Abuse Wisconsin, the Wisconsin Coalition Against Domestic
Violence ("End Abuse"), in response to the above-referenced Proposed Rules to express our
strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum
published in the Federal Register on December 19, 2019.

End Abuse is a statewide organization that promotes social change that transforms societal
attitudes, practices and policies to prevent and eliminate domestic violence, abuse, and
oppression. End Abuse's work includes providing training, support, and technical assistance to
local domestic abuse programs and engaging in local, state, and national policy work.

End Abuse supports humane and fair treatment of immigrants by the government and private
citizens alike. There are an estimated 288,544 foreign-born people residing in Wisconsin.[1]
Wisconsin's immigrant population is on the rise; from 1990 to 2016 Wisconsin's foreign-born
population doubled, from 2.5% to 5% of the total state population.[2] Wisconsin's Latino
population increased by 95% from 2000 to 2015.[3] The dairy industry, very important to the state,

---

[1] State Immigration Data Profiles: Wisconsin, Migration Policy Institute,
https://www.migrationpolicy.org/data/state-profiles/state/demographics/WI.
[2] *Id.*
[3] Wisconsin's Hispanic Population: A Demographic Summary, Wisconsin Department of Health Services,
https://www.dhs.wisconsin.gov/publications/p01697.pdf.

relies heavily on immigrant workers who mainly hail from Latin America.[4] Wisconsin's immigrants are integral to the state's stability and success.

End Abuse works directly with immigrants, including those who are survivors of domestic and sexual violence, those affected by human trafficking, and children who have suffered abuse, abandonment, or neglect. End Abuse also engages in systems advocacy on behalf of immigrants and the local and statewide domestic abuse programs that serve immigrant survivors.

Given our mission and our work and for the reasons detailed in the comments that follow, we stridently oppose the Proposed Rules. The Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact Megan Sprecher, Immigration and Poverty Law Attorney, at 608.237.3981 or megans@endabusewi.org to provide further information.

Sincerely,


Patti Seger
Executive Director

---

[4] How Wisconsin's Dairy Industry Came to Rely on Immigrant Labor, Wisconsin Agriculturist (Feb. 2018) https://www.wisconsinagriculturist.com/dairy/how-wisconsin-s-dairy-industry-came-rely-immigrant-labor.

2

AR.10898

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

**TABLE OF CONTENTS [with jump-links]**

I.  Introduction

II.  The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

III.  The Proposed Rules violate the letter and spirit of United States international treaty obligations

IV.  Those precluded from asylum eligibility will be gravely impacted even if granted withholding or protection under the Convention Against Torture

V.  The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

VI.  The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

VII.  The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

VIII.  The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

IX.  Conclusion

### I.  Introduction

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications. Despite repeated efforts by DHS and DOJ to weaken asylum protections, it remains a lifesaving option for people fleeing violence, including family violence.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5)

any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. End Abuse submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety.

## II.     The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique historic role as a haven for persons fleeing oppression."[5] The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.[6]

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to

---

[5] Deborah Anker, "The Refugee Act of 1980: An Historical Perspective," *In Defense of the Alien* 5 (1982): 89-94, https://www.jstor.org/stable/23141008?read-now=1&refreqid=excelsior%3A1060953608aa0bdd30d5d506e1ff6318&seq=1#page_scan_tab_contents.

[6] *See I.N.S. v. Cardoza-Fonseca*, 40 U.S. 421, 423 (1987).

AR.10900

reunite with immediate family members who may still remain abroad in danger.[7] Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save thousands of Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust.[8] Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad.[9] For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.[10]

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum[11] in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail.[12] The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds.[13] Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path.[14] There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.[15]

---

[7] The permanency and family reunification benefits that accompany asylum are not provided to those granted withholding of removal or protection under the Convention Against Torture, the alternative forms of relief described throughout the Proposed Rules as a justification for the breadth of the new proposed bars. For more details on the differences between the forms of protection, *see* section VI *infra*.

[8] Dara Lind, "How America's rejections of Jews fleeing Nazi Germany haunts our refugee policy today," *Vox*, January 27, 2017, https://www.vox.com/policy-and-politics/2017/1/27/14412082/refugees-history-holocaust.

[9] Council on Foreign Relations, *Independent Task Force Report No. 63: U.S. Immigration Policy* (2009), 117 (additional or dissenting view by Elisa Massimino) ("For better or worse, the United States sets the standard for reasonable and humane treatment of migrants around the world. If the United States endorses harsh treatment of immigrants, it erodes the norms designed to protect them, and other countries will have license to do the same.").

[10] *See, e.g.*, Sarah Stillman, "When deportation is a death sentence," *The New Yorker*, January 8, 2018, https://www.newyorker.com/magazine/2018/01/15/when-deportation-is-a-death-sentence.

[11] 8 USC § 1158(b)(1)(B); 8 CFR § 1240.8(d).

[12] *See* Daniel Connolly, Aaron Montes, and Lauren Villagran, "Asylum seekers in U.S. face years of waiting, little chance of winning their cases," *USA Today*, September 25, 2019, https://www.usatoday.com/in-depth/news/nation/2019/09/23/immigration-court-asylum-seekers-what-to-expect/2026541001/.

[13] Manuel Roig-Franzia, "Immigrants risk it all seeking asylum. The answer is almost always 'no,'" *Washington Post*, July 24, 2019, https://www.washingtonpost.com/lifestyle/style/migrants-risk-it-all-seeking-asylum-the-answer-in-court-is-almost-always-no/2019/07/23/9c161b2e-a3f7-11e9-b732-41a79c2551bf_story.html.

[14] The National Immigrant Justice Center maintains a frequently updated timeline providing details of each of the asylum bans and other policies issued and implemented by the administration undermining asylum access at https://www.immigrantjustice.org/issues/asylum-seekers-refugees. For more information on the harms and rights abuses inherent in the Migrant Protection Protocols, or "Return-to-Mexico" program, *see* Human Rights First, *Delivered to Danger* (December 2019), https://www.humanrightsfirst.org/campaign/remain-mexico.

[15] *See, e.g.,* Stillman, "Death Sentence," *supra* (reporting on a database of more than sixty cases of individuals killed after deportation); *see also* Maria Sachetti, "'Death is waiting for him,'" *The Washington Post*, December 6, 2018, https://www.washingtonpost.com/graphics/2018/local/asylum-deported-ms-13-honduras/ (telling the story of Santos Chirino, denied asylum by a Virginia immigration judge, deported, and then murdered by those he told the

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope.[16] Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum.[17] "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking,[18] it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs.[19] The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.[20]

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct.[21] Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness.[22] The Proposed

---

immigration judge he feared); and Kevin Sieff, "When death awaits deported asylum seekers," *Washington Post*, December 26, 2018, https://www.washingtonpost.com/graphics/2018/world/when-death-awaits-deported-asylum-seekers/.

[16] The existing categorical bars to asylum eligibility are discussed in detail on p. 69641 of the Proposed Rules.

[17] 8 U.S.C. §§ 1158(b)(2)(A)(ii) and (B)(i).

[18] Pub. L. No. 100-690, § 7342, 102 Stat. 4181, 4469-70.

[19] 8 U.S.C. § 1101(a)(43). *See also* Nancy Morawetz, "Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms," *Harvard Law Review* 113 (2000): 1939-40 (criticizing the "'Alice-in-Wonderland-like definition of the term 'aggravated felony'"); Melissa Cook, "Banished for Minor Crimes: The Aggravated Felony Provisions of the Immigration and Nationality Act as a Human Rights Violation," *Boston College Third World Law Journal* (2003): 293.

[20] *See Matter of Pula*, 19 I.&N. Dec. 467 (BIA 1987).

[21] *See id.*

[22] See U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* (2017) (noting that recidivism rates fall substantially with age); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (noting that non-violent offenders recidivate at significantly lower rates); J. Ramos and M. Wenger, "Immigration and recidivism: What is the Link?" *Justice Quarterly* (2019) (finding no correlation between recidivism rates and citizenship status among those formerly incarcerated for felonies in Florida prisons).

Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.[23]

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct.[24] In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors."[25] Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.[26] At first blush this seems like it would be a positive change for survivors but in reality it would negatively impact survivors both because: (a) many abusers weaponize the criminal justice system against their victims, in some cases going so far as causing self-harm and telling law enforcement the victim physically attacked them; and (b) many survivors would not call law enforcement to report abuse or ask for a restraining order for fear of it having a negative impact on the abuser's immigration status, particularly where the abuser and survivor have a child in common.

---

[23] See U.N. High Commissioner for Refugees, *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 11 (July 2007), http://www.unhcr.org/en-us/576d237f7.pdf (the Refugee Convention's particularly serious crime bar only applies if (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows she is a "present or future danger.").

[24] John H. Blume and Rebecca K. Helm, "The Unexonerated: Factually Innocent Defendants Who Plead Guilty," *Cornell Law Review* 100 (2014): 157, https://pdfs.semanticscholar.org/c00f/96d421adf1846d120bf802a8854b5e2c0ff2.pdf.

[25] *Pula*, 19 I.&N. Dec. at 474.

[26] The Proposed Rules at p. 69651 explain that the regulations will "render ineligible [non-citizens] who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction."

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

*The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD).[27] One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.[28]

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder.[29] Asylum seekers in the United States are often unable to access affordable medical care and treatments for complex trauma;[30] some turn to drugs and alcohol in an effort to self-medicate.[31] The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly*

---

[27] Giulia Turrini et al., "Common mental disorders in asylum seekers and refugees: umbrella review of prevalence and intervention studies," *International Journal of Mental Health Systems* 11 (August 2017): 51, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5571637/.

[28] Megan Brooks, "Refugees have high burden of mental health problems," *Psychiatry and Behavioral Health Learning Network*, June 2019, https://www.psychcongress.com/article/refugees-have-high-burden-mental-health-problems.

[29] Jenna L McCauley et al., "Posttraumatic Stress Disorder and Co-Occurring Substance Use Disorders: Advances in Assessment and Treatment," *Clinical Psychology Science and Practice* 19, 3 (October 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3811127/.

[30] For more information on immigrant eligibility for federal benefits, *see* https://www.nilc.org/issues/health-care/.

[31] Carrier Clinic, *Trauma and Addiction* (2019), https://carrierclinic.org/2019/08/06/trauma-and-addiction/ ("...some people struggling to manage the effects of trauma in their lives may turn to drugs and alcohol to self-medicate. PTSD symptoms like agitation, hypersensitivity to loud noises or sudden movements, depression, social withdrawal and insomnia may seem more manageable through the use of sedating or stimulating drugs depending on the symptom. However, addiction soon becomes yet another problem in the trauma survivor's life. Before long, the 'cure' no longer works and causes far more pain to an already suffering person.").

given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

It is common for people suffering from Post-traumatic Stress Disorder (PTSD) to self-medicate, especially when they lack access to health care, health insurance, or community resources.[32] This can be true for survivors of domestic abuse suffering from PTSD. Survivors of domestic abuse may also experience substance use coercion, where their abuser forces them to use or abuse substance or sabotages their recovery efforts.[33] The proposed rule would unfairly block survivors who have criminal histories related to their self-medicating or substance use coercion from accessing asylum, further punishing them for their trauma.

## III.    The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees,[34] which binds parties to the United Nations Convention Relating to the Status of Refugees,[35] the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention

---

[32] Leeies M, Pagura J, Sareen J, Bolton JM, *The use of alcohol and drugs to self-medicate symptoms of posttraumatic stress disorder*, Depress Anxiety. 2010 Aug;27(8):731-6. doi: 10.1002/da.20677.

[33] *The Relationship Between Intimate Partner Violence and Substance Use*, National Center on Domestic Violence, Trauma, and Mental Health, http://www.nationalcenterdvtraumamh.org/wp-content/uploads/2016/03/IPV-SAB-Final202.29.1620NO20LOGO.pdf.

[34] United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 268.

[35] Convention Relating to the Statute of Refugees, July 28, 1951, 140 U.N.T.S. 1954 (hereinafter "Refugee Convention").

allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."[36] However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act."[37] The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum."[38] Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness."[39] Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.[40]

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient,"[41] but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-

---

[36] *Id.* at art. 33(2).

[37] U.N. High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees* 2, U.N. Doc. HCR/IP/Eng/REV. ¶ 154-55, (1979, reissued 2019).

[38] U.N. High Comm'r for Refugees (UNHCR), *Criminal Justice and Immigration Bill: Briefing for the House of Commons at Second Reading* ¶ 7 (July 2007), http://www.unhcr.org/enus/576d237f7.pdf.

[39] *Id.* at ¶ 10.

[40] *Id.* at ¶ 10-11; U.N. High Commissioner for Refugees, *The Nationality, Immigration and Asylum Act 2002: UNHCR Comments on the Nationality, Immigration and Asylum Act 2002 (Specification of Particularly Serious Crimes) Order 2004*, 4 (2004).

[41] Proposed Rules at 69646.

of-the-mill" offenses do not constitute particularly serious crimes.[42] Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*,[43] a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury.[44] Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record."[45] Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276[46] is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence.[47] This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

Survivors of domestic abuse often do not have the luxury of choosing how or where they cross the border; they are fleeing for their lives. They should not be punished for trying to escape their abusers.

## IV. Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

---

[42] *Delgado v. Holder*, 648 F.3d 1095, 1110 (9th Cir. 2011) (en banc) (J. Reinhardt, concurring).

[43] 648 F.3d at 1110 (J. Reinhardt, concurring).

[44] *Id.* at 1110.

[45] *Id.* at 1110.

[46] Proposed Rules at 69659, 69660.

[47] Refugee Convention, *supra*, at art 31.

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules.[48] The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture.[49] Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees[50] affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees.[51] And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation."[52] Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

---

[48] *See, e.g.,* Proposed Rules at 69644.

[49] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion." *INS v. Stevic*, 467 U.S. 407, 411 (1984) (quoting 8 U.S.C. § 1231(b)(3)). Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality. The clear probability standard is more stringent than the well-founded fear standard for asylum. *Id; see also Cardoza-Fonseca*, 480 U.S. at 431 (describing the difference between a well-founded fear of persecution and a clear probability of persecution). For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed by or at the government's acquiescence if removed to the home country. 8 C.F.R. § 1208.16(c)(2).

[50] 19 U.S.T. 6223 T.I.A.S. No. 6577 (1968).

[51] 8 C.F.R. § 223.1.

[52] *See Matter of I-S- & C-S-*, 24 I.&N. Dec. 432, 434 n.3 (BIA 2008); 8 C.F.R. § 241.7.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status.[53] For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban,"[54] which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future.[55] Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.[56]

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status.[57] Asylum, once granted, protects an asylee against removal unless

---

[53] 8 C.F.R. § 208.21(a).

[54] 8 C.F.R. § 1208.13(c)(4).

[55] Adolfo Flores, "An Immigrant Woman Was Allowed To Stay In The US — But Her Three Children Have A Deportation Order," *Buzzfeed*, December 21, 2019, https://www.buzzfeednews.com/article/adolfoflores/an-immigrant-woman-was-allowed-to-stay-in-the-us-but-not.

[56] 8 C.F.R. § 274a.12(a)(10); *Northwest Immigrant Rights Project, et al. v. USCIS, et al.*, No. 2:15-cv-00813-JLR (W.D. Wash., filed May 22, 2015) (class action regarding delays in adjudication of work authorization).

[57] *See, e.g.*, 8 C.F.R. 245.1(d)(1) (defining "lawful immigration status" to include asylees).

13

AR.10909

and until that status is revoked.[58] None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship.[59] Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.[60]

Finally, End Abuse writes to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.[61]

## V. The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case.[62] Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."[63]

---

[58] *See* 8 U.S.C. § 1158(c)(1)(A).

[59] *Matter of Lam*, 18 I.&N. Dec. 15, 18 (BIA 1981); 8 C.F.R. § 245.1(d)(1) (explaining that only those in "lawful immigration status" can seek permanent residency and excluding withholding recipients from such status); 8 C.F.R. § 209.2(a)(1) (authorizing adjustment of status to permanent residence for asylees); 8 C.F.R. § 316.2 (naturalization available only to permanent residents).

[60] *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017).

[61] See, e.g., Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://bit.ly/2sJuEWR.

[62] *See* Proposed Rules at 69649.

[63] *See* Proposed Rules at 69652.

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. If survivors of domestic abuse were called to testify at these "mini-trials," this would create a chilling effect. Forcing survivors to disclose abuse or testify against their abuser leads to decreased reporting rates and in some cases, recanting out of fear. Survivors often fear their disclosure of abuse will cause their abuser to retaliate against them. In the current climate, many survivors even fear disclosure will result in negative immigration consequences for the abuser. This is especially true where the survivor and abuser have a child in common and the abuser's loss of status or deportation could negatively impact the child.

The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases,[64] tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes.[65] Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here.[66] Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration

---

[64] Marissa Esthimer, "Crisis in the Courts: Is the Backlogged U.S. Immigration Court System at Its Breaking Point?," *Migration Policy Institute*, October 3, 2019, https://www.migrationpolicy.org/article/backlogged-us-immigration-courts-breaking-point.
[65] *See* Proposed Rules at 69646, 69656-8.
[66] *Moncrieffe v. Holder*, 569 U.S. 184, 186 (2013).

adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court.[67] As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact."[68] In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.[69]

Particularly in the context of the new proposed bar related to alleged gang affiliation, End Abuse is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.[70]

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators

---

[67] *See Moncrieffe*, 569 U.S. at 191 ("This categorical approach has a long pedigree in our Nation's immigration law."). For a more fulsome history of the development of the categorical approach in immigration court, *see* Alina Das, "The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law," *New York University Law Review* 86, no. 6 (2011): 1689 - 1702, https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-86-6-Das.pdf.

[68] *Moncrieffe*, 569 U.S. at 200-201.

[69] *Id.* at 201.

[70] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.[71]

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes."[72] They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## VI.    The proposed definition of "conviction" and "sentence" for the purposes of the new bars further excludes those in need of protection

The section of the Proposed Rules that outlines a new set of criteria for determining whether a conviction or sentence is valid for the purpose of determining asylum eligibility is an ultra vires exercise of authority that is not authorized by the Immigration and Nationality Act. The Proposed Rules impose an unlawful presumption against asylum eligibility for applicants who seek post-conviction relief while in removal proceedings or longer than one year after their initial convictions. They also deny full faith and credit to state court proceedings by attributing improper motives to state court actors.[73]

---

[71] Melissa del Bosque, "Immigration Officials Use Secretive Gang Databases to Deny Migrant Asylum Claims," *Pro Publica*, July 8, 2019, https://www.propublica.org/article/immigration-officials-use-secretive-gang-databases-to-deny-migrant-asylum-claims.

[72] Proposed Rules at p. 69650.

[73] *See Saleh v. Gonzales*, 495 F.3d 17, 25-26 (2d Cir. 2007) (discussing 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state acts, records, and judicial proceedings and U.S. Const. art. IV, § 1, and finding that there was no violation where the Board of Immigration Appeals stopped short of "refusing to recognize or relitigating the validity of [Saleh's] state conviction.").

*The Proposed Rules undermine Sixth Amendment protections and harms immigrants unfamiliar with the complex criminal and immigration framework governing prior convictions.*

The Proposed Rules outline a new multi-factor process asylum adjudicators must use to determine whether a conviction or sentence remains valid for the purpose of determining asylum eligibility; the proposal includes a rebuttable presumption "against the effectiveness" of an order vacating, expunging, or modifying a conviction or sentence if the order was entered into after the asylum seeker was placed in removal proceedings or if the asylum seeker moved for the order more than one year after the date the original conviction or sentence was entered.[74]

This newly created presumption unfairly penalizes asylum applicants, many of whom may not have the opportunity to seek review of their prior criminal proceedings until applying for asylum.[75] In *Padilla v. Kentucky*, the Supreme Court recognized that the immigration consequences of a conviction are sufficiently serious for the Sixth Amendment to require a noncitizen defendant to be competently advised of them before agreeing to a guilty plea.[76] By imposing a presumption against the validity of a withdrawal or vacatur of a plea, the Proposed Rules hold asylum seekers whose rights were violated under *Padilla* to a different standard; even though they too were denied effective assistance of counsel in the course of their underlying criminal proceedings, asylum seekers will be forced to rebut a presumption that their court-ordered withdrawal or vacatur is invalid. The Proposed Rules therefore compound the harm to immigrants who, in addition to facing persecution in their home countries, have been denied constitutionally compliant process in the United States criminal legal system.

Many asylum applicants, especially those in vulnerable populations isolated from resources and unfamiliar with the due process protections available to them in the United States, may not have discovered the defects in their underlying criminal proceedings until their consultation with an immigration attorney, or until they are placed into removal proceedings, which may happen several years after a conviction. Imposing a presumption *against* the validity of a plea withdrawal or vacatur in these cases will undoubtedly lead to the wrongful exclusion of countless immigrants from asylum simply because they were unable to adequately rebut the presumption, particularly in a complex immigration court setting without the benefit of appointed counsel.

---

[74] Proposed Rules at 69655.

[75] On page 69656 of the Proposed Rules, the Department of Homeland Security and the Department of Justice urge that "[i]t is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds…"

[76] *Padilla v. Kentucky*, 559 U.S. 356 (2010).

18

AR.10914

*The Proposed Rules violate the full faith, and credit to which state court decisions are entitled.*

The Proposed Rules further improperly authorize immigration adjudicators to second-guess the decision of a state court, even where the order on its face cites substantive and procedural defects in the underlying proceeding. The proffered justification for this presumption against the validity of post-conviction relief is to "ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes," "to codify the principle set forth in *Matter of Thomas and Thompson*," and to bring the analysis of post-conviction orders in line with *Matter of Pickering*.[77] The agencies misread the applicable law, however, by authorizing adjudicators to disregard otherwise valid state orders. The immigration law only requires that to be effective for immigration purposes, orders vacating or modifying convictions must be based on substantive or procedural infirmities in the underlying proceedings. The Proposed Rule goes well beyond that requirement.

The Proposed Rules abandon the presumption of regularity that should accompany state court orders, thus upending settled principles of law. The Proposed Rules cite a misleading quote from *Matter of F-* in support of allowing asylum adjudicators to look beyond the face of a state court order; had the Rules' authors looked to the full case, they would have read the following: "Not only the full faith and credit clause of the Federal Constitution, but familiar principles of law require the acceptance at face value of a judgment regularly granted by a competent court, unless a fatal defect is evident upon the judgment's face. However, the presumption of regularity and of jurisdiction may be overcome by extrinsic evidence or by the record itself."[78] In *Matter of F-*, the Board of Immigration Appeals offers support for the proposition that an adjudicator should presume the validity of a state court order unless there is a reason to doubt it, contrary to the *presumption of irregularity* put forward in the Proposed Rules.

The authority extended to adjudicators by the Proposed Rules also violates the law of multiple circuits, including *Pickering*, on which it relies.[79] In *Pickering v. Gonzales*, the Sixth Circuit Court of Appeals held that despite the petitioner's stated motive of avoiding negative immigration consequences, the Board of Immigration Appeals was limited to reviewing the authority of the court issuing the order as to the basis for his vacatur.[80] Similarly, in *Reyes-Torres* the Ninth Circuit Court of Appeals held that the motive of the respondent was not the relevant

---

[77] Proposed Rules at 69655-56 (*citing Matter of Thomas and Thompson*, 27 I.&N. Dec. 674 (A.G. 2019) and *Matter of Pickering*, 23 I.&N. Dec. 621 (BIA 2003), *rev'd on other grounds by Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006)).

[78] *Matter of F-*, 8 I.&N. Dec. 251, 253 (BIA 1959).

[79] *See id.* (*citing Matter of Pickering*, 23 I.&N. Dec. 621).

[80] *Pickering v. Gonzales*, 465 F.3d 263, 267-70 (6th Cir. 2006).

inquiry.[81] Rather, "the inquiry must focus on the state court's rationale for vacating the conviction."[82] In addition, the Third Circuit Court of Appeals in *Rodriguez v. U.S. Att'y Gen.*, which the Proposed Rules cite as "existing precedent," held that the adjudicator must look only to the "reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction."[83] Moreover, the *Rodriguez* court stated that to determine the purpose of a vacatur, the adjudicator must first look to the face of the order vacating the conviction, and "if the order explains the courts reasons … the [adjudicator's] inquiry must end there."[84] The Proposed Rules contain no such limiting language to guide the adjudicator's inquiry. Instead, the Rules grant adjudicators vague and indefinite authority to look beyond even a facially valid vacatur. Such breadth of authority undermines asylum seekers' rights to a full and fair proceeding.

> *The Proposed Rules wrongly extend* Matter of Thomas and Thompson *to all forms of post-conviction relief and impose an ultra vires and unnecessary burden on asylum seekers.*

Finally, the above-described presumption is ultra vires and unnecessary. As an initial matter, the Proposed Rules' reliance on *Matter of Thomas and Thompson* is flawed. The Attorney General's decision in *Matter of Thomas and Thompson* has no justification in the text or history of the immigration statute. Nowhere does the plain text of the Immigration and Nationality Act support giving adjudicators the authority to give effect only to state court sentence modifications undertaken to rectify substantive or procedural defects in the underlying criminal proceedings. Nor does the legislative history support such a rule. The Board of Immigration Appeals recognized this in *Matter of Cota-Vargas*, where it concluded that the application of "the *Pickering* rationale to sentence modifications has no discernible basis in the language of the Act."[85] Based on the text of the Immigration and Nationality Act and the well-documented legislative history behind Congress's definition of "conviction" and "sentence" in 8 U.S.C. § 1101(a)(48), the Board determined that Congress intended to ensure that, generally, proper admissions or findings of guilt were treated as convictions for immigration purposes, even if the conviction itself was later vacated. Neither the text of the INA nor the legislative history of the definitions reveal any attempt on Congress's part to change the longstanding practice of giving effect to state court sentencing modifications. For these reasons, *Matter of Thomas and Thompson* lacks Congressional support for its rule and should not be extended.

---

[81] *Reyes-Torres v. Holder*, 645 F.3d 1073, 1077-78 (9th Cir. 2011) (*citing Cardoso-Tlaseca v, Gonzales*, 460 F.3d 1102, 1107 n.3 (9th Cir. 2006) and *Pickering v. Gonzales*, 454 F.3d 525 (6th Cir. 2006), *amended and superseded* by *Pickering*, 465 F.3d at 263.

[82] *Id.*

[83] *Rodriguez v. U.S. Att'y Gen.*, 844 F.3d 392, 397 (3d Cir. 2006) (noting that "[T]he IJ may rely only on reasons explicitly stated in the record and may not impute an unexpressed motive for vacating a conviction.").

[84] *Id.* ("Put simply, '[w]e will not . . . permit[ ] . . . speculation . . . about the secret motives of state judges and prosecutors,'" *quoting Pinho v. Gonzales*, 432 F.3d 193, 214-215 (3d Cir. 2005)).

[85] *Matter of Cota-Vargas*, 23 I.&N. Dec. 849, 852 (BIA 2005).

20

AR.10916

Moreover, as applicants for immigration benefits or relief from removal, asylum seekers already bear the burden of demonstrating their eligibility for asylum.[86] The Proposed Rules do not alter or shift this burden, nor do they provide evidence supporting the need for this presumption. By introducing a presumption of bad faith into asylum adjudication, the Proposed Rules unfairly interfere with asylum seekers' efforts to establish their claims. Immigration law, and asylum law in particular, is already highly complex, and the process of seeking asylum is in many instances re-traumatizing, particularly for applicants who do not have counsel to represent them and who lacked effective counsel in their underlying criminal proceedings. The Proposed Rules as applied to asylum applicants who seek post-conviction relief transform an already difficult process into an adversarial inquiry, contrary to the intent of Congress.

## VII. The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence.[87] For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community.[88] Furthermore,

---

[86] *Matter of S-K-*, 23 I.&N. Dec. 936, 939-40 (BIA 2006).

[87] D'Vera Cohn et al., "Rise in U.S. Immigrants from El Salvador, Guatemala and Honduras Outpaces Growth from Elsewhere," *Pew Research Center*, December 7, 2017, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2017/12/Pew-Research-Center_Central_American-migration-to-U.S._12.7.17.pdf.

[88] Apart from the statutory aggravated felony bar to asylum, the Board of Immigration Appeals and Attorney General have historically utilized a highly circumstantial approach to the particular serious crime determination that would bar an immigrant from receiving asylum. *See e.g., Matter of Juarez*, 19 I.&N. Dec. 664 (BIA 1988) (ordinarily a single misdemeanor that is not an aggravated felony will not be a particularly serious crime); *Matter of Frentescu*, 18 I.&N. Dec. 244 (BIA 1982), *modified* (setting forth several factors to be considered before imposing the particular serious crime bar, including: (i) the nature of the conviction, (ii) the circumstances and underlying facts for the conviction, (iii) the type of sentence imposed, and (iv) whether the type and circumstances of the crime indicate that the individual will be a danger to the community); *Matter of Y-L-, A-G-, R-S-R-,* 23 I.&N. Dec. 270

21

AR.10917

asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence.[89] These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.[90]

> *Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution.[91] The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States.[92] The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States.[93] The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the

---

(A.G. 2002) (setting forth a multi-factor test to determine the dangerousness of a respondent convicted of a drug-trafficking offense who is otherwise barred from asylum as an aggravated felon, but seeking withholding of removal).

[89] 8 U.S.C. § 1159(c) (2012).

[90] 8 C.F.R. § 208.24(a) (2012).

[91] On April 11, 2017, then-Attorney General Sessions instructed all federal prosecutors to increase their prioritization of immigration offenses for prosecution, including misdemeanor offenses committed by first time entrants. *See* Memorandum from the Attorney General: Renewed Commitment to Criminal Immigration Enforcement (April 11, 2017), https://www.justice.gov/opa/press-release/file/956841/download.

[92] *Id.*; Richard Marosi, "The aggressive prosecution of border crossers is straining the courts. Will zero tolerance make it worse?," *Los Angeles Times*, May 11, 2018, https://www.latimes.com/local/california/la-me-ln-immigrant-prosecutions-20180511-story.html.

[93] Ryan Devereaux, "Documents Detail ICE Campaign to Prosecute Migrant Parents as Smugglers," *The Intercept*, April 29, 2019, https://theintercept.com/2019/04/29/ice-documents-prosecute-migrant-parents-smugglers/ (describing how in May 2017, the Department of Homeland Security set out to target parents and family members of unaccompanied minors for prosecution).

harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

Many survivors of domestic abuse flee and are forced to leave children and other loved ones behind. Some survivors come to the U.S. and then do what they can to help their children or other dependents come to the U.S. to escape the same abuse the survivor suffered. Survivors like this who are just trying to protect their children and other loved ones would be barred by the Proposed Rules.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions.[94] Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

*Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances.[95] Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for

---

[94] Proposed Rules at 69648.
[95] *See Pula*, 19 I.&N. Dec. at 474.

asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.[96]

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent.[97] Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights.[98] The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

> *The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries.[99] Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population.[100] Members of these communities also

---

[96] *Id.*

[97] See American Bar Association, "About Notario Fraud," July 19, 2018, https://www.americanbar.org/groups/public_interest/immigration/projects_initiatives/fight-notario-fraud/about_notario_fraud/.

[98] Paul Harris, "Undocumented workers' grim reality: speak out on abuse and risk deportation," *The Guardian*, March 28, 2013, https://www.theguardian.com/world/2013/mar/28/undocumented-migrants-worker-abuse-deportation.

[99] *See* Aengus Carroll and Lucas Ramon Mendos, *State Sponsored Homophobia: A World Survey of Sexual Orientation Laws: Criminalisation, Protection and Recognition* 12th Ed. (International Lesbian, Gay, Bisexual, Transgender, and Intersex Association (ILGA), 2017), https://ilga.org/downloads/2017/ILGA_State_Sponsored_Homophobia_2017_WEB.pdf.

[100] *See* Sharita Gruberg, "LGBTQ Undocumented Immigrants Face an Increased Risk of Hate Violence," *Center for American Progress*, June 10, 2014,

experience isolation from their kinship and national networks following their migration. This isolation, compounded by the continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community.[101] The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability.[102] The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities.[103] The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate

---

https://www.americanprogress.org/issues/immigration/news/2014/06/10/91233/lgbt-undocumented-immigrants-face-an-increased-risk-of-hate-violence/.

[101] *See eg.*, Sharita Gruberg, "How Police Entanglement with Immigration Enforcement Puts LGBTQ Lives at Risk," *Center for American Progress*, April 12, 2017, https://www.americanprogress.org/issues/lgbtq-rights/reports/2017/04/12/430325/police-entanglement-immigration-enforcement-puts-lgbtq-lives-risk/.

[102] Elise White, et al., "Navigating Force and Choice: Experiences in the New York City Sex Trade and the Criminal Justice System's Response," *Center for Court Innovation*, December 2017 (noting that 78% of participants in the report's study had been arrested, mostly for non-violent, non-prostitution offenses such as *drug possession*).

[103] Marty Schladen, "ICE Agents Detain Alleged Domestic Violence Victim," *El Paso Times*, February 16, 2017, https://www.elpasotimes.com/story/news/2017/02/15/ice-detains-domestic-violence-victim-court/97965624/ (noting that the immigrant detained, a transgender person previously deported following her conviction for crimes such as posession of stolen mail and assault, was then living at the Center Againts Sexual and Family Violence, a shelter for survivors of intimate partner violence).

partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances.[104] The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor.[105] These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar.[106] Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

It is common for domestic abuse survivors themselves to be arrested at the behest of their abuser. Some abusers call in false tips to children's services, others self-harm and tell police that the survivor hurt them. Survivors end up caught up in the criminal justice system as defendants and often do not have access to the financial resources necessary to properly defend themselves or they are too afraid of the abuser to zealously defend themselves. Survivors in this situation, through no fault of their own, would be barred from receiving asylum by the Proposed Rules.

---

[104] Nadine Shaanta Murshid and Elizabeth A. Bowen, "A Trauma-Informed Analysis of the Violence Against Women Act's Provisions for Undocumented Immigrant Women," *Violence Against Women* 24(13) (2018): 1540–1556, https://doi.org/10.1177/1077801217741991.

[105] David Hirschel, et al., "Domestic Violence and Mandatory Arrest Laws: To What Extent Do They Influence Police Arrest Decisions," *Journal of Criminal Law & Criminology* 98, no. 1 (2007-2008): 255, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=7284&context=jclc (noting that "[i]n some cases, dual arrests may be the result of legislation, department policies, or both failing to require officers to identify the primary aggressor. In addition, when such provisions are present, police may lack the training or information needed to identify the primary aggressor when responding to a domestic violence assault. This situation may be compounded by batterers who have become increasingly adept at manipulating the criminal justice system, and may make efforts to 'pre-empt' victims from notifying police in order to further control or retaliate against them.").

[106] 8 U.S.C. § 1227(a)(7)(A).

AR.10922

*Barring asylum for immigrants convicted of "gang-related crimes" based on unreliable evidence and racially disparate policing practices is harmful to youth of color and does not make communities safer.*

In recent years, the expansion of gang databases for use in the apprehension and removal of foreign nationals—including children—has generated tremendous concern among advocates and the communities they serve.[107] The use of gang databases by local law enforcement and Immigration and Customs Enforcement has been widely criticized as an overbroad, unreliable and often biased measure of gang membership and involvement.[108] The Proposed Rules expand the criminal bars to asylum to those accused of gang involvement in the commission of minor criminal offenses, embracing an open-ended adjudicative process that will inevitably result in asylum adjudicators relying unfairly on these discredited methods of gang identification. This outcome would compound the disparate racial impact of inclusion in gang databases and bar asylum seekers who are themselves fleeing violence from gangs in their home countries.[109]

Past legislative efforts to expand the grounds of removal and inadmissibility in the Immigration and Nationality Act to include gang membership have failed to pass both houses of Congress.[110] In addition, immigration adjudicators already routinely premise discretionary denials of relief or release on bond on purported gang membership, and scores of alleged gang members have already been deported on grounds related to immigration violations or criminal convictions for which no relief is available.[111] Creating a "gang-related crime" bar will only exacerbate the due process violations already occurring as the result of unsubstantiated information about supposed gang ties.[112]

---

[107] *See* Nermeen Arastu, et al., "Swept Up In The Sweep: The Impact of Gang Allegations on Immigrant New Yorkers," *New York Immigration Coalition (NYIC) and CUNY School of Law's Immigrant and Non-citizen Rights Clinic*, May 2018, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/SweptUp_Report_Final-1.pdf.

[108] Ali Winston, "Marked for Life: U.S. Government Using Gang Databases to Deport Undocumented Immigrants," *The Intercept*, August 11, 2016, https://theintercept.com/2016/08/11/u-s-government-using-gang-databases-to-deport-undocumented-immigrants/.

[109] *See* Jonathan Blitzer, "How Gang Victims Are Labeled As Gang Suspects," *The New Yorker*, January 23, 2018, https://www.newyorker.com/news/news-desk/how-gang-victims-are-labelled-as-gang-suspects.

[110] *See* Jessica Chacon, "Whose Community Shield?: Examining the Removal of the 'Criminal Street Gang Member,'" *University of Chicago Legal Forum* 317 (2007: 333-336) (reviewing legislative history of failed efforts to expand removability of those accused of gang related offenses and noting criticism that "[t]he only legal effect of the proposed legislation would be to increase the number of noncitizens lawfully present who would be subject to removal on the basis of their purported associations with individuals involved in group criminal activity.").

[111] For an illustration of Immigration and Customs Enforcement's propensity to make gang allegations on the basis of questionable if not fabricated evidence, and the deference to which the evidence is often granted by immigration adjudicators, *see* Mark Joseph Stern, "Bad Liars," *Slate*, May 16, 2018, https://slate.com/news-and-politics/2018/05/federal-judge-accused-ice-of-making-up-evidence-to-prove-that-dreamer-was-gang-affiliated.html.

[112] See Yvette Cabrera, "New ICE Tactic Raises Questions About Due Process," *ThinkProgress*, October 6, 2017, https://thinkprogress.org/ice-targets-gangs-6775356473a8/; Rebecca Hufstader, "Immigration Reliance On Gang Databases: Unchecked Discretion And Undesirable Consequences," 90 *New York University Law Review* 90 (2015): 671.

AR.10923

In addition, by focusing on "reason to believe" as the basis for the bar, rather than the seriousness of the crime, the proposed provision is ultra vires and unconscionably limits the eligibility for asylum of those most in need of protection. The effect of the Proposed Rules would be to expand the number and type of convictions for which an analysis of eligibility is required, sweeping in even petty offenses that would otherwise not trigger immigration consequences. Thus, an asylum applicant convicted of simple assault without use of a weapon, a non-violent property crime, or even possession of under 30 grams of marijuana for personal use (otherwise exempted from the reach of the Proposed Rule), could trigger a bar to asylum if the adjudicator concludes she has "reason to believe" the offense was committed in furtherance of gang activity.[113] In making these determinations, asylum adjudicators would be unable to rely on uncorroborated allegations contained in arrest reports, but could nevertheless shield their decisions by relying on discretion.[114]

The Proposed Rules thus invite extended inquiry into the character of young men of color who otherwise have meritorious asylum claims, based on information gained through racially disparate policing practices. These rules multiply the harm to asylum seekers of color subject to racially disparate policing that results in racially disparate rates of guilty pleas to minor offenses. This same population is overrepresented in gang databases, which are notoriously inaccurate, outdated, and infected by racial bias.[115]

## VIII.  The Proposed Rules are ultra vires to the federal immigration statute to the extent they purport to bar eligibility through a categorical exercise of discretion

When Congress speaks clearly through a statute, the plain meaning of that statute governs.[116] Congress by statute permits the Attorney General to designate certain categories of offenses as "particularly serious crimes."[117] As such, Congress *explicitly* permitted the Attorney General to designate a non-aggravated felony to be a particularly serious crime and thus disqualify a person from asylum. In the context of asylum, all aggravated felonies are *per se*

---

[113] Page 69649 of the Proposed Rules notes that the applicable standard for determining when to apply the bar on asylum seekers convicted of a crime involving criminal street gangs is "reason to believe," as used in 8 U.S.C. § 1182(a)(2)(c), and that  the asylum adjudicator may consider "all reliable evidence" in making their decision.

[114] *See Garces v. U.S. A.G.*, 611 F.3d 1337, 1349-50 (11th Cir 2010) (reversing finding of "reason to believe" that the respondent was a participant in drug trafficking based on unsubstantiated arrest reports); *Matter of Rico*, 16 I.&N. Dec. 181, 185-86 (BIA 1977) (relying on pre-hearing admissions to uphold finding of inadmissibility).

[115] Annie Sweeney and Madeline Buckley, "Chicago police gang data collection faulted by city's inspector general as unchecked and unreliable," *Chicago Tribune*, April 11, 2019, https://www.chicagotribune.com/news/breaking/ct-met-chicago-police-gang-data-04112019-story.html; Anita Chabria, "A routine police stop landed him on California's gang database. Is it racial profiling?," *Los Angeles Times*, May 9, 2019, https://www.latimes.com/politics/la-pol-ca-california-gang-database-calgang-criminal-justice-reform-20190509-story.html.

[116] See, *e.g.*, *Robinson* v. *Shell Oil Co.*, 519 U.S. 337, 340 (1997).

[117] 8 U.S.C. § 1158(b)(2)(B)(ii).

particularly serious crimes and the Attorney General "may designate by regulation [other] offenses that will be considered to be" a particularly serious crime for purposes of asylum.[118]

Here, however—seemingly in an attempt to insulate the Proposed Rules from review, the agencies attempt to designate new bars to asylum both by designating them as "particularly serious crimes" pursuant to 8 U.S.C. § 1158(b)(2)(B)(ii) and rendering them categorically exempt from a positive discretionary adjudication of asylum pursuant to 8 U.S.C. § 1158(b)(2)(C). This effort is unlawful. Section 1158(b)(2)(B)(ii) does permit the Attorney General to, if he wishes, attempt to designate some classes of offenses as particularly serious crimes; such designations are reviewable for legal error (and as explained above, the commenters believe these expansions are unlawful).[119] However, if the offense is not a particularly serious crime, then a discretionary decision must be rendered on the application. It is true that the Attorney General may also provide for "additional limitations and conditions" on asylum applications so long as they are "consistent" with the with the asylum statute.[120] In this case, however, the Proposed Rules add sweeping categories of offenses that automatically remove an applicant from the consideration of discretion—a regulatory proposal that is ultra vires to the plain text of the statute.

To the extent that the proposed rules would adopt a bar to asylum based on a categorical discretionary bar, rather than a particularly serious crime designation, they are similar to the rules struck down by numerous Circuit Courts of Appeal in the context of adjustment of status for those considered by law to be "arriving aliens." Purporting to exercise discretion categorically, then-Attorney General Reno putatively rendered that class of noncitizens ineligible for adjustment of status, a determination that is ordinarily discretionary, even though the statute seemed to allow eligibility. Multiple Circuit Courts of Appeal struck down the proposed regulations, finding them to reflect an impermissible reading of the statute in light of the fact that Congress carefully defined in the statute the categories of people eligible to apply for adjustment of status.[121]

---

[118] *Id.* The Attorney General has not designated "substantial battery" to be a particularly serious crime for any purpose, including for purposes of ineligibility to seek asylum.

[119] 8 U.S.C. § 1252(a)(2)(D).

[120] 8 U.S.C. § 1158(b)(2)(C); *see also* 8 U.S.C. § 1158(d)(5)(B).

[121] The First and Ninth Circuits found the regulations contrary to clear statutory command. *Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005); *Bona v. Gonzales*, 425 F.3d 663, 668-71 (9th Cir. 2005). Other courts invalidated the adjustment regulations under "Step Two" of *Chevron*. Those courts found some ambiguity in the statute, but found a per se discretionary bar not based on a permissible construction of the eligibility standards set forth in the governing statute in light of the statutory scheme and congressional intent. *Zheng v. Gonzales*, 422 F.3d 98, 116-20 (3d Cir. 2005) (invalidating regulation precluding category of people from applying to adjust status "[g]iven Congress's intent as expressed in the language, structure, and legislative history of INA section 245 [8 U.S.C. § 1255]"); *Scherer v. United States Attorney General*, 445 F.3d 1311, 1321-22 (11th Cir. 2006). This reasoning would likewise be applicable to the proposed rule. Where Congress went through the trouble to create a comprehensive statutory scheme to define asylum eligibility, the agency cannot preempt that in the guise of discretion by creating out of whole cloth a separate set of eligibility criteria.

AR.10925

The same logic applies here. In the asylum statute, Congress explicitly made the commission of a particularly serious crime a bar to asylum. The canon of interpretation known as *expressio unius est exclusio alterius* instructs that,"expressing one item of [an] associated group or series excludes another left unmentioned."[122] The Proposed Rules attempt to create numerous categories of discretionary "pseudo-particularly serious crimes," barring asylum through a categorical exercise of discretion even if those offenses are ultimately found not to be particularly serious crimes. Such an effort violates this canon of interpretation and places the Proposed Rules ultra vires to the statute.

## IX.    Conclusion

The Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

---

[122] *United States* v. *Vonn*, 535 U.S. 55, 65 (2002).

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 16, 2020
**Status:** Posted
**Posted:** January 23, 2020
**Tracking No.** 1k4-9eh6-omzb
**Comments Due:** January 21, 2020
**Submission Type:** API

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0564
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Lindsay Harris
**Address:**
   4340 Connecticut Ave
   Washington,  DC,  20008
**Email:** LINDSAY.HARRIS@UDC.EDU
**Phone:** 6502243643
**Organization:** University of the District of Columbia Immigration & Human Rights Clinic

---

## General Comment

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum & Bars to Asylum Eligibility

January 16, 2020

To Whom it May Concern:

I am writing on behalf of the University of the District of Columbias Immigration and Human Rights Clinic in
response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to

AR.10927

amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

The UDC Immigration Clinic represents asylum seekers in affirmative cases before the USCIS asylum office and defensive cases before the immigration court.

For the reasons detailed in the comments attached, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me to provide further information.

Sincerely,

Lindsay M. Harris
Associate Professor
Co-Director, Immigration & Human Rights Clinic

---

# Attachments

Comment on Proposed Regulations 1.16.20

Withholding Protection 2019



UNIVERSITY OF THE
DISTRICT OF COLUMBIA
DAVID A. CLARKE SCHOOL OF LAW

Office of Lindsay M. Harris

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41; Comments in Opposition to Proposed Rulemaking: Procedures for Asylum & Bars to Asylum Eligibility

January 16, 2020

To Whom it May Concern:

I am writing on behalf of the University of the District of Columbia's Immigration and Human Rights Clinic in response to the above-referenced Proposed Rules to express our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

The UDC Immigration Clinic represents asylum seekers in affirmative cases before the USCIS asylum office and defensive cases before the immigration court.

For the reasons detailed in the comments that follow, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) should immediately withdraw their current proposal, and instead dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact me at lindsay.harris@udc.edu or (202) 274-7326 to provide further information.

Sincerely,

Lindsay M. Harris
Associate Professor
Co-Director, Immigration & Human Rights Clinic

4340 Connecticut Avenue, NW | Office 422 | Washington, DC 20008 | 202.274.7326 | Lindsay.harris@udc.edu
*Practice Law. Promote Justice. Change Lives.*

ER-2894

AR.10929

**DETAILED COMMENTS in opposition to the Proposed Rules re Procedures for Asylum and Bars to Asylum Eligibility, 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41**

**TABLE OF CONTENTS [with jump-links]**

**I. Introduction**

On December 19th, the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a joint set of Proposed Rules that would make three primary changes to the rules governing asylum adjudications.

The first proposed set of changes adds the following seven *categorical* bars to asylum eligibility: (1) any conviction of a felony offense; (2) any conviction for "smuggling or harboring" under 8 U.S.C. § 1324(a), even if the asylum seeker committed the offense for the purpose of bringing her own spouse, child or parent to safety; (3) any conviction for illegal reentry under 8 U.S.C. § 1326; (4) any conviction for an offense "involving criminal street gangs," with the adjudicator empowered to look to any evidence to determine applicability; (5) any second conviction for an offense involving driving while intoxicated or impaired; (6) any conviction *or accusation of conduct* for acts of battery involving a domestic relationship; (7) and any conviction for several newly defined categories of misdemeanor offenses, including *any* drug-related offense except for a first-time marijuana possession offense, any offense involving a fraudulent document, and fraud in public benefits.

The second section of the Proposed Rules provides a multi-factor test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

Taken together, these proposed changes constitute an unnecessary, harsh, and unlawful gutting of the asylum protections enshrined in United States and international law. The UDC Law Immigration Clinic submits these comments to express opposition to the entirety of the Proposed Rules and grave concerns with the administration's continued efforts to exclude refugees from obtaining the security and stability the United States asylum system has long promised. We urge that the Proposed Rules be rescinded in their entirety. We are especially concerned about the rules that would create a bar to asylum for those convicted of illegal reentry and to those arrested on domestic violence charges.

**II. The Proposed Rules unnecessarily and cruelly exclude bona fide refugees from asylum eligibility**

*The barriers to asylum for those previously involved in the criminal legal system are already sweeping in scope; adding more barriers is cruel and unnecessary.*

The United States asylum system was first codified in statute through the Refugee Act of 1980, described by one prominent scholar as a bipartisan attempt to "reconcile our rhetoric with our law, our national immigration policy and our international treaty obligations so that we could maintain a consistent posture towards the world as a nation with a strong humanitarian tradition and a unique

2

AR.10930

historic role as a haven for persons fleeing oppression." The Act—among other measures designed to bring the United States domestic legal code into compliance with the provisions of the United Nations Protocol Relating to the Status of Refugees—created a "broad class" of refugees eligible for a discretionary grant of asylum.

The asylum protections provided by United States law are sacred. Asylum provides those fleeing horrors with physical safety, a path to citizenship and security, and the opportunity to reunite with immediate family members who may still remain abroad in danger. Many see the domestic asylum system as a symbol of the United States' commitment never to repeat its failure to save the 936 Jewish refugees refused entry to the United States on the *St. Louis* and others fleeing the Holocaust. Others point to the critical role that domestic asylum policy plays in serving the United States' foreign policy interests abroad. For those individuals seeking asylum in the United States, the stakes could not be higher—a claim denied often means return to death or brutal persecution.

The laws, regulations, and process governing asylum adjudications are already exceedingly harsh. Asylum seekers bear the evidentiary burden of establishing their eligibility for asylum in the face of a complex web of laws and regulations, without the benefit of appointed counsel and often from a remote immigration jail. The obstacles to winning asylum are exceedingly high; indeed in some parts of the country and before certain immigration judges, almost no one succeeds. Today, newly imposed barriers to accessing asylum in the United States are breathtaking in scope, with those seeking safety at the southern border subject to return to dangerous conditions in Mexico and an overlapping web of policies that preclude asylum eligibility for countless migrants simply because of their national origin, manner of entry, or their flight path. There are consistent reports of the documented deaths and brutalities endured by those who sought but were denied asylum protections in the United States.

Specifically, the bars to asylum based on allegations of criminal conduct are *already* sweeping and over-broad in nature and scope. Any conviction for an offense determined to be an "aggravated felony" is considered a *per se* "particularly serious crime" and therefore a mandatory bar to asylum. "Aggravated felony" is a notoriously vague term, which exists only in immigration law. Originally limited to murder, weapons trafficking and drug trafficking, it has metastasized to encompass hundreds of offenses, many of them neither a felony nor aggravated, including petty offenses such as misdemeanor shoplifting, simple misdemeanor battery, or sale of counterfeit DVDs. The existing crime bars should be narrowed, not expanded. Even for those not categorically barred from relief, the immigration adjudicator maintains full discretion to deny asylum.

Immigration adjudicators already have vast discretion to deny asylum to those who meet the refugee definition but have been convicted of criminal conduct. Further categorical bars are not needed. The agencies' efforts to add *seven* new sweeping categories of barred conduct to the asylum eligibility criteria is unnecessary and cruel. The Proposed Rules drain the phrase "*particularly serious* crime," 8 U.S.C. § 1158, of any sensible meaning.

The Proposed Rules are also arbitrary and capricious. They would constitute a marked departure from past practice. And the agencies have proffered no evidence or data to support these changes.

One assumption fundamentally underlying the Proposed Rules, for example, is that every noncitizen convicted of any offense punishable by more than a year in prison necessarily constitutes a

3

AR.10931

danger to the community. But no evidence is provided to support that assumption, and a criminal record, does not, in fact, reliably predict future dangerousness. The Proposed Rules are so capricious as to peremptorily postulate a noncitizen's supposed danger to the community even in circumstances when a federal, state, or local judge has concluded that no danger exists by, for example, imposing a noncustodial sentence. Conviction for a crime does not, without more, make one a present or future danger—which is why the Refugee Convention's particularly serious crime bar, made part of United States law through 8 U.S.C. § 1158, should only properly apply if both (1) a migrant is convicted of a particularly serious crime and (2) a separate assessment shows that she is a present or future danger.

Similarly, the Proposed Rules fail to address or account for the fact that a significant number of people may agree to plead to a crime as to avoid the threat of a severe sentence; not only is a conviction an unreliable predictor of future danger, it can also be an unreliable indicator of past criminal conduct. In addition, the Proposed Rules do not address and make no exception for convictions for conduct influenced by mental illness or duress.

The Board of Immigration Appeals has cautioned that, "in light of the unusually harsh consequences which may befall a [noncitizen] who has established a well-founded fear of persecution; the danger of persecution should generally outweigh all but the most egregious of adverse factors." Yet because of the categorical nature of the seven news bars proposed here, asylum seekers will be precluded from obtaining protection on the basis of a vast array of conduct, without any discretion left to the immigration adjudicator to determine whether the circumstances merit such a harsh penalty. Indeed, in the case of the domestic-violence related ground, the categorical bar will be imposed on the basis of *mere allegations* of conduct without any adjudication of guilt.

Those unjustly precluded from even seeking a discretionary grant of asylum by the Proposed Rules will include, for example: individuals struggling with addiction with one drug-related conviction, regardless of the circumstances of the offense; asylum seekers with two convictions for driving under the influence, regardless of whether the applicant has sought treatment for alcohol addiction or the circumstances of the convictions; community members seeking asylum defensively who have been convicted of a document fraud offense related to their immigration status; and asylum-seeking mothers convicted for bringing their own child across the southern border in an effort to find safety.

*The Proposed Rules cruelly disregard the connections between trauma and involvement in the criminal legal system.*

The harsh nature of the Proposed Rules is especially evident when viewed through a trauma-informed lens. Asylum seekers are an inherently vulnerable population because of the trauma they have experienced in their countries of origin and, often, along the journey to find safety. Existing literature suggests that at least one out of every three asylum seekers struggles with depression, anxiety, and/or post-traumatic stress disorder (PTSD). One recent study found the mental health problems facing refugees and asylum seekers so acute that more than a third of the study's sample admitted having suicidal thoughts in the preceding two weeks.

Studies also consistently reveal a high prevalence of comorbidity of PTSD and substance use disorders, with individuals with PTSD *up to 14 times more likely* to struggle with a substance use disorder. Asylum seekers in the United States are often unable to access affordable medical care and

4

AR.10932

treatments for complex trauma; some turn to drugs and alcohol in an effort to self-medicate. The proposed new bars to asylum include *any* drug-related conviction (with one exception for a first minor marijuana possessory offense) and any second conviction for driving under the influence. This approach is not only cruel but also ignores the evidence. *Particularly* given the vulnerabilities of asylum seeking populations, prior struggles with addiction should be addressed with treatment and compassion, not a closed door and deportation order.

Immigration adjudicators already maintain the authority to deny asylum to individuals with drug-related criminal histories on the basis of discretion; denying asylum seekers even the opportunity to present the countervailing factors of their past trauma and potential recovery is simply cruel.

### III.  The Proposed Rules violate the letter and spirit of United States international treaty obligations

By acceding to the 1967 Protocol Relating to the Status of Refugees, which binds parties to the United Nations Convention Relating to the Status of Refugees, the United States obligated itself to develop and interpret United States refugee law in a manner that complies with the Protocol's principle of non-refoulement (the commitment not to return refugees to a country where they will face persecution on protected grounds), even where potential refugees have allegedly committed criminal offenses. As noted above, adjudicators already have over-broad authority to deny asylum based on allegations of criminal activity, which vastly exceeds the categories for exclusion and expulsion set out in the Convention. Instead of working towards greater congruence with the terms of the Convention, the Proposed Rules carve out categorical bars from protection that violate both the language and spirit of the treaty.

While the Convention allows states to exclude and/or expel potential refugees from protection, the circumstances in which this can occur are limited. In particular, the Convention allows states to exclude and/or expel individuals from refugee protection if the individual "having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country." However, this clause is intended for "extreme cases," in which the particularly serious crime at issue is a "capital crime or a very grave punishable act." The United Nations High Commissioner for Refugees (UNHCR) has asserted that to constitute a "particularly serious crime," the crime "must belong to the gravest category" and be limited "to refugees who become an extremely serious threat to the country of asylum due to the severity of crimes perpetrated by them in the country of asylum." Moreover, the UNHCR has specifically noted that the particularly serious crime bar does not encompass less extreme crimes; "[c]rimes such as petty theft or the possession for personal use of illicit narcotic substances would not meet the threshold of seriousness." Finally, when determining whether an individual should be barred from protection for having been convicted of a particularly serious crime, the adjudicator must conduct an individualized analysis and consider any mitigating factors.

As noted above, legislation and agency interpretation of the Immigration and Nationality Act have already expanded the particularly serious crime bar far beyond what was contemplated in the Convention by creating categorical particularly serious crimes through the aggravated felony definition. The Proposed Rules would amplify the dissonance between U.S. refugee law and the Convention, as well as the violation of U.S. obligations under the Convention, by creating categorical bars within categorical bars. For example, at p. 69659, the Proposed Rules first exclude from protection anyone who

5

AR.10933

was convicted of a felony and then at p. 69660, define "felony" as "any crime punishable by more than one of imprisonment" without any reference to other factors, including dangerousness. The Proposed Rules described the increased categorization of the particularly serious crime bar as necessary because the case-by-case adjudication previously used for non-aggravated felony offenses was "inefficient," but an individualized analysis is exactly what the Convention requires to ensure only those individuals who have been convicted of crimes that are truly serious and therefore present a future danger are placed at risk of refoulement.

Additionally, outside of the aggravated felony context, it has generally been well understood by the Board of Immigration Appeals and the Courts of Appeals that low-level, "run-of-the-mill" offenses do not constitute particularly serious crimes. Under this long-standing interpretation of the particularly serious crime bar in the INA, there is simply no scenario in which low-level offenses like misdemeanor driving under the influence where no injury is caused to another or simple possession of a controlled substance or paraphernalia would constitute a particularly serious crime.

The reason for this is common sense. As Judge Reinhardt explained in a concurring opinion in *Delgado v. Holder*, a decision the Proposed Rules cite in support of the expanded bars, run-of-the-mill crimes like driving under the influence have "little in common" with other crimes the Board of Immigration Appeals has deemed particularly serious—e.g., felony menacing with a deadly weapon, armed robbery, and burglary of a dwelling in which the offender is armed or causes injury. Judge Reinhardt further noted that public opinion does not treat them similarly either: "American voters would be unlikely to elect a president or vice president who had committed a particularly serious crime, yet they had no difficulty in recently electing to each office a candidate with a DUI record." Barring individuals from asylum based on these relatively minor offenses renders the "particularly serious" part of the "particularly serious crime" bar meaningless.

The expansion of the asylum bar to include individuals who have been convicted of reentering the United States without inspection pursuant to INA § 276 is also unlike any of the other bars previously established or as interpreted by the Board of Immigration Appeals or Circuit Courts of Appeals. It is an offense with no element of danger or violence to others, and has no victim. Most significantly, and more so than other bars contained in the Proposed Rules, barring asylum based on the manner of entry directly violates the Convention's prohibition on imposing penalties based on a refugee's manner of entry or presence. This prohibition is a critical part of the Convention because it recognizes that refugees often have little control over the place and manner in which they enter the country where they are seeking refuge.

This expanded asylum bar is particularly concerning to our Clinic. We have represented clients who have entered without inspection due to various factors beyond their control, including being unlawfully rejected by CBP officers. As an example, one client we represented in the last few years, for example, attempted to enter the United States in October 2014 after she fled violence in her home country. Although she stated explicitly that she was afraid for her life, CBP officers did not refer her for a credible fear interview, issued an expedited removal order, and deported her. She again sought protection a month later and was again unlawfully returned to her home country. The third and final time she sought protection she was finally given a reasonable fear interview and was referred to court and ultimately granted protection. Our Clinic Co-Director, Lindsay M. Harris, has written an article, attached, entitled *Withholding Protection* that discusses, at length, the ways in which current CBP

6

AR.10934

processing fails to adhere to existing law and genuine asylum seekers are often forced to attempt entry without inspection and may accrue a conviction for "illegal reentry."

## IV. Those precluded from asylum eligibility will be gravely impacted even if granted withholding of removal or protection under the Convention Against Torture

Throughout the Proposed Rules, the agencies defend the harsh and broad nature of their proposal by pointing to the continued availability of alternative forms of relief for those precluded from asylum eligibility under the new rules. The availability of these alternatives forms of relief, however—known as withholding of removal and protection under the Convention Against Torture (CAT)—does not nullify the harm created by the Proposed Rule's new limits on asylum. The protections afforded by CAT and by statutory withholding of removal are limited in scope and duration, and they are harder to obtain. As a result, a Rule that limits *bona fide* refugees to withholding of removal and CAT protection would impose a very real harm on individuals who have come to the United States in search of protection.

First, the most serious harm that can befall an individual as a result of these Proposed Rules is removal to persecution and torture, and the existence of withholding of removal does not account for that risk. CAT and withholding protections demand a higher level of proof than asylum claims: a clear probability of persecution or torture. Thus, an individual could have a valid asylum claim but be unable to meet the standard under the other forms of relief and therefore would be removed to their country of origin, where they would face persecution or even death.

Even for those who meet the higher standard, withholding and CAT recipients are still subject to significant prejudice. For example, they have no ability to travel internationally. The United Nations Convention Relating to the Status of Refugees affords refugees the right to travel in mandatory terms. Article 28 states, "Contracting States shall issue to refugees lawfully staying in their territory travel documents for the purpose of travel outside their territory." Withholding and CAT recipients do not have access to a travel document as contemplated by Article 28. By regulation, refugee travel documents are available only to asylees. And the Board of Immigration Appeals requires that an individual granted withholding and CAT—unlike an individual granted asylum—must simultaneously be ordered removed, making any international travel a "self-deportation." Refugees granted only withholding of removal or CAT protection are thus effectively trapped within the United States in long-term limbo.

Withholding and CAT recipients also face permanent separation from their spouses and children. Because international travel is prohibited, these individuals cannot reconnect with their families in a third country. And they also cannot reunite with family in the United States because only asylees and refugees are eligible to petition for a spouse and children to join them as derivatives on that status. For many, this will mean that the Proposed Rules institute yet another formal policy of family separation. For example, a mother with two young children who flees to the United States and is subject to one of the expanded asylum bars will not be able to ensure that her children will be able to obtain protection in the United States with her if she is granted relief. Rather, if her children are still in her home country, they would need to come to the United States and seek asylum on their own, likely as unaccompanied children. If her children fled to the United States with her, then they will need to establish their own eligibility for protection before an immigration judge, no matter their age.

7

AR.10935

Recently, this exact scenario played out with a mother who was subject to the so-called Migrant Protection Protocols (also known as Remain in Mexico) and the asylum "transit ban," which made the mother ineligible for asylum and thus required the children to establish their independent eligibility for withholding and CAT protection. An immigration judge granted the mother withholding of removal but denied protection to her young children, leaving the children with removal orders and immense uncertainty about their future. Under the expanded bars in the Proposed Rules, these situations will certainly increase, separating families and forcing parents to return to countries where it has been established they more likely than not will face persecution and torture, rather than leaving their children on their own.

Withholding recipients likewise face hurdles in access to employment. Article 17 of the Refugee Convention states that a contracting state "shall accord to refugees lawfully staying in their territory the most favorable treatment accorded to nationals of a foreign country in the same circumstances, as regards the right to wage-earning employment." Recipients of withholding enjoy no such right. They must apply for work authorization, and they face frequent delays in the adjudication of these applications, which often result in the loss of legal authorization to work.

And perhaps most fundamentally, there is continuing jeopardy for withholding and CAT recipients that does not exist for asylum recipients. When a noncitizen is granted asylum, the person receives a legal status. Asylum, once granted, protects an asylee against removal unless and until that status is revoked. None of these protections exists for withholding and CAT recipients. They have no access to permanent residency or citizenship. Instead, they are subject to a removal order and vulnerable to the permanent prospect of deportation to a third country and subject to potential check ins with immigration officials where they can be made to pursue removal to third countries to which they have no connection.

Finally, UDC Law's Immigration Clinic writes to highlight a different form of prejudice that will flow from the rule: one relating to judicial efficiency. Neither withholding of removal nor CAT protection allow family members who are in the United States together and pursuing protection on the same basis to apply as derivatives on a principal application. As a result, family claims for those rendered ineligible for asylum by the new rules will have to be adjudicated separately, and potentially before different adjudicators even when the claims are interrelated and even when minor children may not be in a position to explain the claim at all or as sufficiently as a parent. In addition to being unjust to the affected family members, this approach would result in gross inefficiencies, which should be avoided in a system that already contains a significant backlog of pending cases.

V.     **The Proposed Rules will result in "mini-trials" in immigration court, undermine judicial efficiency and result in racially-biased decision-making**

In two significant ways, the Proposed Rules require immigration adjudicators to engage in decision-making to determine whether an asylum applicant's conduct—considered independently of any criminal court adjudication—triggers a categorical bar to asylum eligibility. First, the agencies propose that immigration adjudicators be allowed to consider "all reliable evidence" to determine whether there is "reason to believe" an offense was "committed for or related to criminal gang evidence," or "in furtherance of gang-related activity, triggering ineligibility for asylum in either case. Second, the Proposed Rules permit immigration adjudicators to "assess all reliable evidence in order to determine

8

AR.10936

whether [a] conviction amounts to a domestic violence offense;" and to go even further by considering whether non-adjudicated *conduct* "amounts to a covered act of battery or extreme cruelty."

Requiring adjudicators to make complex determinations regarding the nature and scope of a particular conviction or, in the case of the domestic violence bar, *conduct*, will lead to massive judicial inefficiencies and slanted "mini-trials" within the asylum adjudication process. The scope of the "reliable evidence" available to adjudicators in asylum cases is potentially limitless; advocates on both sides would be obligated to present fulsome arguments to make their cases about gang connections to the underlying activity or the relationship of the asylum applicant to the alleged victim. Because of the lack of robust evidentiary rules in immigration proceedings, it will be difficult if not impossible for many applicants to rebut negative evidence marshaled against them, even if false; and in other cases, asylum applicants will struggle to find evidence connected to events that may have happened years prior (especially for those detained). Asylum trials, which are typically three or fewer hours under current policies, would provide insufficient time to fully present arguments on both sides of these unwieldy issues.

As the immigration courts contend with backlogs that now exceed one million cases, tasking adjudicators with a highly nuanced, resource-intensive assessment of the connection of a conviction to gang activity and/or the domestic nature of alleged criminal conduct—assessments far outside their areas of expertise—will prolong asylum proceedings and invariably lead to erroneous determinations that will give rise to an increase in appeals. The Proposed Rules repeatedly cite increased efficiency as justification for many of the proposed changes. Yet requiring adjudicators to engage in mini-trials to determine the applicability of categorical criminal bars, rather than relying on adjudications obtained through the criminal legal system, will dramatically *decrease* efficiency in the asylum adjudication process.

Indeed, the Supreme Court has "long deemed undesirable" exactly the type of "post hoc investigation into the facts of predicate offenses" proposed by the agencies here. Instead, for more than a century the federal courts have repeatedly embraced the "categorical approach" to determine the immigration consequence(s) of a criminal offense, wherein the immigration adjudicator relies on the statute of conviction as adjudicated by the criminal court system, without relitigating the nature or circumstances of the offense in immigration court. As the Supreme Court has explained, this approach "promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact." In *Moncrieffe v. Holder*, the Court forewarned of exactly the sort of harm that would arise from these Proposed Rules; in that case, the Court rejected the government's proposal that immigration adjudicators determine the nature and amount of remuneration involved in a marijuana-related conviction, noting that "our Nation's overburdened immigration courts" would end up weighing evidence "from, for example, the friend of a noncitizen" or the "local police officer who recalls to the contrary," with the end result a disparity of outcomes depending on the whims of the individual immigration judge and a further burdened court system.

Particularly in the context of the new proposed bar related to alleged gang affiliation, the UDC Immigration Clinic is concerned that creating a blanket exclusion for anyone who is convicted of a crime – including a misdemeanor – that an immigration adjudicator deems linked to gang activity will erroneously prevent bona fide asylum seekers from receiving protection. This rule confers on immigration adjudicators—who generally are not criminologists, sociologists, or criminal law experts—

9

the responsibility to determine if there is "reason to believe" any conviction flows from activity taken in furtherance of gang activity. This rule will necessarily ensnare asylum seekers of color who have experienced racial profiling and a criminal legal system fraught with structural challenges and incentives to plead guilty to some crimes, particularly misdemeanors. These same individuals are vulnerable to being erroneously entered into gang databases. Such databases are notoriously inaccurate, outdated, and infected by racial bias.

Indeed, asylum applicants are *already* frequently subjected to wrongful denials of protection because of allegations of gang activity made by the Department of Homeland Security on the basis of information found in notoriously unreliable foreign databases and "fusion" intelligence-gathering centers outside the United States. Empowering immigration adjudicators to render asylum applicants *categorically* excluded from protection on the basis of such spurious allegations will inevitably result in the return of many refugees back to harm.

The Departments curiously argue that all gang-related offenses should be construed as "particularly serious crimes." They cite statistics from up to 16 years ago in an attempt to make the point that gang members commit violent crimes and drug crimes. They then make the illogical leap to the conclusion that *all crimes*—including misdemeanor property crimes—that may be construed as connected to gang activity are particularly serious. This simply does not follow; in fact, the Proposed Rules will inevitably result in the exclusion from protection of asylum seekers of color who live in economically distressed communities and have obtained a minor conviction such as a property crime. Relying on the definition of "particularly serious crime" to prevent asylum seekers convicted of even minor crimes construed as gang-related from accessing asylum protection is disingenuous at best, and tinged with racial animus at worst.

The Departments asks for comments on: (1) what should be considered a sufficient link between an asylum seeker's underlying conviction and the gang related activity in order to trigger the application of the proposed bar, and (2) any other regulatory approaches to defining the type of gang-related activities that should render individuals ineligible for asylum. The premise of these questions is wrong: a vague "gang related" bar should not be introduced at all. The Immigration and Nationality Act and existing regulations already provide overly broad bars to asylum where criminal behavior by an asylum seeker causes concern by an adjudicator. Adding this additional, superfluous layer of complication risks erroneously excluding bona fide asylum seekers from protection without adding any useful adjudicatory tool to the process.

## VII.  The Proposed Rules will disparately impact vulnerable populations already routinely criminalized, including LGBTQ immigrants, survivors of trafficking and domestic violence, and immigrant youth of color

The expanded criminal bars exclude from safety and a pathway to citizenship those convicted of offenses that are coincident to their flight from persecution, and do not accomplish the stated goal of making communities safer. They will disparately impact vulnerable populations, who comprise asylum seekers hailing primarily from Central America and the Global South, and those routinely criminalized because of their identities, racially disparate policing practices, or in connection with experiences of trafficking and domestic violence. For these populations especially, the discretion currently delegated to asylum adjudicators is crucial for them to become fully integrated in the larger community. The

10

imposition of additional categorical bars to asylum will only further marginalize asylum seekers already struggling with trauma and discrimination.

The Proposed Rules turn asylum into a blunt instrument that would prevent the use of discretion where it is most needed and most effective. The existing framework for determining if an offense falls within the particularly serious crime bar already provides the latitude for asylum adjudicators to deny relief to anyone found to pose a danger to the community. Furthermore, asylees with convictions that render them inadmissible must apply for a waiver at the time of their applications for permanent residence. These measures ensure that asylum applicants in vulnerable populations have access to supportive resources and have the opportunity to demonstrate their ongoing commitment to social and personal health. Moreover, the existence of provisions allowing the revocation of asylum status ensures that adjudicators may continue to enforce concerns related to the safety of the community even after asylum is granted.

*Barring asylum for immigrants convicted of migration-related offenses punishes them for fleeing persecution and/or seeking safety for their children, and does not make communities safer.*

The expansion of the criminal bars to asylum to include offenses related to harboring, smuggling of noncitizens by parents and family members and those previously removed further criminalizes vulnerable populations fleeing persecution. The vast expansion of migrant prosecutions at the border during the current administration has created administrative chaos and separated families that do not pose a threat to the safety of communities in the United States. The Proposed Rules threaten to magnify the harm caused by these reckless policies by further compromising the ability of those seeking safety on the southern border to access the asylum system.

The Proposed Rules expand the asylum bar to parents or other caregivers who are convicted of smuggling or harboring offenses after taking steps to help minor children enter the United States in order to flee persecution. This proposed bar is particularly insidious in light of now-public documents revealing this administration's explicit efforts to utilize smuggling prosecutions against parents and caregivers as part of its strategy of deterring families from seeking asylum in the United States. The Proposed Rules seek to take this widely condemned strategy one step further, by additionally barring those parents *already prosecuted* from obtaining asylum protections for themselves and their children. The Proposed Rules multiply the harms parents and caregivers have experienced in their treacherous journeys to safety and callously penalize parents for doing what is only human—taking all necessary steps to protect their children.

The Proposed Rules also expand the asylum bar to those who have fled persecution multiple times and therefore been convicted of illegal reentry. Their inclusion is premised on conclusory statements regarding the dangerousness of recidivist offenders, without consideration of the seriousness of prior convictions. Rather, the Proposed Rules treat all immigration violations as similar in seriousness to those previously warranting inclusion in the particularly serious crime bar, without any independent evidence to justify the expansion. Such an approach renders meaningless the limiting language of "particularly serious" in the statute.

The Proposed Rules also conflate multiple entries by noncitizens having prior removal orders with those who have entered multiple times without ever having their asylum claims heard. Many

11

immigrants who have previously attempted entry to the United States to flee persecution could not have been aware of the complex statutory regime that governs asylum claims and would not have knowingly abandoned their right to apply for asylum. Some asylum seekers have also been wrongly assessed in prior credible fear interviews. And others yet may have previously entered or attempted to enter the United States before the onset of circumstances giving rise to their fear. Preserving discretion to grant asylum in these circumstances allows meritorious asylum seekers to be heard and corrects errors that might have previously occurred.

*Extending the criminal bars to immigrants convicted of misdemeanor document fraud unfairly punishes low-wage immigrant workers and does not make communities safer.*

The Proposed Rules expand the asylum bar to include any asylum seeker who has been convicted of a misdemeanor offense for use of a fraudulent document. In so doing, the Rule entirely ignores the migration-related circumstances that often give rise to convictions involving document fraud. Migrants fleeing persecution often leave their home countries with nothing but the clothes on their backs and must rely on informal networks to navigate their new circumstances. Extension of a blanket bar to asylum seekers who are compelled to resort to fraudulent means to enter the United States, or to remain safely during their applications for asylum, upends decades of settled law directing that violations of law arising from an asylum applicant's manner of flight should constitute only one of many factors to be consulted in the exercise of discretion.

Moreover, migrants in vulnerable communities who are struggling to survive during the pendency of their asylum proceedings are often exploited by unscrupulous intermediaries who offer assurances and documentation that turn out to be fraudulent. Many noncitizens working in the low-wage economy face egregious workplace dangers and discrimination and suffer retaliation for asserting their rights. The continued availability of asylum to low-wage immigrant workers can encourage them to step out of the shadows. The expansion of criminal asylum bars to sweep in all document fraud offenses, on the other hand, would unfairly prejudice immigrants with meritorious asylum claims and force them deeper into the dangerous informal economy.

*The Proposed Rules will harm communities with overlapping vulnerabilities, including LGBTQ asylum seekers, survivors of trafficking, and survivors of domestic violence.*

The Proposed Rules exclude from asylum protections countless members of vulnerable communities who have experienced trauma, abuse, coercion, and trafficking. Many of these individuals may only become aware of their ability to apply for asylum after law enforcement encounters that lead them to service providers who can educate them about their immigration options. Despite the unique difficulties they face, the Proposed Rules would compound their harm and prevent them from achieving family unification and a pathway to citizenship.

The Proposed Rules pose a unique threat to LGBTQ immigrant community members. LGBTQ immigrants in particular may have already experienced a high degree of violence and disenfranchisement from economic and political life in their home countries. Hate violence towards undocumented LGBTQ immigrants in the United States is already disproportionately higher than for other members of the LGBTQ population. Members of these communities also experience isolation from their kinship and national networks following their migration. This isolation, compounded by the

12

continuing discrimination towards the LGBTQ population at large, leave many in the LGBTQ immigrant community vulnerable to trafficking, domestic violence, and substance abuse, in addition to discriminatory policing practices. The expansion of criminal enforcement and prosecution of undocumented people also harms the LGBTQ immigrant community. The Proposed Rules will therefore have a disparate impact on LGBTQ individuals whose involvement in the criminal legal system is often connected to past trauma and/or the result of biased policing.

The expansion of asylum bars to include various misdemeanor offenses that were not previously considered particularly serious also unfairly sweeps trafficking survivors into its dragnet. It is becoming more widely recognized across state court systems that trafficking survivors frequently come into contact with intervention resources and service providers only after contact with law enforcement occurs. Innovative criminal justice reform efforts currently being adopted across the country include special trafficking courts that recognize the need for discretion in the determination of criminal culpability. The same approach should be employed in the determination of asylum eligibility, where the applicant's life and safety are on the line.

The Proposed Rules instead preclude asylum adjudicators from conducting a trauma-centered approach, categorically barring countless trafficking survivors convicted of misdemeanor and felony offenses without any opportunity to present the specific circumstances of their claim.

Survivors of domestic violence include trafficking survivors and LGBTQ community members, such that inclusion of offenses related to domestic violence in the expanded asylum bars affects populations with overlapping vulnerabilities. The Proposed Rules too broadly categorize domestic violence offenses as particularly serious and sweep both offenders and survivors into their dragnet. The immigration laws extend protections to domestic violence survivors outside of the asylum context, recognizing the complex dynamics surrounding intimate partner violence. Provisions in the Violence Against Women Act allow adjudicators evaluating claims for relief arising thereunder to exercise discretion based on a number of factors and circumstances. The blunt approach adopted by the Proposed Rules is inconsistent with the approach taken towards survivors elsewhere in the federal immigration statute and does not rely on any evidence-based justification for treating asylum seekers differently.

Moreover, the domestic violence sections of the Proposed Rules include the only categorical bar to asylum for which a conviction is not required. Domestic violence incidents all too often involve the arrest of both the primary perpetrator of abuse and the survivor. These "cross-arrests" do not always yield clear determinations of victim and perpetrator. Authorizing asylum adjudicators to determine the primary perpetrator of domestic assault, in the absence of a judicial determination, unfairly prejudices survivors who are wrongly arrested in the course of police intervention to domestic disturbances.

Finally, the exemption for asylum applicants who can demonstrate their eligibility for a waiver under section 237(a)(7)(A) of the Immigration and Nationality Act does not cure the harm to asylum seekers caused by imposition of a categorical domestic violence related bar. Rather, it converts a non-adversarial asylum proceeding into a multi-factor, highly specific inquiry into culpability based on circumstances that may be very difficult for an asylum seeker to prove—especially if proceeding without counsel and with limited English proficiency.

13

Over the years we have represented individuals where an abuser has manipulated the criminal justice system to secure an arrest for domestic violence of the actual victim of domestic violence. Domestic violence is all about power and control and this just gives abusers another tool to use to effectuate power over their victims.

## IX.    Conclusion

For the above mentioned reasons, we are deeply concerned about this set of proposed rule and urge that they not be adopted.

14

AR.10942

# WITHHOLDING PROTECTION

Lindsay M. Harris[*]

### ABSTRACT

*In June 2018, President Trump wrote a pair of tweets en route to his golf course, calling for "no Judges or Court Cases" at our border and swift deportation of immigrants, essentially without due process. While immigrant advocates were quick to explain the myriad constitutional problems with this proposal, elements of Trump's dream are already a reality. This Article reveals how a single Customs and Border Protection officer can short-circuit the checks and balances prescribed by U.S. and international law to protect refugees from being returned to harm, and cast a long shadow over a future, meritorious asylum claim.*

*In light of the growing attention to the plight of those fleeing persecution and seeking asylum at our borders, this Article examines shortcomings in both law and practice, illuminating the long-lasting ramifications of erroneously issued expedited removal orders for asylum seekers and their families. Congress designed the expedited removal system to expedite deportations and circumvent due process before an immigration judge. Certain humanitarian protections are built into the system to ensure that the United States meets its international and domestic legal obligations not to return refugees to a place where they*

---

\* Assistant professor of law & Co-Director of the Immigration and Human Rights Clinic at the University of the District of Columbia – David A. Clarke School of Law. LL.M, Georgetown University Law Center, J.D. University of California Berkeley School of Law, B.A. University of California – San Diego. With thanks to Sabi Ardalan, B. Shaw Drake, Attenas Burrola, Kate Evans, Andrew Guthrie Ferguson, Denise Gilman, Laila L. Hlass, Jennifer Lee Koh, Estefania McCarroll, Karen Musalo, Michele Pistone, Trina Realmulto, Shoba Wadhia Sivaprasad, Elissa Steglich, and Sarah Sherman Stokes for their insight at various stages in the editing process. I am grateful to participants of the 2018 NYU Clinical Writers' Workshop and to the participants of the October 2018 mid-Atlantic Clinicians workshop. The editing staff members of the *Columbia Human Rights Law Review*, Nicholas Narbutas in particular, have been fantastic. All errors and omissions are my own. Sincere thanks to my ever-supportive institution, UDC Law, for funding to support this article.

AR.10943

*would face persecution or torture. In practice, these humanitarian protections are too often improperly implemented and front-line border enforcement officials, whether manifesting bias against asylum seekers or lacking proper training and expertise, routinely ignore U.S. law and the Department of Homeland Security's own regulations. This results in the wrongful deportation of asylum seekers and, as revealed in the Article, in permanent negative ramifications for those lucky enough to make it back over the border to in an attempt to re-apply for asylum.*

*The Article examines the disastrous interplay between two of the "speed deportation" processes of expedited removal and reinstatement of removal, the lack of sufficient safeguards that leave refugee screening at our borders in the shadows, and the absence of judicial review. The Article seeks not only to expose and analyze this problem, but also to improve the situation by considering a suite of pragmatic, actionable solutions to close the gap between the humanitarian protections prescribed by law and the reality faced by asylum seekers at the U.S. border. As an immediate first step to implement the humanitarian protections enshrined in law, the Article explores the merits and risks of using readily available technology: the use of Body-Worn Cameras by Customs and Border Protection officers conducting screenings of potential refugees at the border to fill the protection gap.*

AR.10944

TABLE OF CONTENTS

Introduction ............................................................................ 5

I. Expedited Removal in Theory vs. Expedited Removal in
Practice ................................................................................ 19
    A. The Legal Framework for Expedited Removal and
    Mandatory Protections for Asylum Seekers ................. 20
        1. First-Time Asylum Seekers at the Border:
        Expedited Removal and the Credible Fear Interview
        ............................................................................ 22
        2. Asylum Seekers Entering a Second or Subsequent
        Time, Reinstatement of Removal, and the Reasonable
        Fear Interview .......................................................... 28
    B. How the Expedited Removal System Functions in
    Reality: Rampant Abuse of Expedited Removal at the
    Border ........................................................................... 32
    C. Grave Consequences of the Interplay Between
    Reinstatement and the Expedited Removal System .... 37

II. Lack of Accountability Mechanisms for Abuse of
Expedited Removal .............................................................. 41
    A. Asking CBP to Reopen and Rescind Underlying
    Expedited Removal Orders ........................................... 42
    B. Asking the Office of Chief Counsel to Exercise
    Prosecutorial Discretion to Issue an NTA and Not to
    Accept CBP's Reinstatement of the Prior Expedited
    Removal Order ............................................................. 43
    C. Appellate Dreams Dashed: Limited Judicial Review
    of Expedited Removal Orders ...................................... 45

III. Solutions to Stop Depriving Asylum Seekers of
Meaningful Protection ......................................................... 50
    A. Congressional Action ................................................ 51
    B. Prosecutorial Discretion in Expedited Removal and
    Reinstatement of Removal ........................................... 53
    C. Increasing Access to Counsel ................................... 55

AR.10945

D. Enhanced Training for CBP Officers .......................58

IV. Lifting Asylum Seeker Screening at the Border out of
the Shadows: Body-Worn Cameras?...........................................61
  A. Advantages of Body-Worn Cameras.........................63
    1. Transparency.......................................................63
    2. Efficiency, Training, and Supervision ..................65
  B. Concerns Regarding the use of Body-Worn Cameras
  ......................................................................................67
    1. Privacy ...............................................................67
    2. Stifling Disclosure and Increasing Fear in Asylum
    Seekers.....................................................................69
    3. Acceptance by Border Officials .............................70
    4. Discretion for Border Officials operating Body-
    Worn Cameras..........................................................71
    5. The Necessary Reliance on Immigration Officials
    Exercising Prosecutorial Discretion, even with Video
    Evidence....................................................................73
    6. Reliability of Video Evidence ................................73
    7. Logistical and Financial Costs of Body-Worn
    Cameras at the Border.............................................74

Conclusion .....................................................................76

AR.10946

INTRODUCTION

In June 2018, President Trump wrote a pair of tweets en route to his golf course, calling for "no Judges or Court Cases" at our border and swift deportation of immigrants, essentially without due process.[1] While immigrant advocates were quick to explain the myriad constitutional problems with this proposal,[2] elements of Trump's dream were already a reality.[3] This Article reveals how a single Customs and Border Protection (CBP) officer can short-circuit the checks and balances prescribed by U.S. and international law to protect refugees from being returned to harm, and cast a long shadow over a future, meritorious asylum claim.[4] The Article proposes a technology-based solution to this problem: the use of Body-Worn Cameras by CBP officers.

The Article examines the expedited removal system, as well as the consequences of an expedited removal order on asylum seekers and their families, and makes clear the need for reform. Congress designed this system to expedite deportations and circumvent due process before

---

1. Philip Rucker & David Weigel, *Trump Advocates Depriving Undocumented Immigrants of Due Process Rights*, WASH. POST (June 25, 2018), https://www.washingtonpost.com/powerpost/trump-advocates-depriving-undocumented-immigrants-of-due-process-rights/2018/06/24/dfa45d36-77bd-11e8-93cc-6d3beccdd7a3_story.html?utm_term=.b948fe35c3ec (on file with the Columbia Human Rights Law Review).

2. Doina Chiacu & Sarah N. Lynch, *Trump Says Illegal Immigrants Should Be Deported with 'No Judges or Court Cases'*, REUTERS (June 24, 2018), https://www.reuters.com/article/us-usa-immigration-trump/trump-says-illegal-immigrants-should-be-deported-with-no-judges-or-court-cases-idUSKBN1JK0OL [https://perma.cc/5BXM-JHBQ].

3. Jennifer Lee Koh & Shoba Sivaprasad Wadhia, *Deport, Not Court? The U.S. Is Already Doing That*, L.A. TIMES (June 30, 2018), http://www.latimes.com/opinion/op-ed/la-oe-koh-wadhia-deportations-20180630-story.html [https://perma.cc/F7MZ-HJY6] (explaining that the majority of removals from the United States are already carried out through speed deportation programs rather than fully litigated court cases).

4. As this article goes to print, the Trump Administration is experimenting with giving CBP officers even more authority and discretion—by allowing them to conduct credible fear interviews. *See* Stephen Dinan, *Border Patrol Officers to Double as Asylum Officers for Credible Fear Cases*, WASH. TIMES (Apr. 1, 2019), https://www.washingtontimes.com/news/2019/apr/1/border-patrol-agents-double-asylum-officers-credib/?utm_campaign=shareaholic&utm_medium=twitter&utm_source=socialnetwork [https://perma.cc/8URA-3V8G] (discussing a pilot program deputizing CBP officers to conduct credible fear interviews). The credible fear interview, currently conducted by United States Citizenship and Immigration Services trained asylum officers, is discussed in Part I.A. 1 of this article, *infra* p. 22–28.

an immigration judge in limited situations. Certain humanitarian protections are built into the system in an attempt to ensure that the United States meets its international and domestic legal obligations not to return refugees to a place where they would face persecution or torture. In reality, humanitarian protections are not properly implemented and front-line border enforcement officials, who often manifest bias against asylum seekers and lack proper training and expertise, routinely ignore U.S. law and the Department of Homeland Security's (DHS) own regulations. This results in both the wrongful deportation of asylum seekers and, as will be explained, permanent negative ramifications for those lucky enough to make it back over the border to seek asylum in the future.

Though the failures of the expedited removal system existed prior to 2017, the Trump Administration has exacerbated the problem through anti-immigrant rhetoric, policies, and actions.[5] An expedited

---

5.    Indeed, under the Trump Administration, turnbacks of asylum seekers at the border have increased. A high-profile and recent example of these problems was the refugee caravan in April and May of 2018, where border officials denied entry to a caravan of asylum seekers, forcing them to wait outside the United States' port of entry. Kirk Semple & Miriam Jordan, *Migrant Caravan of Asylum Seekers Reaches the U.S. Border*, N.Y. TIMES (Apr. 29, 2018), https://www.nytimes.com/2018/04/29/world/americas/mexico-caravan-trump.html?rref=collection%2Fsection collection%2Fworld&action=click&contentCollection=world&region=rank&modul e=package&version=highlights&contentPlacement=2&pgtype=sectionfront (on file with the Columbia Human Rights Law Review). Eventually, perhaps due to the media coverage the caravan received, the asylum-seeking caravan members were allowed into the United States and their quest for protection deferred, rather than denied entirely. In the summer of 2018, with the public's interest in asylum seekers piqued by the Administration's family separation policy, mainstream media started to cover the issue of asylum seekers being turned back at ports of entry in Texas and California. Neena Satija, *The Trump Administration Is Not Keeping Its Promises to Asylum Seekers Who Come to Ports of Entry*, TEX. TRIB. & REVEAL (July 5, 2018), https://www.texastribune.org/2018/07/05/migrants-seeking-asylum-legally-ports-entry-turned-away-separated-fami/ [https://perma.cc/NW94-YQHA]; John Burnett, *After Traveling 2,000 Miles for Asylum, This Family's Journey Halts at a Bridge*, NPR (June 15, 2018), https://www.npr.org/2018/06/15/620310589/after-a-2-000-mile-asylum-journey-family-is-turned-away-before-reaching-u-s-soil [https://perma.cc/ACC9-8HCN]. As of July 2018, the Administration is apparently considering an official policy blocking asylum seekers from claiming protection at ports of entry. Caitlin Dickerson, *Trump Administration Considers Unprecedented Curbs on Asylum for Migrants*, N.Y. TIMES (July 18, 2018), https://www.nytimes.com/2018/07/18/us/immigration-asylum-children.html (on file with the Columbia Human Rights Law Review). As this article goes to print, the Trump Administration introduced the "Remain in Mexico" policy, which requires asylum seekers to await adjudication of their claims in Mexico. This policy has been challenged in federal court because it violates the Immigration and Nationality Act,

AR.10948

removal order is one issued by a low-level border official, usually within a matter of days, without an individual ever going before an immigration judge. For an asylum seeker who is successful in entering the asylum process upon a second or third attempt, a prior expedited removal order—even if issued in violation of government regulations—nonetheless has lasting adverse ramifications. An individual with one or more removal orders, who has actually been removed, and who re-enters the United States without permission[6] is

---

the Administrative Procedure Act, and constitutional protections. *See* Complaint at 3, Innovation Law Lab v. Nielsen, No. 3:19-cv-0080Y7 (N.D. Cal Feb. 14, 2019). For an overview of the dire consequences of this policy, see HUMAN RIGHTS FIRST, BARRED AT THE BORDER, WAIT "LISTS" LEAVE ASYLUM SEEKERS IN PERIL AT TEXAS PORTS OF ENTRY (Apr. 2019), https://www.humanrightsfirst.org/sites/default/files/BARRED_AT_THE_BORDER.pdf [https://perma.cc/Y6XB-RNGX].

6.    Conversely, if an individual has a prior removal order and does *not* enter without permission, instead seeking admission at a port of entry, that individual is *not* subjected to reinstatement of removal or withholding-only proceedings, and is instead referred for a credible fear interview. In the last couple of years, however, increasingly CBP officers are illegally turning away asylum seekers across the Southern Border at both major and minor ports of entry following the November 2016 election of Donald Trump as U.S. President. *See* B. SHAW DRAKE, ELEANOR ACER & OLGA BYRNE, HUMAN RIGHTS FIRST, CROSSING THE LINE: U.S. BORDER AGENTS ILLEGALLY REJECT ASYLUM SEEKERS 3, 5 (2017), http://www.humanrightsfirst.org/sites/default/files/hrf-crossing-the-line-report.pdf [https://perma.cc/FUL9-4CDX] [hereinafter HRF, CROSSING THE LINE]; Letter from Am. Immigration Council et al. to Megan Mack, Officer for Civil Rights & Civil Liberties, U.S. Dep't of Homeland Sec., & John Roth, Inspector Gen., U.S. Dep't of Homeland Sec. 1 (Jan. 23, 2017), https://www.americanimmigrationcouncil.org/sites/default/files/general_litigation/cbp_systemic_denial_of_entry_to_asylum_seekers_advocacy_document.pdf [https://perma.cc/YZQ8-3LE2]; *see also* Michael Garcia Bochenek, *US Turning Away Asylum Seekers at Mexican Border: Central Americans Who Flee for Their Lives Denied Entry by US Border Guards*, HUMAN RIGHTS WATCH (May 3, 2017), https://www.hrw.org/news/2017/05/03/us-turning-away-asylum-seekers-mexican-border [https://perma.cc/Q8KV-9BE3]; Vivian Yee, *'They Treated Us Like Criminals': U.S. Border Crossers Report Severe Reception*, N.Y. TIMES (May 1, 2017), https://www.nytimes.com/2017/05/01/us/customs-airports-trump.html (on file with the Columbia Human Rights Law Review). Indeed, there is a class action lawsuit pending in California on this very issue. Complaint for Declaratory and Injunctive Relief at 1–3, Al Otro Lado, Inc. v. Kelly, No. 2:17-cv-5111 (C.D. Cal. July 12, 2017), https://americanimmigrationcouncil.org/sites/default/files/litigation_documents/challenging_custom_and_border_protections_unlawful_practice_of_turning_away_asylum_seekers_complaint.pdf [https://perma.cc/K6F6-EL42] [hereinafter *Al Otro Lado* Complaint]. Reports in 2018 have also highlighted turnbacks of asylum seekers before they reach the port of entry. One family was turned back nine times before being allowed to proceed with their claim for asylum inside the United States. Robert Moore, *At the U.S. Border, Asylum Seekers Fleeing Violence Are Told to Come Back Later*, WASH. POST (June 13, 2018), https://www.washingtonpost.com/world/national-security/at-the-us-border-asylum-seekers-fleeing-violence

at risk of having those orders "reinstated" at the discretion of a CBP border official, which then precludes that individual from later being granted asylum protection.[7] Instead, she is eligible only for a lesser form of protection called "withholding of removal."[8]

Take Cecilia's case,[9] for example: Cecilia, the mother of two young children, fled to the United States three times to escape persecution at the hands of her children's father, who had repeatedly attacked her since she was thirteen years old. Before seeking protection in the United States, Cecilia had made eight attempts to flee locally in Honduras and even El Salvador, but her persecutor found her each time.

Cecilia first sought protection in the United States in May 2014, when border officials arrested her near McAllen, Texas. While holding Cecilia in immigration custody, border officials asked why she came to the United States. Cecilia told officials she was afraid the father of her children would kill her, but the officials failed to record her fear or ask her the mandatory questions about that fear, in violation of their own regulations.

Under U.S. law, border agents must refer anyone who expresses a fear of persecution to the asylum office for a fear interview.[10] After Cecilia expressed her fear, instead of referring her to the asylum office, the border agent promptly processed her for deportation. Without an officer reading Cecilia's statement back to her

---

-are-told-to-come-back-later/2018/06/12/79a12718-6e4d-11e8-afd5-778aca903bbe_s tory.html?utm_term=.aa145fd06921 (on file with the Columbia Human Rights Law Review). Notably, the right of an individual to seek asylum and not be returned to danger attaches prior to a potential refugee's arrival at the border and the State's duty not to *refoule* prohibits any measure resulting in refugees being "pushed back into the arms of their persecutors." *See* B. Shaw Drake & Elizabeth Gibson, *Vanishing Protection: Access to Asylum at the Border*, 21 CUNY L. REV. 91, 99–100 (2017) [hereinafter Drake & Gibson, *Vanishing Protection*] (citing JAMES C. HATHAWAY, THE RIGHTS OF REFUGEES UNDER INTERNATIONAL LAW 301 (2005)).

7.    *See infra* Section II.C. (discussing the valiant attempts by advocates to fight, in Courts of Appeals, for asylum seekers with prior removal orders subject to reinstatement of removal).

8.    8 C.F.R. § 241.8 (2018).

9.    The client's name has been changed to protect her identity, but her story is used with her permission. Cecilia is a client of the University of the District of Columbia David A. Clarke School of Law Immigration and Human Rights Clinic. All facts are from the client file, which is on file with the author.

10.    Immigration and Nationality Act (INA) § 235(b)(1)(A), 8 U.S.C. § 1225(b)(1)(A) (2012).

AR.10950

or informing her of her rights—both procedures required by regulation[11]—immigration officials deported her to Honduras.

Cecilia was only in Honduras for a few weeks before fleeing for her life again. In June 2014, border officials arrested her in Rio Grande City, Texas. Once again, they violated the law by refusing to ask Cecilia any questions regarding her fear of returning to Honduras, and instead quickly deported her a second time.

Cecilia entered the United States a third time in October 2015, making one last desperate attempt to survive, this time fleeing with her five-year-old daughter. Again, border officials apprehended and detained her. Unlike in her previous two attempts to seek protection, immigration officials listened to Cecilia's fear that she would be killed by the father of her children and properly referred the matter to the Asylum Office. Cecilia underwent a reasonable fear interview, after which the Asylum Office issued a positive fear determination. Cecilia was then released to pursue her claim for protection in immigration court.

Two and a half years later, in April of 2018, an immigration judge heard Cecilia's case in Arlington, Virginia. Cecilia was in "withholding only" proceedings, because her prior removal order had been "reinstated." By contrast, her daughter, whose claim was largely the same as Cecilia's, was in asylum proceedings, having never been previously deported. Before the trial, with the help of her lawyer, Cecilia asked Customs and Border Protection to rescind the two erroneously issued removal orders and received a negative response several months later. Cecilia also asked the government trial attorney to exercise prosecutorial discretion to allow her to pursue a claim for asylum. Without any documented statements of Cecilia's fear during her interactions with CBP at the border in 2014, the trial attorney declined to exercise discretion in this way. Lacking the authority to remedy the situation, the immigration judge granted Cecilia "withholding" protection and her daughter asylum in court on the day of the hearing. The government waived appeal.

Cecilia's eleven-year-old son remained in Honduras, at risk of violent abuse by his father. As a withholding grantee, Cecilia is unable to travel outside the United States. She is also unable to petition for her son to join her in the United States and faced the difficult choice of whether to send her son on the treacherous journey that she knows so well, alone, as an unaccompanied minor. Cecilia is barred from asylum

---

11.    8 C.F.R. § 235.3(b)(2)(i) (2018).

AR.10951

because of the overbroad provisions allowing for reinstatement of removal and because courts have interpreted the law to say that those with reinstated removal orders cannot apply for asylum. Cecilia's case may have worked out very differently, as will be discussed in this Article, if there were an actual record of the two times she expressed her fear to border agents and it was ignored.

Cecilia's case makes clear how problematic implementation of expedited removal, coupled with reinstatement of removal, is for asylum seekers. Both asylum and withholding are forms of protection, along with relief under the Convention Against Torture, for individuals fleeing persecution. There are, however, substantial differences between the three forms of relief and who, in general, is entitled to receive each form of protection.

First, asylum is discretionary and affords the most robust protection for those fleeing persecution.[12] To be granted asylum, an individual must meet the refugee definition, which includes:

> [A]ny person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unwilling or unable to avail himself or herself or the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.[13]

Once an asylum seeker is granted asylum and becomes an "asylee," she has a path to U.S. citizenship and certain benefits along the way.[14] An asylee is also permitted to travel overseas and, often most importantly, to apply for family reunification.[15]

---

12.   *See* OFFICE FOR IMMIGRATION REV., U.S. DEP'T OF JUSTICE, ASYLUM AND WITHHOLDING OF REMOVAL RELIEF CONVENTION AGAINST TORTURE PROTECTIONS (2009), https://www.justice.gov/sites/default/files/eoir/legacy/2009/01/23/Asylum WithholdingCATProtections.pdf [https://perma.cc/N2K5-84ST]; *see* INA § 101(a)(42), 8 U.S.C. § 1101(A)(42) (defining refugee status); INA § 208(b)(1)(A), 8 U.S.C. § 1158(b)(1)(A) (providing that "the Secretary of Homeland Security or the Attorney General *may* grant asylum" to an eligible applicant) (emphasis added).

13.   INA § 101(a)(42).

14.   *See, e.g.*, Lindsay M. Harris, *From Surviving to Thriving: An Investigation of Asylee Integration in the United States*, 40 N.Y.U. REV. L. & SOC. CHANGE 29, 40–49 (2016) [hereinafter Harris, *From Surviving to Thriving*] (discussing the benefits that asylees are eligible for as long as they meet state requirements).

15.   For more detail on the benefits for "asylees," *see* Section I.C, *infra*.

AR.10952

Certain individuals are barred from asylum protection, including those who: have filed their application for asylum more than one year after their arrival in the United States;[16] have previously been denied asylum;[17] or have been "firmly resettled" in another country prior to arriving in the United States.[18] The merits of these bars can be debated, though they rest on discernable principles. For example, individuals who have previously applied for asylum and been denied by a judge are assumed not to have a valid claim; asylum seekers who delay their filing for more than a year are thought to have potentially fraudulent claims;[19] and those who have already gained protection in another country should not be able to access our limited protection resources.[20] For all of these bars to asylum, however, the asylum seeker has the right to present evidence, to argue certain exceptions apply, and to have the potential bar subjected to the scrutiny of an immigration judge, who has the ultimate decision-making authority regarding whether an individual is barred from asylum.[21]

Second, withholding of removal ("withholding") is a mandatory form of relief—if an individual meets the eligibility requirements, that relief must be granted.[22] This is tied to the United States' international treaty obligation not to *refoule*, or return, an individual to a country where his or her "life or freedom would be threatened."[23] To obtain this relief, individuals must meet a higher legal standard and burden of

---

16.    INA § 208(a)(2)(B), (d); *see generally* Lindsay M. Harris, *The One-Year Bar to Asylum in the Age of the Immigration Court Backlog*, 2016 WIS. L. REV. 1185, 1213–24 (2016) [hereinafter Harris, *The One-Year Bar*] (examining the one-year bar to asylum and how flaws in the immigration system impede compliance).

17.    INA § 208(a)(2)(C)–(D). An application is deemed denied only if denied by an immigration judge or the Board of Immigration Appeals, not the Asylum Office. *See* 8 C.F.R. § 208.4(a)(3) (2018).

18.    8 C.F.R. §§ 208.13(c)(2)(i)(B), 208.15 (2018).

19.    For an overview of the origins of the one-year filing deadline, connected to fears about asylum fraud, along with a detailed critique of the one-year filing deadline and the ways in which it does not take into account that genuine asylum seekers have valid reasons for missing the deadline that are not covered by the current extraordinary or changed circumstances exceptions, *see* Harris, *The One Year Bar*, *supra* note 16.

20.    *See, e.g.*, Matter of A-G-G-, 25 I. & N. Dec. 486, 489–503 (B.I.A. 2011) (discussing the origins and implementation of policies against firm resettlement and the evolution of the firm resettlement bar over the years).

21.    *See* 8 C.F.R. § 208.2(b) (2018).

22.    INA § 241(b)(3), 8 U.S.C. § 1231(b)(3) (2012).

23.    Protocol Relating to the Status of Refugees art. 33, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967).

AR.10953

proof.[24] Although withholding protection is harder to obtain, the benefits are far inferior to asylum—unlike asylum seekers, withholding recipients cannot travel overseas with the certainty that they can return to the United States, cannot petition for family members, and have no pathway to citizenship.[25] Essentially, they live in limbo, having to continually renew their work permits and check in regularly with deportation officers.[26] Further, individuals eligible only for withholding are more likely to be detained during the adjudication of their claim for protection.[27]

Third, applicants for whom criminal bars defeat both asylum and withholding eligibility and who fear government-sanctioned torture in their home country may be eligible for relief under the Convention Against Torture ("CAT").[28]

---

24.      To obtain withholding, an applicant must show a "clear probability" of persecution, meaning that the applicant is more likely than not to be persecuted, while asylum only requires a "well-founded fear" of persecution, meaning the applicant faces at least a one-in-ten chance of persecution. *See generally* INS v. Cardoza-Fonseca, 480 U.S. 421 (1987) (deciding that the standard for asylum is less stringent than that for withholding).

25.      *Withholding of Removal and CAT*, IMMIGR. EQUALITY, https://www.immigrationequality.org/get-legal-help/our-legal-resources/asylum/withholding-of-removal-and-cat/#.W8uQ1RNKjq0 [https://perma.cc/GS8B-XK9K].

26.      *Id.*

27.      *See, e.g.*, DAVID HAUSMAN, AM. CIVIL LIBERTIES UNION, FACT SHEET: WITHHOLDING-ONLY CASES AND DETENTION AN ANALYSIS BASED ON DATA OBTAINED THROUGH THE FREEDOM OF INFORMATION ACT (Apr. 19, 2015) [hereinafter ACLU FACT SHEET: WITHHOLDING-ONLY CASES AND DETENTION], https://www.aclu.org/sites/default/files/field_document/withholding_only_fact_sheet_-_final.pdf [https://perma.cc/35PC-GBH6] (reporting that in over 85% of withholding-only cases, respondents remained detained throughout the adjudication of their claims); Pet. for Writ of Habeas Corpus and Class Action Complaint, Martinez-Banos v. Asher, No. 2:16-cv-01454 (W.D. Wash. 2016), https://www.nwirp.org/wp-content/uploads/2018/04/Martinez-Banos-et-al.-v.-Asher-Complaint2.pdf [https://perma.cc/5KNM-PXDL] (challenging ICE's practice of refusing to allow bond hearings for individuals in withholding-only proceedings); YALE LAW SCH. LOWENSTEIN INT'L HUMAN RIGHTS CLINIC, U.S. DETENTION AND REMOVAL OF ASYLUM SEEKERS: AN INTERNATIONAL HUMAN RIGHTS LAW ANALYSIS 39–40, 40 n.273 (2016), https://law.yale.edu/system/files/area/center/schell/human_rights_first_-_immigration_detention_-_final_-_20160620_for_publication.pdf [https://perma.cc/Z6KZ-367G] ("DHS arrests people who are subject to reinstatement of removal and keeps them in custody throughout the reinstatement proceedings, without the opportunity to seek bond.").

28.      This includes individuals who have been convicted of a particularly serious crime in the United States, have committed a serious non-political crime outside the United States, or pose a threat to U.S. national security. INA § 208(b)(2)(A)(ii)–(iv), 8 U.S.C. § 1158(b)(2)(A)(ii)–(iv) (2012). It also includes those

AR.10954

Federal circuit courts have found, however, that there is another way in which individuals are categorically barred from asylum: a reinstated removal order. Such an order precludes the right to any review of an applicant's asylum eligibility by an immigration judge.[29] Any removal order can be reinstated, but this Article focuses specifically on the situation where an individual receives an expedited removal order, and a border official later decides to subject that individual to reinstatement of removal after the individual re-enters without inspection. In this situation, as with those barred by failure to file within one year or because they were "firmly resettled" in another country, the applicant is only eligible for withholding of removal.[30] Unlike the one-year or firm resettlement bars, however, in this situation the immigration judge has no jurisdiction over whether the individual is in fact subject to a bar from asylum and can only grant withholding protection.[31] In other words, the individual has no way to argue to an immigration judge that the reinstated removal order is the result of an erroneous or illegal action by immigration officials.

EXPEDITED REMOVAL AND REINSTATEMENT OF REMOVAL

This Article builds upon prior scholarship, which has broadly examined the "shadow" deportation system, including the expedited removal and reinstatement of removal processes.[32] This Article is the

---

who are members of a terrorist organization, have participated in terrorist activity, or have given material support to a terrorist organization, INA §§ 212(a)(3)(B)(i)(I)–(IV), (VI), 237(a)(4)(B), or who have persecuted others, INA §§ 101(a)(42)(B), 208(b)(2)(A)(i).

29.     8 C.F.R. § 241.8 (2018). This is discussed in depth in Section II.C, *infra*.

30.     *See id.* § 241.8(e) (providing an exception to reinstatement of removal for an individual expressing fear to be referred for a reasonable, rather than credible, fear interview, leading to potential withholding, rather than asylum eligibility).

31.     *See id.* § 241.8(a) ("The alien has no right to a hearing before an immigration judge in such circumstances.").

32.     INA § 235(b)(1)(A)(i), 8 U.S.C. § 1225(b)(1)(A)(i) (2012); *see, e.g.*, Jennifer Lee Koh, *Removal in the Shadows of Immigration Court*, 90 S. CAL. L. REV. 181, 187 (2017) [hereinafter Koh, *Removal in the Shadows*] (examining five types of removal orders: expedited removal, reinstatement of removal, administrative removal of non-lawful permanent residents with aggravated felony convictions, in absentia orders for failure to appear in immigration court, and stipulated removal orders following waivers of the right to a court hearing). Professor Wadhia refers to expedited removal and reinstatement along with administrative removals as "speed deportations." Shoba Sivaprasad Wadhia, *The Rise of Speed Deportations and the Role of Discretion*, 5 COLUM. J. RACE & L. 1, 6 (2015) [hereinafter Wadhia, *Speed Deportations*]; Jill Family refers to some of these procedures, outside immigration courts, as "diversions." Jill E. Family, *Beyond Decisional Independence: Uncovering*

AR.10955

first, however, to fully explore how the interaction of expedited removal and reinstatement of removal blocks asylum seekers from meaningful protection, relegating them to withholding protection only.

Expedited removal and reinstatement of removal are important areas for examination. [33] The use of these summary deportation systems is on the rise. [34] Indeed, expedited removals and reinstatement represent the majority of all removals in the United States. In 2016, the most recent year for which statistics were available at the time of writing, 83% of removals took place through reinstatement of prior removal orders or expedited removal of individuals seeking admission at the border. [35]

In addition to the alarming frequency of its use of expedited removal and reinstatement, the Trump Administration has also referred to plans to expand the Department of Homeland Security's authority to use expedited removal to the full extent permitted by statute. [36] This would allow the government to issue expedited removal

---

*Contributors to the Immigration Adjudication Crisis*, 59 U. KAN. L. REV. 541, 542 (2011). Stephen Manning and Kari Hong refer to expedited removal as "rapid removals." *See* Stephen Manning & Kari Hong, *Getting It Righted: Access to Counsel in Rapid Removals*, 101 MARQ. L. REV. 673, 676–79 (2018) [hereinafter Manning & Hong, *Access to Counsel*]; *see also* Jennifer Lee Koh, *When Shadow Removals Collide: Searching for Solutions to the Legal Black Holes Created by Expedited Removal and Reinstatement*, 96 WASH. U. L. REV. 337, 340–41 (2018) [hereinafter Koh, *Searching for Solutions*] (examining two forms of "shadow removals," categorized as expedited removal and reinstatement of removal).

33.    Koh, *Searching for Solutions*, *supra* note 32, at 343 (referring to the intersection of expedited removal and reinstatement of removal as "legal black holes—spaces in which executive power is particularly high but where accountability and review are almost nonexistent") (citing Ralph Wilde, *Legal "Black Holes?" Extraterritorial State Action and International Treaty Law on Civil and Political Rights*, 26 MICH. J. INT'L L. 739, 775 (2005)).

34.    *See generally* AM. IMMIGRATION COUNCIL, IMMIGRATION POLICY CTR., REMOVAL WITHOUT RECOURSE: THE GROWTH OF SUMMARY DEPORTATIONS FROM THE UNITED STATES (2014), https://www.americanimmigrationcouncil.org/research/removal-without-recourse-growth-summary-deportations-united-states [https://perma.cc/5YHD-5J6P] (analyzing the dramatic increase in the number of deportations carried out through summary removal procedures, including expedited removal and reinstatement of removal, since 1996).

35.    OFFICE OF IMMIGRATION STATISTICS, U.S. DEP'T OF HOMELAND SEC., ANNUAL REPORT, IMMIGRATION ENFORCEMENT ACTIONS: 2016, at 8 (2017), https://www.dhs.gov/sites/default/files/publications/Enforcement_Actions_2016.pdf [https://perma.cc/VS94-FN23] (reporting that of 340,056 removals in 2016, 141,518 were expedited removal orders and 143,003 were reinstatements, totaling 284,521, or 83.6%).

36.    Memorandum from John Kelly, Sec'y, Dep't of Homeland Security, to Kevin McAleenan, et al, Acting Comm'r, U.S. Customs & Border Prot., at 6 (Feb.

AR.10956

orders throughout the United States against any individual who had not previously been admitted or paroled and is unable to show that he or she has been continuously physically present within the United States for at least two years.[37]

The shortcomings of regular immigration court removal proceedings are even starker in the context of shadow removals.[38] Indeed, procedural due process rights only apply in immigration court.[39] Outside of immigration court, in the expedited removal and reinstatement context, Customs and Border Protection officers "act as investigator, judge, and jury, with the immigration courts completely uninvolved in the removability determination."[40] Unlike immigration judges and asylum officers, CBP officers must meet only minimal eligibility requirements for the job and are not required to have legal training.[41] As will be explained in Section I.C below, the actions of these officers have profound and prolonged consequences for asylum seekers.

Between 1996 and 2016, scholars estimate that rapid removals have accounted for the removal of more than 4.2 million people, all without any review or oversight by the immigration court system.[42]

---

20, 2017); Exec. Order No. 13,767, 83 Fed. Reg. 8793, 8786 (Jan. 15, 2017), § 11(c). For an explanation of the origins and makeup of the Department of Homeland Security, see Wadhia, *Speed Deportations, supra* note 32, at 5–6. For an exploration of the expansion of expedited removals, including implementation of the "contiguous territories" provision, *see* Geoffrey Hoffman, *Contiguous Territories: The Expanded Use of "Expedited Removal" in the Trump Era*, 33 MD. J. INT'L L. 268, 269–73 (2018).

37.     *See* INA § 235(b)(1)(A)(iii)(II) (2012).

38.     Koh, *Removal in the Shadows, supra* note 32, at 222–32 (highlighting how the problems posed by detention, lack of appointed counsel, limits on judicial review, and restrictions on relief and meaningful discretion are exacerbated in the context of shadow removals).

39.     *Id.* at 192.

40.     *Id.* at 193. This is not the only area of law in which low level officials must administer complex immigration laws. *See* Amanda Frost, *Learning from Our Mistakes: Using Immigration Enforcement Errors to Guide Reform*, 92 DENV. U. L. REV. 769, 773 (2015) [hereinafter Frost, *Learning from our Mistakes*].

41.     These requirements include being a U.S. citizen, holding a valid driver's license, being eligible to carry a firearm, being under the age of 40 at the time of referral, and residing in the United States for three of the past five years. CBP officers must go through the hiring process, which includes a basic medical exam, fitness test, background investigation, interview, drug test, and polygraph test. *See CBPO Application Process*, U.S. CUSTOMS & BORDER PROTECTION, https://www.cbp.gov/careers/frontline-careers/cbpo/app-proc [https://perma.cc/XW5C-L59R].

42.     Manning & Hong, *Access to Counsel, supra* note 32, at 680 (calculating that number based on data from 2010–2016, where rapid removals accounted for

AR.10957

Unlike previous scholarship, which has addressed the effects of these processes on individuals in the United States with existing ties to the community,[43] this Article focuses on asylum seekers arriving at the border and the consequences of erroneously issued expedited removal orders for those asylum seekers.

As a further sign of the increasing importance of the interplay between expedited removal and reinstatement of removal, according to the EOIR Statistical Yearbook for 2016, the immigration courts saw a dramatic rise in withholding-only proceedings from fiscal years 2012 to 2016. In FY 2012, immigration courts held 1,091 withholding-only proceedings, but in 2016, this number was 3,249.[44]

This threefold increase in just four years is likely explained by the rising numbers of expedited removal orders issued against arriving asylum seekers who, like Cecilia, are not properly referred to credible fear interviews (CFI). This forces those with a genuine fear of persecution to make the dangerous journey again. When those asylum seekers enter a second or third time, their prior expedited removal order and reinstatement of removal render them ineligible for asylum protection.[45] Because of the prior order of removal, they are eligible only for a reasonable fear interview (RFI), which, if positive, puts them into withholding-only proceedings in immigration court.[46]

The number of individuals in withholding-only proceedings is relatively low compared to the number removed via expedited removal at the border. But those with reinstated removal orders upon entering a second or third time are subjected to a higher standard within the RFI than would be applied in a CFI,[47] and thus may not pass that threshold test despite having an otherwise potentially valid asylum claim.[48]

---

76% of all removals, and extrapolating that same percentage rate to all reported removals between 1996–2016).

43.     Koh, *Searching for Solutions*, *supra* note 32 (focusing particularly on individuals with existing ties to the United States and how they are affected by the interplay between reinstatement and expedited removal).

44.     EXEC. OFFICE FOR IMMIGRATION REVIEW, U.S. DEP'T OF JUSTICE, FY 2016 STATISTICS YEARBOOK, B1 (2017), https://www.justice.gov/eoir/page/file/fysb16/download [https://perma.cc/2CBR-HLVL] [hereinafter EOIR FY 16 STATISTICS YEARBOOK]; *see also* Wadhia, *The Rise of Speed Deportation*, *supra* note 32, at 5–6 (citing the 2013 yearbook).

45.     *See infra* text accompanying notes 160–76.

46.     8 C.F.R. § 208.31 (2018).

47.     *See infra* text accompanying notes 89–92.

48.     Other possible explanations for the increase in withholding proceedings could be that DHS has improved its screening of individuals with a reasonable fear

AR.10958

This Article examines the profound and very human consequences of the interaction between expedited removal and reinstatement of removal. The piece then introduces solutions and examines how the use of readily available technology may safeguard the humanitarian protections for asylum seekers at our borders—protections which, while guaranteed by our laws, are too easily denied in practice.

The Article will examine the expedited removal system and contrast the intended system with its reality. The Article will then make clear the ramifications of a split-second decision made by border enforcement officials to ignore an articulated fear of return and issue an expedited removal order. Part I examines the intersection of expedited removal and reinstatement of removal and how their interplay affects asylum seekers specifically.

Part II examines discretionary remedies for asylum seekers along with a lack of meaningful appellate review and largely unsuccessful challenges in the Federal Circuit Courts of Appeals. The first discretionary remedy is to ask CBP border officials to rescind the underlying removal order and to rescind reinstatement of removal orders. Second, an asylum seeker can ask the government trial attorney assigned to the case to exercise discretion to issue a new Notice to Appear, rather than accepting the Notice of Referral from CBP to withholding-only proceedings. Next, this Part discusses relief through the appellate courts and explains how this avenue is insufficient.

In Part III, the Article proposes solutions to remedy the denial of meaningful protection for asylum seekers. This Part considers a broad range of solutions, including statutory overhaul and increasing Congressional oversight, encouraging prosecutorial discretion, increasing access to counsel, and enhancing training of border officials administering the expedited removal system.

Part IV proposes that, in the absence of larger statutory reform dismantling or dramatically overhauling the expedited removal and reinstatement of removal processes, the government should institute

---

of return or simply that more individuals who are ineligible for asylum have a fear of return. *See* Wadhia, *Speed Deportations*, *supra* note 32, at 13–14. Indeed, the number of reasonable fear interviews has also increased during this time period. *See* EOIR FY16 STATISTICS YEARBOOK, *supra* note 44, at B1 (815 in 2012 and 2,552 in 2016). Alternatively, the increase in withholding-only proceedings may be simply tied to the growth in reinstatements and administrative removals by DHS. Wadhia, *Speed Deportations*, *supra* note 32, at 14.

AR.10959

the use of Body-Worn Cameras (BWCs), a practical and expedient solution which follows the lead of law enforcement agencies across the country. This would require all CBP officials, who are empowered to issue the initial expedited removal orders and ask the screening questions around fear to identify asylum seekers, to wear and use body cameras in those interactions. The body cameras would create a permanent record of the initial screening interview, taking expedited removal out of the shadows. Knowing that their actions are being recorded would hopefully encourage officers to follow the law and procedures for properly screening potential asylum seekers in expedited removal. Failing that, complete video footage of the entire screening interaction would give supervising border officials and trial attorneys the information they need to rescind the underlying expedited removal order and to exercise prosecutorial discretion to decline to reinstate the underlying removal order. Finally, implementation of BWCs also gives Congress a mechanism to ensure that the law is implemented as intended.

As will be discussed, video or even audio footage of Cecilia's interactions with border officials would have preserved her articulated fear claim and perhaps persuaded CBP to rescind their erroneously issued removal orders, or the Immigration and Customs Enforcement (ICE) trial attorney to exercise his discretion and allow her to pursue asylum relief.[49] In the absence of more dramatic reform that overhauls

---

49.     It should be noted, however, that in many ways things would have been worse for Cecilia arriving at the border today. For a period of time in 2018, border officials would have taken her five-year-old daughter away and she could have spent months separated from her child. Further, former Attorney General Jefferson B. Sessions' decision issued in June 2018 attempts to undo asylum and withholding protection for those fleeing domestic violence or gang violence at the hands of non-state actors, so Cecilia may have never received a positive decision in her fear interview with asylum officers. *See* Matter of A-B-, 27 I. & N. Dec. 316 (A.G. 2018) (overruling the BIA decision, *Matter of A-R-C-G-*, which recognized domestic violence as a potential ground for asylum). Further, Cecilia may have also faced prosecution for "illegal entry" under 8 U.S.C. § 1326 (2012), or even for "illegal reentry" under § 1327, despite the fact that under Article 31 of the Refugee Convention, asylum seekers should not be penalized for irregular entry. *Compare Attorney General Announces Zero-Tolerance for Criminal Illegal Entry*, U.S. DEP'T JUST. (Apr. 6, 2018) [hereinafter *Attorney General Announces Zero-Tolerance*], https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry [https://perma.cc/6RNG-QKNN], *with* Convention Relating to the Status of Refugees art. 31, Jul. 28, 1951, 189 U.N.T.S. 137. *Matter of A-B-* is just the latest in what Professor Sarah Sherman-Stokes argues is a decades-long series of government actions aimed at undermining recognition of refugee status for Central Americans, *see* Sarah Sherman-Stokes, *Refugees of the Northern Triangle: Legacies of Discrimination and Denial* 2–3 (July 24, 2018) (unpublished

or eliminates the use of expedited removal, this Article proposes that CBP officials be required to wear body cameras as a short-term solution to prevent erroneous deportations with potentially deadly consequences, preserve due process, and increase transparency. The Article explores the proposed implementation of this solution, drawing from the literature in the criminal context, post-Ferguson in particular, to explore the costs, efficiencies, concerns, and dynamics of BWCs.

### I. EXPEDITED REMOVAL IN THEORY VS. EXPEDITED REMOVAL IN PRACTICE

This Part will present the legal framework for expedited removal and the built-in mandatory protections for asylum seekers. It contrasts the way the system was envisioned with the well-documented reality of expedited removal's rampant abuse. Finally, this Part explains the consequences of that abuse—the erroneous issuance of removal orders for asylum seekers that subjects them to deportation. Not only that, but if an asylum seeker makes it back to the United States to seek protection on subsequent occasions, and if she then enters without inspection, she is at serious risk of being subjected to reinstatement of removal, which would render her no longer eligible for asylum protection.[50]

First, the two discretionary "speed deportation" procedures central to this Article are expedited removal and reinstatement of removal. Expedited removal is a process where certain noncitizens can be removed from the United States without appearing before an immigration judge.[51] Expedited removal can apply to (1) individuals arriving at a port of entry without proper documentation,[52] and (2)

---

manuscript) (on file with the Columbia Human Rights Law Review). The implementation of *Matter of A-B-* was challenged in federal district court and the Court enjoined key portions of the decision and implementing policy memorandum from USCIS. *See* AM. CIVIL LIBERTIES UNION & CTR. FOR GENDER & REFUGEE STUDIES, PRACTICE ADVISORY: *GRACE v. WHITAKER* (Mar. 7, 2019), https://www.aclu.org/legal-document/grace-v-whitaker-practice-advisory [https://perma.cc/2B9C-HUF6].

50.    8 C.F.R. § 241.8 (2018). Many asylum seekers enter without inspection, rather than seeking asylum at a port of entry. This is increasingly understandable given the alarming rates at which CBP is unlawfully turning back those who seek asylum at ports of entry. *See supra* notes 5 and 6.

51.    INA § 235(b)(1)(A)(i), 8 U.S.C. § 1225(b)(1)(A)(i) (2012).

52.    *Id.*

AR.10961

individuals apprehended between ports of entry,[53] among others. Reinstatement of removal refers to the process by which DHS can reinstate final removal orders, including expedited removal orders, without any hearing or review, for noncitizens ordered removed who were in fact removed and then subsequently reentered the United States without inspection.[54] Congress created both expedited removal and reinstatement of removal, but did not mandate their blanket use in all individual cases or categories of cases.[55]

## A. The Legal Framework for Expedited Removal and Mandatory Protections for Asylum Seekers

Before 1996, any person arriving in the United States had the right to seek asylum before an immigration court without passing any initial screening test, and could then appeal that decision to the Board of Immigration Appeals, the federal circuit courts, and potentially even to the Supreme Court.[56] Congress dramatically changed that system when they created the expedited removal system in 1996[57] to more quickly deport recent inadmissible non-asylum seeking migrants found

---

53. *Id.* § 235(b)(1)(A)(iii). The INA allows DHS to use expedited removal for any noncitizen who cannot prove that she has been physically present in the United States continuously for the two-year period immediately prior to apprehension, but this authority is currently limited to individuals apprehended within one hundred miles of the southwest border and within fourteen days of unlawfully entering the United States. Notice Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877, 48,879 (Aug. 11, 2004). Regulations also permit DHS to use expedited removal for aliens apprehended within two years after arriving by sea without being admitted or paroled. Notice Designating Aliens Subject to Expedited Removal Under § 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924, 68,926 (Nov. 13, 2002).

54. INA § 241(a)(5), 8 U.S.C. § 1231(a)(5) (2012).

55. *See infra* note 151; *see also* AM. IMMIGRATION COUNCIL ET AL., THE FLORES LITIGATION AND THE IMPACT ON FAMILY DETENTION, AILA DOC. 15504332 at 2 (2015), https://www.aila.org/advo-media/press-releases/2015/fact-sheet-flores-litigation-family-detention [https://perma.cc/AQS8-AZTB] ("DHS has taken the position that individuals in 'expedited' removal proceedings—rather than ordinary removal proceedings before an immigration judge—are subject to mandatory detention prior to receiving positive credible fear determinations. But the type of removal proceeding DHS chooses to initiate is completely within its own discretion.").

56. *See* Bo Cooper, *Procedures for Expedited Removal and Asylum Screening Under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996*, 29 CONN. L. REV. 1501, 1502 (1997) [hereinafter Cooper, *Procedures of Expedited Removal*] (describing expedited removal as a "colossal change from prior law").

57. INA § 235(b)(1)(A)(i), (b)(1)(B)(iii)(I) (setting up the expedited removal system).

AR.10962

at or near the border.[58] At the same time, Congress created safeguards to ensure that asylum seekers would be protected and allowed to exercise their Refugee Convention rights to seek asylum protection. In theory, immigrant families seeking protection at the border should benefit from the humanitarian safeguards built into the expedited removal system to prevent those who may be persecuted or tortured from being deported, which would be contrary to our international[59] and domestic legal obligations to protect those individuals.

---

58.    The use of expedited removal has rapidly expanded since its initial implementation. Originally, expedited removal was only implemented at ports of entry, but it was expanded beyond the border in 2004, when Congress passed the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108–458 § 7210(d)(1), 118 Stat. 3638, 3825 (codified as amended at 8 U.S.C. § 1225a(a)(4)). Now, expedited removal proceedings may be applied to individuals who are apprehended within one hundred miles of the border and are unable to establish that they have been continuously physically present in the United States for the preceding fourteen-day period. *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877, 48,879 (Aug. 11, 2004). The statute permits the use of expedited removal anywhere in the United States within two years of entry, and the Trump Administration has indicated intent to use the statute as broadly as possible moving forward. *See* INA § 235(b)(1)(A)(iii)(II) (limiting expedited removal to those who cannot establish two years of continuous physical presence); Exec. Order No. 13,767, 82 Fed. Reg. 8,793 (Jan. 25, 2017). For background on the creation of expedited removal, *see generally* Cooper, *Procedures of Expedited Removal*, *supra* note 56 (discussing the creation and controversy of expedited removal).

59.    In addition to the laws of the United States, CBP officials are also obligated to properly conduct a fear screening under international law. The doctrine of *non-refoulement* obligates countries to not return individuals to a country where they would be persecuted or tortured. As a signatory to the 1967 Protocol Relating to the Status of Refugees, the United States is obligated to comply with procedures that ensure that, "No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." United Nations High Comm'r for Refugees (UNHCR), Executive Comm., Note on Non-Refoulement (Submitted by the High Commissioner), U.N. Doc EC/SCP/2 (Aug. 23, 1977). This duty also includes individuals "who present themselves at [ports of entry] along the U.S. border" and mandates U.S. officials to not deny the claims of individuals seeking to cross the border "access to a lawful process to present a claim for asylum." Complaint for Declaratory and Injunctive Relief at 40, Al Otro Lado v. Kelly, 3:17-cv-02366-BAS-KSC (S.D. Cal. 2017).

AR.10963

### 1. First-Time Asylum Seekers at the Border: Expedited Removal and the Credible Fear Interview

According to regulations, CBP officers must conduct a screening interview with all border arrivals.[60] To protect asylum seekers and guard against the deportation of individuals with a fear of return to their country of origin, form I-867A&B, Record of Sworn Statement in Proceedings, requires officers to ask these four questions:

> *Why did you leave your home country or country of last residence?*
>
> *Do you have any fear or concern about being returned to your home country or being removed from the United States?*
>
> *Would you be harmed if you are returned to your home country or country of last residence?*
>
> *Do you have any questions or is there anything you would like to add?*

The law requires CBP officers to refer any individual who "indicates either an intention to apply for asylum . . . or a fear of persecution" to the Asylum Office for a credible fear interview.[61] If a CBP officer fails to refer an asylum seeker for a fear interview, that individual's expedited removal order will be executed and she will be returned to her country of origin.

Currently, the training that CBP officers receive regarding the screening of asylum seekers at the border lacks transparency. The Field Officer's Manual, a previous source of guidance to border officials, was publicly available. Around 2013, however, the Field Officer's Manual was rescinded and replaced by the Officer's Reference Tool, which has not been made publicly available, despite litigation over its release and the lack of CBP transparency.[62] Relying on the most recent

---

60.    8 C.F.R. § 235.3(b)(2) (2018).

61.    INA § 235(b)(1)(A)(ii).

62.    *See* Am. Immigration Lawyers Ass'n v. Dep't of Homeland Sec., 306 F. Supp. 3d 162, 165 (D.D.C. 2018). On March 30, 2018, the court denied DHS's motion for summary judgment and ordered the agency to produce the documents referenced in Chapter 11 of the CBP Officer's Reference Tool during the summer of 2018. In March 2019, "the Court ordered Defendants to produce a Vaughn index and additional information about its search for responsive records." *See FOIA Lawsuit Seeking Disclosure of the CBP Officer's Reference Tool*, AM. IMMIGR. COUNCIL,        https://www.americanimmigrationcouncil.org/litigation/foia-lawsuit-

AR.10964

publicly available guidance, CBP's field manual instructs officers to refer individuals for a credible fear interview whenever the above four questions elicit an expression of fear.[63] The field manual also instructs that an officer must refer an individual to an asylum office for a credible fear interview "if the alien indicates in any fashion or at any time during the inspections process, that he or she has a fear of persecution, or that he or she has suffered or may suffer torture."[64]

Border officials are specifically asked to consider "verbal as well as non-verbal cues" regarding fear in their interactions with potential asylum seekers.[65] Further, border officials are instructed to "err on the side of caution, apply the criteria generously, and refer to the asylum officer any questionable cases."[66]

CBP officials are required to document interactions with border arrivals, recording the question-and-answer format of the interview on the required form I-867A&B.[67] This should result in an accurate, sworn record of any statements made by an individual during

---

seeking-disclosure-cbp-officers-reference-tool [https://perma.cc/F9ML-CV58]. As this article went to print, a number of documents were produced in response to the lawsuit, including one October 2, 2014 memo directing CBP officers to refer asylum seekers for credible fear interviews. These documents are on file with author and the *Columbia Human Rights Law Review*.

63.    CUSTOMS & BORDER PROT., U.S. DEP'T OF HOMELAND SEC., INSPECTOR'S FIELD MANUAL ch. 17.15(b)(1) (2006) [hereinafter INSPECTOR'S FIELD MANUAL], https://www.aila.org/File/Related/11120959F.pdf [https://perma.cc/5UAN-DFQH]; *see also* INA § 235(b)(1)(A)(ii) (discussing when an individual should be referred for a credible fear interview).

64.    INSPECTOR'S FIELD MANUAL, *supra* note 63.

65.    *Id.*

66.    *Id. But see* Michele R. Pistone & John J. Hoeffner, *Rules Are Made to Be Broken: How the Process of Expedited Removal Fails Asylum Seekers*, 20 GEO. IMMIGR. L.J. 167, 187–90 (2006) [hereinafter Pistone & Hoeffner, *Rules are Made to Be Broken*] (critiquing CBP's Field Office Manual for giving conflicting guidance to officers and encouraging them to consult with the asylum office on "questionable cases" despite clear guidance elsewhere in the manual requiring them to simply make the referral for a fear interview if a fear is expressed).

67.    *See* INSPECTOR'S FIELD MANUAL, *supra* note 63 (instructing officers that they must take a sworn statement using form I-867A&B in all expedited removal cases); *see also* INA § 235(b)(1)(B)(iii)(II), 8 U.S.C. § 1225(b)(1)(B)(iii)(ii) (2012) ("The officer *shall* prepare a written record of a determination . . . .") (emphasis added); 8 C.F.R. § 235.3(b)(2)(i) (2018) (requiring officers to create a record of the "facts of the case and statements made by the alien" and to read the statement to the alien, who must "sign and initial each page of the statement and each correction").

AR.10965

an initial screening interview.[68] This record is supposed to be read and initialed by the CBP officer and the individual at the border and should be subject to review by a supervisor.[69]

Once an individual expresses a fear, the statute and regulations require that CBP automatically refer her to the U.S. Citizenship and Immigration Services (USCIS) Asylum Office for a credible fear interview (CFI).[70] Where fear is expressed, Immigration and Customs Enforcement (ICE) detains asylum seekers, transporting them from CBP holding facilities[71] to ICE detention centers, where they await and undergo the CFI with an asylum officer, who, unlike a border official, has undergone extensive training in asylum law and interviewing survivors of trauma. During the CFI, an asylum seeker must demonstrate a "significant possibility" that she will ultimately establish eligibility for asylum at a full hearing.[72]

As stated by the former Chief of the Asylum and Refugee Law Division of the Office of the General Counsel and former General Counsel for the Immigration and Naturalization Service, Owen ("Bo") Cooper, "the act of deciding whether a person is a refugee . . . is more

---

68.     These records may be later used by an immigration judge making a credibility determination. *See* Matter of J-C-H-F-, 27 I. & N. Dec. 211, 211 (B.I.A. 2018) ("When deciding whether to consider a border or airport interview in making a credibility determination, an Immigration Judge should assess the accuracy and reliability of the interview based on the totality of the circumstances, rather than relying on any one factor among a list or mandated set of inquiries.").

69.     INSPECTOR'S FIELD MANUAL, *supra* note 63, ch. 17.15(b).

70.     INA § 235(b)(1)(A)(ii).

71.     Conditions within these CBP holding facilities have been challenged in both Arizona and Texas. *See* Doe v. Kelly, 878 F.3d 710, 725 (9th Cir. 2017) (deciding a class action lawsuit challenging Tucson Sector Border Patrol treatment of immigrants within CBP holding facilities in violation of the U.S. Constitution and CBP policy); *see also* Guillermo Cantor, Am. Immigration Council, Hieleras (Iceboxes) in the Rio Grande Valley Sector: Lengthy Detention, Deplorable Conditions, and Abuse in CBP Holding Cells 9–13 (2015), https://www.americanimmigrationcouncil.org/sites/default/files/research/hieleras_iceboxes_in_t he_rio_grande_valley_sector.pdf [https://perma.cc/VP7B-3QT6] (discussing at length the reports of poor living conditions in CBP holding cells); GUILLERMO CANTOR & WALTER EWING, AM. IMMIGRATION COUNCIL, STILL NO ACTION TAKEN: COMPLAINTS AGAINST BORDER PATROL AGENTS CONTINUE TO GO UNANSWERED 3– 6 (2017), https://www.americanimmigrationcouncil.org/sites/default/files/research/ still_no_action_taken_complaints_against_border_patrol_agents_continue_to_go_ unanswered.pdf [https://perma.cc/WDV6-9M3J] (discussing systemic failure to address poor living conditions in CBP holding cells).

72.     INA § 235(b)(1)(B)(v).

AR.10966

art than science." [73] USCIS amended the credible fear lesson plan, which provides guidance for asylum officers conducting credible fear interviews, in February 2014, [74] tightening the standard for the credible fear interview, [75] and again in 2017. [76] The idea behind the CFI, though, is that it is simply a threshold eligibility test and should be applied generously to identify potential refugees for more in-depth adjudication. [77]

The CFI itself ranges in length and is often conducted by phone. [78] Although counsel is permitted at the interview, immigrants are not entitled to government-paid counsel and when lawyers do appear on behalf of immigrants, they do not play a robust role. [79]

---

73.  *See* Cooper, *Procedures of Expedited Removal*, *supra* note 56, at 1503 ("It is a predictive exercise demanding hairbreadth judgments about the motivations of a persecutor, the seriousness of the harm an applicant has suffered or might face, the likelihood that such harm could take place, the truthfulness of the asylum seeker, the conditions prevailing in distant countries, and so forth.").

74.  U.S. CITIZENSHIP & IMMIGRATION SERVS., RAIO ASYLUM DIVISION OFFICER TRAINING COURSE: CREDIBLE FEAR 1 (2014), https://www.aila.org/infonet/uscis-asylum-division-officer-training-course [https://perma.cc/WKJ2-NKFK].

75.  ELIZABETH CASSIDY & TIFFANY LYNCH, U.S. COMM'N ON INT'L RELIGIOUS FREEDOM, BARRIERS TO PROTECTION: THE TREATMENT OF ASYLUM SEEKERS IN EXPEDITED REMOVAL 35–36 (2016) [hereinafter 2016 USCIRF REPORT], https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf [https://perma.cc/Z93Y-F32N].

76.  U.S. CITIZENSHIP & IMMIGRATION SERVS., RAIO ASYLUM DIVISION OFFICER TRAINING COURSE: CREDIBLE FEAR OF PERSECUTION AND TORTURE DETERMINATIONS 1, 18–20 (2017), https://www.aila.org/infonet/raio-and-asylum-division-officer-training-course [https://perma.cc/X5A6-BEAJ] (seemingly elevating the credibility threshold required in credible fear determinations); *see also* Drake & Gibson, *Vanishing Protection*, *supra* note 6, at 128 (explaining how the credible fear standard is vague and ambiguous and the new memo no longer urges asylum officers to err on the side of issuing a positive determination if in doubt).

77.  *See* Martin, *Expedited Removal*, *infra* note 108, at 681–82; *see* Pistone & Hoeffner, *Rules are Made to Be Broken*, *supra* note 66, at 190; *see* Cooper, *Procedures of Expedited* Removal, *supra* note 56, at 1503 ("Essentially, the asylum officer is applying a threshold screening standard to decide whether an asylum claim holds enough promise that it should be heard through the regular, full process or whether, instead, the person's removal should be effected through the expedited process.").

78.  The fact that these interviews are often conducted by phone undermines an asylum officer's ability to assess tone, demeanor, facial expressions, and other non-verbal cues that can be so essential to determining credibility and in discussing sensitive and difficult topics. *See* 2016 USCIRF REPORT, *supra* note 75, at 36–37 (raising concerns about quality of telephonic interviews). The regulations governing the conduct of a CFI can be found at 8 C.F.R. § 208.30 (2018).

79.  INA § 235(b)(1)(B)(iv), 8 U.S.C. § 1225(b)(1)(B)(iv) (2012) ("An alien who is eligible for such interview may consult with a person or persons of the alien's

AR.10967

Indeed, many asylum officers do not permit counsel to interject to clarify or correct the record, although most do allow the attorney or representative to make a brief statement at the end of the interview.[80]

If the asylum officer determines that the asylum seeker meets this threshold "credible fear test," and therefore the asylum seeker has demonstrated a significant possibility of establishing eligibility for asylum, the officer issues charging documents in the form of a "Notice to Appear" (NTA).[81] The NTA lays out the factual and legal allegations against the asylum seeker and places her in immigration court removal proceedings, where she may apply for asylum as a defense to removal.[82] That asylum application must be filed in immigration court within one year of the date of the asylum seeker's arrival into the United States.[83]

---

choosing prior to the interview or any review thereof . . . ."); *see also* ASYLUM SEEKER ADVOCACY PROJECT, VINDICATING THE RIGHTS OF ASYLUM SEEKERS AT THE BORDER AND BEYOND 26–32 (2018), https://asylumadvocacy.org/wp-content/uploads/2018/06/ASAP-Expedited-Removal-Guide.pdf) [https://perma.cc/224C-M9HV] (describing the attorney's role in a credible fear interview).

80.      *See* 8 C.F.R. § 208.30(d)(4) ("Any person or persons with whom the alien chooses to consult may be present at the interview and may be permitted, in the discretion of the asylum officer, to present a statement at the end of the interview.").

81.      Notably, even if the asylum officer believes that the individual is subject to one or more of the mandatory bars to applying for or being granted asylum under INA § 208(a)(2) and (b)(2), he should still place the individual in removal proceedings under § 240 for "full consideration of the alien's claim." 8 C.F.R. § 208.30(e)(5). An individual subject to reinstatement does not get this chance.

82.      Many of these Notices to Appear are issued without a specific date and time to appear in immigration court. The Supreme Court has recently found such NTAs insufficient and may call into question immigration court jurisdiction. *See* Pereira v. Sessions, 138 S. Ct. 2105 (2018). For asylum applicants, this could arguably mean they can seek to have their claims adjudicated before the asylum office with USCIS rather than the immigration courts through the Executive Office of Immigration Review.

83.      8 C.F.R. § 1208.4(a)(2)(A) (2018). Although the asylum seeker is not informed of the one-year filing deadline for asylum, she is obligated to submit an I-589 Application for Asylum within one year of her most recent entry into the United States in immigration court. *See* Harris, *The One-Year Bar*, *supra* note 16 at 1213–24 (describing the 2016 policy change regarding filing an asylum application in immigration court and providing two examples of the difficulties facing asylum seekers in meeting this deadline operationally); *see also* Mendez-Rojas v. Johnson, No. 2:16-cv-01024-RSM (W.D. Wash. June 30, 2016) (granting summary judgment in class action litigation to asylum-seeking plaintiffs, requiring the government to provide notice to all asylum seekers of the one-year filing deadline and to adopt uniform procedural mechanisms to permit class members to timely file their applications). It is also important to note that even where an individual has received a positive CFI, she may decide, based on various factors (including, in some cases, the prospect of prolonged detention) to accept a removal order. *See, e.g.*, Mejia v. Sessions, 866 F.3d 573, 577 (4th Cir. 2017) (explaining how an asylum seeker's

AR.10968

One hundred fifty days after the asylum application is filed, asylum seekers may apply for a work permit, which can be granted when the asylum application has been pending for at least 180 days, but USCIS typically takes several months to issue employment authorization documents.[84]

If the asylum-seeking individual does *not* receive a positive result following a CFI, she has the opportunity to go before an immigration judge for a negative credible fear review, which must take place within seven days of the initial CFI decision.[85] The asylum seeker remains detained during this time period.[86] Counsel may be present, but may not actually enter an appearance for a negative credible fear review,[87] and some judges do not allow any attorney participation. The immigration judge reviews the decision of the asylum officer *de novo* and decides whether to affirm or vacate the decision. If the decision is affirmed, no additional judicial review of an expedited removal order is permitted, and the asylum seeker is typically quickly removed from the United States.[88] If the judge decides that the applicant has a credible fear of persecution, they are placed in removal proceedings before an

---

prior removal order came after the immigration judge warned her that she had a "serious" credibility problem which would be "extremely difficult to overcome," so that she declined to apply for relief and accepted her removal order).

84.    EXEC. OFFICE FOR IMMIGRATION REVIEW & U.S. CITIZENSHIP & IMMIGRATION SERVS., THE 180-DAY ASYLUM EAD CLOCK NOTICE (2017), https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20%26%20Asylum/Asylum/Asylum_Clock_Joint_Notice_-_revised_05-10-2017.pdf [https://perma.cc/7SWM-W7XY].

85.    INA § 235(b)(1)(B)(iii)(III), 8 U.S.C. § 1225(b)(1)(B)(iii)(III) (2012); 8 C.F.R § 1003.42(e) (2018).

86.    INA § 235(b)(1)(B)(iii)(IV).

87.    The Executive Office for Immigration Review provides that, while the non-citizen is entitled to consult with a person of their choosing before the credible fear review and that person may also be present during the review, the non-citizen "is not represented at the credible fear review. Accordingly, persons acting on the alien's behalf are not entitled to make opening statements, call and question witnesses, conduct cross examinations, object to evidence, or make closing arguments." U.S. DEP'T OF JUSTICE., EXEC. OFFICE FOR IMMIGRATION REVIEW, IMMIGRATION COURT PRACTICE MANUAL ch. 7.4(d)(iv)(c) (2017) [hereinafter IMMIGRATION COURT MANUAL].

88.    However, at various stages in the history of family detention, advocates have had some success filing a request for reconsideration (RFR) with the asylum office following a judge's affirming of a negative CFI or RFI. This is based on the asylum office's regulatory authority to reconsider. *See* 8 C.F.R. § 1208.30(g)(2)(iv)(A) (2018). In response to this filing, the asylum office has, somewhat inconsistently, asked ICE to effectuate a stay while the RFR has been considered, and at times has granted an RFR and given a new interview to the asylum seeker, which can result in a positive credible fear finding.

AR.10969

immigration judge, where the applicant can apply for asylum as a defense to removal.

All of the above describes how the expedited removal system is *supposed* to work.[89] However, much of this process takes place behind closed doors with no internal or external oversight. When researchers *have* been allowed access to the process, they have found that expedited removal operates much differently in practice. This Article focuses on what happens when the system does not function as it should and asylum seekers are *not* referred for a credible fear interview and are instead issued an expedited removal order. This is discussed in Part B below, after a discussion of what happens to an asylum seeker entering *after* a first attempt to seek asylum has resulted in an expedited removal order. Upon attempted reentry, these individuals are at serious risk of being subjected to reinstatement of removal, thus losing their ability to apply for asylum.

### 2. Asylum Seekers Entering a Second or Subsequent Time, Reinstatement of Removal, and the Reasonable Fear Interview

The process is quite different for someone entering the United States who already has a removal order and is attempting to reenter without inspection. Such an individual is subject to detention and "reinstatement" of the original removal order.[90] These individuals are provided with a reasonable—rather than credible—fear interview, and if successful, they are referred to "withholding only" proceedings.[91]

There are significant differences between credible and reasonable fear interviews (RFIs). Those subject to reinstatement of removal because of a prior removal order must meet a higher burden of proof, establishing a "reasonable possibility" of eligibility for withholding protection, to receive a positive determination following an RFI.[92] Specifically, the applicant must establish that she has a "reasonable possibility" that she would be persecuted on account of

---

89. For more details on how the phases of expedited removal work, including credible or reasonable fear interviews and review of negative determinations in immigration court, *see* Manning & Hong, *Access to Counsel*, *supra* note 32, at 684–87.

90. *See* INA § 241(a)(5), 8 U.S.C. § 1231(a)(5) (2012). Prosecution of that individual for illegal re-entry is also increasingly likely under 8 U.S.C. § 1326 (2012).

91. *See* INA § 241(b)(3).

92. *See* 8 C.F.R. § 208.31(c), (g) (2018).

race, religion, nationality, membership in a particular social group, or political opinion, or that she would be tortured in the country of removal.[93]

If the asylum-seeking individual does *not* receive a positive result following the reasonable fear interview, she has the opportunity to go before an immigration judge for a negative reasonable fear review, which must take place within ten days.[94] Unlike credible fear reviews, representation of counsel is actually permitted for reasonable fear review.[95] Just like a credible fear review, the immigration judge reviews the negative decision of the asylum officer *de novo* and decides whether to affirm or vacate the decision.[96] If the decision is affirmed, no additional judicial review is permitted, and the asylum seeker is typically quickly removed again from the United States.[97]

If the judge vacates the negative reasonable fear decision, or if the asylum officer's initial decision is positive, immigration officials issue a Form I-863 Notice of Referral into withholding-only proceedings with the pre-existing removal order attached. Typically, individuals in reinstatement and withholding-only proceedings are not released from detention to pursue their claims.[98] Historically, those who pass a CFI have had more success securing parole and release to pursue an asylum claim outside of detention.[99]

---

93. *Id.* at § 208.31(c). In the author's experience, with a CFI, USCIS will permit a law student or other non-attorney consultant to be present within the interview, but with an RFI, if an attorney is on record with a Notice of Appearance, USCIS requires the attorney to be present at the interview, rather than a law student or non-attorney supervised by that attorney.

94. *Id.* at § 208.31(g).

95. *See* IMMIGRATION COURT MANUAL, *supra* note 87, ch. 7.4(e)(iv)(c) ("Subject to the Immigration Judge's discretion, the alien may be represented during the reasonable fear review at no expense to the government.").

96. 8 C.F.R. § 1003.42(d) (2018); *see also* Office of the Chief Immigration Judge, U.S. Dep't of Justice, OPERATING POLICIES AND PROCEDURES MEMORANDUM NO. 99-5 IMPLEMENTATION OF ARTICLE 3 OF THE UN CONVENTION AGAINST TORTURE 6–7, 8 (1999), https://www.justice.gov/sites/default/files/eoir/legacy/1999/06/01/99_5.pdf [https://perma.cc/DCS5-P5DW] (explaining that in both credible and reasonable fear review, immigration judges must make *de novo* fear determinations).

97. 8 C.F.R. § 208.31(g)(1).

98. *See supra* note 27.

99. This is not, however, consistent, and recent actions by the Attorney General and the Administration make it clear that the government seeks to detain asylum seekers for the pendency of their asylum proceedings. As this article went to print the Attorney General issued Matter of M-S-, 27 I. & N. Dec. 509 (A.G. 2019) (holding that an individual who passed a credible fear interview is ineligible for

AR.10971

This means that a withholding-only applicant bears several disadvantages. First, she has to meet a higher burden of proof, to show that it is more likely than not that she would face a threat to her life or freedom if removed to the country of feared harm.[100] Second, she will have to make this claim from a detained setting. Aside from the physical and psychological disadvantages of detention, particularly for individuals fleeing persecution,[101] detention poses practical barriers to finding and obtaining supporting evidence.[102] Furthermore, access to counsel is dramatically diminished in detention.[103]

---

release on bond). This decision is being challenged in litigation in the Western District of Washington. *See* Padilla v. ICE, No. 2:18-cv-928 MJP (W.D. Wash. filed June 25, 2018). The Administration has also proposed regulations to hold children seeking asylum indefinitely. *See* Apprehension, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 83 Fed. Reg. 45486 (Sept. 7, 2018) (to be codified at 45 C.F.R. pt. 410, 8 C.F.R. pts. 212, 236) (overriding the *Flores* settlement to allow children to remain detained with their parents for the duration of removal proceedings).

100.    INA §241(b)(3), 8 U.S.C. § 1231(b)(3) (2012) ("[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, nationality, membership in a particular social group, or political opinion.").

101.    *See generally*, G.J. Coffey et al., *The Meaning and Mental Health Consequences of Long-Term Immigration Detention for People Seeking Asylum*, 70 Soc. Sci. & Med. 2070 (2010) (examining the psychological consequences of immigration detention); Allen S. Keller et al., *Mental Health of Detained Asylum Seekers*, 362 The Lancet 1721 (2003) (assessing symptoms of anxiety, depression, and PTSD in detained asylum seekers); Physicians for Human Rights & Bellevue/NYU Program for Survivors of Torture, From Persecution to Prison: The Health Consequences of Detention for Asylum Seekers (2003), https://phr.org/wp-content/uploads/2003/06/persecution-to-prison-US-2003.pdf [https://perma.cc/34MK-3ZRU] (describing the traumatic effects of detention on adults); Ctr. for Victims of Torture et al., Tortured and Detained: Survivor Stories of U.S. Immigration Det. 10 (2013), https://www.cvt.org/sites/default/files/Report_TorturedAndDetained_Nov2013.pdf [https://perma.cc/K668-LMC9] (reporting on personal and psychological impact of detention experience); *accord US: Trauma in Family Immigration Detention,* Human Rights Watch (May 15, 2015), http://www.hrw.org/news/2015/05/15/us-trauma-family-immigration-detention [https://perma.cc/DC2Q-F3EJ] (same).

102.    *See, e.g.*, Barbara Hines, *An Overview of U.S. Immigration Law and Policy Since 9/11*, 12 Tex. Hisp. J. L. & Pol'y 9, 20 (2006) ("It is much harder to represent a detained client in immigration court than one who has been released on bond because of issues such as jail access and the client's ability to obtain necessary evidence and witnesses to support his or her claims.").

103.    *See* Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 42 (2015) [hereinafter Eagly & Shafer, *Access to Counsel in Immigration Court*]; *see also* Lindsay M. Harris, *Contemporary Family Detention and Legal Advocacy*, 21 Harv. Latinx L. Rev. 135,

AR.10972

Even if a withholding-only applicant is fortunate enough to be released from detention, she will have difficulty supporting herself while she awaits adjudication of her claim. Unlike asylum applicants, who are able to apply for employment authorization after their applications have been pending for 150 days, withholding applicants do not technically have this right until after they are granted protection.[104] Given the immigration court backlogs, adjudication of a non-detained withholding-only claim may take several years.[105] During this time, a withholding-only applicant without work authorization will struggle to support herself, living in the shadows, and, like asylum seekers, will be ineligible for any public assistance.

All of this—the increased difficulty of winning withholding protection, the increased likelihood of detention, and the ultimate insufficiency of the protection awarded[106] if successful—stems from the initial expedited removal order and the subsequent reinstatement of removal. As discussed in the next section, the issuance of many of the underlying expedited removal orders that lead to reinstatement, and thus ineligibility for asylum, is highly problematic.

---

160–63 (2018) (explaining the consequences arising from lack of access to legal counsel for detained clients).

104.     The instructions of the I-765 Application for Employment Authorization form do provide a category for "applicants for asylum and withholding of removal." Similarly, the form upon which one applies for withholding, I-589, is the same form as used for asylum applicants. As such, many attorneys, including the author, have successfully obtained work permits for withholding-only applicants while they are awaiting adjudication of their claims in immigration court. However, this is not consistent. According to the Operating Policies and Procedures Memorandum for immigration courts, there is no asylum clock for applications for withholding or CAT. *See* Memorandum from the Office of the Chief Immigration Judge, U.S. Dep't of Justice on Operating Policies and Procedures Memorandum 13-02: The Asylum Clock (2013), https://www.justice.gov/sites/default/files/eoir/legacy/2013/12/03/13-02.pdf [https://perma.cc/T94K-ZGBA]. Thus, some court administrators never start the "clock," so that when withholding-only grantees apply for work authorization, USCIS denies their applications.

105.     *See Immigration Court Backlog Tool*, TRAC IMMIGRATION, http://trac.syr.edu/phptools/immigration/court_backlog/ [https://perma.cc/8WV5-W9FA] (reflecting an average of more than 750 days for adjudication of immigration court cases nationwide); *see also* Harris, *The One Year Bar*, *supra* note 16, at 1205 n.94 (pointing out that TRAC's numbers only reflect average, not total wait times for adjudication, and that in September 2015 actual full adjudication of backlogged cases would take "between 659 and 2,401 days").

106.     *See infra* notes 140–48 and accompanying text.

AR.10973

B. How the Expedited Removal System Functions in Reality: Rampant Abuse of Expedited Removal at the Border

The statutorily mandated credible fear process does not always operate according to law, and some asylum-seeking families and individuals, like Cecilia, are wrongfully removed without a credible or reasonable fear interview. Indeed, problems with the expedited removal system have been clear from the very beginning.[107] The architects of the expedited removal system, and those who initially applauded its creation, assumed that where fear was expressed, CBP officers would refer asylum seekers for the appropriate fear-based interview.[108] This assumption was woefully unfounded.

Numerous reports from governmental and non-governmental bodies have sounded the alarm on U.S. failures to meet the international obligation to protect refugees and adhere to the principle of *non-refoulement*.[109] As discussed below, in practice, the expedited

---

107.    Karen Musalo et al., *The Expedited Removal Study: Report on the First Three Years of Implementation of Expedited Removal*, 15 NOTRE DAME J. L., ETHICS & PUB. POL'Y. 1, 1 (2001); Michele R. Pistone & Philip G. Schrag, *The New Asylum Rule: Improved But Still Unfair*, 16 GEO. IMMIGR. L.J. 1, 2–4, 32–62 (2001); Pistone & Hoeffner, *Rules are Made to Be Broken*, *supra* note 66, at 175–84 (2006) (outlining seven key errors and problems with the expedited removal system as applied to asylum seekers from more than a decade ago).

108.    *See* Cooper, *Procedures of Expedited Removal*, *supra* note 56, at 1514, 1516, 1523 (describing expedited removal procedures in detail with the assumption that all the required steps will be undertaken and fear will be recorded accurately, and discussing the credible fear standard with an assumption that all genuine asylum seekers would get to that step in the process). David Martin, who was heavily involved in the establishment of the expedited removal system, assumes throughout his article that officers consistently ask the fear-based questions and accurately record an individual's responses. *See* David Martin, *Two Cheers for Expedited Removal in the New Immigration Laws*, 40 VA. J. INT'L L. 672, 691 (2000) [hereinafter Martin, *Expedited Removal*] ("Someone who simply mentions a fear of return or the wish for asylum is handed over for the credible fear interview and given at least 48 hours to prepare."); RANDY CAPPS, FAYE HIPSMAN & DORIS MEISSNER, MIGRATION POL'Y INST., ADVANCES IN U.S.-MEXICO BORDER ENFORCEMENT: A REVIEW OF THE CONSEQUENCE DELIVERY SYSTEM 5 (2017), https://www.migrationpolicy.org/research/advances-us-mexico-border-enforcement-review-consequence-delivery-system [https://perma.cc/M74L-79KD] (explaining that the "assumptions of effectiveness and deterrence" consequence delivery system, which includes expedited removal and reinstatement of removal, "may be less applicable" since "new and diverse migrant populations, particularly women and children fleeing violence in Central America, have begun to emerge alongside the traditional group of economic migrants . . . .").

109.    *See* ACLU, AMERICAN EXILE: RAPID DEPORTATIONS THAT BYPASS THE COURTROOM 4, 99–100 (2014) [hereinafter ACLU, AMERICAN EXILE],

AR.10974

removal system tramples intended safeguards for asylum seekers as large numbers of applicants are improperly placed in expedited removal without being told of their right to seek fear-based relief, without being able to read and review essential forms, and even in spite of expressing fear of return.

For example, at the behest of Congress, the U.S. Commission on International Religious Freedom (USCIRF) issued three reports on the expedited removal system, the first of which was written after USCIRF was given unprecedented access to border patrol interviews and documents. The first groundbreaking report, released in 2005, raised serious concerns about the integrity of the expedited removal system and the protection of asylum seekers.[110] In particular, following actual observation of border officials on the job, the study found that in 50% of the expedited removal interviews USCIRF observed, border officials failed to inform individuals that they could ask for protection if they feared return.[111] In 72% of cases, individuals were not given the opportunity to read and review forms before they were signed.[112] Finally, in 15% of the interviews observed, asylum seekers who expressed fear were deported without a fear interview, despite the fact that half of those files actually reflected the expression of fear.[113] Since the 2005 release of the first USCIRF report, no organization has been given access to border patrol practices or been allowed to observe credible fear interviews.

The 2005 report made several recommendations to improve expedited removal, all designed to ensure that victims of human rights abuses would have access to asylum protection. However, two years

---

https://www.aclu.org/report/american-exile-rapid-deportations-bypass-courtroom [https://perma.cc/R8UR-5BAP] (explaining the right to apply for asylum and for protection from persecution under international law and norms); CLARA LONG, HUMAN RIGHTS WATCH, "YOU DON'T HAVE RIGHTS HERE:" US BORDER SCREENING AND RETURNS OF CENTRAL AMERICANS TO RISK OF SERIOUS HARM 6, 8 (2014) [hereinafter HRW, YOU DON'T HAVE RIGHTS HERE], http://www.hrw.org/sites/default/files/reports/us1014_web_0.pdf [https://perma.cc/LMB6-T9G2].

110.    MARK HETFIELD ET AL., U.S. COMM'N ON INT'L RELIGIOUS FREEDOM, REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL: VOL. I: FINDINGS AND RECOMMENDATIONS 50–62 (2005); MARK HETFIELD ET AL., U.S. COMM'N ON INT'L RELIGIOUS FREEDOM, REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL: VOL. II: EXPERT REPORTS 33 (2005). For detailed summaries of these three reports, see Manning & Hong, *Access to Counsel*, *supra* note 32, at 689–91; *see also* Frost, *Learning from our Mistakes*, *supra* note 40, at 781–82 (describing the disparity in outcomes between individuals who receive legal assistance and those who do not).

111.    ACLU, AMERICAN EXILE, *supra* note 109, at 43.

112.    *Id.*

113.    *Id.*

AR.10975

later, USCIRF's 2007 annual report gave CBP an "F" because of a total lack of response to USCIRF's 2005 recommendations.[114]

In 2014, several NGOs released reports on expedited removal, all based on interviews with individuals who had gone through the process. A 2014 report from Human Rights Watch (HRW) shared the findings of interviews with Hondurans who were subjected to expedited removal and deported:

> Many said that they had expressed their fears to US Border Patrol officers charged with screening for fear of return before being deported, but fewer than half of these were referred by US Border Patrol for a further assessment of whether they had a 'credible' or 'reasonable' fear of returning to Honduras.[115]

Indeed, HRW reports that "the migrants we interviewed said that the CBP officers whom they encountered seemed singularly focused on removing them from the United States, which impeded their ability to make their fears known."[116] A 2014 report from the ACLU, based on interviews with 89 individuals who had received summary removal orders, reported that 55% were never asked about their fear of persecution.[117] Similarly, a 2014 report from the American Immigration Council details problems with CBP failing to ask the required questions about fear, ignoring fear when expressed, and rapidly conducting interviews without confidentiality and without proper interpretation.[118]

The most recent USCIRF report from 2016 was the result of field research and a review of public information.[119] The report

---

114. U.S. COMM'N ON INT'L RELIGIOUS FREEDOM, ANNUAL REPORT 59 (2007), http://www.uscirf.gov/sites/default/files/resources/AR_2007/annualreport2007.pdf [https://perma.cc/M7QU-4DHH].

115. *See* HRW, YOU DON'T HAVE RIGHTS HERE, *supra* note 109, at 8.

116. *Id.* at 8.

117. *See* ACLU, AMERICAN EXILE, *supra* note 109, at 4.

118. SARA CAMPOS & JOAN FRIEDLAND, AM. IMMIGRATION COUNCIL, MEXICAN AND CENTRAL AMERICAN ASYLUM AND CREDIBLE FEAR CLAIMS 9–11 (2014), https://www.americanimmigrationcouncil.org/research/mexican-and-central-american-asylum-and-credible-fear-claims-background-and-context [https://perma.cc/YF6N-VDQM].

119. This included primary observations of individuals subject to the expedited removal process, interviews with asylum seekers, meetings with government officials and advocates, and meetings with officials at five ports of entry, four border patrol stations, and five asylum offices, along with inspections of 15 detention centers around the United States between 2012 and 2015. *See* 2016

AR.10976

highlighted instances where CBP officers neglected to read back answers to the individual or permit the individual to correct errors on the forms.[120] Further, CBP officers failed to record articulated fear and had pre-populated responses to questions on the forms by copying and pasting from prepared text.[121] USCIRF reports that a key finding was:

> [C]ontinuing and new concerns about CBP officers' interviewing practices and the reliability of the records they create, including: flawed Border Patrol internal guidance that conflates CBP's role with that of USCIS; certain CBP officers' outright skepticism, if not hostility, toward asylum claims; and inadequate quality assurance procedures.[122]

USCIRF expressed concern about "virtual processing" of individuals in expedited removal. This refers to interviews conducted via videoconference by agents located at a different facility, which raises concerns about privacy and the ability to communicate. Also distressing is the use of interviewing "templates" from which officers copy and paste answers.[123]

Existing scholarship has examined some failures of the expedited removal system, including touching on how the system fails asylum seekers,[124] but this Article is the first to fully explore the interaction between expedited removal and reinstatement of removal to block asylum seekers from meaningful protection, relegating them to withholding protection only. Other scholars have highlighted the problems surrounding the screening of asylum seekers in expedited

---

USCIRF REPORT, *supra* note 75, at 9 (describing the methodology informing the report's findings).

    120.    *Id.* at 19.

    121.    *Id.* at 24–25.

    122.    *Id.* at 2.

    123.    *Id.* at 24–25.

    124.    *See, e.g.*, Manning & Hong, *Access to Counsel*, *supra* note 32, at 680–82, 690; Frost, *Learning From Our Mistakes*, *supra* note 40, at 775 (giving the example of a Mexican asylum seeker whose fear was articulated, but the CBP officer erroneously determined he was ineligible for asylum because he feared harm from private actors and he was prosecuted for illegal entry and removed). Even David Martin, whose 2000 article applauds the expedited removal system, recognized back then some of the problems involved. Martin, *Expedited Removal*, *supra* note 108, at 696–97 ("[T]here have been claims that abusive, ill-trained, or ill-motivated inspectors or interpreters have sometimes deliberately ignored or blown past an assertion of feared persecution, and then issued an expedited removal order without referral to an asylum officer.").

AR.10977

removal.[125] The decisions are made by border officials, who are "generally not lawyers and who (unlike [immigration judges]) do not take oaths to do justice or maintain impartiality."[126] Further, these officers "typically operate within agency cultures that prioritize enforcement," rather than protection.[127]

The full scope of this problem is not exactly clear. As one scholar has explained, this is because, conveniently, "the government does not keep records of its mistakes."[128]

The problems for asylum seekers, however, continue beyond simply being turned back at the border.

Expedited removal can mean serious and even deadly consequences for any deported migrant, and particularly so for a wrongfully removed asylum seeker.[129] As the 2014 HRW report details, several of the Hondurans interviewed had been subjected to further violence after their expressed fear was ignored and they were expeditiously removed from the United States.[130] Additional problems are present when asylum seekers are turned away from the Mexican border and urged to seek asylum in Mexico. As the American Immigration Lawyers Association (AILA) has explained, "in Mexico, asylum seekers and other migrants face the threat of kidnapping, sexual assault, and other harm and are consistently targeted on the basis of race, nationality, sexual orientation, and other protected grounds."[131]

---

125.      Koh, *Removal in the Shadows*, *supra* note 32, at 198–200; *see also* Koh, *Searching for Solutions*, *supra* note 32, at 349–56.

126.      *See* Koh, *Removal in the Shadows*, *supra* note 32, at 230.

127.      *See id.* at 231 (citing Nina Rabin, *Victims or Criminals? Discretion, Sorting, and Bureaucratic Culture in the U.S. Immigration System*, 23 S. CAL. REV. L & SOC. JUST. 195, 199 (2014)); *see also* Pistone & Hoeffner, *Rules are Made to Be Broken*, *supra* note 66, at 196 (recognizing that "the culture in which expedited removal occurs is an enforcement culture").

128.      Frost, *Learning from Our Mistakes*, *supra* note 40, at 782.

129.      HRF, CROSSING THE LINE, *supra* note 6, at 6 (reporting that the MS gang murdered a Honduran man two weeks after his deportation); *see* ACLU, AMERICAN EXILE, *supra* note 109, at 4 (detailing several gang rapes, shootings, kidnapping, sex trafficking, and murders following deportation).

130.      HRW, YOU DON'T HAVE RIGHTS HERE, *supra* note 109, at 15–19.

131.      AM. IMMIGRATION LAWYERS ASS'N., AILA POLICY BRIEF: NEW BARRIERS AT THE BORDER IMPEDE DUE PROCESS AND ACCESS TO ASYLUM, Doc. No. 18060102 3 (2018), https://www.aila.org/infonet/policy-brief-new-barriers-at-the-border [https://perma.cc/TL2P-L6Z9]; *see also* HRF, CROSSING THE LINE, *supra* note 6, at 16–18 (detailing the danger asylum seekers face along with a lack of protection in Mexico); *see also* AMNESTY INT'L., FACING WALLS: USA AND MEXICO'S VIOLATIONS OF THE RIGHTS OF ASYLUM SEEKERS 19–22 (2017), https://www.amnestyusa.org/

Asylum seekers like Cecilia who make a repeat attempt to seek protection in the United States are forever marked with the stain of a removal order. This renders the asylum seeker ineligible for asylum protection and eligible only for withholding of removal or relief under the Convention Against Torture. The next section discusses how these forms of relief fail to meet the needs of asylum seekers and do not provide meaningful protection.

## C. Grave Consequences of the Interplay Between Reinstatement and the Expedited Removal System

Having examined the failures of the expedited removal system for asylum seekers, it is critical to understand the consequences of those erroneously issued removal orders. To this date, federal circuit courts have universally found that asylum seekers with prior removal orders, expedited or otherwise, and who have been subject to reinstatement after entering again without inspection are categorically ineligible for asylum protection.[132]

This leaves asylum seekers like Cecilia with the inferior protection options of withholding of removal and relief under the Convention Against Torture. These forms of protection require the individual to meet a higher burden of proof while offering fewer benefits. For an asylum claimant, the Supreme Court has recognized that a chance of future persecution as low as 10% would constitute a

---

wp-content/uploads/2017/06/USA-Mexico-Facing-Walls-REPORT-ENG.pdf [https://perma.cc/8NSJ-FKPY] (describing the devastating impact of new policies and practices leading to asylum seekers "pursuing increasingly more desperate and dangerous means of crossing the border"); HUMAN RIGHTS FIRST, DANGEROUS TERRITORY: MEXICO STILL NOT SAFE FOR REFUGEES (2017), http://www.human rightsfirst.org/sites/default/files/HRF-Mexico-Asylum-System-rep.pdf [https://perma.cc/ER9J-X227]. Problematic conditions for asylum seekers in Mexico have been further highlighted in the litigation challenging the "Remain in Mexico" policy. *See* Complaint, *supra* note 5, at 2. Indeed, in December 2018, two Honduran teens were killed in Tijuana. *See* Mary Beth Sheridan & Kevin Shief, *Two Honduran Teens from Caravan Killed in Tijuana,* WASH. POST (Dec. 19, 2018), https://www.washingtonpost.com/world/two-honduran-teens-from-migrant-carava n-are-killed-in-tijuana/2018/12/19/5ba8f824-03aa-11e9-958c-0a601226ff6b_story.h tml (on file with the Columbia Human Rights Law Review).

132.     *See* Wadhia, *Speed Deportations*, *supra* note 32, at 11–12 (discussing withholding-only proceedings). This Article focuses on the interplay between reinstatement and asylum protection, but it should be noted that those subject to reinstatement are also subject to potential prosecution for illegal re-entry, particularly under the current administration's "zero tolerance" policy and to other bars to admission. *See Attorney General Announces Zero-Tolerance*, *supra* note 49.

AR.10979

well-founded fear to satisfy that element of the asylum definition.[133] For an individual who is ineligible for asylum and seeking withholding, however, the likelihood of harm (a threat to the individual's life or freedom) must be more likely than not—a 51% probability threshold.[134] Cecilia, for example, had to show in her withholding-only proceedings that the father of her children was more likely than not going to kill or harm her again, rather than there being just a "reasonable possibility" (10% or greater chance) of that harm.

This heightened burden of proof means that one who would have otherwise been eligible for asylum may be returned to face danger. Further, the likelihood of detention for withholding-only applicants dramatically reduces their chances of success on the merits, again increasing the chances that an individual who faces persecution will be returned to danger.[135] Detention decreases access to counsel, in a situation in which access to counsel overwhelmingly improves an individual's chances of obtaining relief and release from detention.[136] For detained immigrants specifically, a national study showed that "the odds were almost eleven times greater than those with counsel (as compared to those without) sought relief, three times greater that they successfully obtained relief, and a little over four times greater that they had their case terminated."[137] Even where an individual is granted withholding of removal in a detained setting, she may be detained for several months following the grant while ICE tries to see whether another country would be willing to accept her for admission.[138]

Aside from the heightened burden of proof and the increased likelihood of detention during the adjudication of the protection claim, an individual is substantively far worse off than an individual granted asylum, when she is granted withholding.

133. INS v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987).
134. INS v. Stevic, 467 U.S. 407, 424 (1984).
135. *See* ACLU FACT SHEET: WITHHOLDING ONLY CASES AND DETENTION, *supra* note 27 (reporting that in 95% of withholding-only cases, the individual is detained throughout the adjudication of his claim).
136. Eagly & Shafer, *Access to Counsel in Immigration Court*, *supra* note 103, at 35, 42 (finding that only 14% of detained immigrants are represented, according to data from 2007–2012).
137. *Id.* at 57.
138. *See, e.g.*, PA. STATE UNIV. DICKINSON SCH. OF LAW CTR. FOR IMMIGRANTS' RIGHTS, WITHHOLDING-ONLY PROCEEDINGS TOOLKIT 33–35 (2014), https://pennstatelaw.psu.edu/sites/default/files/documents/pdfs/Immigrants/Withholding-Only-Toolkit.pdf [https://perma.cc/NDD6-A62L] (discussing the ongoing detention of individuals granted withholding of removal).

AR.10980

First, unlike asylees, who can petition for spouses and unmarried children under the age of twenty-one, withholding grantees do not benefit from family reunification. This leaves Cecilia permanently separated from her young son. Further, withholding grantees are unable to travel outside the United States, which can undermine not only personal freedom of movement but also professional opportunities. If Cecilia had been granted asylum, she could have applied immediately for her young son to join her in the United States as a derivative, and, while she waited for his petition to be processed (potentially for months or years),[139] she could have applied for a refugee travel document to visit him overseas.[140]

Second, withholding grantees are not eligible for some of the benefits available to asylees, including refugee medical assistance (a form of temporary insurance), refugee cash assistance, and services such as case management that may be available through voluntary agencies contracted with the Office of Refugee Resettlement within the Department of Health and Human Services.[141]

Third, withholding grantees live in limbo. Asylees are eligible to apply for permanent residence (often colloquially referred to as a "green card") one year after the asylum grant.[142] Four years after receiving permanent residence, asylees can apply for U.S. citizenship. In contrast, withholding grantees will never become permanent residents or citizens.[143] Permanent residence comes with various

---

139.    Harris, *From Surviving to Thriving*, *supra* note 14, at 76–78.

140.    An asylee (an individual who has been granted asylum) would be able to travel overseas to any country (subject, potentially, to visa requirements) other than their country of origin. Returning to the country of feared persecution could constitute "reavailment" under the statute. Reavailment means that an asylee has availed herself of the protection of the country of feared persecution, such as by traveling to the country of origin, renewing a passport, or other similar actions. *See* INA § 208(c)(2)(D), 8 U.S.C. § 1158(c)(2)(D) (2012).

141.    For a full discussion of the benefits for which asylees are eligible, and some of the struggles asylees face after the asylum grant, see Harris, *From Surviving to Thriving*, *supra* note 14; *see also* Wadhia, *Speed Deportations*, *supra* note 32, at 13 (discussing some differences in benefits between asylees and persons granted withholding of removal).

142.    8 C.F.R. § 209.2(a) (2018); *Eligibility Requirements*, USCIS POLICY MANUAL (Feb. 12, 2019), https://www.uscis.gov/policymanual/Print/PolicyManual-Volume7-PartM-Chapter2.html [https://perma.cc/PPB4-B2YD].

143.    *See generally* CHERI ATTIX, AM. IMMIGR. LAW. ASS'N, PRACTICE POINTER: UNDERSTANDING WITHHOLDING OF REMOVAL, AILA DOC. 14021344 at 2 (Apr. 2, 2014), https://www.aila.org/infonet/uscis-understanding-withholding-of-removal (on file with the Columbia Human Rights Law Review) (explaining the

AR.10981

rights, including, critically, the rights to petition for other family members and to become eligible for federal financial aid for education.[144] When permanent residents become U.S. citizens, they gain the right to vote and hold office.[145]

Further, withholding grantees are often ordered to continue to attend mandatory check-ins with a deportation officer, which vary in frequency from weekly to annually.[146] These check-ins, requiring the individual to physically appear at an ICE office, can be burdensome as they require travel, sometimes to faraway locations, and taking time off work. For someone granted withholding because they fear a threat to their life or freedom, it may also be anxiety-provoking to periodically appear at an ICE office. Withholding grantees must renew their work authorization cards every single year.[147] This temporary work permit may undermine an individual's ability to gain employment as employers may be nervous about the temporary nature of the authorization to work. Further, withholding of removal simply means that the individual's removal is withheld from the specific country of feared persecution; should conditions in that country change or ICE find another country to accept the withholding grantee, she may be deported elsewhere.[148]

---

limitations of withholding of removal); *Withholding of Removal and CAT*, *supra* note 25.

144.    *See Welcome to the United States: A Guide for New Immigrants*, U.S. CITIZENSHIP & IMMIGR. SERVS. 14, 66 (2015), https://www.uscis.gov/sites/default/files/files/nativedocuments/M-618.pdf [https://perma.cc/P5RN-AVBD] (providing information on settling in the United States including information on available benefits).

145.    *Id.* at 98–99.

146.    A judge must first issue a removal order before granting withholding of removal. *See, e.g.*, Matter of I-S- & C-S-, 24 I & N Dec. 432, 434 (B.I.A. 2008). Thus, just like any other immigrant subject to a removal order, a withholding applicant must continue to report to ICE Enforcement and Removal Operations for check-in appointments.

147.    *See* 8 C.F.R. § 274a.12(a)(10) (2018) (deeming withholding of deportation grantees eligible for work authorization). The regulation provides that "USCIS may, in its discretion, determine the validity period assigned to any document issued evidencing an alien's authorization to work in the United States." *Id.* § 274a.12(a). That period for withholding grantees is currently one year. *See Withholding of Removal and CAT*, *supra* note 25 ("A person granted withholding of removal is required to pay a yearly renewal fee for an employment authorization document in order to maintain the legal right to work in the United States.").

148.    "An alien . . . granted withholding of removal or deportation . . . may not be deported or removed to the country to which his or her deportation or removal is ordered withheld . . . unless the withholding order is terminated . . . ." 8 C.F.R. § 208.22 (2018). It is current ICE practice to require withholding grantees to apply

The differences in protection, opportunity, and the potential for integration and stability for asylees versus those granted withholding or CAT protection are profound. And that fork in the road comes most often during the very first interaction an asylum seeker has with the U.S. immigration system, the result of a split-second decision made by a low-level border official. If the CBP officer encounters an asylum seeker and follows the law correctly, the asylum seeker should be referred for a credible fear interview and end up in asylum proceedings. If that officer fails to follow the law correctly, the asylum seeker will be quickly removed and then subject to reinstatement of removal and ineligible for asylum if she tries to illegally enter again. While it seems that an erroneous removal order should be easy to remedy, in reality it is a permanent stain on the asylum seeker's record, incredibly unlikely ever to be removed despite various efforts and tactics undertaken by creative attorneys, as discussed below.

## II. LACK OF ACCOUNTABILITY MECHANISMS FOR ABUSE OF EXPEDITED REMOVAL

Given the already widespread use of expedited removal and its anticipated expansion, the problematic ways in which it affects asylum seekers must be addressed. Immigration judges lack the authority to consider an individual eligible for asylum without a Notice to Appear in INA Section 240 proceedings, which, as explained above, is not given to those in withholding-only proceedings.[149] Thus, immigration judges lack the power to remedy the injustice caused by an erroneously issued expedited removal order that has been subsequently reinstated. The avenues for relief lie with immigration officials, who have discretionary power to remedy the situation.

The existing methods of discretionary relief through one of two immigration agencies are discussed below. Prosecutorial discretion is the power that an agency or individual officer has to decide which

---

to at least three other countries for residence or admission. In Cecilia's case, for example, after her withholding grant in April 2018, ICE ordered her to apply to three consulates for admission to their countries. *See* INA § 241(b)(1)(C), 8 U.S.C. § 1231(b)(1)(C) (2012) (laying out alternate countries to which an individual may be removed). Withholding may also be revoked if the grantee's life or freedom would no longer be threatened because country conditions have changed. 8 C.F.R. § 208.24(b)(1) (2018).

149.    8 C.F.R. § 208.2(b), (c)(2) (2018); *see also id.* § 208.31(g)(2)(i) ("The immigration judge shall consider only the alien's application for withholding of removal . . . .").

AR.10983

charges to bring and how to pursue a particular case. [150] In the immigration context, prosecutorial discretion exists at many levels throughout the system. This Part outlines two existing strategies to challenge an erroneously issued expedited removal order, including (1) asking CBP to reopen and rescind the removal order, and (2) asking the ICE trial attorney with the Office of Chief Counsel to exercise discretion to issue a Notice to Appear, rather than accepting CBP's reinstatement of the removal order and issuing a Notice of Referral to withholding-only proceedings. In the current political climate, neither remedy is effective. Federal court challenges are also limited due to strict jurisdictional provisions, and these are discussed below in Part C.

## A. Asking CBP to Reopen and Rescind Underlying Expedited Removal Orders

A logical first step in challenging an erroneously issued removal order is contacting the agency responsible for issuing that order. CBP officers are not required by law to reinstate prior removal orders against individuals who enter without inspection.[151] Similarly, they have the power to rescind a reinstated removal order or expedited removal order.

Under 8 C.F.R. § 103.5, an individual may ask CBP to reopen and rescind a removal order. The Ninth Circuit has explained that the agency must consider all favorable and unfavorable factors relevant to the exercise of its discretion in considering whether to reinstate a removal order, and that failure to do so would constitute an abuse of discretion.[152] Indeed, some attorneys have managed to get a reinstatement of removal order reversed or an expedited removal order rescinded, but with limited success, and primarily under previous

150.  *See* Wadhia, *The Rise of Speed Deportations*, *supra* note 32, at 22 ("'Prosecutorial discretion' refers to a decision by the immigration agency about whether, and to what extent, DHS should enforce immigration laws against a person or group.").

151.  Villa-Anguiano v. Holder, 727 F.3d 873, 878 (9th Cir. 2013) (noting that DHS may "decide to forgo reinstatement of a prior order of removal in favor of initiating new removal proceedings, with the accompanying procedural rights to counsel and a hearing in immigration court"); *see also* Alcala v. Holder, 563 F.3d 1009, 1013–14 (9th Cir. 2009) (noting that the government is not required by law to issue a reinstatement of removal order).

152.  *See Villa-Anguiano*, 727 F.3d at 878 (citing 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 241.8(a)–(b)).

AR.10984

administrations.[153] In a 2014 report, the ACLU interviewed sixty-nine advocates and concluded that "it is incredibly rare to get an order rescinded by border officials."[154] According to a panel discussion at the Federal Bar Association conference in May 2018, a CBP attorney in San Francisco shared that the Port directors determine whether or not to grant such motions, but they are entirely discretionary.[155]

B. Asking the Office of Chief Counsel to Exercise Prosecutorial Discretion to Issue an NTA and Not to Accept CBP's Reinstatement of the Prior Expedited Removal Order

When CBP will not reopen and rescind the expedited removal order, a second strategy is to ask the prosecuting official to decline to

---

153.    Koh, *Removal in the Shadows*, *supra* note 32, at 201–03, has had some success with this. In following up with Professor Koh, she shared the compelling motion filed on behalf of her client, which resulted in the reopening and rescission of the expedited removal order, although this was in 2016 and prior to the Trump Administration. *See also* Koh, *Searching for Solutions*, *supra* note 32, at 360 n.137 (noting reports of some success with motions to reopen and rescind expedited removal orders). Trina Realmulto of the American Immigration Council shared seven decisions issued by CBP granting a request to rescind a removal order, which included three positive decisions from Los Angeles, CA from 2015 and 2016; one positive decision from Nogales, AZ, in 2016, from Hidalgo, TX, in 2016, from Boston, MA in 2015; and most recently from Laredo, TX, in November 2017. She also shared one decision granting attorney Stacy Tolchin's request to rescind a reinstatement of removal order from Los Angeles, issued in 2015. All of these decisions and motions are on file with the author.

154.    ACLU, AMERICAN EXILE, *supra* note 109, at 18, 80.

155.    Telephone Interview with Trina Realmuto, Directing Attorney, American Immigration Council (Aug. 15, 2018). Indeed, in Cecilia's case, counsel filed such a request with CBP's Rio Grande Valley sector in January 2018, where both of Cecilia's prior expedited removal orders were issued, and received no response before Cecilia's April 2018 trial. Cecilia was granted withholding of removal. Later, in August 2018, CBP responded and denied the request to reopen and rescind the removal orders, stating that there is "no prescribed mechanism for U.S. Border Patrol to reopen, reconsider, or vacate an expedited removal order." This request should have been styled instead as a request to reopen and rescind the reinstatement of the removal orders on June 9, 2014 and October 23, 2015. Regardless, unfortunately this would not make a difference for Cecilia. Her withholding grant was largely based on the 2014 *Matter of A-R-C-G-* decision, which was overruled by former Attorney General Sessions' decision in *Matter of A-B-* in June 2018. Even if Cecilia's removal orders could vanish and she could file a motion to reopen and file for asylum today in immigration court, her chances of success are somewhat diminished. Although asylum cases for domestic violence survivors have been granted in the wake of *Matter of A-B-* and Cecilia may prevail on the merits, this is very dependent on the individual judge and DHS trial attorney involved in the case.

place the asylum seeker into withholding-only proceedings based on CBP's reinstatement of the prior order. The prosecuting official within ICE can instead issue a Notice to Appear, placing the individual into full removal proceedings and allowing an asylum seeker to pursue asylum.

The decision to place an individual into withholding-only proceedings, as opposed to regular removal proceedings, lies in the hands of a charging officer or with an attorney from the ICE Office of Chief Counsel.[156] "'Prosecutorial discretion' refers to a decision by the immigration agency about whether, and to what extent, DHS should enforce immigration laws against a person or group."[157] At least in the past, ICE trial attorneys have had broad prosecutorial discretion and, as one scholar has cogently argued, "certain concrete responsibilities—expressed in statutory provisions, case law, and agency guidance—to seek legitimate objectives, take steps to ensure procedural justice, and exercise equitable discretion in appropriate cases."[158] In this case, specifically, under Section 1231(a)(5) of the INA, ICE agents have the power to reinstate a prior removal order but "may exercise their discretion not to pursue streamlined reinstatement procedures."[159]

In Cecilia's case, counsel submitted such a request to the Office of Chief Counsel a few months before Cecilia's withholding-only hearing. In phone conversations with the original ICE trial attorney

---

156.     Matter of E-R-M- & L-R-M-, 25 I. & N. Dec. 520, 523 (B.I.A. 2011) ("[W]e find that the statutory scheme itself supports our reading that the DHS has discretion to put aliens in section 240 removal proceedings even though they may also be subject to expedited removal under section 235(b)(1)(A)(i) of the Act."); *see also* ACLU, AMERICAN EXILE, *supra* note 109, at 14 ("[A]n immigration enforcement officer does have the option to refer a non-citizen to a full hearing in an immigration court even where the non-citizen is eligible for a summary removal procedure."); Wadhia, *Speed Deportations*, *supra* note 32, at 22 (citing memoranda issued in 2011 by then–ICE Director, John Morton).

157.     *See* Wadhia, *Speed Deportations*, *supra* note 32, at 22.

158.     *See* Jason A. Cade, *The Challenge of Seeing Justice Done in Removal Proceedings*, 89 TUL. L. REV. 1, 6 (2014) [hereinafter Cade, *The Challenge of Seeing Justice Done*].

159.     *See* Villa-Anguiano v. Holder, 727 F.3d 873, 878 (9th Cir. 2013) ("[A]n ICE officer may decide to forgo reinstatement of a prior order of removal in favor of initiating new removal proceedings . . . ."). Under 8 C.F.R. § 239.2(b) (2018), where it is "impracticable" for the original officer issuing the NTA to cancel the notice, another officer may do so. Although the BIA has said that trial attorneys do not have the authority to withdraw NTAs that have been filed with the court, the trial attorneys can still file a motion for administrative closure or termination of proceedings, and re-issue a new NTA, or issue a new NTA with the judge's permission.

assigned to the case, that attorney indicated that it was office policy to reinstate all prior removal orders unless there was a clear expression of fear in the record by Cecilia in her interactions with CBP. This is the precise issue—Cecilia expressed her fear and the CBP officers with whom she interacted on two occasions ignored that fear, failed to record it, and deported her.

On the day of her trial, a new trial attorney was assigned to Cecilia's case. He echoed the same policy as his colleague and emphasized a need for "something" in the record indicating a fear expressed at an earlier stage. Ultimately, within the same conversation where he declined to exercise discretion not to reinstate the prior removal orders, he exercised his discretion positively and spontaneously to stipulate to a grant of withholding of removal for Cecilia and asylum for her daughter. This stipulation came solely based on the record before the court, without even hearing testimony from Cecilia, highlighting the strength of the case.

The absurdity and injustice of this decision is paramount. The trial attorney in 2018 recognized how strong Cecilia's case was, so much so that he believed her solely based on the record evidence, without even needing to hear her speak a word or recount her traumatic experiences herself. Regardless, based on her alleged failure to articulate that fear when apprehended by border officials in 2014, he made the decision to preclude her from obtaining durable relief and being reunited with her son.

Ironically, Cecilia's daughter was granted asylum protection, despite having a weaker case than her mother and having endured far less past persecution at the hands of her father, while her mother, the direct victim of the persecution, was only granted withholding protection. It was Cecilia's word against official records from CBP, and in spite of the compelling record evidence, in the absence of concrete, contemporaneous evidence in Cecilia's favor, the ICE attorney chose to side with his immigration agency colleagues.

## C. Appellate Dreams Dashed: Limited Judicial Review of Expedited Removal Orders

With such limited ability to eliminate the underlying removal order, as discussed above, advocates have tried over the years to seek

appellate review of the decision not to allow individuals subject to reinstatement of removal to seek asylum.[160]

Strict limits on judicial review of the expedited removal system make this very difficult.[161] Habeas review, by which an individual can challenge government detention before a judge, is similarly limited and only available in three narrow situations, where there is a need to determine (1) whether the individual is an "alien," (2) whether a removal order was issued, and (3) whether the individual can demonstrate that he or she is a lawful permanent resident, a refugee, or an asylee.[162] Challenges to the expedited removal system as a whole must be brought within sixty days of a written policy change.[163] All of this means that an asylum seeker wrongfully issued an expedited removal order has little recourse through our federal appellate court

---

160.    The litigation is discussed below. In one law review article, Hillary Gaston Walsh argues that the reinstatement of prior orders of removal should not bar asylum seekers from accessing asylum protection. *See* Hillary Gaston Walsh, *Forever Barred: Reinstated Removal Orders and the Right to Seek Asylum*, 66 CATH. U. L. REV. 613, 666 (2017).

161.    *See* INA § 242(a)(2)(A), 8 U.S.C. § 1252(a)(2)(A) (2012). For more on the strict limits to challenging expedited removal orders, see ACLU, AMERICAN EXILE, *supra* note 109, at 3 ("These summary procedures invite, and guarantee, error. And yet erroneous—even illegal—summary removal orders are difficult to challenge because of the speed of the process, the limited 'evidence' required, and the absence of a complete record of the proceeding. These procedures might need more review, as they lack many courtroom safeguards; instead, most summary procedures are subject to strict jurisdictional limits that severely limit the possibility of any judicial review.").

162.    These limitations on habeas review for expedited removal orders are called into question by the Constitution's Suspension Clause. U.S. CONST. art. I, § 9, cl. 2. The Third Circuit addressed this in *Castro v. DHS*, a case brought by 28 women and their children asylum seekers from Central America who challenged the expedited removal orders issued against them. 835 F.3d 422, 445 (3d Cir. 2016). The court found that the asylum seekers did not benefit from the Suspension Clause given their limited contacts and ties in the United States and apprehension within hours of arrival in the United States. *But see* Osorio-Martinez v. U.S. Att'y Gen., 893 F.3d 153, 167 (3d Cir. 2018) (holding that the Suspension Clause did apply to four children granted Special Immigrant Juvenile status while held in immigration detention). As this article went to print, the Ninth Circuit created a circuit split on this issue, finding that asylum seekers are entitled to federal court review of expedited removal orders. *See* Thuraissigiam v. U.S. Dep't of Homeland Sec., 917 F.3d 1097, 1100, 1116–1119 (9th Cir. 2019).

163.    *See* INA § 242(e)(3); *see also* Oluwadamilola E. Obaro, *Expedited Removal and Statutory Time Limits on Judicial Review of Agency Rules*, 92 N.Y.U. L. REV. 2132, 2132 (2017) (arguing that "courts should not read the expedited removal time-limit to bar constitutional challenges to expedited removal that could not have been raised within the prescribed time limit").

AR.10988

system. Perversely, "[t]hose with the least amount of process at the front end also receive virtually no avenue to seek accountability by way of federal court review at the back end."[164]

Advocates have brought challenges to the reinstatement of a prior removal order as a bar to asylum in almost every jurisdiction throughout the United States. Specifically, advocates have argued that conflicting sections of the Immigration and Nationality Act should mean that, under the plain language of the statute, an individual with a reinstated removal order is asylum-eligible.[165] Unfortunately, these challenges have been unsuccessful. Courts have found, in various ways, that those subject to reinstatement of removal after re-entering without inspection may not seek asylum.[166] In April 2018, the Board of Immigration Appeals weighed in definitively on this issue, finding that

---

164.    *See* Koh, *Searching for Solutions*, *supra* note 32, at 372. The ACLU notes that "[t]he reinstatement process is particularly harsh when applied to people who previously were deported in summary proceedings where they did not have a hearing before an immigration judge, and thus, had no opportunity to present evidence, receive legal assistance, or have a meaningful opportunity to appeal the prior removal order." ACLU, AMERICAN EXILE, *supra* note 109, at 21.

165.    *Compare* INA § 208(a)(1), 8 U.S.C. § 1158(a)(1) (2012) ("Any alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum . . . .") *with id.* § 241(a)(5), 8 U.S.C. § 1231(a)(5) (2012) (providing that the previous removal order is "reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and *may not apply for any relief* under this chapter, and the alien shall be removed under the prior order at any time . . . .") (emphasis added).

166.    *See, e.g.*, Garcia v. Sessions, 856 F.3d 27, 31 (1st Cir. 2017), *cert. denied*, 138 S.Ct. 2652 (2018) (according *Chevron* deference to the BIA's interpretation of the statute and finding those subject to reinstatement ineligible for asylum, but the dissent questions underlying validity of the initial removal proceedings); Herrera-Molina v. Holder, 597 F.3d 128, 139 (2d Cir. 2010) (examining the plain language of § 1231(a)(5) and DHS regulations and holding that "relief other than withholding of removal . . . is not available to this petitioner"); Cazun v. U.S. Attorney Gen., 856 F.3d 249, 251 (3d Cir. 2017), *cert. denied*, 138 S.Ct. 2648 (2018); Calla-Mejia v. Sessions, 866 F.3d 573, 587 (4th Cir. 2017); Lara-Aguilar v. Sessions, 889 F.3d 134, 140–43 (4th Cir. 2018); Ramirez-Mejia v. Lynch, 794 F.3d 485, 490–91 (5th Cir. 2015) (considering § 1158's "discretionary nature" and concluding that "[a]ffording asylum relief to aliens whose removal orders are reinstated would be inconsistent with [§ 1231(a)(5)]"); Ochoa-Carillo v. Gonzales, 437 F.3d 842, 847 (8th Cir. 2006); Perez-Guzman v. Lynch, 835 F.3d 1066, 1070 (9th Cir. 2016); Moralez-Izquierdo v. Gonzales, 486 F.3d 484, 506 (9th Cir. 2007); Ayala v. Sessions, 855 F.3d 1012, 1016 (9th Cir. 2017); Jimenez-Morales v. U.S. Attorney Gen., 821 F.3d 1307, 1310 (11th Cir. 2016) (cert. denied) (examining § 1231(a)(5) and § 1158 and concluding that "[a]s asylum is a form of relief from removal" contained in Chapter 12 of Title 8 of the U.S. Code, an individual subject to a reinstated removal order "is not eligible for and cannot seek asylum").

"[a]n applicant in withholding of removal only proceedings who is subject to a reinstated order of removal . . . is ineligible for asylum."[167]

In rejecting advocates' plain language argument—that the statute itself makes clear that any person is eligible to apply for asylum—courts seem to assume that asylum seekers are able to challenge the initial expedited removal order itself.[168] This is an unrealistic expectation for several reasons.

First, beyond review by an immigration judge, the federal appellate courts lack jurisdiction to review expedited removal orders.[169]

Second, even if there were a mechanism by which an asylum seeker could challenge the expedited removal order, many asylum seekers subjected to expedited removal do not even understand that they have acquired a removal order.[170] Further, most asylum seekers are unaware of the process to actually seek asylum. Complicating matters, all of the documents prepared are in English, and although Spanish speakers are often spoken to in some version of their native language, language access for speakers of rare or indigenous languages is poor.

Third, the deadline to petition for reopening such an order is within thirty days of its issuance.[171] It would likely take days or weeks for an asylum seeker to file such a court motion, while deportation after an expedited removal order would be swift.

Fourth, most asylum seekers are fleeing for their lives and thus their immediate safety is the priority. This is especially so for those who have been returned to the place from which they fled persecution.

---

167.     Matter of L-M-P-, 27 I. & N. Dec. 265, 265 (B.I.A. 2018).

168.     *See, e.g.*, *Mejia*, 866 F.3d at 590 ("Rather, we think it more than feasible that an individual removed to her home country could illegally re-enter the United States, have the original removal order reinstated by DHS, and petition for review—all within a month's time.").

169.     INA § 235(b)(1)(A)(i), 8 U.S.C. § 1225(b)(1)(A)(i) (2012) (providing for expedited removal "without further hearing or review" of the officer's determination); 8 C.F.R. § 1003.42(f) (2018).

170.     Immigration clinicians train students and new immigration attorneys to ask whether an individual has ever had any contact with border officials or had their photograph taken or been fingerprinted, to try to assess whether a prior removal order exists. Sometimes, the only way to definitively know is to file a Freedom of Information Act (FOIA) request.

171.     INA § 242(b)(1), 8 U.S.C. § 1252(b)(1) (2012).

Finally, asylum seekers often lack the resources to access counsel, along with the language skills or even literacy to navigate the U.S. court system.[172]

Professor Koh asserts that "the courts might exercise jurisdiction over expedited removal orders issued in error—for instance, because an officer failed to adequately inquire or assess fear."[173] However, most courts have rejected this.[174] Koh has also suggested a different argument, using the Administrative Procedure Act (APA) to challenge placing individuals in reinstatement proceedings following a prior expedited removal order.[175] Specifically, under the APA, agencies must avoid "arbitrary and capricious" action and demonstrate reasoned decision-making.[176] Using the reasoning of the Supreme Court's decision in *Judulang v. Holder*, Koh argues that review of an immigration agency's exercise of discretion should consider various factors including worthiness, merit, an individual's "attributes and circumstance," and whether the individual is "deserving."[177]

---

172.    These concerns about practical barriers facing asylum seekers have been identified in the author's experience representing asylum seekers as Professor and Co-Director of the Immigration and Human Rights Clinic at the University of the District of Columbia David A. Clarke School of Law, and in her previous work with the American Immigration Council, the Georgetown Center for Applied Legal Studies, Tahirih Justice Center, and through law school clinical experiences.

173.    Koh, *Searching for Solutions*, *supra* note 32, at 374. *See also* Am.-Arab Anti-Discrimination Comm, v. Ashcroft, 272 F. Supp. 2d 650, 663 (E.D. Mich. 2003) (asserting habeas jurisdiction "to determine whether the expedited removal statute was *lawfully applied*"); Dugdale v. U.S. Customs & Border Prot., 88 F. Supp. 3d 1, 2 (D.D.C. 2015) (asserting jurisdiction over the applicant's claim that "his removal order was procedurally defective"); Ramirez-Molina v. Ziglar, 436 F.3d 508, 515 (5th Cir. 2006) (finding jurisdiction to review petitioner's underlying removal order but finding no gross miscarriage of justice in underlying proceedings because petitioner failed to challenge his removability).

174.    Koh, *Searching for Solutions*, *supra* note 32, at 374; *see also* Villegas de la Paz v. Holder, 614 F.3d 605, 610 (6th Cir. 2010) (concluding that the court has "jurisdiction over constitutional claims or questions of law raised in the context of reinstatement proceedings," but ultimately finding that it lacks "jurisdiction to review the underlying deportation order"); Lorenzo v. Mukasey, 508 F.3d 1278, 1281 (10th Cir. 2007) (holding that the court lacks "jurisdiction to review any constitutional or statutory claims related to the underlying removal order").

175.    *See id.* at 382 (explaining that arbitrary and capricious review requires courts to "hold unlawful and set aside agency action . . . [that is] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law") (citing 5 U.S.C. § 706(2)).

176.    *Id.*

177.    Judulang v. Holder, 565 U.S. 42, 55–57 (2011). Others have also made arguments that *Judulang* weighs in favor of an exercise of prosecutorial discretion

This is a creative idea that merits exploration by advocates and litigants. However, any daylight on this issue for asylum seekers will take years to come by in the circuit courts. This Article instead considers more immediate solutions to the problematic interplay of expedited removal and reinstatement of removal as it pertains to those seeking protection in the United States.

## III. Solutions to Stop Depriving Asylum Seekers of Meaningful Protection

Pending legal challenges to CBP's implementation of the expedited removal system for asylum seekers do not specifically address the problematic interplay between reinstatement of removal and expedited removal. For example, a lawsuit pending in the Southern District of California alleges that CBP and DHS are violating domestic and international law, along with asylum seekers' Fifth Amendment due process rights.[178] This lawsuit specifically focuses on the illegal turnbacks of individuals who express a fear of return at our border. It does not address the issue of CBP officers failing to refer asylum seekers for credible fear interviews and issuing expedited removal orders that are later reinstated following a subsequent entry without inspection.

In June 2018, a lawsuit was filed under the Federal Torts Claims Act against CBP on behalf of an individual fleeing Mexico and seeking asylum based on his sexual orientation.[179] In addition to numerous other failings in the interview process, CBP failed to ask about the asylum seeker's fear of persecution and deported him to Mexico.[180] When the asylum seeker entered the United States again and expressed his fear of return, his fear was ignored, his removal order was reinstated, and he was again deported to Mexico.[181]

---

taking into account the equities of an individual situation. *See* Jason A. Cade, *Judging Immigration Equity: Deportation and Proportionality in the Supreme Court*, 50 U.C. Davis L. Rev. 1029, 1071–75 (2017); Shoba Sivaprasad Wadhia, *The Immigration Prosecutor and the Judge: Examining the Role of the Judiciary in Prosecutorial Discretion Decisions*, 16 Harv. Latino L. Rev. 39, 53 (2013).

178.     *See Al Otro Lado* Complaint, *supra* note 6, at 2.

179.     Complaint, *Crespo Cagnant v. United States*, No. 1:18-cv-22267-FAM (S.D. Fla. June 7, 2018), https://cbpabusestest2.files.wordpress.com/2018/08/crespo_complaint.pdf [https://perma.cc/3YHK-YWS6].

180.     *Id.* at 10–12.

181.     *Id.* at 12–15.

AR.10992

While these lawsuits are in the works, they may not ultimately be successful and may not have remedies that address the depth of the problem. Consequently, we must consider more systemic reforms. Ideally, given all of the challenges with expedited removal highlighted in this Article, the system should be scrapped and we would return to full due process and judicial review for asylum seekers, eliminating reinstatement of removal altogether. In the current political climate, however, this seems unrealistic.

Thus, this Part considers a number of potential reforms—including congressional action to increase oversight and transparency of the expedited removal system, which in some ways may gain some traction in the current political environment. Next, this Part considers encouraging the exercise of prosecutorial discretion, which, although certainly appropriate, seems unlikely in the current climate. Other solutions include increasing access to counsel, which seems both realistic, considering increased attention and funding for immigration advocacy work, and simultaneously challenging given the government's extreme resistance to allowing attorneys to be more involved in the process. Finally, this Part considers reforms within the Customs and Border Protection agency itself. Broadly, one reform would be enhanced training for CBP officers, which may only go so far in the current environment of extreme animus and anti–asylum seeker rhetoric from the highest levels of our government.

A final, and perhaps the most practical and realistic, proposal will be discussed in Part IV, which is to follow the lead of law enforcement agencies throughout the country in their attempts to counter rampant abuse and a lack of public trust and transparency through the introduction of body-worn cameras. This Article proposes that all CBP officers conducting screening interviews wear these devices to create a permanent and accessible record of asylum seekers expressing their fear and to definitively understand whether required laws and protocols are being followed.

## A. Congressional Action

In the current political climate, statutory overhaul favorable to asylum seekers seems unrealistic.[182] There are, however, actions Congress could take to increase oversight and accountability of CBP given the severity of the failures of the expedited removal system. CBP itself recognizes the stakes of the system and explains them within the

---

182.    *See* Koh, *Searching for Solutions*, *supra* note 32, at 394.

AR.10993

Field Officer's Manual: "The expedited removal proceedings give officers a great deal of authority over aliens and will remain subject to serious scrutiny by the public, advocacy groups, and Congress."[183]

The political will may exist to create such transparency in light of the extreme public engagement after recent actions by the Departments of Homeland Security and Justice to prosecute individuals at the border and separate children from their parents.[184] Indeed, public outrage is at a peak and a campaign to #AbolishICE has gained some traction.[185] Congress could mandate this oversight through the U.S. Commission on International Religious Freedom or another body.[186] Calls for such oversight are not new and the importance of external scrutiny cannot be overstated.[187] Scholars Pistone and Hoeffner have also suggested testers—actors who would go through the expedited removal process to assess whether CBP officers are following the rules.[188]

Comprehensive immigration reform is, of course, always up for debate, but ultimately this Article concludes that such reform is

---

183.    INSPECTOR'S FIELD MANUAL, *supra* note 63, § 17.15(b)(1).

184.    *See, e.g.*, Phil McCausland, Patricia Guadalupe & Kalhan Rosenblatt, *Thousands Across U.S. Join 'Keep Families Together' March to Protest Family Separation*, NBC NEWS (June 30, 2018), https://www.nbcnews.com/news/us-news/thousands-across-u-s-join-keep-families-together-march-protest-n888006 [https://perma.cc/35WQ-7R4A] (reporting on the six hundred marches that occurred throughout the country demanding the Trump administration reunite separated families).

185.    *See, e.g.*, Ron Nixon & Linda Qui, *What is ICE and Why Do Critics Want to Abolish It?*, N.Y. TIMES (July 3, 2018), https://www.nytimes.com/2018/07/03/us/politics/fact-check-ice-immigration-abolish.html (on file with Columbia Human Rights Law Review) (explaining the call to abolish ICE); Eliza Relman, *The First Signs Are Emerging That the Progressive Campaign to Abolish ICE Is Working*, BUS. INSIDER (July 24, 2018), https://www.businessinsider.com/abolish-ice-campaign-democrats-progress-updates-2018-7 [https://perma.cc/YG6G-JH5R] ("72% of Democrats now support eliminating the agency, according to new polling.").

186.    *See, e.g.*, BORDER ENFORCEMENT ACCOUNTABILITY, OVERSIGHT, AND COMMUNITY ENGAGEMENT ACT OF 2017, H.R. 3020, 115TH CONG. (2017) (proposing legislation establishing a DHS border oversight commission and expanding the USCIS Ombudsman's Office created by the Homeland Security Act in 2002 to make it the Ombudsman for Border and Immigration Related Concerns).

187.    *See* Pistone & Hoeffner, *Rules are Made to Be Broken*, *supra* note 66, at 201–02 (arguing that "Congress should authorize a regular schedule of studies with the idea of continuing them until substantial improvement is shown" and the agency should be required to *respond* to those studies).

188.    *Id.* at 202–03.

AR.10994

unlikely and sets up a more focused solution to address this particular problem, below in Part IV.

## B. Prosecutorial Discretion in Expedited Removal and Reinstatement of Removal

Another solution to the problematic interplay between expedited removal and reinstatement of removal may be to expand the use of prosecutorial discretion. Scholars have long called for the expansion of prosecutorial discretion in the "speed deportation" realm[189] and in immigration more broadly.[190] Similarly, Human Rights Watch's 2014 report called for CBP to "apply a presumption of fear of return for migrants in expedited removal" who are from particular countries.[191]

DHS has discretion regarding whether and when to subject an individual to expedited removal or reinstatement of removal.[192] The BIA recognizes that DHS can place individuals who have expedited removal orders into regular removal proceedings, where they could apply for asylum relief.[193] In issuing a Notice to Appear, ICE should "consider humanitarian factors and the possibility for other relief when deciding to place a person who legally qualifies for speed deportation in removal proceedings instead."[194]

As the BIA has recognized, DHS trial attorneys have:

---

189.    *Id.* at 22–25.

190.    *See* Cade, *The Challenge of Seeing Justice Done*, *supra* note 158, at 13 ("This sweeping, categorical, and unforgiving approach thus elevates the role of enforcement discretion, which must compensate for the statute's lack of nuance."); Frost, *Learning from Our Mistakes*, *supra* note 40, at 786 (suggesting that to guard against mistakes in immigration enforcement, immigration officers should "err on the side of interpreting the law expansively," and arguing in favor of a "rule of lenity" to minimize errors leading to the "wrongful exclusion and deportation of those entitled to remain in the United States").

191.    HRW, You Don't Have Rights Here, *supra* note 109, at 41.

192.    *See* Wadhia, *Speed Deportations*, *supra* note 32, at 22 (citing a pair of memos issued by then–ICE Director John Morton in 2011).

193.    Matter of E-R-M- & L-R-M-, 25 I. & N. Dec. 520, 520 (B.I.A. 2011); *see also* Matter of S-M-J-, 21 I. & N. Dec. 722, 726 (B.I.A. 1997) (discussing the immigration judge and trial attorney's responsibilities to ensure that refugee protection is provided where warranted, including introducing evidence favorable to the respondent).

194.    *See* Wadhia, *Speed Deportations*, *supra* note 32, at 24 (citing the Morton Memo).

AR.10995

> [A]n obligation to uphold international refugee law, including the United States' obligation to extend refuge where such refuge is warranted. That is, immigration enforcement obligations do not consist only of initiating and conducting prompt proceedings that lead to removals at any cost. Rather, as has been said, the government wins when justice is done.[195]

In Cecilia's case, and in line with the obligations of DHS trial attorneys, prosecutorial discretion should have been exercised. Cecilia's case presented a clear example of where the equities and the compelling humanitarian case for family reunification, along with Cecilia's eligibility for asylum, merited discretion.[196] Indeed, as made clear from the record in the case, Cecilia's partner, the father of her child, had abused his young son, stuck in Honduras, from the age of three; had served jail time for slashing Cecilia's sister's shoulder with a machete; had set alight two inmates while incarcerated, killing one of them; and yet had been released from custody by the time of Cecilia's asylum hearing. The equities clearly weighed in favor of reunifying this traumatized young boy with his mother.

Unfortunately, in the current era of hyper-aggressive immigration enforcement and directives from on high *not* to exercise prosecutorial discretion, calls for the exercise of prosecutorial discretion seem perhaps unrealistic.[197] In order to more effectively

---

195.   *See S-M-J-*, 21 I. & N. Dec. at 727; *see also* Erin B. Corcoran, *Seek Justice, Not Just Deportation: How to Improve Prosecutorial Discretion in Immigration Law*, 48 LOY. L.A. L. REV. 119, 131 (2014) (arguing that ICE attorneys have ethical duties to pursue justice and that prosecutorial discretion should be formalized through an attorney's manual clearly setting out ICE policies, practices, and priorities for use of prosecutorial discretion).

196.   *See* Cade, *The Challenge of Seeing Justice Done*, *supra* note 158, at 25 ("The other objective [of prosecutorial discretion agency memoranda] is to ensure that ICE attorneys take special account of situations in which noncitizens are technically in violation of civil immigration laws but have strong humanitarian factors militating in favor of discretion."). This case is not unique. The author has handled other cases where withholding grantees are permanently separated from their children with no possibility of reunification because of an erroneously issued expedited removal order. *See also* ACLU, AMERICAN EXILE, *supra* note 109, at 21–22 (giving the example of an indigenous Guatemalan woman who received an expedited removal order because her fear was ignored and now, even if she wins her withholding case, she will not be reunited with her child).

197.   Indeed, much of the positive Obama-era guidance on prosecutorial discretion has implicitly, if not explicitly, been overridden by the Trump executive orders, the end of the Priority Enforcement Program (PEP), etc. *See* Cade, *The Challenge of Seeing Justice Done*, *supra* note 158, at 28–35 (discussing the Morton

persuade trial attorneys and CBP officers to exercise discretion to rescind or amend an erroneously issued expedited removal order, something more is needed to lift the expedited removal process out of the shadows. This will be discussed in Part IV.

## C. Increasing Access to Counsel

One solution to the problem posed here—wrongful deportations of asylum seekers resulting in expedited removal orders that forever stain their quest for meaningful protection—is improved access to counsel. Specifically, within the context of initial screening at the border, access to counsel does not exist.[198] Secondary inspection with a CBP officer is usually a no-go zone for attorneys with zero access and transparency.[199] However, the involvement of attorneys in other pieces of the process, from avoiding an illegal turnback at the border to navigating a credible fear interview and beyond, suggests that involvement of counsel would be highly beneficial in safeguarding the rights of asylum seekers navigating the expedited removal process.

In a 2014 report, the ACLU recommended access to counsel for all individuals facing removal through a summary procedure.[200] Stephen Manning and Kari Hong explore this question and ask whether adequate access to counsel would "mitigate against erroneous removals without undermining the statute's goal of speed."[201] Their resounding answer, drawing on voluminous data from the CARA Pro Bono Project (now the Dilley Pro Bono Project), which operates in Dilley, Texas at the largest family detention center in the country, is

---

Memos in detail). Indeed, even where the directives or, as Pistone and Hoeffner term them, "diktats from above," do mandate prosecutorial discretion, this has little effect on officer behavior in reality. Pistone & Hoeffner, *Rules Are Made to Be Broken*, *supra* note 66, at 197; *see also* Rabin, *supra* note 127, at 200 (2014) (using political scientist James Wilson's analytical framework to understand bureaucratic behavior as applied to ICE—focused on culture, historical formation, and critical tasks).

198.    8 CFR § 292.5(b) (2018).

199.    *See generally* LEGAL ACTION CTR., AM. IMMIGRATION COUNCIL, BEHIND CLOSED DOORS: AN OVERVIEW OF DHS RESTRICTIONS ON ACCESS TO COUNSEL 7–9 (2012), https://elibrary.law.psu.edu/cgi/viewcontent.cgi?article=1006&context=irc_pubs [https://perma.cc/6M3J-3X99].

200.    ACLU, AMERICAN EXILE, *supra* note 109, at 8; *see also* Drake & Gibson, *Vanishing Protection*, *supra* note 6, at 92 (calling for increased attorney involvement and advocacy at earlier stages in the asylum process, including "ensuring that those traveling to the U.S. border have access to the asylum adjudication system").

201.    Manning & Hong, *Access to Counsel*, *supra* note 32, at 678.

AR.10997

yes, access to counsel fundamentally changes the asymmetrical power dynamic surrounding rapid removals. [202] They do not examine, however, the question of intervention of counsel at the border—in the initial screening interaction with the CBP officer who makes a determination of removability and supposedly administers the statutorily required screening for asylum seekers. [203]

Lawyers can indeed make a tremendous difference, even in this early stage of the asylum-seeking process. Human Rights First's 2017 report details numerous instances where advocacy by an attorney prevented CBP's wrongful deportation of an asylum seeker. [204] Around the Spring 2018 refugee caravan, for example, Nicole Ramos, a lawyer with Al Otro Lado, a non-profit organization which operates on the California-Mexico border:

> Would tell officers that every single person in the crowd was afraid of persecution. Every asylum-seeker would carry a Notice of Representation listing Ramos or another volunteer lawyer as his attorney of record. This would allow Al Otro Lado to visit them in detention, document their treatment by Customs and

---

202.    *Id.* at 703–04; *see also* Ingrid Eagly, Steven Shafer, & Jana Whalley, *Detaining Families: A Study of Asylum Adjudication in Family Detention*, 106 CAL. L. REV. 785, 845–47 (2018) (discussing challenges for access to counsel in family detention centers, but also noting the enormous difference legal representation makes in the credible and reasonable fear process).

203.    Manning and Hong outline three distinct moments in which adjudications take place within expedited removal—the first being the "adjudication of removability and the entry of an expedited removal order." Manning & Hong, *Access to Counsel*, *supra* note 32, at 682.

204.    HRF, CROSSING THE LINE, *supra* note 6, at 7, 13. Examples include an attorney who successfully requested that CBP process a Honduran family with bullet wounds as asylum seekers after they had been turned away once by CBP; a Turkish opposition group member who was successfully processed as an asylum seeker only after attorney intervention; and a Mexican family who was turned away twice by CBP before lawyers intervened and CBP processed them on their third attempt, after which an immigration judge granted asylum. *Id.* The report also details attorneys accompanying asylum seekers to border crossings and assisting in the preparation of asylum applications and the presentation of evidence to support the claim at the border; a Mexican journalist who accessed processing as an asylum seeker only with attorney intervention; and a Mexican family stuck on a bridge in Hidalgo until an attorney intervened at the port of entry. *Id. See also* ACLU, AMERICAN EXILE, *supra* note 109, at 40 (recounting an instance where a Honduran asylum seeker eventually secured a credible fear interview due to attorney intervention).

Border Protection, and represent everyone in immigration hearings.[205]

Al Otro Lado's work in Tijuana is gaining attention[206] and, thankfully, funding.[207]

In the current political climate, however, it may be a fool's errand to suggest heightened access to counsel during the critical stage of the CBP interview that determines whether a person will receive a credible fear interview or will instead be deported through expedited removal. Former Attorney General Jefferson Beauregard Sessions III labeled those who assist asylum seekers "dirty immigration lawyers"[208] and former DHS Secretary Kirstjen Nielsen has threatened to prosecute those who "coach" asylum seekers on false claims.[209] For now, while attorneys certainly can and should push within the existing framework on behalf of asylum-seeking clients to access protection, it seems very unlikely that there will be any improvements in access to counsel within the expedited removal process.

At the same time, to the extent that the access to counsel crisis results from a lack of pro bono or low-cost lawyers for asylum seekers in expedited removal proceedings, the current political climate and outrage over family separation has created an, at least temporarily, deep pool of funding to support this work. For example, a Texas-based organization working with detained families and individuals raised more than twenty million dollars in just a few days.[210] Other

---

205.    Daniel Duane, *City of Exiles: Every Month, Thousands of Deportees from the United States and Hundreds of Asylum-Seekers from around the World Arrive in Tijuana. Many Never Leave*, CAL. SUNDAY MAG. (May 30, 2018)*,* https://story.californiasunday.com/tijuana-city-of-exiles [https://perma.cc/2RDN-6D95].

206.    *Id.*

207.    *See also* Drake & Gibson, *Vanishing Protection*, *supra* note 6, at 121–22 (calling on advocates to think beyond the U.S. border and engage asylum seekers in transit through Mexico).

208.    Jefferson Sessions, Attorney Gen., Remarks to the Executive Office for Immigration Review (Oct. 12, 2017), https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-executive-office-immigration-review [https://perma.cc/PLN9-D6U3].

209.    Press Release, Dep't of Homeland Sec., Sec'y Nielsen, Statement on the Arrival of the Central American "Caravan" (Apr. 25, 2018), https://www.dhs.gov/news/2018/04/25/secretary-nielsen-statement-arrival-central-american-caravan [https://perma.cc/DBW9-Y9ED].

210.    Annie Correal, *Women Ask 'What if it Were Me?' And Rush to Aid Separated Families*, N.Y. TIMES (July 20, 2018), https://www.nytimes.com/2018/07/20/nyregion/crowdfunding-immigrant-children-separated.html (on file with Columbia Human Rights Law Review) (mentioning the $20 million that RAICES

AR.10999

organizations on the frontlines of this work, including Southern Poverty Law Center, Northwest Immigrants' Rights Project, Innovation Law Lab, Florence Project, and Al Otro Lado, have all been able to create new, if temporary, positions to increase access to counsel for detained immigrants in light of the current influx of funding. States have also stepped into the fray in the last few years to provide access to counsel for immigrants where the federal government has failed.[211] Thus, despite the absence of formal access to attorneys for secondary screening, as well as a lack of commitment from the federal government to provide or enhance access to counsel for asylum seekers in expedited removal, there is some hope for this solution.

## D. Enhanced Training for CBP Officers

As mentioned above in Part I.A, currently the training that CBP officers receive regarding the screening of asylum seekers at the border lacks transparency. The Officer's Reference Tool, which replaced the Inspector's Field Manual sometime around 2013, is not publicly available. Nonetheless, "if change is going to occur in how DHS processes deportation cases, it is most likely to come from within the agency."[212] Thus, reformed and enhanced training for CBP officers is

---

raised and also a more recent crowdfunding campaign in New York that quickly raised $300,000).

211.    For example, since 2013, the New York Immigrant Family Unity Project, a collaboration of several organizations, has worked to provide universal representation for respondents appearing before the New York City Varick Street Immigration Court without an attorney who meet income threshold criteria. *See* NAT'L IMMIGRATION LAW CTR., BLAZING A TRAIL: THE FIGHT FOR RIGHT TO COUNSEL IN DETENTION AND BEYOND 14 (2016), https://www.nilc.org/wp-content/uploads/2016/04/Right-to-Counsel-Blazing-a-Trail-2016-03.pdf [https://perma.cc/D3MZ-23NS] [hereinafter NILC, BLAZING A TRAIL]. The Project has been expanded to representation in a detention center in Buffalo, New York. *Id.* at 18; *see also* JENNIFER STAVE ET AL., VERA INST. OF JUST., EVALUATION OF THE NEW YORK IMMIGRANT FAMILY UNITY PROJECT: ASSESSING THE IMPACT OF LEGAL REPRESENTATION OF FAMILY AND COMMUNITY UNITY (2017), https://www.vera.org/publications/new-york-immigrant-family-unity-project- [https://perma.cc/9Q53-7EHQ] [hereinafter VERA INST., NYIFUP] (evaluating the impact of the New York Immigrant Family Unity Project on immigrants facing deportation). Also, in the Northeast, in New Jersey the American Friends Service Committee (AFSC) launched the Friends Representation Initiative of New Jersey (FRINJ), a pilot project offering representation, twice a week, to all detained immigrants who appear before the Elizabeth, NJ Immigration Court. *See* NILC, BLAZING A TRAIL, *supra*, at 211.

212.    *See* Cade, *The Challenge of Seeing Justice Done*, *supra* note 158, at 61 (proposing four modest solutions, including introducing discovery obligations, using

AR.11000

one way to fundamentally shift organizational culture in favor of actually following the law and regulations.

Legal scholarship has long highlighted the problems and internal conflicts with the guidance that CBP did make available in the past.[213] As Pistone and Hoeffner explain, CBP's Inspector's Field Manual authorized officers to deport an individual without referring for credible fear when the fear "clearly would not qualify that individual for asylum."[214] This guidance invites the officer to make a complex legal determination and adjudication regarding asylum eligibility that she is not authorized or trained to make. Although it is unclear what the current Officer's Reference Tool advises on this topic, it is very likely that the internal training guidance for CBP needs revision.[215] The advocate community agrees that training of CBP officers is critically important.[216] Legislation to improve CBP training

---

vertical prosecution, increasing responsibility and authority for screening and declining cases, and conducting prehearing conferences).

213.    Pistone & Hoeffner, *Rules Are Made to Be Broken*, *supra* note 66, at 188.

214.    *Id.* (citing Section 17.15(b) of the Immigration Court Practice Manual, *supra* note 87).

215.    *See* Koh, *Removal in the Shadows*, *supra* note 32, at 233 (suggesting that additional information on the training and oversight of individual front-line immigration officials issuing expedited removal and reinstatement orders is essential); Frost, *Learning from Our Mistakes*, *supra* note 40, at 788 (arguing for improved training of CBP officers but basing this suggestion on the premise that failures to recognize valid asylum claims stem from a lack of knowledge of asylum law, rather than a CBP officer's willful disregard of the law); *see also* Drake & Gibson, *Vanishing Protection*, *supra* note 6, at 130 (advocating training for CBP officers on the "importance of protecting potential asylum seekers and the breadth of conduct that is sufficient for a referral").

216.    HRW, YOU DON'T HAVE RIGHTS HERE, *supra* note 109, at 41 (recommending improved training for CBP officers, including "modification of oversight mechanisms; accountability measures, including better quality assurance supervision; and any and all other appropriate measures that initial interviews conducted by CBP properly identify individuals who express fear of return so that they are afforded 'credible' or 'reasonable' fear assessments"); HRF, CROSSING THE LINE, *supra* note 6, at 3 (explaining that training needs to be enhanced for CBP officers to "comply with U.S. domestic law and treaty commitments"); ACLU, AMERICAN EXILE, *supra* note 109, at 8 (recommending that DHS "continuously train and retrain immigration enforcement officers not to use coercion, threats, or misinformation to convince individuals to give up the right to see a judge and accept deportation"); 2016 USCIRF REPORT, *supra* note 75, at 4 (emphasizing a need to retrain all officers on their role in the expedited removal process).

was introduced in the House in 2017, but never advanced further in the Congressional process.[217]

In the current climate, however, training for CBP officers may have only a negligible effect in the wake of former Attorney General Sessions' suggestion that "dirty immigration lawyers" feed magic words to asylum seekers, a message that has only been amplified by President Trump.[218] The administration is working very hard to perpetuate the myth that asylum seekers are gaming the system and falsely claiming a fear of return. As this narrative becomes more deeply entrenched in the public and border enforcement psyche, it will become more difficult to counter.

Prior to the extremely troubling decision issued by former Attorney General Sessions on June 11, 2018, in which he overruled the BIA's precedential decision recognizing asylum claims for survivors of domestic violence,[219] CBP officers were already misapplying asylum law. The regulations CBP must follow require them simply to refer an individual to USCIS for a fear interview if they express fear of return or an intention to apply for protection. Nonetheless, in the twenty-two years since expedited removal was implemented, border officials have taken it upon themselves to deport asylum seekers.[220] The 2018 *Matter of A-B-* decision will only further compound this problem as border officials may be further emboldened by that decision to reject claims related to domestic or gang violence as a threshold matter.[221]

---

217.     *See* Border Enforcement Accountability, Oversight, and Community Engagement Act of 2017, *supra* note 186, § 4 (outlining enhanced training for CBP officers).

218.     Sessions, *supra* note 208; *see also* Donica Phifer, *Donald Trump Calls Asylum Claims a 'Big Fat Con Job,' Says Mexico Should Stop Migrant Caravans Traveling to U.S. Border*, NEWSWEEK (Mar. 29, 2019), https://www.newsweek.com/donald-trump-calls-asylum-claims-big-fat-con-job-says-mexico-should-stop-13 79453 [https://perma.cc/47PG-8VBY] (citing Trump's remarks at a Michigan rally stating that asylum seekers were met by lawyers telling them to say that they are afraid).

219.     Matter of A-B-, 27 I. & N. Dec. 316 (A.G. 2018).

220.     *See* ACLU, AMERICAN EXILE, *supra* note 109, at 37, 104–05.

221.     *Matter of A-B-*, 27 I. & N. Dec. at 320 ("Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum . . . ."); *id.* at 320 n.1 ("Accordingly, few such claims would satisfy the legal standard to determine whether an alien has a credible fear of persecution."); *see also* U.S. Citizenship & Immigration Servs., Guidance for Processing Reasonable Fear, Credible Fear, Asylum, and Refugee Claims in Accordance with Matter of A-B- (July 11, 2018), https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2018/2018-06-18-PM-602-0162-USCIS-Memorandum-Matter-of-A-B.pdf [https://perma.cc/89R3-8D34] (providing direction for

IV. Lifting Asylum Seeker Screening at the Border out of the Shadows: Body-Worn Cameras?

The proposals discussed in Part III all have clear shortcomings and lack immediate political willpower. In contrast, this Part proposes the use of Body-Worn Cameras (BWCs) as a way to more immediately improve the situation on the border for asylum seekers and prevent the erroneous issuance of expedited removal orders that put asylum seekers at risk of being subjected to reinstatement of removal upon attempted reentry.

As discussed above, remedies are few and far between for an asylum seeker with an erroneously issued prior removal order. Providing a record of the initial interaction with CBP would equip an asylum seeker with evidence to support her assertion that she did in fact express a fear of return, proving that it was erroneous for CBP to issue an expedited removal order without referring the asylum seeker to a CFI.

A byproduct of recording CBP secondary screening interactions could be that officers would be more likely to follow their own procedures and fewer erroneous removal orders would be issued. While the implementation of Body-Worn Cameras (BWCs), or simply recording technology more broadly,[222] has a number of advantages, this section will also discuss the challenges to this solution.

---

USCIS officers regarding asylum and refugee eligibility in light of the decision in *Matter of A-B-*). Notably, the ACLU and the Center for Gender and Refugee Studies mounted a successful legal challenge to these new policies. *See* Complaint, Grace v. Whitaker, No. 1:18-cv-01853 (D.D.C. 2018), https://www.aclu.org/legal-document/grace-v-sessions-complaint [https://perma.cc/QE7T-ZZ8V]. Implementation of many of the key provisions of *Matter of A-B-* has been enjoined. *See* Practice Advisory: *Grace v. Whitaker, supra* note 49.

    222.    I focus here on Body-Worn Cameras, but concede that the use of simple audio recordings or of cameras inside an interviewing room might also mitigate problems I have outlined. In reality, however, the screening interviews take place in a variety of locations and so BWCs may be the most reliable way to ensure that each and every screening interview is captured. *See, e.g.* 2016 USCIRF Report, *supra* note 75, at 24–26 (detailing how interviews actually take place, including through banks of computers and virtually conducted interviews with officers in remote locations, sometimes in groups, rather than in an individual setting, and quite rarely in private interview rooms). Another promising solution, brought to the author's attention as this article went to print, is the use of some kind of electronic application, more commonly known as an "app," similar to that proposed by Professors Ferguson and Leo for use to administer *Miranda* warnings. *See* Andrew Guthrie Ferguson & Richard A. Leo, *The Miranda App: Metaphor and Machine*, 97

AR.11003

This is a not a new recommendation,[223] but it has not been thoroughly explored in the legal scholarship and merits further scrutiny in the wake of increased use of and attention towards BWCs since 2014. Literature from the criminal context, where BWCs have been on the rise since the watershed moment of Ferguson,[224] is instructive in thinking through how to implement BWCs at the border. BWCs are used by police officers nationwide.[225] Indeed, as the nation's largest law enforcement agency, CBP is an outlier in the absence of its use of BWCs.[226]

---

B.U. L. REV. 935 (2017). This app could be administered by CBP officials, recorded, and used with any language and with visuals for illiterate individuals.

223.    *See id.* at 4, 7 (repeating USCIRF's recommendation dating back as early as 2005 of videotaping processing interviews as well as supervisory and headquarters review of a sample of interviews for quality assurance); ACLU, AMERICAN EXILE, *supra* note 109, at 105 (recommending that DHS video-record all summary removal proceedings and keep a copy of the recording in the individual's "A-File."). More broadly, the National Immigration Forum has recommended the use of body cameras for all CBP agents in all interactions with the public. JAMES R. LOPEZ ET AL., NAT'L IMMIGRATION FORUM, BODY CAMERAS AND CBP: PROMOTING SECURITY, TRANSPARENCY, AND ACCOUNTABILITY AT OUR NATION'S BORDERS 9 (2015), https://immigrationforum.org/wp-content/uploads/2015/11/Body-Cameras-and-CBP-Report-11062015.pdf [https://perma.cc/5ZZQ-K6XM] [hereinafter BODY CAMERAS AND CBP] (recommending the use of BWCs for all CBP agents in *all* interactions with the public). U.S. lawmakers have also called on ICE to use body-cameras. *See* Rafi Schwartz, *Some Lawmakers Want Immigration Enforcement Officers to Wear Body Cameras*, BUS. INSIDER (Mar. 13, 2017), http://www.businessinsider.com/some-lawmakers-want-immigration-enforcement-officers-to-wear-body-cameras-2017-3?r=UK&IR=T [https://perma.cc/9J6A-EMTF] (discussing the ICE Body Camera Act of 2017, H.R. 1497, introduced by Democratic Brooklyn Congresswoman Yvette Clarke); *see also* Pistone & Hoeffner, *Rules Are Made to Be Broken*, *supra* note 66, at 203–07 (supporting the use of videotaping of secondary inspection interviews as a counterbalance to "the dominant enforcement culture" and also advocating for the appointment of a senior asylum advocate within DHS, along with requiring border officials to confirm in writing that they read required information to applicants and forbidding telephonic review by supervisory officers).

224.    Mary D. Fan, *Privacy, Public Disclosure, Police Body Cameras: Policy Splits*, 68 ALA. L. REV. 395, 408–09 (2016) [hereinafter Fan, *Policy Splits*]; Kami Chavis Simmons, *Body-Mounted Police Cameras: A Primer on Police Accountability vs. Privacy*, 58 HOW. L.J. 881, 882–83 (2015); Seth W. Stoughton, *Police Body-Worn Cameras*, 96 N.C. L. REV. 1363, 1364–66 (2018).

225.    Fan, *Policy Splits*, *supra* note 224, at 409 ("According to a recent survey . . . 95% of seventy law enforcement agencies surveyed have either committed to putting body cameras on officers or have already done so."); Laurent Sacharoff & Sarah Lustbader, *Who Should Own Police Body Camera Videos?*, 95 WASH. U. L. REV. 269, 283 (2017).

226.    BODY CAMERAS AND CBP, *supra* note 223, at 20 ("If CBP does not continue with implementation of body-worn cameras, it risks being the only large

AR.11004

In thinking through the implementation of BWCs at the border in the expedited removal screening process below, the potential advantages and challenges are considered. Although BWCs have arguably not been the panacea for police accountability that was hoped for in the criminal justice context,[227] the goals in utilizing this technology on the border differ and are perhaps less ambitious. Ultimately, this Article concludes that the use of BWCs would be a politically expedient, feasible solution to partially remedy the injustices currently occurring at our border and to protect future asylum seekers from being permanently barred from meaningful protection by a border official's failure to properly do her job.

BWCs should be worn by all CBP officers at all times in all interactions with potential asylum seekers—which means in all screening interviews at the border, throughout the entirety of the interaction. Absent a recording of the interaction, a presumption should operate in the asylum seeker's favor by accepting her version of events rather than the border official's explanation.

## A. Advantages of Body-Worn Cameras

The introduction of BWCs for officials at the border conducting screening interviews poses a number of advantages, including: increased transparency and efficiency; potential reduction in abuses, including the use of physical force; and enhanced possibilities for training and supervision.

### 1. Transparency

Body-Worn Cameras could increase transparency to take expedited removal out of the darkness and put an end to the legal black hole produced by the combination of expedited removal and

---

and most notable law enforcement agency that does not have such a program in place.").

227. *See, e.g.*, Eric Miller, *Do Body Cameras Improve Police Conduct?*, PRAWFSBLOG (Oct. 18, 2018, 1:08 PM), https://prawfsblawg.blogs.com/prawfsblawg /2018/10/do-body-cameras-improve-police-conduct-.html [https://perma.cc/AF3K-XSLA]. While the author lacks expertise in the criminal justice field, the literature available seems primarily focused on the initial question regarding whether or not BWCs should be used. Hopefully, we will begin to see deeper analysis of their implementation and success in achieving the purported goals of their introduction in the coming years.

AR.11005

reinstatement.[228] Currently, "no clear mechanism for correction for CBP officers that fail to even ask about fear—in violation of the agency's own regulations—exists."[229] But the creation of such a mechanism is possible. Requiring the use of BWCs by all CBP officers conducting screening interviews would create a contemporaneous record of the border interview, with the potential to ensure the protection of many more asylum seekers.

The goals of BWCs in the criminal context are similar to the concerns we are aiming to address in the immigration arena. Given the intense distrust of police by communities,[230] BWCs aim to increase transparency, as well as to guard against police violence and improve professionalism.[231] Seth Stoughton discusses the Hawthorne Effect, or "bystander effect," as the "intuitive phenomenon that people behave differently when they know they are being observed."[232] This combined with deterrence theory suggests that officers "may adapt their behaviors because they know their actions are being scrutinized."[233] From the officer's perspective, BWCs may increase good behavior on both sides and enhance officer safety.[234]

---

228.     *See* Koh, *Searching for Solutions*, *supra* note 32, at 361 ("The layering of one shadow removal upon another thus creates an even darker space in immigration law than the operation of each process on its own.").

229.     *See id.* at 392.

230.     Following Ferguson and the death of Michael Brown, President Obama established the President's Task Force on 21st Century Policing to examine ways to improve community distrust of police. Establishment of the President's Task Force on 21st Century Policing, 79 Fed. Reg. 76,865 (Dec. 23, 2014); Stoughton, *supra* note 224, at 1381 ("Police executives, politicians, and policing scholars have expressed their hope that body cams would increase public trust or explicitly asserted that the technology can or is doing so.").

231.     David A. Harris, *Picture This: Body-Worn Video Devices (Head Cams) As Tools for Ensuring Fourth Amendment Compliance by Police*, 43 TEX. TECH. L. REV. 357, 360 (2010) [hereinafter David A. Harris, *Ensuring Fourth Amendment Compliance*].

232.     Stoughton, *supra* note 224, at 1386.

233.     *Id.* at 1389–90 (noting, however, that "cameras may deter misconduct, but only if officers are sufficiently deterred from misusing (or not using) the cameras themselves").

234.     BODY CAMERAS AND CBP, *supra* note 223, at 12 ("[I]n fiscal year 2015 there were still 390 assaults on border patrol agents. Body-worn cameras could help further reduce the number of assaults."). *But see* Nell Greenfieldboyce, *Body Cam Study Shows No Effect on Police Use of Force or Citizen Complaints*, NPR (Oct. 20, 2017), https://www.npr.org/sections/the two-way/2017/10/20/558832090/body-cam-study-shows-no-effect-on-police-use-of-force-or-citizen-complaints [https://perma.cc/9NEX-HEYM] (discussing a study of the DC metropolitan police department's

AR.11006

Importantly, some studies have shown that BWCs may lead to a significant reduction in use-of-force incidents.[235] Video recording all CBP interactions would be beneficial because there are numerous reports of physical abuse perpetrated by CBP officers.[236] Indeed, between 2005 and 2015, CBP agents killed at least forty-five people, and between 2005 and 2012, 2,170 incidents of misconduct by agents were reported.[237] In the summer of 2018, for example, Claudia Gonzalez, a CBP officer, shot a twenty-year-old indigenous woman from Guatemala in the head.[238] With calls to #AbolishICE and public criticism of immigration agencies at an all-time high, it is an appropriate moment for CBP to take steps to improve transparency and their public image.[239]

## 2. Efficiency, Training, and Supervision

Another advantage may be increased efficiency for CBP officers—BWCs would enable recording in real time, resulting in increased accuracy regarding what was said in secondary screening

---

use of BWCs that had not made much of a difference, but recognizing that the department was already in decent shape).

235.    Simmons, *supra* note 224, at 886 (citing one study showing a 60% reduction in use of force incidents by police officers in 2012 in Rialto, California).

236.    *See* HRF, CROSSING THE LINE, *supra* note 6, at 6 (recounting an incident where CBP officers knocked a Salvadoran transgender woman to the ground and put their boots on her neck and groin area); ACLU, AMERICAN EXILE, *supra* note 109, at 36 (recounting an officer slapping an asylum seeker across the face with forms when he refused to sign forms he did not understand).

237.    BODY CAMERAS AND CBP, *supra* note 223, at 10.

238.    Molly Hennessy-Fiske, *Witness Recounts Fatal Border Patrol Shooting of Young Guatemalan Woman in Texas*, L.A. TIMES (May 26, 2018), http://www.latimes.com/nation/la-na-border-shooting-20180526-story.html [https://perma.cc/6UY4-D43W]; *see also* Gus Bova, *The Border Patrol Serial Killer is Part of a Long, Troubled History*, TEX. OBSERVER (Sept. 19, 2018) https://www.texasobserver.org/the-border-patrol-serial-killer-is-part-of-a-long-troubled-history/ [https://perma.cc/6D7Q-BDT5] (describing the history of violent crimes, including murder, committed by CBP agents); Manny Fernandez, *They Were Stopped at the Border. Their Nightmare Had Only Just Begun*, N.Y. TIMES (Nov. 12, 2018), https://www.nytimes.com/2018/11/12/us/rape-texas-border-immigrants-esteban-manzanares.html (on file with the Columbia Human Rights Law Review) (describing incidents of violence and sexual assault committed by CBP agents against women detained while crossing the Rio Grande border).

239.    Legislation introduced in 2017 not only required CBP reporting on the use of force and migrant deaths, but also required reporting to Congress on the use of body-worn cameras. *See* Border Enforcement Accountability, Oversight, and Community Engagement Act of 2017, *supra* note 186, § 6(d).

AR.11007

interviews.[240] Another advantage is that supervision of officer conduct may be more effective—body camera recordings allow a supervisor to "see for himself what really happened."[241] Currently, supervisors rely on a conversation with the screening officer, often telephonic, to review a decision to issue an expedited removal order. The existence of video footage would allow a supervisor, who is required to review each expedited removal order regardless, to view the actual interaction leading to the expedited removal order himself.

In addition, BWCs can improve training by allowing supervisors to use recordings for "assessment, training, and disciplinary decisions."[242] Assistance with training in the CBP context is especially important. Up to thirty percent of border officials leave the job within the first year and a half, but Congress requires that the agency employ more than forty thousand agents and officers, creating a "constant pressure to train and deploy new agents."[243]

Improvements in efficiency will not only be seen at the border with CBP. Implementing BWCs would also lead to efficiencies for ICE Office of Chief Counsel trial attorneys and for our immigration courts. In the case of an alleged erroneously issued removal order, trial attorneys assigned to the case, classified as withholding-only, could readily review the videos of the secondary screening interview, determine whether a fear was in fact articulated, and, if so, exercise their discretion not to reinstate the prior removal order. This would save court time and attorneys' attempts to zealously advocate for their clients on this issue—time that is precious, given our extremely backlogged immigration court system.

The immigration system is desperately in need of efficiencies and reform. Currently, 855,807 cases are pending in the immigration

---

240.    David A. Harris, *Ensuring Fourth Amendment Compliance*, *supra* note 231, at 361.

241.    *Id.* at 363; *see also* Stoughton, *supra* note 224, at 1417 (discussing the parameters around when a supervisor should review an officer's BWC recordings).

242.    David A. Harris, *Ensuring Fourth Amendment Compliance*, *supra* note 231, at 364–65; *see also* Simmons, *supra* note 224, at 887 (discussing how body cameras can be a powerful training tool to correct structural problems within a police department); Mary D. Fan, *Democratizing Proof: Pooling Public and Police Body-Camera Videos*, 96 N.C. L. REV. 1639, 1654–55 (2018) [hereinafter "Fan, *Democratizing Policing*"] ("The crisis in public confidence [following Ferguson] also showed police chiefs the value of body cameras to supply evidence, rebuild trust, reduce unfounded complaints, and potentially exonerate officers.").

243.    BODY CAMERAS AND CBP, *supra* note 223, at 13 (citing H.R. 240, 114th Cong. (1st Sess. 2015)).

AR.11008

court backlog,[244] which will likely increase to over one million, given policies recently instituted by former Attorney General Sessions.[245] The cases already in the backlog take several years to resolve, and all expedited removal cases which receive a credible fear finding are referred to court, joining that long queue. Any reforms to this system to save on trial attorney and judge time should be welcome.

## B. Concerns Regarding the Use of Body-Worn Cameras

Despite the advantages, there are serious concerns regarding the use of BWCs at the border. These include: the protection of asylum seekers' privacy and, relatedly, the risks of stifling disclosure and increasing asylum seekers' fear; officer buy-in and the need to renegotiate union contracts with CBP; challenges regarding how much discretion to give officers with regards to when to use the device; the necessary reliance on the prosecutorial discretion of immigration agents, even with video evidence; and the financial cost of widespread use of BWCs at the border.

### 1. Privacy

One of the most frequently voiced concerns in the criminal context is whether the "possible benefit of these cameras could outweigh the substantial privacy concerns."[246] Indeed, in the criminal context, these are serious concerns, as scholar Mary Fan suggests, because through FOIA public disclosure requests intimate details and private moments can end up in the public sphere.[247] Other scholars

---

244.    *Immigration Court Backlog Tool*, TRAC IMMIGRATION, *supra* note 105. For an in-depth discussion of the backlog, see Harris, *The One-Year Bar*, *supra* note 16, at 1204–08.

245.    *See, e.g.*, Jason Boyd, *8000 New Ways the Trump Administration is Undermining Immigration Court Independence*, HILL (Aug. 19, 2018), http://thehill.com/opinion/immigration/402542-8000-new-ways-the-trump-administration-is-undermining-immigration-court [https://perma.cc/4TNR-4A2S] (discussing decisions in 2018 issued by the Attorney General limiting an immigration judge's ability to manage her own docket, including administratively closing cases or granting motions to continue); *see also Immigration Court Backlog Surpasses One Million Cases*, TRAC IMMIGRATION, https://trac.syr.edu/immigration/reports/536/ [https://perma.cc/U4Zj-DMRX] (explaining how the then–Attorney General's decision to reopen 330,211 previously administratively closed cases brought the total backlog to over one million cases).

246.    Simmons, *supra* note 224, at 884; *see generally* I. B. Capers, *Race, Policing, and Technology*, 95 N.C. L. REV. 1241, 1244–45 (2017) (arguing that giving up some privacy is the price we must pay for reducing racialized policing).

247.    Fan, *Policy Splits*, *supra* note 224, at 397.

AR.11009

suggest that the ownership and control of police body camera videos should be shifted to a neutral police accountability agency.[248]

Privacy concerns are of critical importance in the asylum context. The stakes may potentially be higher than many situations in the criminal context. If a persecutor, whether a governmental or non-governmental actor, obtained access to information disclosed regarding an asylum case, an asylum seeker's family, friends, or associates may be in danger. Further, an asylum seeker herself may face heightened danger if information revealed during her border screening is shared and she is returned to face her persecutors. Asylum seekers are often understandably anxious to begin with about disclosing information about their fear of persecution to anyone, let alone uniformed border agents.

However, current procedures for screening asylum seekers at the border do not prioritize privacy. USCIRF reported that between mid-2013 and February 2015, CBP agents had "virtually processed" more than one hundred thousand people in McAllen, Texas.[249] These individuals were assigned to CBP officers in other stations in Texas or California who completed the fear screening and I-867 form remotely through Skype technology and a bank of computers, not even separated by screens.[250] Private rooms for screening typically are not available in CBP processing facilities, although in one location that has new private rooms with acoustic padding for interviewing, a CBP supervising officer acknowledged to USCIRF that people have been more forthcoming about expressing their fear since the private rooms have been in place.[251] The reality is that in most places, the fear screening interviews lack privacy and so the addition of a video camera may not be as much of an impediment to disclosure, or at least would not be the only impediment.

Regarding the existence of a video or audio recording later down the line for an asylum seeker in the adjudication process, privacy protections already exist. The contents of asylum applications are not publicly available and hearings can be closed to the public upon the asylum seeker's request.[252] In this context, the BWC video recording of

---

248.    Sacharoff & Lustbader, *supra* note 225, at 269, 270, 294–97.

249.    2016 USCIRF REPORT, *supra* note 75, at 24.

250.    *Id.* at 24.

251.    *Id.* at 26.

252.    *See* IMMIGRATION COURT MANUAL, *supra* note 87, § 4.9(a)(i) (allowing asylum hearings to be closed to the public upon request and specifying that the immigration judge will expressly ask the asylum seeker whether they want the hearing to be closed); *see also* 8 C.F.R. § 208.6 (2018) (preventing disclosure of

a particular interaction between a border official and an asylum seeker would simply become part of the asylum seeker's Alien file, subject to the usual privacy exemptions under FOIA disclosure. Although the asylum seeker would not have "symmetrical" access to the video recording, as would be ideal,[253] she would have the same access to it as to the rest of her A-file through filing a FOIA request.

### 2. Stifling Disclosure and Increasing Fear in Asylum Seekers

Another serious concern in the criminal context, potentially heightened in the immigration context, is the fear that recording interactions may make individuals reluctant to speak with law enforcement officials.[254] Serious concerns exist with regards to privacy and confidentiality when interacting with survivors of torture and trauma.[255] Indeed, CBP's own field office manual recognizes that screening interviews should be conducted in "an area that affords sufficient privacy, whenever feasible."[256] Psychologist and trauma expert Stuart Lustig has explained the difficulties that already exist for trauma survivors seeking asylum when disclosing aspects of their trauma at border screenings and in border interviews in the credible fear context.[257]

In the criminal context, Professor Fan has suggested that concerns about reluctance of victims and domestic violence survivors to speak with police officers can be met by police officers affirmatively asking for permission to record.[258] In the immigration context, however, would it make sense to give CBP officers the power to ask

---

information "contained in or pertaining to any asylum application, records pertaining to any credible fear determination . . . without the written consent of the applicant").

253.    Sacharoff & Lustbader, *supra* note 225, at 308–14 (arguing for timely access to video evidence for defendants in the criminal context).

254.    David A. Harris, *Ensuring Fourth Amendment Compliance*, *supra* note 231, at 363, 367; *see also* Simmons, *supra* note 224, at 889.

255.    In the author's immigration clinic at UDC Law and in her previous teaching at Georgetown Law, for example, student attorneys routinely ask asylum-seeking clients if they are comfortable recording interview sessions. This is to facilitate feedback and take some pressure off of student notetaking. Even in this non-adversarial setting, a very small minority of clients express hesitation or decline consent to record their interviews.

256.    INSPECTOR'S FIELD MANUAL, *supra* note 63, at 17.15(b).

257.    Declaration of Dr. Stuart L. Lustig, M.D., M.P.H., Expert on Trauma and Asylum Seekers ¶¶ 3–8 (2017) (on file with author).

258.    Fan, *Policy Splits*, *supra* note 224, at 404, 437–43.

AR.11011

asylum seekers whether or not they wanted recording? Given the long and documented history of CBP abuses of the system in not accurately recording fear statements, the concern is that the officer could just claim an asylum seeker refused video recording to excuse the lack of a video.[259]

In this instance, despite the real concerns about silencing or frightening an already traumatized asylum seeker, the addition of an unobtrusive video camera, potentially affixed within the officer's badge, has the potential to do more good than harm.[260] If a body camera can document the fear and perhaps prevent an asylum seeker being unlawfully returned to potential death, this could be a life-saving technological innovation in the asylum context and would be worth the risk of a silencing effect—already a real concern given that CBP officers are usually armed and uniformed. Given the pre-existing systemic failures and the fact that silencing is a risk whether or not CBP officers wear BWCs, the decrease in erroneously issued expedited removal orders for asylum seekers who express fear most likely outweighs any potential increase in asylum seekers who fail to express fear.

### 3. Acceptance by Border Officials

One concern in the criminal context was officer "buy-in," i.e., would police officers accept the BWCs and use them as instructed? Over time, however, officer buy-in improves and police officers recognize cameras may enhance officer safety[261] and guard against illegitimate complaints.[262] As law enforcement agents, police officers

---

259. *See also* Sacharoff & Lustbader, *supra* note 225, at 322 ("Studies have shown that the more discretion police have to stop filming, or to never start filming, the less that program deters misconduct.") (citations omitted).

260. *But see* Bryce Clayton Newell et al., *Sensors, Cameras, and the New 'Normal' in Clandestine Migration: How Undocumented Migrants Experience Surveillance at the U.S.-Mexico Border*, 15 SURVEILLANCE & SOC'Y 21, 21, 34–37 (2017) (disclosing the findings from a qualitative empirical study of a small group of deported migrants in Mexico, only the minority of whom were asylum seekers, expressing some hesitance regarding the use of BWCs by CBP officers).

261. David A. Harris, *Ensuring Fourth Amendment Compliance, supra* note 231, at 360; *see also* Simmons, *Police Accountability vs. Privacy*, *supra* note 224, at 886 (explaining that body mounted cameras may serve a deterrent effect and promote officer safety by holding officers accountable for their actions).

262. Fan, *Policy Splits*, *supra* note 224, at 410; *see also* Bryce Clayton Newell & Ruben Greidanus, *Officer Discretion and the Choice to Record: Officer Attitudes Towards Body-Worn Camera Activation*, 96 N.C. L. REV. 1525, 1549–50 (2018) [hereinafter *Officer Discretion*] (examining police officer attitudes towards BWCs

have supported the use of BWCs.[263] There are concerns, however, that CBP agency culture is different.[264] In the CBP context, officer buy-in will be especially important given the strength of CBP's union and collective bargaining agreements that may consider BWCs a "change in working conditions" necessitating negotiations between the Border Protection union and the agency.[265] To ensure officer support for the initiative and due to the sheer size of the agency, BWC use should be piloted and phased in over time.[266]

### 4. Discretion for Border Officials Operating Body-Worn Cameras

Another challenge to address in implementing BWCs in the immigration context is when precisely the devices would be used. In the criminal context, rules vary on how much discretion to give officers regarding when to use BWCs. [267] In understanding how best to implement BWCs, CBP has a number of jurisdictions to draw on throughout the United States and could also look to the U.K., which has long implemented BWCs in its police force.[268]

---

based on a four-year study in two municipal police departments in the Pacific Northwest).

263.        David A. Harris, *Ensuring Fourth Amendment Compliance*, *supra* note 231, at 362–63.

264.        *See, e.g.*, Francisco Cantu, Opinion, *Cages are Cruel. The Desert is, Too*, N.Y. TIMES (June 30, 2018), https://www.nytimes.com/2018/06/30/opinion/sunday/cages-are-cruel-the-desert-is-too.html [https://perma.cc/9X5B-LNMU] (recounting CBP officer's observations of cruel behavior by fellow agents who "refer to migrants as 'criminals,' 'aliens,' 'illegals,' 'bodies' or 'toncs' (possibly an acronym for 'temporarily out of native country' or 'territory of origin not known'—or a reference to the sound of a Maglite hitting a migrant's skull")); John Washington, *Why We Need a WhistleBlower in U.S. Customs and Border Protection*, NATION (Apr. 25, 2017), https://www.thenation.com/article/why-we-need-a-whistleblower-in-us-customs-and-border-protection/ [https://perma.cc/2G8U-L9EG] (recounting CBP culture as one lacking transparency and embracing impunity for abuses).

265.        BODY CAMERAS AND CBP, *supra* note 223, at 19.

266.        *Id.* ("Because CBP is the largest law enforcement agency in the country, body-worn cameras may need to be phased in over a multiyear time frame; it would be difficult to train more than 40,000 agents and officers all at once.").

267.        *See* Fan, *Policy Splits*, *supra* note 224, at 412–19 (categorizing various states' approaches to disclosure into three groups: nondisclosure, filtered disclosure, and camera turn-off and turn-on legislation).

268.        *Id.* at 419–22. It appears that the U.K. has also used Body-Worn Cameras within Immigration Removal Centers. *See* NAT'L OFFENDER MGMT. SERVS., PRISON SERVICE INSTRUCTIONS, SECURITY MANAGEMENT: BODY WORN VIDEO CAMERAS (2017) https://www.justice.gov.uk/downloads/offenders/psipso/psi-2017/PSI-2017-04-Body-Worn-Video-Cameras.pdf [https://perma.cc/E3L8-39AT].

AR.11013

In the CBP context, BWCs should be used uniformly and without exception.[269] Further, the absence of a recording[270] should operate to create a presumption in favor of the intending immigrant. For example, in a situation where CBP lacked a recording of a screening interview with an immigrant like Cecilia, Cecilia's own account would be taken as the truth. She would be presumed to be an asylum seeker and her erroneously-issued expedited removal order should automatically be rescinded. While there may be valid reasons why a recording does not exist—technology can malfunction, for example[271]—given the high stakes for asylum seekers as outlined in Part I.C, guarding against abuse in the immigration context requires that the presumption in the absence of a recording should be in the asylum seeker's favor.[272]

It is entirely possible, however, that requiring video recordings could also lead to abuse of that process. Human Rights First details one instance where a Mexican asylum seeker was forced to recant her

---

269.      BODY CAMERAS AND CBP, *supra* note 223, at 17 ("CBP should have the clearest and strictest policy possible—one that at least requires body-worn cameras be on for all encounters with the public."); *see also* Officer Discretion, *supra* note 262, at 1528 ("Research suggests that strict (mandatory) activation policies may increase activation rates . . . .").

270.      In the criminal context, the absence of a recording could potentially give "rise to a presumption that the defendant's version of events should be accepted, absent (1) a compelling reason explaining the failure to record, and (2) a finding that the defendant's version of events could not be believed by a reasonable person." David A. Harris, *Ensuring Fourth Amendment Compliance*, *supra* note 231, at 365; Mary D. Fan, *Justice Visualized: Courts and the Body Camera Revolution*, 50 U.C. DAVIS L. REV. 897, 944 (2017) [hereinafter Fan, *Justice Visualized*] ("In jurisdictions that require video recording, where video is missing or part of an event is unrecorded, judges should inquire into the reasons for the gaps and omissions.").

271.      *See* Fan, *Democratizing Policing*, *supra* note 242, at 1661 (arguing that despite "legitimate reasons for not recording, such as the exigencies and stress of the moment, technological malfunction, inexperience, the transition to new technology and mandates, and other mistakes," there are "potentially problematic reasons for failure to record, such as refusal to comply with rules, concealment, or subversion").

272.      This is contrary to suggestions from scholars in the criminal context that "[c]ourts should accept reasonable explanations without penalty lest other departments considering adopting body cameras be deterred from voluntarily undertaking reform." Fan, *Justice Visualized*, *supra* note 270, at 956. In this context, there is only one department at the federal level who would be implementing BWCs, and, once implemented, the absence of footage should be taken seriously and should operate to benefit the asylum seeker.

AR.11014

fear of return on video.[273] This is why the presumption in favor of an asylum seeker in the absence of a recording is so important.

### 5. The Necessary Reliance on Immigration Officials Exercising Prosecutorial Discretion, Even With Video Evidence

One major concern with the implementation of BWCs at the border is whether—even if ICE trial attorneys and CBP agents and supervisors have video evidence of the screening interview with an asylum seeker—they will exercise discretion favorably. In Cecilia's case, if a video existed of her first interaction with a border official where she explained that she was fleeing for her life, would CBP have later rescinded that removal order? Or, would the ICE trial attorney have actually exercised his discretion in a positive way to preserve her asylum claim? These questions cannot be answered, but of course clear video evidence makes it more likely that an agency employee would admit the mistake and remedy the situation, correcting the injustice.

Ultimately, though, under current law there is no effective mechanism for correcting an unjustifiably issued expedited removal order, even if the errors are obvious and documented. This would require a change in the law and in the jurisdiction awarded to immigration judges, who currently have no authority to grant asylum where a removal order has been reinstated. This change in the law may be more likely to occur, however, if a repository of neutral evidence existed, such as recordings of individual screenings at the border. Such data could be combed to make the case for more comprehensive statutory or regulatory reform, which may include empowering immigration judges with the jurisdiction to determine whether a particular prior removal order should bar an individual from asylum protection.

### 6. Reliability of Video Evidence

Finally, video evidence is not perfect, and although there is the temptation to assume that a video presents a neutral account of what has transpired, the perspective and angle of the camera will actually lead to varying interpretations of what has occurred, as does the bias

---

273.     HRF, CROSSING THE LINE, *supra* note 6, at 12 (detailing CBP officer manipulation of the interview and the video recording).

AR.11015

with which an audience views a video.[274] This is clearly a concern in the criminal context as juries and judges try to understand what exactly transpired and who is at fault. In credible fear screenings, however, video evidence may be more straightforward. Given the way the statute and regulations are written, the screening interview is intended to function, as David Martin describes it, as a "beep test."[275] This means that if an immigrant indicates she has a fear of return or is seeking asylum, this triggers an automatic referral from CBP to USCIS for a fear interview. The video should reliably reveal whether or not such a fear was expressed and thus whether or not the CBP officer took the appropriate, lawfully-mandated action.

Particular populations are especially at risk in the expedited removal process. Indigenous or rare language speakers, for example, are disadvantaged. Those who do not speak common languages like Spanish are often unable to communicate with border officials.[276] In this instance, even a video of the interaction could be inadequate. However, recording the interaction that did occur, even when interpretation was wrong or missing, would surely be better than failing to have any record of the interaction at all.

### 7. Logistical and Financial Costs of Body-Worn Cameras at the Border

Implementing BWCs for CBP will come with costs and challenges. Because CBP operates across state borders and even within Indian reservations, it may have to contend with various state laws regarding privacy and consent to video recording.[277] Further, the data for secondary screening interviews will need to be stored for long periods of time. It may take months or even years for a wrongfully deported asylum seeker to re-enter the United States and pursue her claim for protection. Even if she is admitted the first time and needs

---

274.    Fan, *Justice Visualized, supra* note 270, at 947–53; *see also* Fan, *Democratizing Policing, supra* note 242, at 1658–64 ("Video is no magic bullet to end fierce conflicts in interpretation . . . ."); Stoughton, *supra* note 224, at 1405–13 (discussing the limits of human interpretation and cognitive bias).

275.    *See* Martin, *Expedited Removal, supra* note 108, at 68.

276.    This problem remains, even in immigration court. *See* Jennifer Medina, *Anyone Speak K'iche' or Mam? Immigration Courts Overwhelmed by Indigenous Languages*, N.Y. Times (Mar. 19, 2019), https://www.nytimes.com/2019/03/19/us/translators-border-wall-immigration.html [https://perma.cc/UB9B-HGXT] (explaining a shortage of interpreters, particularly for indigenous languages spoken in Guatemala, in the immigration court system).

277.    BODY CAMERAS AND CBP, *supra* note 223, at 14–16.

evidence involving her interaction with CBP, she will typically wait for several years for her case to be adjudicated in immigration court. As such, a FOIA request for the A-file containing the video recording may be submitted years after the original interaction with CBP.

The cost of implementing BWCs throughout CBP may be substantial. This may be mitigated, however, by the fact that CBP has also launched virtual processing en masse in certain locations, like McAllen, Texas. Where fear screenings are already being conducted by officers stationed in remote locations using video technology, it does not seem that simply recording those screening interview would add much or even any financial burden.[278] Further, CBP has not struggled in recent years with Congressional appropriations, currently having a budget of over sixteen billion dollars per year.[279] Further, it may be more politically feasible for Congress to vote to ensure that border officials follow existing law, rather than voting to change the law itself to improve the treatment of asylum seekers and migrants.

Ultimately, the implementation of BWCs is the most practical and politically feasible solution as a step to remedy the injustice perpetrated by the interplay of the expedited removal and reinstatement of removal processes.[280] It is, however, an imperfect solution that still relies on the exercise of discretion by a government official. Even with incontestable evidence that an asylum seeker articulated her fear in the first instance during a screening interview with a border agent, nothing in the law mandates that a trial attorney or border supervisory agent exercise their discretion to rescind the erroneously issued removal order.

Further, there will undoubtedly be instances where the asylum seeker, although genuinely afraid and with a legitimate claim, does fail

---

278.    2016 USCIRF REPORT, *supra* note 75, at 24 (detailing how CBP virtually processed 100,000 individuals in McAllen, Texas using video technology in less than 2 years).

279.    U.S. DEP'T OF HOMELAND SEC., BUDGET-IN-BRIEF FISCAL YEAR 2018, at 11                                                                    (2018), https://www.dhs.gov/sites/default/files/publications/DHS%20FY18%20BIB%20Final.pdf [https://perma.cc/9VWU-TMZ8] (reporting that CBP's budget is around $16 billion, with an almost $3 billion increase between 2017 and 2018).

280.    Instituting BWCs for CBP officers is a forward-looking solution—meaning that it will not benefit those asylum seekers who have already been unlawfully turned back by CBP officers and did not receive their credible fear interview the first time they articulated a fear. Indeed, there are thousands of erroneously issued expedited removal orders working their way through the courts. For these cases, advocates should continue to build the record and document the widespread abuse of the expedited removal system.

AR.11017

to articulate her fear in the first instance, and the existence of video footage capturing this may serve to further undermine her credibility and claim for even withholding protection. Even then, however, one advantage of the existence of video footage is that it could be used to show patterns of abuse and to highlight bad actors.

Finally, it is entirely possible that an individual who otherwise would have disclosed her fear during the screening process will be deterred from doing so because of the presence of a video camera or the knowledge that what she says is being recorded. In sum, however, given the current chaotic state of affairs at the border and the daily injustices within the expedited removal system, the careful and complete implementation of BWCs will likely save more lives than it will harm. Until more systemic reform is feasible, BWCs should be introduced and implemented at the border.

CONCLUSION

Oversight and reform is needed now more than ever. Asylum seekers will not stop coming to our borders, even if we turn them away. Cecilia did not stop fighting to save her life when she was erroneously denied access to the asylum process in 2014 and sought help again the very next month, and again a year later.

Asylum seekers like Cecilia are not going to stop seeking protection in the United States, because they have nowhere else to go.[281] We must meet international and domestic obligations to protect them. This Article exposes the highly problematic interplay of expedited removal and reinstatement of removal. These two systems interact to create an almost always permanent barrier to meaningful protection for asylum seekers.

---

281.     *See* Drake & Gibson, *Vanishing Protection*, *supra* note 6, at 119 ("Essentially, people are trapped in a burning house, and the United States is hoping that locking the front door will discourage them from trying to escape the flames. Until the root humanitarian crises are addressed, forced migration will continue."). Indeed, despite the Trump Administration's targeted focus on vilifying and attempting to prevent asylum seekers from seeking protection in the United States, high numbers of women and children fleeing violence in Central America continue to arrive at the U.S. southern border. *See* Cristobal Ramón, *New Border Apprehensions Data Shows More Families and Children Arriving at the U.S. Border*, BIPARTISAN POLICY CTR. (Mar. 18, 2019), https://bipartisanpolicy.org/blog/new-border-apprehensions-data-shows-more-families-and-children-arriving-at-the-u-s-border/ [https://perma.cc/Y29N-VBK2].

For a mother like Cecilia who is permanently separated from her young son, withholding protection is not meaningful protection at all. While Cecilia can live and work in the United States and raise her daughter, she is not who Congress intended to be barred from asylum protection. The other bars to asylum protection, which render an individual eligible only for withholding, contemplate an individual's delay in filing for asylum or the fact that she may have already received protection in another country. Further, an immigration judge has no power to consider whether or not these factors should operate to bar an asylum seeker from the most meaningful form of protection. For Cecilia, the only difference between her and an individual granted asylum and able to fully integrate and pursue family reunification is that the officers she encountered at the border in 2014 failed to follow the law. They failed to properly screen her for asylum eligibility and issued two erroneous expedited removal orders that have forever changed the course of her life.

We can and must do better. Of the solutions proposed in this Article, the implementation of body-worn cameras for CBP officers interacting with individuals crossing the border is the most practical and politically feasible strategy while additional structural solutions are developed and litigation-based strategies play out. We must seize the opportunity to take advantage of technology, which was not contemplated in 1996 when the expedited removal system was created, but can be harnessed today to remedy some of the shortcomings of the system and increase protection for asylum seekers.

***

AR.11019

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 23, 2020
**Tracking No.** 1k4-9ego-4jpi
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0565
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Amanda Alvarado Ford
**Organization:** La Raza Centro Legal, Inc

## General Comment

My name is Amanda Alvarado Ford, I am a resident of San Mateo, California and I am an child of immigrants/descendant of immigrants. I am writing to express my concern and opinion relating to the Department of Homeland Security's proposed rule change on "Procedures for Asylum and Bars to Asylum Eligibility."

I am a concerned member of the public who believes strongly that our nation must welcome people fleeing violence, and who is strongly concerned about racial profiling in the criminal legal system. Immigrants are a vital part of my community, my neighborhood, and my state.

Our values call for the U.S. to be a place of refuge for people fleeing violence, starvation, poverty, or persecution.
U.S. law enshrines the protections of the international Refugee Convention, drafted in the wake of the horrors of World War II. Under the Refugee Act of 1980, passed with bipartisan support, anyone present or arriving in the U.S. can apply for asylum.
For asylum seekers, making it to the U.S. often means they have found safety from persecution, torture, and sometimes death. Yet asylum seekers face many unjust obstacles in the immigration system.


This proposed rule would inject racial profiling into the asylum process. This latest attack would put even more people seeking asylum at risk of danger - and death. This would in turn eviscerate one of the most important defenses community members have against deportation.
This proposed Trump rule would punish people who've already endured mistreatment and racial profiling in the criminal legal system a second time -- with deportation back to the very life-threatening situation they fled. This is profoundly immoral, makes a mockery of due process, and comes right out of Steven Miller's racist playbook. The criminal legal system in the U.S. is wracked with racial profiling and obstacles to equal justice. Our harsh immigration laws exploit these obstacles to drive mass incarceration and mass deportation of people of color.

AR.11020

AR.11021

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 23, 2020
**Tracking No.** 1k4-9egm-y2be
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0566
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Russell Novkov

## General Comment

Asylum should be allowed

AR.11022

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 14, 2020
**Status:** Posted
**Posted:** January 23, 2020
**Tracking No.** 1k4-9efz-tb0n
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0567
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** richard smith
**Address:**
    17393 harman
    Melvindale,  MI,  48122
**Email:** richard.smith49@yahoo.com
**Phone:** 3139284212

## General Comment

We used to be the land of the free and the home of the brave. Now were the impregnable fortress of the paranoid racists. Donald Trump is the cause of all this. Don't let him get away with it.

AR.11023

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 02, 2020
**Status:** Pending_Post
**Tracking No.** 1k4-9elw-g4jr
**Comments Due:** January 21, 2020
**Submission Type:** E-mail

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-DRAFT-0578
Comment on EOIR 18-0002; RINs 1615-AC41 & 1125-AA87

---

## Submitter Information

**Name:** Hedi Altman
**Address:**
    Washington,  DC,
**Email:** haltman@heartlandalliance.com
**Phone:** 202-879-4311
**Organization:** National Immigrant Justice Center

---

## General Comment

See Attached

---

## Attachments

Cover email

Comment letter from 110 NGOs

AR.11024

William P. Barr, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Kenneth Cuccinelli, Acting Director
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, N.W.
Washington, D.C. 20529

James McHenry, Director
Executive Office for Immigration Review
5107 Leesburg Pike, 18th floor
Falls Church, VA 22041

Paul Ray, Acting Administrator
Office of Information & Regulatory Affairs
Office of Management and Budget
725 17th Street, NW
Washington, D.C. 20503

Chad Wolf, Acting Secretary
Department of Homeland Security
Washington, D.C. 20528

January 2, 2020

> **RE:** **Request for 60-Day Comment Period for DHS and DOJ Joint Notice of Proposed Rulemaking--USCIS RIN 1615-AC41; EOIR Docket No. 18-0002; A.G. Order No. 4592-2019**

Dear Attorney General Barr, Director McHenry, Acting Secretary Wolf, Acting Director Cuccinelli, and Acting Administrator Ray:

We, the undersigned organizations, write to respectfully request that U.S. Citizenship and Immigration Services (USCIS) and the Executive Office for Immigration Review (EOIR) extend the comment period for the recent rulemaking issued with regard to asylum eligibility (EOIR Docket No. 18-0002; A.G. Order No. 4592-2019) from 30 days to 60 days. The proposed rule puts forth numerous complex and substantial changes to the existing system of asylum adjudication in the United States; we believe that a 60 day comment period is necessary to ensure that organizations and individuals are able to exercise the meaningful opportunity to comment required by law.

The joint notice of proposed rulemaking was issued on December 19th and broken into three sections. The first section proposes to add seven new bars to eligibility for asylum to the federal rules, with varying processes and explanations for how the immigration adjudicator will determine whether an offense or conduct falls within the newly defined category. The second section provides a multi-factored test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for the purpose of determining asylum eligibility. The

1

third section rescinds a provision in the current rules regarding the reconsideration of discretionary asylum.

The current joint notice provides for a 30-day comment period to respond to these proposals. Executive Order 12866[1] directs agencies to "afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days." This directive is echoed in Executive Order 13563,[2] which states: "To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days."

Given the complexity of the legal and policy issues implicated by this rule, the vast scope of impact on those seeking safety in the United States, and the potential implications for the United States' compliance with its obligations under international and domestic asylum law, a 60 day comment period—at minimum—is necessary to ensure that the opportunity to comment is meaningful. This is particularly so given that the originally prescribed 30 day comment period includes two federal holidays and a 10 day work period when many organizations are closed.

Meaningful analysis and commentary on the proposed rule will require research and examination of complex and overlapping areas of law and policy. Specifically, the joint rule:

- ... implicates the United States' obligations under international treaty law, including the Refugee Convention and the Convention Against Torture, and the manner by which these treaties are incorporated into domestic law;
- ... adds *seven* new bars to the regulations governing eligibility for asylum, which will result in a significant change to current asylum adjudications in the affirmative and defensive postures and remove many otherwise eligible applicants from asylum eligibility; and
- .. implicates complex questions regarding the authority of the immigration adjudicator to examine evidence and documents relevant to the facts surrounding alleged criminal conduct, suggesting a deviation from the long-standing categorical approach to determining the impact of a criminal conviction in immigration court and raising important questions of judicial efficiency and fairness.[3]

---

[1] Executive Order 12866 of Sept. 30, 1993, 58 Fed. Reg. 190, Oct. 4, 1993, https://www.archives.gov/files/federal-register/executive-orders/pdf/12866.pdf.

[2] Executive Order 13563 of Jan. 18, 2011, 76 Fed. Reg. 14, Jan. 21, 2011, https://www.reginfo.gov/public/jsp/Utilities/EO_13563.pdf.

[3] For one of many academic analyses of the quite complex intersection between the categorical approach the determination of what constitutes a "particularly serious crime" barring asylum eligibility, *see* Fatma Marouf, 97 Boston Univ. Law Review 1427, "A particularly serious exception to the categorical approach," Sept. 2017, http://www.bu.edu/bulawreview/files/2017/09/MAROUF.pdf.

In addition to the complexity of the legal and policy implications of the joint rule, its massive impact on vulnerable communities merits sufficient time for study and consideration. Those individuals who meet the definition of a refugee but are rendered ineligible for asylum under the rule will suffer very real harms. Although the joint rule discusses alternative forms of relief known as withholding of removal and protection under the Convention Against Torture, these forms of relief require a higher burden of proof than asylum, meaning that many asylum seekers excluded from eligibility under the rule will face deportation back to harm if they cannot meet this higher burden.[4] Furthermore, withholding of removal and Torture Convention protection do not provide a path to lawful permanent residence or the opportunity to reunify with immediate family members who may remain abroad in imminent danger.[5]

A minimum period of 60 days is necessary to ensure that organizations and individuals have a real and meaningful opportunity to engage and comment upon the non-exhaustive list of legal and policy issues described above as well as the economic and human costs that the joint rule will impose.

Thank you in advance for your time and consideration of this request. With any questions or concerns, please contact Heidi Altman at the National Immigrant Justice Center at haltman@heartlandalliance.org or 312-718-5021.


Sincerely,

**National organizations**

ACLU Immigrants' Rights Project
ADL (the Anti-Defamation League)
African Communities Together
Alianza Americas
American Federation of Labor-Congress of Industrial Organizations (AFL-CIO)
American Friends Service Committee
American Immigration Lawyers Association
Asian Pacific Institute on Gender-Based Violence
ASISTA
Black Alliance for Just Immigration (BAJI)
Campaign for Youth Justice

---

[4] For a discussion of the different standards and benefits associated with asylum versus withholding of removal or protection under the Convention Against Torture, *see* Human Rights First, "Withholding of Removal and the U.N. Convention Against Torture--No Substitute for Asylum, Putting Refugees at Risk," Nov. 2018, https://www.humanrightsfirst.org/sites/default/files/CAT_Withholding.pdf.
[5] *Id.*

Catholic Legal Immigration Network, Inc.
Center for American Progress
Center for Victims of Torture
Church World Service
Coalition on Human Needs
CREDO
Detention Watch Network
Freedom for Immigrants
Freedom Network USA
Government Accountability Project
Government Information Watch
HIAS
Hispanic Federation
Human Rights First
Human Rights Watch
Immigrant Defense Project
Immigrant Legal Resource Center
Immigration Equality
Innovation Law Lab
International Refugee Assistance Project (IRAP)
Just Futures Law
Justice Strategies
Kids In Need of Defense (KIND)
Latin America Working Group (LAWG)
National Center for Transgender Equality
National Council of Jewish Women
National Crittenton
National Education Association
National Immigrant Justice Center
National Immigration Forum
National Immigration Law Center
National Immigration Project of the National Lawyers Guild
National LGBTQ Task Force
National Network for Immigrant & Refugee Rights
Quixote Center
Refugee Congress
Refugee Council USA
Service Employees International Union (SEIU)
Tahirih Justice Center
U.S. Committee for Refugees and Immigrants

Union for Reform Judaism
Unitarian Universalist Service Committee
Young Center for Immigrant Children's Rights

**Regional / local organizations**

Advocates for Basic Legal Equality, Inc.
Asylum and Human Rights Clinic, University of Connecticut School of Law
Bellevue Program for Survivors of Torture
Brooklyn Defender Services
California Collaborative for Immigrant Justice
Cape Cod Coalition for Safe Communities
Capital Area Immigrants' Rights Coalition
Catholic Migration Services
Center Global of the DC Center for LGBT Community
Church Council of Greater Seattle
Church of Our Saviour/La Iglesia de Nuestro Salvador
Cleveland Jobs with Justice
Coalition for Humane Immigrant Rights (CHIRLA)
Columbia Law School Immigrants' Rights Clinic
Connecticut Shoreline Indivisible
DC-MD Justice For Our Neighbors
Deportation Research Clinic, Buffett Institute for Global Studies, Northwestern University
First Friends of NJ & NY
Georgia Asylum and Immigration Network
Harvard Immigration and Refugee Clinical Program
Human Rights Initiative of North Texas
Illinois Coalition for a Immigrant and Refugee Rights
Immigrant and Non-Citizen Rights Clinic, CUNY School of Law
Immigrant Defenders Law Center
Immigrant Justice Clinic, James E. Rogers College of Law
Immigrant Legal Advocacy Project
Immigrant Rights Project, University of Tulsa
International Human Rights Law Clinic, American University Washington College of Law
Iowa Coalition Against Domestic Violence (ICADV)
IPVAC - Immigration Clinic, University of Florida
IRIS - Integrated Refugee & Immigrant Services
Kitsap Immigrant Assistance Center
Legal Aid Justice Center
Los Angeles LGBT Center

Loyola University New Orleans College of Law
Massachusetts Immigrant and Refugee Advocacy Coalition
Mid-South Immigration Advocates
Migrant Justice
New Jersey Coalition to End Domestic Violence
New Sanctuary Coalition
New York Immigration Coalition
Northwest Immigrant Rights Project
NWIndiana Resist
Public Counsel
Quinnipiac University School of Law Civil Justice Clinic
Reformed Church of Highland Park Affordable Housing Corp
Rocky Mountain Immigrant Advocacy Network
Southern Poverty Law Center
Taos Immigrant Allies
The Bronx Defenders
The Florence Immigrant & Refugee Rights Project
The North Carolina Coalition Against Domestic Violence
Transformations CDC
ULA - Unidad Latina en Acción
University of Maryland Carey Immigration Clinic
Washington Immigrant Solidarity Network

# PUBLIC SUBMISSION

**As of:** 1/29/20 8:28 AM
**Received:** January 07, 2020
**Status:** Posted
**Posted:** January 24, 2020
**Tracking No.** 1k4-9elw-yqy5
**Comments Due:** January 21, 2020
**Submission Type:** Unknown

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0569
Comment on EOIR Docket No. 18-0002; AG Order No. 4592-2019; RINs 1615-AC41 & 1125-AA87

---

## Submitter Information

**Name:** Richard Blumenthal
**Address:**
    United States Senate
    Washington,  DC,  20510
**Organization:** United States Senate

---

## General Comment

See Attached

---

## Attachments

Comment on EOIR Docket No. 18-0002; AG Order No. 4592-2019; RINs 1615-AC41 & 1125-AA87

AR.11031

RICHARD BLUMENTHAL
CONNECTICUT

COMMITTEES:

AGING

ARMED SERVICES

COMMERCE, SCIENCE, AND TRANSPORTATION

JUDICIARY

VETERANS' AFFAIRS

**United States Senate**

WASHINGTON, DC 20510

706 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224–2823
FAX: (202) 224–9673

90 STATE HOUSE SQUARE, TENTH FLOOR
HARTFORD, CT 06103
(860) 258–6940
FAX: (860) 258–6958

915 LAFAYETTE BOULEVARD, SUITE 304
BRIDGEPORT, CT 06604
(203) 330-0598
FAX: (203) 330-0608
http://blumenthal.senate.gov

January 6, 2020

The Honorable William P. Barr
The Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Mr. Kenneth Cuccinelli
Acting Director
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, N.W.
Washington, D.C. 20529

Mr. James McHenry
Director
Executive Office for Immigration Review
5107 Leesburg Pike, 18th Floor
Falls Church, Virginia 22041

Mr. Paul Ray
Acting Administrator
Office of Information & Regulatory Affairs
Office of Management and Budget
725 17th Street, N.W.
Washington, D.C. 20503

Mr. Chad Wolf
Acting Secretary
Department of Homeland Security
Washington, D.C. 20528

Dear Attorney General Barr, Director McHenry, Acting Secretary Wolf, Acting Director
Cuccinelli, and Acting Administrator Ray:

I write out of grave concern that U.S. Citizenship and Immigration Services (USCIS) and
the Executive Office for Immigration Review have provided an insufficient comment period for
the recent rulemaking, EOIR Docket No. 19-002; AG Order No. 459-2019. The proposed rule
would create seven new bars to asylum and implicates the United States' international and
domestic legal obligations. I urge you to extend the comment period to 60 days to ensure that the
public is provided a meaningful opportunity to comment as required by law.

The joint notice of proposed rulemaking was issued on December 19th and provided only
thirty days for organizations and individuals to provide comments. Given the complexity of the
legal and policy issues implicated by this rule, including the potential violation of the United
States' domestic and international legal obligations, a thirty day comment period is simply

AR.11032

inadequate, especially when those thirty days include two federal holidays. Executive Order 12866[1] directs agencies to "afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days." This directive is echoed in Executive Order 13563,[2] which states: "To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days." The notice of proposed rulemaking provides no justification for setting a truncated comment period.

This proposed rule represents a sweeping change to the process and availability of asylum in the United States and the public deserves the time necessary to evaluate and analyze it. To take but one example, the notice includes a proposal to make a conviction for *any* felony a bar to asylum. As even the notice itself concedes, this proposal is likely vastly over-inclusive. The notice specifically asked for comments about whether there are "crimes that are currently designated as felonies in one or more relevant jurisdictions in the United States that should not be categorical bars to asylum."[3] Combing through the federal criminal code as well as the criminal codes of each of the fifty states and providing analysis on the many felonies that clearly should not be a categorical bar to asylum[4] is an enormous undertaking. And this is but one of *seven* new bars to asylum that the rule proposes, in addition to significant procedural changes to the adjudication of asylum claims.

Further, there are serious questions about the legality of this rule. For example, the Convention and Protocol Relating to the Status of Refugees directs that contracting states shall not impose penalties on asylum-seekers for "illegal entry or presence,"[5] a command that is at the very least in tension with this rule's proposal to make illegal reentry a categorical bar to asylum.[6] I trust that your agencies are interested in fully understanding the implications that this sweeping change to asylum in the United States would have on our international and domestic legal obligations.

---

[1] Executive Order 12866 of Sept. 30, 1993, 58 Fed. Reg. 190, Oct. 4, 1993, https://www.archives.gov/files/federal-register/executive-orders/pdf/12866.pdf.

[2] Executive Order 13563 of Jan. 18, 2011, 76 Fed. Reg. 14, Jan. 21, 2011, https://www.reginfo.gov/public/jsp/Utilities/EO_13563.pdf.

[3] Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. 69640, 69647 (proposed Dec. 19, 2019)(to be codified at 8 C.F.R. pt. 1208).

[4] *See, e.g.* 18 U.S.C. § 1702 (criminalizing opening someone else's mail which is punishable by up to five years in prison and thus a federal felony).

[5] Convention Relating to the Status of Refugees, art. 30, July 28, 1951, 189 U.N.T.S.

[6] Procedures for Asylum and Bars to Asylum Eligibility, 84 Fed. Reg. 69640, 69648 (proposed Dec. 19, 2019)(to be codified at 8 C.F.R. pt. 1208). 69648; This proposal is also at odds with the 1980 Refugee Act which commands that any asylum-seekers who is "physically present in the United States," regardless of whether they arrived at a designated port of entry and "irrespective of such alien's status," is eligible for asylum. 8 U.S.C. §1158 (a)(1).

2

AR.11033

This rule has the potential to inflict irreparable harm on those individuals who meet the definition of a refugee but are rendered ineligible for asylum under the rule—by definition, those individuals face the very real threat of torture, death, or other forms of persecution. Although the joint rule discusses alternative forms of relief known as withholding of removal and protection under the Convention Against Torture, these forms of relief impose a higher burden of proof than asylum, meaning that many asylum seekers excluded from eligibility under the rule will face deportation back to harm if they cannot meet this higher burden.[7] Given the gravity and complexity of this proposed rule, a thirty day comment period is not sufficient.

Thank you for attention to this important matter. If you have any questions, please contact Charlotte Schwartz (Charlotte_Schwartz@blumenthal.senate.gov).

Sincerely,

Richard Blumenthal
United States Senate

---

[7] For a discussion of the different standards and benefits associated with asylum versus withholding of removal or protection under the Convention Against Torture, *see* Human Rights First, "Withholding of Removal and the U.N. Convention Against Torture--No Substitute for Asylum, Putting Refugees at Risk," Nov. 2018, https://www.humanrightsfirst.org/sites/default/files/CAT_Withholding.pdf.

3

AR.11034

# PUBLIC SUBMISSION

**As of:** January 23, 2020
**Received:** January 14, 2020
**Status:** Pending_Post
**Tracking No.** 1k4-9elw-qfzh
**Comments Due:** January 21, 2020
**Submission Type:** Unknown

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-DRAFT-0580
Comment on EOIR Docket No. 18-0002; AG Order No. 4592-2019; RINs 1615-AC41 & 1125-AA87

---

## Submitter Information

**Name:** Pramila Jayapal
**Address:**
    United States House of Representatives
    Washington,  DC,  20515
**Organization:** United States House of Representatives

---

## General Comment

See Attached

---

## Attachments

Comment on EOIR Docket No. 18-0002; AG Order No. 4592-2019; RINs 1615-AC41 & 1125-AA87

AR.11035

**PRAMILA JAYAPAL**
7TH DISTRICT, WASHINGTON

**HOUSE COMMITTEE ON THE JUDICIARY**

VICE CHAIR, SUBCOMMITTEE ON
IMMIGRATION AND CITIZENSHIP

MEMBER, SUBCOMMITTEE ON ANTITRUST,
COMMERCIAL AND ADMINISTRATIVE LAW

**HOUSE COMMITTEE ON THE BUDGET**

**HOUSE COMMITTEE ON EDUCATION
AND LABOR**

MEMBER, SUBCOMMITTEE ON
HIGHER EDUCATION AND WORKFORCE INVESTMENT

MEMBER, SUBCOMMITTEE ON WORKFORCE PROTECTIONS

## Congress of the United States
### House of Representatives
### Washington, DC 20515-4707

1510 LONGWORTH HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-3106

1904 3RD AVENUE
SUITE 510
SEATTLE, WA 98101
(206) 674-0040

January 13, 2020

The Honorable William P. Barr
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20528

Chad Wolf
Acting Secretary
Department of Homeland Security
Washington, D.C. 20530

The Honorable James McHenry
Director
Executive Office for Immigration Review
5107 Leesburg Pike, 18th floor
Falls Church, VA 22041

Kenneth Cuccinelli
Acting Director
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, N.W.
Washington, D.C. 20529

**RE:   Request for 60-Day Comment Period for DHS and DOJ Joint Notice of Proposed
Rulemaking--USCIS RIN 1615-AC41; EOIR Docket No. 18-0002; A.G. Order No. 4592-2019**

Dear Attorney General Barr, Director McHenry, Acting Secretary Wolf, and Acting Director Cuccinelli:

We write to request that U.S. Citizenship and Immigration Service (USCIS) and the Executive
Office for Immigration Review (EOIR) extend the comment period for the recent rulemaking issued
with regard to asylum eligibility (EOIR Docket No. 18-0002; A.G. Order No. 4592-2019) from 30 days
to 60 days. The proposed rule puts forth substantive and complex changes to asylum eligibility in the
United States and should be subject to the standard 60-day comment period. This proposal is likely to
have an enormous impact on the world's most vulnerable communities who are arriving to our nation to
seek safety, thus making the opportunity for thorough consideration highly important. Due to
complexity of this proposed rule, a 30-day comment period is simply not long enough to allow for
meaningful or reasonable opportunity to respond as required by law.

The Administrative Procedures Act (APA) requires agencies to "afford interested persons an
opportunity to participate in the rule making."[1] This has been interpreted to require interested parties a
reasonable and meaningful opportunity for comment.[2] Consistent with the APA, subsequent Executive
Orders have instructed agencies to provide at least 60 days for comment for most rulemakings. Order
12866 directs agencies to "afford the public a meaningful opportunity to comment on any proposed

---

[1] 5 U.S.C. § 553(c).
[2] *See, e.g., Forester v. CPSC*, 559 F.2d 774, 787 (D.C. Cir. 1977).

PRINTED ON RECYCLED PAPER

AR.11036

regulation, which in most cases should include a comment period of not less than 60 days."[3]  This directive is echoed in Executive Order 13563, which states: "To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days."[4]

The proposed 30-day comment period fails to provide a reasonable or meaningful opportunity to comment on the rule. USCIS and EOIR issued the notice of proposed rulemaking on December 19th and provided a 30-day comment period to respond to these proposals. This 30-day period includes two federal holidays and a two-week period in which many offices and organizations are closed, limiting the opportunity for such offices and organizations to provide comment.

The joint notice of proposed rulemaking is also particularly complex, with three sections that require extensive research and examination of complex law and policy. The first section proposes seven new bars to asylum eligibility; the second section consists of a five-part test for immigration adjudicators to determine whether a criminal conviction or sentence is valid for purposes of determining asylum eligibility; and the third section rescinds a preexisting provision regarding the reconsideration of discretionary asylum. Further, the rule implicates the United States' obligations under international treaty law, including the Refugee Convention and the Convention Against Torture, and how these treaties are incorporated into law. To demand that the public review, analyze, and provide meaningful comments on this proposal during the designated 30-day comment period is unreasonable.

Given the complexity of the legal and policy issues impacted by the proposed rulemaking, a 60-day comment period, at the very minimum, is necessary to provide a reasonable opportunity to comment.

Thank you for your consideration.

Sincerely,


**PRAMILA JAYAPAL**
Member of Congress

**VERONICA ESCOBAR**
Member of Congress


**JERROLD NADLER**
Member of Congress

**ZOE LOFGREN**
Member of Congress

---

[3] Executive Order 12866, *Regulatory Planning and Review*, 58 Fed. Reg. 51735 (Oct. 4, 1993), https://www.archives.gov/files/federal-register/executive-orders/pdf/12866.pdf
[4] Executive Order 13563, *Improving Regulation and Regulator Review*, 76 Fed. Reg. 3821 (Jan. 21, 2011), https://www.federalregister.gov/documents/2011/01/21/2011-1385/improving-regulation-and-regulatory-review

AR.11037

SYLVIA R. GARCIA
Member of Congress

RAUL M. GRIJALVA
Member of Congress

DEB HAALAND
Member of Congress

ELEANOR HOLMES NORTON
Member of Congress

DANIEL T. KILDEE
Member of Congress

RAJA KRISHNAMOORTHI
Member of Congress

BARBARA LEE
Member of Congress

JOHN LEWIS
Member of Congress

JAMES P. MCGOVERN
Member of Congress

GRACE MENG
Member of Congress

GWEN MOORE
Member of Congress

GRACE F. NAPOLITANO
Member of Congress

TOM O'HALLERAN
Member of Congress

CHELLIE PINGREE
Member of Congress

ER-3003

AR.11038



**MARK POCAN**
Member of Congress

**AYANNA PRESSLEY**
Member of Congress

**MIKE QUIGLEY**
Member of Congress

**JAMIE RASKIN**
Member of Congress

**LUCILLE ROYBAL-ALLARD**
Member of Congress

**LINDA T. SÁNCHEZ**
Member of Congress

**JAN SCHAKOWSKY**
Member of Congress

**JOSÉ E. SERRANO**
Member of Congress

**DONNA SHALALA**
Member of Congress

**ALBIO SIRES**
Member of Congress

**ADAM SMITH**
Member of Congress

**MIKE THOMPSON**
Member of Congress

AR.11039

JOYCE BEATTY
Member of Congress

DONALD S. BEYER JR.
Member of Congress

EARL BLUMENAUER
Member of Congress

SUZANNE BONAMICI
Member of Congress

ANTHONY G. BROWN
Member of Congress

JULIA BROWNLEY
Member of Congress

TONY CARDENAS
Member of Congress

YVETTE D CLARKE
Member of Congress

ROSA L. DELAURO
Member of Congress

ELIOT L. ENGEL
Member of Congress

ADRIANO ESPAILLAT
Member of Congress

JESÚS G. "CHUY" GARCÍA
Member of Congress

AR.11040

DAVID TRONE
Member of Congress

JUAN VARGAS
Member of Congress

NYDIA M. VELÁZQUEZ
Member of Congress

AR.11041

# PUBLIC SUBMISSION

**As of:** 11/10/20 11:15 AM
**Received:** January 26, 2020
**Status:** Posted
**Posted:** January 26, 2020
**Tracking No.** 1k4-9enz-s8pn
**Comments Due:** January 21, 2020
**Submission Type:** Unknown

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0571
Comment on RIN 1125-AA87, EOIR Docket 18-0002

## Submitter Information

**Name:** Margaret Gordon
**Address:**
   621 Escalona Dr
   Santa Cruz, CA, 95060

## General Comment

See Attached

## Attachments

Comment on RIN 1125-AA87, EOIR Docket 18-0002

AR.11042

Jan. 19, 2020

Dear Lauren Reid:

Re: EOIR Docket No. 19-0002

The EOIR has proposed changes to asylum regulations creating seven new mandatory bars to asylum eligibility & ending automatic reconsideration of discretionary asylum denials. These new bars will not keep Americans safer. We should reconsider asylum denials because they are literally a matter of life or death for the affected parties.

Margaret Gordon

Margaret Gordon
621 Escalona Dr
Santa Cruz, CA 95060

AR.11043

Case: 20-17490, 01/19/2021, ID: 11968426, DktEntry: 9-12, Page 258 of 300

# PUBLIC SUBMISSION

**As of:** 1/29/20 8:30 AM
**Received:** January 17, 2020
**Status:** Posted
**Posted:** January 28, 2020
**Tracking No.** 1k4-9ehx-1688
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0572
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Solomon Steen
**Address:**
    62 Floyd St
    Boston, MA, 02124
**Email:** sols@gwmail.gwu.edu
**Phone:** 4158183565

## Redacted Comment

I am writing in opposition to this regulation as unduly burdensome to asylees. Alex Nowrasteh has written extensively on the subject and can be reached for expert comment at [**DOJ DOCKET NOTE: Commenters on DOJ Proposed Rules have the option to provide or not to provide their own Personal Identifying Information (PII) such as their names. However, in order to protect the privacy of persons other than the commenter who may not have given their consent for such PII to be posted on www.regulations.gov, it is DOJ's policy to redact third-party PII from a comment (including attachments). In such instances, the full, un-redacted comment is available for public inspection in person by contacting the For Further Information Contact identified in the Proposed Rule. Accordingly, in addition to redacting the name of a third-party above, two photos attached and submitted along with this comment that also contained third-party PII have been redacted from the version posted on www.regulations.gov.]

AR.11044

# PUBLIC SUBMISSION

| | |
|---|---|
| **As of:** 1/29/20 8:30 AM |
| **Received:** January 14, 2020 |
| **Status:** Posted |
| **Posted:** January 29, 2020 |
| **Tracking No.** 1k4-9efz-qls8 |
| **Comments Due:** January 21, 2020 |
| **Submission Type:** Web |

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0573
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Frank Noble
**Address:**
   445 E Barrett St
   Henderson,  89011
**Email:** frank121234@gmail.com

## General Comment

I believe Trump IS a Russian agent!

AR.11045

# PUBLIC SUBMISSION

**As of:** 1/29/20 8:31 AM
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 29, 2020
**Tracking No.** 1k4-9egi-lojf
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0574
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Aliya Karmali
**Address:**
   1736 Franklin Street
   Suite 400
   Oakland, CA, 94612
**Email:** karmalilaw@gmail.com
**Phone:** 5109229031
**Fax:** 8666456885

---

## General Comment

Submitted via [https://www.regulations.gov/document?D=EOIR-2019-0005-0001]

Lauren Alder Reid, Assistant Director
Office of Policy, Executive Office for Immigration Review
5107 Leesburg Pike, suite 2616
Falls Church, VA 22041

Maureen Dunn, Chief
Division of Humanitarian Affairs, Office of Policy and Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
20 Massachusetts Ave. NW
Washington, DC 20529-2140

Re: 84 FR 69640; EOIR Docket No. 18-0002, A.G. Order No. 4592-2019; RIN 1125-AA87, 1615-AC41;
Comments in Opposition to Proposed Rulemaking: Procedures for Asylum and Bars to Asylum Eligibility

January 15, 2020

ER-3011

AR.11046

To Whom it May Concern:

I am writing on behalf of the Law Office of Aliya Karmali in response to the above-referenced Proposed Rules to express my/our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

As an immigration attorney who primarily defends asylum seekers in immigration court, I am gravely concerned about these proposed rule changes regarding eligibility for asylum and bars based on alleged criminal charges and/or convictions. There is a breadth of evidence available demonstrating the link between trauma such as state and interpersonal violence and criminal history (See attachment as an example). For example, many of my clients have survived horrific state sponsored massacres and gender based violence, which may lead to emotional and cognitive disorders and over-reliance on controlled substances to manage or cope with PTSD, chronic depression and general anxiety disorder. These are facts that need to be admitted into the record via direct testimony and psychological evaluation reports in order to fully assess whether or not a particular asylum seeker has in fact committed a particularly serious crime for purposes of asylum or withholding of removal. Categorically prohibiting certain classes of asylum seeker's from live saving relief based on an alleged charge or conviction.

The proposed rules would categorically bar an asylum seeker from relief based on a second DUI conviction. This would prevent an analysis under the existing standard set forth in Matter of Frentescu which necessitates a fact based inquiry based on the nature of the charge, circumstances of the alleged incident and particular facts of the case. With DUIs, oftentimes these charges are reduced to lesser included offenses based on the blood alcohol level of the driver or other salient factors such as whether or not an accident transpired or persons or property were involved. The proposed rules would take away the adjudicator's power to assess these factors in a delicate balancing test, and unjustly prevent thousands of deserving asylum seekers from live saving relief.

Similarly, barring someone from asylum based on a mere allegation of domestic violence could have catastrophic consequences for survivors of DV who have been charged with DV related crimes for simply defending themselves against their abusers. Without adhering to current legal standards regarding particularly serious crimes, these proposed rules would do an enormous disservice to bona fide refugees with valid asylum claims.

Thank you for taking these concerns into consideration. My contact information is below.

Sincerely,

Aliya KarmalI
Attorney at Law

# Attachments

Publications _ National Institute on Alcohol Abuse and Alcoholism _ Stess and Alcohol

AR.11047

Case: 20-17490, 01/10/2022, ID: 12968426, DktEntry: 9-13, Page 263 of 300



National Institute
on Alcohol Abuse
and Alcoholism

NIH…Turning Discovery Into Health®

Clinical Trials    ✉ Get Updates    🐦 Follow Us    ⤳ Share

| Alcohol & Your Health | Publications & Multimedia | Research | Grant Funding | News & Events | About NIAAA |

Home » Publications » Journals and Reports » Alcohol Research: Current Reviews » Stress and Alcohol
◄ Table of Contents

Alcohol Research: *Current Reviews*, Volume 34, Issue Number 4

# Childhood Trauma, Posttraumatic Stress Disorder, and Alcohol Dependence

**Kathleen T. Brady, M.D., Ph.D., and Sudie E. Back, Ph.D.**

*Kathleen T. Brady, M.D., Ph.D.*, is a Distinguished University Professor and director of the Clinical Neuroscience Division and *Sudie E. Back, Ph.D.*, is associate professor of Psychiatry and Behavioral Sciences, both at the Medical University of South Carolina and the Ralph H. Johnson Veterans Affairs Medical Center, Charleston, South Carolina.

Early-childhood trauma is strongly associated with developing mental health problems, including alcohol dependence, later in life. People with early-life trauma may use alcohol to help cope with trauma-related symptoms. This article reviews the prevalence of early-childhood trauma and its robust association with the development of alcohol use disorders and posttraumatic stress disorder. It also examines the potential biological mechanisms by which early adverse experiences can result in long-lasting changes in neurobiology underlying this vulnerability, as well as pharmacological and behavioral interventions. Recent investigations highlight the importance of assessing trauma among patients with alcohol use disorders and the positive benefits associated with the application of integrative psychosocial interventions that target both trauma-related symptoms and alcohol dependence.

*Key words:* Alcohol dependence; alcohol use disorders; childhood; childhood trauma; trauma-related symptoms; posttraumatic stress disorder; coping with stress or anxiety; neurobiology; biological mechanisms; treatment; pharmacological intervention; behavioral intervention; integrative psychosocial intervention; adverse child-rearing environment

Children exposed to severe adversity early in life are at increased risk of subsequently developing mental health problems, including alcohol dependence. In general, the onset of trauma precedes the onset of alcohol dependence. Although it is impossible to establish a direct causal relationship, this temporal relationship suggests a robust and positive relationship between exposure to early-life trauma and alcohol-related problems later in life. People with trauma-related symptoms and other negative consequences of early-life trauma may use alcohol to help mitigate such symptoms. People with both a positive history of early childhood trauma and co-occurring alcohol dependence have a more severe clinical profile, as well as worse treatment outcomes when compared with those with either early trauma or alcohol dependence alone. Recent investigations highlight the importance of assessing trauma among patients with alcohol use disorders and the positive benefits associated with the application of integrative psychosocial interventions that target trauma-related symptoms and alcohol dependence. This article reviews the prevalence of early-childhood trauma and its robust association with the development of alcohol use disorders and posttraumatic stress disorder (PTSD). It also examines the potential biological mechanisms by which early adverse experiences can result in long-lasting changes in neurobiology underlying this vulnerability, as well as pharmacologic and behavioral interventions.

## Prevalence

There is little doubt that severe childhood adversity may place an individual at life-long risk for a variety of problems, including those related to mental health, physical health, employment, and legal difficulties (Putnam 2006). In a study conducted by the Centers for Disease Control and Prevention and Kaiser Permanente (Adverse Childhood Experiences [ACE] study; Felitti et al. 1998), a sample of 17,337 adults recruited from a large health maintenance organization were surveyed concerning a range of adverse events that might happen during childhood (e.g., physical or sexual abuse, incarcerated household member, emotional neglect) and adult risk behaviors, health status, and disease. The investigators found a graded relationship between the number of adverse childhood experiences (i.e., ACE score), risk behaviors during adulthood, and leading causes of morbidity and mortality in the United States, including heart disease, diabetes, liver disease, and emphysema. It is possible that these increased rates of medical conditions are not a direct result of childhood adversity but rather the result of dysfunctional and unhealthy behaviors in which victims of childhood abuse engage.

A number of studies also report that victims of child maltreatment are more likely to have emotional difficulties and psychiatric disorders. One of the most consistent results across these studies is the finding that childhood maltreatment is associated with an increased risk for alcohol and drug use disorders (Enoch 2011). In a population-based sample of 1,411 female adult twins, self-reported childhood sexual abuse was positively associated with a number of psychiatric disorders, but the strongest associations were with alcohol and drug dependence (Kendler et al. 2000). In the ACE study, the risk of alcohol dependence increased 7.2-fold, and illicit drug use increased 4.5-fold for people with four or more ACEs (Anda et al. 2006). People with a history of childhood abuse or neglect are vulnerable to using alcohol in order to cope with stressful situations, which in turn may lead to excessive alcohol use (Schuck and Widom 2001). An investigation by Widom and colleagues (2007) demonstrates that the increased risk of excessive alcohol use among victims of childhood abuse or neglect is consistent and stable into middle adulthood (e.g., age 40). Furthermore, research has shown that alcohol-dependent patients with a history of sexual abuse are more likely than nonabused patients to relapse to alcohol use (87.5 vs. 63.3 percent) and to relapse more quickly (median time to first drink = 60 vs. 115 days) in the first year following inpatient treatment for alcohol dependence (Greenfield et al. 2002).

In addition to alcohol use disorders, childhood adversity is associated with an increased risk of PTSD (Widom 1999). Data from a number of studies over the last 20 years have emphasized the high co-occurrence of PTSD and alcohol disorders. For example, among 3,768 female twins participating in the longitudinal Missouri Adolescent Female Twin Study (MOAFTS), Sartor and colleagues (2010) found that women exposed to trauma were nearly twice as likely to develop alcohol dependence (hazard ratio 1.85), and women exposed to trauma who also had PTSD were even more likely to develop alcohol dependence (hazard ratio 3.54; significantly higher than women with trauma exposure alone) when compared with women who had not experienced trauma. Studies of samples of individuals seeking treatment for alcohol use disorders also find a high prevalence of reported childhood adversity and PTSD. In a study of men and women in treatment for addictions, 62 percent reported having been victims of childhood physical or sexual abuse (Grice et al. 1995). A review of studies of individuals seeking treatment for addictions reveals rates of PTSD as high as 50 percent or greater (Dansky et al. 1994). In the majority of cases, the development of PTSD precedes the development of the substance use disorder.

These high rates of childhood victimization in individuals with PTSD and alcohol and other substance-related problems suggests that there is a link between childhood adversity and the development of these disorders, although it is impossible to establish a direct causal relationship. However, even when studies control for demographic differences, family discord, and parental pathology, the specific relationship between childhood abuse and the development of substance use disorders holds true. Several theoretical connections have been postulated (Miller et al. 1993). Childhood victimization may lead to low self-esteem and the subsequent use of alcohol to deal with negative cognitions. It is also possible that victims of childhood abuse feel that they experience

Case: 20-17490, 04/19/2021, ID: 12068426, DktEntry: 9-13, Page 264 of 300

make them "different" from other children and lead them to withdraw from healthier social circles toward fringe groups, where alcohol use is more accepted. In any case, given that victims of child abuse are more likely to develop alcohol use disorders as adults, early intervention, prevention, and training for parents are all important in interrupting this cycle of violence and alcohol problems.

## Neurobiology

Recognizing the pervasive and detrimental effects of adverse childhood experiences on quality of life and health outcomes has led to the exploration of potential biological mechanisms by which early experiences can produce long-lasting changes. Evidence from both animal and human research suggests that early stressors can lead to neurobiological changes in systems known to be involved in the pathophysiology of depression, anxiety, and substance use disorders (De Bellis et al. 1999; Heim and Nemeroff 2001). The hypothalamic–pituitary–adrenal (HPA) axis plays a critical role in the stress response and is involved in the pathophysiology of addictive disorders. Early stressors cause long-term increases in the stress response of the hormone cortisol (Plotsky and Meaney 1993) as well as decreased genetic expression of cortisol receptors and increased expression of corticotropin-releasing factor in the hypothalamus, both of which may contribute to dysregulation of the HPA axis (Ladd et al. 1996). The noradrenergic system also plays a key role in stress (Bremner 2003), and early stressors can lead to long-term decreases in a-2 noradrenergic receptors in the locus coeruleus, which may lead to loss of feedback inhibition of noradrenergic activity with associated increases in the noradrenergic stress responses (Caldji et al. 1998; Sanchez et al. 2001).

In addition to the long-lasting effects of early trauma on the stress response, a number of studies indicate that early trauma has specific effects on the neurotransmitter systems involved in the positive reinforcing effects of alcohol and drugs, particularly the brain pathway for dopamine (i.e., the mesocorticolimbic dopamine system) (Meaney et al. 2002). Higley and colleagues (1991) found that adult rhesus monkeys raised in peer groups without maternal care showed increased HPA response to stress and increased alcohol consumption during periods of stress (Higley et al. 1991). In a series of studies, Meaney and colleagues (2002) demonstrated that repeated periods of maternal separation in the early life of rats decreased dopamine transporter expression and increased dopamine responses to stress and behavioral responses to stress, cocaine, and amphetamine. These findings suggest that early-life experiences can affect the development of the mesocorticolimbic dopamine system and lead to a vulnerability to addiction in later life. Thus, in addition to effects on stress reactivity, early-life events might predispose individuals to the development of alcohol use disorders by directly influencing the reinforcing effects of alcohol. Other neurotransmitter systems involved in the pathophysiology of alcohol dependence, such as brain-derived neurotrophic factor (BDNF), serotonin, and γ-aminobutyric acid (GABA) systems also are affected by early-life trauma in ways that may influence vulnerability to the development of alcohol dependence, but the mechanistic connections in these systems are under active investigation and are not as well understood (Enoch 2011).

Not all children exposed to early-life trauma develop alcohol dependence or other significant pathology, clearly suggesting that resilience and mediating factors play a role (Enoch 2011). The genetic risk for alcohol and drug dependence involves multiple genes. Emerging evidence suggests that variation in some stress-related genes may determine the risk for psychopathology or resilience in people exposed to early-life trauma. In particular, it seems that there are important variations in the genes encoding the CRF system that can influence the development of alcohol dependence following an early-life trauma in a gene-by-environment interaction. One study of at-risk children found an interaction between a particular genetic variant coding for the CRF receptor (i.e., CRHR1) and sexual trauma in adolescents that predicted an earlier age of onset of drinking and heavy alcohol consumption (Blomeyer et al. 2008). This finding is supported by animal studies demonstrating that the CRHR1 genotype and expression interact with environmental factors to reinstate alcohol-seeking in rodents (Hansson et al. 2006), and a functional CRF promoter variant in monkeys conferred increased stress reactivity and was associated with increased alcohol consumption in animals reared under stressful conditions (Barr et al. 2009). These findings suggest that the interaction of genetic susceptibility and environmental exposure can lead to a pathologically activated CRF system, which increases the risk for the development of alcohol dependence in some people.

## Treatment

Both behavioral and pharmacological interventions are important to consider in the treatment of alcohol dependence and trauma/PTSD (Davis et al. 2006; Weiss and Kueppenbender 2006). To date, most empirical studies of behavioral or pharmacological agents have investigated the treatment of either alcohol dependence or PTSD alone.

### Psychosocial Interventions

With regard to psychosocial interventions, cognitive–behavioral therapies (CBTs) are the most widely studied and empirically valid treatments for both PTSD and alcohol use disorders. The CBTs used to treat PTSD fall into three main categories: (1) exposure-based therapies, (2) cognition-focused therapy, and (3) anxiety/stress-management therapy. Exposure-based therapies are considered the gold standard treatment for PTSD (Institute of Medicine 2008) and involve having patients confront safe, but anxiety-provoking situations (i.e., physical location where childhood abuse occurred), known as in vivo exposure; and the memory of the traumatic experience, known as imaginal exposure (Foa et al. 2006). With prolonged, repeated in vivo and imaginal exposure, the trauma-related anxiety is extinguished. Cognition-focused therapy includes cognitive therapy, which addresses the meaning that people assign to early-life trauma; and cognitive- processing therapy, which combines a narrative element of exposure therapy with efforts to identify and modify unhelpful cognitions related to the themes of safety, trust, power, esteem, and intimacy (Resick and Schnicke 1992). Finally, stress inoculation training (Meichenbaum and Novaco 1985), one of the most widely used and empirically investigated forms of anxiety management therapies, aims to provide a sense of mastery over PTSD symptoms by teaching patients a variety of coping skills. Stress inoculation training also has been incorporated into CBTs for substance use disorders and includes relaxation training, breathing retraining, thought stopping, self-instruction training, assertiveness training, cognitive restructuring, anger management, and problem solving.

Recently, integrative psychosocial interventions have been developed to address both trauma/PTSD and substance use disorders simultaneously (Back 2010). Clinicians previously believed that trauma interventions were inappropriate until after a patient had been abstinent from alcohol or drugs for a sustained period of time (e.g., 3 months). This model, known as the "sequential" model, posits that continued alcohol use impedes therapeutic efforts to address and process the trauma, and that trauma interventions commenced before sustained abstinence would result in increased risk of relapse. Contrary to these beliefs, however, recent data reported by several different investigators in the United States and Australia show that treatment outcomes of substance dependent patients who engage in integrative CBT interventions typically experience significant improvements in both conditions and that rates of relapse are not increased by the introduction of therapy for trauma (Brady et al. 2001; Hien et al. 2004; McGovern et al. 2009; Najavits 2002; Trifflleman et al. 1999). Proponents of integrative treatments posit that unprocessed trauma-related memories and PTSD symptoms may, at least in part, drive alcohol use. Thus, attending to and treating the trauma-related symptoms early in the process of therapy may improve the chances of long-term recovery from alcohol (Back et al. 2006; Hien et al. 2010). Although more randomized controlled trials of integrative treatments are needed, the studies to date clearly demonstrate that for the majority of alcohol-dependent patients with trauma/PTSD, the inclusion of trauma interventions confers substantial therapeutic benefits.

### Pharmacological Interventions

There are several general issues to consider when treating co-occurring alcohol dependence and trauma/PTSD. When pharmacological agents are used, treatment should generally follow routine clinical practice for the treatment of PTSD. Regardless, relapse is common, and it is critical to consider the potential toxic interactions that may occur between the prescribed medication and alcohol. Given the high co-occurrence of alcohol and illicit drug use,

potential toxic interactions between the prescribed medication and other substances of abuse must also be addressed. The pharmacological agent with the least abuse liability potential should be chosen for this population. Although benzodiazepines are effective in providing immediate relief of anxiety symptoms, they are generally not considered a first-line treatment for patients with alcohol dependence given the abuse potential of benzodiazepines. During the initial phase of treatment, when latency of onset of antidepressants is an issue, benzodiazepines may be considered as adjunctive medication. The amount of benzodiazepines prescribed to the patient should be limited, and the patient should be closely monitored for relapse or nonmedical use of benzodiazepines or other medications.

The use of pharmacological agents to specifically target alcohol dependence and PTSD is underexplored. Most studies to date, however, show promise and suggest that patients with co-occurring alcohol dependence and trauma/PTSD respond well to standard PTSD pharmacotherapies. Sertraline, a serotonin-specific reuptake inhibitor, has been investigated in patients with comorbid alcohol dependence and PTSD. The first study was a small (n = 9) open-label, 12-week trial, which demonstrated significant pre–post decreases in alcohol use severity (e.g., number of drinking days, number of drinks per day), as well as PTSD symptoms of re-experiencing the trauma, avoidance, and hyperarousal (Brady et al. 1995). A second study examined the efficacy of 12 weeks of sertraline compared with placebo in 94 patients with alcohol dependence and PTSD (Brady et al. 2005). The primary outcome analysis indicated no significant effect of sertraline on alcohol-related outcomes and only trend-level findings for the PTSD outcomes. The sertraline- treated group showed statistical trends for greater improvement in the experience of sudden flashbacks of the traumatic event and hyperarousal symptoms (e.g., insomnia, inability to concentrate). Follow-up cluster analyses suggested that individuals with primary PTSD, compared with primary alcohol dependence, derived more benefit from sertraline treatment as evidenced by significantly less severe alcohol use. The results suggested that patients with early- onset alcohol dependence actually had worse alcohol-related outcomes with sertraline treatment compared with placebo (Brady et al. 2005).

In another study of 254 veterans with alcohol dependence and a variety of co-occurring mood and anxiety disorders (Petrakis et al. 2005), naltrexone, disulfiram, or a combination of both was added to treatment as usual. A high percentage (42.9 percent) of the study participants had PTSD, although data analysis for specific disorders was not conducted. Alcohol-related outcomes improved significantly in patients treated with either medication alone or with combination therapy, compared with placebo, but there was no added improvement with combination therapy when compared with monotherapy. This study strongly suggests that alcohol-dependent patients with co-occurring PTSD should receive medications targeting alcohol consumption.

There is a good rationale for the exploration of a number of other compounds in the treatment of co-occurring PTSD and alcohol dependence. Prazosin blocks a1-adrenergic receptor and has shown promise in several well-controlled trials for the treatment of PTSD, particularly in decreasing PTSD-related sleep disturbance and nightmares (Raskin et al. 2007). In a preliminary study, prazosin decreased alcohol consumption in an alcohol-dependent population (Simpson et al. 2009). This inexpensive and relatively safe drug warrants investigation in the treatment of co-occurring PTSD and alcohol dependence. In addition, several anticonvulsant agents, such as topiramate, have shown promise in the treatment of alcohol dependence (Johnson et al. 2003). It is hypothesized that actions on the glutamatergic systems might be responsible for these agents' therapeutic actions. PTSD also has been associated with glutamatergic dysregulation, and anticonvulsant agents have shown promise in small-number, open-label studies in the treatment of PTSD. This is another area in which additional investigation is warranted. More research clearly is needed to help advance the behavioral and pharmacological treatment of co-occurring trauma/PTSD and substance use disorders.

## Conclusions

Epidemiologic studies as well as studies in treatment-seeking populations converge to support the finding that early-life trauma is common in people with alcohol dependence. There are a number of potential mechanistic explanations for the connection between early-life trauma and the development of alcohol dependence. These include psychological and developmental issues that are affected by trauma, as well as neurobiological effects of early trauma that can lead to increased vulnerability to the development of alcohol and other substance use disorders. These explanatory hypotheses are not mutually exclusive. There is a growing literature on efficacious psychotherapeutic and pharmacotherapeutic treatments for individuals with co-occurring PTSD and alcohol dependence. Integrative psychosocial interventions combining efficacious interventions from the alcohol and PTSD fields have shown promise. Evidence suggests that agents targeting alcohol consumption (i.e., disulfiram, naltrexone) can be useful in patients with co-occurring PTSD and alcohol dependence, but additional investigation clearly is needed.

## Acknowledgments

This work was supported in part by grants K24 DA–00435 (to Kathleen T. Brady) and K23 DA–021228 (to Sudie E. Back) from the National Institute on Drug Abuse.

## Financial Disclosures

The authors declare that they have no competing financial interests.

## References

Anda, R.F.; Felitti, V.J.; Bremner, J.D.; et al. The enduring effects of abuse and related adverse experiences in childhood: A convergence of evidence from neurobiology and epidemiology. *European Archives of Psychiatry and Clinical Neuroscience* 256(3):174–186, 2006. PMID: 16311898

Back, S.E. Toward an improved model of treating co-occurring PTSD and substance use disorders. *American Journal of Psychiatry* 167(1):11–13, 2010. PMID: 20068121

Back, S.E.; Brady, K.T.; Sonne, S.C.; and Verduin, M.L. Symptom improvement in co-occurring PTSD and alcohol dependence. *Journal of Nervous and Mental Disease* 194(9):690–696, 2006. PMID: 16971821

Barr, C.S.; Dvoskin, R.L.; Gupte, M.; et al. Functional CRH variation increases stress-induced alcohol consumption in primates. *Proceedings of the National Academy of Sciences of the United States of America* 106(34): 14593–14598, 2009. PMID: 19706546

Blomeyer, D.; Treutlein, J.; Esser, G.; et al. Interaction between CRHR1 gene and stressful life events predicts adolescent heavy alcohol use. *Biological Psychiatry* 63(2):146–151, 2008. PMID: 17597588

Brady, K.T.; Dansky, B.S.; Back, S.E.; et al. Exposure therapy in the treatment of PTSD among cocaine-dependent individuals: Preliminary findings. *Journal of Substance Abuse Treatment* 21(1):47–54, 2001. PMID: 11516926

Brady, K.T.; Sonne, S.; Anton, R.F.; et al. Sertraline in the treatment of co-occurring alcohol dependence and posttraumatic stress disorder. *Alcoholism: Clinical and Experimental Research* 29(3):395–401, 2005. PMID: 15770115

Brady, K.T.; Sonne, S.C.; and Roberts, J.M. Sertraline treatment of comorbid posttraumatic stress disorder and alcohol dependence. *Journal of Clinical Psychiatry* 56(11):502–505, 1995. PMID: 7592501

Bremner, J.D. *Does Stress Damage the Brain? Understanding Trauma-based Disorders from a Neurological Perspective.* New York: Norton, 2003.

ER-3015

Caldji, C.; Tannenbaum, B.; Sharma, S.; et al. Maternal care during infancy regulates the development of neural systems mediating the expression of fearfulness in the rat. *Proceedings of the National Academy of Sciences of the United States of America* 95(9):5335–5340, 1998. PMID: 9560276

U.S. Department of Health and Human Services Administration on Children. *Child Maltreatment 2003.* Washington, DC: U.S. Government Printing Office, 2005.

Dansky, B.S.; Brady, K.T.; and Roberts, J.T. Post-traumatic stress disorder and substance abuse: Empirical findings and clinical issues. *Substance Abuse* 15(4):247–257, 1994.

Dansky, B.S.; Brady, K.T.; Saladin, M.E.; et al. Victimization and PTSD in individuals with substance use disorders: Gender and racial differences. *American Journal of Drug and Alcohol Abuse* 22(1):75–93, 1996. PMID: 8651146

Davis, M.; Barad, M.; Otto, M.; and Southwick, S. Combining pharmacotherapy with cognitive behavioral therapy: Traditional and new approaches. *Journal of Traumatic Stress* 19(5):571–581, 2006. PMID: 17075906

De Bellis, M.D.; Baum, A.S.; Birmaher, B.; et al. A.E. Bennett Research Award: Developmental traumatology. Part I: Biological stress systems. *Biological Psychiatry* 45(10):1259–1270, 1999. PMID: 10349032

Dube, S.R.; Anda, R.F.; Felitti, V.J.; et al. Childhood abuse, household dysfunction, and the risk of attempted suicide throughout the life span: Findings from the Adverse Childhood Experiences Study. *JAMA: Journal of the American Medical Association* 286(24):3089–3096, 2001. PMID: 11754674

Edwards, V.J.; Holden, G.W.; Felitti, V.J.; and Anda, R.F. Relationship between multiple forms of childhood maltreatment and adult mental health in community respondents: Results from the adverse childhood experiences study. *American Journal of Psychiatry* 160(8): 1453–1460, 2003. PMID: 12900308

Enoch, M.A. The role of early life stress as a predictor for alcohol and drug dependence. *Psychopharmacology (Berlin)* 214(1):17–31, 2011. PMID: 20596857

Felitti, V.J.; Anda, R.F.; Nordenberg, D.; et al. Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults: The Adverse Childhood Experiences (ACE) Study. *American Journal of Preventive Medicine* 14(4):245–258, 1998. PMID: 9635069

Foa , E.; Chrestman, K.; and Riggs, D.S. *Integrating Prolonged Exposure Therapy and Substance Abuse Treatment.* Paper presented at the annual meeting of the International Society for Traumatic Stress Studies, Hollywood, CA, November 4–7, 2006.

Greenfield, S. F.; Kolodziej, M. E.; Sugarman, D. E.; et al. History of abuse and drinking outcomes following inpatient alcohol treatment: A prospective study. *Drug and Alcohol Dependence* 67(3):227–234, 2002. PMID: 12127193

Grice, D.E.; Brady, K.T.; Dustan, L.R.; et al. Sexual and physical assault history and posttraumatic stress disorder in substance-dependent individuals. *American Journal on Addictions* 4:1–9, 1995.

Hansson, A.C.; Cippitelli, A.; Sommer, W.H.; et al. Variation at the rat Crhr1 locus and sensitivity to relapse into alcohol seeking induced by environmental stress. *Proceedings of the National Academy of Sciences of the United States of America* 103(41):15236–15241, 2006. PMID: 17015825

Heim, C., and Nemeroff, C.B. The role of childhood trauma in the neurobiology of mood and anxiety disorders: Preclinical and clinical studies. *Biological Psychiatry* 49(12):1023–1039, 2001. PMID: 11430844

Hien, D.A.; Cohen, L.R.; Miele, G.M.; et al. Promising treatments for women with comorbid PTSD and substance use disorders. *American Journal of Psychiatry* 161(8): 1426–1432, 2004. PMID: 15285969

Hien, D.A.; Jiang, H.; Campbell, A.N.; et al. Do treatment improvements in PTSD severity affect substance use outcomes? A secondary analysis from a randomized clinical trial in NIDA's Clinical Trials Network. *American Journal of Psychiatry* 167(1):95–101, 2010. PMID: 19917596

Higley, J.D.; Hasert, M.F.; Suomi, S.J.; and Linnoila, M. Nonhuman primate model of alcohol abuse: Effects of early experience, personality, and stress on alcohol consumption. *Proceedings of the National Academy of Sciences of the United States of America* 88(16):7261–7265, 1991. PMID: 1871131

Institute of Medicine, Committee on Treatment of Posttraumatic Stress. *Treatment of Posttraumatic Stress Disorder: An Assessment of the Evidence.* Washington, DC: National Academies Press, 2008.

Johnson, B.A.; Ait-Daoud, N.; Bowden, C.L.; et al. Oral topiramate for treatment of alcohol dependence: A randomised controlled trial. *Lancet* 361(9370):1677– 1685, 2003. PMID: 12767733

Kendler, K.S.; Bulik, C.M.; Silberg, J.; et al. Childhood sexual abuse and adult psychiatric and substance use disorders in women: An epidemiological and cotwin control analysis. *Archives of General Psychiatry* 57(10):953– 959, 2000. PMID: 11015813

Ladd, C.O.; Owens, M.J.; and Nemeroff, C.B. Persistent changes in corticotropin-releasing factor neuronal systems induced by maternal deprivation. *Endocrinology* 137(4):1212–1218, 1996. PMID: 8625891

Liu, D.; Diorio, J.; Tannenbaum, B.; et al. Maternal care, hippocampal glucocorticoid receptors, and hypothalamic-pituitary-adrenal responses to stress. *Science* 277(5332):1659–1662, 1997. PMID: 9287218

McCauley, J.; Kern, D.E.; Kolodner, K.; et al. Clinical characteristics of women with a history of childhood abuse: Unhealed wounds. *JAMA: Journal of the American Medical Association* 277(17):1362–1368, 1997. PMID: 9134941

McGovern, M.P.; Lambert-Harris, C.; Acquilano, S.; et al. A cognitive behavioral therapy for co-occurring substance use and posttraumatic stress disorders. *Addictive Behaviors* 34(10):892–897, 2009. PMID: 19395179

Meaney, M.J.; Brake, W.; and Gratton, A. Environmental regulation of the development of mesolimbic dopamine systems: A neurobiological mechanism for vulnerability to drug abuse? *Psychoneuroendocrinology* 27(1–2): 127–138, 2002. PMID: 11750774

Meichenbaum, D., and Novaco, R. Stress inoculation: A preventative approach. Issues in Mental Health Nursing 7(1–4):419–435, 1985. PMID: 3854020

Miller, B.A.; Downs, W.R.; and Testa, M. Interrelationships between victimization experiences and women's alcohol use. *Journal of Studies on Alcohol.* Supplement 11:109–117, 1993. PMID: 8410952

Najavits, L.M. *Seeking Safety: A Treatment Manual for PTSD and Substance Abuse.* New York: Guilford Press, 2002.

Petrakis, I.L.; Poling, J.; Levinson, C.; et al. Naltrexone and disulfiram in patients with alcohol dependence and comorbid psychiatric disorders. *Biological Psychiatry* 57(10):1128–1137, 2005. PMID: 15866552

Plotsky, P.M., and Meaney, M.J. Early, postnatal experience alters hypothalamic corticotropin-releasing factor (CRF) mRNA, median eminence CRF content and stress-induced release in adult rats. *Brain Research. Molecular Brain Research* 18(3):195–200, 1993. PMID: 8497182

Putnam, F.W. The impact of trauma on child development. *Juvenile and Family Court Journal* 57(1):1–11, 2006.

Raskind, M.A.; Peskind, E.R.; Hoff, D.J.; et al. A parallel group placebo controlled study of prazosin for trauma nightmares and sleep disturbance in combat veterans with post-traumatic stress disorder. *Biological Psychiatry* 61(8):928–934, 2007. PMID: 17069768

ER-3016

AR.11051

Reed, P.L.; Anthony, J.C.; and Breslau, N. Incidence of drug problems in young adults exposed to trauma and posttraumatic stress disorder: Do early life experiences and predispositions matter? *Archives of General Psychiatry* 64(12):1435–1442, 2007. PMID: 18056552

Resick, P.A., and Schnicke, M.K. Cognitive processing therapy for sexual assault victims. *Journal of Consulting and Clinical Psychology* 60(5):748–756, 1992. PMID: 1401390

Sanchez, M.M.; Ladd, C.O.; and Plotsky, P.M. Early adverse experience as a developmental risk factor for later psychopathology: Evidence from rodent and primate models. *Development and Psychopathology* 13(3):419–449, 2001. PMID: 11523842

Sartor, C.E.; McCutcheon, V.V.; Pommer, N.E.; et al. Posttraumatic stress disorder and alcohol dependence in young women. *Journal of Studies on Alcohol and Drugs* 71(6):810–818, 2010. PMID: 20946737

Schuck, A.M., and Widom, C.S. Childhood victimization and alcohol symptoms in females: Causal inferences and hypothesized mediators. *Child Abuse & Neglect* 25(8):1069–1092, 2001. PMID: 11601598

Simpson, T.L.; Saxon, A.J.; Meredith, C.W.; et al. A pilot trial of the alpha-1 adrenergic antagonist, prazosin, for alcohol dependence. Alcoholism: *Clinical and Experimental Research* 33(2):255–263, 2009. PMID: 18945226

Triffleman, E.; Carroll, K.; and Kellogg, S. Substance dependence posttraumatic stress disorder therapy: An integrated cognitive-behavioral approach. *Journal of Substance Abuse Treatment* 17(1–2):3–14, 1999. PMID: 10435248

Weiss, R.D., and Kueppenbender, K.D. Combining psychosocial treatment with pharmacotherapy for alcohol dependence. *Journal of Clinical Psychopharmacology* 26(Suppl. 1):S37–S42, 2006. PMID: 17114954

Widom, C.S. Posttraumatic stress disorder in abused and neglected children grown up. American Journal of Psychiatry 156(8):1223–1229, 1999. PMID: 10450264

Widom, C.S.; White, H.R.; Czaja, S.J.; and Marmorstein, N.R. Long-term effects of child abuse and neglect on alcohol use and excessive drinking in middle adulthood. *Journal of Studies on Alcohol and Drugs* 68(3):317– 326, 2007. PMID: 17446970

◄ Table of Contents                                    Next Article ►

Site Map    Accessibility    Privacy    FOIA    Contact Us    Material en Español

USA.gov—Government Made Easy    U.S. Department of Health and Human Services    National Institutes of Health

NIAAA: Understanding the impact of alcohol on human health and well-being

https://pubs.niaaa.nih.gov/publications/arcr344/408-413.htm

ER-3017

AR.11052

5/5

# PUBLIC SUBMISSION

**As of:** 1/29/20 8:32 AM
**Received:** January 15, 2020
**Status:** Posted
**Posted:** January 29, 2020
**Tracking No.** 1k4-9egl-5amh
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0575
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** Margaret Rita Nealon
**Address:**
   300 Yucca Street
   San Antonio,  TX,  78203
**Email:** rnealon9@hotmail.com

---

## General Comment

We need an immigration system that reflects our values as a nation--compassion, fairness and respect for the human dignity of all people regardless of their race, ethnicity, religion or sexual orientation.

Please support the NEW WAY FORWARD ACT.

AR.11053

# PUBLIC SUBMISSION

**As of:** 11/10/20 12:38 PM
**Received:** January 20, 2020
**Status:** Posted
**Posted:** January 29, 2020
**Tracking No.** 1k4-9eju-34wc
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0576
Comment on FR Doc # 2019-27055

## Submitter Information

**Name:** Pini Herman
**Address:**
  468 N. Kings Road
  Los Angeles, CA, 90048

## Redacted Comment

See attached file(s) [**DOJ DOCKET NOTE: Based on a preliminary review, one of the attachments submitted as part of this comment, raised possible issues regarding the posting of copyrighted materials. Accordingly, while the attachment in question will be carefully considered as part of the submitted comment, it will not, however, be publically posted to the Regulations.gov system. Members of the public may review this attachment in-person by making arrangements with the person named in the "For Further Information Contact" portion of the Notice of Proposed Rulemaking associated with this docket.]

## Attachments

Regulations.gov - Your Comment

LAPD gang-framing scandal could have ripple effect on criminal cases - Los Angeles Times

  The attachment is restricted to restrict all because it contains copyrighted data

ER-3019

AR.11054

file:///eoir-file-ood/...sylum%20-%20AA87%20-%20Bars/Comments/combined%20pdf%20of%20comments/EOIR-2019-0005-0576.html[11/10/2020 12:39:58 PM]

January 19, 2020

To Whom it May Concern:

I am writing as a member of Bend the Arc Solidarity & Immigration Steering Committee in response to the above-referenced Proposed Rules to express my/our strong opposition to the Proposed Rules to amend regulations relating to eligibility for asylum published in the Federal Register on December 19, 2019.

I am concerned that our immigration and asylum policies must honor our ideals of compassion, fairness, and respect for human rights.

The proposed rule change would exclude many asylum seekers based on future contact with the U.S.'s flawed criminal legal system.

This would inject racial profiling into the asylum process and put asylum-seekers at risk of danger - even death. It's no secret that racial profiling and obstacles to equal justice already run rampant in the criminal legal system.

For the reasons detailed in the comments that follow, the Department of Homeland Security and the Department of Justice should immediately withdraw their current proposal, and instead, dedicate their efforts to ensuring that individuals fleeing violence are granted full and fair access to asylum protections in the United States.

A glaring example here in Los Angeles, CA has been the recently publicized practice of the LA Police Department's engaged in the falsifying gang affiliation of youth that they have stopped on the street (see: LAPD gang-framing scandal could have ripple effect on criminal cases https://www.latimes.com/california/story/2020-01-15/lapd-gang-framing-scandal-could-have-ripple-effect-on-criminal-cases) which directly relates to the proposed rule change to revise 8 CFR 208.13 that bars asylum seekers that have a federal, state, tribal, or local crime involving criminal street gang activity.

There are numerous other examples of why these rule changes should be abandoned.

Thank you for the opportunity to submit comments on the Proposed Rules. Please do not hesitate to contact [contact name and email address] to provide further information.

Sincerely,

Pini Herman, Ph.D.

Member
Bend the Arc Solidarity & Immigration Steering Committee

Case: 20-17490, 01/19/2021, ID: 11068426, DktEntry: 9-13, Page 271 of 300



# Los Angeles Times

CALIFORNIA

# LAPD gang-framing scandal could have ripple effect on criminal cases



LAPD Chief Michel Moore says the department is trying to understand the "depth and breadth" of the accusations against his officers. (Allen J. Schaben / Los Angeles Times)

By RICHARD WINTON
STAFF WRITER

JAN. 15, 2020
10:12 AM



A scandal rocking the Los Angeles Police Department <u>over allegations that members</u> of the
LAPD's elite Metro Division falsely portrayed
questions about whether the claims will affect
officers.

By continuing to use our site, you agree to our Terms of Service a
Privacy Policy. You can learn more about how we use cookies by
reviewing our Privacy Policy. Close

Case: 20-17490, 01/19/2021, ID: 11968426, DktEntry: 9-13, Page 272 of 300

The scope of the allegations are still unclear, but LAPD Chief Michel Moore said the internal investigation now includes 20 officers. Officers assigned across the city are suspected of falsifying field interview cards from traffic stops and entering incorrect information about those questioned in an effort to boost stop statistics.

So far, the Los Angeles County district attorney is looking at potential criminal charges against one officer.

Law enforcement sources told The Times that the LAPD is working with prosecutors to determine whether any criminal cases are tied to the alleged falsified records and whether the investigation casts doubt on any testimony from the accused officers. That process, the sources said, is ongoing.

Moore said the investigation initially focused on three officers and expanded to others who worked with the original three and then to others who worked with a second group, the chief said.

Moore said 10 officers have been assigned to home and have had their police powers suspended. Another 10 have been removed from the street because investigators have found discrepancies in their work and "don't know if it's inaccuracies or falsehoods," Moore said.

George Gascon, a former LAPD assistant chief who is seeking to unseat Dist. Atty. Jackie Lacey, called on her to pause the prosecutions of any cases involving the officers under investigation.

"Police are the guardians of our community," Gascon said. "When our guardians betray the public's trust, it is incumbent upon the district attorney to safeguard the integrity of the system by ensuring that betrayal does not undermine the fair administration of justice."

It's unclear how many cases could be called into question.

Lacey's office said it was investigating the matter but did not address detailed questions from The Times.

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. [Close]

"Our office is following an established process
discovery obligations and updating our Discovery Compliance System as appropriate," the

AR.11057

Case: 20-17490, 01/19/2021, ID: 11968426, DktEntry: 9-13, Page 273 of 300

statement said. "The underlying matter is still under review and therefore we cannot comment further."

The LAPD said it launched the investigation last year after a Van Nuys mother received a letter in early 2019 informing her that her son had been identified as a gang member. She believed her son was misidentified and reported it to a supervisor at a nearby police station. The supervisor immediately reviewed body camera footage and other information and found inaccuracies in the officer's statements. The department removed the woman's son from the gang database.

While Moore said the internal investigation had found multiple cases in which body-cam videos did match what officers had documented in their paperwork, he pledged that the department was working to understand the "depth and breadth" of the scandal.

CALIFORNIA

---

NEWSLETTER

**Get our Essential California newsletter**

Please enter your email address

Subscribe

---



Richard Winton

 Twitter    Instagram    Email    Facebook

Richard Winton is an investigative crime writer for the Los Angeles Times and part of the team that won the Pulitzer Prize for public service i[...]
years at The Times he also has been part of the[...]
2004 and 2016.

By continuing to use our site, you agree to our Terms of Service a[...] Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close

---

MORE FROM THE LOS ANGELES TIMES

Case: 20-17490, 01/19/2021, ID: 11968426, DktEntry: 9-13, Page 274 of 300



**CALIFORNIA**

### Family skeptical about integrity of San Diego State investigation into student's death

1 hour ago



**CALIFORNIA**

### Suspect in killing of MMA gym owner dies after fight with fellow inmate, officials say

1 hour ago



**CALIFORNIA**

### Woman stabbed to death in Arlington Heights; 2nd woman in custody

Jan. 19, 2020



**CALIFORNIA**

### Owners of electric cars get a break on the gas tax. It's costing California $32 million

Jan. 19, 2020

## Around the Web

Ads by Revcontent



Better Than Solar Panels? New Invention Has Everyone Talking

Online Source Web



96-year-o... Sale. This Inside

hivemedia2

By continuing to use our site, you agree to our Terms of Service a Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close



California: Say Bye To Expensive Solar Panels If You Own A Home in Los Angeles

EnergyBillCruncher

---

LATEST CALIFORNIA ›

CALIFORNIA

Weinstein trial is a milestone for #MeToo and a moment of wrenching truth for survivors

Jan. 19, 2020

CALIFORNIA

Column: A female mayor denounces the harassment she receives. Hours later, a man is arrested at her office

Jan. 19, 2020

OPINION

Op-Ed: California's forgotten slave history

Jan. 19, 2020

CALIFORNIA

Actor Alan Alda and Scripps Research will transform scientists into master storytellers

Jan. 18, 2020

OBITUARIES

'Kiwi Queen' Frieda Caplan, produce-industry pio...

Jan. 18, 2020

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close

Subscribe for unlimited access

**Follow Us**

Copyright © 2020, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell My Info

By continuing to use our site, you agree to our Terms of Service and Privacy Policy. You can learn more about how we use cookies by reviewing our Privacy Policy. Close

# PUBLIC SUBMISSION

**As of:** 1/29/20 8:33 AM
**Received:** January 21, 2020
**Status:** Posted
**Posted:** January 29, 2020
**Tracking No.** 1k4-9ekr-cp23
**Comments Due:** January 21, 2020
**Submission Type:** Web

**Docket:** EOIR-2019-0005
Procedures for Asylum and Bars to Asylum Eligibility

**Comment On:** EOIR-2019-0005-0001
Procedures for Asylum and Bars to Asylum Eligibility

**Document:** EOIR-2019-0005-0577
Comment on FR Doc # 2019-27055

---

## Submitter Information

**Name:** John Palmer
**Address:**
     Calabria 160, 3-2
     Barcelona,  Spain,  08015
**Email:** john.palmer@upf.edu
**Phone:** +34645622124

---

## General Comment

EOIR Docket No. 18-0002, A.G. Order No. 4592-2019
84 FR 69640
RIN 1125-AA87, 1615-AC41
Procedures for Asylum and Bars to Asylum Eligibility
COMMENT ON PROPOSED RULE

BY JOHN R.B. PALMER

Introduction

I am writing to voice my strong opposition to the proposed rule on Procedures for Asylum and Bars to Asylum Eligibility, EOIR Docket No. 18-0002, A.G. Order No. 4592-2019,
84 FR 69640, RIN 1125-AA87, 1615-AC41. I am a U.S. citizen and a professor in the Department of Political and Social Sciences at Pompeu Fabra University in Barcelona, Spain, where I am part of both the Socio-Demography Research Group and the Interdisciplinary Research Group on Immigration. I have worked extensively on issues of forced migration and asylum, and I am appalled at the extent to which the proposed rule would undermine both Congress's asylum law framework and the overall system of international protection on which refugees' lives and freedom depend. Moreover, I am extremely concerned with the harmful effects this proposed rule would have on society in the United States as well as on the proper functioning of the U.S. system of immigration adjudication. None of this has been addressed in the agencies' analysis.

Analysis

ER-3027

AR.11062

There are numerous flaws in the proposed rule, many of which are addressed extensively in other submitted comments, including the comment by Elissa Steglich (https://www.regulations.gov/document?D=EOIR-2019-0005-0129), which I fully endorse and incorporate by reference. In particular, the proposed rule needlessly harms refugees, and it contradicts Congress's asylum legislation by creating categorical bars to asylum well beyond those permitted in 8 U.S.C. 1158(b). It also violates the 1967 Protocol Relating to the Status of Refugees (the Protocol), to which Congress's asylum legislation was intended to bring the United States into compliance.

In addition, the agencies have failed to consider the broader effects that this proposed rule would have on the system of refugee protection worldwide and on U.S. society. It is not just that the proposed rule would bring the United States into violation of the Protocol; the rule actively undermines the Protocol and it would encourage other countries to do the same. In doing this, it would massively accelerate an international "race to the bottom" in refugee protection: As countries see the United States treating minor crimes as "particularly series crimes" in order to bar asylum seekers, they will do the same. This will likely increase the number of refugees bouncing from one country to the next in search of protection, and it could well increase the number of asylum seekers coming to the United States (even knowing that they will be barred from asylum). It will also increase the population of refugees in the United States with only withholding of removal or CAT protection. This is a highly undesirable outcome because those forms of relief make it much harder to integrate into U.S. society. Thus, the rule may simply lead to a larger population of vulnerable, "second-class" citizens, which is detrimental not only to these people's lives, but also to other US residents.

The agencies have also failed to consider how this rule could overwhelm U.S immigration courts by increasing the complexity of the necessary determinations. It will take longer to decide cases because of the additional findings necessary under this rule. This would lead to a backlog of cases, slower and lower quality adjudication of all categories of cases, and the need for additional expenditures, none of which has been considered. Indeed the failure to consider these issues suggests that the rule-making process itself is deficient. Taken together with this administration's other actions related to immigration and asylum, one can only conclude that this is a bad-faith attempt to usurp Congress's authority in this area and to undermine a treaty to which the United States is a party.

Conclusion

For these reasons and those stated in the comment by Elissa Steglich (https://www.regulations.gov/document?D=EOIR-2019-0005-0129), I urge the agencies to abandon this proposed rule.

AR.11063

**69640**

# Proposed Rules

Federal Register

Vol. 84, No. 244

Thursday, December 19, 2019

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**8 CFR Part 208**

**RIN 1615–AC41**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Part 1208**

**[EOIR Docket No. 18–0002; A.G. Order No. 4592–2019]**

**RIN 1125–AA87**

**Procedures for Asylum and Bars to Asylum Eligibility**

**AGENCY:** Executive Office for Immigration Review, Department of Justice; U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Joint notice of proposed rulemaking.

**SUMMARY:** The Department of Justice and the Department of Homeland Security (collectively, "the Departments") propose to amend their respective regulations governing the bars to asylum eligibility. The Departments also propose to clarify the effect of criminal convictions and to remove their respective regulations governing the automatic reconsideration of discretionary denials of asylum applications.

**DATES:** Written or electronic comments must be submitted on or before January 21, 2020. Written comments postmarked on or before that date will be considered timely. The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:** You may submit comments, identified by EOIR Docket No. 18–0002, by one of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the instructions for submitting comments.
• *Mail:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. To ensure proper handling, please reference EOIR Docket No. 18–0002 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.
• *Hand Delivery/Courier:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. Contact Telephone Number (703) 305–0289 (not a toll-free call).

**FOR FURTHER INFORMATION CONTACT:**

Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041, Contact Telephone Number (703) 305–0289 (not a toll-free call).

Maureen Dunn, Chief, Division of Humanitarian Affairs, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, U.S. Citizenship and Immigration Services (USCIS), DHS, 20 Massachusetts NW, Washington, DC 20529–2140; Contact Telephone Number (202) 272–8377 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**I. Public Participation**

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. The Departments also invite comments that relate to the economic, environmental, or federalism effects that might result from this rule. Comments must be submitted in English, or an English translation must be provided. To provide the most assistance to the Departments, comments should reference a specific portion of the rule; explain the reason for any recommended change; and include data, information, or authority that support the recommended change.

All comments submitted for this rulemaking should include the agency name and EOIR Docket No. 18–0002. Please note that all comments received are considered part of the public record and made available for public inspection at *www.regulations.gov.* Such

information includes personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) that the commenter voluntarily submits. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov.*

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and precisely and prominently identify the information for which you seek redaction.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS INFORMATION" in the first paragraph of your comment and precisely and prominently identify the confidential business information for which you seek redaction. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *www.regulations.gov.* Personally identifiable information and confidential business information provided as set forth above will be placed in EOIR's public docket file, but not posted online. To inspect the public docket file in person, you must make an appointment with EOIR. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for the contact information specific to this rule.

**II. Background**

Asylum is a discretionary immigration benefit that generally can be sought by eligible aliens who are physically present or arriving in the United States, irrespective of their status, as provided in section 208 of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1158. Congress, however, has provided that certain

categories of aliens cannot receive asylum and has further delegated to the Attorney General and the Secretary of Homeland Security ("Secretary") the authority to promulgate regulations establishing additional bars on eligibility to the extent consistent with the asylum statute, as well as the authority to establish "any other conditions or limitations on the consideration of an application for asylum" that are consistent with the INA. *See* INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B). This proposed rule will limit aliens' eligibility for this discretionary benefit if they fall within certain categories related to criminal behavior. The proposed rule will also eliminate a regulation concerning the automatic reconsideration of discretionary denials of asylum applications.

### A. Joint Notice of Proposed Rulemaking

The Attorney General and the Acting Secretary of Homeland Security publish this joint notice of proposed rulemaking in the exercise of their respective authorities concerning asylum determinations.

The Homeland Security Act of 2002, Public Law 107–296, as amended ("the Act" or "the HSA"), transferred many functions related to the execution of federal immigration law to the newly created Department of Homeland Security ("DHS"). The Act charges the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. 1103(a)(1), and grants the Secretary the power to take all actions "necessary for carrying out" the provisions of the immigration and nationality laws, *id.* 1103(a)(3). The Act also transferred to U.S. Citizenship and Immigration Services ("USCIS") responsibility for affirmative asylum applications, *i.e.,* applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). If an alien is not in removal proceedings or is an unaccompanied alien child, DHS asylum officers determine in the first instance whether an alien's asylum application should be granted. *See* 8 CFR 208.9.

At the same time, the Act retained for the Attorney General authority over certain individual immigration adjudications, including those related to asylum. These proceedings are conducted by the Department of Justice through the Executive Office for Immigration Review ("EOIR"), subject to the direction and regulation of the Attorney General. *See* 6 U.S.C. 521; 8 U.S.C. 1103(g). Accordingly, immigration judges within the

Department of Justice continue to adjudicate all defensive asylum applications made by aliens during the removal process and review affirmative asylum applications referred by USCIS to the immigration courts. *See* 8 U.S.C. 1101(b)(4); 8 CFR 1208.2. *See generally Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals within the Department of Justice, in turn, hears appeals from immigration judges' decisions. 8 CFR 1003.1. In addition, the HSA amended the INA to mandate "[t]hat determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. 1103(a)(1). This broad division of functions and authorities informs the background of this proposed rule.

### B. Domestic Legal Framework for Asylum

Asylum is a form of discretionary relief under section 208 of the INA, 8 U.S.C. 1158, that precludes an alien from being subject to removal, creates a path to lawful permanent resident status and citizenship, and affords a variety of other ancillary benefits, such as allowing certain alien family members to obtain lawful immigration status derivatively. *See R–S–C* v. *Sessions,* 869 F.3d 1176, 1180 (10th Cir. 2017); *see also, e.g.,* INA 208(c)(1)(A), (C), 8 U.S.C. 1158(c)(1)(A), (C) (asylees cannot be removed and can travel abroad without prior consent); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (allowing derivative asylum for asylee's spouse and unmarried children); INA 209(b), 8 U.S.C. 1159(b) (allowing the Attorney General or Secretary to adjust the status of an asylee to that of a lawful permanent resident); INA 316(a), 8 U.S.C. 1427(a) (describing requirements for naturalization of lawful permanent residents). Aliens who are granted asylum are authorized to work in the United States and to receive certain financial assistance from the Federal Government. *See* INA 208(c)(1)(B), (d)(2), 8 U.S.C. 1158(c)(1)(B), (d)(2); 8 U.S.C. 1612(a)(2)(A), (b)(2)(A); 8 U.S.C. 1613(b)(1); 8 CFR 274a.12(a)(5); *see also* 8 CFR 274a.12(c)(8) (providing that asylum applicants may seek employment authorization 150 days after filing a complete application for asylum).

In 1980, the Attorney General, in his discretion, established several mandatory bars to asylum eligibility. *See* 8 CFR 208.8(f) (1980); Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980). In 1990, the Attorney General substantially amended the asylum

regulations, but exercised his discretion to retain the mandatory bars to asylum eligibility related to persecution of others on account of a protected ground, conviction of a particularly serious crime in the United States, firm resettlement in another country, and the existence of reasonable grounds to regard the alien as a danger to the security of the United States. *See* Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 FR 30674–01, 30678, 30683 (July 27, 1990); *see also Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm resettlement bar); *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly serious crime bar), *abrogated on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc). In 1990, Congress added another mandatory bar for those with aggravated felony convictions. Immigration Act of 1990, Public Law 101–649, sec. 515, 104 Stat. 4987.

With the passage of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996, Congress added three more categorical bars on the ability to apply for asylum, for: (1) Aliens who can be removed to a safe third country pursuant to a bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604. Congress also adopted six mandatory bars to asylum eligibility that largely reflected the pre-existing, discretionary bars set forth in the Attorney General's existing asylum regulations. These bars cover (1) aliens who "ordered, incited, or otherwise participated" in the persecution of others; (2) aliens convicted of a "particularly serious crime" in the United States; (3) aliens who committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) aliens who are a "danger to the security of the United States;" (5) aliens who are inadmissible or removable under a set of specified grounds relating to terrorist activity; and (6) aliens who were "firmly resettled" in another country prior to arriving in the United States. *Id.* (codified at 8 U.S.C. 1158(b)(2) (1997)). Congress further added that aggravated felonies, defined in 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." *Id.* (codified at 8 U.S.C. 1158(b)(2)(B)(i) (1997)).

Although Congress has enacted specific asylum eligibility bars, that statutory list is not exhaustive. Congress, in IIRIRA, further provided

the Attorney General with the authority to establish by regulation ''any other conditions or limitations on the consideration of an application for asylum,'' so long as those limitations are ''not inconsistent with this chapter.'' INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B); *see also* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). Aliens who apply for asylum must satisfy two criteria. They must establish that they (1) are statutorily eligible for asylum; and (2) merit a favorable exercise of discretion. INA 208(b)(1)(A), 240(c)(4)(A), 8 U.S.C. 1158(b)(1)(A), 1229a(c)(4)(A); *Matter of A–B–*, 27 I&N Dec. 316, 345 n.12 (A.G. 2018), *abrogated on other grounds by Grace* v. *Whitaker*, 344 F. Supp. 3d 96, 140 (D.D.C. 2018); *see also, e.g., Fisenko* v. *Lynch*, 826 F.3d 287, 291 (6th Cir. 2016); *Kouljinski* v. *Keisler*, 505 F.3d 534, 541–42 (6th Cir. 2007); *Gulla* v. *Gonzales*, 498 F.3d 911, 915 (9th Cir. 2007); *Dankam* v. *Gonzales*, 495 F.3d 113, 120 (4th Cir. 2007); *Krastev* v. *INS*, 292 F.3d 1268, 1270 (10th Cir. 2002). As the Attorney General recently observed, ''[a]sylum is a discretionary form of relief from removal, and an applicant bears the burden of proving not only statutory eligibility for asylum but that he also merits asylum as a matter of discretion.'' *Matter of A–B–*, 27 I&N Dec. at 345 n.12; *see also Moncrieffe* v. *Holder*, 569 U.S. 184, 187 (2013) (describing asylum as a form of ''discretionary relief from removal''); *Delgado* v. *Mukasey*, 508 F.3d 702, 705 (2d Cir. 2007) (''Asylum is a discretionary form of relief . . . . Once an applicant has established eligibility . . . , it remains within the Attorney General's discretion to deny asylum.'').

With respect to eligibility for asylum, section 208 of the INA provides that an applicant must (1) be ''physically present'' or ''arrive[ ]'' in the United States, INA 208(a)(1), 8 U.S.C. 1158(a)(1); (2) meet the statutory definition of a ''refugee,'' INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A); and (3) otherwise be eligible for asylum, INA 208(b)(2), 8 U.S.C. 1158(b)(2); 8 CFR 1240.8(d).

In general, a refugee is someone who is outside of his country of nationality and who is unable or unwilling to return to that country ''because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'' INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A). The alien bears the burden of proof to establish that he meets eligibility criteria, including that he qualifies as a refugee. INA 208(b)(1)(B)(i), 8 U.S.C. 1158(b)(1)(B)(i).

Aliens must also establish that they are otherwise eligible for asylum, meaning that they are not subject to one of the statutory bars to asylum or any ''additional limitations and conditions . . . under which an alien shall be ineligible for asylum'' established by regulation. *See* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). The INA currently bars from asylum eligibility any alien who (1) ''ordered, incited, assisted, or otherwise participated in the persecution of any person on account of'' a protected ground; (2) ''having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;'' (3) ''has committed a serious nonpolitical crime outside the United States'' prior to arrival in the United States; (4) constitutes ''a danger to the security of the United States;'' (5) is described in the terrorism-related inadmissibility grounds, with limited exception; or (6) ''was firmly resettled in another country prior to arriving in the United States.'' INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi).

Aliens who fall within one of these bars are subject to mandatory denial of asylum. Where there is evidence that ''one or more of the grounds for mandatory denial of the application for relief may apply,'' the applicant in immigration court proceedings bears the burden of establishing that the bar at issue does not apply. 8 CFR 1240.8(d); *see also, e.g., Rendon* v. *Mukasey*, 520 F.3d 967, 973 (9th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the aggravated felony bar to asylum); *Su Qing Chen* v. *U.S. Att'y Gen.*, 513 F.3d 1255, 1257 (11th Cir. 2008) (applying 8 CFR 1240.8 in the context of the persecutor bar); *Xu Sheng Gao* v. *U.S. Att'y Gen.*, 500 F.3d 93, 98 (2d Cir. 2007) (same).

Because asylum is a discretionary benefit, aliens who are eligible for asylum are not automatically entitled to it. Rather, after demonstrating eligibility, aliens must further meet their burden of showing that the Attorney General or Secretary should exercise his or her discretion to grant asylum. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A) (the ''Secretary of Homeland Security or the Attorney General *may* grant asylum to an alien'' who applies in accordance with the required procedures and meets the definition of a refugee (emphasis added)); *Matter of A–B–*, 27 I&N Dec. at 345 n.12; *Matter of Pula*, 19 I&N Dec. 467, 474 (BIA 1987).

Additionally, aliens whose asylum applications are denied may nonetheless be able to obtain protection from removal under other provisions of the immigration laws. A defensive

application for asylum that is submitted by an alien in removal proceedings is also automatically deemed an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 1208.3(b). An immigration judge may also consider an alien's eligibility for withholding and deferral of removal under regulations implementing U.S. obligations under Article 3 of the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (''CAT''), which were issued pursuant to section 2242 of the Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277 (8 U.S.C. 1231 note). *See* 8 CFR 1208.13(c)(1); *see also* 8 CFR 1208.16(c) through 1208.18.

These forms of protection prohibit removal to any country where the alien would more likely than not be persecuted on account of a protected ground or tortured. Applying the relevant standard, if an alien proves that it is more likely than not that the alien's life or freedom would be threatened on account of a protected ground, but is denied asylum for some other reason— for instance, because of an eligibility bar or a discretionary denial of asylum—the alien may be entitled to statutory withholding of removal if not otherwise statutorily barred. INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16, 1208.16; *see also Garcia* v. *Sessions*, 856 F.3d 27, 40 (1st Cir. 2017) (''[W]ithholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood.''). Likewise, an alien who establishes that it is more likely than not that he or she would be tortured if removed to the proposed country of removal will qualify for CAT protection. *See* 8 CFR 1208.16(c) through 1208.18. But, unlike asylum, statutory withholding and CAT protection do not (1) prohibit the Government from removing the alien to a third country where the alien does not face persecution or torture, regardless of whether the country is a party to a bilateral or multilateral agreement specifically authorizing such removal, *contra* 8 U.S.C. 1158(a)(2)(A) (denying eligibility to apply for asylum ''if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a [third] country''); (2) create a path to lawful permanent resident status and citizenship; or (3) afford the same ancillary protection for family members). *See R–S–C*, 869 F.3d at 1180.

Case 3:20-cv-07721-SI Document 61-21 Filed 11/03/20 Page 252 of 300
Case 3:19-cv-07721-SI Document 61-21 Filed 11/03/20 Page 252 of 300

**Federal Register** / Vol. 84, No. 244 / Thursday, December 19, 2019 / Proposed Rules 69643

## C. Bars to Eligibility for Asylum

Eligibility for asylum has long been qualified both by statutory bars and by the discretion of the Attorney General and the Secretary to create additional bars. Those bars have developed over time in a back-and-forth process between Congress and the Attorney General. The original asylum provisions, as set out in the Refugee Act of 1980, Public Law 96–212, simply directed the Attorney General to "establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum," and provided that "the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee" within the meaning of the title. 8 U.S.C. 1158(a) (1994); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 427–29 (1987) (describing the 1980 provisions).

In the 1980 implementing regulations, the Attorney General, in his discretion, established several mandatory bars to asylum eligibility that were modeled on the mandatory bars to eligibility for withholding of deportation under the existing section 243(h) of the INA. *See* 8 CFR 208.8(f) (1980); 45 FR at 37392 ("The application will be denied if the alien does not come within the definition of refugee under the Act, is firmly resettled in a third country, or is within one of the undesirable groups described in section 243(h) of the Act, *e.g.,* having been convicted of a serious crime, constitutes a danger to the United States."). Those regulations required denial of an asylum application if it was determined that (1) the alien was not a refugee within the meaning of section 101(a)(42) of the INA; (2) the alien was firmly resettled in a foreign country before arriving in the United States; (3) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular group, or political opinion; (4) the alien had been convicted by a final judgment of a particularly serious crime and therefore constituted a danger to the community of the United States; (5) there were serious reasons for considering that the alien has committed a serious non-political crime outside the United States prior to the arrival of the alien in the United States; or (6) there were reasonable grounds for regarding the alien as a danger to the security of the United States. 45 FR at 37394–95.

In 1990, the Attorney General substantially amended the asylum regulations, but exercised his discretion to retain the mandatory bars to asylum eligibility for persecution of others on account of a protected ground, conviction of a particularly serious crime in the United States, firm resettlement in another country, and reasonable grounds to regard the alien as a danger to the security of the United States. *See* 55 FR at 30683; *see also Yang,* 79 F.3d at 936–39 (upholding firm resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly serious crime bar). In the Immigration Act of 1990, Congress added an additional mandatory bar to eligibility to apply for or be granted asylum for "an[y] alien who has been convicted of an aggravated felony." Public Law 101–649, sec. 515, 104 Stat. 4987.

In 1996, with the passage of IIRIRA and the Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, Congress amended the asylum provisions in section 208 of the INA, 8 U.S.C. 1158. Among other amendments, Congress created three categories of aliens who are barred from applying for asylum: (1) Aliens who can be removed to a safe third country pursuant to bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604.

Congress also adopted six mandatory bars to asylum eligibility that largely reflected the pre-existing, discretionary bars set forth in the Attorney General's existing asylum regulations. These bars cover (1) aliens who "ordered, incited, or otherwise participated" in the persecution of others; (2) aliens convicted of a "particularly serious crime" in the United States; (3) aliens who committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) aliens who are a "danger to the security of the United States;" (5) aliens who are inadmissible or removable under a set of specified grounds relating to terrorist activity; and (6) aliens who were "firmly resettled" in another country prior to arriving in the United States. *Id.* (codified at 8 U.S.C. 1158(b)(2) (1997)). Congress further added that aggravated felonies, defined in 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." *Id.* (codified at 8 U.S.C. 1158(b)(2)(B)(i) (1997)).

Although Congress has enacted specific asylum eligibility bars, that statutory list is not exhaustive. Congress, in IIRIRA, expressly authorized the Attorney General to expand upon two bars to asylum eligibility—the bars for "particularly serious crimes" and "serious nonpolitical offenses." *See id.* Although Congress prescribed that all aggravated felonies constitute particularly serious crimes, Congress further provided that the Attorney General may "designate by regulation offenses that will be considered" a "particularly serious crime," by reason of which the offender "constitutes a danger to the community of the United States." INA 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(ii). Courts and the Board of Immigration Appeals ("Board") have long held that this grant of authority also authorizes the Board to identify additional particularly serious crimes (beyond aggravated felonies) through case-by-case adjudication. *See, e.g., Delgado* v. *Holder,* 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc); *Ali* v. *Achim,* 468 F.3d 462, 468–69 (7th Cir. 2006). Congress likewise authorized the Attorney General to designate by regulation offenses that constitute "a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." INA 208(b)(2)(A)(iii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(iii), (B)(ii).[1]

In addition to authorizing the discretionary expansion of crimes that would constitute particularly serious crimes or serious nonpolitical offenses, Congress further provided the Attorney General with the authority to establish by regulation "any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B); *see also* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C) (allowing for the establishment by regulation of "additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum"). As the Tenth Circuit has recognized, "[t]his delegation of authority means that Congress was prepared to accept administrative dilution of the asylum guarantee in § 1158(a)(1)," given that "the statute clearly empowers" the Attorney General and the Secretary to "adopt[ ] further limitations" on asylum eligibility. *R–S–C,* 869 F.3d at 1187 & n.9. In providing for "additional limitations and conditions," the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be—*e.g.,* based on non-criminal or procedural grounds like the existing

---

[1] Although these provisions continue to refer only to the Attorney General, those authorities also lie with the Secretary by operation of the HSA.

exceptions for firm resettlement, INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi), or based on filing time limits, INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B), or based on certain criminal activity, INA 208(b)(2)(A)(ii), 8 U.S.C. 1158(b)(2)(A)(ii). The additional limitations on eligibility must simply be established "by regulation," and must be "consistent with" the rest of 8 U.S.C. 1158.

Thus, the Attorney General in the past has invoked section 208(b)(2)(C) of the INA to limit eligibility for asylum based on a "fundamental change in circumstances" and on the ability of an applicant to safely relocate internally within a country. *See* Asylum Procedures, 65 FR 76121, 76127 (Dec. 6, 2000) (codified at 8 CFR 208.13(b)(1)(i)(A) and (B)). The courts have also viewed this provision as a broad authority, and have suggested that ineligibility based on fraud would be authorized under it. *See Nijjar* v. *Holder,* 689 F.3d 1077, 1082 (9th Cir. 2012) (noting that fraud can be "one of the 'additional limitations . . . under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation").

The current statutory framework accordingly leaves the Attorney General (and, after the HSA, the Secretary) significant discretion to adopt additional bars to asylum eligibility. Congress has expressly identified one class of particularly serious crimes—aggravated felonies—so that aliens who commit such offenses are categorically ineligible for asylum and there is no discretion to grant such aliens asylum under any circumstances. Congress has left the task of further defining particularly serious crimes or serious nonpolitical offenses to the discretion of the Attorney General and the Secretary.[2] And Congress has provided the Attorney General and Secretary with additional discretion to establish by regulation additional limitations or conditions on eligibility for asylum. Those limitations may involve other types of crimes or non-criminal conduct, so long as the limitations are consistent with other aspects of the asylum statute.

## D. United States Laws Implementing International Treaty Obligations

The proposed rule is consistent with U.S. obligations under the 1967 Protocol relating to the Status of Refugees ("Refugee Protocol") (incorporating Articles 2 through 34 of the 1951 Convention relating to the Status of Refugees ("Refugee Convention")) and the CAT. Neither the 1967 Refugee Protocol nor the CAT is self-executing. *See Khan* v. *Holder,* 584 F.3d 773, 783 (9th Cir. 2009) ('[T]he [1967 Refugee] Protocol is not self-executing."); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (the CAT "was not self-executing"). Therefore, these treaties are not directly enforceable in U.S. law, but some of the obligations they contain have been implemented by domestic legislation. For example, the United States has implemented the non-refoulement provisions of these treaties—*i.e.,* provisions prohibiting the return of an individual to a country where he or she would face persecution or torture—through the withholding of removal provisions at section 241(b)(3) of the INA and the CAT regulations, not through the asylum provisions at section 208 of the INA. *See Cardoza-Fonseca,* 480 U.S. at 440–41. The proposed rule is consistent with those obligations because it affects only eligibility for asylum. It does not affect grants of the statutory withholding of removal or protection under the CAT regulations. *See R–S–C,* 869 F.3d at 1188 n. 11; *Cazun* v. *Att'y Gen.,* 856 F.3d 249, 257 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

Limitations on eligibility for asylum are also consistent with Article 34 of the 1951 Refugee Convention, concerning assimilation of refugees, as implemented by 8 U.S.C. 1158. Section 1158 reflects that Article 34 is precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See Cardoza-Fonseca,* 480 U.S. at 441; *R–S–C,* 869 F.3d at 1188; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *Garcia,* 856 F.3d at 42; *Cazun,* 856 F.3d at 257 & n.16; *Ramirez-Mejia,* 813 F.3d at 241. Moreover, the state parties to the Refugee Convention sought to "deny admission to their territories of criminals who would present a danger to security and public order." United Nations High Comm'r for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol relating to the Status of Refugees ¶ 148 (1979) (edited Jan. 1992). Accordingly, the Refugee Convention incorporated exclusion clauses,

including a bar to refugee status for those who committed serious nonpolitical crimes outside the country of refuge prior to their entry into the country of refuge that sought "to protect the community of a receiving country from the danger of admitting a refugee who has committed a serious common crime." *Id.* ¶ 151. As noted above, Congress has long recognized this principle in U.S. law by imposing various statutory bars to eligibility for asylum and by authorizing the creation of new bars to eligibility through regulation.[3]

## III. Regulatory Changes

The Departments now propose to (1) establish additional bars to eligibility for asylum for aliens with certain criminal convictions; (2) clarify the effect of criminal convictions; and (3) remove the regulations regarding reconsideration of discretionary denials of asylum.

The Attorney General possesses general authority under section 103(g)(2) of the INA, 8 U.S.C. 1103(g)(2), to "establish such regulations . . . as the Attorney General determines to be necessary for carrying out this section." *See Tamenut* v. *Mukasey,* 521 F.3d 1000, 1004 (8th Cir. 2008) (en banc) (per curiam) (describing section 1103(g)(2) as "a general grant of regulatory authority"). Similarly, Congress has conferred upon the Secretary the authority to "establish such regulations . . . as he deems necessary for carrying out his authority under the provisions of [the INA]." INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3).

Additionally, the Attorney General and the Secretary have authority to promulgate this proposed rule under sections 208(b)(2)(B)(ii) and (C) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii) and (C). Under section 208(b)(2)(B)(ii), "[t]he Attorney General may designate by regulation offenses that will be considered to be a "particularly serious crime" under INA 208(b)(2)(A)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), or a "serious nonpolitical crime" under INA 208(b)(2)(A)(iii), 8 U.S.C.

---

[2] "[A]n alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime. The previous sentence shall not preclude the Attorney General from determining that, notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime." H.R. Rep No. 104–863, at 616 (1996).

[3] Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. Courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to apply for asylum does not constitute a prohibited "penalty" under Article 31(1) of the Refugee Convention. *Mejia,* 866 F.3d at 588; *Cazun,* 856 F.3d at 257 n.16. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for withholding must also be granted asylum. *R–S–C,* 869 F.3d at 1188; *Garcia,* 856 F.3d at 42.

ER-3033

1158(b)(2)(A)(iii). Under INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C), the Attorney General may "by regulation establish additional limitations and conditions, consistent with [8 U.S.C. 1158], under which an alien shall be ineligible for asylum under" INA 208(b)(1).

## A. Additional Limitations on Eligibility for Asylum

The Departments propose to revise 8 CFR 208.13 and 1208.13 by adding paragraphs (c)(6) through (8) to add bars on eligibility for asylum for certain aliens. First, the regulations would add bars on eligibility for asylum for aliens who commit certain offenses in the United States after entering the country. Those bars would apply to aliens who are convicted of (1) a felony under federal or state law; (2) an offense under 8 U.S.C. 1324(a)(1)(A) or 1324(a)(1)(2) (Alien Smuggling or Harboring); (3) an offense under 8 U.S.C. 1326 (Illegal Reentry); (4) a federal, state, tribal, or local crime involving criminal street gang activity; (5) certain federal, state, tribal, or local offenses concerning the operation of a motor vehicle while under the influence of an intoxicant; (6) a federal, state, tribal, or local domestic violence offense, or who are found by an adjudicator to have engaged in acts of battery or extreme cruelty in a domestic context, even if no conviction resulted; and (7) certain misdemeanors under federal or state law for offenses related to false identification; the unlawful receipt of public benefits from a federal, state, tribal, or local entity; or the possession or trafficking of a controlled substance or controlled-substance paraphernalia. The Departments intend that the criminal ineligibility bars would be limited only to aliens with convictions and—with a narrow exception in the domestic violence context [4]—not based only on criminal conduct for which the alien has not been convicted. In addition, although 8 U.S.C. 1101(a)(43) provides for the application of the aggravated felony definition to offenses in violation of the law of a foreign country for which the term of imprisonment was completed within the previous 15 years, this proposal is not intended to cover such foreign convictions.

[4] A conviction would not be required in certain situations involving battery or extreme cruelty. That conduct-specific inquiry is essentially identical to the inquiry already undertaken in situations in which an alien seeks to obtain immigration benefits based on domestic violence that does not necessarily result in a conviction. See, e.g., INA 240A(b)(2)(A), 8 U.S.C. 1229b(b)(2)(A); 8 CFR 204.2(c)(1)(i)(E), (c)(1)(vi), (c)(2)(iv), (e)(1)(i)(E), (e)(1)(vi), and (e)(2)(iv).

### 1. Aliens Convicted of a Felony Under Federal, State, Tribal, or Local Law

The Departments are proposing to implement a new bar on eligibility for asylum for felony convictions. See 8 U.S.C. 1158(b)(2)(B)(ii) and (C). Felonies are defined in the proposed rule as crimes designated as felonies by the relevant jurisdiction or crimes punishable by more than one year's imprisonment.

In the first instance, the Attorney General and the Secretary could reasonably exercise their discretion to classify felony offenses as particularly serious crimes for purposes of 8 U.S.C. 1158(b)(2)(B)(ii). Congress defined "particularly serious crimes" in the asylum statute to expressly encompass all aggravated felonies. See INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i). At present, the INA defines an aggravated felony by reference to an enumerated list of 21 types of convictions. INA 101(a)(43), 8 U.S.C. 1101(a)(43). But Congress did not limit the definition of particularly serious crimes to aggravated felonies. Rather, Congress expressly authorized the Attorney General to designate additional particularly serious crimes through regulation or by case-by-case adjudication. INA 208(b)(2)(B)(ii), 8 U.S.C. 1158(b)(2)(B)(ii); Delgado, 648 F.3d at 1106 ("[t]here is little question that [the asylum] provision permits the Attorney General, by regulation, to make particular crimes categorically particularly serious" (emphasis omitted)); Gao v. Holder, 595 F.3d 549, 556 (4th Cir. 2010) ("we think that [s]ection 1158(b)(2)(B)(ii) . . . empowers the Attorney General to designate offenses which, like aggravated felonies, will be considered per se particularly serious"). By defining "particularly serious crimes" to include all "aggravated felonies," but then giving the Attorney General the discretion to "designate by regulation offenses that will be considered" a "particularly serious crime," Congress made clear that the bar on asylum eligibility for particularly serious crimes necessarily includes, but is not limited to, aggravated felonies. See INA 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(ii); Delgado, 648 F.3d at 1105–06 (explaining that the asylum statute specifies two categories of crimes that are per se particularly serious—aggravated felonies, and those that the Attorney General designates by regulation).

To date, the Attorney General has not used the above-described authority to promulgate regulations identifying additional categories of particularly serious crimes. The Board has engaged in case-by-case adjudication to identify some particularly serious crimes, but this approach imposes significant interpretive difficulties and costs, while producing unpredictable results. The Supreme Court has employed the so-called "categorical" approach, established in Taylor v. United States, 495 U.S. 575 (1990), and its progeny such as Mathis v. United States, 136 S. Ct. 2243 (2016), and Descamps v. United States, 133 S. Ct. 2276 (2013), to determine when an offense constitutes an aggravated felony. Under that approach, courts must compare the elements of the statutory crime for which an alien was convicted with the generic elements of the specified federal aggravated felony. As a general matter, any mismatch between the elements means that the crime of conviction is not an aggravated felony (unless the statute of conviction is divisible and the alien was convicted of a particular offense within the statute that would satisfy the generic definition of the relevant aggravated felony).

Courts, however, have repeatedly expressed frustration with the complexity of applying this approach. See, e.g., United States v. Aguila-Montes de Oca, 655 F.3d 915, 917 (9th Cir. 2011), overruled by Descamps, 570 U.S. 254 ("In the twenty years since Taylor, we have struggled to understand the contours of the Supreme Court's framework. Indeed, over the past decade, perhaps no other area of the law has demanded more of our resources."); see also Quarles v. United States, 139 S. Ct. 1872, 1880 (2019) (Thomas, J., concurring); Williams v. United States, 927 F.3d 427, 446 (6th Cir. 2019) (Merritt, J., concurring); Lowe v. United States, 920 F.3d 414, 420 (6th Cir. 2019) (Thapar, J., concurring) ("in the categorical-approach world, we cannot call rape what it is . . . . [I]t is time for Congress to revisit the categorical approach so we do not have to live in a fictional world where we call a violent rape non-violent"); United States v. Evans, 924 F.3d 21, 31 (2d Cir. 2019) (observing that, although the court may resolve only an actual case or controversy, "the categorical approach paradoxically instructs courts resolving such cases to embark on an intellectual enterprise grounded in the facts of other cases not before them, or even imagined scenarios" (emphases in original)); United States v. Chapman, 866 F.3d 129, 136–39 (3d Cir. 2017) (Jordan, J., concurring); United States v. Faust, 853 F.3d 39, 60–61 (1st Cir. 2017) (Lynch, J., concurring).

Application of the categorical approach has resulted in anomalous

decisions in which aliens convicted of a serious criminal offense have been found not to have been convicted of an aggravated felony. *See, e.g., Harbin* v. *Sessions,* 860 F.3d 58 (2d Cir. 2017) (holding that a New York controlled substance law was not written in a way that allowed it to be used as the basis for establishing that a convicted alien was removable under the INA for drug trafficking); *Larios-Reyes* v. *Lynch,* 843 F.3d 146, 149–50 (4th Cir. 2016) (alien's conviction under Maryland law for sexual abuse of a victim under the age of 14 did not amount to the aggravated felony of "sexual abuse of a minor"). The Board has rectified some anomalies by determining that certain crimes, though not aggravated felonies, are of a sufficiently pernicious nature that they should facially constitute particularly serious crimes that would disqualify aliens from eligibility for asylum or withholding of removal. *See Sopo* v. *U.S. Att'y Gen.,* 739 F. App'x 554, 558 (11th Cir. 2018) (the Board and immigration judges "may focus solely on the elements of the offense" to determine whether an offense is a "particularly serious crime"); *In re N–A–M–,* 24 I&N Dec. 336, 343 (BIA 2007) (explaining that "the proper focus for determining whether a crime is particularly serious is on the nature of the crime," and that its elements alone may be dispositive); *see also, e.g., Ahmetovic* v. *INS,* 62 F.3d 48, 52 (2d Cir. 1995) (upholding the Board's determination that first-degree manslaughter, while not an aggravated felony, is per se "particularly serious" for asylum purposes). Furthermore, the Board has looked at the individual circumstances of a crime to conclude that an even wider range of offenses can be considered particularly serious crimes on an as-applied basis. *See, e.g., Vaskovska* v. *Lynch,* 655 F. App'x 880, 884 (2d Cir. 2016) (the Board did not err in its individualized determination that an alien's conviction for drug possession was a particularly serious crime); *Arbid* v. *Holder,* 700 F.3d 379, 381 (9th Cir. 2012) (the Board did not err in determining that an alien's mail fraud conviction was particularly serious even if not an aggravated felony). Even in the withholding context—where an alien is deemed to have committed a particularly serious crime if he has been convicted of an aggravated felony (or felonies) for which the sentence was an aggregate term of imprisonment of at least 5 years, *see* 8 U.S.C. 1231(b)(3)(B)—courts have routinely concluded that crimes that are not aggravated felonies may be particularly serious. *See, e.g., Valerio-*

*Ramirez* v. *Sessions,* 882 F.3d 289, 291, 296 (1st Cir. 2018) (the Board did not err in determining that an alien's identity theft conviction was particularly serious even though it was not an aggravated felony); *Hamama* v. *INS,* 78 F.3d 233, 240 (6th Cir. 1996) (the Board had power to declare certain firearm possession crimes "facially" particularly serious without an individualized evaluation of the alien's case, even if such crimes are not always aggravated felonies); *In re N–A–M–,* 24 I&N Dec. at 338–39 (felony menacing is a particularly serious crime based on its elements, though not an aggravated felony).

Nonetheless, this mix of case-by-case adjudication and per se rules is an inefficient means of identifying categories of offenses that should constitute particularly serious crimes. The Board has only rarely exercised its authority to designate categories of offenses as facially or per se particularly serious, and instead typically looks to a wide and variable range of evidence in making an individualized determination of a crime's seriousness. *See In re N–A–M–,* 24 I&N Dec. at 343–44; *Matter of L–S–,* 22 I&N Dec. 645, 651 (BIA 1999). This case-by-case adjudication means that aliens convicted of the exact same offense can receive different asylum treatment. For certain crimes—*i.e.,* those described in this notice of proposed rulemaking—the Attorney General and the Secretary have determined that the possibility of such inconsistency is not desirable and that a rule-based approach is instead warranted in this specific context.

The proposed rule would eliminate the inefficiencies described above by providing that all felonies would constitute particularly serious crimes. The determination of whether a crime would be a felony for purposes of asylum eligibility would depend on whether the relevant jurisdiction defines the crime as a felony or whether the statute of conviction allows for a sentence of more than one year. Convictions for which sentences are longer tend to be associated with crimes of a more consequential nature. For example, an offender's "criminal history category" for the purposes of sentencing for federal crimes "serves as [a] proxy for the need to protect the public from further crimes of the defendant." *United States* v. *Hayes,* 762 F.3d 1300, 1314 n.8 (11th Cir. 2014); *see also id.* ("In other words, it is a proxy for recidivism."). And the criminal history category, in turn, is "based on the maximum term imposed in previous sentences rather than on other measures, such as whether the conviction was designated

a felony or misdemeanor." U.S. Sentencing Guidelines Manual § 4A1.2 cmt. background (U.S. Sentencing Comm'n 2018). This calculation thus reflects a recognition that crimes with the potential for longer sentences tend to indicate that the offenders who commit such crimes are greater dangers to the community.

In addition, defining a felony to include such offenses would also be consistent with the definition of felonies in other federal statutes. For instance, convictions for crimes that states designated as felonies may serve as predicate "prior felony conviction[s]" under the federal career offender statute. *See United States* v. *Beasley,* 12 F.3d 280, 282–84 (1st Cir. 1993); *United States* v. *Rivera,* 996 F.2d 993, 994–97 (9th Cir. 1993).

Furthermore, defining felonies to include crimes that involve a possible sentence of more than one year in prison would be generally consistent with the way that federal law defines felonies. *See, e.g.,* 5 U.S.C. 7313(b) ("For the purposes of this section, 'felony' means any offense for which imprisonment is authorized for a term exceeding one year"); *cf.* U.S.S.G. 2L1.2 cmt. n.2 ("'Felony' means any federal, state, or local offense punishable by imprisonment for a term exceeding one year."). The Model Penal Code and most states likewise define a felony as a crime with a possible sentence in "excess of one year." Model Penal Code § 1.04(2); *see* 1 Wharton's Criminal Law § 19 & n.23 (15th ed.) (surveying state laws). Finally, relying on the possibility of a sentence in excess of one year—rather than on the actual sentence imposed— would be consistent with Board precedents adjudicating whether a crime qualifies as "particularly serious" for purposes of asylum or withholding eligibility. In that context, "the sentence imposed is not a dominant factor in determining whether a conviction is for a particularly serious crime" because the sentence actually imposed often depends on factors such as offender characteristics that "may operate to reduce a sentence but do not diminish the gravity of [the] crime." *In re N–A–M–,* 24 I&N Dec. at 343.

Relying on the possibility of a sentence of over one year to define a felony would capture crimes of a particularly serious nature because the offenders who commit such crimes are—as a general matter—more likely to be dangerous to the community than those offenders whose crimes are punishable by shorter sentences. *See* 8 U.S.C. 1158(b)(2)(A)(ii) (tying the "particularly serious crime" determination to "danger[ousness] to

the community"). In addition, by encompassing all crimes with a sentence of more than one year, regardless of whether the crimes are defined felonies by the relevant jurisdiction, the definition would create greater uniformity by accounting for possible variations in how different jurisdictions may label the same offense. Such a definition would also avoid anomalies in the asylum context that arise from the definition of "aggravated felonies" under 8 U.S.C. 1101(a)(43), which defines some qualifying offenses with reference to the length of the actual sentence ordered. *See United States* v. *Pacheco,* 225 F.3d 148, 153–54 (2d Cir. 2000) (agreeing that ordinarily the touchstone in the aggravated felony definition's reference to sentences is the actual term of imprisonment imposed). The proposed definition of a felony would also obviate the need for immigration adjudicators and courts to apply the categorical approach with respect to aggravated felonies. This proposal thus would offer a more streamlined and predictable approach to be applied in the asylum context.[5]

In addition to their authority under section 208(b)(2)(B)(ii) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii), the Attorney General and the Secretary further propose relying on their respective authorities under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), to make all felony convictions disqualifying for purposes of asylum eligibility. Federal, state, tribal, or local felony convictions already carry a number of serious repercussions over and above the sentence imposed. Felons, including those who are U.S. citizens, may lose certain privileges, including the ability to apply for Government grants and live in public housing. *See Estep* v. *United States,* 327 U.S. 114, 122 & n.13 (1946) (explaining that "[a] felon customarily suffers the loss of substantial rights"); *see also, e.g., Dist. of Columbia* v. *Heller,* 554 U.S. 570, 626–27 (2008) (the Second Amendment does not prohibit laws disallowing the possession of firearms by felons). Treating a felony conviction as disqualifying for purposes of obtaining the discretionary benefit of asylum would be consistent with the disabilities arising from felony convictions in these other contexts and

would reflect the serious social cost of such crimes.

The Departments also seek public comment on whether (and, if so, how) to differentiate among crimes designated as felonies and among crimes punishable by more than one year of imprisonment. For example, are there crimes that are currently designated as felonies in one or more relevant jurisdictions in the United States that should not be categorical bars to asylum eligibility? Are there crimes that are currently punishable by more than one year's imprisonment in one or more relevant jurisdictions in the United States that should not be categorical bars to asylum? Should the definition of a felony depend instead on the term of imprisonment that was ordered by the court of jurisdiction? In addition to seeking public comment on whether the definition of felony in the proposed rule might be over-inclusive, the Departments also seek comment on whether it might be under-inclusive— *i.e.,* are there crimes that would not fall under the definition of felony in the proposed rule, and that do not otherwise constitute categorical bars to asylum eligibility, that should be made categorical bars? In sum, the Departments seek input on how the proposed definition of a felony might be modified. Further, the Departments seek comment on what measures, if any, are necessary to ensure that aliens who are victims of human trafficking, but also have convictions caused by or incident to victimization, are not subject to this bar. For instance, victims of severe forms of human trafficking may nevertheless receive a waiver of criminal grounds for inadmissibility in order to qualify for T nonimmigrant status pursuant to 8 CFR 212.16. *See* INA 101(a)(15)(T), 212(d)(13)(B), 8 U.S.C. 1101(a)(15)(T), 1182(d)(13)(B).

Regardless of whether the rule encompasses all felony convictions or some subset of such convictions, the Departments have identified specific types of offenses below that are proposed in this rule as grounds for ineligibility for asylum.

### 2. Federal Convictions for Harboring Aliens

The Attorney General and the Secretary propose to designate all offenses involving the federal crimes of bringing in or harboring certain aliens pursuant to sections 274(a)(1)(A) and (2) of the INA, 8 U.S.C. 1324(a)(1)(A), (2), as particularly serious crimes and, in all events, as discrete bases for ineligibility. *See* INA 208(b)(2)(B)(ii), (C), 8 U.S.C. 1158(b)(2)(B)(ii), (C). To convict a person of harboring an alien under

sections 274(a)(1)(A) or (2) of the INA, the Government must establish that the defendant concealed, harbored, shielded from detection, or transported an alien, or attempted to do so. INA 274(a)(1)(A), (2), 8 U.S.C. 1324(a)(1)(A), (2). Penalties differ depending on whether the act was for commercial advantage or financial gain and on whether serious bodily injury or death occurred. INA 274(a)(1)(B), (2)(B), 8 U.S.C. 1324(a)(1)(B), (2)(B). Most of the prohibited acts carry a penalty of possible imprisonment of at least five years, INA 274(a)(1)(B)(i)–(iii), 8 U.S.C. 1324(a)(1)(B)(i)–(iii), and committing those acts in circumstances resulting in the death of another person can be punished by a sentence of death or life imprisonment, INA 274(a)(1)(B)(iv), 8 U.S.C. 1324(a)(1)(B)(iv). The only exception is for certain instances of the offense of bringing or attempting to bring in an alien who lacks official authorization to enter under section 274(a)(2) of the INA, 8 U.S.C. 1324(a)(2), which carries a possible penalty of imprisonment up to one year, INA 274(a)(2)(A), 8 U.S.C. 274(a)(2)(A).

Convictions under section 1324 are often aggravated felonies under section 101(a)(43)(N) of the INA, 8 U.S.C. 1101(a)(43)(N), which defines an aggravated felony as including "an offense described in [INA 274(a)(1)(A) or (2)], except in the case of a first offense for which the alien has affirmatively shown that the alien committed the offense for the purpose of assisting, abetting, or aiding only the alien's spouse, child, or parent." *See Matter of Ruiz-Romero,* 22 I&N Dec. 486, 488, 492–93 (BIA 1999) (holding that an alien convicted of transporting an illegal alien committed an aggravated felony under section 101(a)(43)(N) of the INA and was thus deportable); *see also Patel* v. *Ashcroft,* 294 F.3d 465 (3d Cir. 2002) (holding that harboring an alien constitutes an aggravated felony); *Gavilan-Cuate* v. *Yetter,* 276 F.3d 418, 419–20 (8th Cir. 2002) (dismissing an appeal for lack of jurisdiction because the court had already determined on the petitioner's direct appeal that he had been convicted of the aggravated felony of transporting and harboring aliens); *United States* v. *Galindo-Gallegos,* 244 F.3d 728, 733–34 (9th Cir. 2001) (holding that transporting aliens under 8 U.S.C. 1324(a)(1)(A)(ii) is an aggravated felony for purposes of section 101(a)(43)(N) of the INA). Aliens convicted of such aggravated felonies would already be ineligible for asylum under section 208(b)(2)(B)(i) of the INA.

The proposed rule would broaden this bar so that first-time offenders who engage in illegal smuggling or harboring

---

[5] The Departments intend that this proposed provision would be limited to aliens with convictions and would not apply to criminal conduct for which the alien has not been convicted. Further, this provision would expand ineligibility for asylum based on offenses committed in the United States, not offenses committed abroad. This provision would thus leave unchanged the provision in 8 U.S.C. 1101(a)(43) that provides for application of the aggravated felony definition to offenses in violation of the law of a foreign country.

to aid certain family members, in violation of section 1324(a)(1)(A) or (2), are deemed to have committed particularly serious crimes. The *mens rea* required for a section 1324 conviction under subsection (a)(1)(A) is "knowing," and under (a)(2) is "knowing or in reckless disregard," meaning such a conviction displays a serious disregard for U.S. immigration law. In all events, conviction of a smuggling offense under section 1324(a)(1)(A) or (2) should also be disqualifying under section 1158(b)(2)(C), which gives the Attorney General and the Secretary additional discretion to identify grounds for ineligibility. Even first-time alien smuggling offenses involving immediate family members display a serious disregard for U.S. immigration law and pose a potential hazard to smuggled family members, which often include a vulnerable child or spouse. *See Arizona* v. *United States,* 567 U.S. 387, 396 (noting the "danger" posed by "alien smugglers or aliens who commit a serious crime"); *United States* v. *Miguel,* 368 F.3d 1150, 1157 (9th Cir. 2004), *overruled on other grounds by United States* v. *Gasca-Ruiz,* 852 F.3d 1167 (9th Cir. 2017) (noting that "young children [are] more susceptible to the criminal conduct because they [do] not fully appreciate the danger involved in illegal smuggling").

### 3. Federal Convictions for Illegal Reentry

The Attorney General and the Secretary further propose to exercise their authority under sections 208(b)(2)(B)(ii) and 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii) and (C), to designate a conviction for the federal crime of illegal reentry pursuant to section 276 of the INA, 8 U.S.C. 1326, as precluding asylum eligibility.

Under section 1326(a), aliens who were previously removed and reenter the United States are subject to fines and to a term of imprisonment of two years or less. 8 U.S.C. 1326(a). Section 1326(b) prescribes significantly higher penalties for certain removed aliens who reenter, such as aliens who were removed after being convicted for aggravated felonies and then reenter. 8 U.S.C. 1326(b) (authorizing sentences of imprisonment up to 20 years as possible penalties).

Some convictions under section 1326 already qualify as aggravated felonies under section 101(a)(43)(O) of the INA, 8 U.S.C. 1101(a)(43)(O), which defines an aggravated felony as including "an offense described in section . . . 1326 . . . committed by an alien who was previously deported on the basis of a conviction for an [aggravated felony]." Aliens who commit such offenses are thus already ineligible for asylum under section 208(b)(2)(B)(i) of the INA, 8 U.S.C. 1158(b)(2)(B)(i).

The proposed rule would broaden this bar so that all aliens convicted of illegal reentry under section 1326 would be considered to have committed an offense that disqualifies them from asylum eligibility. It would also harmonize the treatment of most aliens who have illegally reentered the United States after being removed, as such aliens who have a prior order of removal reinstated are already precluded from asylum eligibility. Section 1326 makes clear that all offenses relating to illegal reentry are quite serious; even the most basic illegal reentry offense is punishable by fine and by up to two years' imprisonment. 8 U.S.C. 1326(a). Illegal reentry also reflects a willingness to repeatedly disregard the immigration laws despite alternative means of presenting a claim of persecution. An alien seeking protection, even one who has previously been removed from the United States, may present himself or herself at a port of entry without illegally reentering the United States. An alien who chooses instead to again enter illegally has repeatedly chosen to flout immigration laws, and such recidivism suggests that the offense should be treated more severely. The fact that the alien has *repeatedly* engaged in criminal conduct suggests a tendency to engage in such conduct in the future, thus warranting a conclusion that the alien poses a danger to the community that makes the alien's crime particularly serious. *See* Mariel Alper et al., 2018 Update on Prisoner Recidivism: A 9-Year Follow-up Period (2005–2014) 17 (2018) ("Overall, excluding probation and parole violations, 82.4% of prisoners released in 30 states in 2005 were arrested within 9 years."); U.S. Sentencing Comm'n, The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders 14 (2017) ("Overall, an offender's total criminal history score is a strong predictor of recidivism. Rearrest rates range from a low of 30.2 percent of offenders with zero criminal history points to a high of 85.7 percent for offenders with 15 or more criminal history points. Each additional criminal history point is generally associated with a greater likelihood of recidivism."); Nick Tilley, Analyzing and Responding to Repeat Offending 11 (2013) ("Once criminal careers are established and offenders are processed by the criminal justice system, recidivism rates become very high: Up

to two-thirds of those who are incarcerated will reoffend within a few years.").

Moreover, Congress, as noted above, has already designated certain crimes related to illegal reentry as aggravated felonies. *See* 8 U.S.C. 1101(a)(43)(O). This designation reflects a congressional decision that aliens who commit these crimes are dangers to the community, *see* 8 U.S.C. 1158(b)(2)(A)(ii) (tying the "particularly serious crime" determination to "danger[ousness] to the community"), so aliens who commit similar crimes related to reentry are also likely to be dangers to the community. Further, 63% of those convicted of illegal reentry had a prior criminal history, again suggesting that the offenders who commit these crimes pose an ongoing danger to others. *See* U.S. Sentencing Comm'n, Quick Facts: Illegal Reentry Offenses 1 (2019), *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY18.pdf*.

As a separate basis for this aspect of the proposed rule, the Attorney General and the Secretary propose making illegal reentry a ground for ineligibility under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). A regulation providing for the mandatory ineligibility for asylum based on convictions for illegal reentry of removed aliens, *see* INA 276, 8 U.S.C. 1326, would bear a close relationship to the statutory bar on applying for asylum when a previous order of removal is reinstated, *see* INA 241(a)(5), 8 U.S.C. 1231(a)(5). An alien subject to reinstatement of a prior removal order is not eligible to apply for any relief from removal, but may seek protection such as statutory withholding of removal and protection pursuant to the CAT regulations. *See, e.g., Cazun,* 856 F.3d at 254. The statutory bar on applying for asylum and other forms of relief when an order of removal is reinstated has been upheld by every circuit to consider the question. *See Garcia* v. *Sessions,* 873 F.3d 553, 557 (7th Cir. 2017), *cert. denied,* 138 S. Ct. 2648 (2018); *R–S–C,* 869 F.3d at 1189; *Mejia,* 866 F.3d at 587; *Garcia,* 856 F.3d at 30; *Cazun,* 856 F.3d at 260; *Perez-Guzman* v. *Lynch,* 835 F.3d 1066, 1082 (9th Cir. 2016); *Jimenez-Morales* v. *U.S. Att'y Gen.,* 821 F.3d 1307, 1310 (11th Cir. 2016); *Ramirez-Mejia* v. *Lynch,* 794 F.3d 485, 489–90 (5th Cir. 2015); *Herrera-Molina* v. *Holder,* 597 F.3d 128, 137–38 (2d Cir. 2010). That bar reflects legislators' apparent concerns that aliens who re-cross the border illegally after having been removed once should not be rewarded with benefits that the United States is not obliged to offer them. *See R–S–C,* 869 F.3d at 1179 &

n.2; H.R. Rep. No. 104–469, pt. 1, at 155 (1996) ("[T]he ability to cross into the United States over and over with no consequences undermines the credibility of our efforts to secure the border."); H.R. Rep. No. 104–469, pt. 1, 113 ("One seemingly intractable problem is repeat border-crossings.").

The existing statutory bar for reinstated removal orders and the proposed bar for aliens convicted of illegal reentry after being previously removed are not coterminous because not all persons with a conviction under section 276 of the INA, 8 U.S.C. 1326, have orders of removal reinstated. *See Lara-Aguilar* v. *Sessions,* 889 F.3d 134, 144 (4th Cir. 2018) (reinstatement of a prior removal order is neither automatic nor obligatory). Furthermore, not all persons with reinstated removal orders have been convicted under section 276 of the INA, 8 U.S.C. 1326. However, the Departments believe that similar policy considerations support the barring of aliens convicted of illegal reentry under section 276 of the INA, 8 U.S.C. 1326, from eligibility for asylum.

Furthermore, although this proposed bar would render ineligible for asylum an alien whose threat of persecution arose after the initial removal and illegal reentry, such an alien could still seek other forms of protection, such as statutory withholding of removal and withholding or deferral of removal under the regulations implementing the CAT. The proposed rule is consistent, therefore, with U.S. treaty obligations under the Refugee Protocol (which incorporates Articles 2 through 34 of the Refugee Convention) and the CAT. U.S. asylum law implements Article 34 of the Refugee Convention, concerning assimilation of refugees, which is precatory and not mandatory. *See Cardoza-Fonseca,* 480 U.S. at 441. In accordance with the non-mandatory nature of Article 34, the asylum statute, INA 208, 8 U.S.C. 1158, was drawn to be discretionary; it does not require asylum to be granted to all refugees. *Id.* For the reasons outlined above, limitations like the ones proposed here do not violate Article 34. *See Garcia,* 856 F.3d at 42; *R–S–C,* 869 F.3d at 1188; *Mejia,* 866 F.3d at 588; *Cazun , 856 F.3d at 257 & n.16; Ramirez-Mejia,* 813 F.3d at 241. In contrast, the United States' non-refoulement obligations under Article 33(1) of the Refugee Convention and Article 3 of the CAT are mandatory to the extent provided by domestic law. They are implemented by statutory withholding of removal, a mandatory provision, and withholding or deferral of removal under the CAT regulations. Because the new limitations adopted here do not affect the availability of

statutory withholding of removal, INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A), or protection under the regulations implementing the CAT, 8 CFR 1208.16(c) through 1208.18, the rule does not affect U.S. compliance with its obligations under Article 33(1) of the Refugee Convention or Article 3 of the CAT. *See R–S–C,* 869 F.3d at 1188 n.11; *Cazun,* 856 F.3d at 257; *Ramirez-Mejia,* 813 F.3d at 241.

Moreover, in rejecting any argument that the Refugee Convention and Refugee Protocol require that the U.S. must grant asylum to anyone who qualifies as a "refugee," the Departments note that the Refugee Convention and Refugee Protocol are not self-executing. Rather, Congress implemented relevant U.S. obligations under the Refugee Protocol through the Refugee Act. *Matter of D–J–,* 23 I&N Dec. 572, 584 n.8 (A.G. 2003). The Refugee Act made asylum discretionary, meaning that Congress did not consider it obligatory to grant asylum to every refugee who qualifies. Public Law 96–212, sec. 208(a), 94 Stat. 102. Moreover, as noted earlier in footnote 3, courts have rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. Courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to apply for asylum does not constitute a prohibited "penalty" under Article 31(1) of the Refugee Convention. *Mejia,* 866 F.3d at 588; *Cazun,* 856 F.3d at 257 n.16. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for withholding must also be granted asylum. *Garcia,* 856 F.3d at 42; *R–S–C,* 869 F.3d at 1188. Thus, the Attorney General may render aliens ineligible for asylum if they enter illegally and are then convicted of unlawfully entering the country, and still remain faithful to U.S. obligations under the Refugee Protocol.

### 4. Federal, State, Tribal, or Local Convictions for Offenses Involving Criminal Street Gangs

The Departments are proposing to bar from asylum all those who are convicted of a crime involving criminal street gangs, regardless of whether that crime qualifies as a felony or as a misdemeanor. One approach the Attorney General and the Secretary are considering is to exercise their

discretionary authority under sections 208(b)(2)(B)(ii) and (C) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii) and (C), to exclude individuals convicted of federal, state, tribal, or local crimes committed in support, promotion, or furtherance of a criminal street gang as that term is defined in the convicting jurisdiction or under 18 U.S.C. 521(a). Specifically, the proposed rule would cover individuals convicted of federal, state, tribal, or local crimes in cases in which the adjudicator knows or has reason to believe the crime was committed in furtherance of criminal street gang activity.[6] The "reason to believe" standard is used elsewhere in the INA, *see* 8 U.S.C. 1182(a)(2)(C), and would allow for consideration of all reliable evidence, including any penalty enhancements, to determine whether the crime was committed for or related to criminal gang activities, *see Garces* v. *U.S. Att'y Gen.,* 611 F.3d 1337, 1350 (11th Cir. 2010); *Matter of Rico,* 16 I&N Dec. 181, 185–86 (BIA 1977). In addition, the Departments have concluded that it is appropriate to allow the adjudicator to determine whether a crime was in fact committed "in furtherance" of gang-related activity. The states, as noted above, have enacted numerous laws that address gang-related crimes, but they have not enacted a uniform definition of what constitutes activity taken "in furtherance" of a gang-related crime. It thus appropriately falls to immigration judges in the first instance to determine whether a person committed the type of crime that warrants withholding of the benefit of legal presence in our communities. Moreover, to the extent that allowing the adjudicator to undertake such an inquiry might raise concerns about inconsistent application of the proposed bar, the Departments note that the Board is capable of

---

[6] California enacted the first major anti-gang legislation in the country in 1988. *See* Cal. Penal. Code 186.22(a) (establishing a substantive criminal offense for "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang"). In the years since, 49 states, the District of Columbia, and the Federal Government have enacted legislation that provides for penalties (including sentence enhancements, fines, or damages) for gang-related criminal activity. National Gang Center, Highlights of Gang-Related Legislation (Dec. 31, 2018), *https:// www.nationalgangcenter.gov/Legislation/Highlights* (last visited June 3, 2019); *see also, e.g.,* 18 U.S.C. 521 (providing a 10-year sentence enhancement for certain convictions regarding criminal street gang activity); Idaho Code Ann. 18–8503; Iowa Code Ann. 723A.2; Kan. Stat. Ann. 21–6314; La. Rev. Stat. 1403; Minn. Stat. Ann. 609.229; Mo. Rev. Stat. 578.423; Mont. Code Ann. 45–8–405; N.C. Gen. Stat. 14–50.17; Ohio Rev. Code Ann. 2923.42; Tenn. Code Ann. 40–35–121; Utah Code Ann. 76–9–903.

ensuring a uniform approach to the gang-related crimes inquiry. *See, e.g.,* 8 CFR 1003.1(e)(6)(i) (allowing for referral of cases to a three-member panel of the Board "to settle inconsistencies among the rulings of different immigration judges").

Some of the relevant criminal street gang-related offenses may already constitute aggravated felonies, such that aliens convicted of such offenses would already be ineligible for asylum. The most common criminal street gang crimes "are street-level drug trafficking, assault, threats and intimidation, robbery, and large-scale drug trafficking." National Gang Intelligence Center, 2015 National Gang Report 12 (2015). Many convictions for such offenses could qualify as aggravated felonies. *See, e.g.,* 8 U.S.C. 1101(a)(43)(B) (defining drug trafficking crimes as aggravated felonies); *id.* 1101(a)(43)(F) (defining crimes of violence punishable by at least one year in prison as aggravated felonies).

Regardless, criminal street gang-related offenses—whether felonies or misdemeanors—could reasonably be designated as "particularly serious crimes" pursuant to 8 U.S.C. 1158(b)(2)(B)(ii). All criminal street gang-related offenses appear to be particularly serious because they are strong indicators of recidivism and ongoing, organized criminality within a community, thus implying that aliens who commit such crimes are likely to pose an ongoing danger to that community. For example, research suggests that criminal street gang members are responsible for 48 percent of violent crime in most U.S. jurisdictions. *See* National Gang Intelligence Center, National Gang Threat Assessment 15 (2011). Criminal street gang members are also more likely than nonmembers to be involved in selling drugs. *See* Dana Peterson, et al., *Gang Membership and Violent Victimization* 21 Just. Q. 793, 798 (2004). And the Federal Bureau of Investigation reports that more than 56 criminal street gangs conduct cross-border crimes such as cross-border drug trafficking. National Gang Intelligence Center, 2015 National Gang Report 9–10 (2015); *see also* J.C. Barnes et al., *Estimating the Effect of Gang Membership on Nonviolent and Violent Delinquency: A Counterfactual Analysis,* 36 Aggressive Behav. 437, 438 (2010) (studying the link between gang membership and crime, and reporting that gang members account for 86 percent of all "serious delinquent acts"). In light of this well-documented link between gang membership and a range of crimes, the Departments believe that

aliens who enter the United States and proceed to be convicted of crimes involving criminal street gang-related activity should be deemed to have committed particularly serious crimes that render them ineligible for asylum.

Further, some of the crimes in which gangs frequently engage—such as drug trafficking—are similar to the kinds of crimes that Congress has already classified as aggravated felonies. *See, e.g.,* 8 U.S.C. 1101(a)(43)(B) (defining aggravated felonies to include "illicit trafficking in a controlled substance"). This classification reflects a congressional determination that such crimes pose a danger to the community, *see* 8 U.S.C. 1158(b)(2)(A)(ii), (b)(2)(B)(i), such that aliens involved in similar, gang-related crimes are also likely to pose a danger to the community. Indeed, the perpetrators of crimes that further gang activity are, by the very nature of the acts they commit, displaying a disregard for basic societal structures in preference of criminal activities that place other members of the community—even other gang members—in danger. Existing law in some cases thus already treats gang-related offenders more harshly than other offenders, *see, e.g.,* U.S. Sentencing Guidelines Manual § 5K2.18 (U.S. Sentencing Comm'n 2018) (allowing for upward departures "to enhance the sentences of defendants who participate in groups, clubs, organizations, or associations that use violence to further their ends"), thereby confirming that these offenders are more likely to be dangerous to the community.

Moreover, even if 8 U.S.C. 1158(b)(2)(B)(ii) did not authorize the proposed bar, the Attorney General and the Secretary would propose designating criminal gang-related offenses as disqualifying under 8 U.S.C. 1158(b)(2)(C). Criminal gangs of all types—including local, regional, or national street gangs; outlaw motorcycle gangs; and prison gangs—are a significant threat to the security and safety of the American public. *See, e.g.,* National Gang Intelligence Center, 2015 National Gang Report 8 (2015) (explaining that "each gang type poses a unique threat to the nation"). Transnational organized crime has also expanded in size, scope, and impact over the past several years.[7] In Executive Order 13773, Enforcing Federal Law With Respect to Transnational Criminal Organizations and Preventing International

Trafficking, 82 FR 10691 (Feb. 9, 2017), the President emphasized the scourge of transnational criminal organizations and directed federal agencies to "pursue and support additional efforts to prevent the operational success of transnational criminal organizations and subsidiary organizations within and beyond the United States." Aliens involved in gang-related criminal activity accordingly represent a threat to the safety and security of the United States, and barring aliens convicted of such activity from receiving the discretionary benefit of asylum is "consistent with" the asylum statute's current provisions specifying that aliens posing such a threat are not eligible for asylum. *See* 8 U.S.C. 1158(b)(2)(A)(ii), (iv).

Finally, the Departments solicit public comments on:

(1) What should be considered a sufficient link between an alien's underlying conviction and the gang-related activity in order to trigger the application of the proposed bar; and

(2) any other regulatory approaches to defining the type of gang-related activities that should render aliens ineligible for asylum.

## 5. Convictions for Offenses Involving Driving While Intoxicated or Impaired

The Attorney General and Secretary further propose that, pursuant to their authorities under 8 U.S.C. 1158(b)(2)(B)(ii) and (C), aliens convicted under federal, state, tribal, or local law of certain offenses involving driving while intoxicated or impaired (also known as driving under the influence ("DUI")) should be ineligible for asylum. Specifically, aliens should be ineligible for asylum if they are convicted under federal, state, tribal, or local law of a second or subsequent offense of driving while intoxicated or impaired, or for a single such offense resulting in death or serious bodily injury. Whether a conviction involves driving while intoxicated or impaired would depend on the definition that the jurisdiction of conviction gives those terms. Such convictions would be disqualifying regardless of whether they constituted felonies or misdemeanors in the jurisdiction of conviction.

An alien convicted of DUI may remain eligible for asylum under current law, even when it is an alien's second or subsequent such conviction or when the DUI offense results in death or serious injury. Not all DUI offenses constitute aggravated felonies within the meaning of section 101(a)(43) of the INA, 8 U.S.C. 1101(a)(43), and thus these offenses may not automatically constitute "particularly serious crimes" for purposes of 8 U.S.C. 1158(b)(2)(B)(i).

---

[7] Office of the Dir. Of Nat'l Intelligence, Transnational Organized Crime, *https://www.dni.gov/files/documents/NIC_toc_foldout.pdf.*

*Cf. Leocal* v. *Ashcroft,* 543 U.S. 1, 13 (2004) (noting that DUI offenses in states whose relevant statutes "do not require any mental state" are not aggravated felony crimes of violence). However, the Board in the withholding of removal context has concluded that a number of DUI-related offenses involving death or serious injury constitute particularly serious crimes, and courts have upheld those determinations. *See, e.g., Avendano-Hernandez* v. *Lynch,* 800 F.3d 1072, 1076, 1076–78 (9th Cir. 2015) (affirming the Board's determination that a felony DUI conviction involving injury to another was a particularly serious crime for purposes of withholding of removal given the inherently dangerous nature of the offense, even though the alien was sentenced to less than one year's imprisonment); *Anaya-Ortiz* v. *Holder,* 594 F.3d 673, 675, 679–80 (9th Cir. 2010) (the Board applied the correct standard to conclude that an alien's actions in crashing "into a house while driving drunk . . . [and] caus[ing] part of the house's sheetrock wall to collapse on an elderly woman who lived inside" constituted a particularly serious crime); *Ursu* v. *INS,* 20 F. App'x 702, 705 (9th Cir. 2001) (upholding the Board's conclusion that a specific DUI offense was a particularly serious crime for withholding purposes because the alien "caused the death of another human being" while severely impaired). These holdings indicate that DUI offenses often have grave consequences, thus supporting a conclusion that they can reasonably be considered "particularly serious" for purposes of asylum eligibility. DUI laws exist, in part, to protect unknowing persons who are transiting through their communities from the dangerous persons who choose to willingly disregard common knowledge that their criminal acts endanger others.

As noted above, however, existing law does not clearly or categorically limit asylum eligibility for aliens convicted of serious DUI offenses, including those resulting in death or serious bodily injury. Establishing such a bar would be consistent with the Attorney General and the Secretary's statutory authority to designate by regulation "particularly serious crimes" that constitute a danger to the community and, thus, render aliens ineligible for asylum. INA 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(ii); *Delgado,* 648 F.3d at 1105–06; *Gao,* 595 F.3d at 555–56; *see also Matter of Carballe,* 19 I&N Dec. 357, 360 (BIA 1986) (an alien convicted of a particularly serious crime constitutes a danger to the community

of the United States). The Fifth Circuit has noted that "the very nature of the crime of [driving while intoxicated] presents a 'serious risk of physical injury' to others." *United States* v. *DeSantiago-Gonzalez,* 207 F.3d 261, 264 (5th Cir. 2000). These decisions in the withholding context underscore that DUI offenses involving serious bodily harm or death are routinely deemed "particularly serious crimes" in that context, and section 101(h)(3) of the INA, 8 U.S.C. 1101(h)(3), classifies driving under the influence as a "serious criminal offense" for purposes of the ground of inadmissibility at section 1182(a)(2)(E). Classifying DUI offenses that involve serious bodily harm or death as particularly serious crimes as a categorical matter would be reasonable given that all such offenses by definition involve a serious danger to the community. Likewise, categorically classifying repeat DUI offenses as particularly serious crimes would be a reasonable exercise of the Attorney General and the Secretary's discretion to designate particularly serious crimes because repeat offenders have already exhibited disregard for the safety of others as well as a likelihood of continuing to engage in extremely dangerous conduct.

Even if some of the proposed DUI-related bars could not be characterized as "particularly serious crimes" for purposes of section 1158(b)(2)(B)(ii), such bars would be within the Attorney General and the Secretary's authority to establish under 8 U.S.C. 1158(b)(2)(C). As the Supreme Court has recognized, "[d]runk driving is an extremely dangerous crime" as a general matter. *Begay* v. *United States,* 553 U.S. 137, 141 (2008), *abrogated on other grounds by Johnson* v. *United States,* 135 S. Ct. 2551 (2015). It takes "a grisly toll on the Nation's roads, claiming thousands of lives, injuring many more victims, and inflicting billions of dollars in property damage every year." *Birchfield* v. *North Dakota,* 136 S. Ct. 2160, 2166 (2016); *see also Marmolejo-Campos* v. *Holder,* 558 F.3d 903, 913 (9th Cir. 2009) (noting that "the dangers of drunk driving are well established"). Furthermore, federal courts have upheld the Board's determination that even if a particular DUI-related offense does not qualify as a "particularly serious crime," such a conviction warrants a discretionary denial of asylum. *See, e.g., Kouljinski* v. *Keisler,* 505 F.3d 534, 543 (6th Cir. 2007) (holding that, regardless of whether driving under the influence of alcohol is a "particularly serious crime," the immigration judge "did not abuse his discretion in this case by

basing his discretionary denial of asylum on [the petitioner's] three drunk-driving convictions"). These cases are consistent with the notion that the Attorney General and Secretary could, in their discretion, identify a subset of DUI convictions reflecting particularly dangerous conduct as grounds to deny eligibility for asylum.

### 6. Domestic Assault or Battery, Stalking, or Child Abuse

Relying on the authority under section 208(b)(2)(B)(ii) of the INA, the proposed regulation would also render aliens convicted of federal, state, tribal, or local offenses involving conduct amounting to domestic assault or battery, stalking, or child abuse in the domestic context ineligible for asylum, irrespective of whether those offenses qualify as felonies or misdemeanors. Relying solely on the Attorney General and the Secretary's authority under section 208(b)(2)(C) of the INA, the regulation would also render ineligible aliens who engaged in acts of battery and extreme cruelty in a domestic context in the United States, regardless of whether such conduct resulted in a criminal conviction. Notably, the asylum statute already contemplates that individuals who engage in certain harmful behavior will be ineligible, regardless of whether that behavior resulted in a conviction. 8 U.S.C. 1158(b)(2)(A)(i), (iii)–(v). Finally, the proposed regulation would except from the ineligibility bar aliens who have been battered or subjected to extreme cruelty and who were not the primary perpetrators of violence in their relationships.

Some of the offenses described above may already render an alien ineligible for asylum, to the extent that a particular conviction qualifies as an aggravated felony. For instance, aggravated felonies encompass "murder, rape, or sexual abuse of a minor," 8 U.S.C. 1101(a)(43)(A), as well as any "crime of violence . . . for which the term of imprisonment [is] at least one year," *id.* 1101(a)(43)(F). Convictions for such offenses automatically constitute "particularly serious crimes" for purposes of 8 U.S.C. 1158(b)(2)(A)(ii). *See* 8 U.S.C. 1158(b)(2)(B)(i). But, as noted, due to the application of the categorical approach, many state convictions that involve sexual abuse or domestic violence-related offenses may not qualify as aggravated felonies. *E.g., Larios-Reyes,* 843 F.3d at 149–50 (alien's conviction under Maryland law for sexual abuse of a victim under the age of 14 did not amount to the aggravated felony of "sexual abuse of a minor"); *Ortega-Mendez* v. *Gonzales,* 450 F.3d

1010, 1021 (9th Cir. 2006) (holding that a conviction for battery under California Penal Code section 242 is not a "crime of violence" within the meaning of 18 U.S.C. 16(a) and thus is not a "crime of domestic violence" within the meaning of 8 U.S.C. 1227(a)(2)(E)(i)); *Tokatly* v. *Ashcroft,* 371 F.3d 613, 624 (9th Cir. 2004) ("Applying *Taylor,* a court may not look beyond the record of conviction to determine whether an alien's crime was one of 'violence,' or whether the violence was 'domestic' within the meaning of the provision.").

The Board has routinely deemed some of the identified domestic violence offenses as particularly serious crimes, and many of those decisions have been upheld on appeal. *See Pervez* v. *Holder,* 546 F. App'x 157, 159 (4th Cir. 2013) (attempted indecent liberties with a child constituted a particularly serious crime even where "no child was actually harmed"); *Lara-Perez* v. *Holder,* 517 F. App'x 255 (5th Cir. 2013) (lewd and lascivious acts with a child constituted particularly serious crime); *Uzoka* v. *Att'y Gen.,* 489 F. App'x 595 (3d Cir. 2012) (endangering welfare of a child constituted a particularly serious crime); *Sosa* v. *Holder,* 457 F. App'x 691 (9th Cir. 2011) (willful infliction of corporal injury on a spouse or cohabitant constituted a particularly serious crime); *Hernandez-Vasquez* v. *Holder,* 430 F. App'x 448 (6th Cir. 2011) (child endangerment constituted a particularly serious crime); *Matter of Singh,* 25 I&N Dec. 670, 670 (BIA 2012) (stalking offense constituted a crime of violence). But the Board's case-by-case assessment of each domestic violence conviction does not cover all of the offenses identified above, and it would not cover domestic violence that does not result in a conviction, as the proposed rule would.

The Attorney General and the Secretary propose classifying domestic violence convictions as particularly serious crimes under section 208(b)(2)(B)(ii) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii), because violent conduct, or conduct creating a substantial risk of violence against the person, generally constitutes a particularly serious offense rendering an alien ineligible for asylum or withholding of removal. *Matter of E–A–,* 26 I&N Dec. 1, 9 n.3 (BIA 2012) (a "serious" crime involves "a substantial risk of violence and harm to persons"); *Matter of Frentescu,* 18 I&N Dec. 244, 247 (BIA 1982) ("Crimes against persons are more likely to be categorized as 'particularly serious crimes.' ").

Even if all of the proposed domestic violence offenses would not qualify as particularly serious crimes, convictions for such offenses—as well as engaging in conduct involving domestic violence that does not result in a conviction— should be a basis for ineligibility for asylum under section 208(b)(2)(C) of the INA. Domestic violence is particularly reprehensible because the perpetrator takes advantage of an "especially vulnerable" victim. *Carrillo* v. *Holder,* 781 F.3d 1155, 1159 (9th Cir. 2015). Congress enacted grounds for removability for domestic violence offenses because "[w]hen someone is an alien and has already shown a predisposition toward violence against women and children, we should get rid of them the first time." *See* 142 Cong. Rec. S4058–02, S4059 (daily ed. Apr. 24, 1996) (statement of Senator Dole on his amendment adding grounds for removability under subsection (E) to 8 U.S.C. 1227(a)(2)). Congress included stalking within the same statutory provision as domestic violence offenses that make an alien subject to removal because it is a "vicious act:" "Of all the women killed in the United States by husbands or boyfriends, 90 percent were stalked before being murdered." *Id.* In addition, "[s]talking behavior often leads to violence which may result in the serious injury or death of stalking victims." *Id.* Congress also included child abuse within the same statutory provision as domestic violence offenses, noting that child abuse includes a range of serious maltreatment, such as negligence, physical abuse, sexual abuse, emotional abuse, and medical negligence. *See id.* (statement of Senator Coverdale). "[American] society will not tolerate crimes against women and children." *Id.* (statement of Senator Dole on his amendment to add subsection (E) to 8 U.S.C. 1227(a)(2)). The same rationale should render aliens who commit domestic violence in the United States ineligible for the discretionary benefit of asylum. Denying asylum eligibility to an alien who has engaged in domestic violence accords with the aim of "send[ing] a message that we will protect our citizens against [domestic] assaults" committed by aliens. *Id.*

The portions of the proposed regulation that require a conviction would permit the adjudicator to assess all reliable evidence in order to determine whether that conviction amounts to a domestic violence offense. In limited circumstances, a similar type of analysis already occurs in the removal context. Although the ground of removability at 8 U.S.C. 1227(a)(2)(E)(ii)—which applies to individuals who violate certain portions of a protective order—does not require a criminal conviction, it does require a judicial order. *See Garcia-Hernandez* v.

*Boente,* 847 F.3d 869, 872 (7th Cir. 2017) ("The text of [8 U.S.C. 1227(a)(2)](E)(ii) does not depend on a criminal conviction but on what a court 'determines' about the alien's conduct."). That ground of removability requires the immigration judge to consider "the probative and reliable evidence regarding what a State court has determined about the alien's violation [of a protective order]." *Matter of Medina-Jimenez,* 27 I&N Dec. 399, 401 (BIA 2018). And, under 8 U.S.C. 1227(a)(2)(E)(i), which requires a conviction, the immigration judge may still apply a circumstance-specific approach to determine whether the "domestic relationship component" of that removability ground is met. *Hernandez-Zavala* v. *Lynch,* 806 F.3d 259, 266–67 (4th Cir. 2015); *Matter of Estrada,* 26 I&N Dec. 749, 752–53 (BIA 2016) ("[T]he circumstance-specific approach is properly applied in analyzing the domestic nature of a conviction to determine if it is for a crime of domestic violence."). Because some states may not have separate offenses for the different types of conduct recognized in federal law as domestic violence offenses, relying on such a factual inquiry would "clos[e] the . . . loopholes" where aliens might otherwise escape the immigration consequences due to the vagaries of states' laws. 142 Cong. Rec. S4058–02, S4059 (statement of Senator Dole).

For similar reasons, the portions of the proposed rule at 8 CFR 208.13(c)(6)(vii) and 1208.13(c)(6)(vii), which would not require a conviction to trigger ineligibility, allow the adjudicator to consider what conduct the alien engaged in to determine if the conduct amounts to a covered act of battery or extreme cruelty. There is precedent for such a conduct-specific inquiry in the asylum statute, *see* INA 208(b)(2)(A)(i), 8 U.S.C. 1158(b)(2)(A)(i), as well as in the removability context, *see* INA 237(a)(1)(E), 8 U.S.C. 1227(a)(1)(E); *see also Meng* v. *Holder,* 770 F.3d 1071, 1076 (2d Cir. 2014) (reviewing the record evidence to determine whether it supported the agency's finding that the applicant's conduct triggered section 1158(b)(2)(A)(i)'s persecutor bar); *Santiago-Rodriguez* v. *Holder,* 657 F.3d 820, 829 (9th Cir. 2011) (explaining that a factual admission may be sufficient to satisfy the Government's burden of demonstrating removability under section 1227(a)(1)(E)(i)). Moreover, this conduct-specific inquiry is materially similar to the inquiry already undertaken in situations in which an

**69653**

alien seeks to obtain immigration benefits based on domestic violence actions that do not necessarily result in a conviction. *See, e.g.,* 8 U.S.C. 1229b(b)(2)(A); 8 CFR 204.2(c)(1)(i)(E), (c)(1)(vi), (c)(2)(iv), (e)(1)(i)(E), (e)(1)(vi), and (e)(2)(iv).

Finally, the proposed regulation would exempt from the ineligibility bar aliens who have been battered or subjected to extreme cruelty and who were not the primary perpetrators of violence in their relationships. These aliens are generally described in section 237(a)(7)(A) of the INA, 8 U.S.C. 1227(a)(7)(A), which provides a waiver of the domestic violence and stalking removability ground when it is determined that the alien (1) was acting in self-defense; (2) was found to have violated a protection order intended to protect the alien; or (3) committed, was arrested for, was convicted of, or pled guilty to committing a crime that did not result in serious bodily injury and where there was a connection between the crime and the alien's having been battered or subjected to extreme cruelty. Although section 237(a)(7)(A) of the INA, 8 U.S.C. 1227(a)(7)(A), excepts such aliens from removability only if they are granted a discretionary waiver, the proposed rule would except all aliens who satisfy the above criteria from the proposed asylum bar. Asylum officers or immigration judges could thus make factual determinations regarding whether an alien fit into this category, making the exception more administrable and uniform in the asylum context. The Departments believe that this exception would provide important protections for domestic violence victims.

### 7. Convictions for Certain Misdemeanor Offenses

The proposed regulation would also make certain misdemeanor offenses bars to asylum based on the authority to create new grounds for ineligibility in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). Other provisions of the INA render aliens ineligible for other benefits based on convictions for certain misdemeanors. *See, e.g.,* INA 244(c)(2)(B)(i), 8 U.S.C. 1254a(c)(2)(B)(i) (barring aliens from eligibility for temporary protected status if they have been convicted of two or more misdemeanors in the United States). The proposed rule would designate offenses involving the use of fraudulent documents, the receipt of public benefits under false pretenses, or the possession or trafficking of drugs as disqualifying for purposes of asylum, even if such offenses are misdemeanors rather than felonies. The proposed

regulation would define a misdemeanor in this context as a crime defined as a misdemeanor by the jurisdiction of conviction, or that involves a potential penalty of one year or less in prison. Convictions for such misdemeanor offenses should be disqualifying because these offenses inherently undermine public safety or Government integrity.

The Departments also seek public comment on whether (and, if so, how) to differentiate among misdemeanor convictions that should warrant designation as grounds for ineligibility for asylum. Are there any additional misdemeanor convictions that should be bars to asylum eligibility? Conversely, should any of the below proposed misdemeanor bars be eliminated?

#### a. Fraudulent Document Offenses

The Departments propose to make aliens ineligible for asylum when they are convicted of a federal, state, tribal, or local misdemeanor for the possession or use, without lawful authority, of an identification document, authentication feature, or false identification document as defined in 18 U.S.C. 1028(d). Aliens convicted of falsifying passports or other identity documents where the term of imprisonment is at least a year are already ineligible for asylum (unless the conduct was a first-time offense for purposes of aiding a specified family member) because such conduct constitutes an aggravated felony under 8 U.S.C. 1101(a)(43)(P). Other felonies relating to fraudulent document offenses would be encompassed within the proposed eligibility bar for felony convictions.

The Attorney General and the Secretary believe that fraudulent document offenses pose such a significant affront to government integrity that even misdemeanor fraudulent document offenses should disqualify aliens from eligibility for asylum. Proper identity documentation is critical in the immigration context. *See Noriega-Perez* v. *United States,* 179 F.3d 1166, 1173–74 (9th Cir. 1999). Furthermore, as Congress acknowledged when it passed the REAL ID Act of 2005, Public Law 109–13, preserving the integrity of identity documents is critical for general national security and public safety reasons. The United States has taken concrete steps to protect all Government-issued identification documents by making the process to obtain identification documents more rigorous. *See, e.g.,* H.R. Rep. No. 109–72, at 179 (2005) (Conf. Rep.) (explaining that the REAL ID Act was passed in part to "correct the chronic weakness among many of the states in

the verification of identity" for the purpose of issuing Government identification documents).

The use of fraudulent documents, especially involving the appropriation of someone else's identity, so strongly undermines government integrity that it would be inappropriate to allow an individual convicted of such an offense to obtain the discretionary benefit of asylum.

Despite the concerns articulated above, the proposed rule would provide an exception for the bar to asylum based on convictions for use or misuse of identification documents if the alien can show that the document was presented before boarding a common carrier for the purpose of coming to the United States, that the document relates to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry. This exception is consistent with distinctions regarding certain document-related offenses made in *Matter of Pula,* 19 I&N Dec. at 474–75, existing statutes, *see* INA 274C(a)(6) and (d)(7), 8 U.S.C. 1324c(a)(6) and (d)(7), and existing regulations, *see* 8 CFR 270.2(j) and 1270.2(j); *see also Matter of Kasinga,* 21 I&N Dec. 357, 368 (BIA 1996) (use of fraudulent passport to come to the United States was not a significant adverse factor where, upon arrival, applicant told the immigration inspector the truth). Other than this exception, aliens seeking to enter, remain, obtain employment, or obtain benefits and services who are convicted of using false or fraudulent documents should not be eligible for asylum.

#### b. Public Benefits Offenses

Many aliens are legally entitled to receive certain categories of federal public benefits. 8 U.S.C. 1611, 1641. The unlawful receipt of public benefits, however, burdens taxpayers and drains a system intended to assist lawful beneficiaries. The inherently pernicious nature of such conduct has previously led the Government to prioritize enforcement of the immigration laws against such offenders, *see* Enhancing Public Safety in the Interior of the United States, Exec. Order No. 13768, 82 FR 8799 (Jan. 25, 2017), and this pernicious conduct warrants the use of the Attorney General and the Secretary's authority to bar convicted individuals

from receiving the discretionary benefit of asylum.[8]

c. Controlled Substances Offenses

Relying on the authority in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Departments propose to make aliens ineligible for asylum when they are convicted of a federal, state, tribal, or local misdemeanor involving controlled-substances offenses. Specifically, the Departments propose that a conviction for possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana, should disqualify an alien from eligibility for asylum.

Aliens who violate controlled substance laws may be removable, *see* INA 212(a)(2)(A)(i)(II), 237(a)(2)(B)(i), 8 U.S.C. 1182(a)(2)(A)(i)(II), 1227(a)(2)(B)(i), and they would already be barred from receiving asylum to the extent a controlled-substance offense constitutes an aggravated felony, *see* INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i); *see also* INA 101(a)(43)(B), 8 U.S.C. 1101(a)(43)(B); *United States* v. *Valdivia-Flores,* 876 F.3d 1201, 1206–07 (9th Cir. 2017) (controlled-substances offenses are aggravated felonies under the INA if they meet the definition of trafficking or involve state analogues to federal trafficking offenses). Furthermore, in cases that the courts of appeals have often upheld, the Board has concluded that various controlled-substances offenses can constitute particularly serious crimes even if they do not rise to the level of aggravated felonies. *See, e.g., Herrera-Davila* v. *Sessions,* 725 F. App'x 589, 590 (9th Cir. 2018) (the Board and immigration judge did not err in determining that an immigrant's conviction for drug possession constituted a particularly serious crime for both asylum and withholding of removal); *Vaskovska* v. *Lynch,* 655 F. App'x 880, 884 (2d Cir. 2016) (the Board did not err in determining that an alien's conviction for drug possession was "a particularly serious crime rendering her ineligible for asylum and withholding of removal"); *Bertrand* v. *Holder,* 448 F. App'x 744, 745 (9th Cir. 2011) (the Board did not err in determining that an alien's conviction for selling cannabis constituted a

particularly serious crime for purposes of both asylum and withholding of removal). Additionally, drug paraphernalia possession can include certain equipment associated with the use, manufacture, packaging, or sale of illegal drugs. *See, e.g.,* 21 U.S.C. 863(d). Under the proposed eligibility bar for felonies, all felony convictions relating to controlled substances would become a basis for ineligibility for asylum.

The Departments further propose to implement a new bar for asylum to include convictions for misdemeanors involving the trafficking or possession of controlled substances. Both possessors and traffickers of controlled substances pose a direct threat to the public health and safety interests of the United States, and they should not be entitled to the benefit of asylum. The harmful effects of controlled substance offenses have been recognized consistently by policymakers and courts. "[F]ar more people die from the misuse of opioids in the United States each year than from road traffic accidents or violence." United Nations Office on Drugs and Crime, World Drug Report: Executive Summary, Conclusions, and Policy Implications 10 (2017). As Attorney General Ashcroft previously recognized in an immigration opinion, "[t]he harmful effect to society from drug offenses has consistently been recognized by Congress in the clear distinctions and disparate statutory treatment it has drawn between drug offenses and other crimes." *Matter of Y–L-,* 23 I&N Dec. 270, 275 (A.G. 2002). He concluded that the "unfortunate situation" of drug abuse and related crime "has reached epidemic proportions and . . . tears the very fabric of American society." *Id.* The federal courts have agreed that drug offenses are serious, and have noted that "immigration laws clearly reflect strong congressional policy against lenient treatment of drug offenders." *Ayala-Chavez* v. *U.S. INS,* 944 F.2d 638 (9th Cir. 1991) (quoting *Blackwood* v. *INS,* 803 F.2d 1165, 1167 (11th Cir. 1986)); *see also Hazzard* v. *INS,* 951 F.2d 435, 438 (1st Cir. 1991); *cf. Mason* v. *Brooks,* 862 F.2d 190, 194 (9th Cir. 1988) ("Congress has forcefully expressed our national policy against persons who possess controlled substances by enacting laws . . . to exclude them from the United States if they are aliens.").

For these reasons, the proposed bar on asylum eligibility is consistent with the INA's current treatment of controlled-substance offenses. Nevertheless, the Departments also propose a limited exception to the proposed bar for convictions involving a single offense involving possession for one's own use

of 30 grams or less of marijuana. That exception would be consistent with an existing exception in the removability context: One who is convicted of a single offense of simple possession of marijuana is not automatically removable under the INA. *See* INA 237(a)(2)(B)(i), 8 U.S.C. 1227(a)(2)(B)(i). An alien with the same conviction would be inadmissible, but has a statutory right to request a waiver, which the Attorney General or the Secretary may grant in his or her discretion. *See* INA 212(a)(2)(A)(i)(II), (h), 8 U.S.C. 1182(a)(2)(A)(i)(II), (h); 8 CFR 212.7(d) and 1212.7(d); *see also* INA 103(a), 8 U.S.C. 1103(a).

The Departments seek public comment on how to differentiate among controlled substance offenses. Are there offenses that are currently designated as a controlled substance offense in one or more relevant jurisdictions in the United States that should not be categorical bars to asylum eligibility? In addition to seeking public comment on whether this proposed definition is over-inclusive, the Departments seek comment on whether it might be under-inclusive: Are there crimes that would not fall under this definition that should be made categorical bars?

*B. Clarifying the Effect of Criminal Convictions*

The proposed regulations governing ineligibility for asylum would also set forth criteria for determining whether a vacated, expunged, or modified conviction or sentence should be recognized for purposes of determining whether an alien is eligible for asylum. The proposed rule would apply the same set of principles to federal, state, tribal, or local convictions that are relevant to the eligibility bars described above. The rule would not apply to convictions that exist prior to the effective date of the proposed regulation. For convictions or sentences imposed thereafter, the proposed rule would provide that (1) vacated or expunged convictions, or modified convictions or sentences, remain valid for purposes of ascertaining eligibility for asylum if courts took such action for rehabilitative or immigration purposes; (2) an immigration judge or other adjudicator may look to evidence other than the order itself to determine whether the order was issued for rehabilitative or immigration purposes; (3) the alien bears the burden of establishing that the vacatur, expungement, or sentence modification was not for rehabilitative or immigration purposes; (4) the alien must further establish that the court had jurisdiction and authority to alter the relevant order;

---

[8] In Fiscal Year ("FY") 2017, approximately 20 percent of Government benefits fraud offenders at the federal level were not U.S. citizens. *See* U.S. Sentencing Comm'n, Quick Facts, *https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Government_Benefits_Fraud_FY17.pdf.*

and (5) there exists a rebuttable presumption against the effectiveness, for immigration purposes, of the order vacating, expunging, or modifying a conviction or sentence if either (i) the order was entered after the initiation of any removal proceeding; or (ii) the alien moved for the order more than one year after the date of the original order of conviction or sentencing. The rule would thus ensure that aliens do not have their convictions vacated or modified for purported rehabilitative purposes that are, in fact, for immigration purposes.

The authority of the Attorney General and the Secretary to promulgate this proposed rule derives from sections 208(b)(2)(B)(ii) and (C) of the INA, 8 U.S.C. 1158(b)(2)(B)(ii) and (C). Prescribing the effect to be given to vacated, expunged, or modified convictions or sentences is an ancillary aspect of prescribing which criminal convictions should constitute "particularly serious crimes" for purposes of asylum ineligibility, as well as prescribing additional limitations or conditions on asylum eligibility. Additionally, the Attorney General possesses general authority under section 103(g)(2) of the INA, 8 U.S.C. 1103(g)(2), to "establish such regulations . . . as the Attorney General determines to be necessary for carrying out this section." *See Tamenut,* 521 F.3d at 1004 (describing section 1103(g)(2) as "a general grant of regulatory authority").[9] Similarly, Congress has conferred upon the Secretary the authority to "establish such regulations . . . as he deems necessary for carrying out his authority under the provisions of [the INA]." INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3).

First, regarding the immigration effect of expungements, vacaturs, or sentence modifications, the rule would codify the principle set forth in *Matter of Thomas and Thompson,* 27 I&N Dec. 674 (A.G. 2019), that, if the underlying reason for the vacatur, expungement, or modification was for "rehabilitation or immigration hardship," the conviction remains effective for immigration purposes. *Id.* at 680; *see also id.*

⁹ The Attorney General has previously exercised his authorities to address related questions regarding what immigration effect should be given to expunged convictions. For example, in 1959, Attorney General Rogers concluded that certain narcotics convictions would survive subsequent expungement for purposes of the immigration laws. *Matter of A–F–,* 8 I&N Dec. 429, 445–46 (A.G. 1959). More recently, Attorney General Ashcroft held that, in light of the INA's definition of "conviction," an alien whose firearms conviction was expunged pursuant to section 1203.4 of the California Penal Code remained "convicted" for immigration purposes. *Matter of Luviano-Rodriguez,* 23 I&N Dec. 718, 718 (A.G. 2005).

(distinguishing between convictions vacated on the basis of a procedural or substantive defect in the underlying proceeding and those vacated because of post-conviction events, such as rehabilitation or immigration hardships); *Matter of Pickering,* 23 I&N Dec. 621 (BIA 2003) (finding that a conviction remains valid for immigration purposes if the conviction is vacated for reasons unrelated to the merits of the underlying criminal proceedings), *rev'd on other grounds by Pickering* v. *Gonzales,* 465 F.3d 263, 267–70 (6th Cir. 2006).

Courts of appeals have repeatedly accepted this principle. The Second Circuit deemed it "reasonable" for the Board to conclude in *Pickering* that convictions vacated for rehabilitative reasons are still effective for purposes of immigration consequences. *Saleh* v. *Gonzales,* 495 F.3d 17, 24 (2d Cir. 2007). That interpretation is "entirely consistent with Congress's intent in enacting the 1996 amendments to broaden the definition of conviction and advances the two purposes earlier identified by the Board: It focuses on the original attachment of guilt (which only a vacatur based on some procedural or substantive defect would call into question) and imposes uniformity on the enforcement of immigration laws." *Id.; see also Pinho* v. *Gonzales,* 432 F.3d 193, 215 (3d Cir. 2005) (applying *Pickering* to conclude that a conviction was vacated "based on a defect in the underlying criminal proceedings," not for rehabilitative or immigration purposes); *cf. Dickerson* v. *New Banner Inst., Inc.,* 460 U.S. 103, 120 (1983) (accepting that Congress need not "be bound by post-conviction state actions . . . that vary widely from State to State and that provide less than positive assurance that the person in question no longer poses an unacceptable risk of dangerousness").

For similar reasons, the rule would provide that court orders *modifying* criminal sentences for rehabilitative purposes should also have no effect on the alien's eligibility for asylum. *See Matter of Thomas and Thompson,* 27 I&N Dec. at 680 (explaining that "the *Pickering* test should apply to state-court orders that modify, clarify, or otherwise alter the term of imprisonment or sentence associated with a state-court conviction").

Second, to avoid gamesmanship and manipulation in the drafting of orders vacating a conviction or modifying a criminal sentence, the proposed regulations would allow an adjudicator to look beyond the face of the order to determine whether it was issued for rehabilitative or immigration purposes

and to determine whether the other requirements of proposed 8 CFR 208.13(c)(7)(v) and 1208.13(c)(7)(v) have been met, notwithstanding the putative basis of the order on its face. This rule is largely consistent with existing precedent. *See Rodriguez* v. *U.S. Att'y Gen.,* 844 F.3d 392, 396–97 (3d Cir. 2016) (applying this approach and looking to court records absent a clear explanation for the basis of the order in the order itself); *see also Cruz* v. *Att'y Gen.,* 452 F.3d 240, 244, 248 (3d Cir. 2006) (holding that the Board could reasonably determine that a conviction was vacated to avoid immigration consequences where a state prosecutor's letter stipulating the terms of a settlement agreement explicitly stated that the petitioner's scheduled deportation was a reason for the state's support for vacating the conviction).

Third, the proposed rule would clarify that the alien bears the burden of establishing that the vacatur, expungement, or sentence modification was not for rehabilitative or immigration purposes. Therefore, if the record is inconclusive based on a standard of preponderance of the evidence, the order should not be given effect for immigration purposes. The burden of proof is on the alien because the INA places the overall burden to establish asylum eligibility on the alien. *See* INA 208(b)(1)(B)(i), 8 U.S.C. 1158(b)(1)(B)(i); *Marikasi* v. *Lynch,* 840 F.3d 281, 287 (6th Cir. 2016). Where there is evidence that "one or more of the grounds for mandatory denial of the application for relief may apply," the applicant bears the burden of establishing that the bar at issue does not apply. 8 CFR 1240.8(d). Consistent with this principle, in an analogous context, the Eighth Circuit has held that, because the INA places the burden of proof on the alien to establish eligibility for cancellation of removal, a form of discretionary relief, the alien bears the burden to prove that he has no disqualifying convictions, including the burden to show that the vacatur of any disqualifying conviction was not for rehabilitative purposes. *Andrade-Zamora* v. *Lynch,* 814 F.3d 945, 949 (8th Cir. 2016).[10] This allocation of the

¹⁰ In contrast, when DHS uses a criminal conviction to prove deportability of an admitted alien, some courts have held that the Government bears the burden of establishing that a subsequent vacatur of that conviction should not be recognized because the vacatur was granted for immigration purposes. *See Nath* v. *Gonzales,* 467 F.3d 1185, 1188–89 (9th Cir. 2006); *Pickering,* 465 F.3d at 268–69 & n.4. Unlike applications for asylum and other forms of relief, where the alien has the burden of proving eligibility, the Government bears the burden of establishing that an admitted alien is
Continued

burden of proof makes sense because, as the Board and federal courts have noted, an alien is in the "best position" to present evidence on the issue. *Id.* at 950. The alien "was a direct party to the criminal proceeding leading to the vacation of his conviction and is therefore in the best position to know why the conviction was vacated and to offer evidence related to the record of conviction." *Matter of Chavez-Martinez,* 24 I&N Dec. 272, 274 (BIA 2007); *see also Rumierz* v. *Gonzales,* 456 F.3d 31, 39 (1st Cir. 2006) (outlining several other reasons that placing the burden on the alien is rational, such as similar burden allocations in the context of criminal law and habeas petitions).

Fourth, the rule would provide that the alien must establish that the court issuing an order vacating or expunging a conviction or modifying a sentence had jurisdiction and authority to do so. This requirement would be consistent with Board precedent, which provides that facially valid orders can be disregarded based on a lack of jurisdiction. *See, e.g., Matter of F-,* 8 I&N Dec. 251 (BIA 1959) ("[T]he presumption of regularity and jurisdiction [of a state court order] may be overcome by extrinsic evidence or by the record itself."); *cf. Adam* v. *Saenger,* 303 U.S. 59, 62 (1938) ("If it appears on its face to be a record of a court of general jurisdiction, such jurisdiction over the cause and the parties is to be presumed unless disproved by extrinsic evidence, or by the record itself. . . . But in a suit upon the judgment of another state the jurisdiction of the court which rendered it is open to judicial inquiry . . . and when the matter of fact or law on which jurisdiction depends was not litigated in the original suit it is a matter to be adjudicated in the suit founded upon the judgment." (citations omitted)). In short, an order purporting to vacate, expunge, or otherwise modify a conviction or sentence is inoperative for purposes of immigration law if the state court lacked jurisdiction over the subject matter or the parties to the action.

Jurisdictional defects in court orders might arise in a number of ways. For example, in *United States* v. *Garza-Mendez,* 735 F.3d 1284 (11th Cir. 2013), a criminal sentencing case, the Eleventh Circuit refused to recognize a clarification order issued by a state judge after the sentencing judge had ordered the defendant to serve 12 months of confinement. The Eleventh Circuit rejected the "subjective,

interpretive clarification order," noting that it was obtained from a different judge, long after entry of the original sentence, for the purpose of preventing enhancement of the defendant's sentence for unlawful reentry in federal court. *Id.* at 1289; *cf. Herrera* v. *U.S. Att'y Gen.,* 811 F.3d 1298, 1299–1301 (11th Cir. 2016) (affirming a Board decision declining to give effect to orders clarifying that defendants were never sentenced to terms of confinement when the original sentencing orders clearly stated to the contrary). A jurisdictional defect could also arise where state law limits the court's authority to grant post-conviction relief in certain ways, such as by imposing a time limitation. *See Matter of Estrada,* 26 I&N Dec. at 756 (noting that section 17–10–1(f) of the Georgia Code Annotated imposes strict time limits with respect to a sentencing court's ability to change or "modify" a sentence).

Finally, the proposed rule creates a rebuttable presumption that the order vacating or expunging the conviction or modifying the sentence was issued for immigration purposes if either (1) the order was entered after the initiation of any proceeding to remove the alien from the United States; or (2) the alien moved for the order more than one year after the date of the original order of conviction or sentencing.

Precedents establish that the timing of such a process is relevant to whether the resulting order should be recognized for immigration purposes. The initiation of such a process after removal proceedings have commenced naturally raises an inference that the resulting order was issued for immigration or rehabilitative purposes. For instance, in *Andrade-Zamora,* the Eighth Circuit refused to credit a state court's vacatur of a conviction when the vacatur occurred two weeks after the Government commenced removal proceedings based on the conviction, and where the state court also modified the alien's sentence for a different conviction in an apparent attempt to fit the conviction within an exception to a criminal ground of removability. 814 F.3d at 949. The court affirmed the Board's refusal to recognize the vacatur and modification, reasoning: "The timing and effect of the order . . . raise an inference the state court did not vacate the conviction on a substantive or procedural ground, but rather to avoid the immigration consequences of the conviction." *Id.* at 949–50.

Further, the rule would create a rebuttable presumption providing that if more than a year has passed between the original conviction and the alien's

effort to seek a subsequent vacatur or expungement of a conviction, or the modification of sentence, the immigration adjudicator should weigh that fact against recognizing the vacatur or modification. It is reasonable to conclude that an alien who has a meritorious challenge to a criminal conviction based on a procedural or substantive defect is more likely to seek post-conviction relief sooner than an alien who is seeking relief on rehabilitative grounds, and who might delay such a challenge until DHS commences immigration proceedings or attempts to remove the alien. *See Rumierz,* 456 F.3d at 38 (affirming the Board's refusal to recognize a vacatur and the Board's reasoning that "Rumierz could easily have sought to vacate the January 1994 Vermont conviction and have presented the vacated conviction to the [Board] in the six years before the [Board's] 2000 order"). This rule promotes finality in immigration proceedings by encouraging an alien to act diligently if there is a legitimate basis to challenge a conviction or sentence.

### C. Reconsiderations of Discretionary Denials of Asylum

The proposed rule would remove the automatic review of a discretionary denial of an alien's asylum application by removing and reserving paragraph (e) in 8 CFR 208.16 and 1208.16. The present regulation provides that the denial of asylum shall be reconsidered in the event that an applicant is denied asylum solely in the exercise of discretion, and the applicant is subsequently granted withholding of deportation or removal under this section, thereby effectively precluding admission of the applicant's spouse or minor children following to join him or her. Factors to be considered include the reasons for the denial and reasonable alternatives available to the applicant such as reunification with his or her spouse or minor children in a third country. This provision, however, has proved confusing, inefficient, and unnecessary.

The courts of appeals have expressed ongoing confusion related to this provision. For example, the regulation states that when an asylum application is denied in the exercise of discretion, but withholding of removal is granted, "the denial of asylum shall be reconsidered," but the regulation does not say who shall reconsider the denial, when the reconsideration shall occur, or how the reconsideration is to be initiated. *See Shantu* v. *Lynch,* 654 F. App'x 608, 613–14 (4th Cir. 2016) (discussing these ambiguities); *see also*

---

deportable by clear and convincing evidence. INA 240(c)(3)(A), 8 U.S.C. 1229a(c)(3)(A).

*Huang* v. *INS,* 436 F.3d 89, 93 (2d Cir. 2006). These ambiguities have not been "definitively resolved," *Shantu,* 654 F. App'x at 614, and continued litigation on these questions would be an ongoing burden for applicants, the immigration system, and courts.

Further, mandating that the decision maker reevaluate the very issue just decided is an inefficient practice that, in the view of the Departments, grants insufficient deference to the original fact finding and exercise of discretion. The regulation also appears unnecessary given that other regulations provide multiple avenues to challenge or otherwise seek to change a discretionary denial of asylum coupled with a grant of withholding of removal.[11] First, an immigration judge may reconsider that decision upon his or her own motion. 8 CFR 1003.23(b)(1). Second, the alien may file a motion to reconsider. *Id.* Third, the alien may also appeal the decision to the Board. 8 CFR 1003.38. The existence of at least three alternative processes for altering a discretionary denial of asylum obviates the need for a mandatory fourth. Moreover, the objective of facilitating family reunification, *see Huang,* 436 F.3d at 93 (describing 8 CFR 1208.16(e) as "manifestly a law designed to further family reunification"), can be fulfilled even in the absence of the existing reconsideration provision because the immigration judge (or other decision maker) already considers these factors when making a discretionary decision in the first instance, *see Fisenko* v. *Lynch,* 826 F.3d 287, 292 (6th Cir. 2016) (stating that "a crucial factor in weighing asylum as a discretionary matter' is family reunification" (internal quotation marks and citation omitted)).

## IV. Regulatory Requirements

### A. Regulatory Flexibility Act

The Departments have reviewed this proposed rule in accordance with the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*)) and have determined that this rule will not have a significant economic impact on a substantial number of small entities. The rule would not regulate "small entities" as that term is defined in 5 U.S.C. 601(6). Only individuals, rather than entities, are eligible to apply for asylum, and only individuals are eligible to apply for asylum or are otherwise placed in immigration proceedings.

### B. Unfunded Mandates Reform Act of 1995

This proposed rule will not result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995. *See* 2 U.S.C. 1532(a).

### C. Congressional Review Act

The Office of Information and Regulatory Affairs has determined that this proposed rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804(2). This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

### D. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 13771 (Reducing Regulation and Controlling Regulatory Costs)

The Office of Information and Regulatory Affairs, Office of Management and Budget (OMB), has designated this rule a "significant regulatory action" under section 3(f)(4) of Executive Order 12866, but not an economically significant regulatory action. Accordingly, the rule has been submitted to OMB for review. The Departments certify that this rule has been drafted in accordance with the principles of Executive Order 12866, section 1(b), Executive Order 13563, and Executive Order 13771.

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health, and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of using the best available methods to quantify costs and benefits, reducing costs, harmonizing rules, and promoting flexibility. Similarly, Executive Order 13771 requires agencies to manage both the public and private costs of regulatory actions.

The proposed regulation would provide seven additional mandatory bars to eligibility for asylum pursuant to the Attorney General and the Secretary's authorities under sections 208(b)(2)(B)(ii), 208(b)(2)(C), and 208(d)(5) of the INA.[12] The proposed rule would add bars on eligibility for aliens who commit certain offenses in the United States after entering the country. Those bars would apply to aliens who are convicted of (1) a felony under federal or state law; (2) an offense under 8 U.S.C. 1324(a)(1)(A) or 1324(a)(1)(2) (Alien Smuggling or Harboring); (3) an offense under 8 U.S.C. 1326 (Illegal Reentry); (4) a federal, state, tribal, or local crime involving criminal street gang activity; (5) certain federal, state, tribal, or local offenses concerning the operation of a motor vehicle while under the influence of an intoxicant; (6) a federal, state, tribal, or local domestic violence offense, or who are found by an adjudicator to have engaged in acts of battery or extreme cruelty in a domestic context, even if no conviction resulted; and (7) certain misdemeanors under federal or state law for offenses related to false identification; the unlawful receipt of public benefits from a federal, state, tribal, or local entity; or the possession or trafficking of a controlled substance or controlled-substance paraphernalia.

The seven proposed bars would be in addition to the existing mandatory bars relating to the persecution of others, convictions for particularly serious crimes, commission of serious nonpolitical crimes, security threats, terrorist activity, and firm resettlement in another country that are currently contained in the INA and its implementing regulations. *See* INA 208(b)(2); 8 CFR 208.13 and 1208.13. Under the current statutory and regulatory framework, asylum officers and immigration judges consider the applicability of mandatory bars to the relief of asylum in every proceeding involving an alien who has submitted an I–589 application for asylum. Although the proposed regulation would expand the mandatory bars to asylum, the proposed regulation does not change the nature or scope of the role of an immigration judge or an asylum officer during proceedings for consideration of asylum applications. Immigration judges and asylum officers are already trained to consider both an alien's previous conduct and criminal

---

[11] With respect to the DHS regulation at 8 CFR 208.16(e), if USCIS denies an individual's asylum application on discretionary grounds, USCIS does not have jurisdiction to consider withholding of removal eligibility because withholding of removal determinations are made by immigration judges and the Board.

[12] As discussed further below, the proposed regulation would not otherwise impact the ability of an alien who is denied asylum to receive the protection of withholding of removal under the INA or withholding of removal or deferral of removal under the CAT.

record to determine whether any immigration consequences result, and the proposed rule does not propose any adjudications that are more challenging than those that are already conducted. For example, immigration judges already consider the documentation of an alien's criminal record that is filed by the alien, the alien's representative, or the DHS representative in order to determine whether one of the mandatory bars applies and whether the alien warrants asylum as a matter of discretion. Because the proposed bars all relate to an alien's criminal convictions or other criminal conduct, adjudicators will conduct the same analysis to determine the applicability of the bars proposed by the rule.[13] The Departments do not expect the proposed additional mandatory bars to increase the adjudication time for immigration court proceedings involving asylum applications.

The Departments note that the proposed expansion of the mandatory bars for asylum would likely result in fewer asylum grants annually;[14] however, because asylum applications are inherently fact-specific, and because there may be multiple bases for denying an asylum application, neither the Department of Justice ("DOJ") nor DHS can quantify precisely the expected decrease. An alien who would be barred from asylum as a result of the proposed rule may still be eligible to apply for the protection of withholding of removal under section 241(b)(3) of the INA or withholding of removal or deferral of removal under regulations implementing U.S. obligations under Article 3 of the CAT. *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 208.16, 208.17 through 18, 1208.16, and 1208.17 through 18. For those aliens barred from asylum under this rule who would otherwise be positively adjudicated for asylum, it is possible they would qualify for withholding (provided a bar to withholding did not apply separate and

apart from this rule).[15] To the extent there are any impacts of this rule, they would almost exclusively fall on that population.[16]

The full extent of the impacts on this population is unclear and would depend on the specific circumstances and personal characteristics of each alien, and neither DHS nor DOJ collects such data at such a level of granularity. Both asylum applicants and those who receive withholding of removal may obtain work authorization in the United States. Although asylees may apply for lawful permanent resident status and later citizenship, they are not required to do so, and some do not. Further, although asylees may bring certain family members to the United States, not all asylees have family members or family members that wish to leave their home countries. Moreover, family members of aliens granted withholding of removal may have valid asylum claims in their own right, which would provide them with a potential path to the United States as well. The only clear impact is that aliens granted withholding of removal generally may not travel outside the United States without executing their underlying order of removal and, thus, may not be allowed to return to the United States; however, even in that situation— depending on the destination of their travel—they may have a prima facie case for another grant of withholding of removal should they attempt to reenter. In short, there is no precise quantification available for the impact, if any, of this rule beyond the general notion that it will likely result in fewer grants of asylum on the whole.

Applications for withholding of removal typically require a similar amount of in-court time to complete as an asylum application due to a similar nucleus of facts. 8 CFR 1208.3(b) (an asylum application is deemed to be an application for withholding of removal). In addition, this proposed rule would

not affect the eligibility of applicants for the employment authorization documents available to recipients of those protections and during the pendency of the consideration of the application in accordance with the current regulations and agency procedures. *See* 8 CFR 274a.12(c)(8) and (18), 208.7, and 1208.7.

The proposed rule would also remove the provision at 8 CFR 208.16(e) and 1208.16(e) regarding reconsideration of discretionary denials of asylum. This change would have no impact on DHS adjudicative operations because DHS does not adjudicate withholding requests. DOJ estimates that immigration judges nationwide must apply 8 CFR 1208.16(e) in approximately 800 cases per year on average.[17] The removal of the requirement to reconsider a discretionary denial would increase immigration court efficiencies and reduce any cost from the increased adjudication time by no longer requiring a second review of the same application by the same immigration judge. This impact, however, would likely be minor because of the small number of affected cases. Accordingly, DOJ assesses that removal of paragraphs 8 CFR 208.16(e) and 1208.16(e) would not increase any EOIR costs or operations, and would, if anything, result in a small increase in efficiency. The Departments note that removal of 8 CFR 208.16(e) and 1208.16(e) may have a marginal cost for aliens in immigration court proceedings by removing one avenue for an alien who would otherwise be denied asylum as a matter of discretion to be granted that relief. DOJ notes, however, that of the average of 800 aliens situated as such each year during the last ten years, an average of fewer than 150, or 0.4%, of the average 38,000 total asylum completions[18] each year filed an appeal in their case, so the affected population is very small and the overall impact would be nominal at most.[19] Moreover, such aliens would retain the ability to file a motion to reconsider in such a situation and, thus, would not actually

---

[13] The Departments note that one of the newly proposed bars, regarding whether or not the alien has "engaged" in certain acts of battery or extreme cruelty, does not necessarily require a criminal conviction. The Departments believe that a criminal arrest or conviction is the most likely evidence to be filed with the immigration court related to this bar, but even in cases where no such evidence is available, the analysis by immigration judges related to this proposed bar is not an expansion from the current analysis immigration judges may conduct during the course of removal proceedings. *See, e.g.,* INA 212(a)(2)(C) (providing that an alien is inadmissible if "the Attorney General knows or has reason to believe" that the alien is an illicit trafficker of a controlled substance, regardless of whether the alien has a controlled substance-related conviction).

[14] In FY 2018, DOJ's immigration courts granted 13,169 applications for asylum.

[15] Because statutory withholding of removal has a higher burden of proof, an alien granted such protection would necessarily also meet the statutory burden of proof for asylum, but would not be otherwise eligible for asylum due to a statutory bar or as a matter of discretion. Because asylum applications may be denied for multiple reasons and because the proposed bars do not have analogues in existing immigration law, there is no precise data on how many otherwise grantable asylum applications would be denied using these bars and, thus, there is no way to calculate precisely how many aliens would be granted withholding. Further, because the immigration judge would have to adjudicate the application in either case, there is no cost to DOJ.

[16] In FY 2018, DOJ's immigration courts completed 45,923 cases with an application for asylum on file. For the first three quarters of FY 2018, 622 applicants were denied asylum but granted withholding.

[17] This approximation is based on the number of initial case completions with an asylum application on file that had a denial of asylum but a grant of withholding during FYs 2009 through the third quarter of 2018.

[18] Thirty-eight thousand is the average of completions of cases with an asylum application on file from years FY 2008 through FY 2018. Completions consist of both initial case completions and subsequent case completions.

[19] Because each case may have multiple bases for appeal and appeal bases are not tracked to specific levels of granularity, it is not possible to quantify precisely how many appeals were successful on this particular issue.

ER-3047

lose the opportunity for reconsideration of a discretionary denial.

For the reasons explained above, the expected costs of this proposed rule are likely to be *de minimis*. This proposed rule is accordingly exempt from Executive Order 13771. *See* Office of Mgmt. & Budget, Guidance Implementing Executive Order 13771, Titled "Reducing Regulation and Controlling Regulatory Costs" (2017).

### E. Executive Order 13132 (Federalism)

This rule will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### F. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### G. Paperwork Reduction Act

This rule does not propose new or revisions to existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. 3501 *et seq.,* and its implementing regulations, 5 CFR part 1320.

### List of Subjects in 8 CFR Parts 208 and 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### Proposed Regulatory Amendments

### DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble, the Acting Secretary of Homeland Security is proposing to amend 8 CFR part 208 as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229, 8 CFR part 2.

■ 2. Section 208.13 is amended by adding paragraphs (c)(6) through (9) to read as follows:

### § 208.13 Establishing asylum eligibility.

\* \* \* \* \*

(c) \* \* \*

(6) Additional limitations on eligibility for asylum. For applications filed on or after [the effective date of the final rule], an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the Secretary knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined either under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the asylum officer to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The asylum officer need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs);

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse,

child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

*(1)* A current or former spouse of the person;

*(2)* An alien with whom the person shares a child in common;

*(3)* An alien who is cohabiting with or has cohabited with the person as a spouse;

*(4)* An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

*(5)* Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v)(A) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the asylum officer is not limited to facts found by the criminal court or provided in the underlying record of conviction;

(C) An alien who was convicted of offenses described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving:

*(1)* The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction resulted from circumstances showing that the document was presented before boarding a common carrier, that the

document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

*(2)* The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

*(3)* Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana;

(vii) There are serious reasons for believing the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) A current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)–(ii) of the Act.

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year of imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any

crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or conviction also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the asylum officer determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

(9) An asylum officer is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine whether such order should be given any effect under this section.

### § 208.16  [Amended]

■ 3. In § 208.16, remove and reserve paragraph (e).

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General proposes to amend 8 CFR part 1208 as follows:

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 4. The authority citation for part 1208 continues to read as fol1ows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229.

■ 5. Section 1208.13 is amended by adding paragraphs (c)(6) through (9) to read as follows:

### § 1208.13  Establishing asylum eligibility.

\*    \*    \*    \*    \*

(c) \* \* \*

(6) Additional limitations on eligibility for asylum. For applications filed on or after [the effective date of the final rule], an alien shall be found ineligible for asylum if:

(i) The alien has been convicted on or after such date of an offense arising under sections 274(a)(1)(A), 274(a)(2), or 276 of the Act;

(ii) The alien has been convicted on or after such date of a Federal, State, tribal, or local crime that the Attorney General or Secretary knows or has reason to believe was committed in support, promotion, or furtherance of the activity of a criminal street gang as that term is defined under the jurisdiction where the conviction occurred or in section 521(a) of title 18;

(iii) The alien has been convicted on or after such date of an offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law, in which such impaired driving was a cause of serious bodily injury or death of another person;

(iv)(A) The alien has been convicted on or after such date of a second or subsequent offense for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the conviction occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs) without regard to whether the conviction is classified as a misdemeanor or felony under Federal, State, tribal, or local law;

(B) A finding under paragraph (c)(6)(iv)(A) of this section does not require the immigration judge to find the first conviction for driving while intoxicated or impaired (including a conviction for driving while under the influence of or impaired by alcohol or drugs) as a predicate offense. The immigration judge need only make a factual determination that the alien was previously convicted for driving while intoxicated or impaired as those terms are defined under the jurisdiction where the convictions occurred (including a conviction for driving while under the influence of or impaired by alcohol or drugs).

(v)(A) The alien has been convicted on or after such date of a crime that involves conduct amounting to a crime of stalking; or a crime of child abuse,

ER-3049

child neglect, or child abandonment; or that involves conduct amounting to a domestic assault or battery offense, including a misdemeanor crime of domestic violence, as described in section 922(g)(9) of title 18, a misdemeanor crime of domestic violence as described in section 921(a)(33) of title 18, a crime of domestic violence as described in section 12291(a)(8) of title 34, or any crime based on conduct in which the alien harassed, coerced, intimidated, voluntarily or recklessly used (or threatened to use) force or violence against, or inflicted physical injury or physical pain, however slight, upon a person, and committed by:

(*1*) A current or former spouse of the person;

(*2*) An alien with whom the person shares a child in common;

(*3*) An alien who is cohabiting with or has cohabited with the person as a spouse;

(*4*) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(*5*) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government.

(B) In making a determination under paragraph (c)(6)(v) of this section, including in determining the existence of a domestic relationship between the alien and the victim, the underlying conduct of the crime may be considered and the adjudicator is not limited to facts found by the criminal court or provided in the underlying record of conviction.

(C) An alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(v)(A) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i) through (ii) of the Act.

(vi) The alien has been convicted on or after such date of—

(A) Any felony under Federal, State, tribal, or local law;

(B) Any misdemeanor offense under Federal, State, tribal, or local law involving

(*1*) The possession or use of an identification document, authentication feature, or false identification document without lawful authority, unless the alien can establish that the conviction

resulted from circumstances showing that the document was presented before boarding a common carrier, that the document related to the alien's eligibility to enter the United States, that the alien used the document to depart a country in which the alien has claimed a fear of persecution, and that the alien claimed a fear of persecution without delay upon presenting himself or herself to an immigration officer upon arrival at a United States port of entry;

(*2*) The receipt of Federal public benefits, as defined in 8 U.S.C. 1611(c), from a Federal entity, or the receipt of similar public benefits from a State, tribal, or local entity, without lawful authority; or

(*3*) Possession or trafficking of a controlled substance or controlled-substance paraphernalia, other than a single offense involving possession for one's own use of 30 grams or less of marijuana.

(vii) There are serious reasons for believing the alien has engaged on or after such date in acts of battery or extreme cruelty as defined in 8 CFR 204.2(c)(1)(vi), upon a person, and committed by:

(A) A current or former spouse of the person;

(B) An alien with whom the person shares a child in common;

(C) An alien who is cohabiting with or has cohabited with the person as a spouse;

(D) An alien similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs; or

(E) Any other alien against a person who is protected from that alien's acts under the domestic or family violence laws of the United States or any State, tribal government, or unit of local government, even if the acts did not result in a criminal conviction;

(F) Except that an alien who was convicted of offenses or engaged in conduct described in paragraph (c)(6)(vii) of this section is not subject to ineligibility for asylum on that basis if the alien would be described in section 237(a)(7)(A) of the Act were the crimes or conduct considered grounds for deportability under section 237(a)(2)(E)(i)–(ii) of the Act.

(7) For purposes of paragraph (c)(6) of this section:

(i) The term "felony" means any crime defined as a felony by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime punishable by more than one year imprisonment.

(ii) The term "misdemeanor" means any crime defined as a misdemeanor by the relevant jurisdiction (Federal, State, tribal, or local) of conviction, or any crime not punishable by more than one year of imprisonment.

(iii) Whether any activity or convictions also may constitute a basis for removability under the Act is immaterial to a determination of asylum eligibility.

(iv) All references to a criminal offense or criminal conviction shall be deemed to include any attempt, conspiracy, or solicitation to commit the offense or any other inchoate form of the offense.

(v) No order vacating a conviction, modifying a sentence, clarifying a sentence, or otherwise altering a conviction or sentence, shall have any effect unless the asylum officer determines that—

(A) The court issuing the order had jurisdiction and authority to do so; and

(B) The order was not entered for rehabilitative purposes or for purposes of ameliorating the immigration consequences of the conviction or sentence.

(8) For purposes of paragraph (c)(7)(v)(B) of this section, the order shall be presumed to be for the purpose of ameliorating immigration consequences if:

(i) The order was entered after the initiation of any proceeding to remove the alien from the United States; or

(ii) The alien moved for the order more than one year after the date of the original order of conviction or sentencing.

(9) An immigration judge or other adjudicator is authorized to look beyond the face of any order purporting to vacate a conviction, modify a sentence, or clarify a sentence to determine whether the requirements of paragraph (c)(7)(v) of this section have been met in order to determine whether such order should be given any effect under this section.

### § 1208.16 [Amended]

■ 6. In § 1208.16, remove and reserve paragraph (e).

Dated: December 9, 2019.

**Chad F. Wolf,**

*Acting Secretary of Homeland Security.*

Dated: December 10, 2019.

**William P. Barr,**

*Attorney General.*

[FR Doc. 2019–27055 Filed 12–18–19; 8:45 am]

**BILLING CODE 9111–97–P 4410–30–P**